Marc Kieselstein, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

James H.M. Sprayregen, P.C
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) Case No. 18-13374 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF TYLER BARON, DIRECTOR
## OF AEGEAN MARINE PETROLEUM NETWORK INC.,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Tyler Baron, hereby declare under penalty of perjury:

1.       I am a Director on the Board of Directors of Aegean Marine Petroleum Network

Inc. ("<u>Aegean Marine</u>") and also serve as Chair of the Audit Committee (as defined and discussed

below).  Aegean Marine is a publicly traded company organized under the laws of the Marshall

Islands and a debtor and debtor-in-possession in the above-captioned cases of Aegean Marine and

74 of its direct and indirect subsidiaries as debtors and debtors in possession (collectively, the

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

"Debtors," and together with Aegean Marine's direct and indirect non-Debtor subsidiaries, collectively "Aegean"). I have served as a Director on the Board of Directors of Aegean Marine since May 2, 2018 and have served as Chair of the Audit Committee since May 31, 2018. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the Debtors, their business, the circumstances leading to these chapter 11 cases. I also submit this Declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"), and the relief the Debtors are seeking in the motions and applications filed contemporaneously herewith (collectively, the "First Day Motions").

3.      The statements in this Declaration are based upon my personal knowledge, information obtained from members of Aegean's management team and advisors, my review of relevant documents and information concerning Aegean's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I would testify competently to the statements set forth in this Declaration.

## I.    Introduction.

4.      Aegean is an international marine fuel logistics company and one of the leading independent physical suppliers of marine fuel and lubricants to vessels in port, at sea, on rivers and other waterways around the globe. Utilizing a modern fleet of 57 owned and chartered vessels and a broad network of supply hubs, Aegean delivers high grade fuels at competitive prices to customers in over 20 countries and more than 50 ports. Aegean, and its 850 employees, provide best-in-class service via a fully integrated supply chain comprised of fuel sourcing, storage (onshore and offshore), vessel-to-vessel delivery, and post-delivery customer care.

5.      To fund operations and purchase its modern fleet of bunkering vessels, the Debtors have historically accessed the capital markets.  As of the Petition Date, the Debtors have approximately $855 million in aggregate funded-debt, including: $131.7 million outstanding under its U.S. credit facility (the "U.S. Credit Facility"), $249.6 million outstanding under its Global credit facility (the "Global Credit Facility"), $206.6 million outstanding under ten secured term loan facilities that, except for two, financed the acquisition of the Debtors' fleet (the "Secured Term Loan Facilities"), and $267 million outstanding under two issuances of unsecured convertible notes (the "Unsecured Convertible Notes").

6.      The Debtors commenced these chapter 11 cases to stabilize business operations, address near term debt maturities (including approximately $94.5 million of Unsecured Convertible Notes that matured on November 1, 2018), and to facilitate a value-maximizing restructuring transaction.  At present, the Debtors seek to pursue a going concern sale of their entire business and are in substantial agreement with Mercuria regarding the terms of a stalking horse asset purchase agreement, which is expected to be filed in the near term.  A going concern sale will maximize value for all stakeholders given numerous challenging circumstances, including (a) the need for a significant amount of incremental financing to enable the Debtors' to operate their business at breakeven volume levels and (b) disparate views on valuation, driven in part by the lack of audited financial statements for fiscal year 2017 and the first 3 quarters of 2018, and the need to restate audited financial statements for certain prior fiscal years.  For these reasons, the Debtors are optimistic that a robust marketing and auction process can serve as the catalyst for expedited and value-maximizing chapter 11 cases.

7.      The filing of these chapter 11 cases follow months of internal operational restructuring initiatives, the overhaul of Aegean Marine's board of directors (the "Board of

Directors") and management at various levels, the commencement of an independent investigation into accounting irregularities, and several rounds of arm's-length, good faith restructuring negotiations with secured and unsecured creditors. At the same time, numerous events severely disrupted Aegean's normal business operations over the last 12 months and nearly forced the company to liquidate in mid-2018.

8.      Aegean's financial performance and operational metrics began to deteriorate in the third quarter of 2017 and continued in the fourth quarter of 2017 with a sharp decline in bunker sales volumes, an operating loss, and negative EBITDA. Aegean attributed the slowdown to certain factors, including strong competitive headwinds in all core supply markets as industry majors increased their worldwide presence and smaller local operators further penetrated regional and single port markets. For example, although certain providers had exited the supply market in Singapore in the second half of 2017, Aegean did not experience an increase in volumes delivered as capacity was almost immediately absorbed by other suppliers in what was, in effect, a hyper saturated market. Regarding its poor financial performance, Aegean highlighted certain non-recurring charges, including the deliberate reduction of physical supply operations in certain jurisdictions, and $12 million in losses on hedging contracts as oil prices increased as key contributing factors.

9.      Although sales volumes and financial performance remained in a depressed but steady state during the first quarter of 2018, limitations imposed by lenders under the U.S. Credit Facility and Global Credit Facility severely hindered Aegean's ability to purchase fuel at volumes sufficient to maintain operations at historic levels. These lenders reduced the size of each facility during March and April 2018, from a peak of $1 billion to $600 million by May 5, 2018, in response to significant concerns regarding Aegean's proposed acquisition of H.E.C. Europe

Limited (a company controlled by Aegean's founder) when there were already issues surrounding "related party transactions" at Aegean. Questions also arose over the use of accounts receivable as part of the consideration for the purchase and why these receivables were not in the lenders borrowing base. In addition, Aegean was first in breach of the interest coverage ratio covenant and later the covenant to deliver audited financial statements on a timely basis.[2]

10.     By reducing the size of these facilities, lenders severely constricted Aegean's access to necessary working capital to purchase inventory and meet customer demand. The impact of these reductions were further exacerbated by an increase in fuel prices, which meant that Aegean had reduced credit availability with which to purchase increasingly expensive fuel. The result was a decline in Aegean's volumes to levels well below break-even. At the same time, certain fuel suppliers that had previously provided open credit began requesting that Aegean post a letter of credit or even prepay when purchasing fuel; an impossible request given Aegean's lack of liquidity. Concerns over Aegean's credit quality became a contagion when credit insurance companies serving the marine fuels space cancelled their coverage of Aegean due to its inability to file audited financials. This also spread to Aegean's customer base, as inquiries to quote and purchase bunkers dropped precipitously during May 2018. Some customers communicated that they would delay further purchases from Aegean until it demonstrated more stability, while others reported having been notified by their banks that the company was in distress. These issues had a cascading effect down the borrowing base, eroding its availability first via reduced fuel inventory levels and later by reduced accounts receivable, which in turn reduced the borrowing base and eliminated Aegean's ability to secure letters of credit to purchase fuel. As volumes fell, gross

---

[2]     On April 30, 2018, Aegean Marine announced that it would not timely file its fiscal year 2017 audited financial statements as required by New York Stock Exchange ("NYSE") guidelines.

profit could not cover fixed costs leading to negative free cash flow.  This was exacerbated by the burden of professional fees related to Aegean's advisors and those of two separate borrowing base lender groups.  While accounts receivable were converting to cash, this cash was consumed by operating costs such that less liquidity was available to procure additional fuel.

11.    On June 4, 2018, Aegean Marine disclosed that $200 million of accounts receivable would likely be written off because the underlying transactions were likely without economic substance.  Aegean Marine's stock, publicly traded on the NYSE, closed down approximately 75% that day.  Below is a chart tracking the stock's daily trading performance beginning in October 2017 and running through mid-October 2018.



12.    Following this disclosure, Aegean experienced additional deterioration in customer activity and was operating without enough liquidity to procure additional stocks of fuel.  In fact, on multiple business days during June 2018, the company had zero borrowing base availability and thus no liquidity, causing fuel inventories in certain critical supply hubs to virtually run dry. Further exacerbating matters, Aegean and its advisors had to negotiate daily with the syndicate of

lenders regarding the short term waiver of continuing covenant defaults under the U.S. Credit Facility and Global Credit Facility.  These negotiations, however, did not provide the company with additional liquidity.  Instead, these lenders required Aegean to submit to extensive and ongoing financial reporting requirements, and urgently pursue strategic alternatives and contingency planning initiatives by certain milestones, and these lenders formally reduced the size of the credit facilities yet further from $600 million to $455 million on an aggregate basis on June 29, 2018.  Virtually all of this reduction came from the Global Credit Facility ($440 million to $300 million), the Debtors' main source of working capital for worldwide operations.

13.    Preparing for, at best, a freefall chapter 11 filing and, at worst, a full-scale liquidation of the business, Aegean and its advisors engaged in substantial contingency planning throughout June 2018.  In parallel with this planning, Aegean and its advisors engaged in good-faith negotiations with certain third party financial and strategic investors as well as an ad hoc committee of Unsecured Convertible Noteholders (the "Ad Hoc Group") to explore and evaluate strategic alternatives and possible liquidity-generating transactions.  During June and July 2018, Aegean and its advisors provided the Ad Hoc Group's advisors with diligence, held multiple telephone conferences, and otherwise engaged these stakeholders regarding both contingency planning and strategic alternatives.  Members of the Ad Hoc Group were not prepared at that time to sign non-disclosure agreements and to become restricted from trading, so those discussions were among advisors only.  At the same time, Aegean and its advisors were in discussions with multiple financial investors regarding potential fixed asset-based financing solutions and with multiple strategic investors regarding potential trade finance partnership opportunities.  Of these strategic investors, seven executed non-disclosure agreements and five submitted diligence requests.

14.     On July 5, 2018, Aegean Marine announced the entry into a memorandum of understanding (the "MOU") with Mercuria Energy Group Limited ("Mercuria"), which contemplated, among other things, refinancing the U.S. Credit Facility and Global Credit Facility by August 15, 2018, the provision of interim credit support to enhance liquidity, and other terms predicated on a potential future global strategic partnership between Mercuria and Aegean.  The MOU granted Mercuria limited exclusivity, subject to certain key carve-outs (including with respect to the Ad Hoc Group), to explore the strategic partnership.  On August 21, 2018, Aegean Marine filed a Form 6-K announcing that Mercuria together with and its affiliates had: (a) become the sole lender under both the U.S. Credit Facility and Global Credit Facility after buying out the prior facility lenders; (b) agreed to extend existing waiver agreements for these facilities; and (c) agreed to provide $30 million of much needed liquidity by way of amendments and waivers to the facilities as well as other financing arrangements.  Mercuria also agreed to support operations by "sleeving" inventory (as described below) and other measures, liquidity enhancing and otherwise.  In return, Aegean Marine issued Mercuria new common stock constituting 30% of Aegean Marine's outstanding common stock on a pro-forma basis and the Board of Directors unanimously agreed to expand the board and subsequently appoint a representative of Mercuria—David Gallagher—to the board.

15.     Mercuria's injection of liquidity was a literal lifeline at a point when Aegean's operations had all but ground to a halt.  Aegean and Mercuria have worked diligently in the weeks following to reestablish customer relationships, increase sales volumes, improve cash flows, and regenerate the borrowing base.  All stations have been replenished with inventory and volumes have recovered significantly from where they were in July and August, though still not at sustainable levels.  Aegean has also implemented internal cost-cutting and restructuring initiatives,

including winding down the back-to-back bunker trading business and marine lubricants business, reducing corporate overhead, reducing station level costs, cutting storage costs, and reconfiguring the fleet to reduce overcapacity and increase revenues by chartering out vessels to third parties. Aegean has made considerable progress, but nonetheless, the business remains below breakeven sales volume levels and remains cash flow negative. Returning to profitability will likely take some months and require a considerable amount of capital as the company recovers from its near-death experience.

16.    Shortly after the Mercuria deal was announced, Aegean began accelerated negotiations with the Ad Hoc Group regarding the November 1, 2018 maturity of the 4% Unsecured Convertible Notes, a key hurdle to a successful out-of-court restructuring. Negotiations with the Ad Hoc Group, including certain members who entered into confidentiality agreements, continued throughout September and October, and out-of-court restructuring proposals were discussed and considered by the parties. Ultimately, the parties were unable to reach a resolution to avoid the filing of these chapter 11 cases, despite extensive good faith negotiations.

17.    In parallel with the foregoing, the Debtors also engaged with Mercuria, the Ad Hoc Group, and third parties regarding the framework for an in-court restructuring, and critically, the provision of debtor-in-possession ("DIP") financing. As discussed in the Jamal Declaration, the Debtors and their advisors canvassed the marketplace in search of committed third party financing. This process ultimately yielded no third party proposals, despite best efforts by the Debtors' advisors, leaving potential competing proposals from Mercuria and the Ad Hoc Group. However, as negotiations continued, it became clear that the Ad Hoc Group proposal was not actionable because the Ad Hoc Group was unable to obtain the necessary commitments to provide DIP financing prior to the Petition Date. The Debtors have determined in their best business judgment

that the DIP financing proposal advanced by Mercuria is the best available option at the present time. With access to DIP financing, the Debtors commenced these chapter 11 cases with a strong message to the market that the company is well-capitalized and has the liquidity necessary to operate its business.

18.    To familiarize the Court with the Debtors, their businesses, and the circumstances leading to these chapter 11 cases, I have organized this declaration as follows:

- **Part II** provides a general overview of the Debtors' corporate structure and business operations;

- **Part III** describes the Debtors' prepetition capital structure;

- **Part IV** describes the circumstances leading to the commencement of these chapter 11 cases; and

- **Part V** provides the information required by rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules").

## II.    General Background.

### A.    History and Corporate Structure.

19.    Aegean began in 1995 as a single bunkering station in the Port of Piraeus, Greece. Debtor Aegean Marine was incorporated on June 6, 2005 as a Marshall Islands holding company under the Marshall Islands Business Corporations Act. On December 13, 2006, Aegean Marine executed an initial public offering ("IPO") of common stock and listed on the NYSE under the ticker "ANW."

20.    Since the IPO, Aegean has expanded its global reach through acquisition and cooperation opportunities to become one of the world's largest independent physical suppliers of

marine fuel with a sizable, modern fleet of bunkering vessels, storage facilities/terminals and service centers dedicated to bunkering operations across the globe.[3]

21.    Aegean's corporate organizational chart is attached hereto as **Exhibit A**.  As illustrated therein, Aegean Marine is the ultimate parent company of each Debtor in these chapter 11 cases.  The remaining Debtors and non-Debtors can be grouped into four main categories: bunkering operations; management; marketing and administrative; and vessel-owning entities.

- ***Bunkering Operations***.  Aegean principally transacts bunkering operations through Debtor Aegean Marine Petroleum S.A. ("AMPSA") and Debtor Aegean Bunkering (USA) LLC ("ABUSA") and operate locally in various jurisdictions through direct or indirect subsidiaries of Aegean Marine (including Debtors and non-Debtors).

- ***Management***.  Aegean provides for the management of bunkering vessels through: (a) Aegean Bunkering Services Inc. ("ABS") for vessels operating outside Greek territorial waters and (b) Aegean Management Services M.C., ("AMS") for vessels operating within Greek territorial waters.

- ***Marketing and Administrative Services***.  Aegean provides general marketing and administrative services for bunkering operations through Aegean Oil (USA), LLC and AMPN USA, LLC.

- ***Vessel-Owning Entities***. 40 vessel-owning entities are direct or indirect subsidiaries of Aegean Shipholdings Inc.; one vessel-owning entity is an indirect subsidiary of Aegean Holdings S.A.

### B.    Bunkering Operations.

22.    Aegean's core business is the physical supply of marine fuel (known as "bunkers") to many types of vessels, including: container ships, dry bulk carriers, cruise ships, oil tankers, and ferries.  Vessel-to-vessel delivery is accomplished via a specialized "bunkering" tanker or barge that delivers bunkers directly to a recipient vessel, in port, at sea, on rivers or other waterways.

---

[3]    The Debtors submit that jurisdiction and venue are proper in the Southern District of New York because each Debtor has an interest in certain bank accounts, professional retainers, contract rights, and/or other property located in the United States and New York, New York.

23.    Bunkering is a capital intensive, low margin business that is dependent on customer relationships, the ability to extend short-term trade credit, competitive sources of product supply, the management of logistical assets such as vessels and storage tanks, and adequate liquidity to finance working capital.  For context, the Debtors have historically generated sales volumes in the range of approximately 10-16 million metric tons of marine fuel per year over the last five years, with sales volumes at the higher end of that range in fiscal years 2016 and 2017.  Sales volumes of this magnitude equate to billions of dollars in total revenue, yet the Debtors have historically generated modest positive EBITDA of only roughly 1% of revenue.

24.    As a physical supplier, Aegean purchases bunker fuel on the spot market or pursuant to supply contracts, takes possession of the inventory for no more than a few weeks in most cases, and then resells and delivers product directly to customers.  Since the Mercuria transaction, Aegean also purchases inventory for delivery in certain regions directly from Mercuria, referred to herein as the "sleeving" of inventory.  Simply put, "sleeving" involves Aegean identifying a cargo of fuel available from one of its suppliers and then arrange for Mercuria to purchase the fuel on its own account before reselling it to the Debtors just prior to when Aegean delivers the fuel to a customer.  "Sleeving" is a liquidity enhancement accommodation provided by Mercuria because it (i) allows Aegean to avoid consuming liquidity on fuel that would otherwise sit on Aegean's balance sheet, (ii) eliminates the 10-15% of the fuel purchase that can't be borrowed as per the borrowing base facility, and (iii) avoids the need to hedge against oil price fluctuations because Aegean buys fuel from Mercuria at the same time such fuel is delivered to the customer.  "Sleeving" transactions are executed on a cost-pass-through basis and include customary delivery charges and other costs that Aegean would otherwise bear if purchasing fuel on their own account.

25.     On the customer side, most sales are priced at a margin over market indexed prices (quoted daily by region and terms of delivery), though Aegean has historically been party to certain other contract relationships.  During the year ended December 31, 2017 and year-to-date in 2018, no single customer accounted for more than 10% of Aegean's total revenues.  A representative list of customers serviced during the past few years include Hapag-Lloyd, Eukor, Cargill International, and Glencore.

### 1.    Fleet and Ship Management.

26.     Aegean operates a large, modern fleet of bunkering vessels of diverse sizes and types, ranging from inland waterway tankers and barges to ocean-going offshore bunkering tankers.  As of the Petition Date, the Debtors own 41 vessels (the "Owned Vessels"), with an aggregate capacity of 316,778 deadweight tonnage ("dwt").[4]  The Owned Vessels are comprised of 37 double hull bunkering tankers, three double hull bunkering barges, and one single hull tanker.  To supplement operations in certain regions, specifically the ARA Region (as defined below) and Germany, the Debtors charter-in additional vessels.  In the U.S., the Debtors contract with third-party barge operators.  As of the Petition Date, the Debtors charter-in 12 double hull bunkering tankers, three double hull in-land waterway bunkering tankers, and one bunkering barge, having an aggregate capacity of 58,219 dwt (the "Charter-In Vessels").  Below are the *Ios I* and *Kalymnos* (both bunkering tankers), currently located in Gibraltar and Jamaica, respectively.

---

[4]     Deadweight tonnage is a measure of the carrying capacity of a vessel.





27.    International maritime law provides that every country has the right to maintain a merchant fleet under its flag and requires that vessels engaged in commerce be registered under the laws of a state that is tasked with enforcing certain regulations in connection with the vessel.[5] Therefore, the Owned Vessels and Charter-In Vessels are each registered in a specific country, which is referred to as the "flag" country for that vessel.  Attached hereto as **Exhibit B-1** and **Exhibit B-2** are tables setting forth the name, flag, build year, and dwt for the Owned Vessels and Charter-In Vessels, respectively, as of the Petition Date.

28.    The Debtors typically enter into an intragroup management agreement between a Vessel Owning-Entity and either ABS or AMS, to provide for the management of a vessel.  ABS provides management services for Owned Vessels and Charter-In Vessels in territorial waters outside of Greece and AMS provides management safety services for Owned Vessels operating in Greek territorial waters.  The ABS intragroup management agreement typically provides that ABS assumes the technical management and the provision of services for the vessel for purposes of the International Safety Management Code ("ISM").  In return for the services they provide, ABS or AMS is paid a flat monthly management fee which steps up annually over the life of the agreement.

29.    The Debtors' capabilities are well-positioned for near term regulatory changes.  Specifically, the International Maritime Organization (the "IMO")[6] has promulgated the 2020 IMO fuel sulfur regulation, which requires all vessels to utilize fuel oil with a maximum sulfur content of 0.5% by January 1, 2020.  Analysis of the impact of this regulation indicates that it will cause significant shifts in product supply and restore focus on the primacy of the physical supplier in the logistical chain, with gross spreads on marine fuel likely to move higher as marine fuel prices

---

[5]    *See, e.g.*, United States Convention on the Law of the Sea, Art. 94 (providing for the registration of vessels and regulation of vessels by flag states).

[6]    The IMO is a specialized agency of the United Nations responsible for regulating shipping.

increase and customers place greater value on surety of supply that meets the new specifications. While this regulatory change may improve spreads it will also require significantly more liquidity to finance higher anticipated prices.

### 2. Storage Facilities.

30.    As of the Petition Date, the Debtors utilize 13 land-based storage facilities where the Debtors store marine fuel in terminals to supply bunkering operations, with an aggregate storage capacity of over 1,000,000 cubic meters. The storage facilities, the majority of which are leased, are located in the U.S., Morocco, the Canary Islands, Germany, and the United Arab Emirates, and have a storage capacity of approximately 350,000, 218,000, 65,000, 33,000, and 465,000 cubic meters, respectively. Below is an aerial shot of the Debtors' storage facility and terminal in Fujairah, United Arab Emirates.



### 3.    Physical Supply Locations

31.    The Debtors' bunkering operations are coordinated through AMPSA and ABUSA, who are typically the Aegean counterparties to customer supply contracts and are the entities that procure the appropriate grade of bunker fuel from a supplier.  The specific process of delivering product to an end customer is generally managed at the station level in a specific jurisdiction.  The Debtors conduct bunkering operations in the following locations.

32.    *Germany*.  The Debtors operate three double hull bunkering tankers in Germany's Baltic Sea and other North Sea ports and have access to approximately 33,000 cubic meters of onshore storage capacity.  Bunkering operations are supported from offices in Hamburg and Rostock, which the Debtors lease.

33.    *Gibraltar/Morocco*.  The Debtors operate three double hull bunkering tankers in and around Gibraltar and store fuel at a storage facility with a capacity of 218,000 cubic meters, near the port of Tanger-Med in Tangiers, Morocco.  Bunkering operations are supported from an office in Gibraltar, which the Debtors lease.

34.    *Greece*.  The Debtors charter-out numerous bunkering tankers and a floating storage facility (the *Mediterranean*) to Aegean Oil S.A., which operates in Piraeus, Patras, and other parts of Greece.  Bunkering operations are supported from an office in Piraeus, which the Debtors lease.

35.    *Gulf of Mexico*.  The Debtors operate two double hull bunkering tankers in U.S. territorial waters and international waters in the Gulf of Mexico, supported by the Debtors' New York office, which the Debtors lease.

36.    *Las Palmas and Tenerife*.  The Debtors operate two double hull bunkering tanker in Las Palmas and own the Shell Las Palmas terminal, a 20,000 square meter facility that includes a lubricants plant, a 65,000 metric ton storage facility and on-site blending facilities to mix all

grades of fuel oils and distillates.  Bunkering operations are supported from an office in Las Palmas, which the Debtors lease.

37.    ***Northern Europe and the Amsterdam-Rotterdam-Antwerp Region* ("ARA Region")**.  The Debtors operate 12 double hull bunkering tankers both offshore and in numerous ports throughout Northern Europe, including the North Sea, Irish Sea (and St. George's Channel), the French Atlantic, the English Channel, Ghent, and throughout the ARA Region.  Bunkering operations are supported from an office near Antwerp, which the Debtors lease.

38.    ***South Africa***.  The Debtors operate three double hull bunkering tankers and one floating storage facility (the *Umnenga I* with 105,401 dwt) near Port Elizabeth.  Bunkering operations are supported from an office in Port Elizabeth, which the Debtors lease.

39.    ***Trinidad and Tobago***.  The Debtors operate two double hull bunkering tankers in the area of Port of Spain in Trinidad and Tobago.  Bunkering operations are supported from an office in Port of Spain, which the Debtors lease.

40.    ***United Arab Emirates***.  The Debtors charter-out two double hull bunkering tankers in the port of Fujairah region and store fuel in a storage facility with a capacity of 465,000 cubic meters in the port of Fujairah.  Bunkering operations were historically supported from offices in Fujairah and Khor Fakken, which the Debtors lease.

41.    ***U.S. East Coast***.  The Debtors operate in the ports of New York, Philadelphia, Baltimore, Norfolk, Savannah and Charleston and have access to approximately 300,000 cubic meters of leased tank storage to conduct operations.  Bunkering operations are supported from an office in New York, which the Debtors lease.

42.    ***U.S. Virgin Islands***.  The Debtors operate a service center in St. Croix, U.S. Virgin Islands.  The Debtors are currently party to a cooperation agreement with Caribbean Bunkers LLC,

a subsidiary of Freepoint Commodities LLC ("Freepoint"), which allows the Debtors to market marine petroleum products supplied by Freepoint to customers calling on the Limetree Bay terminal in St. Croix.

43.     ***U.S. West Coast***.  The Debtors operate in the ports of Los Angeles and Long Beach and have access to approximately 50,000 cubic meters of leased tank storage to conduct operations. Bunkering operations are supported from the Debtors' office in Los Angeles.

44.     ***Vancouver, Canada***.  The Debtors operate two double hull non self-propelled bunkering barges in the Port of Vancouver.  Bunkering operations are supported from an office in Vancouver, which the Debtors lease.

### 4.     Charter-Out Operations.

45.     The Debtors also generate revenue by chartering certain Owned Vessels to third parties.  These revenues, and the associated costs of chartering are recognized over the duration of the charter.  There are currently 15 Owned Vessels chartered out to third parties on a time-charter basis and one Owned Vessel on a voyage basis.

### C.     Offices and Employees.

46.     The Debtors' maintain offices around the world in the various markets where they conduct physical supply operations.  These locations are primarily leased, except for owned office space in Kingston, Jamaica.  The Debtors' corporate offices are located in Piraeus, Greece, where the Debtors oversee certain corporate, financial and accounting, marketing, sales, and ship-management functions and New York, New York, where the Debtors oversee corporate, financial and accounting, marketing, sales and other functions for the Debtors' U.S. operations.  The Debtors maintain offices in various countries and cities around the world where the Debtors conduct station-level operations.

47.     The Debtors employ approximately 850 employees in more than 20 countries across the globe (collectively, the "Employees").  The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  In many instances, the Employees include highly-trained personnel who are not easily replaced given the paramount importance of safety and environmentally compliant operations.

48.     Approximately 507 of the Debtors' Employees are employed offshore and are involved in day-to-day operations of the Debtors' vessels (collectively, "Offshore Employees"), in Europe, North and South Africa, the U.A.E., ARA Region, the U.S., and other countries.  The Debtors also employ approximately 342 workers onshore to support enterprise-wide operations (collectively, "Onshore Employees"), predominantly in Southern Europe, the U.S., and the U.A.E. Onshore Employees serving in operational support roles include such positions as vessel operation coordination and management, sales, purchasing, clerical administration, and accounting.

## III.    Aegean Marine' Capital Structure.

49.     As of the Petition Date, the Debtors had approximately $855 million in aggregate funded debt.  These obligations arise under the Global Credit Facility and U.S. Credit Facility, ten Secured Term Loan Facilities and two issuances of Unsecured Convertible Notes.  The table below summarizes the Debtors' prepetition capital structure.

| Indebtedness | Balance Outstanding as of Petition Date |
|---|---:|
| Global Credit Facility | $249,569,260 |
| U.S. Credit Facility | $131,688,116 |
| 2017 Secured Term Loan | $13,500,000 |
| 2017 South Africa Secured Term Loan | $5,984,585 |
| 2015 Fujairah Secured Term Loan Facility | $90,335,430 |
| 2008 Newbuilding Secured Term Loan | $18,717,000 |
| 2007 Newbuilding Secured Term Loan | $9,158,800 |
| First 2006 Newbuilding Secured Term Loan | $33,459,740 |
| Second 2006 Newbuilding Secured Term Loan | $6,564,028 |
| Third 2006 Newbuilding Secured Term Loan | $12,200,500 |
| 2005 Newbuilding Secured Term Loan | $11,670,000 |
| 2018 Barge Secured Term Loan | $5,000,000 |
| 4.00% Convertible Unsecured Notes due 2018 | $94,550,000 |
| 4.25% Convertible Unsecured Notes due 2021 | $172,500,000 |
| **Total** | **$854,897,459** |

## A.    The Working Capital Credit Facilities.

50.    ***Global Credit Facility.***    As of the Petition Date, the Debtors had a total of $249,569,260 aggregate principal amount outstanding, including letters of credit, under that certain Facility Agreement for a Borrowing Base Facility, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH and Aegean Petroleum Uruguay S.A., as co-borrowers and guarantors, Aegean Marine, as guarantor, ABN AMRO Bank N.V., as arranger, documentation bank, facility agent, collateral management agent, security agent, and certain financial institutions, as lender, issuing banks, and overdraft banks thereto.[7]  Borrowings under the Global Credit Facility will mature, and lending commitments thereunder will terminate on,

---

[7]    As noted previously, Mercuria together with its affiliates, is the sole lender under the Global Credit Facility.

November 30, 2020, and all obligations and the guarantees of those obligations are secured by a first priority lien on certain assets of each co-borrower that make up the borrowing base assets, including certain inventory, receivables and goods as well as the assignment of documents and agreements and pledge of certain accounts of the co-borrowers.

51.    ***U.S. Credit Facility***.    As of the Petition Date, the Debtors had a total of $131,688,116 aggregate principal amount outstanding, including letters of credit, under that certain Second Amended and Restated Security Uncommitted Credit Agreement, dated as of August 3, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering (USA) LLC, as borrower, ABN AMRO Capital USA, as administrative agent, collateral agent, syndication agent, BNP Paribas, as documentation agent, and the lender thereto.[8] Borrowings under the U.S. Credit Facility will mature, and lending commitments thereunder will terminate, on November 8, 2018, and all obligations under the U.S. Credit Facility are secured by a first priority lien on all of the assets of Aegean Bunkering (USA) LLC as well as a pledge of 100% of the equity of Aegean Bunkering (USA) LLC owned by its parent, AMPNI Holdings Co. Limited.

### B.    The Secured Term Loans.

52.    ***2017 Secured Term Loan***.    As of the Petition Date, the Debtors had a total of $13,500,000 aggregate principal outstanding under that certain Loan Agreement, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering Services Inc., as borrower, Aegean Marine, Amorgos Maritime Inc., Kimolos Maritime Inc., Milos Shipping (Pte.) Ltd., Mykonos I Maritime Limited and Tinos Marine Inc., as co-guarantors, and Piraeus Bank S.A., as lender (the "2017 Secured Term Loan").

---

[8]    As noted previously, Mercuria together with its affiliates, is the sole lender under the U.S. Credit Facility.

The 2017 Secured Term Loan matures on November 30, 2022, and all obligations under the 2017 Secured Term Loan are secured by a first priority mortgage on certain vessels—*Amorgos, Kimolos, Milos, Mykonos* and *Syros*—as well as a pledge of certain earning and retention accounts.

53.    ***2017 South Africa Secured Term Loan***.  As of the Petition Date, the Debtors had a total of $5,984,585 aggregate principal outstanding under that certain Loan Agreement, dated as of November 20, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering Services Inc. and Nevado Navigation S.A., as co-borrowers, Aegean Marine, Aegean Management Services M.C., Aegean Ship III Maritime Company, Aegean Ship VIII Maritime Company, Aegean Ace Maritime Company and Aegean Tanking S.A., as co-guarantors, and Piraeus Bank S.A., as lender (the "2017 South Africa Secured Term Loan"). The 2017 South Africa Secured Term Loan matures three years from the Drawdown Date (as that term is defined in the 2017 South Africa Secured Term Loan Agreement), and all obligations under the 2017 South Africa Secured Term Loan are secured by a first priority mortgage on certain vessels—*Aegean III*, *Aegean VIII*, *Aegean Ace*, and *Umnenga I*—as well as a pledge of certain earnings accounts and specific assignments of charterparty documents.

54.    ***2015 Fujairah Secured Term Loan Facility***.  As of the Petition Date, the Debtors had a total of $90,335,430 aggregate principal outstanding under that certain Term Loan Facility Agreement, dated as of October 7, 2015 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Oil Terminal Corporation, as borrower, Aegean Marine, as guarantor, United Arab Bank P.J.S.C., as agent, security agent and lender thereto (the "2015 Fujairah Secured Term Loan").  The 2015 Fujairah Secured Term Loan matures on September 30, 2023, and all obligations under the 2015 Fujairah Term Loan Facility are secured by substantially all of the assets of Aegean Oil Terminal Corporation.

55.    ***2008 Newbuilding Secured Term Loan***.  As of the Petition Date, the Debtors had a total of $18,717,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of April 24, 2008 (as amended, restated, modified, or supplemented from time to time), by and among Kassos Navigation S.A., Symi Navigation S.A., Halki Navigation S.A. and Tilos Shipping (PTE.) LTD., as co-borrowers, Aegean Marine and Aegean Shipholdings Inc., as co-guarantors, Aegean Baltic Bank S.A., as arranger, agent, security agent, account bank, and lender thereto (the "2008 Newbuilding Secured Term Loan").  The 2008 Newbuilding Secured Term Loan matures on June 30, 2020, and all obligations under the 2008 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kassos*, *Tilos*, *Halki*, and *Symi*—as well as a pledge of certain operating accounts and assignments of certain contracts and refund guarantees.

56.    ***2007 Newbuilding Secured Term Loan***.  As of the Petition Date, the Debtors had a total of $9,158,800 million aggregate principal amount outstanding under that certain Loan Agreement, dated as of July 5, 2007 (as amended, restated, modified, or supplemented from time to time), by and among Andros Marine Inc., Dilos Marine Inc., Ios Shipping Ltd, Sifnos Marine Inc. and Aegean VII Shipping Ltd., as co-borrowers, Aegean Marine, as guarantor, and Orix Investment and Management Private Ltd., as lender thereto (the "2007 Newbuilding Secured Term Loan").  The 2007 Newbuilding Secured Term Loan matures in part on February 3, 2020, May 4, 2020 and September 7, 2020, and all obligations under the 2007 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Andros*, *Dilos*, *Ios I*, *Anafi* and *Sikinos*—as well as a pledge of certain operating accounts, and assignments of certain contracts and refund guarantees.

57.    ***First 2006 Newbuilding Secured Term Loan***.  As of the Petition Date, the Debtors had a total of $33,459,740 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 1, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Kerkyra Marine S.A., Ithaki Marine S.A., Cephallonia Marine S.A., Paxoi Marine S.A., Zakynthos Marine S.A., Ios Marine Inc. and Kythira Marine S.A., as co-borrowers, Aegean Marine, Aegean Shipholdings Inc., Aegean Breeze Maritime Company and Aegean Tiffany Maritime Company, as co-guarantors, Aegean Baltic Bank S.A., as arranger, agent, security agent, account bank, and lender thereto (the "First 2006 Newbuilding Secured Term Loan").  The First 2006 Newbuilding Secured Term Loan matures on December 31, 2019, and all obligations under the First 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kerkyra*, *Ithaki*, *Kefalonia*, *Paxoi*, *Zakynthos*, *Lefkas*, *Kythira*, *Aegean Tiffany*, and *Aegean Breeze*—as well as a pledge of certain operating accounts, and assignments of certain contracts and refund guarantees.

58.    ***Second 2006 Newbuilding Secured Term Loan***.   As of the Petition Date, the Debtors had a total of $6,564,028 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 27, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Tasman Seaways Inc. and Santon Limited, as co-borrowers, Aegean Marine and Aegean Bunkering Services Inc., as co-guarantors, and the National Bank of Greece S.A., as lender thereto (the "Second 2006 Newbuilding Secured Term Loan").  The Second 2006 Newbuilding Secured Term Loan matures in part on November 30, 2018 and April 30, 2020, and all obligations under the Second 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kalymnos and Leros*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

59.     ***Third 2006 Newbuilding Secured Term Loan***.  As of the Petition Date, the Debtors had a total of $12,200,500 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 25, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Eton Marine LTD., Benmore Services S.A. and Ingram Enterprises Co., as co-borrowers, Aegean Marine, Aegean Shipholdings Inc. and Sealand Navigation Inc., as co-guarantors, and Aegean Baltic Bank S.A. as arranger, agent, security agent, account bank, and lender thereto (the "Third 2006 Newbuilding Secured Term Loan").  The Third 2006 Newbuilding Secured Term Loan matures on December 31, 2019, and all obligations under the Third 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Patmos*, *Nisyros*, and *Karpathos*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

60.     ***2005 Newbuilding Secured Term Loan***.  As of the Petition Date, the Debtors had a total of $11,670,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of August 30, 2005 (as amended, restated, modified, or supplemented from time to time), by and among Kithnos Maritime Inc., Lefkas Marine S.A., Paros Maritime Inc., Santorini I Maritime Limited and Serifos Shipping (Pte.) Ltd., as co-borrowers, Aegean Marine, Aegean Shipholdings Inc., Aegean Bunkering Services Inc. and Tempest Shiptrade Ltd., as co-guarantors, and Aegean Baltic Bank S.A. as arranger, agent, security agent, account bank, and lender thereto (the "2005 Newbuilding Secured Term Loan").  The 2005 Newbuilding Secured Term Loan matures on January 7, 2019, and all obligations under the Third 2005 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kithnos*, *Naxos*, *Paros I*, *Santorini* and *Serifos*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

61.     ***2018 Barge Secured Term Loan***.  As of the Petition Date, the Debtors had a total

of $5,000,000 aggregate principal amount outstanding under that certain Loan Agreement, dated

as of September 7, 2018 (as amended, restated, modified, or supplemented from time to time), by

and among AMPSA, as borrower, Aegean Marine and I.C.S. Petroleum Limited, as co-guarantors,

and Mercuria Energy Trading S.A., as lender thereto (the "2018 Barge Secured Term Loan").  The

2018 Barge Secured Loan matures on January 31, 2019, and all obligations under the 2018 Barge

Secured Term Loan are secured by a first priority mortgage on certain vessels—*PT22 and PT40*.

### C.     The Unsecured Convertible Notes.[9]

62.     ***4.00% Unsecured Convertible Notes due 2018***.  The Debtors have approximately

$94,550,000 principal amount outstanding 4.00% convertible senior unsecured notes due 2018,

issued pursuant to that certain Senior Indenture, dated as of October 23, 2013 (as amended,

restated, modified, or supplemented from time to time), by and among Aegean Marine, as issuer,

and Deutsche Bank Trust Company Americas, as trustee (the "4.00% Unsecured Convertible

Notes").  The 4.00% Unsecured Convertible Notes matured on November 1, 2018 and require

semi-annual coupon payments at an interest rate of 4.00% per year.

63.     ***4.25% Unsecured Convertible Notes due 2021***.  The Debtors have approximately

$172,500,000 principal amount outstanding 4.25% convertible senior unsecured notes due 2021,

issued pursuant to that certain Indenture, dated as of December 19, 2016 (as amended, restated,

modified, or supplemented from time to time), by and among Aegean Marine, as issuer, and U.S.

Bank National Association, as trustee (the "4.25% Unsecured Convertible Notes").  The 4.25%

---

[9]     On August 10, 2018, Aegean Marine delivered notices to the trustees under each indenture of Unsecured
Convertible Notes notifying such trustees that Aegean Marine elected to pay an additional 0.5% on the next
interest payment date under each indenture, which afforded Aegean Marine an additional 90 days from when the
default noticed by the 4.00% Unsecured Convertible Notes and 4.25% Unsecured Convertible Notes would have
become an event of default in order to cure the noticed default before the holders under each indenture could have
declared amounts thereunder due and payable.

Unsecured Convertible Notes mature on December 15, 2021 and require semi-annual coupon payments at an interest rate of 4.25% per year.

### D.      Trade Receivable Purchase Agreement.

64.      Certain Debtors have entered into trade receivables purchase agreements with Deutsche Bank AG, New York Branch, as a purchaser and documentation agent and Deutsche Bank Trust Company Americas, as a purchaser, pursuant to which certain Debtors transferred ownership of eligible trade accounts receivable to the purchasers without recourse in exchange for cash.  The sellers under the trade receivables agreements include Aegean Bunkering (USA) LLC and Aegean Marine Petroleum S.A., respectively.  The obligations under the trade receivables agreements are secured by a first priority lien on all receivables purchased under such agreements, all collections in respect thereof, all rights and all monies due or to become due under each such purchased receivables sold to the purchasers by the sellers.

### E.      Publicly-Traded Common Stock.

65.      As of Petition Date, Debtor Aegean Marine had approximately 58.19 million shares of common stock, par value $0.01, issued and outstanding.  Aegean Marine's common stock trades on the NYSE under the ticker "ANW."  As of the Petition Date, approximately 30% of Aegean Marine's outstanding common stock was held by Mercuria Asset Holdings Hong Kong.

## IV.      Circumstances Leading to These Chapter 11 Cases.

### A.      Prepetition Challenges.

66.      As discussed previously, the need to commence these chapter 11 cases was a perfect storm of circumstances that nearly forced Aegean to liquidate during the summer of 2018.  Beginning in the second half of 2017 and first quarter of 2018, Aegean's financial performance deteriorated due to competition and challenging market conditions for its shipping customers.  Then, in February 2018, Aegean announced the proposed acquisition of H.E.C. Europe Limited

(from Aegean's founder) in exchange for common stock, cash, an unsecured note, and certain non-eligible accounts receivable (the "Proposed Acquisition").  The announcement of the Proposed Acquisition, and the genesis of the accounts receivable, raised concerns among Aegean's credit facility lenders.    Moreover, Aegean requested that these lenders consent to the Proposed Acquisition and waive certain covenants in the Global Credit Facility agreement, including the interest coverage ratio financial covenant.  Aegean's request for consent went unheeded, but the lenders did agree to temporarily waive the default of the interest coverage ratio covenant with the following conditions—lower the facility size to $485 million (from $750 million) and heightened reporting requirements.    These actions immediately constrained Aegean's ability to operate efficiently because the company lacked the liquidity to purchase sufficient fuel to achieve breakeven levels and to satisfy customer orders at a time when fuel prices were increasing. Moreover, Aegean announced on April 30, 2018 that it would be unable to timely file annual financial statements for fiscal year 2017 and then on June 4, 2018, Aegean announced that approximately $200 million of accounts receivable would likely need to be fully written off.  These events, coupled with a reduced borrowing base and available liquidity, forced the Debtors' business into a negative feedback loop that proved insurmountable.  Below is a graphic detailing the challenges the Debtors faced prepetition.



67.    Faced with these challenges, the Debtors retained Ernst & Young LLP (E&Y) in April 2018 and several months later, Kirkland & Ellis LLP (K&E) to assist with financial and operational initiatives, lender negotiations, and contingency planning.  Then, in July 2018, the Debtors retained Moelis & Company ("Moelis") to assist the Debtors with reviewing and analyzing potential sale and/or financing transactions as well as contingency planning.  The Debtors, with the assistance of their advisors, explored all alternatives, including whether it was practicable to effect an out-of-court transaction or whether an in-court restructuring was necessary.

### B.    Prepetition Initiatives.

68.    In response to substantial financial and operational challenges, the Debtors have implemented various initiatives to reduce costs through headcount reductions, fleet reconfiguration, and business line consolidation.  During 2018, the Debtors have decreased onshore employee headcount by 14%, while also substantially reducing corporate overhead expenses.  In addition, the Debtors have or will realize substantial cost reductions from the following internal restructuring initiatives: (a) exiting bunkering operations in Fujairah, U.A.E. and Piraeus, Greece; (b) reconfiguration of bunkering vessels in and around Gibraltar and in the

ARA Region; and (c) winding down the Debtors' back-to-back trading operations' and four sales offices related to these operations and the Debtors' marine lubricants business.   In total, these initiatives amount to more than $25 million of annualized cost reductions.

69.      By implementing these initiatives, the Debtors have refocused their efforts on maximizing value for the benefit of all stakeholders.   As described in more detail below, the New Independent Directors/Audit Committee (as defined and discussed below) of the Board of Directors accelerated an internal, independent investigation led by Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") focused on the $200 million accounts receivable fraud, removed all legacy Aegean individuals associated with these transactions, and engaged additional independent third party advisors (including forensic accountants, private investigators, and intelligence firms) to assist the Debtors to better understand the nature of the fraud, as well as how best to recover value.

### 1.      Appointment of Independent Directors.

70.      On May 2, 2018, the Debtors announced that Donald Moore, Raymond Bartoszek, and myself (the "New Independent Directors"), had been appointed to the Board of Directors, effective immediately.   The appointment of the New Independent Directors increased the number of independent directors on the Board of Directors to six members.[10]   On May 22, 2018, the Debtors announced that Donald Moore had been appointed to serve as Chairman of the Board of Directors.   On June 4, 2018, the Debtors announced that the Audit Committee was recomposed of solely the New Independent Directors.   Most recently, the Debtors announced that David

---

[10]    The other independent directors on Aegean Marine's Board of Directors are Yiannis N. Papanicolaou, George J. Konomos and Konstantinos Koutsomitopoulos.

Gallagher—Mercuria's Global Head of Structuring and Origination—was appointed as an additional new member of the Board of Directors

71.    The appointment of the New Independent Directors resolved certain shareholder litigation commenced by RBM Holdings LLC (of which I was a member) against Aegean Marine. The settlement paved the way for the appointment of the New Independent Directors, allowing competent and highly qualified individuals to join the Board of Directors to protect shareholders' interests.    Donald Moore, an investment banker with over 41 years at Morgan Stanley, most recently as Chairman of Morgan Stanley Group (Europe) from 2000-2016, has extensive experience in advising governments, institutions and corporations on a variety of financial and strategic matters.    Raymond Baroszek brings over 20 years of experience as an oil trader specializing in the supply of marine bunker fuels to global shipping companies, first at Texaco and then at Glencore Ltd.    While at Glencore Ltd., Raymond Baroszek held a number of senior management positions including Managing Director and head of its oil department where he managed a global team and portfolio of assets.    I have more than 15 years of experience in the financial services and investment management industry, and since 2012, I have been the Portfolio Manager and Managing Partner of Sentinel Rock Capital.

### 2.    Audit Committee Investigation.

72.    The New Independent Directors also comprise the entirety of the audit committee (the "Audit Committee") of the Board of Directors.    I serve as Chair of the Audit Committee. Following the June 4 announcement of the $200 million accounts receivable fraud, the Audit Committee began working closing with Arnold & Porter to assist with investigation (the "Investigation").    Regarding the Investigation, the press release on June 4 stated that:

> These amounts are currently due from four counterparties that were reflected in the Company's financial statements as of December 31, 2017. There was approximately $172 million as of December 31,

2016 and $85 million as of December 31, 2015 due from these four counterparties. The transactions that gave rise to the accounts receivable ("the Transactions") may have been, in full or in part, without economic substance and improperly accounted for in contravention of the Company's normal policies and procedures.

\*\*\*

The Audit Committee is continuing its review and investigation of the Transactions and other matters, with the assistance of independent counsel and forensic accounting advisors, and expects to recommend to the Company that it pursue claims against individuals and entities involved in the Transactions. The Audit Committee is taking all the necessary and appropriate steps to identify weaknesses in the Company's internal controls and remedy any such weaknesses. A number of individuals employed by the Company across multiple functions who are believed to have been involved in the Transactions have been terminated or placed on administrative leave pending the outcome of the investigation. The Company has reported its preliminary findings to the SEC and the Department of Justice and intends to cooperate with any resulting investigations. The Company does not intend to provide an update on this process until the review is completed.

73.     Since this announcement, the Audit Committee and Arnold & Porter has committed substantial resources and efforts to the Investigation.  To date, the Audit Committee and Arnold & Porter have:

- Held numerous meetings with management, potential witnesses, and other relevant parties;
- Received bank account statements and thousands of emails, and retained the services of forensic accountants to assist with that review; and
- Instructed the Debtors' senior management to obtain electronic and physical evidence and conduct physical searches of the Debtors' property in multiple locations.

74.     Based on information reviewed by the Audit Committee and Arnold & Porter to date, it appears that the corporate counterparties to the accounts receivable transactions were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of the Company.   The evidence suggests that the receivables were

improperly entered onto the Debtors books and records as part of a scheme to facilitate and conceal possible misappropriation of the Debtors' assets.  The Audit Committee and Arnold & Porter have made it a priority to investigate individuals formerly associated with the Debtors, to determine who may have had a role in the accounts receivable (or related) transactions.

75.    To avoid even the appearance of impropriety, the Audit Committee and Arnold & Porter have plenary authority to review related party transactions and to follow leads wherever they go and the historical issues appear to go well beyond the transactions that gave rise to the uncollectible accounts receivable.  Moreover, no legacy member of the Board of Directors has any role on the Audit Committee or oversight of the Investigation.  The Debtor have every intention of pursuing and monetizing these claims.  For further information related to the Investigation and related matters, attached hereto as **Exhibit C** is a Form 6-K and press release issued by Aegean Marine on November 2, 2018.

### 3.    Revamped Management and Leadership.

76.    The Debtors have also installed new management and leadership, most recently naming Kostas Polydakis as chief operating officer, John Mystakidis as group financial controller and interim chief financial officer, and Salvatore Drago as global director of supply and trading. Kostas Polydakis, who has held various management positions within the Debtors' shipping division for the past 12 years, brings a renewed focus to the Debtors' fleet and bunkering operations as the Debtors' wind down non-core business lines.  John Mystakidis, formerly a partner at Ernst & Young, has over 25 years of experience in financial reporting, financial management and auditing and has acted as lead partner to multiple large Greek and multinational companies, helping them address and resolve critical financial issues.  Salvatore Drago, who previously served as the Debtors' global director of supply and trading, recently returned to the

position and will be responsible for arbitrage cargo movements, fuel oil blending, and risk management efforts.

77.    On September 27, 2018, the Debtors announced that Messrs. Mystakidis, Polydakis, and Drago will comprise the membership of the Debtors' management committee

### 4.    Key Stakeholder Engagement.

78.    The Debtors and their advisors actively engaged with its creditor constituencies throughout 2018.  Initially, the former lenders under the U.S. Credit Facility and Global Credit Facility were the key negotiating counterparty.  Recalcitrance within this group almost drove the Debtors into liquidation as lenders imposed ever more onerous terms and conditions during negotiations, while also formally reducing the Debtors' borrowing base at critical junctures.  This challenging situation forced the Debtors and their advisors to seek out alternative solutions.

79.    During June and July 2018, Aegean and its advisors were in discussions with numerous parties, including multiple financial investors regarding potential sale-leaseback and second lien financing transactions and multiple strategic investors regarding partnership opportunities such as a trade finance facility, joint venture, and/or acquisition.  Of these strategic investors seven executed non-disclosure agreements and five submitted diligence requests.  One of these strategic investors was Mercuria.  At the same time, the Debtors were also in discussions with the Ad Hoc Group.  Advisors for the Debtors and Ad Hoc Group focused their efforts on the provision of diligence, including multiple telephone conferences among the advisors, and otherwise were engaged regarding both contingency planning and strategic alternatives.

80.    In early July 2018, the Debtors determined after good faith, hard-fought negotiations that the proposal provided by Mercuria provided the best available path forward.  At the time this decision was made, the company had effectively ceased ordinary course operations due to the lack of liquidity and the splintering of many customer and supplier relationships and the

Debtors' liquidity profile was dire.  In the absence of incremental liquidity, the Debtors believed

that a bankruptcy filing and likely full-scale liquidation was necessary within a week or two.

81.    Additionally, the Debtors have proposed prepetition stipulations regarding

adequate protection for the use of vessels and related cash collateral with all of the secured lenders

and/or agents under the Secured Term Loan Facilities to ensure that such parties would not

foreclose on the vessels upon the Debtors' filing.  Negotiations regarding such stipulations

advanced significantly in the week before the Petition Date, and the Debtors were ultimately able

to come to consensual agreements with the secured lenders and agents under four of the Secured

Term Loan Facilities, and continue to pursue agreements with the secured parties under such

remaining facilities.  Absent these adequate protection agreements, the lenders and/or agents under

the Secured Term Loan Facilities may foreclose on their collateral or take other action detrimental

to the value of the enterprise.

### 5.    Mercuria Transaction.

82.    The Debtors and their advisors have worked diligently to explore various out-of-

court restructuring alternatives to address both capital structure and liquidity issues.  In particular,

the Debtors began engaging with Mercuria in early-to-mid June 2018 regarding a potential

strategic transaction.  Following arm's-length, good faith negotiations, the Debtors entered into

the aforementioned MOU on July 5, 2018.  The MOU was bifurcated into two phases, the first

focused on pre-August 15, 2018 and the second focused on post-August 15, 2018.  The MOU also

provided Mercuria with limited exclusivity until January 31, 2019, subject to explicit carveouts

for holders of Unsecured Convertible Notes, direct or indirect holders of Aegean Marine's

common stock, and any person who may provide debtor-in-possession financing, among others.

83.    In the first phase of the MOU, Mercuria agreed to pursue by August 15, 2018 a new

trade finance facility in the amount of $1 billion, split between the Debtors' global ($750 million)

and U.S. ($250 million) operations, with $250 million committed on a *pro rata* basis between the borrowing bases and not less than $30 million of incremental liquidity by way of amendments and waivers and other financing arrangements to support the Debtors' operations.    Upon closing, Mercuria was to receive new shares equal to 30% of the Debtors' common stock on a pro-forma basis and one seat on the Board of Directors.    The Debtors and Mercuria announced the consummation of the entire transaction by Form 6-K on August 21, 2018.

84.    In phase two of the MOU, Mercuria agreed to work with the Debtors on a broader strategic partnership, including operational services, trading and hedging arrangements, as well as efforts to explore a refinancing of the 4.00% Unsecured Convertible Notes due 2018 and 4.25% Unsecured Convertible Notes due 2021.    Since executing the MOU, Mercuria has helped enhance the Debtors' liquidity profile by "sleeving" a significant amount of the Debtors' fuel purchases.

### 6.    DIP Financing, Restructuring Negotiations.

85.    As of the Petition Date, Aegean has approximately $3.2 million in cash on hand. For months, vendors, suppliers, and longstanding customers, have expressed significant unease regarding the Debtors' financial situation.    It is for this reason that I believe that access to committed financing at the outset of these chapter 11 cases is necessary not only to operate but also to quell uncertainty regarding the Debtors' ability to prosper as a going concern.

86.    Beginning in September 2018, the Debtors' advisors sharpened their focus on procuring DIP financing to sustain operations during these chapter 11 cases.    In October 2018, Moelis engaged with 24 potential financing sources, of which nine signed non-disclosure agreements.    Of the nine who signed nondisclosure agreements, six parties expressed some interest in potentially providing financing, although none of these six parties ultimately submitted a financing proposal.    In parallel, the Debtors engaged with existing creditors Mercuria and the Ad

Hoc Group to provide DIP financing.  Negotiations with these parties accelerated significantly in the weeks before the Petition Date.

87.     The DIP financing proposals submitted by Mercuria and the Ad Hoc Group were each tied to restructuring transactions.  For Mercuria, the proposed transaction was a sale process with Mercuria serving as stalking horse bidder.  For the Ad Hoc Group, the proposed transaction was a restructuring support agreement (the "RSA") between the Debtors and the Ad Hoc Group that memorialized the plan treatment for each proposed class of creditors.

### a.     Ad Hoc Group DIP Financing Proposal.

88.     In the days prior to the Petition Date, the Ad Hoc Group provided a DIP financing proposal that contemplated (i) an asset-backed revolving loan credit facility provided by Goldman Sachs Lending Partners LLC or an affiliate and other institutions participating in the facility, (ii) a "first in last out" term loan, provided and fully backstopped by certain holders of Unsecured Convertible Notes, and (iii) a second lien term loan provided by certain holders of the Unsecured Convertible Notes.  This proposal was tied to a RSA that contemplated a standalone reorganization via a chapter 11 plan, the terms of which involved rolling certain of the DIP financing facilities into exit financing, the reinstatement of the Secured Term Loans, reinstatement or payment in full of all general unsecured claims at entities other than Aegean Marine, and a split of equity, warrants, and additional consideration for all general unsecured claims at Aegean Marine (including the Unsecured Convertible Notes).  Ultimately, the Ad Hoc Group was unable to obtain committed financing from a third party to be able to actually provide DIP financing as of the Petition Date.

### b.     Mercuria DIP Financing Proposal.

89.     The DIP financing proposal provided by Mercuria involved Mercuria providing (i) a $160 million U.S. revolving credit facility, (ii) a $300 million global revolving credit facility, and (iii) a $72 million multiple delayed draw term loan credit facility.  This proposal was tied to a

sale process, the terms of which are memorialized in bidding procedures and a stalking horse asset purchase agreement which are substantially final as of the Petition Date and are expected to be filed in the near term. Pursuant to the bidding procedures, there are certain milestones that guide the sale process, including a February 11, 2019 deadline to submit bids, an auction on February 18, 2019 (if necessary), and a sale hearing thereafter in February.

> **c.** **Mercuria DIP Financing Proposal Represents the Best Available Option.**

90.     Based on my discussions with Moelis and the Debtors' other advisors, I understand that the terms of the DIP financing proposal provided by Mercuria is reasonable and that the size of the financing will allow the Debtors' business to operate postpetition and meet administrative obligations during these chapter 11 cases. Additionally, the DIP financing provides the Debtors with immediate stability and certainty and will enable the Debtors to run a sale process for substantially all of the Debtors' assets. Ultimately, as further discussed in the Jamal Declaration, the Debtors in their best business judgment, with the assistance of their advisors, determined that the DIP financing proposal advanced by Mercuria provides the Debtors with the best available option.

## V.    Information Required By Local Bankruptcy Rule 1007-2.

91.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits attached hereto as **Exhibit D** through **Exhibit O**. Specifically, these exhibits contain the following information with respect to the Debtors (on a consolidated basis, unless otherwise noted):[11]

---

[11]    The information contained in the Exhibits attached to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the

- Pursuant to Local Bankruptcy Rule 1007-2(a)(3), **Exhibit D** hereto provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Exhibit E** hereto provides the following information with respect to each of the holders of the Debtors' twenty (20) largest unsecured claims, excluding claims of insiders:  the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Exhibit F** hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Exhibit G** hereto provides a summary of the Debtors' assets and liabilities.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(7), **Exhibit H** hereto provides a summary of the publicly held securities of the Debtors.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(8), **Exhibit I** hereto provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity:  the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Exhibit J** hereto provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(10), **Exhibit K** hereto sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

---

event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(11), **Exhibit L** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

- Pursuant to Local Bankruptcy Rule 1007-2(a)(12), **Exhibit M** hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), **Exhibit N** hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

- Pursuant to Local Bankruptcy Rule 1007-2(b)(3), **Exhibit O** hereto provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  November 6, 2018                    /s/ Tyler Baron

                                                                 Tyler Baron
                                                                  Director
                                                                  Aegean Marine Petroleum Network Inc.

## EXHIBIT A

**Corporate Organizational Structure**



**Notes:**

- The country of incorporation is either in parenthesis or part of the company name.
- Unless otherwise indicated, all ownership of subsidiary entities is 100%.

## EXHIBIT B -1

### List of Owned Vessels

| Vessel | Flag | Year Built | Deadweight (MT) |
|---|---|---|---|
| Aegean Ace | Greek | 1992 | 1,615 |
| Aegean Breeze I | Greek | 2004 | 2,747 |
| Aegean III | Greek | 1990 | 2,972 |
| Aegean Orion | Greek | 1991 | 559 |
| Aegean Tiffany | Greek | 2004 | 2,747 |
| Aegean VIII | Greek | 1990 | 2,973 |
| Amorgos | Gibraltar | 2007 | 4,627 |
| Anafi | Gibraltar | 2011 | 4,584 |
| Andros | Gibraltar | 2010 | 4,605 |
| Dilos | Liberia | 2010 | 4,593 |
| Halki | Gibraltar | 2011 | 6,256 |
| Ios I | Malta | 2010 | 4,620 |
| Ithaki | Liberia | 2009 | 6,272 |
| Kalymnos | Liberia | 2009 | 6,272 |
| Karpathos | Greek | 2010 | 6,247 |
| Kassos | Liberia | 2010 | 6,256 |
| Kefalonia | Liberia | 2009 | 6,290 |
| Kerkyra | Panama | 2009 | 6,290 |
| Kimolos | Liberia | 2008 | 4,641 |
| Kithnos | Malta | 2007 | 4,600 |
| Kythira | Malta | 2010 | 6,314 |
| Lefkas | South Africa | 2010 | 6,321 |
| Leros | Panama | 2010 | 6,311 |
| Mediterranean | Greek | 1982 | 19,894 |
| Milos | Singapore | 2007 | 4,626 |
| Mykonos | Gibraltar | 2008 | 4,623 |
| Naxos | Greek | 2009 | 4,626 |
| Nisyros | Gibraltar | 2010 | 6,312 |
| Paros I | Liberia | 2008 | 4,646 |
| Patmos | Liberia | 2008 | 6,283 |
| Paxoi | Gibraltar | 2009 | 6,310 |
| PT - 22 | Canada | 2001 | 2,448 |
| PT - 40 | Canada | 2014 | 4,000 |
| Santorini | Gibraltar | 2008 | 4,629 |
| Serifos | Singapore | 2007 | 4,664 |
| Sikinos | Malta | 2011 | 4,595 |
| Symi | Gibraltar | 2012 | 6,267 |
| Syros | Greek | 2008 | 4,641 |
| Tilos | Singapore | 2011 | 6,263 |
| Umnenga I | Liberia | 1999 | 105,401 |
| Zakynthos | Gibraltar | 2010 | 6,303 |

## EXHIBIT B -2

### List of Charter-In Vessels

| Vessel | Flag | Year Built | Deadweight (MT) |
|---|---|---|---|
| Alaska | Netherlands | 2013 | 3,458 |
| Alexia | Belgium | 2005 | 3,445 |
| Annika | Germany | 2012 | 1,646 |
| Antonie | Netherlands | 1988 | 2,237 |
| Bergen Troll | Norway | 2005 | 1,652 |
| Beryl | Luxembourg | 2014 | 2,468 |
| Colorado | Belgium | 2004 | -- |
| Florida | Belgium | 2011 | 1,488 |
| Montana | Belgium | 2011 | 4,319 |
| New Jersey | Belgium | 2006 | 4,051 |
| Onyx | Luxembourg | 2010 | 2,979 |
| Pascale | Belgium | 2015 | 2,594 |
| Sloman Herakles | Antigua & Barbados | 2012 | 16,471 |
| Tanzanite | Belgium | 2004 | 4,068 |
| Texas | Belgium | 2004 | 4,164 |
| Willem Sr. | Netherlands | 2006 | 3,179 |

**<u>EXHIBIT C</u>**

**November 2, 2018 Form 6-K**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 6-K**

**REPORT OF FOREIGN PRIVATE ISSUER PURSUANT TO**
**RULE 13A-16 OR 15D-16 UNDER THE SECURITIES**
**EXCHANGE ACT OF 1934**

For the month of November 2018

Commission File Number: 001-33179

**AEGEAN MARINE PETROLEUM NETWORK INC.**
(Translation of registrant's name into English)

**10, Akti Kondili**
**185 45, Piraeus**
**Greece**
(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F.

Form 20-F [ X ] Form 40-F [ ]

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1): _____.

**Note**: Regulation S-T Rule 101(b)(1) only permits the submission in paper of a Form 6-K if submitted solely to provide an attached annual report to security holders.

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7): _____.

**Note**: Regulation S-T Rule 101(b)(7) only permits the submission in paper of a Form 6-K if submitted to furnish a report or other document that the registrant foreign private issuer must furnish and make public under the laws of the jurisdiction in which the registrant is incorporated, domiciled or legally organized (the registrant's "home country"), or under the rules of the home country exchange on which the registrant's securities are traded, as long as the report or other document is not a press release, is not required to be and has not been distributed to the registrant's security holders, and, if discussing a material event, has already been the subject of a Form 6-K submission or other Commission filing on EDGAR.

**INFORMATION CONTAINED IN THIS FORM 6-K REPORT**

Attached as Exhibit 99.1 to this Report on Form 6-K is a copy of the press release of Aegean Marine Petroleum Network Inc. (the "Company"), dated November 2, 2018, announcing among other things, the results of the Company's Audit Committee investigation, the decision to restate certain financial statements, and other related matters.

**SIGNATURES**

       Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<table>
<tr><td></td><td><strong>AEGEAN MARINE PETROLEUM NETWORK INC.</strong><br>(registrant)</td></tr>
<tr><td>Dated: November 2, 2018</td><td>By: /s/ Spyridon Fokas</td></tr>
<tr><td></td><td>Name: Spyridon Fokas<br>Title: General Counsel and Secretary</td></tr>
</table>

Exhibit 99.1

**Aegean Marine Petroleum Network Inc. Announces Results of Audit Committee Investigation and Findings of Substantial Misappropriation of Company Assets**

**NEW YORK, November 2, 2018** – Aegean Marine Petroleum Network Inc. (NYSE:ANW) ("Aegean" or the "Company"), a leading international marine fuel logistics company, today announced the results of the investigation into certain accounting-related matters by the audit committee of the Company's Board of Directors (the "Audit Committee"), as well as the Company's decision to restate certain historical financial statements as a result of the findings of the investigation.

Aegean previously reported on June 4, 2018, that, as a result of the preliminary findings of the investigation, the Audit Committee believed that approximately US$200 million of accounts receivable on the Company's books and records at December 31, 2017 would need to be written off.

*Investigation Findings*

The Audit Committee retained independent legal counsel to conduct the investigation with the assistance of outside forensic accountants and investigators. The investigation is substantially complete and, based on the findings to date, the Audit Committee and Board of Directors have concluded as follows:

1. The Audit Committee believes up to US$300 million of Company cash and other assets were misappropriated through fraudulent activities. The Audit Committee believes that the principal beneficiary of the misappropriation is OilTank Engineering & Consulting Ltd. ("OilTank"), a company based in Fujairah and incorporated on March 15, 2010 in the Marshall Islands. On March 31, 2010 OilTank entered into a contract with Aegean's subsidiary to oversee the construction of the Fujairah Oil Terminal Facility (the "Fujairah Facility"). The Audit Committee believes that this contract was used to misappropriate Company funds through inflated contracts and fraudulent pricing. The Audit Committee has reason to believe that OilTank is controlled by a former affiliate of the Company (the "Former Affiliate").

2. As of December 31, 2017, the Company and/or its subsidiaries had an aggregate of approximately US$200 million in accounts receivable that arose from purported commercial transactions that occurred in 2015, 2016, and 2017. These transactions lacked economic substance as the relevant counterparties were shell companies with no material assets or operations and were owned or controlled by former employees or affiliates of the Company. The Audit Committee believes that the receivables were improperly recorded as part of a scheme to facilitate and conceal an extensive misappropriation of Company assets channeled to OilTank, but accounted for as transactions with these shell companies. The Audit Committee has further confirmed that the approximately US$200 million of receivables are uncollectible and will be written off.

3. The Investigation also uncovered additional actions to defraud the Company and/or its subsidiaries, including prepayment for future oil deliveries that were never made. These fraudulent activities appear to have commenced as early as 2010.

4. The misappropriation of Company assets, and the fraudulent accounting entries and fictitious documentation designed to conceal it, involved over a dozen Company employees, including members of senior management. The employees who directed the scheme, which involved the creation of falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third party certifications, among others, have been terminated.

5. The Audit Committee believes that this misconduct occurred in part because the Former Affiliate has exerted significant control over Company personnel and assets through various inappropriate means, including threats of economic retaliation and physical violence. In addition, the Former Affiliate continues to have access to and control over the Company's electronic and physical files.

The Company intends to take appropriate steps to seek redress from responsible individuals and other parties for the harm to the Company caused by their involvement in the activities described above, including instituting legal proceedings and seeking to seize assets in applicable jurisdictions wherever feasible and appropriate.  Although the Company intends to pursue these matters vigorously, there can be no assurance that it will be able to recover a material portion of the losses it has incurred.

*Cybersecurity Matters*

In connection with the Investigation, the Company's efforts to obtain access to relevant emails and other electronic data stored on the Company's server were and continue to be obstructed as a result of, among other things, the threats of retaliation against Company personnel, and at least one attempt to delete and permanently erase documents from the Company's server through the remote installation of data deletion software by a person with administrator access.  On June 22, 2018, following a complaint by the Former Affiliate and related parties, the Hellenic Data Privacy Authority ("HDPA") issued a provisional order which prohibited the review or use of emails and other files that were collected from the Company's Piraeus, Greece server in connection with the Audit Committee's investigation.  The Company is actively litigating the HDPA's order.

*Involvement of U.S. Law Enforcement Authorities*

As previously disclosed, the Company voluntarily reported its preliminary findings to the U.S. Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ") and has now reported the results of the Audit Committee investigation.  On October 3, 2018 the Company received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York in connection with suspected felonies.  Insofar as it is permitted to do so within the strictures of the HDPA's order, the Company is providing documentation to the DOJ.

*Restatement of Affected Financials*

Based on the foregoing, the Audit Committee has concluded that the Company's financial statements for (i) the fiscal years ended December 31, 2015 and December 31, 2016 included in the Company's Annual Reports on Form 20-F for the years then ended, (ii) the interim periods within such fiscal years included in the Company's Reports on Form 6-K for such periods, and (iii) the periods ended March 31, 2017, June 30, 2017, September 30, 2017 included in the Company's Reports on Form 6-K for such periods (the "Affected Financial Statements"), should no longer be relied upon. Similarly, related press releases describing the Company's financial results for such periods, as well as the fourth quarter of each of 2015, 2016 and 2017 (and the year ended December 31, 2017), should no longer be relied upon. The Company intends to restate the Affected Financial Statements to reflect the effect of the fraudulent activities described above. The Company intends to work with its auditors, PricewaterhouseCoopers S.A. (2016 and 2017) and Deloitte Certified Public Accountants S.A. (2015), to determine the individual and net effect of the inaccurate accounting entries and the theft of Company assets.

Although the Company expects the financial impact on restated periods to be material and believes that the revenues and earnings of the Company were substantially overstated in the years 2015, 2016 and 2017, it cannot currently determine the full impact or how the necessary adjustments will be recorded. In addition, other adjustments may arise as a result of the restatement process that could further impact the Company's financial statements for specified periods. Due to the amount of work involved in the restatement process, the Company cannot be certain when restated financial statements for the affected periods will be complete. In addition, the Company does not expect to file its semi-annual financial statements for the period ending June 30, 2018 until restated financial statements have been completed. The Company intends to file its restated financial statements as soon as reasonably practicable.

*Internal Control Over Financial Reporting*

In light of the matters discussed above, the Company's Board of Directors has concluded that material weaknesses in the Company's internal control over financial reporting ("ICFR") existed as of December 31, 2015, 2016 and 2017 and consequently, management's annual report on ICFR as of December 31, 2015, and 2016 included in the Company's Annual Reports on Form 20-F and also for the 2017 interim results should no longer be relied upon and will be restated. The Company has remediated and will continue to remediate the identified weaknesses through new procedures and controls throughout the Company and its subsidiaries. These actions include, but are not limited to, moving the Company's principal executive offices from its current location; terminating related party transactions; replacing senior management involved in accounting, finance, credit, supply, and terminal management functions; terminating personnel who were involved in the misconduct; centralizing Company systems and controls; addressing the identified cybersecurity issues as described above; and strengthening the Company's senior management team.

*NYSE Update*

As previously disclosed, the NYSE informed the Company that under NYSE rules, the Company has until six months from its due date to file its Annual Report on Form 20-F for the year ended December 31, 2017 with the SEC. The Company has been in contact with the NYSE regarding an additional six-month extension past the due date. Such an extension has not yet been granted. If the Company fails to file the late report and all other periodic reports with subsequent due dates within six months of the filing due date of the late report, the NYSE may, in its sole discretion, allow the Company's securities to remain listed for up to an additional six months depending on certain circumstances. The Company may regain compliance with the NYSE listing standards at any time prior to such date by filing its Form 20-F with the SEC. The NYSE notice also reserves the right of the NYSE to commence delisting proceedings at any time if circumstances warrant.

*Other Matters*

The foregoing information is based on facts obtained to date from the results of the Investigation and the reviews of previously issued financial statements of the Company. Additional information could be discovered through ongoing investigatory activities or as a result of the preparation of restated financial statements. Such information could result in the Company having to make additional adjustments to one or more of the Affected Financial Statements, or identifying and having to remediate other material weaknesses in its ICFR.

*Forward-Looking Statements*

The foregoing discussion includes statements and information that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. For those statements, we claim the protection of the safe harbor for forward-looking statements provided by that Act. These forward-looking statements generally are identified by the words "believe," "project," "expect," "anticipate," "estimate," "intend," "strategy," "future," "opportunity," "plan," "may," "should," "will," "would," "will be," "will continue," "will likely result," and similar expressions or the negative thereof. Such forward-looking statements include, but are not limited to, statements that the Company will need to write-off approximately $200 million of accounts receivable, that the Company intends to restate the Affected Financial Statements, that the Company intends to restate management's annual ICFR reports in its Forms 20-F for the years ended December 31, 2015 and 2016, that the Company intends to take appropriate steps to seek redress from those responsible for the harm to the Company described herein, statements related to intended steps to redress weaknesses in ICFR and cybersecurity vulnerabilities, and the estimated effects of the matters described herein on the Affected Financial Statements. These forward-looking statements are subject to risks, uncertainties and other factors, including discovery of information in addition to or different from the information on which such estimates are based. As a result of these matters, actual results may differ materially from those expressed or implied in the forward-looking statements made in the foregoing discussion. Factors that could affect the Company's actual results include the discovery of further instances of financial misconduct, the impact of identified misconduct on the Company's results of operations, the timing of any restatement of the Affected Financial Statements, the impact of such restatement on the Company's financing agreements and other material agreements, the extent of the weaknesses in the Company's ICFR, the timing of the filing of the Company's Annual Report on Form 20-F for the year ended December 31, 2017 and the furnishing of its financial statements for the period ended June 30, 2018 on Form 6-K, and other uncertainties disclosed in the Company's reports filed with and furnished to the SEC, including its most recent report on Form 20-F and subsequent reports on Form 6-K. The Company urges readers to take such factors and the possibility of such differences into account in any consideration of the forward-looking statements included in this report and not place undue reliance on such statements. The forward-looking statements included in this report are made only as of the date of this report, and the Company undertakes no obligation to update any of these forward-looking statements to reflect subsequent events or circumstances.

**About Aegean Marine Petroleum Network Inc.**

Aegean Marine Petroleum Network Inc. is an international marine fuel logistics company that markets and physically supplies refined marine fuel and lubricants to ships in port and at sea.  The Company procures product from various sources (such as refineries, oil producers, and traders) and resells it to a diverse group of customers across all major commercial shipping sectors and leading cruise lines.  Currently, Aegean has a global presence in more than 30 markets and a team of professionals ready to serve its customers wherever they are around the globe.  For additional information please visit: www.ampni.com.

**Cautionary Statement Regarding Forward-Looking Statements**

This release contains "forward-looking" statements that are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.  Statements that are predictive in nature, that depend upon or refer to future events or conditions, or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates," "will," and similar expressions are forward-looking statements.  Forward-looking statements involve known and unknown risks and uncertainties that may cause actual future results to differ materially from those projected or contemplated in the forward-looking statements.  Given the risks and uncertainties inherent in forward-looking statements, you are cautioned not to place undue reliance on any of our forward-looking statements.  Forward-looking statements speak only as of the date on which the statements are made. Aegean undertakes no duty, and expressly disclaims any obligation, to update these forward-looking statements to reflect any future events, developments or otherwise.

**AEGEAN INVESTORS:**
Aegean Marine Petroleum Network Inc.
+1-212-430-1098
investor@ampni.com

or

**AEGEAN MEDIA:**
Gagnier Communications
Dan Gagnier
+1-646-569-5897
dg@gagnierfc.com

## **EXHIBIT D**

### **Committees Organized Prepetition**

| Prepetition Committee | Counsel | Members |
|---|---|---|
| Informal Group of Convertible Noteholders | Akin Gump Strauss Hauer & Feld LLP | Various holders of 4% Convertible Unsecured Notes due 2018, 4.25% Convertible Unsecured Notes due 2021 |

**EXHIBIT E**

**Consolidated List of the Holders of the Debtors' 20 Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 20 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 1 | 4.25% CONVERTIBLE UNSECURED NOTES DUE 2021 U.S. BANK NATIONAL ASSOCIATION 1000 WALL ST., STE 1600 NEW YORK, NY 10005 | EMAIL – TRUSTCORPORATEACTIONS@USBANK.COM | UNSECURED BOND DEBT | | | | $172,500,000 |
| 2 | 4.00% CONVERTIBLE UNSECURED NOTES DUE 2018 DEUTSCHE BANK TRUST COMPANY AMERICAS 60 WALL ST., MSNYC60-2710 NEW YORK, NY 10005 | ATTN: TRUST AND AGENCY SERVICES CORPORATE TEAM DEAL MANAGER EMAIL – PROXY.MUMBAI@DB.COM | UNSECURED BOND DEBT | | | | $94,550,000 |
| 3 | AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. ATTN: JEFFREY C. CAMPBELL, CFO 200 VESEY STREET NEW YORK, NY 10285 | ATTN: JEFFREY C. CAMPBELL, CFO EMAIL -KEN.F.PAUKOWITS@AEXP.COM; RICHARD.PETRINO@AEXP.COM PHONE - (212) 640-5130 FAX - (212) 640-0404 | CONTRACT CLAIM | C/U/D | | | $20,000,000 |
| 4 | PETROJAM LTD ATTN: SHANETT BROMFIELD, ARO 96, MARCUS GARVEY DRIVE P.O. BOX 241 KINGSTON, 15, JAMAICA | SHANETT BROMFIELD, ARO EMAIL - SHANETT.BROMFIELD@PETROJAM.COM PHONE - +(876) 923-8611-5 FAX - +(876) 923-5698 | TRADE | | | | $3,176,047 |

[1] The Debtors reserve the right to assert setoff and other rights with respect to any of the claims listed herein.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 5 | BP EUROPA SE WITTENER STRABE 45 BOCHUM, GERMANY 44789 | MICHAEL SCHMIDT, CEO PHONE - +49 234 315-0 FAX - +49 234 315 2679 | TRADE | | | | $1,133,079 |
| 6 | AEGEAN OIL SA ATTN: ANTONIS PAPADAKIS, CEO 10, AKTI KONDYLI PIRAEUS, 185 45 GREECE | ANTONIS PAPADAKIS, CEO EMAIL - OPERATION@AEGEANOIL.GR PHONE - +30 210 45 86 000 FAX - +30 210 45 86 245 | TRADE | | | | $475,600 |
| 7 | PORT OF FUJAIRAH ATTN: KHALIL EBRAHEIM HASSAN, CFO FUJAIRAH PORT ROAD, FUJAIRAH SEA PORT FUJAIRAH UNITED ARAB EMIRATES | KHALIL EBRAHEIM HASSAN, CFO EMAIL - FIN_POF@FUJAIRAHPORT.AE PHONE - +09-2070122 FAX - +09-2228811 | TRADE | | | | $395,792 |
| 8 | ANTIPOLLUTION A.N.E. ATTN: IOANNIS KONSTANTINIDIS, VP 57, AKTI MIAOULI PIRAEUS GREECE | IOANNIS KONSTANTINIDIS, VP EMAIL - INFO@ANTIPOLLUTION.GR PHONE - +210 42.92.426-7 FAX - +210 42.92.710 | TRADE | | | | $375,334 |
| 9 | VANE LINE ATTN: ROBERT DAVIS, MANAGER 2100 FRANKHURST AVENUE BALTIMORE, MD 21226 | ROBERT DAVIS, MANGER EMAIL -IBOOTH@VANEBROTHERS.COM PHONE - (410) 631-8100 FAX - (410) 631-5099 | TRADE | | | | $295,000 |
| 10 | ORIENT INSURANCE CO. PJSC ATTN: OMER HASSAN ELAMIN, PRESIDENT ORIENT BUILDING, AL BADIA BUSINESS PARK DUBAI FESTIVAL CITY DUBAI UNITED ARAB EMIRATES | OMER HASSAN ELAMIN, PRESIDENT EMAIL -OMER.ELAMIN@ALFUTTAIM.COM PHONE - +971 4253 1300 FAX - +971 4253 1500 | INSURANCE CLAIM | | | | $288,485 |
| 11 | AGAAT BOTERHAMVAARTWEG 2 ANTWERP, BELGIUM 2030 | ROBERT VAN DER MEIRSSCHE, DIRECTOR FAX - +32 3 544 88 83 | TRADE | | | | $274,999 |
| 12 | AEGEAN AGENCY LTD ATTN: FIRIPPIS NIKOLAOS, VP 10, AKTI KONDYLI PIRAEUS, 185 45 GREECE | FIRIPPIS NIKOLAOS, VP EMAIL - AGENCY@AEGEANOIL.COM PHONE - +30 210 45 86 000 FAX - +30 210 45 86 242 | TRADE | | | | $263,028 |
| 13 | AP OIL PTE LTD ATTN: HO CHEE HON, CEO 30 GUL CRESCENT JURONG, 629535 SINGAPORE | HO CHEE HON, CEO EMAIL - ENQUIRY@APOIL.COM.SG PHONE - +65 6861 5503 FAX - +65 6861 9162 | TRADE | | | | $213,996 |
| 14 | OILCHART OFFSHORE - OILCHART UK LTD ATTN: OWEN WEBBER, MANAGING DIR. 90 LONG ACRE, COVENT GARDEN LONDON UNITED KINGDOM | OWEN WEBBER, MANAGING DIR. EMAIL - OFFSHORE@OILCHART.COM PHONE - +44 20 3002 1783 | TRADE | | | | $208,340 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
|---|---|---|---|---|---|---|---|
| 15 | ELPE (ELL.PETRELAIA SA) 54, AMALIAS AVENUE ATHENS, GREECE 10558 | FAX: +30 210 63 02 510 | TRADE | | | | $183,394 |
| 16 | GREEN PORTS (GIBRALTAR) LTD UNIT 5.23, WORLD TRADE CENTRE, GIBRALTAR GIBRALTAR | PHONE +44 1329 825335 EMAIL – SALES@GREENPORT.COM FAX - +44 1329 550192 | TRADE | | | | $179,800 |
| 17 | PEARL MARINE DMCC PLATINUM TOWER, 12 CLUSTER I STREET, JUMEIRAH LAKES TOWERS, AL THANYAH 5-393, HADAEQ DUBAI UNITED ARAB EMIRATES | PHONE +97 1436 38721 FAX - +97 1 4362 6346 | TRADE | | | | $170,300 |
| 18 | ALFASHIP SHIPPING AGENCY S.L. ATTN: ANTONIO CASTANEDA, REG. MGR. C/LEON Y CASTILLO, 367-PISO 1 CANARY ISLANDS SPAIN | ANTONIO CASTANEDA, REG. MGR EMAIL - ANTONIO.CASTANEDA@ALFASHIP.COM PHONE –+34 09 2824 7978 FAX - +34 09 2898 0650 | TRADE | | | | $166,573 |
| 19 | SCHEEPVAARTBEDRIJF ANT. KOREN BV DE NOORDBANK 36 ROZENBURG (NL) THE NETHERLANDS | PHONE +31 10-2954795 FAX - +31 10-2954799 | TRADE | | | | $160,941 |
| 20 | MELCO PETROLEUM SA AKTI KONDYLI 10 PIRAEUS, 18545 GREECE | PHONE +30 2105 5380 FAX - +30 2105 5775 | TRADE | | | | $157,336 |

## EXHIBIT F

**Consolidated List of the Holders of the Debtors' Five Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Creditor Name, and complete mailing address, including zip code of employee, agents, or department of creditor familiar with claim who may be contacted | Amount of Claim (as of Petition Date) | Collateral Description and Value |
|---|---|---|---|---|
| 1. | ABN AMRO Bank N.V. (Agent to Global Credit Facility) | ABN AMRO Bank N.V. Agency Syndicated Loans Attn: Team 1 Daalsesingel 71 P.O. Box 2059 (EA8550) 3500 GB Utrecht The Netherlands | $249,569,260 | Collateral: Certain assets of each co-borrower, including certain inventory, receivables and goods, the assignment of documents and agreements and a pledge of certain accounts. Collateral Value: Uncertain |
| 2. | ABN AMRO Capital USA LLC (Agent to U.S. Credit Facility) | ABN AMRO Capital USA LLC Attn: ECT Group 100 Park Avenue New York, New York 10017 | $131,688,116 | Collateral: All assets of Aegean Bunkering (USA) LLC as well as a pledge of 100% of the equity of this this entity, owned by its parent, AMPNI Holdings CO. Limited. Collateral Value: Uncertain |
| 3. | United Arab Bank P.J.S.C. (Agent to 2015 Fujairah Secured Term Loan Facility) | UAB Al Quoz Branch Corporate & Institutional Banking Attn: Agency Desk PO Box 392066 Dubai, United Arab Emirates | $90,335,430 | Collateral: Substantially all assets of Aegean Oil Terminal Corporation. Collateral Value: Uncertain |
| 4. | Aegean Baltic Bank S.A. (Agent to First 2006 Newbuilding Secured Term Loan) | Aegean Baltic Bank S.A. 91 Megalou Alexandrou & 25th Martiou Str. 151 24 Maroussi Greece | $33,459,740 | Collateral: Certain vessels, a pledge of certain operating account, and assignments of certain contracts and refund guarantees. Collateral Value: Uncertain |
| 5. | Aegean Baltic Bank S.A. (Agent to 2008 Newbuilding Secured Term Loan) | Aegean Baltic Bank S.A. 91 Megalou Alexandrou & 25th Martiou Str. 151 24 Maroussi Greece | $18,717,000 | Collateral: Certain vessels, a pledge of certain operating account, and assignments of certain contracts and refund guarantees. Collateral Value: Uncertain |

## <u>EXHIBIT G</u>

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated among affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets<br>(Book Value as of June 30, 2018) | $1,372,607,000 |
| Total Liabilities<br>(Book Value as of June 30, 2018) | $880,751,000 |

## <u>EXHIBIT H</u>

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the approximate number of holders thereof as of the Petition Date.

|  | Debt Security[2] | Value Outstanding | Approximate Number of Holders[3] |
|---|---|---|---|
| 1. | 4% Convertible Notes due 2018 | $94,550,000 | 18 |
| 2. | 4.25% Convertible Notes due 2022 | $172,500,000 | 35 |

|  | Equity Security | Number of Shares Outstanding | Approximate Number of Holders[4] |
|---|---|---|---|
| 1. | Common Stock of Aegean Marine Petroleum Network, Inc. | 58.19 million | 99 |

Pursuant to Local Rule 1007-2(a)(7), the following lists the number of shares of common stock held by the Debtors' officers and directors as of the Petition Date.

|  | Name of Beneficial Owner | Title | Shares Beneficially Owned | Percentage of Common Stock Outstanding |
|---|---|---|---|---|
| 1. | Donald A. Moore, Jr. | Director | 360,000 | Less than 1% |
| 2. | Raymond Bartoszek | Director | 175,000 | Less than 1% |
| 3. | Tyler Baron | Director | 160,000 | Less than 1% |

---

[2]    The Debtors' debt securities are tradable by accredited investors or qualified institutional buyers as defined in Regulation D under the Securities Act.  The Debtors disclose this information out of an abundance of caution, and do not believe that their debt securities are "publicly traded" or that they are required to comply with any registration requirements under the Securities Act.

[3]    Known holders based on information provided by Bloomberg Services as of October 30, 2018.

[4]    Based on the Debtors' most recent Form 20-F filed with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2016.

## EXHIBIT I

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## <u>EXHIBIT J</u>

**Summary of Debtors' Property From Which the Debtors Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises location of real property owned or leased from which the Debtors and non-Debtor subsidiaries operate, or have operated, their businesses.  Certain of the leased premises may have been vacated and/or surrendered as of the Petition Date.

| Premises Location | Country | Owned or Leased | Use of Premises |
|---|---|---|---|
| Ruiterijschool 1, Brasschaat, Flemish Region 2930 | Belgium | Leased | Office |
| Praça Floriano, 19, 20th Floor Centro, Rio de Janeiro, RJ, 20031-050 | Brazil | Leased | Office |
| 1066 West Hastings Street, Suite 1450, Vancouver, BC V6E 3X1 | Canada | Leased | Office |
| C/Avda. De las Petroliferas, s/n – 35008, Las Palmas, de Gran Canaria, Las Palmas | Canary Islands/Spain | Leased | Office |
| No. 1038, Nanjing West Road, #2008A, NanJing IiLu, Jingan Qu, Shanghai Shi, 200000 | China | Leased | Office |
| Vyronos 36, Nicosia Tower Center, 8th Floor, Flat/Office 801; P.C. 1506 Nicosia | Cyprus | Leased | Office |
| Holstenwall 5 – Hamburg D-20355 | Germany | Leased | Office |
| Suite 2, Block 4, Watergardens, GX111AA | Gibraltar | Leased | Office |
| Akti Kondili 10, 185 45 Piraeus | Greece | Leased | Office |
| Al Nevskogo Square II, St. Petersburg 191167 | Russia | Leased | Office |
| No. 22 Jalan Kilang #06-01, Mova Building, 159419 | Singapore | Leased | Office |
| The Bay Suites, 3rd Floor, 1A Humewood Road, Humewood, Port Elizabeth EC 6001159419 | South Africa | Leased | Office |
| Seoul City Tower 22/F, 110 Huam-ro, Jung-Gu, Jung-gu, Seoul 04637 | South Korea | Leased | Office |
| 3 French Street, Woodbrook, Port of Spain | Trinidad and Tobago | Leased | Office |
| Unit No.409, Tiffany Towers, Plot No. JLT-PH2-W2A, Dubai | United Arab Emirates | Leased | Office |

| Premises Location | Country | Owned or Leased | Use of Premises |
|---|---|---|---|
| Al Sudah Road, Fujairah Oil Industrial Zone, P.O. Box 2688 Fujairah | United Arab Emirates | Leased | Office |
| Al Madifi, behind Cornich Rd, flat No. 203, Khorfakkan | United Arab Emirates | Leased | Office |
| Aegean Bunkering USA LLC, 52 Vanderbilt Ave, Suite 1405, New York, NY 10017 | United States | Leased | Office |
| 299 Park Ave, 2nd Floor, New York, NY 10171 | United States | Leased | Office |
| Calle los Martinez de Escobar, 11, 35007 Las Palmas, de Gran Canaria, Las Palmas | Canary Islands/Spain | Leased | Office |
| Überseeallee 1, 20457 Hamburg | Germany | Leased | Storage Facility |
| Dalwitzhofer Weg 22a, 18055 Rostock | Germany | Leased | Storage Facility |
| Zone Franche de Ksar Majaz, Tanger | Morocco | Leased | Storage Facility |
| Al Sudah Road, Fujairah Oil Industrial Zone Fujairah AE-FU 2688 | United Arab Emirates | Leased | Storage Facility |
| 400 Oceangate, Suite 1110, Long Beach CA 90802 | United States | Leased | Office |
| 4030 Buell St, Chesapeake, VA 23324 -- Tanks 5603, 5605 | United States | Leased | Storage Facility |
| 2801 S Military Hwy, Chesapeake, VA 23323 -- Tanks 502, 602,604 | United States | Leased | Storage Facility |
| 123 Derousse Ave, Pennsauken Township, NJ 08110 -- Tanks 2001, 2004, 2013, 2015, 2017, 2027, 2009 | United States | Leased | Storage Facility |
| 5905 Pennington Ave, Baltimore, MD 21226 -- Tanks 1963, 1971,1959, 1958, 1965 | United States | Leased | Storage Facility |
| 420 Hook Rd, Bayonne, NJ 07002 -- Tanks 2603, 2605, 2607, 2608, 2621, 2623, 2625, 2609, 2610, 2611, 2612, 2631, 2613, 2614, 2619,2620 | United States | Leased | Storage Facility |
| 5150 Virginia Ave, North Charleston, SC 29405 -- Tanks 9303, 9305, 9307 | United States | Leased | Storage Facility |
| 101 North Lathrop Avenue, Savannah, GA 31415 -- Tanks 4, 14, 15, 16, 17, 19 | United States | Leased | Storage Facility |

| Premises Location | Country | Owned or Leased | Use of Premises |
|---|---|---|---|
| 19003 Frontage Rd, San Antonio, TX 78257 -- Tanks 5401, 5402, 5403, 5404, 1101, 1102, 1014, 1015 | United States | Leased | Storage Facility |
| Harbour Head Pen,  Rock Fort, Kingston 2 | Jamaica | Owned | Land/ Office |

## EXHIBIT K

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtors' Assets | Location |
|---|---|
| Vessels | Generally, the Debtors' vessels are located at sea in international waters or in a port, river, or other waterway.  Because of the nature of the Debtors' business, the Debtors' vessels often move locations.<br><br>As of the Petition Date, the Debtors have vessels in the following territorial waters or in port, river, or other waterway: Las Palmas, Canary Islands; Gibraltar; Jamaica; Trinidad & Tobago; Vancouver, Canada; Port Elizabeth, South Africa; Greece; Amsterdam-Rotterdam-Antwerp Region; Fujairah, U.A.E; and Labuan, Malaysia. |
| Marine Fuel Inventory | Generally, the Debtors store marine fuel inventory in storage facilities in various locations around the world, either on land or offshore. Because of the nature of the Debtors' business, the Debtors may move marine fuel among its storage facilities as needed for operations.<br><br>As of the Petition Date, the Debtors store marine fuel in the following locations, either on land or offshore: Tangier, Morocco; Gibraltar; Fujairah, U.A.E; Jamaica; Trinidad & Tobago; Las Palmas, Canary Islands; Port Elizabeth, South Africa; Vancouver, Canada; Germany; and Amsterdam-Rotterdam-Antwerp Region. |
| Books and Records; leased office space and various FF&E | 10 Akti Kondili, Piraeus, Greece 185 45 |
| Books and Records; leased office space and various FF&E | Holstenwall 5 – Hamburg D-20355, Germany |
| Books and Records; leased office space and various FF&E | Dalwitzhofer Weg 22a, 18055 Rostock, Germany |
| Books and Records; leased office space and various FF&E | Ruiterijschool 1, Brasschaat, Flemish Region 2930, Belgium |

## EXHIBIT L

### Summary of Legal Actions against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status |
|---|---|---|---|
| Aegean Marine Petroleum S.A. | Antonios Varouxis | Asserted claim for commission due for alleged services | The French Court of Appeal ruled on September 20, 2018 that it lacked jurisdiction, invited the parties to go before a court of competent jurisdiction |
| Aegean Marine Petroleum Network Inc. | Nick Simco and Robert Strougo | Securities Class Action claims | Two complaints were filed in June 2018 versus AMPNI, the ex-President and the ex-CFO of AMPNI, before the Southern District of New York |
| Aegean Marine Petroleum S.A. | Various end customers, potentially 30 or so in total | Potential customer claims for delivery of off-spec fuel | Communicating with customers regarding claims; no litigation commenced |
| Aegean Marine Petroleum S.A. | Tony Vertommen | Asserted claim for invalid termination | Received letter on  October 11, 2018, alleging invalid termination; no litigation commenced |
| Aegean Marine Petroleum S.A. | Theodoros Motsenigos | Claim for post termination wages | Judgment rendered for Motsenigos; appeal filed and set for hearing in November 2018 |
| Various vessels | Various third-party vessels, employees | Protection and Indemnity Claims | Ongoing litigation is various stages, including: awaiting claim or report, evaluating and/or negotiating claim, and finalizing claim settlement |
| Aegean Marine Petroleum Network, Inc. | American Express Travel Related Services Company, Inc. | Breach of Contract | Presently in arbitration |

## EXHIBIT M

### Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Jonathan Mcilroy<br>President | Mr. Mcilroy has nearly 25 years of experience in the shipping, energy and bunker trading markets. Mr. Mcilroy has served as Global Trading Manager of Aegean since January 2016. As Global Trading Manager, Mr. Mcilroy managed the expansion of the back-to-back trading division and has helped developed the commercial strategy, global marketing efforts and credit policies. Prior to joining Aegean, Mr. Mcilroy served as a Marketing Manager at Cockett Marine Oil from 2012 to 2015. Previously, he was a Credit Manager at Peninsula Petroleum from 2005 to 2012. Before Peninsula Petroleum, Mr. Mcilroy held roles with Platts, Infospectrum Ltd and MRC Business Information Ltd. Mr. Mcilroy received a BA and an MA with First Class Honors from the University of Oxford, Trinity College. | July 2017-Present<br><br>(Employment will terminate on November 15, 2018) |
| Kostas Polydakis<br>Chief Operating Officer | Kostas Polydakis has more than 20 years of experience in the shipping industry, including nearly 12 years at Aegean. Prior to his appointment as the Company's COO, he served as Managing Director of Shipping, a role in which he oversaw the creation of the Company's shipping division, growing it to a fleet of 50 tankers.<br><br>In his previous positions at Aegean as Technical Manager and Deputy General Manager of the Bunkering Services division from 2006 to 2017, Mr. Polydakis was responsible for the performance and day-to-day operations of all division departments. He also completed over 40 sale and purchase transactions and multiple new building projects, in addition to successfully reducing fleet operating expenses. | 2006 - Present<br><br>(Appointed COO in August 2018) |
| John G. Mysakidis<br>Chief Financial Officer | John Mystakidis brings more than 25 years of experience in financial reporting, financial management and auditing. He has supported and advised clients with significant cross-border presences and foreign operations. During 11 years at Ernst & Young, he acted as Lead Partner to multiple large Greek and multinational companies, helping them to address and resolve critical financial issues. Since May, Mr. Mystakidis has served as a full-time consultant to the Company.<br><br>Prior to Ernst & Young, Mr. Mystakidis was an Assurance and Business Advisory Partner at Arthur Andersen, where he supervised audits and due diligence reviews for a number of Greek and multinational clients. | August 2018 - Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| J.J. Metey<br>Vice President and Head of Corporate Development | Mr. Metey, Head of Corporate Development at Aegean, has more than 30 years of management and executive experience in the oil and servicing industry. Prior to joining Aegean in 2006, Mr. Metey spent more than 20 years in various roles with BP OIL, including Head of Bunkering with BP France and BP OIL U.K. and General Manager of Business Development at BP OIL International Supply and Trading in London. | 2006 - 2018<br><br>July 2017 - Present |
| Salvatore Drago<br>Global Director of Supply and Training | Sal Drago has over 25 years of experience trading fuel oil, feedstock and fuel blending components for key global bunkering locations. From 2013 Mr. Drago served as Aegean's Global Director of Supply and Trading, the position to which he has returned, leading the Company's arbitrage cargo movements, fuel oil blending and risk management efforts.<br><br>Previously, Mr. Drago spent nine years at Hess Corporation, where he was Managing Director, Fuel Oil and Feedstock Trading. There he led the company's transition from a fuel oil wholesaler to a fully integrated supply and trading organization, with retail bunkering operations in five U.S. ports. | 2013 - March 2018<br><br>August 2018 - Present |
| Spyridon Fokas<br>General Counsel, Corporate Secretary | Mr. Spyridon Fokas is General Counsel, Corporate Secretary, Director of Aegean Marine Petroleum Network Inc. He has been a member of the board of directors since June 2005. Mr. Fokas has also served as the General Counsel and as the Corporate Secretary since June 2005. Mr. Fokas currently is an attorney at S. Fokas – B. Koumbiadou Law Offices. Mr. Fokas has been practicing maritime law since 1982 and has represented the Company since 1998. Mr. Fokas is a member of the Greek Maritime Law Association and the Hellenic Society of Maritime Lawyers. Mr. Fokas holds a law degree from the University of Athens School of Law and has undertaken post-graduate studies in shipping law at the University College London. | 2005 - Present |

## <u>EXHIBIT N</u>

**Debtors' Payroll for the 30 Day Period Following the Filing of the
Debtors' Chapter 11 Petitions**

Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the estimate amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | Approx. $3.6 million |
| Payments to officers, directors, and stockholders | Approx. $0 |
| Payments to financial and business consultants | Approx. $10.0 million |

## EXHIBIT O

**Debtors' Estimated Cash Receipts and Disbursements for the Thirty (30) Day Period
Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
| --- | --- |
| Cash Receipts | Approx. $275 million |
| Cash Disbursements | Approx. $296 million |
| Net Cash Loss | Approx. $21 million |
| Unpaid Obligations (excluding professional fees) | Approx. $0 |
| Unpaid Receivables (excluding professional fees) | Approx. $0 |