Marc Kieselstein, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James H.M. Sprayregen, P.C
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) ) Case No. 18-13374 (___) ) |
| Debtors. | ) ) (Joint Administration Requested) ) |

**DEBTORS' MOTION**
**FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING**
**THE DEBTORS TO (A) CONTINUE TO OPERATE**
**THEIR CASH MANAGEMENT SYSTEM AND MAINTAIN**
**EXISTING BANK ACCOUNTS AND (B) CONTINUE TO PERFORM**
**INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration of Tyler Baron, Director of Aegean Marine Petroleum Network Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "Baron First Day Declaration"), and the *Declaration of Andrew Hede, Restructuring Advisor to Aegean Marine Petroleum Network Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "Hede First

## Relief Requested

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the  "Interim Order" and the "Final Order"), (a) authorizing the Debtors to (i) operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, and (ii) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described herein, and (b) granting related relief.

2.     In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

3.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

Day  Declaration"),  filed  contemporaneously  herewith  and  incorporated  by  reference  herein (collectively, the "First Day Declarations").

5.      The bases for the relief requested herein are sections 105, 345, 362, 363, and 553 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

### Background

6.      Aegean Marine Petroleum Network Inc. (together with its Debtor and non-Debtor subsidiaries ("Aegean"), is a leading marine fuel logistics company with approximately 850 employees and active operations in 20 countries worldwide.  The Debtors' core business involves marketing and physically supplying marine fuel and lubricants to vessels in port, at sea, on rivers and other waterways.  The Debtors own and/or operate a fleet of 57 vessels, including 37 owned double hull bunkering tankers, covering more than 50 ports worldwide, including Northern Europe and the Antwerp-Rotterdam-Amsterdam region (the "ARA Region"), the U.S. East and West Coasts, Gibraltar, Greece, Morocco, Canada, Jamaica, Trinidad and Tobago, the Gulf of Mexico, Germany, South Africa, and the U.S. Virgin Islands.  The Debtors also own or lease land-based storage facilities— consisting of two terminals and more than 1,000,000 cubic meters of storage capacity—in the United States, Morocco, Canary Islands, Germany, and the United Arab Emirates.  The Debtors are headquartered in Athens, Greece, and have a corporate office in New York, New York.  As of the date hereof (the "Petition Date"), the Debtors' funded debt obligations totaled approximately $855 million consisting of 12 secured credit facilities and two issuances of unsecured convertible notes.

7.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting

procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Cash Management System

### I.    Overview.

8.      As of the Petition Date, Aegean had approximately $3.2 million in available cash. This cash is managed through a system consisting of a U.S. and rest-of-world component in the ordinary course of business (together, the "Cash Management System"). As a part of the Cash Management System, the Debtors utilize approximately 187 bank accounts (collectively, the "Bank Accounts") that are held in 18 jurisdictions, with 28 banks, in 12 different currencies (collectively, the "Cash Management Banks").[3]

9.      The majority of the Debtors' cash receipts are generated through, or related to, the sale and bunkering of marine fuel oil and distillates, which receipts are then deposited into collection Bank Accounts that are pledged as collateral under the Debtors' Global Credit Facility or U.S. Credit Facility (each as defined in the Baron First Day Declaration) (collectively, the "Bank Facilities").[4] On an as-needed basis, the Debtors then move such cash from these pledged Bank Accounts to various operational Bank Accounts at the station, ship-owning, or ship-management level. The operational-level Bank Accounts generally are not pledged as collateral under the Bank Facilities, but may contain proceeds of collateral of the Debtors' secured lenders.

10.     The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate

---

[3]     In total, Aegean maintains 271 bank accounts as part of its broader cash management system, but 77 bank accounts are held in the name of non-Debtors.

[4]     The Debtors also generate revenue by chartering vessels to third parties.

cash monitoring, forecasting, and reporting. The Cash Management System allows the Debtors to control funds, ensure cash availability for each operating entity, and reduce administrative costs by facilitating the movement of funds among multiple entities. The Debtors' treasury departments in the United States, Greece, Germany, and the ARA Region maintain oversight over the Cash Management System and implement cash management controls for entering, processing, and releasing funds.

11.    As described herein, given the economic and operational scale of the Debtors' businesses, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of their estates and numerous stakeholders. Accordingly, to minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases, subject to the terms described herein.

## II.    The Bank Accounts.

12.    As of the Petition Date, the Cash Management System is comprised of 187 Bank Accounts, each of which is identified on **Exhibit C** attached hereto.[5] The Debtors' primary Cash Management Bank is ABN Amro Bank N.V. ("ABN"), with which the Debtors maintain 18 Bank Accounts. The Debtors also maintain Bank Accounts with a number of other banking institutions, including:

- 52 Bank Accounts at Aegean Baltic Bank S.A.;

- 44 Bank Accounts at Piraeus Bank S.A.;

---

[5]    The Debtors believe that **Exhibit C** is a complete list of their Bank Accounts. The Debtors request that the orders granting the relief sought herein apply to all Bank Accounts actually in, or linked to, the Cash Management System. To the extent that any Bank Account has inadvertently been omitted from that list, the Debtors request that the orders granting the relief sought herein apply to such account.

- Eight Bank Accounts at DBS;

- Seven Bank Accounts at Gibraltar Bank;

- Seven Bank Accounts at Berenberg;

- Six Bank Accounts at BNP Paribas;

- Six Bank Accounts at Bank of Montreal;

- Four Bank Accounts at Mashreq Bank;

- Four Bank Accounts at ETE;

- Three Bank Accounts at KBC Bank NV;

- Three Bank Accounts at United Arab Bank;

- Three Bank Accounts at Banco Popular;

- Three Bank Accounts at Scotiabank;

- Three Bank Accounts at Hellenic Bank; and

- Two or fewer Bank Accounts at multiple other financial institutions, as set forth on **Exhibit C**.

13.     The Bank Accounts generally fall into one of a number of broad categories in the

Debtors' various jurisdictions, each of which is described in the following tables:[6]

| Accounts | Description of the Cash Management System Accounts |
|---|---|
| **Collection Accounts** | The Debtors maintain approximately 5 Bank Accounts at ABN that are primarily funded through supply and trading revenue contracts (collectively, the "Collection Accounts").  The funds in the Collections Accounts are included in the Debtors' global borrowing base under the Debtors' Global Credit Facility and are subject to account pledge agreements.  Funds from Collections Accounts are primarily used to make distributions to fund certain of the Debtors' operational needs.  Funds are transferred from the Overdraft Accounts (defined below) on an as needed basis to cover any shortfalls.<br><br>As of the Petition Date, the Debtors had approximately $118,000 in the Collection Accounts on an aggregate basis. |
| **Overdraft Accounts** | The Debtors maintain approximately 4 Bank Accounts with ABN that are utilized for general corporate disbursements such as credit facility payments, |

---

[6]     These descriptions of Bank Account types are for illustrative purposes only.  A single Bank Account may fall into more than one of the categories described above.

| | |
|---|---|
| | transfers to Collection Accounts and general operating expenses (collectively, the "Overdraft Accounts"). The Overdraft Accounts are funded by proceeds from the Debtors' Global Credit Facility on an as-needed basis to cover disbursements to the Collection Accounts necessary to fund the Debtors' operational needs. The Overdraft Accounts generally do not carry a balance. |
| **Station Accounts** | The Debtors maintain approximately 39 Bank Accounts at the local station level that are used for, among other things, collection of cash receipts and to fund general disbursements such as payments to contract counterparties and affiliates on account of Intercompany Transactions (as defined below) and general operating costs (collectively, the "Station Accounts"). Certain of the Station Accounts held by Aegean Oil Terminal Corporation ("AOTC") are subject to a pledge and assignment account agreement. The Station Accounts also receive intercompany funding from the Collection Accounts on an as needed basis.<br><br>As of the Petition Date, the Debtors had approximately $1.1 million in the Station Accounts on an aggregate basis. |
| **Corporate Accounts** | The Debtors maintain approximately 57 general-purpose, corporate Bank Accounts that are not related specifically to the operations of any vessel-level entity or station-level entity (collectively, the "Corporate Accounts"). The majority of the Corporate Accounts were opened to facilitate the performance of a discrete function necessary to the Debtors' overall business and operations.<br><br>Of these 57 accounts, however, nine are held by Aegean Bunkering Services Inc. ("ABS") in various currencies as required by the payees with whom ABS interacts (the "ABS Accounts"). As described more fully herein, the ABS Accounts are the primary disbursement accounts for the Debtors' bunkering operations and charter out operations (other than with respect to the Greek Fleet (as defined herein)).<br><br>As of the Petition Date, the Debtors had approximately $2.1 million in the Corporate Accounts on an aggregate basis. |
| **Vessel Accounts** | The Debtors' vessel-owning entities maintain approximately 81 Bank Accounts (collectively, the "Vessel Accounts"). In general, the Vessel Accounts receive cash and fund general disbursements such as payments to contract counterparties and affiliates and payment of general operating costs. Certain of the Vessel Accounts are subject to operating account pledges in connection with their respective vessel loans.<br><br>As of the Petition Date, the Debtors had approximately $2.7 million in the Vessel Accounts on an aggregate basis. |
| **U.S. Bank Accounts** | The Debtors maintain seven Bank Accounts in the United States, which support the operations of Aegean Bunkering (USA), LLC ("ABUSA") (collectively, the "U.S. Bank Accounts"). The U.S. Bank Accounts consist of: (a) four operating accounts at ABN,[7] JPMorgan Chase Bank ("Chase"), and Citizens Bank, respectively; and (b) one savings account at Chase. |

---

[7]   ABUSA has a collection account with ABN AMRO Capital USA LLC, which operates by payment of receivables into an account at Wells Fargo Bank N.A. in the name of and owned by ABN AMRO Capital USA LLC. The funds in that account are subject to ABN AMRO Capital USA LLC's control and are released from time to time for use by ABUSA in the ordinary course of business, subject to the rights of the prepetition ABL secured parties.

| | |
|---|---|
| | As of the Petition Date, the Debtors had approximately $521,000 in the U.S. Bank Accounts on an aggregate basis. |
| **Hedging Account** | Debtor ABUSA maintains one Bank Account with Bank of America that is used to settle margin calls for the Debtors' hedging activities (the "Hedging Account"). |
| | As of the Petition Date, the Debtors had approximately $3.1 million in the Hedging Account. |

14. The Debtors incur periodic service charges and other fees in connection with the use and maintenance of the Cash Management System ("Bank Fees"). The Debtors pay the Cash Management Banks an aggregate of approximately $35,000 per month on account of the Bank Fees, which are generally due and paid monthly. As of the Petition Date, the Debtors estimate that they owe the Cash Management Banks approximately $35,000 on account of unpaid Bank Fees, the entirety of which will come due and payable within the interim period. The Debtors seek authority to continue paying Bank Fees, including the prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

### III. Ordinary Course Cash Flows and Intercompany Transactions.

15. The Debtors' cash flows and Intercompany Transactions vary depending on business segment, but can generally be categorized into three areas: (a) U.S. Operations; (b) Charter Out Operations; and (c) Bunkering Operations.

### A. U.S. Operations.

16. The Debtors' U.S. Operations are conducted primarily by ABUSA, which manages delivery of marine fuel oil and distillate to its customers. In a typical scenario, ABUSA responds to buyer indications of interest and arranges for delivery of marine fuel, which it stores in various storage terminals in various ports in the U.S., and then contracts with a barge operator to deliver the product to the customer. Revenues generated through this U.S. system are deposited into

ABUSA's collection account operated by ABN AMRO Capital USA LLC or operations accounts at Chase and Citizens Bank. ABUSA then pays its operating expenses from these same accounts. A schematic detailing the flow of funds for the U.S. Operations is included below:



### B.    Charter Out Operations.

17.    The Debtors have a fleet of approximately 41 vessels, 38 of which are utilized to deliver fuel to end customers throughout the world. Each vessel is owned by an individual operating entity, which enter into charter arrangements with either AMP or unaffiliated third parties to deliver fuel to end customers. Vessel owning entities also enter into management agreements with: (a) ABS, if the entity is operating outside Greek territorial waters, or (b) Debtor Aegean Management Services Maritime Company Co. ("AMS"), if the vessel is operating inside Greek territorial waters. Each of ABS and AMS receive a monthly fee for their services, typically settled in cash on an as-needed basis from one of the Vessel Accounts or via other Intercompany

Transactions (as defined below).

### (1)    Intercompany Charter Operations.

18.    Vessel-owning entities enter into charter agreements with AMP for delivery of marine fuel to end customers.  In these instances, the vessel-owning entities are not paid in cash, but instead, are compensated via an intercompany receivable from AMP.  These entities also incur expenses over the course of a charter, as well as for debt service, the majority of which are paid directly by ABS from one of the ABS Accounts as part of its management services for the vessel. The remaining portions of a vessel's expenses are paid in cash from its respective Vessel Account. An illustrative schematic of intercompany Charter Operations is set forth below:



### (2)    Greek Fleet Operations.

19.    Similarly, the Debtors charter-out their Greek-owned vessels (the "Greek Fleet") to Aegean Oil S.A.  Revenues generated through chartering of the Greek Fleet are deposited into Vessel Accounts associated with the respective vessel-entity and then used to pay operating expenses and make other disbursements.  On occasion, ABS may transfer funds to Vessel Accounts maintained by Greek Fleet Debtors in order to cover temporary shortfalls in the Greek Fleet's ability to pay operating expenses.  These transfers are made only pursuant to an

intercompany loan agreement.   A schematic detailing the flow of funds for the Greek Fleet

Operations is included below:



**(3)    RoW Charter Out Operations.**

20.    The Debtors' non-Greek vessel-owning entities also generate revenue by chartering

vessels to third parties such as oil companies (the "RoW Charter Out Operations").  These third-

party charters generate revenue at the relevant vessel-owning entity, which are either (a) paid to

ABS, who collects the receipts on behalf of the vessel-owning entity and deposits them in one of

the ABS Accounts, or (b) to the vessel-owning entity directly via deposit into its applicable Vessel

Account.  In the latter scenario, the vessel-owning entity than transfers the funds from its Vessel

Account to one of the ABS Accounts, the receipts of which are then be used to satisfy vessel-

operating expenses, such as wages and insurance, and debt service.  Except with respect to the

Greek Fleet, ABS pays these expenses directly.

21.    An illustrative schematic of the Debtors' non-Greek charter out operations is set

forth below:



C.    **Bunkering Operations.**

22.    The Debtors have approximately 19 station-level offices in various ports throughout the world, which manage the purchase and sale of marine fuel oil and distillates by region.  In a typical scenario, Debtor Aegean Marine Petroleum S.A. ("AMP") contracts with customers for the sale of bunker fuel.  AMP then procures the end product from a fuel supplier, purchasing fuel with cash transferred from a Collection Account.  Station-level entities then manage the process of delivering the product to the end customer, incurring various expenses in connection therewith, which either are paid from (a) one of the Station Accounts associated with that particular entity, (b) from one of the ABS Accounts pursuant to a management services agreement, or (c) from a Corporate Account designated for a particular type of disbursement. AMP's customer receipts are deposited into one of the Collection Accounts and transferred as needed to a Station Account, ABS Account, or Corporate Account to cover payment of the foregoing operating expenses and, in some instances, debt service.

23.    Below is an illustrative schematic of the typical flow of funds for the Bunkering

Operations:



24.     With respect to revenues from third-party storage leases at their station in the

United Arab Emirates, the revenues flow into a restricted Station Account held by AOTC and

established in connection with the 2015 Fujairah Secured Term Loan (as defined in the Baron First

Day Declaration).  The amounts in this account are then used to pay AOTC's operating expenses,

including debt service on the 2015 Fujairah Secured Term Loan.  To the extent there any funding

shortfalls, cash is transferred by AMP on an as-needed basis from one of its Collection Accounts.

A schematic illustrating the cash management system at AOTC is set forth below:



## IV.    The Cash Management System's Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.

### A.    U.S. Trustee Authorized Depositories.

25.    The *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee").  Only three of the Cash Management Banks—JP Morgan Chase, Bank of America, and Citizens Bank, where the Debtors maintain 4 of the 187 Bank Accounts—is an authorized depository under the U.S. Trustee Guidelines, while the remaining Cash Management Banks are not.

26.    The Cash Management System spans 18 countries and holds funds in 12 different currencies at 28 different banking institutions.  Many of the Debtors' Bank Accounts are maintained at highly rated, global financial institutions that are widely recognized as well-capitalized and financially stable.  The principal basis for the exclusion of certain of these financial institutions from the U.S. Trustee Guidelines is location, not financial soundness or

stability. Indeed, many of these institutions are simply based outside of the United States, and thus, less likely to be identified by the U.S. Trustee as an authorized depository. For example, ABN Amro, where the Debtors maintain a significant amount of the Bank Accounts, is based in the Netherlands, but has a credit rating comparable to that of JP Morgan Chase, which is an authorized depository.

27.    182 of the 187 Bank Accounts are held in jurisdictions with depository insurance schemes. The other 9 Bank Accounts are held in a jurisdiction (*i.e.*, the United Arab Emirates), where the Debtors must maintain Bank Accounts for regulatory and/or operational reasons. The Debtors believe that these financial institutions are well positioned to perform the depository and cash management functions during the chapter 11 cases and, accordingly, respectfully submit that cause exists to allow the Debtors to continue utilizing the existing Bank Accounts consistent with historical practices. Given the global scope of the Debtors' operations and cash management requirements, it is not feasible to consolidate all cash activities to the narrow group of financial institutions approved in the U.S. Trustee Guidelines.

28.    As described herein, the Cash Management System is complex and critical to the ongoing stability of the Debtors' businesses and transition into chapter 11. Requiring the Debtors to transfer any of the above-described Bank Accounts to a designated authorized depository would place needless and excessive administrative burdens on the Debtors and impose significant, value-destructive costs to their estates. Any effort to relocate the Debtors' entire Cash Management System into strictly U.S. accounts could also potentially have significant tax or regulatory impacts in numerous jurisdictions, all of which would necessitate extensive diligence and analysis to ensure that no unwanted or detrimental effects would arise. Given the breadth of jurisdictions involved, such an analysis would require a tremendous amount of time and resources,

all to the detriment of the Debtors' estates at the outset of these chapter 11 cases. Any significant modification to the Debtors' Cash Management System may require the consent of the lenders under the Bank Facilities (collectively, the "Bank Lenders")—which the Debtors do not have. In any event, the Debtors will continue to work in good faith with the U.S. Trustee to resolve any concerns regarding the continued use of these Bank Accounts on a postpetition basis.

**B.    The Debtors' Purchase Cards.**

29.    As part of the Cash Management System, the Debtors provide certain employees with purchase or debit cards (the "Purchase Cards") issued by American Express and Bank of Cyrpus (the "Purchase Card Program"). The Purchase Cards are utilized by the employees for approved business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business. Costs that employees incur through use of the Purchase Card are debited to the Debtors on a monthly basis. The Debtors seek authority, as applicable, to continue the Purchase Card Program and pay any amount due and owing thereunder in the ordinary course of business on a postpetition basis.

**C.    Business Forms and Books and Records.**

30.    As part of the Cash Management System, the Debtors use a variety of preprinted business forms (including checks, letterhead, correspondence forms, invoices, and other business forms) in the ordinary course of business (collectively, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records"). To minimize administrative expense to their estates and avoid significant disruption to their business operations and confusion among the Debtors' employees, customers suppliers, and vendors (many of whom are foreign and unfamiliar with the U.S. bankruptcy process) during these chapter 11 cases, the Debtors request authorization to continue using all of the Business Forms and Books and Records in a manner consistent with

prepetition practice, without reference to the Debtors' status as chapter 11 debtors in possession, *provided* that the Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new U.S. Business Forms are clearly labeled "Debtor In Possession" and with respect to any U.S. Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

## V.    The Debtors' Intercompany Transactions.

31.    The Debtors operate as a global integrated enterprise, and thus, the Debtors engage in intercompany transactions with each other and with non-Debtor affiliates (each a "Non-Debtor Affiliate", and collectively, the "Non-Debtor Affiliates") in the ordinary course of their business (the "Intercompany Transactions").  The Intercompany Transactions cover a number of different categories, including, but not limited to:  (a) intercompany management services agreements, which cover various intercompany transactions between certain vessel-owning entities in exchange for market or below-market shared services fees that are typically settled in cash; (b) payments, typically settled as journal entries, made pursuant to intercompany chartering arrangements, whereby a vessel-owning entity leases a vessel to the customer-facing entity, who in turn contracts with the third-party end customer; (c) intercompany loans, typically settled as journal entries, to address funding needs on an ad hoc basis; and (d) intercompany accounts receivable and accounts payable when one Debtor entity pays for services provided by another entity, which are typically settled in cash.  In addition, ABS routinely collects receivables and satisfies payables of certain vessel-owning entities as a de facto agent, which amounts may be subject to settlement as Intercompany Transactions pursuant to a management services agreement or otherwise.

32.    At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or Non-Debtor Affiliate.  Each payment from a Debtor and each bookkeeping entry between Debtors and between Debtors and Non-Debtor Affiliates on account of a postpetition Intercompany Transaction (each, a "Postpetition Intercompany Transaction") is an essential component of the Cash Management System.

33.    In certain instances, Intercompany Transactions between Debtors and between Debtors and Non-Debtor Affiliates are "netted" to allocate outstanding amounts due and owing at the Debtors' discretion.  By this Motion, the Debtors respectively request to continue these "netting" practices postpetition in the ordinary course of business.  The Debtors additionally request authority to continue entering into ordinary course Intercompany Transactions between Debtors and Non-Debtor Affiliates.  The Debtors have implemented internal mechanisms that will permit them, with the assistance of their advisors, to track the balance of all prepetition and Postpetition Intercompany Transactions.

34.    The Intercompany Transactions are an essential component of the Debtors' complex global operations, and they are crucial for the Debtors' ability to process payroll and payments to third-party vendors, provide enterprise-wide management and support services, and otherwise facilitate Vessel Operations on a daily basis.  The Debtors would be unduly burdened both financially and logistically if the Debtors were required to halt Intercompany Transactions or otherwise make material changes to the Intercompany System.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders. The Debtors seek the authority—and, to the extent applicable, relief from the automatic stay—to

continue the Intercompany Transactions in the ordinary course of business consistent with past practice.

**Basis for Relief**

**I.      The Court Should Approve the Debtors' Continued Use of the Cash Management System as Essential to the Debtors' Operations and Restructuring Efforts.**

35.      The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for payment of taxes including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor in possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement. *See Region 2 Guidelines for Debtors-in-Possession.* These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims. Considering, however, the breadth and complexity of the Debtors' international businesses and financial affairs and the sheer volume of collections, disbursements, and movement of funds through the Cash Management System on a daily basis, enforcement of these provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt, if not cripple, the Debtors' worldwide operations. Accordingly, the Debtors respectfully request that the Court allow them to operate each of the Bank Accounts that comprise the Cash Management System as each was maintained in the ordinary course of business before the Petition Date and as described herein.

36.      Continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use

19

property of the estate in the ordinary course without notice or a hearing." Section 363(c)(1) of the Bankruptcy Code also allows a debtor in possession to engage in ordinary course transactions required to operate its business without additional oversight from its creditors or the court. *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, Case No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (stating same). Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *In re Frigitemp Corp.*, 34 B.R. 1000, 1010 (S.D.N.Y. 1983), *aff'd*, 753 F.2d 230 (2d Cir. 1985); *see also Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).

37.     Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' worldwide operations. Importantly, the Cash Management System provides the Debtors with the ability to ensure cash availability to companies located throughout the world, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. In light of the size and complexity of the Debtors' worldwide operations, any disruption of the Cash Management System could have a severe adverse effect on the Debtors' restructuring efforts, the cost of which would ultimately be borne by the Debtors' creditors and other stakeholders. Indeed, the Debtors' treasury department does not have enough staff to run another, separate cash management system. By contrast, maintaining the current Cash Management System will facilitate the Debtors' smooth transition into chapter 11 by, among other

things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities as opposed to the non-accretive task of reconstructing the Cash Management System.

38.     Moreover, parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions. The Debtors have implemented appropriate mechanisms to ensure that Debtor entities will not make unauthorized payments on account of prepetition obligations, and, aside from the payment of professional fees, all Cash Management System activities will be made by cash that constitutes cash collateral, with the consent of the Bank Lenders. In light of such protective measures, and consent of the relevant parties, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

39.     The Debtors further request that the Court authorize and direct the Cash Management Banks to receive, process, honor, and pay any and all checks, electronic fund transfer, credit card, ACH payments and other instructions, and drafts payable through, or drawn or directed on, such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, electronic fund transfers, credit card, or ACH payments are dated prior or subsequent to the Petition Date. The Debtors also respectfully request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion, either at the direction of the Debtors or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. Such relief

21

is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise. Considering the breadth and complexity of their international operations, the Debtors need to conduct transactions by debit, electronic fund, ACH payments, and other similar methods. If the Debtors are denied the opportunity to conduct transactions by debit, electronic fund, ACH payments, or other methods used in the ordinary course of business, the Debtors likely would have difficulty performing on their contracts and the Debtors' business operations would be disrupted unnecessarily, burdening the Debtors and their creditors with additional costs.

40.     Finally, the Debtors respectfully request that the Court authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees. In light of the material benefit of maintaining the Cash Management System in order to avoid unnecessary disruption and costly delay, especially as compared to the relatively modest amount of the Bank Fees, the Debtors respectfully submit that such relief is warranted under the circumstances.

41.     Courts in this district have regularly waived certain U.S. Trustee Guidelines and allowed the continued use of cash management system and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business. *See, e.g.*, *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018) (allowing debtors to continue using their cash management system); *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2018) (same); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. June 20, 2017) (same); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y.

Mar. 31, 2017) (same); *In re Ultrapetrol (Bahamas) Limited*, Case No. 17-22168 (RDD) (Bankr.

S.D.N.Y. Mar. 8, 2017) (same).[8]

## II.     The Debtors Should Be Granted Authority to Use Existing Business Forms.

42.     To avoid disruption of the Cash Management System and unnecessary expense, the

Debtors request that they be authorized to continue to use their Business Forms, substantially in

the form existing immediately before the Petition Date, without reference to their status as debtors

in possession.  The Debtors submit that, given the limited nature of the preprinted Business Forms,

parties in interest will not be prejudiced if the Debtors are authorized to continue to use their

Business Forms substantially in the forms existing immediately before the Petition Date.  Parties

doing business with the Debtors undoubtedly will be aware of their status as debtors in possession

and, thus, changing forms such as letterhead would be an unnecessary additional expense and

unduly burdensome.  Moreover, due to the international scope of the Debtors' operations, many

of the parties doing business with the Debtors are foreign.  These parties may be unfamiliar with

the chapter 11 process and therefore the modifications to the Business Forms will have limited, if

any, meaning to these parties, particularly when weighed against the attendant costs of updating

their Business Forms.  Moreover, once the Debtors have exhausted their existing stock of U.S.

Business Forms, they will ensure that any new U.S. Business Forms are clearly labeled "Debtor

In Possession" and with respect to any U.S. Business Forms that exist or are generated

electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled

"Debtor In Possession."

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
Copies of these orders are available upon request to the Debtors' proposed counsel.

43.     In other chapter 11 cases, courts in this district have allowed debtors to use their

prepetition business forms without the "debtor in possession" label.  *See, e.g.*, *In re Nine West*

*Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018) (authorizing use of

existing business forms); I*n re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2018)

(same); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y.

June 20, 2017) (same); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 31,

2017) (same); *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 3, 2016)

(same).

## III.    The Court Should Authorize the Debtors to Continue Engaging in Postpetition Intercompany Transactions.

44.     Allowing the Debtors to engage in Postpetition Intercompany Transactions is in the

best interests of the Debtors' estates and their creditors, and the Debtors seek authority to enter

into such Postpetition Intercompany Transactions in the ordinary course of business.[9]  The Debtors

respectfully submit that Postpetition Intercompany Transactions arising in the ordinary course are

authorized as a matter of law pursuant to section 363(c)(1) of the Bankruptcy Code for which no

additional relief is required.

45.     The Debtors respectfully submit that the relief requested herein fairly balances the

Debtors' needs to facilitate the ordinary course operation of their business, minimize disruption,

and preserve value, on the one hand, with the interests of their stakeholders in transparency, on the

other hand.  The requested relief will also ensure that a Debtor's estate will not be unduly burdened

by the cost of transfers to Debtor and Non-Debtor Affiliates.  As noted above, the Debtors request

---

[9]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common
among similar enterprises, the Debtors believe the Postpetition Intercompany Transactions are ordinary course
transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's
approval.

authority to continue Postpetition Intercompany Transactions in the ordinary course (including with respect to "netting" or setoffs taken in the ordinary course). The Debtors respectfully submit that such a structure reflects a fair balance of interests.

46.    Additionally, the Debtors respectfully request that this Court order: (a) that all valid postpetition payments from a Debtor to another Debtor or from a Non-Debtor Affiliate to a Debtor on account of a Postpetition Intercompany Transaction shall be accorded administrative expense status;  and (b) unless prohibited by applicable law, transfers made by a Debtor to a Non-Debtor Affiliate pursuant to a Postpetition Intercompany Transaction (including disbursements from the Concentration Account) shall be deemed a claim against, and loan to, such Non-Debtor Affiliate (and not a contribution of capital), in each case except to the extent such Postpetition Intercompany Transactions are on account of antecedent debts. As noted above, the Debtors believe such relief is necessary to ensure that a particular Debtor's estate will not be required to fund the operations of other Debtors and Non-Debtor Affiliates without adequate recompense.

47.    Similar relief has been granted in other similarly situated chapter 11 cases in this district and other districts. *See, e.g.*, *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018) (allowing intercompany transactions to continue); *In re Cenveo, Inc.*, No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2018) (same); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. June 20, 2017) (same); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 31, 2017) (same); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. June 15, 2016) (same).

IV.    **Cause Exists for Waiving the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis.**

48.    To the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code, the Debtors further seek a waiver, both on an interim and final basis, of the deposit and investment requirements set forth therein.

49.    Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."  Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more Authorized Depositories.

50.    Courts may waive compliance with the Bankruptcy Code section 345 and the U.S. Trustee Guidelines for "cause."  In evaluating whether "cause" exists, courts have considered a number of factors such as:

(1)    the sophistication of the debtor's business;

(2)    the size of the debtor's business operations;

(3)    the amount of the investments involved;

(4)    the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

(5)    the complexity of the case;

(6)     the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(7)     the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(8)     the benefit to the debtor;

(9)     the harm, if any, to the debtor;

(10)    the harm, if any, to the estate; and

(11)    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

See In re Serv. Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

51.     Because the Bank Accounts are vital to the Cash Management System, requiring the Debtors to transfer funds to other banks would be unduly burdensome to the Debtors' operations, which span multiple jurisdictions and currencies, and potentially cause severe tax consequences to the detriment of the Debtors' estates.   In addition, the Bank Accounts are maintained at well-capitalized, highly-rated banks, hold only de minimis cash amounts, or are otherwise necessary for the Debtors to transact in certain jurisdictions.   Therefore, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business.

52.     Courts in this district and others granted relief similar to that requested herein in other complex, multi-jurisdictional chapter 11 cases.   See, e.g., In re Genco Shipping & Trading Ltd., No. 14-11108 (SHL) (Bankr. S.D.N.Y. July 3, 2014) (waiving application of deposit and investment guidelines set forth in section 345); In re Excel Maritime Carriers Ltd., No. 13-23060 (RDD) (Bankr. S.D.N.Y. Dec. 9, 2013) (same); In re General Maritime Corp., No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 28, 2011) (same); In re Seadrill Ltd., No. 17-60079 (DRJ) (Bankr. S.D.

Tex. Oct. 24, 2017 (same); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. July 13, 2017).

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

53.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 25 days of these chapter 11 cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

54.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

55.     Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Interim Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or

(f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

### Motion Practice

56.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

### Notice

57.     Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances.  Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties- in-interest, including (a) the Office of the United States Trustee for the Southern District of New York; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents for each of the Debtors' secured credit facilities; (d) the indenture trustee for each of the Debtors' unsecured notes; (e) counsel to the ad hoc group of unsecured noteholders; (f) counsel to the Stalking Horse Bidder; (g) counsel to the agent under the Debtors' debtor-in-possession financing facility; (h) counsel to the parties (if known) referenced in clauses (c) and (d); (i) the Office of the United States Attorney for the Southern District of New York; (j) the state attorneys general for states in which the Debtors conduct business; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) the Cash Management Banks; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

58.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

New York, New York
Dated:  November 6, 2018

/s/ Jonathan S. Henes P.C.

Marc Kieselstein, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-13374 (___) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO**
**(A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM AND**
**MAINTAIN EXISTING BANK ACCOUNTS AND (B) CONTINUE TO PERFORM**
**INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an interim order (this "Interim Order") (a) authorizing the Debtors to (i) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto and (ii) continue intercompany transactions and funding consistent with historical practice, as modified as set forth herein and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean. The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances  and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis only as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2018, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2018, and shall be served on:  (a) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Jonathan S. Henes, P.C. and Cristine Pirro Schwarzman, and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Marc Kieselstein, P.C., Ross M. Kwasteniet, P.C., Adam C. Paul, P.C., and W. Benjamin Winger; (b) the Office of The United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Brian S. Matsumoto and Andrew Velez-Rivera; (c) counsel to any statutory committee appointed in these cases; (d) counsel to the agents for each of the Debtors' secured credit facilities; (e) counsel to the Stalking Horse Bidder, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005 (Attn: Abhilash Raval,

Esq. and Lauren C. Doyle, Esq.); (f) counsel to the agent under the Debtors' debtor-in-possession financing facility, Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, Texas 77010-3095 (Attn: Louis Strubeck, Esq. and Josh Agrons, Esq.); and (g) counsel to the indenture trustee for each of the Debtors' unsecured notes.  In the event no objections to entry of a final order on the Motion are timely received, the Court may enter such final order without need for the final hearing.

3.    Subject to the limitations of this Interim Order, the Debtors are authorized, but not directed, to: (a) continue using the Cash Management System as described in the Motion and honor any prepetition obligations related to the use thereof; (b) designate, maintain, close, and continue to use on an interim basis any or all of their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on **Exhibit C** attached to the Motion, in the names and with the account numbers existing immediately before the Petition Date; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, electronic fund transfers, ACH transfers, and other debits or electronic means; (d) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; and (e) open new debtor in possession Bank Accounts.

4.    The Debtors are authorized, but not directed, to continue using the Purchase Cards and the Purchase Card Program in the ordinary course of business and consistent with prepetition practices, including by paying obligations outstanding with respect thereto, subject to the limitations of this Interim Order and any interim and final order(s) of this Court granting the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and  (B) Continue Employee Benefits Programs and (II) Granting Related Relief [Docket No [●]].*

3

5.      The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms (including Purchase Cards), as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, and maintain and continuing using, in their present form, the Books and Records *provided, however*, that once the Debtors have exhausted their existing stock of U.S. Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor In Possession" and *provided, further*, that with respect to any U.S. Business Forms that are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

6.      Except as otherwise provided in this Interim Order and only to the extent funds are available in each applicable Bank Account, all Cash Management Banks at which the Bank Accounts are maintained are directed to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, electronic fund transfers, and ACH transfers issued, whether before or after the Petition Date, and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

7.      The Cash Management Banks are authorized to charge, and the Debtors are authorized to pay, honor, or allow any Bank Fees or charges associated with the Bank Accounts, and charge back returned items to the Bank Accounts in the ordinary course.

8.      As soon as practicable after entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on the Cash Management Banks.

9.      The Debtors are authorized, but not directed to:  (a) pay undisputed prepetition amounts outstanding as of the Petition Date, if any, owed in the ordinary course to the Cash Management Banks as service charges for the maintenance of the Cash Management System; and

(b) reimburse the Cash Management Banks for any claims arising before or after the Petition Date in connection with customer checks deposited with the Cash Management Banks that have been dishonored or returned as a result of insufficient funds in the Bank Accounts in the ordinary course of business, to the same extent the Debtors were responsible for such items prior to the Petition Date.

10.     The Debtors are authorized, but not directed, to enter into and engage in the Intercompany Transactions, including Intercompany Transactions with Non-Debtor Affiliates, and to take any actions related thereto on the same terms as, and materially consistent with, the Debtors' operation of the business in the ordinary course during the prepetition period.  Each payment (or other transfer of cash) from a Debtor to another Debtor under any Postpetition Intercompany Transaction hereby grants to the applicable transferring Debtor a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority security interest in such transferred cash, the bank account where such cash is held, and the receivable held by the transferee Debtor if such cash is further transferred by such Debtor, is hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code.

11.     The Debtors are authorized, but not directed, to set off mutual postpetition obligations relating to intercompany receivables and payables through the Cash Management System.  In connection therewith, the Debtors shall continue to maintain current records with respect to all transfers of cash so that all transactions, including Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.

12.     Those certain deposit agreements existing between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks and, subject to applicable bankruptcy or

other law, all of the provisions of such agreements, including the termination, fee provisions,

rights, benefits, offset rights and remedies afforded under such agreements shall remain in full

force and effect absent further order of the Court or, with respect to any such agreement with any

Cash Management Bank (including, for the avoidance of doubt, any rights of a Cash Management

Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to

the extent permitted under the applicable deposit agreement), unless the Debtors and such Cash

Management Bank agree otherwise, and any other legal rights and remedies afforded to the Cash

Management Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

13.     Except as otherwise set forth herein, the Debtors and the Cash Management Banks

may, without further order of the Court, agree and implement changes to the Cash Management

System and procedures in the ordinary course of business.

14.     The Debtors are authorized to open new bank accounts so long as the Debtors

provide notice to the U.S. Trustee and the Notice Parties of the opening of such account; *provided*

that all accounts opened by any of the Debtors on or after the Petition Date at any bank shall, for

purposes of this Interim Order, be deemed a Bank Account as if it had been listed on **Exhibit C**

attached to the Motion.

15.     The relief granted in this Interim Order is extended to any new bank account opened

by the Debtors after the date hereof, which account shall be deemed a Bank Account, and to the

bank at which such account is opened, which bank shall be deemed a Cash Management Bank.

16.     In the event that any third party deposits funds (whether before, on or after, the

Petition Date) into a Bank Account other than the Bank Account identified by the Debtors to such

third party, such funds shall as soon as reasonably practicable be swept into the correct account.

6

17.    Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines requiring that the Bank Accounts be U.S. Trustee authorized depositories is waived with respect to the Bank Accounts existing as of the Petition Date; provided, however, that, pending entry of a Final Order, the Debtors will consult in good faith with the U.S. Trustee regarding the operation of the Cash Management System and potential arrangements (if any) for bringing the Bank Accounts into compliance with section 345.

18.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Interim Order or any payment made pursuant to this Interim Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors (other than as provided for herein), a waiver of the Debtors' rights to subsequently dispute such claim or lien (other than such claim or lien provided for herein), or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

19.    Notwithstanding any other provision of this Interim Order, should a Cash Management Bank honor a prepetition check or other item drawn on any account that is the subject of this Interim Order (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as the result of an innocent mistake made despite implementation of customary item handling procedures, the Cash Management Bank shall not be deemed to be nor shall be liable to the Debtors or their estates or otherwise be in violation of this Interim Order.  Without limiting the foregoing, any of the Cash Management Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of the Court, and such Cash

7

Management Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

20.     Nothing contained herein shall prevent the Debtors from closing any Bank Accounts as they may deem necessary and appropriate, to the extent consistent with any orders of this Court relating thereto, any relevant bank is authorized to honor the Debtors' requests to close such Bank Accounts, and the Debtors shall give written notice of the closure of any account to the U.S. Trustee.

21.     Notwithstanding entry of this Interim Order, nothing herein shall create, or is intended to (i) create, any rights in favor of or enhance the status of any claim held by any party or (ii) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

22.     Notwithstanding the relief granted in this Interim Order, any relief granted herein or payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and any budget in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith (in either case, the "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and any relief granted or action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

23.     If no objections to the relief granted herein on a permanent basis are timely served and filed in accordance with this Interim Order, the Court may enter a final order granting the relief herein without further notice or hearing.

24.     All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

26.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

27.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

29.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2018

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-13374 (___) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM AND MAINTAIN EXISTING BANK ACCOUNTS AND (B) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of a final order (this "Final Order") (a) authorizing the Debtors to (i) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto and (ii) continue intercompany transactions and funding consistent with historical practice, as modified as set forth herein and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis only as set forth herein.

2.      Subject to the limitations of this Final Order, the Debtors are authorized, but not directed, to: (a) continue using the Cash Management System as described in the Motion and honor any prepetition obligations related to the use thereof; (b) designate, maintain, close, and continue to use on a final basis any or all of their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on **Exhibit C** attached to the Motion, in the names and with the account numbers existing immediately before the Petition Date; (c) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, electronic fund transfers, ACH transfers, and other debits or electronic means; (d) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; and (e) open new debtor in possession Bank Accounts.

3.      The Debtors are authorized, but not directed, to continue using the Purchase Cards and the Purchase Card Program in the ordinary course of business and consistent with prepetition

2

practices, including by paying obligations outstanding with respect thereto, subject to the limitations of this Final Order and any interim and final orders of this Court granting the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No.[●]]*.

4.    The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms (including Purchase Cards), as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, and maintain and continue using, in their present form, the Books and Records.

5.    Except as otherwise provided in this Final Order and only to the extent funds are available in each applicable Bank Account, all Cash Management Banks at which the Bank Accounts are maintained are directed to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, electronic fund transfers, and ACH transfers issued, whether before or after the Petition Date, and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

6.    The Cash Management Banks are authorized to charge, and the Debtors are authorized to pay, honor, or allow any Bank Fees or charges associated with the Bank Accounts, and charge back returned items to the Bank Accounts in the ordinary course.

7.    As soon as practicable after entry of this Final Order, the Debtors shall serve a copy of this Final Order on the Cash Management Banks.

8.    The Debtors are authorized, but not directed to:  (a) pay undisputed prepetition amounts outstanding as of the Petition Date, if any, owed in the ordinary course to the Cash

Management Banks as service charges for the maintenance of the Cash Management System; and (b) reimburse the Cash Management Banks for any claims arising before or after the Petition Date in connection with customer checks deposited with the Cash Management Banks that have been dishonored or returned as a result of insufficient funds in the Bank Accounts in the ordinary course of business, to the same extent the Debtors were responsible for such items prior to the Petition Date.

9.      The Debtors are authorized, but not directed, to enter into and engage in the Intercompany Transactions, including Intercompany Transactions with Non-Debtor Affiliates, and to take any actions related thereto on the same terms as, and materially consistent with, the Debtors' operation of the business in the ordinary course during the prepetition period. Each payment (or other transfer of cash) from a Debtor to another Debtor under any Postpetition Intercompany Transaction hereby grants to the applicable transferring Debtor a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority security interest in such transferred cash, the bank account where such cash is held, and the receivable held by the transferee Debtor if such cash is further transferred by such Debtor and is hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code.

10.     The Debtors are authorized, but not directed, to set off mutual postpetition obligations relating to intercompany receivables and payables through the Cash Management System. In connection therewith, the Debtors shall continue to maintain current records with respect to all transfers of cash so that all transactions, including Intercompany Transactions, may be readily ascertained, traced, and recorded properly on applicable intercompany accounts.

11.     Those certain deposit agreements existing between the Debtors and the Cash Management Banks shall continue to govern the postpetition cash management relationship

between the Debtors and the Cash Management Banks and, subject to applicable bankruptcy or other law, all of the provisions of such agreements, including the termination, fee provisions, rights, benefits, offset rights and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with any Cash Management Bank (including, for the avoidance of doubt, any rights of a Cash Management Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account to the extent permitted under the applicable deposit agreement), unless the Debtors and such Cash Management Bank agree otherwise, and any other legal rights and remedies afforded to the Cash Management Banks under applicable law shall be preserved, subject to applicable bankruptcy law.

12.     Except as otherwise set forth herein, the Debtors and the Cash Management Banks may, without further order of the Court, agree and implement changes to the Cash Management System and procedures in the ordinary course of business.

13.     The Debtors are authorized to open new bank accounts so long as the Debtors provide notice to the U.S. Trustee and the Notice Parties of the opening of such account; *provided* that all accounts opened by any of the Debtors on or after the Petition Date at any bank shall, for purposes of this Final Order, be deemed a Bank Account as if it had been listed on **Exhibit C** attached to the Motion.

14.     The relief granted in this Final Order is extended to any new bank account opened by the Debtors after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened, which bank shall be deemed a Cash Management Bank. As required herein, to the extent the Debtors open a new bank account, they shall provide notice to the Trustee.

15.     In the event that any third party deposits funds (whether before, on or after, the Petition Date) into a Bank Account other than the Bank Account identified by the Debtors to such third party, such funds shall as soon as reasonably practicable be swept into the correct account.

16.     Section 345 of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines requiring that the Bank Accounts be U.S. Trustee authorized depositories is waived with respect to the Bank Accounts existing as of the Petition Date.

17.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in the Motion or this Final Order or any payment made pursuant to this Final Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim or lien against the Debtors (other than as provided for herein), a waiver of the Debtors' rights to subsequently dispute such claim or lien (other than such claim or lien provided for herein), or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

18.     Notwithstanding any other provision of this Final Order, should a Cash Management Bank honor a prepetition check or other item drawn on any account that is the subject of this Final Order (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as the result of an innocent mistake made despite implementation of customary item handling procedures, the Cash Management Bank shall not be deemed to be nor shall be liable to the Debtors or their estates or otherwise be in violation of this Final Order.  Without limiting the foregoing, any of the Cash Management Banks may rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of the Court, and such Cash

Management Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

19.    Nothing contained herein shall prevent the Debtors from closing any Bank Accounts as they may deem necessary and appropriate, to the extent consistent with any orders of this Court relating thereto, any relevant bank is authorized to honor the Debtors' requests to close such Bank Accounts, and the Debtors shall give written notice of the closure of any account to the U.S. Trustee.

20.    Notwithstanding entry of this Final Order, nothing herein shall create, or is intended to (i) create, any rights in favor of or enhance the status of any claim held by any party or (ii) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date.

21.    Notwithstanding the relief granted in this Interim Order, any relief granted herein or payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and any budget in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith (in either case, the "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and any relief granted or action taken or proposed to be taken hereunder, the terms of the DIP Order shall control.

22.    All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

23.    The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

24.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

25.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

26.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

27.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2018

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT C**

**Bank Accounts**

| Company / Depositor | Type | Bank Name | Bank Account No. - Redacted |
|---|---|---|---|
| ABUSA | Collection | ABN AMRO Bank N.V. | ********9979 |
| ABUSA | Corporate | JPMorgan Chase Bank | ********6377 |
| ABUSA | Corporate | JPMorgan Chase Bank | ********3827 |
| ABUSA | Corporate | BNP PARIBAS | ********-001 |
| ABUSA | Corporate | Citizens Bank | ********6635 |
| ABUSA | Hedging | BANK OF AMERICA C/O MERCURI | ********3632 |
| AEGEAN ACE MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-493 |
| AEGEAN AGENCY GIBRALTAR | Station | GIBRALTAR BANK | ******** 004 |
| AEGEAN AGENCY GIBRALTAR | Station | GIBRALTAR BANK | ******** 003 |
| AEGEAN AGENCY GIBRALTAR | Station | GIBRALTAR BANK | ******** 001 |
| AEGEAN AGENCY GIBRALTAR | Station | GIBRALTAR BANK | ******** 002 |
| AEGEAN BREEZE MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-574 |
| AEGEAN BREEZE MARITIME COMPANY | Vessel | Aegean Baltic Bank S.A. | ********0013 |
| AEGEAN BREEZE MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-831 |
| AEGEAN BREEZE MARITIME COMPANY | Vessel | Aegean Baltic Bank S.A. | ********0021 |
| AEGEAN Bunkering (Jamaica) Limited | Station | Scotiabank | ********8*42 |
| AEGEAN Bunkering (Jamaica) Limited | Station | Scotiabank | ********1*89 |
| AEGEAN Bunkering (Jamaica) Limited | Station | Scotiabank | ********1*84 |
| AEGEAN Bunkering (Singapore) PTE. Limited | Station | DBS | ********3022 |
| AEGEAN Bunkering (Singapore) PTE. Limited | Station | DBS | ********83-2 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | Aegean Baltic Bank S.A. | ********0027 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | Aegean Baltic Bank S.A. | ********0011 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | BANCO POPULAR | ********7700 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | BANCO POPULAR | ********2477 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | BANCO SABADELL | ********0367 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | BANCO POPULAR | ********5575 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | BANCO SABADELL | ********4936 |
| AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS S.A. | Station | BNP PARIBAS | ********00 1 |
| AEGEAN BUNKERING GIBRALTAR | Station | GIBRALTAR BANK | ******** 001 |
| AEGEAN BUNKERING GIBRALTAR | Station | GIBRALTAR BANK | ******** 003 |
| AEGEAN BUNKERING GIBRALTAR | Station | GIBRALTAR BANK | ******** 002 |
| AEGEAN BUNKERING MOROCCO | Station | BMCE BANK | ********0000 |
| AEGEAN BUNKERING MOROCCO | Station | BMCE BANK | ********0393 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | PIRAEUS BANK S.A. | ********-179 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | PIRAEUS BANK S.A. | ********-418 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | PIRAEUS BANK S.A. | ********-161 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | Aegean Baltic Bank S.A. | ********0021 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | Aegean Baltic Bank S.A. | ********2018 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | PIRAEUS BANK S.A. | ********-927 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | Aegean Baltic Bank S.A. | ********0015 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | ABN AMRO Bank N.V. | ********4175 |
| AEGEAN BUNKERING SERVICES INC. | Corporate | ABN AMRO Bank N.V. | ********6205 |
| AEGEAN BUNKERING TRINIDAD | Station | BANK OF NOVA SCOTIA | ********2233 |
| AEGEAN BUNKERING TRINIDAD | Station | BANK OF NOVA SCOTIA | ********2232 |
| AEGEAN GAS MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-945 |
| AEGEAN GAS MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-775 |
| AEGEAN MAISTROS MARITIME COMPANY | Vessel | Aegean Baltic Bank S.A. | ********2022 |
| AEGEAN MAISTROS MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-179 |
| AEGEAN MAISTROS MARITIME COMPANY | Vessel | Aegean Baltic Bank S.A. | ********2014 |
| AEGEAN MANAGEMENT SERVICES | Corporate | PIRAEUS BANK S.A. | ********-762 |
| AEGEAN MARINE PETROLEUM NETWORK INC | Corporate | BERENBERG | ********-001 |
| AEGEAN MARINE PETROLEUM NETWORK INC | Corporate | Aegean Baltic Bank S.A. | ********0028 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | Aegean Baltic Bank S.A. | ********0019 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | BANK OF CHINA | ********6324 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | HELLENIC BANK | ********0-02 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | HELLENIC BANK | ********0-02 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | HELLENIC BANK | ********0001 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | HSH NORDBANK | ********7880 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | Aegean Baltic Bank S.A. | ********0014 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | PIRAEUS BANK S.A. | ********-688 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | PIRAEUS BANK S.A. | ********-137 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | Aegean Baltic Bank S.A. | ********0022 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | Aegean Baltic Bank S.A. | ********0022 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | EUROBANK ERGASIAS | ********9272 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | PIRAEUS BANK S.A. | ********-383 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | PIRAEUS BANK S.A. | ********-648 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | EUROBANK ERGASIAS | ********8844 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | Aegean Baltic Bank S.A. | ********0014 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | BNP PARIBAS | ********8001 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | BNP PARIBAS | ********8001 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | MASHREQ BANK | ********7958 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | MASHREQ BANK | ********7968 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | BERENBERG | ********-003 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | BANK OF CYPRUS | ********2727 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | BANK OF CYPRUS | ********2700 |
| AEGEAN MARINE PETROLEUM S.A. | Corporate | NBG LONDON | ********2201 |
| AEGEAN MARINE PETROLEUM S.A. | Collection | ABN AMRO Bank N.V. | ********6210 |
| AEGEAN MARINE PETROLEUM S.A. | Overdraft | ABN AMRO Bank N.V. | ********1215 |
| AEGEAN MARINE PETROLEUM S.A. | Collection | ABN AMRO Bank N.V. | ********8622 |
| AEGEAN MARINE PETROLEUM S.A. | Collection | ABN AMRO Bank N.V. | ********7555 |
| AEGEAN MARINE PETROLEUM S.A. | Collection | ABN AMRO Bank N.V. | ********7993 |
| AEGEAN MARINE PETROLEUM S.A. | Overdraft | ABN AMRO Bank N.V. | ********6178 |
| AEGEAN OIL TERMINAL CORPORATION | Station | United Arab bank | ********6002 |
| AEGEAN OIL TERMINAL CORPORATION | Station | United Arab bank | ********6001 |
| AEGEAN OIL TERMINAL CORPORATION | Station | National Bank of Fujairah | ********0971 |

| AEGEAN OIL TERMINAL CORPORATION | Station | National Bank of Fujairah | ********1013 |
|---|---|---|---|
| AEGEAN OIL TERMINAL CORPORATION | Station | United Arab bank | ********6003 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | HSH NORDBANK | ********1502 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | Aegean Baltic Bank S.A. | ********0015 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | PIRAEUS BANK S.A. | ********-495 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | Aegean Baltic Bank S.A. | ********2018 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | Aegean Baltic Bank S.A. | ********0026 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | Aegean Baltic Bank S.A. | ********2026 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | Aegean Baltic Bank S.A. | ********0020 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | BNP PARIBAS | ********1001 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | BNP PARIBAS | ********1002 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | ABN AMRO Bank N.V. | ********9729 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | ABN AMRO Bank N.V. | ********0590 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Overdraft | ABN AMRO Bank N.V. | ********9534 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Overdraft | ABN AMRO Bank N.V. | ********8694 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | ABN AMRO Bank N.V. | ********8617 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | MASHREQ BANK | ********7912 |
| AEGEAN PETROLEUM INTERNATIONAL INC. | Corporate | MASHREQ BANK | ********7913 |
| AEGEAN SHIP III MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-107 |
| AEGEAN SHIP III MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-003 |
| AEGEAN SHIP VIII MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-069 |
| AEGEAN SHIP XII MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-929 |
| AEGEAN SHIP XII MARITIME COMPANY | Vessel | PIRAEUS BANK S.A. | ********-077 |
| AEGEAN SHIPHOLDING INC/SA | Vessel | PIRAEUS BANK S.A. | ********6338 |
| AEGEAN TANK FARM | Vessel | PIRAEUS BANK S.A. | ********6089 |
| AEGEAN TANKING S.A. | Vessel | PIRAEUS BANK S.A. | ********-257 |
| AEGEAN VII SHIPPING LTD | Vessel | BERENBERG | ********-008 |
| AMORGOS MARITIME INC (EURO) | Vessel | PIRAEUS BANK S.A. | ********-938 |
| AMORGOS MARITIME INC (USD) | Vessel | PIRAEUS BANK S.A. | ********-021 |
| AMPNI HOLDINGS CO LIMITED | Corporate | KBC BANK NV | ********5643 |
| AMPNI HOLDINGS CO LIMITED | Corporate | KBC BANK NV | ********5643 |
| AMPNI INVESTMENTS CO LIMITED | Corporate | KBC BANK NV | ********5542 |
| ANDROS MARINE LIMITED | Vessel | BERENBERG | ********-003 |
| BENMORE SERVICES S.A. | Vessel | Aegean Baltic Bank S.A. | ********2017 |
| CEPHALLONIA MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********2018 |
| DILOS MARINE INC | Vessel | BERENBERG | ********-000 |
| ETON MARINE LTD | Vessel | Aegean Baltic Bank S.A. | ********2015 |
| ETON MARINE LTD | Vessel | Aegean Baltic Bank S.A. | ********0018 |
| HALKI NAVIGATION S.A. | Vessel | Aegean Baltic Bank S.A. | ********2018 |
| ICS Petroleum (Montreal) limited | Station | Bank of Montreal | ********-856 |
| ICS Petroleum (Montreal) limited | Station | Bank of Montreal | ********-039 |
| ICS Petroleum limited | Station | Bank of Montreal | ********-543 |
| ICS Petroleum limited | Station | Bank of Montreal | ********-554 |
| ICS Petroleum limited | Station | Aegean Baltic Bank S.A. | ********0023 |
| ICS Petroleum limited | Station | Aegean Baltic Bank S.A. | ********0031 |
| ICS PETROLEUM MONTREAL LTD. | Station | Aegean Baltic Bank S.A. | ********0036 |
| ICS PETROLEUM MONTREAL LTD. | Station | Aegean Baltic Bank S.A. | ********0028 |
| INGRAM ENTERPRISES CO. | Vessel | Aegean Baltic Bank S.A. | ********2014 |
| IOS MARINE INC | Vessel | Aegean Baltic Bank S.A. | ********0018 |
| IOS SHIPPING LTD | Vessel | BERENBERG | ********-007 |
| ITHAKI MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********2013 |
| KASSOS NAVIGATION S.A. | Vessel | Aegean Baltic Bank S.A. | ********2019 |
| KERKYRA MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********2019 |
| KERKYRA MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********0011 |
| KIMOLOS MARITIME INC. | Vessel | PIRAEUS BANK S.A. | ********8314 |
| KIMOLOS MARITIME INC.(EURO) | Vessel | PIRAEUS BANK S.A. | ********-284 |
| KITHNOS MARITIME INC ME FOROLOGIKO ANTIPROSOPO AE | Vessel | PIRAEUS BANK S.A. | ********-155 |
| KITHNOS MARITIME INC ME FOROLOGIKO ANTIPROSOPO AE | Vessel | PIRAEUS BANK S.A. | ********-201 |
| KITHNOS MARITIME INC(EURO) | Vessel | PIRAEUS BANK S.A. | ********-907 |
| KITHNOS MARITIME INC(USD) | Vessel | PIRAEUS BANK S.A. | ********-940 |
| KITHNOS MARITIME INC. | Vessel | Aegean Baltic Bank S.A. | ********2012 |
| KITHNOS MARITIME INC. | Vessel | Aegean Baltic Bank S.A. | ********0017 |
| KYTHIRA MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********2016 |
| LEFKAS MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********2011 |
| Milos Shipping (Pte) Ltd | Vessel | DBS | ********-022 |
| Milos Shipping (Pte) Ltd | Vessel | DBS | ********03-7 |
| MILOS SHIPPING PTE LTD (EURO) | Vessel | PIRAEUS BANK S.A. | ********-209 |
| MILOS SHIPPING PTE LTD (USD) | Vessel | PIRAEUS BANK S.A. | ********-233 |
| MYKONOS I MARITIME LIMITED (EURO) | Vessel | PIRAEUS BANK S.A. | ********-063 |
| MYKONOS I MARITIME LIMITED (USD) | Vessel | PIRAEUS BANK S.A. | ********-101 |
| NEVADO NAVIGATION - USD | Vessel | PIRAEUS BANK S.A. | ********-930 |
| PAROS SHIPPING (PTE.) LTD. | Vessel | Aegean Baltic Bank S.A. | ********2011 |
| PAXOI MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | ********2012 |
| SANTON LIMITED | Vessel | ETE | ********1830 |
| SANTON LIMITED | Vessel | ETE | ********1673 |
| SANTORINI I MARITIME LIMITED | Vessel | Aegean Baltic Bank S.A. | ********2019 |
| SEALAND NAVIGATION INC | Vessel | Aegean Baltic Bank S.A. | ********0017 |
| SEALAND NAVIGATION INC | Vessel | Aegean Baltic Bank S.A. | ********0028 |
| SEALAND NAVIGATION INC. | Vessel | PIRAEUS BANK S.A. | ********-606 |
| SEALAND NAVIGATION INC. | Vessel | PIRAEUS BANK S.A. | ********-568 |
| SERIFOS MARITIME INC | Vessel | Aegean Baltic Bank S.A. | ********0029 |
| SERIFOS MARITIME INC. | Vessel | Aegean Baltic Bank S.A. | ********2014 |
| SERIFOS SHIPPING (P.T.E.) LTD | Vessel | Aegean Baltic Bank S.A. | ********2017 |
| Serifos Shipping(Pte) Ltd | Vessel | DBS | ********-022 |
| Serifos Shipping(Pte) Ltd | Vessel | DBS | ********85-7 |
| SIFNOS MARINE INC | Vessel | BERENBERG | ********-006 |
| SYMI NAVIGATION S.A. | Vessel | Aegean Baltic Bank S.A. | ********2013 |

| TASMAN SEAWAYS INC | Vessel | ETE | *********1756 |
| TASMAN SEAWAYS INC | Vessel | ETE | *********1590 |
| TEMPEST SHIPTRADE LTD | Vessel | PIRAEUS BANK S.A. | *********-631 |
| TEMPEST SHIPTRADE LTD | Vessel | PIRAEUS BANK S.A. | *********-405 |
| TEMPEST SHIPTRADE LTD | Vessel | Aegean Baltic Bank S.A. | *********0018 |
| TEMPEST SHIPTRADE LTD | Vessel | Aegean Baltic Bank S.A. | *********0026 |
| Tilos Shipping (Pte) Ltd | Vessel | DBS | *********-022 |
| Tilos Shipping (Pte) Ltd | Vessel | DBS | *********76-2 |
| TILOS SHIPPING PTE LTD | Vessel | Aegean Baltic Bank S.A. | *********0014 |
| TINOS MARINE INC. | Vessel | PIRAEUS BANK S.A. | *********-159 |
| TINOS MARINE INC. | Vessel | PIRAEUS BANK S.A. | *********-411 |
| TINOS MARINE INC. | Vessel | PIRAEUS BANK S.A. | *********-687 |
| West coast fuel transport limitecd | Station | Bank of Montreal | *********-493 |
| West coast fuel transport limitecd | Station | Bank of Montreal | *********-617 |
| ZAKYNTHOS MARINE S.A. | Vessel | Aegean Baltic Bank S.A. | *********2017 |