James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Marc Kieselstein, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | Case No. 18-13374 (MEW) |
| Debtors. | (Joint Administration Requested) |

**NOTICE OF FILING OF**
**REVISED INTERIM ORDER (I) AUTHORIZING THE DEBTORS**
**TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION**
**FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV)**
**GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,**
**(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on November 6, 2018, the above-captioned debtors and

debtors in possession (the "Debtors") filed the *Debtors' Motion for Entry of Interim and Final*

*Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors*

*to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and*

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

*Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 17] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that attached as Exhibit B to the Motion was a proposed *Interim Order (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* (the "Initial Proposed Order").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised proposed *Interim Order (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* attached hereto as **Exhibit A** (the "Proposed Interim Order").

**PLEASE TAKE FURTHER NOTICE** that a redline reflecting the changes from the Initial Proposed Order is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Motion will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in Courtroom 723, One Bowling Green, New York, New York on **November 8, 2018 at 10:30 a.m.** (prevailing Eastern Time) or as soon thereafter as counsel may be heard.

New York, New York
Dated:  November 8, 2018

/s/ Jonathan S. Henes, P.C.

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Marc Kieselstein, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

## Proposed Interim Order

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.,*[1] | Case No. 18-13374 ([ ]) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364 AND 507 (I) AUTHORIZING
THE DEBTORS TO OBTAIN SENIOR SECURED PRIMING
SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY;
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, 9006-1, 9013-1, 9014-1 and 9014-2 of the Local Bankruptcy Rules (the "Local Rules") for the United States Bankruptcy Court for the Southern District of New York (this "Court"), *inter alia* requesting, among other things:

(1)     authorization for the Borrowers (as defined in DIP Loan Agreements) to obtain postpetition financing pursuant to the DIP Facilities (defined below), and for each of the Debtors to guarantee unconditionally (the "Guarantors"), on a joint and several basis, and subject to the

---

[1]     A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or DIP Loan Documents (as defined herein), as applicable.

terms and limitations set forth in the DIP Loan Documents in all respects the Borrowers' obligations in connection with the DIP Facilities, consisting of:

a) a senior secured super-priority multiple delayed draw term loan credit facility (the "DIP Term Loan Facility"), on the terms and conditions to be set forth in the U.S. DIP Agreement (as defined below), in an aggregate principal amount of **$72,000,000** in term loan commitments (the "DIP Term Loan Commitment") which shall be available as term loans (the "DIP Term Loans") to the U.S. Borrower upon entry of the Interim Order, and subject to the Closing Date (as defined in the U.S. DIP Agreement), in an amount not to exceed **$40,000,000** (the "Initial DIP Term Loan") and the maximum amount allowed to be drawn by the U.S. Borrower for such period consistent with the U.S. DIP Credit Agreement.

b) a senior secured super-priority asset-based revolving credit facility (the "U.S. DIP Revolving Credit Facility," and together with the DIP Term Loan Facility, the "U.S. DIP Credit Facilities"), on the terms and conditions to be set forth in a Superpriority Secured Debtor-In-Possession Credit Agreement substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, supplemented, waived, extended or otherwise modified from time to time, the "U.S. DIP Agreement," and together with any other related agreements, documents, security agreements, or pledge agreements, the "U.S. DIP Documents"), by and among Aegean Bunkering (USA) LLC, as U.S. Borrower, the Guarantors, ABN AMRO Capital USA LLC, as Administrative Agent, Collateral Agent, Swing Line Lender and Issuing Bank, and Mercuria US Asset Holdings LLC, as U.S. Lender, in an initial aggregate principal amount (subject to availability), and together with the outstanding amounts under the U.S. Prepetition Credit Facility (as defined in the Motion), of **$160,000,000** in revolving commitments (the "U.S. Revolving Commitments", and the loans outstanding under the U.S. Revolving Commitments from time to time, the "U.S. Revolving Loans"), including a **$50,000,000** million sublimit for the issuance of letters of credit ("U.S. Letters of Credit") and Swing Line Loans (as defined in US DIP Credit Facilities), available from time to time until the maturity date of the U.S. DIP Revolving Credit Facility; and

c) a senior secured super-priority asset-based revolving credit facility (the "Global DIP Revolving Credit Facility," and together with the U.S. DIP Credit Facilities, the "DIP Facilities"), on the terms and conditions to be set forth in an Amendment and Restatement Agreement substantially in the form annexed as **Exhibit B** hereto (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "Global DIP Agreement,"[3] and together with any other related agreements, documents, security agreements, or pledge agreements, the "Global DIP Documents"), by and among the Global Borrowers, the Guarantors, non-debtor guarantors party thereto, ABN AMRO Bank, N.V., as Facility Agent, Collateral

---

[3] The Global DIP Agreement and the U.S. DIP Agreement are referred to collectively herein as the "DIP Loan Agreements."

Management Agent, Security Agent, Issuing Bank and Overdraft Bank, and Mercuria Energy Trading S.A., as Lender, in an initial aggregate principal amount (subject to availability), together with the outstanding amounts under the Global Prepetition Credit Facility (as defined in the Motion and, together with the U.S. Prepetition Credit Facility, the "Prepetition Credit Facilities"), of **$300,000,000** in revolving commitments (the "Global Revolving Commitments" and the loans outstanding under the Global Revolving Commitments from time to time, the "Global Revolving Loans," together with the U.S. Revolving Loans, the "Revolving Loans"), including a **$100,000,000** million sublimit for the issuance of letters of credit ("Global Letters of Credit" and, together with the U.S. Letters of Credit, collectively, the "Letters of Credit"), available from time to time until the maturity date under the Global DIP Revolving Credit Facility; and

d) a Roll-Up (as defined below) of the Prepetition Secured Obligations (as defined below) whereby the Prepetition Secured Obligations shall become DIP Obligations (as defined below) in the amounts and at the intervals set forth herein, and subject to the terms and conditions hereof and as set forth in the DIP Loan Documents (as defined below).

(2) authorization for Debtors to execute, deliver, and enter into the U.S. DIP Documents and the Global DIP Documents (collectively, the "DIP Loan Documents") and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(3) authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to any agents under the DIP Loan Documents (collectively, the "DIP Agents") and the issuing banks, swing line lenders, and any other lenders from time to time thereunder (collectively, the "DIP Lenders" and together with the DIP Agents, the "DIP Secured Parties") under the DIP Facilities pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges and disbursements of the respective DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all

obligations in connection with any interest rate, currency swap or other hedging agreement or arrangement (including, without limitation, any such agreement or arrangement designed to, among other things, hedge against fluctuations in commodity prices) in each case constituting (a) all "Obligations" as defined in the U.S. DIP Agreement, (b) all "Outstandings" as defined in the Global DIP Agreement; and (c) all other Debtor and/or Guarantor obligations of any kind under the DIP Loan Documents (collectively, the "DIP Obligations");

(4)    authorization for the Debtors, immediately upon entry of this interim order (this "Interim Order"), to use proceeds of the DIP Facilities (collectively the "DIP Loan Proceeds") as permitted in the DIP Loan Documents and consistent with this Interim Order and the applicable Approved Budget;

(5)    authorization for the Debtors to implement a "roll-up" of the Prepetition ABL Obligations as follows: (a) immediately upon entry of this Interim Order, 50% of the Prepetition Secured Obligations shall become DIP Obligations; (b) between entry of the Interim Order and entry of the Final Order, all cash proceeds of U.S. Priority Collateral securing U.S. Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay down outstanding obligations under the U.S. Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the U.S. DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; (c) between entry of the Interim Order and entry of the Final Order, all cash proceeds of Global Prepetition ABL Collateral securing Global Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay-down outstanding obligations under the Global Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the Global DIP Revolving Credit Facility, subject to

compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; and (d) upon entry of the Final Order, all outstanding Prepetition ABL Obligations shall become DIP Obligations ((a) through (d), the "Roll-Up").

(6)     the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 507(b) and 503(b)(1) of the Bankruptcy Code, to the DIP Agents, for the benefit of themselves and the other DIP Secured Parties, in respect of all DIP Obligations (as defined below), subject to the Carve Out (as defined below);

(7)     granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting ABL Cash Collateral (as defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein;

(8)     providing adequate protection to each of the Prepetition Secured Parties (as defined below) of their security interests in the collateral securing the Prepetition Credit Facilities, as applicable (including, without limitation, ABL Cash Collateral), and equal in amount to, any diminution in the value of such prepetition security interests of such Prepetition Secured Parties calculated in accordance with section 506(a) of the Bankruptcy Code ("Diminution in Value"), whether or not the Diminution in Value results from the sale, lease or use by the Debtors of the Prepetition ABL Collateral (as defined herein), the priming of the prepetition security interests of such Prepetition Secured Parties or the stay of enforcement of any prepetition security interests arising from section 362 of the Bankruptcy Code, or otherwise;

(9)     providing adequate protection to the secured parties (the "Prepetition Term Parties") under the Prepetition Term Loan Facilities (as defined in the Motion) of their security

interests in Prepetition Term Collateral, including Prepetition Term Cash Collateral, (the "Prepetition Term Liens") and equal in amount to, any Diminution in the Value of such prepetition security interests of such Prepetition Term Parties, subject in all respects to any subsequent orders of this Court including but not limited to that certain *Interim Order (I) Granting Adequate Protection to Aegean Baltic Bank S.A., as Agent, (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* and *Interim Order (I) Granting Adequate Protection to National Bank of Greece S.A., (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, each filed contemporaneously herewith (in respect of each of the Prepetition Term Parties identified in such interim order, a "Prepetition Term Adequate Protection Order" and collectively with any other order granting adequate protection to a Prepetition Term Party, the "Prepetition Term Adequate Protection Orders");

(10)   authorization for the Debtors to use ABL Cash Collateral and all other Prepetition ABL Collateral in which any of the Prepetition Secured Parties have an interest consistent with this Interim Order and providing adequate protection to the Prepetition Secured Parties to the extent set forth herein, including authorization for the Debtors to apply ABL Cash Collateral to permanently and indefeasibly pay the Prepetition ABL Obligations;

(11)   the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(12)   subject to entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), a waiver of the Debtors' ability to surcharge against any DIP

Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(13)　the scheduling of a final hearing on the Motion (the "<u>Final Hearing</u>") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(14)　granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on November 7, 2018 (the "<u>Interim Hearing</u>"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Andrew D. Hede (I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2*, the *Declaration of Tyler Baron, Director of Aegean Marine Petroleum Network Inc., in Support of Chapter 11 Petitions and First Day Motions*, the *Declaration of Zul Jamal in Support of Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, and (III) Authorizing Use of ABL Cash Collateral, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* ("the <u>Jamal Declaration</u>"), any exhibits in connection with the foregoing, and the filings and pleadings in the above-captioned Cases (collectively, the "<u>Cases</u>"), the Court having found that the relief requested in the Motion is fair and reasonable and is in the best interests of Debtors, their Estates (defined below), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and appropriate notice of the Motion, the relief

requested therein, and the Interim Hearing (the "Notice") was adequate under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on (a) the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis) (the "30 Largest Unsecured Creditors"); (c) the agents for each of the Debtors' prepetition secured credit facilities (the "Prepetition Agents");[4] (d) the indenture trustee for each of the Debtors' unsecured notes; (e) the DIP Agents; (f) counsel to the parties referenced in clauses (c) through (e); (g) counsel to the ad hoc group of holders of convertible unsecured notes; (h) counsel to Mercuria US Asset Holdings LLC; (i) counsel to Mercuria Energy Trading S.A.; (j) the United States Attorney's Office for the Southern District of New York; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (n) the attorneys general in the states where the Debtors conduct their business operations; (o) counsel for the Prepetition Term Parties, (p) any other notice parties required under any Prepetition Term Loan Document; (q) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

---

[4] The Prepetition Agents are the U.S. Prepetition Agent and the Global Prepetition Agent.

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[5]**

A.     <u>Petition Date</u>.  On November 6, 2018 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition (each, a "<u>Petition</u>") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Cases.

B.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rules 2002-1, 4001-2, 9006-1, 9013-1, 9014-1 and 9014-2.

C.     <u>Committee Formation</u>.  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "<u>Committee</u>") or any other statutory committee has been appointed in the Cases.

D.     <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001 and the Local Rules.

---

[5] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.     Parties' Acknowledgments, Agreements, and Stipulations.  In requesting the DIP Facilities, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facilities and access to the ABL Cash Collateral, and as a condition to providing financing under the DIP Facilities, subject to the rights of the parties set forth in section 4.1, the Debtors, the Prepetition Obligors (as defined in the Motion),[6] and any other non-Debtor affiliates of the Debtors (the "Non-Debtor Affiliates")[7] receiving the benefits of the DIP Facilities permanently and irrevocably admit, stipulate, acknowledge and agree, as follows:

(i)     U.S. Prepetition Loan Documents.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that prior to the Petition Date, the "Secured Parties" (as defined in the U.S. Prepetition Credit Facility, and referred to herein as the "U.S. Prepetition Secured Parties") made loans, advances and/or provided other financial accommodations and/or services to Aegean Bunkering (USA) LLC (the "U.S. Borrower") pursuant to the terms and conditions set forth in (a) the U.S. Prepetition Credit Agreement; and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the agent or agents under the U.S. Prepetition Credit Agreement (the "U.S. Prepetition Agent") or any other Secured Party in connection with the U.S. Prepetition Credit Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the U.S. Prepetition Credit Agreement, as all of the same have heretofore been amended,

---

[6]     For the avoidance of doubt, all references to the Prepetition Obligors include all non-debtor affiliates of the Debtors, the Borrowers, and the Guarantors who are obligors under any of the Prepetition Credit Facilities, Prepetition Loan Documents, and the Prepetition ABL Obligations.

[7]     Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, and Aegean Petroleum Uruguay S.A. are non-Debtor affiliates of the Debtors.

supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "U.S. Prepetition Loan Documents"). Aegean Marine Petroleum Network, Inc. (the "U.S. Guarantor") is jointly and severally liable for the U.S. Borrower's obligations under the U.S. Prepetition Loan Documents.

(ii)     U.S. Prepetition ABL Obligations. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree, that as of the Petition Date, the U.S. Borrower and the U.S. Guarantor were jointly and severally indebted to the U.S. Prepetition Secured Parties under the U.S. Prepetition Loan Documents in respect of Revolving Loans, outstanding Letters of Credit, and Swing Line Loans in an aggregate outstanding principal amount of not less than approximately $131,688,116, plus interest accrued and accruing thereon, together with all costs, fees, expenses and other charges accrued, accruing or chargeable with respect thereto in accordance with the U.S. Prepetition Loan Documents (collectively, the "U.S. Prepetition ABL Obligations"). Subject to Section 4.1 hereof, the U.S. Prepetition ABL Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the U.S. Borrower and the U.S. Guarantor, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization, recoupment, or subordination pursuant to the Bankruptcy Code or any other applicable law or any other claim or cause of action of any nature, and the Debtors and Prepetition Obligors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, cause of action, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the U.S. Prepetition ABL Obligations or the Prepetition Liens (as defined below) on the U.S. Prepetition ABL Collateral (as defined below).

(iii)  <u>U.S. Prepetition ABL Collateral</u>.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree, that as of the Petition Date, the U.S. Prepetition ABL Obligations were fully secured pursuant to the U.S. Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable, first-priority liens on and security interests in all of the U.S. Borrower's assets constituting "<u>Collateral</u>" (as defined in the U.S. Prepetition Loan Documents (all such Collateral in existence on the Petition Date, or the identifiable proceeds thereof, the "<u>U.S. Prepetition ABL Collateral</u>"), subject only to the liens and security interests permitted under the U.S. Prepetition Credit Agreement to the extent that such security interests, liens or encumbrances are valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date.  The Debtors and the Prepetition Obligors do not possess and will not assert any claim, cause of action, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the U.S. Prepetition Agent's and the U.S. Prepetition Lenders' liens, claims or security interests in the U.S. Prepetition ABL Collateral.

(iv)  <u>Global Prepetition Loan Documents</u>.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that prior to the Petition Date, the "Secured Parties" (as defined in the Global Prepetition Credit Facility, and referred to herein as the "<u>Global Prepetition Secured Parties</u>,"[8] and together with the U.S. Prepetition Secured Parties, the "<u>Prepetition Secured Parties</u>") made loans, advances and/or provided other financial accommodations and/or services to Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering

---

[8]  The Global Prepetition Secured Parties includes the agent or agents under the Global Prepetition Credit Facility (the "<u>Global Prepetition Agent</u>").

& Trading GmbH, and Aegean Petroleum Uruguay S.A. (collectively, the "Global Borrowers")[9] pursuant to the terms and conditions set forth in (a) the Global Prepetition Credit Facility; and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Global Prepetition Agent or any other Secured Party in connection with the Global Prepetition Credit Facility, including, without limitation, all documents defined as "Finance Documents" in the Global Prepetition Credit Facility, and all security agreements, notes, guarantees, mortgages, financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Global Prepetition Credit Facility, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Global Prepetition Loan Documents").[10] Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, Aegean Petroleum Uruguay S.A., and Aegean Marine Petroleum Network Inc. (together, the "Global Guarantors" and each, a "Global Guarantor") are jointly and severally liable for the Global Borrowers' obligations under the Global Prepetition Loan Documents.

(v)    Global Prepetition ABL Obligations. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that as of the Petition Date, the Global Borrowers and each of the other Global Guarantors were jointly and severally indebted under the Global

---

[9]    Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, Aegean NWE N.V. and Aegean Petroleum Uruguay S.A. are non-Debtor affiliates of the Debtors.

[10]    The U.S. Prepetition Loan Documents and the Global Prepetition Loan Documents are collectively, the "Prepetition Loan Documents").

Prepetition Loan Documents in respect of Global Revolving Loans,[11] outstanding Global Letters of Credit, Overdraft Facilities (each as defined in the Global Prepetition Credit Facility) and all other Credit Instruments (as defined in the Global Prepetition Credit Facility) in an aggregate outstanding principal amount of not less than approximately $249,569,260, plus interest accrued and accruing thereon, together with all costs, fees, expenses and other charges accrued, accruing or chargeable with respect thereto in accordance with the Global Prepetition Loan Documents (collectively, the "Global Prepetition ABL Obligations," and together with the U.S. Prepetition ABL Obligations, the "Prepetition Secured Obligations").  Subject to Section 4.1 hereof, the Global Prepetition ABL Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Global Borrowers and the Global Guarantors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization, recoupment, or subordination pursuant to the Bankruptcy Code or any other applicable law or any other claim or cause of action of any nature, and the Debtors and the Prepetition Obligors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, cause of action, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Global Prepetition ABL Obligations or the Prepetition Liens on the Global Prepetition ABL Collateral.

(vi)     Global Prepetition ABL Collateral. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that as of the Petition Date, the Global Prepetition ABL Obligations were fully secured pursuant to the Global Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable, first-priority liens on and security

---

[11]   For the avoidance of doubt, the Global Revolving Loans shall include that certain over-advance provided to the Debtors on or about October 31, 2018 to fund certain working capital amounts needed to enable the Debtors to prepare for an orderly chapter 11 filing.

interests in all of the "<u>Transaction Security</u>" (as defined in the Global Prepetition Loan Documents) (all such Transaction Security in existence on the Petition Date, or the identifiable proceeds thereof, the "<u>Global Prepetition ABL Collateral</u>" and collectively with the U.S. Prepetition ABL Collateral, the "<u>Prepetition ABL Collateral</u>"), and subject only to the liens and other security interests specifically permitted under the Global Prepetition Loan Documents to the extent that such security interests, liens or encumbrances are valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date. The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Global Prepetition Secured Parties' liens, claims or security interests in the Global Prepetition ABL Collateral.

(vii) <u>Validity of Prepetition Liens and Prepetition Secured Obligations</u>. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that: (a) the Prepetition Secured Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of certain of the Debtors; (b) no offsets, challenges, objections, defenses, claims, causes of action, or counterclaims of any kind or nature whatsoever to the Prepetition Secured Obligations or Prepetition Liens exist, and no portion of the Prepetition Secured Obligations or Prepetition Liens is subject to any offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever including, without limitation, avoidance, disallowance, reduction, surcharge, disgorgement, recharacterization, recoupment, or subordination, whether pursuant to the Bankruptcy Code or applicable non-bankruptcy law or any other claim or cause of action of any nature; (c) the Prepetition Loan Documents are valid and enforceable by the Prepetition Secured Parties against each of the applicable Debtors (other than

in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); and (d) the Prepetition Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition ABL Collateral and are not subject to avoidance, disallowance, reduction, surcharge, disgorgement, recharacterization, recoupment, or subordination, whether pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(viii)    <u>Sale and Credit Bidding</u>.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that any of the DIP Lenders, DIP Agents, or Prepetition Secured Parties, as applicable, may credit bid the entirety of (or any portion of) the Prepetition Secured Obligations, or the DIP Obligations.

(ix)    <u>Release</u>.  As a condition to obtaining the financing available under the DIP Facilities, and subject only to Section 4.1, each of the Debtors, their Estates, the Borrowers, the Guarantors, and the Prepetition Obligors hereby forever, unconditionally, permanently, and irrevocably release, discharge and acquit each of the DIP Secured Parties, each of the Prepetition Secured Parties and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "<u>Released Parties</u>") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with or relating to the Prepetition Secured Obligations, the Prepetition Loan

Documents, the DIP Facilities or the DIP Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all claims (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security and perfection of any of the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Liens, and further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon or released to any and all acts, omissions, conduct undertaken or events occurring prior to entry of this Interim Order.

(x)     ABL Cash Collateral.  The Debtors admit, stipulate, acknowledge and agree that all of the cash of the Debtors who were obligors under the Prepetition Credit Facilities (the "Debtor ABL Obligors"), wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtor ABL Obligors, whether as Prepetition ABL Collateral or which represent income, proceeds, products, rents, or profits of other Prepetition ABL Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "ABL Cash Collateral").

(xi)     Term Loan Cash Collateral.  The Debtors admit, stipulate, acknowledge and agree that all of the cash of the Debtors who were borrowers under the Prepetition Term Loan Facilities, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors who were borrowers under the Prepetition Term Loan Facilities, whether as Prepetition Term Collateral or which represent income, proceeds, products, rents, or profits of other Prepetition Term Collateral, constitutes "cash collateral" of the Prepetition Term Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Term Loan Cash Collateral").

F.     Findings Regarding the Postpetition Financing.

(i)     Postpetition Financing.  The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim Order, to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the DIP Loan Agreements and the other DIP Loan Documents, respectively (the "DIP Loans").

(ii)     Need for Postpetition Financing.  The Debtors do not have sufficient liquidity, including cash collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties as set forth in this Interim Order, the DIP Loan Agreements, and other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value

of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates") to maximize the recovery to all creditors of the Estates.

(iii)  Priming of Prepetition Liens.  The Debtors believe that the priming of the liens granted in favor of each of the Prepetition Secured Parties in the Prepetition ABL Collateral under section 364(d)(1) of the Bankruptcy Code, by the DIP Facility, as contemplated by the DIP Loan Documents and this Interim Order, will enable the Debtors to continue to operate their businesses for the benefit of their Estates and stakeholders.

(iv)  Stalking Horse Bid.  Certain of the Debtors intend to enter into that certain Asset Purchase Agreement (as amended, restated, modified, or supplemented, from time to time, the "Stalking Horse Agreement") to purchase all or substantially all of the DIP Collateral (as defined below) on the terms and conditions set forth therein (collectively, the "Stalking Horse Bid"). The Stalking Horse Bid is integral to the value provided to the DIP Secured Parties under the DIP Facilities and necessary to maintain, preserve, and maximize the value of the DIP Collateral and the Debtors' operations pending the consummation of the transactions contemplated by the Stalking Horse Agreement.

(v)  No Credit Available on More Favorable Terms.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of

the Bankruptcy Code. The Debtors assert in the Motion and in the Jamal Declaration, and demonstrated at the Interim Hearing, that they have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Loan Documents. Additionally, the Debtors have asserted that should the DIP Facilities not be approved, the Stalking Horse Bid in connection with the sale of certain of the Debtors' assets shall be withdrawn. In light of the foregoing, and considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to them at this time, and are in the best interests of all of their stakeholders. After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to them at this time, and are in the best interests of all of their stakeholders.

(vi) <u>Budget</u>. The Debtors have prepared and delivered to the DIP Secured Parties initial budgets (the "<u>Initial Budgets</u>"), copies of which are attached hereto as **<u>Exhibits C and D</u>**. The Initial Budgets reflect the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budgets and each subsequent approved Budget then in effect, an "<u>Approved Budget</u>"). The Debtors believe that the Initial Budgets are reasonable under the facts and circumstances. The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Approved Budget, the other DIP Loan Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein. For the avoidance of doubt, all references to the Initial

Budgets or the Approved Budget shall be subject in all respects to the Permitted Variance (as defined in the DIP Loan Documents).

(vii)    Certain Conditions to DIP Facilities.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things, (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of their obligations thereunder, and to confer upon the DIP Secured Parties all rights, powers and remedies thereunder; (b) the provision of adequate protection of the Prepetition Secured Parties' interests in the Prepetition ABL Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code, subject to the terms and conditions of the Prepetition Term Adequate Protection Orders; (c) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents: (i) superpriority perfected security interests in and liens upon all of the Prepetition ABL Collateral and any unencumbered assets other than Excluded Assets (as defined in the applicable DIP Loan Agreement), (ii) perfected security interests in and junior liens upon the remaining Debtors' assets, including, without limitation, the Prepetition Term Collateral (collectively hereinafter referred to as the "DIP Collateral," and for avoidance of doubt, the DIP Collateral shall include (w) all advances under the DIP Facilities, (x) subject to entry of the Final Order (and only effective upon the entry of the Final Order), the proceeds of the Litigation Claims (as defined in the U.S. DIP Agreement), (y) subject to entry of the Final Order (and only effective upon the entry of the Final Order), the proceeds of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions"), (z) 100% of the Equity Interests (as defined in the DIP Loan Agreements) of any Borrower, any Debtor, or any Guarantor owned (directly or indirectly),

beneficially or of record, by the Borrower, any Debtor, or any Guarantor other than Aegean Oil Terminal Corp.; and (aa) 100% of the Equity Interests that any Borrower, any Debtor, or any Guarantor may own, beneficially or of record, directly or indirectly, other than Aegean Oil Terminal Corp. (i) in any subsidiary thereof (whether or not such entity is wholly owned or immaterial) and (ii) in any corporation, partnership (limited or general), joint venture, limited liability company, business trust, association or other legally recognized entity (a "Person" as defined in the DIP Loan Agreements), including joint venture interests and majority and minority interests in any Person owned by any Borrower, any Debtor and any Guarantor; and (d) approval of the Stalking Horse Bid.

(viii)    <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. Based upon the pleadings and proceedings of record in the Cases, (a) the terms of the DIP Loan Documents (including, without limitation, the Roll-Up) and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and DIP Secured Parties, with all parties being represented by counsel.   Any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facilities, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of

Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(ix)     Roll-Up of Prepetition Secured Obligations.   Upon entry of this Interim Order, without further action by the Debtors or any other party, (a) the letters of credit issued under the U.S. Prepetition Credit Facility and the Global Prepetition Credit Facility (collectively, the "Prepetition Letters of Credit") shall become Letters of Credit under the DIP Obligations; (b) 50% of the Prepetition Secured Obligations shall become DIP Obligations; (c) all cash proceeds of U.S. Priority Collateral securing U.S. Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay down outstanding obligations under the U.S. Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the U.S. DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; and (d) all cash proceeds of Global Prepetition ABL Collateral securing Global Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay-down outstanding obligations under the Global Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the Global DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount.   The replacement and refinancing of the Prepetition Secured Obligations shall be authorized as compensation for, and in consideration for, and solely on account of, the agreement of the DIP Lenders to fund the DIP Loans and to provide other consideration to the Debtors and the other borrowers under the DIP Facilities. The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Secured Parties would not be willing to provide the DIP Facilities or extend credit to the Debtors

thereunder without the inclusion of the Roll-Up in the DIP Obligations. Moreover, the replacement and refinancing (pursuant to the Roll-Up) will (a) create greater availability under the DIP Facilities, (b) benefit the Debtors and their estates as a result of the DIP Lenders' agreement to make certain revisions to the borrowing base and waiver certain defaults, and (c) will enable the Debtors to obtain urgently needed financing to administer these cases.

(x)     Credit Bidding.  Upon entry of this Interim Order, but subject to section 4.1 herein, the DIP Lenders, DIP Agents, and Prepetition Secured Parties, as applicable, shall have the right to credit bid the entirety of (or any portion of) the full amount of the DIP Obligations and/or Prepetition Secured Obligations (as applicable) in connection with any asset sale process, including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129 of the Bankruptcy Code, and such right to credit bid shall not be subject to challenge or objection.

(xi)     Debtors Will Not Challenge Credit Bid Rights.  No Debtor or Debtor's affiliate shall object to any DIP Lender's, DIP Agent's, Prepetition Secured Parties' right to credit bid up to the full amount of its DIP Obligations and/or Prepetition Secured Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through section 363 of the Bankruptcy Code, in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code, by a chapter 7 or chapter 11 trustee, or otherwise, provided that any proceeds of any sale be applied in accordance with the waterfall set forth in the applicable DIP Loan Documents.

(xii)     Sections 506(c) and 552(b).  Subject to entry of a Final Order, and only effective upon entry of the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that as a material inducement to the DIP Secured Parties to agree

to provide the DIP Facilities, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facilities to the extent set forth herein, (b) the DIP Agents' and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of ABL Cash Collateral consistent with the Approved Budget and the terms of this Interim Order, and subject to the Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled to receive, (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

(xiii)    Good Cause.    Good cause has been shown for the entry of this Interim Order. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets. The terms of the DIP Facilities (including the Roll-Up) are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.

(xiv)    Adequate Protection.    The Prepetition Secured Parties are entitled pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition ABL Collateral (including ABL Cash Collateral), to the extent set forth in this Interim Order.

(xv)  Immediate Entry.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

Section 1.  Authorization and Conditions to Financing.

1.1  Motion Granted.  The Motion is granted to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

1.2  Authorization of DIP Financing.  The Debtors are hereby authorized and empowered to immediately borrow, incur and guarantee (as applicable), (a) pursuant to the terms and conditions of the U.S. DIP Agreement, (i) loans under the U.S. Revolving Credit Facility, up to an initial aggregate principal amount, together with the outstanding amounts under the U.S. Prepetition Credit Facility, of $160,000,000 in U.S. Revolving Commitments, of which up to $50,000,000 shall constitute a sublimit for the issuance of U.S. Letters of Credit and Swing Line Loans; (ii) DIP Term Loans, pursuant to the terms and conditions of the U.S. DIP Agreement, in an aggregate principal amount not to exceed $40,000,000 prior to the entry of the Final Order to the U.S. Borrower, and the loans advanced under the DIP Loan Documents from time to time to the U.S. Borrower, with the right of the U.S. Borrower to make available, through approved inter-company loans, transfers and investments, such funds to the Global Borrowers, consistent with the

applicable Approved Budget and (b) loans under the Global DIP Revolving Credit Facility, pursuant to the Global DIP Agreement, a committed senior secured super-priority asset-based credit facility will be made available to the Global Borrowers in an initial aggregate principal amount, together with the outstanding amounts under the Global Prepetition Credit Facility, of $300,000,000 in Global Revolving Commitments, of which up to $100,000,000 shall constitute a sublimit for the issuance of the Global Letters of Credit.

1.3　　The DIP Facilities may be borrowed by Debtors during the Interim Financing Period (as defined below) in accordance with the DIP Loan Documents, plus all interest, costs, and fees, accrued or accruing under the DIP Loan Agreements and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents, in each case during the period commencing on the date of this Interim Order through and including the entry of the Final Order (the "Interim Financing Period").　Subject to the terms and conditions contained in this Interim Order and the DIP Loan Documents, the Debtors shall use the proceeds of the DIP Facilities pursuant to the terms and conditions consistent with the Approved Budget, DIP Loan Documents and this Interim Order.

1.4　　Financing Documents

(a)　　Authorization.　The Debtors are hereby authorized and directed to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.　Subject to Section 4.1 hereof, no obligation, payment, transfer or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law),

or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule or regulation by any person or entity.

(b)     Approval; Evidence of Borrowing Arrangements.    All terms, conditions and covenants set forth in the DIP Loan Documents (including, without limitation, each of the DIP Loan Agreements) are approved.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agents and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of each DIP Loan Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of each DIP Agent's and DIP Lender's closing, arranger and administrative fees, consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the DIP Loan Documents.  Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding and enforceable against the Debtors, their Estates and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(c)     Payment of DIP Premiums and Other Expenses.  Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees

and expenses, the "DIP Fees") are hereby approved, and the Debtors are authorized to and shall pay the DIP Fees as set forth in the applicable DIP Loan Documents. The Debtors are also authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agents and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order in accordance with Section 6.14 hereof. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

(d)     Non-Material Amendments to DIP Loan Documents. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make ministerial amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agents and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Bankruptcy Court; *provided* that Debtors shall file a notice on the Court's docket of any such ministerial amendment, modification, or supplement, or waiver, not more than three (3) Business Days after the effective date thereof. Any amendments, modifications or supplements to any DIP Loan Documents, other than as set forth in the preceding sentence (collectively, "Material DIP Amendments"),  shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the DIP Agents; (ii) counsel to the DIP Lenders, (iii) counsel for each of the Prepetition Term Parties; (iv) counsel to the Committee, or in the event no such Committee is appointed at the time of such Material DIP Amendment, the 30 Largest Unsecured Creditors, and (v) the U.S. Trustee. If no party in interest files an objection to the Material DIP Amendment with the Court within three (3) Business Days from the date the notice of the Material DIP Amendment is filed with the Court in accordance with this Section 1.4, the Debtors and the applicable DIP Secured Parties are

authorized and empowered to implement, in accordance with the terms of the applicable DIP Loan Documents, such Material DIP Amendment, without further notice, hearing or approval of this Court. Any Material DIP Amendment subject to a timely and unresolved objection must be approved by the Court to be effective.

      1.5     <u>Payments and Application of Payments</u>.

      (a)     All proceeds of the Prepetition ABL Collateral received by any Prepetition Secured Parties, or by any of the Debtors, and any other amounts or payments received by the DIP Agents, any DIP Lender or any of the Debtors in respect of the DIP Obligations, shall be applied or deemed to be applied on a dollar-for dollar basis by the DIP Agents first to repayment of the remaining Prepetition ABL Obligations, then to the repayment in full of the DIP Obligations until indefeasibly paid in full in accordance with the DIP Loan Agreements, the other DIP Loan Documents, and this Interim Order; *provided* that any repayment of the Prepetition ABL Obligations shall be subject to the terms of this remainder of this Interim Order and Section 4.1(a) hereof.

      (b)     Upon entry of this Interim Order, without further action by the Debtors or any other party, (i) the Prepetition Letters of Credit shall become Letters of Credit under the DIP Obligations; (ii) 50% of the Prepetition Secured Obligations shall become DIP Obligations; (iii) all cash proceeds of U.S. Priority Collateral securing U.S. Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay down outstanding obligations under the U.S. Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the U.S. DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; (iv) all cash proceeds of Global Prepetition ABL Collateral securing

Global Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay-down outstanding obligations under the Global Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the Global DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; provided, however, that this section shall be subject to section 4.1 of this Interim Order and Local Rule 4001-2(g)(5).

1.6    <u>Continuation of Prepetition Procedures</u>.  Except to the extent expressly set forth in the Prepetition Loan Documents and DIP Loan Documents, all prepetition practices and procedures for the payment and collection of proceeds of the Prepetition ABL Collateral, sleeving, the turnover of cash, the delivery of property to the U.S. Prepetition Agents and the U.S. Prepetition Lenders, including the Deposit Account Control Agreements (as such term is defined in the U.S. Prepetition Credit Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption.

1.7    <u>Indemnification</u>.  The Debtors are authorized to indemnify and hold harmless the DIP Agents, each DIP Lender and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

Section 2.    <u>Postpetition Lien; Superpriority Administrative Claim Status.</u>

2.1    <u>Postpetition Lien</u>.

(a)     <u>Postpetition DIP Lien Granting</u>.  To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of Debtors to the DIP Secured Parties of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Agents, for the benefit of themselves and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "<u>DIP Liens</u>", and together with the Prepetition Liens on the DIP Collateral, the "<u>DIP Liens</u>") in and upon all DIP Collateral, subject to the priority set forth in Section 2.1(b), below.

(b)     <u>DIP Lien Priority in Collateral</u>.  The DIP Liens securing all DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; <u>provided</u>, <u>however</u>, that the DIP Liens on the (i) DIP Collateral shall be subject to the Carve Out and Permitted Liens (as defined in the applicable DIP Loan Agreement) and (ii) Prepetition Term Collateral shall be subject to the Carve Out, Permitted Liens, Prepetition Term Liens, and any adequate protection liens or claims granted pursuant to the Prepetition Term Adequate Protection Orders (the "<u>Prepetition Term Adequate Protection Liens and Claims</u>"); *provided,* for the avoidance of doubt, the Prepetition Term Adequate Protection Liens and Claims shall be limited to the (i) prepetition collateral granted to any Prepetition Term Party under the respective Prepetition Term Loan Documents (as defined in the Motion) and (ii) the borrowers under the applicable Prepetition Term

Loan Facility under which such Prepetition Term Party is a party and any other Debtor against whom such Prepetition Term Party has a Prepetition Term Lien.

(c)     <u>Postpetition Lien Perfection.</u>  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) party to a Deposit Account Control Agreement or other depository account consisting of DIP Collateral (a "<u>Perfection Act</u>").  Notwithstanding the foregoing, if either DIP Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then such DIP Agent is authorized to perform such act, and the Debtors and Guarantors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  The DIP Agents may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should either DIP Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive

or alter the validity, enforceability, attachment, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the DIP Agents' and the DIP Lenders' liens and security interests granted and created by this Interim Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of the United States Bankruptcy Court.  By virtue of the terms of this Order, to the extent that any DIP Agent has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Order without further action by the applicable DIP Agent.

(e)     The DIP Liens and the DIP Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of these Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee or any other estate representative appointed or elected in these Cases or any Successor Cases and/or upon the dismissal of any of these Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code; *provided, however,* that notwithstanding the foregoing, the DIP Liens and DIP Superpriority Claims shall be subject to the Carve Out, the Prepetition Term Liens, and Prepetition

Term Adequate Protection Liens and Claims; *provided further* that the DIP Lenders intend to require that the Final Order shall provide, and the Debtors have agreed as a condition to obtaining financing under the DIP Facilities, to seek Court approval at the Final Hearing that the DIP Liens and DIP Superpriority Claims shall not be subject to section 506(c) of the Bankruptcy Code.

2.2    Superpriority Administrative Expenses.

(a)    DIP Loans.    For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents or otherwise, the DIP Agents, for the benefit of themselves and the DIP Lenders, are granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve Out, Prepetition Term Liens, and Prepetition Term Adequate Protection Liens and Claims), whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113 or 1114 of the Bankruptcy Code (other than the Carve Out and Prepetition Term Adequate Protection Liens and Claims), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (other than the Carve Out, the Prepetition Term Liens and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) (the "DIP Superpriority Claims"); *provided, however,* that notwithstanding the foregoing, the DIP Superpriority Claims shall be subject to the Carve Out, the Prepetition Term Liens, and the Prepetition Term Adequate Protection Liens and Claims.

2.3    Carve Out.

(a)    Carve Out.  The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by either DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; provided, however, that the Carve Out shall not include amounts related to any completion fee, success fee, restructuring fee, or similar such fee or compensation in respect of any Professional Persons; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first Business Day following delivery by either DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by either DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence

and during the continuation of an Event of Default and acceleration of an obligation under the applicable DIP Facility stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for both revolving and any outstanding delayed draw term loans under the DIP Facilities (on a pro rata basis based on the then outstanding U.S. Revolving Commitments, DIP Term Loan Commitment, or Global Revolving Commitments (together, the "Commitments")), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for both revolving and any outstanding delayed draw term loans under the DIP Facilities (on a pro rata basis based on the then outstanding Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting

from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Facilities to the contrary, including with respect to the existence of a Default (as defined in the applicable DIP Facility) or Event of Default (as defined in the applicable DIP Facility), the failure of the Debtors to satisfy any or all of the conditions precedent for any of the DIP Loans under any of the DIP Facilities, any termination of the Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the applicable DIP Facility), each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the applicable DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless all DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties (as defined in the Motion), in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been

indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Section 2.3, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Section 2.3, prior to making any payments to the DIP Agents or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Loan Agreements) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facilities, or in any Prepetition Credit Facilities, the Carve Out shall be senior to all liens and claims securing all

of the DIP Facilities, the Prepetition Replacement Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations. For the avoidance of doubt, the Carve Out shall not be senior to the Prepetition Term Liens or the Prepetition Term Adequate Protection Liens and Claims.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, the Prepetition Secured Parties, or the Prepetition Term Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or the Prepetition Term Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

2.4     Excluded Professional Fees.  Notwithstanding anything to the contrary in this Interim Order, none of the (i) Carve Out, (ii) DIP Facilities, (iii) DIP Collateral, Prepetition ABL Collateral, DIP Loans, ABL Cash Collateral, Revolving Loans, Letters of Credit, or (iv) any other credit or financial accommodations provided under or in connection with any of the DIP Loan Documents, nor the proceeds of any of the foregoing may be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional Person, directly or indirectly, or by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in these Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any of the following unless, with respect to (ii)-(iv),  agreed to in writing by the DIP Lenders:

(a)     an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the (A) Prepetition Secured Obligations or Prepetition Secured Parties' liens on and security interests in the Prepetition ABL Collateral, and (B) the DIP Obligations or any DIP Agent's or DIP Lender's liens on and security interests in the DIP Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Prepetition Secured Obligations or Prepetition Secured Parties' liens on and security interests in the Prepetition ABL Collateral, and (B) the DIP Obligations or any DIP Agent's or DIP Lender's liens on and security interests in the DIP Collateral; or (iii) preventing, hindering or delaying either DIP Agent's or DIP Lenders' enforcement of any lien, claim, right or security interest or realization upon any DIP

Collateral in accordance with the terms and conditions of either DIP Loan Agreement or any DIP Loan Documents, respectively, and this Interim Order;

(b)     (i) to use or seek to use ABL Cash Collateral; (ii) except as permitted by the DIP Loan Documents, to sell or otherwise dispose of the DIP Collateral (or any portion thereof) other than in accordance with the terms of this Interim Order; (iii) except to the extent permitted by the DIP Loan Documents, to use or seek to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agents and the applicable Required DIP Lenders (as defined in the applicable DIP Loan Document); (iv) except to the extent expressly permitted by the DIP Loan Documents, to seek authorization to incur Indebtedness or Financial Indebtedness (as defined in the applicable DIP Loan Agreements) or to incur liens or security interests; (v) to object to or challenge in any way the rights granted or provided to the DIP Secured Parties under the terms of this Interim Order or the Bankruptcy Code, the DIP Liens, DIP Obligations, Prepetition Liens, Prepetition Secured Obligations, DIP Collateral (including ABL Cash Collateral or Prepetition ABL Collateral or any other claims or liens held by or on behalf of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, respectively, (vi) to prosecute or support any plan of liquidation or reorganization that crams down or reinstates the Prepetition Secured Obligations, (vii) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Released Parties with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition

Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any challenge to, claim, or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents or the Prepetition Secured Obligations, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, limit, restrict, subordinate, disallow, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the DIP Collateral, the Prepetition ABL Collateral, the Prepetition Secured Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agents or the DIP Lenders hereunder or under any of the DIP Loan Documents, the Prepetition Secured Parties under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and this Order and/or the Final Order (as applicable) (provided, however, and subject to entry of the Final Order, that an amount no more than, $50,000 in the aggregate, to be incurred solely by the Committee (the "Investigation Budget Amount") of the DIP Collateral or proceeds from the borrowings under the DIP Facilities or any other amounts, may be used for allowed fees and expenses in investigating (but not objecting to, challenging, litigating (including by way of discovery), opposing, or seeking to subordinate or recharacterize) the validity, enforceability, perfection, priority or extent of the Prepetition Liens, the Prepetition

Loan Documents, or the Prepetition Secured Obligations, within the applicable challenge period as set forth in Section 4.1.

(c)     any act which has or could adversely modify or compromise the rights and remedies of any DIP Secured Party and/or Prepetition Secured Party under this Interim Order, including, without limitation, a challenge to the ability of any DIP Secured Party or Prepetition Secured Party to credit bid in connection with the sale of any assets of the Debtors, or which directly results in the occurrence of a DIP Termination Event under any DIP Loan Documents, or this Interim Order.

2.5     Use of ABL Cash Collateral; Adequate Protection.

(a)     Authorization to Use ABL Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and consistent with the Approved Budget, the Debtors shall be and are hereby authorized to use the ABL Cash Collateral (as defined in section 363 of the Bankruptcy Code) for the period commencing on the date of this Interim Order and terminating upon the occurrence of a DIP Termination Event.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of ABL Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Loan Documents and compliance with the Approved Budget.  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any ABL Cash Collateral shall not be used as a basis to challenge any of the Prepetition Secured Obligations, or the extent, validity, enforceability or perfected status of any of the Prepetition Liens.

(b)     Prepetition Replacement Liens.   As adequate protection for the Diminution in Value of their interests in the Prepetition ABL Collateral (including ABL Cash Collateral) and the subordination to the Carve Out, the Prepetition Secured Parties for the benefit of themselves and the Prepetition Lenders, are hereby granted pursuant to sections 361 and 363 of the Bankruptcy Code, and solely to the extent of the Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all DIP Collateral other than the Prepetition Term Collateral (the "Prepetition Replacement Lien").   The Prepetition Replacement Lien shall be junior and subordinate only to (i) the Carve Out, (ii) the Permitted Liens (as defined in the DIP Loan Agreements) (iii) Prepetition Secured Parties and Prepetition Lenders' liens on the DIP Collateral to secure the Prepetition ABL Obligations, and (iv) the DIP Agents' and DIP Lenders' DIP Lien on the DIP Collateral.  Notwithstanding the foregoing, payment of any documented fees, costs and expenses of the Prepetition Term Parties pursuant to the respective Adequate Protection Order, including all reasonable and documented professional and advisory fees, costs, and expenses of legal, financial and other professionals, shall not be subject to disgorgement.

(c)     Prepetition 507(b) Priority Claims.   As additional adequate protection for the Diminution in Value, the Prepetition Secured Parties for the benefit of themselves and the Prepetition Lenders, are hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of the Diminution in Value, an allowed superpriority administrative expense claim in each of these Cases and any successor bankruptcy cases (the "Prepetition Adequate Protection Superpriority Claim").  The Prepetition Adequate Protection Superpriority Claim shall be junior only to (i) the Carve Out, and (ii) the DIP Superpriority Claim, and (iii) the Prepetition Term Adequate Protection Liens and Claims, and

shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

(d)     Fees and Expenses.  The Prepetition Secured Parties for themselves and for the benefit of the applicable Prepetition Lenders, shall receive from the Debtors current cash payments of all reasonable and documented out-of-pocket fees and expenses (whether incurred prepetition or post-petition) of Allen & Overy LLP; Willkie Farr & Gallaher LLP; Milbank, Tweed, Hadley & McCloy LLP; Norton Rose Fulbright LLP and such other local counsels and advisors as may be required thereby (the "Creditor's Counsel"); provided, that any invoices submitted to, and payments made by, the Debtors under this Section 2.5(d) shall be subject to the procedures set forth in Section 5.14 of this Interim Order.

(e)     Adequate Protection Payments. The Prepetition Secured Parties for themselves and for the benefit of the applicable Prepetition Lenders, shall receive from the Debtors periodic adequate protection payments (the "Adequate Protection Payments") in an amount resulting from applying a per annum rate equal to the non-default interest rate under the applicable Prepetition Credit Facility to the aggregate outstanding amount of Prepetition Secured Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date (and not, for the avoidance of doubt, at any different rate set forth in any of the applicable Prepetition Credit Facilities); provided, however, that any Adequate Protection Payment shall be without prejudice, and with a full reservation of rights, as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as principal payments under the applicable Prepetition Credit Facilities (whether as to principal, interest or otherwise).  The Adequate Protection Payments will be calculated on a monthly basis, and be due and payable on the first business day of each month occurring after the first full month following the Petition Date.

(f)     Adequate Protection Reservation.  The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to paragraph 2.5 of this Interim Order shall not be deemed an admission that the interests of the Prepetition Secured Parties are indeed adequately protected.  Further, nothing contained in this Interim Order shall prejudice or limit the rights of the Prepetition Secured Parties, subject to the Prepetition Intercreditor Agreements, to seek additional relief with respect to the use of ABL Cash Collateral or for additional adequate protection.

Section 3.     Default; Rights and Remedies; Relief from Stay.

3.1     Events of Default.  The occurrence of (a) any "Event of Default" as that term is defined in each of the DIP Loan Agreements; (b) any failure to meet or satisfy any Milestone in accordance with the applicable DIP Loan Agreement; (c) the Maturity Date under any DIP Loan Agreement; and/or (d) any violation, breach or default by any Debtor with respect to any of its obligations under this Interim Order, shall constitute a "DIP Termination Event" hereunder unless waived in writing by the applicable DIP Secured Parties and in accordance with the applicable DIP Loan Documents.

3.2     Rights and Remedies upon a DIP Termination Event.

(a)     Subject to the terms and provisions of the Prepetition Term Adequate Protection Orders, upon the occurrence of and during the continuance of a DIP Termination Event, the DIP Agents shall be entitled to take any act or exercise any right or remedy as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under their respective DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains (including provision of any Letters of Credit); (iii) terminate the DIP Facilities and any DIP Loan Document as to any

future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any ABL Cash Collateral and all authority to use ABL Cash Collateral shall cease, subject to section 3.2(b); (v) invoke the right to charge interest at the default rate under the DIP Loan Documents; (vi) freeze monies or balances in the Debtors' accounts constituting Collateral; (vii) immediately setoff any and all amounts in accounts maintained by the Debtors with the applicable DIP Agents or the DIP Lenders against the DIP Obligations; (viii) otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral for application towards the DIP Obligations, subject to section 3.2(b); and (A) take any other actions or exercise any other rights or remedies permitted under this Order, the DIP Loan Documents or applicable law; *provided, however*, that prior to the exercise of any right set forth in this paragraph, the applicable DIP Agent shall be required to provide three (3) Business Days' written notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee of its intent to exercise its rights and remedies (the "Enforcement Notice Period") other than with respect to funding of the Carve Out. The DIP Secured Parties shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of a DIP Termination Event, or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute a DIP Termination Event. For the avoidance of doubt, notwithstanding the forgoing, the Debtors may use ABL Cash Collateral for (i) the Carve Out Reserves, as set forth in Section 2.3; and (ii) subject to the Approved Budget, amounts that the Debtors have determined in good faith are, in the ordinary course, critical to the preservation of

the Debtors and their Estates and have approved in advance in writing by the applicable Required DIP Lenders.

(b)     Unless during such Enforcement Notice Period the Court determines that a DIP Termination Event has not occurred, the DIP Agents and the DIP Lenders shall be deemed to have received relief from the automatic stay, and subject in each case to the terms and conditions of the Prepetition Term Adequate Protection Orders, may (unless stayed) foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtor ABL Obligors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by the DIP Loan Documents in accordance with applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise.   During the Enforcement Notice Period, the Debtors may use ABL Cash Collateral to pay, subject to the Approved Budget, only the following amounts and expenses: (i) the Carve Out Reserves, as set forth in section 2.3; and (ii) subject to the Approved Budget, amounts that the Debtors have determined in good faith are, in the ordinary course, critical to the preservation of the Debtors and their Estates and have approved in advance in writing by the applicable Required DIP Lenders. The Debtors shall reasonably cooperate with the DIP Agents and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise, and the Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agents and the DIP Lenders set forth in this Interim Order and in the DIP Loan Documents, other than to dispute whether a DIP Termination Event has in fact occurred; *provided, however,* that none of the DIP

Secured Parties shall object to a request by the Debtors for an expedited hearing before the Court to contest whether a DIP Termination Event has in fact occurred.

### 3.3    Modification of Automatic Stay.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to (i) permit the DIP Agents to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Loan Agreements, the DIP Security Agreements, or the other DIP Loan Documents, as applicable, including, without limitation, (A) to implement the postpetition financing arrangements authorized by this Interim Order, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition ABL Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs and expenses permitted under any of the DIP Loan Documents and apply such payments to the Prepetition ABL Obligations, and (D) immediately following the expiration of the Enforcement Notice Period (as referred to above), unless stayed, to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents or applicable law; *provided* that the authorization set forth in this paragraph 3.3(a) shall be subject in each case to the terms and conditions of the Prepetition Term Adequate Protection Orders and (ii) to permit the Stalking Horse Bidder to terminate the Stalking Horse Agreement in accordance with its terms and to deliver any notice or election contemplated thereunder.

### Section 4.    Representations; Covenants; and Waivers.

### 4.1    Reservation of Third Party Challenge Rights.

(a)     Objections to Prepetition ABL Obligations.  Notwithstanding anything to the contrary in the Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, a "Prepetition Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind regarding: (i)  the existence, validity or amount of the Prepetition ABL Obligations, as of the Petition Date, (including as to the value of a secured claim of the Prepetition Agent and Prepetition Lenders solely with respect to Prepetition ABL Obligations, pursuant to section 506(a) of the Bankruptcy Code) or (ii) the extent, legality, validity, perfection or enforceability of the Prepetition Secured Parties and Prepetition Lenders' respective prepetition liens and security interests in the Prepetition ABL Collateral solely with respect to Prepetition ABL Obligations, shall be properly filed with the Court (x) by the Committee, if a Committee is appointed and if the Court grants the Committee the requisite standing, within sixty (60) calendar days from the date of entry of the Final Order (the "Committee Challenge Period"), or (y) if no Committee is appointed, by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of the Final Order (such period, together with the Committee Challenge Period, the "Challenge Periods" and each, a "Challenge Period"); provided, however, that nothing herein shall permit any party to challenge the extent or validity of the DIP Obligations or any liens that secure such DIP Obligations or provide standing to any such party; provided further however, that the portion of the Roll-Up effective immediately upon entry of this Order shall be subject to Local Rule 4001-2(g)(5).  If any such Prepetition Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering some or all of the relief requested in such Prepetition Objection, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the

Prepetition ABL Obligations or the Prepetition Secured Parties or the Prepetition Lenders' liens on the Prepetition ABL Collateral. If no Prepetition Objection is timely and properly filed, or if a Prepetition Objection is timely and properly filed but denied, (i) the Prepetition ABL Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Secured Parties and the Prepetition Lenders' prepetition liens on and security interest in the Prepetition ABL Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes, and (ii) the Prepetition Secured Parties and the Prepetition Lenders, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Prepetition Loan Documents and the Prepetition ABL Obligations, and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time. The stipulations set forth in <u>Section E</u> of this Interim Order shall be binding upon each party in interest, including the Committee (if appointed) unless the Committee or any other party in interest with the requisite standing, (i) timely files a Prepetition Objection pursuant to Section 4.1(a)(x) or 4.1(a)(y) above, as applicable, and (ii) such Prepetition Objection is sustained by a final and non-appealable order. Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Prepetition Secured Parties or any Prepetition Lenders in connection with all postpetition Revolving Loans and Letters of Credit, and any other postpetition financial and credit accommodations provided by Prepetition Secured Parties to Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this

Interim Order and the Prepetition Loan Documents. Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to the DIP Agents or DIP Lenders in connection with all postpetition financial and credit accommodations provided by the DIP Agents or DIP Lenders in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the DIP Loan Documents.

(b)     Nothing in this Interim Order vests or confers on the Committee or any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their Estates, and all rights to object to such standing are expressly reserved.

(c)     If the DIP Facilities are not approved on a final basis due to the existence and approval of competing or alternative debtor-in-possession financing (a "Competing DIP Facility"), the Debtors, Guarantors, and Prepetition Obligors shall pay in cash within 15 days all amounts, obligations, and liabilities owing or payable to any Prepetition Secured Parties Prepetition Lenders, DIP Agents, or DIP Lenders, including any counsel or professionals retained by such Prepetition Secured Parties, Prepetition Lenders, DIP Agents, or DIP Lenders under the Prepetition Loan Documents or DIP Loan Documents including, without limitation, (i) any and all DIP Obligations and (ii) any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges and disbursements of the respective Prepetition Secured Parties (including the reasonable and documented fees and expenses of each of the Prepetition Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case constituting all "Obligations" as defined in the Prepetition

Loan Documents. For the avoidance of doubt, the "DIP Obligations" set forth in this Interim Order will include reasonable and documented fees and expenses incurred by the DIP Secured Parties in connection with the negotiation and preparation of the Stalking Horse Bid and any related documents.

4.2     Debtors' Waivers.  Prior to the payment in full of all Prepetition ABL Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event:  (a) to use ABL Cash Collateral of DIP Agents, the DIP Lenders, or the Prepetition Secured Parties under section 363 of the Bankruptcy Code; (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations, other than as provided in this Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Prepetition ABL Collateral is less than the Prepetition ABL Obligations; (d) to propose, support or have a plan of reorganization or liquidation that does not provide for the payment in cash in full and satisfaction of all DIP Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Loan Documents; (e) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lenders or the Prepetition Lenders from exercising their credit bid rights in connection with the sale of any Assets of the Debtors; or (f) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (i) the rights and remedies of any of the DIP Agents or the DIP Lenders against the Debtors as provided in this Interim Order or any of the DIP Loan Documents or (ii) the exercise of such rights or remedies by any of the DIP

Agents or the DIP Lenders against the Debtors in accordance with the DIP Loan Agreements or this Interim Order (other than to object to the exercise of the rights and remedies within the Enforcement Notice Period on the grounds set forth in Section 3.2 of this Interim Order); provided, however, that the DIP Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agents or any DIP Lender.

4.3     Collateral Rights.     Until all Prepetition ABL Obligations and DIP Obligations shall have been paid in full in accordance with the terms of the Prepetition Loan Documents and DIP Loan Documents, it shall be a DIP Termination Event pursuant to section 3.1 of this Interim Order if any Debtor takes any of the following actions, except to the extent permitted by, and subject in all respects to, the DIP Loan Documents and the Prepetition Term Adequate Protection Orders: take any action to foreclose upon or recover, in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Interim Order, or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or the Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any DIP Termination Event.

Section 5.     Prepetition Term Lender Adequate Protection Liens and Claims

5.1     As adequate protection for the Prepetition Term Parties' respective interests in their respective Prepetition Term Collateral, pursuant to section 361 and 363(e) of the Bankruptcy Code, and as a condition for the Debtors' use of their Prepetition Term Collateral, including any Prepetition Term Cash Collateral, each of the Prepetition Term Parties is granted the adequate protection set forth in (a) the relevant Prepetition Term Adequate Protection Order or (b) if no Prepetition Term Adequate Protection Order has been entered with respect to any Prepetition Term Party, (i) cash payment of all accrued and unpaid interest, at the applicable non-

default rates provided in the respective Prepetition Term Loan Document and (ii) continued maintenance of and appropriate insurance on the applicable collateral in amounts consistent with the Debtors' prepetition practices as set forth in the applicable Prepetition Term Loan Document; *provided, however,* that the Debtors reserve the right to seek recharacterization of adequate protection as being applied to principal and/or seek a determination on the value of the Prepetition Term Collateral. Notwithstanding the foregoing, payment of any documented fees, costs and expenses of the Prepetition Term Parties pursuant to the respective Adequate Protection Order, including all reasonable and documented professional and advisory fees, costs, and expenses of legal, financial and other professionals, shall not be subject to disgorgement.

      5.2     Subject to the provision of the Prepetition Term Adequate Protection Liens and Claims, and the terms of the Prepetition Term Adequate Protection Orders, the Debtors are authorized to use the Prepetition Term Collateral, including the Prepetition Term Cash Collateral.

Section 6.     <u>Other Rights and DIP Obligations.</u>

      6.1     <u>No Modification or Stay of This Interim Order</u>. The DIP Agents and the DIP Lenders have acted in good faith in connection with the DIP Facilities, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, reversed, amended or vacated by a subsequent order of the Court or any other court, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Prepetition Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, any of the DIP Loan Documents or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or

(c) the dismissal or conversion of one or more of the Cases (each, a "Subject Event"), (x) the acts taken by each of the DIP Secured Parties in accordance with this Interim Order, and (y) the DIP Obligations incurred or arising prior to DIP Agents' actual receipt of written notice (email being sufficient) from the Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by each such DIP Secured Party in accordance with this Interim Order, and the liens granted to each DIP Secured Party in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of each DIP Secured Party pursuant to this Interim Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code. For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

6.2     Rights of Access and Information. The Debtors shall comply with the rights of access and information afforded to any DIP Secured Party under the DIP Loan Documents, the Debtors shall be and hereby are required to afford representatives, agents and/or employees of the DIP Agents and the DIP Lenders reasonable access to the Debtors' premises during normal business hours and without interference with the proper operation of the Debtors' businesses and their books and records, and shall reasonably cooperate, reasonably consult with, and reasonably provide to such persons all reasonable information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors; *provided* that (a) the costs and expenses of only one inspection per month will be reimbursed (if such inspection is not conducted by the DIP Agents), (b) representatives of the Debtors and the DIP Agents shall have been provided a reasonable opportunity to be present during the inspection, and (c) in no

event shall such inspection rights require the Debtors to provide any such information (i) in respect of which disclosure is prohibited by law or (ii) is subject to attorney-client privilege or constitutes attorney work-product.

6.3     Power to Waive Rights; Duties to Third Parties.  The DIP Agents shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lenders (the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by the DIP Agents of any DIP Lender Rights shall not be or constitute a continuing waiver unless otherwise provided therein.  Any delay in or failure to exercise or enforce any DIP  Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

6.4     No Unauthorized Disposition of Collateral.  The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and ABL Cash Collateral), other than pursuant to the terms of this Interim Order, the DIP Loan Documents, and the Prepetition Term Adequate Protection Orders.

6.5     No Waiver.  The failure of the DIP Lenders to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facilities, or the Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including

without limitation, the rights of the DIP Lenders to: (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; or (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders.

6.6    <u>Maintenance of DIP Collateral</u>.   Unless the DIP Agents, acting at the direction of the applicable Required DIP Lenders, otherwise consent in writing, until (x) the payment in full or otherwise acceptable satisfaction of all DIP Obligations and (y) the termination of the DIP Agents' and the DIP Lenders' obligations to extend credit under the DIP Facilities, the Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents and in each case in accordance with the DIP Loan Documents.   Upon entry of this Interim Order and to the fullest extent provided by applicable law, each of the DIP Agents (on behalf of the applicable DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

6.7    <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Agent and DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates; *provided,*

*however,* that all such rights shall be subject to the terms and conditions of the Prepetition Term Adequate Protection Orders.

      6.8    <u>Binding Effect</u>.

      (a)    All of the provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, all Liens, and claims granted hereunder in favor of each of the DIP Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of each DIP Agent, DIP Lender, and Prepetition Secured Party set forth herein, including without limitation the parties' acknowledgements, stipulations, and agreements in paragraph E of this Interim Order, subject to section 4.1 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming and use of ABL Cash Collateral provided for hereunder) provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and enforceable immediately upon entry of this Interim Order notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any other order or action, including without limitation any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting one or more of the Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Cases, approving any sale of any or all of the DIP Collateral or the Prepetition ABL Collateral, or vacating, terminating, reconsidering, revoking or otherwise modifying this Interim Order or any provision hereof; *provided* that in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order with respect to any DIP Obligations incurred by the Debtors upon or after entry of the Final Order.

(b)     Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (i) the DIP Superpriority Claim and the DIP Agents' and DIP Lenders' liens on and security interests in the DIP Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition ABL Obligations are indefeasibly paid and satisfied in full, (ii) the DIP Superpriority Claim and DIP Agents' and DIP Lenders' liens on and security interests in the DIP Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)     In the event this Court modifies any of the provisions of this Interim Order or any of the DIP Loan Documents following a Final Hearing, such modifications shall not affect the rights or priorities of any DIP Agent or DIP Lender pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications.

(d)     This Interim Order shall be binding upon Debtors, the Prepetition Obligors, all parties in interest in the Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This

Interim Order shall also inure to the benefit of Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

6.9     Discharge.  The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties has otherwise agreed in writing.  Prior to the payment in full of either DIP Facility, it shall be a DIP Termination Event under such DIP Facility if the Debtors propose or support any Chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the payment of the DIP Obligations (other than indemnities then due and payable) in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, within a commercially reasonable period of time, and in any event no later than the effective date of such Chapter 11 plan or sale, without the written consent of the DIP Agents and the applicable Required DIP Lenders.

6.10     No Priming of Prepetition Secured Obligations.  Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the Prepetition Lenders, no Debtor shall seek authorization from this Court to obtain or incur any Indebtedness or enter into a Competing DIP Facility seeking to impose liens on any Prepetition ABL Collateral ranking on a pari passu or priming basis with respect to the Prepetition Liens held by the Prepetition Lenders; *provided*, however, that nothing herein shall preclude the

Debtors from seeking authorization to incur any Indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the Prepetition Secured Obligations.

6.11    Section 506(c) Waiver.  Subject to the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that in consideration for, among other things, the Carve Out and the payments to be made under the Approved Budget to administer these Cases with the use of ABL Cash Collateral, no costs or expenses of administration which have been or may be incurred in these Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection or enhancement of realization by the DIP Agents or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties or the Prepetition Lenders upon the Prepetition ABL Collateral, as applicable) shall be charged against any of the DIP Agents, DIP Lenders, Prepetition Secured Parties or any Prepetition Lenders or any of the DIP Obligations or Prepetition Secured Obligations or the DIP Collateral or the Prepetition ABL Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

6.12    Section 552(b) Waiver.  Subject to the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that the Prepetition Secured Parties and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) shall

not apply to the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties, the Prepetition Lenders or the Prepetition Secured Obligations.

6.13     No Marshaling/Application of Proceeds.  Subject to the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that in no event shall the DIP Agents, the DIP Lenders, Prepetition Secured Parties or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition ABL Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Loan Documents, as applicable.

6.14     Right to Credit Bid.  Subject to section 363(k) of the Bankruptcy Code, the terms of the DIP Loan Documents, the Final Order, the Prepetition Term Adequate Protection Orders, and section 4.1 hereof, (a) the DIP Agents, DIP Lenders, and each of the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process all or any portion of the full amount of the DIP Obligations, and (b) the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process all or any portion of the full amount of the Prepetition Secured Obligations including, without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code.

6.15     Payment of Lender Fees and Expenses.  Each Debtor shall pay all fees and expenses that may be reasonably required or necessary for the Debtors' performance of their obligations under the U.S. Prepetition Loan Documents, the Global Prepetition Loan Documents, DIP Facilities, the DIP Loan Agreements, or the DIP Loan Documents, as applicable, including, without limitation, the reasonable and documented fees and expenses reimbursable under the DIP

Facilities, the DIP Loan Agreements, or the DIP Loan Documents, as applicable, whether incurred before or after the Petition Date as set forth in this Section 6.15:

(a) All reasonable and documented out-of-pocket costs and expenses of the DIP Agents including, without limitation, reasonable and documented fees and disbursements of counsel to DIP Secured Parties and of counsel to the DIP Agents, incurred in connection with the enforcement or preservation of any rights under the DIP Facilities, the DIP Loan Agreements, or the DIP Loan Documents and any such other documents or any restructuring or "work-out" related hereto and thereto.

(b) <u>DIP Loan Documentation and Related Expenses</u>. Section 6.15(c) notwithstanding, reasonable documented out-of-pocket costs and expenses (including legal fees and expenses) incurred by the DIP Agents or DIP Lenders, as the case may be, in connection with (i) negotiating, drafting, and otherwise documenting this Interim Order, any of the DIP Loan Documents, and any matters related to the foregoing and (ii) the commencement of these Cases (including matters and amounts relating to any "first day" filings or related relief) including prepetition discussions and actions relating to any prepetition financing, including any defaults related thereto, other financing issues, and contingency preparations, shall be due, owing, and payable by the Debtors immediately upon the entry of this Interim Order.

(c) <u>Payment of Certain Fees and Expenses</u>. Under no circumstances shall professionals for any of the DIP Secured Parties be required to comply with the U.S. Trustee fee guidelines or otherwise file a fee or retention application with the Court; *provided, however*, the Debtors shall provide to the U.S. Trustee and the Committee (if appointed) a copy of any invoices received from the DIP Agents or the DIP Lenders for professional fees and expenses during the pendency of these Cases or under this Interim Order within two Business Days of the

Debtors' counsel's receipt thereof. The Debtors shall promptly pay, and/or the DIP Agents are hereby authorized to make an advance under the DIP Loan Documents to timely pay, the submitted invoices for any of the DIP Secured Parties within the ten (10) calendar days of receipt of such invoices.

6.16    Limits on Lender Liability.

(a)    Subject to entry of the Final Order and section 4.1 hereof, in determining to make any loan under the DIP Loan Agreements or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agents and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

(b)    Nothing in this Interim Order or the DIP Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).

(c)    As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

6.17    Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Cases, (b) converting any or all of these Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Cases, or (d) pursuant to which the Court abstains from hearing any of these Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Prepetition Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Cases, following dismissal of any of these Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facilities, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facilities which survive such discharge by their terms) and all commitments to extend credit under the DIP Facilities are terminated, and (ii) in respect of the Prepetition Secured Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties and the Prepetition Lenders provided for in this Interim Order have been indefeasibly paid in full in cash.

6.18    Proofs of Claim.  None of the Prepetition Secured Parties or the Prepetition Lenders shall be required to file proofs of claim in any of these Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s).  Notwithstanding the foregoing, any Prepetition Agent (on behalf of itself and the Prepetition Lenders) is hereby authorized and entitled, in its discretion, but not required, to file (and amend

and/or supplement, as applicable) a master proof of claim for any claims of any of the Prepetition Secured Parties arising from the Prepetition Loan Documents or in respect of the Prepetition Secured Obligations; provided, however, that nothing in this Order shall waive the right of any Prepetition Lender to file its own proof of claim against any of the Debtors.

6.19    No Third Party Rights. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

6.20    No Avoidance.  Subject to section 4.1 hereof, no obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facilities shall be avoidable or recoverable from the DIP Agents or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law; *provided,* for the avoidance of doubt, all such payments or transfers shall be subject to the terms and provisions of the Prepetition Term Adequate Protection Orders.

6.21    Reliance on Order.   All postpetition advances under the DIP Loan Documents are made in reliance on this Order.

6.22    Entry of this Order/Waiver of Applicable Stay.  This Interim Order shall be effective and enforceable upon its entry as of the Petition Date and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

6.23    *Nunc Pro Tunc* Effect of this Order.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry thereof.   Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the

Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

6.24    <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

6.25    <u>Prepetition Term Adequate Protection Orders</u>. The rights and remedies of the DIP Secured Parties under the DIP Loan Documents shall be subject in all respects to the terms and provisions of the Prepetition Term Adequate Protection Orders.

6.26    <u>Effect of Appeal</u>.  To the fullest extent permitted under Section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter  modified, vacated, or stayed on appeal: (a) such stay, modification, or vacation shall not affect the validity of any obligation, indebtedness, or liability incurred or liens granted by the Debtors to any DIP Secured Party prior to the effective date of such stay, modification, or vacation, or the validity, enforceability or priority of any liens, rights, or claims authorized or created under the original provisions of this Interim Order or pursuant to any of the DIP Loan Documents; and (b) any indebtedness, obligation, or liability incurred by the Debtors to any DIP Secured Party under any DIP Loan Document prior to the effective date of such stay, modification, or vacation shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents, and each DIP Secured Party shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Liens and priorities granted to or for its benefit herein or pursuant to the applicable DIP Loan Documents, with respect to any such indebtedness,  obligation, or liability. All DIP credit extensions under the DIP Financing Documents are deemed to have been made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP

Facilities prior to the effective date of any stay, modification, or vacation of this Interim Order cannot as a result of any subsequent order in any of these Cases, or any Successor Case of a Debtor, be (i) subordinated or (ii) deprived of the benefit or priority of the DIP Liens and the Superpriority Claims granted to the DIP Secured Parties under this Interim Order or the DIP Loan Documents.

6.27 <u>General Authorization</u>. The Debtors are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

6.28 <u>Retention of Exclusive Jurisdiction</u>. This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Loan Agreements, and the other DIP Loan Documents; *provided, however,* that no party shall be prevented from seeking relief from this Court to take proceedings relating to the DIP Loan Agreements and the other DIP Loan Documents in any other courts with jurisdiction in accordance with the terms of such agreements.

Section 7. <u>Final Hearing and Response Dates.</u>

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for _____2018, at _____ __.m. (prevailing Eastern Time) before this Court. The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel, if same shall have filed a request for notice. The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at http://dm.epiq11.com/aegean, and such notice is deemed good and sufficient and no further notice need be given. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Jonathan S. Henes, P.C. and Cristine Pirro Schwarzman, and Kirkland &

Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Marc Kieselstein, P.C., Ross M. Kwasteniet, P.C., Adam C. Paul, P.C., and W. Benjamin Winger; (b) counsel to the DIP Lenders, Milbank, 28 Liberty Street, New York, NY 10005, Attn: Lauren Doyle and Norton Rose Fulbright US LLP, 2200 Ross Avenue Suite 3600, Dallas, Texas 75201, Attn: Louis R. Strubeck and Greg Wilkes; (c) counsel to Administrative Agents, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Ana Alfonso; (d) counsel to any Committee; and (e) the U.S. Trustee, Attn: Brian Masumoto; and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on _____, 2018.

Manhattan, New York
Dated: _____, 2018

_____
HONORABLE _____
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

U.S. DIP Agreement

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

November __, 2018

between

AEGEAN BUNKERING (USA) LLC,

as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

The LENDERS Party Hereto,

and

ABN AMRO CAPITAL USA LLC,

as Administrative Agent, Swing Line Lender and an Issuing Bank

TABLE OF CONTENTS

Page

ARTICLE I

**DEFINITIONS**

SECTION 1.01     **Defined Terms** ................................................................................................. 1
SECTION 1.02     **Terms Generally** ........................................................................................... 43
SECTION 1.03     Rounding ........................................................................................................... 44
SECTION 1.04     **Accounting Terms; Changes in GAAP** ...................................................... 44
SECTION 1.05     **Rates** .............................................................................................................. 45
SECTION 1.06     **Letter of Credit Amounts** ........................................................................... 45
SECTION 1.07     **Times of Day; Time for Payment and Performance** ............................... 45
SECTION 1.08     **Certifications** ................................................................................................ 45
SECTION 1.01     **Belgian Terms** .............................................................................................. 45

ARTICLE II

**COMMITMENTS AND CREDIT EXTENSIONS**

SECTION 2.01     **DIP Revolving Credit Facility** ................................................................... 46
SECTION 2.02     **DIP Term Loan Facility** ............................................................................. 47
SECTION 2.03     **Loans and Borrowings.** ................................................................................ 47
SECTION 2.04     **Borrowing Requests.** ................................................................................... 47
SECTION 2.05     **Letters of Credit** .......................................................................................... 48
SECTION 2.06     **Swing Line Loans** ........................................................................................ 54
SECTION 2.07     **Funding of Borrowings** ............................................................................... 56
SECTION 2.08     **Interest Elections** ........................................................................................ 56
SECTION 2.09     **Prepayments** ................................................................................................ 57
SECTION 2.10     **Termination or Reduction of Commitments** ............................................ 59
SECTION 2.11     **Repayment of Loans** ................................................................................... 59
SECTION 2.12     **Interest** .......................................................................................................... 60
SECTION 2.13     **Fees** ................................................................................................................ 60
SECTION 2.14     **Evidence of Debt** ......................................................................................... 61
SECTION 2.15     **Payments Generally; Several Obligations of Lenders** ........................... 62
SECTION 2.16     **Sharing of Payments** ................................................................................... 63
SECTION 2.17     **Compensation for Losses** ........................................................................... 63
SECTION 2.18     **Increased Costs** ........................................................................................... 64
SECTION 2.19     **Taxes** ............................................................................................................. 65
SECTION 2.20     **Inability to Determine Rates** ..................................................................... 69
SECTION 2.21     **Illegality** ....................................................................................................... 69
SECTION 2.22     **Mitigation Obligations; Replacement of Lenders** ................................... 70
SECTION 2.23     **Cash Collateral** ........................................................................................... 71
SECTION 2.24     **Reserves** ....................................................................................................... 72
SECTION 2.25     **Defaulting Lenders** ..................................................................................... 72
SECTION 2.26     **Priority and Liens** ....................................................................................... 74
SECTION 2.27     **Guarantee Limitations (Morocco)** ........................................................... 75

ARTICLE III

## REPRESENTATIONS AND WARRANTIES

SECTION 3.01   **Existence, Qualification and Power** ........................................................ 76
SECTION 3.02   **Authorization; No Violation** ............................................................... 76
SECTION 3.03   **Governmental Authorization; Other Consents** .................................... 77
SECTION 3.04   **Execution and Delivery; Binding Effect** ............................................. 77
SECTION 3.05   **Financial Statements Disclosure; No Material Adverse Effect** ............ 77
SECTION 3.06   **No Material Adverse Change** .............................................................. 77
SECTION 3.07   **Orders** .............................................................................................. 78
SECTION 3.08   **Litigation** .......................................................................................... 78
SECTION 3.09   **No Material Adverse Effect; No Default** ............................................. 78
SECTION 3.10   **Property** ............................................................................................ 78
SECTION 3.11   **Intellectual Property** ......................................................................... 78
SECTION 3.12   **Taxes** ................................................................................................ 79
SECTION 3.13   **Disclosure** ........................................................................................ 79
SECTION 3.14   **Compliance with Laws** ...................................................................... 79
SECTION 3.15   **ERISA Compliance** ........................................................................... 79
SECTION 3.16   **Environmental Matters** ...................................................................... 80
SECTION 3.17   **Federal Regulations** .......................................................................... 81
SECTION 3.18   **Investment Company Act; Other Regulations** ..................................... 81
SECTION 3.19   **Sanctions; Anti-Corruption** ............................................................... 81
SECTION 3.20   **Reserved** ........................................................................................... 82
SECTION 3.21   **No Burdensome Restrictions** .............................................................. 82
SECTION 3.22   **Subsidiaries** ...................................................................................... 82
SECTION 3.23   **Security Documents** ........................................................................... 82
SECTION 3.24   **Labor Relations** ................................................................................ 83
SECTION 3.25   **Insurance** .......................................................................................... 83
SECTION 3.26   **Maximum Position Limits; Risk Management Practices** .................... 83
SECTION 3.27   **No Other Ventures** ............................................................................ 83
SECTION 3.28   **Remittances** ...................................................................................... 83
SECTION 3.29   **Force Majeure** .................................................................................. 83
SECTION 3.30   **Certain Indebtedness** ........................................................................ 84
SECTION 3.31   **Commodity Accounts, Deposit Accounts and Securities Accounts** ..................... 84

ARTICLE IV

## CONDITIONS

SECTION 4.01   **Effective Date** ................................................................................... 84
SECTION 4.02   **Conditions to All Credit Extensions** .................................................. 87

ARTICLE V

## AFFIRMATIVE COVENANTS

SECTION 5.01   **Reporting** .......................................................................................... 88
SECTION 5.02   **Certificates; Other Information** .......................................................... 89
SECTION 5.03   **Notices** .............................................................................................. 91
SECTION 5.04   **Conduct of Business; Preservation of Existence, Etc** .......................... 92

SECTION 5.05     **Maintenance of Properties**................................................................ 92
SECTION 5.06     **Maintenance of Insurance** ................................................................ 92
SECTION 5.07     **Payment of Obligations**.................................................................... 93
SECTION 5.08     **Environmental Matters**.................................................................... 93
SECTION 5.09     **Books and Records** ........................................................................... 93
SECTION 5.10     **Inspection Rights; Update Calls** ..................................................... 93
SECTION 5.11     **Use of Proceeds** ............................................................................... 93
SECTION 5.12     **First and Second Day Orders** ......................................................... 94
SECTION 5.13     **Sanctions; Anti-Corruption Laws** ................................................. 94
SECTION 5.14     **Required Milestones and Actions** ................................................... 94
SECTION 5.15     **Periodic Audit of Borrowing Base** ................................................. 94
SECTION 5.16     **Maximum Position Limits; Risk Management** .............................. 94
SECTION 5.17     **Notification of Account Debtors**..................................................... 94
SECTION 5.18     **Taxes** ................................................................................................ 95
SECTION 5.19     **Additional Collateral; Further Assurances**.................................... 95
SECTION 5.20     **Stored Eligible Commodities** .......................................................... 96
SECTION 5.21     **Cash Management** ........................................................................... 96
SECTION 5.22     **Hedging Policy** ................................................................................ 98
SECTION 5.23     **Commodity Accounts, Deposit Accounts and Securities Accounts**..................... 98

ARTICLE VI

NEGATIVE COVENANTS

SECTION 6.01     **Indebtedness** ..................................................................................... 99
SECTION 6.02     **Liens**.................................................................................................. 99
SECTION 6.03     **Fundamental Changes** .................................................................. 101
SECTION 6.04     **Dispositions** ................................................................................... 101
SECTION 6.05     **Payments** ....................................................................................... 101
SECTION 6.06     **Investments** ................................................................................... 102
SECTION 6.07     **Use of Proceeds** ............................................................................. 103
SECTION 6.08     **Transactions with Affiliates** ......................................................... 103
SECTION 6.09     **Certain Restrictive Agreements** ................................................... 103
SECTION 6.10     **Changes in Fiscal Periods and Accounting** ................................. 104
SECTION 6.11     **Changes in Nature of Business** ..................................................... 104
SECTION 6.12     **Restriction on Use of Proceeds** .................................................... 104
SECTION 6.13     **Budget Variance** ........................................................................... 104
SECTION 6.14     **Sanctions; Anti-Corruption; Use of Proceeds**............................. 104
SECTION 6.15     **Additional Bankruptcy Matters** ................................................... 105
SECTION 6.16     **Limitation on Amendments to Organizational Documents**............... 105
SECTION 6.17     **Limitation on Speculative Transactions, Certain Futures, etc.**........... 105
SECTION 6.18     **Limitation on Cancellation of Indebtedness** ................................ 105
SECTION 6.19     **Limitation on Equity Interests and New Subsidiaries** ................. 105
SECTION 6.20     **Limitation on Modifications to Contractual Obligations** ............. 105
SECTION 6.21     **Risk Management Practices** ......................................................... 106
SECTION 6.22     **Expenses** ........................................................................................ 106

ARTICLE VII

**EVENTS OF DEFAULT**

SECTION 7.01     **Events of Default** ............................................................................ 106
SECTION 7.02     **Application of Payments** ................................................................. 110

ARTICLE VIII

**AGENCY**

SECTION 8.01     **Appointment and Authority** ........................................................... 111
SECTION 8.02     **Agent in Its Individual Capacity** .................................................. 111
SECTION 8.03     **Exculpatory Provisions** ................................................................. 111
SECTION 8.04     **Reliance by Agents** ....................................................................... 111
SECTION 8.05     **Delegation of Duties** ..................................................................... 112
SECTION 8.06     **Successor Administrative Agent, Issuing Bank or Swing Line Lender** ........... 112
SECTION 8.07     **Non-Reliance on Agents and Other Lenders** ................................. 113
SECTION 8.08     **Notice of Default** ........................................................................... 114
SECTION 8.09     **Administrative Agent May File Proofs of Claim** ........................... 114
SECTION 8.10     **Indemnification** ............................................................................. 114
SECTION 8.11     **Intercreditor Agreement** ............................................................... 115
SECTION 8.12     **Collateral Matters** ......................................................................... 115

ARTICLE IX

**MISCELLANEOUS**

SECTION 9.01     **Waivers; Amendments** .................................................................. 116
SECTION 9.02     **Notices** ........................................................................................... 119
SECTION 9.03     **No Waiver; Cumulative Remedies.** ............................................... 120
SECTION 9.04     **Survival of Representations and Warranties** ................................. 120
SECTION 9.05     **Release of Collateral and Guarantee Obligations.** ....................... 120
SECTION 9.06     **Payment of Expenses; Indemnity** ................................................. 121
SECTION 9.07     **Successors and Assigns** ................................................................ 123
SECTION 9.08     **Adjustments; Set-off** ..................................................................... 127
SECTION 9.09     **Counterparts; Integration; Effectiveness; Electronic Execution** ...... 128
SECTION 9.10     **Severability** ................................................................................... 128
SECTION 9.11     **GOVERNING LAW** ..................................................................... 128
SECTION 9.12     Submission to Jurisdiction ................................................................ 128
SECTION 9.13     Acknowledgments. ........................................................................... 129
SECTION 9.14     **WAIVER OF JURY TRIAL** ........................................................ 129
SECTION 9.15     **Confidentiality** ............................................................................. 129
SECTION 9.16     **Specified Laws** .............................................................................. 130
SECTION 9.17     **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.** ...... 131
SECTION 9.18     **Acknowledgement of Security Interests** ....................................... 131
SECTION 9.19     **Loan Documents.** .......................................................................... 132
SECTION 9.20     **Payments Set Aside** ...................................................................... 132
SECTION 9.21     **Spanish Formalities.** ..................................................................... 132

**SCHEDULES**

SCHEDULE 1.1A - Approved Inventory Locations
SCHEDULE 1.1B - Existing Letters of Credit
SCHEDULE 1.1C - Effective Date Eligible Cash Management Banks
SCHEDULE 1.1D - Non-Filing Entities
SCHEDULE 1.1E - Certain Ownership
SCHEDULE 2.01 - Commitments and Lenders
SCHEDULE 2.07 - Funding Account
SCHEDULE 3.03 - FERC Contracts
SCHEDULE 3.08 - Litigation
SCHEDULE 3.10 - Properties; Locations
SCHEDULE 3.11 - Intellectual Property
SCHEDULE 3.16 - Environmental Matters
SCHEDULE 3.22 - Subsidiaries
SCHEDULE 3.23 - Filings and Filing Offices
SCHEDULE 3.25 - Insurance
SCHEDULE 3.27 - Joint Ventures
SCHEDULE 3.30 - Certain Indebtedness
SCHEDULE 4.02(e) Lender Representatives
SCHEDULE 5.14 - Required Milestones
SCHEDULE 6.01 - Indebtedness
SCHEDULE 6.02 - Liens
SCHEDULE 6.03 - Fundamental Changes
SCHEDULE 6.05(c) - Restricted Payment Exceptions
SCHEDULE 6.06 - Investments
SCHEDULE 6.08 - Transactions with Affiliates
SCHEDULE 6.09 - Certain Restrictive Agreements

**EXHIBITS**

EXHIBIT A - Form of Assignment and Assumption
EXHIBIT B - Form of Borrowing Base Report
EXHIBIT C - Debtors' Budget
EXHIBIT D - Form of Interim DIP Order
EXHIBIT E - Form of Marked to Market Report
EXHIBIT F-1 - Form of U.S. Tax Compliance Certificate
EXHIBIT F-2 - Form of U.S. Tax Compliance Certificate
EXHIBIT F-3 - Form of U.S. Tax Compliance Certificate
EXHIBIT F-4 - Form of U.S. Tax Compliance Certificate
EXHIBIT G - Form of Position Report
EXHIBIT H-1 - Form of Borrowing Request
EXHIBIT H-2 - Form of Letter of Credit Request

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of November [_], 2018 (this "**Agreement**"), among AEGEAN BUNKERING (USA) LLC, a limited liability company organized under the laws of Delaware (the "**Borrower**") and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the LENDERS from time to time party hereto, and ABN AMRO CAPITAL USA LLC, a Delaware limited liability company ("**ABN**") as Administrative Agent, Swing Line Lender and an Issuing Bank.

PRELIMINARY STATEMENTS

WHEREAS, on November [__], 2018 (the "**Petition Date**"), the Borrower and the other Debtors (as hereinafter defined) filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of the Debtors, each a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that the Lenders extend credit to it in the form of a debtor-in-possession first-out revolving credit facility in an aggregate principal amount of up to $160,000,000 and a debtor-in-possession first-out multiple draw term credit facility in an aggregate principal amount of up to $72,000,000, subject to the conditions set forth herein. All of the Borrower's obligations under the Facilities are to be guaranteed by Parent and each of the Guarantors (as defined herein). The Lenders are willing to extend such credit, and each of the Issuing Banks is willing to issue letters of credit, to the Borrower, in each case, on the terms and subject to the conditions set forth herein;

WHEREAS, a portion of the Prepetition Obligations in an amount equal to 50% of Prepetition Obligations are to be rolled up as of the Petition Date pursuant to the Interim DIP Order and to be deemed post Petition Date obligations, with additional rollup thereafter as proceeds of pre-petition accounts and proceeds of other assets (if any) are collected, and in the Final DIP Order the remaining amounts not then rolled up as post-petition obligations are to deemed, and will constitute, post-petition obligations of the Borrower, and be entitled to the rights and benefits of post bankruptcy petition obligations, all as set forth in the Interim DIP Order and the Final DIP Order; and

WHEREAS, the respective priorities of the Facility and the other Obligations with respect to the Collateral shall be as set forth in this Agreement, the Interim DIP Order and the Final DIP Order, in each case upon entry thereof (as applicable) by the Bankruptcy Court;

ACCORDINGLY, in consideration of the mutual agreements herein contained and other good valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I

**DEFINITIONS**

SECTION 1.01 **Defined Terms**. As used in this Agreement, the following terms have the meanings specified below:

"**ABN**" has the meaning provided in the introductory paragraph of this Agreement.

"**ABN Representative**" means, so long as ABN is the Administrative Agent hereunder, Melissa Moscola (melissa.moscola@abnamro.com), Martina Cherry (martina.cherry@abnamro.com) and/or any other Person designated from time to time by ABN by written notice to the Lenders.

"**ABR**" means, for any day, a rate per annum equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day **plus** 0.50% and (c) the Adjusted LIBO Rate for a one-month term in effect on such day (taking into account any LIBO Rate floor under the definition of "Adjusted LIBO Rate") **plus** 1.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or such Adjusted LIBO Rate, respectively.

"**ABR Borrowing**" means, as to any Borrowing, the ABR Loans comprising such Borrowing.

"**ABR Loan**" means a Loan that bears interest based on the ABR.

"**Acceptable Reorganization Plan**" means a Debtor Relief Plan that provides for the termination of the Commitments and the payment in full of the Prepetition Obligations and the Obligations (other than contingent indemnification obligations not yet due and payable but which, for the avoidance of doubt, shall be preserved in such Debtor Relief Plan) in cash on the effective date of such Debtor Relief Plan, to the extent not previously paid from the proceeds from a sale under Section 363 of the Bankruptcy Code.

"**Account Control Agreements**" with respect to any Deposit Account, Commodity Account or Securities Account, an account control agreement in form and substance satisfactory to the Required Lenders.

"**Account Debtor**" means a Person who is obligated to the Borrower under an Account Receivable of the Borrower.

"**Account Receivable**" means an account, as defined in Section 9-102 of the UCC, or Payment Intangible of the Borrower.

"**Accounts**" means the aggregate of the unpaid portions of Accounts Receivable arising from the Borrower's sale of Eligible Inventory in the ordinary course of business.

"**Adjusted LIBO Rate**" means, as to any LIBO Rate Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period **divided by** (b) one **minus** the Applicable Reserve Requirement.

"**Administrative Agent**" means ABN, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent appointed in accordance with the terms herein.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth in **Section 9.02**, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agents**" means the Administrative Agent and the Collateral Agent, and "Agent" means each of them, as the context requires.

"**Agreement**" means this Superpriority Secured Debtor-in-Possession Credit Agreement, as amended, restated, waived, modified or supplemented from time to time in accordance with the terms hereof.

"**Anti-Terrorism Law**" means any Requirement of Law relating to economic or trade sanctions, terrorism, corruption, bribery or money laundering.

"**Applicable Law**" means, as to any Person, all applicable Laws binding upon such Person or to which such a Person is subject.

"**Applicable Percentage**" means, with respect to any Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment.  If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments.

"**Applicable Rate**" means, a percentage per annum equal to (i) for LIBO Rate Loans that are Revolving Loans, 3.5% per annum, (ii) for ABR Loans that are Revolving Loans, 3.5% per annum, (iii) for LIBO Rate Loans that are Term Loans, 6.5% per annum, and (iv) for Letter of Credit Fees, 3.5% per annum, and (v) for Swing Line Loans, 3.5% per annum.

"**Applicable Reserve Requirement**" means, at any time for any LIBO Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including, without limitation, any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors of the Federal Reserve Board or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (a) any category of liabilities which includes deposits by reference to which includes deposits by reference to which the applicable LIBO Rate or any other interest rate of a Loan is to be determined, or (b) any category of extensions of credit or other assets which include LIBO Rate Loans. A LIBO Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The Adjusted LIBO Rate for each outstanding LIBO Rate Loan shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Brokerage Accounts**" means brokerage accounts that (a) are maintained by the Borrower with SG Americas, Inc. or another Eligible Commodity Broker for the purpose of allowing the Borrower to engage in the purchase and sale of commodity futures, commodity options, forward or leverage contracts and/or actual or cash commodities, and subject to the Perfected First Lien, subject only to the applicable broker's lien over the account securing only indebtedness of the Borrower to such broker relating to transactions in such account and Permitted Borrowing Base Liens, and (b) are subject to an Account Control Agreement among the Borrower, the Collateral Agent and such broker in form and substance acceptable to the Required Lenders.

"**Approved Foreign Inventory**" means inventory that is (a) located in the United States Virgin Islands (but only if and to the extent that title to such inventory is immediately transferred to a purchaser thereof) or (b) in transit on a barge or other vessel and otherwise satisfies the requirements of Eligible Inventory – Tier 1 or Eligible Inventory – Tier 2.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Approved Inventory Location**" means any pipeline, third-party carrier, terminal or other storage facility that has been notified of the Perfected First Lien on the inventory owned by Loan Parties located in or at such pipeline, third-party carrier, terminal or other storage facility, pursuant to a written notice in form and substance reasonably satisfactory to the Collateral Agent (at the direction of the Required Lenders), and, (a) if such pipeline, third-party carrier, terminal or other storage facility is located in the United States or Canada, which has been approved by the Collateral Agent (at the direction of the Required Lenders), (i) as of the Effective Date and set forth on **Schedule 1.1A** as an Approved Inventory Location or (ii) from time to time after the Effective Date and (b) if such pipeline, third-party carrier, terminal or other storage facility is located outside of the United States or Canada, the inventory located at such pipeline, third-party carrier, terminal or other storage facility constitutes Approved Foreign Inventory, **provided that**, in each case (with respect to clauses (a) and (b) above), at the request of the Collateral Agent (acting at the direction of the Required Lenders), each such storage facility, carrier, bailee or consignee shall also have delivered a written acknowledgment of such notice to the Collateral Agent. **Schedule 1.1A** shall be deemed amended to include any additional Approved Inventory Locations after the Effective Date without further action immediately upon the approval of the Collateral Agent (acting at the direction of the Required Lenders). The Collateral Agent will provide to each Lender, upon any Lender's reasonable request, an updated **Schedule 1.1A**.

"**Asset Purchase Agreement**" means that agreement executed between one or more of the Debtors for the sale of the assets described therein to Mercuria Asset Holdings (Hong Kong) Limited, a company incorporated in Hong Kong with limited liability, dated November 5, 2018.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by **Section 9.07**), and accepted by the Administrative Agent, in substantially the form of **Exhibit A** or any other form approved by the Administrative Agent.

"**Assignment of Claims Act**" means the Federal Assignment of Claims Act of 1940 (31 U.S.C. §3727 et seq.), and any similar Laws.

"**Attributable Indebtedness**" means, as of any date of determination, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"**Availability Period**" means the period from and including the Effective Date to but excluding the Commitment Termination Date.

"**Availability Reserve**" means reserves in such amounts as Administrative Agent in its Permitted Discretion (acting at the written direction of the Required Lenders in the exercise of such

Permitted Discretion), and with two (2) Business Day's prior written notice to the Borrower (and the Administrative Agent and Required Lenders shall be available to discuss any such reserves with the Borrower), may elect to impose from time to time as being appropriate to (i) reflect the impediments to the Administrative Agent's ability to realize upon the Collateral, (ii) to reflect claims and liabilities, including liens and claims that may have (or may appear to have hereafter) priority over that of the Lenders, that the Required Lenders determine will need to be satisfied in connection with the realization upon the Collateral, (iii) reflect the risk that a jurisdiction outside the United States does not give extraterritorial application of orders of the Bankruptcy Court, including (without limitation) with respect to perfection or priority of Liens on assets in the Borrowing Base established by order thereof, (iv) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, the Collateral, the creation, perfection or priority of Liens on Borrowing Base assets (or proceeds thereof), or the validity or enforceability of the Loan Documents or any remedies of the Secured Parties hereunder or thereunder, including (without limitation) matters related to the quality of inventory, rents and costs, taxes, senior obligations and other matters related to the calculation of the Borrowing Base, or (v) reflect Permitted Borrowing Base Liens and the impact thereof (including, without limiting the generality of the foregoing, to reflect the impact (1) on the priority of such Liens on Borrowing Base Assets, (2) of delays arising from such Liens that may impact the collection of Borrowing Base Assets, and (3) on the value of the Borrowing Base from such Liens).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy".

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

"**Basel III**" means all regulations, requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or any United States or foreign regulatory authorities, in each case pursuant to "Basel III", as amended from time to time.

"**Belgian Subsidiary**" means Aegean NWE N.V., a corporation incorporated under the laws of Belgium.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Bidding Procedures Order**" has the meaning given to such term in paragraph D of **Schedule 5.14**.

"**Board**" means the U.S. Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" has the meaning provided in the first paragraph hereof.

"**Borrowing**" means a Revolving Borrowing, a Swing Line Borrowing or a Term Borrowing.

"**Borrowing Base**" means, from time to time, the amount of the Borrowing Base as most recently specified in a written notice by the Required Lenders to the Administrative Agent. The Lenders shall determine the Borrowing Base, using Borrowing Base Reports and other information as permitted herein, as follows:

(a) 100% of Cash; **plus**

(b) 100% of Eligible Net Liquidity in Brokerage Accounts; **plus**

(c) 100% (or in the case of Eligible Accounts Receivable – Tier 1 supported by a letter of credit or credit insurance, 90%) of Eligible Accounts Receivable – Tier 1; **plus**

(d) 95% (or in the case of Eligible Accounts Receivable – Tier 2 with Affiliates, 85%) of Eligible Accounts Receivable – Tier 2; **plus**

(e) 90% of Eligible Unbilled Accounts Receivable; **plus**

(f) 90% of Income Tax Refunds; **plus**

(g) 90% of Eligible Inventory – Tier 1; **plus**

(h) 90% of Eligible Inventory – Tier 2; **plus**

(i) 75% of Eligible Inventory – Tier 3; **plus**

(j) 85% of Eligible LCs Covering Commodities Not Yet Delivered; **less**

(k) 100% of the First Purchaser Lien Amount; **less**

(l) 100% of the Indebtedness secured by Permitted Borrowing Base Liens; **less**

(m) 100% of the Estimated Excise Taxes Payable; **less**

(n) without duplications of any other Availability Reserve or other eligibility criteria, any Availability Reserve.

In no event shall any amounts described in categories (a) through (i) above which may fall into more than one of such categories be counted more than once when making the calculation under this definition. In calculating the Borrowing Base, the following adjustments shall be made:

(i) Any category of the Borrowing Base shall be calculated taking into account any elimination and reduction related to any potential offset to such asset category; and

(ii) if any of the information specified in the definition of "Borrowing Base Report" in **Section 1.01** hereof is not delivered to the Administrative Agent when due in accordance with the terms hereof and such failure shall remain unremedied for a period of five (5) Business Days, the property of the Borrower related to such undelivered information shall be excluded from the

calculation of the Borrowing Base until the next Borrowing Base Date on which the Administrative Agent and the Lenders have received a Borrowing Base Report containing such information but the provisions of this paragraph (ii) shall not constitute a waiver of any Default or Event of Default hereunder.

Promptly following receipt of each Borrowing Base Report required to be delivered hereunder, if the Required Lenders agree on the amount of the Borrowing Base, such Required Lenders shall notify the Administrative Agent in writing of such amount. If following receipt of a Borrowing Base Report required to be delivered hereunder, there is not agreement among the Required Lenders regarding the amount of the Borrowing Base, the Required Lenders shall notify the Administrative Agent in writing that the Borrowing Base is an amount equal to the weighted average (based on Commitment amount) of the amounts determined by the Lenders for the Borrowing Base.

Notwithstanding anything to the contrary herein, in the event the Administrative Agent (acting at the direction of the Required Lenders) imposes any changes to the eligibility criteria or Availability Reserves as a result of changing or reducing credit limits imposed on any account debtor, such changes (i) shall be effective two (2) Business Days following written notice thereof to the Borrower (it being agreed any Accounts created after such notice in excess thereof, may be excluded from the Borrowing Base) and (ii) shall not apply to any Accounts in existence as of the date of imposition of such change.

"**Borrowing Base Availability**" means at any time, the Borrowing Base at such time **minus** the Revolving Credit Exposure at such time **minus** the Prepetition Credit Exposure at such time.

"**Borrowing Base Date**" means at any time, the most recent date as of which the Borrower has calculated a Borrowing Base Report delivered pursuant to **Section 4.01(d)**.

"**Borrowing Base Report**" means a report certified as true and complete by a Responsible Person of the Borrower, substantially in the form of **Exhibit B** attached hereto, with appropriate insertions and schedules, showing the Borrowing Base and Revolving Credit Exposure as of the date set forth therein. Such report shall show the basis on which it was calculated, together with the following supporting information:

(a) for Cash, copies of summary Deposit Account statements issued by ABN (in the case of the Wells Fargo Account) or the applicable Eligible Cash Management Bank where such assets are held, as of the applicable Borrowing Base Date;

(b) a schedule listing each Eligible Account Receivable – Tier 1, Eligible Account Receivable – Tier 2 and Eligible Unbilled Account Receivable, the amount, the counterparty, the time outstanding, if applicable, all offsets, reductions and the contra account balance thereof and, if applicable, the marked-to-market losses, all margin monies received and/or paid and the details of any related letters of credit;

(c) a list of those Eligible Unbilled Accounts Receivable converted into invoices unbilled (with associated invoice numbers);

(d) for Eligible Net Liquidity in Brokerage Accounts, statements for each Commodity Account issued by each Eligible Commodity Broker;

(e) for Eligible Inventory – Tier 1, Eligible Inventory – Tier 2 and Eligible Inventory – Tier 3, a schedule listing inventory locations, Market Value and inventory volumes/quantities by location and type of Eligible Commodity, together with all supporting third party pipeline receipts, terminal tank

receipts and/or inventory statements, and any additional statements issued by terminal/storage facilities to be delivered to the Administrative Agent promptly upon Borrower's receipt, and in any event, no later than the date of delivery of the next Borrowing Base Report following such receipt;

(f)     for Eligible LCs Covering Commodities Not Yet Delivered, a schedule listing each Letter of Credit giving rise to Eligible LCs Covering Commodities Not Yet Delivered, the face amount of such Letter of Credit and the Market Value of the goods to be financed thereunder (and, if applicable, the maximum undrawn amount of such Letter of Credit after giving effect to any tolerance included therein, and the amount of such tolerance);

(g)     a schedule of the First Purchaser Lien Amount, if applicable, setting forth the holder of each First Purchaser Lien and the aggregate First Purchaser Lien Amount of such holder;

(h)     a schedule of the Permitted Borrowing Base Liens, if applicable, setting forth the holder of each Permitted Borrowing Base Lien and the aggregate amount of the Indebtedness secured by the Permitted Borrowing Base Liens;

(i)     a schedule showing the Estimated Excise Taxes Payable for the Borrower, together with a schedule setting forth the balance of any Controlled Account established for the purpose of depositing reserves for federal excise taxes and copies of the most recent bank statements for such accounts, to the extent not previously delivered;

(j)     such other detailed supporting information with respect to the such commodities as requested from time to time by the Required Lenders;

(k)     a summary report showing the total amount outstanding under each type of Credit Extension;

(l)     a schedule of all of the Borrower's accounts payable (including unbilled and provisional accounts payable) listing such accounts payable on a creditor by creditor basis, which shall include an aging of such accounts payable, and specify the nature of such account payable, whether such account payable is due to an Affiliate, whether such account payable is supported by a Letter of Credit issued under the Credit Agreement, and such other supporting information with respect to such accounts payable as requested from time to time by the Required Lenders in their reasonable discretion;

(m)     a schedule listing each Account Receivable of the Borrower that is not included in the Borrowing Base, the amount, the counterparty, the days outstanding, if applicable, all offsets, reductions and the contra account balance thereof and, if applicable, the marked-to-market losses, all margin monies received and/or paid and the details of any related letters of credit; and

(n)     a schedule detailing all deposits to, withdrawals from or other activity in the Chase Account.

"**Borrowing Date**" means any Business Day specified (i) in a Borrowing Request as a date on which a Revolving Loan, Swing Line Loan or Term Loan is to be made or (ii) in a Letter of Credit Request as a date on which a Letter of Credit is to be issued, amended or extended.

"**Borrowing Request**" means a request for a Revolving Loan, Swing Line Loan or a Term Loan, which in each case shall be substantially in the form of Exhibit H-1 attached hereto.

"**Budget**" means the Debtors' budget attached hereto as **Exhibit C**, setting forth (a) in reasonable detail the receipts and disbursements of the Debtors,  on a weekly basis from the Effective Date through the immediately consecutive 13 weeks broken down by week, including the anticipated uses of the Facilities for such period, as such budget may be amended or modified from time to time by the Debtors, provided that the Required Lenders shall have provided prior written consent to any such amendment or modification, together with budgets for subsequent periods proposed by the Debtors and approved by the Required Lenders in their sole discretion.

"**Business Day**" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by Law to close; **provided** that, when used in connection with a LIBO Rate Loan, the term "**Business Day**" means any such day that is also a day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"**Capitalized Lease**" means each lease that has been or is required to be, in accordance with GAAP, recorded as a capitalized lease.

"**Carve Out**" means the term "Carve Out" in the Final DIP Order, or, prior to the entry of the Final DIP Order, the Interim DIP Order.

"**Carve Out Trigger Notice**" has the meaning set forth in the Final DIP Order, or prior to the entry of the Final DIP Order, the Interim Order.

"**Case**" has the meaning provided in the recitals hereto.

"**Cash**" means at the time of any determination thereof, the balance in United States Dollars of collected funds of the Borrower on deposit in (i) a cash collateral account with the Collateral Agent, or (ii) an account maintained with an Eligible Cash Management Bank under arrangements satisfactory to the Required Lenders (including, without limitation, an executed Account Control Agreement in form and substance satisfactory to the Required Lenders), in each case subject to the Perfected First Lien and no other Liens, except Liens permitted under **Section 6.02**, **provided** that the aggregate amount of Cash, if any, included in the Borrowing Base shall be net of the aggregate amount secured by such Liens.

"**Cash Collateral**" means (a) with respect to the Borrower, cash or deposit account balances denominated in United States Dollars that have been pledged to the Collateral Agent, for the ratable benefit of the Secured Parties, to secure repayment of the Obligations, provided that the applicable deposit account is subject to an Account Control Agreement or is in the name, and under the exclusive control, of the Collateral Agent, and (b) with respect to any Defaulting Lender, cash or deposit account balances denominated in United States Dollars that have been pledged to the Collateral Agent, for the benefit of the Swing Line Lender or the Issuing Bank, as the case may be, pursuant to Section 2.25, as security for the obligation of such Defaulting Lender to fund participations in any requested or outstanding Swing Line Loans or Letters of Credit, as applicable; provided that the applicable deposit account is subject to an account control agreement in form and substance reasonably satisfactory Collateral Agent or is in the name, and under the exclusive control, of the Collateral Agent. For the avoidance of doubt, "Cash Collateral" shall include all proceeds of the foregoing.

"**Cash Collateralize**" means (a) with respect to the Borrower, to pledge and deposit with or deliver to the Collateral Agent, for the benefit of one or more of the Issuing Banks or Swing Line Lenders, Cash Collateral as collateral for L/C Obligations or in respect of Swing Line Loans, as applicable, and (b) with respect to any Defaulting Lender, to pledge and deposit with or deliver to the

Collateral Agent, for the benefit of one or more of the Issuing Banks or Swing Line Lenders, as applicable, Cash Collateral as security for the obligations of such Defaulting Lender to fund participations in respect of L/C Obligations or Swing Line Loans, as applicable, in each case pursuant to documentation in form and substance satisfactory to the Collateral Agent and each applicable Issuing Bank or Swing Line Lender, as applicable.

"**Cash Equivalents**" means:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from a Credit Rating Agency;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000.

"**Cash Management Order**" means the Bankruptcy Court order, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, relating to the Debtors' cash management system and bank accounts.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; **provided** that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means an event or series of events by which:  (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial

owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "**option right**")), directly or indirectly, of 35% or more of the Equity Interests of Parent entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); (b) the Direct Parent shall cease to own (directly or indirectly), beneficially and of record, and control, 100% of each class of outstanding Equity Interests of the Borrower free and clear of all Liens, charges or other encumbrances, other than Liens in favor of the Collateral Agent for the ratable benefit of the Secured Parties under the Loan Documents; or (c) Parent shall cease to own (directly or indirectly), beneficially and of record, and control, 100% of each class of outstanding Equity Interests of the Borrower, the Direct Parent and each other Person that is a Subsidiary on the Effective Date (except to the extent permitted hereunder), free and clear of all Liens, charges or other encumbrances, other than (i) Liens (w) in favor of the Collateral Agent for the ratable benefit of the Secured Parties under the Loan Documents, (x) in respect of the Carve Out, (y) contemplated by the Orders (including any adequate protection liens in favor of other lenders), and (z) nonconsensual Permitted Liens or (ii) as otherwise permitted under this Agreement. Notwithstanding the foregoing, ownership as set forth in Schedule 1.1E shall not constitute a Change of Control.

"**Chase**" means JPMorgan Chase Bank, N.A.

"**Chase Account**" means account number 580396377 maintained with Chase.

"**Class**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Borrowings, Swing Line Loans or Borrowings or Term Loans or Borrowings.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, the Debtors' Collateral, the Non-Debtors' Collateral and the "Collateral" as defined or described in any Order.

"**Collateral Account**" has the meaning specified in **Section 2.05(k)**.

"**Collateral Agent**" means ABN, in its capacity as collateral agent under any of the Loan Documents, or any successor collateral agent.

"**Combined Revolving Exposure Limit**" means $160,000,000.

"**Commitment**" means with respect to each Lender on any date, such Lender's Revolving Commitment and Term Commitment.

"**Commitment Termination Date**" means the earliest of (i) [_____][1], 2019 (or if not a Business Day, the first subsequent Business Day); provided that if between [___][2], 2019 and [_____][3], 2019 Borrower requests that the Commitment Termination Date be extended, then if on [_____][4], 2019, (a) no Event of Default is continuing and (b) there remains undrawn Term Commitments in an amount of at least $5,000,000, the Commitment Termination Date shall be extended to [     ],

---

[1] To be 120 days following the Petition Date (or if not a Business Day, the first subsequent Business Day).
[2] Ten days' notice.
[3] Five days' notice.
[4] To be 120 days following the Petition Date (or if not a Business Day, the first subsequent Business Day).

2019[5]; (ii) the effective date of any Plan of Reorganization; (iii) the date of the consummation of a sale of all or substantially all of the Debtors' assets or capital stock under section 363 of the Bankruptcy Code; and (iv) the acceleration of the Loans and termination of the Commitments hereunder, whether pursuant to **Section 7.01** or otherwise.

"**Commodity Account**" has the meaning provided in Section 9-102 of the UCC.

"**Commodity Contract**" means (a) a Physical Commodity Contract, (b) a Futures Contract, (c) any Commodity OTC Agreement or Financial OTC Agreement or (d) contract for the storage or transportation of any physical Eligible Commodity.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Commodity OTC Agreement**": (i) any forward commodity contracts, swaps, options, collars, caps, or floor transactions, in each case based on Eligible Commodities, (ii) any currency swaps, cross-currency note swaps, currency options, interest rate swaps, interest rate caps, or interest rate collars, in each case related to a transaction related to Eligible Commodities and (iii) any other similar transaction (including any option to enter into any of the foregoing) or any combination of the foregoing.

"**Confidential Information**" has the meaning specified in Section 9.15(a).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings analogous thereto. In relation to a Person organized under the laws of Spain this definition shall also include any of the circumstances set forth in Section 42 of the Spanish Commercial Code.

"**Controlled Account**" means each Pledged Account that is subject to an Account Control Agreement and the Wells Fargo Account.

"**Credit Extension**" means (a) a Borrowing or (b) an L/C Credit Extension.

"**Credit Rating**" means a rating as determined by a Credit Rating Agency of the Borrower's non-credit-enhanced, senior unsecured long-term indebtedness.

"**Credit Rating Agency**" means a nationally recognized credit rating agency that evaluates the financial condition of issuers of debt instruments and then assigns a rating that reflects its assessment of the issuer's ability to make debt payments.

---

[5] To be 180 days following the Petition Date (or if not a Business Day, the first subsequent Business Day).

"**Crude Oil**" means crude petroleum oil and all other hydrocarbons, regardless of gravity, produced at the well in liquid form by ordinary production methods.

"**Debtor Relief Law**" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Debtor Relief Plan**" means a plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws.

"**Debtors**" means the Borrower, Parent, and each Subsidiary of Parent that filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code with the Bankruptcy Court on the Petition Date.

"**Debtors' Collateral**" means, collectively, all real, personal, and mixed property (including Equity Interests) of the Debtors' respective estates in the Cases, including, without limitation, all inventory, accounts receivable, general intangibles (including rights under intercompany loans), contracts, chattel paper, owned real estate, real property leaseholds, governmental approvals, licenses and permits, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks (other than any "intent to use" trademark applications for which a Statement of Use or Amendment to Allege Use, as applicable, as not been filed and accepted with the U.S. Patent and Trademark Office), trade names, rights under license agreements and other intellectual property, securities, partnership or membership interests in limited liability companies, and capital stock of any subsidiary of any of the Debtors, including, without limitation, the products and proceeds thereof, in each case excluding Excluded Collateral (as defined in the Security Documents).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate (before as well as after judgment) equal to (a) with respect to overdue principal, the applicable interest rate **plus** 2.0% per annum (**provided** that, with respect to a LIBO Rate Loan, the determination of the applicable interest rate is subject to **Section 2.08(e)** to the extent that LIBO Rate Loans may not be converted to, or continued as, LIBO Rate Loans, pursuant thereto) and (b) with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR Loans in the case of overdue interest or fee **plus** 2.0% per annum.

"**Defaulting Lender**" means, subject to **Section 2.25(b)**, any Lender that (a) has failed to (i) fund all or any portion of its Loans within one Business Day of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the Swing Line Lender, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swing Line Loans) within one Business Day of the date when due, (b) has notified the Borrower, the Administrative Agent, the Swing Line Lender or any Issuing Bank in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing or

public statement) cannot be satisfied), (c) has failed, within one Business Day after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (**provided** that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; **provided** that a Lender shall not be a Defaulting Lender solely as a result of the acquisition or maintenance of ownership of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to **Section 2.25(b)**) upon delivery of written notice of such determination to the Borrower, the Swing Line Lender, each Issuing Bank and each Lender.

"**Deposit Account**" as defined in Section 9-102 of the UCC, and with respect to Canada, any bank account with a comparable deposit function.

"**Direct Parent**" means AMPNI Holdings Co. Limited, a limited liability company incorporated under the laws of the Republic of Cyprus.

"**Direct Parent Pledge Agreement**" means that certain Pledge Agreement dated as of the date hereof by Direct Parent in favor of the Collateral Agent regarding pledge of all the Equity Interests owned by Direct Parent with respect to each Subsidiary thereof, including without limitation that of the Borrower.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interest**" means any Equity Interest that, by its terms (or the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, similar event or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control, similar event or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the sole option of the holder thereof, in whole or in part (other than solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares), (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one days after the Commitment Termination Date; **provided** that if such Equity Interests are issued pursuant to a plan for the benefit of employees of the Borrower or any Subsidiary or by any such

plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"**Documentary Letter of Credit**" means a Letter of Credit intended to be drawn as a means of payment upon the presentation of documents for Eligible Commodities purchased by the Borrower under any Commodity Contract, excluding any such Letter of Credit issued for the primary purpose of serving as a means of payment for or supporting payments for costs, charges or fees relating to transportation, transmission or storage services or similar services

"**Dollar**" and "**$**" mean lawful money of the United States.

"**ECP**" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the first date all the conditions precedent in **Section 4.01** are satisfied or waived in accordance with **Section 9.01**.

"**Eligible Accounts Receivable – Tier 1**" Accounts created by the Borrower (net of any credits, rebates, offsets (including, without limitation, any offset relating to any forward contract marked-to-market loss), holdbacks or other adjustments or commissions and reduced by any sales, use, excise or other taxes, imposts, levies or other governmental charges included therein) that satisfy such eligibility requirements as the Required Lenders may impose from time to time with at least two (2) Business Days prior written notice to the Borrower (and during such time the Administrative Agent and Required Lenders shall be available to discuss such changes), which shall at all times include the requirements that (a) the Borrower has legal, valid and absolute title to such Accounts, subject only to Permitted Borrowing Base Liens, and reasonably and in good faith determines such Accounts to be collectible in full and enforceable in accordance with their terms against the Account Debtors under such Accounts; **provided** that, the amount of the Eligible Account Receivable – Tier 1, if any, included in the Borrowing Base shall be net of the aggregate amount secured by such Permitted Borrowing Base Lien (except Liens in favor of the Collateral Agent for the ratable benefit of the Secured Parties under the Loan Documents); (b) such Accounts are either (i) fully supported by letters of credit on terms and conditions acceptable to the Required Lenders issued by a financial institution acceptable to the Required Lenders, (ii) owing to the Borrower from Account Debtors with an Investment Grade Rating, or (iii) approved for inclusion in Eligible Accounts Receivable – Tier 1 by the Required Lenders in writing; (c) the Account Debtors under

such Accounts:  (i) are not affiliates of the Borrower, (ii) purchased the goods giving rise to the relevant Account in an arm's length bona fide transaction conducted in the ordinary course of business in compliance with all applicable laws and regulations, (iii) are not insolvent or involved in any case or proceeding, whether voluntary or involuntary, under any bankruptcy, reorganization, arrangement, insolvency, adjustment of debt, dissolution, liquidation or similar law of any jurisdiction, (iv) are not the United States government or any department or agency thereof, or any state or municipal government or any department or agency thereof, except if the Borrower has complied in a manner satisfactory to the Required Lenders with the Assignment of Claims Act or any comparable state law, such Accounts as to which the Borrower has so complied shall not be excluded from Eligible Accounts Receivable – Tier 1 by this clause (iv), (v) are organized, located in and primarily conducting business in the United States or any country that is a member country of the Organization for Economic Cooperation and Development, (vi) are not determined by the Borrower or the Required Lenders in their sole judgment to be uncreditworthy, and (vii) have received notice (which may be stamped on the applicable invoices) of the Collateral Agent's lien on the Account and instructions to make payments directly to the  Wells Fargo Account; (d) such Accounts are in payment for goods actually delivered or services or obligations that have been fully performed and are not in dispute or subject to any other claim, defense, offset, reduction or counterclaim or any claim on the part of the Account Debtor denying liability under such Account, and such Accounts shall have been reduced by the amount of all obligations and liabilities of the Borrower to the Account Debtor; (e) such Accounts are not subject to any pledge, restriction, security interest or other lien or encumbrance other than those created by the Loan Documents, the Global Loan Documents or Permitted Borrowing Base Liens; (f) such Accounts are subject to a Perfected First Lien prior to the rights of, and enforceable as such against, any other Person, (g) such Accounts are not outstanding for more than 60 days past the applicable original invoice date therefor; (h) [reserved]; (i) such Accounts represent legal, valid and binding obligations of the applicable Account Debtor, enforceable in accordance with their terms against the Account Debtor; (j) such Accounts are evidenced by an invoice rendered to the Account Debtor and not by any instrument or chattel paper, unless (i) there is only one original of such instrument or chattel paper, (ii) such original shall have been delivered to the Collateral Agent, and (iii) by virtue of such delivery the Collateral Agent shall have a Perfected First Lien on such instrument or chattel paper; (k) such Account arises from a completed sale (on an absolute basis and not on a consignment, sale-and-return, approval or bill and hold basis); (l) such Accounts are payable in U.S. Dollars; (m) such Accounts are not due from any single Account Debtor if more than twenty-five percent (25%) of the aggregate amount of all Accounts owing from such Account Debtor would otherwise not be eligible for inclusion in the Borrowing Base; and (n) such Account shall not be the subject of a Permitted Receivables Sales Transaction.

"**Eligible Accounts Receivable – Tier 2**" all Accounts created by the Borrower (net of any credits, rebates, offsets (including, without limitation, any offset relating to any forward contract marked-to-market loss), holdbacks or other adjustments or commissions and reduced by any sales, use, excise or other taxes, imposts, levies or other governmental charges included therein) which satisfy all of the requirements of Eligible Accounts Receivable - Tier 1 other than clause (b) of the definition thereof, provided that the Account Debtor shall have been approved in writing by the Required Lenders. Notwithstanding the foregoing, (a) the aggregate amount of Eligible Accounts Receivable - Tier 2 due from any Account Debtor and its Affiliates included in the Borrowing Base at any time, after giving effect to the applicable advance rate, shall not exceed 5.0% of the total aggregate amount of Eligible Accounts Receivable - Tier 1, Eligible Accounts Receivable - Tier 2 and Eligible Unbilled Accounts Receivable included in the Borrowing Base at such time, and (b) Eligible Accounts Receivable -Tier 2 due from Account Debtors that are Affiliates of the Borrower shall not be included in the Borrowing Base at any time.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under **Section 9.07(b)(iii)**, **(v)** and **(vi)** (subject to such consents, if any, as may be required under **Section 9.07(b)(iii)**).

"**Eligible Cash Management Bank**" means any financial institution reasonably satisfactory to the Required Lenders.  The financial institutions on **Schedule 1.1C** are satisfactory to the Required Lenders as of the Effective Date.

"**Eligible Commodities**" means bunker fuel, Crude Oil, fuel oil, gas oil, lubricants, and other petroleum products, and with the consent of the Required Lenders, any other energy commodities that are of the type which are purchased, sold or otherwise traded in physical, futures, forward or over the counter markets.

"**Eligible Commodity Broker**" means any commodity broker acceptable to the Required Lenders.

"**Eligible Inventory**" means, at the time of any determination thereof, all inventory of the Borrower's consisting of Eligible Commodities that are acceptable to the Required Lenders, valued at Market Value.  Eligible Inventory shall satisfy such eligibility requirements as the Required Lenders may impose from time to time on at least 2 Business Days prior written notice (during which time the Administrative Agent and the Required Lenders shall be available to discuss such matters), which shall at all times include the following:

(a) such inventory was acquired by the Borrower in the ordinary course of business from a non-Affiliate, or if from an Affiliate, such Affiliate shall be a party to the Global DIP Facility Agreement and the Collateral Agent shall have received an express written release of lien, in form and substance satisfactory to the Required Lenders, duly executed and delivered by an authorized officer of the Facility Agent under the Global DIP Facility Agreement, and such inventory is merchantable and not obsolete, damaged or otherwise unfit for sale or further processing in the ordinary course of business;

(b) the Borrower has legal and valid title to such inventory, free and clear of all Liens other than Perfected First Liens, Liens under the Global Documents or Permitted Borrowing Base Liens and the value of such inventory is reduced by both the Market Value of any net volumetric balance owed by the Borrower to a counterparty which is in possession of the inventory and the aggregate amount secured by such Permitted Borrowing Base Liens;

(c) the Borrower has the full and unqualified right to assign and grant a Lien on such inventory to the Collateral Agent, for the ratable benefit of the applicable Agents and the Secured Parties, as security for the Obligations;

(d) the inventory is subject to a Perfected First Lien, subject only to Permitted Borrowing Base Liens or Liens under the Global Documents;

(e) none of such inventory is evidenced by bills of lading or other documents of title, whether negotiable or non-negotiable, unless such negotiable bill of lading or negotiable document of title has been issued and duly negotiated to the Collateral Agent or to order, or blank endorsed, and in the possession of the Collateral Agent, or such non-negotiable bill of lading or document of title has been issued in the name of and delivered to the Collateral Agent, and, in each case, the issuer is acceptable to the Required Lenders;

(f)     such inventory is either (i) located in the United States at a third party storage facility acceptable to the Required Lenders and such storage facility has executed a control agreement with the Collateral Agent, satisfactory to the Required Lenders, or (ii) in transit on a barge or other vessel to a buyer in connection with a sale in the ordinary course of business and such inventory is (A) evidenced by 3/3 on board negotiable bills of lading that have been issued and duly negotiated to the Collateral Agent, or to order and blank endorsed and in the possession of the Collateral Agent and (B) located on a vessel chartered to the Borrower by a person acceptable to the Required Lenders;

(g)     none of such inventory has given rise to an Eligible Account Receivable – Tier 1, an Eligible Account Receivable – Tier 2 or an Unbilled Eligible Account Receivable; and

(h)     the inventory has not been identified to deliveries with the result that a buyer would have rights to the inventory that would be superior to the Perfected First Liens, nor shall such inventory have become the subject of a customer's ownership or Lien.

Notwithstanding the foregoing, no inventory shall be excluded from Eligible Inventory solely because such inventory is subject to a Permitted Borrowing Base Lien or a Lien under the Global Loan Documents; **provided** that the amount of any such obligations has been deducted in determining the amount of Eligible Inventory.

"**Eligible Inventory – Tier 1**" means Eligible Inventory which meets all of the requirements set forth in the definition of Eligible Inventory (including, without limitation, clause (f) thereof).

"**Eligible Inventory – Tier 2**" means as of any date of determination, inventory of the Borrower in transit on a barge or other vessel which would constitute Eligible Inventory but for the failure to satisfy clauses (e) and (f) of the definition thereof, and is evidenced by copies of negotiable or non-negotiable documents of title issued to the Borrower or the Collateral Agent (and such copies are in the possession of the Collateral Agent), and which was purchased by the Borrower less than 45 days prior to its inclusion in the Borrowing Base (at any time) as Eligible Inventory – Tier 2. Notwithstanding the foregoing, the aggregate amount of Eligible Inventory – Tier 2 included in the Borrowing Base at any time, after giving effect to the applicable advance rate, shall not exceed $40,000,000.

"**Eligible Inventory – Tier 3**" means as of any date of determination, the purchase price of any Eligible Commodities contracted for purchase by the Borrower and actually paid for by the Borrower, but not yet received, **provided** that:

(a)     the applicable supplier has or is required to have title to such Eligible Commodities prior to delivery to the Borrower;

(b)     such Eligible Commodities were purchased and actually paid for by the Borrower less than 10 days prior to their inclusion in the Borrowing Base (at any time) as Eligible Inventory – Tier 3;

(c)     such Eligible Commodities are not included as Eligible LCs Covering Commodities Not Yet Delivered, Eligible Inventory – Tier 1 or Eligible Inventory – Tier 2, in the Borrowing Base but, upon delivery to the Borrower, such Eligible Commodities will qualify as Eligible Inventory – Tier 1 or Eligible Inventory – Tier 2, as applicable; and

(d)     the Borrower has the absolute and unqualified right to obtain such Eligible Commodities from the applicable seller or supplier, and the Borrower's right is subject to the Perfected First Lien and no other equal or prior Liens (other than Permitted Borrowing Base Liens).

Notwithstanding the foregoing, the aggregate amount of Eligible Inventory – Tier 3 included in the Borrowing Base at any time, after giving effect to the applicable advance rate, shall not exceed $7,000,000.

"**Eligible LCs Covering Commodities Not Yet Delivered**" means, as of any date of determination, the face amount of any Letter of Credit supporting the purchase price of any Eligible Commodities contracted for purchase by the Borrower, **provided** that:

(a)     the applicable supplier has or is required to have title to such Eligible Commodities prior to delivery to the Borrower;

(b)     such Eligible Commodities are not included as Eligible Inventory – Tier 1 or Eligible Inventory – Tier 2, in the Borrowing Base but, upon delivery to the Borrower, such Eligible Commodities will qualify as Eligible Inventory – Tier 1 or Eligible Inventory – Tier 2, as applicable; and

(c)     the Borrower has the absolute and unqualified right to obtain such Eligible Commodities from the applicable seller or supplier, and the Borrower's right is subject to the Perfected First Lien and no other equal or prior Liens (other than Permitted Borrowing Base Liens).

"**Eligible Net Liquidity in Brokerage Accounts**" means, as of any date of determination, the aggregate value of "net equity" or "net liquidity value" however designated of Approved Brokerage Accounts, not to exceed the amount that would be available for withdrawal upon closing such account and liquidation of all open positions at current market values, as reported in the account statements for the relevant Approved Brokerage Accounts, which are subject only to Perfected First Liens and the Liens of the Eligible Commodity Broker as provided for in the applicable Account Control Agreement as of such date, **provided** that, if any portion of the net equity is not represented by cash, the value of any such equity shall be determined by the Required Lenders and **provided**, **further**, that all amounts due to such broker secured by Permitted Borrowing Base Liens shall be deducted in calculating Eligible Net Liquidity in Brokerage Accounts.

"**Eligible Unbilled Accounts Receivable**" means all Accounts created by the Borrower (net of any credits, rebates, offsets (including, without limitation, any offset relating to any forward contract marked-to-market loss), holdbacks or other adjustments or commissions and reduced by any sales, use, excise or other taxes, imposts, levies or other governmental charges included therein) which would qualify as Eligible Accounts Receivable – Tier 1 or Eligible Accounts Receivable – Tier 2 but for the fact that an invoice has not yet been issued by the Borrower to the applicable Account Debtor, **provided**, that (a) even if no other services were performed or goods delivered to the Account Debtor, the Borrower has the right to issue an invoice to the Account Debtor for services performed or goods delivered prior to the date as of which Eligible Unbilled Accounts Receivable is determined, (b) no Eligible Unbilled Accounts Receivable shall be included in Eligible Accounts Receivable – Tier 1 or Eligible Accounts Receivable – Tier 2 and (c) upon the issuance of an invoice for any such Account, such Account shall no longer be an Eligible Unbilled Account Receivable.  The amount of Eligible Unbilled Accounts Receivable shall be equal to the amount that would be included as Eligible Accounts Receivable – Tier 1 or Eligible Accounts Receivable – Tier 2 upon the issuance of an invoice therefor. Notwithstanding the foregoing, the aggregate amount of Eligible Unbilled Accounts Receivable included in the Borrowing Base at any time, after giving effect to the applicable advance rate, shall not exceed $20,000,000.

"**Environmental Laws**" means any and all international, European Union, national, federal, state, provincial or local statutes, orders, regulations or other Law concerning protection of the environment or health and safety (to the extent regulating, relating to or imposing liability on standards of conduct concerning exposure to Materials of Environmental Concern) which are in existence now or in the future and are binding at any time on the Loan Parties or any of their respective Subsidiaries in the relevant jurisdiction in which such Loan Party or such Subsidiary has been or is operating (including by the export of its products or its waste to that jurisdiction).

"**Environmental Permit**" means any permit, license, consent, approval and other authorization and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any Loan Party conducted on or from the properties owned or used by any Loan Party.

"**Equity Interests**" means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code or Section 302 of ERISA).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules or the filing of an application for the waiver of the minimum funding standards under the Pension Funding Rules; (c) the incurrence by the Borrower or any ERISA Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA or a cessation of operations with respect to a Pension Plan within the meaning of Section 4062(e) of ERISA; (d) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvent (within the meaning of Title IV of ERISA); (e) the filing of a notice of intent to terminate a Pension Plan under, or the treatment of a Pension Plan amendment as a termination under, Section 4041 of ERISA; (f) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) any event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the determination that any Pension Plan is in at-risk status (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (i) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) the engagement by the Borrower or any ERISA Affiliate in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; (k) the imposition of a lien upon the Borrower pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; or (l) the making of an amendment to a Pension Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code.

"**Estimated Excise Taxes Payable**" means, as of any date of determination, the amount of the Borrower's obligations to any Governmental Authority or taxing authority for sales, excise or other taxes, levies or governmental charges relating to the purchase or sale of its inventory, except to the extent deducted in calculating Eligible Accounts Receivable – Tier 1 or Eligible Accounts Receivable – Tier 2.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" has the meaning specified in **Article VII**.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under **Section 2.22(b)**) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 2.19**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with **Section 2.19(g)** and (d) any withholding Taxes imposed under FATCA.

"**Existing Letters of Credit**" means the letters of credit listed on **Schedule 1.1B**.

"**Extensions of Credit**" means at any date, as to any Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans made by such Lender then outstanding, **plus** (b) the aggregate principal amount of all Term Loans made by such Lender then outstanding, plus (c) the aggregate amount of such Lender's participation, to the extent of its Applicable Percentage of each Letter of Credit, of the L/C Obligations then outstanding , plus (d) the aggregate principal amount of such Lender's participation, to the extent of its Applicable Percentage of each Swing Line Loan, of the Swing Line Loans then outstanding.

"**Facilities**" mean the Revolving Facility and the Term Facility.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any

agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**FCPA**" has the meaning specified in **Section 3.17(c)**.

"**Federal Funds Effective Rate**" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System of the United States.

"**FERC**" means the U.S. Federal Energy Regulatory Commission.

"**FERC Contract Collateral**" means all contracts and the books and records related thereto that, by their nature, require a filing with the FERC for the Secured Party to be able to exercise remedies in respect thereof.

"**Final DIP Order**" means a Final Order substantially in the form and substance of the Interim DIP Order entered by the Bankruptcy Court, with only such modifications in form and substance that are either (x) not adverse to the Administrative Agent or the Lenders or (y) satisfactory to the Administrative Agent and the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of the Administrative Agent and the Required Lenders in accordance with the terms herein) (i) authorizing the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and the other Loan Documents and (b) use cash collateral during the pendency of the Cases, and (ii) granting certain related relief.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has bene filed or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

"**Financial OTC Agreement**": means any currency swap, cross-currency rate swap, currency option, interest rate option, interest rate swap, cap or collar agreement or similar arrangement or any other similar transaction (including any option to enter into any of the foregoing) or any combination of the foregoing including, without limitation, any derivative relating to interest rate or currency rate risk, in each case which is not a Commodity OTC Agreement.

"**First Day Orders**" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date and heard by the Bankruptcy Court at the initial hearing or thereafter, which orders shall each be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"**First Purchaser Lien**" means a so-called "first purchaser" Lien, as defined in Texas Bus. & Com. Code Section 9.343, comparable Laws of the states of Oklahoma, Kansas, Mississippi, Wyoming or New Mexico, or any other comparable Law.

"**First Purchaser Lien Amount**" means as of any Borrowing Base Date, in respect of any property of the Borrower subject to a First Purchaser Lien, the aggregate amount of the obligations outstanding as of such date giving rise to such First Purchaser Lien as of such date, **less** any portion of such obligations that are secured or supported by a Letter of Credit issued hereunder.

"**Foreign Lender**" means a Lender that is not a U.S. Person.

"**Foreign Plan**" means any employee pension benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any Subsidiary with respect to employees employed outside the United States (other than any governmental arrangement).

"**Foreign Subsidiary**" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States, any State thereof or the District of Columbia.

"**Fronting Cap**" means $50,000,000.

"**Fronting Exposure**" means, at any time there is a Defaulting Lender, (a) with respect to any Issuing Bank, such Defaulting Lender's Applicable Percentage of the outstanding L/C Obligations with respect to Letters of Credit issued by such Issuing Bank other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof, and (b) with respect to the Swing Line Lender, such Defaulting Lender's Applicable Percentage of outstanding Swing Line Loans made by the Swing Line Lender other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders.

"**Fund**" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"**Futures Contract**" means a contract for making or taking delivery of Eligible Commodities that is traded on a market-recognized commodity exchange, which contract meets the specification and delivery requirements of commodity futures contracts on such commodity exchange, the value of which shall be reflected in a Commodity Account.

"**GAAP**" means, subject to **Section 1.04**, United States generally accepted accounting principles as in effect as of the date of determination thereof.

"**German Subsidiary**" means Aegean Bunkering Germany GmbH, a limited liability company incorporated under the laws of the Federal Republic of Germany.

"**Global Prepetition Facility**" means the Facility Agreement for a Borrowing Base Facility dated 30 November 2017, among Aegean Marine Petroleum S.A. as the "Company", Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NEW N.V., Aegean Bunkering Germany GMBH, OBAST Bunkering & Trading GMBH and Aegean Petroleum Uruguay S.A. as the Borrowers, certain companies as guarantors, ABN AMRO Bank N.V. as Facility Agent, Collateral Management Agent, Security Agent, Documentation Bank, Active Bookrunning Mandated Lead Arranger and Co-Ordinator, as amended or modified from time to time.

"**Global DIP Facility Agreement**" means the Superpriority Secured Debtor-In-Possession Facility Agreement For A Borrowing Base Facility dated as of 30 November 2017, as amended and restated pursuant to an amendment and restatement agreement dated November __, 2018, among Aegean Marine Petroleum S.A. as the Company, Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GMBH and OBAST Bunkering & Trading GMBH as the Borrowers, certain companies as Guarantors, ABN AMRO Bank N.V. as Facility Agent, Collateral Management Agent, Security Agent, certain persons as Lenders, Issuing Banks and Overdraft Bank, and Mercuria Energy Trading S.A. as Co-Ordinator and as a Hedging Provider.

"**Global DIP Loan Documents**" has the meaning set forth in the Final DIP Order, or prior to the entry of the Final DIP Order, the Interim Order.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); **provided** that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be the lower of (x) an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made and (y) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee, or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantor**" means Parent, Direct Parent, each Subsidiary that is a party to the Guaranty on the date hereof and any other Person who becomes a party to the Guaranty pursuant to a joinder agreement and their respective successors and assigns.

"**Guaranty**" means the Guaranty, dated as of the date hereof, by the Guarantors in favor of the Secured Parties.

"**Hess Litigation**" means the causes of action brought by the Borrower and the Parent, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014.

"**Hess Litigation Proceeds**" means any and all proceeds actually received by the Borrower in respect of the Hess Litigation whether as a judgment, settlement or otherwise, net of any documented costs, expenses and taxes directly related thereto and actually paid by the Borrower.

"**ICE**" means The Intercontinental Exchange, Inc. or any successor thereto.

"**Immaterial Subsidiary**" means any Subsidiary that has neither (a) assets of fair market value exceeding $250,000 nor (b) net income before taxes exceeding $250,000 on an annualized basis.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances and bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)     net obligations of such Person under any Swap Contract;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness;

(g)     all obligations of such Person in respect of Disqualified Equity Interests; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  Indebtedness of a Person shall exclude (i) trade accounts and accrued expenses payable in the ordinary course of business (except to the extent secured by Liens on assets of such Person), (ii) accruals for payroll and other liabilities accrued in the ordinary course of business, (iii) prepaid or deferred revenue arising in the ordinary course of business, and (iv) customary obligations under employment agreements and deferred compensation.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any Indebtedness of any Person for purposes of clause (e) that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Indebtedness) to such Person shall

be deemed to be equal to the lesser of (i) the aggregate principal amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" has the meaning specified in **Section 9.06(a)**.

"**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of the date hereof, between the Administrative Agent and the Administrative Agent (as defined in the Global DIP Facility Agreement).

"**Interest Election Request**" means a request by the Borrower to convert or continue a Borrowing in accordance with **Section 2.08**, which shall be in such form as the Administrative Agent may approve.

"**Interest Payment Date**" means (a) as to any ABR Loan, the first Business Day of each month and the Commitment Termination Date, (b) as to any LIBO Rate Loan, the last day of each Interest Period therefor and the Commitment Termination Date.

"**Interest Period**" means, as to any LIBO Rate Loan or Borrowing, the period commencing on the date of such Loan or Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter, as specified in the applicable Borrowing Request or Interest Election Request; **provided** that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (iii) no Interest Period shall extend beyond the Commitment Termination Date. For purposes hereof, the date of a Loan or Borrowing initially shall be the date on which such Loan or Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan or Borrowing.

"**Interim DIP Order**" means the interim order entered by the Bankruptcy Court (as the same may be amended, waived, supplemented, or modified from time to time after entry thereof, solely in the case of any amendment, waiver, supplement or modification that is not adverse to the rights or duties of the Secured Parties, with the consent of the Administrative Agent and the Required Lenders in their sole discretion) in the form set forth as **Exhibit D**, with changes to such form as are satisfactory to the Administrative Agent and the Required Lenders, in their sole discretion, (i) authorizing, on an inteirm basis, the Debtors to (a) obtain post-peititon secured financing pursuant to this Agreement and (b) use cash collateral during the pendency of the Cases, and (ii) granting certain related relief.

"**Interpolated Rate**" means, at any time, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the rate as displayed on the applicable Reuters page (or on any successor or substitute page or service providing quotations of interest rates applicable to dollar deposits in the London interbank market comparable to those currently provided on such page, as determined by the Administrative Agent from time to time; in each case the "**Screen Rate**") for the longest period (for which that Screen Rate is available) that is shorter than the Interest

Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available) that exceeds the Interest Period, in each case, at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"**Investment**" means, as to any Person, any acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person excluding in each case current trade and customer accounts receivables for inventory sold and services rendered in the ordinary course of busienss. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received by such Person with respect thereto.

"**Investment Grade Rating**" means a long term senior unsecured non-credit enhanced credit rating of BBB- or higher by S&P or Baa3 or higher by Moody's; **provided that**, in the event that the rating given by (or equivalent to) S&P or Moody's is higher than the rating given by (or equivalent to) Moody's or S&P, as applicable, the determination that such rating is an Investment Grade Rating shall be made based on the higher of the two ratings.

"**IRS**" means the United States Internal Revenue Service.

"**ISP**" means the International Standby Practices, International Chamber of Commerce Publication No. 590 (or such later version thereof as may be in effect at the applicable time).

"**Issuing Bank**" means ABN, in its capacity as issuer of Letters of Credit hereunder, and each other Lender (if any) as the Borrower may from time to time select as an Issuing Bank hereunder pursuant to **Section 2.05**; **provided** that such Lender has agreed to be an Issuing Bank.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance or renewal thereof or the extension of the expiry date thereof, or the reinstatement or increase of the amount thereof.

"**L/C Disbursement**" means a payment made by an Issuing Bank pursuant to a Letter of Credit.

"**L/C Documents**" means, as to any Letter of Credit, each application therefor and any other document, agreement and instrument entered into by the Borrower with or in favor of the applicable Issuing Bank and relating to such Letter of Credit.

"**L/C Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all L/C Disbursements that have not yet been reimbursed by or on behalf of the Loan Parties at such time. The L/C Exposure of any Revolving Lender at any time shall be its Revolving Commitment Percentage of the total L/C Exposure at such time.

"**L/C Fee**" has the meaning specified in **Section 2.13(b)**.

"**L/C Obligations**" means, at any time, the sum of (a) the aggregate maximum undrawn amount of all outstanding Letters of Credit at such time (after giving effect to any tolerance included therein, and the amount of such tolerance), including any scheduled increases provided for by the terms of such Letters of Credit, determined without regard to whether any conditions to drawing could be met at that time, **plus** (b) the aggregate amount of all L/C Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The L/C Obligations of any Lender at any time shall be its Applicable Percentage of the total L/C Obligations at such time. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Article 29(a) of the UCP or Rule 3.13 or Rule 3.14 of the ISP or similar terms of the Letter of Credit itself, or if compliant documents have been presented but not yet honored, such Letter of Credit shall be deemed to be "outstanding" and "undrawn" in the amount so remaining available to be paid, and the obligations of the Borrower and each Lender shall remain in full force and effect until the Issuing Bank and the Lenders shall have no further obligations to make any payments or disbursements under any circumstances with respect to any Letter of Credit.

"**L/C Reimbursement Obligation**" means, for any Letters of Credit or letters of credit under the Prepetition Credit Facility, as the case may be, the obligations of any Person to pay any amounts due in connection therewith.

"**L/C Sublimit**" means an amount equal to the lesser of (a) $50,000,000 and (b) the total amount of the Revolving Commitments. The L/C Sublimit is part of, and not in addition to, the Revolving Facility.

"**Legal Reservation**" means any restriction or qualification contained in any legal opinion of legal counsel to Borrower, in relation to matters of German or EC law, delivered to the Administrative Agent pursuant to Section 4.01(j).

"**Lender Representative**" means, with respect to any Lender, a representative (acceptable to the Swing Line Lender or applicable Issuing Bank or Agent, as the case may be, in its sole discretion) of such Lender duly authorized by such Lender to provide directions, instructions and approvals on behalf of such Lender to the Swing Line Lender, Issuing Banks and Agents pursuant to the Loan Documents; **provided** that each Person set forth on Schedule 4.02(e) on the Effective Date (or thereafter designated by Mercuria in accordance with Schedule 4.02(e)) is hereby approved by Mercuria to give any such directions, instructions and approvals to the Swing Line Lender, Issuing Banks and Agents pursuant to the Loan Documents and, in reliance on such approval by Mercuria, each such Person is acceptable to ABN in its capacities Swing Line Lender, Issuing Bank and Agent.

"**Lenders**" means the Persons listed on **Schedule 2.01** and any other Person that shall have become party hereto pursuant to an effective Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption, and shall include, as the context may require, each Issuing Bank and/or the Swing Line Lender.

"**Letter of Credit**" means any standby letter of credit or Documentary Letter of Credit issued hereunder.

"**Letter of Credit Request**" means a request for a Letter of Credit substantially in the form of Exhibit H-2 hereto.

"**LIBO Rate**" means, with respect to any LIBO Rate Loan for any Interest Period, the greater of (a) the rate appearing on the applicable Reuters page (or on any successor or substitute page or service providing quotations of interest rates applicable to dollar deposits in the London interbank market comparable to those currently provided on such page, as determined by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period; **provided** that (i) if such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such LIBO Rate Loan for such Interest Period shall be the Interpolated Rate, and (ii) if the Interpolated Rate is not available, the "LIBO Rate" with respect to such LIBO Rate Loan for such Interest Period shall be the offered quotation rate to first class banks in the London interbank market by the Person that is the Administrative Agent for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of such Person, in its capacity as a Lender (or, if it is not a Lender of such Loan, in such amount determined by the Administrative Agent) for which the LIBO Rate is then being determined with maturities comparable to such Interest Period at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period and (b) 1.0%. A determination of the LIBO Rate shall be conclusive absent manifest error.

"**LIBO Rate Borrowing**" means, as to any Borrowing, the LIBO Rate Loans comprising such Borrowing.

"**LIBO Rate Loan**" means a Loan that bears interest at a rate based on the "Adjusted LIBO Rate."

"**Lien**" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever having or intended to have similar effect (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**Litigation Claims**" means (i) claims of the Parent or any Subsidiary thereof, against any person and existing at any time, arising out of, in connection with, or relating to the events, circumstances, and conduct described in the June 4, 2018, Form 6-K disclosure of Aegean Marine Petroleum Network, Inc., concerning improper accounting for or recordation of accounts receivable, as well as the right of the Parent of any Subsidiary thereof to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (ii) claims of the Parent or any Subsidiary thereof, against any person and existing at any time, arising out of, in connection with, or relating to the construction and maintenance of the Aegean terminal in Fujairah, as well as the right of Grantors to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing, (iii) claims of the Parent or any Subsidiary thereof existing at any time, arising out of, in connection with, or relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melissanidis, claims against auditors related to misappropriation of

funds, related conspiracy to defraud investors in Aegean Marine Petroleum Network, Inc., and claims against Quality Solutions related to construction fraud or other fraud, (iv) claims brought by Aegean Marine Petroleum Network Inc. and the Company, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014, (v) claims of the Parent or any Subsidiary thereof, concerning unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof, (vi) claims of the Parent or any Subsidiary thereof, concerning HSFO product loaded from Petrotrin in Trinidad in December 2016; and (v) claims arising under Chapter 5 of the Bankruptcy Code.

"**Loan**" means a loan by a Lender to the Borrower under **Section 2.01(a)** in the form of a Revolving Loan or **Section 2.01(b)** in the form of a Term Loan or **Section 2.06** in the form of a Swing Line Loan.

"**Loan Documents**" means, collectively, this Agreement, any promissory notes issued pursuant to **Section 2.14(b)**, the L/C Documents, the Interim DIP Order, the Final Order, the Security Documents, the Request to Honor Oral and Telefax Instructions, any agreement creating or perfecting rights in the Cash Collateral pursuant to the provisions of **Section 2.23** and any other documents entered into in connection herewith.

"**Loan Parties**" means the Borrower and each Guarantor.

"**Marked-to-Market Report**" means a report, substantially in the form of **Exhibit E**, of the Borrower's Eligible Commodities purchase and sale positions. Such report shall include all open fixed positions for all current and future time periods and cover all instruments and/or contracts that create either an obligation or a right under a Commodity Contract and/or that generate price exposure and shall include Marked-to-Market Value for each position considered. The instruments and/or contracts shall include but not be limited to contracts for spot and future deliveries of Eligible Commodities, exchanges, derivatives including Physical Commodity Contracts, Commodity OTC Agreements, Financial OTC Agreements and Futures Contracts (and options on such Futures Contracts).

"**Marked-to-Market Value**" with respect to any Commodity Contract of any Person on any date:

(a)    in the case of a Commodity Contract for the purchase, sale, transfer or exchange of any physical Eligible Commodities, the unrealized gain or loss on such Commodity Contract, determined by comparing (i) the amount to be paid or received under such Commodity Contract for such Eligible Commodities pursuant to the terms thereof to (ii) the Market Value of such Eligible Commodities on such date, and

(b)    in the case of any other Commodity Contract, the unrealized gain or loss on such Commodity Contract determined by calculating the amount to be paid or received under such other Commodity Contract pursuant to the terms thereof as if the cash settlement of such other Commodity Contract were to be calculated on such date of determination by reference to the Market Value of the Eligible Commodities which is the subject of such other Commodity Contract;

**provided**, that (i) in the case of any Commodity Contract that is, in whole or in part, an option by its terms, the amount so calculated shall reflect industry standard valuation models approved by the Required Lenders and any associated premium which remains unpaid and (ii) in the case of amounts due under any Forward Contract with a delivery date more than one year from the date of determination, each such amount shall be discounted to present value in a commercially reasonable manner unless otherwise discounted as part of the calculation referred to above.

"**Market Value**" means, with respect to any Eligible Commodities on any date, the price at which such Eligible Commodities could be purchased or sold for delivery on that date or during the applicable period adjusted to reflect the specifications thereof and the location and transportation differential, and, without duplication, reduced by storage, transportation and other costs related to sale thereof. Such prices shall be determined by using prices (a) on the NYMEX, the COMEX, the New York Board of Trade, the International Petroleum Exchange, ICE, the Chicago Board of Trade, the Chicago Mercantile Exchange or, if a price for any such Eligible Commodities (or delivery period or location) is not available on such exchanges, such other markets or exchanges recognized as such in the commodities trading industry, including over-the-counter markets and private quotations, or as published in an independent industry recognized source, in each case reasonably selected by the Borrower and reasonably satisfactory to the Required Lenders, (b) if such a price for any such Eligible Commodities is not available in any market or exchange described in clause (a) above, any other exchange or market reasonably selected by the Borrower and reasonably satisfactory to the Required Lenders on such date or (c) if such a price for any such Eligible Commodities is not available in any market or exchange described in clauses (a) or (b) above, such other value determined pursuant to methodology reasonably selected by the Borrower and satisfactory to the Required Lenders.

"**Margin Stock**" means margin stock within the meaning of Regulations T, U and X.

"**Material Adverse Effect**" means any event or circumstance or series of events or circumstances, an effect which is materially adverse to either: (i) the business, operations, property or financial condition of Parent and its Subsidiaries, taken as a whole, (ii) the ability of Parent and its Subsidiaries, taken as a whole, to perform their material payment obligations under the Loan Documents entered into by each of them or (iii) the rights or remedies of the Agents, the Issuing Banks or the Lenders under the Loan Documents (in each case other than as a result of the filing of the cases, the events leading up to, and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect), and provided, further, that nothing disclosed in (1) any filings or written reports by the Debtors made publicly available through the Petition Date or disclosed to the Lenders prior to the Effective Date and/or (2) any written disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Administrative Agent on or prior to the Petition Date, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect.

"**Materials of Environmental Concern**" means any gasoline or petroleum (including Crude Oil or any fraction thereof) or petroleum products or any pollutant, contaminant, dangerous good, hazardous substances, toxic substances, materials or wastes, defined or regulated as such in or under, or which form the basis of liability under, any Environmental Law or Environmental Permit due to their hazardous or dangerous properties or characteristics, including, without limitation, asbestos, polychlorinated biphenyls and urea-formaldehyde insulation, medical waste, mold, microbial matters, radioactive materials and electromagnetic fields.

"**Maximum Position Limits**" means the risk limits set forth in the trading guidelines of the Risk Management Practices as disclosed to the Lenders and in effect on the Effective Date or as in effect on such other date if approved in accordance with **Section 5.16**.

"**Maximum Rate**" has the meaning specified in **Section 9.19**.

"**Mercuria**" means Mercuria US Asset Holdings, LLC, a Delaware limited liability company.

"**Minimum Collateral Amount**" means, at any time, (i) with respect to Cash Collateral consisting of cash or deposit account balances, an amount equal to 103% of the Fronting Exposure of all Issuing Banks with respect to Letters of Credit issued and outstanding at such time and (ii) otherwise, an amount determined by the Administrative Agent and the Issuing Banks in their sole discretion.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, during the preceding five plan years has made or been obligated to make contributions, or has any liability.

"**Multiple Employer Plan**" means a Plan with respect to which the Borrower or any ERISA Affiliate is a contributing sponsor, and that has two or more contributing sponsors at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid or payable to third parties (other than controlled Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (iii) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition, (iv) in the case of any disposition by a non-wholly-owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly-owned Subsidiary as a result thereof and (v) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, that are attributable to such event (as determined reasonably and in good faith by a Responsible Person of the Borrower) *provided* that, if the Borrower or its Subsidiaries use any portion of such proceeds to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Borrower or its Subsidiaries or to make capital expenditures or other permitted acquisitions or investments, in each case within 12 months of such receipt, such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 12 months of such receipt, so used or committed to be so used; *provided*, *further*, that no proceeds realized in a single transaction or series of related transactions shall constitute Net Proceeds unless such proceeds shall exceed $1,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds).

"**Non-Consenting Lender**" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all or all adversely affected Lenders in accordance with the terms of **Section 9.01** and (b) has been approved by the Required Lenders or at least 50.1% of the adversely affected Lenders.

"**Non-Debtors' Collateral**" means, collectively, all real, personal, and mixed property (including Equity Interests) of Loan Parties that are not Debtors, including, without limitation, all inventory, accounts receivable, general intangibles, contracts, chattel paper, owned real estate, real property leaseholds, governmental approvals, licenses and permits, fixtures, machinery, equipment,

deposit accounts, patents, copyrights, trademarks (other than any "intent to use" trademark applications for which a Statement of Use or Amendment to Allege Use, as applicable, as not been filed and accepted with the U.S. Patent and Trademark Office), trade names, rights under license agreements and other intellectual property, securities, partnership or membership interests in limited liability companies, and capital stock of any subsidiary of such Loan Parties, including, without limitation, the products and proceeds thereof in each case other than Excluded Collateral (as defined in the Security Documents).

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Filing Entity**" means, at any time, each Subsidiary of the Borrower set forth on Schedule 1.1D.

"**NYMEX**" means the New York Mercantile Exchange or any successor thereto; any reference in this Agreement to NYMEX Futures Contracts or options includes ICE future contracts or options of the same type.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Borrower arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, and all Swap Contract Obligations owing to a Lender or any Affiliate of a Lender, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Borrower or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the foregoing, the Obligations include (a) the obligation to pay principal, interest, Reimbursement Obligations, Letter of Credit commissions, charges, expenses, fees, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that the Administrative Agent or any Lender, in each case in its sole discretion, may elect to pay or advance on behalf of the Borrower in accordance with and subject to the terms herein; provided however, that solely to the extent required by Applicable Law, Obligations shall not include Excluded Swap Obligations.

"**OFAC**" has the meaning specified in **Section 3.17(b)**.

"**Operational Proceeds**" has the meaning specified in Section 5.21(c).

"**Orders**" means, collectively, the Interim DIP Order, the Final DIP Order, the Cash Management Order, the First Day Orders and any other orders of the Bankruptcy Court authorizing and approving, on either an interim or final basis, the financing contemplated by this Agreement.

"**Organizational Documents**" means (a) as to any corporation, the charter or certificate or articles of incorporation and the bylaws, (b) as to any limited liability company, the certificate or articles of formation or organization and operating or limited liability agreement and (c) as to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity and, in each case, any equivalent or comparable constitutive documents in any non-U.S. jurisdiction.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.22(b)**).

"**Parent**" means Aegean Marine Petroleum Network Inc., a corporation incorporated under the laws of the Marshall Islands.

"**Participant**" has the meaning specified in **Section 9.07(d)**.

"**Participant Register**" has the meaning specified in **Section 9.07(d)**.

"**PATRIOT Act**" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"**Payment Intangible**" has the meaning provided in Section 9-102 of the UCC.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Act**" means the Pension Protection Act of 2006.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum funding standards and minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Pension Plan**" means any employee pension benefit plan (including a Multiple Employer Plan, but excluding a Multiemployer Plan) that is maintained or is contributed to by the Borrower or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"**Perfection Certificate**" means the Perfection Certificate, dated as of the date hereof, by each Loan Party organized under the laws of the United States, any State thereof or the District of Columbia.

"**Permitted Borrowing Base Liens**" means Liens of carriers, warehousemen, mechanics, materialmen, and any similar Lien arising by operation of Law securing obligations to pay or provide consideration for goods or services with respect to Eligible Commodities, which obligations are not past due, including, without limitation, with respect to Eligible Inventory (i) Liens in favor of the third party from whom the Borrower chartered, rented or leased the property on which such Eligible Inventory is located securing the charter, rent or lease obligations, (ii) Liens for taxes, assessments or governmental

charges that are not overdue for a period of more than thirty (30) days, that are being contested in good faith and by appropriate actions or are otherwise not required to be paid hereunder and (iii) Liens arising from judgments or orders for the payment of money not constituting an Event of Default.

"**Permitted Discretion**" means a determination made by an Agent in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment exercised in accordance with its customary practices in asset-based credit facilities, provided that an Agent may require at any time the direction of the Required Lenders as to any such determination.

"**Perfected First Lien**" means a valid and perfected first priority Lien granted by a Loan Party pursuant to a Security Document in favor of the Collateral Agent, for the ratable benefit of the Secured Parties (subject to Permitted Borrowing Base Liens or nonconsensual Permitted Liens); **provided** that, in the case of inventory that is not located in the United States of America or contracts, Accounts Receivable or Payment Intangibles not governed by Laws of the United States of America or any state or political subdivision thereof, the validity and priority of such Lien shall be confirmed by an opinion of special local counsel, the form and substance of which shall be reasonably satisfactory to the Required Lenders.

"**Permitted Financial Management Liens**" means Liens of an Eligible Cash Management Bank on currency or Cash Equivalents of the Borrower deposited in, or credited to, any Controlled Account (other than a Commodity Account) of the Borrower, **provided** that such Liens arise out of (i) amounts due to the applicable Eligible Cash Management Bank, in respect of customary fees and expenses for the routine maintenance and operation of such Controlled Account, (ii) the face amount of any checks which have been credited to such Controlled Account, but are subsequently returned unpaid because of uncollected or insufficient funds, or (iii) other returned items or mistakes made in crediting such Controlled Account, **provided**, **further** that such Liens are provided for in the related Account Control Agreement or arise by operation of Law.

"**Permitted Liens**" shall have the meaning provided in **Section 6.02**.

"**Permitted Receivables Sales Transactions**" means transactions under which the Borrower sells Accounts without recourse to the Borrower for the credit risk of the applicable Account Debtors, with respect to which (i) the purchase price is paid to the Borrower in cash directly to a deposit account that is subject to an Account Control Agreement, (ii) the discount rate applicable to the transaction is commercially reasonable and (iii) such purchase price shall promptly be used to repay Loans and/or Cash Collateralize Letters of Credit.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning assigned in the recitals.

"**Physical Commodity Contract**" means a contract for the purchase, sale, transfer or exchange of any physical Eligible Commodity.

"**Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Borrower, Parent or any Subsidiary, or any such plan to which the Borrower, Parent or any Subsidiary, is required to contribute on behalf of any of its employees or with respect to which the Borrower has any liability.

"**Plan of Reorganization**" means a plan of reorganization or plan of liquidation in the Cases.

"**Pledged Account**" means all Commodity Accounts, Deposit Accounts and Securities Accounts of the Loan Parties.

"**Post Carve Out Trigger Notice Cap**" means $2,500,000.

"**Prepayment Event**" means (a) any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Section 6.04(a) through (g) and Section 6.04(i), any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than the $100,000.

"**Prepayment Notice**" means a notice by the Borrower to prepay Loans, which shall be in such form as the Administrative Agent may approve.

"**Prepetition Agent**" means the Administrative Agent (as defined in the Prepetition Credit Facility).

"**Prepetition Credit Exposure**" means the Total Extensions of Credit (as defined in the Prepetition Credit Facility).

"**Prepetition Credit Facility**" means the Second Amended and Restated Uncommitted Credit Agreement, dated as of August 3, 2017 (as amended, waived, supplemented or otherwise modified from time to time prior to the date hereof), among Aegean Bunkering (USA) LLC, the lenders party thereto, certain other parties and ABN, as administrative agent.

"**Prepetition L/C Obligations**" means all outstanding "L/C Obligations" as defined in the Prepetition Credit Facility.

"**Prepetition Lenders**" means the Lenders party to the Prepetition Credit Facility.

"**Prepetition Obligations**" means all outstanding "Obligations" as defined in the Prepetition Credit Facility.

"**Prepetition Revolving Credit Loans**" means all outstanding Revolving Credit Loans (as defined in the Prepetition Credit Facility).

"**Prime Rate**" means the rate of interest per annum publicly announced from time to time by Chase in New York City as its base or prime rate. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent or any Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate. Any change in the Prime Rate shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Recipient**" means (a) the Administrative Agent, (b) any Lender or (c) any Issuing Bank, as applicable.

"**Register**" has the meaning specified in **Section 9.07(c)**.

"**Regulation D**" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Reimbursement Obligations**" means the obligation of the Borrower to reimburse an Issuing Bank, pursuant to Section 2.05 for Unreimbursed Amounts.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Request to Honor Oral and Telefax Instructions**" has the meaning specified in Section 4.01(s).

"**Required Lenders**" means, (a) at any time that Mercuria or any of its Affiliates that is a Lender is a Defaulting Lender, the Swing Line Lender and ABN in its capacity as Issuing Bank, and (b) at any other time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders; provided, that in the case of this clause (b), the Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders for any purpose hereunder or under any other Loan Document at any time.

"**Requirement of Law**" means, as to any Person, any Law or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Person**" means with respect to any Loan Party, the chief executive officer, president, chairman, senior vice-president, executive vice-president, vice-president of finance or treasurer or other officer or manager (or similar title) of such Loan Party. Any document delivered hereunder that is signed by a Responsible Person of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Person shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Person's shareholders, partners or members (or the equivalent Persons thereof).

"**Revolving**", when used in reference to any Loan or Borrowing, indicates that such Loan, or the Loans comprising such Borrowing, are made pursuant to **Section 2.01**.

"**Revolving Borrowing**" means a borrowing consisting of simultaneous Revolving Loans of the same Type and, in the case of LIBO Rate Loans, having the same Interest Period made by the Lenders.

"**Revolving Commitment**" means the commitment of a Lender to make or otherwise fund any Revolving Loan and to acquire participations in L/C Obligations and Swing Line Loans hereunder, expressed as an amount representing the maximum possible aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to **Section 2.10** or (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to **Section 9.07**. The initial amount of each Lender's Revolving Commitment is set forth on **Schedule 2.01** or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Revolving Commitment, as applicable. The aggregate amount of the Lenders' Revolving Commitments as of the Effective Date is $160,000,000.

"**Revolving Commitment Percentage**" means, with respect to any Revolving Lender at any time, the percentage of the aggregate Revolving Commitments represented by such Revolving Lender's Revolving Commitment at such time. If the Revolving Commitments have terminated or expired, the Revolving Commitment Percentage shall be determined based on the Revolving Commitments most recently in effect, giving effect to any assignments. The initial Revolving Commitment Percentage of each Revolving Lender is set forth on **Schedule 2.01** or in the Assignment and Assumption pursuant to which such Revolving Lender shall have assumed its Revolving Commitment, as applicable.

"**Revolving Credit Exposure**" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Loans and such Lender's participation in L/C Obligations and Swing Line Loans.

"**Revolving Facility**" means the Revolving Commitments and all Credit Extensions thereunder.

"**Revolving Lender**" means a Lender with a Revolving Commitment and/or Revolving Credit Exposure.

"**Revolving Loan**" means a loan made by a Lender to the Borrower pursuant to **Section 2.01(a)**.

"**Risk Management Practices**" means practices adopted and implemented by the Borrower and satisfactory to the Collateral Agent (acting at the direction of the Required Lenders) for (a) the mitigation of risks including price, location, product grade and time risk associated with the Borrower's Eligible Commodities trading and marketing activities and (b) the evaluation and mitigation of credit risk exposure of the Borrower to an Account Debtor and any counterparty party to a Commodity Contract. The Required Lenders, and the Collateral Agent (upon the instruction of the Required Lenders) confirm that the Risk Management Practices in effect as of the Effective Date are satisfactory to them.

"**Sale Order**" means an order of the Bankruptcy Court approving and authorizing a sale pursuant to section 363 of the Bankruptcy Code of those assets set forth in the Asset Purchase Agreement.

"**Sanctioned Country**" has the meaning specified in **Section 3.17(b)**.

"**Sanctions**" has the meaning specified in **Section 3.17(b)**.

"**Sanctions Provisions**" means Sections 3.19, 5.13, and 6.14 of this Agreement, to the extent applicable to Sanctions.

"**Screen Rate**" has the meaning specified in the definition of the term "Interpolated Rate".

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Obligations**" means the Obligations and the Prepetition Obligations.

"**Secured Party**" means (a) the Lender, (b) each Affiliate of the Lender that is a counterparty to any Swap Contract, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (d) the permitted successors and assigns of each of the foregoing.

"**Securities Account**" as defined in Section 8-501 of the UCC.

"**Security Documents**" means, collectively, the Orders, the US Facility US Security Agreement, the US Facility Global Security Agreements, the US Facility Canadian Security Agreement, the Spanish Security Documents, any Mortgages, and any other agreements, instruments and documents executed pursuant to this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, loan agreements, notes, guarantees, subordination agreements, and pledges.

"**Specified Laws**" means (i) the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (ii) the USA PATRIOT Act.

"**Spanish Certification**" has the meaning specified Section **9.22(b)**.

"**Spanish Civil Code**" means the Spanish *Código Civil*, as amended from time to time.

"**Spanish Commercial Code**" means the Spanish *Código de Comercio*, as amended from time to time.

"**Spanish Insolvency Law**" means the Spanish Insolvency Law 22/2003, dated 9 July (*Ley 22/2003, de 9 de julio, Concursal*), as amended from time to time.

"**Spanish Public Document**" means any Spanish *documento público*, being either any *escritura pública* granted or any *póliza* intervened by a Spanish notary public.

"**Spanish Royal Decree 5/2005**" means means the Royal Decree Law 5/2005 of 11 March 2005 of urgent reforms for the productivity and for the improvement of the public sector contracting (*Real Decreto Ley 5/2005, de 11 de marzo, de reformas urgentes para el impulso de la productividad y para la mejora de la contratación pública*), as amended from time to time.

"**Spanish Security Documents**" means any security agreement governed by Spanish law, including, without limitation, any *prenda (con o sin de whitout limitation any prenda (con o sin desplazamiento posesorio), hipoteca, garantía financiera* and any other *garantía real o personal* or other transaction having the same effect as each of the foregoing intended to secure the Obligations now or hereafter executed by any Loan Party and delivered to the Lender.

"**Spanish Subsidiary**" means Aegean Bunkering Combustibles Las Palmas, S.A., a public limited company (*sociedad anónima*) incorporated under the laws of Spain.

"**Subsidiary**" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body (other than stock, partnership, membership or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership, limited liability company or other entity are at the time owned or the management of which is controlled, directly, or indirectly through one or more intermediaries, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of any Loan Party.

"**Swap Contract Obligations**" means any and all obligations of the Loan Parties and their Subsidiaries, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Contracts permitted hereunder with a Lender or an Affiliate of a Lender, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Contract transaction permitted hereunder with a Lender or an Affiliate of a Lender.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, that are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, as to any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations

provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Swing Line Borrowing**" means a borrowing consisting of simultaneous Swing Line Loans. "Swing Line Lender" means ABN, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"**Swing Line Loan**" has the meaning specified in Section 2.06(a).

"**Swing Line Participation Amount**" has the meaning specified in Section 2.06(c)(i).

"**Swing Line Sublimit**" means an amount equal to the lesser of (a) $30,000,000 and (b) the total amount of the Revolving Commitments. The Swing Line Sublimit is part of, and not in addition to, the Revolving Facility.

"**Synthetic Lease Obligation**" means the monetary obligation of a Person under (a) a lease or property, real or personal, the obligations of the lessee in respect of which are treated as an operating lease for financial accounting purposes in accordance with GAAP and indebtedness for federal tax purposes.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Commitment**" means the commitment of a Lender to make Term Loans hereunder, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to **Section 9.07**. The initial amount of each Lender's Term Commitment is set forth on **Schedule 2.01** or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Term Commitment, as applicable. The aggregate amount of the Lenders' Term Commitments as of the Effective Date is $72,000,000.

"**Term**", when used in reference to any Loan or Borrowing, indicates that such Loan, or the Loans comprising such Borrowing, are made pursuant to **Section 2.04**.

"**Term Borrowing**" means a borrowing consisting of simultaneous Term Loans of the same Type and, in the case of LIBO Rate Loans, having the same Interest Period made by the Lenders.

"**Term Credit Exposure**" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Term Loans.

"**Term Facility**" means the Term Commitments and all Credit Extensions thereunder.

"**Term Loan**" means a loan made by a Lender to the Borrower pursuant to **Section 2.04**.

"**Total Credit Exposure**" means, as to any Lender at any time, the unused Commitments, Revolving Credit Exposure and Term Credit Exposure of such Lender at such time.

"**Trade Date**" has the meaning specified in **Section 9.07(b)(i)(B)**.

"**Trading Business**" means, with respect to each Lender, the day-to-day activities of such Lender or a division or Affiliate of such Lender relating to the proprietary purchase, sale, hedging

and/or trading of commodities, including, without limitation, Eligible Commodities and any related derivative transactions.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the ABR.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or nonperfection or priority.

"**UCC Control**" means (i) with respect to any Deposit Account, "control," within the meaning of Section 9-104 of the UCC, (ii) with respect to any Securities Account, Security Entitlement, Commodity Contract or Commodity Account, control within the meaning of Section 9-106 of the UCC, (iii) with respect to any Uncertificated Security, control within the meaning of Section 8-106(c) of the UCC, (iv) with respect to any Certificated Security, control within the meaning of Section 8-106(a) or (b) of the UCC, (v) with respect to any Electronic Chattel Paper, control within the meaning of Section 9-105 of the UCC, (vi) with respect to Letter-of-Credit Rights, control within the meaning of Section 9-107 of the UCC and (vii) with respect to any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), control within the meaning of Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in the jurisdiction relevant to such transferable record. Terms used in this definition and not defined herein shall have the meanings provided in the UCC.

"**UCP**" means the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600 (or such later version thereof as may be in effect at the applicable time).

"**United States**" and "**U.S.**" mean the United States of America.

"**Unreimbursed Amount**" has the meaning specified in Section 2.05(f).

"**US Facility Canadian Security Agreement**" means the Security Agreement (Canada), dated as of the date hereof, executed and delivered by the Borrower to the Collateral Agent, as amended, modified or supplemented from time to time.

"**US Facility Global Security Agreements**" means each and every security agreement, pledge agreement, guarantee and other agreement, instrument and document intended to create, perfect or evidence Liens to secure the Secured Obligations that is executed by or pertains to assets of Loan Parties that are not U.S. Persons.

"**US Facility US Security Agreement**" means the Security Agreement, dated as of the date hereof, executed and delivered by each Loan Party that is organized under the laws of the United States, any state thereof or the District of Columbia to the Collateral Agent, as amended, modified or supplemented from time to time.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Priority Collateral**" has the meaning specified in the Intercreditor Agreement.

"**U.S. Tax Compliance Certificate**" has the meaning specified in **Section 2.19(g)**.

"**Wells Fargo Account**" means the following account and associated wire instructions:

> BANK NAME: WELLS FARGO BANK, N.A.
> ADDRESS (CITY STATE): SAN FRANCISCO, CA
> ABA #: 121000248 SWIFT: WFBIUS6S
> ACCOUNT NAME: ABN AMRO CAPITAL USA LLC
> ACCOUNT NUMBER: 4122099799
> FURTHER CREDIT: HOUSE ACCOUNT A/C: 45000906
> REFERENCE: AEGEAN BUNKERING (USA) LLC

"**Wholly-Owned**" means, as to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (a) director's qualifying shares and (b) shares issued to foreign nationals to the extent required by Applicable Law) are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

"**Withholding Agent**" means the Borrower and the Administrative Agent.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02 **Terms Generally**. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, waived, restated, restructured, extended, renewed, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements, waivers, restatements, restructures, extensions, renewals or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references to "knowledge" of any Loan Party or a Subsidiary means the actual knowledge of a Responsible Person. All references to "in the ordinary course of business" of the Loan Parties or any Subsidiary thereof means (i) in the ordinary course of business of, or in furtherance of an objective that is in the ordinary course of business of the Loan Party or such Subsidiary, as applicable, (ii) customary and usual in the industry or industries of the Loan Party and its Subsidiaries in

the United States or any other jurisdiction in which the Loan Party or any Subsidiary does business, as applicable or (iii) generally consistent with the past or current practice of the Borrower or such Subsidiary, as applicable, or any similarly situated businesses in the United States or any other jurisdiction in which the Loan Party or any Subsidiary does business, as applicable. In the case of any cure or waiver, the Borrower, the applicable Loan Parties, the Lenders and the Agents shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default cured or waived shall be deemed to be cured and not continuing, it being understood that no such cure or waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

SECTION 1.03 **Rounding**. Any financial ratios required to be maintained by the Borrower or the Parent pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

SECTION 1.04 **Accounting Terms; Changes in GAAP**.

(a) **Accounting Terms**. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall be construed in conformity with GAAP. Financial statements and other information required to be delivered by the Borrower to the Lenders pursuant to **Sections 5.01(a)** and **5.01(b)** shall be prepared in accordance with GAAP in all material respects as in effect at the time of such preparation. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b) **Changes in GAAP**. If the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. It is understood and agreed that any recharacterization of an accounting entry or term shall be permitted hereunder so long as the action relating to or underlying the entry or item as so recharacterized would have been permitted if it had originally been characterized in such manner. Notwithstanding any other provision contained herein, at the Borrower's election (in its sole discretion) (a) any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall not be treated as Indebtedness and shall continue to be treated as an operating lease (and any future lease, if it were in effect on the date hereof, that would be treated as an operating lease for

purposes of GAAP as of the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the date hereof

SECTION 1.05 **Rates**.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "LIBO Rate" or with respect to any comparable or successor rate thereto.

SECTION 1.06 **Letter of Credit Amounts**.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the maximum undrawn amount of such Letter of Credit at such time, including any scheduled increases provided for by the terms of such Letters of Credit, determined without regard to whether any conditions to drawing could be met at that time; **provided** that with respect to any Letter of Credit that, by its terms or the terms of any L/C Document related thereto, provides for one or more automatic increases in the available amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum amount is available to be drawn at such time.

### SECTION 1.07 **Times of Day; Time for Payment and Performance**

.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

### SECTION 1.08 **Certifications**

.  All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

SECTION 1.01 **Belgian Terms**.  In this Agreement, where it relates to a  Belgian party, a reference to:

(a) "**gross negligence**" is a reference to *zware fout/faute lourde* and "**wilful misconduct**" is a reference to *opzet/dol*;

(b) a "**liquidator**", "**trustee in bankruptcy**", "**receiver**", "**administrator**" or similar officer includes any insolventiefunctionaris/praticien de l'insolvabilité, curator/curateur, vereffenaar/liquidateur, gedelegeerd rechter/juge délégué, ondernemingsbemiddelaar/médiateur d'entreprise, gerechtsmandataris/ mandataire de justice, voorlopig bewindvoerder/administrateur provisoire, gerechtelijk bewindvoerder/administrateur judiciaire, mandataris ad hoc/mandataire ad hoc and any sekwester/séquestre;

(c) a "**moratorium of any indebtedness**", or "**reorganisation**" includes any *gerechtelijke reorganisatie/réorganisation judiciaire*;

(d) an "**insolvency**" includes any insolventieprocedure/procedure d'insolvabilité, gerechtelijke reorganisatie/réorganisation judiciaire, faillissement/faillite and any other concurrence between creditors (samenloop van schuldeisers/concours des créanciers);

(e)       a "**security interest**" includes a mortgage (*hypotheek/hypothèque*), a pledge (*pand/gage*), a transfer by way of security (*overdracht ten titel van zekerheid/transfert à titre de garantie*), any other proprietary security interest (*zakelijke zekerheid/sûreté réelle*), a mandate to grant a mortgage, a pledge or any other real surety, a privilege (*voorrecht/privilège*) and a retention of title (*eigendomsvoorbehoud/réserve de propriété*);

(f)       a company being "**incorporated**" in Belgium or of which its "**jurisdiction of incorporation**" is Belgium, means that that company has its principal place of business (*voornaamste vestiging/établissement principal*) within the meaning of the Belgian Act of 16 July 2004 on the conflicts of law code) in Belgium;

(g)       "**administration**" or "**dissolution**" includes any *vereffening/liquidation, ontbinding/dissolution, sluiting van een onderneming/fermeture d'entreprise* and *faillissement/faillite*;

(h)       "**attachment**", "**execution**" or analogous procedures includes any *uitvoerend beslag/saisie exécution* and *bewarend beslag/saisie conservatoire*; and

(i)       an "**amalgamation**" or "**merger**" includes *an overdracht van algemeenheid/transfert d'universalité*, an *overdracht van bedrijfstak/transfert de branche d'activité*, a *splitsing/scission* and a *fusie/fusion* as well as assimilated transactions *(gelijkgestelde verrichtingen/operations assimilées)* in accordance with Articles 676 and 677 of the Belgian Companies Code.

## ARTICLE II

## COMMITMENTS AND CREDIT EXTENSIONS

SECTION 2.01 **DIP Revolving Credit Facility**.   Subject to the terms and conditions set forth herein and in the Interim DIP Order or the Final DIP Order (as applicable), each Lender severally agrees to make Revolving Loans to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Revolving Credit Commitment, (b) the sum of the total Revolving Credit Exposures exceeding the total Revolving Commitments, (c) Borrowing Base Availability being less than zero or (d) the sum of the Revolving Credit Exposure and the Prepetition Credit Exposure exceeding the Combined Revolving Exposure Limit.   Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow (without premium or penalty) Revolving Loans. Revolving Loans may be ABR Loans or LIBO Rate Loans, as further provided herein.   Upon entry of the Interim DIP Order, and subject to the terms thereof, a portion of the principal amount of each Lender's Prepetition Revolving Credit Loans, in the amount of $61,014,558.17, shall be deemed to be a LIBO Rate Borrowing and a LIBO Rate Loan outstanding hereunder, and such principal amount of the Prepetition Revolving Credit Loans is thereby deemed paid or extinguished by extension of a Loan hereunder, and such principal amount of the Prepetition Revolving Credit Loans are thereby converted and included as part of the Obligations outstanding hereunder, and further included as part of the Lender Superpriority Claim (the "**Partial Roll Up DIP Loan**").   Such deemed borrowing by the Borrower of the Partial Roll Up DIP Loan shall not entitle the Borrower to receive any cash from any Agent or any Lender and, notwithstanding that no such cash is exchanged, the Borrower shall thereafter owe the aggregate amount of the Partial Roll Up DIP Loan to the Lenders under the terms hereof and the Orders and not under the Prepetition Credit Facility.

SECTION 2.02 **DIP Term Loan Facility**.   Subject to the terms and conditions set forth herein and in the Interim DIP Order or the Final DIP Order, each Lender severally agrees to make Term Loans to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Term Credit Exposure exceeding such Lender's

Term Commitment or (b) the total Term Credit Exposures exceeding (i) (1) the total Term Commitments **minus** (2) $2,500,000, or (ii) on the date of a proposed Term Borrowing, the Term Credit Exposure specified for such week in the Budget (as increased for any amount unused in respect of one or more prior weeks). Once repaid, the Term Loans may not be reborrowed. Term Loans shall be made only as LIBO Rate Loans (or any replacement rate).

SECTION 2.03 **Loans and Borrowings.**

(a) **Borrowings**. Each Loan shall be made as part of a Revolving Borrowing or Term Borrowing, as applicable, consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Revolving Commitments or Term Commitments, as applicable.

(b) **Type of Loans**. Subject to **Section 2.20**, each Borrowing shall be comprised entirely of ABR Loans or LIBO Rate Loans as the Borrower may request in accordance herewith. Each Swing Line Loan shall be an ABR Loan. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan so long as such action is not disadvantageous to the Borrower; **provided** that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

SECTION 2.04 **Borrowing Requests.Notice by Borrower**. Each Borrowing shall be made upon the Borrower's irrevocable notice to the Administrative Agent. Each such notice shall be in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Person of the Borrower, or may be given by telephone to the Administrative Agent (if promptly confirmed by such a written Borrowing Request consistent with such telephonic notice) and must be received by the Administrative Agent not later than 11:00 a.m. (New York City time) (i) in the case of a LIBO Rate Borrowing, three Business Days prior to the date of the requested Borrowing or (ii) in the case of an ABR Borrowing, one Business Day prior to the date of the requested Borrowing; provided that the Borrower may condition the initial Borrowing hereunder in such notice on the entry of the Interim DIP Order; provided further that the Borrower may deliver new notices if such condition fails to be satisfied on a proposed Borrowing Date.

(b) **Content of Borrowing Requests**. Each Borrowing Request for a Borrowing shall specify the following information in compliance with **Section 2.03**: (i) the aggregate amount of the requested Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) whether such Borrowing is to be a Revolving Borrowing or a Term Borrowing (and if a Revolving Borrowing, shall be accompanied by a Borrowing Base Report as required herein); (iv) whether such Borrowing is to be an ABR Borrowing or a LIBO Rate Borrowing; (v) in the case of a LIBO Rate Borrowing, the Interest Period therefor; and (v) the location and number of the Borrower's account to which funds are to be disbursed.

(c) **Notice by Administrative Agent to Lenders**. Promptly following receipt of a Borrowing Request, the Administrative Agent shall advise each Lender of the details thereof and the amount of such Lender's Loan to be made as part of the requested Borrowing.

(d) **Failure to Elect**. If no election as to the Type of a Borrowing is specified in the applicable Borrowing Request with respect to Revolving Loans, then the requested Borrowing shall be an ABR Borrowing. All Term Loans shall be LIBO Rate Loans.

(e) **Minimum Amounts; Limitation on Number of Borrowings**. Each Term Borrowing shall be in whole multiples of $500,000. Borrowings of more than one Type may be outstanding at the same time; **provided** that there shall not be more than a total of ten LIBO Rate Borrowings outstanding at any time.

SECTION 2.05 **Letters of Credit**.

(a)    **General**.  Subject to the terms and conditions set forth herein (including, without limitation, the Borrower's obligations in respect of unpaid L/C Reimbursement Obligations) and in the Orders, in addition to the Loans provided for in **Section 2.01**, the Borrower may request any Issuing Bank, in reliance on the agreements of the Lenders set forth in this Section, to issue, at any time and from time to time during the Availability Period, Letters of Credit denominated in Dollars for its own account  in such form as is acceptable to the Administrative Agent and such Issuing Bank in each case in its reasonable determination.  Letters of Credit issued hereunder shall constitute utilization of the Revolving Commitments.  The Borrower, the Lenders and the Issuing Banks hereby acknowledge and agree that, on and after the Effective Date, all Existing Letters of Credit shall constitute Letters of Credit issued by ABN, in its capacity as Issuing Bank hereunder, and all Prepetition L/C Obligations shall constitute L/C Obligations under this Agreement, and all such Letters of Credit and L/C Obligations shall thereafter be entitled to all of the rights and benefits under the Loan Documents associated therewith.

(b)    **Notice of Issuance, Amendment, Extension, Reinstatement or Renewal**.  To request the issuance of a Letter of Credit (or the amendment of the terms and conditions, extension of the terms and conditions, extension of the expiration date, or reinstatement of amounts paid, or renewal of an outstanding Letter of Credit), the Borrower shall deliver (or transmit by electronic communication, if arrangements for doing so have been approved by the respective Issuing Bank) to an Issuing Bank selected by it and to the Administrative Agent (reasonably in advance of the requested date of issuance, amendment, extension, reinstatement or renewal) a Letter of Credit Request requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, extended, reinstated or renewed, and specifying the date of issuance, amendment, extension, reinstatement or renewal (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (d) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof, the purpose and nature of the requested Letter of Credit, the documents to be presented by the beneficiary thereof in the case of a drawing or demand for payment thereunder, the delivery instructions for such Letter of Credit and such other information as shall be necessary to prepare, amend, extend, reinstate or renew such Letter of Credit.  If requested by the respective Issuing Bank, the Borrower also shall submit a letter of credit application and reimbursement agreement on such Issuing Bank's standard form in connection with any request for a Letter of Credit.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application and reimbursement agreement or other agreement submitted by the Borrower to, or entered into by the Borrower with, an Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(c)    **Limitations on Amounts, Issuance and Amendment**.  A Letter of Credit shall be issued, amended, extended, reinstated or renewed only if (and upon issuance, amendment, extension, reinstatement or renewal of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, extension, reinstatement or renewal (i) the aggregate amount of L/C Obligations then outstanding shall not exceed (x) the L/C Sublimit, or (y) when taken together with the aggregate principal amount of Swing Line Loans then outstanding, the Fronting Cap, (ii) the Revolving Credit Exposure of any Lender shall not exceed its Revolving Commitment, (iii) the sum of the total Revolving Credit Exposures shall not exceed the total Revolving Commitments, (iv) the Revolving Credit Exposure plus the Prepetition Credit Exposure shall not exceed the Combined Revolving Exposure Limit and (v) Borrowing Base Availability shall not be less than zero.

An Issuing Bank shall not be under any obligation to issue any Letter of Credit, including if:

(i)        any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Issuing Bank from issuing such Letter of Credit, or any Law applicable to such Issuing Bank shall prohibit, or request that such Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such Issuing Bank is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon such Issuing Bank any unreimbursed loss, cost or expense that was not applicable on the Effective Date and that such Issuing Bank in good faith deems material to it;

(ii)        such Letter of Credit is not in form and substance acceptable to such Issuing Bank in its reasonable determination and/or  the issuance of such Letter of Credit would violate one or more policies of such Issuing Bank applicable to letters of credit generally;

(iii)        such Letter of Credit that has automatic extension provisions;

(iv)        except as otherwise agreed by the Administrative Agent and such Issuing Bank, such Letter of Credit will be a standby Letter of Credit in an initial amount less than $500,000; or

(v)        any Lender is at that time a Defaulting Lender, unless such Issuing Bank has entered into arrangements, including the delivery of Cash Collateral, satisfactory to such Issuing Bank (in its sole discretion) with the Borrower or such Lender to eliminate such Issuing Bank's actual or potential Fronting Exposure (after giving effect to **Section 2.25(a)(iv)**) with respect to the Defaulting Lender arising from either such Letter of Credit then proposed to be issued or such Letter of Credit and all other L/C Obligations as to which such Issuing Bank has actual or potential Fronting Exposure, as it may elect in its sole discretion.

An Issuing Bank shall be under no obligation to amend any Letter of Credit if (A) such Issuing Bank would have no obligation at such time to issue the Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of the Letter of Credit does not accept the proposed amendment to the Letter of Credit.

(d)        **Expiration Date**.  Each Letter of Credit shall have a stated expiration date no later than the earlier of (i) the date 180 days after the date of the issuance of such Letter of Credit (or, in the case of any extension of the expiration date thereof by amendment, twelve months after the then-current expiration date of such Letter of Credit) and (ii) the Commitment Termination Date.

(e)        **Participations**.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount or extending the expiration date thereof), and without any further action on the part of the applicable Issuing Bank or the Lenders, such Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute, unconditional and irrevocable and shall not be affected by any circumstance whatsoever, including any amendment, extension, reinstatement or renewal of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments.

In consideration and in furtherance of the foregoing, each Lender hereby absolutely, unconditionally and irrevocably agrees to pay to the Administrative Agent, for account of the respective Issuing Bank, such Lender's Applicable Percentage of each L/C Disbursement made by an Issuing Bank

promptly following the written request of such Issuing Bank at any time from the time of such L/C Disbursement until such L/C Disbursement is reimbursed by the Borrower or at any time after any reimbursement payment is required to be refunded to the Borrower for any reason, including after the Commitment Termination Date. Such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Such payment obligation shall bear interest at the rate applicable to ABR Loans until paid. Each such payment shall be made in the same manner as provided in **Section 2.07** with respect to Loans made by such Lender (and **Section 2.07** shall apply, **mutatis mutandis**, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the respective Issuing Bank the amounts so received by it from the Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to **Section 2.05(f)**, the Administrative Agent shall distribute such payment to the respective Issuing Bank or, to the extent that the Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this paragraph to reimburse an Issuing Bank for any L/C Disbursement shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such L/C Disbursement.

Each Lender further acknowledges and agrees that its participation in each Letter of Credit will be automatically adjusted to reflect such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit at each time such Lender's Revolving Commitment is amended pursuant to Section 2.25 or as a result of an assignment in accordance with **Section 9.07** or otherwise pursuant to this Agreement.

(f)     **Reimbursement**. If an Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such Issuing Bank in respect of such L/C Disbursement by paying to the Administrative Agent an amount equal to such L/C Disbursement not later than 2:00 P.M., New York City time, on (i) the Business Day that the Borrower receives notice of such L/C Disbursement, if such notice is received prior to 12:00 p.m., New York City time, or (ii) the Business Day immediately following the day that the Borrower receives such notice if such notice is not received prior to such time; **provided** that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with **Section 2.03** that such payment be financed, if such L/C Disbursement is not less than $1,000,000, with an ABR Borrowing (as a Revolving Loan), or if it is less than $1,000,000 with a Swing Line Loan and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing or Swing Line Loan, as applicable. Such reimbursement shall be made directly to the applicable Issuing Bank at its applicable lending office in immediately available funds in U.S. Dollars, in an amount equal to (i) the amount so paid by such Issuing Bank in connection with such drawing or payment and (ii) any taxes and any reasonable fees, charges or other costs or expenses incurred in by such Issuing Bank (such amount prior to being reimbursed by the Borrower, the "**Unreimbursed Amount**").

(g)     If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable L/C Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.

(h)     **Obligations Absolute**. The Borrower's obligation to reimburse L/C Disbursements as provided in paragraph (f) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of this Agreement or any Letter of Credit, or any term or provision herein or therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement in such draft or other document being untrue or inaccurate in any respect, (iii) payment by the respective Issuing Bank under a Letter of Credit against presentation of a draft or other document that

does not comply strictly with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder (other than payment or performance).

None of the Administrative Agent, the Lenders, any Issuing Bank, or any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit by the respective Issuing Bank or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms, any error in translation or any consequence arising from causes beyond the control of the respective Issuing Bank; **provided** that the foregoing shall not be construed to excuse an Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by Applicable Law) suffered by the Borrower that are caused by such Issuing Bank's failure to exercise due care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of an Issuing Bank (as finally determined by a court of competent jurisdiction), an Issuing Bank shall be deemed to have exercised care in each such determination, and that:

(i) an Issuing Bank may replace a purportedly lost, stolen, or destroyed original Letter of Credit or missing amendment thereto with a replacement marked as such or waive a requirement for its presentation;

(ii) an Issuing Bank may accept documents that appear on their face to be in substantial compliance with the terms of a Letter of Credit without responsibility for further investigation, regardless of any notice or information to the contrary, and may make payment upon presentation of documents that appear on their face to be in substantial compliance with the terms of such Letter of Credit and without regard to any non-documentary condition in such Letter of Credit;

(iii) an Issuing Bank shall have the right, in its sole discretion, to decline to accept such documents and to make such payment if such documents are not in strict compliance with the terms of such Letter of Credit; and

(iv) this sentence shall establish the standard of care to be exercised by an Issuing Bank when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof (and the parties hereto hereby waive, to the extent permitted by Applicable Law, any standard of care inconsistent with the foregoing).

Without limiting the foregoing, none of the Administrative Agent, the Lenders, any Issuing Bank, or any of their Related Parties shall have any liability or responsibility by reason of (i) any presentation that includes forged or fraudulent documents or that is otherwise affected by the fraudulent, bad faith, or illegal conduct of the beneficiary or other Person, (ii) an Issuing Bank declining to take-up documents and make payment (A) against documents that are fraudulent, forged, or for other reasons by which that it is entitled not to honor or (B) following a Borrower's waiver of discrepancies with respect to such documents or request for honor of such documents or (iii) an Issuing Bank retaining proceeds of a Letter of Credit based on an apparently applicable attachment order, blocking regulation, or third-party claim notified to such Issuing Bank.

Unless otherwise expressly agreed by an Issuing Bank and the Borrower when a Letter of Credit is issued by it (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit. Notwithstanding the foregoing, no Issuing Bank shall be responsible to the Borrower for, and such Issuing Bank's rights and remedies against the Borrower shall not be impaired by, any action or inaction of such Issuing Bank required or permitted under any law, order, or practice that is required or permitted to be applied to any Letter of Credit or this Agreement, including the Laws or any order of a jurisdiction where such Issuing Bank or the beneficiary is located, the practice stated in the ISP or UCP, as applicable, or in the decisions, opinions, practice statements, or official commentary of the International Chamber of Commerce Banking Commission, the Bankers Association for Finance and Trade (BAFT), or the Institute of International Banking Law & Practice, whether or not any Letter of Credit chooses such laws or practice rules.

An Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and such Issuing Bank shall have all of the benefits and immunities (A) provided to the Administrative Agent in **Article VIII** with respect to any acts taken or omissions suffered by such Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and L/C Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in **Article VIII** included such Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to the such Issuing Bank.

(i)     **Disbursement Procedures**. The Issuing Bank for any Letter of Credit shall, within the time allowed by applicable Laws or the specific terms of the Letter of Credit following its receipt thereof, examine all documents purporting to represent a demand for payment under such Letter of Credit. Such Issuing Bank shall, promptly after such examination, notify the Administrative Agent and the Borrower in writing of such demand for payment if such Issuing Bank has made or will make an L/C Disbursement thereunder; **provided** that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse such Issuing Bank and the Lenders with respect to any such L/C Disbursement.

(j)     **Interim Interest**. If the Issuing Bank for any Letter of Credit shall make any L/C Disbursement, then, unless the Borrower shall reimburse such L/C Disbursement in full on the date such L/C Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such L/C Disbursement is made to but excluding the date that the Borrower reimburses such L/C Disbursement, at the rate per annum then applicable to ABR Loans; **provided** that if the Borrower fails to reimburse such L/C Disbursement when due pursuant to paragraph (f) of this Section, then **Section 2.12(b)** shall apply. Interest accrued pursuant to this paragraph shall be for account of such Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to paragraph (f) of this Section to reimburse such Issuing Bank shall be for account of such Lender to the extent of such payment.

(k)     **Replacement of an Issuing Bank**. Any Issuing Bank may be replaced at any time by written agreement between the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of an Issuing Bank. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to **Section 2.13(b)**. From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to include such successor or any previous Issuing Bank, or such successor and all previous Issuing Banks, as the context shall require. After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this

Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

Any Issuing Bank may resign at any time by giving 30 days' prior notice to the Administrative Agent, the Lenders and the Borrower. After the resignation of an Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit or to extend, reinstate, renew or increase any existing Letter of Credit.

(l) **Cash Collateralization**. With respect to any outstanding Letter of Credit, upon the demand at any time of (i) the Required Lenders or (ii) with the consent of the Required Lenders, the Issuing Bank or the Administrative Agent (provided that, in the case of this clause (ii), if an Event of Default has occurred and is continuing, the consent of the Required Lenders shall not be required in connection with any such demand by the Issuing Bank or the Administrative Agent), in each case, the Borrower shall immediately deposit into an account established and maintained on the books and records of the Collateral Agent (the "**Collateral Account**") Cash Collateral in an amount equal to 103% of the total L/C Obligations as of such date **plus** any accrued and unpaid interest thereon. Such deposit shall be held by the Collateral Agent as collateral for the payment and performance of the Obligations. In addition, and without limiting the foregoing or paragraph (d) of this Section, if any L/C Obligations remain outstanding after the expiration date specified in said paragraph (d), the Borrower shall immediately deposit into the Collateral Account Cash Collateral in an amount equal to 103% of such L/C Obligations as of such date **plus** any accrued and unpaid interest thereon. Cash Collateral (or the appropriate portion thereof) provided in accordance herewith shall be released promptly following (i) the elimination of the obligations giving rise thereto (including by the termination of Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee) or there is no longer existing an Event of Default) or (ii) the determination by the Administrative Agent (in consultation with the Borrower) that there exists excess Cash Collateral.

The Collateral Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the Collateral Account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and reasonable discretion of the Collateral Agent and at the Borrower's risk and expense and benefit, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the Collateral Account. Moneys in the Collateral Account shall be applied by the Collateral Agent to reimburse each Issuing Bank for L/C Disbursements for which it has not been reimbursed, together with related fees, costs, and customary processing charges, and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the L/C Obligations at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of Lenders with L/C Obligations representing at least two-thirds of the total L/C Obligations and each Issuing Bank), be applied to satisfy other Secured Obligations. If the Borrower is required to provide an amount of Cash Collateral hereunder, whether on demand or as a result of the occurrence or continuance of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

SECTION 2.06 **Swing Line Loans**.

(a) **Amount of Swing Line Loan.** Subject to the terms and conditions set forth herein, the Swing Line Lender, in reliance upon the agreements of the other Lenders set forth in this Section, may in its sole discretion make swing line loans (individually, a "**Swing Line Loan**" and, collectively, the "**Swing Line Loans**") to the Borrower on same day notice from time to time during the

Availability Period in an aggregate principal amount at any one time outstanding not to exceed (x) the Swing Line Sublimit or (y) when taken together with the aggregate amount of L/C Obligations then outstanding, the Fronting Cap; **provided** that the Borrower shall not request, and the Swing Line Lender shall not make, any Swing Line Loan if, after giving effect to the making of such Swing Line Loan, (i) the Swing Line Lender's Revolving Credit Exposure exceeds its Revolving Commitment, (ii) the sum of the total Revolving Credit Exposures exceeds the total Revolving Commitments, (iii) Borrowing Base Availability is less than zero or (iv) the sum of the Revolving Credit Exposure and the Prepetition Credit Exposure exceeds the Combined Revolving Exposure Limit. The Borrower may use the Swing Line Sublimit by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof, including, without limitation, Section 2.09.

(b) **Classification of Swing Line Loans.** Swing Line Loans may be denominated only in United States Dollars and shall be ABR Loans.

(c) **Refunding of Swing Line Loans**.

(i) If the Administrative Agent shall not have received full repayment in cash of any Swing Line Loan at or before 11:00 a.m. (New York City time) on the day that is five (5) Business Days after the making of such Swing Line Loan, the Swing Line Lender may, not later than 2:00 p.m. (New York City time), on such day, request on behalf of the Borrower (which hereby irrevocably authorizes the Swing Line Lender to act on its behalf), that each Revolving Lender make a Revolving Loan (which initially shall be an ABR Loan with an Interest Period ending the next Business Day) in an amount equal to such Lender's Applicable Percentage of the outstanding amount of such Swing Line Loan (a "**Refunded Swing Line Loan**"). In accordance with **clause (c)(ii) below**, each Revolving Lender (other than Mercuria) shall make the proceeds of its Revolving Loan available to the Swing Line Lender for the account of the Swing Line Lender at the Swing Line Lender's applicable lending office for ABR Loans prior to 11:00 a.m. (New York City time) in funds immediately available on the Business Day next succeeding the date such request is made; **provided** that, with respect to Mercuria, the Administrative Agent will advance Mercuria's portion of such Revolving Loan on the Business Day next succeeding the date such request is made and, in accordance with **clause (c)(ii) below**, Mercuria shall be irrevocably obligated, regardless of whether it has affirmatively agreed to fund its Applicable Percentage of the related Revolving Loan, to pay to the Administrative Agent the amount of such Revolving Loan advanced by the Administrative Agent on Mercuria's behalf, plus interest (at the rate applicable to the Swing Line Loan giving rise to such Revolving Loan) at the Administrative Agent's Office prior to 2:00 p.m. (New York City time) on the date that is one (1) Business Day after such Business Day. The proceeds of such Revolving Loans shall be immediately applied to repay the Refunded Swing Line Loans.

(ii) Immediately upon the making of a Swing Line Loan, and without any further action on the part of the Swing Line Lender or the Lenders, the Swing Line Lender hereby grants to each Lender, and each Lender hereby acquires from such Swing Line Lender, a participation in such Swing Line Loan equal to such Lender's Applicable Percentage of the amount of such Swing Line Loan. If for any reason any Swing Line Loan cannot be refinanced with a Revolving Loan pursuant to **clause (c)(i) above**, each Lender shall, on the date such Revolving Loan was to have been made pursuant to the notice referred to in **clause (c)(i) above**, purchase for cash an undivided participating interest in the then outstanding Swing Line Loans by paying to the Swing Line Lender an amount (the "**Swing Line Participation Amount**") equal to such Lender's Applicable Percentage of the aggregate principal amount of Swing Line Loans then outstanding. Each Lender will immediately transfer to the Swing Line Lender, in immediately available funds, the amount of its Swing Line Participation Amount. Whenever, at any time after the Swing Line Lender has received from any Lender such Lender's Swing Line Participation Amount, the Swing

Line Lender receives any payment on account of the Swing Line Loans, the Swing Line Lender will distribute to such Lender its Swing Line Participation Amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swing Line Loans then due); **provided** that in the event that such payment received by the Swing Line Lender is required to be returned, such Lender will return to the Swing Line Lender any portion thereof previously distributed to it by the Swing Line Lender.

(iii)    Each Revolving Lender's obligation to make Revolving Loans pursuant to **clause (c)(i) above** and to purchase participating interests pursuant to clause (c)(ii) above shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, (i) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrower, or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default, (iii) any failure to satisfy any condition precedent to extensions of credit set forth in **Section 4.02**, (iv) any adverse change in the condition (financial or otherwise) of any Loan Party, (v) any breach of this Agreement by any Loan Party or any other Lender or (vi) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(iv)    If any Lender fails to make available to the Administrative Agent, for the account of the Swing Line Lender, any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.06(c) by the time specified in **clauses (c)(i) or (c)(ii) above**, as applicable, the Swing Line Lender shall be entitled to recover from such Lender, on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the ABR **plus** the Applicable Rate for Swing Line Loans, plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's Revolving Loan or Swing Line Participation Amount, as the case may be.  A certificate of the Swing Line Lender submitted to any Lender with respect to any amounts owing under this clause (iv) shall be presumed correct absent manifest error.

(d)    **Making of Swing Line Loans.**  The Swing Line Lender shall not be under any obligation to make Swing Line Loans, including if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Swing Line Lender from making such Swing Line Loan, or any Law applicable to the Swing Line Lender shall prohibit, or request that the Swing Line Lender refrain from, the extension of credit generally or such Swing Line Loan in particular or shall impose upon the Swing Line Lender with respect to such Swing Line Loan any restriction, reserve or capital requirement (for which the Swing Line Lender is not otherwise compensated hereunder) not in effect on the Effective Date, or shall impose upon the Swing Line Lender any unreimbursed loss, cost or expense that was not applicable on the Effective Date and that the Swing Line Lender in good faith deems material to it.

(e)    **Repayment of Swing Line Loans.**  At any time that there shall exist a Defaulting Lender, (x) promptly upon the request of the Swing Line Lender, the Borrower shall repay the outstanding Swing Line Loans made by the Swing Line Lender in an amount sufficient to eliminate any Fronting Exposure in respect of such Swing Line Loans (which may be achieved with proceeds of Revolving Loans) and (y) the Swing Line Lender shall not be required to fund any Swing Line Loan unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swing Line Loan.

SECTION 2.07 **Funding of Borrowings**. Each Lender shall make the amount of each Borrowing to be made by it hereunder available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 12:00 noon (New York City time) on the proposed date thereof; **provided** that Swing Line Borrowings shall be made as provided in **Section 2.06**. Each such borrowing will then be made available by the Administrative Agent to the Borrower one Business Day following the Borrowing Date requested by the Borrower (or on the Borrowing Date requested by the Borrower if, and only if, each of the Lenders is able to make the amount of its Applicable Percentage of such borrowing available to the Administrative Agent as set forth in the immediately preceding sentence prior to 3:00 p.m. (New York City time) on such Borrowing Date) by wire transfer to the account of the Borrower set forth on **Schedule 2.07** (or such other accounts of the Borrower or other Person acceptable to the Required Lenders in the United States as may be notified in writing by the Borrower to the Administrative Agent from time to time) in like funds as received by the Administrative Agent; **provided** that ABR Borrowings made to finance the reimbursement of an L/C Disbursement as provided in **Section 2.05(f)** shall be remitted by the Administrative Agent to the respective Issuing Bank. If any Lender notifies the Administrative Agent in writing that such Lender refuses to fund further borrowings, the Administrative Agent shall notify the Borrower thereof.

SECTION 2.08 **Interest Elections**.

(a)     **Elections by Borrower for Borrowings**. The Loans comprising each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a LIBO Rate Borrowing, shall have the Interest Period specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing as a Borrowing of the same Type and, in the case of a LIBO Rate Borrowing, may elect the Interest Period therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. Notwithstanding anything to the contrary herein, (i) a Swing Line Loan may not be converted to a LIBO Rate Loan, and (ii) Term Loans are available only as LIBO Rate Borrowings.

(b)     **Notice of Elections**. Each such election pursuant to this Section shall be made upon the Borrower's irrevocable notice to the Administrative Agent. Each such notice shall be in the form of a written Interest Election Request, appropriately completed and signed by a Responsible Person of the Borrower, or may be given by telephone to the Administrative Agent (if promptly confirmed in writing by delivery of such a written Interest Election Request consistent with such telephonic notice) and must be received by the Administrative Agent not later than the time that a Borrowing Request would be required under **Section 2.04** if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.

(c)     **Content of Interest Election Requests**. Each Interest Election Request pursuant to this Section shall specify the following information in compliance with **Section 2.04**:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day; and

56

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or LIBO Rate Borrowing.

(d)     **Notice by Administrative Agent to Lenders**.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and such Lender's portion of each resulting Borrowing.

(e)     **Failure to Elect; Events of Default**.  If the Borrower fails to deliver a timely and complete Interest Election Request with respect to a LIBO Rate Borrowing prior to the end of the Interest Period therefor, then, unless such LIBO Rate Borrowing is repaid as provided herein, the Borrower shall be deemed to have elected that such  LIBO Rate Borrowing shall automatically be converted to an ABR Borrowing at the end of such Interest Period.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as such Event of Default is continuing (i) no outstanding Revolving Borrowing may be converted to or continued as a  LIBO Rate Borrowing and (ii) unless repaid, each LIBO Rate Borrowing shall automatically be converted to an ABR Borrowing at the end of the Interest Period therefor.

SECTION 2.09 **Prepayments**.

(a)     **Optional Prepayments**.  The Borrower may, upon notice to the Administrative Agent, at any time and from time to time prepay the Prepetition Obligations and the Obligations in whole or in part without premium or penalty, and subject to the Orders, any such prepayments to be applied pursuant to **Section 7.02**.  On the date of the entry of the Final DIP Order (the "Entry Date"), as and to the extent expressly provided therein, amounts expressly determined by the Bankruptcy Court in the Final DIP Order to be post-Petition Date obligations shall be deemed a prepayment on the Entry Date of such amounts of the Prepetition Obligations (and such prepayment shall be deemed applied on the Entry Date in accordance with the terms of the Prepetition Credit Facility as set forth therein), and an amount equal to such prepayment shall be deemed outstanding on the Entry Date as a Revolving Loan hereunder that is an ABR Loan.

(b)     **Mandatory Prepayments**.

(i)     If, on any date, the sum of the Revolving Credit Exposure plus the Prepetition Credit Exposure exceeds the Borrowing Base, the Borrower shall make a payment to the Administrative Agent in the amount of such excess to be applied to the Prepetition Obligations and the Obligations pursuant to **Section 7.02** no later than one (1) Business Day immediately following such date.

(ii)     If, on any date, the sum of the Revolving Credit Exposure plus the Prepetition Credit Exposure exceeds the Combined Revolving Exposure Limit, the Borrower shall make a payment to the Administrative Agent in the amount of such excess to be applied to the Prepetition Obligations and the Obligations pursuant to **Section 7.02** no later than one (1) Business Day immediately following such date.

(iii)     If, on any date, the aggregate principal amount of Swing Line Loans then outstanding exceeds (x) the Swing Line Sublimit or (y) when taken together with the aggregate amount of L/C Obligations then outstanding, the Fronting Cap, the Borrower shall prepay Swing Line Loans in an aggregate principal amount equal to such excess no later than one (1) Business Day immediately following such date.

(iv)     If, on any date, the aggregate amount of L/C Obligations then outstanding exceeds (x) the L/C Sublimit, or (y) when taken together with the aggregate principal amount of Swing Line Loans then outstanding , the Fronting Cap, the Borrower shall Cash Collateralize, replace or decrease (if the beneficiary of such Letter of Credit agrees to such decrease) such Letters of Credit in an aggregate amount equal to such excess no later than three (3) Business Days immediately following such date.

(v)     If, on any date, the Borrower shall receive any Hess Litigation Proceeds, the Borrower shall make a payment to the Administrative Agent in the amount of such excess to be applied to the Prepetition Obligations and the Obligations pursuant to **Section 7.02** no later than three (3) Business Days immediately following such date.

(vi)     Without limiting the obligation to apply proceeds of Collateral as set forth in Section 7.02 hereof and subject to the terms of the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, unless otherwise ordered by the Bankruptcy Court, make a payment to the Administrative Agent in the amount of such Net Proceeds to be applied to the Prepetition Obligations and the Obligations pursuant to **Section 7.02** no later than three (3) Business Days immediately following the date on which such Net Proceeds are received.

Notwithstanding any other provisions of this Section 2.09,  to the extent that the repatriation to the United States of any or all of the Net Proceeds of any disposition by a Subsidiary of the Borrower that is not a Subsidiary organized under the Laws of the United States or any state thereof (a "**Foreign Subsidiary**", and any such disposition, a "**Foreign Disposition**") or the Net Proceeds of any casualty event incurred by a Foreign Subsidiary ("**Foreign Casualty Event**") would be prohibited or delayed by applicable Law or (applicable material agreements (in the case of non-wholly owned Subsidiaries), an amount equal to the Net Proceeds that would be so affected were the Borrower to attempt to repatriate such cash will not be required to be applied to repay Term Loans at the times provided in this Section 2.09 so long, but only so long, as the applicable local law or applicable material constituent documents would not otherwise permit repatriation to the United States (the Borrower hereby agrees to use all commercially reasonable efforts to overcome or eliminate any such restrictions on repatriation even if the Borrower does not intend to actually repatriate such cash, so that an amount equal to the full amount of such Net Proceeds will otherwise be subject to repayment under this Section 2.09), and (ii) to, the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Casualty Event is prohibited or delayed pursuant to this paragraph, the Borrower shall, promptly following the request of the Administrative Agent (pursuant to the demand of the Required Lenders) cause such proceeds to be applied prepay Indebtedness outstanding under the Global DIP Facility Agreement (with a permanent commitment reduction for any amounts applied in excess of $250,000).  In the case of each of clauses (i) and (ii), such nonpayment prior to the time such amounts must be prepaid shall not constitute an Event of Default.  For the avoidance of doubt, nothing in this Section 2.09 shall require the Borrower or any Subsidiary to cause any amounts to be repatriated to the United States (whether or not such amounts are used in or excluded from the determination of the amount of any mandatory prepayments hereunder).

(c)     **Notices**.  Each such notice pursuant to clause (a) of this Section shall be in the form of a written Prepayment Notice, appropriately completed and signed by a Responsible Person of the Borrower, or may be given by telephone to the Administrative Agent (if promptly confirmed by such a written Prepayment Notice consistent with such telephonic notice) and must be received by the Administrative Agent (i) in the case of prepayment of a LIBO Rate Borrowing, not later than 11:00 a.m. (New York City time) three Business Days before the date of prepayment, (ii) in the case of prepayment of a ABR Borrowing, not later than 11:00 a.m. (New York City time) one Business Day before the date of prepayment or (iii) in the case of a prepayment of a Swing Line Loan, not later than 11:00 a.m. (New York City time) on the date of prepayment.  Each Prepayment Notice shall specify (x) on the prepayment date

and (y) the principal amount of each Borrowing or portion thereof to be prepaid. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each Prepayment Notice shall be irrevocable; **provided** that, if a notice of prepayment is given in connection with a conditional notice of termination of the Commitments as contemplated by **Section 2.10**, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with **Section 2.10**.

SECTION 2.10 **Termination or Reduction of Commitments**.

(a) **Optional**. The Borrower may, upon notice to the Administrative Agent, terminate any unused portion of the Revolving Commitments without premium or penalty; **provided** that (a) each such notice shall be in writing and must be received by the Administrative Agent at least three Business Days prior to the effective date of such termination or reduction, and shall be irrevocable (**provided** that a notice of termination of the Commitments may state that such notice is conditioned upon the effectiveness of other credit facilities, or any other event, transaction or condition, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), (b) any such partial reduction shall be in an aggregate amount of $1,000,000 or a larger multiple of $500,000 and (c) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the sum of the total Revolving Credit Exposures would exceed the total Revolving Commitments. Unless previously terminated, the Commitments shall automatically terminate on the Commitment Termination Date.

(b) **Application of Commitment Reductions**. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Revolving Commitments pursuant to this Section. Upon any reduction of unused Revolving Commitments, the Revolving Commitment of each Lender shall be reduced by such Lender's ratable share of the amount of such reduction. Upon the effective date of the termination of all of the Commitments, the Borrower shall Cash Collateralize all L/C Obligations, and repay the outstanding principal balance of and all accrued unpaid interest on, all Obligations, and the Lenders shall have such other rights of the Lenders, all in accordance with Section 7.01 (as if an Event of Default had occurred and was then continuing), and the amounts paid by Borrower shall be applied in accordance with Section 7.02.

SECTION 2.11 **Repayment of Loans**.

(a) **Revolving Loans**. The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Commitment Termination Date the aggregate principal amount of all Revolving Loans outstanding on such date.

(b) **Term Loans**. The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Commitment Termination Date the aggregate principal amount of all Term Loans outstanding on such date.

(c) **Swing Line Loans**. The Borrower shall pay to the Administrative Agent for the account of the Swing Line Lender the then unpaid principal amount of each Swing Line Loan owing to the Swing Line Lender upon the demand of the Swing Line Lender or the Required Lenders, or if demand for payment is not made prior thereto, by 11:00 a.m. (New York City time) on the day that is five (5) Business Days following the Borrowing Date of such Swing Line Loan; **provided** that, the Borrower shall be deemed to be in compliance with its obligations in this sentence in the event that such Swing Line Loan is repaid with the proceeds of a Revolving Loan in accordance with **Section 2.06(c)**.

SECTION 2.12 **Interest**.

(a) **Interest Rates and Charges**. Subject to paragraph (b) of this Section, (i) each ABR Loan that is a Revolving Loan or a Swing Line Loan shall bear interest at a rate per annum equal to (A) the ABR **plus** the Applicable Rate for Revolving Loans or (B) the ABR plus the Applicable Rate for Swing Line Loans (as applicable); (ii) each LIBO Rate Loan that is a Revolving Loan shall bear interest at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period therefor **plus** the Applicable Rate, and (iii) each LIBO Rate Loan that is a Term Loan shall bear interest at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period plus the Applicable Rate.

(b) **Default Interest**. If any amount payable by the Borrower under this Agreement or any other Loan Document (including principal of any Loan, interest, fees and other amount) is not paid when due, whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the applicable Default Rate. Upon the request of the Required Lenders (and effective from such request), while any Event of Default exists, the Borrower shall pay interest on the principal amount of all Loans outstanding hereunder at a rate per annum equal to the applicable Default Rate.

(c) **Payment Dates**. Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein; **provided** that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan the Swing Line Lender (in the case of any Swing Line Loan) or the Administrative Agent (at the direction of the Required Lenders) may, in their sole discretion, require the Borrower to pay accrued interest on the principal amount of such Loan so repaid or prepaid on the date of such repayment or prepayment by providing written notice to the Borrower prior to the time of such repayment or prepayment) and (iii) in the event of any conversion of any LIBO Rate Borrowing prior to the end of the Interest Period therefor, accrued interest on such Borrowing shall be payable on the effective date of such conversion.

(d) **Interest Computation**. All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the ABR at times when the ABR is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable ABR or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.13 **Fees**.

(a) **Commitment Fees**. In consideration of the commitment by the Lenders to provide Term Loans and to provide Revolving Loans hereunder, the Borrower agrees to pay to the Administrative Agent for the account of each Lender commitment fees, (i) with respect to the Revolving Facility, in an amount equal to the product obtained by multiplying 1.5% by the maximum amount of the Commitment of each such Lender, and (ii) with respect to the Term Facility, in an amount equal to the product obtained by multiplying 2.5% by the maximum amount of the Commitment of each such Lender. Commitment fees shall be due and payable in full on the Effective Date, and Borrower shall be deemed to have requested, and the Lenders shall be deemed to have funded, Term Loans on the Effective Date, in an aggregate amount equal to the Commitment Fees set forth in this Section 2.13(a), in order to satisfy Borrower's obligation under this paragraph.

(b) **L/C Fees**. The Borrower agrees to pay to the Administrative Agent for the account of each Lender a Letter of Credit fee equal to the Applicate Rate with respect to its participations in each outstanding Letter of Credit (the "**L/C Fee**") on the daily maximum amount then available to be

drawn under such Letter of Credit, which shall accrue at a rate per annum equal to the Applicable Rate during the period from and including the Effective Date to but excluding the later of the Commitment Termination Date and the date on which such Lender ceases to have any L/C Obligations.  Accrued L/C Fees shall be payable in arrears on the first Business Day of each month, commencing on the first such date to occur after the Effective Date, and on the Commitment Termination Date; **provided** that any such fees accruing after the Commitment Termination Date shall be payable on demand.

(c) **L/C Fronting Fees**.  The Borrower agrees to pay to each Issuing Bank for its own account a fronting fee with respect to each Letter of Credit issued by such Issuing Bank at a rate per annum equal to 0.20% on the daily undrawn amount of such Letter of Credit, during the period from and including the Effective Date to but excluding the later of the Commitment Termination Date and the date on which such Issuing Bank ceases to have any L/C Obligations.  Accrued fronting fees shall be payable in arrears on the first Business Day of each month, commencing on the first such date to occur after the Effective Date, and on the Commitment Termination Date; **provided** that any such fees accruing after the Commitment Termination Date shall be payable on demand.  In addition, the Borrower agrees to pay to each Issuing Bank for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such Issuing Bank relating to letters of credit as from time to time in effect (including, without limitation, an amendment fee of $200 for each amendment), which fees, costs and charges shall be payable to such Issuing Bank within five days after its written demand therefor and are nonrefundable.

(d) **Administrative Agent Fee**.  The Borrower agrees to pay to the Administrative Agent, for its own account, a monthly agency fee of $75,000, which fee shall be due and payable monthly in advance (i) on the date hereof in respect of the month ending on November 30, 2018 (pro-rated for this month) and (ii) on the first day of each month commencing after the date hereof until all Obligations and Prepetition Obligations have been indefeasibly paid in full in cash (other than indemnities and other contingent obligations not then due and payable), the Commitments have expired or been terminated and all Letters of Credit have expired, been cancelled or cash collateralized (without any pending drawings).

(e) **Fee Computation**.  All fees payable under this Section shall be computed on the basis of a year of 360 days and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  Each determination by the Administrative Agent of a fee hereunder shall be conclusive absent manifest error.

(f) **Other Fees**.  The Borrower shall pay to Mercuria, in consideration of services to be provided to the Borrower by Mercuria from time to time until the Commitment Termination Date, a monthly fee in the amount of $1,750,000, due and payable on the Effective Date and on the first Business Day of each month thereafter until the Commitment Termination Date.

SECTION 2.14 **Evidence of Debt**.

(a) **Maintenance of Records**.  Each Lender shall maintain in accordance with its usual practice records evidencing the indebtedness of the Borrower to such Lender resulting from each Credit Extension made by such Lender.  The Administrative Agent shall maintain the Register in accordance with **Section 9.07(c)**.  The entries made in the records maintained pursuant to this paragraph (a) shall be **prima facie** evidence absent manifest error of the existence and amounts of the obligations recorded therein.  Any failure of any Lender or the Administrative Agent to maintain such records or make any entry therein or any error therein shall not in any manner affect the obligations of the Borrower under this Agreement and the other Loan Documents.  In the event of any conflict between the records maintained by any Lender and the records maintained by the Administrative Agent in such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(b)     **Promissory Notes**.  Promptly following the request of any Lender made through the Administrative Agent, the Borrower shall prepare, execute and deliver to such Lender a promissory note of the Borrower payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent and such Lender, which shall evidence such Lender's Loans of a particular Class in addition to such records.

SECTION 2.15 **Payments Generally; Several Obligations of Lenders**.

(a)     **Payments by Borrower**.  All payments to be made by the Borrower hereunder and the other Loan Documents shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all such payments shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in immediately available funds not later than 2:00 P.M. (New York City time) on the date specified herein.  All amounts received by the Administrative Agent after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue.  The Administrative Agent will promptly distribute to each Lender its ratable share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable lending office (or otherwise distribute such payment in like funds as received to the Person or Persons entitled thereto as provided herein).  If any payment to be made by the Borrower shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be; **provided** that, if such next succeeding Business Day would fall after the Commitment Termination Date, payment shall be made on the immediately preceding Business Day.  Except as otherwise expressly provided herein, all payments hereunder or under any other Loan Document shall be made in Dollars.

(b)     **Presumptions by Administrative Agent**.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Banks hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Banks, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Banks, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(c)     **Deductions by Administrative Agent**.  If any Lender shall fail to make any payment required to be made by it pursuant to **Section 2.04(c)**, **2.05(e)**, **2.07**, **2.16** or **9.08**, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent, or the applicable Issuing Bank, as applicable, to satisfy such Lender's obligations to the Administrative Agent, and such Issuing Bank until all such unsatisfied obligations are fully paid or (ii) hold any such amounts in a segregated account as Cash Collateral for, and for application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

(d)     **Several Obligations of Lenders**.  The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments pursuant to **Section 9.08** are several and not joint.  The failure of any Lender to make any Loan or to fund

any such participation or to make any such payment on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participations or to make its payment under **Section 9.08**.

SECTION 2.16 **Sharing of Payments**. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in Letters of Credit and Swing Line Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans or participations in Letters of Credit and Swing Line Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in Letters of Credit and Swing Line Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in Letters of Credit and Swing Line Loans and other amounts owing them; **provided** that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the terms of this Agreement or any other Loan Document (including the application of funds arising from the existence of a Defaulting Lender), (y) the application of Cash Collateral provided for in **Section 2.23**, or (z) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Letters of Credit and Swing Line Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

SECTION 2.17 **Compensation for Losses**. In the event of (a) the payment of any principal of any LIBO Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any LIBO Rate Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any LIBO Rate Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under **Section 2.10(b)** and is revoked in accordance therewith), (d) the assignment of any LIBO Rate Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to **Section 2.22(b)**, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a LIBO Rate Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement

of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof, except that such payment shall be due on the next succeeding Business Day after delivery thereof to Borrower if such certificate is (A) delivered before 12:00 noon Eastern time, and (B) delivered in connection with what the Required Lenders expect to be the final payment of principal and interest hereunder and the termination of the Commitments.

SECTION 2.18 **Increased Costs**.

(a) **Increased Costs Generally**. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted LIBO Rate) or any Issuing Bank;

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or any Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, such Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, Issuing Bank or other Recipient hereunder (whether of principal, interest or any other amount) then, promptly following written request of such Lender, Issuing Bank or other Recipient, the Borrower will pay to such Lender, Issuing Bank or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, Issuing Bank or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) **Capital Requirements**. If any Lender or Issuing Bank determines that any Change in Law affecting any Lender or Issuing Bank or any lending office of such Lender or such Lender's or Issuing Bank's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans (including Swing Line Loans) made by, or participations in Letters of Credit or Swing Line Loans, or the Letters of Credit issued by any Issuing Bank, to a level below that which such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuing Bank's policies and the policies of such Lender's or Issuing Bank's holding company with respect to capital adequacy), then from time to time, promptly after written demand, the Borrower will pay to such Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company for any such reduction suffered.

(c)     **Certificates for Reimbursement**.  A certificate of a Lender or Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender or Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     **Delay in Requests**.  Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or Issuing Bank's right to demand such compensation; **provided** that the Borrower shall not be required to compensate a Lender or Issuing Bank pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's or Issuing Bank's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     **Defined Terms.** For purposes of this Section, the term "Lender" includes the Swing Line Lender and the term "Loan" includes each Swing Line Loan.

SECTION 2.19 **Taxes**.

(a)     **Defined Terms**.  For purposes of this Section, the term "Lender" includes the Swing Line Lender and each Issuing Bank and the term "Applicable Law" includes FATCA.

(b)     **Payments Free of Taxes**.  Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     **Payment of Other Taxes by Borrower**.  The Borrower shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     **Indemnification by Borrower**.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     **Indemnification by the Lenders**.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to

such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section 9.07(d)** relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)        **Evidence of Payments**.  As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)        **Status of Lenders**.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower (or, when applicable, any Guarantor) and the Administrative Agent, at the time or times reasonably requested by the Borrower (or, when applicable, any Guarantor) or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower (or, when applicable, any Guarantor) or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (g)(ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

a.　　in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

b.　　executed copies of IRS Form W-8ECI;

c.　　in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit F-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

d.　　to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit F-2** or **Exhibit F-3**, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; **provided** that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit F-4** on behalf of each such direct and indirect partner;

(C)　　any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)　　if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by

Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(iii)　　On or prior to the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent shall provide the Borrower with two duly completed copies of, if it is a U.S. Person, Internal Revenue Service Form W-9 certifying that it is exempt from U.S. federal backup withholding, or, if it is not a U.S. Person, (1) Internal Revenue Service Form W-8ECI with respect to payments to be received by it as a beneficial owner and (2) a U.S. branch withholding certificate on IRS Form W-8IMY or any successor thereto evidencing its agreement with the Borrower to be treated as a U.S. Person for U.S. federal withholding purposes with respect to payments to be received by it on behalf of the Lenders.  At any time thereafter, the Agent shall, upon the reasonable request of the Borrower, provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid.

(h)　　**Treatment of Certain Refunds**.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)　　**Survival**.  Each party's obligations under this Section shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.20 **Inability to Determine Rates**.  If, on or prior to the first day of any Interest Period:

(a)  the Administrative Agent determines (which determination shall be conclusive and binding on the Borrower) that, by reason of circumstances affecting the London interbank eurodollar market, the "LIBO Rate" cannot be determined pursuant to the definition thereof, or

(b)  the Required Lenders determine that for any reason in connection with any request for a LIBO Rate Loan or a conversion thereto or a continuation thereof that (A) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such LIBO Rate Loan, or (B) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan,

the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for ABR Loans in the amount specified therein.

SECTION 2.21 **Illegality**.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain, or fund Loans whose interest is determined by reference to the LIBO Rate, or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, upon written notice thereof by such Lender to the Borrower (through the Administrative Agent), (a) any obligation of such Lender to make or continue LIBO Rate Loans or to convert ABR Loans to LIBO Rate Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the LIBO Rate component of the ABR, the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the LIBO Rate component of the ABR, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the LIBO Rate component of the ABR), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the LIBO Rate, the Administrative Agent shall during the period of such suspension compute the ABR applicable to such Lender without reference to the LIBO Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the LIBO Rate.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to **Section 2.17**.

SECTION 2.22 **Mitigation Obligations; Replacement of Lenders**.

(a)     **Designation of a Different Lending Office**.  If any Lender requests compensation under **Section 2.18**, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Sections 2.18** or **2.19**, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Section 2.18** or **2.19**, as the case may be, in the future, and (ii) would not subject such Lender to any  unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     **Replacement of Lenders**.  If any Lender requests compensation under **Section 2.18**, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.19** and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with paragraph (a) of this Section, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, (i) terminate the Commitments of such Non-Consenting Lender and repay on a non-pro rata basis such Loans as were made thereby, or (ii) upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, **Section 9.07**), all of its interests, rights (other than its existing rights to payments pursuant to **Section 2.18** or **Section 2.19**) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); **provided** that:

(i)     the assignment fee (if any) specified in **Section 9.07** shall have been paid;

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in Letters of Credit and Swing Line Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under **Section 2.17**) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from a claim for compensation under **Section 2.18** or payments required to be made pursuant to **Section 2.19**, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not violate any material Applicable Law; and

(v)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Notwithstanding anything in this Section to the contrary, (i) any Lender that acts as an Issuing Bank may not be replaced hereunder at any time it has any Letter of Credit outstanding hereunder unless arrangements satisfactory to such Lender (including the furnishing of a backstop standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such Issuing Bank or the depositing of Cash Collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such Issuing Bank) have been made with respect to such outstanding Letter of Credit and (ii) a Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of **Section 8.06**.

SECTION 2.23 **Cash Collateral**.

(a) **Obligation to Cash Collateralize**. At any time that there shall exist a Defaulting Lender, within one Business Day following the written request of the Administrative Agent or any Issuing Bank (with a copy to the Administrative Agent), the Borrower shall Cash Collateralize the Issuing Banks' Fronting Exposure with respect to such Defaulting Lender (determined after giving effect to **Section 2.25(a)(iv)** and any Cash Collateral provided by such Defaulting Lender) in an amount not less than the Minimum Collateral Amount *provided* that if any portion of a Defaulting Lender's pro rata share of any Letter of Credit is Cash Collateralized by the Borrower or reallocated to the other Revolving Lenders pursuant to Section 2.25, then the Borrower shall not be required to pay a Letter of Credit fee to such Defaulting Lender with respect to such portion of such Defaulting Lender's pro rata share so long as it is Cash Collateralized by the Borrower or reallocated to the other Revolving Lenders.

(b) **Grant of Security Interest**. The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the Issuing Banks, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for the Obligations and the Defaulting Lender's obligation to fund participations in respect of Letters of Credit and Swing Line Loans, to be applied pursuant to clause (c) below. If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and the Issuing Banks as herein provided, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly following written demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(c) **Application**. Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section or **Section 2.25** in respect of Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of Letters of Credit and Swing Line Loans (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the Cash Collateral was so provided, and thereafter shall be applied in the order provided in **Section 7.02**.

(d) **Termination of Requirement**. Cash Collateral (or the appropriate portion thereof) provided to reduce any Issuing Bank's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (ii) the determination by the Administrative Agent and each Issuing Bank that there exists excess Cash Collateral; **provided** that, subject to **Section 2.25** the Person providing Cash Collateral and each Issuing Bank may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations and **provided further** that to the extent that such Cash Collateral was provided by the Borrower, such Cash Collateral shall remain subject to the security interest granted pursuant to the Loan Documents.

SECTION 2.24 **Reserves**. Notwithstanding anything to the contrary, the Administrative Agent (acting at the direction of the Required Lenders) may at any time and from time to time after two (2) Business Days' prior written notice, establish and increase or decrease the Availability Reserve in the exercise of its Permitted Discretion. The Availability Reserve shall not duplicate eligibility criteria contained in the definition of "Eligible Accounts Receivable – Tier 1" or "Eligible Accounts Receivable – Tier 2."

SECTION 2.25 **Defaulting Lenders**.

(a)     **Defaulting Lender Adjustments**. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)     **Waivers and Amendments**. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and **Section 9.01(a)**.

(ii)     **Defaulting Lender Waterfall**. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Article VII** or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to **Section 9.08** shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to any Agent under the Loan Documents; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Swing Line Lender or any Issuing Bank; *third*, to Cash Collateralize the Issuing Banks' Fronting Exposure with respect to such Defaulting Lender in accordance with **Section 2.23**; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the Issuing Banks' future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in accordance with **Section 2.23**; *sixth*, to the payment of any amounts owing to the Swing Line Lender or the Issuing Banks or the other Lenders as a result of any judgment of a court of competent jurisdiction obtained by the Swing Line Lender, the Issuing Banks or the other Lenders against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; **provided** that if (x) such payment is a payment of the principal amount of any Loans or L/C Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in **Section 4.02** were satisfied or waived, such payment shall be applied solely to pay the Loans of, and L/C Disbursements owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or L/C Disbursements owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Facilities without giving effect to

clause (iv) below.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     **Commitment and L/C Fees.**  (A) No Defaulting Lender shall be entitled to receive any unused line fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)     Each Defaulting Lender shall be entitled to receive L/C Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Applicable Percentage of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to **Section 2.23**.

(C)     With respect to any L/C Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrower shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations and Swing Line Loans that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to each Issuing Bank or Swing Line Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Bank's or Swing Line Lender's Fronting Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)     **Reallocation of Participations to Reduce Fronting Exposure**.  All or any part of such Defaulting Lender's participation in L/C Obligations and Swing Line Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Revolving Commitment) but only to the extent that such reallocation does not cause the aggregate Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Commitment. Subject to **Section 9.17**, no reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)     **Cash Collateral,**  If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, (x) first, prepay Swing Line Loans and (y) second, Cash Collateralize the Issuing Banks' Fronting Exposure in accordance with the procedures set forth in **Section 2.23**.

(b)     **Defaulting Lender Cure**.  If the Borrower, the Administrative Agent, the Swing Line Lender and the Issuing Banks agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility (without giving effect to paragraph (a)(iv) above), whereupon, such Lender will cease to be a Defaulting Lender; **provided** that no adjustments will be made retroactively with respect to fees accrued or

payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and **provided**, **further**, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)     **Letters of Credit; Swing Line Loans**.  So long as any Lender is a Defaulting Lender, no Issuing Bank shall be required to issue, extend, increase, reinstate or renew any Letter of Credit and the Swing Line Lender shall not be required to make a Swing Line Loan, in each case, unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

(d)     **Termination of Defaulting Lender**.  The Borrower may terminate the unused amount of the Commitment or prepay on a non pro rata basis any outstanding Loans of any Lender that is a Defaulting Lender upon not less than three Business Days' prior notice to the Administrative Agent (which shall promptly notify the Lenders thereof), and in such event the provisions of **Section 2.25(a)(ii)** will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts); **provided** that (i) no Event of Default shall have occurred and be continuing, and (ii) such termination shall not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, the Swing Line Lender, any Issuing Bank or any other Lender may have against such Defaulting Lender.

SECTION 2.26 **Priority and Liens**.

(a)     The Obligations are, subject to the Carve Out and the Orders:

(i)     pursuant to section 364(c)(1) of the Bankruptcy Code, entitled (without the need to file a proof of claim) to a joint and several superpriority claim against the Debtors, with priority over any and all other obligations, liabilities, and indebtedness against the Debtors, now existing or hereafter arising, of any kind whatsoever, including on the Litigation Claims and all proceeds thereof (but subject to the Final DIP Order in the case of Litigation Claims), and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 547, 548, 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of the Debtors, each Debtor's estate and any successor trustee, estate representative, or any creditor, in any of the Cases or any subsequent cases or proceedings under the Bankruptcy Code (the "**Lender Superpriority Claim**"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition assets of the Debtors, including, but not limited to, the Debtors' Collateral; provided, such Lender Superpriority Claim in respect of the Revolving Commitments and the Term Loans shall be pari passu, but any payments made on such claims pursuant hereto shall be distributed in accordance with Section 7.02;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first-priority lien on the Debtors' Collateral, which shall include (1) all equity interests of Subsidiaries of the Parent owned by a Loan Party, and (2) all Collateral previously pledged to secure the Prepetition Obligations and Global Facility Collateral securing the Global Prepetition Loan Obligations under the Global Prepetition Facility to the extent such property is not otherwise subject to a Lien;

(iii)     pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected Lien on all Collateral of the Debtors to the extent that such assets are subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the

commencement of the Cases or to valid Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing Liens that secure the Prepetition Obligations and Global Facility Obligations under the Global Prepetition Facility, which Liens shall be primed by the Liens securing the Obligations), subject as to priority to such Liens in favor of such third parties; and

(iv)     pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority, senior priming lien on all Collateral of the Debtors (other than Liens on the Global Facility Collateral), including all capital stock of Subsidiaries of the Parent owned by a Loan Party and, to the extent that such assets are subject to valid, perfected and non- avoidable liens in favor of third parties as of the commencement of the Cases, including all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors that secure the Prepetition Obligations.

(b)     The priorities set forth in the foregoing **Section 2.26(a)** are subject, in each case, only to the Carve Out. All of the Liens and security interests described therein shall be effective and perfected under U.S. Laws as of the date that the Bankruptcy Court enters the Interim DIP Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. The Debtors shall, at Debtors' expense, execute and deliver to the Collateral Agent (for recordation or filing, as appropriate) Security Documents, and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Administrative Agent, acting at the direction of the Required Lenders) to evidence and secure the Obligations in each case as contemplated herein.

(c)     The Obligations are further secured by perfected Liens on the Collateral, including without limitation the Litigation Claims (subject to the Final DIP Order), pursuant to the Security Documents, such Liens first in priority subject only to Permitted Liens.

(d)     The Borrower acknowledges that $2,500,000 has been allocated as a reserve against the Term Facility in order to assure that funds remain available to discharge the Carve Out, including in connection with the application of the Post Carve Out Trigger Notice Cap. The Borrower shall not be permitted to draw such reserve until such time as the Post Carve Out Trigger Notice Cap applies, and then shall do so for the sole purpose of satisfying and discharging the Carve Out by directing the Lenders to remit such amounts to satisfy the Carve Out to the extent of such amount or such lesser amount as may be owed by the Borrower with respect to the Carve Out.

SECTION 2.27 **Guarantee Limitations (Morocco)**

(a)     The restrictions in this clause 2.27 (*Guarantee Limitations (Morocco)*) shall apply to any guarantee and indemnity (hereinafter the **Moroccan Guarantee**) granted by a Guarantor incorporated under the laws of Morocco as a limited liability company with a sole shareholder (**SARLAU**) (a **Moroccan Guarantor**) to secure liabilities of its direct or indirect shareholder(s) (upstream) (excluding, for the avoidance of doubt any direct subsidiary of such Moroccan Guarantor).

(b)     The Moroccan Guarantor shall not guarantee any liability of an Obligor which, if incurred, would constitute a misuse of corporate assets or powers within the meaning of article 107 of law n°5-96 relating to limited liability companies (*sociétés à responsabilité limitée*) or more generally, under any other applicable law or regulations having the same effect, as interpreted by Moroccan courts from time to time.

(c)     Any amount due under a guarantee agreement or security agreement by a Moroccan party to a non-Moroccan party may only be transferred outside Morocco if such payment is in compliance with the applicable Moroccan foreign exchange control regulations or has been expressly approved in advance and in written by the Moroccan Foreign Exchange Office (*Office des Changes marocain*). Any set-off between a Moroccan party and a non-Moroccan party located outside Morocco requires a prior express approval from the Moroccan Foreign Exchange Office (*Office des Changes marocain*).

(d)     The Moroccan Guarantor's obligations under the Loan Documents will only be valid if limited to the amounts which are (i) on-lent or otherwise (directly or indirectly) made available to the relevant Moroccan Guarantor and (ii) are not repaid by the Moroccan Guarantor.

(e)     In the event that there is any inconsistency between the provisions of this Clause 2.27 and any other provision of this Agreement or any other Loan Documents, the provisions of this Clause 2.27 shall prevail.

ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

SECTION 3.01 **Existence, Qualification and Power**.  Each Loan Party (a) is duly formed or organized, validly existing and in good standing under the Laws of the jurisdiction of its organization (to the extent the concept of good standing is applicable), (b) subject to entry and the terms of the orders of the Bankruptcy Court and requirements of local law in respect of Foreign Subsidiaries to the extent applicable has the corporate, limited liability company or partnership (or analogous) power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation, limited liability company or partnership (as applicable) and in good standing under the Laws of each jurisdiction where such qualification is required, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect and (d) is in compliance with all Laws except to the extent that the failure to comply therewith is stayed by the Bankruptcy Orders or could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.02 **Authorization; No Violation**.  Each Loan Party has the corporate, limited liability company or partnership (or analogous) power and authority, and subject to the entry and terms of the Orders the legal right, to execute, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to borrow and obtain Letters of Credit hereunder, and subject to the entry and terms of the Orders and local laws to the extent applicable, has taken all necessary corporate, limited liability company or partnership (or analogous) action to authorize the borrowings and Letters of Credit on the terms and conditions of this Agreement and to authorize the execution, delivery and performance of the Loan Documents to which it is a party.  The execution, delivery and performance of the Loan Documents to which each of the Loan Parties is a party, the borrowings hereunder and the use of the proceeds thereof and the use of Letters of Credit subject to entry and the terms of the Orders and local laws to the extent applicable (i) will not violate any Laws, including any rules or regulations promulgated by the FERC, in each case to the extent applicable to or binding upon such Loan Party or its properties, (ii) will not violate any post-petition Contractual Obligation of any Loan Party or any of their respective Subsidiaries, except where such violation could not reasonably be expected to have a Material Adverse Effect, (iii) will not violate the Organizational Documents of any Loan Party and (iv) will not result in, or require, the creation or imposition of any Lien on any Loan Party's or any of their respective Subsidiaries' properties or revenues pursuant to any such Law or Contractual Obligation (other than Liens created by the Security

Documents in favor of the Collateral Agent for the ratable benefit of the Secured Parties or other Liens approved by order of the Bankruptcy Court).

SECTION 3.03 **Governmental Authorization; Other Consents**. Other than the Orders, the transactions to be entered into and contemplated by the Loan Documents (including, without limiting the generality of the foregoing, in connection with the borrowings or Letters of Credit hereunder or with the execution, delivery, performance, validity or enforceability of the Loan Documents to which the Loan Parties are a party or the granting of Liens under the Security Documents) (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person, including, without limitation, the FERC, except for such as (i) have been obtained or made and are in full force and effect, or (ii) the failure of which to obtain would not reasonably be expected to result in a Material Adverse Effect, and (b) will not violate in any material respect any Applicable Law or the organizational documents of any Loan Party ; provided that, approval by the FERC may be required for the transfer of direct or indirect ownership or control of FERC Contract Collateral; provided further, that, no approval of the FERC is required for the granting of the security interest in the FERC Contract Collateral to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to the Security Documents. As of the Effective Date, the only contracts comprising FERC Contract Collateral of any Loan Party as to which further consent of the FERC may be required in connection with the exercise of remedies by the Administrative Agent or the Collateral Agent under the Loan Documents are contracts for the transportation of certain Eligible Commodities listed on Schedule 3.03.

SECTION 3.04 **Execution and Delivery; Binding Effect**. Subject to the entry and terms of the Orders and application of applicable foreign law to Loan Parties that are formed under such foreign laws, this Agreement constitutes, and each other Loan Document to which it is a party when executed and delivered will constitute, a legal, valid and binding obligation of each Loan Party enforceable against such Loan Party in accordance with its terms, subject to the effects, if any, of bankruptcy, insolvency, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally, and general equitable principles (whether considered in a proceeding in equity or at law).

SECTION 3.05 **Financial Statements Disclosure; No Material Adverse Effect**.

(a) **Financial Statements**. The unaudited consolidated balance sheet of Parent and its consolidated Subsidiaries as at September 30, 2018 and the related unaudited consolidated statements of operations and cash flows for the Fiscal Quarter ended on such date, certified by a Responsible Person of the Borrower, copies of which have heretofore been furnished to each Lender, are complete and correct in all material respects and present fairly in all material respects the consolidated financial condition of the Parent and its Subsidiaries as at such date, and the consolidated results of their operations for the Fiscal Quarter then ended (subject to normal year-end audit adjustments and any notes therein). All such financial statements have been prepared in accordance with GAAP in all material respects (except for the absence of footnote disclosures and any notes therein).

(b) **Disclosure of Liabilities**. The Parent and its Subsidiaries, taken together, do not have liabilities, including liabilities that are contingent and liabilities that are liquidated, that exceed, by more than $10,000,000, the liabilities of the Parent and its Subsidiaries as set forth in the disclosures filed with the Bankruptcy Court on the Petition Date or within 60 days thereafter.

SECTION 3.06 **No Material Adverse Change.** Since the Effective Date, there has been no event or circumstance that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.07 **Orders**.  The Interim DIP Order is (and the Final DIP Order when entered will be) effective to create, in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid, binding, and enforceable perfected security interest in the Debtors' Collateral and the proceeds and products thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents subject to applicable foreign laws with respect to Loan Parties formed under such foreign laws.

SECTION 3.08 **Litigation**.  Other than the Cases and litigation stayed pursuant to the Cases and litigation disclosed on **Schedule 3.08**, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Loan Party, threatened in writing by or against any Loan Party or any of their respective Subsidiaries or against any of their respective properties or revenues (a) with respect to any of the Loan Documents, (b) with respect to any of the transactions contemplated by or occurring simultaneously with the entering into of the Loan Documents in which the litigation, investigation or proceeding is material and has a reasonable basis in fact, or (c) which could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. All material litigation or proceedings pending as of the date hereof before any arbitrator or Governmental Authority against any Loan Party or any of their respective Subsidiaries is set forth on **Schedule 3.08**.

SECTION 3.09 **No Material Adverse Effect; No Default**.  Neither any Loan Party nor any Subsidiary is in default under or with respect to any post-petition Contractual Obligation that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

SECTION 3.10 **Property**.

(a) **Ownership of Properties**.  Each of the Loan Parties  has good title in fee simple to, a valid leasehold interest in, or other rights in, all its real property, and good title to, or a valid leasehold interest in, or other rights in, all its other property necessary to operate the business or otherwise the failure to so maintain could not reasonably be expected to result in a Material Adverse Effect, and none of such property is subject to any Lien except as permitted by **Section 6.02**.  **Schedule 3.10** accurately lists as of the Effective Date:

(i) all of the real property and leasehold interests in real property of each of the Loan Parties, and

(ii) all locations where inventory of the Loan Parties is held on or expected to be held after the Effective Date (other than (i) in-transit inventory, or (ii) inventory out for repair or refurbishment or (iii) inventory in an amount not to exceed $250,000).

SECTION 3.11 **Intellectual Property**.  Each of the Loan Parties owns, is licensed to use or has a common law or contractual right to access and use, all trademarks, trade names, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted and as proposed to be conducted except for those the failure to own or license which could not in the aggregate reasonably be expected to have a Material Adverse Effect (the "**Intellectual Property**").  Except as set forth on **Schedule 3.11**, no claim has been asserted or is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Loan Party know of any valid basis for any such claim, except any claim that could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.  The use of such Intellectual Property by any of the Loan Parties does not infringe on the rights of any Person, except for such infringements that, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.12 **Taxes**.

(a)    Each Loan Party, and each Subsidiary have filed all material federal, state and other material Tax returns and reports required to be filed (after giving effect to extension), and have paid all material federal, state and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except Taxes that are being (i) contested in good faith by appropriate proceedings diligently conducted, for which adequate reserves are being maintained in accordance with GAAP, (ii) stayed by the Bankruptcy Court or (iii) does not exceed $400,000 at any time . Each Loan Party has complied in all material respects with all applicable Laws relating to the withholding and payment of Taxes and has timely withheld from employee wages and payments to any other Person and paid over to the proper Governmental Authorities all material amounts required to be so withheld and paid over for all periods under all applicable Laws.  As of the Effective Date, no Tax return of any Loan Party or any of their respective Tax Affiliates is being audited by any Governmental Authority.  There are no Liens for Taxes against the Collateral or any property of any Loan Party or any of their Subsidiaries and no claim is being asserted with respect to Taxes which could result in such Liens, except for (i) statutory liens for Taxes not yet due and payable or for Taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings and, in each case, with respect to which reserves in conformity with GAAP have been provided on the books of such Loan Party (ii) Liens subject to stay of the Bankruptcy Court or (iii) Liens otherwise permitted hereunder.

SECTION 3.13 **Disclosure**.  (a) All factual written information, reports and other papers and data with respect to the Loan Parties or any of their respective Subsidiaries furnished, and all factual written statements and representations made, to the Administrative Agent or the Lenders by any Loan Party, or on behalf of any Loan Party (excluding any projections, estimates, forecasts, budgets and other forward looking information and information of a general economic or industry nature, as to which no Loan Party makes any representation), were, at the time the same were so furnished or made, when taken together with all such other factual information, reports and other papers and data previously so furnished in connection with this Agreement and the Extensions of Credit hereunder and all such other factual statements and representations previously so made in connection with this Agreement and the Extensions of Credit hereunder, complete and correct in all material respects, to the extent necessary to give the Agents and the Lenders true and accurate knowledge of the subject matter thereof in all material respects, and did not as of the date so furnished or made, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances in which the same were made.

(b)    As of the Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

SECTION 3.14 **Compliance with Laws**.  Each of the Loan Parties is in compliance with the requirements of all Laws (including Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted (b) the failure to so comply, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect or (c) compliance is stayed pursuant to the Cases.

SECTION 3.15 **ERISA Compliance**.

(a)    Except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (i) each Plan is in compliance with the applicable provisions

of ERISA, the Code and other federal or state Laws and (ii) each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS, and, to the knowledge of the Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b)     There are no pending or, to the knowledge of the Borrower, threatened or contemplated claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

(c)     No ERISA Event has occurred, and neither the Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that, either individually or in the aggregate, could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan that, either individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

(d)     Except to the extent that any such excess could not reasonably be expected to have a Material Adverse Effect (or as otherwise disclosed in writing to the Lenders), the present value (determined using actuarial and other assumptions which are reasonable in respect of the benefits provided and the employees participating) of the liability of the Loan Parties and each Commonly Controlled Entity for post-retirement benefits to be provided to their current and former employees under Plans which are welfare benefit plans (as defined in Section 3(1) of ERISA) other than such liability disclosed in the financial statements of the Loan Parties does not, in the aggregate, exceed the assets under all such Plans allocable to such benefits.

(e)     To the extent applicable, each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities, except to the extent that the failure so to comply could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  No Loan Party nor any Subsidiary has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan.

SECTION 3.16  **Environmental Matters**.  Except as set forth on **Schedule 3.16** and except where liability would not exceed $2,000,000:

(a)     The facilities and properties owned, leased or operated by any Loan Party or any of their respective Subsidiaries (the "**Properties**") do not contain, and have not previously contained, any Materials of Environmental Concern in amounts or concentrations which (i) constitute or constituted a violation of, or (ii) could give rise to liability of the Loan Parties under any Environmental Law.

(b)     The Loan Parties, their respective Subsidiaries, the Properties and all operations at the Properties are in compliance, and have, for the duration of their ownership, lease, or operation by the Loan Parties and their respective Subsidiaries, been in compliance with all applicable Environmental Laws, and there is no contamination at, under or about the Properties in violation of any Environmental Law with respect to the Properties or the business operated by the Loan Parties or any of their respective Subsidiaries (the "**Business**").  All Environmental Permits necessary in connection with the ownership and operation of the Business of the Loan Parties and their respective Subsidiaries have been obtained and are in full force and effect.

(c)　　　None of the Loan Parties or any of their respective Subsidiaries have received any notice of violation, alleged violation, non-compliance, liability or potential liability or the incurrence of costs by any Governmental Authority for remediation regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the Business, nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened.

(d)　　　Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law.

(e)　　　No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened, under any Environmental Law to which the Loan Parties or any of their respective Subsidiaries are or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law involving the Loan Parties with respect to the Properties or the Business.

(f)　　　There has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of the Loan Parties or any of their respective Subsidiaries in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could give rise to liability of the Loan Parties under Environmental Laws.

SECTION 3.17 **Federal Regulations**.  No part of the proceeds of any Loan or Letter of Credit will be used for "purchasing" or "carrying" any Margin Stock within the respective meanings of each of the quoted terms under Regulation U, or for any purpose which violates, the provisions of the regulations of the Board.  Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than 25% of the value of the assets (either of the Borrower only or of the Parent and its Subsidiaries on a consolidated basis) will be Margin Stock.  If requested by any Lender or the Administrative Agent, the Borrower will furnish promptly to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in said Regulation U.

SECTION 3.18 **Investment Company Act; Other Regulations**.  None of the Loan Parties is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940.  None of the Loan Parties is subject to regulation under any US Federal or State statute or regulation (other than the Bankruptcy Code) which limits its ability to incur Indebtedness or grant Liens on its assets.  None of the Loan Parties or any of their Affiliates is subject to the jurisdiction of the FERC or any rules and regulations promulgated thereby.

SECTION 3.19 **Sanctions; Anti-Corruption**.

(a)　　　Subject to the Legal Reservations, none of the Loan Parties or any of their respective Subsidiaries are, and none of their respective directors, officers, employees, agents or Affiliates are, in violation of any applicable Requirement of Law relating to economic or trade sanctions, terrorism, corruption, bribery or money laundering.

(b)　　　No Loan Party or Subsidiary, nor any director, officer, employee, agent, or Affiliate of any Loan Party or any of their Subsidiaries is an individual or entity ("**person**") that is, or is owned 50 percent or more, individually or in the aggregate, directly or indirectly, or controlled by persons

that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, the United Nations Security Council, the European Union, Global Affairs Canada, Justice Canada, or Her Majesty's Treasury(collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of comprehensive Sanctions ( currently, Crimea, Cuba, Iran, North Korea and Syria) (each, a "**Sanctioned Country**").

(c)     Each Loan Party, their Subsidiaries and their respective directors, officers and employees and the agents of the Loan Parties and their Subsidiaries, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") and any other applicable anti-corruption law, in all material respects. The Loan Parties and their Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws that are required by Law.

(d)     No part of the proceeds of the Loans or the Letters of Credit will be used, directly or indirectly, for any payments, loans or contributions to or otherwise made available to any Person to fund any activities or business of or with any Person who is the subject of applicable Sanction, or to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in each case in material violation of any applicable Anti-Terrorism Law, or that could result in the violation by, or the imposition of Sanctions against, any party to this Agreement (including any Agent, any Issuing Bank or any Lender).

SECTION 3.20  **Reserved**.

SECTION 3.21  **No Burdensome Restrictions**.  There is no Requirement of Law or post-petition Contractual Obligation of any of the Loan Parties or any of their respective Subsidiaries, compliance with which has had or could reasonably be expected to have a Material Adverse Effect.

SECTION 3.22  **Subsidiaries**.  **Schedule 3.22** sets forth as of the Effective Date the name of each direct or indirect Subsidiary of each Loan Party, their respective forms of organization, their respective jurisdictions of organization, the total number of issued and outstanding shares or other Equity Interests thereof, the classes and number of issued and outstanding shares or other Equity Interests of each such class, whether such Subsidiary is an Immaterial Subsidiary, and with respect to each Loan Party other than Parent, the name of each holder of Equity Interests thereof and the number of shares or other Equity Interests held by each such holder and the percentage of all outstanding shares or other interests of such class of Equity Interests held by such holders.  Subject to all required restrictions imposed by applicable Laws and **Schedule 5.14**, each Subsidiary that is not the Borrower or an Immaterial Subsidiary is a Debtor and a Guarantor and each Debtor is a Guarantor.  The total book value (determined in accordance with GAAP) of all assets of all Immaterial Subsidiaries that are not also Loan Parties does not exceed $2,750,000 in aggregate as of the Effective Date.

SECTION 3.23  **Security Documents**.  Subject to the entry and terms of the Orders, the provisions of the Security Documents (taken as a whole) are effective to create in favor of the Administrative Agent for the ratable benefit of the Secured Parties a legal, valid and enforceable Lien in all right, title and interest of the Borrower in the "Collateral" described therein.  When proper UCC financing statements or other applicable filings listed in **Schedule 3.23** have been filed in the offices in the jurisdictions listed in **Schedule 3.23**, the Security Documents shall create perfected Liens on all right, title and interest of the Borrower in the Collateral described therein that can be perfected by such filing, prior and superior in right to any other Person subject to any Permitted Borrowing Base Liens, in the case of assets in the Borrowing Base, or Liens permitted under Section 6.02 in the case of other assets.  When an Account Control Agreement has been entered into with respect to each Pledged Account, the Security

Agreement shall constitute a Perfected First Lien on all right, title and interest of the Borrower in the portion of the Collateral described therein that consists of Pledged Accounts, prior and superior in right to any other Person subject to any Permitted Liens. Borrower has directed Chase to transfer at the close of business on each Business Day, all amounts in excess of $500,000 from time to time deposited in the Chase Account to the Wells Fargo Account, which direction remains in effect.

SECTION 3.24 **Labor Relations**. As of the Effective Date, none of the Loan Parties or any of their respective Subsidiaries is engaged in any unfair labor practice which could result in a Material Adverse Effect. Except as would not reasonably be expected to result in a Material Adverse Effect, there is (i) no unfair labor practice complaint pending or, to the knowledge of any Loan Party or any of their respective Subsidiaries, threatened in writing against any Loan Party or any of their respective Subsidiaries before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under a collective bargaining agreement is so pending or to their knowledge threatened, (ii) no strike, labor dispute, slowdown or stoppage pending or, to the knowledge of any Loan Party, threatened in writing against any Loan Party and any of their respective Subsidiaries, and (iii) no union representation question existing with respect to the employees of any Loan Party or any of their respective Subsidiaries and no union organizing activities are taking place with respect to any thereof.

SECTION 3.25 **Insurance**. As of the Effective Date, each Loan Party and Subsidiary has, with respect to its properties and business, insurance covering the risks, in the amounts, with the deductible or other retention amounts, and with the carriers, listed on **Schedule 3.25**, which insurance meets the requirements of **Section 5.06** hereof and Section 3 of the Security Agreement. No property insurance covering any of the Collateral names any loss payee or additional insured other than the Collateral Agent for the ratable benefit of the Secured Parties or the Global Administrative Agent (as defined in the Global DIP Facility Agreement) for the benefit of the Global Secured Parties (as defined in the Global DIP Facility Agreement or any other existing creditor (as of the Petition Date) which has a Lien on such Collateral). Except as set forth on **Schedule 3.25** (as updated), no Loan Party has been refused insurance for which it applied or had any policy of insurance terminated (other than at its request).

SECTION 3.26 **Maximum Position Limits; Risk Management Practices.** The Maximum Position Limits and the Risk Management Practices have been duly adopted by the Borrower and are in full force and effect and the Borrower conducts its business in compliance in all material respects with the Maximum Position Limits and the Risk Management Practices.

SECTION 3.27 **No Other Ventures**. Except as set forth in **Schedule 3.27**, none of the Loan Parties or any of their respective Subsidiaries is engaged in any joint venture or partnership with any other Person.

SECTION 3.28 **Remittances**. The Borrower has (i) instructed its Account Debtors in respect of Accounts and each other Person who remits or is to remit payments to the Borrower to remit any and all payments in respect of Accounts or by each such other Person solely to a Controlled Account and (ii) given notice to each Account Debtor of the Lien of the Collateral Agent over Accounts owing from it. All payments in respect of sales by the Borrower of Eligible Commodities are remitted directly to a Controlled Account. Each bank which receives any payment made by any Account Debtor in respect of Accounts or by any other Person making any payment to the Borrower has been instructed to transfer all such payments immediately upon receipt.

SECTION 3.29 **Force Majeure**. Except as would not reasonably be expected to result in a Material Adverse Effect, neither the business nor the properties of the Loan Parties or any of their respective Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of a public enemy or other casualty.

SECTION 3.30 **Certain Indebtedness**. **Schedule 3.30** separately identifies all Indebtedness of the Loan Parties and their respective Subsidiaries, which is (a) for borrowed money.

SECTION 3.31 **Commodity Accounts, Deposit Accounts and Securities Accounts**. Neither the Borrower nor any of its Subsidiaries maintains any Commodity Accounts, Deposit Accounts or Securities Accounts other than the Chase Account, each other Controlled Account and any other Commodity Account, Deposit Account or Securities Account established after the Effective Date with the consent of the Administrative Agent acting at the direction of the Required Lenders; it being understood and agreed that the Wells Fargo Account is maintained in the name of ABN and not in the name of the Borrower.

ARTICLE IV

**CONDITIONS**

SECTION 4.01 **Effective Date**. The obligation of each Lender (including each Issuing Bank) to make Credit Extensions hereunder is subject to the satisfaction (or waiver in accordance with **Section 9.01**) of the following conditions (and, in the case of each document specified in this Section to be received by the Administrative Agent or entered by the Bankruptcy Court, except as expressly provided herein, such document shall be in form and substance satisfactory to the Administrative Agent acting at the direction of the Required Lenders):

(a) **Loan Documents**. The Administrative Agent shall have received:

(i) this Agreement, executed and delivered by a duly authorized officer of the Borrower with a counterpart or conformed copy for each Lender;

(ii) the Guaranty (provided that the Guaranty shall not cover Excluded Swap Obligations);

(iii) the Canadian Guaranty;

(iv) the US Facility US Security Agreement;

(v) the US Facility Canadian Security Agreement;

(vi) the Intercreditor Agreement;

(vii) the Perfection Certificate; and

(viii) the Direct Parent Pledge Agreement.

(b) **[Reserved].**

(c) **Secretary's Certificates**. The Administrative Agent shall have received a certificate of each Loan Party, dated the Effective Date, executed by a duly authorized officer of such Loan Party, or, if applicable, of the general partner or managing member or members of such Loan Party, on behalf of such Loan Party.

(d) **Borrowing Base Report.** The Administrative Agent shall have received, with a counterpart for each Lender, a fully completed Borrowing Base Report showing the Borrowing Base as of one Business Day prior to the Effective Date, executed by a Responsible Person of the Borrower in his or her capacity as a Responsible Person.

(e)     **Proceedings of the Loan Parties**.  The Administrative Agent shall have received a copy of the resolutions of the Board of Directors (or analogous body) of each Loan Party authorizing (i) the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, (ii) the borrowings and Extensions of Credit contemplated hereunder and (iii) the granting by it of the Liens created pursuant to the Security Documents, certified on behalf of such Loan Party by a duly authorized officer of such Loan Party, or, if applicable, of the general partner or managing member or members of such Loan Party, as of the Effective Date, which certification shall be included in the certificate delivered in respect of such Loan Party pursuant to **Section 4.01(b)** and shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded.

(f)     **Incumbency Certificates**.  The Administrative Agent shall have received a certificate of each Loan Party, dated the Effective Date, as to the incumbency and signature of the officers of such Loan Party or, if applicable, of the general partner or managing member or members of such Loan Party, executing any Loan Document, executed by a duly authorized officer of such Loan Party, or, if applicable, of the general partner or managing member or members of such Loan Party, on behalf of such Loan Party.

(g)     **Organizational Documents**. The Administrative Agent shall have received as to each Loan Party true and complete copies of the Organizational Documents of such Loan Party, certified as of the Effective Date as complete and correct copies thereof by a duly authorized officer of such Loan Party, or, if applicable, of the general partner or managing member or members of such Loan Party, on behalf of such Loan Party, which certification shall be included in the certificate delivered in respect of such Loan Party pursuant to **Section 4.01(c)**. With respect to the Spanish Subsidiary, the Parties agree that the delivery of an on-line registry excerpt (*Nota Simple*) issued by the commercial registry of incorporation of such Subsidiary will be sufficient to fulfill this condition precedent.

(h)     **Good Standing Certificates**.  The Administrative Agent shall have received certificates dated as of a recent date from the Secretary of State or other appropriate authority, evidencing to the extent applicable) the good standing of each Loan Party in the jurisdiction of its organization.  In relation to the Spanish Subsidiary, the Parties agree that the delivery of the document referred to in Section 4.01(c) above shall be sufficient to fulfill this condition precedent.

(i)     **Borrower's Certificate**.  The Administrative Agent shall have received a certificate signed by a Responsible Person of the Borrower, stating on behalf of the Borrower that:

(i) The representations and warranties contained in **Article III** are true and correct in all material respects on and as of such date, as though made on and as of such date;

(ii) No Default or Event of Default exists; and

(iii) The Borrower is in compliance with the Maximum Position Limits as of the most recent Business Day prior to the Effective Date.

(j)     **Opinion of Counsel to Borrower**.  The Administrative Agent shall have received opinions of Kirkland & Ellis, counsel to the Borrower, addressed to the Administrative Agent, the Lenders, the Swing Line Lenders and the Issuing Banks and dated the Effective Date, in form and substance satisfactory to the Administrative Agent and the Required Lenders (and the Borrower hereby instructs such counsel to deliver such opinion to such Persons).

(k)     **Fees and Expenses**.  To the extent invoiced at least one business day prior, all invoiced costs, fees, expenses (including, without limitation, reasonable and documented out-of-pocket legal fees) and other compensation contemplated by the Loan Documents to be payable to the Administrative Agent and the Lenders in respect of the Facilities shall have been paid to the extent earned, due and payable.

(l)     **Position Report**.  The Administrative Agent and the Lenders shall have received from the Borrower a completed Position Report, substantially in the form of **Exhibit G**, certified by a Responsible Person of the Borrower as of the date hereof.

(m)     **Financial Statements**.  The Administrative Agent and the Lenders shall have received copies of the financial statements referred to in **Section 3.05**.

(n)     **Petition Date**.  The Petition Date with respect to each Debtor shall have occurred, and the First Day Orders sought by the Debtors shall have been entered by the Bankruptcy Court.

(o)     **No Prepetition Daylight Overdraft or Swing Line Loans**.  No Daylight Overdraft Loans (as defined in the Prepetition Credit Facility) or Swing Line Loans (as defined in the Prepetition Credit Facility) shall be outstanding under the Prepetition Credit Facility on the Petition Date.

(p)     **Interim DIP Order**.  The Interim DIP Order shall have been entered by the Bankruptcy Court in the Cases and shall be in full force and effect and shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the Administrative Agent and the Required Lenders.  The Debtors shall be in compliance in all material respects with the material terms of the Interim DIP Order.

(q)     **Cash Management**.  All orders entered by the Bankruptcy Court pertaining to cash management (including the Cash Management Order), and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance satisfactory to the Administrative Agent acting at the direction of the Required Lenders.

(r)     **Insurance**.  The Administrative Agent shall have received evidence that all of the requirements of **Section 5.06** hereof and Section 3 of the Security Agreement shall have been satisfied.

(s)     **Request to Honor Oral and Telefax Instructions**.  The Administrative Agent shall have received from the Borrower a completed request to honor oral and telefax instructions dated the date hereof (the "**Request to Honor Oral and Telefax Instructions**"), executed by a Responsible Person of the Borrower.

(t)     **Risk Management Practices**.  The Administrative Agent shall have received copies of the Risk Management Practices as in effect on the Effective Date, certified as true and complete by a Responsible Person of the Borrower.

(u)     **Additional Matters**.  All corporate, limited liability company or partnership (as applicable) and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement and the other Loan Documents shall be satisfactory in form and substance to the Administrative Agent acting at the direction of the Required Lenders, and the Administrative Agent shall have received such other documents and legal opinions in respect of any aspect or consequence of the transactions contemplated hereby or thereby as the Required Lenders shall reasonably request.

(v)     **KYC Information**.  The Administrative Agent and each Lender shall have received, prior to the Effective Date, (i) all documentation and other information requested by the Administrative Agent or such Lender in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act, and (ii) a properly completed and signed IRS Form W-8 or W-9, as applicable, for each Loan Party; and (iii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower, in each case in form and substance satisfactory to the Administrative Agent or such Lender, as applicable.

(w)     **Litigation**.  Except for the Cases, there shall not exist any pending or threatened litigation, proceeding, or investigation that (i) would prohibit, enjoin, or contest the transactions contemplated by the Loan Documents or (ii) could have a Material Adverse Effect.

Without limiting the generality of **Section 9.01**, for purposes of determining satisfaction of the conditions specified in this Section, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

The Borrower, by its signature to this Agreement, represents and warrants to the Administrative Agent and the Lenders that the conditions specified in **Section 4.01** have been satisfied on and as of the Effective Date.  Notwithstanding the foregoing, the obligations of the Lenders to make Credit Extensions hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to **Section 9.01**) at or prior to 3:00 p.m. (New York City time) on [___], 2018 (and, in the event that such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

SECTION 4.02 **Conditions to All Credit Extensions**.  The obligation of each Lender (including the Swing Line Lender and each Issuing Bank) to make a Credit Extension (including its initial Credit Extension) is additionally subject to the satisfaction (or waiver) of the following conditions:

(a)     the Administrative Agent and, if applicable, the Swing Line Lender or the applicable Issuing Bank shall have received a written Borrowing Request or Letter of Credit Request, as applicable, in accordance with the requirements hereof;

(b)     the representations and warranties of the Borrower set forth in this Agreement and in any other Loan Document shall be true and correct in all material respects (or, in the case of any such representation or warranty already qualified by materiality, in all respects) on and as of the date of such Credit Extension (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date);

(c)     the Borrower is in compliance with the covenants set forth herein, and no Default or Event of Default shall have occurred and be continuing or would result from such Credit Extension or from the application of proceeds thereof;

(d)     in the case of any request for a Swing Line Loan or L/C Credit Extension, the Swing Line Lender or applicable Issuing Bank, as the case may be, shall have received (i) a Borrowing Request or Letter of Credit Request (as applicable) from the Borrower, and shall not have received from the Required Lenders written notice that a Default or Event of Default has occurred or is continuing and (ii) written approval of such Swing Line Loan or L/C Credit Extension from a Lender Representative of each Lender (it being agreed hereby that the approval

of the Lender Representative shall not be withheld unless (i) a Default or Event of Default has occurred or would result from such Swing Line Loan or L/C Credit Extension, (ii) any of the covenants set forth herein have been breached or violated, or would be breached or violated by the making of such Swing Line Loan or L/C Credit Extension, or (iii) any of the conditions set forth in this Article IV have not been satisfied); **provided**, **further**, that nothing in this paragraph shall be deemed to limit the rights of the Issuing Banks under **Section 2.05(f)** or the Swing Line Lender under **Section 2.06(c); and**

(e)     in the case of any request for a Loan other than a Swing Line Loan, the Administrative Agent shall have received (i) a Borrowing Request from the Borrower, and shall not have received from the Required Lenders written notice that a Default or Event of Default has occurred or is continuing and (ii) written approval of such Loan from a Lender Representative of each Lender (it being agreed hereby that the approval of the Lender Representative shall not be withheld unless (i) a Default or Event of Default has occurred or would result from such Loan, (ii) any of the covenants set forth herein have been breached or violated, or would be breached or violated by the making of such Loan, or (iii) any of the conditions set forth in this Article IV have not been satisfied);.

Each Borrowing Request or Letter of Credit Request delivered, by the Borrower hereunder shall be deemed to constitute a representation and warranty by the Borrower on and as of the date of the applicable Credit Extension as to the matters specified in clauses (b) and (c) above in this Section.

## ARTICLE V

## **AFFIRMATIVE COVENANTS**

Until the Commitments have expired or been terminated, all Obligations shall have been paid in full (other than contingent indemnification obligations not yet due and owing) and all Letters of Credit shall have expired or been canceled or collateralized in cash (without any pending drawings), the Borrower covenants and agrees with the Lenders that:

SECTION 5.01 **Reporting**.  The Borrower will furnish to the Administrative Agent (for distribution to each Lender):

(a)     as soon as available, but in any event not later than 30 days after the end of each fiscal month of the Borrower, (i) a copy of the unaudited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as at the end of such fiscal month and the related unaudited consolidated statements of income and retained earnings for such fiscal month and the portion of the Fiscal Year through the end of such fiscal month, setting forth in each case in comparative form the figures for the previous Fiscal Year, certified by a Responsible Person of the Borrower, in his or her capacity as a Responsible Person, as fairly presenting in all material respects the Borrower's and such Subsidiaries' financial condition, results of operations and cash flows in accordance with GAAP, and (ii) the net book value, determined in accordance with GAAP, of all assets of the Immaterial Subsidiaries;

(b)     The Borrower shall also provide on a weekly basis and on a roll forward basis a Budget variance report/reconciliation for each week (commencing on the date that is one week following the Petition Date) (delivered no later than the end of each week), (i) showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding week, noting therein all material variances from values set forth for such historical periods in the Budget, and shall include explanations for all such variances, and (ii) accompanied by a

certification by a Responsible Person of the Borrower (A) as to its reasonableness when made by the Borrower and (B) that the Borrower has not breached or violated Section 6.13 hereof; and

(c) on each Tuesday and Friday (or, if any such day is not a Business Day, the next succeeding Business Day), the Borrower shall furnish to the Administrative Agent a Borrowing Base Report, calculated as of the close of business on the second Business Day immediately preceding such day and certified as true and complete by a Responsible Person of the Borrower.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in the case of clauses (a) and (b) in accordance in all material respects with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

SECTION 5.02 **Certificates; Other Information**. The Borrower will deliver to the Administrative Agent (for distribution to each Lender):

(a) concurrently with the delivery of the financial statements referred to in **Sections 5.01(b)**, a duly completed certificate signed by a Responsible Person of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with **Sections 6.13**;

(b) as soon as practicable in advance of filing with the Bankruptcy Court, all motions, applications, pleadings, proposed orders, judicial or financial information, and other documents as soon as practical in advance of filing by or on behalf of the Debtors with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Cases; provided that all pleadings and proposed orders and any other such filings that relate to the Loan Documents, the Obligations, the Final Order, bidding procedures, or any plan of reorganization or plan of liquidation, or any disclosure statement related thereto shall be in form and substance satisfactory to the Lenders.

(c) promptly after the same are publicly available, copies of each annual report, proxy or financial statement or other report or communication sent to the shareholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements that the Borrower or any Subsidiary may file or be required to file with the SEC or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, and not otherwise required to be delivered pursuant hereto;

(d) promptly after the furnishing thereof, copies of any material request or notice received by the Parent or any Subsidiary, or any statement or report furnished by the Parent or any Subsidiary to any holder of debt securities with a principal amount in excess of $1,000,000 of the Parent or any Subsidiary, pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished pursuant hereto;

(e) promptly after receipt thereof by the Parent or any Subsidiary, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of the Parent or any Subsidiary;

(f) promptly after receipt thereof by the Parent or any Subsidiary, copies of any detailed final audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Parent by independent

accountants in connection with the accounts or books of the Parent or any Subsidiary, or any audit of any of them;

(g)    concurrently with the delivery of the financial statements referred to in **Section 5.01(b)**, the Marked-to-Market Report, substantially in the form of **Exhibit E**, for the Borrower and for the Parent and its other Subsidiaries, certified by the Borrower;

(h)    during the first fiscal quarter of each fiscal year, a report of a reputable insurance broker with respect to the insurance maintained by or on behalf of the Parent and its Subsidiaries in accordance with **Section 5.06** of this Agreement;

(i)    promptly, upon receipt thereof, copies of all final "management letters" submitted to the Parent or any Subsidiary by the independent public accountants referred to in **Section 5.01(a)** above;

(j)    promptly following the reasonable request of the Administrative Agent or Required Lenders, a Position Report, substantially in the form of **Exhibit G**, for the Borrower, by commodity, location and time, which shall set forth in reasonable detail the information necessary to calculate compliance with the Maximum Position Limits;

(k)    promptly after delivery thereof to the lenders under the Global DIP Facility Agreement, copies of all financial statements, projections, forecasts, reconciliations and cash balance reports, borrowing base reports and/or other financial reporting delivered to the lenders under the Global DIP Facility Agreement,;

(l)    promptly, such information on the Hess Litigation as the Administrative Agent or any Lender may from time to time reasonably request; provided that such information is not (i) entitled to legal privilege such as attorney work product and attorney-client communications (unless such information is subject to a common interest) or (ii) otherwise subject to a confidentiality restriction that would prohibit Borrower from providing such information;

(m)    promptly, copies of any account statements or reports as the Administrative Agent or any Lender may from time to time reasonably request that have been received by or are available to any Loan Party with respect to any Pledged Account;

(n)    on the last Business Day of each week (for written confirmation by the Administrative Agent to the Lenders), with respect to the Operational Proceeds applied in accordance with Section 5.21 during the previous week, a written summary (calculated as of the last day of the previous week) of (i) the unpaid principal balance of the Prepetition Credit Facility, (ii) the amount of Operational Proceeds applied during such week to payment and satisfaction of the Prepetition Credit Facility, (iii) the outstanding unpaid principal balance of the Loans under this Agreement; and

(o)    promptly, such additional financial and other information regarding the Loan Parties and their respective Subsidiaries as any Lender may from time to time reasonably request.

In no event shall the requirements set forth in this **Section 5.02** require the Loan Parties to provide any such information (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or (ii) as is subject to attorney-client privilege or constitutes attorney work-product.

SECTION 5.03 **Notices**.  The Borrower will promptly notify the Administrative Agent (for distribution thereby to each Lender) upon obtaining knowledge of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) default or event of default under any material post-petition Contractual Obligation of the Loan Parties or any of their respective Subsidiaries of more than $500,000 or that would reasonably be expected to result in a Material Adverse Effect, (ii) post-petition Contractual Obligation of the Loan Parties or their Subsidiaries of more than $500,000 or that would reasonably be expected to result in a Material Adverse Effect being declared or otherwise accelerated prior to its stated maturity or (iii) litigation, investigation or proceeding which may exist at any time between the Loan Parties or any of their respective Subsidiaries and any Governmental Authority;

(c)    any litigation or proceeding against any Loan Party or any of their respective Subsidiaries in which the amount involved is $100,000 or more or in which injunctive or similar relief is sought;

(d)    the occurrence of any ERISA Event that, either individually or together with any other ERISA Events, could reasonably be expected to result in liability of the Parent and its Subsidiaries in an aggregate amount that would reasonably be expected to have a Material Adverse Effect;

(e)    any time at which (i)  Borrowing Base availability is less than zero, (ii) the aggregate outstanding amount of L/C Obligations exceeds the L/C Sublimit, (iii) any of the limits set forth in Sections 2.01 and 2.02 on total Revolving Credit Exposure, Prepetition Credit Exposure and Term Credit Exposure is exceeded, (iv)  the aggregate principal amount of outstanding Swing Line Loans exceeds the Swing Line Sublimit, or (v) the aggregate amount of L/C Obligations  then outstanding, when taken together with the aggregate principal amount of Swing Line Loans then outstanding, exceeds the Fronting Cap;

(f)    promptly upon the occurrence of any violation by the Borrower of the Maximum Position Limits, telephonic notice thereof to the Administrative Agent  followed by a notice in writing the same Business Day, outlining actions taken or to be taken to remedy the violation;

(g)    notice of any action arising under any Environmental Law or of any noncompliance by the Parent or any Subsidiary with any Environmental Law or any permit, approval, license or other authorization required thereunder, in either case that, if adversely determined, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $500,000 or have a Material Adverse Effect;

(h)    any change in accounting or financial reporting practices by the Parent or any Subsidiary;

(i)    any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification;

(j)    any change in a Subsidiary of the Parent, such that it has become, or is no longer, an Immaterial Subsidiary;

(k)    any matter or development that has had or could reasonably be expected to have a Material Adverse Effect; and

(l)     promptly following any request thereof, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act and the Beneficial Ownership Regulation .

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Person of the Borrower setting forth the details of the occurrence requiring such notice and stating what action the Borrower has taken and proposes to take with respect thereto, and the Borrower shall answer any and all questions of the Administrative Agent or the Required Lenders regarding same.

SECTION 5.04 **Conduct of Business; Preservation of Existence, Etc**.  The Borrower will, and will cause each Loan Party and Subsidiary to, continue to engage in the respective businesses of the same general type as conducted by each of them on the Effective Date or reasonably related business or extension thereof.  The Borrower will, and will cause each Loan Party and Subsidiary to, (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by **Section 6.03** or **6.04**; (b) take all reasonable action to maintain all rights, licenses, permits, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (d) preserve the goodwill and business of the customers, suppliers and others having business relations with the Loan Parties or any of their respective Subsidiaries, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (e) use commercially reasonable efforts to keep available the services and goodwill of such of its present employees as are, in the reasonable opinion of the Loan Parties or any of their respective Subsidiaries, as applicable, necessary for the conduct of its business as it is currently conducted, except, with respect to any Guarantor that is not a Loan Party, as otherwise permitted under the Global DIP Facility Agreement; (f) perform and observe all the terms, covenants and conditions required to be performed and observed by it under its post-petition Contractual Obligations and do all things necessary to preserve and keep unimpaired its rights under such Contractual Obligations except to the extent failure to maintain such Contractual Obligations would not reasonably be expected to result in a Material Adverse Effect; (g) perform and observe in all material respects the terms, covenants and conditions set forth in material prepetition secured Indebtedness in respect of the collateral securing such Indebtedness; and (h) comply with all Laws orders, writs, injunctions and decrees applicable to it or to its business or property, except, with respect to any Guarantor, as otherwise permitted under the Global DIP Facility Agreement, except as would not reasonably be expected to result in a Material Adverse Effect, or except as stayed by the Cases.

SECTION 5.05 **Maintenance of Properties**.  The Borrower will, and will cause each Loan Party and Subsidiary to keep all property necessary in their business in good working order and condition (ordinary wear and tear, casualty and condemnation excepted).

SECTION 5.06 **Maintenance of Insurance**.  The Borrower will, and will cause each Loan Party and Subsidiary to, (a) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business all of which insurance shall name the Collateral Agent for the ratable benefit of the Secured Parties as lender loss payee and additional insured, in the case of property or casualty insurance, and as an additional insured, in the case of liability insurance, as its interests may appear (and in each case if another party is already named as lender loss payee and additional insured, to the extent a second named Lender loss payee and additional insured is not prohibited by law or contract); (b) furnish to the Administrative Agent, promptly following written request, full information as to

the insurance carried, a copy of the underlying policy, the related cover note and all addendums thereto; and (c) promptly pay all insurance premiums covering the Collateral.

SECTION 5.07 **Payment of Obligations**. The Borrower will, and will cause each Loan Party and Subsidiary to, pay, in all respects discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its post-petition obligations of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on its books or where failure to pay, discharge or satisfy would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08 **Environmental Matters**. Except as could not reasonably be expected, either individually or in the aggregate, to result in liabilities of $2,000,000 or more, the Borrower will, and will cause each Loan Party and Subsidiary to:

(a) Comply with, and cause compliance by all tenants and subtenants (if any) with, all applicable Environmental Laws and obtain and comply with and maintain, and use commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b) Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions, required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except to the extent that the same are being contested in good faith by appropriate proceedings, and for which adequate reserves have been established and maintained on the books and records of the applicable Loan Party and the applicable Subsidiary in accordance with GAAP.

(c) Handle, transport and dispose of, and cause all subtenants to handle, transport and dispose of, all Materials of Environmental Concern in compliance with all applicable Environmental Laws.

SECTION 5.09 **Books and Records**. The Borrower will, and will cause each Loan Party and Subsidiary to, keep proper books of records and accounts in which complete and correct entries in conformity in all material respects with GAAP and all requirements of Applicable Law, shall be made of all dealings and transactions in relation to its business and activities.

SECTION 5.10 **Inspection Rights; Update Calls**. The Borrower will, and will cause each Loan Party and Subsidiary to, permit (x) representatives and independent contractors of the Administrative Agent or its Related Parties and (y) any representative selected by the Required Lenders, in each case to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, advisors and independent public accountants, all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably requested; *provided* that (i) the costs and expenses of only one inspection per month will be reimbursed (if such inspection is not conducted by the Administrative Agent or its Related Parties or independent contractors), (ii) representatives of the Borrower, the Loan Parties and the Administrative Agent shall have been provided a reasonable opportunity to be present during the inspection, and (iii) the information during such inspection shall be limited to the extent provided in the last paragraph of **Section 5.02**.

SECTION 5.11 **Use of Proceeds**. The Borrower will, and will cause each Loan Party and Subsidiary to, use the proceeds of the Loans and the Letters of Credit to (a) pay reasonable costs, fees, and expenses, including fees of the Agents, the Swing Line Lender, the Issuing Banks and the other Lenders, associated with the transactions contemplated by this Agreement and the other Loan Documents, (b) pay for fees, costs, and expenses incurred by persons or firms retained by the Loan Parties pursuant to section 327,

328, or 363 of the Bankruptcy Code, and (c) provide ongoing working capital requirements of the Loan Parties and the Subsidiaries and to pay for fees, costs, and expenses relating to the Cases (other than fees, costs, and expenses referred to in clause (b)), in each case consistent with the Budget. Proceeds of the Loans and the Letters of Credit shall not be used (i) to permit any Loan Party, any Subsidiary or any of their respective representatives to challenge or otherwise contest or institute any proceeding to determine (x) the validity, perfection or priority of any security interest in favor of any of the Secured Parties, or (y) the enforceability of the obligations of the Borrower of any Guarantor under this Agreement or (ii) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the Lenders, each in such capacity, and their respective agents, attorneys, advisors or representatives, including, without limitation, any lender liability, subordination or similar claims.

SECTION 5.12 **First and Second Day Orders**.  The Borrower shall cause all proposed First Day Orders and, "second day" orders, to be reasonably acceptable to the Administrative Agent and the Required Lenders in all respects.

SECTION 5.13 **Sanctions; Anti-Corruption Laws**.  The Borrower will, and will cause each Loan Party and Subsidiary to, maintain in effect policies and procedures designed to promote compliance by the Loan Parties, the Subsidiaries, and their respective directors, officers, employees, and agents with applicable Sanctions and with the FCPA and any other applicable anti-corruption laws and Anti-Terrorism Laws.

SECTION 5.14 **Required Milestones and Actions**.  The Debtors shall comply with and satisfy (by the occurrence thereof) each of the Required Milestones, and perform each of the actions, set forth on **Schedule 5.14** attached hereto, on or before the dates required for such compliance and actions as set forth in such Schedule.

SECTION 5.15 **Periodic Audit of Borrowing Base**.  The Borrower will, and will cause each Loan Party and Subsidiary to, permit the Administrative Agent, its representatives or any other designee of the Administrative Agent or the Required Lenders to perform, or to have an independent inspector perform, at the cost and expense of the Borrower, (a) a collateral and risk management practices review for the Loan Parties and Subsidiaries and (b) periodic due diligence inspections, tests and reviews of all of the assets of the Loan Parties that comprise Collateral, each asset category set forth in the definition of Borrowing Base, the Loan Parties' and Subsidiaries' other reporting under this Agreement and compliance with the Risk Management Practices, once during the term of this Agreement (or more frequently as the Administrative Agent or the Required Lenders may require if the Commitment Termination Date occurs more than 120 days after the Effective Date) during business hours.  The Administrative Agent will provide copies of final reports prepared by independent inspectors to each Lender promptly following receipt by the Administrative Agent thereof.

SECTION 5.16 **Maximum Position Limits; Risk Management**.  The Borrower will, and will cause each Loan Party and Subsidiary to, comply in all material respects with the Maximum Position Limits and the Risk Management Practices, in each case, as in effect on the Effective Date.  The Borrower shall provide at least five (5) Business Days' prior written notice to the Administrative Agent (for distribution to each Lender) of any proposed material change to the Risk Management Practices.  Any change (whether material or immaterial) to the Risk Management Practices that relates to the Maximum Position Limits (unless corresponding to a decrease) must be approved in advance by the Administrative Agent and the Required Lenders.

SECTION 5.17 **Notification of Account Debtors**.  The Borrower will  notify each Account Debtor and each other Person who remits or is to remit payments to the Borrower of the Perfected First Lien of the Collateral Agent, and instruct each Account Debtor and each such other Person to make all

payments to the Borrower to a Controlled Account, without offset, defense or counterclaim of any kind, nature or description whatsoever. The Borrower shall cause all payments in respect of sales by the Borrower of Eligible Commodities to be remitted directly to a Controlled Account. The Borrower shall instruct any bank at which it holds a Deposit Account of the Borrower that is not a Controlled Account to immediately transfer payments received into such Deposit Account to a Controlled Account.

SECTION 5.18 **Taxes**. The Borrower will, and will cause each Loan Party and Subsidiary to, timely file or cause to be filed all material income, franchise and other Tax returns required to be filed by any of them and shall timely pay all material income, franchise and other Taxes due and payable (other than any Taxes (i) the amount or validity of which are being contested in good faith by appropriate proceedings, with respect to which reserves in conformity with GAAP have been provided on the books of the Loan Parties and their respective Subsidiaries, as applicable, or (ii) where stayed by the Cases; provided that, in the case of any Debtor, such payments shall be made in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court.

SECTION 5.19 **Additional Collateral; Further Assurances**.

(a)     The Borrower shall promptly cause each Subsidiary of Parent formed or acquired after the date of this Agreement, other than any Immaterial Subsidiary, to join the Guaranty and Security Documents pursuant to joinders in form satisfactory to the Required Lenders and subject to satisfaction of the requirements set forth in the last sentence of this clause (a). If and when any Subsidiary ceases to be an Immaterial Subsidiary, the Borrower shall promptly cause such Subsidiary to join the Guaranty and Security Documents pursuant to joinders in form reasonably satisfactory to the Required Lenders. The Administrative Agent and each Lender shall have received, prior to the effectiveness of any such joinder, (x) all documentation and other information regarding such Subsidiary requested by the Administrative Agent or such Lender in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, and (y) a properly completed and signed IRS Form W-8 or W-9, as applicable, for such Subsidiary, and all such documentation and other information described in clauses (x) and (y) shall be acceptable to the Administrative Agent in its sole discretion.

(b)     With respect to any Collateral of a Loan Party as to which the Collateral Agent for the ratable benefit of the Secured Parties does not have a perfected lien, or, in the case of assets of Debtors already encumbered as of the Petition Date in favor of other creditors other than a Lender, a perfected junior lien, such Loan Party shall cause within 45 days of the date hereof (or 60 Business Days in the case of Subsidiaries organized in South Africa), or in the case of after-acquired or after-arising Collateral, within 45 days of the date such Collateral is acquired or arises, such Debtor to (i) execute and deliver to the Collateral Agent (A) such amendments to the Security Agreement or such other documents necessary to grant to the Collateral Agent for the ratable benefit of the Secured Parties a perfected Lien in such Collateral not already encumbered as of the Petition Date in favor of a Lender, including the Equity Interests of all Subsidiaries of the Parent, and (B) security agreements, vessel mortgages and such other documents necessary or advisable to grant to the Collateral Agent for the ratable benefit of the Secured Parties a perfected lien in such Collateral as was already encumbered as of the Petition Date in favor of a Person other than a Lender, and (ii) take all other actions necessary to grant to the Collateral Agent for the ratable benefit of the Secured Parties (A) a perfected Lien in such property, including, without limitation, the filing of UCC financing statements in such jurisdictions as may be required by the Security Agreement or by Law or as may be requested by the Collateral Agent and (B) a perfected lien in such other Collateral as was already encumbered as of the Petition Date in favor of a Person other than a Lender, including, without limitation, the filing of UCC financing

statements, vessel mortgages and other documents and the delivery of customary opinions of counsel and certificates of Loan Parties and public officials, in such jurisdictions as may be advisable or required by the Security Agreement or by Law or as may be requested by the Collateral Agent, *provided* that with respect to Loan Parties that are not U.S. Persons, and with respect to documents and actions necessary or advisable pursuant to the laws of jurisdictions outside of the United States and its States and territories, such obligation shall be subject to and in accordance with the Agreed Security Principles (as defined in the Global DIP Facility agreement). With respect to any Person that becomes a Loan Party after the Effective Date, or any Collateral of the Loan Parties acquired or arising after the Effective Date, the Borrower shall cause the execution, delivery and performance of the items required pursuant to the foregoing sentence within 60 days of the date that such Person becomes a Loan Party, or the date that such property arises or is acquired, as applicable.

SECTION 5.20 **Stored Eligible Commodities**. The Borrower will store all Eligible Commodities in an Approved Inventory Location so long as whenever applicable, (i) such Eligible Commodities are covered by an appropriate insurance policy that names the Collateral Agent for the ratable benefit of the Secured Parties as additional insured and loss payee as their interests may appear, (ii) the Collateral Agent shall have received such amendments to the Security Agreement or such other documents and customary legal opinions as the Collateral Agent (acting at the direction of the Required Lenders) deems necessary or advisable to grant the Collateral Agent for the ratable benefit of the Secured Parties a perfected Lien in such Eligible Commodities and (iii) the Borrower shall take all actions necessary or advisable to grant to the Collateral Agent for the ratable benefit of the Secured Parties a perfected Lien in such property, including, without limitation, the filing of UCC or PPSA financing statements in such jurisdiction as may be required by the Security Documents or by Law or as may be requested by the Collateral Agent (acting at the direction of the Required Lenders); provided, however, that the Approved Inventory Locations as of the Effective Date are acceptable to the Collateral Agent (acting at the direction of the Required Lenders).

SECTION 5.21 **Cash Management**. The Borrower hereby irrevocably authorizes, directs, and agrees as follows:

(a) On the Effective Date, (i) the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed to have removed and applied all amounts on deposit in the Wells Fargo Account as of the opening of business on the Effective Date, in partial satisfaction of the principal amount of the Prepetition Revolving Credit Loans, (ii) the Borrower shall be deemed to have requested from the Lenders, and the Lenders shall be deemed to have made to the Borrower, a LIBO Rate Loan (based on the LIBO Rate for an Interest Period commencing on the Effective Date) in accordance with **Section 2.01** and (iii) the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed to have deposited in the Wells Fargo Account on the same day as such application (pursuant to clause (a)(i) above) an amount equal to such amount as was deemed removed therefrom (it being acknowledged hereby that all of the foregoing shall be in addition to the Partial Roll Up DIP Loan and shall be accomplished by bookkeeping entries, rather than physical movements of funds, on the Effective Date).

(b) On the Effective Date, (i) the Borrower shall be deemed to have obtained and removed from each of the Controlled Accounts, the entire balance therein as of the opening of business on the Effective Date, and (ii) (A) the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed to have applied such balance amounts in partial satisfaction of the principal amount of the Prepetition Revolving Credit Loans, (B) the Lenders shall be deemed, in accordance with Section 2.01 hereof (and subject to all other terms, conditions and provisions hereof) to have made a LIBO Rate Loan (based on the LIBO Rate for an Interest Period commencing on

the Effective Date) to the Borrower on the Effective Date in the amount of such amounts applied pursuant to the foregoing clause (ii)(A) (provided that the Borrower shall notify the Administrative Agent in writing of the principal amount of such LIBO Rate Loan) and (C) the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed to have deposited, on the same day as such removal, in each of such Controlled Accounts an amount, from the proceeds of such Loan, equal to such portion of such amount as was deemed removed therefrom pursuant to the foregoing (it being acknowledged hereby that all of the foregoing shall be in addition to the Partial Roll Up DIP Loan and shall be accomplished by bookkeeping entries, rather than physical movements of funds, on the Effective Date).

(c)     So long as any Prepetition Obligations have not been paid in full in cash (or unless otherwise directed in writing by the Required Lenders), on each Business Day (beginning with the Business Day immediately after the Effective Date), (i) as of the end of each such Business Day, the Borrower shall identify in a written notice (the "**Operational Proceeds Notice**") to the Administrative Agent (for distribution to each Lender) the amount on deposit in each of the Controlled Accounts as of the opening of business on such Business Day that constitutes proceeds from the sales of goods or other U.S. Priority Collateral or the collection of accounts and other proceeds of U.S. Priority Collateral ("**Operational Proceeds**"), (ii) the Borrower shall be deemed (without any further action needed), on the next succeeding Business Day after the Borrower provided such written notice, to have transferred from each of the Controlled Accounts (other than the Wells Fargo Account) to the Wells Fargo Account such Operational Proceeds as identified by the Borrower in such notice, (iii) the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed, on the date of such transfer, to have obtained and removed from the Wells Fargo Account, the balance equal to such Operational Proceeds on deposit in the Wells Fargo Account plus such Operational Proceeds deemed so transferred to the Wells Fargo Account, (iv) the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed to have applied such amount of Operational Proceeds on deposit in the Wells Fargo Account plus such Operational Proceeds deemed so transferred to the Wells Fargo Account immediately upon deemed receipt pursuant to the foregoing clause (c)(iii) to the Prepetition Obligations in accordance with the terms of the Prepetition Credit Facility, and the Lenders shall be deemed to have made a LIBO Rate Loan (based on the LIBO Rate for an Interest Period commencing on such Business Day) to the Borrower in the amount of such amount of Operational Proceeds deemed so applied (**provided** that the Borrower shall notify the Administrative Agent in writing of the principal amount of such LIBO Rate Loan) and (v) to the extent of the Loan described in the foregoing clause (iv), the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) be deemed to have deposited, on the same day as such removal (or as promptly thereafter as is commercially practicable), in each of such Controlled Accounts, an amount equal to such to such amount as was deemed transferred therefrom by the Borrower (it being acknowledged that all of the foregoing deemed events shall be evidenced by bookkeeping entries, and shall not require the actual transfer of funds); provided however, that the deemed application of funds and deemed making of Loans under this Section 5.21(c) shall be suspended thereafter and without subsequent effect upon written notice from the Administrative Agent (acting at the direction of the Required Lenders) stating that the operation of Section 5.21(c) is suspended (but such suspension shall not affect any deemed applications of funds or deemed Loans effected pursuant hereto prior to the date of such notice).

(d)     Until the occurrence of an Event of Default, and subject in all respects to the remedies of the Agents and the Lenders as are set forth herein or in any of the other Loan Document upon an Event of Default, each Lender acknowledges and agrees that the Borrower shall be permitted to withdraw amounts on deposit in the Wells Fargo Account (but only in accordance with, and subject to, the Budget) on any Business Day by providing a written request to the Administrative Agent; **provided** that ABN and the Administrative Agent shall (i) be fully protected and have no liability or obligation to any Person in relying on any request or direction with regard to transfer of funds in the Wells Fargo Account

reasonably believed by them to be genuine (including, without limitation, any request or direction sent by any Lender Representative via email) and have no obligation to ascertain or to inquire as to any matter relating to any such request or direction including without limitation as to whether or not any such written request is with respect to funds constituting Operational Proceeds in the Wells Fargo Account or in accordance with, and subject to, the Budget, or has been approved by any Lender and (ii) comply with each such written request from the Borrower unless it receives a written direction to the contrary from the Required Lenders and has reasonably sufficient time to act on such contrary written direction  and in this regard it shall have no liability or obligation for any delays on the part of Wells Fargo Bank (it being understood and agreed that, absent any such written direction from the Required Lenders, ABN shall not be liable for any withdrawal made or approved by ABN in reliance on any such written request from the Borrower).

(e)     Borrower shall take all actions necessary so that all Deposit Accounts (other than the Chase Account) shall be and remain Controlled Accounts.

(f)     For the avoidance of doubt, the Administrative Agent shall (and is hereby authorized and directed by the Required Lenders and the Borrower to) apply all payments received from time to time on account of the Obligations or the Prepetition Obligations or as proceeds of any Collateral in accordance with **Section 7.02**, and nothing in this **Section 5.21** shall be deemed to limit such obligation of the Administrative Agent (or such authorization and direction from the Required Lenders and the Borrower).

SECTION 5.22 **Hedging Policy**.  The Borrower shall adopt and implement, within ten Business Days after the Effective Date, a commodity price hedging policy that is satisfactory to the Required Lenders and consistent in all material respects with the commodity price hedging policies required under the Global DIP Facility Agreement.  The Borrower's commodity price hedging policy shall be designed and implemented no later than the tenth Business Day after the Effective Date, so as to hedge against the economic impact of downward movements in the price for commodities purchased by the Borrower, including fuels and other such assets as constitute a part of the inventory of the Borrower.  The Borrower shall execute hedges via Swap Contracts, and shall do so only with Lenders in order to satisfy the obligations arising under this Section 5.22.

SECTION 5.23 **Commodity Accounts, Deposit Accounts and Securities Accounts**. Neither the Borrower nor any of its Subsidiaries shall open or maintain any Commodity Account, Deposit Account or Securities Account other than the Chase Account, each other Controlled Account and any other Commodity Account, Deposit Account or Securities Account established with the consent of the Administrative Agent (acting upon instructions of the Required Lenders); it being understood and agreed that the Wells Fargo Account is maintained in the name of ABN AMRO Capital USA LLC and not in the name of the Borrower.

ARTICLE VI

**NEGATIVE COVENANTS**

Until the Commitments have expired or been terminated, all Obligations (other than contingent indemnification obligation not due and owing) have been paid in full and all Letters of Credit have expired, been canceled or otherwise Cash Collateralized (without any pending drawings), the Borrower covenants and agrees with the Lenders that:

SECTION 6.01 **Indebtedness**.  The Borrower will not, nor will it permit any Loan Party to, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Loan Documents;

(b)    Indebtedness and Guaranty obligations outstanding on the date hereof and listed on **Schedule 6.01** or any refinancings, renewals or extensions thereof ("**Permitted Refinancing Indebtedness**") which do not result in an increase thereof provided that, (i) the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension, other than by an amount equal to accrued interest, fees and expenses incurred in connection therewith (ii) such refinancing, refunding, renewal or extended Indebtedness shall (A) not have a final maturity prior to the final maturity date of the Indebtedness being refinanced, refunded, renewed or extended and (B) have an average life to maturity (without giving effect to any prepayment) equal to or greater than such Indebtedness, (iii)  the terms of such refinancing, refunding, renewal or extension shall not be more restrictive (taken as a whole) than the terms of such Indebtedness, (iv) any guarantee entered into in connection with such refinancing, refunding, renewal or extension that is not a refinancing of an existing guarantee of such Indebtedness shall not be permitted under this Section 6.01(b) and (v) if the Indebtedness being refinanced is subordinated, such Permitted Refinancing Indebtedness shall be subordinated to at least the same extent, and on terms at least as favorable to the Lenders, as the Indebtedness being refinanced;

(c)    Indebtedness under Commodity OTC Agreements and Financial OTC Agreements entered into in compliance with the Risk Management Practices;

(d)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(e)    Indebtedness (i) resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business or (ii) arising under or in connection with cash management services in the ordinary course of business;

(f)    Indebtedness (i) under the Global DIP Facility Agreement and the Loan Documents (as defined in the Global DIP Facility Agreement) and (ii) any Indebtedness permitted to be incurred or outstanding by the terms of the Global DIP Facility Agreement;

(g)    Indebtedness permitted by the Interim DIP Order;

(h)    Indebtedness owing by any Loan Party to any other Loan Party;

(i)    the Prepetition Obligations;

(j)    as permitted by the Cash Management Order; and

(k)    Indebtedness not otherwise permitted hereunder in an aggregate amount not to exceed $250,000 at any time outstanding.

SECTION 6.02 **Liens**.   The Borrower will not, nor will it permit any Loan Party or Subsidiary to, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (collectively, "**Permitted Liens**"):

(a)     Liens for taxes, assessments or governmental charges (including Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods) or levies not yet due and payable or not then required to be paid hereunder;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, lessor's or other similar Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith by appropriate proceedings for which adequate reserves are maintained on its books and records in accordance with GAAP;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     Permitted Borrowing Base Liens;

(f)     Permitted Financial Management Liens and Liens on Commodities Accounts in favor of Eligible Commodity Brokers permitted under the applicable Account Control Agreement;

(g)     easements, rights-of-way, restrictions and other similar title exceptions and encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount, secure obligations that do not constitute Indebtedness, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Loan Parties and their respective Subsidiaries;

(h)     Liens created pursuant to the Security Documents;

(i)     First Purchaser Liens;

(j)     Liens (i) listed on **Schedule 6.02,** including Liens securing the Prepetition Obligations, and (ii) securing the obligations under the Global DIP Loan Documents;

(k)     Liens securing judgments for the payment of money not constituting an Event of Default under **Section 7.01(g)**;

(l)     Liens on cash deposited as collateral by the Borrower to secure the performance of Indebtedness permitted pursuant to **Section 6.01(c)**, in an amount not to exceed that which is required by the contract with the applicable counterparty (or counterparties) thereto;

(m)     Liens arising pursuant to the Orders, First Day Orders and "second day" orders;

(n)     Liens securing Indebtedness (i) under the Global DIP Facility Agreement and the Loan Documents (as defined in the Global DIP Facility Agreement) and (ii) permitted to be incurred or outstanding by the terms of the Global DIP Facility Agreement;

(o)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(p)     any interest or title of a licensor, sublicensor, lessor or sublessor under any license or operating or true lease agreement incurred in the ordinary course of business;

(q)     security given to a public or private utility or any Governmental Authority as required in accordance with the First Day Orders or "second day" orders;

(r)     Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with the Loan Parties in the ordinary course of business; and

(s)     Liens not otherwise permitted hereunder securing obligations in an aggregate amount outstanding at any time not to exceed $250,000.

SECTION 6.03 **Fundamental Changes**.  The Borrower will not, nor will it permit any Loan Party or Subsidiary to, enter into any merger, consolidation or amalgamation, or liquidate, wind up, divide or dissolve itself (or suffer any liquidation, division or dissolution), or Dispose of all or substantially all of the property, business or assets, without the prior written consent of the Required Lenders, except,(i) to the extent permitted under the Global DIP Facility Agreement in respect of Guarantors, (ii) as described on Schedule 6.03 (iii) mergers, consolidations or amalgamations between and among the Loan Parties, (iv) liquidations and dissolutions of any Subsidiary so long as the assets are directly or indirectly transferred to a Loan Party.

SECTION 6.04 **Dispositions**.  The Borrower will not, and will not permit any Loan Party or Subsidiary to, make any Disposition, except:

(a)     Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)     the sale of Eligible Commodities and other inventory in the ordinary course of business;

(c)     Dispositions by any Loan Party to any other Loan Party;

(d)     Dispositions in accordance with the Orders, the First Day Orders and "second day" Orders;

(e)     leases, subleases, licenses and sublicenses of real or personal property, in each case in the ordinary course of business (excluding any such transaction with a Subsidiary that is not a Loan Party);

(f)     any Disposition of property to a Governmental Authority as a result of a condemnation of such property where the book value of such property does not exceed $400,000 in aggregate for all such Dispositions;

(g)     Transactions permitted under Section 6.02, 6.03, 6.05 and 6.06;

(h)     Dispositions not otherwise permitted hereunder in an aggregate book value amount not to exceed $400,000 in aggregate for all such Dispositions; and

(i)     Dispositions by parties to the Global DIP Facility Agreement permitted under the Global DIP Facility Agreement.

SECTION 6.05 **Payments**.

(a)    The Borrower will not, and will not permit any Loan Party or Subsidiary to, declare or make any Restricted Payment except that, so long as no Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(i)    each Subsidiary (excluding Borrower) may make Restricted Payments to Parent or any other Subsidiary and any other Person that owns an Equity Interest in such Subsidiary, ratably according to their respective holdings of such Equity Interests in respect of which such Restricted Payment is being made;

(ii)    Restricted Payments to the extent constituting Investments permitted hereunder;

(iii)    Restricted Payments provided for in the Orders; "First Day Orders" or "second day Orders";  and

(iv)    the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such Person.

(b)    The Borrower will not, and will not permit any other Debtor to, make any payment to, or otherwise provide any adequate protection for, any prepetition creditors, other than pursuant to the Interim DIP Order, the Final DIP Order, the First Day Orders and other cash collateral orders acceptable to the Required Lenders or in accordance with the Budget.

(c)    The Borrower will not, and will not permit any Loan Party or Subsidiary to, prepay any prepetition Indebtedness (other than the Prepetition Obligations and other than, for the avoidance of doubt, any payments under any financial or physical trading transaction (including hedges), including commodities transactions), except as (i) pursuant to the First Day Orders or other Bankruptcy Court orders acceptable to the Required Lenders, (ii) as disclosed on **Schedule 6.05(c),** (iii) as permitted under the Global DIP Facility Agreement, (iv) in accordance with the Budget and (v) any other order of the Bankruptcy Court.

Anything contained in this Section 6.05, or any other covenant or other provision of this Agreement to the contrary notwithstanding, in no event shall the Borrower or any Loan Party make any Restricted Payment to any Subsidiary of Parent that is not a Guarantor or Borrower hereunder.

SECTION 6.06 **Investments**.  The Borrower will not, and will not permit any Loan Party or Subsidiary to, make any Investments, except:

(a)    Investments in the form of Cash Equivalents;

(b)    Investments by any Loan Party or any of their respective Subsidiaries in the Borrower;

(c)    Investments consisting of cash and Cash Equivalents posted as collateral to satisfy margin requirements with counterparties of Commodity Contracts or Swap Contracts of the Borrower and its Subsidiaries;

(d)    Investments by Loan Parties (other than the Borrower) in other Loan Parties;

(e)    Investments by Loan Parties (other than the Borrower) in any direct or indirect Wholly-Owned Subsidiary of Parent;

(f)     Investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(g)     Investments by any Loan Party (other than the Borrower) to the extent permitted under the Global DIP Facility Agreement;

(h)     Investments made in accordance with the Orders, the First Day Orders or the "second day" Orders;

(i)     Intercompany loans and advances by Borrower to Loan Parties;

(j)     Investments permitted under Sections 6.01, 6.04 and 6.08;

(k)     Investments in an aggregate amount outstanding not to exceed $400,000; and

(l)     Investments in existence on the Effective Date and listed on **Schedule 6.06**, together with any renewals and extensions thereof so long as the principal amount of such renewal or extension does not exceed the original principal amount of such Investment.

Anything contained in this Section 6.06, or any other covenant or other provision of this Agreement to the contrary notwithstanding, in no event shall the Borrower or any Loan Party make Loans to or Investments in any Subsidiary of Parent that is not a Guarantor or Borrower hereunder, except to the extent permitted under Section 6.06(l) above.

SECTION 6.07 **Use of Proceeds**.  The Borrower will not, and will not permit any Loan Party or Subsidiary to, use the proceeds of Loans or Letters of Credit other than in accordance with this Agreement, the Interim DIP Order, the Final DIP Order or such other order entered by the Bankruptcy Court.

SECTION 6.08 **Transactions with Affiliates**.  The Borrower will not, and will not permit any Loan Party or Subsidiary to, engage or enter into any transaction or arrangement, including, without limitation, any purchase, sale, transfer, lease or exchange of property or the rendering of any service, with any Affiliate, other than (a) transactions of a type or nature that is described on **Schedule 6.08**; provided that this clause (a) shall not permit the purchase of inventory by the Borrower from, or sale of inventory by the Borrower to, any Affiliate (it being understood and agreed that such purchases and sales of inventory are prohibited by this Agreement), (b) transactions among Loan Parties or among Subsidiaries that are not Loan Parties, (c) transactions in accordance in all material respects with the Orders,  (d) Investments permitted under Section 6.06, (e) employment contracts with officers and management of the Loan Parties and their Subsidiaries and payment of reasonable compensation to directors, officers and employees for services actually rendered to any such Loan Party or any of its Subsidiaries and indemnification arrangements, and (f) payment of director's fees, expenses and indemnities, and (g) other transactions on an arm's length basis other than transactions among any one or more Loan Parties and any one or more Subsidiaries that are not Loan Parties.  The parties hereto acknowledge that as of the Effective Date no Lender is an Affiliate of the Borrower.

SECTION 6.09 **Certain Restrictive Agreements**.  The Borrower will not, and will not permit any Loan Party or Subsidiary to, enter into any Contractual Obligation after the Petition Date (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary to make Restricted Payments to Parent or any Subsidiary or to otherwise transfer property to Parent or any Subsidiary, (b) Parent or any Subsidiary to Guarantee Indebtedness of Parent or any Subsidiary or (c) Parent

or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations except for any restrictions existing under or by reason of: (i) the Loan Documents, the Global DIP Facility Agreement and Loan Documents (as defined in the Global DIP Facility Agreement), and the Prepetition Credit Facility, (ii) any encumbrance or restriction pursuant to applicable Law or an agreement in effect at or entered into on the Closing Date subject to the Bankruptcy Cases or other applicable order of the Bankruptcy Court, (iii) any encumbrances or restrictions applicable solely to a Foreign Subsidiary and contained in any credit facility extended to any Foreign Subsidiary that is otherwise permitted hereunder; <u>provided</u> that such encumbrances and restrictions do not extend to any Subsidiary that is not a Foreign Subsidiary, (iv) any restrictions (related to the assets being sold) imposed pursuant to an agreement that has been entered into in connection with the disposition of assets of a Loan Party or a Subsidiary thereof to the extent such disposition is permitted hereunder, (v) any encumbrance or restriction that restricts the subletting, assignment, subleasing, sublicensing or transfer of any property or asset or right and is contained in any lease, license or other contract entered into in the ordinary course of business (vi) as disclosed on **Schedule 6.09**, and (vii) restrictions on transfers of assets pursuant to a Lien permitted by Section 6.02.

SECTION 6.10 **Changes in Fiscal Periods and Accounting**. The Borrower will not (a) permit the last day of its or Parent's fiscal year to end on a day other than December 31 or change the Borrower's method of determining its fiscal quarters, or (b) make any significant change in its accounting treatment or reporting practices, except as required by GAAP, without providing the Administrative Agent with at least ten days' prior written notice of such change. At the end of any calendar quarter during which any such change has occurred, the Borrower shall prepare and deliver to the Administrative Agent an explanatory statement, in form and substance satisfactory to the Administrative Agent (acting at the direction of the Required Lenders), reconciling the previous treatment or practice with the new treatment or practice.

SECTION 6.11 **Changes in Nature of Business**. The Borrower will not, and will not permit any Loan Party or Subsidiary to, engage to any material extent in any business other than those businesses conducted by the Loan Parties and Subsidiaries on the Effective Date or any business reasonably related or incidental thereto or representing a reasonable expansion thereof, except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court.

SECTION 6.12 **Restriction on Use of Proceeds**. The Borrower will not use the proceeds of any Credit Extension, whether immediately, incidentally or ultimately, to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose.

SECTION 6.13 **Budget Variance**. Commencing after the conclusion of the fourth full week after the Petition Date as of the last day of each week thereafter, the Debtors' total cumulative operating disbursements since the Petition Date will not exceed 105% of the amount set forth in the Approved Budget(s) covering such cumulative period (which amount, for the avoidance of doubt, shall take into account any positive or negative variances—i.e., the amount by which total operating disbursements is less or greater than 100% of the budgeted amount—from any prior testing period that may be carried forward and applied to the current period), unless the Required Lenders have provided a written waiver of such excess.

SECTION 6.14 **Sanctions; Anti-Corruption; Use of Proceeds**. The Borrower will not, and will not permit any Loan Party or Subsidiary to, directly or indirectly, use the proceeds of the Loans or use the Letters of Credit, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of the FCPA or any other applicable anti-corruption law, or (ii) (A) to fund any activities or business of or with

any Person, or in any Sanctioned Country, in each case that would result in a violation of applicable Sanctions, or (B) in any other manner that would result in a violation of applicable Sanctions by any Person (including any Person participating in the Loans or Letters of Credit, whether as Administrative Agent, Collateral Agent, Swing Line Lender, Issuing Bank, Lender, underwriter, advisor, investor, or otherwise).

SECTION 6.15 **Additional Bankruptcy Matters**.

(a)    The Borrower will not, nor will it permit any other Debtor to, file or support the confirmation of any Plan of Reorganization other than an Acceptable Reorganization Plan.

(b)    No Debtor shall consent to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the "**Exclusivity Periods**") or fail to object to any motion by a party in interest (other than a Lender or an Agent) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders).

SECTION 6.16 **Limitation on Amendments to Organizational Documents**.  The Borrower shall not, nor shall it permit any Loan Party or Subsidiary to, amend its Organizational Documents in any manner adverse to the Lenders except as required by law.

SECTION 6.17 **Limitation on Speculative Transactions, Certain Futures, etc.**  The Borrower shall not, nor shall it permit any Loan Party or Subsidiary to, (a) purchase or sell Swap Contracts, Futures Contracts or options on Futures Contracts except purchases or sales by the Borrower of energy Swap Contracts, Futures Contracts or options on energy Futures Contracts on the NYMEX or ICE or any commodity exchange acceptable to the Required Lenders in compliance with the Maximum Position Limits and for the sole purpose of hedging its Eligible Inventory or any risk exposure in connection with a Commodity Contract; (b) engage in (i) any speculative transaction in respect of Eligible Commodities which would at any time cause the Borrower to exceed the Maximum Position Limits or (ii) any other speculative transaction which is not directly related to the Borrower's usual Eligible Commodities trading and marketing activities or has or may result in a Material Adverse Effect, or (c) obtain any credit from any futures broker except with the prior written approval of the Required Lenders.

SECTION 6.18 **Limitation on Cancellation of Indebtedness**.  Cancel any claim or Indebtedness owed to it except for (i) adequate consideration, (ii) as approved by an order of the Bankruptcy Court or (iii) permitted hereby (including as required by the Asset Purchase Agreement).

SECTION 6.19 **Limitation on Equity Interests and New Subsidiaries**.  The Borrower shall not, nor shall it permit any Loan Party or Subsidiary to, (a) issue, agree to issue, or permit to be transferred to any Person any shares of such Person's Equity Interests which issuance or transfer results in a Change of Control or (b) incorporate or otherwise organize any new Subsidiary which was not in existence on the date hereof, unless (i) such new Subsidiary becomes a Guarantor in accordance with the terms hereof and (ii) the Borrower, the Agents and the Required Lenders shall have entered into amendments to this Agreement and the Loan Documents in accordance with the terms hereof, satisfactory to them in their sole discretion.

SECTION 6.20 **Limitation on Modifications to Contractual Obligations**.  The Borrower shall not, nor shall it permit any Loan Party or Subsidiary to, amend, modify, rescind, terminate or waive any of its rights under, any of their respective post-petition Contractual Obligations, except in the ordinary course of business or where such action could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.21 **Risk Management Practices**.  The Borrower shall not, nor shall it permit any Loan Party or Subsidiary to, amend, waive or modify the Risk Management Practices in any material manner.

SECTION 6.22 **Expenses**.  Subject to the Final Order, and except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, including, without limitation, pursuant to Bankruptcy Code Sections 105(a) or 506(c), or any similar principle of law or equity, without the prior written consent of the Required Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any Lender.

ARTICLE VII

**EVENTS OF DEFAULT**

SECTION 7.01 **Events of Default**.  If any of the following events (each, an "**Event of Default**") shall occur:

(a)  the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any L/C Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)  the Borrower shall fail to pay any interest on any Loan or any L/C Obligation, or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under this Agreement or under any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) or more Business Days;

(c)  any representation or warranty made or deemed made by the Borrower or any other Loan Party herein or any other Loan Document or any amendment or modification hereof or thereof, or any waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof, or any waiver hereunder or thereunder, shall prove to have been incorrect in any material respect (or, in the case of any such representation or warranty under this Agreement or any other Loan Document already qualified by materiality, such representation or warranty shall prove to have been incorrect) when made or deemed made;

(d)  the Borrower shall fail to observe or perform any covenant, condition or agreement contained in (i) **Sections 5.01** (Reporting), and such default shall continue for two (2) Business Days, or (ii) **Section 5.03(a)**, **5.04** (Notices), **5.04** (with respect to the Borrower's existence), **5.12** (First and Second Day Orders), **5.15** (Periodic Audit of Borrowing Base) or in **Article VI** (Negative Covenants);

(e)  the Borrower or any other Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Section) and such failure shall continue unremedied for a period of  seven (7) or more Business Days after the earlier of any Loan Party's knowledge thereof or written notice thereof by the Administrative Agent or the Required Lenders to the Borrower;

(f)     any Event of Default (as defined in the Global DIP Facility Agreement) shall occur;

(g)     there is entered against the Parent or any Subsidiary (i) a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $2,500,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage), or (ii) a non-monetary final judgment or order that, either individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect;

(h)     an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of any Loan Party or Subsidiary under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC that could reasonably be expected to have a Material Adverse Effect;

(i)     a Change of Control shall occur;

(j)     any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as permitted hereunder or thereunder (or as a result of action or inaction of the Administrative Agent, the Collateral Agent or Lenders) or satisfaction in full of all Obligations, ceases to be in full force and effect; or the Borrower or any other Person contests in writing the validity or enforceability of any provision of any such Loan Document; or the Borrower or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document, or purports in writing to revoke, terminate or rescind any Loan Document;

(k)     any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, a receiver, interim receiver, receiver or manager shall be appointed in any of the Cases and the order appointing such trustee, examiner, receiver, interim receiver or manager shall not be reversed or vacated within ten (10) days after the entry thereof;

(l)     any order by the Bankruptcy Court shall be entered, terminating or modifying the exclusivity right of any Debtor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

(m)     Any other material superpriority administrative expense claim or "claim" which is *pari passu* with or senior to the claims of the Secured Parties under the Facilities, as applicable (other than in each case the Carve Out or the Obligations) or any material lien that is *pari passu* with or senior to the liens of the Secured Parties under the Facilities shall be granted in any of the Cases;

(n)     the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any asset of the Debtors of fair market value exceeding $1,500,000 in

aggregate from or permit other actions that would reasonably be expected to result in a Material Adverse Effect;

(o) an order shall be entered reversing, supplementing, staying for a period of three (3) Business Days or more, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order in a manner that is materially adverse to the interests of the Secured Parties, or any Debtor shall apply for authority to do so, without the prior written consent of the Agents and the Required Lenders, or the Interim DIP order or Final DIP order shall cease to be in full force and effect;

(p) the Bidding Procedures Order or Sale Order shall be reversed, supplemented, stayed, vacated or modified in a manner adverse to the Required Lenders without the consent of the Required Lenders;

(q) a Debtor makes any payments relating to prepetition obligations other than in accordance with (i) a Bankruptcy Court order, (ii) the Interim DIP Order, (iii) the Final DIP Order, (iv) as agreed to by the Required Lenders, (v) contemplated by the Budget, or (vi) as otherwise permitted hereunder;

(r) a plan shall be proposed by a Debtor in any of the Cases, that is not supported by the Lenders, that does not provide for (i) termination of the Commitments under the Facilities, (ii) the indefeasible payment in full in cash of the Obligations (other than indemnities and other contingent obligations not then due and payable), and (iii) payment in full in cash of the Prepetition Obligations (or other treatment agreed to by the Prepetition Lenders), in each case in the foregoing clauses (i)-(iii) on the effective date of such plan;

(s) a plan is proposed by any person other than the Debtors, in any of the Cases that is not supported by the Lenders, including a plan that does not provide for (i) termination of the Commitments under the Facilities, as applicable, (ii) the indefeasible payment in full in cash of the Obligations (other than indemnities and other contingent obligations not then due and payable), and (iii) payment in full in cash of the Prepetition Obligations (or other treatment agreed to by the Prepetition Lenders), in each case in the foregoing clauses (i)-(iii) on the effective date of such plan, and such plan is confirmed; the Interim DIP Order or Final DIP Order, as applicable, shall fail to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim DIP Order or Final DIP Order, (ii) amending or modifying the Interim DIP Order or Final DIP Order in a manner that is adverse to the Secured Parties, or (iii) staying for a period in excess of seven days the Interim DIP Order or Final DIP Order (as applicable);

(t) the Security Documents shall cease to create a valid and perfected lien on any material Collateral, solely to the extent required hereunder;

(u) any Debtor shall fail to comply with the material terms of an Order in any material respect for a period of more than 5 Business Days;

(v) any Debtor shall file a motion seeking, or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order, authorizing the sale of all or substantially all of the Debtors' assets (unless, in the case of each of the foregoing, either (i) (A) the Required Lenders consent to the filing of such motion, and (B) any order approving the sale expressly provides for application of cash proceeds in accordance with the terms of this Agreement and is otherwise in form and substance acceptable to the Administrative Agent and the Required

Lenders, or (ii) the order approving such sale contemplates payment in full in cash of the Obligations upon consummation of such sale);

(w)     the Bankruptcy Court shall enter a Final Order that is adverse in any material respect to (i) the interests (when taken as a whole) of the Secured Parties in any of the Collateral, or (ii) the creation, perfection or priority of any of the Liens securing the Obligations; provided however, that this clause (x) will not apply to the termination of the use of cash collateral (which shall be governed exclusively by clause (x) below);

(x)     the use of cash collateral by a Debtor shall be terminated and a Debtor shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance acceptable to the Required Lenders;

(y)     the Loan Parties or any of their subsidiaries, or any Person claiming by or through the Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of Secured Parties in any Case or case relating to the Facilities or any challenge to the validity, enforceability, priority or perfection of liens securing the Prepetition Obligations, as applicable;

(z)     The filing of any equitable subordination or recharacterization claim by any of the Borrowers, seeking thereby to subordinate or recharacterize, by order of a court of competent jurisdiction, any of the rights to payment, or rights in collateral securing any such payment, of any indebtedness owed to any such Lender;

(aa)     The entry of an order providing for the equitable subordination or recharacterization of any Lender's rights to payment, or rights in Collateral securing any payment, or any Indebtedness owed to any Lender; or

(bb)     The entry of an order that restricts any of the Lenders from credit bidding in any sale of the assets of a Debtor under Section 363 of the Bankruptcy Code;

then, and in every such event, subject to the Orders, and at any time thereafter during the continuance of such event, (provided however, that after giving such notice, no Loans shall be made hereunder and no Letters of Credit shall be issued), the Administrative Agent at the request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times, subject in all respects to the terms, conditions and provisions of the DIP Order:

(i)     issue and deliver a Carve Out Trigger Notice;

(ii)     terminate the Commitments, and thereupon the Commitments shall terminate immediately;

(iii)     declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;

(iv)     require that the Borrower Cash Collateralize the L/C Obligations as provided in **Section 2.05(l)** or **Section 2.23** as applicable; and

(v)     exercise on behalf of itself, the Lenders and the Issuing Banks all rights and remedies available to it, the Lenders and the Issuing Banks under the Loan Documents and Applicable Law.

SECTION 7.02 **Application of Payments**.  Notwithstanding anything herein or in the Prepetition Credit Facility to the contrary, all payments (including voluntary and mandatory prepayments, but excluding any mandatory prepayment pursuant to **Section 2.09(b)(iii)**) and any payment of Cash Collateral pursuant to **Section 2.05(l)** or **Section 2.23**, but subject to the terms, conditions and provisions of the DIP Order) received on account of the Obligations or the Prepetition Obligations or as proceeds of any Collateral shall be applied by the Administrative Agent as follows:

(a)     **first**, to the payment, pro rata, of all Obligations or obligations of the Lenders consisting of out of pocket costs, reasonable expenses, reasonable fees, indemnities and other amounts in each case payable to (x) the Agents in their respective capacities as such  or incurred in connection with the administration, enforcement, preservation or exercise of any rights or remedies under this Agreement and the other Loan Documents or (y) the Swing Line Lender or any Issuing Bank (including, without limitation, principal of Reimbursement Obligations and obligations to Cash Collateralize Letters of Credit) in their respective capacities as such (in each case, including, without limitation, fees and disbursements and other charges of their respective counsel and agents payable under **Section 9.06**);

(b)     **second**, paid over to the Prepetition Agent to be applied to payment of the Prepetition Obligations in accordance with the terms of the Prepetition Credit Facility, until the Prepetition Obligations are repaid in full;

(c)     **third**, to payment of all other Obligations constituting fees, indemnities and other amounts (other than principal, and interest) payable to the Lenders (including fees and disbursements and other charges of counsel payable under **Section 9.06**) arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause (d) payable to them;

(d)     **fourth**, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans;

(e)     **fifth**, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans;

(f)     **sixth**, to the payment in full of all Swap Contract Obligations**;**

(g)     **seventh,** to the payment in full of all other Obligations, in each case ratably among the Secured Parties based upon the respective aggregate amounts of all such Obligations owing to them in accordance with the respective amounts thereof then due and payable; and

(h)     **finally**, the balance, if any, after all Obligations have been indefeasibly paid in full, as directed by the Bankruptcy Court or as otherwise required by Law.

If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired (without any pending drawings) and all L/C Obligations have been paid in full in cash, such remaining amount shall be applied to the Prepetition Obligations and the other Obligations, if any, in the order set forth above.

## ARTICLE VIII

## AGENCY

SECTION 8.01 **Appointment and Authority**.  Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 8.02 **Agent in Its Individual Capacity**.  Each Agent and its Affiliates may make loans and other extensions of credit to, accept deposits from and generally engage in any kind of business with the Borrower and the other Loan Parties as though such Agent were not an Agent hereunder and under the other Loan Documents.  With respect to the Loans and other Extensions of Credit made by it, if any, pursuant to the Loan Documents each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 8.03 **Exculpatory Provisions**.  Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, neither any Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (i) liable for any action taken or not taken by it with the consent, instruction, direction, approval or at the request of the Required Lenders (or such other number or percentage of Lenders as shall be necessary under the circumstances), (ii) otherwise liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by any Agent under or in connection with, this Agreement or any other Loan Document (including, without limitation, in any audit or due diligence report prepared by the internal auditor of any Agent or by any external experts or auditors of any Agent, each of which is to be accepted by each Lender without representation or warranty by any Agent and without recourse to any Agent) or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

SECTION 8.04 **Reliance by Agents**.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, electronic communication (including electronic mail), cablegram, telegram, telecopy, telex or teletype

message, statement, order or other document or conversation (including any instructions from the Borrower delivered pursuant to the Request to Honor Oral and Telefax Instructions) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Loan Parties), independent accountants and other experts selected by such Agent without gross negligence or willful misconduct. The Agents may deem and treat the payee of any promissory note issued pursuant to **Section 2.14(b)** as the owner thereof for all purposes unless a notice of assignment, negotiation or transfer thereof shall have been filed with such Agent. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of Required Lenders (including in connection with any request by the Borrower for a Credit Extension), as it deems appropriate or as otherwise required by **Section 9.01** or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (including in connection with any request by the Borrower for a Credit Extension), or as otherwise required by **Section 9.01** and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders and all future holders of the Loans and all other Obligations.

SECTION 8.05 **Delegation of Duties**. Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 8.06 **Successor Administrative Agent, Issuing Bank or Swing Line Lender**.

(a) The Administrative Agent may resign as Administrative Agent upon 30 days' prior notice to the Lenders. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor Administrative Agent for the Lenders, which successor Administrative Agent shall be approved by the Borrower (unless an Event of Default shall have occurred and then be continuing), whereupon such successor Administrative Agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor Administrative Agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans or other Obligations. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this **Article VIII** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents. If no successor Administrative Agent has accepted appointment as Administrative Agent by the date which is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of such Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

(b) The Collateral Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Collateral Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Collateral Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Collateral Agent, the Administrative Agent or any Lender.

(c)       After any retiring Agent's resignation as Agent, the provisions of this **Article VIII** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(d)       Any Issuing Bank may resign at any time by giving 30 days' prior notice to the Administrative Agent, the Lenders and the Borrower.  If and to the extent a resigning Issuing Bank has then outstanding Letters of Credit, then after the resignation of such Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to such outstanding Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit or to extend, renew or increase any existing Letter of Credit.

(e)       The Swing Line Lender may resign at any time by giving 30 days' prior notice to the Administrative Agent, the Lenders and the Borrower.  If and to the extent a resigning Swing Line Lender has then outstanding and unpaid Swing Line Loans, then after the resignation of such Swing Line Lender hereunder, the retiring Swing Line Lender shall remain a party hereto and shall continue to have all the rights and obligations of the Swing Line Lender under this Agreement and the other Loan Documents with respect to Swing Line Loans made by it prior to such resignation, but shall not be required to make any additional Swing Line Loans.

SECTION 8.07 **Non-Reliance on Agents and Other Lenders**.  Each Lender expressly acknowledges that none of the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by any Agent hereinafter taken, including any review of the affairs of any Loan Party or any audit or due diligence review prepared by the internal auditor or other employees or experts of any Agent, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties and made its own decision to extend credit to the Borrower hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder or under the other Loan Documents, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party which may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates, but to the extent any Agent does from time to time provide any such information to any Lender, (x) such Agent shall be deemed to do so solely as an administrative convenience to such Lender and (y) such Lender acknowledges and agrees that neither such Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made, or will be deemed to make, any representations or warranties to such Lender with respect thereto.  Without limiting the generality of the foregoing, no Agent shall have any duty to monitor or verify the Collateral used to calculate the Borrowing Base or the reporting requirements or the contents of reports (including Borrowing Base Reports) delivered by the Borrower , but to the extent that any Agent performs any such monitoring or verification, (a) such Agent shall be deemed to do so solely as an administrative convenience to such Lender and (b) such Lender acknowledges and agrees that neither such Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made, or will be deemed to make, any representations or warranties to

such Lender with respect thereto. Each party to this Agreement acknowledges and agrees that the Administrative Agent has no obligation to advise the Lenders of any Loan Party's failure to deliver any reports, notices and other information which any Loan Party is required to deliver to the Lenders under the Loan Documents (it being understood and agreed that, in the event that the Administrative Agent in its sole discretion does so from time to time, no course of dealing or implied duty to continue shall be deemed to arise or thereafter apply). Each Lender assumes the responsibility of keeping itself informed at all times.

SECTION 8.08 **Notice of Default**. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 8.09 **Administrative Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to the Borrower, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Banks and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Banks and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Banks and the Administrative Agent under **Section 9.06**) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Bank to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Banks, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under **Section 9.06**.

SECTION 8.10 **Indemnification**. The Lenders (other than the Swing Line Lender and the Issuing Banks) agree to indemnify each Agent, the Swing Line Lender and each Issuing Bank in its respective capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Applicable Percentages in effect on the date on which indemnification is sought, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of the Loans and L/C Reimbursement Obligations and the Cash Collateralization of the L/C Obligations) be imposed on,

incurred by or asserted against such Agent, Swing Line Lender or Issuing Bank, as the case may be, in any way relating to or arising out of this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent, Swing Line Lender or Issuing Bank, as the case may be, under or in connection with any of the foregoing; provided that, no such Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the gross negligence or willful misconduct of any Agent, the Swing Line Lender or any Issuing Bank, as the case may be, as determined by a court of competent jurisdiction in a final non-appealable order. The agreements in this **Section 8.10** shall survive the payment of the Loans, L/C Reimbursement Obligations, all other amounts payable hereunder and the Cash Collateralization of the L/C Obligations.

SECTION 8.11 **Intercreditor Agreement**. Each Lender hereby (i) instructs and authorizes the Collateral Agent to execute and deliver the Intercreditor Agreement on its behalf, (ii) authorizes and directs the Administrative Agent to exercise all of the Administrative Agent's rights and to comply with all of its obligations under the Intercreditor Agreement, (iii) agrees that the Administrative Agent may take actions on its behalf as is contemplated by the terms of the Intercreditor Agreement and (iv) understands, acknowledges and agrees that at all times following the execution and delivery of the Intercreditor Agreement such Lender (and each of its successors and assigns) shall be bound by the terms thereof.

SECTION 8.12 **Collateral Matters**.

(a) The Collateral Agent is authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to the Loan Documents; provided that except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder and under the other Loan Documents, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party which may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

(b) The Lenders irrevocably authorize the Collateral Agent, at its option, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of all Commitments, the expiration or termination of all Letters of Credit and the payment in full of all Loans and all other Obligations known to the Administrative Agent and payable under this Agreement or any other Loan Document (except indemnification obligations for which no claim has been made and of which no Responsible Person of any Loan Party has knowledge); (ii) constituting property sold or to be sold or Disposed of as part of or in connection with any Disposition permitted hereunder; or (iii) if approved, authorized or ratified in writing by all or the requisite number of the Lenders as set forth in **Section 9.01**. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this **Section 8.12**; **provided** that the absence of any such confirmation for whatever reason shall not affect the Collateral Agent's rights under this **Section 8.12**.

(c) The Collateral Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Collateral Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.

(d)     The Collateral Agent, the Swing Line Lender and the Issuing Banks shall be entitled to all rights, indemnities and limitations on liability under this **Article VIII** available to the Administrative Agent to the same extent as if each reference to the Administrative Agent in this **Article VIII** were a reference to the Collateral Agent.

ARTICLE IX

**MISCELLANEOUS**

SECTION 9.01 **Waivers; Amendments**.

(a)     **No Waiver; Remedies Cumulative; Enforcement**.  No failure or delay by the Administrative Agent, the Collateral Agent any Issuing Bank or any Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege, or any abandonment or discontinuance of steps to enforce such a right remedy, power or privilege, preclude any other or further exercise thereof or the exercise of any other right remedy, power or privilege.  The rights, remedies, powers and privileges of the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders hereunder and under the Loan Documents are cumulative and are not exclusive of any rights, remedies, powers or privileges that any such Person would otherwise have.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Borrower shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with **Section 8.01** for the benefit of all the Lenders and the Issuing Banks; **provided** that the foregoing shall not prohibit (i) the Administrative Agent or the Collateral Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent or Collateral Agent, as applicable) hereunder and under the other Loan Documents, (ii) the Swing Line Lender and each Issuing Bank from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Swing Line Lender or an Issuing Bank, as applicable) hereunder and under the other Loan Documents, or (iii) any Lender from exercising setoff rights in accordance with **Section 9.08** (subject to the terms of **Section 2.16**) or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to the Borrower under any Debtor Relief Law; **provided**, **further**, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (x) the Required Lenders shall have the rights otherwise provided to the Administrative Agent pursuant to **Section 8.01** and (y) in addition to the matters set forth in clauses (ii), (iii) and (iv) of the preceding proviso and subject to Section 2.16, any Lender may, with the prior written consent of the Required Lenders, enforce any rights or remedies available to it and as authorized by the Required Lenders.

(b)     **Amendments, Etc.**  Except as otherwise expressly set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower therefrom, shall be effective unless in writing executed by the Borrower and the Required Lenders, and acknowledged by the Administrative Agent, or by the Borrower and the Administrative Agent with the consent of the Required Lenders, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; **provided** that no such amendment, waiver or consent shall:

(i)     extend or increase any Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in **Article IV**

or the waiver of any Default shall not constitute an extension or increase of any Commitment of any Lender), provided however that any written waiver (executed by the Administrative Agent and the Required Lenders) of a mandatory prepayment or default interest would not be deemed to constitute an extension or an increase;

(ii)     reduce the principal of, or rate of interest specified herein on, any Loan or any L/C Disbursement, or any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly and adversely affected thereby (**provided** that only the consent of the Required Lenders shall be necessary (x) to amend the definition of "Default Rate" or to waive the obligation of the Borrower to pay interest at the Default Rate or (y) to amend any financial covenant (or any defined term directly or indirectly used therein), even if the effect of such amendment would be to reduce the rate of interest on any Loan or other Obligation or to reduce any fee payable hereunder);

(iii)     postpone any date scheduled for any payment of principal of, or interest on, any Loan or any L/C Disbursement, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, without the written consent of each Lender directly and adversely affected thereby; provided however that any such written postponement or waiver (executed by the Administrative Agent and the Required Lenders) of a payment would not be deemed to constitute an extension or an increase of any Commitment hereunder;

(iv)     change **Section 2.16** in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly and adversely affected thereby;

(v)     waive any condition set forth in **Section 4.01** without the written consent of each Issuing Bank and each Lender;

(vi)     change **Section 2.05(d)** in a manner that would permit the expiration date of any Letter of Credit to occur after the Commitment Termination Date without the written consent of each Issuing Bank and each Lender;

(vii)     consent to the release by the Collateral Agent of any Collateral or release any Guarantor from its Guarantee Obligations under the Guarantee Agreement except as otherwise expressly permitted herein, without the written consent of the Required Lenders,

(viii)     amend or modify (1) the definition of "Borrowing Base" (including any advance rate set forth therein) or the definition of any component of "Borrowing Base" without the written consent (which may be given by email) of all of the Lenders and, so long as ABN is the Administrative Agent hereunder, written evidence of such consent (including by email) to each ABN Representative, or (2) the definition of "Change of Control" without the consent of all of the Lenders;  or

(ix)     amend, modify or waive any provision of Article VIII, or any other provision affecting the rights, duties or obligations of any Agent, without the written consent of any Agent directly affected thereby,

(x)     amend, modify or waive any provision of this Section or any provision setting forth the requisite Lenders for granting any consent or taking any action or change to the definition of "Cash", "Cash Collateral", "Cash Collateralize", "Defaulting Lender", "Mercuria",

"Required Lenders" (or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or to make any determination or grant any consent hereunder) or in each case the definition of any term used therein, or consent to the assignment or transfer by any of the Borrower or any of the Guarantors of any of their rights and obligations under this Agreement and the other Loan Documents (except as expressly permitted hereby), in each case without the written consent of each Lender; or

(xi)    amend, modify or waive **Sections 2.23** (Cash Collateral), **2.25** (Defaulting Lenders), **2.26** (Priority and Liens) (or otherwise subordinate or modify the priority of any Lender Superpriority Claim or any Lien granted by any Loan Party pursuant to the Loan Documents) or **7.02** (Application of Payments) without the consent of the Swing Line Lender and each Issuing Bank;

**provided**, **further**, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of (A) any Agent (including **Section 5.21(d)** or **(f)**), unless in writing executed by such Agent, (B) any Issuing Bank, (including any rights set forth in **Sections 2.05**, **9.06** or **9.07**) unless in writing executed by such Issuing Bank or (C) the Swing Line Lender (including any rights set forth in **Sections 2.06**, **9.06** or **9.07**), unless in writing executed by the Swing Line Lender, in each case, in addition to the Borrower and the Lenders required above; provided, further, that, without limiting any consent rights that the Swing Line Lender or any Issuing Bank may otherwise have under this Section, any amendment, waiver or consent referred to in clause (i) through (iv) (in each case to the extent impacting the rights, duties or obligations of any such Person), (vii), (viii) (1) or (ix) shall require the consent of the Swing Line Lender and each Issuing Bank.

Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent that by its terms requires the consent of all the Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loan may not be extended, or the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

In addition, notwithstanding anything in this Section to the contrary, if the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten Business Days following receipt of notice thereof.

(c)    Notwithstanding anything to the contrary herein, any waiver or consent to any departure from, or amendment, supplement or modification of (i) any of the terms or conditions of this Agreement or any other Loan Document at any time that (A) there are any drawings under Letters of Credit that have not been reimbursed by the Borrower or Cash Collateralized by the Borrower or the Lenders in an amount equal to 103% thereof and (B) any Lender has not funded any portion of its participation therein, or (ii) any of the terms or conditions of this Agreement or any other Loan Document at any time that any Lender has not funded its participation in Swing Line Loans or (iii) an Event of

Default under **Section 7.01(a)** or any of the terms or conditions of this Agreement or any other Loan Document at any time that any such Event of Default has occurred and is continuing (or any waiver, consent, amendment, supplement or modification that would permit a Credit Extension to be made hereunder notwithstanding the occurrence and continuance of any such Event of Default), in each case, shall require the consent of (x) in the case of clause (i), each Issuing Bank, (y) in the case of clause (ii), the Swing Line Lender, and (z) in the case of clause (iii), each Issuing Bank and the Swing Line Lender.

SECTION 9.02 **Notices; Public Information**.

(a) **Notices Generally**.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email as follows:

(i) if to the Borrower, to it at:

> 52 Vanderbilt Avenue
> Suite 1405
> New York, New York 10017
> Attention:  Carlos Zamudio
> Fax:  (212) 207-9298

(ii) if to any Agent, the Swing Line Lender or ABN in its capacity as Issuing Bank, to it at:

> ABN AMRO Capital USA LLC
> 100 Park Avenue
> New York, New York 10017
> Attention: ECT Group
> Fax: (917) 284-6697
>
> with a copy to:
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attention:  Ana Alfonso
> Fax:  (212) 728-9244
> Email:  aalfonso@willkie.com

(iii) if to a Lender, to any Lender Representative of such Lender or to its address (or facsimile number or email address) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)     **Limited Use of Electronic Communications**.  Electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information required to be delivered pursuant hereto, and to distribute Loan Documents for execution by the parties thereto, and may not be used to deliver any notice hereunder.

(c)     **Reliance by Agents and Lenders**.  Each Agent and Lender shall be entitled to rely and act upon any notices (including telephonic and electronic mail notices) believed in good faith by such Agent or Lender, as applicable, to be given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice believed in good faith by such  Agent or Lender, as applicable, to be given by or on behalf of the Borrower.

(d)     **Change of Address, etc**.  Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

SECTION 9.03 **No Waiver; Cumulative Remedies**.

No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents  shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No notice to or demand on the Borrower in any case shall entitle the Borrower to any notice or demand in similar or other circumstances, except as specifically required hereby. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 9.04 **Survival of Representations and Warranties**.  All covenants, agreements, representations and warranties made by the Borrower herein and in any Loan Document or other documents delivered in connection herewith or therewith or pursuant hereto or thereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the making of the Credit Extensions hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Issuing Bank or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding and so long as the Commitments have not expired or been terminated.  The provisions of **Sections 2.17 (Compensation for Losses), 2.18 (Increased Costs), 9.03 (No Waiver; Cumulative Remedies) and 9.15 (Confidentiality) and Article VIII (Agency)** shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the payment in full of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.05 **Release of Collateral and Guarantee Obligations**.

(a)     Upon any sale or other transfer of any Collateral that is permitted under the Loan Documents by any Loan Party or upon the effectiveness of any written consent to the release of the Lien granted hereby in any Collateral pursuant to Section 9.05 hereof, or if in accordance with the Intercreditor Agreement and Orders, the Lien in such Collateral (but not the proceeds thereof) shall automatically terminate after application of such proceeds in accordance with the Loan Documents and any guarantee

obligations under any Loan Document of any Person being Disposed of in such Disposition shall automatically terminate, in each case, to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations have been paid in full in cash, and all Letters of Credit shall have terminated or expired, upon request of the Borrower, the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release (without recourse to or representation or warranty by any Agent) its security interest in all Collateral, and to release all guarantee obligations under any Loan Document. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)     With respect to the Spanish Security Documents, the Lenders shall appear, or, where applicable, shall instruct the Collateral Agent to appear, before a Spanish Notary Public in order to formalize in Spanish Public Document the release of the Spanish Security Document and / or the Guarantee granted by the Spanish Subsidiary (or any other Subsidiary incorporated and existing under the laws of Spain acceding to this Agreement) within ten (10) business days from the date in which such release is deemed to have taken place pursuant to the terms set out in this Agreement.

SECTION 9.06 **Payment of Expenses; Indemnity**.

(a)     **Costs and Expenses**.  The Borrower shall, (a) pay or reimburse each Agent and each Lender, for all its reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable out-of-pocket legal fees and expenses, and printing, reproduction and document delivery expenses) incurred in connection with the syndication, development, preparation, negotiation, execution, delivery and administration of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees and disbursements of counsel to the Agents, (b) to pay or reimburse each Lender, the Issuing Banks and each Agent for all its documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents or any restructuring or "work-out" related hereto and thereto, including, without limitation, the reasonable and documented fees and disbursements of counsel to the Lenders and of counsel to the Agents, (c) to pay or reimburse each Agent for its documented costs and expenses incurred in connection with inspections performed pursuant to **Section 5.10**, and any other due diligence performed in connection with this Agreement and the other Loan Documents, including (i) the documented fees and disbursements of counsel to the Agents, and (ii)  the costs and expenses associated with lien searches, and (d) to pay, indemnify, and hold each Lender, the Issuing Banks and each Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent (including the determination of whether or not any such waiver or consent is required) under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (e) to pay, indemnify, and hold each Lender, the Issuing Banks and each Agent, and each of their respective officers, employees, directors, trustees, agents, advisors, affiliates

and controlling persons (each, an "Indemnitee"), harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable and documented legal fees) with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents, and any such other documents, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Loan Party or any of their respective Subsidiaries, or any of the Properties (all the foregoing in this clause (e), collectively, the "Indemnified Liabilities"); provided that, the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities, to the extent such Indemnified Liabilities (i) are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the intentional breach, gross negligence or willful misconduct of such Indemnitee, or (ii) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final, non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction. The Borrower also agrees that no Indemnitee shall have any liability (whether direct or indirect, in contract, tort, equity or otherwise) to the Borrower or the Borrower's Subsidiaries or Affiliates or to the Borrower's or its equity holders or creditors arising out of, related to or in connection with any aspect of this Agreement, the Loan Documents or any of the transactions contemplated hereby, except to the extent of direct (as opposed to special, indirect, consequential or punitive) damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnitee's gross negligence or willful misconduct. It is further agreed that the Indemnitees shall have liability only to the Borrower (as opposed to any other person). Notwithstanding any other provision of this Agreement, no party hereto shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, except to the extent such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise directly from the gross negligence, bad faith, intentional breach or willful misconduct of such Indemnitee. The agreements in this Section 9.06 shall survive repayment of the Loans, Reimbursement Obligations and all other amounts payable hereunder and termination of this Agreement. This Section 9.06(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(b)     **Reimbursement by Lenders**. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), any Issuing Bank, or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), such Issuing Bank, or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Applicable Percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), such Issuing Bank or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), such Issuing Bank in connection with such capacity. The obligations of the Lenders under this paragraph (c) are subject to the provisions of **Section 2.15(d)**.

(c)     **Waiver of Consequential Damages, Etc.** To the fullest extent permitted by Applicable Law, no party hereto shall assert, and each party hereto hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions

contemplated hereby or thereby, any Loan or Letter of Credit, or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d)  **Payments**.  All amounts due under this Section shall be payable promptly, and in any event not later than seven Business Days after demand therefor.

(e)  **Survival**.  Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

(f)  Defined Terms.  For purposes of this Section, the term "Lender" includes the Swing Line Lender.

SECTION 9.07 **Successors and Assigns**.

(a)  **Successors and Assigns Generally**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  **Assignments by Lenders**.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving or Term Commitments and the Revolving or Term Loans at the time owing to it); **provided** that any such assignment shall be subject to the following conditions:

(i)  **Minimum Amounts**.

(A)  in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving or Term Commitment and/or the Revolving or Term Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)  in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of a Revolving Commitment (which for this purpose includes Revolving Loans outstanding thereunder) or, if the Revolving Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "**Trade Date**"

is specified in the Assignment and Assumption, as of the Trade Date) assigned shall not be less than $10,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(C)     in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of a Term Commitment (which for this purpose includes Term Loans outstanding thereunder) or, if the Term Commitment is not then in effect, the principal outstanding balance of the Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "**Trade Date**" is specified in the Assignment and Assumption, as of the Trade Date) assigned shall not be less than $10,000,000, unless each of the Administrative Agent and, so long as no payment Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)     **Proportionate Amounts**.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)     **Required Consents**.  No consent shall be required for any assignment except to the extent required by paragraph (b)(i)(B) or (b)(i)(C) of this Section however, and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a payment Event of Default has occurred and is continuing at the time of such assignment, (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund or (z) such assignment occurs on or after the date that is six months after the Effective Date; **provided** that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten Business Days after having received written notice thereof;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     the consent of the Swing Line Lender and each Issuing Bank shall be required (such consent not to be unreasonably withheld or delayed).

(iv)     **Assignment and Assumption**.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; **provided** that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment**.**  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     **No Assignment to Certain Persons**.  No such assignment shall be made to (A) the Borrower or any of the Borrower's controlled Affiliates or Subsidiaries, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof, or (C) any other Person

that is not a commercial bank or a Person that has an Investment Grade Rating, except in the case of this clause (C) with the consent of the Swing Line Lender and each Issuing Bank.

(vi)     **No Assignment to Natural Persons**.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vii)     **Certain Additional Payments**.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, each Issuing Bank, the Swing Line Lender and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of **Sections 2.17** (Compensation for Losses), **2.18** (Increased Costs) and **9.03** (No Waiver; Cumulative Remedies)with respect to facts and circumstances occurring prior to the effective date of such assignment; **provided**, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     **Register**.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes

of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)　　**Participations**.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a Defaulting Lender, a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); **provided** that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, the Issuing Banks, the Swing Line Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under **Section 9.06(b)** with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in **Section 9.01(b)(i)** through **(xi)** that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of **Sections 2.17** (Compensation for Losses), **2.18** (Increased Costs) and **2.19** (Taxes) (subject to the requirements and limitations therein, including the requirements under **Section 2.19(g)** (it being understood that the documentation required under **Section 2.19(g)** shall be delivered to the participating Lender)) to the same extent the Lender  had acquired its interest by assignment pursuant to paragraph (b) of this Section; **provided** that such Participant (A) agrees to be subject to the provisions of **Section 2.22** as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under **Section 2.18** or **2.19**, with respect to any participation, than its participating Lender would have been entitled to receive.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of **Section 2.22(b)** with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of **Section 9.08** as though it were a Lender; provided that such Participant agrees to be subject to **Section 2.16** as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); **provided** that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)　　**Certain Pledges**.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; **provided** that no such pledge or

assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     **Assignments by Lenders in Spain**. The Lenders shall only notarize any assignment of rights and obligations under this Agreement, or under the Spanish Security Documents or any lien, charge or guarantee in connection with this Agreement, in a Spanish Public Document provided that this notarization in a Spanish Public Document (including any ratification of powers of attorney granted to the Agents or any ancillary documents as it may be necessary) does not entail an expense or an increase of costs for the Loan Parties.

SECTION 9.08    **Adjustments; Set-off**

(a)     Subject to the Intercreditor Agreement and Interim Order and Final DIP Order, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of its Loans or Reimbursement Obligations, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in any bankruptcy proceeding referred to in **Section 7.01**, or otherwise), in excess of the amount such Benefited Lender is otherwise entitled to hereunder, as applicable at such time, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loan, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders;  except that with respect to any Lender that is a Defaulting Lender by virtue of such Lender failing to fund its required share (if any) of any Revolving Credit Loan, Swing Line Loan or L/C Obligation, such Defaulting Lender's pro rata share of the excess payment shall be allocated to the Lender (or the Lenders, pro rata) that funded such Defaulting Lender's required share or, if no Lender funded such Defaulting Lender's required share, the Swing Line Lender or Issuing Bank, as the case may be, to whom such required share is owed; provided, however, that (i) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (ii) the provisions of this **Section 9.08(a)** shall not be construed to apply to (x) any payment made pursuant to and in accordance with the express terms of this Agreement (including, without limitation, the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment or sale of a participation in or other interest in any of its Loans and reimbursement obligations arising under **Section 2.05(f)**.  The Borrower agrees that each Lender so purchasing a portion of another Lender's Loan may exercise all rights of payment (including, without limitation, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(b)     Subject to the Intercreditor Agreement and Interim Order and Final DIP Order, in addition to any rights and remedies of the Lenders provided by Law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Law, during the existence of an Event of Default, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration, demand or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final) (other than trustor payroll accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender; provided that, the failure to give such notice shall not affect the validity of such set-off and application.

SECTION 9.09 **Counterparts; Integration; Effectiveness; Electronic Execution**.

(a)    **Counterparts; Effectiveness**.  This Agreement and the other Loan Documents may be executed by one or more of the parties to this Agreement and such other Loan Documents, as applicable, on any number of separate counterparts (including by facsimile transmission or electronic mail transmission with pdf of signature pages hereto and thereto), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement and the other Loan Documents by facsimile transmission or by electronic mail with pdf attachment shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement and the other Loan Documents signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

(b)    **Electronic Execution of Assignments**.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)    **Integration.**  This Agreement and the other Loan Documents represent the agreement of the Borrower, the Agents and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

SECTION 9.10 **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 9.11 **GOVERNING LAW**.

(a)    **Governing Law**.  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK  WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (provided, that solely with respect to Subsidiaries doing business in Morocco, this Agreement shall not apply such laws to so govern or construe this Agreement and such rights and obligations to the extent such application would violate Moroccan public policy rules (*dispositions d'ordre public*)).

SECTION 9.12 Submission to Jurisdiction.

The Borrower, hereby irrevocably and unconditionally, for itself and for each Loan Party:

(a)    submits for itself and each Loan Party and their respective property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Loan Parties as the case may be, at the address set forth in <u>Section 9.02</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Law or shall limit the right to sue in any other jurisdiction; and

(e)      waives, to the maximum extent not prohibited by Law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 9.12</u> any special, exemplary, punitive or consequential damages.  The Borrower irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.13  Acknowledgments.

The Borrower, hereby acknowledges, for itself and for each Loan Party, that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      none of the Agents nor any Lender has any fiduciary relationship with or duty to the Loan Parties arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Borrower and the other Loan Parties, on one hand, and the Agents and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

SECTION 9.14  **WAIVER OF JURY TRIAL**.  THE BORROWER, THE BORROWER ON BEHALF OF THE LOAN PARTIES, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT (TO THE EXTENT PERMITTED BY APPLICABLE LAW) OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 9.15  **Confidentiality**.

(a)      Each Agent and Lender shall:  (i) keep confidential, and to cause its directors, officers, employees, representatives, branches, teams, agents or auditors (collectively, "<u>Representatives</u>") to keep confidential) all information that such Agent or Lender receives from or on behalf of the Loan Parties other than information that is identified by the Loan Parties as being non-confidential information (all such information that is not so identified being "<u>Confidential Information</u>"); <u>provided</u> that, nothing in this <u>Section 9.15</u> shall prevent any Agent or any Lender from disclosing for any purpose, subject to the

terms and requirements of this Section 9.15, such information to an Affiliate or its Representatives, (ii) use Confidential Information solely for purposes of evaluating and administering the Loans and the Loan Documents (including by sharing and discussing such Confidential Information with existing and prospective Lenders) or enforcing its rights hereunder or under any other Loan Document or in connection with a workout or other insolvency event of the Borrower or any Affiliate of the Borrower and (iii) subject to Section 9.15(d), not disclose Confidential Information to Representatives of its Trading Business.  Each Agent and Lender shall have satisfied its confidentiality obligations under this Section if such Person accords such information the same care as it does for its own confidential information.

(b)      Notwithstanding anything in this Section 9.15 to the contrary, any Confidential Information may be disclosed by any Lender (the affected Lender being, the "Disclosing Party") (i) if the Disclosing Party is compelled by judicial process or is required by Law or regulation or is requested to do so by any examiner or any other regulatory authority or recognized self-regulatory organization including, without limitation, the Financial Industry Regulatory Authority, the New York Stock Exchange, the Federal Reserve Board, the New York State Banking Department and the SEC, in each case having or asserting jurisdiction over the Disclosing Party or (ii) in connection with any pledge or assignment by a Disclosing Party of any Loan or promissory note issued in connection therewith to any Federal Reserve Bank or any other central bank to the extent permitted hereunder.

(c)      The obligations of each Lender and its Representatives under this **Section 9.15** with respect to Confidential Information shall not apply to (i) any Confidential Information which, as of the date of disclosure to such Lender or its Representatives is in the public domain or subsequently comes into the public domain (including as a result of any public filing with the United States Bankruptcy Court) other than as a result of a breach of the obligations of any Lender or its Representatives hereunder, (ii) any information that was or becomes available to such Lender or its Representatives from a person or source that is not, to the knowledge of such Lender or its Representatives, bound by a confidentiality agreement with the Loan Parties or otherwise prohibited from transferring such information to such Lender or its Representatives, (iii) any information which was or becomes available to such Lender or its Representatives without any obligation of confidentiality prior to or after its disclosure by or on behalf of the Loan Parties or (iv) any information which is developed independently by such Lender or its Representatives, if such independently developed information is not based on Confidential Information.

(d)      Notwithstanding anything herein to the contrary, each Lender may disclose Confidential Information to those Representatives of its Trading Business, solely to the extent (i) such disclosure is (A) advisable, in the good faith discretion of such Lender, to assist such Lender in protecting and enforcing its rights under the Loan Documents and other credit facilities with which such Lender or its Affiliates has with the Borrower (or their Affiliates) and (B) relevant to such assistance, (ii) such Representatives have been advised of, and agree to, the confidential nature, and restrictions on use, of such Confidential Information and need to know same in connection with providing such assistance, and (iii) such Confidential Information is not used for any purpose other than that set forth in this **Section 9.15**.

(e)      Notwithstanding anything herein to the contrary, each Lender may disclose Confidential Information to any Participant or Assignee (each a "Transferee"), any prospective Transferee and any direct, indirect, actual or prospective counterparty (and its advisor) to any swap, derivative or securitization transaction related to the Obligations; provided that such Transferee, prospective Transferee, counterparty or advisor shall have agreed to be bound by the provisions of this Section 9.15 or substantially equivalent provisions.

SECTION 9.16 **Specified Laws**.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the Specified Laws, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the names and addresses of the Borrower and the Guarantors and other

information that will allow such Lender or Administrative Agent, as applicable, to identify the Borrower and the Guarantors in accordance with the Specified Laws.

SECTION 9.17 **Acknowledgement and Consent to Bail-In of EEA Financial Institutions.** . Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any of the parties thereto, each of the Borrower and the Secured Parties acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

SECTION 9.18 **Acknowledgement of Security Interests**.

(a) The Borrower hereby acknowledges, confirms and agrees that the Collateral Agent has had and shall on and after the date hereof continue to have, for itself and the ratable benefit of the Lenders, a security interest in and lien upon the Collateral granted to the Collateral Agent (or its predecessors in whatever capacity) pursuant to the Loan Documents to secure the Obligations.

(b) The Liens and security interests of the Collateral Agent in the Collateral shall be deemed to be continuously granted and perfected from the earliest date of the granting and perfection of such Liens and security interests to the Collateral Agent, whether under this Agreement or any of the other Loan Documents.

(c) The Liens and security interests and the administrative priority and Lien priority specified above hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the  Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative; provided that to the extent of conflict the Interim DIP Order (or, as applicable, the Final DIP Order) controls.

(d) Notwithstanding anything herein to the contrary, (i) the Lien and security interest granted to the Collateral Agent pursuant to the Security Documents and the exercise of any right or remedy by the Collateral Agent thereunder are subject to the provisions of the Intercreditor Agreement and the Orders and (ii) to the extent of conflict, the Interim DIP Order (or, as applicable, the Final DIP Order) shall control.  In the event of any conflict between the terms of the Security Documents and the Intercreditor Agreement, the terms of the Intercreditor Agreement shall govern and control.

SECTION 9.19 **Loan Documents**.

(a)        Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under Applicable Law (collectively, "**charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all charges payable in respect thereof, shall be limited to the Maximum Rate.  To the extent lawful, the interest and charges that would have been paid in respect of such Loan but were not paid as a result of the operation of this Section shall be cumulated and the interest and charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the amount collectible at the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate for each day to the date of repayment, shall have been received by such Lender.  Any amount collected by such Lender that exceeds the maximum amount collectible at the Maximum Rate shall be applied to the reduction of the principal balance of such Loan or refunded to the Borrower so that at no time shall the interest and charges paid or payable in respect of such Loan exceed the maximum amount collectible at the Maximum Rate.

SECTION 9.20 **Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, any Issuing Bank or any Lender, or the Administrative Agent, any Issuing Bank or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such Issuing Bank or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each Issuing Bank severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

SECTION 9.21 **Spanish Formalities**.

(a)        This Agreement shall be raised, if requested by the Agents as soon as possible upon the occurrence of an Event of Default. For such purposes, the Agents shall appear, and require the Spanish Subsidiary to appear, before a Spanish Notary Public in Spain in order to formalize this Agreement as Spanish Public Document for the purposes of giving compliment to Section 517 of the Spanish Civil Procedure Law.

(b)        For purposes of the provisions of Section 571 *et seq*. of the Spanish Civil Procedure Law: (i) the amounts due and payable by the Spanish Subsidiary (or any other Subsidiary validly existing under the laws of Spain acceding to this Agreement) under this Agreement that may be claimed in any executive proceeding brought before any Spanish court shall be those specified in the relevant internal accounts of the Agent (or relevant Lender, as the case may be) which is opened and maintained in the name of the Spanish Subsidiary and on which they will record the amounts owed in concept of principal, ordinary interest, default interest, fees, expenses, additional costs and any other amounts that are due by the Spanish Subsidiary under this Agreement from time to time so that the balance shown in such accounts represents at all times (and unless manifest calculation error) the total amount owed by the Spanish Subsidiary under this Agreement; and at any given time, the Administrative Agent or the applicable Lender will close and settle such account and determine the balance and issue a certificate for enforcement purposes (the

"**Spanish Certification**"); (ii) upon the occurrence of an Event of Default which is continuing, the Agent or the applicable Lender may cause the Spanish Certification to be notarized; and (iii) the Agent will be entitled to determine the amounts which are due and payable pursuant to this Agreement and the other Loan Documents in the Spanish Certification. In order for the Agent to exercise an executive action in Spain, the presentation of the following documents shall suffice: (a) an original notarial copy of this Agreement and/or the Loan Document (as appropriate) complying with the formalities of Sections 517.2.4º or 517.2.5º of the Spanish Civil Procedure Law, as the case may be; (b) the Spanish Certification reflecting the amounts due and payable by the Spanish Subsidiary, together with an extract from the credit and debit entries made by the Agent (or relevant Lender, as the case may be) in respect of the Spanish Subsidiary; (c) a notarial document attesting that the calculation of outstanding amounts set forth in the Spanish Certification; and (d) a notarial certificate evidencing that the Spanish Subsidiary, has been duly served notice of the amount that is due and payable hereunder.

(c)     The Spanish Subsidiary hereby expressly authorizes the Agent (and each of the Lenders, as appropriate) to request and obtain certificates and documents issued by the notary who has formalized this Agreement and/or any other Loan Document as a Spanish Public Document in order to evidence its compliance with the entries of his registry-book and the relevant entry date for the purpose of number 4º and/or 5º (as applicable) of Section 517.2, of the Spanish Law of Civil Procedure.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

AEGEAN BUNKERING (USA) LLC


By_____
   Name:
   Title:

**AGENT**:

ABN AMRO CAPITAL USA LLC,
    as Issuing Bank, Administrative Agent and Swing
    Line Lender


By_____
    Name:
    Title:

**LENDERS**:

MERCURIA US ASSET HOLDINGS LLC

By_____
    Name:
    Title:

**Approved Inventory Locations**

## Existing Letters of Credit

| LC ISSUANCE: | Total/Global Amt | Tolerance | Total L/C | Issuance date | Extended | Extended | Extended | Expiry date | Current Tenor | LC # |
|---|---|---|---|---|---|---|---|---|---|---|
| Valero | $ 800,000 | 0% | $ 800,000 | 23-Feb-18 | 9-May-18 | 6-Jun-18 | 29-Aug-18 | 14-Dec-18 | 107 | USAY0009420 |
| Caribbean Bunkering | $ 1,500,000 | 0% | $ 1,500,000 | 23-May-18 | 30-Jul-18 | 27-Aug-18 | 26-Oct-18 | 26-Jan-19 | 92 | USAY0009744 |
| PBF | $ 730,000 | 10% | $ 803,000 | 1-Nov-18 | | | | 29-Nov-18 | 28 | USAY0010207 |
| **Total** | **$ 3,030,000.00** | | **$ 3,103,000.00** | | | | | | | |

**Effective Date Eligible Cash Management Banks**

1.  ABN AMRO Bank N.V.

2.  JPMorgan Chase Bank, N.A.

3.  Citizens Bank

4.  Bank of America, National Association

**Non-Filing Entities**

**Commitments and Lenders**

| Name of Lender | Revolving Commitment | Term Commitment | Revolving Commitment Percentage |
|---|---|---|---|
| Mercuria US Asset Holdings, LLC | $160,000,000 | $72,000,000 | 100.000000000% |
| TOTAL | **$160,000,000** | **$72,000,000** | **100.000000000%** |

**Funding Account**

**FERC Contracts**

**Litigation**

## Properties; Locations

**Intellectual Property**

**Environmental Matters**

**Subsidiaries**

**Filings and Filing Offices**

**Insurance**

**Joint Ventures**

**Certain Indebtedness**

**Lender Representatives**

**In the case of Mercuria:**
**1. John Etheridege (jetheridge@mercuria.com)**
**2. Marty Bredehoft (mbredehoft@mercuria.com)**
**3. Any other Person designated from time to time by John Etheridege or Marty Bredehoft (or any successor thereto designated in accordance herewith) by written notice (including by email) to, so long as ABN is the Administrative Agent hereunder, each ABN Representative.**

**Required Milestones**

1.      On the Petition Date, the Debtors shall file a motion seeking approval of the facility evidenced by the Facilities and the Term Facility.

2.      On or before three (3) business days after the Petition Date, the Interim DIP Order shall have been entered by the Bankruptcy Court.

3.      Each Loan Party shall have executed and/or delivered with respect to all Collateral, within 45 days of the Effective Date (other than in respect of (i) any Person organized under the laws of South Africa, or (ii) any pledge of Equity Interests of a Person that is not a Loan Party, in each case which shall be 60 days), all new security agreements, pledge agreements, vessel mortgages, control agreements, financing statements, legal opinions, filings to perfect liens under applicable law, and such other documents and agreements as the Administrative Agent and the Required Lenders may require (including amendments to the then-existing forms, if any, of such security agreements, pledge agreements, vessel mortgages, control agreements, financing statements, filings to perfect liens under applicable law and other documents) so as to create and perfect, or in connection with the creation and perfection of, liens upon and security interests in all of the Collateral of AMPNI and the other Loan Parties to secure the Secured Obligations, including without limitation with respect to all Collateral of Loan Parties that are U.S. Persons:

      a.      an Account Control Agreement with respect to each Deposit Account, Commodity Account and Securities Account and such other documents or actions as may be necessary to establish UCC Control with respect to any Collateral over which UCC Control may be established pursuant to the UCC; and

      b.      the Borrower shall have notified each storage facility, carrier, bailee or consignee holding inventory of any Loan Party of the Collateral Agent's security interest in such inventory (and provided to the Administrative Agent a copy of such notice) and Borrower shall use commercially reasonable efforts to obtain from each such storage facility, carrier, bailee or consignee a written acknowledgement of such notice;

*provided* that with respect to Loan Parties that are not U.S. Persons, and with respect to documents and actions necessary or advisable pursuant to the laws of jurisdictions outside of the United States and its States and territories, such obligation shall be subject to and in accordance with the Agreed Security Principles (as defined in the Global DIP Facility agreement).

4.      On or before 45 days after the Petition Date, the Final Order authorizing and approving the Facilities on a final basis shall have been entered by the Bankruptcy Court.

5.      Not later than one day after entry by the Bankruptcy Court of the Interim DIP Order, the Debtors shall have filed with the Bankruptcy Court a motion (the **"Sale Motion"** and the date of such filing, the "***Sale Motion Filing Date***") seeking (i) entry of an order, in form and substance acceptable to the Lenders, approving a sale under section 363 of the Bankruptcy Code, of all or substantially all of the Borrowers' assets (including, without limitation the Collateral) (the "***Sale***"); (ii) approval of bidding and sale procedures in form and substance acceptable to the Lenders (the "***Bidding Procedures***"); (iii) approval of (A) an agreement, in form and substance acceptable to the Lenders, for the Sale, and (B) such other agreements contemplated in the foregoing agreement of Sale as the Lenders may require, and (v) as to the stalking horse bidder providing its bid for the Sale (the "***Sale Bidder***"), approving bid protections for  such Sale Bidder (the "***Bid Protections***").

6. The Borrower shall procure that promptly following:

a. if requested by the Required Lenders, receipt of exchange control approval from the Financial Surveillance Department of the South African Reserve Bank, and in any event within 40 Business Days of the entry of the Interim DIP Order, the Borrower shall cause Aegean Bunkering Marine Services Proprietary Limited, a limited liability company incorporated in South Africa, to join the Guaranty and Security Documents and deliver such other documents and information as is contemplated by clauses (a) and (b) of **Section 5.19**, and the Borrower shall (and shall procure that Aegean Bunkering Marine Services Proprietary Limited) use its best efforts to obtain such exchange control approval as soon as possible for the purpose of becoming an Additional Guarantor; and

b. (b) the Effective Date and in any event by no later than the date falling ten Business Days thereafter, each of Aegean Bunkering (Hong Kong) Limited, a limited liability company incorporated in Hong Kong, and Aegean Caribbean Holdings, Inc. a company incorporated in St Lucia, shall join the Guaranty and Security Documents and deliver such other documents and information as is contemplated by clauses (a) and (b) of **Section 5.19**.

7. Within thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (the "***Bidding Procedures Order***"), in form and substance acceptable to the Lenders, approving the Bidding Procedures and the Bid Protections and setting related deadlines;

8. The Bidding Procedures Order shall provide that bids shall be due within at most seventy (70) calendar days after entry of the Bidding Procedures Order (the "***Bid Deadline***");

9. Within five (5) business days of the Bid Deadline, the Debtors shall conduct the auction, if necessary, pursuant to the Bidding Procedures Order;

10. Within ten (10) business days of the Bid Deadline, the Bankruptcy Court shall enter an order, in form and substance acceptable to the Lenders and the Sale Bidder, approving the Sale; and

11. On the date of the closing of the Sale, the proceeds of the Sale shall have been used to repay the Obligations, the Prepetition Obligations in full in cash and to pay any break-up fee required in the purchase agreement signed by any of the Debtors and any of the Lenders.

**Indebtedness**

**Liens**

**Investments**

**Transaction with Affiliates**

## [FORM OF ASSIGNMENT AND ASSUMPTION]

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [the][each][6] Assignor identified in item 1 below ([the][each, an] "**Assignor**") and [the][each][7] Assignee identified in item 2 below ([the][each, an] "**Assignee**"). [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][8] hereunder are several and not joint.][9] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee. The Standard Terms and Conditions set forth in **Annex 1** attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including any letters of credit, guarantees, and swingline loans included in such facilities), and (ii) to the extent permitted to be assigned under Applicable Law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "**Assigned Interest**"). Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor. Assignee represents and warrants that it is not a Defaulting Lender.

1.      Assignor[s]:      _____

_____

2.      Assignee[s]:      _____

_____

**[Assignee is an [Affiliate][Approved Fund] of [*identify Lender*]**

3.      Borrower(s):      _____

---

[6] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[7] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[8] Select as appropriate.

[9] Include bracketed language if there are either multiple Assignors or multiple Assignees.

4. Administrative Agent:   ABN AMRO CAPITAL USA LLC, as the administrative agent under the Credit Agreement

5. Credit Agreement:  The Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [November __], 2018 among Aegean Bunkering (USA) LLC, the Lenders parties thereto, and ABN AMRO CAPITAL USA LLC, as Administrative Agent

6.   Assigned Interest[s]:

| Assignor[s][10] | Assignee[s][11] | Facility Assigned[12] | Aggregate Amount of Commitment/Loans for all Lenders[13] | Amount of Commitment/ Loans Assigned[8] | Percentage Assigned of Commitment/ Loans[14] | CUSIP Number |
|---|---|---|---|---|---|---|
| | | | $ | $ | % | |
| | | | $ | $ | % | |
| | | | $ | $ | % | |

[7.   Trade Date:   _____][15]

[Page break]

---

[10] List each Assignor, as appropriate.
[11] List each Assignee, as appropriate.
[12] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment.
[13] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.
[14] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.
[15] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR[S][16]
[NAME OF ASSIGNOR]


By:_____
   Title:


[NAME OF ASSIGNOR]


By:_____
   Title:


ASSIGNEE[S][17]
[NAME OF ASSIGNEE]


By:_____
   Title:


[NAME OF ASSIGNEE]


By:_____
   Title:


[Consented to and][18] Accepted:

[NAME OF ADMINISTRATIVE AGENT], as
   Administrative Agent


By: _____

Title:

---

[16] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).
[17] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).
[18] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[Consented to:]<sup>19</sup>

[NAME OF RELEVANT PARTY]


By: _____

Title:

---

<sup>19</sup> To be added only if the consent of the Issuing Bank is required by the terms of the Credit Agreement.

-2-

Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [November __], 2018

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.     **Representations and Warranties**.

1.1     **Assignor[s]**. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents [or any collateral thereunder], (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2     **Assignee[s]**. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 9.07 of the Credit Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to **Section 5.01** thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vii) if it is a Foreign Lender attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.     **Payments**. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts that have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts that have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

3. **General Provisions**. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

## FORM OF BORROWING BASE REPORT

[To come]

EXHIBIT C

DEBTORS' BUDGET

[Attached]

INTERIM DIP ORDER

[Attached]

FORM OF MARKED TO MARKET REPORT

[To come]

[FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

        Reference is hereby made to the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [November __], 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**") among Aegean Bunkering (USA) LLC, the Lenders parties thereto, and ABN AMRO CAPITAL USA LLC, as Administrative Agent.

        Pursuant to the provisions of **Section 2.19** of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

        The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

        Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____
Name:
Title:

Date: _____ __, 20[  ]

[FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [November __], 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**") among Aegean Bunkering (USA) LLC, the Lenders parties thereto, and ABN AMRO CAPITAL USA LLC, as Administrative Agent.

Pursuant to the provisions of **Section 2.19** of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

[FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [November __], 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**") among Aegean Bunkering (USA) LLC, the Lenders parties thereto, and ABN AMRO CAPITAL USA LLC, as Administrative Agent.

Pursuant to the provisions of **Section 2.19** of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

[FORM OF

## U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [November __], 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**") among Aegean Bunkering (USA) LLC, the Lenders parties thereto, and ABN AMRO CAPITAL USA LLC, as Administrative Agent.

Pursuant to the provisions of **Section 2.19** of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

FORM OF POSITION REPORT

[To come]

FORM OF BORROWING REQUEST

FORM OF LETTER OF CREDIT REQUEST

# **EXHIBIT B**

Global DIP Agreement

|CONFIDENTIAL

**Dated 30 November 2017 as amended
and restated pursuant to an
amendment and restatement
agreement dated            2018**

**AEGEAN MARINE PETROLEUM S.A.**
as the Company

**AEGEAN MARINE PETROLEUM S.A.
AEGEAN PETROLEUM INTERNATIONAL INC.
AEGEAN NWE N.V.
AEGEAN BUNKERING GERMANY GMBH** and
**OBAST BUNKERING & TRADING GMBH**
as the Borrowers

**CERTAIN COMPANIES**
as Guarantors

**ABN AMRO BANK N.V.**
as Facility Agent, Collateral Management Agent and Security Agent

**CERTAIN PERSONS**
as Lenders, Issuing Banks and Overdraft Bank

**MERCURIA ENERGY TRADING S.A.**
as Co-Ordinator and as a Hedging Provider

# SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION FACILITY AGREEMENT FOR A BORROWING BASE FACILITY

# Contents

| Clause | | Page |
|---|---|---|
| Section 1 Interpretation | | 2 |
| 1 | Definitions and Interpretation | 2 |
| Section 2 The Facility | | 41 |
| 2 | The Facilities | 41 |
| 3 | Purpose | 44 |
| 4 | Conditions of Utilisation | 44 |
| Section 3 Utilisation | | 47 |
| 5 | Utilisation | 47 |
| 6 | Fronted Facilities | 50 |
| Section 4 Repayment, Prepayment and Cancellation | | 60 |
| 7 | Repayment | 60 |
| 8 | Voluntary prepayment and cancellation | 61 |
| 9 | Mandatory prepayment and cancellation | 62 |
| 10 | Restrictions | 65 |
| Section 5 Costs of Utilisation | | 66 |
| 11 | Interest | 66 |
| 12 | Interest Periods | 67 |
| 13 | Changes to the Calculation of Interest | 68 |
| 14 | Fees | 69 |
| Section 6 Additional Payment Obligations | | 71 |
| 15 | Tax Gross Up and Indemnities | 71 |
| 16 | Increased Costs | 76 |
| 17 | Other Indemnities | 77 |
| 18 | Mitigation by the Lenders | 80 |
| 19 | Costs and Expenses | 80 |
| Section 7 Guarantee | | 83 |
| 20 | Guarantee and Indemnity | 83 |
| Section 8 Representations, Undertakings and Events of Default | | 91 |

| 21 | Representations | 91 |
|---|---|---|
| 22 | Information Undertakings | 98 |
| 23 | Budget variance | 107 |
| 24 | General Undertakings | 107 |
| 25 | Bank Accounts | 121 |
| 26 | Events of Default | 124 |

Section 9 Changes to Parties ............................................................................................132

| 27 | Changes to the Lenders | 132 |
|---|---|---|
| 28 | Restriction on Debt Purchase Transactions | 136 |
| 29 | Changes to the Obligors | 137 |

Section 10 The Finance Parties .........................................................................................141

| 30 | Role of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Overdraft Bank and Others | 141 |
|---|---|---|
| 31 | The Security Agent | 152 |
| 32 | Conduct of Business by the Finance Parties | 164 |
| 33 | Sharing among the Finance Parties | 165 |

Section 11 Administration ..................................................................................................167

| 34 | Payment mechanics | 167 |
|---|---|---|
| 35 | Set-Off | 171 |
| 36 | Notices | 171 |
| 37 | Calculations and Certificates | 174 |
| 38 | Partial Invalidity | 175 |
| 39 | Remedies and Waivers | 175 |
| 40 | Amendments and Waivers | 175 |
| 41 | Confidentiality | 177 |
| 42 | Counterparts | 180 |

Section 12 Governing Law and Enforcement .....................................................................181

| 43 | Governing Law | 181 |
|---|---|---|
| 44 | Enforcement | 181 |
| 45 | Bail-in Clause | 183 |

46      Resolution Stay ......................................................................................................184

Schedule 1 The Original Parties...........................................................................................186

Part I The Obligors ...............................................................................................................186

Part II The Original Lenders .................................................................................................188

Schedule 2 Conditions precedent ........................................................................................189

Part I Conditions precedent to initial Utilisation .................................................................189

Part II Conditions precedent required to be delivered by an Additional Obligor ...................193

Part III Conditions precedent required to be delivered in connection with Sensitive Zones ...............194

Part IV Spanish Pledgor conditions precedent......................................................................194

Schedule 3 Utilisation Request ............................................................................................196

Schedule 4 Form of Transfer Certificate ..............................................................................199

Schedule 5 Form of Assignment Agreement........................................................................201

Schedule 6 Form of Compliance Certificate.........................................................................204

Schedule 7 Timetables .........................................................................................................205

Schedule 8 Forms of Notifiable Debt Purchase Transaction Notice .....................................206

Part I Form of Notice on Entering into Notifiable Debt Purchase Transaction .....................206

Part II Form of Notice on Termination of Notifiable Debt Purchase Transaction / Notifiable Debt Purchase Transaction ceasing to be with Parent Affiliate ..................................................207

Schedule 9 Form of Accession Letter ...................................................................................208

Schedule 10 Form of Resignation Letter...............................................................................209

Schedule 11 Borrowing Base Amount...................................................................................210

Schedule 12 Form of Borrowing Base Report.......................................................................217

Schedule 13 Approved Suppliers .........................................................................................219

Schedule 14 Permitted Financial Indebtedness ...................................................................220

Schedule 15 Form of New Lender Spanish Power of Attorney...............................................222

Schedule 16 Form of Deed of Undertaking ..........................................................................225

Schedule 17 Form of Lender utilisation report ......................................................................230

Schedule 18 Debtors' Budget...............................................................................................231

Schedule 19 Interim DIP Order .............................................................................................232

Schedule 20 - Required Milestones ......................................................................................233

Schedule 21 - Agreed Security Principles ............................................................................................. 235

Schedule 22 – Existing Security ........................................................................................................... 238

SIGNATURES ....................................................................................................................................... 242

**THIS AGREEMENT** is dated 30 November 2017 as amended and restated pursuant to an amendment and restatement agreement dated                    2018 and made between:

(1)     **AEGEAN MARINE PETROLEUM S.A.** a corporation incorporated under the laws of Liberia with registered office at 80 Broad Street, Monrovia, Republic of Liberia (the **Company**);

(2)     **AEGEAN PETROLEUM INTERNATIONAL INC.**, a corporation incorporated under the laws of the Marshall Islands with registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (**APII**);

(3)     **AEGEAN NWE N.V.**, a limited liability company incorporated under the laws of Belgium having its registered office at Ruiterijschool 1, 2930 Brasschaat, Belgium, registered under company number BTW BE 0412.527.142 RPR/RPM Antwerp (section Antwerp) (**ANNV**);

(4)     **AEGEAN BUNKERING GERMANY GMBH**, a limited liability company incorporated under the laws of the Federal Republic of Germany, having its business address at Holstenwall 5, 20355 Hamburg, Germany which is registered in the commercial register (*Handelsregister*) kept at the local court (*Amtsgericht*) of Kiel under registration number HRB 16326 KI (**ABGG**);

(5)     **OBAST BUNKERING & TRADING GMBH**, a limited liability company incorporated under the laws of the Federal Republic of Germany, having its business address at Dalwitzhofer Weg 22 a, 18055 Rostock, Germany which is registered in the commercial register (*Handelsregister*) kept at the local court (*Amtsgericht*) of Rostock under registration number HRB 13560 (**OBTG**);

(6)     **THE COMPANIES** listed in Part I (*The Obligors*) of Schedule 1 (*The Original Parties*) as guarantors (the **Guarantors**);

(7)     **THE PERSONS** listed in Part II (*The Original Lenders*) of Schedule 1 (*The Original Parties*) as lenders (the **Original Lenders**);

(8)     **ABN AMRO BANK N.V.** as facility agent of the other Finance Parties (the **Facility Agent**);

(9)     **ABN AMRO BANK N.V.** as collateral management agent of the other Finance Parties (the **Collateral Management Agent**);

(10)    **ABN AMRO BANK N.V.** as security trustee for the Secured Parties (the **Security Agent**);

(11)    **MERCURIA ENERGY TRADING S.A. (METSA)** as co-ordinator (the **Co-Ordinator**);

(12)    **ABN AMRO BANK N.V.** as Facility B Tranche 1 issuing bank (the **Facility B Tranche 1 Issuing Bank**);

(13)    **ABN AMRO BANK N.V.** as Facility B Tranche 2 issuing bank (the **Facility B Tranche 2 Issuing Bank**);

(14)    **ABN AMRO BANK N.V.** as overdraft bank (the **Overdraft Bank**); and

(15)    **MERCURIA ENERGY TRADING S.A.** (**METSA**) as hedging provider (a **Hedging Provider**).

**WHEREAS**:

(A)     On ___ November 2018 (the **Petition Date**), the Parent and the other Debtors filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of the relevant Borrowers and the Guarantors, each a **Case** and together, the **Cases**) and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(B)     The Obligors have requested that the Lenders extend credit to them in the form of a debtor-in-possession first-out revolving credit facility in an aggregate principal amount of up to

$300,000,000, subject to the conditions set out in this Agreement. All of the Borrowers' obligations under the Facility are to be guaranteed by the Parent and certain of its Subsidiaries (subject to the terms of this Agreement). The Lenders are willing to extend such credit, and the Issuing Bank is willing to issue letters of credit, to the relevant Borrowers, in each case, on the terms and subject to the conditions set out in this Agreement.

(C)    The respective priorities of each Facility and the other Secured Obligations shall be as set out in this Agreement, the Interim DIP Order and the Final DIP Order, in each case upon entry thereof (as applicable) by the Bankruptcy Court.

**IT IS AGREED** as follows:

**Section 1**
**Interpretation**

# 1    Definitions and Interpretation

### 1.1    Definitions

In this Agreement (including the Recitals):

**Acceptable Bank** means:

(a)    ABN AMRO Bank N.V.;

(b)    a bank or financial institution which:

(i)    has a rating for its long-term unsecured and non-credit-enhanced debt obligations of BBB- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or Baa3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency; and

(ii)    (other than when used in the definitions of "Cash" and "Cash Equivalent Investments") has been approved in writing by the Issuing Bank; and/or

(c)    any other bank or financial institution approved by the Facility Agent and the Issuing Banks.

**Acceptable Reorganization Plan** means a Debtor Relief Plan that provides for the termination of the Commitments and the payment in full of the Prepetition Obligations and the Secured Obligations (other than contingent indemnification obligations not yet due and payable but which, for the avoidance of doubt, shall be preserved in such Debtor Relief Plan) in cash on the effective date of such Debtor Relief Plan to the extent not previously paid from the proceeds from a sale under Section 363 of the Bankruptcy Code

**Accession Letter** means a document substantially in the form set out in Schedule 9 (*Form of Accession Letter*)

**Account Bank** means the Collateral Management Agent

**Accounting Principles** means generally accepted accounting principles in The United States of America

**Accounting Reference Date** means 31 December

**Account Pledge Agreements** means the pledge agreement dated on or about 30 November 2017 between the Borrowers as pledgors and the Security Agent as pledgee, pursuant to which the Borrowers pledge, inter alia, all amounts standing to the credit of the Collection Accounts and the Facility Accounts in favour of the Security Agent to secure the First Secured Obligations

**Additional Borrower** means any company which becomes an Additional Borrower in accordance with clause 29 (*Changes to the Obligors*)

**Additional Guarantor** means any company which becomes an Additional Guarantor in accordance with clause 29 (*Changes to the Obligors*)

**Additional Obligor** means an Additional Borrower or an Additional Guarantor

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company provided that, in relation to any Obligor or other Group member, the term shall not include Mercuria Energy Group Limited or any MEGL Affiliate from time to time

**Agent's Rate of Exchange** means the Facility Agent's spot rate of exchange for the purchase of the relevant currency with the Base Currency in the London foreign exchange market at or about 11:00 a.m. on the date of the most recently delivered Borrowing Base Report

**Agreed Security Principles** means the agreed security principles set out in Schedule 21 (*Agreed Security Principles*)

**Amendment and Restatement Agreement** means the amendment and restatement agreement in relation to this Agreement dated on the date set out above and entered into between the Parties

**AOTC** means Aegean Oil Terminal Corporation, a company duly incorporated in the Marshall Islands with its registered address at PO Box 1405, Majuro, Marshall Islands

**Applicable KYC Procedures** means any applicable "know your customer" checks or similar identification procedures, or equivalent internal policies of a Lender, or any equivalent procedures required by applicable law or regulations (including the Money laundering and anti-terrorism Act (*Wet ter voorkoming van witwassen en financieren terrorisme*))

**Applicable Law** means:

(a) in relation to any jurisdiction or to the European Union, any law, regulation, treaty, directive, decision, rule, regulatory requirement, judgment, order, ordinance, request, guideline or direction or any other act of any government entity of such jurisdiction or of any EU Institution whether or not having the force of law and with which any Party is required to comply, or with which it would, in the normal course of its business, comply; and

(b) in relation to any Lender, any Basel II Regulation applicable to that Lender

**Approved Suppliers** means:

(a) the suppliers listed in Schedule 13 (*Approved Suppliers*);

(b) any refinery in compliance with the terms and conditions of clause 22.13 (*Proof of Origin*); and

(c) any other supplier which is approved in writing by the Company and the Facility Agent (acting on the instructions of the Majority Lenders),

but in each case only to the extent of any supply contracts entered into in respect of the Sensitive Zone and provided that an Approved Supplier shall cease to be an Approved Supplier on the date on which:

(i) the Facility Agent (acting on the instructions of the Majority Lenders) so directs in writing to the Company; and/or

(ii) any Lender so directs in writing to the Facility Agent and the Company on the basis of such Lender's internal or external compliance requirements

**Asset Purchase Agreement** means that agreement executed between one or more of the Debtors for the sale of the assets described therein to Mercuria Asset Holdings (Hong Kong) Limited, a company incorporated in Hong Kong with limited liability, dated 5 November 2018.

**Assignment Agreement** means an agreement substantially in the form set out in Schedule 5 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee

**Auditors** means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche

**Authorisation** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration

**Availability Period** means:

(a) in relation to Facility A, the period from and including the date of this Agreement to and including the date which is one (1) Month prior to the Termination Date provided that the Availability Period shall not extend beyond the Petition Date;

(b) in relation to Facility A Tranche 2, the period from and including the date of this Agreement to and including the Termination Date

(c) in relation to Facility B Tranche 1, the period from and including the date of this Agreement to and including the Termination Date provided that the Availability Period shall not extend beyond the Petition Date; and

(d) in relation to Facility B Tranche 2, the period from and including the date of this Agreement to and including the Termination Date

**Available Facility** means, in relation to a Facility or Tranche, the aggregate for the time being of each Lender's Available Commitment in respect of that Facility or Tranche, subject to clause 4.7 (*Maximum Available Amount*) and clause 4.8 (*Fronting Bank Limit*)

**Available Commitment** means, subject to clause 14.4, in relation to a Facility and, where applicable, a Tranche:

(a) a Lender's Commitment under that Facility and Tranche provided that, in respect of Tranche 2 of each Facility, the Available Commitment shall not exceed the aggregate amount of Tranche 1 repayments or prepayments made in relation to that Facility in accordance with clauses 9.4 and 9.5 since the Effective Date including any repayments or prepayments to be netted off against the proceeds of the Loan to be made on the proposed Utilisation Date; minus

(b)

(i) the Base Currency Amount of its participation in any outstanding Utilisations under that Facility and Tranche; and

(ii) in relation to any proposed Utilisation, the Base Currency Amount of its participation in any Utilisations that are due to be made under that Facility and Tranche on or before the proposed Utilisation Date,

other than that Lender's participation in any Utilisation that are due to be repaid, prepaid, reduced or cancelled on or before the proposed Utilisation Date

**Bail-In Action** means the exercise of any Write-down and Conversion Powers

**Bail-In Legislation** means:

(a)    in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms , the relevant implementing law or regulation  as described in the EU Bail-In Legislation Schedule from time to time;  and

(b)    in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation

**Bankruptcy Code** means Title 11 of the United States Code entitled "Bankruptcy"

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time

**Base Currency** means Dollars

**Base Currency Amount** means:

(a)    in relation to a Utilisation, the amount specified in the Utilisation Request delivered by a Borrower for that Utilisation (or, if the amount requested is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Rate of Exchange as at the date which is three (3) Business Days before the Utilisation Date or, if later, on the date the Facility Agent receives the Utilisation Request) adjusted to reflect any repayment, prepayment, consolidation or division of the Utilisation; and

(b)    in relation to the calculation of any other amount which is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Rate of Exchange as at the date which is three (3) Business Days before the relevant calculation date

**Basel II Accord** means the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 as updated prior to, and in the form existing on, the date of this Agreement, excluding any amendment thereto arising out of the Basel III Accord

**Basel II Approach** means, in relation to any Finance Party, either the Standardised Approach or the relevant Internal Ratings Based Approach (each as defined in the Basel II Accord) adopted by that Finance Party (or any of its Affiliates) for the purposes of implementing or complying with the Basel II Accord

**Basel II Increased Cost** means an Increased Cost which is attributable to the implementation or application of or compliance with any Basel II Regulation in force as at the date hereof (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates)

**Basel II Regulation** means:

(a)    any Applicable Law in force as at the date hereof implementing the Basel II Accord (including the relevant provisions of directive 2013/36/EU (**CRD IV**) and regulation 575/2013 (**CRR**) of the European Union); or

(b)    any Basel II Approach adopted by a Finance Party or any of its Affiliates;

but excludes any Applicable Law implementing the Basel III Accord save and to the extent that it is a re-enactment of any Applicable Law referred to in paragraph (a) of this definition

**Basel III Accord** means, together:

(a)	the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(b)	the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement - Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(c)	any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III"

**Basel III Increased Cost** means an Increased Cost which is attributable to the implementation or application of or compliance with any Basel III Regulation (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates)

**Basel III Regulation** means any Applicable Law implementing the Basel III Accord (including CRD IV and CRR) save and to the extent that it is re-enacts a Basel II Regulation

**Belgian Borrower** means a Borrower incorporated under the laws of Belgium

**Belgian Obligor** means an Obligor incorporated under the laws of Belgium

**Bidding Procedures** has the meaning given to such term in Schedule 20

**Bidding Procedures Order** has the meaning given to such term in Schedule 20

**Borrower** means an Original Borrower or an Additional Borrower in each case unless it has ceased to be a Borrower in accordance with clause 29 (*Changes to the Obligors*)

**Borrowing Base** means the aggregate of cash, inventory and receivables from time to time included in the Borrowing Base Report in accordance with Schedule 11 (*Borrowing Base Amount*)

**Borrowing Base Amount** means at any time:

(a) the Base Currency Amount of the aggregate of the Borrowing Base calculated pursuant to Schedule 11 (*Borrowing Base Amount*);

less

(b) the Outstandings

**Borrowing Base Audit Report** means an audit report in respect of the Borrowing Base to be provided by the Company in accordance with the terms of this Agreement, provided by a report provider acceptable to the Collateral Management Agent (which shall not be a Borrower's auditors) addressed to, on terms acceptable to, and capable of being replied upon by, the Collateral Management Agent

**Borrowing Base Report** means a report substantially in the form set out in Schedule 12 (*Form of Borrowing Base Report*) and taking into account any additional requirements set out in Schedule 11 (*Borrowing Base Amount*), duly completed by the Company and signed on its behalf by two (2) authorised signatories

**Break Costs** means the amount (if any) by which:

(a)    the interest which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)    the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period

**Bridge Financing** means loan financing provided on a bilateral basis by any Lender to members of the Group for the purpose of financing working capital needs of the Group, with a maximum tenor (including any potential extensions and/or renewals) of 90 days and which is intended to be refinanced by Utilisations

**Budget** means the Debtors' budget delivered to the Facility Agent on or prior to the Effective Date, setting forth (a) in reasonable detail the receipts and disbursements of the Debtors on a weekly basis from the Effective Date through the immediately consecutive 13 weeks broken down by week, including the anticipated uses of the Facilities for such period, as such budget may be amended or modified from time to time by the Debtors provided that the Majority Lenders shall have provided prior written consent to any such amendment or modification, together with budgets for subsequent periods proposed by the Debtors and approved by the Majority Lenders in their sole discretion

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Paris, Geneva, Amsterdam and New York City and (in relation to any date for payment or purchase of euro) any TARGET Day

**Canadian Barges** means each of the following vessels registered in Vancouver, Canada:

(a)    having official number 822652 and USCG VIN Number CG061360 and which, as at the date of the Amendment and Restatement Agreement, has vessel name "PT22"; and

(b)    having official number 838658 and USCG VIN Number L838658 and which, as at the date of the Amendment and Restatement Agreement, has vessel name "PT40"

**Canadian Barges Loan** means the loan provided by METSA to the Company pursuant to a loan agreement dated September 7, 2018 and made between METSA, the Company, the Parent and I.C.S. Petroleum Limited and secured by the Canadian Barges

**Canadian Security Agreement** means the Security Agreement (Canada), dated on or about the date hereof, executed and delivered by Aegean Bunkering (USA) LLC to the Security Agent, as amended, modified or supplemented from time to time.

**Capital Stock** means any and all shares, interests, participations or other equivalents (however designated) of capital stock, any and all equivalent ownership interests in any company, corporation, limited liability company, general partnerships, limited partnership, limited liability partnership, trust, estate, proprietorship, joint venture or other business organization and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt security convertible into or exchangeable for such interest

**Carve-Out** means the term "Carve-Out" in the Final DIP Order, or, prior to the entry of the Final DIP Order, the Interim DIP Order

**Carve-Out Trigger Notice** has the meaning set forth in the Final DIP Order, or prior to the entry of the Final DIP Order, the Interim Order

**Case** has the meaning given to such term in the Recitals

**Cash** means, at any time, cash in hand or at bank and (in the latter case) credited to an account in the name of a member of the Group with an Acceptable Bank and to which a member of the Group is alone (or together with other members of the Group) beneficially entitled and for so long as:

(a)     that cash is repayable on demand;

(b)     repayment of that cash is not contingent on the prior discharge of any other indebtedness of any member of the Group or of any other person whatsoever or on the satisfaction of any other condition;

(c)     there is no Security over that cash except for Transaction Security or any Security permitted pursuant to clause 24.12 (*Negative pledge*) constituted by a netting or set-off arrangement entered into by members of the Group in the ordinary course of their banking arrangements; and

(d)     the cash is freely and immediately available to be applied in repayment or prepayment of the Facilities

**Cash Equivalent Investments** means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank;

(b)     any investment in marketable debt obligations issued or guaranteed by the government of the United States of America, the United Kingdom, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

  (i)     for which a recognised trading market exists;

  (ii)    issued by an issuer incorporated in the United States of America, the United Kingdom, any member state of the European Economic Area or any Participating Member State;

  (iii)   which matures within one year after the relevant date of calculation; and

  (iv)    which has a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investors Service Limited, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d)     any investment in money market funds which (i) have a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investors Service Limited, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (d) above and (iii) can be turned into cash on not more than thirty (30) days' notice; or

(e)     any other debt security approved by the Majority Lenders,

in each case, to which any member of the Group is alone (or together with other members of the Group beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than Security arising under the Transaction Security Documents)

**Cash Management Order** means the Bankruptcy Court order, in form and substance reasonably satisfactory to the Facility Agent and the Majority Lenders, relating to the Debtors' cash management system and bank accounts

**Certificate of Origin** means a certificate received from an Approved Supplier stating clearly the country of origin of the underlying goods

**Change of Control** means an event or series of events by which:

(a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an **option right**)), directly or indirectly, of 35% or more of the Equity Interests of any Holding Company of a Borrower entitled to vote for members of the board of directors or equivalent governing body of that Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or

(b) the direct Holding Company of a Borrower shall cease to own (directly or indirectly), beneficially and of record, and control, 100% of each class of outstanding Equity Interests of that Borrower free and clear of all Security, charges or other encumbrances, other than Security in favour of the Security Agent for the ratable benefit of the Secured Parties and/or in favour of the US DIP Administrative Agent in respect of the Second Secured Obligations; or

(c) the Parent shall cease to own (directly or indirectly), beneficially and of record, and control, 100% of each class of outstanding Equity Interests of the Borrowers, the direct Holding Company of each Borrower and each other person that is a Subsidiary on the Effective Date (except to the extent permitted hereunder), free and clear of all Security, charges or other encumbrances, other than (i) Security (w) in favour of the Security Agent for the ratable benefit of the Secured Parties and/or in favour of the US DIP Administrative Agent in respect of the Second Secured Obligations, (x) in respect of the Carveout, and (y) contemplated by the Orders (including any adequate protection liens in favour of other lenders), or (ii) as otherwise permitted under this Agreement

Notwithstanding the foregoing, ownership changes in the document entitled "1.1E Certain Ownership" delivered to the Facility Agent prior to the Effective Date shall not constitute a Change of Control

**Charged Property** means all of the assets of the Obligors and any Spanish Pledgor (if any) which from time to time are, or are expressed to be, the subject of the Transaction Security

**Clearing Providers** means ABN AMRO Clearing Bank N.V. (a company incorporated in the Netherlands) or any other clearing provider which is an Affiliate of a Facility B Lender and which is approved in writing by the Facility Agent and which enters into a Multi-Party TPA Agreement with the Company, and **Clearing Provider** means any of them as the case may be

**Clearing Provider Hedging Agreement** means any document evidencing a Clearing Provider Hedging Transaction

**Clearing Provider Hedging Transactions** has the meaning given to it in clause 2.4 (*Hedging/Clearing*)

**Code** means the US Internal Revenue Code of 1986

**Collateral Management Agreement** means a collateral management agreement in respect of inland storage to be entered into between the Security Agent, the relevant Borrower and the Collateral Manager in form and substance satisfactory to the Facility Agent acting on the instructions of all Lenders

**Collateral Manager** means a collateral manager approved in writing by the Facility Agent acting on the instructions of all Lenders

**Collection Accounts** means the bank accounts opened and maintained by each Borrower with the Account Bank in accordance with clause 25 (*Bank Accounts*) and includes any interest of the Borrowers in any replacement account or any sub-division or sub-account of any of these accounts

**Commitment** means, in relation to a Lender, its Facility A Tranche 1 Commitment, Facility A Tranche 2 Commitment, Facility B Tranche 1 Commitment and/or Facility B Tranche 2 Commitment (as the case may be)

**Commodities** means bunker fuel, crude oil, fuel oil, gas oil, lubricants, and other petroleum products, and with the consent of the Majority Lenders, any other energy commodities that are of the type which are purchased, sold or otherwise traded in physical, futures, forward or over the counter markets

**Compliance Certificate** means a certificate substantially in the form set out in Schedule 6 (*Form of Compliance Certificate*)

**Compliance Policy** means the policy of the Group, approved by the Board of Directors of the Company, in relation to operational control procedures related to product origin (traceability, compliance with United States of America, European Union and United Nations Sanctions or any other state or authority which has issued Sanctions with which a member of the Group is required to comply)

**Compliant Borrowing Base Report** means a Borrowing Base Report showing a Borrowing Base Amount which is zero (0) or a positive number

**Compliant Cross-Check Borrowing Base Report** means a Cross-Check Borrowing Base Report, the accuracy of which has been verified by the Majority Lenders based on the information provided by sources acceptable to the Majority Lenders and reflected therein relating to:

(i)     the storage volumes at any inland storage facilities, leased or owned by the Borrowers and any Spanish Pledgor (if any) and which have capacity equal to or in excess of 50,000 metric tons; and

(ii)    the storage volumes on any vessels leased or owned by the Borrowers and any Spanish Pledgor (if any) which have capacity equal to or in excess of 15,000 metric tons,

and which shows a Borrowing Base, the Base Currency Amount of which is not less than ninety five per cent. (95%) of the Base Currency Amount of the Borrowing Base as reported in the most recent Compliant Borrowing Base Report

**Confidential Information** means all information relating to any Obligor, the Group, the Finance Documents or a Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or a Facility from either:

(a)     any member of the Group or any of its advisers; or

(b)    another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)    is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of clause 41 (*Confidentiality*); or

(ii)    is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(iii)    is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality

**Confidentiality Undertaking** means a confidentiality undertaking substantially in a recommended form of the LMA from time to time or in any other form agreed between the Company and the Facility Agent

**Contractual Obligation** means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound

**Credit Instrument** means any transaction-related standby or documentary letter of credit or guarantee issued, to be issued or deemed to be issued by an Issuing Bank under the relevant Tranche of Facility B and in such form requested by a Borrower which is acceptable to the relevant Issuing Bank in accordance with the terms of this Agreement including without limitation clause 5.3 (*Completion of a Utilisation Request for Fronted Facilities*) and clause 6 (*Fronted Facilities*)

**Cross-Check Borrowing Base Report** means a report duly completed by the Company and signed on its behalf by two (2) authorised signatories in the form required pursuant to clause 22.7(c) (*Borrowing Base Report*)

**Current Assets** means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including prepayments in relation to operating items and sundry debtors (including Cash and Cash Equivalent Investments) expected to be realised within twelve (12) months from the date of computation but **excluding** amounts in respect of:

(a)    receivables in relation to Tax;

(b)    Exceptional Items and other non-operating items;

(c)    insurance claims; and

(d)    any interest owing to any member of the Group

**Debt Purchase Transaction** means, in relation to a person, a transaction where such person:

(a)    purchases by way of assignment or transfer;

(b)    enters into any sub-participation in respect of; or

(c)     enters into any other agreement or arrangement having an economic effect substantially similar to a sub-participation in respect of,

any Commitment or amount outstanding under this Agreement

**Debtor Relief Laws** means the Bankrupcty Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganisation, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect

**Debtor Relief Plan** means a plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws

**Debtors** means the Borrowers (other than ANNV, ABGG and OBTG), the Parent, and each other Subsidiary of the Parent that filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code with the Bankruptcy Court on the Petition Date and each a **Debtor**

**Debtors' Collateral** means, collectively, all real, personal, and mixed property (including Equity Interests) of the Debtors' respective estates in the Cases, including, without limitation, all inventory, accounts receivable, general intangibles (including rights under intercompany loans), contracts, chattel paper, owned real estate, real property leaseholds, governmental approvals, licenses and permits, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks (other than any "intent to use" trademark, applications for which a Statement of Use or Amendment to Allege Use, as applicable, has not been filed and accepted with the US Patent and Trademark Office or any similar authority in other jurisdictions), trade names, rights under license agreements and other intellectual property, securities, partnership or membership interests in limited liability companies, and capital stock of any subsidiary of any of the Debtors, including, without limitation, the products and proceeds thereof, in each case excluding any collateral that is described in any Transaction Security Document as being excluded collateral.

**Deed of Undertaking** means a deed of undertaking in the form set out in Schedule 16 (*Form of Deed of Undertaking*) to be entered into between a third party, a Borrower and an Issuing Bank

**Default** means an Event of Default or any event or circumstance specified in clause 26 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default

**Deficient Borrowing Base Report** means a Borrowing Base Report immediately after delivery of which it appears that the Borrowing Base Amount is a negative number

**Deficient Cross-Check Borrowing Base Report** means a Cross-Check Borrowing Base Report which is not a Compliant Cross-Check Borrowing Base Report

**Delegate** means any delegate, agent, attorney or co-trustee appointed by the Security Agent

**Disruption Event** means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facilities (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)     from performing its payment obligations under the Finance Documents; or

       (ii)    from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted

**Dormant Company** means a company that is no longer operational and has no material assets or activities as specified in the Group Structure Chart as updated from time to time

**EEA Member Country** means any member state of the European Union, Iceland, Liechtenstein and Norway

**Effective Date** has the meaning given in the Amendment and Restatement Agreement

**Eligible LOI Counterparty** means a person or their replacement notified from time to time by five (5) Business Days' notice in writing by the Facility Agent (acting on the instructions of all Facility B Lenders) to the Company) and any other person approved by all Facility B Lenders to the relevant Tranche as being suitable to issue a letter of indemnity for presentation for payment under a Credit Instrument

**Eligible Receivables** has the meaning given to in in Schedule 11 (*Borrowing Base Amount*)

**Environment** means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

(a)    air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)    water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c)    land (including, without limitation, land under water)

**Environmental Claim** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law

**Environmental Law** means any applicable law or regulation which relates to:

(a)    the pollution or protection of the Environment;

(b)    the conditions of the workplace; or

(c)    the generation, handling, storage, use, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste

**Environmental Permits** means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Group conducted on or from the properties owned or used by any member of the Group

**Equity Interests** means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not

such shares, warrants, options, rights or other interests are outstanding on any date of determination

**EU Bail-In Legislation** Schedule means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

**Event of Default** means any event or circumstance specified as such in clause 26 (*Events of Default*)

**Existing Security** means the Security described in Schedule 22 (*Existing Security*)

**Existing Security Holder** means any person which holds directly Security which is permitted under and in accordance with clause 24.12 (*Negative pledge*)

**Expiry Date** means, for a Fronted Facility, the last day of its Term

**Facility** means Facility A or Facility B

**Facility Accounts** means the bank accounts opened and maintained by each Borrower with the Account Bank in accordance with clause 25 (*Bank Accounts*) and includes any replacement account or any sub-division or sub-account of any of those accounts

**Facility A** means together:

(a)     Facility A Tranche 1; and

(b)     Facility A Tranche 2

**Facility A Margin** means in relation to the Facility A Tranche 1, the Facility A Tranche 1 Margin and in relation to the Facility A Tranche 2, the Facility A Tranche 2 Margin

**Facility A Tranche 1** means the secured committed multicurrency borrowing base revolving credit facility made available under this Agreement as described in clause 2.1(a)(i) (*The Facilities*)

**Facility A Tranche 1 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility A Tranche 1 Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Facility A Tranche 1 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility A Tranche 1 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility A Tranche 1 Margin** means two point six per cent. (2.6%) per annum

**Facility A Tranche 1 Total Commitments** means the aggregate of the Facility A Tranche 1 Commitments

**Facility A Tranche 2** means the secured committed multicurrency borrowing base revolving credit facility made available under this Agreement as described in clause 2.1(a)(ii) (*The Facilities*)

**Facility A Tranche 2 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility A Tranche " Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Facility A Tranche 2 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility A Tranche 2 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility A Tranche 2 Margin** means three point five per cent. (3.5%) per annum

**Facility A Tranche 2 Total Commitments** means the aggregate of the Facility A Tranche 2 Commitments

**Facility A Total Commitments** means the aggregate of the Facility A Tranche 1 Commitments and the Facility A Tranche 2 Commitments, being $200,000,000 at the date of the Amendment and Restatement Agreement

**Facility B** means together:

(a)     Facility B Tranche 1; and

(b)     Facility B Tranche 2

**Facility B Lender** means in relation to a particular Tranche of Facility B, a Lender who has at any time a Facility B Tranche 1 Commitment or Facility B Tranche 2 Commitment

**Facility B Margin** means three point five per cent. (3.5%) per annum

**Facility B Total Commitments** means the aggregate of the Facility B Tranche 1 Commitments and the Facility B Tranche 2 Commitments, being US$125,200,000 at the date of the Amendment and Restatement Agreement

**Facility B Tranche 1** means a secured uncommitted multicurrency borrowing base revolving credit facility for the entry into or issue of Fronted Facilities which was in place on or prior to the Petition Date and as described in clause 2.1(b)(i) (*The Facilities*)

**Facility B Tranche 1 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility B Tranche 1 Commitment" in Part II of Schedule 1 (*The Original Parties*), such amount having been adjusted in respect of Credit Instruments in accordance with clause 9.5 and the amount of any other Facility B Tranche 1 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility B Tranche 1 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility B Tranche 1 Issuing Bank** means each Party identified in the recitals to this Agreement as a Facility B Tranche 1 Issuing Bank and any Facility B Lender which has become a Facility B Tranche 1 Issuing Bank pursuant to clause 5.11(a) (*Appointment of additional Issuing Banks*) (and if there is more than one such Party, such Parties shall be referred to, whether acting individually or together, as the **Facility B Tranche 1 Issuing Bank**) **provided that**, in respect of a Credit Instrument issued or to be issued pursuant to the terms of this Agreement, the **Facility B Tranche 1 Issuing Bank** shall be the Facility B Tranche 1 Issuing Bank which has issued or agreed to issue that Credit Instrument under Facility B Tranche 1

**Facility B Tranche 1 Total Commitments** means the aggregate of the Facility B Tranche 1 Commitments

**Facility B Tranche 2** means a secured committed multicurrency borrowing base revolving credit facility as described in clause 2.1(b)(ii) (*The Facilities*)

**Facility B Tranche 2 Commitments** means:

(a) in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility B Tranche 2 Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Facility B Tranche 2 Commitment transferred to it under this Agreement; and

(b) in relation to any other Lender, the amount in the Base Currency of any Facility B Tranche 2 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility B Tranche 2 Issuing Bank** means each Party identified in the recitals to this Agreement as a Facility B Tranche 2 Issuing Bank and any Facility B Lender which has become a Facility B Tranche 2 Issuing Bank pursuant to clause 5.11(a) (*Appointment of additional Issuing Banks*) (and if there is more than one such Party, such Parties shall be referred to, whether acting individually or together, as the **Facility B Tranche 2 Issuing Bank**) **provided that**, in respect of a Credit Instrument issued, to be issued or deemed to be issued pursuant to the terms of this Agreement, the **Facility B Tranche 2 Issuing Bank** shall be the Facility B Tranche 2 Issuing Bank which has issued, deemed to have issued or agreed to issue that Credit Instrument under Facility B Tranche 2

**Facility B Tranche 2 Total Commitments** means the aggregate of the Facility B Tranche 2 Commitments

**Facility B Utilisation** means in relation to a particular Tranche of Facility B, a Utilisation made or to be made under the relevant Tranche of Facility B or the principal amount outstanding for the time being of that Utilisation

**Facility Office** means:

(a) in respect of a Lender, Issuing Bank or Overdraft Bank, the office or offices notified by that Lender, Issuing Bank or Overdraft Bank to the Facility Agent in writing on or before the date it becomes a Lender,  Issuing Bank or Overdraft Bank (or, following that date, by not less than five (5) Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

(b) in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes

**FATCA** means:

(a) sections 1471 to 1474 of the Code or any associated regulations or other official guidance;

(b) any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of paragraph (a) above; or

(c) any agreement pursuant to the implementation of paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction

**FATCA Application Date** means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)     in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2019; or

(c)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2019,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction

**FATCA FFI** means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if any Finance Party is not a FATCA Exempt Party, could be required to make a FATCA Deduction

**Final DIP Order** means a Final Order substantially in the form and substance of the Interim DIP Order entered by the Bankruptcy Court, with only such modifications in form and substance that are either (x) not adverse to the Secured Parties or (y) satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders) as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of the Facility Agent and the Majority Lenders, in accordance with the terms herein (i) authorizing the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and the other Finance Documents and (b) use cash collateral during the pendency of the Cases, and (ii) granting certain related relief

**Final Order** means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has bene filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice

**Finance Document** means:

(a)     this Agreement;

(b)     the Intercreditor Agreement;

(c)     any Compliance Certificate;

(d)     any Accession Letter;

(e)     any Resignation Letter;

(f)     each Transaction Security Document;

(g)     each Deed of Undertaking;

(h)     each Borrowing Base Report;

(i)     each Cross-Check Borrowing Base Report;

(j)     any Hedging Agreement to which METSA is a party;

(k)     the Amendment and Restatement Agreement;

(l)     any Utilisation Request; and

(m)     any other document designated as a "Finance Document" by the Facility Agent and the Company

**Finance Lease** means any lease or hire purchase contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease

**Finance Party** means the Facility Agent, the Collateral Management Agent, the Security Agent, the Co-Ordinator, the Account Bank, the Issuing Bank, the Overdraft Bank, a Lender or the Hedging Provider

**Financial Indebtedness** means any indebtedness for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c)     any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of Finance Leases;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under the Accounting Principles);

(f)     any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

(h)     any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the Termination Date or are otherwise classified as borrowings under the Accounting Principles);

(i)     any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than ninety (90) days after the date of supply;

(j)     any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(k) the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (j) above

**Financial Officer** means, as to any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person

**Financial Year** means each of the Company's financial years ending on 31 December

**First Day Orders** means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date and heard by the Bankruptcy Court at the initial hearing or thereafter, which orders shall each be in form and substance reasonably satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders)

**First Secured Obligations** means all obligations at any time due, owing or incurred by any Obligor or any Spanish Pledgor to any Secured Party under the First Finance Documents, including the obligations set out in clause 31.3 (*Parallel Debt* (*Covenant to pay the Security Agent*)) whether present or future, actual or contingent (and whether incurred solely or jointly and whether as principal or surety or in some other capacity)

**First Security** means the Security created or expressed to be created in favour of the Security Agent pursuant to the First Security Documents

**First Security Documents** means

(a) the Account Pledge Agreements;

(b) the Security Agreements;

(c) the Moroccan Pledge;

(d) the UAE Pledges;

(e) any Spanish Pledges and any Spanish Irrevocable Power of Attorney;

(f) the German Security Transfer Agreements;

(g) the South African Pledge;

(h) any Stock Monitoring Agreement;

(i) any Collateral Management Agreement;

(j) the Canadian Security Agreement;

(k) the US Security Agreement; and

(l) any documents in respect of which Security is granted to the Security Agent pursuant to clause 24.25 (*Conditions Subsequent*),

together with any other document entered into by any Obligor or any Spanish Pledgor creating or expressed to create any Security over all or any part of its assets in respect of the obligations of any of the Obligors under any of the Finance Documents other than the Hedging Agreements

**First Security Period** means the period terminating on the date on which the First Secured Obligations are unconditionally and irrevocably discharged in full

**Fronted Facilities** means Overdraft Facilities and/or Credit Instruments issued (or deemed to have been issued) or entered into by Issuing Banks pursuant to this Agreement

**Fronted Proportion** means in relation to a Facility B Lender in respect of any Fronted Facility, the proportion (expressed as a percentage) which that Facility B Lender's Available Commitment bears to the Available Facility (in each case in respect of the relevant Tranche of Facility B) immediately prior to the issue of that Fronted Facility, adjusted to reflect any assignment or transfer under this Agreement to or by that Facility B Lender under the relevant Tranche and taking into account any change in a Lender's proportion on or prior to the relevant date as a result of the provisions of this Agreement (including without limitation clause 9.5)

**Fronting Bank** means the Issuing Bank and the Overdraft Bank provided that if a bank or financial institution (or a bank or financial institution and one of its Affiliates) is both an Issuing Bank and an Overdraft Bank in relation to a Tranche it shall be considered for the purposes of the Fronting Bank Limit calculation to be single Fronting Bank

**Fronting Bank Limit** means, from time to time, in relation to each Fronting Bank in a particular Tranche, the amount which is:

(i) the aggregate of the Commitments of each Facility B Lender in that Tranche

divided by

(ii) the total number of Fronting Banks in that Tranche

**FX Hedging Provider** means any Lender which enters into a FX Hedging Provider Hedging Agreement with a Borrower

**FX Hedging Provider Hedging Agreement** means any document evidencing a FX Hedging Provider Hedging Transaction

**FX Hedging Provider Hedging Transactions** has the meaning given to it in clause 2.4 (*Hedging/Clearing*)

**German Security Transfer Agreement** means:

(a)    the German law security transfer agreement entered into by ABGG in favour of the Security Agent; and

(b)    the German law security transfer agreement entered into by OBTG in favour of the Security Agent

**Governmental Authority** means the government of any nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank)

**Gross Assets** means, in respect of an entity, all assets identified as such in that entity's accounts

**Group** means the Parent, the Company and each of their respective Subsidiaries from time to time

**Group Structure Chart** means the group structure chart in the agreed form

**Guarantor** means an Original Guarantor or an Additional Guarantor, unless in each case it has ceased to be a Guarantor in accordance with clause 29 (*Changes to the Obligors*)

**Hedging Agreement** means a Hedging Provider Hedging Agreement, a Clearing Provider Hedging Agreement and a FX Hedging Provider Hedging Agreement

**Hedging Policy** means the hedging policy delivered to the Facility Agent within 10 Business Days after the Effective Date as may be amended from time to time with the prior written approval of the Facility Agent (acting on the instructions of the Majority Lenders)

**Hedging Provider** means:

(a)     ABN AMRO Bank N.V.;

(b)     Mercuria Energy Trading S.A.; or

(c)     any other hedging provider which is an Affiliate of a Facility B Lender and which is approved in writing by the Facility Agent and which enters into a Multi-Party TPA Agreement with the Company

**Hedging Provider Hedging Agreement** means any document evidencing a Hedging Provider Hedging Transaction

**Hedging Provider Hedging Transactions** has the meaning given to it in clause 2.4 (*Clearing*)

**Hess Litigation** means the causes of action brought by Aegean Bunkering (USA) LLC and the Parent, as plaintiffs, against Hess Corporation, as defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014

**Holding Company** means, in relation to a person, any other person in respect of which it is a Subsidiary

**Immaterial Subsidiary** means any Subsidiary that has neither (a) assets of fair market value exceeding $250,000 nor (b) net income before taxes exceeding $250,000 on an annualized basis

**Impaired Agent** means the Facility Agent at any time when:

(a)     it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under the Finance Documents by the due date for payment;

(b)     the Facility Agent otherwise rescinds or repudiates a Finance Document; or

(c)     an Insolvency Event has occurred and is continuing with respect to the Facility Agent;

unless, in the case of paragraph (a) above:

(i)     its failure to pay is caused by:

(A)     administrative or technical error; or

(B)     a Disruption Event,

and payment is made within five (5) Business Days of its due date; or

(ii)     the Facility Agent is disputing in good faith whether it is contractually obliged to make the payment in question

**Insolvency Event** in relation to the Facility Agent means that the Facility Agent:

(a)     is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)     becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)     makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)     institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)     has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

        (i)     results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

        (ii)    is not dismissed, discharged, stayed or restrained in each case within thirty (30) days of the institution or presentation thereof;

(f)     has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g)     has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h)     seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in paragraph (d) above);

(i)     has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty (30) days thereafter;

(j)     causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (i) above; or

(k)     takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts

**Interim DIP Order** means the interim order entered by the Bankruptcy Court (as the same may be amended, waived, supplemented, or modified from time to time after entry thereof, solely in the case of any amendment, waiver, supplement or modification that is not adverse to the rights or duties of the Finance Parties, with the consent of the Facility Agent and the Majority Lenders in their sole discretion) in the form provided to the Facility Agent prior to the Effective Date, with changes to such form as are satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders, in their sole discretion), (i)  authorizing, on an interim basis, the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and (b) use cash collateral during the pendency of the Cases, and (ii) granting certain related relief

**Intercreditor Agreement** means the intercreditor agreement entered into on or about the date of the Amendment and Restatement Agreement between, amongst others, the Facility Agent, the US DIP Administrative Agent and the Company

**Interest Period** means, in relation to a Loan, each period determined in accordance with clause 12 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with clause 11.4 (*Default interest*)

**Interpolated Screen Rate** means, in relation to LIBOR for any Loan, the rate (rounded to the same number of decimal places as the two relevant Screen Rates) which results from interpolating on a linear basis between:

(a)   the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the Interest Period of that Loan; and

(b)   the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the Interest Period of that Loan,

each as of the Specified Time on the Quotation Day for the currency of that Loan.

**Investment** means, as to any person, any acquisition or investment by such person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another person, including any partnership or joint venture interest in such other person, or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another person or assets constituting a business unit, line of business or division of such person excluding in each case current trade and customer accounts receivables for inventory sold and services rendered in the ordinary course of business. For purposes of covenant compliance, the amount of any **Investment** shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received by such person with respect thereto

**Investment Grade Rating** means a long term senior unsecured non-credit enhanced credit rating of BBB- or higher by S&P or Baa3 or higher by Moody's; provided that, in the event that the rating given by (or equivalent to) S&P or Moody's is higher than the rating given by (or equivalent to) Moody's or S&P, as applicable, the determination that such rating is an Investment Grade Rating shall be made based on the higher of the two ratings

**Issuing Bank** means in relation to a particular Tranche of Facility B, the relevant Facility B Tranche 1 Issuing Bank or the Facility B Tranche 2 Issuing Bank.

**Joint Security Period** means the period terminating upon the earlier of the end of the First Security Period and the end of the Second Security Period

**Joint Venture** means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity

**Legal Reservations** means:

(a)   the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors (including the principle that a Moroccan court may not recognize and award court costs for all costs and expenses incurred by the prevailing party in the proceedings in front of that court);

(b)   the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     similar principles, rights and defences to the foregoing under the laws of any Relevant Jurisdiction;

(d)     any restriction or qualification contained in any legal opinion in relation to matters of German or EC law delivered to the Facility Agent pursuant to paragraph 4 (*Legal opinions*) of Schedule 2 (*Conditions precedent to the Effective Date*) of the Amendment and Restatement Agreement;

(e)     the principle that any Finance Document would require to be legalised and accompanied with a sworn translation into French or Arabic to be submitted as evidence in any action or proceeding before a Moroccan court and in order to be enforceable against third parties and when used with Moroccan public bodies and administrations for any purposes; and

(f)     the principle that (i) any amount due under a guarantee agreement or security agreement by a Moroccan incorporated party to a non-Moroccan incorporated party may only be transferred outside Morocco if such payment is in compliance with the applicable Moroccan foreign exchange control regulations or has been expressly approved in advance and in written by the Moroccan Foreign Exchange Office (*Office des Changes marocain*). Any set-off between a Moroccan party and a non-Moroccan party located outside Morocco requires a prior express approval from the Moroccan Foreign Exchange Office (*Office des Changes marocain*), being specified that any amount due by the Moroccan Guarantor under the Moroccan Guarantee may be freely transferable to the Lenders on the ground of article 17 of the law No. 19-94 (Dahir No. 1-95-1 dated January 26, 1995) applicable to free export zonesand (ii) any set-off between a Moroccan party and a counterparty located outside Morocco shall require a prior express approval of the Moroccan Foreign Exchange Office (*Office des Changes marocain*).

**Lender** means:

(a)     any Original Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party as a Lender in accordance with clause 27 (*Changes to the Lenders*),

which in each case has not ceased to be a Lender in accordance with the terms of this Agreement

**Lender Discounting Facility** means any trade receivables purchase facility entered into between a Lender and a Borrower on arm's length terms and for full market value providing for such Lender to discount trade receivables of the relevant Borrower represented by confirmed letters of credit on a non-recourse basis and meeting any requirement for de-recognition under the Accounting Principles

**Lender Superpriority Claim** means pursuant to section 364(c)(1) of the Bankruptcy Code, the entitlement (without the need to file a proof of claim) to a joint and several superpriority claim against the Debtors, with priority over any and all other obligations, liabilities, and indebtedness against the Debtors, now existing or hereafter arising, of any kind whatsoever, including on the Litigation Claims and all proceeds thereof (but subject to the Final DIP Order in the case of Litigation Claims), and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of the Debtors, each Debtor's estate and any successor trustee, estate representative, or any creditor, in any of the Cases or any subsequent cases or proceedings under the Bankruptcy Code

**LIBOR** means, in relation to any Loan:

(a)     the applicable Screen Rate;

(b)     (if no Screen Rate is available for the Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)     if:

(i)     no Screen Rate is available for the currency of that Loan; or

(ii)    no Screen Rate is available for the Interest Period of that Loan and it is not possible to calculate an Interpolated Screen Rate for that Loan,

the Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for the currency of that Loan and a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, LIBOR shall be deemed to be zero

**Litigation Claims** means (i) claims of the Parent or any Subsidiary thereof, against any person and existing at any time, arising out of, in connection with, or relating to the events, circumstances, and conduct described in the 4 June 2018, Form 6-K disclosure of Aegean Marine Petroleum Network, Inc., concerning improper accounting for or recordation of accounts receivable, as well as the right of the Parent of any Subsidiary thereof to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (ii) claims of the Parent or any Subsidiary thereof, against any person and existing at any time, arising out of, in connection with, or relating to the construction and maintenance of the Aegean terminal in Fujairah, as well as the right of grantors to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing, (iii) claims of the Parent or any Subsidiary thereof existing at any time, arising out of, in connection with, or relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melissanidis, claims against auditors related to misappropriation of funds, related conspiracy to defraud investors in Aegean Marine Petroleum Network, Inc., and claims against Quality Solutions related to construction fraud or other fraud, (iv) claims brought by Aegean Marine Petroleum Network Inc. and the Company, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014, (v) claims of the Parent or any Subsidiary thereof, concerning unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof, (vi) claims of the Parent or any Subsidiary thereof, concerning HSFO product loaded from Petrotrin in Trinidad in December 2016; and (v) claims arising under Chapter 5 of the Bankruptcy Code

**Limitation Acts** means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984

**LMA** means the Loan Market Association

**Loan** means a loan made or to be made under Facility A or the principal amount outstanding for the time being of that loan

**Majority Lenders** means a Lender or Lenders whose Commitment aggregate more than 66 ⅔ per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 66 ⅔ per cent. of the Commitments immediately prior to that reduction

**Margin** means:

(a)     in relation to Facility A, the Facility A Margin; and

(b)     in relation to Facility B, the Facility B Margin

**Material Adverse Effect** means in the opinion of the Majority Lenders a material adverse effect on:

(a)     the business (including the production and export capacity), operations, property, condition (financial, legal or otherwise) or prospects of any Obligor or the Group taken as a whole; or

(b)     the ability of an Obligor to perform its obligations under the Finance Documents; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents,

(in each case other than as a direct result of the filing of the cases, the events leading up to, and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting directly from such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect), and provided, further, that nothing disclosed in (1) any filings or written reports by the Debtors made publicly available through the Petition Date or disclosed to the Lenders prior to the Effective Date and/or (2) any written disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Facility Agent on or prior to the Petition Date, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect

**Material Subsidiary** means each member of the Group which is not a Dormant Company

**Maximum Available Amount** means, at any time, the Base Currency Amount which is the lower of:

(a)     the aggregate of the Total Commitments at such time less any amount Outstanding in respect of Facility B Tranche 1; and

(b)     the aggregate of the Borrowing Base Amount at such time

**MEGL Affiliate** means a Subsidiary of Mercuria Energy Group Limited or a Holding Company of Mercuria Energy Group Limited or any other Subsidiary of that Holding Company

**Month** means a period starting on one (1) day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)     if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period. **Monthly** shall be construed accordingly

**Moroccan Pledge** means the master pledge agreement (*convention cadre de gage*) and related pledge instrument entered into by the Company, the Lenders, the Security Agent and Horizon Tangiers Terminal S.A in respect of assets owned by the Company and located in Morocco

**Multi-Party TPA Agreements** means each agreement entered into between the Company, a Hedging Provider or a Clearing Provider and the Security Agent (including any service or similar agreement related thereto between the Company and a Hedging Provider or a Clearing Provider (as the case may be)) complying with the provisions set out in clause 6.39 (*Multi-Party TPA Agreements*)

**New Lender** has the meaning given to that term in clause 27 (*Changes to the Lenders*)

**Non-Acceptable Bank** means a Facility B Lender which:

(a)     is not an Acceptable Bank within the meaning of paragraph (a) of the definition of "Acceptable Bank"; or

(b)     has failed to make (or has notified the Facility Agent that it will not make) a payment to be made by it under clause 6.11 (*Indemnities*) or clause 30.10 (*Lenders' indemnity to the Facility Agent and the Collateral Management Agent*) or 31.14 (*Lenders' indemnity to the Security Agent*)  or any other payment to be made by it under the Finance Documents to or for the account of any other Finance Party in its capacity as Lender by the due date for payment

**Non-Borrowing Base Receivables** mean certain receivables currently recorded in the accounts of the Company with a book value of approximately $200,000,000 and owed to the Company by certain third parties

**Notifiable Debt Purchase Transaction** has the meaning given to that term in paragraph (b) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*)

**Obligor** means a Borrower or a Guarantor and **Obligors** means each of them

**Obligors' Agent** means the Company, appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to clause 2.3 (*Obligors' Agent*)

**OECD** means Organisation for Economic Co-operation and Development

**Orders** means, collectively, the Interim DIP Order, the Final DIP Order, the Cash Management Order, the First Day Orders and any other orders of the Bankruptcy Court authorizing and approving, on either an interim or final basis, the financing contemplated by this Agreement

**Original Borrowers** means each of the Company, APII, ANNV, ABGG and OBTG, each as more particularly described in Part I (*The Original Obligors*) of Schedule 1 (*The Original Parties*)

**Original Financial Statements** means in relation to each Obligor its audited financial statements for its Financial Year ended 31 December 2016

**Original Guarantors** means each of the companies described in Part I (*The Original Obligors*) of Schedule 1 (*The Original Parties*)

**Original Jurisdiction** means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is incorporated as at the date of this Agreement, in relation to any Spanish Pledgor (if any), Spain and in relation to a South African Pledge Counterparty, the jurisdiction under whose laws that party is incorporated

**Outstandings** means the aggregate of the Base Currency Amount of:

(a)     the outstanding Loans;

(b)     the maximum actual and contingent liabilities of the Borrowers in respect of any Overdraft Facilities; and

(c)    the maximum actual or contingent liabilities of the Lenders in respect of any Credit Instruments

**Overdraft Bank** means each Party identified in the recitals to this Agreement as an Overdraft Bank

**Parent** means Aegean Marine Petroleum Network Inc. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MHJ96960

**Parent Affiliate** means each Affiliate of the Parent

**Participating Member State** means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union

**Party** means a party to this Agreement

**Permitted Financial Management Liens** means Security of a financial institution on currency or Cash Equivalent Investments of Aegean Bunkering (USA) LLC deposited in, or credited to, any account of the Borrower subject to Transaction Security, provided that such Security arise out of (i) amounts due to the relevant financial institution, in respect of customary fees and expenses for the routine maintenance and operation of such account, (ii) the face amount of any checks which have been credited to such account, but are subsequently returned unpaid because of uncollected or insufficient funds, or (iii) other returned items or mistakes made in crediting such account, provided, further that such Security is provided for in the related Transaction Security Document or arise by operation of law

**Petition Date** means has the meaning given to such term in the Recitals

**Pre-Approved SBLC Beneficiary** means such person notified or replaced from time to time by five (5) Business Days' notice in writing by the Facility Agent (acting on the instructions of all Facility B Lenders) to the Company) and any other person approved as a beneficiary of a standby letter of credit by all Facility B Lenders under the Tranche to which such standby letter of credit is proposed to be issued.

**Prepetition Obligations** has the meaning given to it in clause 2.2(e)

**Prohibited Person** means a person that is:

(a)    listed on, or owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

(b)    located in, incorporated under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a person located in or organized under the laws of a country or territory that is the target of country-wide or territory-wide Sanctions; or

(c)    otherwise a target of Sanctions (namely a person with whom a US person or other national under the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities)

**Quarter Date** means each of 31 March, 30 June, 30 September and 31 December

**Quasi-Security** has the meaning given to that term in clause 24.12 (*Negative pledge*)

**Quotation Day** means, in relation to any period for which an interest rate is to be determined:

(a)    (if the currency is euro), two TARGET Days before the first day of that period; or

(b)    (if the currency is Dollars), two Business Days before the first day of that period,

unless market practice differs in the Relevant Interbank Market for a currency, in which case the Quotation Day for that currency will be determined by the Facility Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one (1) day, the Quotation Day will be the last of those days)

**Receiver** means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property

**Reference Bank Rate** means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Facility Agent at its request by the Reference Banks as the rate at which the relevant Reference Bank could borrow funds in the London interbank market in the relevant currency and for the relevant period, were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in that currency and for that period

**Reference Banks** means the principal London offices of ABN AMRO Bank N.V. or other banks as may be appointed by the Facility Agent in consultation with the Company

**Related Fund** in relation to a fund (the **first fund**), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund

**Relevant Interbank Market** means in relation to Euro, the European interbank market, and in relation to any other currency, the London interbank market

**Relevant Jurisdiction** means, in relation to an Obligor, any Spanish Pledgor and each South African Pledge Counterparty:

(a)    its Original Jurisdiction;

(b)    any jurisdiction where any asset subject to or intended to be subject to the Transaction Security to be created by it is situated;

(c)    any jurisdiction where it conducts its business; and

(d)    the jurisdiction whose laws govern the perfection of any of the Transaction Security Documents entered into by it

**Repeating Representations** means each of the representations set out in clause 21.2 (*Status*) to clause 21.7 (*Governing law and enforcement*), clause 21.10 (*No default*), paragraph (d) of clause 21.11 (*No misleading information*), clause 21.19 (*Ranking*) to clause 21.21 (*Legal and beneficial ownership*), clause 21.25 (*Centre of main interests and establishments*) and clause 21.27 (*Pari Passu Ranking*)

**Representative** means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian

**Resignation Letter** means a letter substantially in the form set out in Schedule 10 (*Form of Resignation Letter*)

**Responsible Person** means with respect to any Obligor, the chief executive officer, president, chairman, senior vice-president, executive vice-president, vice-president of finance or treasurer or other officer or manager (or similar title) of such Obligor.  Any document delivered under this Agreement that is signed by a Responsible Person of an Obligor shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Obligor and such Responsible Person shall be conclusively presumed to have acted on behalf of such Obligor

**Resolution Authority** means anybody which has authority to exercise any Write-down and Conversion Powers

**Restricted Payment** means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such person's shareholders, partners or members (or the equivalent persons thereof)

**Rollover Loan** means one or more Loans:

(a)     made or to be made on the same day that a maturing Loan is due to be repaid;

(b)     the aggregate amount of which is equal to or less than the amount of the maturing Loan;

(c)     in the same currency as the maturing Loan; and

(d)     made or to be made to the same Borrower for the purpose of refinancing a maturing Loan (as the case may be)

**Sale Order** means an order of the Bankruptcy Court approving and authorizing a sale pursuant to section 363 of the Bankruptcy Code of those assets set forth in the Asset Purchase Agreement

**Sanctions** means the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by any Sanctions Authority (whether or not any Obligor, any other Group member or any Affiliate of any Group member is legally bound to comply with such laws, regulations, embargoes or measures)

**Sanctions Authority** means any of:

(a)     the United States government;

(b)     the United Nations;

(c)     the United Kingdom;

(d)     Switzerland;

(e)     the European Union or its Member States,

and includes any government entity of any of the above, including, without limitation, the Office of Foreign Assets Control of the US Department of Treasury (OFAC), the United States Department of State, Her Majesty's Treasury (HMT) and the Swiss State Secretariat for Economic Affairs (SECO)

**Sanctions List** means:

(a)     the "Specially Designated Nationals and Blocked Persons" list maintained by OFAC;

(b)     the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by HMT; or

(c)     any similar list maintained by, or public announcement of Sanctions designation made by, any other Sanctions Authority

**Screen Rate** means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for

the relevant currency and period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters. If such page or service ceases to be available, the Facility Agent may specify another page or service displaying the relevant rate after consultation with the Company

**SEC** means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions

**Second Account Pledge Agreements** means the pledge agreement to be entered into between the Company and APII as pledgors and the US DIP Administrative Agent as pledgee, pursuant to which the Company and APII pledge, *inter alia*, all amounts standing to the credit of the Collection Accounts and the Facility Accounts in favour of the US DIP Administrative Agent to secure the obligations of the relevant Obligors to the US DIP Creditors under any of the US DIP Finance Documents

**Second Secured Obligations** means all obligations at any time due, owing or incurred by any Obligor or any Spanish Pledgor to the US Secured Parties under the US DIP Finance Documents whether present or future, actual or contingent (and whether incurred solely or jointly and whether as principal or surety or in some other capacity)

**Second Security Period** means the period terminating on the date on which the Second Secured Obligations are unconditionally and irrevocably discharged in full

**Second Security** means the Security created or expressed to be created in favour of the US DIP Administrative Agent pursuant to the Second Security Documents

**Second Security Agreements** means:

(a)     the English law security agreement to be entered into by the Company; and

(b)     the English law security agreement to be entered into by APII;

in each case, and in favour of the US DIP Administrative Agent

**Second Security Documents** means

(a)     the Second Account Pledge Agreements;

(b)     the Second Security Agreements;

together with any other document entered into by any Obligor creating or expressed to create any Security over all or any part of its assets in respect of the Second Secured Obligations

**Secured Obligations** means the First Secured Obligations and the Second Secured Obligations

**Secured Parties** means each Finance Party from time to time party to this Agreement and any Receiver or Delegate

**Security** means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect

**Security Agreements** means:

(a)     the English law security agreement entered into by the Company in favour of the Security Agent in form and substance satisfactory to the Security Agent;

(b)     the English law security agreement entered into by APII in favour of the Security Agent in form and substance satisfactory to the Security Agent;

(c)     the English law security agreement entered into by ANNV in favour of the Security Agent in form and substance satisfactory to the Security Agent;

(d)     the English law security agreement entered into by ABGG in favour of the Security Agent in form and substance satisfactory to the Security Agent; and

(e)     the English law security agreement entered into by OBTG in favour of the Security Agent in form and substance satisfactory to the Security Agent

**Sensitive Zone** means:

(a)     the territorial waters and shores of Kuwait, Saudi Arabia, Bahrain, Qatar, United Arab Emirates, Oman, Iraq, and any other relevant countries as determined by the Facility Agent (either in its sole discretion or as instructed by the Majority Lenders); and

(b)     the international waters of the Persian Gulf.

**Single Purpose Ship Owning Company** means a single purpose ship owning company whose business is solely ownership and operation of ships and who has obtained finance secured on such ships

**Single Purpose Terminal Owning Company** means a single purpose company whose business is solely ownership and operation of terminals and who has obtained finance secured on such terminals

**South African Pledge** means:

(a)     the pledge and cession in security agreement in relation to certain goods located onboard floating storage (having official number 18329 and IMO Number 91737733 and which, as at the date of this Agreement, has vessel name "UMNENGA I"), entered or to be entered into between the Company and the Security Agent, and shall include the letter agreement or side letter entered into in relation thereto between the Security Agent, the Company and the relevant South African Pledge Counterparties;

(b)     any replacement pledge and cession in security agreement for that described in paragraph (a) above in relation to a floating storage vessel which may replace the m.t. "UMNENGA I", entered or to be entered into between the Company and the Security Agent, which shall include the letter agreement or side letter entered into in relation thereto between the Security Agent, the Company and the relevant South African Pledge Counterparties; and

(c)     any pledge and cession in security agreement in relation to other goods located in South Africa entered into between, amongst others, a Borrower and the Security Agent, including any letter agreement or side letter in relation thereto

**South African Pledge Counterparties** means:

(a)     Aegean Tanking S.A., a company incorporated under the laws of the Republic of Liberia, with its registered office at 80 Broad Street, Monrovia, Republic of Liberia, and Aegean Bunkering Marine Services Proprietary Limited, a private company duly incorporated under South African law, with registration number 2013/191834/07, and with registered offices at 26 Waverley Drive, Mill Park, Port Elizabeth 6000, South Africa; and

(b)     any other entity which is party to a South African Pledge (including, in each case, a letter agreement or side letter) other than the Borrower which owns the relevant pledged goods

(and each shall be a **South African Pledge Counterparty**)

**Spanish Capital Companies Law** means *Real Decreto Legislativo 1/2010, de 2 de Julio, por el que se aprueba el texto refundido de la Ley de Sociedades de Capital*, as amended from time to time

**Spanish Civil Code** means the Spanish *Código Civil*, as amended from time to time

**Spanish Civil Procedural Law** means *Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil*, as amended from time to time

**Spanish Commercial Code** means the Spanish *Código de Comercio*, as amended from time to time

**Spanish Irrevocable Power of Attorney** means any irrevocable power of attorney which is granted by a Spanish Pledgor in favour of the Security Agent and/or the US DIP Administrative Agent as a consequence of and in relation to any Spanish Pledge.

**Spanish Obligor** means an Obligor incorporated under the laws of the Kingdom of Spain.

**Spanish Pledges** means any non-possessory pledge agreement which the Facility Agent (acting on the instructions of the Majority Lenders) may from time to time agree is to be entered into between a Spanish Pledgor and the Security Agent, the US DIP Administrative Agent and certain other Finance Parties or US DIP Finance Parties by virtue of which that Spanish Pledgor grants an in rem right of security over oil-derived products inventory or other assets and shall include any deed of amendment, extension and/or ratification thereof

**Spanish Pledgor** means any person which enters into a Spanish Pledge under or in connection with this Agreement

**Spanish Public Document** means any Spanish *documento público*, being either any *escritura pública* granted or any *póliza* intervened by a Spanish notary public.

**Specified Time** means a time determined in accordance with Schedule 7 (*Timetables*)

**Stock Monitoring Agreement** means a stock monitoring agreement in respect of floating storage to be entered into between the Security Agent, the relevant Borrower and the Stock Monitoring Inspector in form and substance satisfactory to the Facility Agent acting on the instructions of all Lenders

**Stock Monitoring Inspector** means a stock surveillance or inspection company approved in writing by the Facility Agent acting on the instructions of all Lenders

**Subsidiary** means any person (referred to as the **first person**) in respect of which another person (referred to as the **second person**):

(a)   holds a majority of the voting rights in that first person or has the right under the constitution of the first person to direct the overall policy of the first person or alter the terms of its constitution; or

(b)   is a member of that first person and has the right to appoint or remove a majority of its board of directors or equivalent administration, management or supervisory body; or

(c)   has the right to exercise a dominant influence (which must include the right to give directions with respect to operating and financial policies of the first person which its directors are obliged to comply with whether or not for its benefit) over the first person by virtue of provisions contained in the articles (or equivalent) of the first person or by virtue of a control contract which is in writing and is authorised by the articles (or equivalent) of the first person and is permitted by the law under which such first person is established; or

(d)     is a member of that first person and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the first person or the rights under its constitution to direct the overall policy of the first person or alter the terms of its constitution; or

(e)     has the power to exercise, or actually exercises dominant influence or control over the first person; or

(f)     together with the first person are managed on a unified basis,

and, for the purposes of this definition, a person shall be treated as a member of another person if any of that person's Subsidiaries is a member of that other person or if any shares in that other person are held by a person acting on behalf of it or any of its Subsidiaries

**TARGET2** means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007

**TARGET Day** means any day on which TARGET2 is open for the settlement of payments in euro

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same)

**Term** means each period determined under this Agreement for which a relevant Facility B Lender is under a liability under a Fronted Facility

**Termination Date** means the earliest of:

(a)     [_____] , 2019 (or if not a Business Day, the first subsequent Business Day); provided that if between [____] , 2019 and [____] , 2019 Borrower requests that the Termination Date be extended, then if on [_____] , 2019:

        (i)      no Event of Default is continuing; and

        (ii)     there remain undrawn "Term Commitments" as defined in the US DIP Credit Facility Agreement in an amount of at least $5,000,000,

        the Termination Date shall be extended to [      ], 2019;

(b)     the effective date of any plan of reorganization or plan of liquidation in the Cases;

(c)     the date of the consummation of a sale of all or substantially all of the Debtors' assets or capital stock under section 363 of the Bankruptcy Code;

(d)     the date on which any Financial Indebtedness, or any commitment for any Financial Indebtedness, of any member of the Group under the US DIP Credit Facility Agreement is:

        (i)      declared to be or otherwise becomes due and payable prior to its specified maturity; or

        (ii)     cancelled or suspended by a creditor of any member of the Group,

        as a result of an event of default (however described).

**Total Commitment** means the aggregate of the Facility A Total Commitments and the Facility B Total Commitments

**Tranches** means each of Facility A Tranche 1, Facility A Tranche 2, Facility B Tranche 1 and Facility B Tranche 2

**Transaction Security** means:

(a)     the First Security; and

(b)     the Second Security

**Transaction Security Documents** means each of:

(a)     the First Security Documents; and

(b)     the Second Security Documents

**Transfer Certificate** means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Facility Agent and the Company

**Transfer Date** means, in relation to an assignment or a transfer, the later of:

(a)     the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)     the date on which the Facility Agent executes the relevant Assignment Agreement or Transfer Certificate

**Treasury Transactions** means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price

**UAE Pledges** means:

(a)     the pledge over moveables located at the Fujairah Freezone, Emirate of Fujairah, UAE entered or to be entered into between the Company, AOTC (as bailee) and the Security Agent (the **Company UAE Pledge**);

(b)     the pledge over moveables located at the Fujairah Freezone, Emirate of Fujairah, UAE entered or to be entered into between APII, AOTC (as bailee) and the Security Agent (the **APII UAE Pledge**);

(c)     any bailee agreement and/or addendum issued pursuant to or in connection with the Company UAE Pledge; and

(d)     any bailee agreement and/or addendum issued pursuant to or in connection with the APII UAE Pledge

**Unpaid Sum** means any sum due and payable but unpaid by an Obligor under the Finance Documents

**US DIP Administrative Agent** ABN AMRO Capital USA LLC as administrative agent and collateral agent under the US DIP Credit Facility Agreement

**US DIP Credit Facility Agreement** means the superpriority secured debtor-in-possession credit agreement dated on or about the date of the Amendment and Restatement Agreement and made between (among others) Aegean Bunkering (USA) LLC as borrower and the US DIP Administrative Agent

**US DIP Credit Facilities** means the superpriority secured debtor-in-possession credit facilities provided pursuant to the US DIP Credit Facility Agreement

**US DIP Finance Documents** has the meaning given to the term "Loan Documents" in the US DIP Credit Facility Agreement

**US Prepetition Credit Facility** means the Second Amended and Restated Uncommitted Credit Agreement, dated August 3, 2017, among Aegean Bunkering (USA) LLC, the lenders party thereto, certain other parties and ABN AMRO Capital USA LLC, as administrative agent

**US Secured Parties** has the meaning given to the term "Secured Party" in the US DIP Credit Facility

**US Security Agreement** means the security agreement, dated on or about the date hereof, executed and delivered by certain of the Guarantors to the Security Agent, as amended, modified or supplemented from time to time

**US Tax Obligor** means:

(a)     an Obligor which is resident for tax purposes in the United States of America; or

(b)     an Obligor some or all of whose payments under the Finance Documents are from sources within the United States for US federal income tax purposes

**Utilisation** means a utilisation of a Facility (by way of a Loan or Fronted Facility)

**Utilisation Date** means the date on which a Utilisation is, or is to be, made

**Utilisation Request** means a notice substantially in the relevant form set out in Schedule 3 (*Utilisation Request*)

**VAT** means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

**Write-down and Conversion Powers** means:

(a)      in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule.; and

(b)     in relation to any other applicable Bail-In Legislation:

(i)     any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(ii)     any similar or analogous powers under that Bail-In Legislation

1.2     **Construction**

(a)     Unless a contrary indication appears, a reference in this Agreement to:

(i) the **Facility Agent**, the **Collateral Management Agent**, any **Finance Party**, any **Issuing Bank**, any **Lender**, any **Obligor**, the **Hedging Provider**, any **Overdraft Bank**, any **Party**, any **Secured Party**, the **Security Agent** or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii) a document in **agreed form** is a document which is previously agreed in writing by or on behalf of the Company and the Facility Agent or, if not so agreed, is in the form specified by the Facility Agent;

(iii) **assets** includes present and future properties, revenues and rights of every description;

(iv) a **Finance Document** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(v) a **group of Lenders** includes all the Lenders;

(vi) **guarantee** means (other than in clause 20 (*Guarantee and Indemnity*)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vii) **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii) a **person** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(ix) a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(x) **including** means including without limitation;

(xi) a provision of law is a reference to that provision as amended or re-enacted;

(xii) a time of day is a reference to Central European Time;

(xiii) the Interest Period of a Credit Instrument will be construed as a reference to the Term of that Credit Instrument;

(xiv) an amount borrowed includes any amount utilised by way of a Fronted Facility;

(xv) a Utilisation made or to be made to a Borrower includes a Fronted Facility entered into or issued on its behalf;

(xvi) a Lender funding its participation in a Utilisation includes a Lender issuing or entering into or participating in a Fronted Facility;

(xvii) amounts outstanding under this Agreement include amounts outstanding under or in respect of a Fronted Facility;

(xviii) an outstanding amount of a Fronted Facility at any time is the maximum amount that is or may be payable by a Borrower in respect of that Fronted Facility at that time;

(xix) a Borrower repaying or prepaying a Credit Instrument means:

(A) that Borrower providing cash cover for that Credit Instrument;

(B) the maximum amount payable under the Credit Instrument being reduced in accordance with its terms; or

(C) the Issuing Bank which issued the Credit Instrument being satisfied that it has no further liability under that Credit Instrument,

and the amount by which a Credit Instrument is repaid or prepaid under sub-clauses (A) and (B) above is the amount of the relevant cash cover or reduction; and

(xx) a Borrower providing cash cover for a Credit Instrument means that Borrower paying an amount equal to the maximum actual and contingent liabilities of the relevant Lender under such Credit Instruments in the currency of the Credit Instrument to an interest-bearing account in the name of that Borrower and the following conditions are met:

(A) the account is with the relevant Issuing Bank which issued the Credit Instrument;

(B) cash cover in the form of deposits shall not bear interest other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Issuing Bank and at the Borrowers' risk and expense;

(C) withdrawals from the account may only be made to pay a Finance Party amounts due and payable to it under this Agreement in respect of that Credit Instrument until no amount is or may be outstanding under that Credit Instrument; and

(D) the Borrower has executed a security document, in form and substance satisfactory to the Facility Agent and the Issuing Bank with which that account is held, creating a first ranking security interest over that account; and

(xxi) a Lender's participation in relation to a Fronted Facility shall be construed as a reference to the relevant amount that is or may be payable by a Lender in relation to that Fronted Facility.

(b) In determining the amount of the Available Facility for the purposes of this Agreement the Commitment of a Lender will be calculated ignoring any cash cover provided for outstanding Credit Instruments.

(c) Section, clause and Schedule headings are for ease of reference only.

(d) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(e)    A Default (other than an Event of Default) is **continuing** if it has not been remedied or waived and an Event of Default is **continuing** if it has not been waived.

(f)    A Borrower's obligation on Utilisations becoming **due and payable** includes the Borrower repaying any Credit Instrument in accordance with paragraph (a)(xix) above.

## 1.3    Belgian terms

where it relates to a Belgian Obligor, a reference to :

(a)    "**gross negligence**" is a reference to *zware fout/faute lourde* and "**wilful misconduct**" is a reference to *opzet/dol*;

(b)    a "**liquidator**", "**compulsory manager**", "**receiver**", "**administrative receiver**", "**administrator**" or similar officer includes any *insolventiefunctionaris/praticien de l'insolvabilité, curator/curateur, vereffenaar/liquidateur, gedelegeerd rechter/juge délégué, ondernemingsbemiddelaar/médiateur d'entreprise, gerechtsmandataris/ mandataire de justice, voorlopig bewindvoerder/administrateur provisoire, gerechtelijk bewindvoerder/administrateur judiciaire, mandataris ad hoc/mandataire ad hoc* and any *sekwester/séquestre*;

(c)    a "**suspension of payments**", "**moratorium of any indebtedness**", or "**reorganisation**" includes any *gerechtelijke reorganisatie/réorganisation judiciaire*;

(d)    an "**insolvency**" includes any *insolventieprocedure/procedure d'insolvabilité, gerechtelijke reorganisatie/réorganisation judiciaire, faillissement/faillite* and any other concurrence between creditors (*samenloop van schuldeisers/concours des créanciers*);

(e)    a "**security interest**" includes a mortgage (*hypotheek/hypothèque*), a pledge (*pand/gage*), a transfer by way of security (*overdracht ten titel van zekerheid/transfert à titre de garantie*), any other proprietary security interest (*zakelijke zekerheid/sûreté réelle*), a mandate to grant a mortgage, a pledge or any other real surety, a privilege (*voorrecht/privilège*) and a retention of title (*eigendomsvoorbehoud/réserve de propriété*);

(f)    an Obligor being "**incorporated**" in Belgium or of which its "**jurisdiction of incorporation**" is Belgium, means that that Obligor has its principal place of business (*voornaamste vestiging/établissement principal*) within the meaning of the Belgian Act of 16 July 2004 on the conflicts of law code) in Belgium;

(g)    a person being "**unable to pay its debts**" is that person being in a state of cessation of payments (*staking van betaling/cessation de paiements*);

(h)    a "**composition**" includes any *minnelijk akkoord met schuldeisers/accord amiable avec des créanciers* or any *gerechtelijke reorganisatie/réorganisation judiciaire*;

(i)    "**winding-up**", "**administration**" or "**dissolution**" includes any *vereffening/liquidation, ontbinding/dissolution, sluiting van een onderneming/fermeture d'entreprise* and *faillissement/faillite*;

(j)    "**attachment**", "**sequestration**", "**distress**", "**execution**" or analogous procedures includes any *uitvoerend beslag/saisie exécution* and *bewarend beslag/saisie conservatoire*;

(k)     an "**amalgamation**", "**demerger**", "**merger**" or "**corporate reconstruction**" includes an *overdracht van algemeenheid/transfert d'universalité*, an *overdracht van bedrijfstak/transfert de branche d'activité*, a *splitsing/scission* and a *fusie/fusion* as well as assimilated transactions (*gelijkgestelde verrichtingen/operations assimilées*) in accordance with Articles 676 and 677 of the Belgian Companies Code; and

(l)     a "**group for VAT purposes**" refers to a *BTW-eenheid/unité TVA* and a reference to the "**representative member**" of such group has the same meaning as the term *vertegenwoordiger/représentant* in the Belgian Royal Decree No. 55 of 9 March 2007.

## 1.4     Currency symbols and definitions

(a)     **$**, **USD** and **dollars** denote the lawful currency of the United States of America;

(b)     **€**, **EUR**, **EURO** and **euro** denote the single currency of the Participating Member States.

## 1.5     Third party rights

(a)     Other than the US DIP Administrative Agent and otherwise unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or enjoy the benefit of any term of this Agreement.

(b)     Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

## 1.6     Joint and Several Liability

All obligations of the Borrowers under this Agreement shall be assumed jointly and severally. Any payment obligations of ABGG and OBTG that are not repayment obligations with respect to any Utilisations that such Borrower has made itself shall be limited by the restrictions set out in clause 20.10 (*Guarantee Limitations - Germany*) applied *mutatis mutandis.*

## 1.7     Release from restrictions

Any person authorizing any other person or granting to any other person a power of attorney, releases such other person from any restrictions of double representation or self-dealing under any applicable law, including, but not limited to, such restrictions pursuant to Section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*).

## 1.8     Agreed Security Principles

Any provision contemplating or requiring the creation and/or perfection of any Security and anything related to the terms of any document relating to or governing the terms and conditions of such Security shall be subject to the Agreed Security Principles.

**Section 2**
**The Facility**

## 2 The Facilities

### 2.1 The Facilities

Subject to the terms of this Agreement and in the Interim DIP Order or the Final DIP Order, the Lenders make available to the Borrowers a secured multicurrency borrowing base facility comprising:

(a) Facility A in an aggregate amount equal to:

    (i) the Facility A Tranche 1 Total Commitments; and

    (ii) the Facility A Tranche 2 Total Commitments.

(b) Facility B in an aggregate amount equal to:

    (i) the Facility B Tranche 1 Total Commitments; and

    (ii) the Facility B Tranche 2 Total Commitments.

### 2.2 Finance Parties' rights and obligations

(a) The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b) The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c) A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

(d)

    (i) Notwithstanding any other provision of this Agreement, the issue or making available of Fronted Facilities shall be entirely in the discretion of the Issuing Bank or Overdraft Bank (as the case may be) and the Borrowers acknowledge that no Issuing Bank or Overdraft Bank shall have any obligation or commitment to make Fronted Facilities available to the Borrowers and the making of a Utilisation pursuant to Facility B shall not be deemed to be a commitment to make any other Utilisation under Facility B available by way of a Fronted Facility.

    (ii) An Issuing Bank and an Overdraft Bank shall be entitled to decline a particular Utilisation Request under Facility B on a case-by-case basis without prejudicing its ability to agree to subsequent Facility B Utilisation Requests.

(e) The obligations of the Borrowers under the Finance Documents, subject to the Carve-Out and the Orders:

    (i) include paying or procuring the payment of the Lender Superpriority Claims, and the Lender Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition assets of the Debtors, including, but not limited to, the

Debtors' Collateral provided that any claims pursuant hereto shall be distributed in accordance with clause 34.6;

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code, are secured by a perfected first-priority lien on substantially all now owned or hereafter acquired assets and property of the Debtors, including, for the avoidance of doubt, (1) all equity interests of Subsidiaries of the Parent and (2) all collateral previously pledged to secure the obligations owed to the Finance Parties under this Agreement prior to the Petition Date and obligations under the US Prepetition Credit Facility (**Prepetition Obligations**);

(iii)   pursuant to section 364(c)(3) of the Bankruptcy Code, are secured by a perfected lien on all assets of the Debtors to the extent that such assets are subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the Prepetition Obligations and obligations under the US Prepetition Credit Facility, which liens shall be primed by the liens securing the Obligations); and

(iv)    pursuant to section 364(d) of the Bankruptcy Code, are secured by a perfected first priority, senior priming lien on all assets of the Debtors (other than any Security in favour of the US Secured Parties in respect of the US DIP Finance Documents) including all capital stock of Subsidiaries of the Debtors and, to the extent that such assets are subject to valid, perfected and non- avoidable liens in favor of third parties as of the commencement of the Cases, including all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors that secure the Prepetition Obligations.

(f)    The priorities set forth in clause 2.2(e) are subject, in each case, only to the Carve-Out. All of the Security and security interests described therein shall be effective and perfected under US law as of the date that the Bankruptcy Court enters the Interim DIP Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. The Debtors shall, at the Debtors' expense, execute and deliver to the Facility Agent (for recordation or filing, as appropriate) Security Documents, and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Facility Agent) to evidence and secure the obligations under this Agreement in each case as contemplated herein.

(g)    The obligations of the Debtors to the Finance Parties under this Agreement are to be further secured by perfected Security in the Debtor's Collateral, including without limitation the Litigation Claims (subject to the Final DIP Order), such Security ranking first in priority subject only to Security permitted in accordance with the Finance Documents.

## 2.3    Obligors' Agent

(a)    Each Obligor (other than the Company) by its execution of this Agreement irrevocably appoints the Company (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

(i)    the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of the Borrowers, Utilisation Requests and any notices, certificates or confirmations under any Finance Document), to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor, without further reference to or the consent of that Obligor; and

(ii)     each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)     Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document on behalf of another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it. In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

(c)     The powers of the Company (as Obligors' Agent) under this clause 2.3 (Obligors' Agent) shall be no greater than as set out in this clause 2.3 (Obligors' Agent) and shall remain valid for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

2.4     **Hedging/Clearing**

(a)     The Company may enter into commodity hedging transactions which have not been cleared (the **Hedging Provider Hedging Transactions**) with the Hedging Providers for the purpose of hedging the Company's ongoing exposure to commodity prices.  Such Hedging Provider Hedging Transactions will be transacted under the 2002 Master Agreement as published by the International Swaps and Derivatives Association Inc. (**Master Agreement**).

(b)     The Company may enter into cleared commodity hedging transactions (the **Clearing Provider Hedging Transactions**) with the Clearing Providers.  Such Clearing Provider Hedging Transactions will be transacted pursuant to the Clearing Provider's customary terms of business.

(c)     Each Borrower may enter into spot and forward foreign exchange hedging transactions (the **FX Hedging Provider Hedging Transactions**) with the FX Hedging Providers for the purpose of hedging the Borrowers' ongoing exposure to foreign exchange risk provided that:

(i)     any such hedging shall be directly linked to the acquisition of assets comprised in the Borrowing Base;

(ii)     the Borrowers' exposure under each hedging transaction shall have a maximum tenor of 45 days; and

(iii)     such FX Hedging Provider Hedging Transactions will be transacted under a Master Agreement.

(d)     The Company may enter into Multi-Party TPA Agreements which comply with the terms of this Agreement.

(e)     No Borrower shall enter into any commodity hedging or clearing transactions or foreign exchange hedging transactions or documents related to any of the same other than as permitted by this clause 2.4.

(f)     The Borrowers shall procure that all Hedging Agreements are entered into in compliance with the Hedging Policy.

# 3 Purpose

## 3.1 Purpose

(a) Each Borrower shall apply all amounts borrowed by it under the Facilities in a manner consistent with the terms of the Budget (provided that any net underspend may be carried forward) or as otherwise agreed in advance in writing by the Facility Agent (acting on the instructions of the Majority Lenders) from time to time towards:

    (i) financing any and all working capital needs and for any other general corporate purposes, including without limitation, to finance the Debtors' purchase, transportation, storage, hedging and sale of Eligible Inventory and accounts receivable;

    (ii) provision for letters of credit;

    (iii) payment of related transaction costs, fees, premiums, liabilities and expenses and administration costs incurred in connection with the Cases and the commitment, negotiation, syndication, documentation, execution and closing of the Amendment and Restatement Agreement and the US DIP Credit Facility Agreement;

    (iv) payment of any other fees, costs and expenses payable hereunder; and

    (v) in addition in relation to Facility B only, financing payments to FX Hedging Providers in respect of its obligations under a Master Agreement in respect of an FX Hedging Provider Hedging Transaction.

(b) The Credit Instruments shall be used for general corporate purposes.

## 3.2 Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## 3.3 The Borrowing Base

Schedule 11 (*Borrowing Base Amount*) sets out the Parties' understanding of the operation of the Borrowing Base.

# 4 Conditions of Utilisation

## 4.1 Initial conditions precedent

(a) No Borrower may deliver a Utilisation Request unless the Facility Agent has received all of the documents and other evidence listed in Part I of Schedule 2 (*Conditions precedent*) in form and substance satisfactory to the Facility Agent. The Facility Agent shall notify the Company and the Lenders promptly upon being so satisfied.

(b) Other than to the extent that the Majority Lenders notify the Facility Agent in writing to the contrary before the Facility Agent gives the notification described in paragraph (a) above, the Lenders authorise (but do not require) the Facility Agent to give that notification. The Facility Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

## 4.2 Further conditions precedent

(a) Subject to clause 4.1 *(Initial conditions precedent)* and notwithstanding that the Issuing Bank and Overdraft Bank shall at all times have full discretion whether to issue or enter into any Fronted Facility, the Lenders will only be obliged to comply with clause 5.5

(*Lenders' participation in Loans*) or issue or enter into a Fronted Facility if on the date of the Utilisation Request and on the proposed Utilisation Date:

(i) in the case of a Rollover Loan, no Event of Default is continuing or would result from the proposed loan and, in the case of any other Loan, no Default is continuing or would result from the proposed Utilisation;

(ii) the Company has not issued a notice pursuant to clause 22.4(c) (*Notification of default and of expectation not to meet Budget*) after the date of its last Compliance Certificate (or if no Compliance Certificate has yet been provided), the date of this Agreement;

(iii) the Repeating Representations to be made by each Obligor are true;

(iv) a Borrowing Base Report and a Cross-Check Borrowing Base Report have been provided on the most recent reporting dates in accordance with clauses 22.7 (*Borrowing Base Report*);

(v) no Obligor or their respective Subsidiaries, or any person claiming by or through the Obligors or their respective Subsidiaries, shall have obtained court authorization to commence, or shall have commenced, joined in, assisted or otherwise participated as an adverse party in any suit or other proceeding against any Finance Party in any Case or case relating to the Finance Documents seeking to subordinate or challenging the validity, enforceability, priority or perfection of Security securing the Secured Obligations;

(vi) if a Borrowing Base Report was to be delivered on such date based on the Borrowing Base as at that date, such Borrowing Base Report would be a Compliant Borrowing Base Report; and

(vii) the Majority Lenders have given their consent to the proposed Fronted Facility.

(b) The Lenders will only be obliged to comply with 34.10 (*Change of currency*) if, on the first day of an Interest Period, no Default is continuing or would result from the change of currency and the Repeating Representations to be made by each Obligor are true.

### 4.3 Further conditions precedent for Sensitive Zones

Without prejudice to clauses 4.1 (*Initial conditions precedent*) and 4.2 (*Further conditions precedent*) no Borrower may submit a Utilisation Request which relates to payments being made into, or investment or activity connected with, Sensitive Zones (including, without limitation, issuing Credit Instruments to entities established in or for the purposes of transactions in, or in connection with activities in, Sensitive Zones) unless the Facility Agent has received all of the documents and other evidence listed in Part III of Schedule 2 (*Conditions precedent*) in form and substance satisfactory to the Facility Agent.

### 4.4 Further conditions precedent in relation to ABGG and OBTG

Without prejudice to clauses 4.1 (*Initial conditions precedent*) and 4.2 (*Further conditions precedent*) ABGG and OBTG may not submit a Utilisation Request unless the Facility Agent and the Lenders have confirmed in writing that they have received evidence satisfactory to each such Party (including any legal opinions or other professional opinions) that there would be no tortious liability (for the avoidance of doubt, including liability arising under or in connection with creditor impairment (*Gläubigergefährdung*)) associated with lending to such Borrower or any other cost, loss or liability attributable to any breach of law or regulation.

### 4.5 Further conditions precedent for issue of Credit Instruments in respect of third parties

Without prejudice to clauses 4.1 (*Initial conditions precedent)* and 4.2 (*Further conditions precedent*) no Borrower may submit a Utilisation Request for a Credit Instrument to be issued at the request of a third party unless both it and the third party have executed and delivered to the relevant Issuing Bank (with a copy to the Facility Agent) a Deed of Undertaking in respect of that Credit Instrument together with:

(a) such corporate and signing authorities; and

(b) such documentation and other evidence in order for the applicable Issuing Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws,

as the Issuing Bank and/or the Facility Agent may reasonably request in connection therewith.

### 4.6 Maximum number of Utilisations

A Borrower (or the Company on its behalf) may not deliver a Utilisation Request if as a result of the proposed Utilisation the aggregate number of outstanding Loans would exceed ten (10).

### 4.7 Maximum Available Amount

A Borrower (or the Company on its behalf) may not deliver a Utilisation Request if as a result of the proposed Utilisation, the Outstandings (including any Outstandings which are to be incurred between the date of delivery of the relevant Utilisation Request and the proposed Utilisation Date) would exceed the Maximum Available Amount at such time.

### 4.8 Fronting Bank Limit

Each Issuing Bank and the Company shall ensure that the aggregate amount of Fronted Facilities will not at any time exceed:

(a) $100,000,000; and

(b) in respect of which each Fronting Bank is the Issuing Bank, such Fronting Bank's Fronting Bank Limit.

## 5 Utilisation

### 5.1 Delivery of a Utilisation Request and first Utilisations

A Borrower may utilise a Facility by delivery from the Obligors' Agent on behalf of that Borrower:

(a) to the Facility Agent (with a copy to the Collateral Management Agent and each Issuing Bank) (in respect of any Loan under the Facilities); and

(b) to the Facility Agent for and on behalf of each Issuing Bank with a copy to the Collateral Management Agent (in respect of a Fronted Facility),

of a duly completed Utilisation Request not later than the Specified Time.

### 5.2 Completion of a Utilisation Request for Loans

(a) Each Utilisation Request for a Loan under each of Facility A is irrevocable and will not be regarded as having been duly completed unless:

(i) it identifies the Tranche of Facility A to be utilised;

(ii) it identifies the relevant Borrower in respect of whom the Utilisation request is being made;

(iii) the proposed Utilisation Date is a Business Day within the Availability Period applicable to the relevant Tranche of Facility A;

(iv) the currency and amount of the Utilisation comply with clause 5.4 (*Currency and amount*); and

(v) the proposed Interest Period complies with clause 12 (*Interest Periods*).

(b) Only one Loan may be requested in each Utilisation Request.

### 5.3 Completion of a Utilisation Request for Credit Instruments

Without prejudice to clauses 2.2(d)(i), 5.8(c) and 5.9, each Utilisation Request for a Credit Instrument is irrevocable and will not be regarded as having been duly completed unless:

(a) it specifies the proposed Fronted Facility and the applicable Tranche;

(b) it identifies the relevant Borrower;

(c) it identifies the proposed Issuing Bank which has agreed to enter into or issue the Fronted Facility;

(d) the proposed Utilisation date is a Business Day within the Availability Period applicable to the relevant Tranche of Facility B;

(e) the currency and amount of the Fronted Facility comply with clause 5.4 (*Currency and amount*);

(f) (unless otherwise agreed by the Facility Agent and the Facility B Lenders) the Expiry Date of the Fronted Facility falls on or before the Termination Date;

(g) the maximum contingent liability of the relevant Facility B Lender in respect of the Fronted Facility is determinable at the time of issue or entry into of the Fronted Facility;

(h) the Term is specified and does not exceed the earlier of (i) ninety (90) days (unless otherwise agreed by the Majority Lenders and the relevant Issuing Bank); and (ii) the date that is five Business Days prior to the Termination Date; provided that at least five (5) Business Days prior to the Termination Date, all Credit Instruments that expire after the Termination Date shall be cash collateralized by the relevant Borrower in an amount equal to 103% of the aggregate then undrawn and unexpired amount of each such Credit Instrument;

(i) the maximum actual or contingent liability of the relevant Issuing Bank would (after issuing such Credit Instrument) exceed $150,000,000.

(j) unless otherwise agreed by the Facility Agent and the relevant Issuing Bank, the form of the Credit Instrument is attached and is in full compliance with this Agreement;

(k) the delivery instructions for the Credit Instrument are specified; and

(l) it identifies where the request is to issue a Credit Instrument at the request of a third party;

(m) the identity of the beneficiary is:

(i) in the case of a Credit Instrument other than a standby letter of credit to which paragraph (B) below applies, approved by the Issuing Bank; and

(ii) (unless approved all Facility B Lenders) in the case of a standby letter of credit in an amount exceeding $5,000,000, a Pre-Approved SBLC Beneficiary (unless such standby letter of credit is payable against a full set of original bills of lading); and

(n) where the Credit Instrument permits payment upon delivery of, amongst other things, a letter of indemnity, the issuer of a letter of indemnity is an Eligible LOI Counterparty or such letter of indemnity is countersigned by an Acceptable Bank which has agreed to accept liability thereunder.

5.4    **Currency and amount**

(a) The currency specified in a Utilisation Request must be the Base Currency or euro.

(b) The amount of the proposed Loan must be:

(i) if the currency selected is the Base Currency, a minimum of $1,000,000 and otherwise in multiples of $500,000 or, if less, the Available Facility;

(ii) if the currency selected is euro, a minimum of €1,000,000 and otherwise in multiples of €500,000 or, if less, the Available Facility; and

(iii) in any event such that its Base Currency Amount is less than or equal to the Available Facility.

(c) The amount of a proposed Fronted Facility must be, when aggregated with all other outstanding Fronted Facilities under the relevant Tranche, less than or equal to the Available Facility under that Tranche, and must not require any Lender to exceed, or result in any Lender exceeding, its Available Commitment under the relevant Tranche.

(d) The amount of any proposed Loan or Fronted Facility must not be of an amount which would, upon the Loan or Fronted Facility being made, result in a failure to comply with:

(i) clause 4.7 (*Maximum Facility Amount*); or

(ii)      clause 4.8 (*Fronting Bank Limit*).

(e)      The amount of any proposed Utilisation must be such that, immediately following that Utilisation, if a Borrowing Base Report was to be delivered based on the Borrowing Base as at that date, such Borrowing Base Report would be a Compliant Borrowing Base Report.  It will be the sole responsibility of the Borrowers to ensure that this condition is complied with.

## 5.5      Lenders' participation in Loans and Fronted Facilities

(a)      If the conditions set out in this Agreement have been met each Lender shall make its participation in each Loan under the relevant Facility available by the Utilisation Date through its Facility Office.

(b)      The amount of each Lender's participation in each Loan under the relevant Facility will be equal to the proportion borne by its Available Commitment in such Facility under the applicable Tranche to the Available Facility immediately prior to making the Loan.

(c)      The amount of each Facility B Lender's participation in each Fronted Facility will be equal to its Fronted Proportion under the applicable Tranche, and such Fronted Facilities are made available by the Issuing Bank and the Overdraft Bank against the Facility B Lenders' indemnity contained in clause 6.

## 5.6      Role of Facility Agent and Issuing Bank

The Facility Agent shall determine the Base Currency Amount of each Loan under any Facility which is to be made in euro and shall notify each relevant Lender of the amount, currency and the Base Currency Amount of each Loan and the amount of its participation in that Loan, in each case by the Specified Time.

## 5.7      Cancellation of Commitment

The Commitment in respect of a Facility which, at that time, are unutilised shall be immediately cancelled at the end of the Availability Period for that Facility.

## 5.8      Issue of Credit Instruments

(a)      Without prejudice to clause 2.2(d)(i), if the conditions set out in this Agreement have been met, an Issuing Bank under a relevant Tranche may issue a Credit Instrument on its Utilisation Date on behalf of the Facility B Lenders under the relevant Tranche.

(b)      The Company shall procure that on the date of the Utilisation Request in respect of a Credit Instrument and on the proposed Utilisation Date of that Credit Instrument:

(i)      the proposed Credit Instrument is on terms acceptable to the Issuing Bank;

(ii)      no Default is continuing or would result from the proposed Utilisation; and

(iii)      the Repeating Representations to be made by each Obligor are true in all material respects.

(c)      The Issuing Bank shall not comply with a Facility B Utilisation Request if it is aware, or has received written confirmation from the Facility Agent (for the avoidance of doubt, the Facility Agent has no duty to enquire as to or monitor compliance), that clauses 5.3 and 5.4 have not been complied with.

## 5.9      Issue of or entry into Overdraft Facilities

The Overdraft Facility shall not be utilised or made available other than by operation of clause 6.5.

5.10    **Fronted Facilities**

(a)    The Issuing Bank and Overdraft Bank has no duty to enquire of any person whether or not any of the conditions set out in clauses 5.3, 5.4, and 5.8(b) above have been met. The Issuing Bank and Overdraft Bank may assume that those conditions have been met unless it is expressly notified to the contrary by the Facility Agent (for the avoidance of doubt, the Facility Agent likewise has no duty to enquire, or monitor any such conditions). The Issuing Bank will have no liability to any person for issuing or making available a Fronted Facility based on such assumption.

(b)    The Issuing Bank is solely responsible for the form of the Credit Instrument that it issues. The Facility Agent has no duty to monitor the form of that document.

(c)    Subject to clause 30.6(h) (*Rights and discretions*), each of the Issuing Bank, the Overdraft Bank and the Facility Agent shall provide the other with any information reasonably requested by the other and available to it that relates to a Fronted Facility and its issue or granting.

(d)    The Issuing Bank may issue a Credit Instrument in the form of a SWIFT message or other form of communication customary in the relevant market but has no obligation to issue that Credit Instrument in any particular form of communication.

5.11    **Appointment of additional Issuing Banks**

(a)    Subject to paragraph (b) below, any Lender which has agreed to the Company's request to be an Issuing Bank under a particular Tranche pursuant to the terms of this Agreement shall become an Issuing Bank under that Tranche for the purposes of this Agreement upon notifying the Facility Agent, each other Fronting Bank under the relevant Tranche and the Company that it has so agreed to be an Issuing Bank and on making that notification that Lender shall become bound by the terms of this Agreement as an Issuing Bank.

(b)    No person may become an Issuing Bank under this Agreement if immediately after becoming the same the requirements of clause 4.8 would not be satisfied.

# 6    Fronted Facilities

**Credit Instruments**

6.1    If a Credit Instrument or any amount outstanding under a Credit Instrument becomes immediately payable under this Agreement, the relevant Borrower shall repay or prepay that amount immediately.

6.2    Each Borrower irrevocably and unconditionally authorises the Issuing Bank to pay any claim made or purported to be made under a Credit Instrument requested by it and which appears on its face to be in order (a **claim**).

6.3    For the avoidance of doubt, where a Borrower requests the issue of a Credit Instrument at the request of a third party then (without prejudice to clause 4.5 (*Further conditions precedent for issue of Credit Instruments in respect of third parties)*) such Credit Instrument shall be deemed to be a Utilisation of the relevant Borrower who shall be liable for payments in respect of thereof in accordance with clause 6.4.

6.4    Each Borrower which requested a Credit Instrument shall immediately on demand pay to the Facility Agent for the Issuing Bank an amount equal to the amount of any claim under that Credit Instrument.

6.5    To the extent an Issuing Bank is required to make a payment in respect of a claim and that Issuing Bank is also an Overdraft Bank, the amount of each such payment paid by the Issuing Bank shall be converted into an Overdraft Facility with the relevant Borrower and

Issuing Bank (in its capacity as Overdraft Bank) on the date of the payment thereof without the need for a Utilisation Request (notwithstanding that any conditions to the making of Utilisations hereunder have not been satisfied) and the utilisation of such Overdraft Facility shall be deemed to discharge the Borrower's obligation under clause 6.4 to make payment to the Issuing Bank in the amount of that claim.

6.6    Each Borrower acknowledges that the Issuing Bank:

   (a)    is not obliged to carry out any investigation or seek any confirmation from any other person before paying a claim; and

   (b)    deals in documents only and will not be concerned with the legality of a claim or any underlying transaction or any available set-off, counterclaim or other defence of any person.

6.7    The obligations of a Borrower under this clause will not be affected by:

   (a)    the sufficiency, accuracy or genuineness of any claim or any other document; or

   (b)    any incapacity of, or limitation on the powers of, any person signing a claim or other document.

**Credit Instruments extending beyond the Termination Date and reduction or expiry of Credit Instruments**

6.8    Each Borrower shall on the Termination Date provide cash cover for any Credit Instrument in respect of which the Term expires after the Termination Date.

6.9    If the amount of any Credit Instrument is wholly or partially reduced or it is repaid or prepaid or it expires prior to its Expiry Date, the relevant Issuing Bank and the Borrower that requested the issue of that Credit Instrument shall promptly notify the Collateral Management Agent of the details upon becoming aware of them.

**Indemnities - Facility B**

6.10    Each Borrower shall immediately on demand indemnify the Issuing Bank or the Overdraft Bank which has issued or entered into a Fronted Facility against any cost, loss or liability incurred by that Issuing Bank or Overdraft Bank (otherwise than by reason of the that Issuing Bank or Overdraft Bank's gross negligence or wilful misconduct) in acting as an Issuing Bank or Overdraft Bank under any Fronted Facility.

6.11    Each Facility B Lender shall (according to its Fronted Proportion in a relevant Tranche) immediately on demand indemnify the Issuing Bank against any cost, loss or liability incurred by the Issuing Bank (otherwise than by reason of that Issuing Bank's gross negligence or wilful misconduct) in acting as the Issuing Bank under any Fronted Facility under that Tranche (unless the Issuing Bank has been reimbursed by an Obligor pursuant to a Finance Document).  Notwithstanding any other provision of this Agreement, each Facility B Lender acknowledges and agrees (for the benefit of the other Finance Parties only) that:

   (a)    the Issuing Bank and the Overdraft Bank are not in a position to monitor Utilisations on a live basis and accordingly, provided it complies with its own Fronting Bank Limit, a Fronting Bank will be relying on (i) the Borrowers to ensure that Utilisations under Facility B do not exceed the Facility B Total Commitments or the Available Facility from time to time and (ii) the other Fronting Banks to ensure that they do not exceed their Fronting Bank Limits; and accordingly

   (b)    it shall be liable for its proportionate share of any amount by which the Facility B Total Commitments (or the applicable Facility B Tranche 1 Commitments or Facility B Tranche 2 Commitments) are exceeded in such manner and its indemnity to the Issuing Bank and

Overdraft Bank under the applicable Tranche (which is expressed to be subject to absence of the relevant Issuing Bank's or Overdraft Bank's gross negligence or wilful misconduct) which has remained within its Fronting Bank Limit will extend to cover any such excess caused by another Fronting Bank exceeding its Fronting Bank Limit.

6.12    The Borrower which requested a Fronted Facility shall immediately on demand reimburse any Lender for any payment it makes to the Issuing Bank under clause 6.11 in respect of that Fronted Facility.

6.13    The obligations of each Lender or Borrower under this clause are continuing obligations and will extend to the ultimate balance of sums payable by that Lender or Borrower in respect of any Fronted Facility under the relevant Tranche of Facility B, regardless of any intermediate payment or discharge in whole or in part.

6.14    If a Borrower has provided cash cover in respect of a Lender's participation in a Credit Instrument, the Issuing Bank shall seek reimbursement from that cash cover before making a demand of that Lender under clause 6.11 above. Any recovery made by an Issuing Bank pursuant to that cash cover will reduce that Lender's liability under clause 6.11 above.

6.15    The Borrowers' obligations pursuant to clauses 6.12 to 6.14 above shall extend to cover any Lender liability under any arrangement entered into by the Finance Parties with HSH Nordbank AG substantially on the terms of clause 6.11 in respect of HSH Nordbank AG's liabilities referred to in those clauses under the following credit instruments outstanding on the Effective Date:

| Credit Instrument | Borrower | Outstanding value | Expiry date |
|---|---|---|---|
| Letter of guarantee | ABGG | EUR3,000,000 | 31 January 2019 |
| Letter of guarantee | OBTG | EUR3,000,000 | 31 January 2019 |
| Letter of credit | OBTG | $2,580,000 | 7 February 2019 |

6.16    The obligations of any Lender or Borrower under this clause 6 will not be affected by any act, omission, matter or thing which, but for this clause, would reduce, release or prejudice any of its obligations under this clause (without limitation and whether or not known to it or any other person) including:

(a)     any time, waiver or consent granted to, or composition with, any Obligor, any beneficiary under a Credit Instrument or any other person;

(b)     the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor or any member of the Group;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor, any beneficiary under a Credit Instrument or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor, any beneficiary under a Credit Instrument or any other person;

(e) any amendment (however fundamental) or replacement of a Finance Document, any Fronted Facility, any Credit Instrument or any other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document, any Fronted Facility, any Credit Instrument or any other document or security; or

(g) any insolvency or similar proceedings.

6.17 **Rights of contribution**

No Obligor will be entitled to any right of contribution or indemnity from any Finance Party in respect of any payment it may make under this clause 6.

**Cash collateral by Non-Acceptable Banks and Borrower's option to provide cash cover**

6.18 If, at any time, a Facility B Lender under a Credit Instrument is or becomes a Non-Acceptable Bank, the Issuing Bank and/or Overdraft Bank may, by notice to that Facility B Lender, request that Facility B Lender to pay and that Facility B Lender shall pay, on or prior to the date requested by the Issuing Bank, an amount equal to that Lender's Fronted Proportion of:

(a) the outstanding amount of a Credit Instrument;

(b) the maximum potential liability under an Overdraft Facility; and/or

(c) in the case of a proposed Credit Instrument, the amount of that proposed Credit Instrument,

and in the currency of that Fronted Facility to an interest-bearing account held in the name of that Facility B Lender with the Issuing Bank.

6.19 The Facility B Lender to whom a request has been made in accordance with paragraph 6.18 above shall enter into a security document or other form of collateral arrangement over the account, in form and substance satisfactory to the Issuing Bank and/or Overdraft Bank, as collateral for any amounts due and payable under this Agreement by that Facility B Lender to the Issuing Bank and/or Overdraft Bank in respect of that Fronted Facility.

6.20 Subject to clause 6.23 below, withdrawals from such an account may only be made to pay the Issuing Bank and/or Overdraft Bank amounts due and payable to it under this Agreement by the Non-Acceptable Bank in respect of that Fronted Facility until no amount is or may be outstanding under that Fronted Facility.

6.21 Each Facility B Lender shall notify the Facility Agent and the Company:

(a) on the date of this Agreement or on any later date on which it becomes such a Facility B Lender if it is a Non-Acceptable Bank; and

(b) as soon as practicable upon becoming aware of the same, that it is a Non-Acceptable Bank.

6.22 Any notice received by the Facility Agent pursuant to clause 6.21 above shall constitute notice to the Issuing Bank and the Overdraft Bank of that Facility B Lender's status and the Facility Agent shall, upon receiving each such notice, promptly notify the Issuing Bank and the Overdraft Bank and each other Facility B Lender of that Lender's status as specified in that notice.

6.23 Notwithstanding clause 6.20 above, a Lender which has provided cash collateral in accordance with this clause 6 may, by notice to the Issuing Bank and the Overdraft Bank, request that an amount equal to the amount provided by it as collateral in respect of the relevant Fronted Facility (together with any accrued interest) be returned to it:

(a) to the extent that such cash collateral has not been applied in satisfaction of any amount due and payable under this Agreement by that Lender to the Issuing Bank in respect of the relevant Fronted Facility;

(b) if:

(i) it ceases to be a Non-Acceptable Bank;

(ii) its obligations in respect of the relevant Fronted Facility are transferred to another Facility B Lender in accordance with the terms of this Agreement; or

(iii) an Acceptable Bank has agreed to undertake that Facility B Lender's obligations in respect of the relevant Fronted Facility in accordance with the terms of this Agreement; and

(c) if no amount is due and payable by that Facility B Lender in respect of a Fronted Facility,

and the Issuing Bank and the Overdraft Bank (as applicable) shall pay that amount to the Lender within three (3) Business Days of that Lender's request (and shall cooperate with the Lender in order to procure that the relevant security or collateral arrangement is released and discharged).

6.24 To the extent that a Non-Acceptable Bank fails to provide cash collateral (or notifies the Issuing Bank that it will not provide cash collateral) in accordance with clauses 6.18 to 6.24 in respect of a proposed Fronted Facility, the Issuing Bank shall promptly notify the Company (with a copy to the Collateral Management Agent) and the Borrower of that proposed Fronted Facility may, at any time before the proposed Utilisation Date of that Fronted Facility, provide cash cover to an account with the Issuing Bank in an amount equal to that Lender's Fronted Proportion of the amount of that proposed Fronted Facility.

6.25 As an alternative to providing cash collateral under this clause 6, a Non-Acceptable Bank may satisfy its cash collateral obligations by providing to the Issuing Bank and/or the Overdraft Bank (as applicable) in a form and substance satisfactory to the Issuing Bank and/or the Overdraft Bank and the Facility Agent such security or other credit support as the Issuing Bank, Overdraft Bank and Facility Agent may require in support of such Non-Acceptable Bank's obligations in respect of Fronted Facilities under the relevant Tranche of Facility B.

**Requirement for cash cover from Borrower**

6.26 If:

(a) a Non-Acceptable Bank fails to provide cash collateral or make a required payment (or notifies the Issuing Bank and/or Overdraft Bank (as the case may be) that it will not provide cash collateral or make such repayment) in accordance with clauses 6.18 to 6.24 (*Cash collateral by Non Acceptable Lender and Borrower's option to provide cash cover*) in respect of a Fronted Facility that has been issued or made available;

(b) the Issuing Bank and/or the Overdraft Bank (as the case may be) notifies the Company (with a copy to the Collateral Management Agent) that it requires the Borrower of the relevant: (i) Credit Instrument to provide cash cover to an account with the Issuing Bank in an amount equal to that Lender's Fronted Proportion of the outstanding amount of that Credit Instrument; or (ii) Overdraft Facility to repay that Lender's Fronted Proportion of such Overdraft Facility; and

(c) that Borrower has not already provided such cash cover or repayment which (in the case of cash cover) is continuing to stand as collateral,

then that Borrower shall provide such cash cover and make such repayment within three (3) Business Days of the notice referred to in paragraph (b) above.

**Regulation and consequences of cash cover provided by Borrower**

6.27 Notwithstanding clause 1.2(a)(xx) (*Construction*), the relevant Borrower may request that an amount equal to the cash cover (together with any accrued interest) provided by it pursuant to clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable Bank and Borrower's option to provide cash cover*) or clause 6.26 (*Requirement for cash cover from Borrower*) be returned to it:

(a) to the extent that such cash cover has not been applied in satisfaction of any amount due and payable under this Agreement by that Borrower to the Issuing Bank in respect of a Credit Instrument;

(b) if:

(i) the relevant Lender ceases to be a Non-Acceptable Bank;

(ii) the relevant Lender's obligations in respect of the Credit Instrument are transferred to another Facility B Lender under the same Tranche in accordance with the terms of this Agreement; or

(iii) an Acceptable Bank has agreed to undertake that Facility B Lender's obligations in respect of the relevant Credit Instrument in accordance with the terms of this Agreement;

(c) if no amount is due and payable by the relevant Lender in respect of the relevant Credit Instrument; and

(d) if no Default is continuing,

and the Issuing Bank shall pay that amount to that Borrower within three (3) Business Days of that Borrower's request.

6.28 To the extent that a Borrower has provided cash cover pursuant to clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable Bank and Borrower's option to provide cash cover*) or clause 6.26 (*Requirement for cash cover from Borrower*), the relevant Lender's Fronted Proportion in respect of that Credit Instrument will remain (but that Lender's obligations in relation to that Credit Instrument may be satisfied in accordance with clause 1.2(a)(xx)(B) (*Construction*)). However the relevant Borrower's obligation to pay any Credit Instrument fee in relation to the relevant Credit Instrument to the Collection Account (for the account of that Lender) in accordance with clause 14.2 (*Facility B fees*) will be reduced proportionately as from the date on which it provides that cash cover (and for so long as the relevant amount of cash cover continues to stand as collateral).

6.29 The relevant Issuing Bank shall promptly notify the Collateral Management Agent of the extent to which a Borrower provides cash cover or repays an Overdraft Facility pursuant to clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable Bank and Borrower's option to provide cash cover*) or clause 6.26 (*Requirement for cash cover from Borrower*) and of any change in the amount of cash cover so provided.

**Utilisation of Fronted Facilities when a Lender is a Non-Acceptable Bank**

6.30 If, on the proposed Utilisation Date of a Fronted Facility, any Facility B Lender under the applicable Tranche is a Non-Acceptable Bank and:

(a) that Lender has failed to provide cash collateral to the Issuing Bank in accordance with clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable L/C Lender and Borrower's option to provide cash cover*) or an alternative in accordance with clause 6.25; and

(b) the Borrower of that proposed Fronted Facility has not exercised its right to provide cash cover to the Issuing Bank in accordance with clause 6.24 (*Cash collateral by Non-Acceptable L/C Lender and Borrower's option to provide cash cover*),

the Issuing Bank may:

(i) reduce the amount of that Fronted Facility by an amount equal to the amount of the participation of that Non-Acceptable Bank in respect of that Fronted Facility and that Non-Acceptable Bank shall be deemed not to have any participation (or obligation to indemnify the Issuing Bank) in respect of that Credit Instrument for the purposes of the Finance Documents; or

(ii) proceed with the Utilisation of the Fronted Facility as requested by the Borrower on the basis that each Facility B Lender excluding for this purpose any Non-Acceptable Bank shall participate in such Utilisation on the basis of a Fronted Proportion calculated as if the Non-Acceptable Bank had ceased to be a Facility B Lender, and each such Facility B Lender shall (subject to not exceeding its Available Commitment) be liable for such increased Fronted Proportion in relation to the Fronted Facility in the event that the Non-Acceptable Bank fails to comply with its obligations to provide cash collateral hereunder.

The Issuing Bank shall notify the Collateral Management Agent and the Company of each reduction made pursuant to this clause 6.30.  This clause 6.30 shall not affect the participation of each other Lender in that Credit Instrument.

**Role of the Issuing Bank and Overdraft Bank - Facility B**

6.31 Nothing in this Agreement constitutes an Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility as a trustee or fiduciary of any other person.

6.32 An Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility:

(a) shall not be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account in respect of a Fronted Facility;

(b) may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor;

(c) may rely on:

(i) any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii) any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify;

(d) may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts;

(e) may act in relation to the Fronted Facility through its personnel and agents; and

(f) is not responsible for:

(i) the adequacy, accuracy and/or completeness of any information (whether oral or written) provided by the Facility Agent, any Party (including itself), or any other

person under or in connection with the Fronted Facility, the transactions contemplated by the Fronted Facility or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with the Fronted Facility; or

(ii) the legality, validity, effectiveness, adequacy or enforceability of the Fronted Facility or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with the Fronted Facility.

**Exclusion of liability**

6.33 Without limiting clause 6.34 (*Exclusion of liability*) below, an Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility will not be liable for any action taken by it under or in connection with that Fronted Facility, unless directly caused by its gross negligence or wilful misconduct.

6.34 No Party (other than an Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility) may take any proceedings against any officer, employee or agent of that Issuing Bank or Overdraft Bank in respect of any claim it might have against that Issuing Bank or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Fronted Facility.

**Terms of Fronted Facilities**

6.35 Except as provided below, the terms of any Fronted Facility shall be those agreed by the relevant Issuing Bank or Overdraft Bank and the Company.

6.36 Those terms:

(a) must be based upon normal commercial terms at that time (except as varied by this Agreement);

(b) may allow only Borrowers to use Fronted Facilities; and

(c) must comply with the provisions of this Agreement including, without limitation, in relation to Term, currency and amount.

6.37 If there is any inconsistency or conflict between any term of a Fronted Facility and any term of this Agreement, this Agreement shall prevail.

**Amendments and Waivers - Fronted Facilities**

6.38 No amendment or waiver of a term of any Fronted Facility shall require the consent of any Finance Party other than the relevant Issuing Bank or Overdraft Bank unless such amendment or waiver itself relates to or gives rise to a matter which would require an amendment of or under this Agreement (including, for the avoidance of doubt, under this clause 6).

**Multi-Party TPA Agreements**

6.39 Each of the Borrowers agrees to procure that the terms of any Multi-Party TPA Agreement shall comply with this clause 6.39 (*Multi-Party TPA Agreements*) (and the execution by a Finance Party of a Multi-Party TPA Agreement which does not comply with this 6.39 (*Multi-Party TPA Agreements*) shall not be construed as a waiver thereof unless expressly confirmed in writing by the Facility Agent acting on the instructions of the Majority Lenders). Each Multi-Party TPA Agreement shall:

(a) be expressly capable of being assigned by the Company to the Security Agent pursuant to the relevant Security Agreement (but not otherwise);

(b) provide that payments for the account of the Company thereunder shall be paid to its relevant Collection Account;

(c) contain any notices and acknowledgements of assignment required by each Security Agreement;

(d) be governed by English or Dutch law; and

(e) not otherwise conflict with or cause the Company to breach the terms of this Agreement and any other Finance Document.

6.40 Pursuant to a Multi-Party TPA the Company may grant Security in favour of the Hedging Provider or Clearing Provider (as the case may be) in respect only of the Company's rights under and in connection with the Hedging Provider Hedging Transaction or Clearing Provider Hedging Transaction but not, for the avoidance of doubt, in respect of any inventory pledged to the Security Agent pursuant to the Transaction Security Documents.

**Master Agreements for FX hedging**

6.41 Unless the Hedging Provider is METSA, each of the Borrowers agrees to procure that the terms of any FX Hedging Provider Hedging Agreement shall comply with this clause 6.41 (*Master Agreement for FX hedging)* (and the execution by a Finance Party of a FX Hedging Provider Hedging Agreement which does not comply with this clause 6.41 (*Master Agreement for FX hedging)* shall not be construed as a waiver thereof unless expressly confirmed in writing by the Facility Agent acting on the instructions of the Majority Lenders). Each FX Hedging Provider Hedging Agreement shall:

(a) be expressly capable of being assigned by the Borrower to the Security Agent pursuant to the relevant Security Agreement (but not otherwise);

(b) provide that payments for the account of the Borrower thereunder shall be paid to its relevant Collection Account;

(c) contain any notices and acknowledgements of assignment required by each Security Agreement;

(d) be governed by English law; and

(e) not otherwise conflict with or cause the Borrower to breach the terms of this Agreement and any other Finance Document.

**Inconsistency and conflict**

6.42 If there is any inconsistency or conflict between any term of a Multi-Party TPA Agreement or a Deed of Undertaking or a FX Hedging Provider Hedging Agreement and any term of this Agreement, this Agreement shall prevail.

**Replacement of a Non-Acceptable Bank**

6.43 The Company may, at any time after a Lender has:

(a) become and continues to be a Non-Acceptable Bank; or

(b) failed (and continues to fail) to provide cash collateral (or has notified the Issuing Bank, the Overdraft Bank or the Company (which has notified the Facility Agent) that it will not provide cash collateral) in accordance with clauses 6.18 to 6.24 (*Cash collateral by Non Acceptable Lender and Borrower's option to provide cash cover*),

by giving ten (10) Business Days' notice to the Facility Agent and such Lender, replace such Lender by requiring such Lender to (and, to the extent permitted by law, such Lender

shall) transfer pursuant to clause 27 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to another Facility B Lender under the relevant Tranche which is an Acceptable Bank or (if no existing Facility B Lenders wish to acquire the same) to an Acceptable Bank designated by the Company, in each case in accordance with clause 27 (*Changes to Lenders*).

Any transfer of rights and obligations of a Non-Acceptable Bank pursuant to this clause 6.43 shall be subject to the following conditions:

(i) the Company shall have no right to replace the Facility Agent, the Collateral Management Agent or the Security Agent;

(ii) neither the Facility Agent nor the Non-Acceptable Bank shall have any obligation to the Company to find a replacement lender;

(iii) the transfer must take place no later than 10 days after the Non-Acceptable Bank received the notice referred to above;

(iv) in no event shall the Non-Acceptable Bank be required to pay or surrender to the Replacement Lender any of the fees received by the Non-Acceptable Bank pursuant to the Finance Documents; and

(v) the Non-Acceptable Bank shall only be obliged to transfer its rights and obligations pursuant to this clause once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer to the replacement lender. The Non-Acceptable Bank shall perform such checks as soon as reasonably practicable and shall notify the Facility Agent and the Company when it is satisfied that it has complied with those checks.

**Reporting of Collection Account balances**

6.44 The Collateral Management Agent shall notify to all Lenders on each Business Day the opening balance on each Collection Account on such day.

**Reporting of margin balances**

6.45 The Collateral Management Agent shall deliver to all Lenders on each Business Day of any margin statement (containing details of, amongst other things, initial margin, variation margin and account status) issued to the Collateral Management Agent by a Clearing Provider or Hedging Provider on such day (provided it is received by the Collateral Management Agent prior to midday on such day).

## Section 4
## Repayment, Prepayment and Cancellation

# 7    Repayment

## 7.1    Repayment of Loans

(a)    Each Borrower which has drawn a Loan shall repay that Loan on the last day of its Interest Period.

(b)    Without prejudice to each Borrower's obligation under paragraph (a) above, if:

(i)    one or more Loans are to be made available to a Borrower:

(A)    on the same day that a maturing Loan is due to be repaid by that Borrower;

(B)    in the same currency as the maturing Loan; and

(C)    in whole or in part for the purpose of refinancing the maturing Loan; and

(ii)    the proportion borne by each Lender's participation in the maturing Loan to the amount of that maturing Loan is the same as the proportion borne by that Lender's participation in the new Loans to the aggregate amount of those new Loans,

the aggregate amount of the new Loans shall, unless the relevant Borrower or the Parent notifies the Facility Agent to the contrary in the relevant Utilisation Request, be treated as if applied in or towards repayment of the maturing Loan so that:

(A)    if the amount of the maturing Loan exceeds the aggregate amount of the new Loans:

(1)    the relevant Borrower will only be required to make a payment under clause 34.1 (*Payments to the Facility Agent*) in an amount in the relevant currency equal to that excess; and

(2)    each Lender's participation in the new Loans shall be treated as having been made available and applied by the relevant Borrower in or towards repayment of that Lender's participation in the maturing Loan and that Lender will not be required to make a payment under clause 34.1 (*Payments to the Facility Agent*) in respect of its participation in the new Loans; and

(B)    if the amount of the maturing Loan is equal to or less than the aggregate amount of the new Loans:

(1)    the relevant Borrower will not be required to make a payment under clause 34.1 (*Payments to the Facility Agent*); and

(2)    each Lender will be required to make a payment under clause 34.1 (*Payments to the Facility Agent*) in respect of its participation in the new Loans only to the extent that its participation in the new Loans exceeds that Lender's participation in the maturing Loan and the remainder of that Lender's participation in the new Loans shall be treated as having been made available and applied by the relevant Borrower in or towards repayment of that Lender's participation in the maturing Loan.

7.2    **Repayment of Overdraft Facilities**

(a)    Without prejudice to clauses 7.2(b) and 25.3(e), each Overdraft Facility shall be repayable on demand and if not demanded shall be repayable on the Termination Date.

(b)    If an Overdraft Bank proposes to demand repayment of an Overdraft Facility it shall notify the Facility Agent and the Company in writing of such proposal and:

(i)    the Facility Agent shall inform the Collateral Management Agent and the other Lenders within one (1) Business Day of receipt thereof; and

(ii)    (subject to clause 7.2(d)) all Overdraft Facilities with that Overdraft Bank shall be repayable on the date which is five (5) Business Days from the date of the Facility Agent's notice under clause 7.2(b)(i) (the **Demand Repayment Date**).

(c)    Upon receipt by each other Lender of the Facility Agent's notice referred to in paragraph 7.2(b)(ii), each other Overdraft Bank shall be entitled to demand repayment on the Demand Repayment Date of all (but not part) of the Overdraft Facilities entered into between it and the Borrowers and shall notify the Facility Agent and the Collateral Management Agent if it wishes to do so (and the amounts to be repaid) no later than two (2) Business Days prior to the Demand Repayment Date.  The Facility Agent shall promptly notify the Company which Overdraft Banks have demanded repayment and the amounts to be repaid;

(d)    Provided that no Event of Default has occurred and is continuing, on the Demand Repayment Date the Collateral Management Agent shall apply all monies held on the Collection Accounts towards the discharge of the amounts demanded and due on that date in respect of Overdraft Facilities.  To the extent any amounts remain outstanding and provided that no Event of Default occurs and is continuing the Borrowers shall have a further twenty (20) days to procure that all Overdraft Facilities which have been demanded are repaid in full by application of monies received from third parties into the Collection Account.  Failure to pay all amounts due upon the expiry of the twenty (20) day period shall constitute an Event of Default.

(e)    No Lender shall be obliged to make any Utilisation on or prior to the date on which all Overdraft Facilities which have been the subject of a demand have been repaid in full by the Borrowers.

# 8    Voluntary prepayment and cancellation

8.1    **Voluntary cancellation**

A Borrower (or the Company on its behalf) may, if it gives the Facility Agent not less than five (5) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part (being a minimum amount of $5,000,000 or EUR5,000,000) of an Available Facility. Any cancellation under this clause 8.1 shall reduce the Commitments of the Lenders rateably under that Facility.

8.2    **Voluntary prepayment of Loans**

(a)    A Borrower may, if it (or the Company on its behalf) gives the Facility Agent not less than five (5) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of a Loan (but, if in part, being an amount that reduces the amount of that Loan by a minimum amount of $5,000,000 or EUR5,000,000 (as applicable)).

(b)    A Borrower may prepay the whole or any part of a Loan without notice and in any amount if necessary for the purposes of compliance with clause 24.26 (*Borrowing Base Amount*)

and, for the purpose of any such prepayment, the restrictions set out in paragraph (a) above shall not apply.

### 8.3 Right of cancellation and repayment in relation to a single Lender, Issuing Bank or Overdraft Bank

(a) If:

    (i) any sum payable to any Lender or Issuing Bank or Overdraft Bank by an Obligor is required to be increased under paragraph (c) of clause 15.2 (*Tax gross-up*);

    (ii) any Lender, Issuing Bank or Overdraft Bank claims indemnification from the Company or an Obligor under clause 15.3 (*Tax indemnity*) or clause 16.1 (*Increased costs*); or

    (iii) at any time on or after the date which is six (6) months before the earliest FATCA Application Date for any payment by a Party to a Lender (or to the Facility Agent for the account of that Lender), that Lender is not, or has ceased to be, a FATCA Exempt Party and, as a consequence, a Party will be required to make a FATCA Deduction from a payment to that Lender (or to the Facility Agent for the account of that Lender) on or after that FATCA Application Date,

the Company may, whilst the circumstance giving rise to the requirement for that increase or indemnification or FATCA Deduction continues, give the Facility Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation or liability in the Utilisations and (if such circumstances relate to the Issuing Bank or Overdraft Bank) of repayment of outstanding Fronted Facility issued or made available by it and cancellation of its appointment as an Issuing Bank or Overdraft Bank (as the case may be) under this Agreement in relation to any Fronted Facilities to be issued in the future.

(b) On receipt of a notice referred to in paragraph (a) above in relation to a Lender, the Commitment of that Lender shall immediately be reduced to zero.

(c) On the last day of each Interest Period which ends after the Company has given notice under paragraph (a) above in relation to a Lender (or, if earlier, the date specified by the Company in that notice), each Borrower, to which a loan is outstanding shall repay that Lender's participation in that Loan together with all interest and other amounts accrued under the Finance Documents.

### 8.4 Right of cancellation in relation to a Non-Acceptable Bank

(a) If any Facility B Lender becomes a Non-Acceptable Bank, the Company may, at any time whilst the Facility B Lender continues to be a Non-Acceptable Bank, give the Facility Agent fifteen (15) Business Days' notice of cancellation of each Available Commitment of that Lender.

(b) On the notice referred to in paragraph (a) above becoming effective, each Available Commitment of the Non-Acceptable Bank shall immediately be reduced to zero.

(c) The Facility Agent shall as soon as practicable after receipt of a notice referred to in paragraph (a) above, notify all the Lenders.

## 9 Mandatory prepayment and cancellation

### 9.1 Illegality

If it is or becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in any Utilisation including to leave outstanding any Fronted Facilities, that Lender shall promptly

notify the Facility Agent upon becoming aware of that event and, upon the Facility Agent notifying the Company (and if requested by the relevant Lender):

(a)    the Available Commitment of that Lender will be immediately cancelled; and/or

(b)    Company shall (or shall procure that the relevant Borrower shall) immediately provide full cash cover in respect of that Lender's participation in any outstanding Credit Instrument; and/or

(c)    each Borrower shall repay that Lender's participation in the Utilisations made to that Borrower on the last day of the Interest Period for each Utilisation occurring after the Facility Agent has notified the Company or, if earlier, the date specified by the Lender in the notice delivered to the Facility Agent (being no earlier than the last day of any applicable grace period permitted by law),

and that Lender's corresponding Commitment shall be cancelled in the amount of the participations repaid.

## 9.2    Illegality in relation to Issuing Bank

If it becomes unlawful for an Issuing Bank to issue or leave outstanding any Fronted Facility, then:

(e)    that Issuing Bank shall promptly notify the Facility Agent upon becoming aware of that event;

(f)    any obligation of such Issuing Bank to issue any Credit Instrument will be immediately cancelled; and

(g)    the Company shall, or shall notify the relevant Borrower and upon such notice that Borrower shall, use its best endeavours to procure the release of each Credit Instrument issued by a relevant Issuing Bank and outstanding at such time and until such release has been effected the Company shall (or shall procure that the relevant Borrower shall) immediately provide full cash cover in respect of such Credit Instruments.

## 9.3    Change of Control

Upon the occurrence of:

(a)    a Change of Control; or

(b)    the sale of all or substantially all of the assets of the Group whether in a single transaction or a series of related transactions,

    (i)    the Company shall promptly notify the Facility Agent upon becoming aware of that event;

    (ii)    a Lender shall not be obliged to fund a Utilisation;

    (iii)    a Lender shall not be obliged to enter into or issue a Fronted Facility; and

    (iv)    if a Lender so requires and notifies the Facility Agent within twenty (20) days of the Company notifying the Facility Agent of the event the Facility Agent shall, by not less than twenty (20) days' notice to the Company, cancel the Commitment of that Lender and declare the participation or liability of that Lender in all outstanding Utilisations, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Commitment of that Lender will be cancelled and all such outstanding amounts will become immediately due and payable, and the Company shall procure that the relevant Borrower shall use its best endeavours to procure the release of each

Credit Instrument issued by that Lender and outstanding at that time and until such release has been effected the Company shall procure that the relevant Borrower shall immediately provide full cash cover in respect of such Credit Instruments.

9.4     **Facility Accounts sweep**

(a)     For so long as any amount is outstanding under Facility A Tranche 1 or Facility B Tranche 1, and subject to prior payment of any other amounts then due and payable under the Finance Documents, the Borrowers shall:

(i)     by no later than 14:00 on the next Business Day falling 14 days after the date of this Agreement (and thereafter on each Business Day falling 14 days from the date of the previous payment); and

(ii)    otherwise at such times as the Facility Agent (acting on the instructions of the Majority Lenders) may by notice require,

prepay Facility A Tranche 1 and Facility B Tranche 1 on a *pro rata* basis in an aggregate amount equal to that standing to the credit of the Facility Accounts.

(b)     The Lenders shall apportion any such prepayments as between interest and principal in accordance with clause 10.2 and shall notify the Facility Agent of such allocation and the Facility Agent shall not be responsible for any calculation of interest and principal upon such prepayments.

(c)     Any prepayment to be made pursuant to paragraph (a) above shall be made by way of set-off of the amount to be prepaid against a deemed Utilisation of Tranche 2 of the corresponding Facilty. Such deemed Utilisation by a Borrower shall not entitle the Borrower to receive any cash from the Facility Agent or any Lender and, notwithstanding that no such cash is exchanged, the Borrower shall thereafter owe the aggregate amount of the deemed Utilisations to the Lenders under the terms hereof and the Orders and they shall not constitute Prepetition Obligations. The prepaid amount of the Prepetition Obligations shall be deemed to have been finally discharged as a consequence of the set-off.

9.5     **Tranche 1 prepayment – Orders and Credit Instruments**

(a)     If the Orders so require, Tranche 1 of each Facility shall be prepaid on the Effective Date in the amount so required (or within any applicable timeframe and in such amounts imposed by the Orders).

(b)     Any prepayment to be made pursuant to paragraph (a) above shall be made by way of set-off of the amount to be prepaid against a deemed Utilisation of Tranche 2 of the corresponding Facilty. Such deemed Utilisation by a Borrower shall not entitle the Borrower to receive any cash from the Facility Agent or any Lender and, notwithstanding that no such cash is exchanged, the Borrower shall thereafter owe the aggregate amount of the deemed Utilisations to the Lenders under the terms hereof and the Orders and they shall not constitute Prepetition Obligations. The prepaid amount of the Prepetition Obligations shall be deemed to have been finally discharged as a consequence of the set-off.

(c)     Any Credit Instruments issued by an Issuing Bank under Tranche 1 of Facility B which are outstanding as at the Effective Date shall be deemed, from the Effective Date, to have been issued under Tranche 2 of Facility B (and not under Tranche 1 of Facility B) in the same amount and on the same terms and the outstanding Utilisations under Tranche 1 and Tranche 2 shall be deemed adjusted accordingly.

## 10 Restrictions

### 10.1 Notices of Cancellation or Prepayment

Any notice of cancellation, prepayment, authorisation or other election given by any Party under clause 8 (*Voluntary prepayment and cancellation*) or clause 9 (*Mandatory prepayment and cancellation*) shall (subject to the terms of those clauses) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

### 10.2 Interest and other amounts

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

### 10.3 Prepayment in accordance with Agreement

(a)  Unless a contrary indication appears in this Agreement, any part a Facility which is prepaid or repaid may be reborrowed in accordance with the terms of this Agreement.

(b)  The Borrowers shall not repay or prepay all or any part of the Loans or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

### 10.4 No reinstatement of Commitments

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

### 10.5 Facility Agent's receipt of Notices

If the Facility Agent receives a notice under clause 8 (*Voluntary prepayment and cancellation*) or clause 9 (*Mandatory prepayment and cancellation*), it shall promptly forward a copy of that notice or election to the Company or the affected Lender(s), as appropriate.

### 10.6 Effect of repayment and prepayment on Commitments

If all or part of any Lender's participation in a Loan is repaid or prepaid and is not available for redrawing, an amount of that Lender's Commitment (equal to the Base Currency Amount of the participation which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment.

### 10.7 Effect of the Intercreditor Agreement

Any obligation of any Obligor to make a mandatory prepayment under this Agreement shall be subject to the terms and conditions of the Intercreditor Agreement.

**Section 5
Costs of Utilisation**

# 11 Interest

## 11.1 Calculation of interest - Loans

The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

(a) Margin; and

(b) LIBOR.

## 11.2 Calculation of interest – Overdraft Facilities

The rate of interest on each Overdraft Facility is the percentage rate per annum which is the aggregate of:

(a) the Facility B Margin; and

(b) LIBOR.

## 11.3 Payment of interest

(a) **Loans**

On the last day of each Interest Period (and, if the Interest Period relating to Facility B is longer than one (1) Month, on the dates falling at Monthly intervals after the first day of the Interest Period) the Borrower to which a Loan has been made shall pay accrued interest on the Loan to which that Interest Period relates provided that in relation to Interest Periods relating to Facility A no payment shall be required to be made unless permitted by the Bankruptcy Court and, if not so permitted, interest shall accrue on a compounded basis until the Termination Date.

(b) **Overdraft Facilities**

Interest in respect of Overdraft Facilities shall accrue on a daily basis and shall be calculated and payable within five (5) Business Days after the end of each calendar month (notwithstanding that the Overdraft Facility may have been cancelled and/or repaid during that month in accordance with its terms and/or with the terms of this Agreement). On the calculation date each Overdraft Bank shall notify the Company of any interest payable by the Borrowers as at that date. A failure by an Overdraft Bank to notify the Company of any interest payable hereunder shall not prejudice the Lenders' rights to receive such interest. The amount of interest payable to an Overdraft Bank shall be payable from an Overdraft Facility with such Overdraft Bank without the need for a Utilisation Request provided the conditions in clauses 5.4(b)(ii) to 5.4(e) are met (the Overdraft Bank is authorised and instructed to transfer the relevant funds directly to the Collection Account), failing which the Company shall instruct the payment and, if not done by the Company within three (3) Business Days, the Collateral Management Agent shall be authorised to debit the Collection Account (and the Borrowers shall immediately pay any shortfall to the extent all interest obligations are not satisfied therefrom).

## 11.4 Default interest

(a) If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (i) below, is two (2) per cent. per annum higher than:

(i)     in respect of a Loan, the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan under the relevant Facility in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Facility Agent (acting reasonably; and

(ii)    in respect of an Overdraft Facility, the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted an Overdraft Facility of the type to which the overdue amount relates in the currency of the overdue.

Any interest accruing under this clause 11.4 shall be immediately payable by the Obligor on demand by the Facility Agent.

(b)     If any overdue amount consists of all or part of a Utilisation which became due on a day which was not the last day of an Interest Period relating to that Utilisation:

(i)     the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Utilisation; and

(ii)    the rate of interest applying to the overdue amount during that first Interest Period shall be two (2) per cent. per annum higher than the rate which would have applied if the overdue amount had not become due.

(c)     Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

## 11.5    Notification of rates of interest

(a)     The Facility Agent shall promptly notify the relevant Lenders and the relevant Borrower (or the Company) of the determination of a rate of interest under this Agreement in respect of any Facility other than the Fronted Facilities.

(b)     The relevant Overdraft Bank shall notify the relevant Borrower of a determination of a rate of interest in respect of an Overdraft Facility.

# 12    Interest Periods

## 12.1    Selection of Interest Periods

(a)     Subject to paragraph (b) below, a Borrower (or the Company on behalf of a Borrower) may select an Interest Period relating to Facility A of three (3) Months or any other period agreed between the Borrower (or the Company on its behalf) and the Facility Agent (acting on the instructions of the Majority Lenders).

(b)     An Interest Period for a Loan shall not extend beyond the Termination Date applicable to its Facility.

(c)     A Loan has one Interest Period only.

## 12.2    Non-Business Days

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

## 13 Changes to the Calculation of Interest

### 13.1 Absence of quotations

Subject to clause 13.2 (*Market disruption*) if LIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by the Specified Time on the Quotation Day, the applicable LIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

### 13.2 Market disruption

(a) If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on each Lender's share of that Loan for the Interest Period shall be the percentage rate per annum which is the sum of:

    (i) the Margin; and

    (ii) the rate notified to the Facility Agent by that Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in that Loan from whatever source it may reasonably select.

(b) If:

    (i) the percentage rate per annum notified by a Lender pursuant to paragraph (a)(ii) above is less than LIBOR; or

    (ii) a Lender has not notified the Facility Agent of a percentage rate per annum pursuant to paragraph (a)(ii) above,

the cost to that Lender of funding its participation in that Loan for that Interest Period shall be deemed, for the purposes of paragraph (a) above, to be LIBOR.

(c) If a Market Disruption Event occurs, the Facility Agent shall, as soon as is practicable, notify the Company.

(d) In this Agreement:

**Market Disruption Event** means:

    (i) at or about noon on the Quotation Day for the relevant Interest Period LIBOR is to be determined by reference to the Reference Banks and none or only one of the Reference Banks supplies a rate to the Facility Agent to determine LIBOR for the relevant currency and Interest Period; or

    (ii) before close of business in London on the Quotation Day for the relevant Interest Period, the Facility Agent receives notifications from a Lender or Lenders (whose participations in a Loan exceed twenty (20) per cent. of that Loan) that the cost to it of funding its participation in that Loan from whatever source it may reasonably select would be in excess of LIBOR.

### 13.3 Alternative basis of interest or funding

(a) If a Market Disruption Event occurs and the Facility Agent (acting on the instructions of all the Lenders) or the Company so requires, the Facility Agent and the Company shall enter into negotiations (for a period of not more than thirty (30) days) with a view to agreeing a substitute basis for determining the rate of interest.

(b)     Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Company, be binding on all Parties.

### 13.4    Break Costs

(a)     Each Borrower shall, within three Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of a Loan or Unpaid Sum being paid by that Borrower on a day other than the last day of an Interest Period for that Loan or Unpaid Sum.

(b)     Each Lender shall, as soon as reasonably practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

## 14     Fees

### 14.1    Up-front fee

(a)     The Company shall pay to the Facility Agent an up-front fee in an aggregate amount of US$4,500,000 (being an amount equal to one point five (1.5%) per cent. of the Total Commitments in respect of Facility A Tranche 2 and Facility B Tranche 2 as at the Effective Date) for the account of each Lender in proportion to its Commitment in Facility A Tranche 2 and Facility B Tranche 2.

(b)     The up-front fee is payable on the Effective Date.

### 14.2    Agency fee

The Company shall pay to the Facility Agent (a) (for the account of the Facility Agent and Security Agent) an agency fee of US$10,000 in aggregate and; (b) (for the account of the Collateral Management Agent) an agency fee of US$65,000, in each case payable on the Effective Date and Monthly thereafter until the end of the Joint Security Period.

### 14.3    Facility B fees

(a)     The Company shall pay the relevant Issuing Bank (for the account of each relevant Facility B Lender) fees in Dollars calculated at the following rates:

(i)      in respect of each documentary letter of credit issued by an Issuing Bank, 3.50% flat per annum or part thereof of the value of the letter of credit or the amount of the drawings honoured thereunder, whichever is higher, payable (subject to paragraph (b) below) upon maturity;

(ii)     in respect of each standby letter of credit issued by an Issuing Bank, 3.50% flat per annum or part thereof of the value of the standby letter of credit or the amount paid in cancellation of the standby letter of credit, whichever is higher, payable (subject to paragraph (b) below) upon maturity; and

(iii)    in respect of each guarantee issued by an Issuing Bank, 3.50% per annum of the maximum amount of the guarantee payable (subject to paragraph (b) below) upon issuance of the guarantee.

(b)     Facility B fees payable to an Issuing Bank (other than fronting fees) shall be calculated and payable within one Business Day after the end of each calendar month. On the calculation date each Issuing Bank shall notify the Company of any fees (other than fronting fees) payable by the Borrowers as at that date.  A failure by an Issuing Bank to notify the Company of any such fees shall not prejudice the Lenders' rights to receive the same.  If the relevant Issuing Bank is also an Overdraft Bank, such fees shall be payable from an Overdraft Facility with such Issuing Bank (in its capacity as Overdraft Bank) without the need for a Utilisation Request provided the conditions in clauses 5.4(c) to

5.4(e) are met (the Overdraft Bank is authorised and instructed to transfer the relevant funds directly to the Collection Account), failing which the Company shall instruct the payment and, if not done by the Company within three (3) Business Days, the Collateral Management Agent shall be authorised to debit the Collection Account (and the Borrowers shall immediately pay any shortfall to the extent all interest obligations are not satisfied therefrom).

14.4    **Fronting fees – Facility B Tranche 2**

The Borrowers shall pay to the Issuing Bank (for its own account) a fronting fee of 0.20% per annum on the average daily Facility B Tranche 2 Outstandings (including in respect of Credit Instruments deemed to have been issued under Facility B Tranche 2 pursuant to clause 9.5). Such fees are to be calculated and payable within one Business Day after the end of each calendar month. Such fees shall be payable from an Overdraft Facility with the relevant Overdraft Bank or (if it is also an Overdraft Bank) Issuing Bank (in its capacity as Overdraft Bank) without the need for a Utilisation Request provided the conditions in clauses 5.4(c) to 5.4(e) are met (the Overdraft Bank is authorised and instructed to debit the relevant Overdraft Facility for its own account), failing which (including if the relevant Issuing Bank is not an Overdraft Bank) the Company shall instruct the payment and, if not done by the Company within three (3) Business Days, the Collateral Management Agent shall be authorised to debit the Collection Account for payment to the relevant Issuing Bank or Overdraft Bank (and the Borrowers shall immediately pay to the Issuing Bank or Overdraft Bank any shortfall to the extent such fronting fee is not satisfied therefrom).

**Section 6**
**Additional Payment Obligations**

# 15    Tax Gross Up and Indemnities

### 15.1    Definitions

(a)    In this Agreement:

**FATCA Payment** means either:

(a)    the increase in a payment made by an Obligor to a Finance Party under clause 15.8 (*FATCA Deduction and gross-up by Obligor*) or clause 15.9 (*FATCA Deduction by Finance Party*); or

(b)    a payment under clause 15.9 (*FATCA Deduction by Finance Party*).

**Protected Party** means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

**Tax Credit** means a credit against, relief or remission for, or repayment of, any Tax.

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means either the increase in a payment made by an Obligor to a Finance Party under clause 15.2 (*Tax gross-up*) or a payment under clause 15.3 (*Tax indemnity*).

(b)    Unless a contrary indication appears, in this clause 15 a reference to **determines** or **determined** means a determination made in the absolute discretion of the person making the determination.

### 15.2    Tax gross-up

(a)    Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Facility Agent accordingly.  Similarly, a Lender, Overdraft Bank or Issuing Bank shall notify the Facility Agent on becoming so aware in respect of a payment payable to that Lender, Overdraft Bank or Issuing Bank.  If the Facility Agent receives such notification from a Lender, Overdraft Bank or Issuing Bank it shall notify the Company and that Obligor.

(c)    If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e)    Within thirty (30) days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Facility Agent for the Finance Party entitled to the payment evidence reasonably

satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

### 15.3 Tax indemnity

(a) The Company shall (within three Business Days of demand by the Facility Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b) Paragraph (a) above shall not apply:

    (i) with respect to any Tax assessed on a Finance Party under the law of the jurisdiction in which:

        (A) that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

        (B) that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

    if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

    (ii) to the extent a loss, liability or cost:

        (A) is compensated for by an increased payment under clause 15.2 (*Tax gross-up*), clause 15.8 (*FATCA Deduction and gross-up by Obligor*) or clause 15.9 (*FATCA Deduction by Finance Party*); or

        (B) is compensated for by a payment under clause 15.9 (*FATCA Deduction by Finance Party*).

(c) A Protected Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Facility Agent of the event which will give, or has given, rise to the claim, following which the Facility Agent shall notify the Company.

(d) A Protected Party shall, on receiving a payment from an Obligor under this clause 15.3, notify the Facility Agent.

### 15.4 Tax Credit

If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

(a) a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b) that Finance Party has obtained, utilised and retained that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

### 15.5 Stamp taxes

The Company shall pay and, within three (3) Business Days of demand, indemnify each Secured Party against any cost, loss or liability that Secured Party incurs in relation to all stamp

duty, registration and other similar Taxes payable in respect of any Finance Document, provided that this Clause shall not apply in respect of any stamp duty, registration or similar Taxes payable in respect of an assignment, sub-participation or transfer by a Secured Party of any of its rights or obligations under a Finance Document.

15.6    **VAT**

(a)    All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)    If VAT is or becomes chargeable on any supply made by any Finance Party (the **Supplier**) to any other Finance Party (the **Recipient**) under a Finance Document, and any Party other than the Recipient (the **Relevant Party**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The Recipient must (where this paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)    Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)    Any reference in this clause 15.6 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term **representative member** to have the same meaning as in the Value Added Tax Act 1994).

(e)    In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

## 15.7 FATCA Information

(a) Subject to clause 15.7(c) below, each Party shall, within ten (10) Business Days of a reasonable request by another Party:

    (i) confirm to that other Party whether it is:

        (A) a FATCA Exempt Party; or

        (B) not a FATCA Exempt Party,

    (ii) supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

    (iii) supply to that other Party such forms, documentation and other information relating to its status as that other Paty reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b) If a Party confirms to another Party pursuant to clause (A) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c) Clause 15.7(a) above shall not oblige any Finance Party to do anything which would or might in its reasonable opinion constitute a breach of:

    (i) any law or regulation;

    (ii) any fiduciary duty; or

    (iii) any duty of confidentiality.

(d) If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with clause 15.7(a) above (including, for the avoidance of doubt, where clause 15.7(c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e) If a Borrower is a US Tax Obligor, or where the Facility Agent reasonably believes that its obligations under FATCA require it, each Lender shall, within ten (10) Business Days of:

    (i) where a Borrower is a US Tax Obligor and the relevant Lender is an Original Lender, the date of this Agreement;

    (ii) where a Borrower is a US Tax Obligor and the relevant Lender is a New Lender, the relevant Transfer Date;

    (iii) the date a new US Tax Obligor accedes as a Borrower; or

    (iv) where the Borrower is not a US Tax Obligor, the date of a request from the Facility Agent,

supply to the Facility Agent:

    (v) a withholding certificate on Form W-8 or Form W-9 (or any successor form) (as applicable); or

(vi) any withholding statement and other documentation, authorisations and waivers as the Facility Agent may require to certify or establish the status of such Lender under FATCA.

The Facility Agent shall provide any withholding certificate, withholding statement, documentation, authorisations and waivers it receives from a Lender pursuant to this paragraph (e) to the Borrower and shall be entitled to rely on any such withholding certificate, withholding statement, documentation, authorisations and waivers provided without further verification. The Facility Agent shall not be liable for any action taken by it under or in connection with this paragraph (e).

(f) Each Lender agrees that if any withholding certificate, withholding statement, documentation and waivers provided to the Facility Agent pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, it shall such withholding certificate, withholding statement, documentation, authorisations and waivers or promptly notify the Facility Agent in writing of its legal inability to do so. The Facility Agent shall, upon the reasonable request of the Borrower, provide any such updated withholding certificate, withholding statement, documentation, authorisations and waivers to the Borrower. The Facility Agent shall not be liable for any action taken by it under or in connection with this paragraph (f).

## 15.8 FATCA Deduction and gross-up by Obligor

(a) If an Obligor is required to make a FATCA Deduction, that Obligor shall make that FATCA Deduction and any payment required in connection with that FATCA Deduction within the time allowed and in the minimum amount required by FATCA.

(b) If a FATCA Deduction is required to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any FATCA Deduction) leaves an amount equal to the payment which would have been due if no FATCA Deduction had been required.

(c) The Company shall promptly upon becoming aware that an Obligor must make a FATCA Deduction (or that there is any change in the rate or the basis of a FATCA Deduction) notify the Facility Agent accordingly. Similarly, a Finance Party shall notify the Facility Agent on becoming so aware in respect of a payment payable to that Finance Party. If the Facility Agent receives such notification from a Finance Party it shall notify the Company and that Obligor and the Facility Agent shall notify the other Parties.

(d) Within thirty (30) days of making either a FATCA Deduction or any payment required in connection with that FATCA Deduction, the Obligor making that FATCA Deduction or payment shall deliver to the Facility Agent for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party that the FATCA Deduction has been made or (as applicable) any appropriate payment paid to the relevant governmental or taxation authority.

## 15.9 FATCA Deduction by a Finance Party

(a) Each Finance Party may make any FATCA Deduction it is required by FATCA to make, and any payment required in connection with that FATCA Deduction, and no Finance Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction. A Finance Party which becomes aware that it must make a FATCA Deduction in respect of a payment to another Party (or that there is any change in the rate or the basis of such FATCA Deduction) shall notify that Party and the Facility Agent and the Facility Agent shall notify the other Parties.

(b) If the Facility Agent is required to make a FATCA Deduction in respect of a payment to a Finance Party under clause 34.2 (*Distributions by the Facility Agent*) which relates to a payment by an Obligor, the amount of the payment due from that Obligor shall be

increased to an amount which (after the Facility Agent has made such FATCA Deduction), leaves the Facility Agent with an amount equal to the payment which would have been made by the Facility Agent if no FATCA Deduction had been required.

(c)     The Facility Agent shall promptly upon becoming aware that it must make a FATCA Deduction in respect of a payment to a Finance Party under clause 34.2 (*Distributions by the Facility Agent*) which relates to a payment by an Obligor (or that there is any change in the rate or the basis of such a FATCA Deduction) notify the Company, the relevant Obligor and the relevant Finance Party.

(d)     The Company shall (within three (3) Business Days of demand by the Facility Agent) pay to a Finance Party (as the case may be) an amount equal to the loss, liability or cost which that Finance Party determines will be or has been (directly or indirectly) suffered by that Finance Party as a result of another Finance Party making a FATCA Deduction in respect of a payment due to it under a Finance Document. This paragraph shall not apply to the extent a loss, liability or cost is compensated for by an increased payment under clause 15.9(b) above.

(e)     A Finance Party making, or intending to make, a claim under clause 15.9(d) above shall promptly notify the Facility Agent of the FATCA Deduction which will give, or has given, rise to the claim, following which the Facility Agent shall notify the Company.

15.10     **Tax Credit and FATCA**

If an Obligor makes a FATCA Payment and the relevant Finance Party determines that:

(a)     a Tax Credit is attributable to an increased payment of which that FATCA Payment forms part, to that FATCA Payment or to a FATCA Deduction in consequence of which that FATCA Payment was required; and

(b)     that Finance Party has obtained, utilised and retained that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the FATCA Payment not been required to be made by the Obligor.

# 16     Increased Costs

16.1     **Increased costs**

(a)     Subject to clause 16.3 (*Exceptions*), the Company shall, within three (3) Business Days of a demand by the Facility Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates, including any Increased Cost which:

(i)     arises as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement; and/or

(ii)     is a Basel II Increased Cost and/or a Basel III Increased Cost.

(b)     In this Agreement **Increased Costs** means:

(i)     a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(ii)     an additional or increased cost; or

(iii)     a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of their respective Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document and as determined by that Finance Party.

## 16.2 Increased cost claims

(a) A Finance Party intending to make a claim pursuant to clause 16.1 (*Increased costs*) shall notify the Facility Agent of the event giving rise to the claim, following which the Facility Agent shall promptly notify the Company.

(b) Each Finance Party shall, as soon as practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Increased Costs.

## 16.3 Exceptions

(a) Clause 16.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(i) attributable to a Tax Deduction required by law to be made by an Obligor;

(ii) compensated for by clause 15.9 (*FATCA Deduction by a Finance Party*);

(iii) compensated for by clause 15.3 (*Tax indemnity*) (or would have been compensated for under clause 15.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of clause 15.3 (*Tax indemnity*) applied); or

(iv) attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation.

(b) In this clause 16.3 reference to a **Tax Deduction** has the same meaning given to the term in clause 15.1 (*Definitions*).

# 17 Other Indemnities

## 17.1 Currency indemnity

(a) If any sum due from an Obligor under the Finance Documents (a **Sum**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **First Currency**) in which that Sum is payable into another currency (the **Second Currency**) for the purpose of:

(i) making or filing a claim or proof against that Obligor; or

(ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within three (3) Business Days of demand, indemnify the each Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 17.2 Other indemnities

(a) The Company shall (or shall procure that an Obligor will), within three (3) Business Days of demand, indemnify each Secured Party against any cost, loss or liability incurred by it as a result of:

    (i) the occurrence of any Event of Default;

    (ii) a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of clause 33 (*Sharing among the Finance Parties*);

    (iii) funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower or the Company in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone);

    (iv) issuing or making arrangements to issue or make available a Fronted Facility requested by a Borrower in a Utilisation Request but not issued by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

    (v) a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company.

(b) The Company shall promptly indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate, against any cost, loss or liability incurred by that Finance Party or its Affiliate (or officer or employee of that Finance Party or Affiliate) in connection with or arising out of the use of proceeds under the Facility or Transaction Security being taken over the Charged Property (including but not limited to those incurred in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry concerning the use of proceeds under the Facility), unless such loss or liability is caused by the gross negligence or wilful misconduct of that Finance Party or its Affiliate (or employee or officer of that Finance Party or Affiliate). Any Affiliate or any officer or employee of a Finance Party or its Affiliate may rely on this clause 17.2 subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

### 17.3 Indemnity to the Facility Agent and/or Collateral Management Agent

The Company shall promptly indemnify the Facility Agent and/or the Collateral Management Agent against:

(a) any cost, loss or liability incurred by the Facility Agent and/or the Collateral Management Agent (acting reasonably) as a result of:

    (i) investigating any event which it reasonably believes is a Default;

    (ii) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

    (iii) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

(b) any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Facility Agent and/or the Collateral Management Agent (otherwise than by reason of the such party's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to clause 34.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's or the

Collateral Management Agent's (as the case may be) negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent and/or the Collateral Management Agent (as the case may be) in acting as the Facility Agent and/or the Collateral Management Agent (as the case may be) under the Finance Documents.

17.4    **Indemnity to the Security Agent**

(a)    Each Obligor jointly and severally shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:

(i)    any failure by the Company to comply with its obligations under clause 19 (*Costs and expenses*);

(ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(iii)    the taking, holding, protection or enforcement of the Transaction Security;

(iv)    the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

(v)    any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

(vi)    acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b)    Each Obligor expressly acknowledges and agrees that the continuation of its indemnity obligations under this clause 17.4 will not be prejudiced by any release under clause 31.26 (*Releases*) or otherwise in accordance with the terms of this Agreement.

(c)    The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this clause 17.4 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

17.5    **Limited Liability - Germany**

(a)    The enforcement of each joint and several liability under this clause 17.4 (*Indemnities*) and the other payment obligations set out in this Agreement (in particular clause 19.4 (*Indemnity expenses*) and clause 31.3 (*Parallel Debt (Covenant to pay the Security Agent)*) owed by any German Obligor) shall be limited as set out in clause 20.10 (*Guarantee Limitations (Germany)*), which shall apply *mutatis mutandis.*

(b)    Paragraph (f) of clause 24.36 (*Dividends and share redemptions*) and clause 25.4 (*Withdrawals from Collection Account*) and any other payment, receipt or withdrawal restriction shall not apply to a German Obligor to the extent as required in order to ensure compliance with the limitations set out in clause 20.10 (*Guarantee Limitations (Germany)*), which shall apply *mutatis mutandis.*

(c)    The limitation set out in clause 20.10 (*Guarantee Limitations (Germany)*) of this Agreement shall apply *mutatis mutandis* to any upstream or cross-stream distributions, payments and cash sweeps pursuant to the Finance Documents and made by a German Obligor (including without limitation, clause 9.4 (*Facility Accounts sweep*).

## 18    Mitigation by the Lenders

### 18.1    Mitigation

(a)    Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in any facility ceasing to be available or any amount becoming payable under or pursuant to, or cancelled pursuant to, any of clause 9.1 (*Illegality*) or, in respect of the Issuing Bank, clause 9.2 (*Illegality in relation to the Issuing Bank*), clause 15 (*Tax gross-up and indemnities*) or clause 16 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

### 18.2    Limitation of liability

(a)    The Company shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under clause 18.1 (*Mitigation*).

(b)    A Finance Party is not obliged to take any steps under clause 18.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 19    Costs and Expenses

### 19.1    Transaction expenses

The Company shall promptly on demand pay each Secured Party the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (and, in the case of the Security Agent, by any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the date of this Agreement,

and shall promptly on demand pay to each Issuing Bank the amount of all costs and expenses including without limitation postage, courier fees, SWIFT charges and out-of-pocket expenses in connection with the issue or entry into and operation of Fronted Facilities.

In relation to any Obligor incorporated under the laws of Spain and to each Spanish Pledgor (if any) and any Finance Documents they execute, sign or formalize subject to the laws of Spain, the Company and/or the corresponding Spanish Obligor or Spanish Pledgor shall also pay the applicable notary public fees and registry fees whenever due.

### 19.2    Amendment costs

If (a) an Obligor requests an amendment, waiver or consent, or additional or replacement security as contemplated in clause 24.25 (*Conditions Subsequent*) or otherwise, or (b) an amendment is required or agreed pursuant to clause 34.10 (*Change of currency*),  the Company shall, within three (3) Business Days of demand, reimburse each Secured Party for the amount of all costs and expenses (including legal fees) reasonably incurred by that Secured Party (and, in the case of the Security Agent, by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

In relation to any Obligor incorporated under the laws of Spain and to each Spanish Pledgor (if any) and any Finance Documents they execute, sign or formalize subject to the laws of Spain,

the Company and/or the corresponding Spanish Obligor or Spanish Pledgor shall also pay the applicable notary public fees and registry fees whenever due.

### 19.3 Enforcement and preservation costs

The Company shall, within three (3) Business Days of demand, pay to each Secured Party the amount of all costs and expenses (including legal fees and the fees of any court representative (*procurador*), even if the intervention of lawyers or court representatives is not mandatory)) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

### 19.4 Indemnity expenses

The Company shall:

(a) pay or reimburse the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent, for all its reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable out-of-pocket legal fees and expenses, and printing, reproduction and document delivery expenses) incurred in connection with the syndication, development, preparation, negotiation, execution, delivery and administration of, and any amendment, supplement or modification to, this Agreement and the other Finance Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees and disbursements of counsel to such Finance Parties;

(b) pay or reimburse each Lender, the Issuing Banks, the Overdraft Bank and the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent for all its documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Finance Documents and any such other documents or any restructuring or "work-out" related hereto and thereto, including, without limitation, the reasonable and documented fees and disbursements of counsel to the Lenders and of counsel to the Issuing Bank, the Overdraft Bank, Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent;

(c) pay or reimburse the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent for its documented costs and expenses incurred in connection with inspections performed pursuant to the Finance Documents, and any other due diligence performed in connection with this Agreement and the other Finance Documents, including:

(i) the documented fees and disbursements of counsel to the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent; and

(ii) the costs and expenses associated with Security searches;

(d) pay, indemnify, and hold each Finance Party harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent (including the determination of whether or not any such waiver or consent is required) under or in respect of, this Agreement, the other Finance Documents and any such other documents;

(e) pay, indemnify, and hold each Finance Party, and each of their respective officers, employees, directors, trustees, agents, advisors, affiliates and controlling persons (each, an **Indemnitee**), harmless from and against any and all other liabilities, obligations,

losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable and documented legal fees) with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Finance Documents, and any such other documents, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Obligor or any of their respective Subsidiaries, or any of its properties (all the foregoing in this paragraph (e), collectively, the **Indemnified Liabilities**); provided that, the Obligors shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities, to the extent such Indemnified Liabilities:

(i)     are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the intentional breach, gross negligence or willful misconduct of such Indemnitee; or

(ii)    result from a claim brought by any Obligor against an Indemnitee for breach in bad faith of such Indemnitee's obligations under this Agreement or under any other Finance Document, if such Obligor has obtained a final, non-appealable judgment in its favour on such claim as determined by a court of competent jurisdiction.

No Indemnitee shall have any liability (whether direct or indirect, in contract, tort, equity or otherwise) to an Obligor or an Obligor's Subsidiaries or Affiliates or to an Obligor's or its equity holders or creditors arising out of, related to or in connection with any aspect of this Agreement, the other Finance Documents or any of the transactions contemplated by this Agreement, except to the extent of direct (as opposed to special, indirect, consequential or punitive) damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnitee's bad faith, intentional breach, gross negligence or willful misconduct. The Indemnitees shall have liability only to the relevant Obligor (as opposed to any other person).  Notwithstanding any other provision of this Agreement, no party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, except to the extent such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise directly from the gross negligence, bad faith, intentional breach or willful misconduct of such Indemnitee. The agreements in this clause 19.4 (*Indemnity expenses*) shall survive repayment of the Outstandings and all other amounts payable under the Finance Documents and termination of this Agreement. This clause 19.4 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**Section 7**
**Guarantee**

## 20   Guarantee and Indemnity

### 20.1   Guarantee and indemnity

Each Guarantor irrevocably and unconditionally jointly and severally:

(a)     guarantees to each Finance Party punctual performance by each other Obligor, each Spanish Pledgor and each South African Pledge Counterparty of all that Obligor's obligations under the Finance Documents;

(b)     undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c)     agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of an Obligor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due.   The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this clause 20 if the amount claimed had been recoverable on the basis of a guarantee.

### 20.2   Continuing Guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

### 20.3   Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration, judicial management or otherwise, without limitation, then the liability of each Guarantor under this clause 20 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

### 20.4   Waiver of defences

The obligations of each Guarantor under this clause 20 will not be affected by an act, omission, matter or thing which, but for this clause 20, would reduce, release or prejudice any of its obligations under this clause 20 (without limitation and whether or not known to it or any Finance Party) including:

(a)     any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)     the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)    any amendment, novation, supplement, extension restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)    any insolvency or similar proceedings.

In case of an Additional Guarantor incorporated under the laws of Spain accedes to this Agreement as Guarantor, such Spanish Guarantor waives any right of exclusion, order and/or division (*beneficios de excusión, orden y division*) under article 1830 et seq of the Spanish Civil Code.

20.5    **Guarantor Intent**

Without prejudice to the generality of clause 20.4 (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following:  business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

20.6    **Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on behalf of any of them) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this clause 20.  This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

20.7    **Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on behalf of any of them) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on behalf of any of them) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this clause 20.

20.8    **Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Facility Agent otherwise directs, no Guarantor will exercise any rights which it may have by reason of

performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this clause 20:

(a) to be indemnified by an Obligor;

(b) to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

(c) to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d) to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under clause 20.1 (*Guarantee and indemnity*);

(e) to exercise any right of set-off against any Obligor; and/or

(f) to claim or prove as a creditor of any Obligor in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it will promptly pay an equal amount to the Facility Agent or as the Facility Agent may direct for application in accordance with clause 34 (*Payment mechanics*).

## 20.9 Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

## 20.10 Guarantee Limitations (Germany)

(a) The restrictions in this clause 20.10 (*Guarantee Limitations (Germany)*) shall apply to any guarantee, and indemnity granted by a Guarantor incorporated under the laws of Germany as a limited liability company (**GmbH**) (a **German Guarantor**) or other payment obligation under this clause 20 (*Guarantee and indemnity*) or any other provision of the Finance Documents (hereinafter a **German Guarantee**) with respect to liabilities of its direct or indirect shareholder(s) (upstream) or an entity affiliated with such shareholder (*verbundenes Unternehmen*) within the meaning of section 15 et seq. of the German Stock Corporation Act *(Aktiengesetz)* (cross-stream) (excluding, for the avoidance of doubt any direct or indirect Subsidiary of such German Guarantor).

(b) The restrictions in this clause 20.10 shall not apply to the extent the German Guarantor secures any indebtedness under any Finance Document in respect of (i) loans to the extent they are on-lent or otherwise (directly or indirectly) passed on to the relevant German Guarantor or its Subsidiaries and such amount on-lent or otherwise passed on is not repaid or (ii) any other benefit granted under the Finance Documents.

(c) If payment under this German Guarantee would (i) cause the amount of a German Guarantor's net assets, as calculated pursuant to this clause 20.10, to fall below the amount of its registered share capital (*Stammkapital*), or (ii) increase an existing shortage of its registered share capital (*Vertiefung einer Unterbilanz*), in each case in violation of section 30 of the German Limited Liability Companies Act (*Gesetz betreffend die Gesellschaft mit beschränkter Haftung*) (**GmbHG**) (such events are hereinafter referred to as a **Capital Impairment**), then the Finance Parties shall not demand such payment or enforcement from such German Guarantor except in an amount and to the extent such Capital Impairment would not occur.

(d) If the relevant German Guarantor does not notify the Facility Agent in writing (the **Management Notification**) within ten (10) Business Days after the Facility Agent notified

such German Guarantor of its intention to demand payment under the German Guarantee that a Capital Impairment would occur (setting out in reasonable detail to what extent a Capital Impairment would occur), then the restrictions set out in paragraph (c) shall not apply.

(e)     If the relevant German Guarantor does not provide an Auditors' Determination within 30 Business Days from the date on which the Facility Agent received the Management Notification then the restrictions set out in the paragraph (c) shall not apply and the Facility Agent shall not be obliged to assign or make available to the German Guarantor any net proceeds realized, provided that this paragraph (e) shall not apply if the relevant German Guarator has taken all reasonable endeavours to have the Auditors' Determination prepared within the aforementioned timeframe but such Auditors' Determination has not become available to that German Guarantor (including, but not limited to, for the reason that the relevant Auditors did not and/or were not able to prepare the relevant Auditors' Determination within the aforementioned timeframe), it being understood that in such case the relevant German Guarantor shall provide the Auditors' Determination to the Facility Agent as soon as it becomes available.

(f)     The calculation of net assets (the **Net Assets**) shall only take into account the sum of the values of the assets of the relevant German Guarantor determined in accordance with applicable law and court decisions and, if there is no positive going concern (positive *Fortführungsprognose*) based on the lower of book value (*Buchwert*) and liquidation value (*Liquidationswert*) (consisting of all assets which correspond to those items listed in section 266 subsection (2) A, B and C of the German Commercial Code (*Handelsgesetzbuch*) **HGB**) less the relevant German Guarantor's liabilities (consisting of all liabilities and liability reserves which correspond to those items listed in accordance with section 266 subsection (3) B, C and D HGB).

(g)     For the purposes of calculating the Net Assets, the following balance sheet items shall be adjusted as follows:

(i)     the amount of any increase in the registered share capital of the relevant German Guarantor which was carried out after the date of  the Amendment and Restatement Agreement without the prior written consent of the Facility Agent shall be deducted from the amount of the registered share capital of the relevant German Guarantor; and

(ii)     loans or other contractual liabilities incurred by the relevant German Guarantor in breach of the Finance Documents shall not be taken into account as liabilities.

(h)     The relevant German Guarantor shall realize, to the extent legally permitted and commercially reasonable in a situation where it does not have sufficient Net Assets to maintain its registered share capital, all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the assets if such asset is not necessary for the German Guarantor's business (*betriebsnotwendig*).

(i)     The relevant German Guarantor shall take any specific measure (the **Specific Measure**) which the Facility Agent has reasonably requested and which the relevant German Guarantor is legally permitted to take in order to avoid demanding payment under the German Guarantee causing a Capital Impairment of the relevant German Guarantor (including without limitation, setting off-claims), provided that it is commercially justifiable to take the Specific Measure. The restrictions set out in paragraph (c) above shall not apply if and to the extent that the relevant German Guarantor has not taken the relevant Specific Measure within an appropriate period, and such failure has reduced the amount realized under the German Guarantee, unless:

(i)     the Specific Measure requires any cooperation of any person and such person does not take any required action or otherwise fails to cooperate at the appropriate time;

(ii)     taking the Specific Measure is commercially not justifiable;

(iii)    it is impossible to take the Specific Measure; or

(iv)     taking the Specific Measure is not legally permitted.

(j)     If the relevant German Guarantor claims that a Capital Impairment would occur on payment under this German Guarantee, the German Guarantor may (at its own cost and expense) arrange for the preparation of a balance sheet by a firm of recognized auditors (the **Auditors**) in order to have such Auditors determine whether (and, if so, to what extent) any payment under this Guarantee would cause a Capital Impairment (the **Auditors' Determination**).

(k)     The Auditors' Determination shall be prepared, taking into account the adjustments set out in paragraphs (f) and (g), by applying the generally accepted accounting principles applicable from time to time in Germany (*Grundsätze ordnungsmäßiger Buchführung*) based on the same principles and evaluation methods as constantly applied by the relevant German Guarantor in the preparation of its financial statements, in particular in the preparation of its most recent annual balance sheet, and taking into consideration applicable court rulings of German courts. Subject to paragraph (o) below, such Auditors' Determination shall be binding on the relevant German Guarantor and the Finance Parties.

(l)     Even if the relevant German Guarantor arranges for the preparation of an Auditors' Determination, the relevant German Guarantor's obligations under the mitigation provisions set out in paragraph (h) shall continue to exist.

(m)    If, after it has been provided with an Auditors' Determination which prevented it from demanding any or only partial payment under the German Guarantee, the Facility Agent has reasonable grounds to believe that the financial condition of the relevant German Guarantor as set out in the Auditors' Determination has substantially improved (in particular, if the relevant German Guarantor has taken any action in accordance with the mitigation provisions set out in paragraph (h)), the Facility Agent may (but shall not be obligated), at the direction of the Majority Lenders, at the relevant German Guarantor's cost and expense, arrange for the preparation of an updated balance sheet of the relevant German Guarantor by applying the same principles that were used for the preparation of the Auditors' Determination by the Auditors who prepared the Auditors' Determination pursuant to paragraph (j) in order for such Auditors to determine whether (and, if so, to what extent) the situation leading to a Capital Impairment has been cured as a result of the improvement of the financial condition of the relevant German Guarantor. The Facility Agent may, at the direction of the Majority Lenders, demand payment under the German Guarantee to the extent that the Auditors determine that the Capital Impairment has been cured. Without prejudice to the foregoing, the Facility Agent shall have no obligation to examine or analyze the financial condition of any German Guarantor.

(n)     Any managing director (*Geschäftsführer*) of a German Guarantor may request reimbursement from the Lenders (pro rata) or the Facility Agent for such net proceeds received by the relevant Lenders or Facility Agent from the realization of the security and/or this guarantee provided hereunder if such managing director is required to reimburse the German Guarantor pursuant to section 64, sentence 3 GmbHG due to a final nonappealable (*rechtskräftig*) court decision (other than a court decision based on omission (*Versäumnisurteil*) or recognisance (*Anerkenntnis*)) which states that either the granting or a payment under the German Guarantee led to the illiquidity (*Zahlungsunfähigkeit*) of the relevant German Guarantor, such request to be made within one month from the date of service (*Zustellung*) on such managing director the German Guarantor of such final court decision.

(o)     Notwithstanding any limitation under this Guarantee, the Facility Agent shall be entitled (but not required) to further pursue in court payment claims under this guarantee granted

by the respective German Guarantor if it disagrees with the Auditor's Determination by claiming in court that demanding payment under the German Guarantee against the relevant German Guarantor does not violate §§ 30, 31 GmbHG.

The agreement of the Facility Agent to abstain from demanding any or part of the payment under this Guarantee in accordance with the provisions above shall constitute neither a waiver (*Verzicht*) of any right granted under this Agreement or any other Finance Document to any Finance Party nor a definite defense (*Einwendung*) of the relevant German Guarantor against any of the guaranteed obligations, but such defense shall always be subject to the terms and conditions of this Clause 20.10.

(p)     In addition to the limitations on the granting, enforcement of and performance under the German Guarantee set forth in this clause 20.10, it is hereby agreed that the German Guarantor shall have a defense against any claim, enforcement, or other request for performance or requirement to perform, whether such requirement is based on statute, contract or otherwise, to the extent such claim, enforcement or other performance would result in personal liability for the German Guarantor's managing director(s) under then applicable law and any claims arising under the German Guarantee shall be limited to the extent of such defense, such that such personal liability would not be incurred. Nothing herein shall nor shall be deemed to prevent the Facility Agent from asserting, in a court of law or otherwise, that the claim, enforcement or other request for performance would not cause the German Guarantor's managing director(s) to incur any liability, nor shall it prevent the German Guarantor from asserting, in a court of law or otherwise, to the contrary.

(q)     The aforementioned provisions shall apply to a limited partnership with a limited liability company as its general partner (GmbH & Co. KG) mutatis mutandis and all references to net assets shall be construed as a reference to the aggregated net assets of the general partner and the limited partnership.

20.11    **Guarantee Limitations (Spain)**

Where a Guarantor is incorporated under the laws of Spain (the "**Spanish Guarantor**"):

(i)     The obligations of any Spanish Guarantor as a limited liability company (*sociedad de responsabilidad limitada*) shall not extend to any obligations or liabilities incurred by any Obligor (as applicable) borrowing (or guaranteeing the borrowing of) funds (but only in respect of those funds) under this Agreement for the purpose of (a) acquiring quotas (*participaciones sociales*) representing the share capital of such Spanish Guarantor or quotas (*participaciones sociales*) or shares (*acciones*) representing the share capital of a company within its group, or (b) refinancing a previous debt incurred by any Obligor for the acquisition of quotas (*participaciones sociales*) representing the share capital of such Spanish Guarantor or quotas (*participaciones sociales*) or shares (*acciones*) representing the share capital of a company within its group;

For the purposes of the above, a reference to the "group" of a Spanish Obligor shall have the meaning set out in article 42 of the Spanish Commercial Code.

(ii)    In case a Spanish Guarantor incorporated under the laws of Spain in the form of a Spanish public limited company (*sociedad anónima*) accedes to this Agreement (or in case a Spanish Guarantor is transformed into a Spanish *sociedad anónima*), the obligations of such Spanish Guarantor shall not extend to any obligations or liabilities incurred by any Obligor, as a result of such Obligor borrowing (or guaranteeing the borrowing of) funds (but only in respect of those funds) under this Agreement for the purpose of (a) acquiring shares (*acciones*) representing the share capital of such Spanish Guarantor or shares (*acciones*) or quotas (*participaciones sociales*) representing the share capital of its holding company, or (b) refinancing a previous debt incurred by any Obligor for the acquisition of shares (*acciones*) representing the share capital of such Spanish Guarantor or shares

(*acciones*) or quotas (*participaciones sociales*) representing the share capital of its holding company.

For the purposes of sections (i) and (ii) above, a reference to a "holding company" of a Spanish Guarantor shall mean the company which, directly or indirectly, owns the majority of the voting rights of such Spanish Guarantor or that may have a dominant influence on such Spanish Obligor. It shall be presumed that one company has a dominant influence on another company when: (i) any of the scenarios set out in section 1 of article 42 of the Spanish Commercial Code are met; or (ii) at least half plus one of the members of the managing body of the Spanish Guarantor are also members of the managing body or top managers (*altos directivos*) of the dominant company or of another company controlled by such dominant company.

(iii)    The limitation set out in sections (i) and (ii) above shall apply *mutatis mutandis* to the Spanish Pledges created by each Spanish Pledgor or to any other security granted by any security provider incorporated under the laws of Spain and to any guarantee, undertaking, obligation, indemnity and payment, including (but not limited to) distributions, cash sweeps, credits, loans and set-offs, pursuant to or permitted by the Finance Documents and made by a Spanish Obligor.

In any event, any Transaction Security Documents that are signed by any Spanish Obligor, will specify which Facilities are secured by such Guarantor and/or such Transaction Security and any other relevant issues which could have an impact on such limitation language.

## 20.12    Guarantee Limitations (Belgium)

The total liability of any Belgian Obligor for the obligations of any other Obligor under the Finance Documents shall at all times be limited to an amount not exceeding the greater of:

(a)    the aggregate of all principal amounts borrowed by such Belgian Obligor (or its direct or indirect Subsidiaries) under any intra-group arrangement (regardless of the form thereof,including through the subscription of debt instruments) to the extent funded by funds borrowed under this Agreement; and

(b)    the greater of:

(i)    eighty per cent. (80%) of such Belgian Obligor's net assets (*eigen vermogen/capitaux propres*) as derived from the latest audited financial statements of the respective Belgian Obligor available at the time a demand for payment under this Agreement is made; and

(ii)    eighty per cent. (80%) of such Belgian Obligor's net assets (*eigen vermogen/capitaux propres*) as derived from the current audited financial statements of the respective Belgian Obligor;

but so that the amount determined under (i) and (ii) shall be limited to the difference between (a) hundred per cent. (100%) of such Belgian Obligor's net assets (*eigen vermogen/capitaux propres*) as derived from the latest audited financial statements of the Belgian Obligor available at the time a demand for payment under this Agreement is made, or the current audited financial statements of such Belgian Obligor, whichever is higher; and (b) the amount then due and payable, or the amount that has been paid, by such Belgian Obligor under the U.S. Loan Documents (as defined in the Intercreditor Agreement). No Belgian Obligor shall be liable for the obligations of any other Obligor under the Finance Documents, to the extent that such liability would result in such guarantee constituting unlawful financial assistance within the meaning of Article 329 or 629 of the Belgian Companies Code (or any equivalent and applicable provisions in any Relevant Jurisdiction).

No Belgian Obligor shall be liable for the obligations of any other Obligor under the Finance Documents, to the extent that such liability would result in such guarantee constituting unlawful

financial assistance within the meaning of Article 329 or 629 of the Belgian Companies Code (or any equivalent and applicable provisions in any Relevant Jurisdiction).

20.13    **Guarantee Limitations (Morocco)**

(a)    The restrictions in this clause 20.13 (*Guarantee Limitations (Morocco)*) shall apply to any guarantee and indemnity (hereinafter the **Moroccan Guarantee**) granted by a Guarantor incorporated under the laws of Morocco as a limited liability company with a sole shareholder (**SARLAU**) (a **Moroccan Guarantor**) to secure liabilities of its direct or indirect shareholder(s) (upstream) (excluding, for the avoidance of doubt any direct subsidiary of such Moroccan Guarantor).

(b)    The Moroccan Guarantor shall not guarantee any liability of an Obligor which, if incurred, would constitute a misuse of corporate assets or powers within the meaning of article 107 of law n°5-96 relating to limited liability companies (*sociétés à responsabilité limitée*) or more generally, under any other applicable law or regulations having the same effect, as interpreted by Moroccan courts from time to time.

(c)    Any amount due under a guarantee agreement or security agreement by a Moroccan party to a non-Moroccan party may only be transferred outside Morocco if such payment is in compliance with the applicable Moroccan foreign exchange control regulations or has been expressly approved in advance and in written by the Moroccan Foreign Exchange Office (*Office des Changes marocain*). Any set-off between a Moroccan party and a non-Moroccan party located outside Morocco requires a prior express approval from the Moroccan Foreign Exchange Office (*Office des Changes marocain*), being specified that any amount due by the Moroccan Guarantor under the Moroccan Guarantee may be freely transferable to the Lenders on the ground of article 17 of the law No. 19-94 (Dahir No. 1-95-1 dated January 26, 1995) applicable to free export zones.

(d)    The Moroccan Guarantor's obligations under the Finance Documents will only be valid if limited to the amounts which are (i) on-lent or otherwise (directly or indirectly) made available to the relevant Moroccan Guarantor and (ii) are not repaid by the Moroccan Guarantor.

(e)    In the event that there is any inconsistency between the provisions of this Clause 20.13 and any other provision of this Agreement or any other Finance Documents, the provisions of this Clause 20.13 shall prevail.

## Section 8
## Representations, Undertakings and Events of Default

## 21    Representations

### 21.1    General

Each Obligor makes the representations and warranties set out in this clause 21 to each Finance Party.

### 21.2    Status

(a)    It is a limited liability corporation, duly incorporated and validly existing under the law of its Original Jurisdiction.

(b)    Each of its Subsidiaries is a limited liability corporation, duly incorporated and validly existing and in good standing under the law of its jurisdiction of incorporation (in relation to good standing, to the extent that concept is applicable in that jurisdiction).

(c)    Subject to the Orders, it and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(d)    It is not a FATCA FFI or a US Tax Obligor, but excluding those Obligors identified by the Company as US Tax Obligors prior to the Effective Date and notified to the Facility Agent

### 21.3    Binding obligations

Subject to the Legal Reservations and the Orders:

(a)    the obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations; and

(b)    (without limiting the generality of paragraph (a) above), each Security Document to which it is a party creates the security interests which that Security Document purports to create and those security interests are valid and effective.

### 21.4    Non-conflict with other obligations

Subject to the Orders and the Legal Reservations, the entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security do not and will not conflict with:

(a)    any law or regulation applicable to it;

(b)    the constitutional documents of any member of the Group; or

(c)    any agreement or instrument binding upon it or any member of the Group or any of its or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument.

### 21.5    Power and authority

(a)    Subject to the Orders, it has the power to enter into, perform and deliver, and, subject to the Orders, have taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b) No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

## 21.6 Validity and admissibility in evidence

(a) All Authorisations and any other acts, conditions or things required or desirable:

    (i) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

    (ii) to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained, effected, done, fulfilled or performed and are in full force and effect except any Authorisation or other act, condition or thing referred to in clause 21.8 (*No filing or stamp taxes*), which will be promptly obtained, effected, done, fulfilled or performed after the date of this Agreement.

(b) All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect.

## 21.7 Governing law and enforcement

(a) The choice of governing law of the Finance Documents will be recognised and enforced in its Relevant Jurisdictions (provided, as regards Morocco, that the Finance Documents do not contravene with Moroccan public policy rules (*dispositions d'ordre public*)).

(b) Any judgment obtained in relation to a Finance Document in the relevant jurisdiction as specified in that Finance Document will be recognised and enforced in its Relevant Jurisdictions.

(c) Any arbitral award obtained in relation to a Finance Document in the relevant seat of that arbitral tribunal specified in that Finance Document will be recognised and enforced in its jurisdiction of incorporation (subject, as regards Morocco, to being vested with exequatur by Moroccan competent courts).

## 21.8 No filing or stamp taxes

Other than under US law as required by the Orders, under the laws of its Relevant Jurisdiction it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents except:

(a) for any stamp duty to be paid on the Finance Documents for the purpose of making them admissible as evidence in the courts of the Republic of Cyprus or in the courts of the Hellenic Republic or to enforce them in the Hellenic Republic or to take security for the Finance Documents over assets located in the Hellenic Republic; and (ii) for any fees and duties in connection with the opening of court or enforcement proceedings in respect of the Finance Documents in the Hellenic Republic or the registration or enforcement of any security interest over assets located or deemed located in the Hellenic Republic;

(b) the Spanish Pledges (if any) and any other Transaction Security governed by Spanish law granted as a non-possessory pledge (*prenda sin desplazamiento*) or mortgage (*hipoteca*) which are subject to registration with the relevant register and there will be notary fees and registrar's fees, as well as stamp taxes if documented by means of a public deed (*escritura pública*) to be paid in respect of the execution and registration of those documents, which registrations, filings and fees will be made and paid promptly after the date of the relevant Finance Document;

(c) for the fees to be incurred in connection with (i) the notarisation (*Beurkundung*) of share and/or interest pledge agreements governed by German law and (ii) the registration of mortgages, ship mortgages and land charges with the relevant registry in Germany; and

(d) any further requirements for any Security created after the Effective Date and notified to the Facility Agent in writing prior to entry into that Security or set out in the relevant Transaction Security Document.

## 21.9 Deduction of Tax

(a) Subject to paragraph (b) below, it is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

(b) Notwithstanding any other provision of this Agreement, no representation or warranty is given under this clause 21.9 in respect of the Obligors incorporated in certain jurisdictions and notified in writing to the Facility Agent prior to the Effective Date.

## 21.10 No default

(a) No Event of Default and, on the date of this Agreement, no Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document.

(b) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which has or is reasonably likely to have a Material Adverse Effect.

(c) There is no requirement of law or regulation applicable to, or contractual obligation under any agreement or instrument which is binding on, any of the Obligors or any of their respective Subsidiaries, compliance with which has had or could reasonably be expected to have a Material Adverse Effect.

## 21.11 No misleading information

(a) Any factual information provided by any member of the Group to the Finance Parties (or any of them) prior to the date of this Agreement relating to the Obligors, the Group and the proposed application of the proceeds of the Facility was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b) Any financial projections provided by any member of the Group to the Finance Parties (or any of them) prior to the date of this Agreement have been prepared on the basis of recent historical information and on the basis of reasonable assumptions.

(c) Nothing has occurred or been omitted from any factual information provided by any member of the Group to the Finance Parties (or any of them) prior to the date of this Agreement and no information has been given or withheld that results in such factual information being untrue or misleading in any material respect.

(d) All other written information provided by any member of the Group (including its advisers) to a Finance Party was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

## 21.12 Original Financial Statements

The unaudited consolidated balance sheet of Parent and its consolidated Subsidiaries as at 30 September 2018 and the related unaudited consolidated statements of operations and cash

flows for the quarter ended on such date, certified by a director of the Borrower, copies of which have heretofore been furnished to each Lender, are complete and correct in all material respects and present fairly in all material respects the consolidated financial condition of the Parent and its Subsidiaries as at such date, and the consolidated results of their operations for the quarter then ended (subject to normal year end audit adjustments and any notes therein). All such financial statements have been prepared in accordance with the Accounting Principles in all material respects (except for the absence of footnote disclosures and any notes therein).

21.13    **No proceedings pending or threatened**

Other than the Cases and any litigation proceedings the details of which have been disclosed in writing to the Facility Agent prior to the date of the Amendment and Restatement Agreement, no litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect, have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it or any of its Subsidiaries.

21.14    **No breach of laws**

(a)    It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(b)    No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

(c)    Subject to the Legal Reservations, each member of the Group is in full compliance with all regulations and rules issued by any Sanctions Authority and has instituted and maintained policies and procedures designed to promote and achieve compliance with such rules and regulations.  In addition, each Group member has set up internal systems which enable it to control the origin of all products it purchases to ensure such products are not originating from a person referred to, noted on or otherwise concerned by the Sanctions List.

(d)    Each Group member has in particular instituted and maintained policies and procedures designed to promote and achieve evaluation of all new suppliers and subcontractors in the Sensitive Zones.  No new transactions, within the Sensitive Zone, whether financed on any Group member own funds or via a financial institution, is, has been or will be initiated with suppliers which are not Approved Suppliers.

(e)    The entry into and performance by each Group member of any supply or sale contracts with any of their counterparties, is not and will not be prohibited or restricted by, and will not expose the Finance Parties, their affiliates, or their agents and/or employees to Sanctions, prohibitions or restrictions under any applicable national or international laws, including rules and regulations of the Sanctions Authorities (including for the avoidance of doubt trade or economic sanctions, prohibitions or restrictions upon Iran and/or Syria).

21.15    **Environmental laws**

(a)    Except as disclosed in writing to the Facility Agent prior to the Effective Date, each member of the Group is in compliance with clause 24.3 (*Environmental compliance*) and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance.

(b)    No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any member of the Group where that claim has or is reasonably likely, if determined against that member of the Group, to have a Material Adverse Effect.

21.16 **Taxation**

(a) Taking into account any extensions, it is not (and none of its Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax, except to the extent (i) payment of any Tax is contested in good faith or (ii) the delay of such filing or payment may not reasonably be expected to have a Material Adverse Effect or (iii) payment is otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

(b) No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes, except to the extent any such claim or investigation is not reasonably expected to have a Material Adverse Effect.

(c) Other than in respect of each Obligor incorporated in Liberia, it is resident for Tax purposes only in its Original Jurisdiction.

21.17 **Anti-corruption law and Money Laundering**

Each member of the Group has conducted its businesses in compliance with applicable anti-corruption, anti-terrorism, bribery and money laundering laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

21.18 **Security and Financial Indebtedness**

(a) No Security or Quasi-Security exists over all or any of the present or future assets of any member of the Group other than as permitted by this Agreement.

(b) No member of the Group has any Financial Indebtedness outstanding other than as permitted by this Agreement.

21.19 **Ranking**

Subject to the Orders, the Transaction Security has or when executed will have first ranking priority (subject only, in relation to any Second Security to the First Security) and it is not otherwise subject to any prior ranking or *pari passu* ranking Security other than:

(a) (in respect of assets secured in Multi-Party TPA Agreements) Security granted by the Company in favour of Hedging Providers and/or Clearing Providers contained in Multi-Party TPA Agreements (as contemplated in clause 6.39 (*Multi-Party TPA Agreements*)), which shall have first priority in respect of those assets; and

(b) in respect of Security granted by the Company in favour of the US Finance Parties in accordance with the terms of the Intercreditor Agreement.

21.20 **Good title to assets**

It and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

21.21 **Legal and beneficial ownership**

(a) It and each of its Subsidiaries is the sole legal and beneficial owner of the respective assets over which it purports to grant Security free from any claims, third party rights or competing interests other than Security permitted under clause 24.12 (*Negative pledge*).

(b) The Borrowers and each Spanish Pledgor hold and will hold full legal and beneficial title to all assets included in the Borrowing Base from time to time, free from any retention of title arrangements.

21.22    **Group Structure Chart**

(a)    The Group Structure Chart delivered to the Facility Agent pursuant to clause 3.1 (*Conditions precedent documentation*) of the Amendment and Restatement Agreement is true, complete and accurate in all material respects and shows the following information:

(i)    each member of the Group, including current name and company registration number, its Original Jurisdiction (in the case of an Obligor), its jurisdiction of incorporation (in the case of a member of the Group which is not an Obligor) and/or its jurisdiction of establishment, a list of shareholders and indicating whether a company is not a company with limited liability;

(ii)    all minority interests in any member of the Group and any person in which any member of the Group holds shares in its issued share capital or equivalent ownership interest of such person; and

(iii)    whether it is a Dormant Company and/or Immaterial Subsidiary.

(b)    Subject to all required restrictions imposed by applicable law and regulation and subject to the Agreed Security Principles, each Subsidiary of the Parent is, or will be upon its accession, a Guarantor. The total book value (determined in accordance with the Accounting Principles) of all assets of all Immaterial Subsidiaries that are not also Obligors does not exceed $2,750,000.

21.23    **Accounting Reference Date**

The Accounting Reference Date of each member of the Group is 31 December.

21.24    **Insurance**

(a)    Each member of the Group maintains:

(i)    insurances on and in relation to its fixed assets and its inventory with reputable underwriters or insurance companies or associations against those risks and to the extent as is consistent with sound commercial practice normally maintained by companies carrying on the same or substantially similar business;

(ii)    without limitation to clause (a) above, marine cargo insurance (or any equivalent policy of insurance (howsoever described) relating to goods in transit and/or storage) on and in relation to any other of its assets which are or may be taken into account when calculating any Borrowing Base when such assets are in transit or storage against those risks and to the extent as is consistent with normal business practice (including, but not limited to, theft, fire and damage).

(b)    Except as disclosed in writing to the Facility Agent prior to the Effective Date (as such disclosure may be updated from time to time by the Borrowers with the written consent of the Majority Lenders), no Obligor has been refused insurance for which it applied or had any policy of insurance terminated (other than at its request).

21.25    **Centre of main interests and establishments**

(a)    Unless otherwise disclosed in writing to the Facility Agent prior to the date of the Amendment and Restatement Agreement, for the purposes of The Council of the European Union Regulation No. 848/2015 on Insolvency Proceedings (the **Regulation**), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its Original Jurisdiction and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

(b)    The Company and APII are non-resident domestic entities and do not have any assets in their respective Original Jurisdictions.

### 21.26    No adverse consequences

(a)    Other than in respect of any Utilisation made by ABGG or OBTG following the Effective Date, it is not necessary under the laws of its Relevant Jurisdictions:

    (i)    in order to enable any Finance Party to enforce its rights under any Finance Document; or

    (ii)    by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in any of its Relevant Jurisdictions.

(b)    Other than in respect of any Utilisation made by ABGG or OBTG following the Effective Date, no Finance Party is or will be deemed to be resident, domiciled or carrying on business in its Relevant Jurisdictions by reason only of the execution, performance and/or enforcement of any Finance Document.

### 21.27    Pari Passu Ranking

Any unsecured and unsubordinated claims of the Finance Parties against it, any Spanish Pledgor or any South African Pledge Counterparty under the Finance Documents shall rank at least *pari passu* with the claims of all of its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies or pursuant to any Order.

### 21.28    Sanctions

No Obligor nor any other member of the Group, nor any of their respective directors, officers or employees nor, to the knowledge of any Obligor, any persons acting on any of their behalf:

(a)    is a Prohibited Person;

(b)    is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person;

(c)    owns or controls a Prohibited Person;

(d)    is in breach of Sanctions; or

(e)    has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority.

Each Obligor and its Affiliates is in full compliance with all regulations and rules issued by any Sanctions Authority and has instituted and maintained policies and procedures designed to promote and achieve compliance with such rules and regulations.

In addition, each Obligor and its Affiliates has set up internal systems which enable it to control the origin of all products it purchases to ensure such products are not originating from a person referred to, noted on or otherwise concerned by the Sanctions List.

The entry into and performance by each Obligor and its Affiliates of any supply or sale contracts with any of their counterparties, is not and will not be prohibited or restricted by, and will not expose the Finance Parties, their affiliates, or their agents and/or employees to Sanctions, prohibitions or restrictions under any applicable national or international laws, including rules and regulations of the Sanctions Authorities.

21.29    **Force Majeure**

Except as would not reasonably be expected to result in a Material Adverse Effect, neither the business nor the properties of the Obligors or any of their respective Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labour dispute, drought, storm, hail, earthquake, embargo, act of God or of a public enemy or other casualty.

21.30    **Permitted Financial Indebtedness**

Schedule 14 (*Permitted Financial Indebtedness*) separately identifies all Financial Indebtedness (other than trade payables, the Loans or the Credit Instruments) of the Obligors and their respective Subsidiaries, which is for borrowed money.

21.31    **Times when representations made**

(a)    All the representations and warranties in this clause 21 are made by each Obligor on the date of this Agreement, the date of the Amendment and Restatement Agreement.

(b)    The Repeating Representations are deemed to be made by each Obligor on the date of each Utilisation Request, on each Utilisation Date, on the first day of each Interest Period and, in the case of an Additional Obligor, on the day on which the company becomes (or it is proposed that the company becomes) an Additional Obligor.

(c)    Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

## 22    Information Undertakings

The undertakings in this clause 22 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

22.1    **Financial statements and reports**

The Company shall supply to the Facility Agent in sufficient copies for all the Lenders:

(a)    as soon as available, but in any event not later than 30 days after the end of each fiscal month of Parent, (i) a copy of the unaudited consolidated balance sheets of Parent and its consolidated Subsidiaries as at the end of such fiscal month and the related unaudited consolidated statements of income and retained earnings for such fiscal month and the portion of the fiscal year through the end of such fiscal month, setting forth in each case in comparative form the figures for the previous fiscal year, certified by a Responsible Person of the Company, in his or her capacity as a Responsible Person, as fairly presenting in all material respects the Borrowers' and such Subsidiaries' financial condition, results of operations and cash flows in accordance with Accounting Principles and (ii) the net book value, determined in accordance with Accounting Principles, of all assets of the Immaterial Subsidiaries;

(b)    on a weekly basis and on a roll forward basis, a Budget variance report/reconciliation for each week (commencing on the date that is one week following the Petition Date) (delivered no later than the end of each week),

(i)    showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding week, noting therein all material variances from values set forth for such historical periods in the Budget, and shall include explanations for all such variances; and

(ii)    accompanied by a certification by a Responsible Person of the Company (A) as to its reasonableness when made by the Company; and (B) that each Obligor is in compliance with clause 23 (*Budget variance*);

(c)     as soon as practicable in advance of filing with the Bankruptcy Court, all motions, applications, pleadings, proposed orders, judicial or financial information, and other documents as soon as practical in advance of filing by or on behalf of the Debtors with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Cases; provided that all pleadings and proposed orders and any other such filings that relate to the Finance Documents, the Secured Obligations, the Final Order, bidding procedures, or any plan of reorganization or plan of liquidation, or any disclosure statement related thereto shall be in form and substance satisfactory to the Lenders.

## 22.2     Provision and contents of Compliance Certificate

(a)     The Company shall supply a Compliance Certificate to the Facility Agent with each set of financial statements of the Parent delivered in accordance with clause 22.1(a), but only to the extent consistent with accounting industry policies generally followed by independent certified public accountants, a certificate of its independent certified public accountants stating that in making the examination necessary therefor no knowledge was obtained of any Default arising from a breach under clause 23 (*Budget variance*) or, if any such Default shall exist, stating the nature and status of such event.

(b)     The Company shall supply a Compliance Certificate to the Facility Agent with each set of financial statements of the Parent delivered in accordance with clause 22.1(a) a duly completed certificate signed by a Responsible Person of the Parent (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with clause 23 (*Budget variance*).

## 22.3     Information: miscellaneous

The Company shall supply to the Facility Agent (in sufficient copies for all the Lenders, if the Facility Agent so requests) and, in relation to paragraph (s) below and following any Finance Party request, to that Finance Party's professional advisors:

(a)     promptly after the same are publicly available, copies of each annual report, proxy or financial statement or other report or communication sent to the shareholders of the Obligors generally and copies of all annual, regular, periodic and special reports and registration statements that the Parent or any Subsidiary may file or be required to file with the SEC or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, and not otherwise required to be delivered pursuant hereto;

(b)     promptly after the furnishing thereof, copies of any material request or notice received by the Parent or any Subsidiary, or any statement or report furnished by the Parent or any Subsidiary to any holder of debt securities with a principal amount in excess of $1,000,000 of the Parent or any Subsidiary, pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished pursuant hereto;

(c)     promptly after receipt thereof by the Parent or any Subsidiary, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of the Parent or any Subsidiary;

(d)     promptly after receipt thereof by the Parent or any Subsidiary, copies of any detailed final audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Parent by independent accountants in connection with the accounts or books of the Parent or any Subsidiary, or any audit of any of them;

(e)     promptly, upon receipt thereof, copies of all final "management letters" submitted to the Parent or any Subsidiary by the independent public accountants referred to in clause 22.2;

(f)     within one Business Day after delivery thereof to the lenders in relation to the US DIP Credit Facilities, copies of all financial statements, projections, forecasts, reconciliations and cash balance reports, borrowing base reports and/or other financial reporting delivered to the lenders in relation to the US DIP Credit Facilities;

(g)     promptly, such information on the Hess Litigation as the Facility Agent or any Lender may from time to time reasonably request; provided that such information is not (i) entitled to legal privilege such as attorney work product and attorney-client communications (unless such information is subject to a common interest) or (ii) otherwise subject to a confidentiality restriction that would prohibit the Company from providing such information;

(h)     promptly, copies of any account statements or reports as the Facility Agent or any Lender may from time to time reasonably request that have been received by or are available to any Obligor with respect to any bank account that is the subject of an Account Pledge Agreement;

(i)     details of any (i) default or event of default under any post-petition contractual obligation of the Obligors or any of their respective Subsidiaries of more than $500,000 or that would reasonably be expected to result in a Material Adverse Effect, (ii) post-petition contractual obligation of the Obligors or their Subsidiaries of more than $500,000 or that would reasonably be expected to result in a Material Adverse Effect being declared or otherwise accelerated prior to its stated maturity or (iii) litigation, investigation or proceeding which may exist at any time between the Obligors or any of their respective Subsidiaries and any Governmental Authority;

(j)     promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any Obligor, and which, if adversely determined, are reasonably likely to have a Material Adverse Effect or which would involve a liability, or a potential alleged liability, exceeding $100,000 (or its equivalent in other currencies);

(k)     promptly, notice at any time at which the Borrowing Base Amount is less than zero;

(l)     promptly, details of any change in the information provided in the Group Structure Chart that would result in a change to the list of beneficial owners identified in such certification;

(m)     promptly, details of any change in a Subsidiary of the Parent, such that it has become, or is no longer, an Immaterial Subsidiary;

(n)     promptly, such information as the Security Agent may reasonably require about the Charged Property and compliance of the Obligors with the terms of any Transaction Security Documents;

(o)     promptly on request, such further information regarding the financial condition, business assets and operations of the Group and/or any member of the Group (including any requested amplification or explanation of any item in the financial statements, or other material provided by any Obligor under this Agreement and an up to date copy of its shareholders' register (or equivalent in its Original Jurisdiction)) as any Finance Party, through the Facility Agent, may reasonably request;

(p)     promptly upon becoming aware of them, details of any claim made by an Obligor under any insurance policy, the underlying cause of which might have a Material Adverse Effect;

(q)     promptly upon becoming aware of them, details of any change in the structure of the Group relating to the Obligors from that reflected in the Group Structure Chart (in a form agreed on or around the date of the Amendment and Restatement Agreement);

(r)     promptly upon request, such information regarding any Lender Discounting Facility as the Facility Agent or the Security Agent may from time to time reasonably request;

(s)     regular updates and ongoing information in relation to the preparation and filing of the financial statements described in 22.1(a) in respect of the Parent's Financial Year ending 31 December 2017 and the consequences of for the Group of the failure to finalise and file the same;

(t)     promptly upon becoming aware of it, the execution of or any material change to any Lender Discounting Facility;

(u)     promptly upon request, and in any event within three (3) Business Day of such request, details of any off-takers (including legal name, address and contact details); and

(v)     promptly, responses any and all questions of the Facility Agent or the Majority Lenders regarding the foregoing.

## 22.4    Notification of default and of expectation not to meet Budget

(a)     Each Obligor shall notify the Facility Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)     Promptly upon a request by the Facility Agent, the Company shall supply to the Facility Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

(c)     The Company shall promptly upon becoming aware of the same notify the Facility Agent of the expectation that the Debtors will not meet the Budget.

## 22.5    "Know your customer" checks

(a)     If:

(i)     the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii)    any change in the status of an Obligor, any Spanish Pledgor or any South African Pledge Counterparty or (other than in relation to the Parent) the composition of the shareholders of an Obligor, any Spanish Pledgor or any South African Pledge Counterparty after the date of this Agreement;

(iii)   a proposed assignment or transfer by a Lender of any of its rights and/or obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer;

(iv)    any Change in UBO (other than in respect of the Parent listed on the New York Stock Exchange), after the date of this Agreement; or

(v)     any Applicable KYC Procedures,

obliges the Facility Agent or any Lender (or, in the case of paragraph (iii) above, any prospective new Lender), or any Lender obliges the Facility Agent or any Lender (or, in the case of paragraph (iii) above, any prospective new Lender), to comply with "know your customer" or similar identification procedures in circumstances where the necessary

information is not already available to it, each Obligor shall promptly upon the request of the Facility Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Facility Agent, such Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)     Each Lender shall promptly upon the request of the Facility Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself) in order for the Facility Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(c)     For this purpose **Change in UBO** means any event by which a private individual (*natuurlijk persoon*) acquires the legal and beneficial ownership (directly or indirectly) of 10 per cent. or more of the issued share capital of an Obligor, or the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to (directly or indirectly) cast, or control the casting of, 25 per cent. or more of the votes that might be cast at a general meeting of an Obligor, any Spanish Pledgor or any South African Pledge Counterparty.

## 22.6     Additional Obligors

(a)     The Company shall, by not less than ten (10) Business Days' prior written notice to the Facility Agent, notify the Facility Agent (which shall promptly notify the Lenders) of its intention to request that one of its Subsidiaries becomes an Additional Obligor pursuant to clause 29 (*Changes to the Obligors*).

(b)     Following the giving of any notice pursuant to clause 22.6(a) above, if the accession of such Additional Obligor obliges the Facility Agent or any Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Facility Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective new Lender) in order for the Facility Agent or such Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement as an Additional Obligor.

## 22.7     Borrowing Base Report and Cross-Check Borrowing Base Report

(a)     For the purposes of the valuation of the Borrowing Base, the Company shall deliver to the Collateral Management Agent for distribution to the Lenders:

(i)      a Borrowing Base Report on every Business Day following the date of this Agreement; and

(ii)     a Cross-Check Borrowing Base Report on a four-weekly basis to be delivered within ten (10) days of every second Borrowing Base Report (or, if the 10th day is not a Business Day, by the next Business Day).

(b)     Each Borrowing Base Report shall:

(i)      be based on information and figures as at close of business on the second Business Day immediately preceding the date of such Borrowing Base Report; and

(ii)     set out the Outstandings under each Facility on the date of its issue.

(c)     Each Cross-Check Borrowing Base Report shall be in the same form as the Borrowing Base Report but shall:

(i)     be based on information and figures relating to inventory provided by independent sources (copies of which shall be provided to the Collateral Management Agent) in respect of:

(A)     the storage volumes at any inland storage facilities, leased or owned by the Borrowers and the Spanish Pledgor and which have capacity equal to or in excess of 50,000 metric tons; and

(B)     the storage volumes on any vessels leased or owned by the Borrowers and the Spanish Pledgor which have capacity equal to or in excess of 15,000 metric tons; and

(ii)     replace non-invoiced Eligible Receivables with corresponding invoices in each case based on the Group's figures for the date on which the most recent Borrowing Base Report related.

(d)     The Collateral Management Agent (acting on the instructions of the Majority Lenders) shall be entitled at any time, in relation to all or any part of the information contained in a Borrowing Base Report or a Cross-Check Borrowing Base Report to:

(i)     examine (upon request) the records of any Obligor to verify such information; and/or

(ii)     require that an independent reputable surveyor or accounting firm verify such information,

and the Company shall take all such action as is available to it and do all such acts and things as the Collateral Management Agent (acting on the instructions of the Majority Lenders) may specify in this regard the costs of such verification shall be promptly paid by the Company.

(e)     Any failure to deliver information required under this Agreement or any delivery information which is not satisfactory to the Collateral Management Agent (acting on the instructions of the Majority Lenders) and relating to any item in a Borrowing Base Report or a Cross-Check Borrowing Base Report shall result in such item being excluded from the Borrowing Base.

## 22.8     Borrowing Base Audit Report

(a)     Subject to paragraph (c), the Company shall deliver to the Collateral Management Agent (in sufficient copies for the Lenders if the Collateral Management Agent so requests) a Borrowing Base Audit Report promptly upon the Collateral Management Agent's request (as instructed by the Majority Lenders).

(b)     Subject to paragraph (c), until such time as the Facility Agent notifies the Company in writing that the following shall cease to apply:

(i)     at any time and on any number of occasions the Finance Parties shall be entitled to appoint third parties to:

(A)     perform an audit report in respect of the Borrowing Base; and/or

(B)     inspect any inventory included or capable of being included in the Borrowing Base,

and in each case the Company shall:

    (1)    permit those third parties, and procure the permission by any applicable person for such third parties to have, free access at all times and at the risk and cost of the Company to the relevant facilities or premises where any relevant inventory is located; and

    (2)    within three (3) Business Days of demand pay to the Facility Agent all costs and expenses incurred by the Finance Parties from time to time in connection with the engagement of such third parties.

(c)    The Collateral Management Agent may only make one such request and the Facility Agent may only deliver one notice respectively under paragraphs (a) and (b) above unless an Event of Default is continuing or the Termination Date occurs more than 120 days after the Effective Date.

## 22.9 Deficient Borrowing Base Report

If, at any time, any Deficient Borrowing Base Report is delivered to the Collateral Management Agent:

(a)    the Company shall, from the date the Deficient Borrowing Base Report is delivered to the Collateral Management Agent until it is replaced by a Compliant Borrowing Base Report in accordance with part (b) below, provide the Collateral Management Agent (for distribution to the Lenders) with Borrowing Base Reports on a daily basis showing the information and Outstandings as at the previous day, which additional Borrowing Base Reports must show that there has been no further decrease in the Borrowing Base Amount; and

(b)    the Company shall within fourteen (14) days of such delivery procure the cancellation of such Deficient Borrowing Base Report and its replacement by a Compliant Borrowing Base Report.

## 22.10 Title to Borrowing Base assets

Each Borrower shall ensure that it holds full legal and beneficial title to the assets purporting to be owned by it in the Borrowing Base, free of any retention of title arrangements.

## 22.11 Additional Cross-Check Borrowing Base Reporting

Each Cross-Check Borrowing Base Report shall be accompanied by the following (in sufficient copies for the Lenders if the Collateral Management Agent (acting on the instructions of the Majority Lenders) so requests):

(a)    a report of an independent inspector approved by the Facility Agent detailing:

    (i)    the storage volumes at any inland storage facilities, leased or owned by the Borrowers and the Spanish Pledgors; and

    (ii)    the storage volumes on any vessels leased or owned by the Borrowers and the Spanish Pledgors,

    or, in each case, a holding certificate from a third party storer acceptable to the Collateral Management Agent (acting on the instructions of the Majority Lenders) and in a form acceptable to the Collateral Management Agent (acting on the instructions of the Majority Lenders);

(b)    a report of an independent inspector approved by the Facility Agent detailing the storage volumes in any German storage which is the subject of the German Security Transfer Agreements;

(c)    a sample of thirty (30) randomly selected trade confirmations/bunker confirmations;

(d)    a list of those non-invoiced Eligible Receivables converted into invoices (with associated invoice numbers) and reconciliation with the list of non-invoiced Eligible Receivables detailed in the most recent Borrowing Base Report;

(e)    the lower of:

    (i)    a sample of sixty (60) randomly selected invoices; and

    (ii)    all invoices,

evidencing invoicing of non-invoiced Eligible Receivables as reported in the most recent Borrowing Base Report;

(f)    a sample of sixty (60) randomly selected invoices already reported as invoiced Eligible Receivables in the most recent Borrowing Base Report;

(g)    all copies of bills of lading in respect of barges above 3,000 dwt confirming values on board and showing issuance or endorsement to the order of the Security Agent; and

(h)    a report in form and substance satisfactory to the Collateral Management Agent (acting on the instructions of the Majority Lenders) evidencing as at close of business on the last Business Day of each calendar month all receivables sold pursuant to any receivables purchase programme or invoice discounting programme.

## 22.12    Reporting

(a)    Each Lender and Borrower shall promptly (and in any event within one (1) Business Day) provide the Facility Agent upon request with such details in respect of Utilisations made by it as the Facility Agent may request.

(b)    If a Borrowing Base Report indicates that the Borrowing Base Amount is a negative number no Borrower shall request or make Utilisations until a Compliant Borrowing Base Report has been provided to the Collateral Management Agent (which, if not provided on the date of a regular weekly Borrowing Base Report, shall be provided in addition thereto).

## 22.13    Non-Borrowing Base Receivables Report

The Company hereby agrees that it shall provide to the Facility Agent by 31 January 2019 (or such earlier date on which a press release may be issued or an announcement made by the Company in respect of the Non-Borrowing Base Receivables):

(a)    in circumstances where Arnold & Porter (acting on behalf of the audit committee of the Company) provides a written report regarding the Non-Borrowing Base Receivables, a copy of that report or, in circumstances where the Company is concerned about the loss of attorney-client privilege or its impact upon the investigation, a written summary of that report; or

(b)    in circumstances where Arnold & Porter does not provide a written report regarding the Non-Borrowing Base Receivables, a written summary of the Company's investigations into the Non-Borrowing Base Receivables (either in the form of a press release or summary prepared specifically for the Facility Agent).

## 22.14    Proof of Origin

All incoming flows in respect of the Sensitive Zone, either purchased through letter of credit (including against any countersigned letter of indemnity) or on open account basis but subject to

incoterms linked to any place within the Sensitive Zone, should be documented with bills of lading showing an acceptable port of loading and:

(a) if the Approved Supplier is a refinery, shall be accompanied by a Certificate of Origin; or

(b) if the Approved Supplier is not a refinery, the Company shall use its best endeavours to procure it is accompanied by a Certificate of Origin.

## 22.15 Inspection and Management in Sensitive Zones

The Borrowers shall procure that all stocks and inventory of the Borrowers located offshore or inland in the Sensitive Zone shall be the subject of a Stock Monitoring Agreement or a Collateral Management Agreement as the case may be.

## 22.16 Hess Corporation proceedings

The Company shall promptly provide such information on the Hess Litigation as the Facility Agent or any Lender may from time to time reasonably request; provided that such information is not (i) entitled to legal privilege such as attorney work product and attorney-client communications (unless such information is subject to a common interest) or (ii) otherwise subject to a confidentiality restriction that would prohibit Borrower from providing such information

## 22.17 Insolvency proceedings and Bankruptcy Court filings

As soon as practicable in advance of filing with the Bankruptcy Court, the Company shall provide to the Facility Agent all motions, applications, pleadings, proposed orders, judicial or financial information, and other documents as soon as practical in advance of filing by or on behalf of the Debtors with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Cases; provided that all pleadings and proposed orders and any other such filings that relate to the Finance Documents, the Commitments, the Final Order, bidding procedures, or any plan of reorganization or plan of liquidation, or any disclosure statement related thereto shall be in form and substance satisfactory to the Facility Agent and the Majority Lenders.

## 22.18 US DIP Credit Facility Agreement waivers

If any member of the Group is obliged under the terms of any waivers granted in relation to the US DIP Credit Facility Agreement (the **US Waivers**) to provide information to the lenders or any agent under the US DIP Credit Facility Agreement or their advisors which is either:

(a) Additional Required Information; or

(b) Early Delivery Information,

the Company shall procure that such information is delivered to the Facility Agent on the same date and on the same terms as required under the US Waivers.

For these purposes:

**Additional Required Information** shall mean information required to be delivered under a US Waiver which is not otherwise required to be delivered by an Obligor to any Finance Party Facility Agent and Lender (acting reasonably) to be of direct relevance to the Obligors, a Facility or the matters set out in this Letter provided that the Facility Agent shall have given the Company reasonable notice that it will require disclosure of such information pursuant to this paragraph 17.

**Early Delivery Information** shall mean information required to be provided under this Letter at a later date than such information is required to be provided to the lenders or agent under the US DIP Credit Facility Agreement or their advisors under the US Waivers.

## 23    Budget variance

(a)    Commencing after the conclusion of the fourth full week after the Petition Date, the Obligors' total cumulative operating disbursements since the Petition Date will not exceed 105% of the amount set forth in the approved Budget(s) covering such cumulative period (which amount, for the avoidance of doubt, shall take into account any positive or negative variances—i.e., the amount by which total operating disbursements is less or greater than 100% of the budgeted amount—from any prior testing period that may be carried forward and applied to the current period), unless the Majority Lenders have provided a written waiver of such excess.

(b)    No Obligor shall make any payments relating to prepetition obligations other than in accordance with the Budget or as otherwise permitted hereunder or, if a that Obligor is a Debtor, with (i) a Bankruptcy Court order, (ii) the Interim DIP Order, (iii) the Final DIP Order, or (iv) as agreed to by the Majority Lenders.

## 24    General Undertakings

The undertakings in this clause 24 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

**Authorisations and compliance with laws**

### 24.1    Authorisations

Each Obligor shall (and shall procure that the Spanish Pledgors and the South African Pledge Counterparties shall) promptly:

(a)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)    supply certified copies to the Facility Agent of:

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

> (A)    enable it to perform its obligations under the Finance Documents;
>
> (B)    ensure the legality, validity, enforceability or admissibility in evidence of any Finance Document; and
>
> (C)    carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

### 24.2    Compliance with laws

Each Obligor shall (and the Company shall ensure that each member of the Group will) comply in all respects with all laws to which it may be subject, if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

### 24.3    Environmental compliance

Each Obligor shall (and the Company shall ensure that each member of the Group will):

> (i)    comply with all Environmental Law;
>
> (ii)    obtain, maintain and ensure compliance with all requisite Environmental Permits; and
>
> (iii)    implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

### 24.4 Environmental claims

Each Obligor shall (through the Company), promptly upon becoming aware of the same, inform the Facility Agent in writing of:

(a) any Environmental Claim against any member of the Group which is current, pending or threatened; and

(b) any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any member of the Group,

where the claim, if determined against that member of the Group, has or is reasonably likely to have a Material Adverse Effect.

### 24.5 Anti-corruption law

(a) No Obligor shall (and the Company shall ensure that no other member of the Group will) directly or indirectly use the proceeds of the Facility for any purpose which would breach the Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977, the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act or other similar legislation in other jurisdictions.

(b) Each Obligor shall (and the Company shall ensure that each other member of the Group will):

(i) conduct its businesses in compliance with applicable anti-corruption, anti-terrorism, bribery and money laundering laws; and

(ii) maintain policies and procedures designed to promote and achieve compliance with such laws.

### 24.6 Taxation

(a) Each Obligor shall (and the Company shall ensure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

(i)

(A) such payment is being contested in good faith;

(B) adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Facility Agent under clause 22.1 (*Financial statements*); and

(C) such payment can be lawfully withheld; or

(ii) payment is stayed by the Bankruptcy Court.

(b) No member of the Group may change its residence for Tax purposes.

**Restrictions on business focus**

24.7 **Merger**

No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction except:

(a)     as set out in the "Fundamental Changes" schedule delivered by the Company to the Facility Agent prior to the Effective Date;

(b)     mergers, consolidations or amalgamations between and among the Obligors; and

(c)     liquidations and dissolutions of any Subsidiary so long as the assets are directly or indirectly transferred to an Obligor.

24.8 **Change of business**

The Company shall procure that no substantial change is made to the general nature of the business of the Parent, the Obligors or the Group taken as a whole from that carried on by the Group at the date of the Amendment and Restatement Agreement except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court.

24.9 **Application of FATCA**

The Company shall procure that, unless otherwise agreed by all the Finance Parties, no Obligor shall become a FATCA FFI or a US Tax Obligor excluding those Obligors identified by the Company as US Tax Obligors prior to the Effective Date and notified to the Facility Agent.

**Restrictions on dealing with assets and Security**

24.10 **Preservation of assets**

(a)     Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain in good working order and condition (ordinary wear and tear excepted) all of its assets necessary or desirable in the conduct of its business.

(b)     Each Obligor shall (and the Company shall ensure that each other member of the Group will) use all reasonable endeavours to keep available the services and goodwill of such of its present employees as are, in the reasonable opinion of the Obligors or any of their respective Subsidiaries, as applicable, necessary or desirable for the conduct of its business as it is currently conducted.

24.11 **Pari passu ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies or pursuant to any Order.

24.12 **Negative pledge**

In this clause 24.12, **Quasi-Security** means an arrangement or transaction described in paragraph (b) below.

Except as permitted under paragraph (c) below:

(a)     No Obligor shall (and the Company shall ensure that no other member of the Group will) create or permit to subsist any Security over any of its assets.

(b)   No Obligor shall (and the Company shall ensure that no other member of the Group will):

(i)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Group;

(ii)   sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)  enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(iv)   enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c)   Paragraphs (a) and (b) above do not apply to any Security or (as the case may be) Quasi-Security, which is:

(i)    Transaction Security;

(ii)   Existing Security;

(iii)  approved in writing by the Facility Agent (acting on the instructions of the Majority Lenders);

(iv)   to secure the Prepetition Obligations;

(v)    to secure Bridge Financing which is expressly permitted pursuant to clause 24.18(a)(ii) (*Financial Indebtedness*);

(vi)   Security (other than Security arising under any Environmental Law) for taxes, assessments or governmental charges (including Security in favor of customs and revenues authorities imposed by applicable law arising in the ordinary course of business in connection with the importation of goods) or levies not yet due and payable;

(vii)  carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, lessor's or other similar liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith by appropriate proceedings for which adequate reserves are maintained on its books and records in accordance with Accounting Principles;

(viii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(ix)   deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(x)    Security of carriers, warehousemen, mechanics, materialmen, and any similar Security arising by operation of law securing obligations to pay or provide consideration for goods or services with respect to Commodities, which obligations are not past due, including, without limitation, with respect to Eligible Inventory (as defined in the US DIP Credit Agreement) (i) Security in favour of the third party from whom Aegean Bunkering (USA) LLC chartered, rented or leased the property on which such Eligible Inventory is located securing the charter, rent or lease obligations, (ii) Security for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days, that are being contested in good faith and by appropriate actions or are otherwise not required to be paid

hereunder and (iii) Security arising from judgments or orders for the payment of money not constituting an Event of Default;

(xi) Permitted Financial Management Liens and Security on "Commodities Accounts" (as defined in Section 9-102 of the UCC) in favour of any Eligible Commodity Broker (as defined in the US Credit Agreement) and under the terms.permitted under the applicable account control agreement;

(xii) any "first purchaser" lien (as defined in Texas Bus. & Com. Code Section 9.343, comparable laws of the states of Oklahoma, Kansas, Mississippi, Wyoming or New Mexico, or any other comparable law);

(xiii) Security securing judgments for the payment of money not constituting an Event of Default;

(xiv) Security on cash deposited as collateral by Aegean Bunkering (USA) LLC to secure the performance of Indebtedness (as defined in the US Credit Agreement) permitted pursuant to section 6.01(c) of the US Credit Agreement), in an amount not to exceed that which is required by the contract with the applicable counterparty (or counterparties) thereto;

(xv) Security arising pursuant to the Orders, the First Day Orders or any "second day" orders;

(xvi) with respect to the Canadian Barges in favour of METSA or any of its Affiliates in connection with the Canadian Barges Loan;

(xvii) Security arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(xviii) any interest or title of a licensor, sublicensor, lessor or sublessor under any license or operating or true lease agreement incurred in the ordinary course of business;

(xix) Security given to a public or private utility or any Governmental Authority as required in accordance with the First Day Orders or "second day" orders;

(xx) Security in the nature of the right of setoff in favor of counterparties to contractual agreements with the Obligors in the ordinary course of business;

(xxi) Security not otherwise permitted hereunder securing obligations in an aggregate amount outstanding at any time not to exceed $250,000; and

(xxii) otherwise as expressly contemplated by this Agreement.

(d) Notwithstanding the other provisions of this clause, no Obligor shall (and the Company shall ensure that no other member of the Group will) create or permit to subsist any Security over any assets comprised in the Borrowing Base other than pursuant to the Transaction Security Documents.

## 24.13 Disposals

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset without the prior written consent of the Facility Agent acting on the instructions of the Majority Lenders (such consent to be confirmed or declined within fifteen (15) Business Days of receipt by the Facility Agent of a request in writing from the Company).

(b)     Paragraph (a) above does not apply to:

   (i)     any sales, leases, transfers or other disposals (A) by any Subsidiary of a Borrower to a Borrower or a Subsidiary of the Borrower, or (B) by any Borrower or any Guarantor to any other Borrower or Guarantor or (C) the sale of any Commodities and other inventory in the ordinary course of business, or (D) of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

   (ii)    any sales, leases, transfers or other disposals for a value which is in accordance with the Bidding Procedures or authorized by an order of the Bankruptcy Court;

   (iii)   leases, subleases, licenses and sublicenses of real or personal property, in each case in the ordinary course of business (excluding any such transaction with a Subsidiary that is not an Obligor;

   (iv)    disposals of receivables pursuant to the terms (as at the date of this Agreement) of any Lender Discounting Facility (provided that the proceeds of such disposals are paid to the Collection Account in the relevant currency held by the relevant Borrower);

   (v)     any sales, leases, transfers or other disposals of property to a Governmental Authority as a result of a condemnation of such property where the book value of such property does not exceed $400,000;

   (vi)    transactions permitted under clauses 24.12 (*Negative pledge*), 24.7 (*Merger*), 24.36 (*Dividends and share redemptions*) and 24.15 (*Investments*);and

   (vii)   sales, leases, transfers or other disposals not otherwise permitted hereunder in an aggregate book value amount not to exceed $400,000.

(c)     To the extent a Lender completes a purchase from a Borrower of receivables pursuant to any Lender Discounting Facility (and provided that the purchase price is paid by the Lender to the relevant Collection Account), such receivables (other than the proceeds of sale of such receivables) that are so sold shall be released from the Security created under the relevant Security Agreement and Second Security Agreement without any further action on the part of any person.

## 24.14     Arm's length basis

No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any transaction with any person except on arm's length terms and for full market value.

**Restrictions on movement of cash - cash out**

## 24.15     Investments

No Obligor shall (and the Company shall ensure that no other member of the Group will) make any Investments, except:

(a)     Investments in the form of Cash Equivalent Investments;

(b)     Investments by any Obligor or any of their respective Subsidiaries in Aegean Bunkering (USA) LLC;

(c)     Investments consisting of cash and Cash Equivalent Investments posted as collateral to satisfy margin requirements with counterparties of a physical commodity contract, (b) a futures contract, (c) any commodity OTC agreement or financial OTC agreement (d) contract for the storage or transportation of any physical Commodity, or (e) Hedging Agreements of Aegean Bunkering (USA) LLC and its Subsidiaries;

(d)     Investments by Obligors (other than by any Borrower) in other Obligors;

(e)     Investments by Obligors (other than the Borrowers) in any direct or indirect wholly-owned Subsidiary of Parent;

(f)     Investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(g)     Investments made in accordance with the Orders, the First Day Orders or the "second day" Orders;

(h)     intercompany loans and advances by any Borrower to Obligors;

(i)     Investments permitted under clauses 24.18 (*Financial Indebtedness*), 24.13 (*Disposals*) and 24.16 (*Transactions with Affiliates*);

(j)     Investments in an aggregate amount outstanding not to exceed $400,000; and

(k)     Investments in existence on the Effective Date and notified to the Facility Agent prior to the date of the Amendment and Restatement Agreement, together with any renewals and extensions thereof so long as the principal amount of such renewal or extension does not exceed the original principal amount of such Investment; and

Anything contained in this clause 24.15, or any other covenant or other provision of this Agreement to the contrary notwithstanding, in no event shall any Obligor make loans to or Investments in any Subsidiary of Parent that is not an Obligor hereunder, except to the extent permitted under paragraph (k) above.

24.16     **Transactions with Affiliates**

No Obligor shall (and the Company shall ensure that no other member of the Group will), engage or enter into any transaction or arrangement, including, without limitation, any purchase, sale, transfer, lease or exchange of property or the rendering of any service, with any Affiliate, other than (a) transactions of a type or nature that is described and notified in writing to the Facility Agent prior to the Effective Date in the document entitled "6.08 Transactions with Affiliates"; provided that this clause (a) shall not permit the purchase of inventory by Aegean Bunkering (USA) LLC from, or sale of inventory by Aegean Bunkering (USA) LLC to, any Affiliate (it being understood and agreed that such purchases and sales of inventory are prohibited by this Agreement), (b) transactions among Obligors or among Subsidiaries that are not Obligors, (c) transactions in accordance in all material respects with the Orders,  (d) Investments permitted under clause 24.15 (*Investments*), (e) employment contracts with officers and management of the Obligors and their Subsidiaries and payment of reasonable compensation to directors, officers and employees for services actually rendered to any such Obligor or any of its Subsidiaries and indemnification arrangements, and (f) payment of director's fees, expenses and indemnities, and (g) other transactions on an arm's length basis other than transactions among any one or more Obligors and any one or more Subsidiaries that are not Obligors.  The parties hereto acknowledge that as of the Effective Date no Lender is an Affiliate of any Borrower.

24.17     **Cases**

(a)     Each Obligor will not, nor will it permit any other Debtor to, file or support the confirmation of any Debtor Relief Plan or liquidation other than an Acceptable Reorganization Plan.

(b)     The Debtors shall not consent to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the **Exclusivity Periods**) nor shall they fail to object to any motion by a party in interest

(other than a Finance Party) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Facility Agent.

**Restrictions on movement of cash - cash in**

24.18    **Financial Indebtedness**

(a)    No Obligor shall (and the Company shall ensure that no other member of the Group, other than any Immaterial Subsidiary, will) incur or allow to remain outstanding any Financial Indebtedness other than in the following circumstances:

(i)    as permitted under paragraph (b) below;

(ii)    with the prior written consent of the Facility Agent acting on the instructions of the Majority Lenders, which the Lenders shall confirm or decline within fifteen (15) Business Days of receipt of a request from the Company; or

(iii)    if such Financial Indebtedness is incurred pursuant to, and remains in accordance with, the Finance Documents or the US DIP Finance Documents.

(b)    Paragraph (a) above does not apply to any Financial Indebtedness:

(i)    outstanding on the Effective Date hereof and identified in Schedule 14 (*Permitted Financial Indebtedness*) or any refinancings, renewals or extensions thereof (**Permitted Refinancing Indebtedness**) which do not result in an increase thereof provided that, (i) the amount of such Financial Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension, other than by an amount equal to accrued interest, fees and expenses incurred in connection therewith  (ii) such refinancing, refunding, renewal or extended Financial Indebtedness shall (A) not have a final maturity prior to the final maturity date of the Financial Indebtedness being refinanced, refunded, renewed or extended and (B) have an average life to maturity (without giving effect to any prepayment) equal to or greater than such Financial Indebtedness, (iii) the terms of such refinancing, refunding, renewal or extension shall not be more restrictive (taken as a whole) than the terms of such Financial Indebtedness, (iv) any guarantee entered into in connection with such refinancing, refunding, renewal or extension that is not a refinancing of an existing guarantee of such Financial Indebtedness shall not be permitted under this paragraph (viii) if the Financial Indebtedness being refinanced is subordinated, such Permitted Refinancing Indebtedness shall be subordinated to at least the same extent, and on terms at least as favorable to the Lenders, as the Financial Indebtedness being refinanced;

(ii)    under commodity OTC agreements and financial OTC agreements entered into in compliance with the Risk Management Policies;

(iii)    in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(iv)    (i) resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business or (ii) arising under or in connection with cash management services in the ordinary course of business;

(v)    under the US DIP Finance Documents;

(vi)    permitted by the Interim DIP Order;

(vii)    owing by any Obligor to any other Obligor;

(viii)    the Prepetition Obligations;

(ix)    as permitted by the Cash Management Order; and

(x)    not otherwise permitted hereunder in an aggregate amount not to exceed $250,000 at any time outstanding.

**Miscellaneous**

24.19    **Insurance**

(a)    Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially similar business.

(b)    All insurances must be with reputable independent insurance companies or underwriters approved by the Facility Agent (acting on the instructions of the Majority Lenders).

(c)    All insurances referred to in clause (a) above relating to the Borrowers and each Spanish Pledgor shall be maintained on terms satisfactory to the Facility Agent and each Borrower shall (and the Company shall procure that each Spanish Pledgor will) procure that the Security Agent and the US DIP Administrative Agent is named as a co-insured and sole loss payees of such insurance in a manner which is in form and substance satisfactory to the Facility Agent and without liability on the part of the Security Agent for premiums or calls of whatever nature.

24.20    **Commercial Contracts**

Each Obligor shall ensure that any sales order confirmation or invoice issued after 21 May 2018 under any "Commercial Contract" (as defined in each Security Agreement) and prior to the execution of the Second Security Documents, contains the following wording:

"*We give you notice that under a security agreement dated 30 November 2017 entered into by us in favour of ABN AMRO Bank N. V., we have assigned to ABN AMRO Bank N. V. by way of first assignment, all of our rights in respect of our agreement with you to which this confirmation or invoice relates.  We instruct you to make payment hereunder to our account with ABN AMRO Bank N.V. with the following details: [insert details of relevant Collection Account]*"

and once the Second Security Documents have been executed, the following wording:

"*We give you notice that: (i) under a security agreement dated 30 November 2017 entered into by us in favour of ABN AMRO Bank N. V., we have assigned to ABN AMRO Bank N. V. by way of first assignment; and (ii) under a security agreement dated [\*\*\*insert date\*\*\*] entered into by us in favour of Mercuria Energy Trading S.A., we have assigned to Mercuria Energy Trading S.A. by way of second assignment, all of our rights in respect of our agreement with you to which this confirmation or invoice relates.  We instruct you to make payment hereunder to our account with ABN AMRO Bank N.V. with the following details: [insert details of relevant Collection Account]*".

24.21    **Super-priority administrative expense claims and Adequeate Protection Payments**

(a)    The Company will not, and will not permit any other Debtor to, make any payment or distribution to any non-Debtor affiliate or corporate insider outside of the ordinary course of business, except as expressly provided or permitted under this Agreement or in a First Day Order or "second day" order complying with the terms of this Agreement.

(b)    The Company will not, and will not permit any other Debtor to, make any payment to, or otherwise provide any adequate protection for, any prepetition creditors, other than

pursuant to the Interim DIP Order, the Final Order or other cash collateral orders acceptable to the Majority Lenders.

(c)   The Parent will not, and will not permit any Obligor or Subsidiary to, prepay any Financial Indebtedness (other than, for the avoidance of doubt, any payments under any financial or physical trading transaction (including hedges), including commodities transactions), except as pursuant to the First Day Orders or other orders by the Bankruptcy Court upon pleadings in form and substance satisfactory to the Facility Agent and the Lenders.

24.22   **Access**

Each Obligor shall, and the Company shall ensure that each member of the Group will once during each calendar month permit the Finance Parties and/or accountants or other professional advisers and contractors of the Facility Agent or Security Agent access to information (including historical information) and personnel (during normal business hours and subject to confidentiality and data protection obligations imposed by law) and, notwithstanding anything to the contrary in this Agreement, the Obligors' obligations to reimburse any Finance Party other than the Facility Agent or any of its Affiliates in respect of any exercise of this clause 24.22 shall be limited to reasonable costs and expenses.

24.23   **Treasury Transactions**

No Obligor shall (and the Company will procure that no other member of the Group will) enter into any Treasury Transaction, other than:

(a)   hedging transactions documented by the Hedging Agreements; and/or

(b)   hedging transactions in accordance with the Hedging Policy.

24.24   **Further assurance**

(a)   Other than in respect of the Second Security, each Obligor shall (and the Company shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(i)   to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law; and/or

(ii)   to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b)   In respect of the Second Security, each Obligor shall (and the Company shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the US DIP Administrative Agent may reasonably specify (and in such form as the US DIP Administrative Agent may reasonably require in favour of the US DIP Administrative Agent or its nominee(s)):

(i)   to perfect the Security created or intended to be created under or evidenced by the Second Security Documents or for the exercise of any rights, powers and remedies of the US DIP Administrative Agent provided by or pursuant to the Second Security Documents or by law; and/or

(ii)   to facilitate the realisation of the assets which are, or are intended to be, the subject of the Second Security.

(c) Each Obligor shall (and the Company shall procure that each other member of the Group will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent, the US DIP Administrative Agent, the Finance Parties or the US DIP Finance Parties by or pursuant to the Finance Documents.

(d) The Parent will not, nor will it permit any Obligor or any of its Subsidiaries to, enter into a material Contractual Obligation without the consent of the Facility Agent and the Majority Lenders.

24.25    **Conditions subsequent**

(a) The Company shall procure that if any assets which are included in the Borrowing Base at any time are located in a jurisdiction in which a perfected first priority security interest cannot be granted in respect of future assets, the Borrowers will enter into periodic pledges with the Security Agent (the frequency of which shall be agreed with the Lenders provided that such frequency shall be no less than on a weekly basis) in respect of assets located in such jurisdictions. The Company shall provide to the Security Agent such corporate authorities and legal opinions as the Security Agent may require in respect of such security.

(b) Notwithstanding any other provision of the Finance Documents, the assets of any Spanish Pledgor shall be deemed to be unsecured for the purposes of determining their eligibility for inclusion in the Borrowing Base until the date on which the Facility Agent confirms in writing to the Company and the Collateral Management Agent that it has received the following:

(i) duly executed originals of the relevant Spanish Pledge(s);

(ii) a duly executed original of the Spanish Irrevocable Power of Attorney;

(iii) evidence of the registration of any relevant Spanish Pledge amendments at the relevant Registries of Moveable Property;

(iv) the conditions precedent specified in Part IV of Schedule 2 (*Conditions Precedent*); and

(v) a legal opinion of Garrigues in relation to Spanish law,

in each case in form and substance satisfactory to the Facility Agent.

(c) Notwithstanding any other provision of the Finance Documents, any inventory located in South Africa other than the inventory owned by the Company onboard any vessel which is the subject of the South African Pledge shall be deemed to be unsecured for the purposes of determining its eligibility for inclusion in the Borrowing Base until the later of the date on which the Facility Agent confirms in writing to the Company and the Collateral Management Agent that it has received duly executed originals of a South African Pledge in relation to any such inventory or its location, together with such evidence satisfactory to it that all action needed to perfect the Security created by such South African Pledge has been completed and the Facility Agent has received all legal opinions, corporate approvals and other conditions precedent required by it (acting on the instructions of the Majority Lenders) in connection with such security.

(d) The Company shall (or shall procure that each Spanish Pledgor will), following any change whatsoever in the identity or participations of the Lenders hereunder or any other registered details in relation to the Spanish Pledges, including without limitation as a consequence of any increases of the Facilities, take such steps as the Facility Agent may require (based on advice received from its external legal advisers) (including executing any extension, amendment and/or ratification agreement and carried out the relevant

actions before the relevant registry to obtain registration of said documents) to update the relevant Spanish Registries of Moveable Property.

24.26    **Borrowing Base Amount**

The Company shall procure that the Borrowing Base Amount shall at all times be zero or a positive number. For the avoidance of doubt, any breach of this clause 24.26 is capable of remedy by way of a voluntary prepayment made in accordance with clause 8.2 (*Voluntary prepayment of Loans*) in the period specified in clause 26 (*Events of Default*).

24.27    **Parent Listing**

The Parent shall at all times maintain its listing on the New York Stock Exchange.

24.28    **Risk Management Policy**

The Company shall procure that no material changes are made to the risk management policy provided to the Facility Agent pursuant to Part I of Schedule 2 (*Conditions Precedent*) without the prior written approval of the Facility Agent acting on the instructions of the Majority Lenders.

24.29    **First and Second Day Orders**

The Borrowers shall cause all proposed First Day Orders, "second day" orders to be reasonably acceptable to the Facility Agent (acting on the instructions of the Majority Lenders) in all respects.

24.30    **Sanctions**

(a)    The Obligors shall not, and shall procure that each other member of the Group shall not, permit or authorise any other person to, directly or indirectly, use, lend, make payments of, contribute or otherwise make available, all or any part of the proceeds of the Facilities or other transactions contemplated by this Agreement to fund or facilitate trade, business or other activities: (i) involving or for the benefit of any Prohibited Person; (ii) relating to a country or territory that is the target of country-wide or territory-wide Sanctions; or (iii) in any other manner that could result in any Obligor or a Finance Party being in breach of any Sanctions or becoming a Prohibited Person.

(a)    The Obligors shall ensure that (i) no person that is a Prohibited Person will have any legal or beneficial interest in any funds repaid or remitted by the Obligors to any Finance Party in connection with the Facility, and (ii) it shall not use any revenue or benefit derived from any activity or dealing with a Prohibited Person for the purpose of discharging amounts owing to any Finance Party in respect of the Facility.

24.31    **Payments under Multi-Party TPA Agreements**

Each Borrower shall procure that any amounts payable to it pursuant to a Multi-Party TPA Agreement and any FX Hedging Provider Hedging Agreement and any Lender Discounting Facility shall be paid to the Collection Account in the relevant currency held by the relevant Borrower.

24.32    **Inventory**

Each Borrower shall procure that no inventory shall be held or intended by it to be held, for a period in excess of one hundred and eighty (180) days nor shall any inventory be acquired for speculative purposes.

24.33    **Bills of Lading**

Each Obligor shall procure that all bills of lading issued in respect of assets comprised from time to time in the Borrowing Base shall be issued or endorsed in the name of the Security Agent and delivered to the Collateral Management Agent.

24.34    **Spanish Pledgor**

Each Borrower shall procure that each Spanish Pledgor:

(a)    shall at all times be and remain a wholly-owned Subsidiary of the Parent; and

(b)    will only sell or otherwise dispose of assets or inventory which are from time to time the subject of the Spanish Pledges to a Borrower.

24.35    **Sensitive Zone**

The Borrowers, when purchasing from suppliers in the Sensitive Zone, shall only enter into supply contracts with Approved Suppliers. Such supply contracts shall systematically include a clause specifying compliance of both parties with Sanctions regardless of the whether these purchases are financed through the Facility or through any other means.

24.36    **Dividends and share redemptions**

(a)    No Obligor shall (and the Company shall ensure that no other member of the Group will) declare or make any Restricted Payment except that, so long as no Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

(i)    each Subsidiary (excluding a Borrower) may make Restricted Payments to the Parent or any other Subsidiary and any other person that owns an Equity Interest in such Subsidiary, ratably according to their respective holdings of such Equity Interests in respect of which such Restricted Payment is being made;

(ii)    Restricted Payments to the extent constituting Investments permitted hereunder;

(iii)    Restricted Payments provided for in the Orders; "First Day Orders" or "second day Orders"; and

(iv)    the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such person.

(b)    No Borrower shall, and will not permit any other Debtor to, make any payment to, or otherwise provide any adequate protection for, any prepetition creditors, other than pursuant to the Interim DIP Order, the Final DIP Order, the First Day Orders and other cash collateral orders acceptable to the Majority Lenders or in accordance with the Budget.

(c)    No Obligor shall (and the Company shall ensure that no other member of the Group will), prepay any prepetition Financial Indebtedness (other than the Prepetition Obligations and other than, for the avoidance of doubt, any payments under any financial or physical trading transaction (including hedges), including commodities transactions), except as (i) pursuant to the First Day Orders or other Bankruptcy Court orders acceptable to the Majority Lenders, (ii) as disclosed in writing to the Facility Agent prior to the Effective Date in the document entitled "6.05 Payments", (iii) in accordance with the Budget and (iv) any other order of the Bankruptcy Court.

### 24.37 Accounting principles

No Obligor shall make any significant change in its accounting treatment or reporting practices, except as required by the Accounting Principles, without providing the Facility Agent with at least ten days' prior written notice of such change. At the end of any calendar quarter during which any such change has occurred, the relevant Obligor shall prepare and deliver to the Facility Agent an explanatory statement, in form and substance satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders), reconciling the previous treatment or practice with the new treatment or practice.

### 24.38 Cancellation of Financial Indebtedness

No Obligor shall cancel any claim or Financial Indebtedness owed to it except for adequate consideration or as approved by an order of the Bankruptcy Court or permitted under this Agreement (including as required by the Asset Purchase Agreement).

### 24.39 Limitation on capital structure

(a) No Obligor shall, nor shall it permit any of its Subsidiaries to, make any changes in its capital structure (including, without limitation, the terms of its outstanding share capital).

(b) Other than in respect of the Parent listed on the New York Stock Exchange, no Obligor shall, nor shall it permit any of its Subsidiaries to, change the ownership of the right to any votes that might be cast at a general meeting of any Obligor or of the issued share capital of an Obligor.

### 24.40 Required Milestones and actions

(a) The Obligors shall comply with and satisfy (by the occurrence thereof) each of the Required Milestones, and perform each of the actions, set forth on Schedule 20 (*Required Milestones*) attached hereto, on or before the dates required for such compliance and actions as set forth in such Schedule and in accordance with the Agreed Security Principles.

(b) Subject in all respects to the Agreed Security Principles, with respect to any Security of an Obligor as to which the Security Agent does not have perfected Security, or, in the case of assets of Debtors already encumbered as of the Petition Date in favor of other creditors other than a Lender, a perfected junior Security, such Obligor shall cause within 45 days of the date hereof (or 60 Business Days in the case of Subsidiaries organised in South Africa), or in the case of after-acquired or after-arising assets, within 45 days of the date such property is acquired or arises, such Debtor to (i) execute and deliver to the Security Agent (A) such amendments to the Transaction Security Document or such other documents necessary to grant to the Security Agent for and on behalf of the Secured Parties Security in such property not already encumbered as of the Petition Date in favour of the Secured Parties, including the Equity Interests of all Subsidiaries of the Parent, and (B) security agreements, vessel mortgages and such other documents necessary or advisable to grant to the Security Agent for and on behalf of the Secured Parties a perfected Security as was already encumbered as of the Petition Date in favour of a person other than a Lender, and (ii) take all other actions necessary to grant to the Security Agent for and on behalf of the Secured Parties (A) a perfected Security in such property, including, without limitation, the filing of UCC financing statements in such jurisdictions as may be required by the Transaction Security Document or by applicable law or regulation or as may be requested by the Security Agent (acting on the instructions of the Majority Lenders) and (B) a perfected Security in such property as was already encumbered as of the Petition Date in favor of a person other than a Lender, including, without limitation, the filing of UCC financing statements, vessel mortgages and other documents in such jurisdictions as may be advisable or required by the Transaction Security Document or by applicable law or regulation or as may be requested by the Security Agent. With respect to any person that becomes an Obligor after the Effective Date, or any assets of the Obligors acquired or arising after the Effective Date, the

Borrower shall cause the execution, delivery and performance of the items required pursuant to the foregoing sentence within 60 days of the date that such person becomes an Obligor, or the date that such property arises or is acquired, as applicable.

## 25 Bank Accounts

### 25.1 Designation of Accounts

Each Borrower shall maintain in its name the following bank accounts:

(a) within the Amsterdam branch of the Account Bank:

(i) a deposit account in Dollars designated "Facility Account"; and

(ii) a deposit account in Dollars designated "Collection Account";

(b) within the German branch of the Account Bank a deposit account in EURO designated "Collection Account",

and each of the Company and ANNV shall maintain in its name with the Amsterdam branch of the Account Bank a deposit account in EURO designated "Collection Account".

### 25.2 Account balances

The Company will procure that all cash owned by an Obligor (other than (a) cash in the "Controlled Accounts" (as the expression is defined in the US DIP Credit Facility Agreement); and (b) a maximum additional aggregate amount held by any member of the Group of USD5,000,000) is credited to an account in the name of a member of the Group with an Acceptable Bank which is subject to the Transaction Security or any other Security created or expressed to be created in favour of the Security Agent (in form and substance satisfactory to the Security Agent).

### 25.3 Collection Account

(a) Each of the Collateral Management Agent and the relevant Borrower shall have signing rights on a Collection Account.

(b) All payments to be made by any Obligor pursuant to any Facility shall be paid to the Collection Account in the relevant currency held by the relevant Borrower.

(c) Each Borrower will procure that all receivables payable to it and all proceeds of any true sale of receivables or any discounting programme conducted by it shall be paid to the relevant Collection Account in the relevant currency held by the relevant Borrower.

(d) Each Borrower shall by no later than 14:00 on each applicable day instruct the Collateral Management Agent to transfer amounts credited to the Collection Accounts to the relevant Facility Account to meet that Borrowers' payment obligations under the Facilities provided that no transfer of any amount to be set-off pursuant to clause 9.5(b) shall be required to be made pursuant to this paragraph (d).

(e) On each Monday and Thursday (or if any such day is not a Business Day, on the next Business Day) while there are any Outstandings in respect of Overdraft Facilities, and provided that:

(i) there shall remain in aggregate in the Collection Accounts and/or the Facility Accounts following any application pursuant to this sub-clause (e) sufficient funds to meet the Borrowers' repayment obligations in relation to any Loans which are scheduled to fall due in the next seven (7) days; and

(ii)　　no Default is continuing,

the Company shall instruct the Collateral Management Agent to apply amounts credited to the Collection Accounts to meet the Borrowers' payment obligations under Overdraft Facilities on a pro-rata basis.

The Borrowers' payment obligations to each Overdraft Bank under Overdraft Facilities (and amounts to be paid hereunder) on each such date shall be ascertained and the payments implemented as follows:

| Deadline on relevant date | Action required |
|---|---|
| 10:00am | Overdraft Bank to notify the Facility Agent by email of their Facility B outstandings in respect of Overdraft Facilities as at close of business on the previous Business Day (the **Overdraft Bank Outstandings**). |
| 12:00 midday | Facility Agent to notify the Company and the Collateral Management Agent (with a copy to all Lenders (which may be made by posting on debt domain)) of the Overdraft Bank Outstandings notified to it and the payments to be made to each Overdraft Bank under this clause 25.3(e) (the **Facility Agent's Notification**). |
| 14:00 | Company to instruct the payments in accordance with the Facility Agent's Notification (or in accordance with the Company's Account Certification (as defined below)). |

If an Overdraft Bank fails to provide details of its Overdraft Bank Outstandings in accordance with this clause 25.3(e), its outstandings for the purposes of calculating payments to be made under this clause 25.3(e) on the date in question shall be deemed to be such amount as the Company may certify in writing to the Facility Agent by no later than 12:00 midday on the relevant day (such certification being the **Company's Account Certification**) (and if the Company does not provide any such certification then the relevant Overdraft Bank's outstandings shall be deemed to be zero for such purpose).

(f)　　If a Borrower does not instruct the making of any payments under and in accordance with clauses 25.3(d) and 25.3(e), the Collateral Management Agent shall be irrevocably authorised to apply amounts credited to the Collection Accounts of that Borrower (or any of them) to meet the Borrowers' payment obligations under any Facility.

25.4　　**Withdrawals from Collection Account**

(a)　　Funds standing to the credit of a Collection Account shall be freely available to the relevant Borrower for application in accordance with the Budget:

(i)　　provided that:

(A)　　no Event of Default is continuing or would result from a withdrawal from a Collection Account;

(B)　　no notices have been issued in respect of Overdraft Facilities pursuant to clause 7.2 (*Repayment of Overdraft Facilities*) (unless all amounts payable under that clause following a Demand Repayment Date (as defined therein) have been repaid in full); and

(C)    a withdrawal would not result in the Borrowing Base Amount being less than zero (0) or a negative number; or

(ii)    otherwise, with the prior written consent of the Majority Lenders.

(b)    Save as set out in clause 25.4(a), no Obligor may withdraw any amount from or allow any amount to be debited from a Collection Account (except in accordance with paragraph (d) of clause 25.3 (*Collection Account*) or otherwise in payment of to the US Secured Parties of any amount due and payable under the US DIP Finance Documents).

(c)    Without prejudice to clause 25.4(a), any funds which are available to a Borrower pursuant to clause 25.4(a) may be transferred to an account held with another Lender provided that such funds shall not be applied to a payment due to that Lender under the Finance Documents or under any agreement in connection with any Fronted Facility or in connection with any Multi-Party TPA Agreement or FX Hedging Provider Hedging Agreement.

## 25.5    Facility Account

(a)    Each of the Collateral Management Agent and the relevant Borrower shall have signing rights on a Facility Account.

(b)    All Loans utilised by a Borrower under the Facilities shall be paid by the Facility Agent to the relevant Facility Account.

(c)    The Borrower irrevocably authorises the Facility Agent to apply amounts credited to the Facility Account to meet the Borrower's payment obligations under the Facilities.

## 25.6    Withdrawals from Facility Account

(a)    Funds standing to the credit of a Facility Account shall be freely available to the relevant Borrower for application in accordance with the Budget

(i)    provided that:

(A)    no Event of Default is continuing or would result from a withdrawal from a Facility Account;

(B)    no notices have been issued in respect of Overdraft Facilities pursuant to clause 7.2 (*Repayment of Overdraft Facilities*) (unless all amounts payable under that clause following a Demand Repayment Date (as defined therein) have been repaid in full); and

(C)    a withdrawal would not result in the Borrowing Base Amount being zero (0) or a negative number; or

(ii)    otherwise, with the prior written consent of the Majority Lenders.

(b)    Save as set out in clause 25.6(a), no Obligor may withdraw any amount from or allow any amount to be debited from a Facility Account (except in accordance with paragraph (c) of clause 25.5 (*Facility Account*) or otherwise in payment of to the US Secured Parties of any amount due and payable under the US DIP Finance Documents).

## 25.7    Cash cover

(a)    With respect to any outstanding Credit Instrument, upon the demand at any time of (i) the Majority Lenders or (ii) with the consent of the Majority Lenders, the Issuing Bank or the Facility Agent (provided that, in the case of this clause (ii), if an Event of Default has occurred and is continuing, the consent of the Majority Lenders shall not be required in connection with any such demand by the Issuing Bank or the Facility Agent), in each

case, the Borrowers shall immediately deposit into an account established and maintained on the books and records of the Security Agent cash cover equal to 103% of the total Credit Instrument Outstandings as of such date plus any accrued and unpaid fees thereon. Such deposit shall be held by the Security Agent as collateral for the payment and performance of the Secured Obligations. In addition, and without limiting the foregoing or paragraph (d) of this clause, if any Credit Instrument Outstandings remain unpaid after the expiration date specified in said paragraph (d), the Borrowers shall immediately deposit cash cover in an amount equal to 103% of such Credit Instrument Outstandings as of such date plus any accrued and unpaid fees thereon.

(b)     Notwithstanding anything to the contrary in any Finance Document, the Obligors may withdraw any amount on any Collection Account or any Facility Account for the purpose of granting cash cover as required under any Finance Document.

## 26     Events of Default

Each of the events or circumstances set out in this clause 26 is an Event of Default (save for clause 26.20 (*Acceleration*)) unless, other than in respect of clause 26.5(a), such events or circumstances are capable of remedy and are remedied within five (5) Business Days of the earlier of (i) the Facility Agent giving notice to the Company or relevant Obligor and (ii) the Company or an Obligor becoming aware of the failure to comply.

### 26.1     Non-payment

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a)     its failure to pay is caused by:

(i)     administrative or technical error; or

(ii)     a Disruption Event; and

(b)     payment is made within five (5) Business Days of its due date.

### 26.2     Covenants

(a)     An Obligor does not comply with any provision of any Transaction Security Document.

(b)     A Borrower does not comply with clause 24.35 (*Sensitive Zone*).

(c)     An Obligor does not comply with clause 24.13 (*Disposals*).

(d)     An Obligor does not comply with clause 23(b) (*Budget variance*).

### 26.3     Other obligations

An Obligor does not comply with any provision of the Finance Documents (other than those referred to in clause 26.1 (*Non-payment*), clause 26.2 (*Covenants*) and clause 24.9 (*Application of FATCA*)) and such failure to comply continues unremedied for a period of five (5) or more Business Days after notice thereof by the Facility Agent or the Majority Lenders to the Company.

### 26.4     Misrepresentation

Any representation or statement made or deemed to be made by an Obligor in the Finance Documents or any other document delivered by or on behalf of any Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading when

made or deemed to be made (save that this clause 26.4 shall not apply to clause 21.2(d) (*Status*)).

26.5     **Cross default**

(a)     Any Event of Default (as defined in the US DIP Credit Facility Agreement) occurs.

(b)     Any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) is not paid when due nor within any originally applicable grace period.

(c)     Any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(d)     Any commitment for any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) is cancelled or suspended by a creditor of any member of the Group (other than an Immaterial Subsidiary) as a result of an event of default (however described).

(e)     Any creditor of any member of the Group (other than an Immaterial Subsidiary) becomes entitled to declare any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) due and payable prior to its specified maturity as a result of an event of default (however described).

26.6     **Insolvency**

(a)     A member of the Group other than a Debtor:

(i)     is unable or admits inability to pay its debts as they fall due;

(ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

(iii)   suspends or threatens to suspend making payments on any of its debts; or

(iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b)     The value of the assets of any member of the Group (other than a Debtor) is less than its liabilities (taking into account contingent and prospective liabilities).

(c)     A moratorium is declared in respect of any indebtedness of any member of the Group other than a Debtor.  If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

26.7     **Insolvency proceedings**

(a)     Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(i)     the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, judicial management or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any member of the Group;

(ii)    a composition, compromise, assignment or arrangement with any creditor of any member of the Group;

(iii)   the appointment of a liquidator, receiver, administrative receiver, receiver and manager, administrator, judicial manager, interim judicial manager, compulsory

manager or other similar officer in respect of any member of the Group or any of its assets; or

(iv)     enforcement of any Security over any assets of any member of the Group,

or any analogous procedure or step is taken in any jurisdiction.

(b)     Paragraph (a) shall not apply to:

(i)      any of the proceedings described in clause 26.10;

(ii)     any member of the Group which is a Debtor;

(iii)    any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within fourteen (14) days of commencement; or

(iv)     the solvent liquidation or reorganisation of any member of the Group which is not an Obligor so long as any payments or assets distributed as a result of such liquidation or reorganisation are distributed to other members of the Group.

## 26.8     Creditors' process

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group other than a Debtor.

## 26.9     Failure to comply with court judgment or arbitral award

(a)     Any Obligor fails to pay any unstayed final judgment, arbitral award, order or decree rendered against it by a court or arbitral tribunal or other arbitral body of competent jurisdiction located in any jurisdiction.

(b)     No Event of Default under paragraph (a) above will occur if:

(i)      the aggregate liability under all such judgments, arbitral awards, orders or decrees is less than US$5,000,000 (or its equivalent in any other currency or currencies) and is discharged within 45 days; or

(ii)     such judgment or arbitral award is entirely covered by insurance or indemnity and provided such carrier has coverage or such indemnification has not been denied.

## 26.10    Debtors and Cases

(a)     Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, a receiver, interim receiver, receiver or manager shall be appointed in any of the Cases and the order appointing such trustee, examiner, receiver, interim receiver or manager shall not be reversed or vacated within 10 days after the entry thereof.

(b)     Any order by the Bankruptcy Court shall be entered, terminating or modifying the exclusivity right of any Debtor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

(c)     Any other material superpriority administrative expense claim or "claim" which is *pari passu* with or senior to the claims of the Secured Parties under the Facilities, as applicable (other than in each case the Carve Out) or any material lien that is *pari passu*

with or senior to the liens of the Secured Parties under this Agreement shall be granted in any of the Cases.

(d)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any asset of the Debtors of fair market value exceeding $1,500,000 in aggregate from or permit other actions that would reasonably be expected to result in a Material Adverse Effect.

(e)     An order shall be entered reversing, supplementing, staying for a period of three (3) Business Days or more, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order in a manner that is materially adverse to the interests of the Finance Parties, or any Debtor shall apply for authority to do so without the prior written consent of the Facility Agent (acting on the instructions of the Majority Lenders), or the Interim DIP Order or the Final DIP Order shall cease to be in full force and effect.

(f)     The Bidding Procedures Order or Sale Order shall be reversed, supplemented, stayed, vacated or modified in a manner adverse to the Majority Lenders without the consent of the Majority Lenders.

(g)     A Debtor makes any payments relating to prepetition obligations other than in accordance with a Bankruptcy Court order, the Interim DIP Order, the Final DIP Order, or as otherwise agreed to by the Facility Agent and the Majority Lenders or contemplated by the Budget or otherwise permitted hereunder.

(h)     A plan shall be proposed by a Debtor in any of the Cases that is not supported by the Lenders, including a plan that does not provide for (i) termination of the Commitments and the commitments under the US DIP Credit Facilities, (ii) the indefeasible payment in full in cash of the Outstandings (other than indemnities and other contingent obligations not then due and payable), and (iii) payment in full in cash of the Prepetition Obligations (or other treatment agreed to by the Finance Parties), in each case in the foregoing clauses (i)-(iii) on the effective date of such plan.

(i)     A plan is proposed by any person other than the Debtors, in any of the Cases, that is not supported by the Lenders, including a plan that does not provide for (i) termination of the Commitments and the commitments under the US DIP Credit Facilities, (ii) the indefeasible payment in full in cash of the Outstandings (other than indemnities and other contingent obligations not then due and payable), and (iii) payment in full in cash of the obligations owed to the Finance Parties prior to the Petition Date (or other treatment agreed to by the Prepetition Lenders), in each case in the foregoing clauses (i)-(iii) on the effective date of such plan, and such plan is confirmed.

(j)     The Interim DIP Order or Final DIP Order, as applicable, shall fail to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim DIP Order or Final DIP Order, (ii) amending or modifying the Interim DIP Order or Final DIP Order in a manner that is adverse to the Finance Parties, or (iii) staying for a period in excess of seven days the Interim DIP Order or Final DIP Order (as applicable).

(k)     the Transaction Security Documents shall cease to create a valid and perfected lien on any material assets purported to be subject to Transaction Security, solely to the extent required hereunder;

(l)     any Debtor shall fail to comply with the material terms of an Order in any material respect for a period of more than 5 Business Days;

(m)     any Debtor shall file a motion seeking, or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order, authorizing the sale of all or substantially all of the Debtors' assets (unless, in the case of each of the foregoing, either (i) (A) the Majority Lenders consent to the filing of such motion, and (B) any order approving the sale expressly provides for application of cash proceeds in accordance with the terms of this

Agreement and is otherwise in form and substance reasonably acceptable to the Facility Agent, or (ii) the order approving such sale contemplates payment in full in cash of the Outstandings upon consummation of such sale);

(n)     the Bankruptcy Court shall enter a Final Order that is adverse in any material respect to (i) the interests (when taken as a whole) of the Secured Parties in any of the Transaction Security, or (ii) the creation, perfection or priority of any of the Security securing the Secured Obligations; provided however, that this paragraph (n) will not apply to the termination of the use of cash collateral (which shall be governed exclusively by paragraph (o) below);

(o)     the use of cash collateral by a Debtor shall be terminated and a Debtor shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance reasonably acceptable to the Majority Lender;

(p)     the Obligors or any of their subsidiaries, or any person claiming by or through the Obligors or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Finance Parties in any Case or case relating to the Facilities or the US DIP Credit Facilities or any challenge to the validity, enforceability, priority or perfection of liens securing the obligations under this Agreement prior to the Petition Date, as applicable; or

(q)     the filing of any equitable subordination or recharacterization claim by any of the Borrowers, seeking thereby to subordinate or recharacterize, by order of a court of competent jurisdiction, any of the rights to payment, or rights in collateral securing any such payment, of any indebtedness owed to any such Lender; or

(r)     the entry of an order providing for the equitable subordination or recharacterization of any Lender's rights to payment, or rights in Transaction Security securing any payment, or any Financial Indebtedness owed to any Lender; or

(s)     the entry of an order that restricts any of the Lenders from credit bidding in any sale of the assets of a Debtor under Section 363 of the Bankruptcy Code.

## 26.11     Unlawfulness and invalidity

(a)     A Lender determines that it is or has become unlawful for an Obligor, any Spanish Pledgor or any South African Pledge Counterparty to perform any of its obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective.

(b)     Any obligation or obligations of any Obligor, any Spanish Pledgor or any South African Pledge Counterparty under any Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Lenders under the Finance Documents.

(c)     Any Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than a Finance Party) to be ineffective.

## 26.12     Cessation of business

Any member of the Group suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

### 26.13 Change in Parent management

Any individual resigns or is removed from the board of directors of the Parent unless another person reasonably acceptable to the Facility Agent (acting on the instructions of the Majority Lenders) is appointed to the board in their place within 5 days of such resignation or removal.

### 26.14 Reporting

(a) The Company fails to provide a Borrowing Base Report to the Collateral Management Agent when required pursuant to clause 22.7(a)(i) (*Borrowing Base Report*) and such failure is not remedied within two (2) Business Days.

(b) The Company fails to provide a Cross-Check Borrowing Base Report to the Collateral Management Agent pursuant to clause 22.7(a)(ii) (*Borrowing Base Report)* and such failure is not remedied within two (2) Business Days.

(c) The Company fails to provide a Compliant Borrowing Base Report to the Collateral Management Agent when required pursuant to clause 22.9 (*Deficient Borrowing Base Report*).

(d) In each period of twelve (12) Months commencing on the date of this Agreement and each anniversary thereof:

    (i) the Company is required to remedy a failure to provide a Borrowing Base Report in accordance with clause 26.13(a) on more than four (4) occasions;

    (ii) the Company is required to remedy a failure to provide a Cross-Check Borrowing Base Report in accordance with clause 26.13(b) on more than two (2) occasions;

    (iii) five (5) or more Deficient Borrowing Base Reports are provided to the Collateral Management Agent pursuant to this Agreement; or

    (iv) three (3) or more Deficient Cross-Check Borrowing Base Reports are provided to the Collateral Management Agent pursuant to this Agreement.

(e) The Company provides two (2) consecutive Deficient Cross-Check Borrowing Base Reports to the Collateral Management Agent pursuant to this Agreement.

### 26.15 Repudiation and rescission of agreements

An Obligor, any Spanish Pledgor or any South African Pledge Counterparty (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

### 26.16 Accounts

Without the prior written consent of the Facility Agent on the instructions of the Majority Lenders any Collection Account or Facility Account is closed or requested to be closed (other than in accordance with the terms of this Agreement).

### 26.17 Litigation

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against any member of the Group or its assets which have or are reasonably likely to have a Material Adverse Effect.

26.18    **Expropriation**

The authority or ability of any member of the Group to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, compulsory acquisition, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets or the shares in that member of the Group (including without limitation the displacement of all or part of the management of any member of the Group).

26.19    **Material adverse change**

Any event or circumstance occurs which the Majority Lenders reasonably believe has or is reasonably likely to have a Material Adverse Effect.

26.20    **Sanctions**

Any Obligor or any other member of the Group:

(a)      becomes a Prohibited Person or becomes owned or controlled by, or acts directly or indirectly on behalf of, a Prohibited Person or any of such persons becomes the owner or controller of a Prohibited Person; or

(b)      fails to comply with any Sanctions.

26.21    **Acceleration**

On and at any time after the occurrence of an Event of Default the Facility Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

(a)      issue and deliver a Carve-Out Trigger Notice;

(b)      cancel the Total Commitments at which time they shall immediately be cancelled;

(c)      declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

(d)      declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Facility Agent on the instructions of the Majority Lenders;

(e)      declare that cash cover in respect of each Credit Instrument is immediately due and payable at which time it shall become immediately due and payable;

(f)      declare that cash cover in respect of each Credit Instrument is payable on demand at which time it shall immediately become due and payable on demand by the Facility Agent on the instructions of the Majority Lenders;

(g)      declare all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Fronted Facilities to be immediately due and payable, at which time they shall become immediately due and payable;

(h)      declare that all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Fronted Facilities be payable on demand, at which time they shall immediately become payable on demand by the Facility Agent on the instructions of the Majority Lenders;

(i)      instruct the close-out of any hedging or clearing transactions which are the subject of a Multi-Party TPA Agreement or require the Borrowers to close out any FX Hedging Provider Hedging Transactions; and/or

(j)     exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

**Section 9**
**Changes to Parties**

# 27     Changes to the Lenders

### 27.1      Assignments and transfers by the Lenders

Subject to this clause 27 and to clause 28 (*Restriction on Debt Purchase Transactions*), a Lender (the **Existing Lender**) may:

(a)      assign any of its rights; or

(b)      transfer by novation any of its rights and obligations,

under any Finance Document to any other person which is a commercial bank or a person that has an Investment Grade Rating (the **New Lender**).

### 27.2      Conditions of assignment or transfer

(a)      The consent of the relevant Issuing Bank is required for any assignment or transfer by an Existing Lender of any of its rights and/or obligations under a Fronted Facility. This requirement shall apply to any such transfer irrespective of the circumstances of the transfer and notwithstanding any other provision of this Agreement.

(b)      The consent of the Company is required for an assignment or transfer by an Existing Lender, unless the assignment or transfer is:

(i)      to an Acceptable Bank;

(ii)      to a Lender or an Affiliate of a Lender; or

(iii)      made at a time when an Event of Default is continuing.

(c)      The consent of the Company to an assignment or transfer must not be unreasonably withheld or delayed.  The Company will be deemed to have given its consent five (5) Business Days after the Existing Lender has requested it unless consent is expressly refused by the Company within that time.

(d)      An assignment will only be effective on:

(i)      receipt by the Facility Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Facility Agent) that the New Lender will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it was an Original Lender;

(ii)      the performance by the Facility Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Facility Agent shall promptly notify to the Existing Lender and the New Lender; and

(iii)      if any Spanish Pledge has been entered into, receipt by the Facility Agent from the New Lender of a notarised power of attorney substantially in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under the Spanish Pledges.  For the avoidance of doubt, all costs and expenses relating to the execution of the power of attorney in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) shall be borne by the entity granting such power of attorney.

(e)     A transfer will only be effective if the procedure set out in clause 27.5 (*Procedure for transfer*) is complied with.

(f)     If:

    (i)     a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

    (ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under clause 16 (*Increased Costs*), then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under that clause to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred. This paragraph (f) shall not apply in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Facility or to the extent that the payment under clause 15 (*Tax Gross Up and Indemnities*) relates to a FATCA Deduction.

(g)     Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Facility Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

## 27.3    Assignment or transfer fee

Unless the Facility Agent otherwise agrees and excluding an assignment or transfer (i) to an Affiliate of a Lender, (ii) to a Related Fund (iii) made in connection with primary syndication of the Facility, or (iv) to Mercuria Energy Group Limited or any of its Affiliates, the New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Facility Agent (for its own account) a fee of $3,500.

## 27.4    Limitation of responsibility of Existing Lenders

(a)     Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

    (i)     the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents, the Transaction Security or any other documents;

    (ii)    the financial condition of any Obligor;

    (iii)   the performance and observance by any Obligor or any other member of the Group of its obligations under the Finance Documents or any other documents; or

    (iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)     Each New Lender confirms to the Existing Lender, the other Finance Parties and the Secured Parties that it:

    (i)     has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other

Finance Party in connection with any Finance Document or the Transaction Security; and

(ii) will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c) Nothing in any Finance Document obliges an Existing Lender to:

(i) accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this clause 27; or

(ii) support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Finance Documents or otherwise.

27.5 **Procedure for transfer**

(a) Subject to the conditions set out in clause 27.2 (*Conditions of assignment or transfer*) a transfer is effected in accordance with paragraph (b) below when the Facility Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender. The Facility Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate.

(b) The Facility Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once: (A) it is satisfied it has complied with all necessary "know your customer" or similar checks under all applicable laws and regulations in relation to the transfer to such New Lender; and (B) it has received from the New Lender a notarised power of attorney substantially in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under the Spanish Pledges. For the avoidance of doubt, all costs and expenses relating to the execution of the power of attorney in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) shall be borne by the entity granting such power of attorney.

(c) Subject to clause 27.9 (*Pro rata interest settlement*), on the Transfer Date:

(i) to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security each of the Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the **Discharged Rights and Obligations**);

(ii) each of the Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor or other member of the Group and the New Lender have assumed and/or acquired the same in place of that Obligor and the Existing Lender;

(iii) the Facility Agent, the Collateral Management Agent, the Security Agent, the New Lender, the Issuing Bank, the Overdraft Bank and the other Lenders shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Lender been an Original Lender with the rights, and/or obligations

acquired or assumed by it as a result of the transfer and to that extent the Facility Agent, the Collateral Management Agent, the Security Agent, the Issuing Bank, the Overdraft Bank and the Existing Lender shall each be released from further obligations to each other under the Finance Documents; and

(iv) the New Lender shall become a Party as a **Lender**.

27.6 **Procedure for assignment**

(a) Subject to the conditions set out in clause 27.2 (*Conditions of assignment or transfer*) an assignment may be effected in accordance with paragraph (c) below when the Facility Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender. The Facility Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

(b) The Facility Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

(c) Subject to clause 27.9 (*Pro rata interest settlement*), on the Transfer Date:

(i) the Existing Lender will assign absolutely to the New Lender its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

(ii) the Existing Lender will be released from the obligations (the **Relevant Obligations**) expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(iii) the New Lender shall become a Party as a **Lender** and will be bound by obligations equivalent to the Relevant Obligations.

(d) Lenders may utilise procedures other than those set out in this clause 27.6 to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with clause 27.5 (*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender) **provided that** they comply with the conditions set out in clause 27.2 (*Conditions of assignment or transfer*).

27.7 **Copy of Transfer Certificate or Assignment Agreement to the Company**

The Facility Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Company a copy of that Transfer Certificate or Assignment Agreement.

27.8 **Security over Lenders' rights**

In addition to the other rights provided to Lenders under this clause 27, each Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a) any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b) in the case of any Lender which is a fund, any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i) release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or other Security for the Lender as a party to any of the Finance Documents; or

(ii) require any payments to be made by an Obligor or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents.

### 27.9 Pro rata interest settlement

(a) If the Facility Agent has notified the Lenders that it is able to distribute interest payments on a "pro rata basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to clause 27.5 (*Procedure for transfer*) or any assignment pursuant to clause 27.6 (*Procedure for assignment*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(i) any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date (**Accrued Amounts**) and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six (6) Months, on the next of the dates which falls at six (6) Monthly intervals after the first day of that Interest Period); and

(ii) the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts so that, for the avoidance of doubt:

(A) when the Accrued Amounts become payable, those Accrued Amounts will be payable for the account of the Existing Lender; and

(B) the amount payable to the New Lender on that date will be the amount which would, but for the application of this clause 27.9, have been payable to it on that date, but after deduction of the Accrued Amounts.

(b) In this clause 27.9, references to **Interest Period** shall be construed to include a reference to any other period for accrual of fees.

## 28 Restriction on Debt Purchase Transactions

### 28.1 Prohibition on Debt Purchase Transactions by the Group

The Company shall not, and shall procure that each other member of the Group shall not, enter into any Debt Purchase Transaction or beneficially own all or any part of the share capital of a company that is a Lender or a party to a Debt Purchase Transaction of the type referred to in paragraphs (b) or (c) of the definition of Debt Purchase Transaction.

### 28.2 Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates

(a) For so long as a Parent Affiliate:

(i) beneficially owns a Commitment; or

(ii) has entered into a sub-participation agreement relating to a Commitment or other agreement or arrangement having a substantially similar economic effect and such agreement or arrangement has not been terminated,

in ascertaining:

(A) the Majority Lenders; or

(B) whether:

(1) any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments; or

(2) the agreement of any specified group of Lenders,

has been obtained to approve any request for a consent, waiver, amendment or other vote under the Finance Documents such Commitment shall be deemed to be zero; and such Parent Affiliate or the person with whom it has entered into such sub-participation, other agreement or arrangement shall be deemed not to be a Lender for the purposes of paragraphs (A) and (B) above (unless in the case of a person not being a Parent Affiliate it is a Lender by virtue otherwise than by beneficially owning the relevant Commitment).

(b) Each Lender shall, unless such Debt Purchase Transaction is an assignment or transfer, promptly notify the Facility Agent in writing if it knowingly enters into a Debt Purchase Transaction with a Parent Affiliate (a **Notifiable Debt Purchase Transaction**), such notification to be substantially in the form set out in Part I of Schedule 8 (*Forms of Notifiable Debt Purchase Transaction Notice*).

(c) A Lender shall promptly notify the Facility Agent if a Notifiable Debt Purchase Transaction to which it is a party:

(i) is terminated; or

(ii) ceases to be with a Parent Affiliate,

such notification to be substantially in the form set out in Part II of Schedule 8 (*Forms of Notifiable Debt Purchase Transaction Notice*).

(d) Each Parent Affiliate that is a Lender agrees that:

(i) in relation to any meeting or conference call to which all the Lenders are invited to attend or participate, it shall not attend or participate in the same if so requested by the Facility Agent or, unless the Facility Agent otherwise agrees, be entitled to receive the agenda or any minutes of the same; and

(ii) in its capacity as Lender, unless the Facility Agent otherwise agrees, it shall not be entitled to receive any report or other document prepared at the behest of, or on the instructions of, the Facility Agent or one or more of the Lenders.

# 29 Changes to the Obligors

## 29.1 Assignment and transfers by Obligors

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**Additional Borrowers**

29.2    Subject to compliance with the provisions of clause 22.5 *("Know your customer" checks)*, the Company may request that any of its Subsidiaries becomes an Additional Borrower. That Subsidiary shall become an Additional Borrower if:

(a)    all the Lenders (or, in the case of a Subsidiary which would be a FATCA FFI or a US Tax Obligor if it became an Additional Borrower, all the Finance Parties) approve the addition of that Subsidiary;

(b)    the Company delivers to the Facility Agent a duly completed and executed Accession Letter;

(c)    the Subsidiary is (or becomes) a Guarantor prior to becoming a Borrower;

(d)    the Company confirms that no Default is continuing or would occur as a result of that Subsidiary becoming an Additional Borrower; and

(e)    the Facility Agent has received all of the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*) in relation to that Additional Borrower, each in form and substance satisfactory to the Facility Agent.

In case of an Additional Borrower incorporated under the laws of Spain acceding this Agreement, if requested by the Facility Agent (acting reasonably) within ten (10) Business Days of the date on which the completed and executed Accession Letter has been provided pursuant to the terms of this Agreement, the Accession Letter and any relevant Finance Documents shall be notarized before a Spanish Notary Public, and the parties to the notarial deed shall acknowledge that it qualifies as a "*título ejecutivo*" in case of enforcement in Spain.

29.3    The Facility Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*).

**Resignation of a Borrower**

29.4    The Company may request that a Borrower (other than the Company) ceases to be a Borrower by delivering to the Facility Agent a Resignation Letter.

29.5    The Facility Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(a)    the Majority Lenders have consented to the Company's request;

(b)    where the Borrower is also a Guarantor (unless its resignation has been accepted in accordance with clause 29.13 (*Resignation of a Guarantor*)), its obligations in its capacity as Guarantor continue to be legal, valid, binding and enforceable and in full force and effect and the amount guaranteed by it as Guarantor is not decreased (and the Company has confirmed this is the case);

(c)    no Default is continuing or would result from the acceptance of the Resignation Letter (and the Company has confirmed this is the case); and

(d)    the Borrower is under no actual or contingent obligations as a Borrower under any Finance Documents,

whereupon that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents.

29.6    The Facility Agent may, at the cost and expense of the Company, require a legal opinion from counsel to the Facility Agent confirming the matters set out in paragraph 29.5(b) above and the Facility Agent shall be under no obligation to accept a Resignation Letter until it has obtained such opinion in form and substance satisfactory to it.

**Additional Guarantors**

29.7    The Company shall procure that promptly following:

(a)    if requested by the Required Lenders, exchange control approval from the Financial Surveillance Department of the South African Reserve Bank and in any event within 40 Business Days of the granting of the Interim DIP Order, Aegean Bunkering Marine Services Proprietary Limited a limited liability company incorporated in South Africa, shall become an Additional Guarantor in accordance with clauses 29.10 and 29.11 below and the Company shall (and shall procure that Aegean Bunkering Marine Services Proprietary Limited) uses best endeavours to obtain the exchange control approval from the Financial Surveillance Department of the South African Reserve Bank as soon as possible for the purpose of becoming an Additional Guarantor; and

(b)    the Effective Date and in any event by no later than the date falling ten Business Days thereafter, each of Aegean Bunkering (Hong Kong) Limited, a limited liability company incorporated in Hong Kong, and Aegean Caribbean Holdings, Inc. a company incorporated in St Lucia, shall become an Additional Guarantor in accordance with clauses 29.10 and 29.11 below.

29.8    The Borrowers shall promptly cause each Subsidiary of the Parent formed or acquired after the date of this Agreement, other than any Immaterial Subsidiary, to become an Additional Guarantor. If and when any Subsidiary ceases to be an Immaterial Subsidiary, the Borrower shall promptly cause such Subsidiary become an Additional Guarantor.

29.9    Notwithstanding the provisions of clause 29.7, the Company may at any time request that any of its Subsidiaries (or any Subsidiaries of the Parent) become an Additional Guarantor.

29.10   The Company shall procure that each proposed Additional Guarantor pursuant to clauses 29.6 to 29.8 shall comply with the provisions of clause 22.5 (*"Know your customer" checks*). An entity shall become an Additional Guarantor upon:

(a)    in the case of an entity which would be a FATCA FFI or a US Tax Obligor if it became an Additional Guarantor, all the Finance Parties approving the addition of that entity;

(b)    the Company delivering to the Facility Agent a duly completed and executed Accession Letter; and

(c)    the Facility Agent having given written confirmation that the provisions of clause 22.5 (*"Know your customer" checks*) are satisfied; and

(d)    the Facility Agent having received all of the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the Facility Agent.

29.11   The Facility Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*).

**Resignation of a Guarantor**

29.12   The Company may request that a Guarantor (other than the Parent or the Company) ceases to be a Guarantor by delivering to the Facility Agent a Resignation Letter.

29.13 The Facility Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(a) no Default is continuing or would result from the acceptance of the Resignation Letter (and the Company has confirmed this is the case);

(b) where the Guarantor is also a Borrower, it is under no actual or contingent obligations as a Borrower and has resigned and ceased to be a Borrower under clause 29.4 (*Resignation of a Borrower*);

(c) all Lenders have consented to the Company's request; and

(d) no payment is due from the Guarantor under this Agreement.

**Compulsory resignation of FATCA FFIs and US Tax Obligors**

29.14 If so directed by the Facility Agent (acting on the instructions of all Lenders), the Company shall procure that any Obligor which is a FATCA FFI or a US Tax Obligor shall resign as a Borrower or a Guarantor (as the case may be) prior to the earliest FATCA Application Date relating to any payment by that Obligor (or any payment by the Facility Agent which relates to a payment by that Obligor). For the purposes of clause 29.13(c) (*Resignation of a Guarantor*) each Lender consents to the resignation of a Guarantor required pursuant to this clause 29.14.

**Repetition of Representations**

29.15 Delivery of an Accession Letter constitutes confirmation by the relevant Subsidiary that the Repeating Representations are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

## Section 10
## The Finance Parties

## 30 Role of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Overdraft Bank and Others

### 30.1 Appointment of the Facility Agent and the Collateral Management Agent

(a) Each of the Issuing Bank, the Overdraft Bank and the Lenders appoints the Facility Agent and the Collateral Management Agent to act as its agent under and in connection with the Finance Documents.

(b) Each of the Issuing Bank, the Overdraft Bank and the Lenders authorises the Facility Agent and the Collateral Management Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Facility Agent and the Collateral Management Agent (as the case may be) under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions (even if it involves self-contracting (*autocontratación*), multi-representation or conflict of interest), including, without limitation, to enter and raise into Spanish public status before a Spanish public notary any document related to this mandate and, specifically, those deemed necessary or appropriate according to the mandate received (including, but not limited to, documents of formalisation, acknowledgement, confirmation, modification or release, acceptance of any security interest and acceptance of acknowledgement of debts by Obligors).

### 30.2 Instructions

(a) Each of the Facility Agent and the Collateral Management Agent shall:

(i) unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Facility Agent or the Collateral Management Agent (as the case may be) in accordance with any instructions given to it by:

(A) all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; or

(B) in all other cases, the Majority Lenders; and

(ii) not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above.

(b) Each of the Facility Agent and the Collateral Management Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Facility Agent and the Collateral Management Agent may refrain from acting unless and until they receive those instructions or that clarification.

(c) Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Facility Agent or the Collateral Management Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties save for the Security Agent.

(d) Each of the Facility Agent and the Collateral Management Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has

received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

(e) In the absence of instructions, each of the Facility Agent and the Collateral Management Agent may act (or refrain from acting) as it considers to be in the best interest of the Lenders.

(f) The Facility Agent and the Collateral Management Agent are not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document. This paragraph (f) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Transaction Security Documents or enforcement of the Transaction Security or Transaction Security Documents.

### 30.3 Duties of the Facility Agent and the Collateral Management Agent

(a) The duties of the Facility Agent and the Collateral Management Agent under the Finance Documents are solely mechanical and administrative in nature.

(b) Subject to paragraph (c) below, each of the Facility Agent and the Collateral Management Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Facility Agent or the Collateral Management Agent for that Party by any other Party.

(c) Without prejudice to clause 27.7 (*Copy of Transfer Certificate or Assignment Agreement to the Company*) and clause 6.22, paragraph (a) above shall not apply to any Transfer Certificate or any Assignment Agreement.

(d) Except where a Finance Document specifically provides otherwise, neither the Facility Agent and the Collateral Management Agent is obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(e) If the Facility Agent or the Collateral Management Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(f) If the Facility Agent or the Collateral Management Agent is aware of the non-payment of any principal, interest, up-front fee or other fee payable to a Finance Party (other than the Facility Agent, the Collateral Management Agent or the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

(g) The Facility Agent shall provide to the Company within five (5) Business Days of a request by the Company (but no more frequently than once per calendar month), a list (which may be in electronic form) setting out the names of the Lenders as at that Business Day, their respective Commitments, the address and email (and the department or officer, if any, for whose attention any communication is to be made) of each Lender for any communication to be made or document to be delivered under or in connection with the Finance Documents, the electronic mail address and/or any other information required to enable the sending and receipt of information by electronic mail or other electronic means to and by each Lender to whom any communication under or in connection with the Finance Documents may be made by that means and the account details of each Lender for any payment to be distributed by the Facility Agent to that Lender under the Finance Documents.

(h) Each of the Facility Agent and the Collateral Management Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

(i)     Each Lender instructs, authorises and agrees with the Facility Agent:

    (i)     to execute and deliver the Intercreditor Agreement on its behalf;

    (ii)    to exercise all of the Facility Agent's rights and to comply with all of its obligations under the Intercreditor Agreement;

    (iii)   to take actions on its behalf as is contemplated by the terms of the Intercreditor Agreement; and

    (iv)   that at all times following the execution and delivery of the Intercreditor Agreement such Lender (and each of its successors and assigns) shall be bound by the terms thereof.

## 30.4    No fiduciary duties

(a)     Nothing in any Finance Document constitutes the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank as a trustee or fiduciary of any other person.

(b)     None of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

## 30.5    Business with the Group

The Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank and the Issuing Bank may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

## 30.6    Rights and discretions

(a)     Each of the Facility Agent, the Issuing Bank, the Overdraft Bank and the Collateral Management Agent may:

    (i)     rely on any representation, communication, notice or document (including, without limitation, any notice given by a Lender pursuant to paragraphs (b) or (c) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*)) believed by it to be genuine, correct and appropriately authorised;

    (ii)    assume that:

        (A)     any instructions received by it from the Majority Lenders, any Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents; and

        (B)     unless it has received notice of revocation, that those instructions have not been revoked; and

    (iii)   rely on a certificate from any person:

        (A)     as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

        (B)     to the effect that such person approves of any particular dealing, transaction, step, action or thing,

        as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b) Each of the Facility Agent and the Collateral Management Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

(i) no Default has occurred (unless it has actual knowledge of a Default arising under clause 26.1 (*Non-payment*));

(ii) any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised;

(iii) any notice or request made by the Company (other than a Utilisation Request) is made on behalf of and with the consent and knowledge of all the Obligors; and

(iv) no Notifiable Debt Purchase Transaction:

(A) has been entered into;

(B) has been terminated; or

(C) has ceased to be with a Parent Affiliate.

(c) Each of the Facility Agent and the Collateral Management Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d) Without prejudice to the generality of paragraph (c) above or paragraph (e) below, each of the Facility Agent and the Collateral Management Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to it (and so separate from any lawyers instructed by the Lenders) if it in its reasonable opinion deems this to be desirable.

(e) Each of the Facility Agent and the Collateral Management Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by it or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f) Each of the Facility Agent and the Collateral Management Agent may act in relation to the Finance Documents through its officers, employees and agents and shall not:

(i) be liable for any error of judgment made by any such person; or

(ii) be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by its gross negligence or wilful misconduct.

(g) Unless a Finance Document expressly provides otherwise each of the Facility Agent and the Collateral Management Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(h) Notwithstanding any other provision of any Finance Document to the contrary, none of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank is obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i) The Facility Agent is not obliged to disclose to any Finance Party any details of the rate notified to the Facility Agent by any Lender or the identity of any such Lender for the purpose of paragraph (a)(ii) of clause 13.2 (*Market Disruption*).

(j)     Notwithstanding any provision of any Finance Document to the contrary, neither the Facility Agent nor the Collateral Management Agent is obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(k)     Without prejudice to the generality of paragraph (g) above, the Facility Agent:

    (i)     may disclose; and

    (ii)    on the written request of the Company or the Majority Lenders shall, as soon as reasonably practicable, disclose,

the identity of a Non-Acceptable Bank to the Company and the other Finance Parties.

## 30.7     Responsibility for documentation

None of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank is responsible or liable for:

(a)     the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Issuing Bank, the Overdraft Bank, an Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into made or executed in anticipation of, under or in connection with any Finance Document;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security; or

(c)     any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 30.8     No duty to monitor

Neither the Facility Agent nor the Collateral Management Agent shall be bound to enquire:

(a)     whether or not any Default has occurred;

(b)     as to the performance, default or any breach by any Party of its obligations under any Finance Document;

(c)     whether any other event specified in any Finance Document has occurred; or

(d)     whether at any time, including upon receipt of a Utilisation Request and upon a Utilisation occurring hereunder, the Borrowing Base Amount is or will continue to be zero or a positive number, in respect of which all Finance Parties shall be entitled to rely on the Borrowers to comply with their obligations under this Agreement to ensure that at all times the Borrowing Base Amount is zero or a positive number.

## 30.9     Exclusion of liability

(a)     Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Facility Agent , Issuing Bank, the Overdraft Bank or the Collateral Management Agent, neither the Facility Agent, Issuing Bank, Overdraft Bank nor the Collateral Management Agent will be liable

(including, without limitation, for negligence or any other category of liability whatsoever) for:

(i) any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct;

(ii) exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security; or

(iii) without prejudice to the generality of paragraphs (i) and (ii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(A) any act, event or circumstance not reasonably within its control; or

(B) the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b) No Party (other than the Facility Agent) may take any proceedings against any officer, employee or agent of the Facility Agent, in respect of any claim it might have against the Facility Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Facility Agent may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(c) No Party (other than the Collateral Management Agent) may take any proceedings against any officer, employee or agent of the Collateral Management Agent, in respect of any claim it might have against the Collateral Management Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Collateral Management Agent may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(d) No Party (other than the Issuing Bank) may take any proceedings against any officer, employee or agent of the Issuing Bank, in respect of any claim it might have against the Issuing Bank or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Issuing Bank may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(e) Neither the Facility Agent nor the Collateral Management Agent will be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(f) Nothing in this Agreement shall oblige the Facility Agent, the Collateral Management Agent or the Co-Ordinator to carry out:

(i) any "know your customer" or other checks in relation to any person; or

(ii) any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Lender,

on behalf of any Lender and each Lender confirms to the Facility Agent, the Collateral Management Agent and the Co-Ordinator that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Facility Agent, the Collateral Management Agent or the Co-Ordinator.

(g) Without prejudice to any provision of any Finance Document excluding or limiting either the Facility Agent's or the Collateral Management Agent's liability, any liability of the Facility Agent or the Collateral Management Agent arising under or in connection with any Finance Document or the Transaction Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Facility Agent or the Collateral Management Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Facility Agent or the Collateral Management Agent at any time which increase the amount of that loss. In no event shall the Facility Agent or the Collateral Management Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Facility Agent has been advised of the possibility of such loss or damages.

## 30.10 Lenders' indemnity to the Facility Agent and the Collateral Management Agent

(a) Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Facility Agent and the Collateral Management Agent, within three (3) Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Facility Agent and the Collateral Management Agent (as the case may be) (otherwise than by reason of the Facility Agent's and the Collateral Management Agent's (as the case may be) gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to clause 34.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's and the Collateral Management Agent's (as the case may be) negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent or the Collateral Management Agent (as the case may be) in acting as Facility Agent or Collateral Management Agent under the Finance Documents (unless the Facility Agent or the Collateral Management Agent (as the case may be) has been reimbursed by an Obligor pursuant to a Finance Document).

(b) Subject to paragraph (c) below, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Facility Agent or the Collateral Management Agent pursuant to paragraph (a) above.

(c) Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Facility Agent or the Collateral Management Agent to an Obligor.

## 30.11 Resignation of the Facility Agent and the Collateral Management Agent

(a) The Facility Agent and/or the Collateral Management Agent may resign and appoint one of their respective Affiliates acting through an office:

(i)  in the Netherlands; or

(ii)  elsewhere in the European Union or the United Kingdom, provided that, if on the basis of the laws and regulations in force prior to the appointment, such appointment would result in any amount becoming payable under or pursuant to clause 15 (*Tax gross-up and indemnities*) or clause 16 (*Increased Costs*) the Borrowers may refuse the resignation and/or appointment;

as successor by giving notice to the Lenders and the Company.

(b)  Alternatively the Facility Agent and/or the Collateral Management Agent may resign by giving thirty (30) days' notice to the Lenders and the Company, in which case the Majority Lenders (after consultation with the Company) may appoint a successor Facility Agent and/or the Collateral Management Agent (as the case may be).

(c)  If the Majority Lenders have not appointed a successor Facility Agent and/or the Collateral Management Agent in accordance with paragraph (b) above within twenty (20) days after notice of resignation was given, the retiring Facility Agent and/or the Collateral Management Agent (as the case may be) (after consultation with the Company) may appoint a successor Facility Agent and/or Collateral Management Agent (as the case may be) (acting through an office in the Netherlands or, subject to paragraph (a)(ii) above, elsewhere in the European Union or the United Kingdom).

(d)  If the Facility Agent or the Collateral Management Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Facility Agent or the Collateral Management Agent is entitled to appoint a successor under paragraph (c) above, it may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Facility Agent or Collateral Management Agent to become a party to this Agreement in such capacity) agree with the proposed successor amendments to this clause 30 and any other term of this Agreement dealing with the rights or obligations of the Facility Agent or Collateral Management Agent (as the case may be) consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Facility Agent's or Collateral Management Agent's normal fee rates and those amendments will bind the Parties.  Any amendments relating to matters which are not merely technical or administrative and/or relating to agency fees shall be subject to the prior consent of the Majority Lenders.

(e)  The retiring Facility Agent and/or Collateral Management Agent shall make available to the successor such documents and records and provide such assistance as the successor may reasonably request for the purposes of performing its functions as Facility Agent and/or Collateral Management Agent under the Finance Documents.  The Company shall, within three (3) Business Days of demand, reimburse the retiring Facility Agent and/or Collateral Management Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

(f)  The Facility Agent's or the Collateral Management Agent's resignation notice shall only take effect upon the appointment of a successor.

(g)  Upon the appointment of a successor, the retiring Facility Agent and/or Collateral Management Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (e) above) but shall remain entitled to the benefit of clause 17.3 (*Indemnity to the Facility Agent and/or Collateral Management Agent*) and this clause 30 (and any agency fees for the account of the retiring Facility Agent and/or Collateral Management Agent (as the case may be) shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(h)  The Facility Agent shall resign in accordance with clause 30.11 above (and, to the extent applicable, shall use reasonable endeavours to appoint a successor pursuant to such clause) if on or after the date which is three (3) months before the earliest FATCA Application Date relating to any payment to the Facility Agent under the Finance Documents, either:

(i)  the Facility Agent fails to respond to a request under clause 15.7 (*FATCA Information*) and the Company or a Lender reasonably believes that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(ii)  the information supplied by the Facility Agent pursuant to clause 15.7 (*FATCA Information*) indicates that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(iii)  the Facility Agent notifies the Company and the Lenders that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) the Company or a Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Facility Agent were a FATCA Exempt Party, and the Company or that Lender, by notice to the Facility Agent, requires it to resign.

## 30.12  Replacement of the Facility Agent or Collateral Management Agent

(a)  After consultation with the Company, the Majority Lenders may, by giving thirty (30) days' notice to the Facility Agent or Collateral Management Agent (as the case may be) (or, in respect of the Facility Agent, at any time the Facility Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Facility Agent or Collateral Management Agent (as the case may be) by appointing a successor.

(b)  The retiring Facility Agent or Collateral Management Agent (as the case may be) shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to its successor such documents and records and provide such assistance as the successor may reasonably request for the purposes of performing its functions as Facility Agent or Collateral Management Agent (as the case may be) under the Finance Documents.

(c)  The appointment of the successor Facility Agent or Collateral Management Agent (as the case may be) shall take effect on the date specified in the notice from the Majority Lenders to the retiring Facility Agent or Collateral Management Agent (as the case may be).  As from this date, the retiring Facility Agent or Collateral Management Agent (as the case may be) shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) above) but shall remain entitled to the benefit of clause 17.3 (*Indemnity to the Facility Agent or Collateral Management Agent*) and this clause 30 (and any agency fees for the account of the retiring Facility Agent or Collateral Management Agent (as the case may be) shall cease to accrue from (and shall be payable on) that date).

(d)  Any successor Facility Agent or Collateral Management Agent (as the case may be) and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

## 30.13  Confidentiality

(a)  In acting as agent for the Finance Parties, the Facility Agent and Collateral Management Agent (as the case may be) shall be regarded as acting through its agency or collateral management division (as applicable), which shall be treated as a separate entity from any other of its divisions or departments.

(b)     If information is received by another division or department of the Facility Agent or Collateral Management Agent (as the case may be), it may be treated as confidential to that division or department and the Facility Agent or Collateral Management Agent (as the case may be) shall not be deemed to have notice of it.

(c)     Notwithstanding any other provision of any Finance Document to the contrary, none of the Facility Agent, the Collateral Management Agent nor the Co-Ordinator is obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 30.14     Relationship with the Lenders

(a)     Subject to clause 27.9 (*Pro rata interest settlement*), each of the Facility Agent and Collateral Management Agent may treat the person shown in its records as Lender at the opening of business (in the place of the Facility Agent or Collateral Management Agent (as the case may be) principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office:

(i)     entitled to or liable for any payment due under any Finance Document on that day; and

(ii)     entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five (5) Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b)     Any Lender may by notice to the Facility Agent and Collateral Management Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents.  Such notice shall contain the address, email and (where communication by electronic mail or other electronic means is permitted under clause 36.6 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, electronic mail address, department and officer by that Lender for the purposes of clause 36.2 (*Addresses*) and paragraph (a)(ii) of clause 36.6 (*Electronic communication*) and the Facility Agent and Collateral Management Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

## 30.15     Credit appraisal by the Lenders and Issuing Bank

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender and Issuing Bank confirms to the Facility Agent, the Collateral Management Agent and each Issuing Bank that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)     the financial condition, status and nature of each member of the Group;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)     whether that Lender or Issuing Bank has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with

any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(d)  the adequacy, accuracy or completeness of the Reports and any other information provided by the Facility Agent, the Collateral Management Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)  the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 30.16  Compliance appraisal by the Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any compliance issues, each Lender confirms to the Facility Agent and the Collateral Management Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all compliance related risks arising under or in connection with any activities of the Obligors, the Spanish Pledgors and the South African Pledge Counterparties including but not limited to:

(a)  activities in the Sensitive Zones;

(b)  any Utilisation of a Fronted Facility affected by compliance related matters; and

(c)  the adequacy, accuracy or completeness of any information the Facility Agent or the Collateral Management Agent may (but has no obligation to) communicate to a Lender in relation to a counterparty (whether supplier or purchaser), products, origins or nature of a transaction.

## 30.17  Reference Banks

If a Reference Bank (or, if a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Facility Agent shall (in consultation with the Company) appoint another Lender or an Affiliate of a Lender to replace that Reference Bank.

## 30.18  Facility Agent's and Collateral Management Agent's management time

(a)  Any amount payable to the Facility Agent or the Collateral Management Agent under clause 17.3 (*Indemnity to the Facility Agent or Collateral Management Agent*), clause 19 (*Costs and expenses*) and clause 30.10 (*Lenders' indemnity to the Facility Agent and the Collateral Management Agent*) shall include the cost of utilising the Facility Agent's or Collateral Management Agent's (as the case may be) management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Facility Agent or the Collateral Management Agent (as the case may be) may notify to the Company and the Lenders, and is in addition to any fee paid or payable to the Facility Agent or the Collateral Management Agent under clause 14 (*Fees*).

(b)  Any cost of utilising the Facility Agent's or Collateral Management Agent's (as the case may be) management time or other resources shall include, without limitation, any such costs in connection with clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*).

30.19    **Deduction from amounts payable by the Facility Agent**

If any Party owes an amount to the Facility Agent or the Collateral Management Agent under the Finance Documents the Facility Agent or the Collateral Management Agent  (as the case may be) may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Facility Agent or the Collateral Management Agent (as the case may be) would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

# 31    The Security Agent

31.1    **Security Agent as trustee**

(a)    Subject to clause 31.2 (*German law security property*) below, the Security Agent declares that it holds the Transaction Security (to the extent possible under applicable law) on trust for the Secured Parties on the terms contained in this Agreement.  For the purpose of the Moroccan Pledge, the Security Agent is irrevocably appointed by the Secured Parties as their agent for the purpose of executing the Moroccan Pledge, and to register, manage and enforce the Moroccan Pledge on the terms of this clause 31.

(b)    Each of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Issuing Bank and each Lender authorises the Security Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Finance Documents and any Multi-Party TPA Agreement together with any other incidental rights, powers, authorities and discretions (even if it involves self-contracting (*autocontratación*), multi-representation or conflict of interest), including, without limitation, to enter and raise into Spanish public status before a Spanish public notary any document related to this mandate and, specifically, those deemed necessary or appropriate according to the mandate received (including, but not limited to, documents of formalisation, acknowledgement, confirmation, modification or release, acceptance of any security interest and acceptance of acknowledgement of debts by Obligors).

31.2    **German law security property**

(a)    Each of the Secured Parties (other than the Security Agent) hereby appoints the Security Agent as trustee (*Treuhänder*) and administrator for the purpose of accepting and administering the Charged Property governed by German law (**German Security Property**) for and on behalf of the other Secured Parties.

(b)    The Security Agent shall:

(i)    hold and administer and, as the case may be, release any German Security Property which is security assigned (*Sicherungseigentum/Sicherungsabtretung*) or otherwise transferred under a non-accessory security right (*nichtakzessorische Sicherheit*) to it as trustee (*treuhänderisch*) for the benefit of the Secured Parties; and

(ii)    administer and, as the case may be, release any German Security Property which is pledged (*Verpfändung*) or otherwise transferred to the Secured Parties under an accessory security right (*akzessorische Sicherheit*) as agent.

(c)    Each of the Secured Parties hereby authorises the Security Agent (whether or not by or through employees or agents):

(i)    to exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the Security Agent under the German Security Property together with such powers and discretions as are reasonably incidental thereto;

(ii) to take such action on its behalf as may from time to time be authorised under or in accordance with the German Security Property; and

(iii) to accept as its representative (*Stellvertreter*) any pledge or other creation of any accessory security right granted in favour of such Secured Parties in connection with the Debt Documents and to agree to and execute on its behalf as its representative (*Stellvertreter*) any amendments, releases and/or alterations to any German Security Property which creates a pledge or any other accessory security right (*akzessorische Sicherheit*) including the release or confirmation of release of such German Security Property.

(d) Each Secured Party releases the Security Agent from any applicable restrictions on entering into any transaction as a representative of:

(i) two or more principals contracting with each other; and

(ii) one or more principals with whom it is contracting in its own name,

including in particular from the restrictions provided for in section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*), and similar restrictions applicable to it pursuant to any other applicable law, in each case to the extent legally possible to such Secured Party. A Secured Party which is barred by its constitutional documents or by-laws from granting such exemption shall notify the Security Agent accordingly.

(e) The Security Agent shall be entitled to grant sub-powers of attorney (and shall be entitled to release any sub-attorney from the restrictions referred to in paragraph (d) above).

(f) Each Secured Party hereby ratifies and approves all acts and declarations previously done by the Security Agent on such Secured Party's behalf.

## 31.3 Parallel debt (Covenant to pay the Security Agent)

(a) Notwithstanding any other provision of this Agreement, each Obligor hereby irrevocably and unconditionally undertakes to pay to the Security Agent, as creditor in its own right and not as representative of the other Secured Parties, sums equal to and in the currency of each amount payable by the Obligors to each of the Secured Parties under each of the Finance Documents as and when that amount falls due for payment under the relevant Finance Document or would have fallen due but for any discharge resulting from failure of another Secured Party to take appropriate steps, in insolvency proceedings affecting the Obligor, to preserve its entitlement to be paid that amount.

(b) The Security Agent shall have its own independent right to demand payment of the amounts payable by the Obligors under this clause 31.3 irrespective of any discharge of the Obligor's obligation to pay those amounts to the other Secured Parties resulting from failure by them to take appropriate steps, in insolvency proceedings affecting the Obligor, to preserve their entitlement to be paid those amounts.

(c) Any amount due and payable by an Obligor to the Security Agent under this clause 31.3 shall be decreased to the extent that the other Secured Parties have received (and are able to retain) payment in full of the corresponding amount under the other provisions of the Finance Documents and any amount due and payable by the Obligors to the other Secured Parties under those provisions shall be decreased to the extent that the Security Agent has received (and is able to retain) payment in full of the corresponding amount under this clause 31.3.

## 31.4 Enforcement through Security Agent only

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the First Security or to exercise any right, power, authority or discretion arising under the First Security Documents except through the Security Agent.

If any Secured Party (other than the Security Agent) is a party to any of the Spanish Pledges it shall promptly upon being requested by the Facility Agent to do so grant a power of attorney or other sufficient authority to the Security Agent to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under such Spanish Pledges.

31.5    **Instructions**

(a)    The Security Agent shall:

(i)    subject to paragraphs (d) and (e) below exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by the Majority Lenders (or the Facility Agent on their behalf);

(ii)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above (or if this Agreement stipulates the matter is a decision for any other Lender or group of Lenders in accordance with instructions given to it by that Lender or group of Lenders).

(b)    The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or the Facility Agent on their behalf) (or, if this Agreement stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Security Agent may refrain from acting unless and until it receives those instructions or that clarification.

(c)    Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under this Agreement and unless a contrary intention appears in this Agreement, any instructions given to the Security Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Secured Parties.

(d)    Paragraph (a) above shall not apply:

(i)    where a contrary indication appears in this Agreement;

(ii)    where this Agreement requires the Security Agent to act in a specified manner or to take a specified action; or

(iii)    in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured Parties including, without limitation, clauses 31.8 (*No duty to account*) to clause 31.13 (*Exclusion of liability*), clause 31.16 (*Confidentiality*) to clause 31.22 (*Custodians and nominees*) and clause 31.25 (*Acceptance of title*) to clause 31.29 (*Disapplication of Trustee Acts*).

(e)    The Security Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability (together with any associated VAT) which it may incur in complying with those instructions.

(f)    Without prejudice to the provisions of the remainder of this clause 31.5, in the absence of instructions, the Security Agent may act (or refrain from acting) as it considers in its discretion to be appropriate.

31.6    **Duties of the Security Agent**

(a)    The Security Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

(b)    The Security Agent shall promptly:

(i)    forward to the Facility Agent a copy of any document received by the Security Agent from any Obligor, any Spanish Pledgor or any South African Pledge Counterparty under any Finance Document; and

(ii)    forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

(c)    Except where a Finance Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)    If the Security Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Facility Agent.

(e)    The Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

31.7    **No fiduciary duties to Obligors**

Nothing in this agreement constitutes the Security Agent as an agent, trustee or fiduciary of any Obligor.

31.8    **No duty to account**

The Security Agent shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

31.9    **Business with the Group**

The Security Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

31.10    **Rights and discretions**

(a)    The Security Agent may:

(i)    rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(ii)    assume that:

(A)    any instructions received by it from the Majority Lenders, the Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents;

(B)    unless it has received actual notice of revocation, that those instructions have not been revoked; and

（C）　if it receives any instructions to act in relation to the Transaction Security, that all applicable conditions under the Finance Documents for so acting have been satisfied; and

(iii)　rely on a certificate from any person:

（A）　as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

（B）　to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b)　The Security Agent may assume (unless it has received notice to the contrary in its capacity as security trustee for the Secured Parties) that:

(i)　no Default has occurred;

(ii)　any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised; and

(iii)　any notice made by the Company is made on behalf of and with the consent and knowledge of all the Obligors.

(c)　The Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d)　Without prejudice to the generality of paragraph (c) above or paragraph (e) below, the Security Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Security Agent (and so separate from any lawyers instructed by the Lenders and/or the Facility Agent) if the Security Agent in its reasonable opinion deems this to be desirable.

(e)　The Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Secured Party) and shall not be responsible or liable for any losses to any person, any diminution in value or any liability arising as a result of its so relying.

(f)　The Security Agent, any Receiver and any Delegate may act in relation to the Finance Documents and the Transaction Security through its officers, employees and agents and shall not:

(i)　be liable for any error of judgment made by any such person; or

(ii)　be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct.

(g)　Unless this Agreement expressly specifies otherwise, the Security Agent may disclose to any other Party any information it reasonably believes it has received as security trustee under this Agreement.

(h)　Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would, or might in its

reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i)     Notwithstanding any provision of any Finance Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

## 31.11    Responsibility for documentation

None of the Security Agent, any Receiver nor any Delegate is responsible or liable for:

(a)     the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent, an Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security; or

(c)     any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 31.12    No duty to monitor

The Security Agent shall not be bound to enquire:

(a)     whether or not any Default has occurred;

(b)     as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

(c)     whether any event specified in any Finance Document has occurred.

## 31.13    Exclusion of liability

(a)     Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate), none of the Security Agent, any Receiver nor any Delegate will be liable for:

(i)     any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security unless directly caused by its gross negligence or wilful misconduct;

(ii)    exercising or not exercising any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security;

(iii)   any shortfall which arises on the enforcement or realisation of the Transaction Security; or

(iv) without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs, losses, diminution in value or liability whatsoever arising as a result of:

(A) any act, event or circumstance not reasonably within its control; or

(B) the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b) No Party (other than the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Transaction Security and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(c) Nothing in this Agreement shall oblige the Security Agent to carry out:

(i) any "know your customer" or other checks in relation to any person; or

(ii) any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any other Secured Party,

on behalf of any other Secured Party and each other Secured Party confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

(d) Without prejudice to any provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate, any liability of the Security Agent, any Receiver or Delegate arising under or in connection with any Finance Document or the Transaction Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate (as the case may be) or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, Receiver or Delegate (as the case may be) at any time which increase the amount of that loss. In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Security Agent, Receiver or Delegate (as the case may be) has been advised of the possibility of such loss or damages.

## 31.14 Lenders' indemnity to the Security Agent

(a) Each Lender shall (in the proportion that its Commitments bear to the Total Commitments for the time being (or, if the Total Commitments are zero, immediately prior to their being reduced to zero)), indemnify the Security Agent and every Receiver and every Delegate, within three (3) Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or

Delegate under, or exercising any authority conferred under, the Debt Documents (unless the relevant Security Agent, Receiver or Delegate has been reimbursed by an Obligor pursuant to a Finance Document).

(b)     Subject to paragraph (c) below, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Security Agent pursuant to paragraph (a) above.

(c)     Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Security Agent to an Obligor.

## 31.15     Resignation of the Security Agent

(a)     The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the Lenders and the Company.

(b)     Alternatively the Security Agent may resign by giving thirty (30) days' notice to the Lenders and the Company, in which case the Majority Lenders may appoint a successor Security Agent.

(c)     If the Majority Lenders have not appointed a successor Security Agent in accordance with paragraph (b) above within twenty (20) days after notice of resignation was given, the retiring Security Agent (after consultation with the Facility Agent) may appoint a successor Security Agent.

(d)     The retiring Security Agent shall make available to the successor Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents.  The Company shall, within three (3) Business Days of demand, reimburse the retiring Security Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

(e)     The Security Agent's resignation notice shall only take effect upon:

(i)     the appointment of a successor; and

(ii)    the transfer of all the Transaction Security to that successor.

(f)     Upon the appointment of a successor, the retiring Security Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) of clause 31.27 (*Winding up of trust*) and paragraph (d) above) but shall remain entitled to the benefit of this clause 31 and clause 17.4 (*Indemnity to the Security Agent*) (and any Security Agent fees for the account of the retiring Security Agent shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

(g)     The Majority Lenders may, by notice to the Security Agent, require it to resign in accordance with paragraph (b) above.  In this event, the Security Agent shall resign in accordance with paragraph (b) above.

## 31.16     Confidentiality

(a)     In acting as trustee for the Secured Parties, the Security Agent shall be regarded as acting through its trustee division which shall be treated as a separate entity from any other of its divisions or departments.

(b)    If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it.

(c)    Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 31.17    Information from the Lenders

Each Lender shall supply the Security Agent with any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.

## 31.18    Credit appraisal by the Secured Parties

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)    the financial condition, status and nature of each member of the Group;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)    whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(d)    the adequacy, accuracy or completeness of any information provided by the Security Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)    the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 31.19    Reliance and engagement letters

The Security Agent may obtain and rely on any certificate or report from any Obligor's auditor and may enter into any reliance letter or engagement letter relating to that certificate or report on such terms as it may consider appropriate (including, without limitation, restrictions on the auditor's liability and the extent to which that certificate or report may be relied on or disclosed).

## 31.20    No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

(a)    require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor or any Spanish Pledgor to any of the Charged Property;

(b)     obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Finance Document or the Transaction Security;

(c)     register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any law or regulation or to give notice to any person of the execution of any Finance Document or of the Transaction Security;

(d)     take, or to require any Obligor or any Spanish Pledgor to take, any step to perfect its title to any of the Charged Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under any law or regulation; or

(e)     require any further assurance in relation to any Transaction Security Document.

## 31.21     Insurance by Security Agent

(a)     The Security Agent shall not be obliged:

(i)     to insure any of the Charged Property;

(ii)    to require any other person to maintain any insurance; or

(iii)   to verify any obligation to arrange or maintain insurance contained in any Finance Document.

and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

(b)     Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Majority Lenders request it to do so in writing and the Security Agent fails to do so within fourteen (14) days after receipt of that request.

## 31.22     Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

## 31.23     Delegation by the Security Agent

(a)     Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it as Security Agent, Receiver or Delegate.

(b)     That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

(c)     The Security Agent, Receiver or Delegate shall not be bound to supervise, or be in any way responsible for any loss incurred by reason of any misconduct, omission or default on the part of, any such delegate or sub-delegate.

31.24    **Additional Security Agents**

(a)    The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(i)    if it considers that appointment to be in the interests of the Secured Parties; or

(ii)    for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(iii)    for obtaining or enforcing any judgment in any jurisdiction,

and the Security Agent shall give prior notice to the Company and the Lenders of that appointment.

(b)    Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Finance Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c)    The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

31.25    **Acceptance of title**

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Obligor or any Spanish Pledgor may have to any of the Charged Property and shall not be liable for, or bound to require any Obligor or any Spanish Pledgor to remedy, any defect in its right or title.

31.26    **Releases**

Upon a disposal of any of the Charged Property pursuant to the enforcement of the Transaction Security by a Receiver or the Security Agent, the Security Agent is irrevocably authorised (at the cost of the Obligors and without any consent, sanction, authority or further confirmation from any other Secured Party) release, without recourse or warranty, that property from the Transaction Security, any release of the Transaction Security or other claim over that asset and to issue any certificates of non-crystallisation of floating charges that may be required or desirable.

31.27    **Winding up of trust**

If the Security Agent, with the approval of the Facility Agent, determines that:

(a)    all of the Secured Obligations and all other obligations secured by the Transaction Security Documents have been fully and finally discharged; and

(b)    no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Finance Documents,

then:

(i)    the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Transaction Security Documents; and

(ii) any Security Agent which has resigned pursuant to clause 31.15 (*Resignation of the Security Agent*) shall release, without recourse or warranty, all of its rights under each Transaction Security Document.

### 31.28 Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Finance Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

### 31.29 Disapplication of Trustee Acts

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement. Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent allowed by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

### 31.30 Order of Application

All amounts from time to time received or recovered by the Security Agent pursuant to the terms of any Finance Documents, under clause 31.3 (*Parallel Debt (Covenant to pay the Security Agent)*), or in connection with the realisation or enforcement of all or any part of the Transaction Security shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law, in the following order of priority:

(a) in discharging pro rata and pari passu any sums owing to the Security Agent (in its capacity as such) (other than pursuant to clause (a) (*Parallel debt (Covenant to pay the Security Agent)*), any Receiver or any Delegate;

(b) in payment or distribution to the Facility Agent, on its behalf and on behalf of the other Secured Parties, for application towards the discharge pro rata and pari passu of all sums due and payable by any Obligor, any Spanish Pledgor or any South African Pledge Counterparty to such parties under any of the Finance Documents in accordance with clause 34.6 (*Partial payments*);

(c) if none of the Obligors is under any further actual or contingent liability under any Finance Document, in payment or distribution pro rata to any person to whom the Security Agent is obliged to pay or distribute in priority to any Obligor; and

(d) the balance, if any, in payment or distribution to the relevant Obligor.

### 31.31 Investment of proceeds

Prior to the application of the proceeds of the Transaction Security in accordance with clause 31.30 (*Order of Application*) the Security Agent may, at its discretion, hold all or part of those proceeds in one or more interest bearing (if any) suspense accounts with any Acceptable Bank (including itself) and for so long as the Security Agent thinks fit (the interest (if any) being credited to the relevant account) pending the application from time to time of those monies at the Security Agent's discretion in accordance with the provisions of clause 31.30 (*Order of Application*).

### 31.32 Currency conversion

(a) For the purpose of, or pending the discharge of, any of the Secured Obligations the Security Agent may convert any moneys received or recovered by the Security Agent

from one currency to another, at the spot rate at which the Security Agent is able to purchase the currency in which the Secured Obligations are due with the amount received.

(b) The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

## 31.33 Permitted Deductions

The Security Agent shall be entitled (a) to set aside by way of reserve amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any law or regulation to make from any distribution or payment made by it under this Agreement, and to pay all Taxes which may be assessed against it in respect of any of the Charged Property, or as a consequence of performing its duties or exercising its rights, powers, authorities and discretions, or by virtue of its capacity as Security Agent under any of the Finance Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

## 31.34 Good discharge

(a) Any distribution or payment to be made in respect of the Secured Obligations by the Security Agent may be made to the Facility Agent on behalf of the Lenders and any distribution or payment made in that way shall be a good discharge, to the extent of that payment or distribution, by the Security Agent.

(b) The Security Agent is under no obligation to make payment to the Facility Agent in the same currency as that in which any Unpaid Sum is denominated.

## 31.35 Amounts received by Obligors

If any of the Obligors receives or recovers any amount which, under the terms of any of the Finance Documents, should have been paid to the Security Agent, that Obligor will hold the amount received or recovered on trust for the Security Agent and promptly pay that amount to the Security Agent for application in accordance with the terms of this Agreement.

## 31.36 Application and consideration

In consideration for the covenants given to the Security Agent by each Obligor in relation to clause 31.3 (*Parallel Debt (Covenant to pay the Security Agent)*), the Security Agent agrees with each Obligor to apply all moneys from time to time paid by such Obligor to the Security Agent in accordance with the foregoing provisions of this clause 31.

# 32 Conduct of Business by the Finance Parties

32.1 No provision of this Agreement will:

(a) interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b) oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c) oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

32.2 Each Facility B Lender agrees with the other Finance Parties that it will not without the prior written consent of the Facility Agent or unless expressly provided in this Agreement:

(a) request, demand or accept repayment in respect of any Fronted Facility or accept any payment in respect thereof directly from an Obligor, any Spanish Pledgor or any South African Pledge Counterparty; or

(b) exercise any rights of set-off, combination of accounts or other remedy against any Obligor, any Spanish Pledgor or any South African Pledge Counterparty or allow to exist or receive the benefit of any Security, guarantee or other assurance against loss otherwise than pursuant to the Finance Documents,

and each Facility B Lender agrees that any payments received by it otherwise than in accordance with clause 34 (*Payment mechanics*) or recoveries by way of set-off, in each case from the Obligors, any Spanish Pledgor or any South African Pledge Counterparty, shall be held by it for the benefit of all Finance Parties and applied in accordance with clause 33 (*Sharing among the Finance Parties*).

32.3 Each Lender agrees with the other Finance Parties that it will on each Monday (or if such date is not a Business Day, on the next Business Day) falling in the week after the date of issue of a scheduled Borrowing Base Report in accordance with clause 22.7(a)(i) (being every week) until all Availability Periods have expired deliver to the Collateral Management Agent a utilisation report in the form set out in Schedule 17 (*Form of Lender utilisation report*).

## 33 Sharing among the Finance Parties

### 33.1 Payments to Finance Parties

(a) Subject to clause 25.4(c) (*Withdrawals from the Collection Account*) and to paragraph (ii) below, if a Finance Party (each a **Recovering Party**) receives or recovers any amount from an Obligor, any Spanish Pledgor or any South African Pledge Counterparty or (or from a third party in respect of an obligation owing to it by an Obligor) other than in accordance with clause 34 (*Payment mechanics*) (including any amounts under or in connection with any Multi-Party TPA Agreement, FX Hedging Provider Hedging Agreement or Deed of Undertaking) (a **Recovered Amount**) and applies that amount to a payment due under the Finance Documents or in connection with any Multi-Party TPA Agreement or FX Hedging Provider Hedging Agreement then:

(i) the Recovering Party shall, within three (3) Business Days, notify details of the receipt or recovery, to the Facility Agent;

(ii) the Facility Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Party would have been paid had the receipt or recovery been received or made by the Facility Agent and distributed in accordance with clause 34 (Payment mechanics), without taking account of any Tax which would be imposed on the Facility Agent in relation to the receipt, recovery or distribution; and

(iii) the Recovering Party shall, within three (3) Business Days of demand by the Facility Agent, pay to the Facility Agent an amount (the Sharing Payment) equal to such receipt or recovery less any amount which the Facility Agent determines may be retained by the Recovering Party as its share of any payment to be made, in accordance with clause 34.6 (*Partial payments*).

(b) Paragraph (a) above shall not apply to any amount received or recovered by an Issuing Bank in respect of any cash cover provided for the benefit of that Issuing Bank.

## 33.2 Redistribution of payments

The Facility Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Party) (the **Sharing Parties**) in accordance with clause 34.6 (*Partial payments*) towards the obligations of that Obligor to the Sharing Parties.

## 33.3 Recovering Party's rights

On a distribution by the Facility Agent under clause 33.2 (*Redistribution of payments*) of a payment received by a Recovering Party from an Obligor, as between the relevant Obligor and the Recovering Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

## 33.4 Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Party becomes repayable and is repaid by that Recovering Party, then:

(a) each Sharing Party shall, upon request of the Facility Agent, pay to the Facility Agent for the account of that Recovering Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Party for its proportion of any interest on the Sharing Payment which that Recovering Party is required to pay) (the **Redistributed Amount**); and

(b) as between the relevant Obligor and each relevant Sharing Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

## 33.5 Exceptions

(a) This clause 33 shall not apply to the extent that the Recovering Party would not, after making any payment pursuant to this clause, have a valid and enforceable claim against the relevant Obligor.

(b) A Recovering Party is not obliged to share with any other Finance Party any amount which the Recovering Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i) it notified the other Finance Party of the legal or arbitration proceedings; and

(ii) the other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

# Section 11
## Administration

## 34 Payment mechanics

### 34.1 Payments to the Facility Agent

(a) On each date on which an Obligor or a Lender is required to make a payment under a Finance Document that Obligor or Lender shall make the same available to the Facility Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Facility Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b) Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in such Participating Member State or London, as specified by the Facility Agent) and with such bank as the Facility Agent, in each case, specifies.

(c) For the avoidance of doubt, each Obligor agrees that it shall not (without the prior written consent of the Facility Agent) make any payment under any of the Facilities directly to a Lender.

### 34.2 Distributions by the Facility Agent

Each payment received by the Facility Agent under the Finance Documents for another Party shall, subject to clause 34.3 (*Distributions to an Obligor*) and clause 34.4 (*Clawback and pre-funding*) be made available by the Facility Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Facility Agent by not less than five (5) Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London, as specified by that Party). Payments shall be applied in or towards payment *pro rata* of any unpaid amount owing to the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Security Agent, the Issuing Bank (including without limitation under clauses 6.4, 6.10 to 6.12 and 6.26) under those Finance Documents prior to interest on, or the principal amount of, the Loans or any fees, expenses, indemnities or other amounts, payable to any other Person hereunder.

### 34.3 Distributions to an Obligor

The Facility Agent may (with the consent of the Obligor or in accordance with clause 35 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

### 34.4 Clawback and pre-funding

(a) Where a sum is to be paid to the Facility Agent under the Finance Documents for another Party, the Facility Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b) Unless paragraph (c) below applies, if the Facility Agent pays an amount to another Party and it proves to be the case that the Facility Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Facility Agent shall on demand refund the same to the Facility Agent together with interest on that amount from the date of payment to the date of receipt by the Facility Agent, calculated by the Facility Agent to reflect its cost of funds.

(c)     If the Facility Agent is willing to make available amounts for the account of a Borrower before receiving funds from the Lenders then if and to the extent that the Facility Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to the Borrower:

(i)     the Facility Agent shall notify the Borrower of that Lender's identity and the Borrower shall on demand refund it to the Facility Agent; and

(ii)    the Lender by whom those funds should have been made available or, if that Lender fails to do so, the Borrowers shall on demand pay to the Facility Agent the amount (as certified by the Facility Agent) which will indemnify the Facility Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

## 34.5    Impaired Agent

(a)     If, at any time, the Facility Agent becomes an Impaired Agent, an Obligor or a Lender which is required to make a payment under the Finance Documents to the Facility Agent in accordance with clause 34.1 (*Payments to the Facility Agent*) may instead either:

(i)     pay that amount direct to the required recipient(s); or

(ii)    if in its absolute discretion it considers that it is not reasonably practicable to pay that amount directly to the required recipient(s), pay that amount or the relevant part of that amount to an interest-bearing account held with an Acceptable Bank within the meaning of paragraph (a) of the definition of **Acceptable Bank** and in relation to which no Insolvency Event has occurred and is continuing, in the name of the Obligor or the Lender making the payment (the **Paying Party**) and designated as a trust account for the benefit of the Party or Parties beneficially entitled to that payment under the Finance Documents (the **Recipient Party** or **Recipient Parties**).

In each case such payments must be made on the due date for payment under the Finance Documents.

(b)     All interest accrued on the amount standing to the credit of the trust account shall be for the benefit of the Recipient Party or the Recipient Parties *pro rata* to their respective entitlements.

(c)     A Party which has made a payment in accordance with this clause 34.5 shall be discharged of the relevant payment obligation under the Finance Documents and shall not take any credit risk with respect to the amounts standing to the credit of the trust account.

(d)     Promptly upon the appointment of a successor Facility Agent in accordance with clause 30.12 (*Replacement of the Facility Agent or Collateral Management Agent*), each Paying Party shall (other than to the extent that that Party has given an instruction pursuant to paragraph (e) below) give all requisite instructions to the bank with whom the trust account is held to transfer the amount (together with any accrued interest) to the successor Facility Agent for distribution to the relevant Recipient Party or Recipient Parties in accordance with clause 34.2 (*Distributions by the Facility Agent*).

(e)     A Paying Party shall, promptly upon request by a Recipient Party and to the extent:

(i)     that it has not given an instruction pursuant to paragraph (d) above; and

(ii)    that it has been provided with the necessary information by that Recipient Party,

give all requisite instructions to the bank with whom the trust account is held to transfer the relevant amount (together with any accrued interest) to that Recipient Party.

34.6    **Partial payments**

(a)    If the Facility Agent receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Facility Agent shall apply that payment towards the obligations of that Obligor under those Finance Documents in the following order:

(i)    **first**, in or towards payment *pro rata* of any unpaid amount owing to the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Security Agent, the Issuing Bank ((including without limitation under clauses 6.4, 6.10 to 6.12 and 6.26)) under those Finance Documents;

(ii)    **secondly**, in or towards payment to the Secured Parties *pro rata* of any accrued interest, fee or commission due but unpaid under the First Finance Documents;

(iii)    **thirdly**, in or towards payment to the Secured Parties *pro rata* of any principal due but unpaid under those First Finance Documents;

(iv)    **fourthly**, in or towards payment *pro rata* of any other sum due but unpaid under the First Finance Documents; and

(v)    **fifthly**, in or towards any sum due put unpaid in relation to the Second Secured Obligations.

(b)    The Facility Agent shall, if so directed by the Majority Lenders, vary the order set out in paragraphs (a)(ii) to (iv) above.

(c)    Paragraphs (a) and (b) above will override any appropriation made by an Obligor.

34.7    **Set-off by Obligors**

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

34.8    **Business Days**

(a)    Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

34.9    **Currency of account**

(a)    Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b)    A repayment of a Utilisation or a part of a Utilisation shall be made in the currency in which that Utilisation is denominated on its due date.

(c)    Each repayment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated when that interest accrued.

(d)    Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e)     Any amount expressed to be payable in a currency other than Base Currency shall be paid in that other currency.

## 34.10    Change of currency

(a)     Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)     any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Facility Agent (after consultation with the Company); and

(ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Facility Agent (acting reasonably).

(b)     If a change in any currency of a country occurs, this Agreement will, to the extent the Facility Agent (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency, with the intention of putting the Obligors and the Finance Parties in the same position as if the change had not occurred.

## 34.11    Disruption to Payment Systems etc.

If either the Facility Agent determines (in its discretion) that a Disruption Event has occurred or the Facility Agent is notified by the Company that a Disruption Event has occurred:

(a)     the Facility Agent may, and shall if requested to do so by the Company, consult with the Company with a view to agreeing with the Company such changes to the operation or administration of the Facility as the Facility Agent may deem necessary in the circumstances;

(b)     the Facility Agent shall not be obliged to consult with the Company in relation to any changes mentioned in paragraph (a) if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)     the Facility Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)     any such changes agreed upon by the Facility Agent and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of clause 40 (*Amendments and Waivers*);

(e)     the Facility Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this clause 34.11; and

(f)     the Facility Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

## 35    Set-Off

Without prejudice to clause 32.2 and subject to the Legal Reservations, a Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 36    Notices

### 36.1    Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by email or letter.

### 36.2    Addresses

The address and email (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)    in the case of each Obligor, as follows:

      10, Akti Kondili
      Piraeus 185 45
      Greece

      Email: sfokas@ampni.com

      Attention: Mr Spyros Fokas

(b)    in the case of each Lender, that notified in writing to the Facility Agent on or prior to the date on which it becomes a Party; and

(c)    in the case of the Facility Agent or the Security Agent, as follows:

      **ABN AMRO Bank N.V.**
      Agency Syndicated Loans
      Attn: Team 1
      Gustav Mahlerlaan 10 (HQ9037)
      1082 PP Amsterdam
      The Netherlands

      E-mail: ABN.AMRO.Agency.Team.1@nl.abnamro.com

(d)    in the case of the Collateral Management Agent, as follows:

      **ABN AMRO Bank N.V.**
      Credit & Collateral Management

      Att: Nelli Oganesian / Anastasia.Romm - HQ0051
      Gustav Mahlerlaan 10
      1082 PP Amsterdam
      The Netherlands

      T + 31 (0) 20 343 6703

E-mail: nelli.organesian@nl.abnamro.com and anastasia.romm@nl.abnamro.com

(e)     in the case of the Issuing Banks, as follows:

      **ABN AMRO Bank N.V.**
      Att: Nydhal El Mahfoudhi
      Gustav Mahlerlaan 10
      1082 PP Amsterdam
      The Netherlands

      Email: nydhal.elmahfoudhi@nl.abnamro.com

      Tel:    +31 (0) 20 6 282 337

(f)     in the case of the Overdraft Bank, as follows:

      **ABN AMRO Bank N.V.**
      Att: Nydhal El Mahfoudhi
      Gustav Mahlerlaan 10
      1082 PP Amsterdam
      The Netherlands

      Email: nydhal.elmahfoudhi@nl.abnamro.com

      Tel:    +31 (0) 20 6 282 337

or any substitute address, email or department or officer as the Party may notify to the Facility Agent (or the Facility Agent may notify to the other Parties, if a change is made by the Facility Agent) by not less than five (5) Business Days' notice.

36.3    **Delivery**

(a)     Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

    (i)     if by way of email, when received in legible form; or

    (ii)    if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under clause 36.2 (*Addresses*), if addressed to that department or officer.

(b)     Any communication or document to be made or delivered to the Facility Agent, the Collateral Management Agent or the Security Agent will be effective only when actually received by the Facility Agent, the Collateral Management Agent or Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Facility Agent's or Collateral Management Agent's or Security Agent's signature below (or any substitute department or officer as the Facility Agent, the Collateral Management Agent or Security Agent shall specify for this purpose).

(c)     All notices from or to an Obligor shall be sent through the Facility Agent.

(d)     Any communication or document made or delivered to the Company in accordance with this clause 36.3 will be deemed to have been made or delivered to each of the Obligors.

(e)     Any communication or document which becomes effective, in accordance with paragraphs (a) to (d) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

### 36.4 Notification of address and email

Promptly upon receipt of notification of an address or email or change of address or email pursuant to clause 36.2 (*Addresses*) or changing its own address or email, the Facility Agent shall notify the other Parties.

### 36.5 Communication when Facility Agent is Impaired Agent

If the Facility Agent is an Impaired Agent the Parties may, instead of communicating with each other through the Facility Agent, communicate with each other directly and (while the Facility Agent is an Impaired Agent) all the provisions of the Finance Documents which require communications to be made or notices to be given to or by the Facility Agent shall be varied so that communications may be made and notices given to or by the relevant Parties directly. This provision shall not operate after a replacement Facility Agent has been appointed.

### 36.6 Electronic communication

(a) Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication and if those two Parties:

   (i) notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

   (ii) notify each other of any change to their address or any other such information supplied by them by not less than five (5) Business Days' notice.

(b) Any electronic communication made between those two Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Facility Agent, Collateral Management Agent or the Security Agent only if it is addressed in such a manner as the Facility Agent, Collateral Management Agent or Security Agent shall specify for this purpose.

(c) Any electronic communication which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

### 36.7 Use of websites

(a) The Company may satisfy its obligation under this Agreement to deliver any information in relation to those Lenders (the **Website Lenders**) who accept this method of communication by posting this information onto an electronic website designated by the Company and the Facility Agent (the **Designated Website**) if:

   (i) the Facility Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

   (ii) both the Company and the Facility Agent are aware of the address of and any relevant password specifications for the Designated Website; and

   (iii) the information is in a format previously agreed between the Company and the Facility Agent.

If any Lender (a **Paper Form Lender**) does not agree to the delivery of information electronically then the Facility Agent shall notify the Company accordingly and the Company shall at its own cost supply the information to the Facility Agent (in sufficient copies for each Paper Form Lender) in paper form. In any event the Company shall at its

own cost supply the Facility Agent with at least one copy in paper form of any information required to be provided by it.

(b)     The Facility Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company and the Facility Agent.

(c)     The Company shall promptly upon becoming aware of its occurrence notify the Facility Agent if:

(i)     the Designated Website cannot be accessed due to technical failure;

(ii)    the password specifications for the Designated Website change;

(iii)   any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(iv)    any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(v)     the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If the Company notifies the Facility Agent under paragraph (c)(i) or paragraph (c)(v) above, all information to be provided by the Company under this Agreement after the date of that notice shall be supplied in paper form unless and until the Facility Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

(d)     Any Website Lender may request, through the Facility Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website.  The Company shall at its own cost comply with any such request within ten (10) Business Days.

36.8    **English language**

(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

(i)     in English; or

(ii)    if not in English, and if so required by the Facility Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

# 37     Calculations and Certificates

37.1    **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

### 37.2 Certificates and determinations

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

### 37.3 Day count convention

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

## 38 Partial Invalidity

If, at any time, any provision of a Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 39 Remedies and Waivers

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 40 Amendments and Waivers

### 40.1 Required consents

(a)     Subject to clause 40.2 (*All Lender matters*) and clause 40.3 (*Other exceptions*), any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and the Company and any such amendment or waiver will be binding on all Parties.

(b)     The Facility Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this clause 40.

(c)     Without prejudice to the generality of paragraphs (c), (d) and (e) of clause 30.6 (*Rights and discretions*), the Facility Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment or waiver under this Agreement.

(d)     Each Obligor agrees to any such amendment or waiver permitted by this clause 40 which is agreed to by the Company. This includes any amendment or waiver which would, but for this paragraph (d), require the consent of all of the Guarantors.

### 40.2 All Lender matters

(a)     An amendment or waiver that has the effect of changing or which relates to:

(i)     the definitions of **Majority Lenders**, **Prohibited Person**, **Sanctions**, **Sanctions Authority** or **Sanctions List** in clause 1.1 (*Definitions*);

(ii)     an extension to the date of payment of any amount under the Finance Documents (other than in relation to clause 9 (*Mandatory prepayment and cancellation*));

(iii)    a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable;

(iv)    a change in currency of payment of any amount under the Finance Documents;

(v)     an increase in any Commitment or the Total Commitments, an extension of the Availability Period or any requirement that a cancellation of Commitments reduces the Commitments rateably;

(vi)    a change to a Borrower or Guarantors;

(vii)   any provision which expressly requires the consent of all the Lenders;

(viii)  clause 2.2 (*Finance Parties' rights and obligations*), clause 9 (*Mandatory prepayment and cancellation*), clause 22.13 (*Proof of Origin*), clause 27 (*Changes to the Lenders*), this clause 40, the governing law of any Finance Document or clause 44.1 (*Jurisdiction of English courts*);

(ix)    the nature or scope of:

(A)    the guarantee and indemnity granted under clause 20 (*Guarantee and Indemnity*);

(B)    the Charged Property; or

(C)    the manner in which the proceeds of enforcement of the Transaction Security are distributed; or

(x)     subject to clause 40.5 (*Release of non-eligible receivables by the Security Agent*), the release of any guarantee and indemnity granted under clause 20 (*Guarantee and Indemnity*) or of any Transaction Security,

shall not be made, or given, without the prior consent of all the Lenders.

## 40.3    Other exceptions

An amendment or waiver which relates to the rights or obligations of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Co-Ordinator, the Security Agent or FX Hedging Provider (each in their capacity as such) may not be effected without the consent of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Co-Ordinator, the Security Agent and the FX Hedging Provider.

## 40.4    Excluded Commitments

If any Lender fails to respond to a request for a consent, waiver, amendment of or in relation to any term of any Finance Document or any other vote of Lenders under the terms of this Agreement within ten (10) Business Days of that request being made (unless the Company and the Facility Agent agree to a longer time period in relation to any request):

(a)    its Commitments hall not be included for the purpose of calculating the Total Commitment when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) of Total Commitments has been obtained to approve that request; and

(b)    its status as a Lender shall be disregarded for the purpose of ascertaining whether the agreement of any specified group of Lenders (including, for the avoidance of doubt, all the Lenders) has been obtained to approve that request.

### 40.5　Release of non-eligible receivables by the Security Agent

Notwithstanding any other provision of any Finance Document, the Security Agent may in its sole discretion, and is hereby (without any further confirmation or instruction required) authorised to, execute a release from the Transaction Security from time to time of trade receivables which are not or have ceased to be Eligible Receivables and which have a face value in an amount which is less than $500,000 per receivable.　The Security Agent (or the Facility Agent) shall notify the Lenders of any release made pursuant to this clause.

## 41　Confidentiality

### 41.1　Confidential Information

Each Finance Party agrees to use commercially reasonable efforts in accordance with safe and sound practices applicable to banks to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by clause 41.2 (*Disclosure of Confidential Information*) and clause 41.3 (*Disclosure to numbering service providers*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 41.2　Disclosure of Confidential Information

Any Finance Party may disclose:

(a)　to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, insurers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)　to any person:

(i)　to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Facility Agent, Collateral Management Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(ii)　with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(iii)　appointed by any Finance Party or by a person to whom paragraph (b)(i) or (ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under paragraph (b) of clause 30.14 (*Relationship with the Lenders*));

(iv)　who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v)　to the Bankruptcy Court, in connection with a Sale Motion or otherwise to whom information is required or requested to be disclosed by any court of competent

jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi) to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii) to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to clause 27.8 (*Security over Lenders' rights*);

(viii) who is a Party; or

(ix) with the consent of the Company;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A) in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B) in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C) in relation to paragraphs (b)(v), (b)(vi) and (b)(vii) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c) to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Company and the relevant Finance Party; and

(d) to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors.

### 41.3 Disclosure to numbering service providers

(a) Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facility and/or one or more Obligors the following information:

(i) names of Obligors, the Spanish Pledgors and the South African Pledge Counterparties;

(ii) country of domicile of Obligors, the Spanish Pledgors and the South African Pledge Counterparties;

(iii) place of incorporation of Obligors, the Spanish Pledgors and the South African Pledge Counterparties;

(iv) date of this Agreement;

(v) clause 43 (*Governing Law*);

(vi) the names of the Facility Agent, the Collateral Management Agent and the Co-Ordinator;

(vii) amount of Total Commitments;

(viii) currency of the Facility;

(ix) type of Facility;

(x) ranking;

(xi) Termination Date;

(xii) changes to any of the information previously supplied pursuant to paragraphs (i) to (xi) above; and

(xiii) such other information agreed between such Finance Party and the Company,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

(b) The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facility and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

(c) Each Obligor represents that none of the information set out in paragraphs (i) to (xiii) of paragraph (a) above is, nor will at any time be, unpublished price-sensitive information.

(d) The Facility Agent shall notify the Company and the other Finance Parties of:

(i) the name of any numbering service provider appointed by the Facility Agent in respect of this Agreement, the Facility and/or one or more Obligors; and

(ii) the number or, as the case may be, numbers assigned to this Agreement, the Facility and/or one or more Obligors by such numbering service provider.

## 41.4    Entire agreement

This clause 41 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

41.5    **Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

41.6    **Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Company:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to paragraph (b)(v) of clause 41.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this clause 41.

41.7    **Continuing obligations**

The obligations in this clause 41 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of twelve (12) months from the earlier of:

(a)    the date on which all amounts payable by the Obligors, the Spanish Pledgors and the South African Pledge Counterparties under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

# 42    Counterparts

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## Section 12
## Governing Law and Enforcement

# 43    Governing Law

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

# 44    Enforcement

### 44.1    Jurisdiction of English courts

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    This clause 44.1 is for the benefit of the Finance Parties and Secured Parties only.  As a result, no Finance Party or Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Finance Parties and Secured Parties may take concurrent proceedings in any number of jurisdictions.

### 44.2    Service of process

(a)    Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(i)    irrevocably appoints Portland Place Nominees Limited of c/o Riches & Company, 34 Anyards Road, Cobham, Surrey KT11 2LA as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(ii)    agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within three (3) days of such event taking place) appoint another agent on terms acceptable to the Facility Agent.  Failing this, the Facility Agent may appoint another agent for this purpose.

### 44.3    Enforcement procedures in Spain

(a)    This Agreement and any other Finance Document, at the discretion of the Facility Agent, as well as any amendments hereto or thereto, shall be formalised in a Spanish Public Document, so that it may have the status of a notarial document of loan for all purposes contemplated in Article 517, number 4 of the Spanish Civil Procedural Law (Law 1/2000 of 7th January) *("Ley de Enjuiciamiento Civil")* (the "**Civil Procedural Law**").

(b)    For such purposes, upon demand by the Facility Agent or the Security Agent, any Spanish Obligor that may accede to this Agreement shall: (i) raise this Agreement to the status of a Spanish Public Document before a Spanish notary public and (ii) raise the deed by virtue of which any Spanish Obligor becomes a party to this Agreement to the status of a Spanish Public Document.

(c)     Upon enforcement, the sum payable by the any Spanish Obligor or any Spanish Pledgor regarding the relevant Transaction Security shall be the total aggregate amount of the balance of the accounts maintained by the Facility Agent (and/or the relevant Finance Party, as the case may be). For the purposes of Articles 517 et seq. of the Civil Procedural Law, such balances shall be considered as due, liquid and payable and may be claimed pursuant to the same provisions of such law. In this regard:

(i)     For purposes of enforcing the provisions of or foreclosing under this Agreement pursuant to Spanish law (including, without limitation, the guarantee provided by a Spanish Guarantor pursuant to Clause 20 or the security granted by any Spanish Pledgor under the Transaction Security Documents), the Facility Agent, in its capacity as such (and on behalf of the Finance Parties), shall open and maintain a special credit facility account in its books on behalf of the Obligors, from which all interest, fees, expenses, default interest, additional costs and any other amounts that the Obligors owe to the Finance Parties under the Finance Documents will be debited and into which all amounts received by or on account of the Finance Parties from the Obligors under the Finance Documents will be credited, so that the balance of the credit account represents the amount owed from time to time by the Obligors to the Finance Parties.

(ii)    In addition to the account referred to in the above paragraph, each Finance Party shall open and maintain a special account in its records equivalent to that referred to above, into which the interest, fees, expenses, default interest, additional costs and any other amounts that the Obligors owe to the Finance Party hereunder will be debited and into which all amounts received by the Finance Party from the Obligors under the Finance Documents shall be credited, so that the sum of the balance of the credit account represents the amount owed from time to time by the Obligors to the Finance Party. In the event of assignment as provided in Clause 27, the assignor will totally or partially cancel the referenced accounts, with corresponding accounts to be opened by the assignee.

(iii)   Any failure to keep the records referred to in paragraphs (i) and (ii) above or any error in doing so will not, however, limit or otherwise affect the obligation of the Obligors to pay any amount owed pursuant to the Finance Documents. In the event of any discrepancy between the accounts and records maintained by any Finance Party and the accounts and records of the Facility Agent corresponding to such matters, the Facility Agent's accounts and records will take precedence in the absence of manifest error.

(iv)    If any of the events of termination by maturity or acceleration of the Facility occurs, the Facility Agent will settle the accounts referred to in this section. For the purposes of enforcement in judicial or extrajudicial proceedings, it is expressly agreed that the balance of the accounts referred to above resulting from the certification for that purpose issued by the Facility Agent will be deemed a liquid, due and payable amount enforceable against the Obligors, provided that it is evidenced in a notarial document that the settlement was made in the form agreed by the parties in the enforceable instrument (*título ejecutivo*) and that the outstanding balance is equivalent to that recording in the corresponding account of the Obligors opened in connection with the Facility.

(d)     For the purpose of the provisions of Article 571. et seq. of the Civil Procedural Law, it is expressly agreed that the determination of the debt to be claimed through the enforcement proceedings shall be effected by the Facility Agent (or the relevant Finance Party, as the case may be) by means of the appropriate certificate evidencing the balances shown in the relevant account(s) referred to in paragraph (c) above. By virtue of the foregoing, to enforcement of this Agreement by the Facility Agent or any of the Finance Party it will be sufficient to deliver:

(i)     an original notarial first or authentic copy of this Agreement;

(ii) a notarial certificate, if necessary, for the purposes described in paragraph (e) below;

(iii) the notarial document (*acta notarial*) which incorporates the certificate issued by the Facility Agent (and/or the relevant Finance Party, as the case may be) of the amount due by the Spanish Obligor including an excerpt of the credits and debits (including the interest applied) which appear in the relevant account(s) referred to in paragraph (iii) above, evidencing that the determination of the amounts due and payable by the Spanish Obligor have been calculated as agreed in this Agreement and that such amounts coincide with the balance of such accounts; and

(iv) a notarial document (*acta notarial*) evidencing that the Spanish Obligor has been served notice of the amount that is due and payable.

(e) Paragraph (c) above is also applicable to any Finance Party with regard to its participation in the Facility. Such Finance Party may issue the appropriate certification of the balances of the relevant account(s) referred to in paragraph (iii) above and the certification of the balances of such accounts may be legalised by a notary.

(f) The amount of the balances so established shall be notified to the Spanish Obligor in an attestable manner at least three (3) days in advance of the enforcement action set out in paragraph (c) above.

(g) the Facility Agent and the Security Agent (and each Finance Party, as appropriate) are hereby authorised to request and obtain certificates and documents issued by the notary who formalises this Agreement in order to evidence its compliance with the entries of his registry-book and the relevant entry date for the purposes of number 4 of Article 517, of the Spanish Civil Procedural Law in case this Agreement is notarized by means of a Spanish "*póliza*"; and to request any second or subsequent copies of the relevant Spanish Public Document in which this Agreement is formalised, in the event that it is formalised by means of a Spanish "*escritura pública*". The cost of such certificate and documents will be for the account of the Company and/or the Spanish Obligor in the manner provided under this Agreement.

(h) For the purposes of a Spanish Obligor and the Guarantee it provides when acceding to this Agreement, the Spanish Public Document:

(i) will have the effects established under articles 517 et seq. of the Spanish Civil Procedural Law; and

(ii) may, at the decision of the Facility Agent or the Security Agent, include a translation into Spanish of this Clause 44.3 (*Enforcement Proceeding in Spain*).

# 45 Bail-in Clause

## 45.1 Contractual Recognition of bail-in

Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(a) any Bail-In Action in relation to any such liability, including (without limitation):

(i) a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(ii) a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and;

<blockquote>

(iii)    a cancellation of any such liability; and

(b)    a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.
</blockquote>

## 46    Resolution Stay

46.1    Each Party irrevocably and unconditionally acknowledges, consents, accepts and agrees that the occurrence, existence or continuation of a Resolution Event in relation to another Finance Party does not:

(a)    entitle it, directly or indirectly, whether pursuant to a default clause, a cross-default clause, a guarantee or otherwise, to:

(i)    exercise any termination, suspension, modification, netting or set-off rights or similar rights;  or

(ii)    obtain possession, exercise control or enforce any security over any property of such Finance Party,

under or in relation to this Agreement or any other agreement between it and such Finance Party; or

(b)    adversely affect the rights and remedies of such Finance Party under this Agreement or any other agreement between that Finance Party and it,

unless the Resolution Legislation explicitly provides otherwise.

46.2    Each Party shall promptly take all action that is necessary or in the opinion of the relevant Finance Party or any Resolution Authority desirable in connection with this clause, the exercise of a Resolution Power by any Resolution Authority, or the occurrence, existence or continuation of any Resolution Event.

46.3    Notwithstanding any other term, condition or clause in this Agreement or any other agreement, arrangement or understanding between a Finance Party and another Party, each Party irrevocably and unconditionally acknowledges, accepts, consents and agrees that this clause prevails and may be enforced by any Resolution Authority.

46.4    In this clause:

References to a Finance Party include any parent, subsidiary or branch of that Finance Party, including its successors in title and assigns and transferees.

**Resolution Authority** means any administrative authority or any other person with the ability to exercise a Resolution Power.

**Resolution Event** means:

(a)    the exercise by a Resolution Authority of any or more Resolution Powers in relation to a relevant Finance Party;

(b)    any other action taken by a Resolution Authority based on or taken in connection with Resolution Legislation in relation to a relevant Finance Party, including, without limitation, any request by the Resolution Authority to that Finance Party to take any action;

(c)    any action taken by a relevant Finance Party in connection with the events referred to under (a) or (b), including, without limitation, any action taken to comply with any request by the Resolution Authority referred to in paragraph (b) above; and

(d)    any event directly linked to any event as referred to in paragraphs (a), (b) or (c) above.

**Resolution Legislation** means any laws, regulations, rules, directives or requirements relating to the resolution or recovery of banks, banking group companies, credit institutions or investment firms applicable to a relevant Finance Party from time to time, including, without limitation, EU Directive 2014/59/EU ("**BRRD**") and EU Regulation No 806/2014 ("**SRM**"), both as amended from time to time, and any EU directive or regulation issued in replacement of or supplement to the same, and any laws, regulations, rules, directives or requirements implementing any of the foregoing.

**Resolution Power** means any power existing from time to time under any Resolution Legislation, including, without limitation, the power to take a crisis prevention measure or a crisis management measure such as write-down (a reduction, including, without limitation, to zero, in the principal amount or outstanding amount due, including any accrued but unpaid interest), conversion, cancellation, amendment or suspension powers existing from time to time, or to exercise any corresponding power.


**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

## Schedule 1
## The Original Parties

## Part I
## The Obligors

| Name of Original Borrowers | Registration number (or equivalent, if any) | Original Jurisdiction |
|---|---|---|
| Aegean Marine Petroleum S.A. | C-76656 | Liberia |
| Aegean Petroleum International Inc. | 28486 | Marshall Islands |
| Aegean NWE N.V. | BE412.527.142 | Belgium |
| Aegean Bunkering Germany GmbH | HRB 16326 KI | Germany |
| Obast Bunkering & Trading GmbH | HRB 13560 | Germany |

| Name of Original Guarantors | Registration number (or equivalent, if any) | Original Jurisdiction |
|---|---|---|
| Kithnos Maritime Inc. | 13452 | Marshall Islands |
| Paros Maritime Inc. | 13458 | Marshall Islands |
| Santorini I Maritime Limited | HE277602 | Cyprus |
| SERIFOS MARITIME INC. | 13451 | Marshall Islands |
| Lefkas Marine S.A. | | Liberia |
| Aegean Bunkering Services Inc. | 9165 | Marshall Islands |
| Aegean Shipholdings Inc. | 15000 | Marshall Islands |
| Aegean Breeze Maritime Company | 4390 | Greece |
| Aegean Tiffany Maritime Company | 4391 | Greece |
| Ithaki Marine S.A. | | Liberia |
| Cephallonia Marine S.A. | | Liberia |
| Kerkyra Marine S.A. | | Liberia |
| Kythira Marine S.A. | | Liberia |
| Ios Marine Inc. | | Liberia |
| Paxoi Marine S.A. | | Liberia |
| Zakynthos Marine Limited | HE378106 | Cyprus |
| Aegean Barges N.V. | BE0860.038.523, RPR/RPM Antwerp, section Antwerp | Belgium |
| Aegean NWE N.V. | BE0412.527.142, RPR/RPM Antwerp, section Antwerp | Belgium |
| Aegean Bunkering Germany GmbH | HRB 16326 KI | Germany |
| Obast Bunkering & Trading GmbH | HRB 13560 | Germany |
| Sifnos Marine Inc. | | Liberia |
| Andros Marine Limited | HE334504 | Cyprus |
| Dilos Marine Inc. | | Liberia |
| Ios Shipping Ltd | C58204 | Malta |
| Aegean VII Shipping Ltd | C22401 | Malta |
| Halki Navigation S.A. | | Liberia |
| Kassos Navigation S.A. | | Liberia |
| Symi Navigation S.A. | | Liberia |
| Tilos Shipping (Pte.) Ltd. | 201103601N | Singapore |
| Aegean Oil Terminal Corporation | 29458 | Marshall Islands |
| Aegean Management Services M.C. | 4281 | Greece |
| Kimolos Maritime Inc. | 13454 | Marshall Islands |
| Milos Shipping (Pte.) Ltd. | 200617549N | Singapore |
| Mykonos I Maritime Limited | HE277601 | Cyprus |

| Name of Original Guarantors | Registration number (or equivalent, if any) | Original Jurisdiction |
|---|---|---|
| Tinos Marine Inc. | | Liberia |
| Serifos Shipping (Pte.) Ltd. | 200617548D | Singapore |
| Aegean Ship XII Maritime Company | 4324 | Greece |
| Tempest Shiptrade Ltd. | 68920 | Marshall Islands |
| Amorgos Maritime Inc. | 13453 | Marshall Islands |
| Aegean Marine Petroleum Network Inc. | 14958 | Marshall Islands |
| Aegean Petroleum International Inc. | 28486 | Marshall Islands |
| Tasman Seaways Inc. | | Liberia |
| Santon Limited | | Liberia |
| Aegean Ace Maritime Company | 4392 | Greece |
| Aegean Ship III Maritime Company | 4326 | Greece |
| Aegean Ship VIII Maritime Company | 4325 | Greece |
| Nevado Navigation S.A. | | Liberia |
| Aegean Tanking S.A | | Liberia |
| Sealand Navigation Inc. | 47283 | Marshall Islands |
| Benmore Services S.A. | | Liberia |
| Eton Marine Ltd. | | Liberia |
| Ingram Enterprises Co. | | Liberia |
| Aegean Marine Petroleum S.A. | C-76656 | Liberia |
| I.C.S. Petroleum Ltd. | BC 0904178 | Canada |
| Aegean Bunkering (USA) LLC | 5427961 | Delaware |
| Aegean Maistros Maritime Company | 4254 | Greece |
| Aegean Gas Maritime Company | 3185 | Greece |
| Aegean Bunkering Combustibles Las Palmas SOCIEDAD ANÓNIMA | A76062967 | Las Palmas (Spain) |
| | | |
| Aegean (Fujairah) Bunkering SA | 20805 | Marshall Islands |
| Aegean Agency (Gibraltar) Limited | 94757 | Gibraltar |
| Caribbean Renewable Energy Sources Inc. | 1383829 | British Virgin Islands |
| West Coast Fuel Transport Ltd | BC 0393251 | Canada |
| Aegean Bunkering (Gibraltar) Limited | 62347 | Gibraltar |
| Aegean Holdings S.A. | 1932 | Marshall Islands |
| Aegean Bunkering (Jamaica) Limited | 69,725 | Jamaica |
| AMPN USA, LLC | 4268678 | Delaware |
| Aegean Oil (USA), LLC | 3827668 | Delaware |
| I.C.S. Petroleum (Montreal) Ltd. | 206054-0 | Canada |
| Aegean Bunkering Morocco SARL AU | 46175 (trade registry of Tangier, Morocco) | Morocco |
| Aegean Bunkering (Singapore) Pte. Ltd. | 200507771M | Singapore |
| Aegean Bunkering (Trinidad) Ltd. | A-3728(95) | Trinidad & Tobago |
| AMPNI Investments Co. Limited | HE245425 | Cyprus |
| AMPNI Holdings Co. Limited | HE245361 | Cyprus |
| Maistros RORO Shipholdings Ltd | C42783 | Malta |
| Ostria RORO Shipholdings Ltd | C42784 | Malta |
| Aegean Tankfarms Holdings S.A. | 47687 | Marshall Islands |
| Aegean Investments S.A. | 9825 | Marshall Islands |

## Part II
## The Original Lenders

| Name of Original Lender | Facility A Tranche 1 Commitments ($) | Facility A Tranche 2 Commitments ($) | Facility B Tranche 1 Commitments ($) | Facility B Tranche 2 Commitments ($) |
|---|---|---|---|---|
| Mercuria Energy Trading S.A. | 200,000,000 | 200,000,000 | 25,200,000 | 100,000,000 |

# Schedule 2
# Conditions precedent

## Part I
## Conditions precedent to initial Utilisation

*For the avoidance of doubt, these Part I conditions precedent applied to the initial Utilisation only and the initial Utilisation occurred prior to the Effective Date.*

**1      Obligors and parties to security documents**

(a)      A copy of the constitutional documents of each Obligor.

(b)      If required by the Facility Agent, a copy of a signed resolution of the board of directors of each Obligor:

     (i)      approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

     (ii)      authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf;

     (iii)      authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

     (iv)      in the case of an Obligor other than the Company, authorising the Company to act as its agent in connection with the Finance Documents.

(c)      A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(d)      A copy of a resolution signed by all the holders of the issued shares in each Guarantor approving the terms of, and the transactions contemplated by, the Finance Documents to which that Guarantor is a party.

(e)      If required, a copy of a resolution of the board of directors of each corporate shareholder of each Guarantor approving the terms of the resolution referred to in paragraph (d) above.

(f)      A certificate of each Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(g)      A certificate of an authorised signatory of the Company or other relevant Obligor certifying that each copy document relating to it specified in this Part I of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

(h)      A certificate of good standing in respect of each of the Parent, the Company and APII.

(i)      Evidence of the authority of Horizon Tangiers Terminal S.A. to execute the Moroccan Pledge.

(j)      Evidence of the authority of AOTC (as bailee) to execute the UAE Pledges.

(k)      In respect of Aegean Tanking S.A.:

(i)   a copy of its constitutional documents;

(ii)   a copy of a signed resolution of its board of directors:

   (A)   approving the terms of, and the transactions contemplated by, each South African Pledge to which it is a party and resolving that it execute, deliver and perform each South African Pledge to which it is a party;

   (B)   authorising a specified person or persons to execute each South African Pledge to which it is a party on its behalf; and

   (C)   authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with each South African Pledge to which it is a party;

(iii)   a specimen of the signature of each person authorised by the resolution referred to in paragraph (ii) above in relation to each South African Pledge; and

(iv)   a certificate of good standing.

(l)   In respect of Aegean Bunkering Marine Services Proprietary Limited:

(i)   a copy of its constitutional documents;

(ii)   a copy of a signed resolution of its board of directors:

   (A)   approving the terms of, and the transactions contemplated by, each South African Pledge to which it is a party and resolving that it execute, deliver and perform the New South African Security Documents to which it is a party;

   (B)   authorising a specified person or persons to execute each South African Pledge to which it is a party on its behalf; and

   (C)   authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with each South African Pledge to which it is a party; and

(iii)   a specimen of the signature of each person authorised by the resolution referred to in paragraph (ii) above in relation to each South African Pledge.

## 2   Finance Documents

(a)   This Agreement executed by the Obligors party to this Agreement.

(b)   The fee letters duly executed by each party.

(c)   Any Stock Monitoring Agreement or Collateral Management Agreement required pursuant to clause 22.15 (*Inspection and Management in Sensitive Zones*).

(d)   At least two originals of the documents referred to in paragraphs (a)-(g) of the definition of Transaction Security Documents (other than those listed as conditions subsequent in clause 24.25 (*Conditions subsequent*)), duly executed by each party.

(e)   A copy of all notices required to be sent under the Transaction Security Documents referred to in paragraph (d) above, executed by the Borrower, duly acknowledged by the addressee to the extent required by the relevant Transaction Security Document.

(f) Evidence, satisfactory to the Facility Agent, that all steps have been taken in any relevant jurisdiction to perfect any Security created by the Transaction Security Documents.

## 3 Insurance

(a) Copies of all insurances required to be maintained by the Borrowers and the Spanish Pledgor in respect of assets included or capable of being included in the Borrowing Base.

(b) A letter from WILLIS Limited, 51 Line Street, London EC3M 7DQ, UK, as insurance broker, dated no earlier than the date of this Agreement addressed to the Facility Agent, the Security Agent and the Lenders listing the insurance policies of the Borrowers and the Spanish Pledgor and confirming that they are on risk and that the insurance for Borrowers and the Spanish Pledgor at the date of this Agreement are at a level acceptable to the Majority Lenders and covering appropriate risks for the business carried out by Borrowers and the Spanish Pledgor and otherwise confirming compliance by the Borrowers with the insurance requirements of this Agreement including that Security Agent and the US DIP Administrative Agent is each named as a co-insured and together sole loss payees in respect of such insurance.

## 4 Accounts

A letter from the Account Bank to the Collateral Management Agent, the Security Agent and the Facility Agent confirming the opening of each Facility Account and each Collection Account and specifying the account name, account number and the name and address of the bank where each such account is held.

## 5 Legal opinions

The following legal opinions, each addressed to the Facility Agent, the Security Agent and the Original Lenders and capable of being relied upon by any persons who become Lenders pursuant to the primary syndication of the Facility.

(a) A legal opinion of the following legal advisers to the Facility Agent:

(i) Norton Rose Fulbright LLP as to English law;

(ii) Norton Rose Fulbright Morocco SARL as to Moroccan law;

(iii) Koan as to Belgian law;

(iv) Norton Rose Fulbright LLP as to Dutch law;

(v) Norton Rose Fulbright (Middle East) LLP as to UAE law;

(vi) Norton Rose Fulbright South Africa Inc. as to South African law;

(vii) Norton Rose Fulbright US LLP as to Marshall Islands law;

(viii) Norton Rose Fulbright US LLP as to Liberian law; and

(ix) Norton Rose Fulbright LLP as to German law,

each substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(b) If an Obligor is incorporated in a jurisdiction other than those referred to in paragraph (a) above, a legal opinion of the legal advisers to the Facility Agent in the relevant jurisdiction, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

# 6 Other documents and evidence

(a) Evidence that any process agent referred to in clause 44.2 (*Service of process*), if not an Obligor, has accepted its appointment.

(b) The Group Structure Chart.

(c) A copy, certified by an authorised signatory of the Company to be a true copy, of the Original Financial Statements of each Obligor.

(d) A letter of engagement with the Finance Parties and Secured Parties from the Auditors of the Group which will be providing Compliance Certificates.

(e) A copy of any other Authorisation or other document, opinion or assurance which the Facility Agent considers to be necessary or desirable (if it has notified the Company accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(f) Evidence that the fees, costs and expenses then due from the Company pursuant to clause 14 (*Fees*), clause 15.5 (*Stamp taxes*) and clause 19 (*Costs and Expenses*) have been paid or will be paid by the first Utilisation Date.

(g) A copy of any waiver required under any existing loan facilities of any Group member in connection with the entry into of the Finance Documents.

(h) A risk management policy as mandated by management in form and substance acceptable to the Lenders.

(i) Evidence that each Material Subsidiary has executed this Agreement as a Guarantor and that no additional Guarantors are required to accede to this Agreement pursuant to clause 29.7 (*Additional Guarantors*).

(j) Evidence that each Finance Party has satisfied its "know-your-customer" requirements in connection with the transactions contemplated by this Agreement.

(k) An overview of existing security and existing indebtedness, to the extent not refinanced or released by the Facilities.

(l) Evidence (in the form of deeds of release executed by the beneficiary of the security or such other form as the Facility Agent may require acting on the advice of legal counsel) that immediately following the making of the Utilisation any existing Security granted by any member of the Group in respect of Financial Indebtedness of any Group member (other than the Facilities) which relates to assets which may be included in the Borrowing Base and secured by the Transaction Security are released in full (including without limitation any Security in respect of the assets secured by the Moroccan Pledges and the Security Agreement and any floating charges or Security of similar general application in any jurisdiction).

(m) An overview of existing loans and guarantees.

(n) A copy of the Compliance Policy acceptable to the Lenders.

(o) A copy of the Group's hedging policy in the form approved by all Lenders.

(p) Address details for all warehouses where Eligible Inventory is located.

# Part II
# Conditions precedent required to be delivered by an Additional Obligor

1    An Accession Letter, duly executed by the Additional Obligor and the Company.

2    A copy of the constitutional documents of the Additional Obligor.

3    Originals of any Transaction Security Documents to be entered into by an Additional Borrower as required by the Facility Agent (acting on the instructions of the Majority Lenders) together with such legal opinions as the Facility Agent (acting on the instructions of the Majority Lenders) shall require in connection therewith.

4    A copy of a resolution of the board of directors of the Additional Obligor:

    (a)    approving the terms of, and the transactions contemplated by, the Accession Letter and the Finance Documents and resolving that it execute the Accession Letter;

    (b)    authorising a specified person or persons to execute the Accession Letter on its behalf;

    (c)    authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to an Additional Borrower, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents; and

    (d)    authorising the Company to act as its agent in connection with the Finance Documents.

5    A specimen of the signature of each person authorised by the resolution referred to in paragraph 4 above.

6    A copy of a resolution signed by all the holders of the issued shares of the Additional Guarantor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Guarantor is a party.

7    A certificate of the Additional Obligor (signed by a director) confirming that borrowing or guaranteeing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on it to be exceeded.

8    A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Part II of Schedule 2 is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Letter.

9    A copy of any other Authorisation or other document, opinion or assurance which the Facility Agent considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Letter or for the validity and enforceability of any Finance Document.

10    If available, the latest audited financial statements of the Additional Obligor.

11    A legal opinion of Norton Rose Fulbright, legal advisers to the Facility Agent in England.

12    If the Additional Obligor is incorporated in a jurisdiction other than England and Wales, or is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Facility Agent in the jurisdiction in which the Additional Obligor is incorporated or, as the case may be, the jurisdiction of the governing law of that Finance Document.

13    If the proposed Additional Obligor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in clause 44.2 (*Service of process*), if not an Obligor, has accepted its appointment in relation to the proposed Additional Obligor.

14    Additionally, in respect of a Spanish Obligor:

(i)    a copy of the  excerpt (certificación literal parcial) issued by the relevant Commercial Registry of incorporation of such Spanish Obligor containing the up to date by-laws, the current composition of the management body, evidencing that it is duly incorporated and validly existing and has not been dissolved, liquidated or become subject to an insolvencyproceeding.

(ii)   a resolution signed by all the holders of the issued shares in it approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party for the purposes of Article 160f) of the Spanish Companies Act.

# Part III
## Conditions precedent required to be delivered in connection with Sensitive Zones

The Facility Agent shall have entered into a valid Stock Monitoring Agreement (in respect of floating storage) and a Collateral Management Agreement (in respect of inland storage) (as applicable) with the parties thereto and the relevant Borrowers shall have provided to the Facility Agent such security documents and related legal opinions as may be required by, and in a form and substance satisfactory to, the Facility Agent (acting on the instructions of all Lenders) in respect of the relevant part of the Sensitive Zone.

# Part IV
## Spanish Pledgor conditions precedent

(b)   A copy of the constitutional documents of the Spanish Pledgor and  a copy  of  the excerpt (*certificación literal*) issued by the relevant Commercial Registry containing the up-to-date bylaws, containing the current composition of the management body, evidencing that it is duly incorporated and validly existing and has not been dissolved, liquidated or become subject to an insolvency proceeding.

(c)   If required by the Facility Agent, a copy of a signed resolution of the board of directors of the Spanish Pledgor:

(i)    approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

(ii)   authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf;

(iii)  authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

(iv)   in the case of an Obligor other than the Company, authorising the Company to act as its agent in connection with the Finance Documents.

(d)     A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(e)     A copy of a resolution signed by all the holders of the issued shares in the Spanish Pledgor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Spanish Pledgor is a party for the purposes of Article 160f) of the Spanish Companies Act.

(f)     A certificate of the Spanish Pledgor (signed by a director) confirming that securing the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(g)     A certificate of an authorised signatory of the Spanish Pledgor certifying that each copy document relating to it specified in this Part IV of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

(h)     Evidence that any existing Security granted by the Spanish Pledgor which relates to assets which may be included in the Borrowing Base and secured by the Transaction Security are released in full.

# Schedule 3
# Utilisation Request

## Part A: Loans

From:     [Aegean Marine Petroleum S.A.] [Borrower]
To:       ABN AMRO Bank N.V. as Facility Agent
Copy:     ABN AMRO Bank N.V. as Collateral Management Agent
          [list all issuing banks]

Dated:

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1    We refer to the Facility Agreement.  This is a Utilisation Request.  Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2    We wish to make a Utilisation on the following terms:

     (a)    Proposed Utilisation Date:      [      ] (or, if that is not a Business Day, the next Business Day)

     (b)    Borrower:       [       ]

     (c)    Facility to be utilised: Facility A

     (d)    Tranche to be utilised:  [Tranche 1 / Tranche 2]

     (e)    Amount:      [       ] or, if less, the Available Facility

     (f)    Currency of Loan: [dollars/euro]

     (g)    Interest Period:     [       ]

     (h)    [Term or Expiry Date:     [       ]]

3    We confirm that:

     (a)    each condition specified [in clause 4.4 (*Further conditions precedent in relation to ABGG and OBTG*) and] clause 4.2 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request; and

     (b)    each of the requirements set out in clauses 5.4(c) - (e) (*Currency and amount*) are correct as at the date of this Utilisation Request and will be correct on the Utilisation Date.

4    The proceeds of this Loan should be credited to [*account*].

5    This Utilisation Request is irrevocable.

Yours faithfully


…………………………………
authorised signatory for

[the Company on behalf of [*insert name of Borrower*]]/ [*insert name of Borrower*]

**Part B: Fronted Facilities**

From:      [Aegean Marine Petroleum S.A.] [Borrower]
To:        [ ] as Issuing Bank

Copy:     ABN AMRO Bank N.V. as Collateral Management Agent
          [list all issuing banks]

Dated:

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1     We refer to the Facility Agreement. This is a Utilisation Request. Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2     We wish to make a Utilisation on the following terms:

     (a)    Proposed Utilisation Date:    [     ] (or, if that is not a Business Day, the next Business Day)

     (b)    Borrower:    [    ]

     (c)    Facility to be utilised: [Facility B Tranche 1 / Facility B Tranche 2]

     (d)    Proposed Issuing Bank: [   ]

     (e)    Amount:    [    ] or, if less, the Available Facility

     (f)    [Beneficiary:    [     ]]

     (g)    [Term or Expiry Date:   [    ]]

     (h)    [Delivery Instructions]

3     We confirm that:

     (a)    each condition specified [in clause 4.4 (*Further conditions precedent in relation to ABGG and OBTG*) and] clause 4.2 (*Further conditions precedent*) and 5.8 (*Issue of Credit Instruments*) is satisfied on the date of this Utilisation Request; and

     (b)    each of the requirements set out in clauses 5.4(c) - (e) (*Currency and amount*) are correct as at the date of this Utilisation Request and will be correct on the Utilisation Date.

4     This Utilisation Request is irrevocable.

Yours faithfully

…………………………………
authorised signatory for

[the Company on behalf of [*insert name of Borrower*]]/ [*insert name of Borrower*]

## Schedule 4
## Form of Transfer Certificate

To:     ABN AMRO Bank N.V. as Facility Agent

From:   [*The Existing Lender*] (the **Existing Lender**) and [*The New Lender*] (the **New Lender**)

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1    We refer to the Facility Agreement.  This agreement (the **Agreement**) shall take effect as a Transfer Certificate for the purpose of the Facility Agreement.  Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2    We refer to clause 27.5 (*Procedure for transfer*) of the Facility Agreement:

   (a)    The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation and in accordance with clause 27.5 (*Procedure for transfer*) all of the Existing Lender's rights and obligations under the Facility Agreement and the other Finance Documents which relate to that portion of the Existing Lender's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

   (b)    The proposed Transfer Date is [        ].

   (c)    The Facility Office and address, email and attention details for notices of the New Lender for the purposes of clause 36.2 (*Addresses*) are set out in the Schedule.

3    The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of clause 27.4 (*Limitation of responsibility of Existing Lenders*).

4    The New Lender confirms that it [is]/[is not]*** a Parent Affiliate.

5    This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

6    This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

7    This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:     The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

---

*** Delete as applicable.

## The Schedule
### Commitment/rights and obligations to be transferred

*[insert relevant details]*
*[Facility Office address, email and attention details for notices and account details for payments,]*

[Existing Lender]                                    [New Lender]

By:                                                        By:


This Agreement is accepted as a Transfer Certificate for the purposes of the Facility Agreement by the Facility Agent and the Transfer Date is confirmed as [  ].

[Facility Agent]

By:

# Schedule 5
# Form of Assignment Agreement

To: ABN AMRO Bank N.V. as Facility Agent and Aegean Marine Petroleum S.A. as the Company, for and on behalf of each Obligor

From: [the *Existing Lender*] (the **Existing Lender**) and [the *New Lender*] (the **New Lender**)

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1   We refer to the Facility Agreement. This is an Assignment Agreement. This agreement (the **Agreement**) shall take effect as an Assignment Agreement for the purpose of the Facility Agreement. Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2   We refer to clause 27.6 (*Procedure for assignment*) of the Facility Agreement:

   (a)   The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Facility Agreement, the other Finance Documents and in respect of the Transaction Security which correspond to that portion of the Existing Lender's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

   (b)   The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitment and participations in Utilisations under the Facility Agreement specified in the Schedule.

   (c)   The New Lender becomes a Party as a Lender and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph (b) above.

3   The proposed Transfer Date is [  ].

4   On the Transfer Date the New Lender becomes Party to the relevant Finance Documents as a Lender.

5   The Facility Office and address, email and attention details for notices of the New Lender for the purposes of clause 36.2 (*Addresses*) are set out in the Schedule.

6   The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of clause 27.4 (*Limitation of responsibility of Existing Lenders*).

7   The New Lender confirms that it [is]/[is not]*** a Parent Affiliate.

8   This Agreement acts as notice to the Facility Agent (on behalf of each Finance Party) and, upon delivery in accordance with clause 27.7 (*Copy of Transfer Certificate or Assignment Agreement to the Company*), to the Company (on behalf of each Obligor) of the assignment referred to in this Agreement.

***  Delete as applicable.

9       This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

10      This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

11      This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:      The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

# The Schedule

**Commitment/rights and obligations to be transferred by assignment, release and accession**

*[insert relevant details]*
*[Facility office address, email and attention details for notices and account details for payments]*

[Existing Lender]                                                    [New Lender]

By:                                                                         By:

This Agreement is accepted as an Assignment Agreement for the purposes of the Facility Agreement by the Facility Agent and the Transfer Date is confirmed as [ ].

Signature of this Agreement by the Facility Agent constitutes confirmation by the Facility Agent of receipt of notice of the assignment referred to in this Agreement, which notice the Facility Agent receives on behalf of each Finance Party.

[Facility Agent]

By:

**Schedule 6
Form of Compliance Certificate**

To:      ABN AMRO Bank N.V. as Facility Agent

From:    Aegean Marine Petroleum Network Inc.

Dated:

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated pursuant to an amendment and restatement agreement dated [●] 2018 (the Facility Agreement)**

1     We refer to the Facility Agreement. This is a Compliance Certificate. Terms defined in the Facility Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2     We confirm that:

*[Insert details to be certified].*

3     [We confirm that no Default is continuing.]*

Signed     ……………………..        ……………………..

              Director                  Director

              of                      Of

              Aegean Marine Petroleum Network Inc.    Aegean Marine Petroleum Network Inc.

[The Auditors confirm that in making the examination necessary to provide this Compliance Certificate no knowledge was obtained of any Default arising from a breach under clause [23] (*Budget variance*) or, if any such Default shall exist, stating the nature and status of such event. *

……………………..
for and on behalf of
[*name of Auditors of Parent*]]**

**NOTES:**

*      If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.

**    To be provided only to the extent consistent with accounting industry policies generally followed by independent certified public accountants

# Schedule 7
# Timetables

|  | Utilisations in euro | Utilisations in other currencies |
|---|---|---|
| Delivery of a duly completed Utilisation Request (clause 5.1 (*Delivery of a Utilisation Request*)) – **Facility A** | U-3<br><br>9.30am | U-3<br><br>9.30am |
| Delivery of a duly completed Utilisation Request (clause 5.1 (*Delivery of a Utilisation Request*)) – **Facility B** | not applicable | not applicable |
| Facility Agent determines (in relation to a Utilisation) the Base Currency Amount of the Loan, if required under clause 5.6 and notifies the Lenders of the Loan in accordance with clause 5.6 (*Role of Facility Agent and Issuing Bank*) | U-3<br><br>Noon | U-3<br><br>noon |
| Relevant Issuing Bank notifies the Facility B Lenders of the Fronted Facility in accordance with clause 5.6 (*Role of Facility Agent and Issuing Bank*) |  |  |
| LIBOR is fixed | Quotation Day as of 11:00 a.m. in respect of LIBOR | Quotation Day as of 11:00 a.m. |

| "U" | = | date of utilisation or, if applicable, in the case of a Loan that has already been borrowed, the first day of the relevant Interest Period for that Loan. |
|---|---|---|
| "U - X" | = | X Business Days prior to date of utilisation |

# Schedule 8
## Forms of Notifiable Debt Purchase Transaction Notice

## Part I
## Form of Notice on Entering into Notifiable Debt Purchase Transaction

To:      ABN AMRO Bank N.V. as Facility Agent

From:    [*The Lender*]

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1    We refer to paragraph (b) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*) of the Facility Agreement.  Terms defined in the Facility Agreement have the same meaning in this notice unless given a different meaning in this notice.

2    We have entered into a Notifiable Debt Purchase Transaction.

3    The Notifiable Debt Purchase Transaction referred to in paragraph 2 above relates to the amount of our Commitment(s) as set out below.

| Commitment | Amount of our Commitment to which Notifiable Debt Purchase Transaction relates |
|---|---|
| Commitment | [*insert amount (of that Commitment) to which the relevant Debt Purchase Transaction applies*] |

[Lender]

By:

## Part II
## Form of Notice on Termination of Notifiable Debt Purchase Transaction / Notifiable Debt Purchase Transaction ceasing to be with Parent Affiliate

To:        ABN AMRO Bank N.V. as Facility Agent

From:    [*The Lender*]

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1    We refer to paragraph (c) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*) of the Facility Agreement.  Terms defined in the Facility Agreement have the same meaning in this notice unless given a different meaning in this notice.

2    A Notifiable Debt Purchase Transaction which we entered into and which we notified you of in a notice dated [ ] has [terminated]/[ceased to be with a Parent Affiliate].*

3    The Notifiable Debt Purchase Transaction referred to in paragraph 2 above relates to the amount of our Commitment (s) as set out below.

| **Commitment** | **Amount of our Commitment to which Notifiable Debt Purchase Transaction relates** |
|---|---|
| [Commitment | [*insert amount (of that Commitment) to which the relevant Debt Purchase Transaction applies*] |

[Lender]

By:

| Name | Registration number (or equivalent, if any) Jurisdiction of incorporation | Invoice Buyer/ LC Buyer | [Any conditions in relation to that Buyer] |
|---|---|---|---|
| | | | |
| | | | |

---

*    Delete as applicable.

# Schedule 9
# Form of Accession Letter

To:     ABN AMRO Bank N.V. as Facility Agent

From: [Subsidiary] and Aegean Marine Petroleum S.A.

Dated: [●]

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Agreement)**

1    We refer to the Agreement.  This is an Accession Letter.  Terms defined in the Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

2    [*Subsidiary*] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Agreement as an Additional [Borrower]/[Guarantor] pursuant to clauses [29.2 and 0 (*Additional Borrowers*)]/[clauses 29.7 and 29.11 (*Additional Guarantors*)] of the Agreement. [Subsidiary] is a company duly incorporated under the laws of [*name of relevant jurisdiction*].

3    [The Company confirms that no Default is continuing or would occur as a result of [*Subsidiary*] becoming an Additional Borrower.]

4    [*Subsidiary's*] administrative details are as follows:

Address:

Email:

Attention:

5    This Accession Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

This Accession Letter is entered into by deed.


…………………………….                    …………………………….

Aegean Marine Petroleum S.A.              [Subsidiary]

# Schedule 10
# Form of Resignation Letter

To:     ABN AMRO Bank N.V. as Facility Agent

From: [resigning Obligor] and Aegean Marine Petroleum S.A.

Dated: [●]

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Agreement)**

1       We refer to the Agreement.  This is a Resignation Letter.  Terms defined in the Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2       Pursuant to [clauses 29.4 and 29.5 (*Resignation of a Borrower*)]/[clauses 29.12 and 29.13 (*Resignation of a Guarantor*)], we request that [*resigning Obligor*] be released from its obligations as a [Borrower]/[Guarantor] under the Agreement.

3       We confirm that[:

        (a)     no Default is continuing or would result from the acceptance of this request; and

        (b)     no payment is due from us under the Finance Documents;

        (c)     [*where Guarantor is also a Borrower:*] we have no actual or contingent obligations as a Borrower under any Finance Document.

4       This Resignation Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.


        ……………………………                        ……………………….

Aegean Marine Petroleum S.A.                    [Subsidiary]

By:                                             By:

# Schedule 11
# Borrowing Base Amount

**1      Borrowing Base**

(a)      The **Borrowing Base** shall be calculated by

(i) multiplying the Borrowing Base Items by the Advance Rate applicable to each specific Borrowing Base Item set out below; and

(ii) deducting 85% of trade payables to suppliers based on open credit:

| Borrowing Base Items | Advance Rate |
|---|---|
| Secured Cash | 100% |
| Hedging Credit Balances | 80% |
| Tier 1 Eligible Receivables | 100% |
| Tier 2 Eligible Receivables | 95% |
| Tier 3 Eligible Receivables | 85% |
| Tier 1 Eligible Inventory | 90% |
| Tier 2 Eligible Inventory | 85% |
| Tier 3 Eligible Inventory | 85% |
| Non-Performed Letters of Credit | 85% |

; and

(iii) and, without duplication of any other Availability Reserve of other eligibility criteria, deducting any Availability Reserve.

*provided that:*

(i)      all such assets referred to above will only be included in the calculation of the Borrowing Base Amount if such assets (and any insurances or other rights in relation thereto) are:

(A)      held by a Borrower or, in the case of assets secured by the Spanish Pledges, by a Spanish Pledgor with unencumbered title;

(B)      not subject to any dispute, litigation, arbitration proceedings or threatened litigation or arbitration proceedings;

(C)      (save as expressly contemplated to the contrary in this Schedule 12 (*Borrowing Base Amount*)) subject to a fully-perfected charge, pledge or other Security granted on a first-ranking basis in favour of the Security Agent in accordance with the terms of this Agreement and the Transaction Security Documents and not otherwise subject to any set-off or Security rights in favour of any party other than the Security Agent;

(D) in respect of inventory located in the Sensitive Zone, the subject of a Stock Monitoring Agreement (for floating storage) or a Collateral Management Agreement (for inland storage);

(ii) no asset shall be eligible for inclusion in the calculation of the Borrowing Base Amount if such asset does not otherwise comply with the eligibility conditions set out in this Agreement;

(iii) no asset shall be eligible for inclusion in more than one category of the same Borrowing Base Report;

(iv) promptly following receipt of each Borrowing Base Report required to be delivered under this Agreement, if the Majority Lenders agree on the amount of the Borrowing Base, such Majority Lenders shall notify the Facility Agent in writing of such amount. If following receipt of a Borrowing Base Report required to be delivered hereunder, there is not agreement among the Majority Lenders regarding the amount of the Borrowing Base, the Majority Lenders shall notify the Facility Agent in writing that the Borrowing Base is an amount equal to the weighted average (based on Commitment amount) of the amounts determined by each Lender for the Borrowing Base; and

(v) notwithstanding any other provision of this Agreement, in the event the Facility Agent (acting on the instructions of the Majority Lenders) imposes any changes to the Borrowing Base Items or Availability Reserves as a result of changing or reducing credit limits imposed on any account debtor, such changes (i) shall be effective two (2) Business Days following written notice thereof to the Borrower (it being agreed any Eligible Receivables created after such notice in excess thereof, may be excluded from the Borrowing Base) and (ii) shall not apply to any Eligible Receivables in existence as of the date of imposition of such change.

## 2 Reserves

Notwithstanding any other provision of this Agreement, the Facility Agent (on the instructions of the Majority Lenders) may at any time and from time to time after two (2) Business Days' prior written notice, establish and increase or decrease the Availability Reserve in the exercise of its Permitted Discretion. The Availability Reserve shall not duplicate eligibility criteria contained in the definition of Tier 1 Eligible Receivables or Tier 1 Eligible Receivables.

## 3 Definitions

Terms used in this Schedule 11 (*Borrowing Base Amount*) have the following meanings:

**Advance Rate** means each rate referred to in the second column of the table set out in paragraph 1(a) (*Borrowing Base*) above

**Approved Barge Territory** means Gibraltar and any other jurisdiction as may be approved in writing by the Facility Agent (acting on the instructions of Majority Lenders) to the Company from time to time

**Availability Reserve** means reserves in such amounts as the Facility Agent in its Permitted Discretion, upon the written instruction of the Majority Lenders in the exercise of such Permitted Discretion, and with two (2) Business Day's prior written notice to the Borrower (and the Facility Agent (acting on the instructions of the Majority Lenders) shall be available to discuss any such reserves with the Borrower), may elect to impose from time to time as being appropriate to (i) reflect the impediments to the Facility Agent's ability to realize upon the Transaction Security, (ii) to reflect claims and liabilities, including liens and claims that may have (or may appear to have hereafter) priority over that of the Finance Parties, that the Facility Agent determines will need to be satisfied in connection with the realization upon the Transaction Security, (iii) reflect the risk that a jurisdiction outside the United States does not give extraterritorial application of orders of the Bankruptcy Court, including (without limitation) with respect to perfection or priority

of Security on assets in the Borrowing Base established by order thereof, or (iv) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, the Transaction Security, the creation, perfection or priority of Security over Borrowing Base assets (or proceeds thereof), or the validity or enforceability of the Finance Documents or any remedies of the Secured Parties hereunder or thereunder, including (without limitation) matters related to the quality of inventory, rents and costs, taxes, senior obligations and other matters related to the calculation of the Borrowing Base

**Borrowing Base Item** means each item referred to in the first column of the table set out in paragraph 1(a) (*Borrowing Base*) above

**Credit Insurance** means credit insurance taken out with an insurer or insurers which has a rating for its long-term unsecured and non-credit-enhanced debt obligations of BBB- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or Baa3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency

**Eligible Inventory** means inventory representing a marked to market value (based on West Med FOB/CIF prices in Argus, Platts or any other pricing acceptable to the Lenders) up to a maximum amount before applying the Advance Rate of:

(a)     $100,000,000 per location; and

(b)     $350,000,000 in total,

or any other maximum amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Eligible Receivables** means trade receivables (excluding receivables owing from another member of the Group) which are governed by English, Greek or Belgian law (or any other governing law approved by the Facility Agent) and are payable into a Collection Account representing:

(a)     a nominal face value owing to the Borrowers up to a maximum amount before applying the Advance Rate per counterpart of $20,000,000, other than trade receivables in relation to:

(A) such entities notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company from time to time at such limits applicable to those entities as the Facility Agent (acting on the instructions of the Majority Lenders) may in its sole discretion apply; and

(B) Majors, for which the maximum amount in aggregate for a Listed Oil Major, its wholly-owned Subsidiaries and its Subsidiaries which are not wholly-owned but the obligations in respect of which are guaranteed by a parent company guarantee from such Listed Oil Major, shall be $40,000,000; and

(b)     a maximum tenor of:

(i)     if non-invoiced, invoices must be dispatched within five (5) Business Days of the physical delivery date; or

(ii)     if invoiced, sixty (60) days (such tenor being made up as follows: payment terms within forty five (45) days of the date of invoice (**Due Date**), with a grace period of no more than fifteen (15) days from the Due Date),

or any other maximum amount and maximum tenor from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Hedge Account** means an account held by the Company with a Hedging Provider or a Clearing Provider for the purpose of financing margin calls (and collecting margin returns and settlement amounts) and which is subject to the Transaction Security.

**Hedging Credit Balances** means any sum of cash (being in respect of margin calls) standing to the credit of a Hedge Account as an amount that is returnable after unwinding of, and payment of all amounts due from the Company under, Hedging Agreements.

**Inventory in Transit** mean inventory on board vessels:

(a)   for which bills of lading (comprising documents of title) are issued and endorsed in favour of (and in the possession of) the Security Agent and

    (i)   are in the possession of the Security Agent; or

    (ii)   have been deposited with a reputable international courier for delivery to the Security Agent (and the Security Agent has been provided with evidence satisfactory to it of the same); and

(b)   for a maximum tenor of forty-five (45) days from the bill of lading date for which original bills of lading are issued or endorsed in favour of the Security Agent.

**Listed Oil Major** means:

(a)   BP p.l.c.;

(b)   Chevron Corporation;

(c)   ConocoPhillips Co.;

(d)   ExxonMobil Corporation;

(e)   Royal Dutch Shell plc; and

(f)   Total S.A.

**Major** means:

(a)   a Listed Oil Major;

(b)   a Listed Oil Major's wholly-owned Subsidiaries;

(c)   any Subsidiaries of a Listed Oil Major that is not a wholly-owned Subsidiary but the obligations in respect of which are guaranteed by a parent company guarantee from such Listed Oil Major; and/or

(d)   any other debtor approved by the Facility Agent acting on the instructions of the Majority Lenders,

provided that the Facility Agent (acting on the instructions of the Majority Lenders) may from time to time by three Business Days' notice to the Company exclude any such debtor

**Non-Performed Letters of Credit** means a Credit Instrument in the form of a documentary or standby letter of credit in respect of which the relevant underlying physical transaction relating to the sale and purchase of oil products is yet to occur

**Permitted Discretion** means a determination made by the Majority Lenders in good faith and in the exercise of reasonable (from the prospective of a secured asset-based lender) business judgment exercised in accordance with its customary practices in asset-based credit facilities

**Secured Cash** means cash funds deposited in a Collection Account

**Tier 1 Eligible Receivables** means:

(a)     VAT refund claims (*Steuervergütungsansprüche*) against the competent tax authority (*zuständige Finanzbehörde*) in the Federal Republic of Germany; and

(b)     invoiced Eligible Receivables:

    (i)      covered by a letter of credit issued or confirmed by an Acceptable Bank; or

    (ii)     on open account for Majors; or

    (iii)    meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company with at least two (2) Business Days prior written notice to the Borrowers (and during such time the Facility Agent (acting on the instructions of the Majority Lenders) shall be available to discuss such changes)

**Tier 2 Eligible Receivables** means invoiced Eligible Receivables on open account for non-Majors or meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Tier 3 Eligible Receivables** means non-invoiced Eligible Receivables up to a maximum amount before applying the Advance Rate of $90,000,000 in total or any other amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Tier 1 Eligible Inventory** means Eligible Inventory:

(a)     located in an OECD country;

(b)     subject to perfected Security in favour of the Security Agent; and

(c)     excluding floating inventory; or

(d)     meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company with at least two (2) Business Days prior written notice to the Borrowers (and during such time the Facility Agent (acting on the instructions of the Majority Lenders) shall be available to discuss such changes)

**Tier 2 Eligible Inventory** means:

(a)     Eligible Inventory other than Tier 1 Eligible Inventory which is:

    (i)      onshore, subject to perfected Security in favour of the Security Agent;

    (ii)     Inventory in Transit (excluding inventory on barges);

    (iii)    secured floating inventory (excluding inventory on barges) for which bills of lading (comprising documents of title) are issued or endorsed in favour of (and in the possession of) the Security Agent;

    (iv)     inventory on barges if located in territorial waters of an Approved Barge Territory;

    (v)      inventory on barges where such inventory is secured under a German Security Transfer Agreement prior to loading onto such barge and where such barge has remained in German territorial waters or international waters and has not entered the territory of any other jurisdiction;

(vi) inventory on barges where such inventory is secured under a South African Pledge and located on a barge which is the subject of a South African Pledge where such barge has remained in South African territorial waters; or

(vii) inventory on barges where such barges remain at all times in international waters; and

(b) Eligible Inventory which is subject to a perfected South African Pledge and provided that the floating storage in relation to the South African Pledge is located within South African territorial waters; or

(c) meets any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company,

and in aggregate up to a maximum amount before applying the Advance Rate of $25,000,000 in total or any other amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Tier 3 Eligible Inventory** means Eligible Inventory:

(a) other than Tier 2 Eligible Inventory;

(b) including unsecured floating inventory for which bills of lading are not issued or endorsed in favour of the Security Agent; and

(c) up to a maximum amount before applying the Advance Rate of $30,000,000 in total or any other amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company; or

(d) meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Inventory locations**

For the purposes of this Schedule 11 (and without prejudice to any of the foregoing):

(a) where inventory is located in a particular jurisdiction or in its territorial waters, it shall only be considered capable of being "secured" (ie capable of being included in the Borrowing Base, subject to the other conditions for inclusion in respect thereof) if it is located in one of the following jurisdictions or any other jurisdiction as may be approved in writing by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company from time to time; and

(b) in relation to any such jurisdiction the permitted locations/barges, conditions and limits set out below shall apply,

and each Borrowing Base Report shall include all relevant details identifying such jurisdictions and conditions. Where permitted locations or barges are identified, the same may be amended or supplemented from time to time at the request of the Company and subject to the prior written consent of the Facility Agent (acting on the instructions of the Majority Lenders)

| Jurisdiction | Permitted Location | Permitted Barges | Other specific conditions for inclusion in the Borrowing Base |
| --- | --- | --- | --- |
| Spain | Subject to clause 24.25 (*Conditions Subsequent*) | | |
| Germany | Midgardstraße 50, 26954 Nordenham, Germany with Rhenus | Not limited to specific barges (subject to | Subject to clause 24.25 (*Conditions* |

| | | paragraph (a) (v) of the definition of "Tier 2 Eligible Inventory") | *Subsequent*) |
|---|---|---|---|
| | Midgard GmbH & Co. KG<br><br>Alter Rethedamm 2, 21107 Hamburg, Germany with Vopak Dupeg Terminal Hamburg GmbH<br><br>Uferstraße 48, 24106 Kiel, Germany with UTG Unabhängige Tanklogistik GmbH (from 1 January 2018) | | |
| Morocco | Horizon Terminals Tangiers facility located in Tanger Med Port, Morocco: Free Zone, Ksar Majed, Tanger Med, Tanger 90000, Morocco | n/a | n/a |
| UAE | Each tank identified in Schedule 1 (*Initial Pledged Assets*) of each UAE Pledge and or, following the date hereof, such tank or tanks as is or are identified in any Holding Certificate, Additional Pledged Assets Notice or Transfer Certificate, as relevant (each as defined in the UAE Pledges), and in each case forming part of the Aegean Oil Terminal located in the Fujairah Free Zone (FOIZ), Al Sudah, PO BOX 2688, Emirate of Fujairah, UAE | n/a | n/a |
| South Africa | FLOATING STORAGE UNIT "MT UMNENGA I" which is the subject of a South African Pledge, whilst in South African territorial waters | Subject to paragraph (a) (vi) of the definition of "Tier 2 Eligible Inventory" – which is limited to specific barges identified in the security. | Subject to clause 24.25 (*Conditions Subsequent*) |
| Gibraltar | n/a | Not limited to specific barges. | n/a |

## Schedule 12
## Form of Borrowing Base Report



FX Rates:
EUR/USD    1.17270
GBP/USD
USD/SGD

**Borrowing Base Certificate in USD**

As of    [Date]

| ASSETS | | Limits & CAPs | Gross Collateral Before CAP | Gross collateral After CAP | Advance Rate | Net Collateral |
|---|---|---|---|---|---|---|
| **Eligible Cash** | | | $ 54,245,744 | 54,245,744.22 | 100% | 54,245,744.22 |
| Secured Cash held by the Account Bank | | | $ - | $ - | 100% | - |
| Hedging Credit Balances | | | $ - | $ - | 80% | - |
| **Eligible Receivables** | | | | | | |
| **Tier1 Eligible Receivables** | | | | | | |
| Trade receivables covered by documentary or standby L/C | | | $ - | $ - | 100% | - |
| Trade receivables from open account sales to Majors | Max: | $ 40,000,000 | $ 7,154,224 | 7,154,224 | 100% | 7,154,223.82 |
| **Tier2 Eligible Receivables** | | | | | | |
| Trade Receivables from Approved Debtors | | | $ 62,548,400 | $ 62,548,400 | 95% | 59,420,980.32 |
| Trade Receivables from open account sales to other non-Majors | | | $ 179,433,784 | $ 179,433,784 | 95% | 170,462,094.99 |
| **Tier3 Eligible Receivables** | Max: | $ 90,000,000 | | | | |
| Not yet invoiced receivables | | | $ 5,762,608 | $ 5,762,608 | 85% | 4,898,216.70 |
| **Eligible Inventory** | Max: | $ 350,000,000 | | | | 166,035,350.23 |
| **Tier1 Eligible Inventory** | | | | | | |
| Inventory Shoretank located in OECD country | | | $ 11,435,012 | $ 11,435,012 | 90% | 10,291,510.80 |
| **Tier2 Eligible Inventory** | | | | | | |
| Inventory Shoretank located in Non OECD country | | | $ 75,877,326 | $ 75,877,326 | 85% | 64,495,727.42 |
| Inventory in Transit (BLs to the order of the Security Agent) | | | $ 68,423,397 | $ 68,423,397 | 85% | 58,159,887.26 |
| Floating Storage | | | $ 21,227,210 | $ 21,227,210 | 85% | 18,043,128.32 |
| Total: | Max: | $ 250,000,000 | $ 165,527,933 | $ 165,527,933 | 85% | 140,698,743.00 |
| **Tier3 Eligible Inventory** | | | | | | |
| Inventory on Barges (no BLs) | Max: | $ 30,000,000 | $ 25,075,161 | $ 25,075,161 | 60% | 15,045,096.42 |
| (SB)LCs opened but not yet performed | | | 62,000,000.00 | | 80% | 49,600,000.00 |
| **Trade Payables (Deducted)** | | | 1,073,632.96 | | 85% | 912,588.01 |
| **GROSS / NET BORROWING BASE AMOUNT** | | | 117,319,377.18 | | | 270,793,682.46 |

| LIABILITIES | | Limits & CAPs | Gross Colateral | | Advance Rate | Net Collateral |
|---|---|---|---|---|---|---|
| **Facility A Utilisation** | Max: | $ 200,000,000 | | | | - |
| Loans | | | $ - | | 100% | $ - |
| **Facility B Utilisation** | Max: | $ 550,000,000 | | | | |
| Overdraft | | | | | | |
| Overdraft | | | $ - | | 100% | $ - |
| Credit Instruments | | | | | | |
| Letter of Credit | | | $ 52,000,000 | | 100% | $ 52,000,000 |
| Bank Guarantees | | | $ 96,000,000 | | 100% | $ 96,000,000 |
| **TOTAL OUTSTANDING** | | | - | | | 148,000,000.00 |
| **FACILITY EXCESS / (SHORTFALL)** | | | | | | 122,793,682.46 |

Place, Date:     Piraeus, [Date]

Signature:

Function:

Company:



**Schedule 13**
**Approved Suppliers**

BP p.l.c. and its wholly-owned subsidiaries (directly or indirectly)

Royal Dutch Shell plc and its wholly-owned subsidiaries (directly or indirectly)

Glencore PLC and its wholly-owned subsidiaries (directly or indirectly)

Mercuria Energy Group Ltd and its wholly-owned subsidiaries (directly or indirectly)

Trafigura Beheer BV and its wholly-owned subsidiaries (directly or indirectly)

Vitol Holding B.V. and its wholly-owned subsidiaries (directly or indirectly)

# Schedule 14
## Permitted Financial Indebtedness

1. Trade Receivables Purchase Agreement, dated as of March 30, 2016, among Aegean Bunkering (USA) LLC, a Delaware limited liability company, as seller, Deutsche Bank AG, New York Branch, as a purchaser and documentation agent and Deutsche Bank Trust Company Americas, as a purchaser, in the amount of $31,000,000.

2. Amended and Restated Trade Receivables Purchase Agreement, dated as of November 13, 2015, among Aegean Marine Petroleum S.A., a corporation organized under the laws of Liberia, as seller, Deutsche Bank AG, New York Branch, as a purchaser and documentation agent and Deutsche Bank Trust Company Americas, as a purchaser, as further amended and restated on November 14, 2016 and November 14, 2017 in the amount of $40,000,000.

3. Indenture, dated as of December 19, 2016, among Aegean Marine Petroleum Network Inc., a corporation organized under the laws of the Marshall Islands, as issuer, and U.S. Bank National Association, as trustee, in the amount of $172,500,000.

4. Senior Indenture, dated as of October 23, 2013, among Aegean Marine Petroleum Network Inc., a corporation organized under the laws of the Marshall Islands, as issuer, and Deutsche Bank Trust Company Americas, as trustee, in the amount of $132,050,000.

5. 2005 Newbuilding Secured Syndicated Term Loan, dated as of October 1, 2006, by and among Kithnos Maritime Inc., Lefkas Marine S.A., Paros Maritime Inc., Santorini Maritime Limited, and Serifos Shipping (Pte.) Ltd, as Borrowers, Aegean Bunkering Services Inc., Aegean Marine Petroleum Network Inc., Aegean Shipholding Inc. and Tempest Shiptrade Ltd., as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A , as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $35,500,000.

6. 2006 Newbuilding Secured Term Loan, dated as of October 1, 2006, by and among Kerkyra Marine S.A., Ithaki Marine S.A., Cephallonia Marine S.A., Paxoi Marine S.A., Zakynthos Marine S.A., Kythira Marine S.A. and Lefkas Shipping (PTE.) LTD., as Borrowers, Aegean Marine Petroleum Network Inc., Aegean Shipholdings Inc., Aegean Breeze Maritime Company and Aegean Tiffany Maritime Company, as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A , as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $64,750,000.

7. Second 2006 Newbuilding Secured Term Loan, dated as of October 27, 2006, by and among Tasman Seaways Inc., Santon Limited, as Borrowers, Aegean Marine Petroleum Network Inc., Aegean Bunkering Services Inc., as Guarantors, and National Bank of Greece S.A., as Lender and Agent, in the amount of $17,600,000.

8. Third 2006 Newbuilding Secured Term Loan, dated as of October 27, 2006, by and among Eton Marine LTD., Benmore Services S.A. and Ingram Enterprises Co., as Borrowers, Aegean Shipholdings Inc. and Aegean Marine Petroleum Network Inc., as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A., as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $26,250,000.

9. 2007 Newbuilding Secured Term Loan, dated as of July 5, 2007, by and among Andros Marine Limited, Dilos Marine Inc., Aegean VII Shipping Ltd, Ios Shipping Ltd and Sifnos Marine Inc., as Borrowers, Aegean Marine Petroleum Network Inc., as Guarantor, and Orix Investment and Management Private Ltd. (successor to The Royal Bank of Scotland) as Lender and Agent, in the amount of $37,560,000.

10. 2008 Newbuilding Secured Term Loan, dated as of April 24, 2008, by and among Kassos Navigation S.A., Symi Navigation S.A., Halki Navigation S.A. and Tilos Shipping (PTE.) LTD., as Borrowers, Aegean Marine Petroleum Network Inc. and Aegean Shipholdings Inc., as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A , as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $38,800,000.

11. 2017 Secured Term Loan, dated as of November 30, 2017 Aegean Bunkering Services Inc., as Borrower, Amorgos Maritime Inc., Kimolos Maritime Inc., Milos Shipping (Pte.) Ltd., Mykonos I Maritime Limited, Tinos Marine Inc. and Aegean Marine Petroleum Network Inc., as Guarantors, and Piraeus Bank S.A., as Lender and Agent, in the amount of $15,000,000.

12. 2015 Fujairah Credit Facility, dated as of October 7, 2015, by and among Aegean Oil Terminal Corporation, as Borrower, Aegean Marine Petroleum Network Inc., as Guarantor, United Arab Bank P.J.S.C., Abu Dhabi Commercial Bank P.J.S.C., Commercial Bank of Dubai psc and National Bank of Oman S.A.O.G., Dubai Branch, as Lenders, and United Arab Bank P.J.S.C., as Agent, in the amount of $440,000,000.

13. 2017 South Africa Credit Facility, dated as of November 20, 2017 by and among Aegean Bunkering Services Inc. and Nevado Navigation S.A., as Borrowers, Aegean Ship III Maritime Company, Aegean Ship VIII Maritime Company, Aegean Ace Maritime Company, Aegean Tanking S.A., Aegean Marine Petroleum Network Inc. and Aegean Management Services M.C., as Guarantors, Piraeus Bank S.A., as Lender and Agent, in the amount of $12,500,000.

14. Loan Agreement, dated as of September 7, 2018, by and among Aegean Marine Petroleum S.A., Aegean Marine Petroleum Network Inc., I.C.S. Petroleum Limited and Mercuria Energy Trading S.A, in the amount of $5,000,000.

15. Letter of Credit, dated as of October 16, 2018, in the amount of $5,000,000 issued by Sumitomo Mitsui Banking Corporation with Aegean Bunkering (USA) LLC as the beneficiary and Toyota Tsusho Petroleum PTE. LTD as applicant.

16. Letter of Credit, dated as of October 30, 2008, in the amount of $2,000,000 issued by Sumitomo Mitsui Banking Corporation with Aegean Marine Petroleum SA as the beneficiary and Toyota Tsusho Petroleum PTE. LTD as applicant with an expiration date of January 29, 2019.

17. Letter of Guarantee, dated as of January 12, 2018, in the amount of €3,000,000 with Aegean Bunkering Germany as the beneficiary and an expiration date of January 31, 2019.

18. Letter of Guarantee, dated as January 12, 2018, in the amount of €3,000,000 with Obast Bunkering & Trading GMBH as the beneficiary and an expiration date of January 31, 2019.

19. Letter of Credit, dated as December 28, 2017, in the amount of $2,580,000 with Obast Bunkering & Trading GMBH as the beneficiary and an expiration date of February 7, 2019.

20. Letter of Credit, dated as June 26, 2018, in the amount of $4,000,000 with Aegean Marine Petroleum as the beneficiary and an expiration date of January 31, 2019.

21. Letter of Credit, dated as October 25, 2018, in the amount of $1,223,200 with Aegean Marine Petroleum as the beneficiary and an expiration date of November 30, 2018.

22. Letter of Credit, dated as August 27, 2018, in the amount of $7,920,000 with Aegean North West Europe NV as the beneficiary and an expiration date of December 18, 2018.

23. Letter of Credit, dated as August 30, 2018, in the amount of $1,815,000 with Aegean North West Europe NV as the beneficiary and an expiration date of January 31, 2019.

24. Letter of Credit, dated as of November [1], 2018, issued by ABN AMRO Capital in the amount of $803,000 with PBF Holding Company LLC as the beneficiary and Aegean Bunkering (USA) LLC as the applicant with an expiration date of November 29, 2018.

# Schedule 15
## Form of New Lender Spanish Power of Attorney


### POWER OF ATTORNEY

**APPEARS**

Mr., [❉] as stated by the appearing party, acting in the name and on behalf [❉], an entity incorporated under the laws of [❉], having its registered office in [❉] registered and filed before [❉] (hereinafter, the "**Grantor**").

**GRANTS**

Grantor grants a Power of Attorney (hereinafter referred as the "**Power of Attorney**"), as wide as sufficient in law might be necessary, in favour of **ABN AMRO Bank N.V.,** a public company with limited liability duly organised and existing under the laws of the Netherlands having its registered office in Amsterdam at [at Gustav Mahlerlaan 10, 1082 PP] and registered at the Chamber of Commerce with number 34334259, that may act through its own attorneys (hereinafter, the "**Attorney**" or the "**Security Agent**") so that acting jointly and severally as, with its sole signature, any time, in connection with the financing executed between, among others, ABN AMRO Bank N.V.as security agent, ABN AMRO Bank N.V.as facility agent, and lender ("**Facility Agent**" and "**Lender**"), Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH and Obast Bunkering & Trading GmbH as borrower (the "**Borrowers**"), the Borrowers and Aegean Marine Petroleum Network Inc. as guarantors (the "**Guarantors**" and jointly with the Borrower, the "**Obligors**") for an amount up to [●] (the "**Facility Agreement**"), in the name and on behalf of the Grantor may perform any of the following authorities, even if entering in self-contracting (*auto-contratación*), multiple representation or conflict of interests and including expressly the authority of substitution:

1. Ratify and formalise the Facility Agreement as a Spanish notarial document.

2. Sign, grant, ratify and/or execute as Spanish notarial document, in the terms and conditions that the Attorney may deem appropriate, a non-possessory pledge over non-fixed assets (including but not limited to stocks, chattels, inventory and raw materials) in favour of the Grantor as lender under the Facility Agreement, and accept the creation of any such pledge in the name and on behalf of the Grantor.

3. Sign, grant, ratify and/or execute as Spanish notarial document, in the terms and conditions that the Attorney may deem appropriate, one or several assignment agreements to be entered into with any third party (either as assignor or assignee) in relation with the Facility Agreement and the Non-Possesory pledge referred to in the preceding paragraphs.

4. Sign, grant, ratify and/or execute as Spanish notarial document, any agreement or document for the amendment, rectification or clarification of any of the documents referred to above.

5. Appear and file any private and/or notarial documents before any private or public entity, as well as Public Registry, public administration, registries, consulates or tax administration, for its recording or validation (including its novation, assignments and amendments), and file and/or pay any tax or registry fees related to the granting, formalisation, execution, and registration of the documents and/or agreements described in the above paragraphs.

6. Act, appear before and disclose information to any authority or body of the Spanish or foreign public administration, state, provincial, municipal or regional agency, court of justice or any other public body of a civil, criminal, administrative or labour nature, to obtain all manner of permits or licenses and to make all such notifications as may be required by the applicable legislation

concerning the transactions included in the documents referred to above, and, in particular, but not limited to, the Bank of Spain ("Banco de España") and the Spanish Revenue ("Agencia Estatal de la Administración Tributaria") or any tax authorities, in order to execute, deliver and file, in the name and on behalf of Grantor, any document, statement, payment, application or official forms (including those of a tax nature) that may be necessary or advisable for the fulfilment of, or in connection with, any of the transactions, actions, faculties, agreements or documents foreseen in this power and any other ancillary measures required for the full and complete fulfilment of the powers hereby granted (including the granting of the final shareholder statement).

7. In order to obtain and/or renew the Foreign Identification Number ("Número de Identificación de Extranjero"), carry out before the Spanish Revenue or any other institutions, as many actions which may be deemed necessary or convenient to obtain it, and for these effects sign any documents or forms needed, and in special fulfil the 036 form and designate the Grantor's address in Spain, sign and execute all documents, either notarial or private, that may be deemed necessary or convenient for this purpose and appear before the Spanish Revenue or any other institutions, trustees or any others.

8. Enforce any personal guarantee, right "in rem" security as well as any undertakings to grant any personal guarantee or right "in rem" security granted in favour of the Grantor as security for the Facility Agreement, including but not limited to, any actions that they may deem necessary for the purposes of enforcement, such as making and submitting demands for payment, claims, notices, liquidations, announcements, issuing certifications, requesting certified first copies of documents (notarial or otherwise), appointing counsel and court-attorneys, initiating auctions and any type of enforcement action (in court or out of court) and appearing before any relevant notary public or court of jurisdiction.

9. Appear before any courts, appellate courts and other ordinary or special courts, at any instance and in any order of jurisdiction, and before any other authority, judges, public prosecutor's office, notary's office, public registry, tax office or tax agency, or government office or officer; and thereat to file, conduct and terminate, acting either as claimant or defendant, all kinds of court or out-of court actions and proceedings relating to the Facility Agreement and the security documents entered into in relation to it.

10. The above authorities, in all or in part, may be delegated or substituted in favour of any third person that the Attorneys may deem convenient.

In WITNESS WHEREOF this Power of Attorney has been executed as a deed by the Grantor and is intended to be effective and is hereby delivered on the date of the Notarial Certificate below and shall be in force until [✱] unless it is revoked prior to such date.

In witness thereof this Power of Attorney is granted.

I have informed the attendant of his right to read this document himself, and I proceed to read this document aloud with his tacit consent.

This Power of Attorney is governed by and construed in accordance with the laws of [☐].

He states that he is aware of its contents and ratifies it in all its provisions, signing the same with me.

In [✱], on [✱].

[*Grantor's corporate name*]


_____

Mr. [✱]

Office: [✱]

# **NOTARIAL CERTIFICATE**

I, the undersigned, Notary Public in [      ], on this [      ] day of [      ] of 20[ ], do hereby certify that:

1. [Grantor's corporate name] is a [      ] incorporated in accordance with the laws of [   ], having its registered office in [          ] at [     ] and registered under number [  ], , and with sufficient capacity for the granting this power of attorney.

2. [     ] is authorised and has the capacity to grant the above power of attorney in the name and on behalf of [Grantor's corporate name] according to the laws of [       ], according to the laws of the incorporation of the Grantor, its constitutional documents, by-laws and other corporate documents.

3. The signature of [     ] in this document is authentic.

4. This power of attorney constitutes a legally valid and binding document and all actions undertaken by the attorneys-in-fact nominated herein within the scope of the power shall be legally valid and binding on [Grantor's corporate name].

WITNESS, I sign this power of attorney and stamp my official seal


Place: [✻]

Date: [✻]

Signature: [✻]

# Schedule 16
## Form of Deed of Undertaking

**THIS DEED** is made this [**] day of [**].

**Between**

1. [**Third party**], a company incorporated in [•] (Registration No. [**]) and having its registered office at [**] (the "**Applicant**"); and

2. [**AEGEAN MARINE PETROLEUM S.A. / AEGEAN PETROLEUM INTERNATIONAL INC. / AEGEAN NWE N.V. / AEGEAN BUNKERING GERMANY GMBH / OBAST BUNKERING & TRADING GMBH**], a company incorporated in [**] (Registration No. [**]) and having its registered office at [**](the "**Obligor**")

**in favour of:**

3. [**Relevant Issuing Bank**], a company incorporated in [**]and having its registered office at [**] (the "**Issuing Bank**").

**WHEREAS**:

(A) Issuing Bank, amongst others, has granted to Obligor, amongst others, certain facilities pursuant to a facility agreement for a borrowing base facility dated 30 November 2017 as amended and restated on [●] 2018 (any of or all of such facilities shall hereinafter be referred to as the "**Facilities**").

(B) Applicant and Obligor intend to jointly and severally authorise, empower and request Issuing Bank to issue a documentary letter of credit under, and subject to the terms and conditions of, the Facilities from time to time in favour of [**], subject to the approval of Issuing Bank at its absolute discretion (the "**Letter of Credit**").

(C) At all times, (i) as between the Obligor and the Issuing Bank, the responsibility and liability of any Letter of Credit in name of the Applicant shall rest with Obligor; and (ii) as between the Applicant and the Issuing Bank, the Applicant shall indemnify Issuing Bank in respect of any liabilities arising from any Letter of Credit.

**NOW THIS DEED WITNESSES AS FOLLOWS**:

1. Obligor herewith instructs Issuing Bank to indicate in the Letter of Credit the full name and address of Applicant if so indicated by Obligor in its requests to the Issuing Bank to issue Letter of Credit, rather than the full name and address of the Obligor itself as applicant, such however under the full responsibility and financial liability of the Obligor and under, and subject to the terms and conditions of, the Facilities.

2. Obligor undertakes to Issuing Bank that the Letter of Credit in the name of the Applicant shall be issued at the full risk, responsibility and financial liability of Obligor and consequently authorises Issuing Bank to debit (i) upon issuance of a Letter of Credit the liability account in in the name of Obligor in the books of Issuing Bank with the full amount of the Letter of Credit, and (ii) upon Letter of Credit settlement(s) the current account of Obligor in the books of the Issuing Bank for the full amount of each settlement.

3. Applicant herewith gives notice to Issuing Bank that it shall not have at any time any claim, right or demand or any pretension of any nature whatsoever against Issuing Bank in relation to the Letter of Credit, and herewith irrevocably instructs and authorises Issuing Bank and consents to the same:

   (a) to indicate its full name and address as applicant in the wording of the Letter of Credit as instructed by Obligor;

   (b) to follow the instructions of Obligor to amend the Letter of Credit without any obligation on the part of Applicant and without its further instructions or confirmation;

(c) to carry out all other instructions from Obligor in all matters related to the Letter of Credit;

(d) to address all correspondence relative to the Letter of Credit directly to Obligor;

(e) to handle and dispose the original shipping documents related to the Letter of Credit in accordance with the instructions of Obligor and to endorse the relevant bills of lading as per the instructions of Obligor to the order of any entity nominated by Obligor; and

(f) to act as its Attorney-in-Fact, in respect to endorsement of bills of lading (or other documents) under the Letter of Credit and authorises Issuing Bank to endorse the same, where applicable, to the order of any entity nominated to Issuing Bank by Obligor or as otherwise may be necessary to enforce security rights.

4. Applicant herewith expressly confirms (a) that this Deed is to be deemed as irrevocable on the part of the Applicant and that it has no right whatsoever to amend the same and (b) that it has no rights, or relinquishes, renounces and/or forfeits any and all of its rights to interest in and any claims in respect of:
   (a) the relevant material purchased under the Letter of Credit (the "**Material**");

   (b) the receivable(s) arising from the sale of such material (the "**Receivables**"); and

   (c) the proceeds arising from collection of any Receivables.

5. Applicant herewith further expressly agrees that the Material, the Receivables and the proceeds thereof, will only belong to Obligor, or to ABN AMRO Bank N.V. as security taker of Obligor's property rights and Applicant hereby acknowledges the security interest of ABN AMRO Bank N.V. in the Material, the title documents covering the Material, the Receivables and the proceeds arising from collection of the Receivables.

6. Applicant herewith further expressly confirms that, immediately after payment of the Letter of Credit, no third party other than Obligor or ABN AMRO Bank N.V. as security taker of Obligor's property rights will have any rights and or interest of any nature whatsoever regarding any part of the Material or any part of the Receivables and proceeds thereof and/or the title with respect to the same.

7. Obligor and Applicant agree and accept that the issuance of the Letter of Credit and any amendment thereof shall at all times be subject to Issuing Bank's absolute discretion.

8. Neither Obligor nor Applicant shall make any claim that it has, may have or may have had against Issuing Bank, whether directly or indirectly, in connection to any Letter of Credit, or to the issuance or non-issuance of the Letter of Credit by the Issuing Bank.

9. Each of Applicant and Obligor hereby jointly and severally irrevocably and unconditionally undertake to indemnify Issuing Bank and to keep Issuing Bank indemnified fully and completely against all claims and demands actions and proceedings, losses, damages, costs and expenses including legal costs on a full indemnity basis and all other liabilities of whatsoever nature and description which may be made, taken, incurred or suffered by Issuing Bank as a result of acting in accordance with this Deed and the above mentioned instructions.

10. Applicant represents and warrants to Issuing Bank that:

   (a) Capacity: it (i) is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation; (ii) has the power to own its assets and carry on its business as it is being conducted; and (iii) has duly executed and delivered, and has all requisite power, authority and approvals to enter into and perform its obligations under, this Deed;

   (b) Authority: it has, and any person designated by it has, and it and they will at all times have, due authorisation to act in all respects in relation to this Deed;

   (c) Validity: this Deed is a valid and legally binding obligation, enforceable against it in accordance with its terms except for the effect of bankruptcy, insolvency, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally;

(d) Insolvency etc.: no bankruptcy, receivership, judicial management, winding up or liquidation notice, petition or analogous insolvency proceeding has been threatened or filed against it in any jurisdiction; and

(e) Violations: its execution, delivery and performance of this Deed does not and will not violate, contravene, conflict with or constitute a default under any provision of its memorandum and articles of association (or equivalent constituent documents) or any law, regulation, rule, decree, order, judgement or charge, contract, trust deed or other instrument binding on it or any of its assets.

11. Neither the Applicant nor the Obligor, nor any of their respective directors, officers or employees nor, to the knowledge of the Applicant or the Obligor, any persons acting on any of their behalf:

    (a)    is a Prohibited Person;

    (b)    is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person;

    (c)    owns or controls a Prohibited Person;

    (d)    is in breach of Sanctions; or

    (e)    has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority; or

    (f)    shall permit present any business or transaction to the Issuing Bank that contains any direct or indirect violation of Sanctions or authorise any other person to, directly or indirectly, use, make payments of, contribute or otherwise make available, the Letter of Credit or transactions contemplated thereby to fund or facilitate trade, business or other activities: (i) involving or for the benefit of any Prohibited Person; or (ii) relating to a country or territory that is the target of country-wide or territory-wide Sanctions; or (iii) in any other manner that could result in the Applicant or the Obligor or the Issuing Bank being in breach of any Sanctions or becoming a Prohibited Person.

For the purposes of this clause 11 the following words shall have the following meanings:

**Prohibited Person** means a person that is:

    (a)    listed on, or owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

    (b)    located in, incorporated under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a person located in or organized under the laws of a country or territory that is the target of country-wide or territory-wide Sanctions; or

    (c)    otherwise a target of Sanctions (namely a person with whom a US person or other national under the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities)

**Sanctions** means the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by any Sanctions Authority (whether or not the Applicant or the Obligor or any other member of their respective groups or any affiliates of any group member is legally bound to comply with such laws, regulations, embargoes or measures)

**Sanctions Authority** means any of:

    (a)    the United States government;

    (b)    the United Nations;

    (c)    the United Kingdom;

(d)     Switzerland;

(e)     the European Union; or

(f)     Hong Kong Special Administrative Region of the People's Republic of China,

and includes any government entity of any of the above, including, without limitation, the Office of Foreign Assets Control of the US Department of Treasury (OFAC), the United States Department of State, Her Majesty's Treasury (HMT) and the Swiss State Secretariat for Economic Affairs (SECO)

**Sanctions List** means:

(a)     the "Specially Designated Nationals and Blocked Persons" list maintained by OFAC;

(b)     the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by HMT; or

(c)     any similar list maintained by, or public announcement of Sanctions designation made by, any other Sanctions Authority

If either Applicant or Obligor knows or may have reason to believe that the transaction under the Letter of Credit that is conducted through the Issuing Bank is or may become in violation with Sanctions or the above provisions, it will immediately notify the Issuing Bank thereof and provide all information on the business or transaction that may be relevant for the Issuing Bank, or as reasonably requested by the Issuing Bank. In such case, Applicant and Obligor shall use their best efforts to adjust the business or transaction in such a way that violation with the abovementioned laws, resolutions or regulations is prevented. If violation with the abovementioned laws, resolutions or regulations cannot be prevented Applicant and Obligor shall each use its best efforts to legally allow the Issuing Bank to exit the business or transaction without costs or other negative consequences for the Issuing Bank. Furthermore, each of the Applicant and Obligor undertakes to indemnify the Issuing Bank for any and all claims and demands actions and proceedings, losses, damages, costs and expenses incurred in connection with such business or transaction, in accordance with clause 9 of this Deed.

12. Issuing Bank's records, unless shown to be wrong, will be evidence of Obligor's and Applicant's dealings with Issuing Bank in connection with the Deed. Both Obligor and Applicant agree that it will not object to the admission of Issuing Bank's records as evidence in any legal proceedings on the grounds that such records are not originals, are not in writing or are documents produced by a computer. Obligor and Applicant will not rely on the Issuing Bank to comply with Obligor's and Applicant's record keeping obligations.

13. This Deed and the Facilities contain the entire agreement between the parties hereto relating to the subject matter of this Deed to the exclusion of any terms implied by law which may be excluded by contract.

14. Issuing Bank's rights under this Deed may be assigned to any person without the consent of either Obligor or Applicant. The Obligor's or Applicant's rights under this Deed are personal to that party and not capable of assignment.

15. The obligations under this Deed bind, and the rights will be enforceable by, each party hereto and each party's respective successors and permitted assigns.

16. Each provision of this Deed is severable and if any provision becomes invalid, void, voidable or unenforceable or contravenes any applicable regulations the remaining provisions will not be affected.

17. Other than ABN AMRO Bank N.V., a person who is not a party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 (the Third Parties Act) to enforce or enjoy the benefit of any its terms.

18. The rights and remedies provided under this Deed are cumulative and not exclusive of those provided by law. The failure to exercise or delay in exercising a right or remedy under this Deed will not constitute a waiver of the right or remedy or a waiver of any other rights or remedies and no single or partial exercise of a right or remedy under this Deed will prevent any further exercise of the right or remedy or the exercise of any other right or remedy.

19. This Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

The parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no party will argue to the contrary.

This clause 18 is for the benefit of the Issuing Bank only. As a result, the Issuing Bank shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Issuing Bank may take concurrent proceedings in any number of jurisdictions.

Without prejudice to any other mode of service allowed under any relevant law, each of the Applicant and the Obligor irrevocably appoints [•] as its agent for service of process in relation to any proceedings before the English courts in connection with this Deed.]

**The parties have executed this Deed as a deed with the intention that it be delivered on the date written at the beginning of this Deed.**

| | |
|---|---|
| **Executed as a deed and delivered by [*third party*]** | …………………………………………... |
| | Name: |
| | Title: |
| Acting persons who in accordance with the law of [•] are acting under the authority of the company | …………………………………………... |
| | Name: |
| | Title: |
| **Signed as a deed and delivered by [AEGEAN MARINE PETROLEUM S.A. / AEGEAN PETROLEUM INTERNATIONAL INC. / AEGEAN NWE N.V. / AEGEAN BUNKERING GERMANY GMBH/ OBAST BUNKERING & TRADING GMBH]** | …………………………………………... |
| | Name: |
| | Title: |
| | …………………………………………... |
| | Name: |
| | Title: |
| Acting by persons who in accordance with the law of [**] are acting under the authority of the company | |
| Signed for and on behalf of [***Relevant Issuing Bank***] | …………………………………………... |
| | Name: |
| | Title: |
| | …………………………………………... |
| | Name: |
| | Title: |

## Schedule 17
## Form of Lender utilisation report

| Bank |
| --- |
| Date |

| | Date of issuance | Beneficiary | Amount |
| --- | --- | --- | --- |
| Standby or Documentary Letter of Credit | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Open Account Payments to Suppliers | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total | |

**Schedule 18
Debtors' Budget**

[TO BE ATTACHED]

**Schedule 19**
**Interim DIP Order**

# Schedule 20 - Required Milestones

(a)  On the Petition Date, the Debtors shall file a motion seeking approval of the facility evidenced by the Facility and the US DIP Credit Facilities.

(b)  On or before three (3) Business Days after the Petition Date, the Interim DIP Order shall have been entered by the Bankruptcy Court.

(c)  Each Obligor shall have executed and/or delivered, with respect to any Security for any Secured Obligations, within 45 days of the Effective Date (other than in respect of (i) any person organised under the laws of South Africa, or (ii) any pledge of Equity Interests of a person that is not an Obligor, in each case which shall be 60 days) , , all new security agreements, pledge agreements, vessel mortgages, control agreements, financing statements, legal opinions, filings to perfect liens under applicable law, and such other documents and agreements as the Facility Agent (acting on the instructions of the Majority Lenders) may require (including amendments to the then-existing forms, if any, of such security agreements, pledge agreements, vessel mortgages, control agreements, financing statements, filings to perfect liens under applicable law and other documents) so as to create and perfect, or in connection with the creation and perfection of, liens upon and security interests in all of the Security of the Parent and the other Obligors to secure the Secured Obligations including without limitation with respect to all Security of Obligors that are "United States Persons" (as defined in Section 7701(a)(30) of the Code, **US Persons**):

   (i)  an account control agreement with respect to certain bank accounts and such other documents or actions as may be necessary to establish UCC control with respect to any Security over which UCC control may be established pursuant to the UCC; and

   (ii)  each Obligor shall have notified each storage facility, carrier, bailee or consignee holding inventory of any Obligor of the Security Agent's security interest in such inventory (and provide to the Facility Agent a copy of such notice) and each Obligor shall use commercially reasonable efforts to obtain from and each such storage facility, carrier, bailee or consignee shall have delivered a written acknowledgement of such notice,

   provided that with respect to obligors that are not US Persons, and with respect to documents and actions necessary or advisable pursuant to the laws of jurisdictions outside of the United States and its States and territories, such obligation shall be subject to and in accordance with the Agreed Security Principles.

(d)  On or before 45 days after the Petition Date, the Final Order authorizing and approving the Facilities on a final basis shall have been entered by the Bankruptcy Court.

(e)  Not later than one day after entry by the Bankruptcy Court of the Interim DIP Order, the Debtors shall have filed with the Bankruptcy Court a motion (the **Sale Motion** and the date of such filing, the **Sale Motion Filing Date**) seeking (i) entry of an order, in form and substance acceptable to the Lenders, approving a sale under section 363 of the Bankruptcy Code of all or substantially all of the Debtors' assets (including, without limitation the Security) (the **Sale**); (ii) approval of bidding and sale procedures in form and substance acceptable to the Lenders (the **Bidding Procedures**); (iii) approval of (A) an agreement in form and substance acceptable to the Lenders, for the Sale and (B) such other agreements contemplated in the foregoing agreement of Sale as the Lenders may require, and (iv) as the the stalking horse bidder providing its bid for the Sale (the **Sale Bidder**), approving bid protections for such Sale Bidder (the **Bid Protections**).

(f)  Within thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (the **Bidding Procedures Order**), in form and substance acceptable to

the Lenders, approving the Bidding Procedures and the Bid Protections and setting related deadlines;

(g)     The Bidding Procedures Order shall provide that bids shall be due within at most seventy (70) calendar days after entry of the Bidding Procedures Order (the **Bid Deadline**);

(h)     Within five (5) business days of the Bid Deadline, the Debtors shall conduct the auction, if necessary, pursuant to the Bidding Procedures Order;

(i)     Within ten (10) business days of the Bid Deadline, the Bankruptcy Court shall enter an order, in form and substance acceptable to the Lenders and the Sale Bidder, approving the Sale; and

(j)     On the date of the closing of the Sale, the proceeds of the Sale shall have been used to repay the Secured Obligations, the Prepetition Obligations in full in cash and to pay any break-up fee required in the purchase agreement signed by any of the Debtors and any of the Lenders.

# Schedule 21 - Agreed Security Principles

## 1. Agreed Security Principles

The security to be provided under the Finance Documents which the Facility Agreement provides is to be created or perfected after the Effective Date will be given in accordance with the security principles set out in this Schedule 21 (the Agreed Security Principles). This Schedule 21 identifies the Agreed Security Principles and determines the extent and terms of the security proposed to be provided under any Finance Document.

## 2. Certain Principles

The Finance Parties have agreed and acknowledged that their rights and obligations under the Finance Documents to require any Security to be created or perfected shall not apply to the extent that such Transaction Security would:

(a)      result in any breach of corporate benefit, financial assistance, fraudulent preference or thin capitalisation laws or regulations (or analogous restrictions) of any applicable jurisdiction if the outcome of such regulations or restrictions would put the Obligor in a materially worse position than it was in before such creation or perfection; or

(b)      result in a significant risk to the officers of the relevant grantor of Transaction Security of contravention of their fiduciary duties (which shall include other directors duties) and of civil or criminal liability and, in particular, result in any breach of any applicable German capital maintenance rules requiring that upstream / cross-stream Security given by any German company incorporated as a GmbH or GmbH &Co. KG be limited;

(c)      result in time and cost (including adverse effects on taxes, interest deductibility, stamp duty, registration taxes, step or process in relation to paragraphs (a) and (b) respectively to avoid such breach or liability, notarial costs guarantee fees payable to any person that is not a member of the Group and all applicable legal fees) which, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)) be disproportionate to the benefit accruing to the Secured Parties of obtaining such security;

(d)      in relation to any assignment to be provided, require the consent of a third party for the creation or perfection of such Transaction Security and provided the Company and the relevant Obligor has used its best endeavours to obtain such consent applying best efforts; and

(e)      where a class of assets to be secured includes material and immaterial assets, result in costs in relation to the granting of security over the immaterial assets that would be, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)), disproportionate to the benefit of such security, in which case security will be granted over the material assets only.

Without prejudice to clause 20.10 (*Guarantee Limitations (Germany)*), for the purposes of this paragraph 2, references to **breach** and **liability** exclude those which may be avoided by the Obligors and/or any of the Secured Parties taking such steps, or carrying out any process which, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)) would not be disproportionate to the benefit accruing to the Secured Parties of obtaining such security, or inappropriate or outside the control of the relevant Obligor.

The Obligors' obligation to create and perfect Security shall include the obligation to deliver or caused to be delivered opinions of counsel, certificates of officers or directors of Obligors, certificates of public officials, and such other documents and to take or cause to be taken the adoption of authorizing resolutions and such other actions as in each case may be, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)), necessary or customary in connection with such creation and perfection (except where, in the case of any opinion, such opinion is customarily provided by counsel to any Secured Party).

## 3. Terms - Security Documents

The following principles will be reflected in the terms of any Security taken as part of this transaction:

(a)     Security shall, to the extent possible under local law, be enforceable on the occurrence of an Event of Default;

(b)     Unless otherwise specified in a Finance Document, any obligation of an Obligor or any other grantor of Transaction Security to perform any act, provide any document, or create any Transaction Security, must be discharged as soon as reasonably practicable;

(c)     To the extent the creation, perfection or maintenance (of priority or otherwise) of any Transaction Security requires any action other than due execution of the relevant Security Document (including notarisation, legalisation, apostillation, registration, payment of fees, duties or taxes, and delivery of notices to third parties), the relevant grantor of Transaction Security must (and the Borrowers' shall procure that each grantor of Transaction Security will) perform such action and complete it as soon as reasonably practicable following the execution of such Security Document, and in any event within any period required or permitted by applicable law to complete such action for the purpose of creation, perfection or maintenance of such Transaction Security and its priority.

(d)     In respect of any Transaction Security that is an assignment or otherwise requires notice to be delivered to a third party to be effective or perfected, unless otherwise agreed with the Security Agent (acting on the instructions of the Majority Lenders) or the relevant Existing Security Holder, the relevant grantor of Transaction Security must (and the Borrowers shall procure that each security provider will), as soon as reasonably practicable following the execution of the assignment or other agreement, deliver to the relevant counterparty or other third party a notice of assignment and actively and diligently seek an acknowledgment of such notice from the counterparty, in both cases in a form satisfactory to the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)) or the relevant Existing Security Holder, provided that the grantor of Transaction Security shall not be obliged to seek such acknowledgment where, in the reasonable opinion of the Security Agent or the relevant Existing Security Holder, doing so would be materially prejudicial to the commercial interests of that grantor of Transaction Security.

 (e)     In respect of any Transaction Security, the relevant grantor of Transaction Security must (and the Borrowers shall procure that each grantor of Transaction Security will) promptly provide to the Security Agent or relevant Existing Security Holder such supplementary documentation as may be required or as the Security Agent or relevant Existing Security Holder may reasonably request for the purposes of creating, perfecting or protecting such Transaction Security.

(f)     Where appropriate, defined terms in the Transaction Security Documents should mirror those in the Facility Agreement.

(g)     The parties to the Facility Agreement agree to negotiate the form of each Security Document diligently and in good faith in accordance with the terms of this Schedule and will ensure that all documentation required to be entered into is in a finally agreed form and duly executed as soon as reasonably practicable.

(h)     Each Security Document shall be in form and substance satisfactory to the Security Agent or Existing Security Holder (as applicable) and will include the terms customary for such document in the relevant jurisdiction for similar transactions and will include further assurance and perfection obligations on the relevant grantor of Transaction Security and exculpatory, indemnity and hold harmless provisions in favour of the Security Agent or Existing Security Holder.

(i)     Without prejudice to the above paragraph, where any Transaction Security is required to be created pursuant to these Agreed Security Principles then, to the extent equivalent Transaction Security has been created previously (such equivalence being determined by jurisdiction and type of assets involved), documentation in substantially the same form as the Security Document that creates such equivalent Transaction Security shall be used. This shall not, however, operate to require the Parties to use such a form of documentation where the Security Agent or Existing Security Holder (on the advice of its legal counsel) determines that as a result of any change in law, regulation, practice, factual circumstances or any other relevant matter such form of documentation is not the most appropriate form for the relevant Transaction Security.

(j)     The cost of documenting, creating, perfecting and maintaining the Transaction Security and supporting arrangements shall be borne in full by the Borrowers in accordance with clause 19 (*Costs and Expenses*) of the Facility Agreement and that provision shall be incorporated by reference in the individual Security Documents rather than set out in full unless required by law.

(k)     Each grantor of Transaction Security must (and the Borrowers shall procure that each grantor of Transaction Security will) provide such powers of attorney or delegations of authority to the Security Agent as it may reasonably request in respect of any Transaction Security provided by that grantor for the exercise of any rights, powers and remedies of the Security Agent or the Finance Paries provided by or pursuant to the Finance Documents or by law.

(l)     Any representations, warranties or undertakings which are required to be included in any Security Document shall reflect (to the extent to which the subject matter of such representation, warranty and undertaking is the same as the corresponding representation, warranty and undertaking in the Facility Agreement or any equivalent Security Document) the equivalent provisions set out in the Facility Agreement or such equivalent Security Document (save to the extent that the Security Agent's local counsel deem it necessary or advisable to include any further provisions (or deviate from those contained in the Facility Agreement or such equivalent Security Document) in order to protect or preserve the Transaction Security).

## 4.     Security

(a)     Subject to the due execution of all relevant Security Documents, completion of relevant perfection formalities within statutorily prescribed time limits, payment of all registration fees and documentary taxes, any other rights arising by operation of law, obtaining any relevant foreign legal opinions and subject to any qualifications which may be set out in this Agreement and any relevant legal opinions obtained and subject to the requirements of the Agreed Security Principles, it is further acknowledged that the Security Agent shall:

(i)     receive the benefit of Security granted to secure all liabilities of the Obligors under and in connection with the Finance Documents subject to the Agreed Security Principles; and

(ii)     without prejudice to the generality of the Required Milestones, (in the case of those Security Documents creating pledges or charges over shares in an member of the Group) obtain (1) a first priority valid charge or analogous or equivalent Security over all of the shares in issue at any time in that member of the Group which are owned by another member of the Group and (2) subject to the principles set out above, a first priority valid vessel mortgage in respect of each vessel owned by an Obligor. Subject to local law requirements, such Security Document shall be governed by the laws of the jurisdiction in which such member of the Group whose shares are being pledged is formed unless, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders), any other law would be more appropriate.

 (b)     To the extent possible, all Security shall be given in favour of the Security Agent and not the Finance Parties individually. The concept of "parallel debt" will be used where necessary and clause 31.3 (*Parallel Debt* (*Covenant to pay the Security Agent*) of the Facility Agreement will apply and will not not be expressly set out in each Security Document unless required under local laws.

## 5.     Release of Transaction Security

Unless required by local law, the release of the Transaction Security shall be governed by the relevant provisions of the Intercreditor Agreement.

# Schedule 22 – Existing Security

1. Security granted prior to the date of the Amendment and Restatement Agreement to secure obligations constituting the Permitted Financial Indebtedness listed on Schedule 14 (Permitted Financial Indebtedness)

2. The following Security:

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 06/08/2018 | 2013 4980604 12/17/2013 | Aegean Bunkering (USA) LLC<br><br>299 Park Avenue, 2nd Floor New York, NY 10171 | ABN AMRO Capital USA LLC<br><br>100 Park Avenue New York, NY 10017 | All assets. |
| Secretary of State, Delaware | AMEND 06/08/2018 | 2014 3399318 08/25/2014 | | ABN AMRO Capital USA LLC, as Collateral Agent<br><br>100 Park Avenue New York, NY 10017 | Secured Party changed to: ABN AMRO Capital USA LLC, as Collateral Agent 100 Park Avenue New York, NY 10017 |
| Secretary of State, Delaware | UCC 06/08/2018 | 2016 5194327 08/25/2016 | Aegean Bunkering (USA) LLC<br><br>299 Park Avenue New York, NY 10171 | Deutsche Bank AG New York Branch<br><br>60 Wall Street New York, NY 10005<br><br>Additional Secured Party:<br><br>Deutsche Bank Trust Company Americas<br><br>60 Wall Street New York, NY 10005 | Please see Annex A attached thereto for a description of the Collateral, which is hereby incorporated by reference therein and made a part thereof. See Schedule A hereto for full UCC-1 with attached exhibits. |

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Supreme Court, New York County, New York | LIT 06/14/2018 | 652568/2018 05/22/2018 | Defendant: Aegean Marine Petroleum Network, Inc. 52 Vanderbilt Ave, Suite 1405 New York, NY 10017 | Plaintiff: E. Nikolas Tavlarios | Status: Open Summons with Notice Breach of Contract - Section 1(f) of a Settlement Agreement effective May 31, 2017 between Plaintiff and Defendant. Relief sought: a) damages in the amount of $1,207,000 b) specific performance of the contract by delivery to Plaintiff of 340,000 unrestricted shares of AMPNI ; and c) other and further relief |
| Ontario, Canada | PPSA 06/28/2018 | 698932683 08/14/2014 | Aegean Bunkering (USA) LLC 299 Park Avenue New York, NY 10171 and AMPNI Holdings Co. Limited 299 Park Avenue New York, NY 10171 | ABN AMRO Capital USA, LLC, as Collateral Agent 100 Park Avenue, New York, NY 10017 | Inventory, Equipment, Accounts, Other, Motor Vehicles Included Expires 08/14/2024 |
| Ontario, Canada | PPSA 06/28/2018 | 698932701 08/14/2014 | Aegean Bunkering (USA) LLC 299 Park Avenue New York, NY 10171 and | ABN AMRO Capital USA, LLC, as Collateral Agent 100 Park Avenue, New York, NY 10017 | Inventory, Equipment, Accounts, Other, Motor Vehicles Included Expires 08/14/2024 |

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| U.S. District Court, New York Southern District | LIT 06/18/2018 | 1:18-cv-04993-NRB 06/05/2018 | Defendant:<br><br>Aegean Marine Petroleum Network Inc.<br><br>Additional defendant:<br><br>E. Nikolas Tavlarios<br><br>Additional defendant:<br><br>Spyros Giannotis | Plaintiff: Nick Simco | Civil: Open<br>Nature of Suit: 850 Securities/Commodities<br>Cause: 15:78m(a) Securities Exchange Act<br>Count I: Violation of Section 10(b) and Rule 10b-5 Against all Defendants<br>Count II: The individual Defendants violated Section 20(a) of the Exchange Act |
| U.S. District Court, New York Southern District | LIT 06/18/2018 | 1:18-cv-05165-NRB 06/08/2018 | Defendant:<br><br>Aegean Marine Petroleum Network Inc.<br><br>Additional defendant:<br><br>E. Nikolas Tavlarios<br><br>Additional defendant:<br><br>Spyros Giannotis | Plaintiff: Robert Strougo | Class Action Complaint<br>Count I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against all Defendants<br>Count II: Violation of Section 20(a) of the Exchange Act Against the individual Defendant(s) |
| Recorder of Deeds, Dist. of Columbia | UCC 06/25/2018 | 2011105534 10/19/2011 | AEGEAN MARINE PETROLEUM S.A.<br><br>10, Akti Kondili Piraeus, Greece 185 45 | DEUTSCHE BANK AG, NEW YORK BRANCH<br><br>60 WALL STREET NEW YORK, NY 10005 | Please see Annex A attached thereto and made a part thereof for the "Collateral Description." |
| Recorder of Deeds, Dist. of Columbia | AMEND 06/25/2018 | 2016087702 08/26/2016 | | Deutsche Bank Trust Company Americas<br><br>60 Wall Street New York, NY 10005 | Addition of Secured Party: Deutsche Bank Trust Company Americas<br>60 Wall Street<br>New York, NY 10005 |

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Recorder of Deeds, Dist. of Columbia | AMEND 06/25/2018 | 2016088912 08/30/2016 | | | Restatement of collateral: Please see Annex A attached thereto for a description of the Collateral, which is thereby incorporated by reference therein and made a part thereof. |
| Recorder of Deeds, Dist. of Columbia | UCC 06/25/2018 | 2013138996 12/18/2013 | AMPNI HOLDINGS CO. LIMITED<br><br>Vyronos 36, Nicosia Tower Center, 8th Floor Nicosia, CYP P.C. 1506 | ABN AMRO Capital USA LLC<br><br>100 Park Avenue New York, NY 10017 | All of Debtor's right, title and interest to the entire limited liability company membership interest of Aegean Bunkering (USA) LLC, a Delaware limited liability company, certain related assets and proceeds thereof, all as more particularly described on Schedule A attached to the UCC-1.<br><br>See attached Schedule A hereto for UCC-1 with exhibits attached. |

# SIGNATURES

<u>**THE COMPANY**</u>

**AEGEAN MARINE PETROLEUM S.A.**                       ………………….. …………………………

By:

<u>**THE BORROWERS**</u>

**AEGEAN MARINE PETROLEUM S.A.**                       ………………….. …………………………

By:

**AEGEAN PETROLEUM INTERNATIONAL INC.**    ………………….. …………………………

By:

**AEGEAN NWE N.V.**                       ………………….. …………………………

By:

**AEGEAN BUNKERING GERMANY GMBH**          ………………….. …………………………

By:

**OBAST BUNKERING & TRADING GMBH**          ………………….. …………………………

By:

<u>**THE GUARANTORS**</u>
**KITHNOS MARITIME INC.**                       ………………………… …………………………

By:

**PAROS MARITIME INC.**                       ………………………… …………………………

By:

**SANTORINI I MARITIME LIMITED** ………………………… …………………………
By:

**SERIFOS MARITIME INC.** ………………………… …………………………
By:

**LEFKAS MARINE S.A.** ………………………… …………………………
By:

**AEGEAN BUNKERING SERVICES INC.** ………………………… …………………………
By:

**AEGEAN SHIPHOLDINGS INC.** ………………………… …………………………
By:

**AEGEAN BREEZE MARITIME COMPANY** ………………………… …………………………
By:

**AEGEAN TIFFANY MARITIME COMPANY** ………………………… …………………………
By:

**ITHAKI MARINE S.A.** ………………………… …………………………
By:

**CEPHALLONIA MARINE S.A.** ………………………… …………………………
By:

**KERKYRA MARINE S.A.** ………………………… …………………………
By:

**KYTHIRA MARINE S.A.** ………………………… …………………………
By:

**IOS MARINE INC.** ………………………… …………………………
By:

**PAXOI MARINE S.A.** ………………………… …………………………
By:

**ZAKYNTHOS MARINE LIMITED** ………………………… …………………………
By:

**SIFNOS MARINE INC.** ………………………… …………………………

By:

**ANDROS MARINE LIMITED** ………………………… …………………………
By:

**DILOS MARINE INC.** ………………………… …………………………
By:

**IOS SHIPPING LTD** ………………………… …………………………
By:

**AEGEAN VII SHIPPING LTD** ………………………… …………………………
By:

**HALKI NAVIGATION S.A.** ………………………… …………………………
By:

**KASSOS NAVIGATION S.A.** ………………………… …………………………
By:

**SYMI NAVIGATION S.A.** ………………………… …………………………
By:

**TILOS SHIPPING (PTE.) LTD.** ………………………… …………………………
By:

**AEGEAN OIL TERMINAL CORPORATION** ………………………… …………………………
By:

**AEGEAN MANAGEMENT SERVICES M.C.** ………………………… …………………………
By:

**KIMOLOS MARITIME INC.** ………………………… …………………………
By:

**MILOS SHIPPING (PTE.) LTD.** ………………………… …………………………
By:

**MYKONOS I MARITIME LIMITED** ………………………… …………………………
By:

**TINOS MARINE INC.** ………………………… …………………………
By:

**SERIFOS SHIPPING (PTE.) LTD** ………………………… …………………………
By:


**AEGEAN SHIP XII MARITIME COMPANY** ………………………… …………………………
By:

**TEMPEST SHIPTRADE LTD.** ………………………… …………………………
By:

**AMORGOS MARITIME INC.** ………………………… …………………………
By:

**AEGEAN MARINE PETROLEUM NETWORK** ………………………… …………………………
**INC.**
By:

**AEGEAN PETROLEUM INTERNATIONAL** ………………………… …………………………
**INC.**
By:

**TASMAN SEAWAYS INC.** ………………………… …………………………
By:

**SANTON LIMITED** ………………………… …………………………
By:

**AEGEAN ACE MARITIME COMPANY** ………………………… …………………………
By:

**AEGEAN SHIP III MARITIME COMPANY** ………………………… …………………………
By:


**AEGEAN SHIP VIII MARITIME COMPANY** ………………………… …………………………
By:

**NEVADO NAVIGATION S.A.** ………………………… …………………………
By:

**AEGEAN TANKING S.A** ………………………… …………………………
By:

**SEALAND NAVIGATION INC.** ………………………… …………………………
By:

**BENMORE SERVICES S.A.** ………………………… …………………………
By:

**ETON MARINE LTD.** ………………………… …………………………
By:

**INGRAM ENTERPRISES CO.** ………………………… …………………………
By:

**AEGEAN MARINE PETROLEUM S.A.** ………………………… …………………………
By:

**I.C.S. PETROLEUM LTD.** ………………………… …………………………
By:

**AEGEAN BUNKERING (USA) LLC** ………………………… …………………………
By:

**AEGEAN MAISTROS MARITIME COMPANY** ………………………… …………………………
By:

**AEGEAN GAS MARITIME COMPANY** ………………………… …………………………
By:

**AEGEAN BUNKERING COMBUSTIBLES LAS** ………………………… …………………………
**PALMAS SOCIEDAD ANÓNIMA**
By:

**AEGEAN (FUJAIRAH) BUNKERING SA** ………………………… …………………………
By:

**AEGEAN AGENCY (GIBRALTAR) LIMITED** ………………………… …………………………
By:

**CARIBBEAN RENEWABLE ENERGY** ………………………… …………………………
**SOURCES INC.**
By:

**WEST COAST FUEL TRANSPORT LTD** ………………………… …………………………
By:

**AEGEAN BUNKERING (GIBRALTAR)** ………………………… …………………………
**LIMITED**
By:

**AEGEAN HOLDINGS S.A.** ………………………… …………………………

By:

**AEGEAN BUNKERING (JAMAICA) LIMITED** ………………………… …………………………
By:


**AMPN USA, LLC** ………………………… …………………………
By:

**AEGEAN OIL (USA), LLC** ………………………… …………………………
By:


**I.C.S. PETROLEUM (MONTREAL) LTD.** ………………………… …………………………
By:

**AEGEAN BUNKERING MOROCCO SARL AU** ………………………… …………………………
By:

**AEGEAN BUNKERING (SINGAPORE) PTE.** ………………………… …………………………
**LTD.**
By:

**AEGEAN BUNKERING (TRINIDAD) LTD.** ………………………… …………………………
By:

**AMPNI INVESTMENTS CO. LIMITED** ………………………… …………………………
By:

**AMPNI HOLDINGS CO. LIMITED** ………………………… …………………………
By:

**MAISTROS RORO SHIPHOLDINGS LTD** ………………………… …………………………
By:

**OSTRIA RORO SHIPHOLDINGS LTD** ………………………… …………………………
By:


**AEGEAN TANKFARMS HOLDINGS S.A.** ………………………… …………………………
By:

**AEGEAN INVESTMENTS S.A.** ………………………… …………………………
By:

**THE FACILITY AGENT**

**ABN AMRO BANK N.V.** ……………………….. …………………………

By:

**THE COLLATERAL MANAGEMENT AGENT**

**ABN AMRO BANK N.V.** ……………………….. …………………………

By:

**THE SECURITY AGENT**

**ABN AMRO BANK N.V.** ……………………….. …………………………

By:

**THE LENDERS**

**MERCURIA ENERGY TRADING S.A.** ……………………….. …………………………

By:

**THE CO-ORDINATOR**

**MERCURIA ENERGY TRADING S.A.** ……………………….. …………………………

By:

**THE ISSUING BANK**

**ABN AMRO BANK N.V.**    ……………………..    …………………………

By:


**HEDGING PROVIDER**

**MERCURIA ENERGY TRADING S.A.**    ……………………..    …………………………

By:

## EXHIBIT B

**Redline Against Initial Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.,*[1] | ) | Case No. 18-13374 ([ ]) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING
THE DEBTORS TO OBTAIN SENIOR SECURED PRIMING
SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY;
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, 9006-1, 9013-1, 9014-1 and 9014-2 of the Local Bankruptcy Rules (the "Local Rules") for the United States Bankruptcy Court for the Southern District of New York (this "Court"), *inter alia* requesting, among other things:

(1)     authorization for the Borrowers (as defined in DIP Loan Agreements) to obtain postpetition financing pursuant to the DIP Facilities (defined below), and for each of the Debtors

---

[1]     A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or DIP Loan Documents (as defined herein), as applicable.

to guarantee unconditionally (the "Guarantors"), on a joint and several basis, and subject to the terms and limitations set forth in the DIP Loan Documents in all respects the Borrowers' obligations in connection with the DIP Facilities, consisting of:

a) a senior secured super-priority multiple delayed draw term loan credit facility (the "DIP Term Loan Facility"), on the terms and conditions to be set forth in the U.S. DIP Agreement (as defined below), in an aggregate principal amount of **$72,000,000** in term loan commitments (the "DIP Term Loan Commitment") which shall be available as term loans (the "DIP Term Loans") to the U.S. Borrower upon entry of the Interim Order, and subject to the Closing Date (as defined in the U.S. DIP Agreement), in an amount not to exceed **$40,000,000** (the "Initial DIP Term Loan") and the maximum amount allowed to be drawn by the U.S. Borrower for such period consistent with the U.S. DIP Credit Agreement.

b) a senior secured super-priority asset-based revolving credit facility (the "U.S. DIP Revolving Credit Facility," and together with the DIP Term Loan Facility, the "U.S. DIP Credit Facilities"), on the terms and conditions to be set forth in a Superpriority Secured Debtor-In-Possession Credit Agreement substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, supplemented, waived, extended or otherwise modified from time to time, the "U.S. DIP Agreement," and together with any other related agreements, documents, security agreements, or pledge agreements, the "U.S. DIP Documents"), by and among Aegean Bunkering (USA) LLC, as U.S. Borrower, the Guarantors, ABN AMRO Capital USA LLC, as Administrative Agent, Collateral Agent, Swing Line Lender and Issuing Bank, and Mercuria US Asset Holdings LLC, as U.S. Lender, in an initial aggregate principal amount (subject to availability), and together with the outstanding amounts under the U.S. Prepetition Credit Facility (as defined in the Motion), of $**160,000,000** in revolving commitments (the "U.S. Revolving Commitments", and the loans outstanding under the U.S. Revolving Commitments from time to time, the "U.S. Revolving Loans"), including a **$50,000,000** million sublimit for the issuance of letters of credit ("U.S. Letters of Credit") and Swing Line Loans (as defined in US DIP Credit Facilities), available from time to time until the maturity date of the U.S. DIP Revolving Credit Facility; and

c) a senior secured super-priority asset-based revolving credit facility (the "Global DIP Revolving Credit Facility," and together with the U.S. DIP Credit Facilities, the "DIP Facilities"), on the terms and conditions to be set forth in an Amendment and Restatement Agreement substantially in the form annexed as **Exhibit B** hereto (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "Global DIP Agreement,"[3] and together with any other related agreements, documents, security agreements, or pledge agreements, the "Global DIP

---

[3] The Global DIP Agreement and the U.S. DIP Agreement are referred to collectively herein as the "DIP Loan Agreements."

Documents"), by and among the Global Borrowers, the Guarantors, non-debtor guarantors party thereto, ABN AMRO Bank, N.V., as Facility Agent, Collateral Management Agent, Security Agent, Issuing Bank and Overdraft Bank, and Mercuria Energy Trading S.A., as Lender, in an initial aggregate principal amount (subject to availability), together with the outstanding amounts under the Global Prepetition Credit Facility (as defined in the Motion and, together with the U.S. Prepetition Credit Facility, the "Prepetition Credit Facilities"), of **$300,000,000** in revolving commitments (the "Global Revolving Commitments" and the loans outstanding under the Global Revolving Commitments from time to time, the "Global Revolving Loans," together with the U.S. Revolving Loans, the "Revolving Loans"), including a **$100,000,000** million sublimit for the issuance of letters of credit ("Global Letters of Credit" and, together with the U.S. Letters of Credit, collectively, the "Letters of Credit"), available from time to time until the maturity date under the Global DIP Revolving Credit Facility; and

d) a Roll-Up (as defined below) of the Prepetition Secured Obligations (as defined below) whereby the Prepetition Secured Obligations shall become DIP Obligations (as defined below) in the amounts and at the intervals set forth herein, and subject to the terms and conditions hereof and as set forth in the DIP Loan Documents (as defined below).

(2)     authorization for Debtors to execute, deliver, and enter into the U.S. DIP Documents and the Global DIP Documents (collectively, the "DIP Loan Documents") and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(3)     authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to any agents under the DIP Loan Documents (collectively, the "DIP Agents") and the issuing banks, swing line lenders, and any other lenders from time to time thereunder (collectively, the "DIP Lenders" and together with the DIP Agents, the "DIP Secured Parties") under the DIP Facilities pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges and disbursements of the respective DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect

3

of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap or other hedging agreement or arrangement (including, without limitation, any such agreement or arrangement designed to, among other things, hedge against fluctuations in commodity prices) in each case constituting (a) all "Obligations" as defined in the U.S. DIP Agreement, (b) all "Outstandings" as defined in the Global DIP Agreement; and (c) all other Debtor and/or Guarantor obligations of any kind under the DIP Loan Documents (collectively, the "<u>DIP Obligations</u>");

(4)     authorization for the Debtors, immediately upon entry of this interim order (this "<u>Interim Order</u>"), to use proceeds of the DIP Facilities (collectively the "<u>DIP Loan Proceeds</u>") as permitted in the DIP Loan Documents and consistent with this Interim Order and the applicable Approved Budget;

(5)     authorization for the Debtors to implement a "roll-up" of the Prepetition ABL Obligations as follows: (a) immediately upon entry of this Interim Order, 50% of the Prepetition Secured Obligations ~~(as defined herein)~~ shall become DIP Obligations; (b) between entry of the Interim Order and entry of the Final Order, all cash proceeds of U.S. Priority Collateral securing U.S. Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay down outstanding obligations under the U.S. Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the U.S. DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; (c) between entry of the Interim Order and entry of the Final Order, all cash proceeds of Global Prepetition ABL Collateral securing Global Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay-down outstanding obligations under the Global Prepetition Credit Facility on a dollar-for-dollar basis and,

contemporaneously therewith, increase availability under the Global DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; and (d) upon entry of the Final Order, all outstanding Prepetition ABL Obligations shall become DIP Obligations ((a) through (d), the "Roll-Up").

(6)     the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 507(b) and 503(b)(1) of the Bankruptcy Code, to the DIP Agents, for the benefit of themselves and the other DIP Secured Parties, in respect of all DIP Obligations (as defined below), subject to the Carve Out (as defined below);

(7)     granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting ABL Cash Collateral (as defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein;

(8)     providing adequate protection to each of the Prepetition Secured Parties (as defined below) of their security interests in the collateral securing the Prepetition Credit Facilities, as applicable (including, without limitation, ABL Cash Collateral), and equal in amount to, any diminution in the value of such prepetition security interests of such Prepetition Secured Parties calculated in accordance with section 506(a) of the Bankruptcy Code ("Diminution in Value"), whether or not the Diminution in Value results from the sale, lease or use by the Debtors of the Prepetition ABL Collateral (as defined herein), the priming of the prepetition security interests of such Prepetition Secured Parties or the stay of enforcement of any prepetition security interests arising from section 362 of the Bankruptcy Code, or otherwise;

(9)     providing adequate protection to the secured parties (the "Prepetition Term Parties") under the Prepetition Term Loan Facilities (as defined in the Motion) of their security interests in Prepetition Term Collateral, including Prepetition Term Cash Collateral, (the "Prepetition Term Liens") and equal in amount to, any Diminution in the Value of such prepetition security interests of such Prepetition Term Parties, subject in all respects to any subsequent orders of this Court including but not limited to that certain *Interim Order (I) Granting Adequate Protection to Aegean Baltic Bank S.A., as Agent, (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* and *Interim Order (I) Granting Adequate Protection to National Bank of Greece S.A., (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, each filed contemporaneously herewith (in respect of each of the Prepetition Term Parties identified in such interim order, a "Prepetition Term Adequate Protection Order" and collectively with any other order granting adequate protection to a Prepetition Term Party, the "Prepetition Term Adequate Protection Orders");

(10)    authorization for the Debtors to use ABL Cash Collateral and all other Prepetition ABL Collateral in which any of the Prepetition Secured Parties have an interest consistent with this Interim Order and providing adequate protection to the Prepetition Secured Parties to the extent set forth herein, including authorization for the Debtors to apply ABL Cash Collateral to permanently and indefeasibly pay the Prepetition ABL Obligations;

(11)    the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(12)     subject to entry of a final order granting the relief requested in the Motion on a final basis (the "Final Order"), a waiver of the Debtors' ability to surcharge against any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(13)     the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(14)     granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on November [___]7, 2018 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Andrew D. Hede (I) in Support of Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2*, the *Declaration of Tyler Baron, Director of Aegean Marine Petroleum Network Inc., in Support of Chapter 11 Petitions and First Day Motions*, the *Declaration of Zul Jamal in Support of Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, and (III) Authorizing Use of ABL Cash Collateral, (IV) Granting Adequate Protection, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* ("the Jamal Declaration"), any exhibits in connection with the foregoing, and the filings and pleadings in the above-captioned Cases (collectively, the "Cases"), the Court having found that the relief requested in the Motion is fair and reasonable and is in the best interests of Debtors, their Estates (defined below), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to the Court that granting the interim relief

requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was adequate under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on (a) the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis) (the "30 Largest Unsecured Creditors"); (c) the agents for each of the Debtors' prepetition secured credit facilities (the "Prepetition Agents");[4] (d) the indenture trustee for each of the Debtors' unsecured notes; (e) the DIP Agents; (f) counsel to the parties referenced in clauses (c) through (e); (g) counsel to the ad hoc group of holders of convertible unsecured notes; (h) counsel to Mercuria US Asset Holdings LLC; (i) counsel to Mercuria Energy Trading S.A.; (j) the United States Attorney's Office for the Southern District of New York; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (n) the attorneys general in the states where the Debtors conduct their business operations; (o) counsel for the Prepetition Term Parties, (p) any other notice parties required under any Prepetition Term Loan Document; (q) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and all objections, if any, to the relief requested in the Motion

---

[4] The Prepetition Agents are the U.S. Prepetition Agent and the Global Prepetition Agent.

having been withdrawn, resolved or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[5]

A.     <u>Petition Date</u>.  On November 6, 2018 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition (each, a "<u>Petition</u>") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Cases.

B.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013 and 9014 and Local Rules 2002-1, 4001-2, 9006-1, 9013-1, 9014-1 and 9014-2.

C.     <u>Committee Formation</u>.  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "<u>Committee</u>") or any other statutory committee has been appointed in the Cases.

D.     <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief

---

[5] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001 and the Local Rules.

      E.     <u>Parties' Acknowledgments, Agreements, and Stipulations</u>.  In requesting the DIP Facilities, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facilities and access to the ABL Cash Collateral, and as a condition to providing financing under the DIP Facilities, subject to the rights of the parties set forth in section 4.1, the Debtors, the Prepetition Obligors (as defined in the Motion),[6] and any other non-Debtor affiliates of the Debtors (the "<u>Non-Debtor Affiliates</u>")[7] receiving the benefits of the DIP Facilities permanently and irrevocably admit, stipulate, acknowledge and agree, as follows:

      (i)     <u>U.S. Prepetition Loan Documents</u>.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that prior to the Petition Date, the "Secured Parties" (as defined in the U.S. Prepetition Credit Facility, and referred to herein as the "<u>U.S. Prepetition Secured Parties</u>") made loans, advances and/or provided other financial accommodations and/or services to Aegean Bunkering (USA) LLC (the "<u>U.S. Borrower</u>") pursuant to the terms and conditions set forth in (a) the U.S. Prepetition Credit Agreement; and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the agent or agents under the U.S. Prepetition Credit Agreement (the "<u>U.S. Prepetition Agent</u>") or any other Secured Party in connection with the U.S. Prepetition Credit Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed

---

[6]    For the avoidance of doubt, all references to the Prepetition Obligors include all non-debtor affiliates of the Debtors, the Borrowers, and the Guarantors who are obligors under any of the Prepetition Credit Facilities, Prepetition Loan Documents, and the Prepetition ABL Obligations.

[7]    Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, and Aegean Petroleum Uruguay S.A. are non-Debtor affiliates of the Debtors.

and/or delivered in connection therewith or related thereto (all of the foregoing, together with the U.S. Prepetition Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "U.S. Prepetition Loan Documents"). Aegean Marine Petroleum Network, Inc. (the "U.S. Guarantor") is jointly and severally liable for the U.S. Borrower's obligations under the U.S. Prepetition Loan Documents.

(ii) U.S. Prepetition ABL Obligations. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree, that as of the Petition Date, the U.S. Borrower and the U.S. Guarantor were jointly and severally indebted to the U.S. Prepetition Secured Parties under the U.S. Prepetition Loan Documents in respect of Revolving Loans, outstanding Letters of Credit, and Swing Line Loans in an aggregate outstanding principal amount of not less than approximately $131,688,116, plus interest accrued and accruing thereon, together with all costs, fees, expenses and other charges accrued, accruing or chargeable with respect thereto in accordance with the U.S. Prepetition Loan Documents (collectively, the "U.S. Prepetition ABL Obligations"). Subject to Section 4.1 hereof, the U.S. Prepetition ABL Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the U.S. Borrower and the U.S. Guarantor, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization, recoupment, or subordination pursuant to the Bankruptcy Code or any other applicable law or any other claim or cause of action of any nature, and the Debtors and Prepetition Obligors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, cause of action, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any

of the U.S. Prepetition ABL Obligations or the Prepetition Liens (as defined below) on the U.S. Prepetition ABL Collateral (as defined below).

(iii) <u>U.S. Prepetition ABL Collateral</u>. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree, that as of the Petition Date, the U.S. Prepetition ABL Obligations were fully secured pursuant to the U.S. Prepetition Loan Documents by valid, perfected, enforceable and non-avoidable, first-priority liens on and security interests in all of the U.S. Borrower's assets constituting "<u>Collateral</u>" (as defined in the U.S. Prepetition Loan Documents (all such Collateral in existence on the Petition Date, or the identifiable proceeds thereof, the "<u>U.S. Prepetition ABL Collateral</u>"), subject only to the liens and security interests permitted under the U.S. Prepetition Credit Agreement to the extent that such security interests, liens or encumbrances are valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date. The Debtors and the Prepetition Obligors do not possess and will not assert any claim, cause of action, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the U.S. Prepetition Agent's and the U.S. Prepetition Lenders' liens, claims or security interests in the U.S. Prepetition ABL Collateral.

(iv) <u>Global Prepetition Loan Documents</u>. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that prior to the Petition Date, the "Secured Parties" (as defined in the Global Prepetition Credit Facility, and referred to herein as the "<u>Global Prepetition Secured Parties</u>,"[8] and together with the U.S. Prepetition Secured Parties, the "<u>Prepetition Secured Parties</u>") made loans, advances and/or provided other financial

---

[8] The Global Prepetition Secured Parties includes the agent or agents under the Global Prepetition Credit Facility (the "<u>Global Prepetition Agent</u>").

accommodations and/or services to Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, and Aegean Petroleum Uruguay S.A. (collectively, the "Global Borrowers")[9] pursuant to the terms and conditions set forth in (a) the Global Prepetition Credit Facility; and (b) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Global Prepetition Agent or any other Secured Party in connection with the Global Prepetition Credit Facility, including, without limitation, all documents defined as "Finance Documents" in the Global Prepetition Credit Facility, and all security agreements, notes, guarantees, mortgages, financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Global Prepetition Credit Facility, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Global Prepetition Loan Documents").[10]   Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, Aegean Petroleum Uruguay S.A., and Aegean Marine Petroleum Network Inc. (together, the "Global Guarantors" and each, a "Global Guarantor") are jointly and severally liable for the Global Borrowers' obligations under the Global Prepetition Loan Documents.

(v)    Global Prepetition ABL Obligations. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that as of the Petition Date, the Global Borrowers

---

[9]    Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH, Aegean NWE N.V. and Aegean Petroleum Uruguay S.A. are non-Debtor affiliates of the Debtors.

[10]    The U.S. Prepetition Loan Documents and the Global Prepetition Loan Documents are collectively, the "Prepetition Loan Documents").

and each of the other Global Guarantors were jointly and severally indebted under the Global Prepetition Loan Documents in respect of Global Revolving Loans,[11] outstanding Global Letters of Credit, Overdraft Facilities (each as defined in the Global Prepetition Credit Facility) and all other Credit Instruments (as defined in the Global Prepetition Credit Facility) in an aggregate outstanding principal amount of not less than approximately $249,569,260, plus interest accrued and accruing thereon, together with all costs, fees, expenses and other charges accrued, accruing or chargeable with respect thereto in accordance with the Global Prepetition Loan Documents (collectively, the "Global Prepetition ABL Obligations," and together with the U.S. Prepetition ABL Obligations, the "Prepetition Secured Obligations").  Subject to Section 4.1 hereof, the Global Prepetition ABL Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Global Borrowers and the Global Guarantors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization, recoupment, or subordination pursuant to the Bankruptcy Code or any other applicable law or any other claim or cause of action of any nature, and the Debtors and the Prepetition Obligors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, cause of action, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Global Prepetition ABL Obligations or the Prepetition Liens on the Global Prepetition ABL Collateral.

(vi) <u>Global Prepetition ABL Collateral.</u> The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that as of the Petition Date, the Global Prepetition ABL Obligations were fully secured pursuant to the Global Prepetition Loan

---

[11] For the avoidance of doubt, the Global Revolving Loans shall include that certain over-advance provided to the Debtors on or about October 31, 2018 to fund certain working capital amounts needed to enable the Debtors to prepare for an orderly chapter 11 filing.

Documents by valid, perfected, enforceable and non-avoidable, first-priority liens on and security interests in all of the "Transaction Security" (as defined in the Global Prepetition Loan Documents) (all such Transaction Security in existence on the Petition Date, or the identifiable proceeds thereof, the "Global Prepetition ABL Collateral" and collectively with the U.S. Prepetition ABL Collateral, the "Prepetition ABL Collateral"), and subject only to the liens and other security interests specifically permitted under the Global Prepetition Loan Documents to the extent that such security interests, liens or encumbrances are valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date. The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Global Prepetition Secured Parties' liens, claims or security interests in the Global Prepetition ABL Collateral.

(vii) <u>Validity of Prepetition Liens and Prepetition Secured Obligations</u>. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that: (a) the Prepetition Secured Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of certain of the Debtors; (b) no offsets, challenges, objections, defenses, claims, causes of action, or counterclaims of any kind or nature whatsoever to the Prepetition Secured Obligations or Prepetition Liens exist, and no portion of the Prepetition Secured Obligations or Prepetition Liens is subject to any offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature whatsoever including, without limitation, avoidance, disallowance, reduction, surcharge, disgorgement, recharacterization, recoupment, or subordination, whether pursuant to the Bankruptcy Code or applicable non-bankruptcy law or any other claim or cause of action of any nature; (c) the Prepetition Loan Documents are valid and

enforceable by the Prepetition Secured Parties against each of the applicable Debtors (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code); and (d) the Prepetition Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition ABL Collateral and are not subject to avoidance, disallowance, reduction, surcharge, disgorgement, recharacterization, recoupment, or subordination, whether pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(viii)     Sale and Credit Bidding.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge and agree that any of the DIP Lenders, DIP Agents, or Prepetition Secured Parties, as applicable, may credit bid the entirety of (or any portion of) the Prepetition Secured Obligations, or the DIP Obligations.

(ix)     Release.  As a condition to obtaining the financing available under the DIP Facilities, and subject only to Section 4.1, each of the Debtors, their Estates, the Borrowers, the Guarantors, and the Prepetition Obligors hereby forever, unconditionally, permanently, and irrevocably release, discharge and acquit each of the DIP Secured Parties, each of the Prepetition Secured Parties and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in

connection with or relating to the Prepetition Secured Obligations, the Prepetition Loan Documents, the DIP Facilities or the DIP Loan Documents, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all claims (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security and perfection of any of the Prepetition Secured Obligations, the Prepetition Loan Documents or the Prepetition Liens, and further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon or released to any and all acts, omissions, conduct undertaken or events occurring prior to entry of this Interim Order.

(x)     ABL Cash Collateral.  The Debtors admit, stipulate, acknowledge and agree that all of the cash of the Debtors who were obligors under the Prepetition Credit Facilities (the "Debtor ABL Obligors"), wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtor ABL Obligors, whether as Prepetition ABL Collateral or which represent income, proceeds, products, rents, or profits of other Prepetition ABL Collateral, constitutes "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "ABL Cash Collateral").

(xi)     Term Loan Cash Collateral.  The Debtors admit, stipulate, acknowledge and agree that all of the cash of the Debtors who were borrowers under the Prepetition Term Loan Facilities, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors who were borrowers under the Prepetition Term Loan Facilities, whether as Prepetition Term Collateral or which represent income, proceeds, products, rents, or profits of other Prepetition Term Collateral, constitutes "cash collateral" of the Prepetition Term ~~Loan~~ Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Term Loan Cash Collateral").

F.     Findings Regarding the Postpetition Financing.

(i)     Postpetition Financing.  The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim Order, to extend certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order, the DIP Loan Agreements and the other DIP Loan Documents, respectively (the "DIP Loans").

(ii)     Need for Postpetition Financing.  The Debtors do not have sufficient liquidity, including cash collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties as set forth in this Interim Order, the DIP Loan Agreements, and other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value

of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates") to maximize the recovery to all creditors of the Estates.

(iii)     Priming of Prepetition Liens. The Debtors believe that the priming of the liens granted in favor of each of the Prepetition Secured Parties in the Prepetition ABL Collateral under section 364(d)(1) of the Bankruptcy Code, by the DIP Facility, as contemplated by the DIP Loan Documents and this Interim Order, will enable the Debtors to continue to operate their businesses for the benefit of their Estates and stakeholders.

(iv)     Stalking Horse Bid. Certain of the Debtors intend to enter into that certain Asset Purchase Agreement (as amended, restated, modified, or supplemented, from time to time, the "Stalking Horse Agreement") to purchase all or substantially all of the DIP Collateral (as defined below) on the terms and conditions set forth therein (collectively, the "Stalking Horse Bid"). The Stalking Horse Bid is integral to the value provided to the DIP Secured Parties under the DIP Facilities and necessary to maintain, preserve, and maximize the value of the DIP Collateral and the Debtors' operations pending the consummation of the transactions contemplated by the Stalking Horse Agreement.

(v)     No Credit Available on More Favorable Terms. The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of

the Bankruptcy Code.  The Debtors assert in the Motion and in the Jamal Declaration, and demonstrated at the Interim Hearing, that they have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Loan Documents.  Additionally, the Debtors have asserted that should the DIP Facilities not be approved, the Stalking Horse Bid in connection with the sale of certain of the Debtors' assets shall be withdrawn.  In light of the foregoing, and considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to them at this time, and are in the best interests of all of their stakeholders.  After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to them at this time, and are in the best interests of all of their stakeholders.

(vi)     Budget.  The Debtors have prepared and delivered to the DIP Secured Parties initial budgets (the "Initial Budgets"), copies of which are attached hereto as **Exhibits C and D**.  The Initial Budgets reflect the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budgets and each subsequent approved Budget then in effect, an "Approved Budget").  The Debtors believe that the Initial Budgets are reasonable under the facts and circumstances.  The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Approved Budget, the other DIP Loan Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein.  For the avoidance of doubt, all references to the Initial

Budgets or the Approved Budget shall be subject in all respects to the Permitted Variance (as defined in the DIP Loan Documents).

(vii)    Certain Conditions to DIP Facilities.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things, (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of their obligations thereunder, and to confer upon the DIP Secured Parties all rights, powers and remedies thereunder; (b) the provision of adequate protection of the Prepetition Secured Parties' interests in the Prepetition ABL Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code, subject to the terms and conditions of the Prepetition Term Adequate Protection Orders; (c) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents: (i) superpriority perfected security interests in and liens upon all of the Prepetition ABL Collateral and any unencumbered assets other than Excluded Assets (as defined in the applicable DIP Loan Agreement), (ii) perfected security interests in and junior liens upon the remaining Debtors' assets, including, without limitation, the Prepetition Term Collateral (collectively hereinafter referred to as the "DIP Collateral," and for avoidance of doubt, the DIP Collateral shall include (w) all advances under the DIP Facilities, (x) subject to entry of the Final Order (and only effective upon the entry of the Final Order), the proceeds of the Litigation Claims (as defined in the U.S. DIP Agreement), (y) subject to entry of the Final Order, (and only effective upon the entry of the Final Order), the proceeds of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions"), (z) 100% of the Equity Interests (as defined in the DIP Loan Agreements) of any Borrower, any Debtor, or any Guarantor owned (directly or indirectly),

beneficially or of record, by the Borrower, any Debtor, or any Guarantor other than Aegean Oil Terminal Corp.; and (aa) 100% of the Equity Interests that any Borrower, any Debtor, or any Guarantor may own, beneficially or of record, directly or indirectly, other than Aegean Oil Terminal Corp. (i) in any subsidiary thereof (whether or not such entity is wholly owned or immaterial) and (ii) in any corporation, partnership (limited or general), joint venture, limited liability company, business trust, association or other legally recognized entity (a "Person" as defined in the DIP Loan Agreements), including joint venture interests and majority and minority interests in any Person owned by any Borrower, any Debtor and any Guarantor; and (d) approval of the Stalking Horse Bid.

(viii)   <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  Based upon the pleadings and proceedings of record in the Cases, (a) the terms of the DIP Loan Documents (including, without limitation, the Roll-Up) and this Interim Order are fair, just and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and DIP Secured Parties, with all parties being represented by counsel.   Any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facilities, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of

Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(ix) <u>Roll-Up of Prepetition Secured Obligations</u>. Upon entry of this Interim Order, without further action by the Debtors or any other party, (a) the letters of credit issued under the U.S. Prepetition Credit Facility and the Global Prepetition Credit Facility (collectively, the "<u>Prepetition Letters of Credit</u>") shall become Letters of Credit under the DIP Obligations; (b) 50% of the Prepetition Secured Obligations shall become DIP Obligations; (c) all cash proceeds of U.S. Priority Collateral securing U.S. Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay down outstanding obligations under the U.S. Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the U.S. DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; and (d) all cash proceeds of Global Prepetition ABL Collateral securing Global Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay-down outstanding obligations under the Global Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the Global DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount. The replacement and refinancing of the Prepetition Secured Obligations shall be authorized as compensation for, and in consideration for, and solely on account of, the agreement of the DIP Lenders to fund the DIP Loans and to provide other consideration to the Debtors and the other borrowers under the DIP Facilities. The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Secured Parties would not be willing to provide the DIP Facilities or extend credit to the Debtors

thereunder without the inclusion of the Roll-Up in the DIP Obligations. Moreover, the replacement and refinancing (pursuant to the Roll-Up) will (a) create greater availability under the DIP Facilities, (b) benefit the Debtors and their estates as a result of the DIP Lenders' agreement to make certain revisions to the borrowing base and waiver certain defaults, and (c) will enable the Debtors to obtain urgently needed financing to administer these cases.

(x)     Credit Bidding.  Upon entry of this Interim Order, but subject to section 4.1 herein, the DIP Lenders, DIP Agents, and Prepetition Secured Parties, as applicable, shall have the right to credit bid the entirety of (or any portion of) the full amount of the DIP Obligations and/or Prepetition Secured Obligations (as applicable) in connection with any asset sale process, including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129 of the Bankruptcy Code, and such right to credit bid shall not be subject to challenge or objection.

(xi)     Debtors Will Not Challenge Credit Bid Rights.  No Debtor or Debtor's affiliate shall object to any DIP Lender's, DIP Agent's, Prepetition Secured Parties' right to credit bid up to the full amount of its DIP Obligations and/or Prepetition Secured Obligations, in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through section 363 of the Bankruptcy Code, in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code, by a chapter 7 or chapter 11 trustee, or otherwise, provided that any proceeds of any sale be applied in accordance with the waterfall set forth in the applicable DIP Loan Documents.

(xii)     Sections 506(c) and 552(b).  Subject to entry of a Final Order, and only effective upon entry of the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that as a material inducement to the DIP Secured Parties to agree

to provide the DIP Facilities, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facilities to the extent set forth herein, (b) the DIP Agents' and DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of ABL Cash Collateral consistent with the Approved Budget and the terms of this Interim Order, and subject to the Final Order, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled to receive, (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

(xiii)    Good Cause.    Good cause has been shown for the entry of this Interim Order. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets. The terms of the DIP Facilities (including the Roll-Up) are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.

(xiv)    Adequate Protection.    The Prepetition Secured Parties are entitled pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition ABL Collateral (including ABL Cash Collateral), to the extent set forth in this Interim Order.

(xv)    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

Section 1.    <u>Authorization and Conditions to Financing.</u>

1.1    <u>Motion Granted</u>.  The Motion is granted to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that has not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

1.2    <u>Authorization of DIP Financing</u>.  The Debtors are hereby authorized and empowered to immediately borrow, incur and guarantee (as applicable), (a) pursuant to the terms and conditions of the U.S. DIP Agreement, (i) loans under the U.S. Revolving Credit Facility, up to an initial aggregate principal amount, together with the outstanding amounts under the U.S. Prepetition Credit Facility, of $160,000,000 in U.S. Revolving Commitments, of which up to $50,000,000 shall constitute a sublimit for the issuance of U.S. Letters of Credit and Swing Line Loans; (ii) DIP Term Loans, pursuant to the terms and conditions of the U.S. DIP Agreement, in an aggregate principal amount not to exceed $40,000,000 prior to the entry of the Final Order to the U.S. Borrower, and the loans advanced under the DIP Loan Documents from time to time to the U.S. Borrower, with the right of the U.S. Borrower to make available, through approved inter-company loans, transfers and investments, such funds to the Global Borrowers, consistent with the

applicable Approved Budget and (b) loans under the Global DIP Revolving Credit Facility, pursuant to the Global DIP Agreement, a committed senior secured super-priority asset-based credit facility will be made available to the Global Borrowers in an initial aggregate principal amount, together with the outstanding amounts under the Global Prepetition Credit Facility, of $300,000,000 in Global Revolving Commitments, of which up to $100,000,000 shall constitute a sublimit for the issuance of the Global Letters of Credit.

1.3     The DIP Facilities may be borrowed by Debtors during the Interim Financing Period (as defined below) in accordance with the DIP Loan Documents, plus all interest, costs, and fees, accrued or accruing under the DIP Loan Agreements and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents, in each case during the period commencing on the date of this Interim Order through and including the entry of the Final Order (the "Interim Financing Period").  Subject to the terms and conditions contained in this Interim Order and the DIP Loan Documents, the Debtors shall use the proceeds of the DIP Facilities pursuant to the terms and conditions consistent with the Approved Budget, DIP Loan Documents and this Interim Order.

1.4     Financing Documents

(a)     Authorization.  The Debtors are hereby authorized and directed to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.  Subject to Section 4.1 hereof, no obligation, payment, transfer or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law),

or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule or regulation by any person or entity.

(b)     Approval; Evidence of Borrowing Arrangements.     All terms, conditions and covenants set forth in the DIP Loan Documents (including, without limitation, each of the DIP Loan Agreements) are approved.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agents and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of each DIP Loan Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of each DIP Agent's and DIP Lender's closing, arranger and administrative fees, consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the DIP Loan Documents.  Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding and enforceable against the Debtors, their Estates and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(c)     Payment of DIP Premiums and Other Expenses.  Any and all fees and expenses payable pursuant to the DIP Loan Documents (including, for the avoidance of any

~~doubt, any original issue discount)~~ (collectively, any and all such fees and expenses, the "<u>DIP Fees</u>") are hereby approved, and the Debtors are authorized to and shall pay the DIP Fees as set forth in the applicable DIP Loan Documents. The Debtors are also authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agents and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order in accordance with Section 6.14 hereof. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

(d)     <u>Non-Material Amendments to DIP Loan Documents</u>. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make ministerial amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agents and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Bankruptcy Court; *provided* that Debtors shall file a notice on the Court's docket of any such ministerial amendment, modification, or supplement, or waiver, not more than three (3) Business Days after the effective date thereof. Any amendments, modifications or supplements to any DIP Loan Documents, other than as set forth in the preceding sentence (collectively, "<u>Material DIP Amendments</u>"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the DIP Agents; (ii) counsel to the DIP Lenders, (iii) counsel for each of the Prepetition Term Parties; (iv) counsel to the Committee, or in the event no such Committee is appointed at the time of such Material DIP Amendment, the 30 Largest Unsecured Creditors, and (v) the U.S. Trustee. If no party in interest files an objection to the Material DIP Amendment with the Court within three (3) Business Days from the date the notice of the Material DIP Amendment is filed with the

Court in accordance with this Section 1.4, the Debtors and the applicable DIP Secured Parties are authorized and empowered to implement, in accordance with the terms of the applicable DIP Loan Documents, such Material DIP Amendment, without further notice, hearing or approval of this Court. Any Material DIP Amendment subject to a timely and unresolved objection must be approved by the Court to be effective.

      1.5      <u>Payments and Application of Payments</u>.

      (a)      All proceeds of the Prepetition ABL Collateral received by any Prepetition Secured Parties, or by any of the Debtors, and any other amounts or payments received by the DIP Agents, any DIP Lender or any of the Debtors in respect of the DIP Obligations, shall be applied or deemed to be applied on a dollar-for-dollar basis by the DIP Agents first to repayment of the remaining Prepetition ABL Obligations, then to the repayment in full of the DIP Obligations until indefeasibly paid in full in accordance with the DIP Loan Agreements, the other DIP Loan Documents, and this Interim Order; *provided* that any repayment of the Prepetition ABL Obligations shall be subject to the terms of this remainder of this Interim Order and Section 4.1(a) hereof.

      (b)      Upon entry of this Interim Order, without further action by the Debtors or any other party, (i) the Prepetition Letters of Credit shall become Letters of Credit under the DIP Obligations; (ii) 50% of the Prepetition Secured Obligations shall become DIP Obligations; (iii) all cash proceeds of U.S. Priority Collateral securing U.S. Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay down outstanding obligations under the U.S. Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the U.S. DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a

corresponding amount; (iv) all cash proceeds of Global Prepetition ABL Collateral securing Global Secured Obligations (each as defined in the DIP Intercreditor Agreement) shall be deemed to pay-down outstanding obligations under the Global Prepetition Credit Facility on a dollar-for-dollar basis and, contemporaneously therewith, increase availability under the Global DIP Revolving Credit Facility, subject to compliance with any applicable borrowing base limitations as set forth herein, by a corresponding amount; provided, however, that ~~(i) and (ii) hereof~~this section shall be subject to section 4.1 of this Interim Order and Local Rule 4001-2(g)(5).

1.6     <u>Continuation of Prepetition Procedures</u>.  Except to the extent expressly set forth in the Prepetition Loan Documents and DIP Loan Documents, all prepetition practices and procedures for the payment and collection of proceeds of the Prepetition ABL Collateral, sleeving, the turnover of cash, the delivery of property to the U.S. Prepetition Agents and the U.S. Prepetition Lenders, including the Deposit Account Control Agreements (as such term is defined in the U.S. Prepetition Credit Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption.

1.7     <u>Indemnification</u>.  The Debtors are authorized to indemnify and hold harmless the DIP Agents, each DIP Lender and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

Section 2.     <u>Postpetition Lien; Superpriority Administrative Claim Status.</u>

2.1     <u>Postpetition Lien</u>.

(a)     Postpetition DIP Lien Granting.   To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of Debtors to the DIP Secured Parties of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Agents, for the benefit of themselves and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "DIP Liens", and together with the Prepetition Liens on the DIP Collateral, the "DIP Liens") in and upon all DIP Collateral, subject to the priority set forth in Section 2.1(b), below.

(b)     DIP Lien Priority in Collateral.   The DIP Liens securing all DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Liens on the (i) DIP Collateral shall be subject to the Carve Out and Permitted Liens (as defined in the applicable DIP Loan Agreement) and (ii) Prepetition Term Collateral shall be subject to the Carve Out, Permitted Liens, Prepetition Term Liens, and any adequate protection liens or claims granted pursuant to the Prepetition Term Adequate Protection Orders (the "Prepetition Term Adequate Protection Liens and Claims"); provided, for the avoidance of doubt, the Prepetition Term Adequate Protection Liens and Claims shall be limited to the (i) prepetition collateral granted to any Prepetition Term Party under the respective Prepetition Term Loan Documents (as defined in the Motion) and (ii) the borrowers under the applicable Prepetition Term

Loan Facility under which such Prepetition Term Party is a party and any other Debtor against whom such Prepetition Term Party has a Prepetition Term Lien.

(c) <u>Postpetition Lien Perfection.</u> This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the DIP Liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) party to a Deposit Account Control Agreement or other depository account consisting of DIP Collateral (a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if either DIP Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then such DIP Agent is authorized to perform such act, and the Debtors and Guarantors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. The DIP Agents may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should either DIP Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive

or alter the validity, enforceability, attachment, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)      To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the DIP Agents' and the DIP Lenders' liens and security interests granted and created by this Interim Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of the United States Bankruptcy Court. By virtue of the terms of this Order, to the extent that any DIP Agent has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Order without further action by the applicable DIP Agent.

(e)      The DIP Liens and the DIP Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of these Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee or any other estate representative appointed or elected in these Cases or any Successor Cases and/or upon the dismissal of any of these Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code; *provided, however,* that notwithstanding the foregoing, the DIP Liens and DIP Superpriority Claims shall be subject to the Carve Out, the Prepetition Term Liens, and Prepetition

Term Adequate Protection Liens and Claims; *provided further* that the DIP Lenders intend to require that the Final Order shall provide, and the Debtors have agreed as a condition to obtaining financing under the DIP Facilities, to seek Court approval at the Final Hearing that the DIP Liens and DIP Superpriority Claims shall not be subject to section 506(c) of the Bankruptcy Code.

2.2 <u>Superpriority Administrative Expenses.</u>

(a) <u>DIP Loans</u>. For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents or otherwise, the DIP Agents, for the benefit of themselves and the DIP Lenders, are granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve Out, Prepetition Term Liens, and Prepetition Term Adequate Protection Liens and Claims), whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113 or 1114 of the Bankruptcy Code (other than the Carve Out and Prepetition Term Adequate Protection Liens and Claims), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (other than the Carve Out, the Prepetition Term Liens and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) (the "<u>DIP Superpriority Claims</u>"); *provided, however,* that notwithstanding the foregoing, the DIP Superpriority Claims shall be subject to the Carve Out, the Prepetition Term Liens, and the Prepetition Term Adequate Protection Liens and Claims.

2.3     Carve Out.

(a)     Carve Out.  The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $~~50~~100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by either DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; *provided, however,* that the Carve Out shall not include amounts related to any completion fee, success fee, restructuring fee, or similar such fee or compensation in respect of any Professional Persons; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first Business Day following delivery by either DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by either DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence

and during the continuation of an Event of Default and acceleration of an obligation under the applicable DIP Facility stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for both revolving and any outstanding delayed draw term loans under the DIP Facilities (on a pro rata basis based on the then outstanding U.S. Revolving Commitments, DIP Term Loan Commitment, or Global Revolving Commitments (together, the "<u>Commitments</u>")), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for both revolving and any outstanding delayed draw term loans under the DIP Facilities (on a pro rata basis based on the then outstanding Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting

from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Facilities to the contrary, including with respect to the existence of a Default (as defined in the applicable DIP Facility) or Event of Default (as defined in the applicable DIP Facility), the failure of the Debtors to satisfy any or all of the conditions precedent for any of the DIP Loans under any of the DIP Facilities, any termination of the Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the applicable DIP Facility), each DIP Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the applicable DIP Facility. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless all DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties (as defined in the Motion), in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agents for the benefit of the DIP Lenders, unless the DIP Obligations have been

indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Section 2.3, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Section 2.3, prior to making any payments to the DIP Agents or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agents and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Loan Agreements) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facilities, or in any Prepetition Credit Facilities, the Carve Out shall be senior to all liens and

claims securing all of the DIP Facilities, the Prepetition Replacement Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations. For the avoidance of doubt, the Carve Out shall not be senior to the Prepetition Term Liens or the Prepetition Term Adequate Protection Liens and Claims.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, the Prepetition Secured Parties, or the Prepetition Term Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, or the Prepetition Term Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

2.4     Excluded Professional Fees.  Notwithstanding anything to the contrary in this Interim Order, none of the (i) Carve Out, (ii) DIP Facilities, (iii) DIP Collateral, Prepetition ABL Collateral, DIP Loans, ABL Cash Collateral, Revolving Loans, Letters of Credit, or (iv) any other credit or financial accommodations provided under or in connection with any of the DIP Loan Documents, nor the proceeds of any of the foregoing may be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional Person, directly or indirectly, or by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in these Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any of the following unless, with respect to (ii)-(iv),  agreed to in writing by the DIP Lenders:

(a)     an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the (A) Prepetition Secured Obligations or Prepetition Secured Parties' liens on and security interests in the Prepetition ABL Collateral, and (B) the DIP Obligations or any DIP Agent's or DIP Lender's liens on and security interests in the DIP Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Prepetition Secured Obligations or Prepetition Secured Parties' liens on and security interests in the Prepetition ABL Collateral, and (B) the DIP Obligations or any DIP Agent's or DIP Lender's liens on and security interests in the DIP Collateral; or (iii) preventing, hindering or delaying either DIP Agent's or DIP Lenders' enforcement of any lien, claim, right or security interest or realization upon any DIP

Collateral in accordance with the terms and conditions of either DIP Loan Agreement or any DIP Loan Documents, respectively, and this Interim Order;

(b)        (i) to use or seek to use ABL Cash Collateral; (ii) except as permitted by the DIP Loan Documents, to sell or otherwise dispose of the DIP Collateral (or any portion thereof) other than in accordance with the terms of this Interim Order; (iii) except to the extent permitted by the DIP Loan Documents, to use or seek to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agents and the applicable Required DIP Lenders (as defined in the applicable DIP Loan Document); (iv) except to the extent expressly permitted by the DIP Loan Documents, to seek authorization to incur Indebtedness or Financial Indebtedness (as defined in the applicable DIP Loan Agreements) or to incur liens or security interests; (v) to object to or challenge in any way the rights granted or provided to the DIP Secured Parties under the terms of this Interim Order or the Bankruptcy Code, the DIP Liens, DIP Obligations, Prepetition Liens, Prepetition Secured Obligations, DIP Collateral (including ABL Cash Collateral or Prepetition ABL Collateral or any other claims or liens held by or on behalf of any of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, respectively, (vi) to prosecute or support any plan of liquidation or reorganization that crams down or reinstates the Prepetition Secured Obligations, (vii) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Released Parties with respect to any transaction, occurrence, omission, action or other matter arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the Prepetition

Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any challenge to, claim, or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents  or the Prepetition Secured Obligations, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, limit, restrict, subordinate, disallow, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the DIP Collateral, the Prepetition ABL Collateral, the Prepetition Secured Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agents or the DIP Lenders hereunder or under any of the DIP Loan Documents, the Prepetition Secured Parties under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and this Order and/or the Final Order (as applicable) (provided, however, and subject to entry of the Final Order, that an amount no more than, $50,000 in the aggregate, to be incurred solely by the Committee (the "Investigation Budget Amount") of the DIP Collateral or proceeds from the borrowings under the DIP Facilities or any other amounts, may be used for allowed fees and expenses in investigating (but not objecting to, challenging, litigating (including by way of discovery), opposing, or seeking to subordinate or recharacterize) the validity, enforceability, perfection, priority or extent of the Prepetition Liens, the Prepetition

Loan Documents, or the Prepetition Secured Obligations, within the applicable challenge period as set forth in Section 4.1.

(c)     any act which has or could adversely modify or compromise the rights and remedies of any DIP Secured Party and/or Prepetition Secured Party under this Interim Order, including, without limitation, a challenge to the ability of any DIP Secured Party or Prepetition Secured Party to credit bid in connection with the sale of any assets of the Debtors, or which directly results in the occurrence of a DIP Termination Event under any DIP Loan Documents, or this Interim Order.

2.5     Use of ABL Cash Collateral; Adequate Protection.

(a)     Authorization to Use ABL Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and consistent with the Approved Budget, the Debtors shall be and are hereby authorized to use the ABL Cash Collateral (as defined in section 363 of the Bankruptcy Code) for the period commencing on the date of this Interim Order and terminating upon the occurrence of a DIP Termination Event.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of ABL Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Loan Documents and compliance with the Approved Budget.  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any ABL Cash Collateral shall not be used as a basis to challenge any of the Prepetition Secured Obligations, or the extent, validity, enforceability or perfected status of any of the Prepetition Liens.

(b)     **Prepetition Replacement Liens**.   As adequate protection for the Diminution in Value of their interests in the Prepetition ABL Collateral (including ABL Cash Collateral) and the subordination to the Carve Out, the Prepetition Secured Parties for the benefit of themselves and the Prepetition Lenders, are hereby granted pursuant to sections 361 and 363 of the Bankruptcy Code, and solely to the extent of the Diminution in Value, valid, binding, enforceable and perfected replacement liens upon and security interests in all DIP Collateral other than the Prepetition Term Collateral (the "**Prepetition Replacement Lien**").   The Prepetition Replacement Lien shall be junior and subordinate only to (i) the Carve Out, (ii) the Permitted Liens (as defined in the DIP Loan Agreements) (iii) Prepetition Secured Parties and Prepetition Lenders' liens on the DIP Collateral to secure the Prepetition ABL Obligations, and (iv) the DIP Agents' and DIP Lenders' DIP Lien on the DIP Collateral. Notwithstanding the foregoing, payment of any documented fees, costs and expenses of the Prepetition Term Parties pursuant to the respective Adequate Protection Order, including all reasonable and documented professional and advisory fees, costs, and expenses of legal, financial and other professionals, shall not be subject to disgorgement.

(c)     **Prepetition 507(b) Priority Claims**.   As additional adequate protection for the Diminution in Value, the Prepetition Secured Parties for the benefit of themselves and the Prepetition Lenders, are hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of the Diminution in Value, an allowed superpriority administrative expense claim in each of these Cases and any successor bankruptcy cases (the "**Prepetition Adequate Protection Superpriority Claim**").   The Prepetition Adequate Protection Superpriority Claim shall be junior only to (i) the Carve Out, and (ii) the DIP Superpriority Claim, and (iii) the Prepetition Term Adequate Protection Liens and Claims, and

shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

(d)    Fees and Expenses.  The Prepetition Secured Parties for themselves and for the benefit of the applicable Prepetition Lenders, shall receive from the Debtors current cash payments of all reasonable and documented out-of-pocket fees and expenses (whether incurred prepetition or post-petition) of Allen & Overy LLP; Willkie Farr & Gallaher LLP; Milbank, Tweed, Hadley & McCloy LLP; Norton Rose Fulbright LLP and such other local counsels and advisors as may be required thereby (the "Creditor's Counsel"); provided, that any invoices submitted to, and payments made by, the Debtors under this Section 2.5(d) shall be subject to the procedures set forth in Section 5.14 of this Interim Order.

(e)    Adequate Protection Payments. The Prepetition Secured Parties for themselves and for the benefit of the applicable Prepetition Lenders, shall receive from the Debtors periodic adequate protection payments (the "Adequate Protection Payments") in an amount resulting from applying a per annum rate equal to the non-default interest rate under the applicable Prepetition Credit Facility to the aggregate outstanding amount of Prepetition Secured Obligations as of the Petition Date in respect of such relevant periods ending after the Petition Date (and not, for the avoidance of doubt, at any different rate set forth in any of the applicable Prepetition Credit Facilities); provided, however, that any Adequate Protection Payment shall be without prejudice, and with a full reservation of rights, as to whether such payment should be recharacterized or reallocated pursuant to section 506(b) of the Bankruptcy Code as principal payments under the applicable Prepetition Credit Facilities (whether as to principal, interest or otherwise).  The Adequate Protection Payments will be calculated on a monthly basis, and be due and payable on the first business day of each month occurring after the first full month following the Petition Date.

(f)     Adequate Protection Reservation.  The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to paragraph 2.5 of this Interim Order shall not be deemed an admission that the interests of the Prepetition Secured Parties are indeed adequately protected.  Further, nothing contained in this Interim Order shall prejudice or limit the rights of the Prepetition Secured Parties, subject to the Prepetition Intercreditor Agreements, to seek additional relief with respect to the use of ABL Cash Collateral or for additional adequate protection.

Section 3.     Default; Rights and Remedies; Relief from Stay.

3.1     Events of Default.  The occurrence of (a) any "Event of Default" as that term is defined in each of the DIP Loan Agreements; (b) any failure to meet or satisfy any Milestone in accordance with the applicable DIP Loan Agreement; (c) the Maturity Date under any DIP Loan Agreement; and/or (d) any violation, breach or default by any Debtor with respect to any of its obligations under this Interim Order, shall constitute a "DIP Termination Event" hereunder unless waived in writing by the applicable DIP Secured Parties and in accordance with the applicable DIP Loan Documents.

3.2     Rights and Remedies upon a DIP Termination Event.

(a)     Subject to the terms and provisions of the Prepetition Term Adequate Protection Orders, upon the occurrence of and during the continuance of a DIP Termination Event, the DIP Agents shall be entitled to take any act or exercise any right or remedy as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under their respective DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains (including provision of any Letters of Credit); (iii) terminate the DIP Facilities and any DIP Loan Document as to any

future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any ABL Cash Collateral and all authority to use ABL Cash Collateral shall cease, subject to section 3.2(b); (v) invoke the right to charge interest at the default rate under the DIP Loan Documents; (vi) freeze monies or balances in the Debtors' accounts constituting Collateral; (vii) immediately setoff any and all amounts in accounts maintained by the Debtors with the applicable DIP Agents or the DIP Lenders against the DIP Obligations; (viii) otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral for application towards the DIP Obligations, subject to section 3.2(b); and (A) take any other actions or exercise any other rights or remedies permitted under this Order, the DIP Loan Documents or applicable law; *provided, however*, that prior to the exercise of any right set forth in this paragraph, the applicable DIP Agent shall be required to provide three (3) Business Days' written notice to counsel to the Debtors, counsel to the Committee and the U.S. Trustee of its intent to exercise its rights and remedies (the "Enforcement Notice Period") other than with respect to funding of the Carve Out. The DIP Secured Parties shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of a DIP Termination Event, or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute a DIP Termination Event. For the avoidance of doubt, notwithstanding the forgoing, the Debtors may use ABL Cash Collateral for (i) the Carve Out Reserves, as set forth in Section 2.3; and (ii) subject to the Approved Budget, amounts that the Debtors have determined in good faith are, in the ordinary course, critical to the preservation of

the Debtors and their Estates and have approved in advance in writing by the applicable Required DIP Lenders.

(b)     Unless during such Enforcement Notice Period the Court determines that a DIP Termination Event has not occurred, the DIP Agents and the DIP Lenders shall be deemed to have received relief from the automatic stay, and subject in each case to the terms and conditions of the Prepetition Term Adequate Protection Orders, may (unless stayed) foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtor ABL Obligors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by the DIP Loan Documents in accordance with applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise.  During the Enforcement Notice Period, the Debtors may use ABL Cash Collateral to pay, subject to the Approved Budget, only the following amounts and expenses: (i) the Carve Out Reserves, as set forth in section 2.3; and (ii) subject to the Approved Budget, amounts that the Debtors have determined in good faith are, in the ordinary course, critical to the preservation of the Debtors and their Estates and have approved in advance in writing by the applicable Required DIP Lenders. The Debtors shall reasonably cooperate with the DIP Agents and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise, and the Debtors shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agents and the DIP Lenders set forth in this Interim Order and in the DIP Loan Documents, other than to dispute whether a DIP Termination Event has in fact occurred; *provided, however,* that none of the DIP

Secured Parties shall object to a request by the Debtors for an expedited hearing before the Court to contest whether a DIP Termination Event has in fact occurred.

3.3    Modification of Automatic Stay.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to (i) permit the DIP Agents to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Loan Agreements, the DIP Security Agreements, or the other DIP Loan Documents, as applicable, including, without limitation, (A) to implement the postpetition financing arrangements authorized by this Interim Order, (B) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (C) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition ABL Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs and expenses permitted under any of the DIP Loan Documents and apply such payments to the Prepetition ABL Obligations, and (D) immediately following the expiration of the Enforcement Notice Period (as referred to above), unless stayed, to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents or applicable law; *provided* that the authorization set forth in this paragraph 3.3(a) shall be subject in each case to the terms and conditions of the Prepetition Term Adequate Protection Orders and (ii) to permit the Stalking Horse Bidder to terminate the Stalking Horse Agreement in accordance with its terms and to deliver any notice or election contemplated thereunder.

Section 4.    Representations; Covenants; and Waivers.

4.1    Reservation of Third Party Challenge Rights.

(a)    <u>Objections to Prepetition ABL Obligations</u>.    Notwithstanding anything to the contrary in the Interim Order, any action, claim, defense, complaint, motion or other written opposition (hereinafter, a "<u>Prepetition Objection</u>") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind regarding: (i) the existence, validity or amount of the Prepetition ABL Obligations, as of the Petition Date, (including as to the value of a secured claim of the Prepetition Agent and Prepetition Lenders solely with respect to Prepetition ABL Obligations, pursuant to section 506(a) of the Bankruptcy Code) or (ii) the extent, legality, validity, perfection or enforceability of the Prepetition Secured Parties and Prepetition Lenders' respective prepetition liens and security interests in the Prepetition ABL Collateral solely with respect to Prepetition ABL Obligations, shall be properly filed with the Court (x) by the Committee, if a Committee is appointed and if the Court grants the Committee the requisite standing, within sixty (60) calendar days from the date of entry of the Final Order (the "<u>Committee Challenge Period</u>"), or (y) if no Committee is appointed, by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of the Final Order (such period, together with the Committee Challenge Period, the "<u>Challenge Periods</u>" and each, a "<u>Challenge Period</u>"); <u>provided</u>, <u>however</u>, that nothing herein shall permit any party to challenge the extent or validity of the DIP Obligations or any liens that secure such DIP Obligations or provide standing to any such party; *provided further however,* that the portion of the Roll-Up effective immediately upon entry of this Order shall be subject to Local Rule 4001-2(g)(5). If any such Prepetition Objection is timely and properly filed and a final, non-appealable order is entered by a court of competent jurisdiction sustaining and ordering some or all of the relief requested in such Prepetition Objection, nothing in this Interim Order shall prevent the Court from granting appropriate relief with respect to the

Prepetition ABL Obligations or the Prepetition Secured Parties or the Prepetition Lenders' liens on the Prepetition ABL Collateral. If no Prepetition Objection is timely and properly filed, or if a Prepetition Objection is timely and properly filed but denied, (i) the Prepetition ABL Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Secured Parties and the Prepetition Lenders' prepetition liens on and security interest in the Prepetition ABL Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes, and (ii) the Prepetition Secured Parties and the Prepetition Lenders, and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns (each in their respective capacities as such) shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Prepetition Loan Documents and the Prepetition ABL Obligations, and shall not be subject to any further objection or challenge relating thereto or arising therefrom by any party at any time. The stipulations set forth in Section E of this Interim Order shall be binding upon each party in interest, including the Committee (if appointed) unless the Committee or any other party in interest with the requisite standing, (i) timely files a Prepetition Objection pursuant to Section 4.1(a)(x) or 4.1(a)(y) above, as applicable, and (ii) such Prepetition Objection is sustained by a final and non-appealable order. Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Prepetition Secured Parties or any Prepetition Lenders in connection with all postpetition Revolving Loans and Letters of Credit, and any other postpetition financial and credit accommodations provided by Prepetition Secured Parties to Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this

Interim Order and the Prepetition Loan Documents. Nothing contained in this Section 4.1(a) or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to the DIP Agents or DIP Lenders in connection with all postpetition financial and credit accommodations provided by the DIP Agents or DIP Lenders in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the DIP Loan Documents.

(b)     Nothing in this Interim Order vests or confers on the Committee or any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their Estates, and all rights to object to such standing are expressly reserved.

(c)     If the DIP Facilities are not approved on a final basis due to the existence and approval of competing or alternative debtor-in-possession financing (a "Competing DIP Facility"), the Debtors, Guarantors, and Prepetition Obligors shall pay in cash within 15 days all amounts, obligations, and liabilities owing or payable to any Prepetition Secured Parties Prepetition Lenders, DIP Agents, or DIP Lenders, including any counsel or professionals retained by such Prepetition Secured Parties, Prepetition Lenders, DIP Agents, or DIP Lenders under the Prepetition Loan Documents or DIP Loan Documents including, without limitation, (i) any and all DIP Obligations and (ii) any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges and disbursements of the respective Prepetition Secured Parties (including the reasonable and documented fees and expenses of each of the Prepetition Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case constituting all "Obligations" as defined in the Prepetition

Loan Documents. For the avoidance of doubt, the "DIP Obligations" set forth in this Interim Order will include reasonable and documented fees and expenses incurred by the DIP Secured Parties in connection with the negotiation and preparation of the Stalking Horse Bid and any related documents.

4.2     Debtors' Waivers. Prior to the payment in full of all Prepetition ABL Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event: (a) to use ABL Cash Collateral of DIP Agents, the DIP Lenders, or the Prepetition Secured Parties under section 363 of the Bankruptcy Code; (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations, other than as provided in this Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Prepetition ABL Collateral is less than the Prepetition ABL Obligations; (d) to propose, support or have a plan of reorganization or liquidation that does not provide for the payment in cash in full and satisfaction of all DIP Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Loan Documents; (e) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lenders or the Prepetition Lenders from exercising their credit bid rights in connection with the sale of any Assets of the Debtors; or (f) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (i) the rights and remedies of any of the DIP Agents or the DIP Lenders against the Debtors as provided in this Interim Order or any of the DIP Loan Documents or (ii) the exercise of such rights or remedies by any of the DIP

Agents or the DIP Lenders against the Debtors in accordance with the DIP Loan Agreements or this Interim Order (other than to object to the exercise of the rights and remedies within the Enforcement Notice Period on the grounds set forth in Section 3.2 of this Interim Order); provided, however, that the DIP Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agents or any DIP Lender.

4.3     Collateral Rights.    Until all Prepetition ABL Obligations and DIP Obligations shall have been paid in full in accordance with the terms of the Prepetition Loan Documents and DIP Loan Documents, it shall be a DIP Termination Event pursuant to section 3.1 of this Interim Order if any Debtor takes any of the following actions, except to the extent permitted by, and subject in all respects to, the DIP Loan Documents and the Prepetition Term Adequate Protection Orders: take any action to foreclose upon or recover, in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Interim Order, or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or the Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any DIP Termination Event.

Section 5.     Prepetition Term Lender Adequate Protection Liens and Claims

5.1     As adequate protection for the Prepetition Term Parties' respective interests in their respective Prepetition Term Collateral, pursuant to section 361 and 363(e) of the Bankruptcy Code, and as a condition for the Debtors' use of their Prepetition Term Collateral, including any Prepetition Term Cash Collateral, each of the Prepetition Term Parties is granted the adequate protection set forth in (a) the relevant Prepetition Term Adequate Protection Order or (b) if no Prepetition Term Adequate Protection Order has been entered with respect to any Prepetition Term Party, (i) cash payment of all accrued and unpaid interest, at the applicable non-

default rates provided in the respective Prepetition Term Loan Document and (ii) continued maintenance of and appropriate insurance on the applicable collateral in amounts consistent with the Debtors' prepetition practices as set forth in the applicable Prepetition Term Loan Document; *provided, however,* that the Debtors reserve the right to seek recharacterization of adequate protection as being applied to principal and/or seek a determination on the value of the Prepetition Term Collateral. Notwithstanding the foregoing, payment of any documented fees, costs and expenses of the Prepetition Term Parties pursuant to the respective Adequate Protection Order, including all reasonable and documented professional and advisory fees, costs, and expenses of legal, financial and other professionals, shall not be subject to disgorgement.

5.2     Subject to the provision of the Prepetition Term Adequate Protection Liens and Claims, and the terms of the Prepetition Term Adequate Protection Orders, the Debtors are authorized to use the Prepetition Term Collateral, including the Prepetition Term Cash Collateral.

Section 6.     Other Rights and DIP Obligations.

6.1     No Modification or Stay of This Interim Order. The DIP Agents and the DIP Lenders have acted in good faith in connection with the DIP Facilities, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with Section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, reversed, amended or vacated by a subsequent order of the Court or any other court, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Prepetition Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim Order, any of the DIP Loan Documents or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or

56

(c) the dismissal or conversion of one or more of the Cases (each, a "<u>Subject Event</u>"), (x) the acts taken by each of the DIP Secured Parties in accordance with this Interim Order, and (y) the DIP Obligations incurred or arising prior to DIP Agents' actual receipt of written notice (email being sufficient) from the Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by each such DIP Secured Party in accordance with this Interim Order, and the liens granted to each DIP Secured Party in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of each DIP Secured Party pursuant to this Interim Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code. For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

6.2    <u>Rights of Access and Information</u>. The Debtors shall comply with the rights of access and information afforded to any DIP Secured Party under the DIP Loan Documents, the Debtors shall be and hereby are required to afford representatives, agents and/or employees of the DIP Agents and the DIP Lenders reasonable access to the Debtors' premises during normal business hours and without interference with the proper operation of the Debtors' businesses and their books and records, and shall reasonably cooperate, reasonably consult with, and reasonably provide to such persons all reasonable information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors; *provided* that (a) the costs and expenses of only one inspection per month will be reimbursed (if such inspection is not conducted by the DIP Agents), (b) representatives of the Debtors and the DIP Agents shall have been provided a reasonable opportunity to be present during the inspection, and (c) in no

event shall such inspection rights require the Debtors to provide any such information (i) in respect of which disclosure is prohibited by law or (ii) is subject to attorney-client privilege or constitutes attorney work-product.

6.3     Power to Waive Rights; Duties to Third Parties.  The DIP Agents shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lenders (the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Right(s).  Any waiver by the DIP Agents of any DIP Lender Rights shall not be or constitute a continuing waiver unless otherwise provided therein.  Any delay in or failure to exercise or enforce any DIP  Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agent or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agent or any DIP Lender.

6.4     No Unauthorized Disposition of Collateral.  The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and ABL Cash Collateral), other than pursuant to the terms of this Interim Order, the DIP Loan Documents, and the Prepetition Term Adequate Protection Orders.

6.5     No Waiver.  The failure of the DIP Lenders to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facilities, or the Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including

without limitation, the rights of the DIP Lenders to: (a) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases; or (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders.

6.6     <u>Maintenance of DIP Collateral</u>.  Unless the DIP Agents, acting at the direction of the applicable Required DIP Lenders, otherwise consent in writing, until (x) the payment in full or otherwise acceptable satisfaction of all DIP Obligations and (y) the termination of the DIP Agents' and the DIP Lenders' obligations to extend credit under the DIP Facilities, the Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents and in each case in accordance with the DIP Loan Documents.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, each of the DIP Agents (on behalf of the applicable DIP Lenders) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

6.7     <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Agent and DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates; *provided,*

*however,* that all such rights shall be subject to the terms and conditions of the Prepetition Term Adequate Protection Orders.

6.8     Binding Effect.

(a)     All of the provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, all Liens, and claims granted hereunder in favor of each of the DIP Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of each DIP Agent, DIP Lender, and Prepetition Secured Party set forth herein, including without limitation the parties' acknowledgements, stipulations, and agreements in paragraph E of this Interim Order, subject to section 4.1 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming and use of ABL Cash Collateral provided for hereunder) provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and enforceable immediately upon entry of this Interim Order notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h) and 7062, shall continue in full force and effect, and shall survive entry of any other order or action, including without limitation any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting one or more of the Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Cases, approving any sale of any or all of the DIP Collateral or the Prepetition ABL Collateral, or vacating, terminating, reconsidering, revoking or otherwise modifying this Interim Order or any provision hereof; *provided* that in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order with respect to any DIP Obligations incurred by the Debtors upon or after entry of the Final Order.

(b)     Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (i) the DIP Superpriority Claim and the DIP Agents' and DIP Lenders' liens on and security interests in the DIP Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition ABL Obligations are indefeasibly paid and satisfied in full, (ii) the DIP Superpriority Claim and DIP Agents' and DIP Lenders' liens on and security interests in the DIP Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

(c)     In the event this Court modifies any of the provisions of this Interim Order or any of the DIP Loan Documents following a Final Hearing, such modifications shall not affect the rights or priorities of any DIP Agent or DIP Lender pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations which arises or is incurred or is advanced prior to such modifications.

(d)     This Interim Order shall be binding upon Debtors, the Prepetition Obligors, all parties in interest in the Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This

Interim Order shall also inure to the benefit of Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

6.9     Discharge. The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties has otherwise agreed in writing. Prior to the payment in full of either DIP Facility, it shall be a DIP Termination Event under such DIP Facility if the Debtors propose or support any Chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the payment of the DIP Obligations (other than indemnities then due and payable) in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, within a commercially reasonable period of time, and in any event no later than the effective date of such Chapter 11 plan or sale, without the written consent of the DIP Agents and the applicable Required DIP Lenders.

6.10     No Priming of Prepetition Secured Obligations. Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the Prepetition Lenders, no Debtor shall seek authorization from this Court to obtain or incur any Indebtedness or enter into a Competing DIP Facility seeking to impose liens on any Prepetition ABL Collateral ranking on a pari passu or priming basis with respect to the Prepetition Liens held by the Prepetition Lenders; *provided*, however, that nothing herein shall preclude the

Debtors from seeking authorization to incur any Indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the Prepetition Secured Obligations.

6.11    Section 506(c) Waiver.  Subject to the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that in consideration for, among other things, the Carve Out and the payments to be made under the Approved Budget to administer these Cases with the use of ABL Cash Collateral, no costs or expenses of administration which have been or may be incurred in these Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection or enhancement of realization by the DIP Agents or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties or the Prepetition Lenders upon the Prepetition ABL Collateral, as applicable) shall be charged against any of the DIP Agents, DIP Lenders, Prepetition Secured Parties or any Prepetition Lenders or any of the DIP Obligations or Prepetition Secured Obligations or the DIP Collateral or the Prepetition ABL Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

6.12    Section 552(b) Waiver.  Subject to the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that the Prepetition Secured Parties and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) shall

not apply to the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties, the Prepetition Lenders or the Prepetition Secured Obligations.

6.13    No Marshaling/Application of Proceeds.  Subject to the Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facilities that in no event shall the DIP Agents, the DIP Lenders, Prepetition Secured Parties or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition ABL Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Loan Documents, as applicable.

6.14    Right to Credit Bid.  Subject to section 363(k) of the Bankruptcy Code, the terms of the DIP Loan Documents, the Final Order, the Prepetition Term Adequate Protection Orders, and section 4.1 hereof, (a) the DIP Agents, DIP Lenders, and each of the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process all or any portion of the full amount of the DIP Obligations, and (b) the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process all or any portion of the full amount of the Prepetition Secured Obligations including, without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code.

6.15    Payment of Lender Fees and Expenses.  Each Debtor shall pay all fees and expenses that may be reasonably required or necessary for the Debtors' performance of their obligations under the U.S. Prepetition Loan Documents, the Global Prepetition Loan Documents, DIP Facilities, the DIP Loan Agreements, or the DIP Loan Documents, as applicable, including, without limitation, the reasonable and documented fees and expenses reimbursable under the DIP

Facilities, the DIP Loan Agreements, or the DIP Loan Documents, as applicable, whether incurred before or after the Petition Date as set forth in this Section 6.15:

(a)    All reasonable and documented out-of-pocket costs and expenses of the DIP Agents including, without limitation, reasonable and documented fees and disbursements of counsel to DIP Secured Parties and of counsel to the DIP Agents, incurred in connection with the enforcement or preservation of any rights under the DIP Facilities, the DIP Loan Agreements, or the DIP Loan Documents and any such other documents or any restructuring or "work-out" related hereto and thereto.

(b)    DIP Loan Documentation and Related Expenses.  Section 6.15(c) notwithstanding, reasonable documented out-of-pocket costs and expenses (including legal fees and expenses) incurred by the DIP Agents or DIP Lenders, as the case may be, in connection with (i) negotiating, drafting, and otherwise documenting this Interim Order, any of the DIP Loan Documents, and any matters related to the foregoing and (ii) the commencement of these Cases (including matters and amounts relating to any "first day" filings or related relief) including prepetition discussions and actions relating to any prepetition financing, including any defaults related thereto, other financing issues, and contingency preparations, shall be due, owing, and payable by the Debtors immediately upon the entry of this Interim Order.

(c)    Payment of Certain Fees and Expenses.  Under no circumstances shall professionals for any of the DIP Secured Parties be required to comply with the U.S. Trustee fee guidelines or otherwise file a fee or retention application with the Court; *provided, however*, the Debtors shall provide to the U.S. Trustee and the Committee (if appointed) a copy of any invoices received from the DIP Agents or the DIP Lenders for professional fees and expenses during the pendency of these Cases or under this Interim Order within two Business Days of the

Debtors' counsel's receipt thereof. The Debtors shall promptly pay, and/or the DIP Agents are hereby authorized to make an advance under the DIP Loan Documents to timely pay, the submitted invoices for any of the DIP Secured Parties within the ten (10) calendar days of receipt of such invoices.

6.16    Limits on Lender Liability.

(a)    ~~In~~Subject to entry of the Final Order and section 4.1 hereof, in determining to make any loan under the DIP Loan Agreements or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agents and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the DIP Lenders' actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

(b)    Nothing in this Interim Order or the DIP Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).

(c)    As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

6.17    Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Cases, (b) converting any or all of these Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Cases, or (d) pursuant to which the Court abstains from hearing any of these Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Prepetition Lenders pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Cases, following dismissal of any of these Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facilities, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facilities which survive such discharge by their terms) and all commitments to extend credit under the DIP Facilities are terminated, and (ii) in respect of the Prepetition Secured Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties and the Prepetition Lenders provided for in this Interim Order have been indefeasibly paid in full in cash.

6.18    Proofs of Claim.  None of the Prepetition Secured Parties or the Prepetition Lenders shall be required to file proofs of claim in any of these Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s). Notwithstanding the foregoing, any Prepetition Agent (on behalf of itself and the Prepetition Lenders) is hereby authorized and entitled, in its discretion, but not required, to file (and amend

and/or supplement, as applicable) a master proof of claim for any claims of any of the Prepetition Secured Parties arising from the Prepetition Loan Documents or in respect of the Prepetition Secured Obligations; <u>provided</u>, <u>however</u>, that nothing in this Order shall waive the right of any Prepetition Lender to file its own proof of claim against any of the Debtors.

6.19 <u>No Third Party Rights</u>. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

6.20 <u>No Avoidance</u>. Subject to section 4.1 hereof, no obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facilities shall be avoidable or recoverable from the DIP Agents or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law; *provided,* for the avoidance of doubt, all such payments or transfers shall be subject to the terms and provisions of the Prepetition Term Adequate Protection Orders.

6.21 <u>Reliance on Order</u>. All postpetition advances under the DIP Loan Documents are made in reliance on this Order.

6.22 <u>Entry of this Order/Waiver of Applicable Stay</u>. This Interim Order shall be effective and enforceable upon its entry as of the Petition Date and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

6.23 *<u>Nunc Pro Tunc</u>* <u>Effect of this Order</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the

Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

6.24    Limited Effect.  In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

6.25    Prepetition Term Adequate Protection Orders. The rights and remedies of the DIP Secured Parties under the DIP Loan Documents shall be subject in all respects to the terms and provisions of the Prepetition Term Adequate Protection Orders.

6.26    Effect of Appeal.  To the fullest extent permitted under Section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter  modified, vacated, or stayed on appeal: (a) such stay, modification, or vacation shall not affect the validity of any obligation, indebtedness, or liability incurred or liens granted by the Debtors to any DIP Secured Party prior to the effective date of such stay, modification, or vacation, or the validity, enforceability or priority of any liens, rights, or claims authorized or created under the original provisions of this Interim Order or pursuant to any of the DIP Loan Documents; and (b) any indebtedness, obligation, or liability incurred by the Debtors to any DIP Secured Party under any DIP Loan Document prior to the effective date of such stay, modification, or vacation shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents, and each DIP Secured Party shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Liens and priorities granted to or for its benefit herein or pursuant to the applicable DIP Loan Documents, with respect to any such indebtedness,  obligation, or liability. All DIP credit extensions under the DIP Financing Documents are deemed to have been made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP

Facilities prior to the effective date of any stay, modification, or vacation of this Interim Order cannot as a result of any subsequent order in any of these Cases, or any Successor Case of a Debtor, be (i) subordinated or (ii) deprived of the benefit or priority of the DIP Liens and the Superpriority Claims granted to the DIP Secured Parties under this Interim Order or the DIP Loan Documents.

6.27    General Authorization. The Debtors are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

6.28    Retention of Exclusive Jurisdiction.  This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Loan Agreements, and the other DIP Loan Documents; *provided, however,* that no party shall be prevented from seeking relief from this Court to take proceedings relating to the DIP Loan Agreements and the other DIP Loan Documents in any other courts with jurisdiction in accordance with the terms of such agreements.

Section 7.    Final Hearing and Response Dates.

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for _____2018, at _____ __.m. (prevailing Eastern Time) before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel, if same shall have filed a request for notice.  The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at http://dm.epiq11.com/aegean, and such notice is deemed good and sufficient and no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Jonathan S. Henes, P.C. and Cristine Pirro Schwarzman, and Kirkland &

Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Marc Kieselstein, P.C., Ross M. Kwasteniet, P.C., Adam C. Paul, P.C., and W. Benjamin Winger; (b) counsel to the DIP Lenders, Milbank, 28 Liberty Street, New York, NY 10005, Attn: Lauren Doyle and Norton Rose Fulbright US LLP, 2200 Ross Avenue Suite 3600, Dallas, Texas 75201, Attn: Louis R. Strubeck and Greg Wilkes; (c) counsel to Administrative Agents, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Ana Alfonso; (d) counsel to any Committee; and (e) the U.S. Trustee, Attn: Brian Masumoto; and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on _____, 2018.


Manhattan, New York
Dated: _____, 2018

                                             _____
                                             HONORABLE _____
                                             UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

U.S. DIP Agreement

| No. | Type | Changed Text | Author |
|-----|------|--------------|--------|
| 367 | Insertion | 30 | |
| 368 | Deletion | 28 | |
| 369 | Insertion | 30 | |
| 370 | Deletion | 28 | |
| 371 | Insertion | 30 | |
| 372 | Deletion | 28 | |
| 373 | Insertion | 30 | |
| 374 | Deletion | 28 | |
| 375 | Insertion | 30 | |

**EXHIBIT B**

Global DIP Agreement

|CONFIDENTIAL

**Dated 30 November 2017 as amended
and restated pursuant to an
amendment and restatement
agreement dated          2018**


**AEGEAN MARINE PETROLEUM S.A.**
as the Company

**AEGEAN MARINE PETROLEUM S.A.
AEGEAN PETROLEUM INTERNATIONAL INC.
AEGEAN NWE N.V.
AEGEAN BUNKERING GERMANY GMBH** and
**OBAST BUNKERING & TRADING GMBH**
as the Borrowers

**CERTAIN COMPANIES**
as Guarantors

**ABN AMRO BANK N.V.**
as Facility Agent, Collateral Management Agent and Security Agent

**CERTAIN PERSONS**
as Lenders, Issuing Banks and Overdraft Bank

**MERCURIA ENERGY TRADING S.A.**
as Co-Ordinator and as a Hedging Provider




# SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION FACILITY AGREEMENT FOR A BORROWING BASE FACILITY

# Contents

| Clause | | Page |
|---|---|---|

Section 1 Interpretation ...................................................................................................6

1      Definitions and Interpretation ...............................................................................6

Section 2 The Facility .....................................................................................................45

2      The Facilities ........................................................................................................45

3      Purpose ................................................................................................................48

4      Conditions of Utilisation .......................................................................................48

Section 3 Utilisation ........................................................................................................51

5      Utilisation ..............................................................................................................51

6      Fronted Facilities .................................................................................................54

Section 4 Repayment, Prepayment and Cancellation.....................................................64

7      Repayment ...........................................................................................................64

8      Voluntary prepayment and cancellation ..............................................................65

9      Mandatory prepayment and cancellation ............................................................66

10     Restrictions.........................................................................................................~~68~~69

Section 5 Costs of Utilisation ..........................................................................................70

11     Interest .................................................................................................................70

12     Interest Periods ...................................................................................................71

13     Changes to the Calculation of Interest ...............................................................72

14     Fees.....................................................................................................................73

Section 6 Additional Payment Obligations ......................................................................75

15     Tax Gross Up and Indemnities ...........................................................................75

16     Increased Costs ...................................................................................................80

17     Other Indemnities ................................................................................................81

18     Mitigation by the Lenders ....................................................................................84

19     Costs and Expenses ...........................................................................................84

Section 7 Guarantee .......................................................................................................87

20     Guarantee and Indemnity ...................................................................................87

Section 8 Representations, Undertakings and Events of Default .....................................95

| 21 | Representations | 95 |
|----|-----------------|-----|
| 22 | Information Undertakings | 102 |
| 23 | Budget variance | 111 |
| 24 | General Undertakings | 111 |
| 25 | Bank Accounts | 125 |
| 26 | Events of Default | 128 |

Section 9 Changes to Parties .................................................. 136

| 27 | Changes to the Lenders | 136 |
|----|------------------------|-----|
| 28 | Restriction on Debt Purchase Transactions | 140 |
| 29 | Changes to the Obligors | 141 |

Section 10 The Finance Parties .................................................. 145

| 30 | Role of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Overdraft Bank and Others | 145 |
|----|---------------|-----|
| 31 | The Security Agent | 156 |
| 32 | Conduct of Business by the Finance Parties | 168 |
| 33 | Sharing among the Finance Parties | 169 |

Section 11 Administration .................................................. 171

| 34 | Payment mechanics | 171 |
|----|-------------------|-----|
| 35 | Set-Off | 175 |
| 36 | Notices | 175 |
| 37 | Calculations and Certificates | 178 |
| 38 | Partial Invalidity | 179 |
| 39 | Remedies and Waivers | 179 |
| 40 | Amendments and Waivers | 179 |
| 41 | Confidentiality | 181 |
| 42 | Counterparts | 184 |

Section 12 Governing Law and Enforcement .................................................. 185

| 43 | Governing Law | 185 |
|----|---------------|-----|
| 44 | Enforcement | 185 |
| 45 | Bail-in Clause | 187 |

46      Resolution Stay ............................................................................................................188

Schedule 1 The Original Parties...............................................................................................190

Part I The Obligors ..................................................................................................................190

Part II The Original Lenders .....................................................................................................192

Schedule 2 Conditions precedent ............................................................................................193

Part I Conditions precedent to initial Utilisation ......................................................................193

Part II Conditions precedent required to be delivered by an Additional Obligor ....................197

Part III Conditions precedent required to be delivered in connection with Sensitive Zones ...198

Part IV Spanish Pledgor conditions precedent........................................................................198

Schedule 3 Utilisation Request ................................................................................................200

Schedule 4 Form of Transfer Certificate .................................................................................203

Schedule 5 Form of Assignment Agreement............................................................................205

Schedule 6 Form of Compliance Certificate ............................................................................208

Schedule 7 Timetables .............................................................................................................209

Schedule 8 Forms of Notifiable Debt Purchase Transaction Notice .......................................210

Part I Form of Notice on Entering into Notifiable Debt Purchase Transaction ........................210

Part II Form of Notice on Termination of Notifiable Debt Purchase Transaction / Notifiable Debt Purchase Transaction ceasing to be with Parent Affiliate ....................................................211

Schedule 9 Form of Accession Letter ......................................................................................212

Schedule 10 Form of Resignation Letter..................................................................................213

Schedule 11 Borrowing Base Amount......................................................................................214

Schedule 12 Form of Borrowing Base Report..........................................................................221

Schedule 13 Approved Suppliers .............................................................................................223

Schedule 14 Permitted Financial Indebtedness .......................................................................224

Schedule 15 Form of New Lender Spanish Power of Attorney.................................................226

Schedule 16 Form of Deed of Undertaking .............................................................................229

Schedule 17 Form of Lender utilisation report .........................................................................234

Schedule 18 Debtors' Budget...................................................................................................235

Schedule 19 Interim DIP Order ................................................................................................236

Schedule 20 - Required Milestones .........................................................................................237

Schedule 21 - Agreed Security Principles ........................................................................239

Schedule 22 – Existing Security .....................................................................................242

SIGNATURES ......................................................................................................... 242243

**THIS AGREEMENT** is dated 30 November 2017 as amended and restated pursuant to an amendment and restatement agreement dated                    2018 and made between:

(1)     **AEGEAN MARINE PETROLEUM S.A.** a corporation incorporated under the laws of Liberia with registered office at 80 Broad Street, Monrovia, Republic of Liberia (the **Company**);

(2)     **AEGEAN PETROLEUM INTERNATIONAL INC.**, a corporation incorporated under the laws of the Marshall Islands with registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, MH96960, Marshall Islands (**APII**);

(3)     **AEGEAN NWE N.V.**, a limited liability company incorporated under the laws of Belgium having its registered office at Ruiterijschool 1, 2930 Brasschaat, Belgium, registered under company number BTW BE 0412.527.142 RPR/RPM Antwerp (section Antwerp) (**ANNV**);

(4)     **AEGEAN BUNKERING GERMANY GMBH**, a limited liability company incorporated under the laws of the Federal Republic of Germany, having its business address at Holstenwall 5, 20355 Hamburg, Germany which is registered in the commercial register (*Handelsregister*) kept at the local court (*Amtsgericht*) of Kiel under registration number HRB 16326 KI (**ABGG**);

(5)     **OBAST BUNKERING & TRADING GMBH**, a limited liability company incorporated under the laws of the Federal Republic of Germany, having its business address at Dalwitzhofer Weg 22 a, 18055 Rostock, Germany which is registered in the commercial register (*Handelsregister*) kept at the local court (*Amtsgericht*) of Rostock under registration number HRB 13560 (**OBTG**);

(6)     **THE COMPANIES** listed in Part I (*The Obligors*) of Schedule 1 (*The Original Parties*) as guarantors (the **Guarantors**);

(7)     **THE PERSONS** listed in Part II (*The Original Lenders*) of Schedule 1 (*The Original Parties*) as lenders (the **Original Lenders**);

(8)     **ABN AMRO BANK N.V.** as facility agent of the other Finance Parties (the **Facility Agent**);

(9)     **ABN AMRO BANK N.V.** as collateral management agent of the other Finance Parties (the **Collateral Management Agent**);

(10)    **ABN AMRO BANK N.V.** as security trustee for the Secured Parties (the **Security Agent**);

(11)    **MERCURIA ENERGY TRADING S.A. (METSA)** as co-ordinator (the **Co-Ordinator**);

(12)    **ABN AMRO BANK N.V.** as Facility B Tranche 1 issuing bank (the **Facility B Tranche 1 Issuing Bank**);

(13)    **ABN AMRO BANK N.V.** as Facility B Tranche 2 issuing bank (the **Facility B Tranche 2 Issuing Bank**);

(14)    **ABN AMRO BANK N.V.** as overdraft bank (the **Overdraft Bank**); and

(15)    **MERCURIA ENERGY TRADING S.A.** (**METSA**) as hedging provider (a **Hedging Provider**).

**WHEREAS**:

(A)     On ___ November 2018 (the **Petition Date**), the Parent and the other Debtors filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of the relevant Borrowers and the Guarantors, each a **Case** and together, the **Cases**) and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(B)     The Obligors have requested that the Lenders extend credit to them in the form of a debtor-in-possession first-out revolving credit facility in an aggregate principal amount of up to

$300,000,000, subject to the conditions set out in this Agreement. All of the Borrowers' obligations under the Facility are to be guaranteed by the Parent and certain of its Subsidiaries (subject to the terms of this Agreement). The Lenders are willing to extend such credit, and the Issuing Bank is willing to issue letters of credit, to the relevant Borrowers, in each case, on the terms and subject to the conditions set out in this Agreement.

(C)    The respective priorities of each Facility and the other Secured Obligations shall be as set out in this Agreement, the Interim DIP Order and the Final DIP Order, in each case upon entry thereof (as applicable) by the Bankruptcy Court.

**IT IS AGREED** as follows:

**Section 1**
**Interpretation**

# 1    Definitions and Interpretation

## 1.1    Definitions

In this Agreement (including the Recitals):

**Acceptable Bank** means:

(a)    ABN AMRO Bank N.V.;

(b)    a bank or financial institution which:

   (i)    has a rating for its long-term unsecured and non-credit-enhanced debt obligations of BBB- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or Baa3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency; and

   (ii)    (other than when used in the definitions of "Cash" and "Cash Equivalent Investments") has been approved in writing by the Issuing Bank; and/or

(c)    any other bank or financial institution approved by the Facility Agent and the Issuing Banks.

**Acceptable Reorganization Plan** means a Debtor Relief Plan that provides for the termination of the Commitments and the payment in full of the Prepetition Obligations and the Secured Obligations (other than contingent indemnification obligations not yet due and payable but which, for the avoidance of doubt, shall be preserved in such Debtor Relief Plan) in cash on the effective date of such Debtor Relief Plan to the extent not previously paid from the proceeds from a sale under Section 363 of the Bankruptcy Code

**Accession Letter** means a document substantially in the form set out in Schedule 9 (*Form of Accession Letter*)

**Account Bank** means the Collateral Management Agent

**Accounting Principles** means generally accepted accounting principles in The United States of America

**Accounting Reference Date** means 31 December

**Account Pledge Agreements** means the pledge agreement dated on or about 30 November 2017 between the Borrowers as pledgors and the Security Agent as pledgee, pursuant to which the Borrowers pledge, inter alia, all amounts standing to the credit of the Collection Accounts and the Facility Accounts in favour of the Security Agent to secure the First Secured Obligations

**Additional Borrower** means any company which becomes an Additional Borrower in accordance with clause 29 (*Changes to the Obligors*)

**Additional Guarantor** means any company which becomes an Additional Guarantor in accordance with clause 29 (*Changes to the Obligors*)

**Additional Obligor** means an Additional Borrower or an Additional Guarantor

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company provided that, in relation to any Obligor or other Group member, the term shall not include Mercuria Energy Group Limited or any MEGL Affiliate from time to time

**Agent's Rate of Exchange** means the Facility Agent's spot rate of exchange for the purchase of the relevant currency with the Base Currency in the London foreign exchange market at or about 11:00 a.m. on the date of the most recently delivered Borrowing Base Report

**Agreed Security Principles** means the agreed security principles set out in Schedule 21 (*Agreed Security Principles*)

**Amendment and Restatement Agreement** means the amendment and restatement agreement in relation to this Agreement dated on the date set out above and entered into between the Parties

**AOTC** means Aegean Oil Terminal Corporation, a company duly incorporated in the Marshall Islands with its registered address at PO Box 1405, Majuro, Marshall Islands

**Applicable KYC Procedures** means any applicable "know your customer" checks or similar identification procedures, or equivalent internal policies of a Lender, or any equivalent procedures required by applicable law or regulations (including the Money laundering and anti-terrorism Act (*Wet ter voorkoming van witwassen en financieren terrorisme*))

**Applicable Law** means:

(a)   in relation to any jurisdiction or to the European Union, any law, regulation, treaty, directive, decision, rule, regulatory requirement, judgment, order, ordinance, request, guideline or direction or any other act of any government entity of such jurisdiction or of any EU Institution whether or not having the force of law and with which any Party is required to comply, or with which it would, in the normal course of its business, comply; and

(b)   in relation to any Lender, any Basel II Regulation applicable to that Lender

**Approved Suppliers** means:

(a)   the suppliers listed in Schedule 13 (*Approved Suppliers*);

(b)   any refinery in compliance with the terms and conditions of clause 22.13 (*Proof of Origin*); and

(c)   any other supplier which is approved in writing by the Company and the Facility Agent (acting on the instructions of the Majority Lenders),

but in each case only to the extent of any supply contracts entered into in respect of the Sensitive Zone and provided that an Approved Supplier shall cease to be an Approved Supplier on the date on which:

(i) the Facility Agent (acting on the instructions of the Majority Lenders) so directs in writing to the Company; and/or

(ii) any Lender so directs in writing to the Facility Agent and the Company on the basis of such Lender's internal or external compliance requirements

**Asset Purchase Agreement** means that agreement executed between one or more of the Debtors for the sale of the assets described therein to Mercuria Asset Holdings (Hong Kong) Limited, a company incorporated in Hong Kong with limited liability, dated ——5 November 2018.

**Assignment Agreement** means an agreement substantially in the form set out in Schedule 5 (*Form of Assignment Agreement*) or any other form agreed between the relevant assignor and assignee

**Auditors** means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche

**Authorisation** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration

**Availability Period** means:

(a) in relation to Facility A, the period from and including the date of this Agreement to and including the date which is one (1) Month prior to the Termination Date provided that the Availability Period shall not extend beyond the Petition Date;

(b) in relation to Facility A Tranche 2, the period from and including the date of this Agreement to and including the Termination Date

(c) in relation to Facility B Tranche 1, the period from and including the date of this Agreement to and including the Termination Date provided that the Availability Period shall not extend beyond the Petition Date; and

(d) in relation to Facility B Tranche 2, the period from and including the date of this Agreement to and including the Termination Date

**Available Facility** means, in relation to a Facility or Tranche, the aggregate for the time being of each Lender's Available Commitment in respect of that Facility or Tranche, subject to clause 4.7 (*Maximum Available Amount*) and clause 4.8 (*Fronting Bank Limit*)

**Available Commitment** means, subject to clause 14.4, in relation to a Facility and, where applicable, a Tranche:

(a) a Lender's Commitment under that Facility and Tranche provided that, in respect of Tranche 2 of each Facility, the Available Commitment shall not exceed the aggregate amount of Tranche 1 repayments or prepayments made in relation to that Facility in accordance with clauses 9.4 and 9.5 since the Effective Date including any repayments or prepayments to be netted off against the proceeds of the Loan to be made on the proposed Utilisation Date; minus

(b)

(i) the Base Currency Amount of its participation in any outstanding Utilisations under that Facility and Tranche; and

(ii) in relation to any proposed Utilisation, the Base Currency Amount of its participation in any Utilisations that are due to be made under that Facility and Tranche on or before the proposed Utilisation Date,

other than that Lender's participation in any Utilisation that are due to be repaid, prepaid, reduced or cancelled on or before the proposed Utilisation Date

**Bail-In Action** means the exercise of any Write-down and Conversion Powers

**Bail-In Legislation** means:

(a) in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms , the relevant implementing law or regulation  as described in the EU Bail-In Legislation Schedule from time to time;  and

(b) in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation

**Bankruptcy Code** means Title 11 of the United States Code entitled "Bankruptcy"

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time

**Base Currency** means Dollars

**Base Currency Amount** means:

(a) in relation to a Utilisation, the amount specified in the Utilisation Request delivered by a Borrower for that Utilisation (or, if the amount requested is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Rate of Exchange as at the date which is three (3) Business Days before the Utilisation Date or, if later, on the date the Facility Agent receives the Utilisation Request) adjusted to reflect any repayment, prepayment, consolidation or division of the Utilisation; and

(b) in relation to the calculation of any other amount which is not denominated in the Base Currency, that amount converted into the Base Currency at the Agent's Rate of Exchange as at the date which is three (3) Business Days before the relevant calculation date

**Basel II Accord** means the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 as updated prior to, and in the form existing on, the date of this Agreement, excluding any amendment thereto arising out of the Basel III Accord

**Basel II Approach** means, in relation to any Finance Party, either the Standardised Approach or the relevant Internal Ratings Based Approach (each as defined in the Basel II Accord) adopted by that Finance Party (or any of its Affiliates) for the purposes of implementing or complying with the Basel II Accord

**Basel II Increased Cost** means an Increased Cost which is attributable to the implementation or application of or compliance with any Basel II Regulation in force as at the date hereof (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates)

**Basel II Regulation** means:

(a) any Applicable Law in force as at the date hereof implementing the Basel II Accord (including the relevant provisions of directive 2013/36/EU (**CRD IV**) and regulation 575/2013 (**CRR**) of the European Union); or

(b) any Basel II Approach adopted by a Finance Party or any of its Affiliates;

but excludes any Applicable Law implementing the Basel III Accord save and to the extent that it is a re-enactment of any Applicable Law referred to in paragraph (a) of this definition

**Basel III Accord** means, together:

(a)   the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(b)   the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement - Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(c)   any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III"

**Basel III Increased Cost** means an Increased Cost which is attributable to the implementation or application of or compliance with any Basel III Regulation (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates)

**Basel III Regulation** means any Applicable Law implementing the Basel III Accord (including CRD IV and CRR) save and to the extent that it is re-enacts a Basel II Regulation

**Belgian Borrower** means a Borrower incorporated under the laws of Belgium

**Belgian Obligor** means an Obligor incorporated under the laws of Belgium

**Bidding Procedures** has the meaning given to such term in Schedule 20

**Bidding Procedures Order** has the meaning given to such term in Schedule 20

**Borrower** means an Original Borrower or an Additional Borrower in each case unless it has ceased to be a Borrower in accordance with clause 29 (*Changes to the Obligors*)

**Borrowing Base** means the aggregate of cash, inventory and receivables from time to time included in the Borrowing Base Report in accordance with Schedule 11 (*Borrowing Base Amount*)

**Borrowing Base Amount** means at any time:

(a) the Base Currency Amount of the aggregate of the Borrowing Base calculated pursuant to Schedule 11 (*Borrowing Base Amount*);

less

(b) the Outstandings

**Borrowing Base Audit Report** means an audit report in respect of the Borrowing Base to be provided by the Company in accordance with the terms of this Agreement, provided by a report provider acceptable to the Collateral Management Agent (which shall not be a Borrower's auditors) addressed to, on terms acceptable to, and capable of being replied upon by, the Collateral Management Agent

**Borrowing Base Report** means a report substantially in the form set out in Schedule 12 (*Form of Borrowing Base Report*) and taking into account any additional requirements set out in Schedule 11 (*Borrowing Base Amount*), duly completed by the Company and signed on its behalf by two (2) authorised signatories

**Break Costs** means the amount (if any) by which:

(a)     the interest which a Lender should have received for the period from the date of receipt of all or any part of its participation in a Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period

**Bridge Financing** means loan financing provided on a bilateral basis by any Lender to members of the Group for the purpose of financing working capital needs of the Group, with a maximum tenor (including any potential extensions and/or renewals) of 90 days and which is intended to be refinanced by Utilisations

**Budget** means the Debtors' budget delivered to the Facility Agent on or prior to the Effective Date, setting forth (a) in reasonable detail the receipts and disbursements of the Debtors on a weekly basis from the Effective Date through the immediately consecutive 13 weeks broken down by week, including the anticipated uses of the Facilities for such period, as such budget may be amended or modified from time to time by the Debtors provided that the Majority Lenders shall have provided prior written consent to any such amendment or modification, together with budgets for subsequent periods proposed by the Debtors and approved by the Majority Lenders in their sole discretion

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Paris, Geneva, Amsterdam and New York City and (in relation to any date for payment or purchase of euro) any TARGET Day

**Canadian Barges** means each of the following vessels registered in Vancouver, Canada:

(a)     having official number 822652 and USCG VIN Number CG061360 and which, as at the date of the Amendment and Restatement Agreement, has vessel name "PT22"; and

(b)     having official number 838658 and USCG VIN Number L838658 and which, as at the date of the Amendment and Restatement Agreement, has vessel name "PT40"

**Canadian Barges Loan** means the loan provided by METSA to the Company pursuant to a loan agreement dated September 7, 2018 and made between METSA, the Company, the Parent and I.C.S. Petroleum Limited and secured by the Canadian Barges

**Canadian Security Agreement** means the Security Agreement (Canada), dated on or about the date hereof, executed and delivered by Aegean Bunkering (USA) LLC to the Security Agent, as amended, modified or supplemented from time to time.

**Capital Stock** means any and all shares, interests, participations or other equivalents (however designated) of capital stock, any and all equivalent ownership interests in any company, corporation, limited liability company, general partnerships, limited partnership, limited liability partnership, trust, estate, proprietorship, joint venture or other business organization and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt security convertible into or exchangeable for such interest

**Carve-Out** means the term "Carve-Out" in the Final DIP Order, or, prior to the entry of the Final DIP Order, the Interim DIP Order

**Carve-Out Trigger Notice** has the meaning set forth in the Final DIP Order, or prior to the entry of the Final DIP Order, the Interim Order

**Case** has the meaning given to such term in the Recitals

**Cash** means, at any time, cash in hand or at bank and (in the latter case) credited to an account in the name of a member of the Group with an Acceptable Bank and to which a member of the Group is alone (or together with other members of the Group) beneficially entitled and for so long as:

(a)     that cash is repayable on demand;

(b)     repayment of that cash is not contingent on the prior discharge of any other indebtedness of any member of the Group or of any other person whatsoever or on the satisfaction of any other condition;

(c)     there is no Security over that cash except for Transaction Security or any Security permitted pursuant to clause 24.12 (*Negative pledge*) constituted by a netting or set-off arrangement entered into by members of the Group in the ordinary course of their banking arrangements; and

(d)     the cash is freely and immediately available to be applied in repayment or prepayment of the Facilities

**Cash Equivalent Investments** means at any time:

(a)     certificates of deposit maturing within one year after the relevant date of calculation and issued by an Acceptable Bank;

(b)     any investment in marketable debt obligations issued or guaranteed by the government of the United States of America, the United Kingdom, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

     (i)     for which a recognised trading market exists;

     (ii)     issued by an issuer incorporated in the United States of America, the United Kingdom, any member state of the European Economic Area or any Participating Member State;

     (iii)     which matures within one year after the relevant date of calculation; and

     (iv)     which has a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investors Service Limited, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d)     any investment in money market funds which (i) have a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investors Service Limited, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (d) above and (iii) can be turned into cash on not more than thirty (30) days' notice; or

(e)     any other debt security approved by the Majority Lenders,

in each case, to which any member of the Group is alone (or together with other members of the Group beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security (other than Security arising under the Transaction Security Documents)

**Cash Management Order** means the Bankruptcy Court order, in form and substance reasonably satisfactory to the Facility Agent and the Majority Lenders, relating to the Debtors' cash management system and bank accounts

**Certificate of Origin** means a certificate received from an Approved Supplier stating clearly the country of origin of the underlying goods

**Change of Control** means an event or series of events by which:

(a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an **option right**)), directly or indirectly, of 35% or more of the Equity Interests of any Holding Company of a Borrower entitled to vote for members of the board of directors or equivalent governing body of that Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or

(b) the direct Holding Company of a Borrower shall cease to own (directly or indirectly), beneficially and of record, and control, 100% of each class of outstanding Equity Interests of that Borrower free and clear of all Security, charges or other encumbrances, other than Security in favour of the Security Agent for the ratable benefit of the Secured Parties and/or in favour of the US DIP Administrative Agent in respect of the Second Secured Obligations; or

(c) the Parent shall cease to own (directly or indirectly), beneficially and of record, and control, 100% of each class of outstanding Equity Interests of the Borrowers, the direct Holding Company of each Borrower and each other person that is a Subsidiary on the Effective Date (except to the extent permitted hereunder), free and clear of all Security, charges or other encumbrances, other than (i) Security (w) in favour of the Security Agent for the ratable benefit of the Secured Parties and/or in favour of the US DIP Administrative Agent in respect of the Second Secured Obligations, (x) in respect of the Carveout, and (y) contemplated by the Orders (including any adequate protection liens in favour of other lenders), or (ii) as otherwise permitted under this Agreement

Notwithstanding the foregoing, ownership changes in the document entitled "1.1E Certain Ownership" delivered to the Facility Agent prior to the Effective Date shall not constitute a Change of Control

**Charged Property** means all of the assets of the Obligors and any Spanish Pledgor (if any) which from time to time are, or are expressed to be, the subject of the Transaction Security

**Clearing Providers** means ABN AMRO Clearing Bank N.V. (a company incorporated in the Netherlands) or any other clearing provider which is an Affiliate of a Facility B Lender and which is approved in writing by the Facility Agent and which enters into a Multi-Party TPA Agreement with the Company, and **Clearing Provider** means any of them as the case may be

**Clearing Provider Hedging Agreement** means any document evidencing a Clearing Provider Hedging Transaction

**Clearing Provider Hedging Transactions** has the meaning given to it in clause 2.4 (*Hedging/Clearing*)

**Code** means the US Internal Revenue Code of 1986

**Collateral Management Agreement** means a collateral management agreement in respect of inland storage to be entered into between the Security Agent, the relevant Borrower and the Collateral Manager in form and substance satisfactory to the Facility Agent acting on the instructions of all Lenders

**Collateral Manager** means a collateral manager approved in writing by the Facility Agent acting on the instructions of all Lenders

**Collection Accounts** means the bank accounts opened and maintained by each Borrower with the Account Bank in accordance with clause 25 (*Bank Accounts*) and includes any interest of the Borrowers in any replacement account or any sub-division or sub-account of any of these accounts

**Commitment** means, in relation to a Lender, its Facility A Tranche 1 Commitment, Facility A Tranche 2 Commitment, Facility B Tranche 1 Commitment and/or Facility B Tranche 2 Commitment (as the case may be)

**Commodities** means bunker fuel, crude oil, fuel oil, gas oil, lubricants, and other petroleum products, and with the consent of the Majority Lenders, any other energy commodities that are of the type which are purchased, sold or otherwise traded in physical, futures, forward or over the counter markets

**Compliance Certificate** means a certificate substantially in the form set out in Schedule 6 (*Form of Compliance Certificate*)

**Compliance Policy** means the policy of the Group, approved by the Board of Directors of the Company, in relation to operational control procedures related to product origin (traceability, compliance with United States of America, European Union and United Nations Sanctions or any other state or authority which has issued Sanctions with which a member of the Group is required to comply)

**Compliant Borrowing Base Report** means a Borrowing Base Report showing a Borrowing Base Amount which is zero (0) or a positive number

**Compliant Cross-Check Borrowing Base Report** means a Cross-Check Borrowing Base Report, the accuracy of which has been verified by the Majority Lenders based on the information provided by sources acceptable to the Majority Lenders and reflected therein relating to:

(i) the storage volumes at any inland storage facilities, leased or owned by the Borrowers and any Spanish Pledgor (if any) and which have capacity equal to or in excess of 50,000 metric tons; and

(ii) the storage volumes on any vessels leased or owned by the Borrowers and any Spanish Pledgor (if any) which have capacity equal to or in excess of 15,000 metric tons,

and which shows a Borrowing Base, the Base Currency Amount of which is not less than ninety five per cent. (95%) of the Base Currency Amount of the Borrowing Base as reported in the most recent Compliant Borrowing Base Report

**Confidential Information** means all information relating to any Obligor, the Group, the Finance Documents or a Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or a Facility from either:

(a) any member of the Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of clause 41 (*Confidentiality*); or

(ii)    is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(iii)   is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality

**Confidentiality Undertaking** means a confidentiality undertaking substantially in a recommended form of the LMA from time to time or in any other form agreed between the Company and the Facility Agent

**Contractual Obligation** means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound

**Credit Instrument** means any transaction-related standby or documentary letter of credit or guarantee issued, to be issued or deemed to be issued by an Issuing Bank under the relevant Tranche of Facility B and in such form requested by a Borrower which is acceptable to the relevant Issuing Bank in accordance with the terms of this Agreement including without limitation clause 5.3 (*Completion of a Utilisation Request for Fronted Facilities*) and clause 6 (*Fronted Facilities*)

**Cross-Check Borrowing Base Report** means a report duly completed by the Company and signed on its behalf by two (2) authorised signatories in the form required pursuant to clause 22.7(c) (*Borrowing Base Report*)

**Current Assets** means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including prepayments in relation to operating items and sundry debtors (including Cash and Cash Equivalent Investments) expected to be realised within twelve (12) months from the date of computation but **excluding** amounts in respect of:

(a)     receivables in relation to Tax;

(b)     Exceptional Items and other non-operating items;

(c)     insurance claims; and

(d)     any interest owing to any member of the Group

**Debt Purchase Transaction** means, in relation to a person, a transaction where such person:

(a)     purchases by way of assignment or transfer;

(b)     enters into any sub-participation in respect of; or

(c)     enters into any other agreement or arrangement having an economic effect substantially similar to a sub-participation in respect of,

any Commitment or amount outstanding under this Agreement

**Debtor Relief Laws** means the Bankrupcty Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganisation, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect

**Debtor Relief Plan** means a plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws

**Debtors** means the Borrowers (other than ANNV, ABGG and OBTG), the Parent, and each other Subsidiary of the Parent that filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code with the Bankruptcy Court on the Petition Date and each a **Debtor**

**Debtors' Collateral** means, collectively, all real, personal, and mixed property (including Equity Interests) of the Debtors' respective estates in the Cases, including, without limitation, all inventory, accounts receivable, general intangibles (including rights under intercompany loans), contracts, chattel paper, owned real estate, real property leaseholds, governmental approvals, licenses and permits, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks (other than any "intent to use" trademark, applications for which a Statement of Use or Amendment to Allege Use, as applicable, has not been filed and accepted with the US Patent and Trademark Office or any similar authority in other jurisdictions), trade names, rights under license agreements and other intellectual property, securities, partnership or membership interests in limited liability companies, and capital stock of any subsidiary of any of the Debtors, including, without limitation, the products and proceeds thereof, in each case excluding any collateral that is described in any Transaction Security Document as being excluded collateral.

**Deed of Undertaking** means a deed of undertaking in the form set out in Schedule 16 (*Form of Deed of Undertaking*) to be entered into between a third party, a Borrower and an Issuing Bank

**Default** means an Event of Default or any event or circumstance specified in clause 26 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default

**Deficient Borrowing Base Report** means a Borrowing Base Report immediately after delivery of which it appears that the Borrowing Base Amount is a negative number

**Deficient Cross-Check Borrowing Base Report** means a Cross-Check Borrowing Base Report which is not a Compliant Cross-Check Borrowing Base Report

**Delegate** means any delegate, agent, attorney or co-trustee appointed by the Security Agent

**Disruption Event** means either or both of:

(a)     a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facilities (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)     the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)      from performing its payment obligations under the Finance Documents; or

        (ii)      from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted

**Dormant Company** means a company that is no longer operational and has no material assets or activities as specified in the Group Structure Chart as updated from time to time

**EEA Member Country** means any member state of the European Union, Iceland, Liechtenstein and Norway

**Effective Date** has the meaning given in the Amendment and Restatement Agreement

**Eligible LOI Counterparty** means a person or their replacement notified from time to time by five (5) Business Days' notice in writing by the Facility Agent (acting on the instructions of all Facility B Lenders) to the Company) and any other person approved by all Facility B Lenders to the relevant Tranche as being suitable to issue a letter of indemnity for presentation for payment under a Credit Instrument

**Eligible Receivables** has the meaning given to in in Schedule 11 (*Borrowing Base Amount*)

**Environment** means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

(a)    air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)    water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c)    land (including, without limitation, land under water)

**Environmental Claim** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law

**Environmental Law** means any applicable law or regulation which relates to:

(a)    the pollution or protection of the Environment;

(b)    the conditions of the workplace; or

(c)    the generation, handling, storage, use, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste

**Environmental Permits** means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Group conducted on or from the properties owned or used by any member of the Group

**Equity Interests** means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not

such shares, warrants, options, rights or other interests are outstanding on any date of determination

**EU Bail-In Legislation** Schedule means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

**Event of Default** means any event or circumstance specified as such in clause 26 (*Events of Default*)

**Existing Security** means the Security described in Schedule 22 (*Existing Security*)

**Existing Security Holder** means any person which holds directly Security which is permitted under and in accordance with clause 24.12 (*Negative pledge*)

**Expiry Date** means, for a Fronted Facility, the last day of its Term

**Facility** means Facility A or Facility B

**Facility Accounts** means the bank accounts opened and maintained by each Borrower with the Account Bank in accordance with clause 25 (*Bank Accounts*) and includes any replacement account or any sub-division or sub-account of any of those accounts

**Facility A** means together:

(a)     Facility A Tranche 1; and

(b)     Facility A Tranche 2

**Facility A Margin** means in relation to the Facility A Tranche 1, the Facility A Tranche 1 Margin and in relation to the Facility A Tranche 2, the Facility A Tranche 2 Margin

**Facility A Tranche 1** means the secured committed multicurrency borrowing base revolving credit facility made available under this Agreement as described in clause 2.1(a)(i) (*The Facilities*)

**Facility A Tranche 1 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility A Tranche 1 Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Facility A Tranche 1 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility A Tranche 1 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility A Tranche 1 Margin** means two point six per cent. (2.6%) per annum

**Facility A Tranche 1 Total Commitments** means the aggregate of the Facility A Tranche 1 Commitments

**Facility A Tranche 2** means the secured committed multicurrency borrowing base revolving credit facility made available under this Agreement as described in clause 2.1(a)(ii) (*The Facilities*)

**Facility A Tranche 2 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility A Tranche " Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Facility A Tranche 2 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility A Tranche 2 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility A Tranche 2 Margin** means three point five per cent. (3.5%) per annum

**Facility A Tranche 2 Total Commitments** means the aggregate of the Facility A Tranche 2 Commitments

**Facility A Total Commitments** means the aggregate of the Facility A Tranche 1 Commitments and the Facility A Tranche 2 Commitments, being $200,000,000 at the date of the Amendment and Restatement Agreement

**Facility B** means together:

(a)     Facility B Tranche 1; and

(b)     Facility B Tranche 2

**Facility B Lender** means in relation to a particular Tranche of Facility B, a Lender who has at any time a Facility B Tranche 1 Commitment or Facility B Tranche 2 Commitment

**Facility B Margin** means three point five per cent. (3.5%) per annum

**Facility B Total Commitments** means the aggregate of the Facility B Tranche 1 Commitments and the Facility B Tranche 2 Commitments, being US$~~100,000~~125,200,000 at the date of the Amendment and Restatement Agreement

**Facility B Tranche 1** means a secured uncommitted multicurrency borrowing base revolving credit facility for the entry into or issue of Fronted Facilities which was in place on or prior to the Petition Date and as described in clause 2.1(b)(i) (*The Facilities*)

**Facility B Tranche 1 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility B Tranche 1 Commitment" in Part II of Schedule 1 (*The Original Parties*), such amount having been adjusted in respect of Credit Instruments in accordance with clause 9.5 and the amount of any other Facility B Tranche 1 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility B Tranche 1 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility B Tranche 1 Issuing Bank** means each Party identified in the recitals to this Agreement as a Facility B Tranche 1 Issuing Bank and any Facility B Lender which has become a Facility B Tranche 1 Issuing Bank pursuant to clause 5.11(a) (*Appointment of additional Issuing Banks*) (and if there is more than one such Party, such Parties shall be referred to, whether acting individually or together, as the **Facility B Tranche 1 Issuing Bank**) **provided that**, in respect of a Credit Instrument issued or to be issued pursuant to the terms of this Agreement, the **Facility B Tranche 1 Issuing Bank** shall be the Facility B Tranche 1 Issuing Bank which has issued or agreed to issue that Credit Instrument under Facility B Tranche 1

**Facility B Tranche 1 Total Commitments** means the aggregate of the Facility B Tranche 1 Commitments

**Facility B Tranche 2** means a secured committed multicurrency borrowing base revolving credit facility as described in clause 2.1(b)(ii) (*The Facilities*)

**Facility B Tranche 2 Commitments** means:

(a)     in relation to an Original Lender, the amount in the Base Currency set opposite its name under the heading "Facility B Tranche 2 Commitment" in Part II of Schedule 1 (*The Original Parties*) and the amount of any other Facility B Tranche 2 Commitment transferred to it under this Agreement; and

(b)     in relation to any other Lender, the amount in the Base Currency of any Facility B Tranche 2 Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement

**Facility B Tranche 2 Issuing Bank** means each Party identified in the recitals to this Agreement as a Facility B Tranche 2 Issuing Bank and any Facility B Lender which has become a Facility B Tranche 2 Issuing Bank pursuant to clause 5.11(a) (*Appointment of additional Issuing Banks*) (and if there is more than one such Party, such Parties shall be referred to, whether acting individually or together, as the **Facility B Tranche 2 Issuing Bank**) **provided that**, in respect of a Credit Instrument issued, to be issued or deemed to be issued pursuant to the terms of this Agreement, the **Facility B Tranche 2 Issuing Bank** shall be the Facility B Tranche 2 Issuing Bank which has issued, deemed to have issued or agreed to issue that Credit Instrument under Facility B Tranche 2

**Facility B Tranche 2 Total Commitments** means the aggregate of the Facility B Tranche 2 Commitments

**Facility B Utilisation** means in relation to a particular Tranche of Facility B, a Utilisation made or to be made under the relevant Tranche of Facility B or the principal amount outstanding for the time being of that Utilisation

**Facility Office** means:

(a)     in respect of a Lender, Issuing Bank or Overdraft Bank, the office or offices notified by that Lender, Issuing Bank or Overdraft Bank to the Facility Agent in writing on or before the date it becomes a Lender, Issuing Bank or Overdraft Bank (or, following that date, by not less than five (5) Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes

**FATCA** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations or other official guidance;

(b)     any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of paragraph (a) above; or

(c)     any agreement pursuant to the implementation of paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction

**FATCA Application Date** means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)     in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2019; or

(c)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2019,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction

**FATCA FFI** means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if any Finance Party is not a FATCA Exempt Party, could be required to make a FATCA Deduction

**Final DIP Order** means a Final Order substantially in the form and substance of the Interim DIP Order entered by the Bankruptcy Court, with only such modifications in form and substance that are either (x) not adverse to the Secured Parties or (y) satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders) as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of the Facility Agent and the Majority Lenders, in accordance with the terms herein (i) authorizing the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and the other Finance Documents and (b) use cash collateral during the pendency of the Cases, and (ii) granting certain related relief

**Final Order** means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has bene filed or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice

**Finance Document** means:

(a)     this Agreement;

(b)     the Intercreditor Agreement;

(c)     any Compliance Certificate;

(d)     any Accession Letter;

(e)     any Resignation Letter;

(f)     each Transaction Security Document;

(g)     each Deed of Undertaking;

(h)    each Borrowing Base Report;

(i)    each Cross-Check Borrowing Base Report;

(j)    any Hedging Agreement to which METSA is a party;

(k)    the Amendment and Restatement Agreement;

(l)    any Utilisation Request; and

(m)    any other document designated as a "Finance Document" by the Facility Agent and the Company

**Finance Lease** means any lease or hire purchase contract which would, in accordance with the Accounting Principles, be treated as a finance or capital lease

**Finance Party** means the Facility Agent, the Collateral Management Agent, the Security Agent, the Co-Ordinator, the Account Bank, the Issuing Bank, the Overdraft Bank, a Lender or the Hedging Provider

**Financial Indebtedness** means any indebtedness for or in respect of:

(a)    moneys borrowed and debit balances at banks or other financial institutions;

(b)    any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c)    any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)    the amount of any liability in respect of Finance Leases;

(e)    receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under the Accounting Principles);

(f)    any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g)    any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution;

(h)    any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the Termination Date or are otherwise classified as borrowings under the Accounting Principles);

(i)    any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than ninety (90) days after the date of supply;

(j)    any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(k)    the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (j) above

**Financial Officer** means, as to any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person

**Financial Year** means each of the Company's financial years ending on 31 December

**First Day Orders** means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date and heard by the Bankruptcy Court at the initial hearing or thereafter, which orders shall each be in form and substance reasonably satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders)

**First Secured Obligations** means all obligations at any time due, owing or incurred by any Obligor or any Spanish Pledgor to any Secured Party under the First Finance Documents, including the obligations set out in clause 31.3 (*Parallel Debt* (*Covenant to pay the Security Agent*)) whether present or future, actual or contingent (and whether incurred solely or jointly and whether as principal or surety or in some other capacity)

**First Security** means the Security created or expressed to be created in favour of the Security Agent pursuant to the First Security Documents

**First Security Documents** means

(a)    the Account Pledge Agreements;

(b)    the Security Agreements;

(c)    the Moroccan Pledge;

(d)    the UAE Pledges;

(e)    any Spanish Pledges and any Spanish Irrevocable Power of Attorney;

(f)    the German Security Transfer Agreements;

(g)    the South African Pledge;

(h)    any Stock Monitoring Agreement;

(i)    any Collateral Management Agreement;

(j)    the Canadian Security Agreement;

(k)    the US Security Agreement; and

(l)    any documents in respect of which Security is granted to the Security Agent pursuant to clause 24.25 (*Conditions Subsequent*),

together with any other document entered into by any Obligor or any Spanish Pledgor creating or expressed to create any Security over all or any part of its assets in respect of the obligations of any of the Obligors under any of the Finance Documents other than the Hedging Agreements

**First Security Period** means the period terminating on the date on which the First Secured Obligations are unconditionally and irrevocably discharged in full

**Fronted Facilities** means Overdraft Facilities and/or Credit Instruments issued (or deemed to have been issued) or entered into by Issuing Banks pursuant to this Agreement

**Fronted Proportion** means in relation to a Facility B Lender in respect of any Fronted Facility, the proportion (expressed as a percentage) which that Facility B Lender's Available Commitment bears to the Available Facility (in each case in respect of the relevant Tranche of Facility B) immediately prior to the issue of that Fronted Facility, adjusted to reflect any assignment or transfer under this Agreement to or by that Facility B Lender under the relevant Tranche and taking into account any change in a Lender's proportion on or prior to the relevant date as a result of the provisions of this Agreement (including without limitation clause 9.5)

**Fronting Bank** means the Issuing Bank and the Overdraft Bank provided that if a bank or financial institution (or a bank or financial institution and one of its Affiliates) is both an Issuing Bank and an Overdraft Bank in relation to a Tranche it shall be considered for the purposes of the Fronting Bank Limit calculation to be single Fronting Bank

**Fronting Bank Limit** means, from time to time, in relation to each Fronting Bank in a particular Tranche, the amount which is:

(i) the aggregate of the Commitments of each Facility B Lender in that Tranche

divided by

(ii) the total number of Fronting Banks in that Tranche

**FX Hedging Provider** means any Lender which enters into a FX Hedging Provider Hedging Agreement with a Borrower

**FX Hedging Provider Hedging Agreement** means any document evidencing a FX Hedging Provider Hedging Transaction

**FX Hedging Provider Hedging Transactions** has the meaning given to it in clause 2.4 (*Hedging/Clearing*)

**German Security Transfer Agreement** means:

(a)     the German law security transfer agreement entered into by ABGG in favour of the Security Agent; and

(b)     the German law security transfer agreement entered into by OBTG in favour of the Security Agent

**Governmental Authority** means the government of any nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank)

**Gross Assets** means, in respect of an entity, all assets identified as such in that entity's accounts

**Group** means the Parent, the Company and each of their respective Subsidiaries from time to time

**Group Structure Chart** means the group structure chart in the agreed form

**Guarantor** means an Original Guarantor or an Additional Guarantor, unless in each case it has ceased to be a Guarantor in accordance with clause 29 (*Changes to the Obligors*)

**Hedging Agreement** means a Hedging Provider Hedging Agreement, a Clearing Provider Hedging Agreement and a FX Hedging Provider Hedging Agreement

**Hedging Policy** means the hedging policy delivered to the Facility Agent within 10 Business Days after the Effective Date as may be amended from time to time with the prior written approval of the Facility Agent (acting on the instructions of the Majority Lenders)

**Hedging Provider** means:

(a)     ABN AMRO Bank N.V.;

(b)     Mercuria Energy Trading S.A.; or

(c)     any other hedging provider which is an Affiliate of a Facility B Lender and which is approved in writing by the Facility Agent and which enters into a Multi-Party TPA Agreement with the Company

**Hedging Provider Hedging Agreement** means any document evidencing a Hedging Provider Hedging Transaction

**Hedging Provider Hedging Transactions** has the meaning given to it in clause 2.4 (*Clearing*)

**Hess Litigation** means the causes of action brought by Aegean Bunkering (USA) LLC and the Parent, as plaintiffs, against Hess Corporation, as defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014

**Holding Company** means, in relation to a person, any other person in respect of which it is a Subsidiary

**Immaterial Subsidiary** means any Subsidiary that has neither (a) assets of fair market value exceeding $250,000 nor (b) net income before taxes exceeding $250,000 on an annualized basis

**Impaired Agent** means the Facility Agent at any time when:

(a)     it has failed to make (or has notified a Party that it will not make) a payment required to be made by it under the Finance Documents by the due date for payment;

(b)     the Facility Agent otherwise rescinds or repudiates a Finance Document; or

(c)     an Insolvency Event has occurred and is continuing with respect to the Facility Agent;

unless, in the case of paragraph (a) above:

(i)     its failure to pay is caused by:

(A)     administrative or technical error; or

(B)     a Disruption Event,

and payment is made within five (5) Business Days of its due date; or

(ii)     the Facility Agent is disputing in good faith whether it is contractually obliged to make the payment in question

**Insolvency Event** in relation to the Facility Agent means that the Facility Agent:

(a)     is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)     becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c) makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

  (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

  (ii) is not dismissed, discharged, stayed or restrained in each case within thirty (30) days of the institution or presentation thereof;

(f) has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in paragraph (d) above);

(i) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty (30) days thereafter;

(j) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (i) above; or

(k) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts

**Interim DIP Order** means the interim order entered by the Bankruptcy Court (as the same may be amended, waived, supplemented, or modified from time to time after entry thereof, solely in the case of any amendment, waiver, supplement or modification that is not adverse to the rights or duties of the Finance Parties, with the consent of the Facility Agent and the Majority Lenders in their sole discretion) in the form provided to the Facility Agent prior to the Effective Date, with changes to such form as are satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders, in their sole discretion), (i) authorizing, on an interim basis, the Debtors to (a) obtain post-petition secured financing pursuant to this Agreement and (b) use cash collateral during the pendency of the Cases, and (ii) granting certain related relief

**Intercreditor Agreement** means the intercreditor agreement entered into on or about the date of the Amendment and Restatement Agreement between, amongst others, the Facility Agent, the US DIP Administrative Agent and the Company

**Interest Period** means, in relation to a Loan, each period determined in accordance with clause 12 (*Interest Periods*) and, in relation to an Unpaid Sum, each period determined in accordance with clause 11.4 (*Default interest*)

**Interpolated Screen Rate** means, in relation to LIBOR for any Loan, the rate (rounded to the same number of decimal places as the two relevant Screen Rates) which results from interpolating on a linear basis between:

(a)     the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the Interest Period of that Loan; and

(b)     the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the Interest Period of that Loan,

each as of the Specified Time on the Quotation Day for the currency of that Loan.

**Investment** means, as to any person, any acquisition or investment by such person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another person, including any partnership or joint venture interest in such other person, or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another person or assets constituting a business unit, line of business or division of such person excluding in each case current trade and customer accounts receivables for inventory sold and services rendered in the ordinary course of business.  For purposes of covenant compliance, the amount of any **Investment** shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received by such person with respect thereto

**Investment Grade Rating** means a long term senior unsecured non-credit enhanced credit rating of BBB- or higher by S&P or Baa3 or higher by Moody's; provided that, in the event that the rating given by (or equivalent to) S&P or Moody's is higher than the rating given by (or equivalent to) Moody's or S&P, as applicable, the determination that such rating is an Investment Grade Rating shall be made based on the higher of the two ratings

**Issuing Bank** means in relation to a particular Tranche of Facility B, the relevant Facility B Tranche 1 Issuing Bank or the Facility B Tranche 2 Issuing Bank.

**Joint Security Period** means the period terminating upon the earlier of the end of the First Security Period and the end of the Second Security Period

**Joint Venture** means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity

**Legal Reservations** means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors (including the principle that a Moroccan court may not recognize and award court costs for all costs and expenses incurred by the prevailing party in the proceedings in front of that court);

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c) similar principles, rights and defences to the foregoing under the laws of any Relevant Jurisdiction;

(d) any restriction or qualification contained in any legal opinion in relation to matters of German or EC law delivered to the Facility Agent pursuant to paragraph 4 (*Legal opinions*) of Schedule 2 (*Conditions precedent to the Effective Date*) of the Amendment and Restatement Agreement;

(e) the principle that any Finance Document would require to be legalised and accompanied with a sworn translation into French or Arabic to be submitted as evidence in any action or proceeding before a Moroccan court and in order to be enforceable against third parties and when used with Moroccan public bodies and administrations for any purposes; and

(f) the principle that (i) any amount due under a guarantee agreement or security agreement by a Moroccan incorporated party to a non-Moroccan incorporated party may only be transferred outside Morocco if such payment is in compliance with the applicable Moroccan foreign exchange control regulations or has been expressly approved in advance and in written by the Moroccan Foreign Exchange Office (*Office des Changes marocain*). Any set-off between a Moroccan party and a non-Moroccan party located outside Morocco requires a prior express approval from the Moroccan Foreign Exchange Office (*Office des Changes marocain*), being specified that any amount due by the Moroccan Guarantor under the Moroccan Guarantee may be freely transferable to the Lenders on the ground of article 17 of the law No. 19-94 (Dahir No. 1-95-1 dated January 26, 1995) applicable to free export zonesand (ii) any set-off between a Moroccan party and a counterparty located outside Morocco shall require a prior express approval of the Moroccan Foreign Exchange Office (*Office des Changes marocain*).

**Lender** means:

(a) any Original Lender; and

(b) any bank, financial institution, trust, fund or other entity which has become a Party as a Lender in accordance with clause 27 (*Changes to the Lenders*),

which in each case has not ceased to be a Lender in accordance with the terms of this Agreement

**Lender Discounting Facility** means any trade receivables purchase facility entered into between a Lender and a Borrower on arm's length terms and for full market value providing for such Lender to discount trade receivables of the relevant Borrower represented by confirmed letters of credit on a non-recourse basis and meeting any requirement for de-recognition under the Accounting Principles

**Lender Superpriority Claim** means pursuant to section 364(c)(1) of the Bankruptcy Code, the entitlement (without the need to file a proof of claim) to a joint and several superpriority claim against the Debtors, with priority over any and all other obligations, liabilities, and indebtedness against the Debtors, now existing or hereafter arising, of any kind whatsoever, including on the Litigation Claims and all proceeds thereof (but subject to the Final DIP Order in the case of Litigation Claims), and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of the Debtors, each Debtor's estate and any successor trustee, estate representative, or any creditor, in any of the Cases or any subsequent cases or proceedings under the Bankruptcy Code

**LIBOR** means, in relation to any Loan:

(a)     the applicable Screen Rate;

(b)     (if no Screen Rate is available for the Interest Period of that Loan) the Interpolated Screen Rate for that Loan; or

(c)     if:

   (i)     no Screen Rate is available for the currency of that Loan; or

   (ii)    no Screen Rate is available for the Interest Period of that Loan and it is not possible to calculate an Interpolated Screen Rate for that Loan,

the Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for the currency of that Loan and a period equal in length to the Interest Period of that Loan and, if that rate is less than zero, LIBOR shall be deemed to be zero

**Litigation Claims** means (i) claims of the Parent or any Subsidiary thereof, against any person and existing at any time, arising out of, in connection with, or relating to the events, circumstances, and conduct described in the 4 June 2018, Form 6-K disclosure of Aegean Marine Petroleum Network, Inc., concerning improper accounting for or recordation of accounts receivable, as well as the right of the Parent of any Subsidiary thereof to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (ii) claims of the Parent or any Subsidiary thereof, against any person and existing at any time, arising out of, in connection with, or relating to the construction and maintenance of the Aegean terminal in Fujairah, as well as the right of grantors to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing, (iii) claims of the Parent or any Subsidiary thereof existing at any time, arising out of, in connection with, or relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melissanidis, claims against auditors related to misappropriation of funds, related conspiracy to defraud investors in Aegean Marine Petroleum Network, Inc., and claims against Quality Solutions related to construction fraud or other fraud, (iv) claims brought by Aegean Marine Petroleum Network Inc. and the Company, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014, (v) claims of the Parent or any Subsidiary thereof, concerning unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof, (vi) claims of the Parent or any Subsidiary thereof, concerning HSFO product loaded from Petrotrin in Trinidad in December 2016; and (v) claims arising under Chapter 5 of the Bankruptcy Code

**Limitation Acts** means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984

**LMA** means the Loan Market Association

**Loan** means a loan made or to be made under Facility A or the principal amount outstanding for the time being of that loan

**Majority Lenders** means a Lender or Lenders whose Commitment aggregate more than 66 ⅔ per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than 66 ⅔ per cent. of the Commitments immediately prior to that reduction

**Margin** means:

(a)     in relation to Facility A, the Facility A Margin; and

(b)     in relation to Facility B, the Facility B Margin

**Material Adverse Effect** means in the opinion of the Majority Lenders a material adverse effect on:

(a)   the business (including the production and export capacity), operations, property, condition (financial, legal or otherwise) or prospects of any Obligor or the Group taken as a whole; or

(b)   the ability of an Obligor to perform its obligations under the Finance Documents; or

(c)   the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents,

(in each case other than as a direct result of the filing of the cases, the events leading up to, and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting directly from such events, commencement, continuation and prosecution, which shall not, individually or in the aggregate, constitute a Material Adverse Effect), and provided, further, that nothing disclosed in (1) any filings or written reports by the Debtors made publicly available through the Petition Date or disclosed to the Lenders prior to the Effective Date and/or (2) any written disclosure statement related to any plan of reorganization or liquidation of Debtors provided to the Facility Agent on or prior to the Petition Date, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect

**Material Subsidiary** means each member of the Group which is not a Dormant Company

**Maximum Available Amount** means, at any time, the Base Currency Amount which is the lower of:

(a)   the aggregate of the Total Commitments at such time less any amount Outstanding in respect of Facility B Tranche 1; and

(b)   the aggregate of the Borrowing Base Amount at such time

**MEGL Affiliate** means a Subsidiary of Mercuria Energy Group Limited or a Holding Company of Mercuria Energy Group Limited or any other Subsidiary of that Holding Company

**Month** means a period starting on one (1) day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)   (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b)   if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c)   if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period. **Monthly** shall be construed accordingly

**Moroccan Pledge** means the master pledge agreement (*convention cadre de gage*) and related pledge instrument entered into by the Company, the Lenders, the Security Agent and Horizon Tangiers Terminal S.A in respect of assets owned by the Company and located in Morocco

**Multi-Party TPA Agreements** means each agreement entered into between the Company, a Hedging Provider or a Clearing Provider and the Security Agent (including any service or similar agreement related thereto between the Company and a Hedging Provider or a Clearing Provider (as the case may be)) complying with the provisions set out in clause 6.39 (*Multi-Party TPA Agreements*)

**New Lender** has the meaning given to that term in clause 27 (*Changes to the Lenders*)

**Non-Acceptable Bank** means a Facility B Lender which:

(a)     is not an Acceptable Bank within the meaning of paragraph (a) of the definition of "Acceptable Bank"; or

(b)     has failed to make (or has notified the Facility Agent that it will not make) a payment to be made by it under clause 6.11 (*Indemnities*) or clause 30.10 (*Lenders' indemnity to the Facility Agent and the Collateral Management Agent*) or 31.14 (*Lenders' indemnity to the Security Agent*)  or any other payment to be made by it under the Finance Documents to or for the account of any other Finance Party in its capacity as Lender by the due date for payment

**Non-Borrowing Base Receivables** mean certain receivables currently recorded in the accounts of the Company with a book value of approximately $200,000,000 and owed to the Company by certain third parties

**Notifiable Debt Purchase Transaction** has the meaning given to that term in paragraph (b) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*)

**Obligor** means a Borrower or a Guarantor and **Obligors** means each of them

**Obligors' Agent** means the Company, appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to clause 2.3 (*Obligors' Agent*)

**OECD** means Organisation for Economic Co-operation and Development

**Orders** means, collectively, the Interim DIP Order, the Final DIP Order, the Cash Management Order, the First Day Orders and any other orders of the Bankruptcy Court authorizing and approving, on either an interim or final basis, the financing contemplated by this Agreement

**Original Borrowers** means each of the Company, APII, ANNV, ABGG and OBTG, each as more particularly described in Part I (*The Original Obligors*) of Schedule 1 (*The Original Parties*)

**Original Financial Statements** means in relation to each Obligor its audited financial statements for its Financial Year ended 31 December 2016

**Original Guarantors** means each of the companies described in Part I (*The Original Obligors*) of Schedule 1 (*The Original Parties*)

**Original Jurisdiction** means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is incorporated as at the date of this Agreement, in relation to any Spanish Pledgor (if any), Spain and in relation to a South African Pledge Counterparty, the jurisdiction under whose laws that party is incorporated

**Outstandings** means the aggregate of the Base Currency Amount of:

(a)     the outstanding Loans;

(b)     the maximum actual and contingent liabilities of the Borrowers in respect of any Overdraft Facilities; and

(c)    the maximum actual or contingent liabilities of the Lenders in respect of any Credit Instruments

**Overdraft Bank** means each Party identified in the recitals to this Agreement as an Overdraft Bank

**Parent** means Aegean Marine Petroleum Network Inc. of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MHJ96960

**Parent Affiliate** means each Affiliate of the Parent

**Participating Member State** means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union

**Party** means a party to this Agreement

**Permitted Financial Management Liens** means Security of a financial institution on currency or Cash Equivalent Investments of Aegean Bunkering (USA) LLC deposited in, or credited to, any account of the Borrower subject to Transaction Security, provided that such Security arise out of (i) amounts due to the relevant financial institution, in respect of customary fees and expenses for the routine maintenance and operation of such account, (ii) the face amount of any checks which have been credited to such account, but are subsequently returned unpaid because of uncollected or insufficient funds, or (iii) other returned items or mistakes made in crediting such account, provided, further that such Security is provided for in the related Transaction Security Document or arise by operation of law

**Petition Date** means has the meaning given to such term in the Recitals

**Pre-Approved SBLC Beneficiary** means such person notified or replaced from time to time by five (5) Business Days' notice in writing by the Facility Agent (acting on the instructions of all Facility B Lenders) to the Company) and any other person approved as a beneficiary of a standby letter of credit by all Facility B Lenders under the Tranche to which such standby letter of credit is proposed to be issued.

**Prepetition Obligations** has the meaning given to it in clause 2.2(e)

**Prohibited Person** means a person that is:

(a)    listed on, or owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

(b)    located in, incorporated under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a person located in or organized under the laws of a country or territory that is the target of country-wide or territory-wide Sanctions; or

(c)    otherwise a target of Sanctions (namely a person with whom a US person or other national under the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities)

**Quarter Date** means each of 31 March, 30 June, 30 September and 31 December

**Quasi-Security** has the meaning given to that term in clause 24.12 (*Negative pledge*)

**Quotation Day** means, in relation to any period for which an interest rate is to be determined:

(a)    (if the currency is euro), two TARGET Days before the first day of that period; or

(b)    (if the currency is Dollars), two Business Days before the first day of that period,

unless market practice differs in the Relevant Interbank Market for a currency, in which case the Quotation Day for that currency will be determined by the Facility Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one (1) day, the Quotation Day will be the last of those days)

**Receiver** means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property

**Reference Bank Rate** means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Facility Agent at its request by the Reference Banks as the rate at which the relevant Reference Bank could borrow funds in the London interbank market in the relevant currency and for the relevant period, were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in that currency and for that period

**Reference Banks** means the principal London offices of ABN AMRO Bank N.V. or other banks as may be appointed by the Facility Agent in consultation with the Company

**Related Fund** in relation to a fund (the **first fund**), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund

**Relevant Interbank Market** means in relation to Euro, the European interbank market, and in relation to any other currency, the London interbank market

**Relevant Jurisdiction** means, in relation to an Obligor, any Spanish Pledgor and each South African Pledge Counterparty:

(a)     its Original Jurisdiction;

(b)     any jurisdiction where any asset subject to or intended to be subject to the Transaction Security to be created by it is situated;

(c)     any jurisdiction where it conducts its business; and

(d)     the jurisdiction whose laws govern the perfection of any of the Transaction Security Documents entered into by it

**Repeating Representations** means each of the representations set out in clause 21.2 (*Status*) to clause 21.7 (*Governing law and enforcement*), clause 21.10 (*No default*), paragraph (d) of clause 21.11 (*No misleading information*), clause 21.19 (*Ranking*) to clause 21.21 (*Legal and beneficial ownership*), clause 21.25 (*Centre of main interests and establishments*) and clause 21.27 (*Pari Passu Ranking*)

**Representative** means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian

**Resignation Letter** means a letter substantially in the form set out in Schedule 10 (*Form of Resignation Letter*)

**Responsible Person** means with respect to any Obligor, the chief executive officer, president, chairman, senior vice-president, executive vice-president, vice-president of finance or treasurer or other officer or manager (or similar title) of such Obligor.  Any document delivered under this Agreement that is signed by a Responsible Person of an Obligor shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Obligor and such Responsible Person shall be conclusively presumed to have acted on behalf of such Obligor

**Resolution Authority** means anybody which has authority to exercise any Write-down and Conversion Powers

**Restricted Payment** means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such person's shareholders, partners or members (or the equivalent persons thereof)

**Rollover Loan** means one or more Loans:

(a)     made or to be made on the same day that a maturing Loan is due to be repaid;

(b)     the aggregate amount of which is equal to or less than the amount of the maturing Loan;

(c)     in the same currency as the maturing Loan; and

(d)     made or to be made to the same Borrower for the purpose of refinancing a maturing Loan (as the case may be)

**Sale Order** means an order of the Bankruptcy Court approving and authorizing a sale pursuant to section 363 of the Bankruptcy Code of those assets set forth in the Asset Purchase Agreement

**Sanctions** means the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by any Sanctions Authority (whether or not any Obligor, any other Group member or any Affiliate of any Group member is legally bound to comply with such laws, regulations, embargoes or measures)

**Sanctions Authority** means any of:

(a)     the United States government;

(b)     the United Nations;

(c)     the United Kingdom;

(d)     Switzerland;

(e)     the European Union or its Member States,

and includes any government entity of any of the above, including, without limitation, the Office of Foreign Assets Control of the US Department of Treasury (OFAC), the United States Department of State, Her Majesty's Treasury (HMT) and the Swiss State Secretariat for Economic Affairs (SECO)

**Sanctions List** means:

(a)     the "Specially Designated Nationals and Blocked Persons" list maintained by OFAC;

(b)     the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by HMT; or

(c)     any similar list maintained by, or public announcement of Sanctions designation made by, any other Sanctions Authority

**Screen Rate** means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for

the relevant currency and period displayed on pages LIBOR01 or LIBOR02 of the Reuters screen (or any replacement Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters. If such page or service ceases to be available, the Facility Agent may specify another page or service displaying the relevant rate after consultation with the Company

**SEC** means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions

**Second Account Pledge Agreements** means the pledge agreement to be entered into between the Company and APII as pledgors and the US DIP Administrative Agent as pledgee, pursuant to which the Company and APII pledge, *inter alia*, all amounts standing to the credit of the Collection Accounts and the Facility Accounts in favour of the US DIP Administrative Agent to secure the obligations of the relevant Obligors to the US DIP Creditors under any of the US DIP Finance Documents

**Second Secured Obligations** means all obligations at any time due, owing or incurred by any Obligor or any Spanish Pledgor to the US Secured Parties under the US DIP Finance Documents whether present or future, actual or contingent (and whether incurred solely or jointly and whether as principal or surety or in some other capacity)

**Second Security Period** means the period terminating on the date on which the Second Secured Obligations are unconditionally and irrevocably discharged in full

**Second Security** means the Security created or expressed to be created in favour of the US DIP Administrative Agent pursuant to the Second Security Documents

**Second Security Agreements** means:

(a)     the English law security agreement to be entered into by the Company; and

(b)     the English law security agreement to be entered into by APII;

in each case, and in favour of the US DIP Administrative Agent

**Second Security Documents** means

(a)     the Second Account Pledge Agreements;

(b)     the Second Security Agreements;

together with any other document entered into by any Obligor creating or expressed to create any Security over all or any part of its assets in respect of the Second Secured Obligations

**Secured Obligations** means the First Secured Obligations and the Second Secured Obligations

**Secured Parties** means each Finance Party from time to time party to this Agreement and any Receiver or Delegate

**Security** means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect

**Security Agreements** means:

(a)     the English law security agreement entered into by the Company in favour of the Security Agent in form and substance satisfactory to the Security Agent;

(b)     the English law security agreement entered into by APII in favour of the Security Agent in form and substance satisfactory to the Security Agent;

(c) the English law security agreement entered into by ANNV in favour of the Security Agent in form and substance satisfactory to the Security Agent;

(d) the English law security agreement entered into by ABGG in favour of the Security Agent in form and substance satisfactory to the Security Agent; and

(e) the English law security agreement entered into by OBTG in favour of the Security Agent in form and substance satisfactory to the Security Agent

**Sensitive Zone** means:

(a) the territorial waters and shores of Kuwait, Saudi Arabia, Bahrain, Qatar, United Arab Emirates, Oman, Iraq, and any other relevant countries as determined by the Facility Agent (either in its sole discretion or as instructed by the Majority Lenders); and

(b) the international waters of the Persian Gulf.

**Single Purpose Ship Owning Company** means a single purpose ship owning company whose business is solely ownership and operation of ships and who has obtained finance secured on such ships

**Single Purpose Terminal Owning Company** means a single purpose company whose business is solely ownership and operation of terminals and who has obtained finance secured on such terminals

**South African Pledge** means:

(a) the pledge and cession in security agreement in relation to certain goods located onboard floating storage (having official number 18329 and IMO Number 91737733 and which, as at the date of this Agreement, has vessel name "UMNENGA I"), entered or to be entered into between the Company and the Security Agent, and shall include the letter agreement or side letter entered into in relation thereto between the Security Agent, the Company and the relevant South African Pledge Counterparties;

(b) any replacement pledge and cession in security agreement for that described in paragraph (a) above in relation to a floating storage vessel which may replace the m.t. "UMNENGA I", entered or to be entered into between the Company and the Security Agent, which shall include the letter agreement or side letter entered into in relation thereto between the Security Agent, the Company and the relevant South African Pledge Counterparties; and

(c) any pledge and cession in security agreement in relation to other goods located in South Africa entered into between, amongst others, a Borrower and the Security Agent, including any letter agreement or side letter in relation thereto

**South African Pledge Counterparties** means:

(a) Aegean Tanking S.A., a company incorporated under the laws of the Republic of Liberia, with its registered office at 80 Broad Street, Monrovia, Republic of Liberia, and Aegean Bunkering Marine Services Proprietary Limited, a private company duly incorporated under South African law, with registration number 2013/191834/07, and with registered offices at 26 Waverley Drive, Mill Park, Port Elizabeth 6000, South Africa; and

(b) any other entity which is party to a South African Pledge (including, in each case, a letter agreement or side letter) other than the Borrower which owns the relevant pledged goods

(and each shall be a **South African Pledge Counterparty**)

**Spanish Capital Companies Law** means *Real Decreto Legislativo 1/2010, de 2 de Julio, por el que se aprueba el texto refundido de la Ley de Sociedades de Capital*, as amended from time to time

**Spanish Civil Code** means the Spanish *Código Civil*, as amended from time to time

**Spanish Civil Procedural Law** means *Ley 1/2000, de 7 de enero, de Enjuiciamiento Civil*, as amended from time to time

**Spanish Commercial Code** means the Spanish *Código de Comercio*, as amended from time to time

**Spanish Irrevocable Power of Attorney** means any irrevocable power of attorney which is granted by a Spanish Pledgor in favour of the Security Agent and/or the US DIP Administrative Agent as a consequence of and in relation to any Spanish Pledge.

**Spanish Obligor** means an Obligor incorporated under the laws of the Kingdom of Spain.

**Spanish Pledges** means any non-possessory pledge agreement which the Facility Agent (acting on the instructions of the Majority Lenders) may from time to time agree is to be entered into between a Spanish Pledgor and the Security Agent, the US DIP Administrative Agent and certain other Finance Parties or US DIP Finance Parties by virtue of which that Spanish Pledgor grants an in rem right of security over oil-derived products inventory or other assets and shall include any deed of amendment, extension and/or ratification thereof

**Spanish Pledgor** means any person which enters into a Spanish Pledge under or in connection with this Agreement

**Spanish Public Document** means any Spanish *documento público*, being either any *escritura pública* granted or any *póliza* intervened by a Spanish notary public.

**Specified Time** means a time determined in accordance with Schedule 7 (*Timetables*)

**Stock Monitoring Agreement** means a stock monitoring agreement in respect of floating storage to be entered into between the Security Agent, the relevant Borrower and the Stock Monitoring Inspector in form and substance satisfactory to the Facility Agent acting on the instructions of all Lenders

**Stock Monitoring Inspector** means a stock surveillance or inspection company approved in writing by the Facility Agent acting on the instructions of all Lenders

**Subsidiary** means any person (referred to as the **first person**) in respect of which another person (referred to as the **second person**):

(a)     holds a majority of the voting rights in that first person or has the right under the constitution of the first person to direct the overall policy of the first person or alter the terms of its constitution; or

(b)     is a member of that first person and has the right to appoint or remove a majority of its board of directors or equivalent administration, management or supervisory body; or

(c)     has the right to exercise a dominant influence (which must include the right to give directions with respect to operating and financial policies of the first person which its directors are obliged to comply with whether or not for its benefit) over the first person by virtue of provisions contained in the articles (or equivalent) of the first person or by virtue of a control contract which is in writing and is authorised by the articles (or equivalent) of the first person and is permitted by the law under which such first person is established; or

(d)     is a member of that first person and controls alone, pursuant to an agreement with other shareholders or members, a majority of the voting rights in the first person or the rights under its constitution to direct the overall policy of the first person or alter the terms of its constitution; or

(e)     has the power to exercise, or actually exercises dominant influence or control over the first person; or

(f)     together with the first person are managed on a unified basis,

and, for the purposes of this definition, a person shall be treated as a member of another person if any of that person's Subsidiaries is a member of that other person or if any shares in that other person are held by a person acting on behalf of it or any of its Subsidiaries

**TARGET2** means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007

**TARGET Day** means any day on which TARGET2 is open for the settlement of payments in euro

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same)

**Term** means each period determined under this Agreement for which a relevant Facility B Lender is under a liability under a Fronted Facility

**Termination Date** means the earliest of:

(a)     [_____] , 2019 (or if not a Business Day, the first subsequent Business Day); provided that if between [___] , 2019 and [____] , 2019 Borrower requests that the Termination Date be extended, then if on [_____] , 2019:

        (i)     no Event of Default is continuing; and

        (ii)    there remain undrawn "Term Commitments" as defined in the US DIP Credit Facility Agreement in an amount of at least $5,000,000,

        the Termination Date shall be extended to [        ], 2019;

(b)     the effective date of any plan of reorganization or plan of liquidation in the Cases;

(c)     the date of the consummation of a sale of all or substantially all of the Debtors' assets or capital stock under section 363 of the Bankruptcy Code;

(d)     the date on which any Financial Indebtedness, or any commitment for any Financial Indebtedness, of any member of the Group under the US DIP Credit Facility Agreement is:

        (i)     declared to be or otherwise becomes due and payable prior to its specified maturity; or

        (ii)    cancelled or suspended by a creditor of any member of the Group,

        as a result of an event of default (however described).

**Total Commitment** means the aggregate of the Facility A Total Commitments and the Facility B Total Commitments

**Tranches** means each of Facility A Tranche 1, Facility A Tranche 2, Facility B Tranche 1 and Facility B Tranche 2

**Transaction Security** means:

(a)     the First Security; and

(b)     the Second Security

**Transaction Security Documents** means each of:

(a)     the First Security Documents; and

(b)     the Second Security Documents

**Transfer Certificate** means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Facility Agent and the Company

**Transfer Date** means, in relation to an assignment or a transfer, the later of:

(a)     the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)     the date on which the Facility Agent executes the relevant Assignment Agreement or Transfer Certificate

**Treasury Transactions** means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price

**UAE Pledges** means:

(a)     the pledge over moveables located at the Fujairah Freezone, Emirate of Fujairah, UAE entered or to be entered into between the Company, AOTC (as bailee) and the Security Agent (the **Company UAE Pledge**);

(b)     the pledge over moveables located at the Fujairah Freezone, Emirate of Fujairah, UAE entered or to be entered into between APII, AOTC (as bailee) and the Security Agent (the **APII UAE Pledge**);

(c)     any bailee agreement and/or addendum issued pursuant to or in connection with the Company UAE Pledge; and

(d)     any bailee agreement and/or addendum issued pursuant to or in connection with the APII UAE Pledge

**Unpaid Sum** means any sum due and payable but unpaid by an Obligor under the Finance Documents

**US DIP Administrative Agent** ABN AMRO Capital USA LLC as administrative agent and collateral agent under the US DIP Credit Facility Agreement

**US DIP Credit Facility Agreement** means the superpriority secured debtor-in-possession credit agreement dated on or about the date of the Amendment and Restatement Agreement and made between (among others) Aegean Bunkering (USA) LLC as borrower and the US DIP Administrative Agent

**US DIP Credit Facilities** means the superpriority secured debtor-in-possession credit facilities provided pursuant to the US DIP Credit Facility Agreement

**US DIP Finance Documents** has the meaning given to the term "Loan Documents" in the US DIP Credit Facility Agreement

**US Prepetition Credit Facility** means the Second Amended and Restated Uncommitted Credit Agreement, dated August 3, 2017, among Aegean Bunkering (USA) LLC, the lenders party thereto, certain other parties and ABN AMRO Capital USA LLC, as administrative agent

**US Secured Parties** has the meaning given to the term "Secured Party" in the US DIP Credit Facility

**US Security Agreement** means the security agreement, dated on or about the date hereof, executed and delivered by certain of the Guarantors to the Security Agent, as amended, modified or supplemented from time to time

**US Tax Obligor** means:

(a)     an Obligor which is resident for tax purposes in the United States of America; or

(b)     an Obligor some or all of whose payments under the Finance Documents are from sources within the United States for US federal income tax purposes

**Utilisation** means a utilisation of a Facility (by way of a Loan or Fronted Facility)

**Utilisation Date** means the date on which a Utilisation is, or is to be, made

**Utilisation Request** means a notice substantially in the relevant form set out in Schedule 3 (*Utilisation Request*)

**VAT** means:

(a)     any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)     any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

**Write-down and Conversion Powers** means:

(a)     in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule.; and

(b)     in relation to any other applicable Bail-In Legislation:

(i)     any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(ii)    any similar or analogous powers under that Bail-In Legislation

1.2     **Construction**

(a)     Unless a contrary indication appears, a reference in this Agreement to:

(i)     the **Facility Agent**, the **Collateral Management Agent**, any **Finance Party**, any **Issuing Bank**, any **Lender**, any **Obligor**, the **Hedging Provider**, any **Overdraft Bank**, any **Party**, any **Secured Party**, the **Security Agent** or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii)    a document in **agreed form** is a document which is previously agreed in writing by or on behalf of the Company and the Facility Agent or, if not so agreed, is in the form specified by the Facility Agent;

(iii)   **assets** includes present and future properties, revenues and rights of every description;

(iv)    a **Finance Document** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(v)     a **group of Lenders** includes all the Lenders;

(vi)    **guarantee** means (other than in clause 20 (*Guarantee and Indemnity*)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vii)   **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii)  a **person** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(ix)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(x)     **including** means including without limitation;

(xi)    a provision of law is a reference to that provision as amended or re-enacted;

(xii)   a time of day is a reference to Central European Time;

(xiii)  the Interest Period of a Credit Instrument will be construed as a reference to the Term of that Credit Instrument;

(xiv)   an amount borrowed includes any amount utilised by way of a Fronted Facility;

(xv)    a Utilisation made or to be made to a Borrower includes a Fronted Facility entered into or issued on its behalf;

(xvi)   a Lender funding its participation in a Utilisation includes a Lender issuing or entering into or participating in a Fronted Facility;

(xvii) amounts outstanding under this Agreement include amounts outstanding under or in respect of a Fronted Facility;

(xviii) an outstanding amount of a Fronted Facility at any time is the maximum amount that is or may be payable by a Borrower in respect of that Fronted Facility at that time;

(xix) a Borrower repaying or prepaying a Credit Instrument means:

    (A) that Borrower providing cash cover for that Credit Instrument;

    (B) the maximum amount payable under the Credit Instrument being reduced in accordance with its terms; or

    (C) the Issuing Bank which issued the Credit Instrument being satisfied that it has no further liability under that Credit Instrument,

and the amount by which a Credit Instrument is repaid or prepaid under sub-clauses (A) and (B) above is the amount of the relevant cash cover or reduction; and

(xx) a Borrower providing cash cover for a Credit Instrument means that Borrower paying an amount equal to the maximum actual and contingent liabilities of the relevant Lender under such Credit Instruments in the currency of the Credit Instrument to an interest-bearing account in the name of that Borrower and the following conditions are met:

    (A) the account is with the relevant Issuing Bank which issued the Credit Instrument;

    (B) cash cover in the form of deposits shall not bear interest other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Issuing Bank and at the Borrowers' risk and expense;

    (C) withdrawals from the account may only be made to pay a Finance Party amounts due and payable to it under this Agreement in respect of that Credit Instrument until no amount is or may be outstanding under that Credit Instrument; and

    (D) the Borrower has executed a security document, in form and substance satisfactory to the Facility Agent and the Issuing Bank with which that account is held, creating a first ranking security interest over that account; and

(xxi) a Lender's participation in relation to a Fronted Facility shall be construed as a reference to the relevant amount that is or may be payable by a Lender in relation to that Fronted Facility.

(b) In determining the amount of the Available Facility for the purposes of this Agreement the Commitment of a Lender will be calculated ignoring any cash cover provided for outstanding Credit Instruments.

(c) Section, clause and Schedule headings are for ease of reference only.

(d) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(e)     A Default (other than an Event of Default) is **continuing** if it has not been remedied or waived and an Event of Default is **continuing** if it has not been waived.

(f)     A Borrower's obligation on Utilisations becoming **due and payable** includes the Borrower repaying any Credit Instrument in accordance with paragraph (a)(xix) above.

1.3     **Belgian terms**

where it relates to a Belgian Obligor, a reference to :

(a)     "**gross negligence**" is a reference to *zware fout/faute lourde* and "**wilful misconduct**" is a reference to *opzet/dol*;

(b)     a "**liquidator**", "**compulsory manager**", "**receiver**", "**administrative receiver**", "**administrator**" or similar officer includes any *insolventiefunctionaris/praticien de l'insolvabilité, curator/curateur, vereffenaar/liquidateur, gedelegeerd rechter/juge délégué, ondernemingsbemiddelaar/médiateur d'entreprise, gerechtsmandataris/ mandataire de justice, voorlopig bewindvoerder/administrateur provisoire, gerechtelijk bewindvoerder/administrateur judiciaire, mandataris ad hoc/mandataire ad hoc* and any *sekwester/séquestre*;

(c)     a "**suspension of payments**", "**moratorium of any indebtedness**", or "**reorganisation**" includes any *gerechtelijke reorganisatie/réorganisation judiciaire*;

(d)     an "**insolvency**" includes any *insolventieprocedure/procedure d'insolvabilité, gerechtelijke reorganisatie/réorganisation judiciaire, faillissement/faillite* and any other concurrence between creditors (*samenloop van schuldeisers/concours des créanciers*);

(e)     a "**security interest**" includes a mortgage (*hypotheek/hypothèque*), a pledge (*pand/gage*), a transfer by way of security (*overdracht ten titel van zekerheid/transfert à titre de garantie*), any other proprietary security interest (*zakelijke zekerheid/sûreté réelle*), a mandate to grant a mortgage, a pledge or any other real surety, a privilege (*voorrecht/privilège*) and a retention of title (*eigendomsvoorbehoud/réserve de propriété*);

(f)     an Obligor being "**incorporated**" in Belgium or of which its "**jurisdiction of incorporation**" is Belgium, means that that Obligor has its principal place of business (*voornaamste vestiging/établissement principal*) within the meaning of the Belgian Act of 16 July 2004 on the conflicts of law code) in Belgium;

(g)     a person being "**unable to pay its debts**" is that person being in a state of cessation of payments (*staking van betaling/cessation de paiements*);

(h)     a "**composition**" includes any *minnelijk akkoord met schuldeisers/accord amiable avec des créanciers* or any *gerechtelijke reorganisatie/réorganisation judiciaire*;

(i)     "**winding-up**", "**administration**" or "**dissolution**" includes any *vereffening/liquidation, ontbinding/dissolution, sluiting van een onderneming/fermeture d'entreprise* and *faillissement/faillite*;

(j)     "**attachment**", "**sequestration**", "**distress**", "**execution**" or analogous procedures includes any *uitvoerend beslag/saisie exécution* and *bewarend beslag/saisie conservatoire*;

(k)    an "**amalgamation**", "**demerger**", "**merger**" or "**corporate reconstruction**" includes an *overdracht van algemeenheid/transfert d'universalité*, an *overdracht van bedrijfstak/transfert de branche d'activité*, a *splitsing/scission* and a *fusie/fusion* as well as assimilated transactions (*gelijkgestelde verrichtingen/operations assimilées*) in accordance with Articles 676 and 677 of the Belgian Companies Code; and

(l)    a "**group for VAT purposes**" refers to a *BTW-eenheid/unité TVA* and a reference to the "**representative member**" of such group has the same meaning as the term *vertegenwoordiger/représentant* in the Belgian Royal Decree No. 55 of 9 March 2007.

## 1.4    Currency symbols and definitions

(a)    **$**, **USD** and **dollars** denote the lawful currency of the United States of America;

(b)    **€**, **EUR**, **EURO** and **euro** denote the single currency of the Participating Member States.

## 1.5    Third party rights

(a)    Other than the US DIP Administrative Agent and otherwise unless expressly provided to the contrary in a Finance Document, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or enjoy the benefit of any term of this Agreement.

(b)    Notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

## 1.6    Joint and Several Liability

All obligations of the Borrowers under this Agreement shall be assumed jointly and severally. Any payment obligations of ABGG and OBTG that are not repayment obligations with respect to any Utilisations that such Borrower has made itself shall be limited by the restrictions set out in clause 20.10 (*Guarantee Limitations - Germany*) applied *mutatis mutandis.*

## 1.7    Release from restrictions

Any person authorizing any other person or granting to any other person a power of attorney, releases such other person from any restrictions of double representation or self-dealing under any applicable law, including, but not limited to, such restrictions pursuant to Section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*).

## 1.8    Agreed Security Principles

Any provision contemplating or requiring the creation and/or perfection of any Security and anything related to the terms of any document relating to or governing the terms and conditions of such Security shall be subject to the Agreed Security Principles.

**Section 2**
**The Facility**

## 2 The Facilities

### 2.1 The Facilities

Subject to the terms of this Agreement and in the Interim DIP Order or the Final DIP Order, the Lenders make available to the Borrowers a secured multicurrency borrowing base facility comprising:

(a) Facility A in an aggregate amount equal to:

    (i) the Facility A Tranche 1 Total Commitments; and

    (ii) the Facility A Tranche 2 Total Commitments.

(b) Facility B in an aggregate amount equal to:

    (i) the Facility B Tranche 1 Total Commitments; and

    (ii) the Facility B Tranche 2 Total Commitments.

### 2.2 Finance Parties' rights and obligations

(a) The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b) The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor shall be a separate and independent debt.

(c) A Finance Party may, except as otherwise stated in the Finance Documents, separately enforce its rights under the Finance Documents.

(d)

    (i) Notwithstanding any other provision of this Agreement, the issue or making available of Fronted Facilities shall be entirely in the discretion of the Issuing Bank or Overdraft Bank (as the case may be) and the Borrowers acknowledge that no Issuing Bank or Overdraft Bank shall have any obligation or commitment to make Fronted Facilities available to the Borrowers and the making of a Utilisation pursuant to Facility B shall not be deemed to be a commitment to make any other Utilisation under Facility B available by way of a Fronted Facility.

    (ii) An Issuing Bank and an Overdraft Bank shall be entitled to decline a particular Utilisation Request under Facility B on a case-by-case basis without prejudicing its ability to agree to subsequent Facility B Utilisation Requests.

(e) The obligations of the Borrowers under the Finance Documents, subject to the Carve-Out and the Orders:

    (i) include paying or procuring the payment of the Lender Superpriority Claims, and the Lender Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition assets of the Debtors, including, but not limited to, the

Debtors' Collateral provided that any claims pursuant hereto shall be distributed in accordance with clause 34.6;

(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, are secured by a perfected first-priority lien on substantially all now owned or hereafter acquired assets and property of the Debtors, including, for the avoidance of doubt, (1) all equity interests of Subsidiaries of the Parent and (2) all collateral previously pledged to secure the obligations owed to the Finance Parties under this Agreement prior to the Petition Date and obligations under the US Prepetition Credit Facility (**Prepetition Obligations**);

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, are secured by a perfected lien on all assets of the Debtors to the extent that such assets are subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the Prepetition Obligations and obligations under the US Prepetition Credit Facility, which liens shall be primed by the liens securing the Obligations); and

(iv)    pursuant to section 364(d) of the Bankruptcy Code, are secured by a perfected first priority, senior priming lien on all assets of the Debtors (other than any Security in favour of the US Secured Parties in respect of the US DIP Finance Documents) including all capital stock of Subsidiaries of the Debtors and, to the extent that such assets are subject to valid, perfected and non- avoidable liens in favor of third parties as of the commencement of the Cases, including all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors that secure the Prepetition Obligations.

(f)     The priorities set forth in clause 2.2(e) are subject, in each case, only to the Carve-Out. All of the Security and security interests described therein shall be effective and perfected under US law as of the date that the Bankruptcy Court enters the Interim DIP Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. The Debtors shall, at the Debtors' expense, execute and deliver to the Facility Agent (for recordation or filing, as appropriate) Security Documents, and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Facility Agent) to evidence and secure the obligations under this Agreement in each case as contemplated herein.

(g)     The obligations of the Debtors to the Finance Parties under this Agreement are to be further secured by perfected Security in the Debtor's Collateral, including without limitation the Litigation Claims (subject to the Final DIP Order), such Security ranking first in priority subject only to Security permitted in accordance with the Finance Documents.

## 2.3     Obligors' Agent

(a)     Each Obligor (other than the Company) by its execution of this Agreement irrevocably appoints the Company (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

(i)      the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of the Borrowers, Utilisation Requests and any notices, certificates or confirmations under any Finance Document), to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor, without further reference to or the consent of that Obligor; and

(ii)     each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)     Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document on behalf of another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it. In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

(c)     The powers of the Company (as Obligors' Agent) under this clause 2.3 (Obligors' Agent) shall be no greater than as set out in this clause 2.3 (Obligors' Agent) and shall remain valid for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

## 2.4     Hedging/Clearing

(a)     The Company may enter into commodity hedging transactions which have not been cleared (the **Hedging Provider Hedging Transactions**) with the Hedging Providers for the purpose of hedging the Company's ongoing exposure to commodity prices.  Such Hedging Provider Hedging Transactions will be transacted under the 2002 Master Agreement as published by the International Swaps and Derivatives Association Inc. (**Master Agreement**).

(b)     The Company may enter into cleared commodity hedging transactions (the **Clearing Provider Hedging Transactions**) with the Clearing Providers.  Such Clearing Provider Hedging Transactions will be transacted pursuant to the Clearing Provider's customary terms of business.

(c)     Each Borrower may enter into spot and forward foreign exchange hedging transactions (the **FX Hedging Provider Hedging Transactions**) with the FX Hedging Providers for the purpose of hedging the Borrowers' ongoing exposure to foreign exchange risk provided that:

(i)     any such hedging shall be directly linked to the acquisition of assets comprised in the Borrowing Base;

(ii)     the Borrowers' exposure under each hedging transaction shall have a maximum tenor of 45 days; and

(iii)     such FX Hedging Provider Hedging Transactions will be transacted under a Master Agreement.

(d)     The Company may enter into Multi-Party TPA Agreements which comply with the terms of this Agreement.

(e)     No Borrower shall enter into any commodity hedging or clearing transactions or foreign exchange hedging transactions or documents related to any of the same other than as permitted by this clause 2.4.

(f)     The Borrowers shall procure that all Hedging Agreements are entered into in compliance with the Hedging Policy.

## 3    Purpose

### 3.1    Purpose

(a)    Each Borrower shall apply all amounts borrowed by it under the Facilities in a manner consistent with the terms of the Budget (provided that any net underspend may be carried forward) or as otherwise agreed in advance in writing by the Facility Agent (acting on the instructions of the Majority Lenders) from time to time towards:

    (i)    financing any and all working capital needs and for any other general corporate purposes, including without limitation, to finance the Debtors' purchase, transportation, storage, hedging  and sale of Eligible Inventory and accounts receivable;

    (ii)    provision for letters of credit;

    (iii)    payment of related transaction costs, fees, premiums, liabilities and expenses and administration costs incurred in connection with the Cases and the commitment, negotiation, syndication, documentation, execution and closing of the Amendment and Restatement Agreement and the US DIP Credit Facility Agreement;

    (iv)    payment of any other fees, costs and expenses payable hereunder; and

    (v)    in addition in relation to Facility B only, financing payments to FX Hedging Providers in respect of its obligations under a Master Agreement in respect of  an FX Hedging Provider Hedging Transaction.

(b)    The Credit Instruments shall be used for general corporate purposes.

### 3.2    Monitoring

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

### 3.3    The Borrowing Base

Schedule 11 (*Borrowing Base Amount*) sets out the Parties' understanding of the operation of the Borrowing Base.

## 4    Conditions of Utilisation

### 4.1    Initial conditions precedent

(a)    No Borrower may deliver a Utilisation Request unless the Facility Agent has received all of the documents and other evidence listed in Part I of Schedule 2 (*Conditions precedent*) in form and substance satisfactory to the Facility Agent.  The Facility Agent shall notify the Company and the Lenders promptly upon being so satisfied.

(b)    Other than to the extent that the Majority Lenders notify the Facility Agent in writing to the contrary before the Facility Agent gives the notification described in paragraph (a) above, the Lenders authorise (but do not require) the Facility Agent to give that notification.  The Facility Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

### 4.2    Further conditions precedent

(a)    Subject to clause 4.1 *(Initial conditions precedent)* and notwithstanding that the Issuing Bank and Overdraft Bank shall at all times have full discretion whether to issue or enter into any Fronted Facility*,* the Lenders will only be obliged to comply with clause 5.5

(*Lenders' participation in Loans*) or issue or enter into a Fronted Facility if on the date of the Utilisation Request and on the proposed Utilisation Date:

(i)     in the case of a Rollover Loan, no Event of Default is continuing or would result from the proposed loan and, in the case of any other Loan, no Default is continuing or would result from the proposed Utilisation;

(ii)    the Company has not issued a notice pursuant to clause 22.4(c) (*Notification of default and of expectation not to meet Budget*) after the date of its last Compliance Certificate (or if no Compliance Certificate has yet been provided), the date of this Agreement;

(iii)   the Repeating Representations to be made by each Obligor are true;

(iv)    a Borrowing Base Report and a Cross-Check Borrowing Base Report have been provided on the most recent reporting dates in accordance with clauses 22.7 (*Borrowing Base Report*);

(v)     no Obligor or their respective Subsidiaries, or any person claiming by or through the Obligors or their respective Subsidiaries, shall have obtained court authorization to commence, or shall have commenced, joined in, assisted or otherwise participated as an adverse party in any suit or other proceeding against any Finance Party in any Case or case relating to the Finance Documents seeking to subordinate or challenging the validity, enforceability, priority or perfection of Security securing the Secured Obligations;

(vi)    if a Borrowing Base Report was to be delivered on such date based on the Borrowing Base as at that date, such Borrowing Base Report would be a Compliant Borrowing Base Report; and

(vii)   the Majority Lenders have given their consent to the proposed Fronted Facility.

(b)   The Lenders will only be obliged to comply with 34.10 (*Change of currency*) if, on the first day of an Interest Period, no Default is continuing or would result from the change of currency and the Repeating Representations to be made by each Obligor are true.

### 4.3     Further conditions precedent for Sensitive Zones

Without prejudice to clauses 4.1 (*Initial conditions precedent*) and 4.2 (*Further conditions precedent*) no Borrower may submit a Utilisation Request which relates to payments being made into, or investment or activity connected with, Sensitive Zones (including, without limitation, issuing Credit Instruments to entities established in or for the purposes of transactions in, or in connection with activities in, Sensitive Zones) unless the Facility Agent has received all of the documents and other evidence listed in Part III of Schedule 2 (*Conditions precedent*) in form and substance satisfactory to the Facility Agent.

### 4.4     Further conditions precedent in relation to ABGG and OBTG

Without prejudice to clauses 4.1 (*Initial conditions precedent*) and 4.2 (*Further conditions precedent*) ABGG and OBTG may not submit a Utilisation Request unless the Facility Agent and the Lenders have confirmed in writing that they have received evidence satisfactory to each such Party (including any legal opinions or other professional opinions) that there would be no tortious liability (for the avoidance of doubt, including liability arising under or in connection with creditor impairment (*Gläubigergefährdung*)) associated with lending to such Borrower or any other cost, loss or liability attributable to any breach of law or regulation.

4.5 **Further conditions precedent for issue of Credit Instruments in respect of third parties**

Without prejudice to clauses 4.1 (*Initial conditions precedent)* and 4.2 (*Further conditions precedent*) no Borrower may submit a Utilisation Request for a Credit Instrument to be issued at the request of a third party unless both it and the third party have executed and delivered to the relevant Issuing Bank (with a copy to the Facility Agent) a Deed of Undertaking in respect of that Credit Instrument together with:

(a) such corporate and signing authorities; and

(b) such documentation and other evidence in order for the applicable Issuing Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws,

as the Issuing Bank and/or the Facility Agent may reasonably request in connection therewith.

4.6 **Maximum number of Utilisations**

A Borrower (or the Company on its behalf) may not deliver a Utilisation Request if as a result of the proposed Utilisation the aggregate number of outstanding Loans would exceed ten (10).

4.7 **Maximum Available Amount**

A Borrower (or the Company on its behalf) may not deliver a Utilisation Request if as a result of the proposed Utilisation, the Outstandings (including any Outstandings which are to be incurred between the date of delivery of the relevant Utilisation Request and the proposed Utilisation Date) would exceed the Maximum Available Amount at such time.

4.8 **Fronting Bank Limit**

Each Issuing Bank and the Company shall ensure that the aggregate amount of Fronted Facilities will not at any time exceed:

(a) $100,000,000; and

(a)(b) in respect of which each Fronting Bank is the Issuing Bank will not at any time exceed, such Fronting Bank's Fronting Bank Limit.

**Section 3**
**Utilisation**

## 5  Utilisation

### 5.1  Delivery of a Utilisation Request and first Utilisations

A Borrower may utilise a Facility by delivery from the Obligors' Agent on behalf of that Borrower:

(a)  to the Facility Agent (with a copy to the Collateral Management Agent and each Issuing Bank) (in respect of any Loan under the Facilities); and

(b)  to the Facility Agent for and on behalf of each Issuing Bank with a copy to the Collateral Management Agent (in respect of a Fronted Facility),

of a duly completed Utilisation Request not later than the Specified Time.

### 5.2  Completion of a Utilisation Request for Loans

(a)  Each Utilisation Request for a Loan under each of Facility A is irrevocable and will not be regarded as having been duly completed unless:

    (i)  it identifies the Tranche of Facility A to be utilised;

    (ii)  it identifies the relevant Borrower in respect of whom the Utilisation request is being made;

    (iii)  the proposed Utilisation Date is a Business Day within the Availability Period applicable to the relevant Tranche of Facility A;

    (iv)  the currency and amount of the Utilisation comply with clause 5.4 (*Currency and amount*); and

    (v)  the proposed Interest Period complies with clause 12 (*Interest Periods*).

(b)  Only one Loan may be requested in each Utilisation Request.

### 5.3  Completion of a Utilisation Request for Credit Instruments

Without prejudice to clauses 2.2(d)(i), 5.8(c) and 5.9, each Utilisation Request for a Credit Instrument is irrevocable and will not be regarded as having been duly completed unless:

(a)  it specifies the proposed Fronted Facility and the applicable Tranche;

(b)  it identifies the relevant Borrower;

(c)  it identifies the proposed Issuing Bank which has agreed to enter into or issue the Fronted Facility;

(d)  the proposed Utilisation date is a Business Day within the Availability Period applicable to the relevant Tranche of Facility B;

(e)  the currency and amount of the Fronted Facility comply with clause 5.4 (*Currency and amount*);

(f)  (unless otherwise agreed by the Facility Agent and the Facility B Lenders) the Expiry Date of the Fronted Facility falls on or before the Termination Date;

(g)    the maximum contingent liability of the relevant Facility B Lender in respect of the Fronted Facility is determinable at the time of issue or entry into of the Fronted Facility;

(h)    the Term is specified and does not exceed the earlier of (i) ninety (90) days (unless otherwise agreed by the Majority Lenders and the relevant Issuing Bank); and (ii) the date that is five Business Days prior to the Termination Date; provided that at least five (5) Business Days prior to the Termination Date, all Credit Instruments that expire after the Termination Date shall be cash collateralized by the relevant Borrower in an amount equal to 103% of the aggregate then undrawn and unexpired amount of each such Credit Instrument;

(i)    the maximum actual or contingent liability of the relevant Issuing Bank would (after issuing such Credit Instrument) exceed $150,000,000.

(j)    unless otherwise agreed by the Facility Agent and the relevant Issuing Bank, the form of the Credit Instrument is attached and is in full compliance with this Agreement;

(k)    the delivery instructions for the Credit Instrument are specified; and

(l)    it identifies where the request is to issue a Credit Instrument at the request of a third party;

(m)    the identity of the beneficiary is:

    (i)    in the case of a Credit Instrument other than a standby letter of credit to which paragraph (B) below applies, approved by the Issuing Bank; and

    (ii)    (unless approved all Facility B Lenders) in the case of a standby letter of credit in an amount exceeding $5,000,000, a Pre-Approved SBLC Beneficiary (unless such standby letter of credit is payable against a full set of original bills of lading); and

(n)    where the Credit Instrument permits payment upon delivery of, amongst other things, a letter of indemnity, the issuer of a letter of indemnity is an Eligible LOI Counterparty or such letter of indemnity is countersigned by an Acceptable Bank which has agreed to accept liability thereunder.

### 5.4    Currency and amount

(a)    The currency specified in a Utilisation Request must be the Base Currency or euro.

(b)    The amount of the proposed Loan must be:

    (i)    if the currency selected is the Base Currency, a minimum of $1,000,000 and otherwise in multiples of $500,000 or, if less, the Available Facility;

    (ii)    if the currency selected is euro, a minimum of €1,000,000 and otherwise in multiples of €500,000 or, if less, the Available Facility; and

    (iii)    in any event such that its Base Currency Amount is less than or equal to the Available Facility.

(c)    The amount of a proposed Fronted Facility must be, when aggregated with all other outstanding Fronted Facilities under the relevant Tranche, less than or equal to the Available Facility under that Tranche, and must not require any Lender to exceed, or result in any Lender exceeding, its Available Commitment under the relevant Tranche.

(d)    The amount of any proposed Loan or Fronted Facility must not be of an amount which would, upon the Loan or Fronted Facility being made, result in a failure to comply with:

    (i)    clause 4.7 (*Maximum Facility Amount*); or

(ii)     clause 4.8 (*Fronting Bank Limit*).

(e)     The amount of any proposed Utilisation must be such that, immediately following that Utilisation, if a Borrowing Base Report was to be delivered based on the Borrowing Base as at that date, such Borrowing Base Report would be a Compliant Borrowing Base Report.  It will be the sole responsibility of the Borrowers to ensure that this condition is complied with.

## 5.5     Lenders' participation in Loans and Fronted Facilities

(a)     If the conditions set out in this Agreement have been met each Lender shall make its participation in each Loan under the relevant Facility available by the Utilisation Date through its Facility Office.

(b)     The amount of each Lender's participation in each Loan under the relevant Facility will be equal to the proportion borne by its Available Commitment in such Facility under the applicable Tranche to the Available Facility immediately prior to making the Loan.

(c)     The amount of each Facility B Lender's participation in each Fronted Facility will be equal to its Fronted Proportion under the applicable Tranche, and such Fronted Facilities are made available by the Issuing Bank and the Overdraft Bank against the Facility B Lenders' indemnity contained in clause 6.

## 5.6     Role of Facility Agent and Issuing Bank

The Facility Agent shall determine the Base Currency Amount of each Loan under any Facility which is to be made in euro and shall notify each relevant Lender of the amount, currency and the Base Currency Amount of each Loan and the amount of its participation in that Loan, in each case by the Specified Time.

## 5.7     Cancellation of Commitment

The Commitment in respect of a Facility which, at that time, are unutilised shall be immediately cancelled at the end of the Availability Period for that Facility.

## 5.8     Issue of Credit Instruments

(a)     Without prejudice to clause 2.2(d)(i), if the conditions set out in this Agreement have been met, an Issuing Bank under a relevant Tranche may issue a Credit Instrument on its Utilisation Date on behalf of the Facility B Lenders under the relevant Tranche.

(b)     The Company shall procure that on the date of the Utilisation Request in respect of a Credit Instrument and on the proposed Utilisation Date of that Credit Instrument:

(i)     the proposed Credit Instrument is on terms acceptable to the Issuing Bank;

(ii)     no Default is continuing or would result from the proposed Utilisation; and

(iii)     the Repeating Representations to be made by each Obligor are true in all material respects.

(c)     The Issuing Bank shall not comply with a Facility B Utilisation Request if it is aware, or has received written confirmation from the Facility Agent (for the avoidance of doubt, the Facility Agent has no duty to enquire as to or monitor compliance), that clauses 5.3 and 5.4 have not been complied with.

## 5.9     Issue of or entry into Overdraft Facilities

The Overdraft Facility shall not be utilised or made available other than by operation of clause 6.5.

5.10    **Fronted Facilities**

(a)     The Issuing Bank and Overdraft Bank has no duty to enquire of any person whether or not any of the conditions set out in clauses 5.3, 5.4, and 5.8(b) above have been met. The Issuing Bank and Overdraft Bank may assume that those conditions have been met unless it is expressly notified to the contrary by the Facility Agent (for the avoidance of doubt, the Facility Agent likewise has no duty to enquire, or monitor any such conditions). The Issuing Bank will have no liability to any person for issuing or making available a Fronted Facility based on such assumption.

(b)     The Issuing Bank is solely responsible for the form of the Credit Instrument that it issues. The Facility Agent has no duty to monitor the form of that document.

(c)     Subject to clause 30.6(h) (*Rights and discretions*), each of the Issuing Bank, the Overdraft Bank and the Facility Agent shall provide the other with any information reasonably requested by the other and available to it that relates to a Fronted Facility and its issue or granting.

(d)     The Issuing Bank may issue a Credit Instrument in the form of a SWIFT message or other form of communication customary in the relevant market but has no obligation to issue that Credit Instrument in any particular form of communication.

5.11    **Appointment of additional Issuing Banks**

(a)     Subject to paragraph (b) below, any Lender which has agreed to the Company's request to be an Issuing Bank under a particular Tranche pursuant to the terms of this Agreement shall become an Issuing Bank under that Tranche for the purposes of this Agreement upon notifying the Facility Agent, each other Fronting Bank under the relevant Tranche and the Company that it has so agreed to be an Issuing Bank and on making that notification that Lender shall become bound by the terms of this Agreement as an Issuing Bank.

(b)     No person may become an Issuing Bank under this Agreement if immediately after becoming the same the requirements of clause 4.8 would not be satisfied.

# 6    Fronted Facilities

**Credit Instruments**

6.1     If a Credit Instrument or any amount outstanding under a Credit Instrument becomes immediately payable under this Agreement, the relevant Borrower shall repay or prepay that amount immediately.

6.2     Each Borrower irrevocably and unconditionally authorises the Issuing Bank to pay any claim made or purported to be made under a Credit Instrument requested by it and which appears on its face to be in order (a **claim**).

6.3     For the avoidance of doubt, where a Borrower requests the issue of a Credit Instrument at the request of a third party then (without prejudice to clause 4.5 (*Further conditions precedent for issue of Credit Instruments in respect of third parties)*) such Credit Instrument shall be deemed to be a Utilisation of the relevant Borrower who shall be liable for payments in respect of thereof in accordance with clause 6.4.

6.4     Each Borrower which requested a Credit Instrument shall immediately on demand pay to the Facility Agent for the Issuing Bank an amount equal to the amount of any claim under that Credit Instrument.

6.5     To the extent an Issuing Bank is required to make a payment in respect of a claim and that Issuing Bank is also an Overdraft Bank, the amount of each such payment paid by the Issuing Bank shall be converted into an Overdraft Facility with the relevant Borrower and

Issuing Bank (in its capacity as Overdraft Bank) on the date of the payment thereof without the need for a Utilisation Request (notwithstanding that any conditions to the making of Utilisations hereunder have not been satisfied) and the utilisation of such Overdraft Facility shall be deemed to discharge the Borrower's obligation under clause 6.4 to make payment to the Issuing Bank in the amount of that claim.

6.6     Each Borrower acknowledges that the Issuing Bank:

(a)     is not obliged to carry out any investigation or seek any confirmation from any other person before paying a claim; and

(b)     deals in documents only and will not be concerned with the legality of a claim or any underlying transaction or any available set-off, counterclaim or other defence of any person.

6.7     The obligations of a Borrower under this clause will not be affected by:

(a)     the sufficiency, accuracy or genuineness of any claim or any other document; or

(b)     any incapacity of, or limitation on the powers of, any person signing a claim or other document.

**Credit Instruments extending beyond the Termination Date and reduction or expiry of Credit Instruments**

6.8     Each Borrower shall on the Termination Date provide cash cover for any Credit Instrument in respect of which the Term expires after the Termination Date.

6.9     If the amount of any Credit Instrument is wholly or partially reduced or it is repaid or prepaid or it expires prior to its Expiry Date, the relevant Issuing Bank and the Borrower that requested the issue of that Credit Instrument shall promptly notify the Collateral Management Agent of the details upon becoming aware of them.

**Indemnities - Facility B**

6.10    Each Borrower shall immediately on demand indemnify the Issuing Bank or the Overdraft Bank which has issued or entered into a Fronted Facility against any cost, loss or liability incurred by that Issuing Bank or Overdraft Bank (otherwise than by reason of the that Issuing Bank or Overdraft Bank's gross negligence or wilful misconduct) in acting as an Issuing Bank or Overdraft Bank under any Fronted Facility.

6.11    Each Facility B Lender shall (according to its Fronted Proportion in a relevant Tranche) immediately on demand indemnify the Issuing Bank against any cost, loss or liability incurred by the Issuing Bank (otherwise than by reason of that Issuing Bank's gross negligence or wilful misconduct) in acting as the Issuing Bank under any Fronted Facility under that Tranche (unless the Issuing Bank has been reimbursed by an Obligor pursuant to a Finance Document). Notwithstanding any other provision of this Agreement, each Facility B Lender acknowledges and agrees (for the benefit of the other Finance Parties only) that:

(a)     the Issuing Bank and the Overdraft Bank are not in a position to monitor Utilisations on a live basis and accordingly, provided it complies with its own Fronting Bank Limit, a Fronting Bank will be relying on (i) the Borrowers to ensure that Utilisations under Facility B do not exceed the Facility B Total Commitments or the Available Facility from time to time and (ii) the other Fronting Banks to ensure that they do not exceed their Fronting Bank Limits; and accordingly

(b)     it shall be liable for its proportionate share of any amount by which the Facility B Total Commitments (or the applicable Facility B Tranche 1 Commitments or Facility B Tranche 2 Commitments) are exceeded in such manner and its indemnity to the Issuing Bank and

Overdraft Bank under the applicable Tranche (which is expressed to be subject to absence of the relevant Issuing Bank's or Overdraft Bank's gross negligence or wilful misconduct) which has remained within its Fronting Bank Limit will extend to cover any such excess caused by another Fronting Bank exceeding its Fronting Bank Limit.

6.12    The Borrower which requested a Fronted Facility shall immediately on demand reimburse any Lender for any payment it makes to the Issuing Bank under clause 6.11 in respect of that Fronted Facility.

6.13    The obligations of each Lender or Borrower under this clause are continuing obligations and will extend to the ultimate balance of sums payable by that Lender or Borrower in respect of any Fronted Facility under the relevant Tranche of Facility B, regardless of any intermediate payment or discharge in whole or in part.

6.14    If a Borrower has provided cash cover in respect of a Lender's participation in a Credit Instrument, the Issuing Bank shall seek reimbursement from that cash cover before making a demand of that Lender under clause 6.11 above.  Any recovery made by an Issuing Bank pursuant to that cash cover will reduce that Lender's liability under clause 6.11 above.

6.15    The Borrowers' obligations pursuant to clauses 6.12 to 6.14 above shall extend to cover any Lender liability under any arrangement entered into by the Finance Parties with HSH Nordbank AG substantially on the terms of clause 6.11 in respect of HSH Nordbank AG's liabilities referred to in those clauses under the following credit instruments outstanding on the Effective Date:

| Credit Instrument | Borrower | Outstanding value | Expiry date |
|---|---|---|---|
| Letter of guarantee | ABGG | EUR3,000,000 | 31 January 2019 |
| Letter of guarantee | OBTG | EUR3,000,000 | 31 January 2019 |
| Letter of credit | OBTG | $2,580,000 | 7 February 2019 |

6.16    The obligations of any Lender or Borrower under this clause 6 will not be affected by any act, omission, matter or thing which, but for this clause, would reduce, release or prejudice any of its obligations under this clause (without limitation and whether or not known to it or any other person) including:

(a)    any time, waiver or consent granted to, or composition with, any Obligor, any beneficiary under a Credit Instrument or any other person;

(b)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor or any member of the Group;

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor, any beneficiary under a Credit Instrument or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor, any beneficiary under a Credit Instrument or any other person;

(e) any amendment (however fundamental) or replacement of a Finance Document, any Fronted Facility, any Credit Instrument or any other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document, any Fronted Facility, any Credit Instrument or any other document or security; or

(g) any insolvency or similar proceedings.

6.17 Rights of contribution

No Obligor will be entitled to any right of contribution or indemnity from any Finance Party in respect of any payment it may make under this clause 6.

**Cash collateral by Non-Acceptable Banks and Borrower's option to provide cash cover**

6.18 If, at any time, a Facility B Lender under a Credit Instrument is or becomes a Non-Acceptable Bank, the Issuing Bank and/or Overdraft Bank may, by notice to that Facility B Lender, request that Facility B Lender to pay and that Facility B Lender shall pay, on or prior to the date requested by the Issuing Bank, an amount equal to that Lender's Fronted Proportion of:

(a) the outstanding amount of a Credit Instrument;

(b) the maximum potential liability under an Overdraft Facility; and/or

(c) in the case of a proposed Credit Instrument, the amount of that proposed Credit Instrument,

and in the currency of that Fronted Facility to an interest-bearing account held in the name of that Facility B Lender with the Issuing Bank.

6.19 The Facility B Lender to whom a request has been made in accordance with paragraph 6.18 above shall enter into a security document or other form of collateral arrangement over the account, in form and substance satisfactory to the Issuing Bank and/or Overdraft Bank, as collateral for any amounts due and payable under this Agreement by that Facility B Lender to the Issuing Bank and/or Overdraft Bank in respect of that Fronted Facility.

6.20 Subject to clause 6.23 below, withdrawals from such an account may only be made to pay the Issuing Bank and/or Overdraft Bank amounts due and payable to it under this Agreement by the Non-Acceptable Bank in respect of that Fronted Facility until no amount is or may be outstanding under that Fronted Facility.

6.21 Each Facility B Lender shall notify the Facility Agent and the Company:

(a) on the date of this Agreement or on any later date on which it becomes such a Facility B Lender if it is a Non-Acceptable Bank; and

(b) as soon as practicable upon becoming aware of the same, that it is a Non-Acceptable Bank.

6.22 Any notice received by the Facility Agent pursuant to clause 6.21 above shall constitute notice to the Issuing Bank and the Overdraft Bank of that Facility B Lender's status and the Facility Agent shall, upon receiving each such notice, promptly notify the Issuing Bank and the Overdraft Bank and each other Facility B Lender of that Lender's status as specified in that notice.

6.23    Notwithstanding clause 6.20 above, a Lender which has provided cash collateral in accordance with this clause 6 may, by notice to the Issuing Bank and the Overdraft Bank, request that an amount equal to the amount provided by it as collateral in respect of the relevant Fronted Facility (together with any accrued interest) be returned to it:

(a)    to the extent that such cash collateral has not been applied in satisfaction of any amount due and payable under this Agreement by that Lender to the Issuing Bank in respect of the relevant Fronted Facility;

(b)    if:

(i)    it ceases to be a Non-Acceptable Bank;

(ii)    its obligations in respect of the relevant Fronted Facility are transferred to another Facility B Lender in accordance with the terms of this Agreement; or

(iii)    an Acceptable Bank has agreed to undertake that Facility B Lender's obligations in respect of the relevant Fronted Facility in accordance with the terms of this Agreement; and

(c)    if no amount is due and payable by that Facility B Lender in respect of a Fronted Facility,

and the Issuing Bank and the Overdraft Bank (as applicable) shall pay that amount to the Lender within three (3) Business Days of that Lender's request (and shall cooperate with the Lender in order to procure that the relevant security or collateral arrangement is released and discharged).

6.24    To the extent that a Non-Acceptable Bank fails to provide cash collateral (or notifies the Issuing Bank that it will not provide cash collateral) in accordance with clauses 6.18 to 6.24 in respect of a proposed Fronted Facility, the Issuing Bank shall promptly notify the Company (with a copy to the Collateral Management Agent) and the Borrower of that proposed Fronted Facility may, at any time before the proposed Utilisation Date of that Fronted Facility, provide cash cover to an account with the Issuing Bank in an amount equal to that Lender's Fronted Proportion of the amount of that proposed Fronted Facility.

6.25    As an alternative to providing cash collateral under this clause 6, a Non-Acceptable Bank may satisfy its cash collateral obligations by providing to the Issuing Bank and/or the Overdraft Bank (as applicable) in a form and substance satisfactory to the Issuing Bank and/or the Overdraft Bank and the Facility Agent such security or other credit support as the Issuing Bank, Overdraft Bank and Facility Agent may require in support of such Non-Acceptable Bank's obligations in respect of Fronted Facilities under the relevant Tranche of Facility B.

**Requirement for cash cover from Borrower**

6.26    If:

(a)    a Non-Acceptable Bank fails to provide cash collateral or make a required payment (or notifies the Issuing Bank and/or Overdraft Bank (as the case may be) that it will not provide cash collateral or make such repayment) in accordance with clauses 6.18 to 6.24 (*Cash collateral by Non Acceptable Lender and Borrower's option to provide cash cove*r) in respect of a Fronted Facility that has been issued or made available;

(b)    the Issuing Bank and/or the Overdraft Bank (as the case may be) notifies the Company (with a copy to the Collateral Management Agent) that it requires the Borrower of the relevant: (i) Credit Instrument to provide cash cover to an account with the Issuing Bank in an amount equal to that Lender's Fronted Proportion of the outstanding amount of that Credit Instrument; or (ii) Overdraft Facility to repay that Lender's Fronted Proportion of such Overdraft Facility; and

(c)     that Borrower has not already provided such cash cover  or repayment which (in the case of cash cover) is continuing to stand as collateral,

then that Borrower shall provide such cash cover and make such repayment within three (3) Business Days of the notice referred to in paragraph (b) above.

**Regulation and consequences of cash cover provided by Borrower**

6.27    Notwithstanding clause 1.2(a)(xx) (*Construction*), the relevant Borrower may request that an amount equal to the cash cover (together with any accrued interest) provided by it pursuant to clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable Bank and Borrower's option to provide cash cover*) or clause 6.26 (*Requirement for cash cover from Borrower*) be returned to it:

(a)     to the extent that such cash cover has not been applied in satisfaction of any amount due and payable under this Agreement by that Borrower to the Issuing Bank in respect of a Credit Instrument;

(b)     if:

(i)      the relevant Lender ceases to be a Non-Acceptable Bank;

(ii)     the relevant Lender's obligations in respect of the Credit Instrument are transferred to another Facility B Lender under the same Tranche in accordance with the terms of this Agreement; or

(iii)    an Acceptable Bank has agreed to undertake that Facility B Lender's obligations in respect of the relevant Credit Instrument in accordance with the terms of this Agreement;

(c)     if no amount is due and payable by the relevant Lender in respect of the relevant Credit Instrument; and

(d)     if no Default is continuing,

and the Issuing Bank shall pay that amount to that Borrower within three (3) Business Days of that Borrower's request.

6.28    To the extent that a Borrower has provided cash cover pursuant to clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable Bank and Borrower's option to provide cash cover*) or clause 6.26 (*Requirement for cash cover from Borrower*), the relevant Lender's Fronted Proportion in respect of that Credit Instrument will remain (but that Lender's obligations in relation to that Credit Instrument may be satisfied in accordance with clause 1.2(a)(xx)(B) (*Construction*)). However the relevant Borrower's obligation to pay any Credit Instrument fee in relation to the relevant Credit Instrument to the Collection Account (for the account of that Lender) in accordance with clause 14.2 (*Facility B fees*) will be reduced proportionately as from the date on which it provides that cash cover (and for so long as the relevant amount of cash cover continues to stand as collateral).

6.29    The relevant Issuing Bank shall promptly notify the Collateral Management Agent of the extent to which a Borrower provides cash cover or repays an Overdraft Facility pursuant to clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable Bank and Borrower's option to provide cash cover*) or clause 6.26 (*Requirement for cash cover from Borrower*) and of any change in the amount of cash cover so provided.

**Utilisation of Fronted Facilities when a Lender is a Non-Acceptable Bank**

6.30    If, on the proposed Utilisation Date of a Fronted Facility, any Facility B Lender under the applicable Tranche is a Non-Acceptable Bank and:

(a) that Lender has failed to provide cash collateral to the Issuing Bank in accordance with clauses 6.18 to 6.24 (*Cash collateral by Non-Acceptable L/C Lender and Borrower's option to provide cash cover*) or an alternative in accordance with clause 6.25; and

(b) the Borrower of that proposed Fronted Facility has not exercised its right to provide cash cover to the Issuing Bank in accordance with clause 6.24 (*Cash collateral by Non-Acceptable L/C Lender and Borrower's option to provide cash cover*),

the Issuing Bank may:

(i) reduce the amount of that Fronted Facility by an amount equal to the amount of the participation of that Non-Acceptable Bank in respect of that Fronted Facility and that Non-Acceptable Bank shall be deemed not to have any participation (or obligation to indemnify the Issuing Bank) in respect of that Credit Instrument for the purposes of the Finance Documents; or

(ii) proceed with the Utilisation of the Fronted Facility as requested by the Borrower on the basis that each Facility B Lender excluding for this purpose any Non-Acceptable Bank shall participate in such Utilisation on the basis of a Fronted Proportion calculated as if the Non-Acceptable Bank had ceased to be a Facility B Lender, and each such Facility B Lender shall (subject to not exceeding its Available Commitment) be liable for such increased Fronted Proportion in relation to the Fronted Facility in the event that the Non-Acceptable Bank fails to comply with its obligations to provide cash collateral hereunder.

The Issuing Bank shall notify the Collateral Management Agent and the Company of each reduction made pursuant to this clause 6.30. This clause 6.30 shall not affect the participation of each other Lender in that Credit Instrument.

**Role of the Issuing Bank and Overdraft Bank - Facility B**

6.31 Nothing in this Agreement constitutes an Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility as a trustee or fiduciary of any other person.

6.32 An Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility:

(a) shall not be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account in respect of a Fronted Facility;

(b) may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor;

(c) may rely on:

(i) any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii) any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify;

(d) may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts;

(e) may act in relation to the Fronted Facility through its personnel and agents; and

(f) is not responsible for:

(i) the adequacy, accuracy and/or completeness of any information (whether oral or written) provided by the Facility Agent, any Party (including itself), or any other

person under or in connection with the Fronted Facility, the transactions contemplated by the Fronted Facility or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with the Fronted Facility; or

(ii) the legality, validity, effectiveness, adequacy or enforceability of the Fronted Facility or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with the Fronted Facility.

**Exclusion of liability**

6.33 Without limiting clause 6.34 (*Exclusion of liability*) below, an Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility will not be liable for any action taken by it under or in connection with that Fronted Facility, unless directly caused by its gross negligence or wilful misconduct.

6.34 No Party (other than an Issuing Bank or Overdraft Bank which has issued or entered into a Fronted Facility) may take any proceedings against any officer, employee or agent of that Issuing Bank or Overdraft Bank in respect of any claim it might have against that Issuing Bank or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Fronted Facility.

**Terms of Fronted Facilities**

6.35 Except as provided below, the terms of any Fronted Facility shall be those agreed by the relevant Issuing Bank or Overdraft Bank and the Company.

6.36 Those terms:

(a) must be based upon normal commercial terms at that time (except as varied by this Agreement);

(b) may allow only Borrowers to use Fronted Facilities; and

(c) must comply with the provisions of this Agreement including, without limitation, in relation to Term, currency and amount.

6.37 If there is any inconsistency or conflict between any term of a Fronted Facility and any term of this Agreement, this Agreement shall prevail.

**Amendments and Waivers - Fronted Facilities**

6.38 No amendment or waiver of a term of any Fronted Facility shall require the consent of any Finance Party other than the relevant Issuing Bank or Overdraft Bank unless such amendment or waiver itself relates to or gives rise to a matter which would require an amendment of or under this Agreement (including, for the avoidance of doubt, under this clause 6).

**Multi-Party TPA Agreements**

6.39 Each of the Borrowers agrees to procure that the terms of any Multi-Party TPA Agreement shall comply with this clause 6.39 (*Multi-Party TPA Agreements*) (and the execution by a Finance Party of a Multi-Party TPA Agreement which does not comply with this 6.39 (*Multi-Party TPA Agreements*) shall not be construed as a waiver thereof unless expressly confirmed in writing by the Facility Agent acting on the instructions of the Majority Lenders). Each Multi-Party TPA Agreement shall:

(a) be expressly capable of being assigned by the Company to the Security Agent pursuant to the relevant Security Agreement (but not otherwise);

(b) provide that payments for the account of the Company thereunder shall be paid to its relevant Collection Account;

(c) contain any notices and acknowledgements of assignment required by each Security Agreement;

(d) be governed by English or Dutch law; and

(e) not otherwise conflict with or cause the Company to breach the terms of this Agreement and any other Finance Document.

6.40    Pursuant to a Multi-Party TPA the Company may grant Security in favour of the Hedging Provider or Clearing Provider (as the case may be) in respect only of the Company's rights under and in connection with the Hedging Provider Hedging Transaction or Clearing Provider Hedging Transaction but not, for the avoidance of doubt, in respect of any inventory pledged to the Security Agent pursuant to the Transaction Security Documents.

**Master Agreements for FX hedging**

6.41    Unless the Hedging Provider is METSA, each of the Borrowers agrees to procure that the terms of any FX Hedging Provider Hedging Agreement shall comply with this clause 6.41 (*Master Agreement for FX hedging)* (and the execution by a Finance Party of a FX Hedging Provider Hedging Agreement which does not comply with this clause 6.41 (*Master Agreement for FX hedging)* shall not be construed as a waiver thereof unless expressly confirmed in writing by the Facility Agent acting on the instructions of the Majority Lenders).  Each FX Hedging Provider Hedging Agreement shall:

(a) be expressly capable of being assigned by the Borrower to the Security Agent pursuant to the relevant Security Agreement (but not otherwise);

(b) provide that payments for the account of the Borrower thereunder shall be paid to its relevant Collection Account;

(c) contain any notices and acknowledgements of assignment required by each Security Agreement;

(d) be governed by English law; and

(e) not otherwise conflict with or cause the Borrower to breach the terms of this Agreement and any other Finance Document.

**Inconsistency and conflict**

6.42    If there is any inconsistency or conflict between any term of a Multi-Party TPA Agreement or a Deed of Undertaking or a FX Hedging Provider Hedging Agreement and any term of this Agreement, this Agreement shall prevail.

**Replacement of a Non-Acceptable Bank**

6.43    The Company may, at any time after a Lender has:

(a) become and continues to be a Non-Acceptable Bank; or

(b) failed (and continues to fail) to provide cash collateral (or has notified the Issuing Bank, the Overdraft Bank or the Company (which has notified the Facility Agent)  that it will not provide cash collateral) in accordance with clauses 6.18 to 6.24 (*Cash collateral by Non Acceptable  Lender and Borrower's option to provide cash cove*r),

by giving ten (10) Business Days' notice to the Facility Agent and such Lender, replace such Lender by requiring such Lender to (and, to the extent permitted by law, such Lender

shall) transfer pursuant to clause 27 (*Changes to the Lenders*) all (and not part only) of its rights and obligations under this Agreement to another Facility B Lender under the relevant Tranche which is an Acceptable Bank or (if no existing Facility B Lenders wish to acquire the same) to an Acceptable Bank designated by the Company, in each case in accordance with clause 27 (*Changes to Lenders*).

Any transfer of rights and obligations of a Non-Acceptable Bank pursuant to this clause 6.43 shall be subject to the following conditions:

(i) the Company shall have no right to replace the Facility Agent, the Collateral Management Agent or the Security Agent;

(ii) neither the Facility Agent nor the Non-Acceptable Bank shall have any obligation to the Company to find a replacement lender;

(iii) the transfer must take place no later than 10 days after the Non-Acceptable Bank received the notice referred to above;

(iv) in no event shall the Non-Acceptable Bank be required to pay or surrender to the Replacement Lender any of the fees received by the Non-Acceptable Bank pursuant to the Finance Documents; and

(v) the Non-Acceptable Bank shall only be obliged to transfer its rights and obligations pursuant to this clause once it is satisfied that it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to that transfer to the replacement lender. The Non-Acceptable Bank shall perform such checks as soon as reasonably practicable and shall notify the Facility Agent and the Company when it is satisfied that it has complied with those checks.

### Reporting of Collection Account balances

6.44 The Collateral Management Agent shall notify to all Lenders on each Business Day the opening balance on each Collection Account on such day.

### Reporting of margin balances

6.45 The Collateral Management Agent shall deliver to all Lenders on each Business Day of any margin statement (containing details of, amongst other things, initial margin, variation margin and account status) issued to the Collateral Management Agent by a Clearing Provider or Hedging Provider on such day (provided it is received by the Collateral Management Agent prior to midday on such day).

# Section 4
# Repayment, Prepayment and Cancellation

## 7    Repayment

### 7.1    Repayment of Loans

(a)    Each Borrower which has drawn a Loan shall repay that Loan on the last day of its Interest Period.

(b)    Without prejudice to each Borrower's obligation under paragraph (a) above, if:

(i)    one or more Loans are to be made available to a Borrower:

(A)    on the same day that a maturing Loan is due to be repaid by that Borrower;

(B)    in the same currency as the maturing Loan; and

(C)    in whole or in part for the purpose of refinancing the maturing Loan; and

(ii)    the proportion borne by each Lender's participation in the maturing Loan to the amount of that maturing Loan is the same as the proportion borne by that Lender's participation in the new Loans to the aggregate amount of those new Loans,

the aggregate amount of the new Loans shall, unless the relevant Borrower or the Parent notifies the Facility Agent to the contrary in the relevant Utilisation Request, be treated as if applied in or towards repayment of the maturing Loan so that:

(A)    if the amount of the maturing Loan exceeds the aggregate amount of the new Loans:

(1)    the relevant Borrower will only be required to make a payment under clause 34.1 (*Payments to the Facility Agent*) in an amount in the relevant currency equal to that excess; and

(2)    each Lender's participation in the new Loans shall be treated as having been made available and applied by the relevant Borrower in or towards repayment of that Lender's participation in the maturing Loan and that Lender will not be required to make a payment under clause 34.1 (*Payments to the Facility Agent*) in respect of its participation in the new Loans; and

(B)    if the amount of the maturing Loan is equal to or less than the aggregate amount of the new Loans:

(1)    the relevant Borrower will not be required to make a payment under clause 34.1 (*Payments to the Facility Agent*); and

(2)    each Lender will be required to make a payment under clause 34.1 (*Payments to the Facility Agent*) in respect of its participation in the new Loans only to the extent that its participation in the new Loans exceeds that Lender's participation in the maturing Loan and the remainder of that Lender's participation in the new Loans shall be treated as having been made available and applied by the relevant Borrower in or towards repayment of that Lender's participation in the maturing Loan.

7.2     **Repayment of Overdraft Facilities**

(a)     Without prejudice to clauses 7.2(b) and 25.3(e), each Overdraft Facility shall be repayable on demand and if not demanded shall be repayable on the Termination Date.

(b)     If an Overdraft Bank proposes to demand repayment of an Overdraft Facility it shall notify the Facility Agent and the Company in writing of such proposal and:

   (i)     the Facility Agent shall inform the Collateral Management Agent and the other Lenders within one (1) Business Day of receipt thereof; and

   (ii)     (subject to clause 7.2(d)) all Overdraft Facilities with that Overdraft Bank shall be repayable on the date which is five (5) Business Days from the date of the Facility Agent's notice under clause 7.2(b)(i) (the **Demand Repayment Date**).

(c)     Upon receipt by each other Lender of the Facility Agent's notice referred to in paragraph 7.2(b)(ii), each other Overdraft Bank shall be entitled to demand repayment on the Demand Repayment Date of all (but not part) of the Overdraft Facilities entered into between it and the Borrowers and shall notify the Facility Agent and the Collateral Management Agent if it wishes to do so (and the amounts to be repaid) no later than two (2) Business Days prior to the Demand Repayment Date.   The Facility Agent shall promptly notify the Company which Overdraft Banks have demanded repayment and the amounts to be repaid;

(d)     Provided that no Event of Default has occurred and is continuing, on the Demand Repayment Date the Collateral Management Agent shall apply all monies held on the Collection Accounts towards the discharge of the amounts demanded and due on that date in respect of Overdraft Facilities.   To the extent any amounts remain outstanding and provided that no Event of Default occurs and is continuing the Borrowers shall have a further twenty (20) days to procure that all Overdraft Facilities which have been demanded are repaid in full by application of monies received from third parties into the Collection Account.   Failure to pay all amounts due upon the expiry of the twenty (20) day period shall constitute an Event of Default.

(e)     No Lender shall be obliged to make any Utilisation on or prior to the date on which all Overdraft Facilities which have been the subject of a demand have been repaid in full by the Borrowers.

# 8     Voluntary prepayment and cancellation

## 8.1     Voluntary cancellation

A Borrower (or the Company on its behalf) may, if it gives the Facility Agent not less than five (5) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, cancel the whole or any part (being a minimum amount of $5,000,000 or EUR5,000,000) of an Available Facility. Any cancellation under this clause 8.1 shall reduce the Commitments of the Lenders rateably under that Facility.

## 8.2     Voluntary prepayment of Loans

(a)     A Borrower may, if it (or the Company on its behalf) gives the Facility Agent not less than five (5) Business Days' (or such shorter period as the Majority Lenders may agree) prior notice, prepay the whole or any part of a Loan (but, if in part, being an amount that reduces the amount of that Loan by a minimum amount of $5,000,000 or EUR5,000,000 (as applicable)).

(b)     A Borrower may prepay the whole or any part of a Loan without notice and in any amount if necessary for the purposes of compliance with clause 24.26 (*Borrowing Base Amount*)

and, for the purpose of any such prepayment, the restrictions set out in paragraph (a) above shall not apply.

### 8.3 Right of cancellation and repayment in relation to a single Lender, Issuing Bank or Overdraft Bank

(a) If:

    (i) any sum payable to any Lender or Issuing Bank or Overdraft Bank by an Obligor is required to be increased under paragraph (c) of clause 15.2 (*Tax gross-up*);

    (ii) any Lender, Issuing Bank or Overdraft Bank claims indemnification from the Company or an Obligor under clause 15.3 (*Tax indemnity*) or clause 16.1 (*Increased costs*); or

    (iii) at any time on or after the date which is six (6) months before the earliest FATCA Application Date for any payment by a Party to a Lender (or to the Facility Agent for the account of that Lender), that Lender is not, or has ceased to be, a FATCA Exempt Party and, as a consequence, a Party will be required to make a FATCA Deduction from a payment to that Lender (or to the Facility Agent for the account of that Lender) on or after that FATCA Application Date,

the Company may, whilst the circumstance giving rise to the requirement for that increase or indemnification or FATCA Deduction continues, give the Facility Agent notice of cancellation of the Commitment of that Lender and its intention to procure the repayment of that Lender's participation or liability in the Utilisations and (if such circumstances relate to the Issuing Bank or Overdraft Bank) of repayment of outstanding Fronted Facility issued or made available by it and cancellation of its appointment as an Issuing Bank or Overdraft Bank (as the case may be) under this Agreement in relation to any Fronted Facilities to be issued in the future.

(b) On receipt of a notice referred to in paragraph (a) above in relation to a Lender, the Commitment of that Lender shall immediately be reduced to zero.

(c) On the last day of each Interest Period which ends after the Company has given notice under paragraph (a) above in relation to a Lender (or, if earlier, the date specified by the Company in that notice), each Borrower, to which a loan is outstanding shall repay that Lender's participation in that Loan together with all interest and other amounts accrued under the Finance Documents.

### 8.4 Right of cancellation in relation to a Non-Acceptable Bank

(a) If any Facility B Lender becomes a Non-Acceptable Bank, the Company may, at any time whilst the Facility B Lender continues to be a Non-Acceptable Bank, give the Facility Agent fifteen (15) Business Days' notice of cancellation of each Available Commitment of that Lender.

(b) On the notice referred to in paragraph (a) above becoming effective, each Available Commitment of the Non-Acceptable Bank shall immediately be reduced to zero.

(c) The Facility Agent shall as soon as practicable after receipt of a notice referred to in paragraph (a) above, notify all the Lenders.

## 9 Mandatory prepayment and cancellation

### 9.1 Illegality

If it is or becomes unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund, issue or maintain its participation in any Utilisation including to leave outstanding any Fronted Facilities, that Lender shall promptly

notify the Facility Agent upon becoming aware of that event and, upon the Facility Agent notifying the Company (and if requested by the relevant Lender):

(a)    the Available Commitment of that Lender will be immediately cancelled; and/or

(b)    Company shall (or shall procure that the relevant Borrower shall) immediately provide full cash cover in respect of that Lender's participation in any outstanding Credit Instrument; and/or

(c)    each Borrower shall repay that Lender's participation in the Utilisations made to that Borrower on the last day of the Interest Period for each Utilisation occurring after the Facility Agent has notified the Company or, if earlier, the date specified by the Lender in the notice delivered to the Facility Agent (being no earlier than the last day of any applicable grace period permitted by law),

and that Lender's corresponding Commitment shall be cancelled in the amount of the participations repaid.

## 9.2    Illegality in relation to Issuing Bank

If it becomes unlawful for an Issuing Bank to issue or leave outstanding any Fronted Facility, then:

(e)    that Issuing Bank shall promptly notify the Facility Agent upon becoming aware of that event;

(f)    any obligation of such Issuing Bank to issue any Credit Instrument will be immediately cancelled; and

(g)    the Company shall, or shall notify the relevant Borrower and upon such notice that Borrower shall, use its best endeavours to procure the release of each Credit Instrument issued by a relevant Issuing Bank and outstanding at such time and until such release has been effected the Company shall (or shall procure that the relevant Borrower shall) immediately provide full cash cover in respect of such Credit Instruments.

## 9.3    Change of Control

Upon the occurrence of:

(a)    a Change of Control; or

(b)    the sale of all or substantially all of the assets of the Group whether in a single transaction or a series of related transactions,

(i)     the Company shall promptly notify the Facility Agent upon becoming aware of that event;

(ii)    a Lender shall not be obliged to fund a Utilisation;

(iii)   a Lender shall not be obliged to enter into or issue a Fronted Facility; and

(iv)   if a Lender so requires and notifies the Facility Agent within twenty (20) days of the Company notifying the Facility Agent of the event the Facility Agent shall, by not less than twenty (20) days' notice to the Company, cancel the Commitment of that Lender and declare the participation or liability of that Lender in all outstanding Utilisations, together with accrued interest, and all other amounts accrued under the Finance Documents immediately due and payable, whereupon the Commitment of that Lender will be cancelled and all such outstanding amounts will become immediately due and payable, and the Company shall procure that the relevant Borrower shall use its best endeavours to procure the release of each

Credit Instrument issued by that Lender and outstanding at that time and until such release has been effected the Company shall procure that the relevant Borrower shall immediately provide full cash cover in respect of such Credit Instruments.

9.4 **Facility Accounts sweep**

(a) For so long as any amount is outstanding under Facility A Tranche 1 or Facility B Tranche 1, and subject to prior payment of any other amounts then due and payable under the Finance Documents, the Borrowers shall:

(i) by no later than 14:00 on the next Business Day falling 14 days after the date of this Agreement (and thereafter on each Business Day falling 14 days from the date of the previous payment); and

(ii) otherwise at such times as the Facility Agent (acting on the instructions of the Majority Lenders) may by notice require,

prepay Facility A Tranche 1 and Facility B Tranche 1 on a *pro rata* basis in an aggregate amount equal to that standing to the credit of the Facility Accounts.

(b) The Lenders shall apportion any such prepayments as between interest and principal in accordance with clause 10.2 and shall notify the Facility Agent of such allocation and the Facility Agent shall not be responsible for any calculation of interest and principal upon such prepayments.

(c) Any prepayment to be made pursuant to paragraph (a) above shall be made by way of set-off of the amount to be prepaid against a deemed Utilisation of Tranche 2 of the corresponding Facilty. Such deemed Utilisation by a Borrower shall not entitle the Borrower to receive any cash from the Facility Agent or any Lender and, notwithstanding that no such cash is exchanged, the Borrower shall thereafter owe the aggregate amount of the deemed Utilisations to the Lenders under the terms hereof and the Orders and they shall not constitute Prepetition Obligations. The prepaid amount of the Prepetition Obligations shall be deemed to have been finally discharged as a consequence of the set-off.

9.5 **Tranche 1 prepayment – Orders and Credit Instruments**

(a) If the Orders so require, Tranche 1 of each Facility shall be prepaid on the Effective Date in the amount so required (or within any applicable timeframe and in such amounts imposed by the Orders).

(b) Any prepayment to be made pursuant to paragraph (a) above shall be made by way of set-off of the amount to be prepaid against a deemed Utilisation of Tranche 2 of the corresponding Facilty. Such deemed Utilisation by a Borrower shall not entitle the Borrower to receive any cash from the Facility Agent or any Lender and, notwithstanding that no such cash is exchanged, the Borrower shall thereafter owe the aggregate amount of the deemed Utilisations to the Lenders under the terms hereof and the Orders and they shall not constitute Prepetition Obligations. The prepaid amount of the Prepetition Obligations shall be deemed to have been finally discharged as a consequence of the set-off.

(c) Any Credit Instruments issued by an Issuing Bank under Tranche 1 of Facility B which are outstanding as at the Effective Date shall be deemed, from the Effective Date, to have been issued under Tranche 2 of Facility B (and not under Tranche 1 of Facility B) in the same amount and on the same terms and the outstanding Utilisations under Tranche 1 and Tranche 2 shall be deemed adjusted accordingly.

## 10    Restrictions

### 10.1    Notices of Cancellation or Prepayment

Any notice of cancellation, prepayment, authorisation or other election given by any Party under clause 8 (*Voluntary prepayment and cancellation*) or clause 9 (*Mandatory prepayment and cancellation*) shall (subject to the terms of those clauses) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

### 10.2    Interest and other amounts

Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

### 10.3    Prepayment in accordance with Agreement

(a)    Unless a contrary indication appears in this Agreement, any part a Facility which is prepaid or repaid may be reborrowed in accordance with the terms of this Agreement.

(b)    The Borrowers shall not repay or prepay all or any part of the Loans or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

### 10.4    No reinstatement of Commitments

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

### 10.5    Facility Agent's receipt of Notices

If the Facility Agent receives a notice under clause 8 (*Voluntary prepayment and cancellation*) or clause 9 (*Mandatory prepayment and cancellation*), it shall promptly forward a copy of that notice or election to the Company or the affected Lender(s), as appropriate.

### 10.6    Effect of repayment and prepayment on Commitments

If all or part of any Lender's participation in a Loan is repaid or prepaid and is not available for redrawing, an amount of that Lender's Commitment (equal to the Base Currency Amount of the participation which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment.

### 10.7    Effect of the Intercreditor Agreement

Any obligation of any Obligor to make a mandatory prepayment under this Agreement shall be subject to the terms and conditions of the Intercreditor Agreement.

**Section 5
Costs of Utilisation**

# 11 Interest

### 11.1 Calculation of interest - Loans

The rate of interest on each Loan for each Interest Period is the percentage rate per annum which is the aggregate of the applicable:

(a)     Margin; and

(b)     LIBOR.

### 11.2 Calculation of interest – Overdraft Facilities

The rate of interest on each Overdraft Facility is the percentage rate per annum which is the aggregate of:

(a)     the Facility B Margin; and

(b)     LIBOR.

### 11.3 Payment of interest

(a)     **Loans**

On the last day of each Interest Period (and, if the Interest Period relating to Facility B is longer than one (1) Month, on the dates falling at Monthly intervals after the first day of the Interest Period) the Borrower to which a Loan has been made shall pay accrued interest on the Loan to which that Interest Period relates provided that in relation to Interest Periods relating to Facility A no payment shall be required to be made unless permitted by the Bankruptcy Court and, if not so permitted, interest shall accrue on a compounded basis until the Termination Date.

(b)     **Overdraft Facilities**

Interest in respect of Overdraft Facilities shall accrue on a daily basis and shall be calculated and payable within five (5) Business Days after the end of each calendar month (notwithstanding that the Overdraft Facility may have been cancelled and/or repaid during that month in accordance with its terms and/or with the terms of this Agreement). On the calculation date each Overdraft Bank shall notify the Company of any interest payable by the Borrowers as at that date. A failure by an Overdraft Bank to notify the Company of any interest payable hereunder shall not prejudice the Lenders' rights to receive such interest. The amount of interest payable to an Overdraft Bank shall be payable from an Overdraft Facility with such Overdraft Bank without the need for a Utilisation Request provided the conditions in clauses 5.4(b)(ii) to 5.4(e) are met (the Overdraft Bank is authorised and instructed to transfer the relevant funds directly to the Collection Account), failing which the Company shall instruct the payment and, if not done by the Company within three (3) Business Days, the Collateral Management Agent shall be authorised to debit the Collection Account (and the Borrowers shall immediately pay any shortfall to the extent all interest obligations are not satisfied therefrom).

### 11.4 Default interest

(a)     If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (i) below, is two (2) per cent. per annum higher than:

(i)     in respect of a Loan, the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan under the relevant Facility in the currency of the overdue amount for successive Interest Periods, each of a duration selected by the Facility Agent (acting reasonably; and

(ii)    in respect of an Overdraft Facility, the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted an Overdraft Facility of the type to which the overdue amount relates in the currency of the overdue.

Any interest accruing under this clause 11.4 shall be immediately payable by the Obligor on demand by the Facility Agent.

(b)    If any overdue amount consists of all or part of a Utilisation which became due on a day which was not the last day of an Interest Period relating to that Utilisation:

(i)     the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to that Utilisation; and

(ii)    the rate of interest applying to the overdue amount during that first Interest Period shall be two (2) per cent. per annum higher than the rate which would have applied if the overdue amount had not become due.

(c)    Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

11.5    **Notification of rates of interest**

(a)    The Facility Agent shall promptly notify the relevant Lenders and the relevant Borrower (or the Company) of the determination of a rate of interest under this Agreement in respect of any Facility other than the Fronted Facilities.

(b)    The relevant Overdraft Bank shall notify the relevant Borrower of a determination of a rate of interest in respect of an Overdraft Facility.

# 12    Interest Periods

12.1    **Selection of Interest Periods**

(a)    Subject to paragraph (b) below, a Borrower (or the Company on behalf of a Borrower) may select an Interest Period relating to Facility A of three (3) Months or any other period agreed between the Borrower (or the Company on its behalf) and the Facility Agent (acting on the instructions of the Majority Lenders).

(b)    An Interest Period for a Loan shall not extend beyond the Termination Date applicable to its Facility.

(c)    A Loan has one Interest Period only.

12.2    **Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

## 13 Changes to the Calculation of Interest

### 13.1 Absence of quotations

Subject to clause 13.2 (*Market disruption*) if LIBOR is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by the Specified Time on the Quotation Day, the applicable LIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

### 13.2 Market disruption

(a) If a Market Disruption Event occurs in relation to a Loan for any Interest Period, then the rate of interest on each Lender's share of that Loan for the Interest Period shall be the percentage rate per annum which is the sum of:

    (i) the Margin; and

    (ii) the rate notified to the Facility Agent by that Lender as soon as practicable and in any event before interest is due to be paid in respect of that Interest Period, to be that which expresses as a percentage rate per annum the cost to that Lender of funding its participation in that Loan from whatever source it may reasonably select.

(b) If:

    (i) the percentage rate per annum notified by a Lender pursuant to paragraph (a)(ii) above is less than LIBOR; or

    (ii) a Lender has not notified the Facility Agent of a percentage rate per annum pursuant to paragraph (a)(ii) above,

the cost to that Lender of funding its participation in that Loan for that Interest Period shall be deemed, for the purposes of paragraph (a) above, to be LIBOR.

(c) If a Market Disruption Event occurs, the Facility Agent shall, as soon as is practicable, notify the Company.

(d) In this Agreement:

**Market Disruption Event** means:

    (i) at or about noon on the Quotation Day for the relevant Interest Period LIBOR is to be determined by reference to the Reference Banks and none or only one of the Reference Banks supplies a rate to the Facility Agent to determine LIBOR for the relevant currency and Interest Period; or

    (ii) before close of business in London on the Quotation Day for the relevant Interest Period, the Facility Agent receives notifications from a Lender or Lenders (whose participations in a Loan exceed twenty (20) per cent. of that Loan) that the cost to it of funding its participation in that Loan from whatever source it may reasonably select would be in excess of LIBOR.

### 13.3 Alternative basis of interest or funding

(a) If a Market Disruption Event occurs and the Facility Agent (acting on the instructions of all the Lenders) or the Company so requires, the Facility Agent and the Company shall enter into negotiations (for a period of not more than thirty (30) days) with a view to agreeing a substitute basis for determining the rate of interest.

(b) Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Company, be binding on all Parties.

## 13.4 Break Costs

(a) Each Borrower shall, within three Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of a Loan or Unpaid Sum being paid by that Borrower on a day other than the last day of an Interest Period for that Loan or Unpaid Sum.

(b) Each Lender shall, as soon as reasonably practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Break Costs for any Interest Period in which they accrue.

# 14 Fees

## 14.1 Up-front fee

(a) The Company shall pay to the Facility Agent an up-front fee in an aggregate amount of US$4,500,000 (being an amount equal to one point five (1.5%) per cent. of the Total Commitments in respect of Facility A Tranche 2 and Facility B Tranche 2 as at the Effective Date) for the account of each Lender in proportion to its Commitment in Facility A Tranche 2 and Facility B Tranche 2.

(b) The up-front fee is payable on the Effective Date.

## 14.2 Agency fee

The Company shall pay to the Facility Agent (a) (for the account of the Facility Agent and Security Agent) an agency fee of US$10,000 in aggregate and; (b) (for the account of the Collateral Management Agent) an agency fee of US$65,000, in each case payable on the Effective Date and Monthly thereafter until the end of the Joint Security Period.

## 14.3 Facility B fees

(a) The Company shall pay the relevant Issuing Bank (for the account of each relevant Facility B Lender) fees in Dollars calculated at the following rates:

(i) in respect of each documentary letter of credit issued by an Issuing Bank, 3.50% flat per annum or part thereof of the value of the letter of credit or the amount of the drawings honoured thereunder, whichever is higher, payable (subject to paragraph (b) below) upon maturity;

(ii) in respect of each standby letter of credit issued by an Issuing Bank, 3.50% flat per annum or part thereof of the value of the standby letter of credit or the amount paid in cancellation of the standby letter of credit, whichever is higher, payable (subject to paragraph (b) below) upon maturity; and

(iii) in respect of each guarantee issued by an Issuing Bank, 3.50% per annum of the maximum amount of the guarantee payable (subject to paragraph (b) below) upon issuance of the guarantee.

(b) Facility B fees payable to an Issuing Bank (other than fronting fees) shall be calculated and payable within one Business Day after the end of each calendar month. On the calculation date each Issuing Bank shall notify the Company of any fees (other than fronting fees) payable by the Borrowers as at that date. A failure by an Issuing Bank to notify the Company of any such fees shall not prejudice the Lenders' rights to receive the same. If the relevant Issuing Bank is also an Overdraft Bank, such fees shall be payable from an Overdraft Facility with such Issuing Bank (in its capacity as Overdraft Bank) without the need for a Utilisation Request provided the conditions in clauses 5.4(c) to

5.4(e) are met (the Overdraft Bank is authorised and instructed to transfer the relevant funds directly to the Collection Account), failing which the Company shall instruct the payment and, if not done by the Company within three (3) Business Days, the Collateral Management Agent shall be authorised to debit the Collection Account (and the Borrowers shall immediately pay any shortfall to the extent all interest obligations are not satisfied therefrom).

14.4    **Fronting fees – Facility B Tranche 2**

The Borrowers shall pay to the Issuing Bank (for its own account) a fronting fee of 0.20% per annum on the average daily Facility B Tranche 2 Outstandings (including in respect of Credit Instruments deemed to have been issued under Facility B Tranche 2 pursuant to clause 9.5). Such fees are to be calculated and payable within one Business Day after the end of each calendar month. Such fees shall be payable from an Overdraft Facility with the relevant Overdraft Bank or (if it is also an Overdraft Bank) Issuing Bank (in its capacity as Overdraft Bank) without the need for a Utilisation Request provided the conditions in clauses 5.4(c) to 5.4(e) are met (the Overdraft Bank is authorised and instructed to debit the relevant Overdraft Facility for its own account), failing which (including if the relevant Issuing Bank is not an Overdraft Bank) the Company shall instruct the payment and, if not done by the Company within three (3) Business Days, the Collateral Management Agent shall be authorised to debit the Collection Account for payment to the relevant Issuing Bank or Overdraft Bank (and the Borrowers shall immediately pay to the Issuing Bank or Overdraft Bank any shortfall to the extent such fronting fee is not satisfied therefrom).

# Section 6
## Additional Payment Obligations

## 15   Tax Gross Up and Indemnities

15.1    **Definitions**

(a)    In this Agreement:

**FATCA Payment** means either:

(a)    the increase in a payment made by an Obligor to a Finance Party under clause 15.8 (*FATCA Deduction and gross-up by Obligor*) or clause 15.9 (*FATCA Deduction by Finance Party*); or

(b)    a payment under clause 15.9 (*FATCA Deduction by Finance Party*).

**Protected Party** means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

**Tax Credit** means a credit against, relief or remission for, or repayment of, any Tax.

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means either the increase in a payment made by an Obligor to a Finance Party under clause 15.2 (*Tax gross-up*) or a payment under clause 15.3 (*Tax indemnity*).

(b)    Unless a contrary indication appears, in this clause 15 a reference to **determines** or **determined** means a determination made in the absolute discretion of the person making the determination.

15.2    **Tax gross-up**

(a)    Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)    The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Facility Agent accordingly.  Similarly, a Lender, Overdraft Bank or Issuing Bank shall notify the Facility Agent on becoming so aware in respect of a payment payable to that Lender, Overdraft Bank or Issuing Bank.  If the Facility Agent receives such notification from a Lender, Overdraft Bank or Issuing Bank it shall notify the Company and that Obligor.

(c)    If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e)    Within thirty (30) days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Facility Agent for the Finance Party entitled to the payment evidence reasonably

satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

15.3     **Tax indemnity**

(a)     The Company shall (within three Business Days of demand by the Facility Agent) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b)     Paragraph (a) above shall not apply:

(i)     with respect to any Tax assessed on a Finance Party under the law of the jurisdiction in which:

(A)     that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

(B)     that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(ii)     to the extent a loss, liability or cost:

(A)     is compensated for by an increased payment under clause 15.2 (*Tax gross-up*), clause 15.8 (*FATCA Deduction and gross-up by Obligor*) or clause 15.9 (*FATCA Deduction by Finance Party*); or

(B)     is compensated for by a payment under clause 15.9 (*FATCA Deduction by Finance Party*).

(c)     A Protected Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Facility Agent of the event which will give, or has given, rise to the claim, following which the Facility Agent shall notify the Company.

(d)     A Protected Party shall, on receiving a payment from an Obligor under this clause 15.3, notify the Facility Agent.

15.4     **Tax Credit**

If an Obligor makes a Tax Payment and the relevant Finance Party determines that:

(a)     a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b)     that Finance Party has obtained, utilised and retained that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

15.5     **Stamp taxes**

The Company shall pay and, within three (3) Business Days of demand, indemnify each Secured Party against any cost, loss or liability that Secured Party incurs in relation to all stamp

duty, registration and other similar Taxes payable in respect of any Finance Document, provided that this Clause shall not apply in respect of any stamp duty, registration or similar Taxes payable in respect of an assignment, sub-participation or transfer by a Secured Party of any of its rights or obligations under a Finance Document.

15.6 **VAT**

(a) All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b) If VAT is or becomes chargeable on any supply made by any Finance Party (the **Supplier**) to any other Finance Party (the **Recipient**) under a Finance Document, and any Party other than the Recipient (the **Relevant Party**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i) (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT. The Recipient must (where this paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii) (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c) Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d) Any reference in this clause 15.6 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term **representative member** to have the same meaning as in the Value Added Tax Act 1994).

(e) In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

## 15.7 FATCA Information

(a) Subject to clause 15.7(c) below, each Party shall, within ten (10) Business Days of a reasonable request by another Party:

    (i) confirm to that other Party whether it is:

        (A) a FATCA Exempt Party; or

        (B) not a FATCA Exempt Party,

    (ii) supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

    (iii) supply to that other Party such forms, documentation and other information relating to its status as that other Paty reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b) If a Party confirms to another Party pursuant to clause (A) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c) Clause 15.7(a) above shall not oblige any Finance Party to do anything which would or might in its reasonable opinion constitute a breach of:

    (i) any law or regulation;

    (ii) any fiduciary duty; or

    (iii) any duty of confidentiality.

(d) If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with clause 15.7(a) above (including, for the avoidance of doubt, where clause 15.7(c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e) If a Borrower is a US Tax Obligor, or where the Facility Agent reasonably believes that its obligations under FATCA require it, each Lender shall, within ten (10) Business Days of:

    (i) where a Borrower is a US Tax Obligor and the relevant Lender is an Original Lender, the date of this Agreement;

    (ii) where a Borrower is a US Tax Obligor and the relevant Lender is a New Lender, the relevant Transfer Date;

    (iii) the date a new US Tax Obligor accedes as a Borrower; or

    (iv) where the Borrower is not a US Tax Obligor, the date of a request from the Facility Agent,

supply to the Facility Agent:

    (v) a withholding certificate on Form W-8 or Form W-9 (or any successor form) (as applicable); or

(vi)     any withholding statement and other documentation, authorisations and waivers as the Facility Agent may require to certify or establish the status of such Lender under FATCA.

The Facility Agent shall provide any withholding certificate, withholding statement, documentation, authorisations and waivers it receives from a Lender pursuant to this paragraph (e) to the Borrower and shall be entitled to rely on any such withholding certificate, withholding statement, documentation, authorisations and waivers provided without further verification.  The Facility Agent shall not be liable for any action taken by it under or in connection with this paragraph (e).

(f)     Each Lender agrees that if any withholding certificate, withholding statement, documentation and waivers provided to the Facility Agent pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, it shall such withholding certificate, withholding statement, documentation, authorisations and waivers or promptly notify the Facility Agent in writing of its legal inability to do so.  The Facility Agent shall, upon the reasonable request of the Borrower, provide any such updated withholding certificate, withholding statement, documentation, authorisations and waivers to the Borrower.  The Facility Agent shall not be liable for any action taken by it under or in connection with this paragraph (f).

## 15.8     FATCA Deduction and gross-up by Obligor

(a)     If an Obligor is required to make a FATCA Deduction, that Obligor shall make that FATCA Deduction and any payment required in connection with that FATCA Deduction within the time allowed and in the minimum amount required by FATCA.

(b)     If a FATCA Deduction is required to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any FATCA Deduction) leaves an amount equal to the payment which would have been due if no FATCA Deduction had been required.

(c)     The Company shall promptly upon becoming aware that an Obligor must make a FATCA Deduction (or that there is any change in the rate or the basis of a FATCA Deduction) notify the Facility Agent accordingly. Similarly, a Finance Party shall notify the Facility Agent on becoming so aware in respect of a payment payable to that Finance Party. If the Facility Agent receives such notification from a Finance Party it shall notify the Company and that Obligor and the Facility Agent shall notify the other Parties.

(d)     Within thirty (30) days of making either a FATCA Deduction or any payment required in connection with that FATCA Deduction, the Obligor making that FATCA Deduction or payment shall deliver to the Facility Agent for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party that the FATCA Deduction has been made or (as applicable) any appropriate payment paid to the relevant governmental or taxation authority.

## 15.9     FATCA Deduction by a Finance Party

(a)     Each Finance Party may make any FATCA Deduction it is required by FATCA to make, and any payment required in connection with that FATCA Deduction, and no Finance Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.  A Finance Party which becomes aware that it must make a FATCA Deduction in respect of a payment to another Party (or that there is any change in the rate or the basis of such FATCA Deduction) shall notify that Party and the Facility Agent and the Facility Agent shall notify the other Parties.

(b)     If the Facility Agent is required to make a FATCA Deduction in respect of a payment to a Finance Party under clause 34.2 (*Distributions by the Facility Agent*) which relates to a payment by an Obligor, the amount of the payment due from that Obligor shall be

increased to an amount which (after the Facility Agent has made such FATCA Deduction), leaves the Facility Agent with an amount equal to the payment which would have been made by the Facility Agent if no FATCA Deduction had been required.

(c)  The Facility Agent shall promptly upon becoming aware that it must make a FATCA Deduction in respect of a payment to a Finance Party under clause 34.2 (*Distributions by the Facility Agent*) which relates to a payment by an Obligor (or that there is any change in the rate or the basis of such a FATCA Deduction) notify the Company, the relevant Obligor and the relevant Finance Party.

(d)  The Company shall (within three (3) Business Days of demand by the Facility Agent) pay to a Finance Party (as the case may be) an amount equal to the loss, liability or cost which that Finance Party determines will be or has been (directly or indirectly) suffered by that Finance Party as a result of another Finance Party making a FATCA Deduction in respect of a payment due to it under a Finance Document. This paragraph shall not apply to the extent a loss, liability or cost is compensated for by an increased payment under clause 15.9(b) above.

(e)  A Finance Party making, or intending to make, a claim under clause 15.9(d) above shall promptly notify the Facility Agent of the FATCA Deduction which will give, or has given, rise to the claim, following which the Facility Agent shall notify the Company.

15.10   **Tax Credit and FATCA**

If an Obligor makes a FATCA Payment and the relevant Finance Party determines that:

(a)  a Tax Credit is attributable to an increased payment of which that FATCA Payment forms part, to that FATCA Payment or to a FATCA Deduction in consequence of which that FATCA Payment was required; and

(b)  that Finance Party has obtained, utilised and retained that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the FATCA Payment not been required to be made by the Obligor.

# 16   Increased Costs

16.1   **Increased costs**

(a)  Subject to clause 16.3 (*Exceptions*), the Company shall, within three (3) Business Days of a demand by the Facility Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates, including any Increased Cost which:

(i)  arises as a result of (i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation or (ii) compliance with any law or regulation made after the date of this Agreement; and/or

(ii)  is a Basel II Increased Cost and/or a Basel III Increased Cost.

(b)  In this Agreement **Increased Costs** means:

(i)  a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(ii)  an additional or increased cost; or

(iii)  a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of their respective Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document and as determined by that Finance Party.

16.2 **Increased cost claims**

(a) A Finance Party intending to make a claim pursuant to clause 16.1 (*Increased costs*) shall notify the Facility Agent of the event giving rise to the claim, following which the Facility Agent shall promptly notify the Company.

(b) Each Finance Party shall, as soon as practicable after a demand by the Facility Agent, provide a certificate confirming the amount of its Increased Costs.

16.3 **Exceptions**

(a) Clause 16.1 (*Increased costs*) does not apply to the extent any Increased Cost is:

(i) attributable to a Tax Deduction required by law to be made by an Obligor;

(ii) compensated for by clause 15.9 (*FATCA Deduction by a Finance Party*);

(iii) compensated for by clause 15.3 (*Tax indemnity*) (or would have been compensated for under clause 15.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of clause 15.3 (*Tax indemnity*) applied); or

(iv) attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation.

(b) In this clause 16.3 reference to a **Tax Deduction** has the same meaning given to the term in clause 15.1 (*Definitions*).

# 17 Other Indemnities

17.1 **Currency indemnity**

(a) If any sum due from an Obligor under the Finance Documents (a **Sum**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **First Currency**) in which that Sum is payable into another currency (the **Second Currency**) for the purpose of:

(i) making or filing a claim or proof against that Obligor; or

(ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within three (3) Business Days of demand, indemnify the each Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

17.2 **Other indemnities**

(a) The Company shall (or shall procure that an Obligor will), within three (3) Business Days of demand, indemnify each Secured Party against any cost, loss or liability incurred by it as a result of:

    (i) the occurrence of any Event of Default;

    (ii) a failure by an Obligor to pay any amount due under a Finance Document on its due date, including without limitation, any cost, loss or liability arising as a result of clause 33 (*Sharing among the Finance Parties*);

    (iii) funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower or the Company in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone);

    (iv) issuing or making arrangements to issue or make available a Fronted Facility requested by a Borrower in a Utilisation Request but not issued by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

    (v) a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company.

(b) The Company shall promptly indemnify each Finance Party, each Affiliate of a Finance Party and each officer or employee of a Finance Party or its Affiliate, against any cost, loss or liability incurred by that Finance Party or its Affiliate (or officer or employee of that Finance Party or Affiliate) in connection with or arising out of the use of proceeds under the Facility or Transaction Security being taken over the Charged Property (including but not limited to those incurred in connection with any litigation, arbitration or administrative proceedings or regulatory enquiry concerning the use of proceeds under the Facility), unless such loss or liability is caused by the gross negligence or wilful misconduct of that Finance Party or its Affiliate (or employee or officer of that Finance Party or Affiliate). Any Affiliate or any officer or employee of a Finance Party or its Affiliate may rely on this clause 17.2 subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

17.3 **Indemnity to the Facility Agent and/or Collateral Management Agent**

The Company shall promptly indemnify the Facility Agent and/or the Collateral Management Agent against:

(a) any cost, loss or liability incurred by the Facility Agent and/or the Collateral Management Agent (acting reasonably) as a result of:

    (i) investigating any event which it reasonably believes is a Default;

    (ii) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; or

    (iii) instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and

(b) any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Facility Agent and/or the Collateral Management Agent (otherwise than by reason of the such party's gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to clause 34.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's or the

Collateral Management Agent's (as the case may be) negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent and/or the Collateral Management Agent (as the case may be) in acting as the Facility Agent and/or the Collateral Management Agent (as the case may be) under the Finance Documents.

### 17.4 Indemnity to the Security Agent

(a) Each Obligor jointly and severally shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability incurred by any of them as a result of:

(i) any failure by the Company to comply with its obligations under clause 19 (*Costs and expenses*);

(ii) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

(iii) the taking, holding, protection or enforcement of the Transaction Security;

(iv) the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent and each Receiver and Delegate by the Finance Documents or by law;

(v) any default by any Obligor in the performance of any of the obligations expressed to be assumed by it in the Finance Documents; or

(vi) acting as Security Agent, Receiver or Delegate under the Finance Documents or which otherwise relates to any of the Charged Property (otherwise, in each case, than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b) Each Obligor expressly acknowledges and agrees that the continuation of its indemnity obligations under this clause 17.4 will not be prejudiced by any release under clause 31.26 (*Releases*) or otherwise in accordance with the terms of this Agreement.

(c) The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this clause 17.4 and shall have a lien on the Transaction Security and the proceeds of the enforcement of the Transaction Security for all moneys payable to it.

### 17.5 Limited Liability - Germany

(a) The enforcement of each joint and several liability under this clause 17.4 (*Indemnities*) and the other payment obligations set out in this Agreement (in particular clause 19.4 (*Indemnity expenses*) and clause 31.3 (*Parallel Debt (Covenant to pay the Security Agent)*) owed by any German Obligor) shall be limited as set out in clause 20.10 (*Guarantee Limitations (Germany)*), which shall apply *mutatis mutandis.*

(b) Paragraph (f) of clause 24.36 (*Dividends and share redemptions*) and clause 25.4 (*Withdrawals from Collection Account*) and any other payment, receipt or withdrawal restriction shall not apply to a German Obligor to the extent as required in order to ensure compliance with the limitations set out in clause 20.10 (*Guarantee Limitations (Germany)*), which shall apply *mutatis mutandis.*

(c) The limitation set out in clause 20.10 (*Guarantee Limitations (Germany)*) of this Agreement shall apply *mutatis mutandis* to any upstream or cross-stream distributions, payments and cash sweeps pursuant to the Finance Documents and made by a German Obligor (including without limitation, clause 9.4 (*Facility Accounts sweep*).

## 18    Mitigation by the Lenders

### 18.1    Mitigation

(a)    Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in any facility ceasing to be available or any amount becoming payable under or pursuant to, or cancelled pursuant to, any of clause 9.1 (*Illegality*) or, in respect of the Issuing Bank, clause 9.2 (*Illegality in relation to the Issuing Bank*), clause 15 (*Tax gross-up and indemnities*) or clause 16 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

### 18.2    Limitation of liability

(a)    The Company shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under clause 18.1 (*Mitigation*).

(b)    A Finance Party is not obliged to take any steps under clause 18.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

## 19    Costs and Expenses

### 19.1    Transaction expenses

The Company shall promptly on demand pay each Secured Party the amount of all costs and expenses (including legal fees) reasonably incurred by any of them (and, in the case of the Security Agent, by any Receiver or Delegate) in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the date of this Agreement,

and shall promptly on demand pay to each Issuing Bank the amount of all costs and expenses including without limitation postage, courier fees, SWIFT charges and out-of-pocket expenses in connection with the issue or entry into and operation of Fronted Facilities.

In relation to any Obligor incorporated under the laws of Spain and to each Spanish Pledgor (if any) and any Finance Documents they execute, sign or formalize subject to the laws of Spain, the Company and/or the corresponding Spanish Obligor or Spanish Pledgor shall also pay the applicable notary public fees and registry fees whenever due.

### 19.2    Amendment costs

If (a) an Obligor requests an amendment, waiver or consent, or additional or replacement security as contemplated in clause 24.25 (*Conditions Subsequent*) or otherwise, or (b) an amendment is required or agreed pursuant to clause 34.10 (*Change of currency*), the Company shall, within three (3) Business Days of demand, reimburse each Secured Party for the amount of all costs and expenses (including legal fees) reasonably incurred by that Secured Party (and, in the case of the Security Agent, by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

In relation to any Obligor incorporated under the laws of Spain and to each Spanish Pledgor (if any) and any Finance Documents they execute, sign or formalize subject to the laws of Spain,

the Company and/or the corresponding Spanish Obligor or Spanish Pledgor shall also pay the applicable notary public fees and registry fees whenever due.

19.3    **Enforcement and preservation costs**

The Company shall, within three (3) Business Days of demand, pay to each Secured Party the amount of all costs and expenses (including legal fees and the fees of any court representative (*procurador*), even if the intervention of lawyers or court representatives is not mandatory)) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

19.4    **Indemnity expenses**

The Company shall:

(a)    pay or reimburse the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent, for all its reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable out-of-pocket legal fees and expenses, and printing, reproduction and document delivery expenses) incurred in connection with the syndication, development, preparation, negotiation, execution, delivery and administration of, and any amendment, supplement or modification to, this Agreement and the other Finance Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees and disbursements of counsel to such Finance Parties;

(b)    pay or reimburse each Lender, the Issuing Banks, the Overdraft Bank and the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent for all its documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Finance Documents and any such other documents or any restructuring or "work-out" related hereto and thereto, including, without limitation, the reasonable and documented fees and disbursements of counsel to the Lenders and of counsel to the Issuing Bank, the Overdraft Bank, Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent;

(c)    pay or reimburse the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent for its documented costs and expenses incurred in connection with inspections performed pursuant to the Finance Documents, and any other due diligence performed in connection with this Agreement and the other Finance Documents, including:

(i)    the documented fees and disbursements of counsel to the Co-Ordinator, the Facility Agent, the Security Agent and the Collateral Management Agent; and

(ii)    the costs and expenses associated with Security searches;

(d)    pay, indemnify, and hold each Finance Party harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent (including the determination of whether or not any such waiver or consent is required) under or in respect of, this Agreement, the other Finance Documents and any such other documents;

(e)    pay, indemnify, and hold each Finance Party, and each of their respective officers, employees, directors, trustees, agents, advisors, affiliates and controlling persons (each, an **Indemnitee**), harmless from and against any and all other liabilities, obligations,

losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable and documented legal fees) with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Finance Documents, and any such other documents, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Obligor or any of their respective Subsidiaries, or any of its properties (all the foregoing in this paragraph (e), collectively, the **Indemnified Liabilities**); provided that, the Obligors shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities, to the extent such Indemnified Liabilities:

(i)     are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the intentional breach, gross negligence or willful misconduct of such Indemnitee; or

(ii)    result from a claim brought by any Obligor against an Indemnitee for breach in bad faith of such Indemnitee's obligations under this Agreement or under any other Finance Document, if such Obligor has obtained a final, non-appealable judgment in its favour on such claim as determined by a court of competent jurisdiction.

No Indemnitee shall have any liability (whether direct or indirect, in contract, tort, equity or otherwise) to an Obligor or an Obligor's Subsidiaries or Affiliates or to an Obligor's or its equity holders or creditors arising out of, related to or in connection with any aspect of this Agreement, the other Finance Documents or any of the transactions contemplated by this Agreement, except to the extent of direct (as opposed to special, indirect, consequential or punitive) damages determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted directly from such Indemnitee's bad faith, intentional breach, gross negligence or willful misconduct. The Indemnitees shall have liability only to the relevant Obligor (as opposed to any other person).   Notwithstanding any other provision of this Agreement, no party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, except to the extent such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise directly from the gross negligence, bad faith, intentional breach or willful misconduct of such Indemnitee. The agreements in this clause 19.4 (*Indemnity expenses*) shall survive repayment of the Outstandings and all other amounts payable under the Finance Documents and termination of this Agreement. This clause 19.4 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**Section 7**
**Guarantee**

## 20 Guarantee and Indemnity

### 20.1 Guarantee and indemnity

Each Guarantor irrevocably and unconditionally jointly and severally:

(a) guarantees to each Finance Party punctual performance by each other Obligor, each Spanish Pledgor and each South African Pledge Counterparty of all that Obligor's obligations under the Finance Documents;

(b) undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c) agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of an Obligor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this clause 20 if the amount claimed had been recoverable on the basis of a guarantee.

### 20.2 Continuing Guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

### 20.3 Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration, judicial management or otherwise, without limitation, then the liability of each Guarantor under this clause 20 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

### 20.4 Waiver of defences

The obligations of each Guarantor under this clause 20 will not be affected by an act, omission, matter or thing which, but for this clause 20, would reduce, release or prejudice any of its obligations under this clause 20 (without limitation and whether or not known to it or any Finance Party) including:

(a) any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b) the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e) any amendment, novation, supplement, extension restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g) any insolvency or similar proceedings.

In case of an Additional Guarantor incorporated under the laws of Spain accedes to this Agreement as Guarantor, such Spanish Guarantor waives any right of exclusion, order and/or division (*beneficios de excusión, orden y división*) under article 1830 et seq of the Spanish Civil Code.

20.5 **Guarantor Intent**

Without prejudice to the generality of clause 20.4 (*Waiver of defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following: business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

20.6 **Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on behalf of any of them) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this clause 20. This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

20.7 **Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on behalf of any of them) may:

(a) refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on behalf of any of them) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b) hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this clause 20.

20.8 **Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Facility Agent otherwise directs, no Guarantor will exercise any rights which it may have by reason of

performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this clause 20:

(a)     to be indemnified by an Obligor;

(b)     to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d)     to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under clause 20.1 (*Guarantee and indemnity*);

(e)     to exercise any right of set-off against any Obligor; and/or

(f)     to claim or prove as a creditor of any Obligor in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it will promptly pay an equal amount to the Facility Agent or as the Facility Agent may direct for application in accordance with clause 34 (*Payment mechanics*).

## 20.9     Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

## 20.10    Guarantee Limitations (Germany)

(a)     The restrictions in this clause 20.10 (*Guarantee Limitations (Germany)*) shall apply to any guarantee, and indemnity granted by a Guarantor incorporated under the laws of Germany as a limited liability company (**GmbH**) (a **German Guarantor**) or other payment obligation under this clause 20 (*Guarantee and indemnity*) or any other provision of the Finance Documents (hereinafter a **German Guarantee**) with respect to liabilities of its direct or indirect shareholder(s) (upstream) or an entity affiliated with such shareholder (*verbundenes Unternehmen*) within the meaning of section 15 et seq. of the German Stock Corporation Act *(Aktiengesetz)* (cross-stream) (excluding, for the avoidance of doubt any direct or indirect Subsidiary of such German Guarantor).

(b)     The restrictions in this clause 20.10 shall not apply to the extent the German Guarantor secures any indebtedness under any Finance Document in respect of (i) loans to the extent they are on-lent or otherwise (directly or indirectly) passed on to the relevant German Guarantor or its Subsidiaries and such amount on-lent or otherwise passed on is not repaid or (ii) any other benefit granted under the Finance Documents.

(c)     If payment under this German Guarantee would (i) cause the amount of a German Guarantor's net assets, as calculated pursuant to this clause 20.10, to fall below the amount of its registered share capital (*Stammkapital*), or (ii) increase an existing shortage of its registered share capital (*Vertiefung einer Unterbilanz*), in each case in violation of section 30 of the German Limited Liability Companies Act (*Gesetz betreffend die Gesellschaft mit beschränkter Haftung*) (**GmbHG**) (such events are hereinafter referred to as a **Capital Impairment**), then the Finance Parties shall not demand such payment or enforcement from such German Guarantor except in an amount and to the extent such Capital Impairment would not occur.

(d)     If the relevant German Guarantor does not notify the Facility Agent in writing (the **Management Notification**) within ten (10) Business Days after the Facility Agent notified

(e) such German Guarantor of its intention to demand payment under the German Guarantee that a Capital Impairment would occur (setting out in reasonable detail to what extent a Capital Impairment would occur), then the restrictions set out in paragraph (c) shall not apply.

(e) If the relevant German Guarantor does not provide an Auditors' Determination within 30 Business Days from the date on which the Facility Agent received the Management Notification then the restrictions set out in the paragraph (c) shall not apply and the Facility Agent shall not be obliged to assign or make available to the German Guarantor any net proceeds realized, provided that this paragraph (e) shall not apply if the relevant German Guarator has taken all reasonable endeavours to have the Auditors' Determination prepared within the aforementioned timeframe but such Auditors' Determination has not become available to that German Guarantor (including, but not limited to, for the reason that the relevant Auditors did not and/or were not able to prepare the relevant Auditors' Determination within the aforementioned timeframe), it being understood that in such case the relevant German Guarantor shall provide the Auditors' Determination to the Facility Agent as soon as it becomes available.

(f) The calculation of net assets (the **Net Assets**) shall only take into account the sum of the values of the assets of the relevant German Guarantor determined in accordance with applicable law and court decisions and, if there is no positive going concern (positive *Fortführungsprognose*) based on the lower of book value (*Buchwert*) and liquidation value (*Liquidationswert*) (consisting of all assets which correspond to those items listed in section 266 subsection (2) A, B and C of the German Commercial Code (*Handelsgesetzbuch*) **HGB**) less the relevant German Guarantor's liabilities (consisting of all liabilities and liability reserves which correspond to those items listed in accordance with section 266 subsection (3) B, C and D HGB).

(g) For the purposes of calculating the Net Assets, the following balance sheet items shall be adjusted as follows:

(i) the amount of any increase in the registered share capital of the relevant German Guarantor which was carried out after the date of the Amendment and Restatement Agreement without the prior written consent of the Facility Agent shall be deducted from the amount of the registered share capital of the relevant German Guarantor; and

(ii) loans or other contractual liabilities incurred by the relevant German Guarantor in breach of the Finance Documents shall not be taken into account as liabilities.

(h) The relevant German Guarantor shall realize, to the extent legally permitted and commercially reasonable in a situation where it does not have sufficient Net Assets to maintain its registered share capital, all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the assets if such asset is not necessary for the German Guarantor's business (*betriebsnotwendig*).

(i) The relevant German Guarantor shall take any specific measure (the **Specific Measure**) which the Facility Agent has reasonably requested and which the relevant German Guarantor is legally permitted to take in order to avoid demanding payment under the German Guarantee causing a Capital Impairment of the relevant German Guarantor (including without limitation, setting off-claims), provided that it is commercially justifiable to take the Specific Measure. The restrictions set out in paragraph (c) above shall not apply if and to the extent that the relevant German Guarantor has not taken the relevant Specific Measure within an appropriate period, and such failure has reduced the amount realized under the German Guarantee, unless:

(i) the Specific Measure requires any cooperation of any person and such person does not take any required action or otherwise fails to cooperate at the appropriate time;

(ii)     taking the Specific Measure is commercially not justifiable;

(iii)    it is impossible to take the Specific Measure; or

(iv)    taking the Specific Measure is not legally permitted.

(j)     If the relevant German Guarantor claims that a Capital Impairment would occur on payment under this German Guarantee, the German Guarantor may (at its own cost and expense) arrange for the preparation of a balance sheet by a firm of recognized auditors (the **Auditors**) in order to have such Auditors determine whether (and, if so, to what extent) any payment under this Guarantee would cause a Capital Impairment (the **Auditors' Determination**).

(k)     The Auditors' Determination shall be prepared, taking into account the adjustments set out in paragraphs (f) and (g), by applying the generally accepted accounting principles applicable from time to time in Germany (*Grundsätze ordnungsmäßiger Buchführung*) based on the same principles and evaluation methods as constantly applied by the relevant German Guarantor in the preparation of its financial statements, in particular in the preparation of its most recent annual balance sheet, and taking into consideration applicable court rulings of German courts. Subject to paragraph (o) below, such Auditors' Determination shall be binding on the relevant German Guarantor and the Finance Parties.

(l)     Even if the relevant German Guarantor arranges for the preparation of an Auditors' Determination, the relevant German Guarantor's obligations under the mitigation provisions set out in paragraph (h) shall continue to exist.

(m)     If, after it has been provided with an Auditors' Determination which prevented it from demanding any or only partial payment under the German Guarantee, the Facility Agent has reasonable grounds to believe that the financial condition of the relevant German Guarantor as set out in the Auditors' Determination has substantially improved (in particular, if the relevant German Guarantor has taken any action in accordance with the mitigation provisions set out in paragraph (h)), the Facility Agent may (but shall not be obligated), at the direction of the Majority Lenders, at the relevant German Guarantor's cost and expense, arrange for the preparation of an updated balance sheet of the relevant German Guarantor by applying the same principles that were used for the preparation of the Auditors' Determination by the Auditors who prepared the Auditors' Determination pursuant to paragraph (j) in order for such Auditors to determine whether (and, if so, to what extent) the situation leading to a Capital Impairment has been cured as a result of the improvement of the financial condition of the relevant German Guarantor. The Facility Agent may, at the direction of the Majority Lenders, demand payment under the German Guarantee to the extent that the Auditors determine that the Capital Impairment has been cured. Without prejudice to the foregoing, the Facility Agent shall have no obligation to examine or analyze the financial condition of any German Guarantor.

(n)     Any managing director (*Geschäftsführer*) of a German Guarantor may request reimbursement from the Lenders (pro rata) or the Facility Agent for such net proceeds received by the relevant Lenders or Facility Agent from the realization of the security and/or this guarantee provided hereunder if such managing director is required to reimburse the German Guarantor pursuant to section 64, sentence 3 GmbHG due to a final nonappealable (*rechtskräftig*) court decision (other than a court decision based on omission (*Versäumnisurteil*) or recognisance (*Anerkenntnis*)) which states that either the granting or a payment under the German Guarantee led to the illiquidity (*Zahlungsunfähigkeit*) of the relevant German Guarantor, such request to be made within one month from the date of service (*Zustellung*) on such managing director the German Guarantor of such final court decision.

(o)     Notwithstanding any limitation under this Guarantee, the Facility Agent shall be entitled (but not required) to further pursue in court payment claims under this guarantee granted

by the respective German Guarantor if it disagrees with the Auditor's Determination by claiming in court that demanding payment under the German Guarantee against the relevant German Guarantor does not violate §§ 30, 31 GmbHG.

The agreement of the Facility Agent to abstain from demanding any or part of the payment under this Guarantee in accordance with the provisions above shall constitute neither a waiver (*Verzicht*) of any right granted under this Agreement or any other Finance Document to any Finance Party nor a definite defense (*Einwendung*) of the relevant German Guarantor against any of the guaranteed obligations, but such defense shall always be subject to the terms and conditions of this Clause 20.10.

(p)  In addition to the limitations on the granting, enforcement of and performance under the German Guarantee set forth in this clause 20.10, it is hereby agreed that the German Guarantor shall have a defense against any claim, enforcement, or other request for performance or requirement to perform, whether such requirement is based on statute, contract or otherwise, to the extent such claim, enforcement or other performance would result in personal liability for the German Guarantor's managing director(s) under then applicable law and any claims arising under the German Guarantee shall be limited to the extent of such defense, such that such personal liability would not be incurred. Nothing herein shall nor shall be deemed to prevent the Facility Agent from asserting, in a court of law or otherwise, that the claim, enforcement or other request for performance would not cause the German Guarantor's managing director(s) to incur any liability, nor shall it prevent the German Guarantor from asserting, in a court of law or otherwise, to the contrary.

(q)  The aforementioned provisions shall apply to a limited partnership with a limited liability company as its general partner (GmbH & Co. KG) mutatis mutandis and all references to net assets shall be construed as a reference to the aggregated net assets of the general partner and the limited partnership.

## 20.11    Guarantee Limitations (Spain)

Where a Guarantor is incorporated under the laws of Spain (the "**Spanish Guarantor**"):

(i)  The obligations of any Spanish Guarantor as a limited liability company (*sociedad de responsabilidad limitada*) shall not extend to any obligations or liabilities incurred by any Obligor (as applicable) borrowing (or guaranteeing the borrowing of) funds (but only in respect of those funds) under this Agreement for the purpose of (a) acquiring quotas (*participaciones sociales*) representing the share capital of such Spanish Guarantor or quotas (*participaciones sociales*) or shares (*acciones*) representing the share capital of a company within its group, or (b) refinancing a previous debt incurred by any Obligor for the acquisition of quotas (*participaciones sociales*) representing the share capital of such Spanish Guarantor or quotas (*participaciones sociales*) or shares (*acciones*) representing the share capital of a company within its group;

For the purposes of the above, a reference to the "group" of a Spanish Obligor shall have the meaning set out in article 42 of the Spanish Commercial Code.

(ii)  In case a Spanish Guarantor incorporated under the laws of Spain in the form of a Spanish public limited company (*sociedad anónima*) accedes to this Agreement (or in case a Spanish Guarantor is transformed into a Spanish *sociedad anónima*), the obligations of such Spanish Guarantor shall not extend to any obligations or liabilities incurred by any Obligor, as a result of such Obligor borrowing (or guaranteeing the borrowing of) funds (but only in respect of those funds) under this Agreement for the purpose of (a) acquiring shares (*acciones*) representing the share capital of such Spanish Guarantor or shares (*acciones*) or quotas (*participaciones sociales*) representing the share capital of its holding company, or (b) refinancing a previous debt incurred by any Obligor for the acquisition of shares (*acciones*) representing the share capital of such Spanish Guarantor or shares

(*acciones*) or quotas (*participaciones sociales*) representing the share capital of its holding company.

For the purposes of sections (i) and (ii) above, a reference to a "holding company" of a Spanish Guarantor shall mean the company which, directly or indirectly, owns the majority of the voting rights of such Spanish Guarantor or that may have a dominant influence on such Spanish Obligor. It shall be presumed that one company has a dominant influence on another company when: (i) any of the scenarios set out in section 1 of article 42 of the Spanish Commercial Code are met; or (ii) at least half plus one of the members of the managing body of the Spanish Guarantor are also members of the managing body or top managers (*altos directivos*) of the dominant company or of another company controlled by such dominant company.

(iii) The limitation set out in sections (i) and (ii) above shall apply *mutatis mutandis* to the Spanish Pledges created by each Spanish Pledgor or to any other security granted by any security provider incorporated under the laws of Spain and to any guarantee, undertaking, obligation, indemnity and payment, including (but not limited to) distributions, cash sweeps, credits, loans and set-offs, pursuant to or permitted by the Finance Documents and made by a Spanish Obligor.

In any event, any Transaction Security Documents that are signed by any Spanish Obligor, will specify which Facilities are secured by such Guarantor and/or such Transaction Security and any other relevant issues which could have an impact on such limitation language.

20.12    **Guarantee Limitations (Belgium)**

The total liability of any Belgian Obligor for the obligations of any other Obligor under the Finance Documents shall at all times be limited to an amount not exceeding the greater of:

(a) the aggregate of all principal amounts borrowed by such Belgian Obligor (or its direct or indirect Subsidiaries) under any intra-group arrangement (regardless of the form thereof, including through the subscription of debt instruments) to the extent funded by funds borrowed under this Agreement; and

(b) the greater of:

(i) eighty per cent. (80%) of such Belgian Obligor's net assets (*eigen vermogen/capitaux propres*) as derived from the latest audited financial statements of the respective Belgian Obligor available at the time a demand for payment under this Agreement is made; and

(ii) eighty per cent. (80%) of such Belgian Obligor's net assets (*eigen vermogen/capitaux propres*) as derived from the current audited financial statements of the respective Belgian Obligor~~.~~,

but so that the amount determined under (i) and (ii) shall be limited to the difference between (a) hundred per cent. (100%) of such Belgian Obligor's net assets (*eigen vermogen/capitaux propres*) as derived from the latest audited financial statements of the Belgian Obligor available at the time a demand for payment under this Agreement is made, or the current audited financial statements of such Belgian Obligor, whichever is higher; and (b) the amount then due and payable, or the amount that has been paid, by such Belgian Obligor under the U.S. Loan Documents (as defined in the Intercreditor Agreement). No Belgian Obligor shall be liable for the obligations of any other Obligor under the Finance Documents, to the extent that such liability would result in such guarantee constituting unlawful financial assistance within the meaning of Article 329 or 629 of the Belgian Companies Code (or any equivalent and applicable provisions in any Relevant Jurisdiction).

No Belgian Obligor shall be liable for the obligations of any other Obligor under the Finance Documents, to the extent that such liability would result in such guarantee constituting unlawful

financial assistance within the meaning of Article 329 or 629 of the Belgian Companies Code (or any equivalent and applicable provisions in any Relevant Jurisdiction).

20.13    **Guarantee Limitations (Morocco)**

(a)    The restrictions in this clause 20.13 (*Guarantee Limitations (Morocco)*) shall apply to any guarantee and indemnity (hereinafter the **Moroccan Guarantee**) granted by a Guarantor incorporated under the laws of Morocco as a limited liability company with a sole shareholder (**SARLAU**) (a **Moroccan Guarantor**) to secure liabilities of its direct or indirect shareholder(s) (upstream) (excluding, for the avoidance of doubt any direct subsidiary of such Moroccan Guarantor).

(b)    The Moroccan Guarantor shall not guarantee any liability of an Obligor which, if incurred, would constitute a misuse of corporate assets or powers within the meaning of article 107 of law n°5-96 relating to limited liability companies (*sociétés à responsabilité limitée*) or more generally, under any other applicable law or regulations having the same effect, as interpreted by Moroccan courts from time to time.

(c)    Any amount due under a guarantee agreement or security agreement by a Moroccan party to a non-Moroccan party may only be transferred outside Morocco if such payment is in compliance with the applicable Moroccan foreign exchange control regulations or has been expressly approved in advance and in written by the Moroccan Foreign Exchange Office (*Office des Changes marocain*). Any set-off between a Moroccan party and a non-Moroccan party located outside Morocco requires a prior express approval from the Moroccan Foreign Exchange Office (*Office des Changes marocain*), being specified that any amount due by the Moroccan Guarantor under the Moroccan Guarantee may be freely transferable to the Lenders on the ground of article 17 of the law No. 19-94 (Dahir No. 1-95-1 dated January 26, 1995) applicable to free export zones.

(d)    The Moroccan Guarantor's obligations under the Finance Documents will only be valid if limited to the amounts which are (i) on-lent or otherwise (directly or indirectly) made available to the relevant Moroccan Guarantor and (ii) are not repaid by the Moroccan Guarantor.

(e)    In the event that there is any inconsistency between the provisions of this Clause 20.13 and any other provision of this Agreement or any other Finance Documents, the provisions of this Clause 20.13 shall prevail.

**Section 8**
**Representations, Undertakings and Events of Default**

## 21 Representations

### 21.1 General

Each Obligor makes the representations and warranties set out in this clause 21 to each Finance Party.

### 21.2 Status

(a) It is a limited liability corporation, duly incorporated and validly existing under the law of its Original Jurisdiction.

(b) Each of its Subsidiaries is a limited liability corporation, duly incorporated and validly existing and in good standing under the law of its jurisdiction of incorporation (in relation to good standing, to the extent that concept is applicable in that jurisdiction).

(c) Subject to the Orders, it and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(d) It is not a FATCA FFI or a US Tax Obligor, but excluding those Obligors identified by the Company as US Tax Obligors prior to the Effective Date and notified to the Facility Agent

### 21.3 Binding obligations

Subject to the Legal Reservations and the Orders:

(a) the obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations; and

(b) (without limiting the generality of paragraph (a) above), each Security Document to which it is a party creates the security interests which that Security Document purports to create and those security interests are valid and effective.

### 21.4 Non-conflict with other obligations

Subject to the Orders and the Legal Reservations, the entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security do not and will not conflict with:

(a) any law or regulation applicable to it;

(b) the constitutional documents of any member of the Group; or

(c) any agreement or instrument binding upon it or any member of the Group or any of its or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument.

### 21.5 Power and authority

(a) Subject to the Orders, it has the power to enter into, perform and deliver, and, subject to the Orders, have taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b) No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

## 21.6 Validity and admissibility in evidence

(a) All Authorisations and any other acts, conditions or things required or desirable:

   (i) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

   (ii) to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

   have been obtained, effected, done, fulfilled or performed and are in full force and effect except any Authorisation or other act, condition or thing referred to in clause 21.8 (*No filing or stamp taxes*), which will be promptly obtained, effected, done, fulfilled or performed after the date of this Agreement.

(b) All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect.

## 21.7 Governing law and enforcement

(a) The choice of governing law of the Finance Documents will be recognised and enforced in its Relevant Jurisdictions (provided, as regards Morocco, that the Finance Documents do not contravene with Moroccan public policy rules (*dispositions d'ordre public*)).

(b) Any judgment obtained in relation to a Finance Document in the relevant jurisdiction as specified in that Finance Document will be recognised and enforced in its Relevant Jurisdictions.

(c) Any arbitral award obtained in relation to a Finance Document in the relevant seat of that arbitral tribunal specified in that Finance Document will be recognised and enforced in its jurisdiction of incorporation (subject, as regards Morocco, to being vested with exequatur by Moroccan competent courts).

## 21.8 No filing or stamp taxes

Other than under US law as required by the Orders, under the laws of its Relevant Jurisdiction it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents except:

(a) for any stamp duty to be paid on the Finance Documents for the purpose of making them admissible as evidence in the courts of the Republic of Cyprus or in the courts of the Hellenic Republic or to enforce them in the Hellenic Republic or to take security for the Finance Documents over assets located in the Hellenic Republic; and (ii) for any fees and duties in connection with the opening of court or enforcement proceedings in respect of the Finance Documents in the Hellenic Republic or the registration or enforcement of any security interest over assets located or deemed located in the Hellenic Republic;

(a)(b) the Spanish Pledges (if any) and any other Transaction Security governed by Spanish law granted as a non-possessory pledge (*prenda sin desplazamiento*) or mortgage (*hipoteca*) which are subject to registration with the relevant register and there will be notary fees and registrar's fees, as well as stamp taxes if documented by means of a public deed (*escritura pública*) to be paid in respect of the execution and registration of those documents, which registrations, filings and fees will be made and paid promptly after the date of the relevant Finance Document;

(b)(c) for the fees to be incurred in connection with (i) the notarisation (*Beurkundung*) of share and/or interest pledge agreements governed by German law and (ii) the registration of mortgages, ship mortgages and land charges with the relevant registry in Germany; and

(c)(d) any further requirements for any Security created after the Effective Date and notified to the Facility Agent in writing prior to entry into that Security or set out in the relevant Transaction Security Document.

21.9 **Deduction of Tax**

(a) Subject to paragraph (b) below, it is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

(b) Notwithstanding any other provision of this Agreement, no representation or warranty is given under this clause 21.9 in respect of the Obligors incorporated in certain jurisdictions and notified in writing to the Facility Agent prior to the Effective Date.

21.10 **No default**

(a) No Event of Default and, on the date of this Agreement, no Default is continuing or is reasonably likely to result from the making of any Utilisation or the entry into, the performance of, or any transaction contemplated by, any Finance Document.

(b) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which has or is reasonably likely to have a Material Adverse Effect.

(c) There is no requirement of law or regulation applicable to, or contractual obligation under any agreement or instrument which is binding on, any of the Obligors or any of their respective Subsidiaries, compliance with which has had or could reasonably be expected to have a Material Adverse Effect.

21.11 **No misleading information**

(a) Any factual information provided by any member of the Group to the Finance Parties (or any of them) prior to the date of this Agreement relating to the Obligors, the Group and the proposed application of the proceeds of the Facility was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b) Any financial projections provided by any member of the Group to the Finance Parties (or any of them) prior to the date of this Agreement have been prepared on the basis of recent historical information and on the basis of reasonable assumptions.

(c) Nothing has occurred or been omitted from any factual information provided by any member of the Group to the Finance Parties (or any of them) prior to the date of this Agreement and no information has been given or withheld that results in such factual information being untrue or misleading in any material respect.

(d) All other written information provided by any member of the Group (including its advisers) to a Finance Party was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

21.12 [**Original Financial Statements**]

[The unaudited consolidated balance sheet of Parent and its consolidated Subsidiaries as at [_____]30 September 2018 and the related unaudited consolidated statements of

operations and cash flows for the quarter ended on such date, certified by a director of the Borrower, copies of which have heretofore been furnished to each Lender, are complete and correct in all material respects and present fairly in all material respects the consolidated financial condition of the Parent and its Subsidiaries as at such date, and the consolidated results of their operations for the quarter then ended (subject to normal year end audit adjustments and any notes therein). All such financial statements have been prepared in accordance with the Accounting Principles in all material respects (except for the absence of footnote disclosures and any notes therein).—]

21.13 **No proceedings pending or threatened**

Other than the Cases and any litigation proceedings the details of which have been disclosed in writing to the Facility Agent prior to the date of the Amendment and Restatement Agreement, no litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect, have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it or any of its Subsidiaries.

21.14 **No breach of laws**

(a) It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(b) No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

(c) Subject to the Legal Reservations, each member of the Group is in full compliance with all regulations and rules issued by any Sanctions Authority and has instituted and maintained policies and procedures designed to promote and achieve compliance with such rules and regulations. In addition, each Group member has set up internal systems which enable it to control the origin of all products it purchases to ensure such products are not originating from a person referred to, noted on or otherwise concerned by the Sanctions List.

(d) Each Group member has in particular instituted and maintained policies and procedures designed to promote and achieve evaluation of all new suppliers and subcontractors in the Sensitive Zones. No new transactions, within the Sensitive Zone, whether financed on any Group member own funds or via a financial institution, is, has been or will be initiated with suppliers which are not Approved Suppliers.

(e) The entry into and performance by each Group member of any supply or sale contracts with any of their counterparties, is not and will not be prohibited or restricted by, and will not expose the Finance Parties, their affiliates, or their agents and/or employees to Sanctions, prohibitions or restrictions under any applicable national or international laws, including rules and regulations of the Sanctions Authorities (including for the avoidance of doubt trade or economic sanctions, prohibitions or restrictions upon Iran and/or Syria).

21.15 **Environmental laws**

(a) Except as disclosed in writing to the Facility Agent prior to the Effective Date, each member of the Group is in compliance with clause 24.3 (*Environmental compliance*) and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance.

(b) No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any member of the Group where that claim has or is reasonably likely, if determined against that member of the Group, to have a Material Adverse Effect.

21.16    **Taxation**

(a)    Taking into account any extensions, it is not (and none of its Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax, except to the extent (i) payment of any Tax is contested in good faith or (ii) the delay of such filing or payment may not reasonably be expected to have a Material Adverse Effect or (iii) payment is otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

(b)    No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes, except to the extent any such claim or investigation is not reasonably expected to have a Material Adverse Effect.

(c)    Other than in respect of each Obligor incorporated in Liberia, it is resident for Tax purposes only in its Original Jurisdiction.

21.17    **Anti-corruption law and Money Laundering**

Each member of the Group has conducted its businesses in compliance with applicable anti-corruption, anti-terrorism, bribery and money laundering laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

21.18    **Security and Financial Indebtedness**

(a)    No Security or Quasi-Security exists over all or any of the present or future assets of any member of the Group other than as permitted by this Agreement.

(b)    No member of the Group has any Financial Indebtedness outstanding other than as permitted by this Agreement.

21.19    **Ranking**

Subject to the Orders, the Transaction Security has or when executed will have first ranking priority (subject only, in relation to any Second Security to the First Security) and it is not otherwise subject to any prior ranking or *pari passu* ranking Security other than:

(a)    (in respect of assets secured in Multi-Party TPA Agreements) Security granted by the Company in favour of Hedging Providers and/or Clearing Providers contained in Multi-Party TPA Agreements (as contemplated in clause 6.39 (*Multi-Party TPA Agreements*)), which shall have first priority in respect of those assets; and

(b)    in respect of Security granted by the Company in favour of the US Finance Parties in accordance with the terms of the Intercreditor Agreement.

21.20    **Good title to assets**

It and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

21.21    **Legal and beneficial ownership**

(a)    It and each of its Subsidiaries is the sole legal and beneficial owner of the respective assets over which it purports to grant Security free from any claims, third party rights or competing interests other than Security permitted under clause 24.12 (*Negative pledge*).

(b)    The Borrowers and each Spanish Pledgor hold and will hold full legal and beneficial title to all assets included in the Borrowing Base from time to time, free from any retention of title arrangements.

21.22    **Group Structure Chart**

(a)    The Group Structure Chart delivered to the Facility Agent pursuant to clause 3.1 (*Conditions precedent documentation*) of the Amendment and Restatement Agreement is true, complete and accurate in all material respects and shows the following information:

(i)    each member of the Group, including current name and company registration number, its Original Jurisdiction (in the case of an Obligor), its jurisdiction of incorporation (in the case of a member of the Group which is not an Obligor) and/or its jurisdiction of establishment, a list of shareholders and indicating whether a company is not a company with limited liability;

(ii)    all minority interests in any member of the Group and any person in which any member of the Group holds shares in its issued share capital or equivalent ownership interest of such person; and

(iii)    whether it is a Dormant Company and/or Immaterial Subsidiary.

(b)    Subject to all required restrictions imposed by applicable law and regulation and subject to the Agreed Security Principles, each Subsidiary of the Parent is, or will be upon its accession, a Guarantor. The total book value (determined in accordance with the Accounting Principles) of all assets of all Immaterial Subsidiaries that are not also Obligors does not exceed $2,750,000.

21.23    **Accounting Reference Date**

The Accounting Reference Date of each member of the Group is 31 December.

21.24    **Insurance**

(a)    Each member of the Group maintains:

(i)    insurances on and in relation to its fixed assets and its inventory with reputable underwriters or insurance companies or associations against those risks and to the extent as is consistent with sound commercial practice normally maintained by companies carrying on the same or substantially similar business;

(ii)    without limitation to clause (a) above, marine cargo insurance (or any equivalent policy of insurance (howsoever described) relating to goods in transit and/or storage) on and in relation to any other of its assets which are or may be taken into account when calculating any Borrowing Base when such assets are in transit or storage against those risks and to the extent as is consistent with normal business practice (including, but not limited to, theft, fire and damage).

(b)    Except as disclosed in writing to the Facility Agent prior to the Effective Date (as such disclosure may be updated from time to time by the Borrowers with the written consent of the Majority Lenders), no Obligor has been refused insurance for which it applied or had any policy of insurance terminated (other than at its request).

21.25    **Centre of main interests and establishments**

(a)    Unless otherwise disclosed in writing to the Facility Agent prior to the date of the Amendment and Restatement Agreement, for the purposes of The Council of the European Union Regulation No. 848/2015 on Insolvency Proceedings (the **Regulation**), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its Original Jurisdiction and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

(b)    The Company and APII are non-resident domestic entities and do not have any assets in their respective Original Jurisdictions.

### 21.26 No adverse consequences

(a) Other than in respect of any Utilisation made by ABGG or OBTG following the Effective Date, it is not necessary under the laws of its Relevant Jurisdictions:

  (i) in order to enable any Finance Party to enforce its rights under any Finance Document; or

  (ii) by reason of the execution of any Finance Document or the performance by it of its obligations under any Finance Document,

  that any Finance Party should be licensed, qualified or otherwise entitled to carry on business in any of its Relevant Jurisdictions.

(b) Other than in respect of any Utilisation made by ABGG or OBTG following the Effective Date, no Finance Party is or will be deemed to be resident, domiciled or carrying on business in its Relevant Jurisdictions by reason only of the execution, performance and/or enforcement of any Finance Document.

### 21.27 Pari Passu Ranking

Any unsecured and unsubordinated claims of the Finance Parties against it, any Spanish Pledgor or any South African Pledge Counterparty under the Finance Documents shall rank at least *pari passu* with the claims of all of its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies or pursuant to any Order.

### 21.28 Sanctions

No Obligor nor any other member of the Group, nor any of their respective directors, officers or employees nor, to the knowledge of any Obligor, any persons acting on any of their behalf:

(a) is a Prohibited Person;

(b) is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person;

(c) owns or controls a Prohibited Person;

(d) is in breach of Sanctions; or

(e) has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority.

Each Obligor and its Affiliates is in full compliance with all regulations and rules issued by any Sanctions Authority and has instituted and maintained policies and procedures designed to promote and achieve compliance with such rules and regulations.

In addition, each Obligor and its Affiliates has set up internal systems which enable it to control the origin of all products it purchases to ensure such products are not originating from a person referred to, noted on or otherwise concerned by the Sanctions List.

The entry into and performance by each Obligor and its Affiliates of any supply or sale contracts with any of their counterparties, is not and will not be prohibited or restricted by, and will not expose the Finance Parties, their affiliates, or their agents and/or employees to Sanctions, prohibitions or restrictions under any applicable national or international laws, including rules and regulations of the Sanctions Authorities.

21.29    **Force Majeure**

Except as would not reasonably be expected to result in a Material Adverse Effect, neither the business nor the properties of the Obligors or any of their respective Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labour dispute, drought, storm, hail, earthquake, embargo, act of God or of a public enemy or other casualty.

21.30    **Permitted Financial Indebtedness**

Schedule 14 (*Permitted Financial Indebtedness*) separately identifies all Financial Indebtedness (other than trade payables, the Loans or the Credit Instruments) of the Obligors and their respective Subsidiaries, which is for borrowed money.

21.31    **Times when representations made**

(a)    All the representations and warranties in this clause 21 are made by each Obligor on the date of this Agreement, the date of the Amendment and Restatement Agreement.

(b)    The Repeating Representations are deemed to be made by each Obligor on the date of each Utilisation Request, on each Utilisation Date, on the first day of each Interest Period and, in the case of an Additional Obligor, on the day on which the company becomes (or it is proposed that the company becomes) an Additional Obligor.

(c)    Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

## 22    Information Undertakings

The undertakings in this clause 22 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

22.1    **Financial statements and reports**

The Company shall supply to the Facility Agent in sufficient copies for all the Lenders:

(a)    as soon as available, but in any event not later than 30 days after the end of each fiscal month of Parent, (i) a copy of the unaudited consolidated balance sheets of Parent and its consolidated Subsidiaries as at the end of such fiscal month and the related unaudited consolidated statements of income and retained earnings for such fiscal month and the portion of the fiscal year through the end of such fiscal month, setting forth in each case in comparative form the figures for the previous fiscal year, certified by a Responsible Person of the Company, in his or her capacity as a Responsible Person, as fairly presenting in all material respects the Borrowers' and such Subsidiaries' financial condition, results of operations and cash flows in accordance with Accounting Principles and (ii) the net book value, determined in accordance with Accounting Principles, of all assets of the Immaterial Subsidiaries;

(b)    on a weekly basis and on a roll forward basis, a Budget variance report/reconciliation for each week (commencing on the date that is one week following the Petition Date) (delivered no later than the end of each week),

(i)    showing a statement of actual cash sources and uses of all free cash flow for the immediately preceding week, noting therein all material variances from values set forth for such historical periods in the Budget, and shall include explanations for all such variances; and

(ii)    accompanied by a certification by a Responsible Person of the Company (A) as to its reasonableness when made by the Company; and (B) that each Obligor is in compliance with clause 23 (*Budget variance*);

(c) as soon as practicable in advance of filing with the Bankruptcy Court, all motions, applications, pleadings, proposed orders, judicial or financial information, and other documents as soon as practical in advance of filing by or on behalf of the Debtors with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Cases; provided that all pleadings and proposed orders and any other such filings that relate to the Finance Documents, the Secured Obligations, the Final Order, bidding procedures, or any plan of reorganization or plan of liquidation, or any disclosure statement related thereto shall be in form and substance satisfactory to the Lenders.

## 22.2 Provision and contents of Compliance Certificate

(a) The Company shall supply a Compliance Certificate to the Facility Agent with each set of financial statements of the Parent delivered in accordance with clause 22.1(a), but only to the extent consistent with accounting industry policies generally followed by independent certified public accountants, a certificate of its independent certified public accountants stating that in making the examination necessary therefor no knowledge was obtained of any Default arising from a breach under clause 23 (*Budget variance*) or, if any such Default shall exist, stating the nature and status of such event.

(b) The Company shall supply a Compliance Certificate to the Facility Agent with each set of financial statements of the Parent delivered in accordance with clause 22.1(a) a duly completed certificate signed by a Responsible Person of the Parent (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with clause 23 (*Budget variance*).

## 22.3 Information: miscellaneous

The Company shall supply to the Facility Agent (in sufficient copies for all the Lenders, if the Facility Agent so requests) and, in relation to paragraph (s) below and following any Finance Party request, to that Finance Party's professional advisors:

(a) promptly after the same are publicly available, copies of each annual report, proxy or financial statement or other report or communication sent to the shareholders of the Obligors generally and copies of all annual, regular, periodic and special reports and registration statements that the Parent or any Subsidiary may file or be required to file with the SEC or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, and not otherwise required to be delivered pursuant hereto;

(b) promptly after the furnishing thereof, copies of any material request or notice received by the Parent or any Subsidiary, or any statement or report furnished by the Parent or any Subsidiary to any holder of debt securities with a principal amount in excess of $1,000,000 of the Parent or any Subsidiary, pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished pursuant hereto;

(c) promptly after receipt thereof by the Parent or any Subsidiary, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of the Parent or any Subsidiary;

(d) promptly after receipt thereof by the Parent or any Subsidiary, copies of any detailed final audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Parent by independent accountants in connection with the accounts or books of the Parent or any Subsidiary, or any audit of any of them;

(e) promptly, upon receipt thereof, copies of all final "management letters" submitted to the Parent or any Subsidiary by the independent public accountants referred to in clause 22.2;

(f) within one Business Day after delivery thereof to the lenders in relation to the US DIP Credit Facilities, copies of all financial statements, projections, forecasts, reconciliations and cash balance reports, borrowing base reports and/or other financial reporting delivered to the lenders in relation to the US DIP Credit Facilities;

(g) promptly, such information on the Hess Litigation as the Facility Agent or any Lender may from time to time reasonably request; provided that such information is not (i) entitled to legal privilege such as attorney work product and attorney-client communications (unless such information is subject to a common interest) or (ii) otherwise subject to a confidentiality restriction that would prohibit the Company from providing such information;

(h) promptly, copies of any account statements or reports as the Facility Agent or any Lender may from time to time reasonably request that have been received by or are available to any Obligor with respect to any bank account that is the subject of an Account Pledge Agreement;

(i) details of any (i) default or event of default under any post-petition contractual obligation of the Obligors or any of their respective Subsidiaries of more than $500,000 or that would reasonably be expected to result in a Material Adverse Effect, (ii) post-petition contractual obligation of the Obligors or their Subsidiaries of more than $500,000 or that would reasonably be expected to result in a Material Adverse Effect being declared or otherwise accelerated prior to its stated maturity or (iii) litigation, investigation or proceeding which may exist at any time between the Obligors or any of their respective Subsidiaries and any Governmental Authority;

(j) promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any Obligor, and which, if adversely determined, are reasonably likely to have a Material Adverse Effect or which would involve a liability, or a potential alleged liability, exceeding $100,000 (or its equivalent in other currencies);

(k) promptly, notice at any time at which the Borrowing Base Amount is less than zero;

(l) promptly, details of any change in the information provided in the Group Structure Chart that would result in a change to the list of beneficial owners identified in such certification;

(m) promptly, details of any change in a Subsidiary of the Parent, such that it has become, or is no longer, an Immaterial Subsidiary;

(n) promptly, such information as the Security Agent may reasonably require about the Charged Property and compliance of the Obligors with the terms of any Transaction Security Documents;

(o) promptly on request, such further information regarding the financial condition, business assets and operations of the Group and/or any member of the Group (including any requested amplification or explanation of any item in the financial statements, or other material provided by any Obligor under this Agreement and an up to date copy of its shareholders' register (or equivalent in its Original Jurisdiction)) as any Finance Party, through the Facility Agent, may reasonably request;

(p) promptly upon becoming aware of them, details of any claim made by an Obligor under any insurance policy, the underlying cause of which might have a Material Adverse Effect;

(q)     promptly upon becoming aware of them, details of any change in the structure of the Group relating to the Obligors from that reflected in the Group Structure Chart (in a form agreed on or around the date of the Amendment and Restatement Agreement);

(r)     promptly upon request, such information regarding any Lender Discounting Facility as the Facility Agent or the Security Agent may from time to time reasonably request;

(s)     regular updates and ongoing information in relation to the preparation and filing of the financial statements described in 22.1(a) in respect of the Parent's Financial Year ending 31 December 2017 and the consequences of for the Group of the failure to finalise and file the same;

(t)     promptly upon becoming aware of it, the execution of or any material change to any Lender Discounting Facility;

(u)     promptly upon request, and in any event within three (3) Business Day of such request, details of any off-takers (including legal name, address and contact details); and

(v)     promptly, responses any and all questions of the Facility Agent or the Majority Lenders regarding the foregoing.

22.4    **Notification of default and of expectation not to meet Budget**

(a)     Each Obligor shall notify the Facility Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)     Promptly upon a request by the Facility Agent, the Company shall supply to the Facility Agent a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

(c)     The Company shall promptly upon becoming aware of the same notify the Facility Agent of the expectation that the Debtors will not meet the Budget.

22.5    **"Know your customer" checks**

(a)     If:

        (i)     the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

        (ii)    any change in the status of an Obligor, any Spanish Pledgor or any South African Pledge Counterparty or (other than in relation to the Parent) the composition of the shareholders of an Obligor, any Spanish Pledgor or any South African Pledge Counterparty after the date of this Agreement;

        (iii)   a proposed assignment or transfer by a Lender of any of its rights and/or obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer;

        (iv)    any Change in UBO (other than in respect of the Parent listed on the New York Stock Exchange), after the date of this Agreement; or

        (v)     any Applicable KYC Procedures,

        obliges the Facility Agent or any Lender (or, in the case of paragraph (iii) above, any prospective new Lender), or any Lender obliges the Facility Agent or any Lender (or, in the case of paragraph (iii) above, any prospective new Lender), to comply with "know your customer" or similar identification procedures in circumstances where the necessary

information is not already available to it, each Obligor shall promptly upon the request of the Facility Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Facility Agent, such Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)   Each Lender shall promptly upon the request of the Facility Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself) in order for the Facility Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(c)   For this purpose **Change in UBO** means any event by which a private individual (*natuurlijk persoon*) acquires the legal and beneficial ownership (directly or indirectly) of 10 per cent. or more of the issued share capital of an Obligor, or the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to (directly or indirectly) cast, or control the casting of, 25 per cent. or more of the votes that might be cast at a general meeting of an Obligor, any Spanish Pledgor or any South African Pledge Counterparty.

22.6   **Additional Obligors**

(a)   The Company shall, by not less than ten (10) Business Days' prior written notice to the Facility Agent, notify the Facility Agent (which shall promptly notify the Lenders) of its intention to request that one of its Subsidiaries becomes an Additional Obligor pursuant to clause 29 (*Changes to the Obligors*).

(b)   Following the giving of any notice pursuant to clause 22.6(a) above, if the accession of such Additional Obligor obliges the Facility Agent or any Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Facility Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself or on behalf of any Lender) or any Lender (for itself or on behalf of any prospective new Lender) in order for the Facility Agent or such Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement as an Additional Obligor.

22.7   **Borrowing Base Report and Cross-Check Borrowing Base Report**

(a)   For the purposes of the valuation of the Borrowing Base, the Company shall deliver to the Collateral Management Agent for distribution to the Lenders:

(i)   a Borrowing Base Report on every Business Day following the date of this Agreement; and

(ii)   a Cross-Check Borrowing Base Report on a four-weekly basis to be delivered within ten (10) days of every second Borrowing Base Report (or, if the 10th day is not a Business Day, by the next Business Day).

(b)   Each Borrowing Base Report shall:

(i)   be based on information and figures as at close of business on the second Business Day immediately preceding the date of such Borrowing Base Report; and

(ii)    set out the Outstandings under each Facility on the date of its issue.

(c)    Each Cross-Check Borrowing Base Report shall be in the same form as the Borrowing Base Report but shall:

(i)    be based on information and figures relating to inventory provided by independent sources (copies of which shall be provided to the Collateral Management Agent) in respect of:

(A)    the storage volumes at any inland storage facilities, leased or owned by the Borrowers and the Spanish Pledgor and which have capacity equal to or in excess of 50,000 metric tons; and

(B)    the storage volumes on any vessels leased or owned by the Borrowers and the Spanish Pledgor which have capacity equal to or in excess of 15,000 metric tons; and

(ii)    replace non-invoiced Eligible Receivables with corresponding invoices in each case based on the Group's figures for the date on which the most recent Borrowing Base Report related.

(d)    The Collateral Management Agent (acting on the instructions of the Majority Lenders) shall be entitled at any time, in relation to all or any part of the information contained in a Borrowing Base Report or a Cross-Check Borrowing Base Report to:

(i)    examine (upon request) the records of any Obligor to verify such information; and/or

(ii)    require that an independent reputable surveyor or accounting firm verify such information,

and the Company shall take all such action as is available to it and do all such acts and things as the Collateral Management Agent (acting on the instructions of the Majority Lenders) may specify in this regard the costs of such verification shall be promptly paid by the Company.

(e)    Any failure to deliver information required under this Agreement or any delivery information which is not satisfactory to the Collateral Management Agent (acting on the instructions of the Majority Lenders) and relating to any item in a Borrowing Base Report or a Cross-Check Borrowing Base Report shall result in such item being excluded from the Borrowing Base.

## 22.8    Borrowing Base Audit Report

(a)    Subject to paragraph (c), the Company shall deliver to the Collateral Management Agent (in sufficient copies for the Lenders if the Collateral Management Agent so requests) a Borrowing Base Audit Report promptly upon the Collateral Management Agent's request (as instructed by the Majority Lenders).

(b)    Subject to paragraph (c), until such time as the Facility Agent notifies the Company in writing that the following shall cease to apply:

(i)    at any time and on any number of occasions the Finance Parties shall be entitled to appoint third parties to:

(A)    perform an audit report in respect of the Borrowing Base; and/or

(B)    inspect any inventory included or capable of being included in the Borrowing Base,

and in each case the Company shall:

(1) permit those third parties, and procure the permission by any applicable person for such third parties to have, free access at all times and at the risk and cost of the Company to the relevant facilities or premises where any relevant inventory is located; and

(2) within three (3) Business Days of demand pay to the Facility Agent all costs and expenses incurred by the Finance Parties from time to time in connection with the engagement of such third parties.

(c) The Collateral Management Agent may only make one such request and the Facility Agent may only deliver one notice respectively under paragraphs (a) and (b) above unless an Event of Default is continuing or the Termination Date occurs more than 120 days after the Effective Date.

## 22.9 Deficient Borrowing Base Report

If, at any time, any Deficient Borrowing Base Report is delivered to the Collateral Management Agent:

(a) the Company shall, from the date the Deficient Borrowing Base Report is delivered to the Collateral Management Agent until it is replaced by a Compliant Borrowing Base Report in accordance with part (b) below, provide the Collateral Management Agent (for distribution to the Lenders) with Borrowing Base Reports on a daily basis showing the information and Outstandings as at the previous day, which additional Borrowing Base Reports must show that there has been no further decrease in the Borrowing Base Amount; and

(b) the Company shall within fourteen (14) days of such delivery procure the cancellation of such Deficient Borrowing Base Report and its replacement by a Compliant Borrowing Base Report.

## 22.10 Title to Borrowing Base assets

Each Borrower shall ensure that it holds full legal and beneficial title to the assets purporting to be owned by it in the Borrowing Base, free of any retention of title arrangements.

## 22.11 Additional Cross-Check Borrowing Base Reporting

Each Cross-Check Borrowing Base Report shall be accompanied by the following (in sufficient copies for the Lenders if the Collateral Management Agent (acting on the instructions of the Majority Lenders) so requests):

(a) a report of an independent inspector approved by the Facility Agent detailing:

(i) the storage volumes at any inland storage facilities, leased or owned by the Borrowers and the Spanish Pledgors; and

(ii) the storage volumes on any vessels leased or owned by the Borrowers and the Spanish Pledgors,

or, in each case, a holding certificate from a third party storer acceptable to the Collateral Management Agent (acting on the instructions of the Majority Lenders) and in a form acceptable to the Collateral Management Agent (acting on the instructions of the Majority Lenders);

(b) a report of an independent inspector approved by the Facility Agent detailing the storage volumes in any German storage which is the subject of the German Security Transfer Agreements;

(c)    a sample of thirty (30) randomly selected trade confirmations/bunker confirmations;

(d)    a list of those non-invoiced Eligible Receivables converted into invoices (with associated invoice numbers) and reconciliation with the list of non-invoiced Eligible Receivables detailed in the most recent Borrowing Base Report;

(e)    the lower of:

    (i)    a sample of sixty (60) randomly selected invoices; and

    (ii)    all invoices,

    evidencing invoicing of non-invoiced Eligible Receivables as reported in the most recent Borrowing Base Report;

(f)    a sample of sixty (60) randomly selected invoices already reported as invoiced Eligible Receivables in the most recent Borrowing Base Report;

(g)    all copies of bills of lading in respect of barges above 3,000 dwt confirming values on board and showing issuance or endorsement to the order of the Security Agent; and

(h)    a report in form and substance satisfactory to the Collateral Management Agent (acting on the instructions of the Majority Lenders) evidencing as at close of business on the last Business Day of each calendar month all receivables sold pursuant to any receivables purchase programme or invoice discounting programme.

## 22.12    Reporting

(a)    Each Lender and Borrower shall promptly (and in any event within one (1) Business Day) provide the Facility Agent upon request with such details in respect of Utilisations made by it as the Facility Agent may request.

(b)    If a Borrowing Base Report indicates that the Borrowing Base Amount is a negative number no Borrower shall request or make Utilisations until a Compliant Borrowing Base Report has been provided to the Collateral Management Agent (which, if not provided on the date of a regular weekly Borrowing Base Report, shall be provided in addition thereto).

## 22.13    Non-Borrowing Base Receivables Report

The Company hereby agrees that it shall provide to the Facility Agent by 31 January 2019 (or such earlier date on which a press release may be issued or an announcement made by the Company in respect of the Non-Borrowing Base Receivables):

(a)    in circumstances where Arnold & Porter (acting on behalf of the audit committee of the Company) provides a written report regarding the Non-Borrowing Base Receivables, a copy of that report or, in circumstances where the Company is concerned about the loss of attorney-client privilege or its impact upon the investigation, a written summary of that report; or

(b)    in circumstances where Arnold & Porter does not provide a written report regarding the Non-Borrowing Base Receivables, a written summary of the Company's investigations into the Non-Borrowing Base Receivables (either in the form of a press release or summary prepared specifically for the Facility Agent).

## 22.14    Proof of Origin

All incoming flows in respect of the Sensitive Zone, either purchased through letter of credit (including against any countersigned letter of indemnity) or on open account basis but subject to

incoterms linked to any place within the Sensitive Zone, should be documented with bills of lading showing an acceptable port of loading and:

(a)     if the Approved Supplier is a refinery, shall be accompanied by a Certificate of Origin; or

(b)     if the Approved Supplier is not a refinery, the Company shall use its best endeavours to procure it is accompanied by a Certificate of Origin.

## 22.15    Inspection and Management in Sensitive Zones

The Borrowers shall procure that all stocks and inventory of the Borrowers located offshore or inland in the Sensitive Zone shall be the subject of a Stock Monitoring Agreement or a Collateral Management Agreement as the case may be.

## 22.16    Hess Corporation proceedings

The Company shall promptly provide such information on the Hess Litigation as the Facility Agent or any Lender may from time to time reasonably request; provided that such information is not (i) entitled to legal privilege such as attorney work product and attorney-client communications (unless such information is subject to a common interest) or (ii) otherwise subject to a confidentiality restriction that would prohibit Borrower from providing such information

## 22.17    Insolvency proceedings and Bankruptcy Court filings

As soon as practicable in advance of filing with the Bankruptcy Court, the Company shall provide to the Facility Agent all motions, applications, pleadings, proposed orders, judicial or financial information, and other documents as soon as practical in advance of filing by or on behalf of the Debtors with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Cases; provided that all pleadings and proposed orders and any other such filings that relate to the Finance Documents, the Commitments, the Final Order, bidding procedures, or any plan of reorganization or plan of liquidation, or any disclosure statement related thereto shall be in form and substance satisfactory to the Facility Agent and the Majority Lenders.

## 22.18    US DIP Credit Facility Agreement waivers

If any member of the Group is obliged under the terms of any waivers granted in relation to the US DIP Credit Facility Agreement (the **US Waivers**) to provide information to the lenders or any agent under the US DIP Credit Facility Agreement or their advisors which is either:

(a)     Additional Required Information; or

(b)     Early Delivery Information,

the Company shall procure that such information is delivered to the Facility Agent on the same date and on the same terms as required under the US Waivers.

For these purposes:

**Additional Required Information** shall mean information required to be delivered under a US Waiver which is not otherwise required to be delivered by an Obligor to any Finance Party Facility Agent and Lender (acting reasonably) to be of direct relevance to the Obligors, a Facility or the matters set out in this Letter provided that the Facility Agent shall have given the Company reasonable notice that it will require disclosure of such information pursuant to this paragraph 17.

**Early Delivery Information** shall mean information required to be provided under this Letter at a later date than such information is required to be provided to the lenders or agent under the US DIP Credit Facility Agreement or their advisors under the US Waivers.

## 23 Budget variance

(a)  Commencing after the conclusion of the fourth full week after the Petition Date, the Obligors' total cumulative operating disbursements since the Petition Date will not exceed 105% of the amount set forth in the approved Budget(s) covering such cumulative period (which amount, for the avoidance of doubt, shall take into account any positive or negative variances—i.e., the amount by which total operating disbursements is less or greater than 100% of the budgeted amount—from any prior testing period that may be carried forward and applied to the current period), unless the Majority Lenders have provided a written waiver of such excess.

(b)  No Obligor shall make any payments relating to prepetition obligations other than in accordance with the Budget or as otherwise permitted hereunder or, if a that Obligor is a Debtor, with (i) a Bankruptcy Court order, (ii) the Interim DIP Order, (iii) the Final DIP Order, or (iv) as agreed to by the Majority Lenders.

## 24 General Undertakings

The undertakings in this clause 24 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

**Authorisations and compliance with laws**

### 24.1 Authorisations

Each Obligor shall (and shall procure that the Spanish Pledgors and the South African Pledge Counterparties shall) promptly:

(a)  obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)  supply certified copies to the Facility Agent of:

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(A)  enable it to perform its obligations under the Finance Documents;

(B)  ensure the legality, validity, enforceability or admissibility in evidence of any Finance Document; and

(C)  carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

### 24.2 Compliance with laws

Each Obligor shall (and the Company shall ensure that each member of the Group will) comply in all respects with all laws to which it may be subject, if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

### 24.3 Environmental compliance

Each Obligor shall (and the Company shall ensure that each member of the Group will):

(i)  comply with all Environmental Law;

(ii)  obtain, maintain and ensure compliance with all requisite Environmental Permits; and

(iii)  implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

### 24.4 Environmental claims

Each Obligor shall (through the Company), promptly upon becoming aware of the same, inform the Facility Agent in writing of:

(a) any Environmental Claim against any member of the Group which is current, pending or threatened; and

(b) any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against any member of the Group,

where the claim, if determined against that member of the Group, has or is reasonably likely to have a Material Adverse Effect.

### 24.5 Anti-corruption law

(a) No Obligor shall (and the Company shall ensure that no other member of the Group will) directly or indirectly use the proceeds of the Facility for any purpose which would breach the Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977, the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act or other similar legislation in other jurisdictions.

(b) Each Obligor shall (and the Company shall ensure that each other member of the Group will):

(i) conduct its businesses in compliance with applicable anti-corruption, anti-terrorism, bribery and money laundering laws; and

(ii) maintain policies and procedures designed to promote and achieve compliance with such laws.

### 24.6 Taxation

(a) Each Obligor shall (and the Company shall ensure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

(i)

(A) such payment is being contested in good faith;

(B) adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the Facility Agent under clause 22.1 (*Financial statements*); and

(C) such payment can be lawfully withheld; or

(ii) payment is stayed by the Bankruptcy Court.

(b) No member of the Group may change its residence for Tax purposes.

**Restrictions on business focus**

24.7    **Merger**

No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction except:

(a)    as set out in the "Fundamental Changes" schedule delivered by the Company to the Facility Agent prior to the Effective Date;

(b)    mergers, consolidations or amalgamations between and among the Obligors; and

(c)    liquidations and dissolutions of any Subsidiary so long as the assets are directly or indirectly transferred to an Obligor.

24.8    **Change of business**

The Company shall procure that no substantial change is made to the general nature of the business of the Parent, the Obligors or the Group taken as a whole from that carried on by the Group at the date of the Amendment and Restatement Agreement except as required by the Bankruptcy Code or orders entered by the Bankruptcy Court.

24.9    **Application of FATCA**

The Company shall procure that, unless otherwise agreed by all the Finance Parties, no Obligor shall become a FATCA FFI or a US Tax Obligor excluding those Obligors identified by the Company as US Tax Obligors prior to the Effective Date and notified to the Facility Agent.

**Restrictions on dealing with assets and Security**

24.10    **Preservation of assets**

(a)    Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain in good working order and condition (ordinary wear and tear excepted) all of its assets necessary or desirable in the conduct of its business.

(b)    Each Obligor shall (and the Company shall ensure that each other member of the Group will) use all reasonable endeavours to keep available the services and goodwill of such of its present employees as are, in the reasonable opinion of the Obligors or any of their respective Subsidiaries, as applicable, necessary or desirable for the conduct of its business as it is currently conducted.

24.11    **Pari passu ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies or pursuant to any Order.

24.12    **Negative pledge**

In this clause 24.12, **Quasi-Security** means an arrangement or transaction described in paragraph (b) below.

Except as permitted under paragraph (c) below:

(a)    No Obligor shall (and the Company shall ensure that no other member of the Group will) create or permit to subsist any Security over any of its assets.

(b) No Obligor shall (and the Company shall ensure that no other member of the Group will):

    (i) sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by an Obligor or any other member of the Group;

    (ii) sell, transfer or otherwise dispose of any of its receivables on recourse terms;

    (iii) enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

    (iv) enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c) Paragraphs (a) and (b) above do not apply to any Security or (as the case may be) Quasi-Security, which is:

    (i) Transaction Security;

    (ii) ~~existing prior to the date of this Agreement and details of which have been provided to the Facility Agent pursuant to paragraph 6 of Part 1 of Schedule 2 (*Conditions precedent to initial Utilisation*);~~

    (ii) Existing Security;

    (iii) approved in writing by the Facility Agent (acting on the instructions of the Majority Lenders);

    (iv) to secure the Prepetition Obligations;

    (v) to secure Bridge Financing which is expressly permitted pursuant to clause 24.18(a)(ii) (*Financial Indebtedness*);

    (vi) Security (other than Security arising under any Environmental Law) for taxes, assessments or governmental charges (including Security in favor of customs and revenues authorities imposed by applicable law arising in the ordinary course of business in connection with the importation of goods) or levies not yet due and payable;

    (vii) carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, lessor's or other similar liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith by appropriate proceedings for which adequate reserves are maintained on its books and records in accordance with Accounting Principles;

    (viii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

    (ix) deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

    (x) Security of carriers, warehousemen, mechanics, materialmen, and any similar Security arising by operation of law securing obligations to pay or provide consideration for goods or services with respect to Commodities, which obligations are not past due, including, without limitation, with respect to Eligible Inventory (as defined in the US DIP Credit Agreement) (i) Security in favour of the third party from whom Aegean Bunkering (USA) LLC chartered, rented or leased the property

on which such Eligible Inventory is located securing the charter, rent or lease obligations, (ii) Security for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days, that are being contested in good faith and by appropriate actions or are otherwise not required to be paid hereunder and (iii) Security arising from judgments or orders for the payment of money not constituting an Event of Default;

(xi) Permitted Financial Management Liens and Security on "Commodities Accounts" (as defined in Section 9-102 of the UCC) in favour of any Eligible Commodity Broker (as defined in the US Credit Agreement) and under the terms.permitted under the applicable account control agreement;

(xii) any "first purchaser" lien (as defined in Texas Bus. & Com. Code Section 9.343, comparable laws of the states of Oklahoma, Kansas, Mississippi, Wyoming or New Mexico, or any other comparable law);

(xiii) Security securing judgments for the payment of money not constituting an Event of Default;

(xiv) Security on cash deposited as collateral by Aegean Bunkering (USA) LLC to secure the performance of Indebtedness (as defined in the US Credit Agreement) permitted pursuant to section 6.01(c) of the US Credit Agreement), in an amount not to exceed that which is required by the contract with the applicable counterparty (or counterparties) thereto;

(xv) Security arising pursuant to the Orders, the First Day Orders or any "second day" orders;

(xvi) with respect to the Canadian Barges in favour of METSA or any of its Affiliates in connection with the Canadian Barges Loan;

(xvii) Security arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(xviii) any interest or title of a licensor, sublicensor, lessor or sublessor under any license or operating or true lease agreement incurred in the ordinary course of business;

(xix) Security given to a public or private utility or any Governmental Authority as required in accordance with the First Day Orders or "second day" orders;

(xx) Security in the nature of the right of setoff in favor of counterparties to contractual agreements with the Obligors in the ordinary course of business;

(xxi) Security not otherwise permitted hereunder securing obligations in an aggregate amount outstanding at any time not to exceed $250,000; and

(xxii) otherwise as expressly contemplated by this Agreement.

(d) Notwithstanding the other provisions of this clause, no Obligor shall (and the Company shall ensure that no other member of the Group will) create or permit to subsist any Security over any assets comprised in the Borrowing Base other than pursuant to the Transaction Security Documents.

24.13 **Disposals**

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Company shall ensure that no other member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell,

lease, transfer or otherwise dispose of any asset without the prior written consent of the Facility Agent acting on the instructions of the Majority Lenders (such consent to be confirmed or declined within fifteen (15) Business Days of receipt by the Facility Agent of a request in writing from the Company).

(b) Paragraph (a) above does not apply to:

(i) any sales, leases, transfers or other disposals (A) by any Subsidiary of a Borrower to a Borrower or a Subsidiary of the Borrower, or (B) by any Borrower or any Guarantor to any other Borrower or Guarantor or (C) the sale of any Commodities and other inventory in the ordinary course of business, or (D) of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(ii) any sales, leases, transfers or other disposals for a value which is in accordance with the Bidding Procedures or authorized by an order of the Bankruptcy Court;

(iii) leases, subleases, licenses and sublicenses of real or personal property, in each case in the ordinary course of business (excluding any such transaction with a Subsidiary that is not an Obligor;

(iv) disposals of receivables pursuant to the terms (as at the date of this Agreement) of any Lender Discounting Facility (provided that the proceeds of such disposals are paid to the Collection Account in the relevant currency held by the relevant Borrower);

(v) any sales, leases, transfers or other disposals of property to a Governmental Authority as a result of a condemnation of such property where the book value of such property does not exceed $400,000;

(vi) transactions permitted under clauses 24.12 (*Negative pledge*), 24.7 (*Merger*), 24.36 (*Dividends and share redemptions*) and 24.15 (*Investments*);and

(vii) sales, leases, transfers or other disposals not otherwise permitted hereunder in an aggregate book value amount not to exceed $400,000.

(c) To the extent a Lender completes a purchase from a Borrower of receivables pursuant to any Lender Discounting Facility (and provided that the purchase price is paid by the Lender to the relevant Collection Account), such receivables (other than the proceeds of sale of such receivables) that are so sold shall be released from the Security created under the relevant Security Agreement and Second Security Agreement without any further action on the part of any person.

## 24.14 Arm's length basis

No Obligor shall (and the Company shall ensure that no other member of the Group will) enter into any transaction with any person except on arm's length terms and for full market value.

**Restrictions on movement of cash - cash out**

## 24.15 Investments

No Obligor shall (and the Company shall ensure that no other member of the Group will) make any Investments, except:

(a) Investments in the form of Cash Equivalent Investments;

(b) Investments by any Obligor or any of their respective Subsidiaries in Aegean Bunkering (USA) LLC;

(c)     Investments consisting of cash and Cash Equivalent Investments posted as collateral to satisfy margin requirements with counterparties of a physical commodity contract, (b) a futures contract, (c) any commodity OTC agreement or financial OTC agreement (d) contract for the storage or transportation of any physical Commodity, or (e) Hedging Agreements of Aegean Bunkering (USA) LLC and its Subsidiaries;

(d)     Investments by Obligors (other than by any Borrower) in other Obligors;

(e)     Investments by Obligors (other than the Borrowers) in any direct or indirect wholly-owned Subsidiary of Parent;

(f)     Investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(g)     Investments made in accordance with the Orders, the First Day Orders or the "second day" Orders;

(h)     intercompany loans and advances by any Borrower to Obligors;

(i)     Investments permitted under clauses 24.18 (*Financial Indebtedness*), 24.13 (*Disposals*) and 24.16 (*Transactions with Affiliates*);

(j)     Investments in an aggregate amount outstanding not to exceed $400,000; and

(k)     Investments in existence on the Effective Date and notified to the Facility Agent prior to the date of the Amendment and Restatement Agreement, together with any renewals and extensions thereof so long as the principal amount of such renewal or extension does not exceed the original principal amount of such Investment; and

Anything contained in this clause 24.15, or any other covenant or other provision of this Agreement to the contrary notwithstanding, in no event shall any Obligor make loans to or Investments in any Subsidiary of Parent that is not an Obligor hereunder, except to the extent permitted under paragraph (k) above.

## 24.16     Transactions with Affiliates

No Obligor shall (and the Company shall ensure that no other member of the Group will), engage or enter into any transaction or arrangement, including, without limitation, any purchase, sale, transfer, lease or exchange of property or the rendering of any service, with any Affiliate, other than (a) transactions of a type or nature that is described and notified in writing to the Facility Agent prior to the Effective Date in the document entitled "6.08 Transactions with Affiliates"; provided that this clause (a) shall not permit the purchase of inventory by Aegean Bunkering (USA) LLC from, or sale of inventory by Aegean Bunkering (USA) LLC to, any Affiliate (it being understood and agreed that such purchases and sales of inventory are prohibited by this Agreement), (b) transactions among Obligors or among Subsidiaries that are not Obligors, (c) transactions in accordance in all material respects with the Orders,  (d) Investments permitted under clause 24.15 (*Investments*), (e) employment contracts with officers and management of the Obligors and their Subsidiaries and payment of reasonable compensation to directors, officers and employees for services actually rendered to any such Obligor or any of its Subsidiaries and indemnification arrangements, and (f) payment of director's fees, expenses and indemnities, and (g) other transactions on an arm's length basis other than transactions among any one or more Obligors and any one or more Subsidiaries that are not Obligors.  The parties hereto acknowledge that as of the Effective Date no Lender is an Affiliate of any Borrower.

24.17    **Cases**

(a)    Each Obligor will not, nor will it permit any other Debtor to, file or support the confirmation of any Debtor Relief Plan or liquidation other than an Acceptable Reorganization Plan.

(b)    The Debtors shall not consent to the termination or reduction of the Debtors' exclusive plan filing and plan solicitation periods under section 1121 of the Bankruptcy Code (the **Exclusivity Periods**) nor shall they fail to object to any motion by a party in interest (other than a Finance Party) seeking to terminate or reduce the Exclusivity Periods, in each case without the prior written consent of the Facility Agent.

**Restrictions on movement of cash - cash in**

24.18    **Financial Indebtedness**

(a)    No Obligor shall (and the Company shall ensure that no other member of the Group, other than any Immaterial Subsidiary, will) incur or allow to remain outstanding any Financial Indebtedness other than in the following circumstances:

(i)    as permitted under paragraph (b) below;

(ii)    with the prior written consent of the Facility Agent acting on the instructions of the Majority Lenders, which the Lenders shall confirm or decline within fifteen (15) Business Days of receipt of a request from the Company; or

(iii)    if such Financial Indebtedness is incurred pursuant to, and remains in accordance with, the Finance Documents or the US DIP Finance Documents.

(b)    Paragraph (a) above does not apply to any Financial Indebtedness:

(i)    outstanding on the Effective Date hereof and identified in Schedule 14 (*Permitted Financial Indebtedness*) or any refinancings, renewals or extensions thereof (**Permitted Refinancing Indebtedness**) which do not result in an increase thereof provided that, (i) the amount of such Financial Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension, other than by an amount equal to accrued interest, fees and expenses incurred in connection therewith  (ii) such refinancing, refunding, renewal or extended Financial Indebtedness shall (A) not have a final maturity prior to the final maturity date of the Financial Indebtedness being refinanced, refunded, renewed or extended and (B) have an average life to maturity (without giving effect to any prepayment) equal to or greater than such Financial Indebtedness, (iii) the terms of such refinancing, refunding, renewal or extension shall not be more restrictive (taken as a whole) than the terms of such Financial Indebtedness, (iv) any guarantee entered into in connection with such refinancing, refunding, renewal or extension that is not a refinancing of an existing guarantee of such Financial Indebtedness shall not be permitted under this paragraph (viii) if the Financial Indebtedness being refinanced is subordinated, such Permitted Refinancing Indebtedness shall be subordinated to at least the same extent, and on terms at least as favorable to the Lenders, as the Financial Indebtedness being refinanced;

(ii)    under commodity OTC agreements and financial OTC agreements entered into in compliance with the Risk Management Policies;

(iii)    in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(iv)  (i) resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business or (ii) arising under or in connection with cash management services in the ordinary course of business;

(v)  under the US DIP Finance Documents;

(vi)  permitted by the Interim DIP Order;

(vii)  owing by any Obligor to any other Obligor;

(viii)  the Prepetition Obligations;

(ix)  as permitted by the Cash Management Order; and

(x)  not otherwise permitted hereunder in an aggregate amount not to exceed $250,000 at any time outstanding.

**Miscellaneous**

24.19  **Insurance**

(a)  Each Obligor shall (and the Company shall ensure that each other member of the Group will) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially similar business.

(b)  All insurances must be with reputable independent insurance companies or underwriters approved by the Facility Agent (acting on the instructions of the Majority Lenders).

(c)  All insurances referred to in clause (a) above relating to the Borrowers and each Spanish Pledgor shall be maintained on terms satisfactory to the Facility Agent and each Borrower shall (and the Company shall procure that each Spanish Pledgor will) procure that the Security Agent and the US DIP Administrative Agent is named as a co-insured and sole loss payees of such insurance in a manner which is in form and substance satisfactory to the Facility Agent and without liability on the part of the Security Agent for premiums or calls of whatever nature.

24.20  **Commercial Contracts**

Each Obligor shall ensure that any sales order confirmation or invoice issued after 21 May 2018 under any "Commercial Contract" (as defined in each Security Agreement) and prior to the execution of the Second Security Documents, contains the following wording:

"*We give you notice that under a security agreement dated 30 November 2017 entered into by us in favour of ABN AMRO Bank N. V., we have assigned to ABN AMRO Bank N. V. by way of first assignment, all of our rights in respect of our agreement with you to which this confirmation or invoice relates.  We instruct you to make payment hereunder to our account with ABN AMRO Bank N.V. with the following details: [insert details of relevant Collection Account]*"

and once the Second Security Documents have been executed, the following wording:

"*We give you notice that: (i) under a security agreement dated 30 November 2017 entered into by us in favour of ABN AMRO Bank N. V., we have assigned to ABN AMRO Bank N. V. by way of first assignment; and (ii) under a security agreement dated [***insert date***] entered into by us in favour of Mercuria Energy Trading S.A., we have assigned to Mercuria Energy Trading S.A. by way of second assignment, all of our rights in respect of our agreement with you to which this confirmation or invoice relates.  We instruct you to make payment hereunder to our account with ABN AMRO Bank N.V. with the following details: [insert details of relevant Collection Account]*".

24.21    **Super-priority administrative expense claims and Adequeate Protection Payments**

(a)    The Company will not, and will not permit any other Debtor to, make any payment or distribution to any non-Debtor affiliate or corporate insider outside of the ordinary course of business, except as expressly provided or permitted under this Agreement or in a First Day Order or "second day" order complying with the terms of this Agreement.

(b)    The Company will not, and will not permit any other Debtor to, make any payment to, or otherwise provide any adequate protection for, any prepetition creditors, other than pursuant to the Interim DIP Order, the Final Order or other cash collateral orders acceptable to the Majority Lenders.

(c)    The Parent will not, and will not permit any Obligor or Subsidiary to, prepay any Financial Indebtedness (other than, for the avoidance of doubt, any payments under any financial or physical trading transaction (including hedges), including commodities transactions), except as pursuant to the First Day Orders or other orders by the Bankruptcy Court upon pleadings in form and substance satisfactory to the Facility Agent and the Lenders.

24.22    **Access**

Each Obligor shall, and the Company shall ensure that each member of the Group will once during each calendar month permit the Finance Parties and/or accountants or other professional advisers and contractors of the Facility Agent or Security Agent access to information (including historical information) and personnel (during normal business hours and subject to confidentiality and data protection obligations imposed by law) and, notwithstanding anything to the contrary in this Agreement, the Obligors' obligations to reimburse any Finance Party other than the Facility Agent or any of its Affiliates in respect of any exercise of this clause 24.22 shall be limited to reasonable costs and expenses.

24.23    **Treasury Transactions**

No Obligor shall (and the Company will procure that no other member of the Group will) enter into any Treasury Transaction, other than:

(a)    hedging transactions documented by the Hedging Agreements; and/or

(b)    hedging transactions in accordance with the Hedging Policy.

24.24    **Further assurance**

(a)    Other than in respect of the Second Security, each Obligor shall (and the Company shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(i)    to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law; and/or

(ii)    to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b)    In respect of the Second Security, each Obligor shall (and the Company shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the US DIP Administrative Agent may reasonably specify (and in such form as the US DIP Administrative Agent may reasonably require in favour of the US DIP Administrative Agent or its nominee(s)):

(i)    to perfect the Security created or intended to be created under or evidenced by the Second Security Documents or for the exercise of any rights, powers and remedies of the US DIP Administrative Agent provided by or pursuant to the Second Security Documents or by law; and/or

(ii)    to facilitate the realisation of the assets which are, or are intended to be, the subject of the Second Security.

(c)    Each Obligor shall (and the Company shall procure that each other member of the Group will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent, the US DIP Administrative Agent, the Finance Parties or the US DIP Finance Parties by or pursuant to the Finance Documents.

(d)    The Parent will not, nor will it permit any Obligor or any of its Subsidiaries to, enter into a material Contractual Obligation without the consent of the Facility Agent and the Majority Lenders.

## 24.25    Conditions subsequent

(a)    The Company shall procure that if any assets which are included in the Borrowing Base at any time are located in a jurisdiction in which a perfected first priority security interest cannot be granted in respect of future assets, the Borrowers will enter into periodic pledges with the Security Agent (the frequency of which shall be agreed with the Lenders provided that such frequency shall be no less than on a weekly basis) in respect of assets located in such jurisdictions. The Company shall provide to the Security Agent such corporate authorities and legal opinions as the Security Agent may require in respect of such security.

(b)    Notwithstanding any other provision of the Finance Documents, the assets of any Spanish Pledgor shall be deemed to be unsecured for the purposes of determining their eligibility for inclusion in the Borrowing Base until the date on which the Facility Agent confirms in writing to the Company and the Collateral Management Agent that it has received the following:

(i)    duly executed originals of the relevant Spanish Pledge(s);

(ii)    a duly executed original of the Spanish Irrevocable Power of Attorney;

(iii)    evidence of the registration of any relevant Spanish Pledge amendments at the relevant Registries of Moveable Property;

(iv)    the conditions precedent specified in Part IV of Schedule 2 (*Conditions Precedent*); and

(v)    a legal opinion of Garrigues in relation to Spanish law,

in each case in form and substance satisfactory to the Facility Agent.

(c)    Notwithstanding any other provision of the Finance Documents, any inventory located in South Africa other than the inventory owned by the Company onboard any vessel which is the subject of the South African Pledge shall be deemed to be unsecured for the purposes of determining its eligibility for inclusion in the Borrowing Base until the later of the date on which the Facility Agent confirms in writing to the Company and the Collateral Management Agent that it has received duly executed originals of a South African Pledge in relation to any such inventory or its location, together with such evidence satisfactory to it that all action needed to perfect the Security created by such South African Pledge has been completed and the Facility Agent has received all legal opinions, corporate

approvals and other conditions precedent required by it (acting on the instructions of the Majority Lenders) in connection with such security.

(d)     The Company shall (or shall procure that each Spanish Pledgor will), following any change whatsoever in the identity or participations of the Lenders hereunder or any other registered details in relation to the Spanish Pledges, including without limitation as a consequence of any increases of the Facilities, take such steps as the Facility Agent may require (based on advice received from its external legal advisers) (including executing any extension, amendment and/or ratification agreement and carried out the relevant actions before the relevant registry to obtain registration of said documents) to update the relevant Spanish Registries of Moveable Property.

## 24.26     Borrowing Base Amount

The Company shall procure that the Borrowing Base Amount shall at all times be zero or a positive number. For the avoidance of doubt, any breach of this clause 24.26 is capable of remedy by way of a voluntary prepayment made in accordance with clause 8.2 (*Voluntary prepayment of Loans*) in the period specified in clause 26 (*Events of Default*).

## 24.27     Parent Listing

The Parent shall at all times maintain its listing on the New York Stock Exchange.

## 24.28     Risk Management Policy

The Company shall procure that no material changes are made to the risk management policy provided to the Facility Agent pursuant to Part I of Schedule 2 (*Conditions Precedent*) without the prior written approval of the Facility Agent acting on the instructions of the Majority Lenders.

## 24.29     First and Second Day Orders

The Borrowers shall cause all proposed First Day Orders, "second day" orders to be reasonably acceptable to the Facility Agent (acting on the instructions of the Majority Lenders) in all respects.

## 24.30     Sanctions

(a)     The Obligors shall not, and shall procure that each other member of the Group shall not, permit or authorise any other person to, directly or indirectly, use, lend, make payments of, contribute or otherwise make available, all or any part of the proceeds of the Facilities or other transactions contemplated by this Agreement to fund or facilitate trade, business or other activities: (i) involving or for the benefit of any Prohibited Person; (ii) relating to a country or territory that is the target of country-wide or territory-wide Sanctions; or (iii) in any other manner that could result in any Obligor or a Finance Party being in breach of any Sanctions or becoming a Prohibited Person.

(a)     The Obligors shall ensure that (i) no person that is a Prohibited Person will have any legal or beneficial interest in any funds repaid or remitted by the Obligors to any Finance Party in connection with the Facility, and (ii) it shall not use any revenue or benefit derived from any activity or dealing with a Prohibited Person for the purpose of discharging amounts owing to any Finance Party in respect of the Facility.

## 24.31     Payments under Multi-Party TPA Agreements

Each Borrower shall procure that any amounts payable to it pursuant to a Multi-Party TPA Agreement and any FX Hedging Provider Hedging Agreement and any Lender Discounting Facility shall be paid to the Collection Account in the relevant currency held by the relevant Borrower.

24.32    **Inventory**

Each Borrower shall procure that no inventory shall be held or intended by it to be held, for a period in excess of one hundred and eighty (180) days nor shall any inventory be acquired for speculative purposes.

24.33    **Bills of Lading**

Each Obligor shall procure that all bills of lading issued in respect of assets comprised from time to time in the Borrowing Base shall be issued or endorsed in the name of the Security Agent and delivered to the Collateral Management Agent.

24.34    **Spanish Pledgor**

Each Borrower shall procure that each Spanish Pledgor:

(a)    shall at all times be and remain a wholly-owned Subsidiary of the Parent; and

(b)    will only sell or otherwise dispose of assets or inventory which are from time to time the subject of the Spanish Pledges to a Borrower.

24.35    **Sensitive Zone**

The Borrowers, when purchasing from suppliers in the Sensitive Zone, shall only enter into supply contracts with Approved Suppliers. Such supply contracts shall systematically include a clause specifying compliance of both parties with Sanctions regardless of the whether these purchases are financed through the Facility or through any other means.

24.36    **Dividends and share redemptions**

(a)    No Obligor shall (and the Company shall ensure that no other member of the Group will) declare or make any Restricted Payment except that, so long as no Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom:

    (i)    each Subsidiary (excluding a Borrower) may make Restricted Payments to the Parent or any other Subsidiary and any other person that owns an Equity Interest in such Subsidiary, ratably according to their respective holdings of such Equity Interests in respect of which such Restricted Payment is being made;

    (ii)    Restricted Payments to the extent constituting Investments permitted hereunder;

    (iii)    Restricted Payments provided for in the Orders; "First Day Orders" or "second day Orders"; and

    (iv)    the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in common Equity Interests of such person.

(b)    No Borrower shall, and will not permit any other Debtor to, make any payment to, or otherwise provide any adequate protection for, any prepetition creditors, other than pursuant to the Interim DIP Order, the Final DIP Order, the First Day Orders and other cash collateral orders acceptable to the Majority Lenders or in accordance with the Budget.

(c)    No Obligor shall (and the Company shall ensure that no other member of the Group will), prepay any prepetition Financial Indebtedness (other than the Prepetition Obligations and other than, for the avoidance of doubt, any payments under any financial or physical trading transaction (including hedges), including commodities transactions), except as (i) pursuant to the First Day Orders or other Bankruptcy Court orders acceptable to the Majority Lenders, (ii) as disclosed in writing to the Facility Agent prior to the Effective

Date in the document entitled "6.05 Payments", (iii) in accordance with the Budget and (iv) any other order of the Bankruptcy Court.

24.37    **Accounting principles**

No Obligor shall make any significant change in its accounting treatment or reporting practices, except as required by the Accounting Principles, without providing the Facility Agent with at least ten days' prior written notice of such change.  At the end of any calendar quarter during which any such change has occurred, the relevant Obligor shall prepare and deliver to the Facility Agent an explanatory statement, in form and substance satisfactory to the Facility Agent (acting on the instructions of the Majority Lenders), reconciling the previous treatment or practice with the new treatment or practice.

24.38    **Cancellation of Financial Indebtedness**

No Obligor shall cancel any claim or Financial Indebtedness owed to it except for adequate consideration or as approved by an order of the Bankruptcy Court or permitted under this Agreement (including as required by the Asset Purchase Agreement).

24.39    **Limitation on capital structure**

(a)    No Obligor shall, nor shall it permit any of its Subsidiaries to, make any changes in its capital structure (including, without limitation, the terms of its outstanding share capital).

(b)    Other than in respect of the Parent listed on the New York Stock Exchange, no Obligor shall, nor shall it permit any of its Subsidiaries to, change the ownership of the right to any votes that might be cast at a general meeting of any Obligor or of the issued share capital of an Obligor.

24.40    **Required Milestones and actions**

(a)    The Obligors shall comply with and satisfy (by the occurrence thereof) each of the Required Milestones, and perform each of the actions, set forth on Schedule 20 (*Required Milestones*) attached hereto, on or before the dates required for such compliance and actions as set forth in such Schedule and in accordance with the Agreed Security Principles.

(b)    Subject in all respects to the Agreed Security Principles, with respect to any Security of an Obligor as to which the Security Agent does not have perfected Security, or, in the case of assets of Debtors already encumbered as of the Petition Date in favor of other creditors other than a Lender, a perfected junior Security, such Obligor shall cause within 45 days of the date hereof (or 60 Business Days in the case of Subsidiaries organised in South Africa), or in the case of after-acquired or after-arising assets, within 45 days of the date such property is acquired or arises, such Debtor to (i) execute and deliver to the Security Agent (A) such amendments to the Transaction Security Document or such other documents necessary to grant to the Security Agent for and on behalf of the Secured Parties Security in such property not already encumbered as of the Petition Date in favour of the Secured Parties, including the Equity Interests of all Subsidiaries of the Parent, and (B) security agreements, vessel mortgages and such other documents necessary or advisable to grant to the Security Agent for and on behalf of the Secured Parties a perfected Security as was already encumbered as of the Petition Date in favour of a person other than a Lender, and (ii) take all other actions necessary to grant to the Security Agent for and on behalf of the Secured Parties (A) a perfected Security in such property, including, without limitation, the filing of UCC financing statements in such jurisdictions as may be required by the Transaction Security Document or by applicable law or regulation or as may be requested by the Security Agent (acting on the instructions of the Majority Lenders) and (B) a perfected Security in such other property as was already encumbered as of the Petition Date in favor of a person other than a Lender, including, without limitation, the filing of UCC financing statements, vessel mortgages and other documents in such jurisdictions as may be advisable or required by the Transaction

Security Document or by applicable law or regulation or as may be requested by the Security Agent. With respect to any person that becomes an Obligor after the Effective Date, or any assets of the Obligors acquired or arising after the Effective Date, the Borrower shall cause the execution, delivery and performance of the items required pursuant to the foregoing sentence within 60 days of the date that such person becomes an Obligor, or the date that such property arises or is acquired, as applicable.

## 25      Bank Accounts

### 25.1      Designation of Accounts

Each Borrower shall maintain in its name the following bank accounts:

(a)      within the Amsterdam branch of the Account Bank:

     (i)      a deposit account in Dollars designated "Facility Account"; and

     (ii)      a deposit account in Dollars designated "Collection Account";

(b)      within the German branch of the Account Bank a deposit account in EURO designated "Collection Account",

and each of the Company and ANNV shall maintain in its name with the Amsterdam branch of the Account Bank a deposit account in EURO designated "Collection Account".

### 25.2      Account balances

The Company will procure that all cash owned by an Obligor (other than (a) cash in the "Controlled Accounts" (as the expression is defined in the US DIP Credit Facility Agreement); and (b) a maximum additional aggregate amount held by any member of the Group of USD5,000,000) is credited to an account in the name of a member of the Group with an Acceptable Bank which is subject to the Transaction Security or any other Security created or expressed to be created in favour of the Security Agent (in form and substance satisfactory to the Security Agent).

### 25.3      Collection Account

(a)      Each of the Collateral Management Agent and the relevant Borrower shall have signing rights on a Collection Account.

(b)      All payments to be made by any Obligor pursuant to any Facility shall be paid to the Collection Account in the relevant currency held by the relevant Borrower.

(c)      Each Borrower will procure that all receivables payable to it and all proceeds of any true sale of receivables or any discounting programme conducted by it shall be paid to the relevant Collection Account in the relevant currency held by the relevant Borrower.

(d)      Each Borrower shall by no later than 14:00 on each applicable day instruct the Collateral Management Agent to transfer amounts credited to the Collection Accounts to the relevant Facility Account to meet that Borrowers' payment obligations under the Facilities provided that no transfer of any amount to be set-off pursuant to clause 9.5(b) shall be required to be made pursuant to this paragraph (d).

(e)      On each Monday and Thursday (or if any such day is not a Business Day, on the next Business Day) while there are any Outstandings in respect of Overdraft Facilities, and provided that:

     (i)      there shall remain in aggregate in the Collection Accounts and/or the Facility Accounts following any application pursuant to this sub-clause (e) sufficient funds

to meet the Borrowers' repayment obligations in relation to any Loans which are scheduled to fall due in the next seven (7) days; and

(ii)     no Default is continuing,

the Company shall instruct the Collateral Management Agent to apply amounts credited to the Collection Accounts to meet the Borrowers' payment obligations under Overdraft Facilities on a pro-rata basis.

The Borrowers' payment obligations to each Overdraft Bank under Overdraft Facilities (and amounts to be paid hereunder) on each such date shall be ascertained and the payments implemented as follows:

| Deadline on relevant date | Action required |
|---|---|
| 10:00am | Overdraft Bank to notify the Facility Agent by email of their Facility B outstandings in respect of Overdraft Facilities as at close of business on the previous Business Day (the **Overdraft Bank Outstandings**). |
| 12:00 midday | Facility Agent to notify the Company and the Collateral Management Agent (with a copy to all Lenders (which may be made by posting on debt domain)) of the Overdraft Bank Outstandings notified to it and the payments to be made to each Overdraft Bank under this clause 25.3(e) (the **Facility Agent's Notification**). |
| 14:00 | Company to instruct the payments in accordance with the Facility Agent's Notification (or in accordance with the Company's Account Certification (as defined below)). |

If an Overdraft Bank fails to provide details of its Overdraft Bank Outstandings in accordance with this clause 25.3(e), its outstandings for the purposes of calculating payments to be made under this clause 25.3(e) on the date in question shall be deemed to be such amount as the Company may certify in writing to the Facility Agent by no later than 12:00 midday on the relevant day (such certification being the **Company's Account Certification**) (and if the Company does not provide any such certification then the relevant Overdraft Bank's outstandings shall be deemed to be zero for such purpose).

(f)     If a Borrower does not instruct the making of any payments under and in accordance with clauses 25.3(d) and 25.3(e), the Collateral Management Agent shall be irrevocably authorised to apply amounts credited to the Collection Accounts of that Borrower (or any of them) to meet the Borrowers' payment obligations under any Facility.

25.4    **Withdrawals from Collection Account**

(a)     Funds standing to the credit of a Collection Account shall be freely available to the relevant Borrower for application in accordance with the Budget:

(i)     provided that:

(A)     no Event of Default is continuing or would result from a withdrawal from a Collection Account;

(B)     no notices have been issued in respect of Overdraft Facilities pursuant to clause 7.2 (*Repayment of Overdraft Facilities*) (unless all amounts payable

under that clause following a Demand Repayment Date (as defined therein) have been repaid in full); and

(C) a withdrawal would not result in the Borrowing Base Amount being less than zero (0) or a negative number; or

(ii) otherwise, with the prior written consent of the Majority Lenders.

(b) Save as set out in clause 25.4(a), no Obligor may withdraw any amount from or allow any amount to be debited from a Collection Account (except in accordance with paragraph (d) of clause 25.3 (*Collection Account*) or otherwise in payment of to the US Secured Parties of any amount due and payable under the US DIP Finance Documents).

(c) Without prejudice to clause 25.4(a), any funds which are available to a Borrower pursuant to clause 25.4(a) may be transferred to an account held with another Lender provided that such funds shall not be applied to a payment due to that Lender under the Finance Documents or under any agreement in connection with any Fronted Facility or in connection with any Multi-Party TPA Agreement or FX Hedging Provider Hedging Agreement.

25.5 **Facility Account**

(a) Each of the Collateral Management Agent and the relevant Borrower shall have signing rights on a Facility Account.

(b) All Loans utilised by a Borrower under the Facilities shall be paid by the Facility Agent to the relevant Facility Account.

(c) The Borrower irrevocably authorises the Facility Agent to apply amounts credited to the Facility Account to meet the Borrower's payment obligations under the Facilities.

25.6 **Withdrawals from Facility Account**

(a) Funds standing to the credit of a Facility Account shall be freely available to the relevant Borrower for application in accordance with the Budget

(i) provided that:

(A) no Event of Default is continuing or would result from a withdrawal from a Facility Account;

(B) no notices have been issued in respect of Overdraft Facilities pursuant to clause 7.2 (*Repayment of Overdraft Facilities*) (unless all amounts payable under that clause following a Demand Repayment Date (as defined therein) have been repaid in full); and

(C) a withdrawal would not result in the Borrowing Base Amount being zero (0) or a negative number; or

(ii) otherwise, with the prior written consent of the Majority Lenders.

(b) Save as set out in clause 25.6(a), no Obligor may withdraw any amount from or allow any amount to be debited from a Facility Account (except in accordance with paragraph (c) of clause 25.5 (*Facility Account*) or otherwise in payment of to the US Secured Parties of any amount due and payable under the US DIP Finance Documents).

25.7 **Cash cover**

(a) With respect to any outstanding Credit Instrument, upon the demand at any time of (i) the Majority Lenders or (ii) with the consent of the Majority Lenders, the Issuing Bank or the

Facility Agent (provided that, in the case of this clause (ii), if an Event of Default has occurred and is continuing, the consent of the Majority Lenders shall not be required in connection with any such demand by the Issuing Bank or the Facility Agent), in each case, the Borrowers shall immediately deposit into an account established and maintained on the books and records of the Security Agent cash cover equal to 103% of the total Credit Instrument Outstandings as of such date plus any accrued and unpaid fees thereon. Such deposit shall be held by the Security Agent as collateral for the payment and performance of the Secured Obligations. In addition, and without limiting the foregoing or paragraph (d) of this clause, if any Credit Instrument Outstandings remain unpaid after the expiration date specified in said paragraph (d), the Borrowers shall immediately deposit cash cover in an amount equal to 103% of such Credit Instrument Outstandings as of such date plus any accrued and unpaid fees thereon.

(b) Notwithstanding anything to the contrary in any Finance Document, the Obligors may withdraw any amount on any Collection Account or any Facility Account for the purpose of granting cash cover as required under any Finance Document.

## 26 Events of Default

Each of the events or circumstances set out in this clause 26 is an Event of Default (save for clause 26.20 (*Acceleration*)) unless, other than in respect of clause 26.5(a), such events or circumstances are capable of remedy and are remedied within five (5) Business Days of the earlier of (i) the Facility Agent giving notice to the Company or relevant Obligor and (ii) the Company or an Obligor becoming aware of the failure to comply.

### 26.1 Non-payment

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a) its failure to pay is caused by:

(i) administrative or technical error; or

(ii) a Disruption Event; and

(b) payment is made within five (5) Business Days of its due date.

### 26.2 Covenants

(a) An Obligor does not comply with any provision of any Transaction Security Document.

(b) A Borrower does not comply with clause 24.35 (*Sensitive Zone*).

(c) An Obligor does not comply with clause 24.13 (*Disposals*).

(d) An Obligor does not comply with clause 23(b) (*Budget variance*).

### 26.3 Other obligations

An Obligor does not comply with any provision of the Finance Documents (other than those referred to in clause 26.1 (*Non-payment*), clause 26.2 (*Covenants*) and clause 24.9 (*Application of FATCA*)) and such failure to comply continues unremedied for a period of five (5) or more Business Days after notice thereof by the Facility Agent or the Majority Lenders to the Company.

26.4    **Misrepresentation**

Any representation or statement made or deemed to be made by an Obligor in the Finance Documents or any other document delivered by or on behalf of any Obligor under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made (save that this clause 26.4 shall not apply to clause 21.2(d) (*Status*)).

26.5    **Cross default**

(a)    Any Event of Default (as defined in the US DIP Credit Facility Agreement) occurs.

(b)    Any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) is not paid when due nor within any originally applicable grace period.

(c)    Any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(d)    Any commitment for any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) is cancelled or suspended by a creditor of any member of the Group (other than an Immaterial Subsidiary) as a result of an event of default (however described).

(e)    Any creditor of any member of the Group (other than an Immaterial Subsidiary) becomes entitled to declare any Financial Indebtedness of any member of the Group (other than an Immaterial Subsidiary) due and payable prior to its specified maturity as a result of an event of default (however described).

26.6    **Insolvency**

(a)    A member of the Group other than a Debtor:

(i)    is unable or admits inability to pay its debts as they fall due;

(ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

(iii)    suspends or threatens to suspend making payments on any of its debts; or

(iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its indebtedness.

(b)    The value of the assets of any member of the Group (other than a Debtor) is less than its liabilities (taking into account contingent and prospective liabilities).

(c)    A moratorium is declared in respect of any indebtedness of any member of the Group other than a Debtor.  If a moratorium occurs, the ending of the moratorium will not remedy any Event of Default caused by that moratorium.

26.7    **Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken in relation to:

(i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration, judicial management or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any member of the Group;

(ii) a composition, compromise, assignment or arrangement with any creditor of any member of the Group;

(iii) the appointment of a liquidator, receiver, administrative receiver, receiver and manager, administrator, judicial manager, interim judicial manager, compulsory manager or other similar officer in respect of any member of the Group or any of its assets; or

(iv) enforcement of any Security over any assets of any member of the Group,

or any analogous procedure or step is taken in any jurisdiction.

(b) Paragraph (a) shall not apply to:

(i) any of the proceedings described in clause 26.10;

(ii) any member of the Group which is a Debtor;

(iii) any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within fourteen (14) days of commencement; or

(iv) the solvent liquidation or reorganisation of any member of the Group which is not an Obligor so long as any payments or assets distributed as a result of such liquidation or reorganisation are distributed to other members of the Group.

## 26.8 Creditors' process

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group other than a Debtor.

## 26.9 Failure to comply with court judgment or arbitral award

(a) Any Obligor fails to pay any unstayed final judgment, arbitral award, order or decree rendered against it by a court or arbitral tribunal or other arbitral body of competent jurisdiction located in any jurisdiction.

(b) No Event of Default under paragraph (a) above will occur if:

(i) the aggregate liability under all such judgments, arbitral awards, orders or decrees is less than US$5,000,000 (or its equivalent in any other currency or currencies) and is discharged within 45 days; or

(ii) such judgment or arbitral award is entirely covered by insurance or indemnity and provided such carrier has coverage or such indemnification has not been denied.

## 26.10 Debtors and Cases

(a) Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, a receiver, interim receiver, receiver or manager shall be appointed in any of the Cases and the order appointing such trustee, examiner, receiver, interim receiver or manager shall not be reversed or vacated within 10 days after the entry thereof.

(b)     Any order by the Bankruptcy Court shall be entered, terminating or modifying the exclusivity right of any Debtor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

(c)     Any other material superpriority administrative expense claim or "claim" which is *pari passu* with or senior to the claims of the Secured Parties under the Facilities, as applicable (other than in each case the Carve Out) or any material lien that is *pari passu* with or senior to the liens of the Secured Parties under this Agreement shall be granted in any of the Cases.

(d)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any asset of the Debtors of fair market value exceeding $1,500,000 in aggregate from or permit other actions that would reasonably be expected to result in a Material Adverse Effect.

(e)     An order shall be entered reversing, supplementing, staying for a period of three (3) Business Days or more, vacating or otherwise modifying the Interim DIP Order or the Final DIP Order in a manner that is materially adverse to the interests of the Finance Parties, or any Debtor shall apply for authority to do so without the prior written consent of the Facility Agent (acting on the instructions of the Majority Lenders), or the Interim DIP Order or the Final DIP Order shall cease to be in full force and effect.

(f)     The Bidding Procedures Order or Sale Order shall be reversed, supplemented, stayed, vacated or modified in a manner adverse to the Majority Lenders without the consent of the Majority Lenders.

(g)     A Debtor makes any payments relating to prepetition obligations other than in accordance with a Bankruptcy Court order, the Interim DIP Order, the Final DIP Order, or as otherwise agreed to by the Facility Agent and the Majority Lenders or contemplated by the Budget or otherwise permitted hereunder.

(h)     A plan shall be proposed by a Debtor in any of the Cases that is not supported by the Lenders, including a plan that does not provide for (i) termination of the Commitments and the commitments under the US DIP Credit Facilities, (ii) the indefeasible payment in full in cash of the Outstandings (other than indemnities and other contingent obligations not then due and payable), and (iii) payment in full in cash of the Prepetition Obligations (or other treatment agreed to by the Finance Parties), in each case in the foregoing clauses (i)-(iii) on the effective date of such plan.

(i)     A plan is proposed by any person other than the Debtors, in any of the Cases, that is not supported by the Lenders, including a plan that does not provide for (i) termination of the Commitments and the commitments under the US DIP Credit Facilities, (ii) the indefeasible payment in full in cash of the Outstandings (other than indemnities and other contingent obligations not then due and payable), and (iii) payment in full in cash of the obligations owed to the Finance Parties prior to the Petition Date (or other treatment agreed to by the Prepetition Lenders), in each case in the foregoing clauses (i)-(iii) on the effective date of such plan, and such plan is confirmed.

(j)     The Interim DIP Order or Final DIP Order, as applicable, shall fail to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim DIP Order or Final DIP Order, (ii) amending or modifying the Interim DIP Order or Final DIP Order in a manner that is adverse to the Finance Parties, or (iii) staying for a period in excess of seven days the Interim DIP Order or Final DIP Order (as applicable).

(k)     the Transaction Security Documents shall cease to create a valid and perfected lien on any material assets purported to be subject to Transaction Security, solely to the extent required hereunder;

(l)     any Debtor shall fail to comply with the material terms of an Order in any material respect for a period of more than 5 Business Days;

(m)     any Debtor shall file a motion seeking, or take any action supporting a motion seeking, or the Bankruptcy Court shall enter, an order, authorizing the sale of all or substantially all of the Debtors' assets (unless, in the case of each of the foregoing, either (i) (A) the Majority Lenders consent to the filing of such motion, and (B) any order approving the sale expressly provides for application of cash proceeds in accordance with the terms of this Agreement and is otherwise in form and substance reasonably acceptable to the Facility Agent, or (ii) the order approving such sale contemplates payment in full in cash of the Outstandings upon consummation of such sale);

(n)     the Bankruptcy Court shall enter a Final Order that is adverse in any material respect to (i) the interests (when taken as a whole) of the Secured Parties in any of the Transaction Security, or (ii) the creation, perfection or priority of any of the Security securing the Secured Obligations; provided however, that this paragraph (n) will not apply to the termination of the use of cash collateral (which shall be governed exclusively by paragraph (o) below);

(o)     the use of cash collateral by a Debtor shall be terminated and a Debtor shall not have obtained use of cash collateral (consensually or non-consensually) pursuant to an order in form and substance reasonably acceptable to the Majority Lender;

(p)     the Obligors or any of their subsidiaries, or any person claiming by or through the Obligors or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Finance Parties in any Case or case relating to the Facilities or the US DIP Credit Facilities or any challenge to the validity, enforceability, priority or perfection of liens securing the obligations under this Agreement prior to the Petition Date, as applicable; or

(q)     the filing of any equitable subordination or recharacterization claim by any of the Borrowers, seeking thereby to subordinate or recharacterize, by order of a court of competent jurisdiction, any of the rights to payment, or rights in collateral securing any such payment, of any indebtedness owed to any such Lender; or

(r)     the entry of an order providing for the equitable subordination or recharacterization of any Lender's rights to payment, or rights in Transaction Security securing any payment, or any Financial Indebtedness owed to any Lender; or

(s)     the entry of an order that restricts any of the Lenders from credit bidding in any sale of the assets of a Debtor under Section 363 of the Bankruptcy Code.

26.11   **Unlawfulness and invalidity**

(a)     A Lender determines that it is or has become unlawful for an Obligor, any Spanish Pledgor or any South African Pledge Counterparty to perform any of its obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective.

(b)     Any obligation or obligations of any Obligor, any Spanish Pledgor or any South African Pledge Counterparty under any Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Lenders under the Finance Documents.

(c)     Any Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than a Finance Party) to be ineffective.

26.12    **Cessation of business**

Any member of the Group suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

26.13    **Change in Parent management**

Any individual resigns or is removed from the board of directors of the Parent unless another person reasonably acceptable to the Facility Agent (acting on the instructions of the Majority Lenders) is appointed to the board in their place within 5 days of such resignation or removal.

26.14    **Reporting**

(a)    The Company fails to provide a Borrowing Base Report to the Collateral Management Agent when required pursuant to clause 22.7(a)(i) (*Borrowing Base Report*) and such failure is not remedied within two (2) Business Days.

(b)    The Company fails to provide a Cross-Check Borrowing Base Report to the Collateral Management Agent pursuant to clause 22.7(a)(ii) (*Borrowing Base Report)* and such failure is not remedied within two (2) Business Days.

(c)    The Company fails to provide a Compliant Borrowing Base Report to the Collateral Management Agent when required pursuant to clause 22.9 (*Deficient Borrowing Base Report*).

(d)    In each period of twelve (12) Months commencing on the date of this Agreement and each anniversary thereof:

(i)    the Company is required to remedy a failure to provide a Borrowing Base Report in accordance with clause 26.13(a) on more than four (4) occasions;

(ii)    the Company is required to remedy a failure to provide a Cross-Check Borrowing Base Report in accordance with clause 26.13(b) on more than two (2) occasions;

(iii)    five (5) or more Deficient Borrowing Base Reports are provided to the Collateral Management Agent pursuant to this Agreement; or

(iv)    three (3) or more Deficient Cross-Check Borrowing Base Reports are provided to the Collateral Management Agent pursuant to this Agreement.

(e)    The Company provides two (2) consecutive Deficient Cross-Check Borrowing Base Reports to the Collateral Management Agent pursuant to this Agreement.

26.15    **Repudiation and rescission of agreements**

An Obligor, any Spanish Pledgor or any South African Pledge Counterparty (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security.

26.16    **Accounts**

Without the prior written consent of the Facility Agent on the instructions of the Majority Lenders any Collection Account or Facility Account is closed or requested to be closed (other than in accordance with the terms of this Agreement).

26.17    **Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened in relation to the Finance Documents or

the transactions contemplated in the Finance Documents or against any member of the Group or its assets which have or are reasonably likely to have a Material Adverse Effect.

## 26.18 Expropriation

The authority or ability of any member of the Group to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, compulsory acquisition, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets or the shares in that member of the Group (including without limitation the displacement of all or part of the management of any member of the Group).

## 26.19 Material adverse change

Any event or circumstance occurs which the Majority Lenders reasonably believe has or is reasonably likely to have a Material Adverse Effect.

## 26.20 Sanctions

Any Obligor or any other member of the Group:

(a) becomes a Prohibited Person or becomes owned or controlled by, or acts directly or indirectly on behalf of, a Prohibited Person or any of such persons becomes the owner or controller of a Prohibited Person; or

(b) fails to comply with any Sanctions.

## 26.21 Acceleration

On and at any time after the occurrence of an Event of Default the Facility Agent may, and shall if so directed by the Majority Lenders, by notice to the Company:

(a) issue and deliver a Carve-Out Trigger Notice;

(b) cancel the Total Commitments at which time they shall immediately be cancelled;

(c) declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

(d) declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Facility Agent on the instructions of the Majority Lenders;

(e) declare that cash cover in respect of each Credit Instrument is immediately due and payable at which time it shall become immediately due and payable;

(f) declare that cash cover in respect of each Credit Instrument is payable on demand at which time it shall immediately become due and payable on demand by the Facility Agent on the instructions of the Majority Lenders;

(g) declare all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Fronted Facilities to be immediately due and payable, at which time they shall become immediately due and payable;

(h) declare that all or any part of the amounts (or cash cover in relation to those amounts) outstanding under the Fronted Facilities be payable on demand, at which time they shall immediately become payable on demand by the Facility Agent on the instructions of the Majority Lenders;

(i)     instruct the close-out of any hedging or clearing transactions which are the subject of a Multi-Party TPA Agreement or require the Borrowers to close out any FX Hedging Provider Hedging Transactions; and/or

(j)     exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

**Section 9**
**Changes to Parties**

## 27     Changes to the Lenders

### 27.1     Assignments and transfers by the Lenders

Subject to this clause 27 and to clause 28 (*Restriction on Debt Purchase Transactions*), a Lender (the **Existing Lender**) may:

(a)     assign any of its rights; or

(b)     transfer by novation any of its rights and obligations,

under any Finance Document to any other person which is a commercial bank or a person that has an Investment Grade Rating (the **New Lender**).

### 27.2     Conditions of assignment or transfer

(a)     The consent of the relevant Issuing Bank is required for any assignment or transfer by an Existing Lender of any of its rights and/or obligations under a Fronted Facility. This requirement shall apply to any such transfer irrespective of the circumstances of the transfer and notwithstanding any other provision of this Agreement.

(b)     The consent of the Company is required for an assignment or transfer by an Existing Lender, unless the assignment or transfer is:

    (i)     to an Acceptable Bank;

    (ii)     to a Lender or an Affiliate of a Lender; or

    (iii)     made at a time when an Event of Default is continuing.

(c)     The consent of the Company to an assignment or transfer must not be unreasonably withheld or delayed.  The Company will be deemed to have given its consent five (5) Business Days after the Existing Lender has requested it unless consent is expressly refused by the Company within that time.

(d)     An assignment will only be effective on:

    (i)     receipt by the Facility Agent (whether in the Assignment Agreement or otherwise) of written confirmation from the New Lender (in form and substance satisfactory to the Facility Agent) that the New Lender will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it was an Original Lender;

    (ii)     the performance by the Facility Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Lender, the completion of which the Facility Agent shall promptly notify to the Existing Lender and the New Lender; and

    (iii)     if any Spanish Pledge has been entered into, receipt by the Facility Agent from the New Lender of a notarised power of attorney substantially in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under the Spanish Pledges.  For the avoidance of doubt, all costs and expenses relating to the execution of the power of attorney in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) shall be borne by the entity granting such power of attorney.

(e)     A transfer will only be effective if the procedure set out in clause 27.5 (*Procedure for transfer*) is complied with.

(f)     If:

(i)     a Lender assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Lender or Lender acting through its new Facility Office under clause 16 (*Increased Costs*), then the New Lender or Lender acting through its new Facility Office is only entitled to receive payment under that clause to the same extent as the Existing Lender or Lender acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.  This paragraph (f) shall not apply in respect of an assignment or transfer made in the ordinary course of the primary syndication of the Facility or to the extent that the payment under clause 15 (*Tax Gross Up and Indemnities*) relates to a FATCA Deduction.

(g)     Each New Lender, by executing the relevant Transfer Certificate or Assignment Agreement, confirms, for the avoidance of doubt, that the Facility Agent has authority to execute on its behalf any amendment or waiver that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the transfer or assignment becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as the Existing Lender would have been had it remained a Lender.

## 27.3     Assignment or transfer fee

Unless the Facility Agent otherwise agrees and excluding an assignment or transfer (i) to an Affiliate of a Lender, (ii) to a Related Fund (iii) made in connection with primary syndication of the Facility, or (iv) to Mercuria Energy Group Limited or any of its Affiliates, the New Lender shall, on the date upon which an assignment or transfer takes effect, pay to the Facility Agent (for its own account) a fee of $3,500.

## 27.4     Limitation of responsibility of Existing Lenders

(a)     Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i)     the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents, the Transaction Security or any other documents;

(ii)    the financial condition of any Obligor;

(iii)   the performance and observance by any Obligor or any other member of the Group of its obligations under the Finance Documents or any other documents; or

(iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)     Each New Lender confirms to the Existing Lender, the other Finance Parties and the Secured Parties that it:

(i)     has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Lender or any other

Finance Party in connection with any Finance Document or the Transaction Security; and

(ii) will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c) Nothing in any Finance Document obliges an Existing Lender to:

(i) accept a re-transfer or re-assignment from a New Lender of any of the rights and obligations assigned or transferred under this clause 27; or

(ii) support any losses directly or indirectly incurred by the New Lender by reason of the non-performance by any Obligor of its obligations under the Finance Documents or otherwise.

## 27.5 Procedure for transfer

(a) Subject to the conditions set out in clause 27.2 (*Conditions of assignment or transfer*) a transfer is effected in accordance with paragraph (b) below when the Facility Agent executes an otherwise duly completed Transfer Certificate delivered to it by the Existing Lender and the New Lender. The Facility Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate.

(b) The Facility Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Existing Lender and the New Lender once: (A) it is satisfied it has complied with all necessary "know your customer" or similar checks under all applicable laws and regulations in relation to the transfer to such New Lender; and (B) it has received from the New Lender a notarised power of attorney substantially in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under the Spanish Pledges. For the avoidance of doubt, all costs and expenses relating to the execution of the power of attorney in the form set out in Schedule 15 (*Form of New Lender Spanish Power of Attorney*) shall be borne by the entity granting such power of attorney.

(c) Subject to clause 27.9 (*Pro rata interest settlement*), on the Transfer Date:

(i) to the extent that in the Transfer Certificate the Existing Lender seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security each of the Obligors and the Existing Lender shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the **Discharged Rights and Obligations**);

(ii) each of the Obligors and the New Lender shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor or other member of the Group and the New Lender have assumed and/or acquired the same in place of that Obligor and the Existing Lender;

(iii) the Facility Agent, the Collateral Management Agent, the Security Agent, the New Lender, the Issuing Bank, the Overdraft Bank and the other Lenders shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Lender been an Original Lender with the rights, and/or obligations

acquired or assumed by it as a result of the transfer and to that extent the Facility Agent, the Collateral Management Agent, the Security Agent, the Issuing Bank, the Overdraft Bank and the Existing Lender shall each be released from further obligations to each other under the Finance Documents; and

(iv) the New Lender shall become a Party as a **Lender**.

27.6 **Procedure for assignment**

(a) Subject to the conditions set out in clause 27.2 (*Conditions of assignment or transfer*) an assignment may be effected in accordance with paragraph (c) below when the Facility Agent executes an otherwise duly completed Assignment Agreement delivered to it by the Existing Lender and the New Lender. The Facility Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement.

(b) The Facility Agent shall only be obliged to execute an Assignment Agreement delivered to it by the Existing Lender and the New Lender once it is satisfied it has complied with all necessary "know your customer" or similar checks under all applicable laws and regulations in relation to the assignment to such New Lender.

(c) Subject to clause 27.9 (*Pro rata interest settlement*), on the Transfer Date:

(i) the Existing Lender will assign absolutely to the New Lender its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

(ii) the Existing Lender will be released from the obligations (the **Relevant Obligations**) expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(iii) the New Lender shall become a Party as a **Lender** and will be bound by obligations equivalent to the Relevant Obligations.

(d) Lenders may utilise procedures other than those set out in this clause 27.6 to assign their rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with clause 27.5 (*Procedure for transfer*), to obtain a release by that Obligor from the obligations owed to that Obligor by the Lenders nor the assumption of equivalent obligations by a New Lender) **provided that** they comply with the conditions set out in clause 27.2 (*Conditions of assignment or transfer*).

27.7 **Copy of Transfer Certificate or Assignment Agreement to the Company**

The Facility Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Company a copy of that Transfer Certificate or Assignment Agreement.

27.8 **Security over Lenders' rights**

In addition to the other rights provided to Lenders under this clause 27, each Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a) any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)     in the case of any Lender which is a fund, any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i)     release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or other Security for the Lender as a party to any of the Finance Documents; or

(ii)    require any payments to be made by an Obligor or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents.

27.9    **Pro rata interest settlement**

(a)     If the Facility Agent has notified the Lenders that it is able to distribute interest payments on a "pro rata basis" to Existing Lenders and New Lenders then (in respect of any transfer pursuant to clause 27.5 (*Procedure for transfer*) or any assignment pursuant to clause 27.6 (*Procedure for assignment*) the Transfer Date of which, in each case, is after the date of such notification and is not on the last day of an Interest Period):

(i)     any interest or fees in respect of the relevant participation which are expressed to accrue by reference to the lapse of time shall continue to accrue in favour of the Existing Lender up to but excluding the Transfer Date (**Accrued Amounts**) and shall become due and payable to the Existing Lender (without further interest accruing on them) on the last day of the current Interest Period (or, if the Interest Period is longer than six (6) Months, on the next of the dates which falls at six (6) Monthly intervals after the first day of that Interest Period); and

(ii)    the rights assigned or transferred by the Existing Lender will not include the right to the Accrued Amounts so that, for the avoidance of doubt:

(A)    when the Accrued Amounts become payable, those Accrued Amounts will be payable for the account of the Existing Lender; and

(B)    the amount payable to the New Lender on that date will be the amount which would, but for the application of this clause 27.9, have been payable to it on that date, but after deduction of the Accrued Amounts.

(b)     In this clause 27.9, references to **Interest Period** shall be construed to include a reference to any other period for accrual of fees.

# 28      Restriction on Debt Purchase Transactions

28.1    **Prohibition on Debt Purchase Transactions by the Group**

The Company shall not, and shall procure that each other member of the Group shall not, enter into any Debt Purchase Transaction or beneficially own all or any part of the share capital of a company that is a Lender or a party to a Debt Purchase Transaction of the type referred to in paragraphs (b) or (c) of the definition of Debt Purchase Transaction.

28.2    **Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates**

(a)     For so long as a Parent Affiliate:

(i)     beneficially owns a Commitment; or

(ii)     has entered into a sub-participation agreement relating to a Commitment or other agreement or arrangement having a substantially similar economic effect and such agreement or arrangement has not been terminated,

in ascertaining:

(A)     the Majority Lenders; or

(B)     whether:

(1)     any given percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments; or

(2)     the agreement of any specified group of Lenders,

has been obtained to approve any request for a consent, waiver, amendment or other vote under the Finance Documents such Commitment shall be deemed to be zero; and such Parent Affiliate or the person with whom it has entered into such sub-participation, other agreement or arrangement shall be deemed not to be a Lender for the purposes of paragraphs (A) and (B) above (unless in the case of a person not being a Parent Affiliate it is a Lender by virtue otherwise than by beneficially owning the relevant Commitment).

(b)     Each Lender shall, unless such Debt Purchase Transaction is an assignment or transfer, promptly notify the Facility Agent in writing if it knowingly enters into a Debt Purchase Transaction with a Parent Affiliate (a **Notifiable Debt Purchase Transaction**), such notification to be substantially in the form set out in Part I of Schedule 8 (*Forms of Notifiable Debt Purchase Transaction Notice*).

(c)     A Lender shall promptly notify the Facility Agent if a Notifiable Debt Purchase Transaction to which it is a party:

(i)     is terminated; or

(ii)     ceases to be with a Parent Affiliate,

such notification to be substantially in the form set out in Part II of Schedule 8 (*Forms of Notifiable Debt Purchase Transaction Notice*).

(d)     Each Parent Affiliate that is a Lender agrees that:

(i)     in relation to any meeting or conference call to which all the Lenders are invited to attend or participate, it shall not attend or participate in the same if so requested by the Facility Agent or, unless the Facility Agent otherwise agrees, be entitled to receive the agenda or any minutes of the same; and

(ii)     in its capacity as Lender, unless the Facility Agent otherwise agrees, it shall not be entitled to receive any report or other document prepared at the behest of, or on the instructions of, the Facility Agent or one or more of the Lenders.

# 29     Changes to the Obligors

## 29.1     Assignment and transfers by Obligors

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**Additional Borrowers**

29.2 Subject to compliance with the provisions of clause 22.5 *("Know your customer" checks)*, the Company may request that any of its Subsidiaries becomes an Additional Borrower. That Subsidiary shall become an Additional Borrower if:

(a) all the Lenders (or, in the case of a Subsidiary which would be a FATCA FFI or a US Tax Obligor if it became an Additional Borrower, all the Finance Parties) approve the addition of that Subsidiary;

(b) the Company delivers to the Facility Agent a duly completed and executed Accession Letter;

(c) the Subsidiary is (or becomes) a Guarantor prior to becoming a Borrower;

(d) the Company confirms that no Default is continuing or would occur as a result of that Subsidiary becoming an Additional Borrower; and

(e) the Facility Agent has received all of the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*) in relation to that Additional Borrower, each in form and substance satisfactory to the Facility Agent.

In case of an Additional Borrower incorporated under the laws of Spain acceding this Agreement, if requested by the Facility Agent (acting reasonably) within ten (10) Business Days of the date on which the completed and executed Accession Letter has been provided pursuant to the terms of this Agreement, the Accession Letter and any relevant Finance Documents shall be notarized before a Spanish Notary Public, and the parties to the notarial deed shall acknowledge that it qualifies as a "*título ejecutivo*" in case of enforcement in Spain.

29.3 The Facility Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*).

**Resignation of a Borrower**

29.4 The Company may request that a Borrower (other than the Company) ceases to be a Borrower by delivering to the Facility Agent a Resignation Letter.

29.5 The Facility Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(a) the Majority Lenders have consented to the Company's request;

(b) where the Borrower is also a Guarantor (unless its resignation has been accepted in accordance with clause 29.13 (*Resignation of a Guarantor*)), its obligations in its capacity as Guarantor continue to be legal, valid, binding and enforceable and in full force and effect and the amount guaranteed by it as Guarantor is not decreased (and the Company has confirmed this is the case);

(c) no Default is continuing or would result from the acceptance of the Resignation Letter (and the Company has confirmed this is the case); and

(d) the Borrower is under no actual or contingent obligations as a Borrower under any Finance Documents,

whereupon that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents.

29.6    The Facility Agent may, at the cost and expense of the Company, require a legal opinion from counsel to the Facility Agent confirming the matters set out in paragraph 29.5(b) above and the Facility Agent shall be under no obligation to accept a Resignation Letter until it has obtained such opinion in form and substance satisfactory to it.

**Additional Guarantors**

29.7    The Company shall procure that promptly following:

(a)    if requested by the Required Lenders, exchange control approval from the Financial Surveillance Department of the South African Reserve Bank and in any event within 40 Business Days of the granting of the Interim DIP Order, Aegean Bunkering Marine Services Proprietary Limited a limited liability company incorporated in South Africa, shall become an Additional Guarantor in accordance with clauses 29.10 and 29.11 below. The and the Company shall (and shall procure that Aegean Bunkering Marine Services Proprietary Limited) uses best endeavours to obtain the exchange control approval from the Financial Surveillance Department of the South African Reserve Bank as soon as possible for the purpose of becoming an Additional Guarantor.; and

(b)    the Effective Date and in any event by no later than the date falling ten Business Days thereafter, each of Aegean Bunkering (Hong Kong) Limited, a limited liability company incorporated in Hong Kong, and Aegean Caribbean Holdings, Inc. a company incorporated in St Lucia, shall become an Additional Guarantor in accordance with clauses 29.10 and 29.11 below.

29.7 29.8    The Borrowers shall promptly cause each Subsidiary of the Parent formed or acquired after the date of this Agreement, other than any Immaterial Subsidiary, to become an Additional Guarantor. If and when any Subsidiary ceases to be an Immaterial Subsidiary, the Borrower shall promptly cause such Subsidiary become an Additional Guarantor.

29.8 29.9    Notwithstanding the provisions of clause 29.7, the Company may at any time request that any of its Subsidiaries (or any Subsidiaries of the Parent) become an Additional Guarantor.

29.9 29.10    The Company shall procure that each proposed Additional Guarantor pursuant to clauses 29.6 to 29.8 shall comply with the provisions of clause 22.5 ("*Know your customer*" *checks*). An entity shall become an Additional Guarantor upon:

(a)    in the case of an entity which would be a FATCA FFI or a US Tax Obligor if it became an Additional Guarantor, all the Finance Parties approving the addition of that entity;

(b)    the Company delivering to the Facility Agent a duly completed and executed Accession Letter; and

(c)    the Facility Agent having given written confirmation that the provisions of clause 22.5 ("*Know your customer*" *checks*) are satisfied; and

(d)    the Facility Agent having received all of the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the Facility Agent.

29.10 29.11    The Facility Agent shall notify the Company and the Lenders promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 2 of Schedule 2 (*Conditions precedent*).

**Resignation of a Guarantor**

29.11 29.12    The Company may request that a Guarantor (other than the Parent or the Company) ceases to be a Guarantor by delivering to the Facility Agent a Resignation Letter.

29.12 29.13    The Facility Agent shall accept a Resignation Letter and notify the Company and the Lenders of its acceptance if:

(a)     no Default is continuing or would result from the acceptance of the Resignation Letter (and the Company has confirmed this is the case);

(b)     where the Guarantor is also a Borrower, it is under no actual or contingent obligations as a Borrower and has resigned and ceased to be a Borrower under clause 29.4 (*Resignation of a Borrower*);

(c)     all Lenders have consented to the Company's request; and

(d)     no payment is due from the Guarantor under this Agreement.

**Compulsory resignation of FATCA FFIs and US Tax Obligors**

29.13 29.14    If so directed by the Facility Agent (acting on the instructions of all Lenders), the Company shall procure that any Obligor which is a FATCA FFI or a US Tax Obligor shall resign as a Borrower or a Guarantor (as the case may be) prior to the earliest FATCA Application Date relating to any payment by that Obligor (or any payment by the Facility Agent which relates to a payment by that Obligor). For the purposes of clause 29.13(c) (*Resignation of a Guarantor*) each Lender consents to the resignation of a Guarantor required pursuant to this clause 29.14.

**Repetition of Representations**

29.14 29.15    Delivery of an Accession Letter constitutes confirmation by the relevant Subsidiary that the Repeating Representations are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

## Section 10
## The Finance Parties

# 30 Role of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Overdraft Bank and Others

### 30.1 Appointment of the Facility Agent and the Collateral Management Agent

(a) Each of the Issuing Bank, the Overdraft Bank and the Lenders appoints the Facility Agent and the Collateral Management Agent to act as its agent under and in connection with the Finance Documents.

(b) Each of the Issuing Bank, the Overdraft Bank and the Lenders authorises the Facility Agent and the Collateral Management Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Facility Agent and the Collateral Management Agent (as the case may be) under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions (even if it involves self-contracting (*autocontratación*), multi-representation or conflict of interest), including, without limitation, to enter and raise into Spanish public status before a Spanish public notary any document related to this mandate and, specifically, those deemed necessary or appropriate according to the mandate received (including, but not limited to, documents of formalisation, acknowledgement, confirmation, modification or release, acceptance of any security interest and acceptance of acknowledgement of debts by Obligors).

### 30.2 Instructions

(a) Each of the Facility Agent and the Collateral Management Agent shall:

    (i) unless a contrary indication appears in a Finance Document, exercise or refrain from exercising any right, power, authority or discretion vested in it as Facility Agent or the Collateral Management Agent (as the case may be) in accordance with any instructions given to it by:

        (A) all Lenders if the relevant Finance Document stipulates the matter is an all Lender decision; or

        (B) in all other cases, the Majority Lenders; and

    (ii) not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above.

(b) Each of the Facility Agent and the Collateral Management Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or, if the relevant Finance Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Facility Agent and the Collateral Management Agent may refrain from acting unless and until they receive those instructions or that clarification.

(c) Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under the relevant Finance Document and unless a contrary indication appears in a Finance Document, any instructions given to the Facility Agent or the Collateral Management Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Finance Parties save for the Security Agent.

(d) Each of the Facility Agent and the Collateral Management Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has

received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability which it may incur in complying with those instructions.

(e)     In the absence of instructions, each of the Facility Agent and the Collateral Management Agent may act (or refrain from acting) as it considers to be in the best interest of the Lenders.

(f)     The Facility Agent and the Collateral Management Agent are not authorised to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings relating to any Finance Document.  This paragraph (f) shall not apply to any legal or arbitration proceeding relating to the perfection, preservation or protection of rights under the Transaction Security Documents or enforcement of the Transaction Security or Transaction Security Documents.

## 30.3     Duties of the Facility Agent and the Collateral Management Agent

(a)     The duties of the Facility Agent and the Collateral Management Agent under the Finance Documents are solely mechanical and administrative in nature.

(b)     Subject to paragraph (c) below, each of the Facility Agent and the Collateral Management Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Facility Agent or the Collateral Management Agent for that Party by any other Party.

(c)     Without prejudice to clause 27.7 (*Copy of Transfer Certificate or Assignment Agreement to the Company*) and clause 6.22, paragraph (a) above shall not apply to any Transfer Certificate or any Assignment Agreement.

(d)     Except where a Finance Document specifically provides otherwise, neither the Facility Agent and the Collateral Management Agent is obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(e)     If the Facility Agent or the Collateral Management Agent receives notice from a Party referring to this Agreement, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(f)     If the Facility Agent or the Collateral Management Agent is aware of the non-payment of any principal, interest, up-front fee or other fee payable to a Finance Party (other than the Facility Agent, the Collateral Management Agent or the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

(g)     The Facility Agent shall provide to the Company within five (5) Business Days of a request by the Company (but no more frequently than once per calendar month), a list (which may be in electronic form) setting out the names of the Lenders as at that Business Day, their respective Commitments, the address and email (and the department or officer, if any, for whose attention any communication is to be made) of each Lender for any communication to be made or document to be delivered under or in connection with the Finance Documents, the electronic mail address and/or any other information required to enable the sending and receipt of information by electronic mail or other electronic means to and by each Lender to whom any communication under or in connection with the Finance Documents may be made by that means and the account details of each Lender for any payment to be distributed by the Facility Agent to that Lender under the Finance Documents.

(h)     Each of the Facility Agent and the Collateral Management Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

(i) Each Lender instructs, authorises and agrees with the Facility Agent:

(i) to execute and deliver the Intercreditor Agreement on its behalf;

(ii) to exercise all of the Facility Agent's rights and to comply with all of its obligations under the Intercreditor Agreement;

(iii) to take actions on its behalf as is contemplated by the terms of the Intercreditor Agreement; and

(iv) that at all times following the execution and delivery of the Intercreditor Agreement such Lender (and each of its successors and assigns) shall be bound by the terms thereof.

30.4 **No fiduciary duties**

(a) Nothing in any Finance Document constitutes the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank as a trustee or fiduciary of any other person.

(b) None of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

30.5 **Business with the Group**

The Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank and the Issuing Bank may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

30.6 **Rights and discretions**

(a) Each of the Facility Agent, the Issuing Bank, the Overdraft Bank and the Collateral Management Agent may:

(i) rely on any representation, communication, notice or document (including, without limitation, any notice given by a Lender pursuant to paragraphs (b) or (c) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*)) believed by it to be genuine, correct and appropriately authorised;

(ii) assume that:

(A) any instructions received by it from the Majority Lenders, any Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents; and

(B) unless it has received notice of revocation, that those instructions have not been revoked; and

(iii) rely on a certificate from any person:

(A) as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(B) to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b) Each of the Facility Agent and the Collateral Management Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Lenders) that:

(i) no Default has occurred (unless it has actual knowledge of a Default arising under clause 26.1 (*Non-payment*));

(ii) any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised;

(iii) any notice or request made by the Company (other than a Utilisation Request) is made on behalf of and with the consent and knowledge of all the Obligors; and

(iv) no Notifiable Debt Purchase Transaction:

(A) has been entered into;

(B) has been terminated; or

(C) has ceased to be with a Parent Affiliate.

(c) Each of the Facility Agent and the Collateral Management Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d) Without prejudice to the generality of paragraph (c) above or paragraph (e) below, each of the Facility Agent and the Collateral Management Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to it (and so separate from any lawyers instructed by the Lenders) if it in its reasonable opinion deems this to be desirable.

(e) Each of the Facility Agent and the Collateral Management Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by it or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f) Each of the Facility Agent and the Collateral Management Agent may act in relation to the Finance Documents through its officers, employees and agents and shall not:

(i) be liable for any error of judgment made by any such person; or

(ii) be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part, of any such person,

unless such error or such loss was directly caused by its gross negligence or wilful misconduct.

(g) Unless a Finance Document expressly provides otherwise each of the Facility Agent and the Collateral Management Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement.

(h) Notwithstanding any other provision of any Finance Document to the contrary, none of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank is obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i) The Facility Agent is not obliged to disclose to any Finance Party any details of the rate notified to the Facility Agent by any Lender or the identity of any such Lender for the purpose of paragraph (a)(ii) of clause 13.2 (*Market Disruption*).

(j) Notwithstanding any provision of any Finance Document to the contrary, neither the Facility Agent nor the Collateral Management Agent is obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(k) Without prejudice to the generality of paragraph (g) above, the Facility Agent:

(i) may disclose; and

(ii) on the written request of the Company or the Majority Lenders shall, as soon as reasonably practicable, disclose,

the identity of a Non-Acceptable Bank to the Company and the other Finance Parties.

## 30.7 Responsibility for documentation

None of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Overdraft Bank or the Issuing Bank is responsible or liable for:

(a) the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Issuing Bank, the Overdraft Bank, an Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into made or executed in anticipation of, under or in connection with any Finance Document;

(b) the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security; or

(c) any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

## 30.8 No duty to monitor

Neither the Facility Agent nor the Collateral Management Agent shall be bound to enquire:

(a) whether or not any Default has occurred;

(b) as to the performance, default or any breach by any Party of its obligations under any Finance Document;

(c) whether any other event specified in any Finance Document has occurred; or

(d) whether at any time, including upon receipt of a Utilisation Request and upon a Utilisation occurring hereunder, the Borrowing Base Amount is or will continue to be zero or a positive number, in respect of which all Finance Parties shall be entitled to rely on the Borrowers to comply with their obligations under this Agreement to ensure that at all times the Borrowing Base Amount is zero or a positive number.

## 30.9 Exclusion of liability

(a) Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Facility Agent , Issuing Bank, the Overdraft Bank or the Collateral Management Agent, neither the Facility Agent, Issuing Bank, Overdraft Bank nor the Collateral Management Agent will be liable

(including, without limitation, for negligence or any other category of liability whatsoever) for:

(i) any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security, unless directly caused by its gross negligence or wilful misconduct;

(ii) exercising, or not exercising, any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security; or

(iii) without prejudice to the generality of paragraphs (i) and (ii) above, any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of:

(A) any act, event or circumstance not reasonably within its control; or

(B) the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets (including any Disruption Event); breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b) No Party (other than the Facility Agent) may take any proceedings against any officer, employee or agent of the Facility Agent, in respect of any claim it might have against the Facility Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Facility Agent may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(c) No Party (other than the Collateral Management Agent) may take any proceedings against any officer, employee or agent of the Collateral Management Agent, in respect of any claim it might have against the Collateral Management Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Collateral Management Agent may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(d) No Party (other than the Issuing Bank) may take any proceedings against any officer, employee or agent of the Issuing Bank, in respect of any claim it might have against the Issuing Bank or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document and any officer, employee or agent of the Issuing Bank may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(e) Neither the Facility Agent nor the Collateral Management Agent will be liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by it if it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(f) Nothing in this Agreement shall oblige the Facility Agent, the Collateral Management Agent or the Co-Ordinator to carry out:

    (i) any "know your customer" or other checks in relation to any person; or

    (ii) any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Lender,

on behalf of any Lender and each Lender confirms to the Facility Agent, the Collateral Management Agent and the Co-Ordinator that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Facility Agent, the Collateral Management Agent or the Co-Ordinator.

(g) Without prejudice to any provision of any Finance Document excluding or limiting either the Facility Agent's or the Collateral Management Agent's liability, any liability of the Facility Agent or the Collateral Management Agent arising under or in connection with any Finance Document or the Transaction Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Facility Agent or the Collateral Management Agent or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Facility Agent or the Collateral Management Agent at any time which increase the amount of that loss. In no event shall the Facility Agent or the Collateral Management Agent be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Facility Agent has been advised of the possibility of such loss or damages.

## 30.10 Lenders' indemnity to the Facility Agent and the Collateral Management Agent

(a) Each Lender shall (in proportion to its share of the Total Commitments or, if the Total Commitments are then zero, to its share of the Total Commitments immediately prior to their reduction to zero) indemnify the Facility Agent and the Collateral Management Agent, within three (3) Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Facility Agent and the Collateral Management Agent (as the case may be) (otherwise than by reason of the Facility Agent's and the Collateral Management Agent's (as the case may be) gross negligence or wilful misconduct) (or, in the case of any cost, loss or liability pursuant to clause 34.11 (*Disruption to Payment Systems etc.*) notwithstanding the Facility Agent's and the Collateral Management Agent's (as the case may be) negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent or the Collateral Management Agent (as the case may be) in acting as Facility Agent or Collateral Management Agent under the Finance Documents (unless the Facility Agent or the Collateral Management Agent (as the case may be) has been reimbursed by an Obligor pursuant to a Finance Document).

(b) Subject to paragraph (c) below, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Facility Agent or the Collateral Management Agent pursuant to paragraph (a) above.

(c) Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Facility Agent or the Collateral Management Agent to an Obligor.

## 30.11 Resignation of the Facility Agent and the Collateral Management Agent

(a) The Facility Agent and/or the Collateral Management Agent may resign and appoint one of their respective Affiliates acting through an office:

(i)     in the Netherlands; or

(ii)    elsewhere in the European Union or the United Kingdom, provided that, if on the basis of the laws and regulations in force prior to the appointment, such appointment would result in any amount becoming payable under or pursuant to clause 15 (*Tax gross-up and indemnities*) or clause 16 (*Increased Costs*) the Borrowers may refuse the resignation and/or appointment;

as successor by giving notice to the Lenders and the Company.

(b)    Alternatively the Facility Agent and/or the Collateral Management Agent may resign by giving thirty (30) days' notice to the Lenders and the Company, in which case the Majority Lenders (after consultation with the Company) may appoint a successor Facility Agent and/or the Collateral Management Agent (as the case may be).

(c)    If the Majority Lenders have not appointed a successor Facility Agent and/or the Collateral Management Agent in accordance with paragraph (b) above within twenty (20) days after notice of resignation was given, the retiring Facility Agent and/or the Collateral Management Agent (as the case may be) (after consultation with the Company) may appoint a successor Facility Agent and/or Collateral Management Agent (as the case may be) (acting through an office in the Netherlands or, subject to paragraph (a)(ii) above, elsewhere in the European Union or the United Kingdom).

(d)    If the Facility Agent or the Collateral Management Agent wishes to resign because (acting reasonably) it has concluded that it is no longer appropriate for it to remain as agent and the Facility Agent or the Collateral Management Agent is entitled to appoint a successor under paragraph (c) above, it may (if it concludes (acting reasonably) that it is necessary to do so in order to persuade the proposed successor Facility Agent or Collateral Management Agent to become a party to this Agreement in such capacity) agree with the proposed successor amendments to this clause 30 and any other term of this Agreement dealing with the rights or obligations of the Facility Agent or Collateral Management Agent (as the case may be) consistent with then current market practice for the appointment and protection of corporate trustees together with any reasonable amendments to the agency fee payable under this Agreement which are consistent with the successor Facility Agent's or Collateral Management Agent's normal fee rates and those amendments will bind the Parties.  Any amendments relating to matters which are not merely technical or administrative and/or relating to agency fees shall be subject to the prior consent of the Majority Lenders.

(e)    The retiring Facility Agent and/or Collateral Management Agent shall make available to the successor such documents and records and provide such assistance as the successor may reasonably request for the purposes of performing its functions as Facility Agent and/or Collateral Management Agent under the Finance Documents.   The Company shall, within three (3) Business Days of demand, reimburse the retiring Facility Agent and/or Collateral Management Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

(f)    The Facility Agent's or the Collateral Management Agent's resignation notice shall only take effect upon the appointment of a successor.

(g)    Upon the appointment of a successor, the retiring Facility Agent and/or Collateral Management Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (e) above) but shall remain entitled to the benefit of clause 17.3 (*Indemnity to the Facility Agent and/or Collateral Management Agent*) and this clause 30 (and any agency fees for the account of the retiring Facility Agent and/or Collateral Management Agent (as the case may be) shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

(h) The Facility Agent shall resign in accordance with clause 30.11 above (and, to the extent applicable, shall use reasonable endeavours to appoint a successor pursuant to such clause) if on or after the date which is three (3) months before the earliest FATCA Application Date relating to any payment to the Facility Agent under the Finance Documents, either:

(i) the Facility Agent fails to respond to a request under clause 15.7 (*FATCA Information*) and the Company or a Lender reasonably believes that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(ii) the information supplied by the Facility Agent pursuant to clause 15.7 (*FATCA Information*) indicates that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(iii) the Facility Agent notifies the Company and the Lenders that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

and (in each case) the Company or a Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Facility Agent were a FATCA Exempt Party, and the Company or that Lender, by notice to the Facility Agent, requires it to resign.

30.12 **Replacement of the Facility Agent or Collateral Management Agent**

(a) After consultation with the Company, the Majority Lenders may, by giving thirty (30) days' notice to the Facility Agent or Collateral Management Agent (as the case may be) (or, in respect of the Facility Agent, at any time the Facility Agent is an Impaired Agent, by giving any shorter notice determined by the Majority Lenders) replace the Facility Agent or Collateral Management Agent (as the case may be) by appointing a successor.

(b) The retiring Facility Agent or Collateral Management Agent (as the case may be) shall (at its own cost if it is an Impaired Agent and otherwise at the expense of the Lenders) make available to its successor such documents and records and provide such assistance as the successor may reasonably request for the purposes of performing its functions as Facility Agent or Collateral Management Agent (as the case may be) under the Finance Documents.

(c) The appointment of the successor Facility Agent or Collateral Management Agent (as the case may be) shall take effect on the date specified in the notice from the Majority Lenders to the retiring Facility Agent or Collateral Management Agent (as the case may be). As from this date, the retiring Facility Agent or Collateral Management Agent (as the case may be) shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) above) but shall remain entitled to the benefit of clause 17.3 (*Indemnity to the Facility Agent or Collateral Management Agent*) and this clause 30 (and any agency fees for the account of the retiring Facility Agent or Collateral Management Agent (as the case may be) shall cease to accrue from (and shall be payable on) that date).

(d) Any successor Facility Agent or Collateral Management Agent (as the case may be) and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

30.13 **Confidentiality**

(a) In acting as agent for the Finance Parties, the Facility Agent and Collateral Management Agent (as the case may be) shall be regarded as acting through its agency or collateral management division (as applicable), which shall be treated as a separate entity from any other of its divisions or departments.

(b)     If information is received by another division or department of the Facility Agent or Collateral Management Agent (as the case may be), it may be treated as confidential to that division or department and the Facility Agent or Collateral Management Agent (as the case may be) shall not be deemed to have notice of it.

(c)     Notwithstanding any other provision of any Finance Document to the contrary, none of the Facility Agent, the Collateral Management Agent nor the Co-Ordinator is obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 30.14     Relationship with the Lenders

(a)     Subject to clause 27.9 (*Pro rata interest settlement*), each of the Facility Agent and Collateral Management Agent may treat the person shown in its records as Lender at the opening of business (in the place of the Facility Agent or Collateral Management Agent (as the case may be) principal office as notified to the Finance Parties from time to time) as the Lender acting through its Facility Office:

(i)     entitled to or liable for any payment due under any Finance Document on that day; and

(ii)     entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered on that day,

unless it has received not less than five (5) Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b)     Any Lender may by notice to the Facility Agent and Collateral Management Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents.  Such notice shall contain the address, email and (where communication by electronic mail or other electronic means is permitted under clause 36.6 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, electronic mail address, department and officer by that Lender for the purposes of clause 36.2 (*Addresses*) and paragraph (a)(ii) of clause 36.6 (*Electronic communication*) and the Facility Agent and Collateral Management Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

## 30.15     Credit appraisal by the Lenders and Issuing Bank

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Lender and Issuing Bank confirms to the Facility Agent, the Collateral Management Agent and each Issuing Bank that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)     the financial condition, status and nature of each member of the Group;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)     whether that Lender or Issuing Bank has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with

any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(d) the adequacy, accuracy or completeness of the Reports and any other information provided by the Facility Agent, the Collateral Management Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e) the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 30.16 Compliance appraisal by the Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any compliance issues, each Lender confirms to the Facility Agent and the Collateral Management Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all compliance related risks arising under or in connection with any activities of the Obligors, the Spanish Pledgors and the South African Pledge Counterparties including but not limited to:

(a) activities in the Sensitive Zones;

(b) any Utilisation of a Fronted Facility affected by compliance related matters; and

(c) the adequacy, accuracy or completeness of any information the Facility Agent or the Collateral Management Agent may (but has no obligation to) communicate to a Lender in relation to a counterparty (whether supplier or purchaser), products, origins or nature of a transaction.

## 30.17 Reference Banks

If a Reference Bank (or, if a Reference Bank is not a Lender, the Lender of which it is an Affiliate) ceases to be a Lender, the Facility Agent shall (in consultation with the Company) appoint another Lender or an Affiliate of a Lender to replace that Reference Bank.

## 30.18 Facility Agent's and Collateral Management Agent's management time

(a) Any amount payable to the Facility Agent or the Collateral Management Agent under clause 17.3 (*Indemnity to the Facility Agent or Collateral Management Agent*), clause 19 (*Costs and expenses*) and clause 30.10 (*Lenders' indemnity to the Facility Agent and the Collateral Management Agent*) shall include the cost of utilising the Facility Agent's or Collateral Management Agent's (as the case may be) management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Facility Agent or the Collateral Management Agent (as the case may be) may notify to the Company and the Lenders, and is in addition to any fee paid or payable to the Facility Agent or the Collateral Management Agent under clause 14 (*Fees*).

(b) Any cost of utilising the Facility Agent's or Collateral Management Agent's (as the case may be) management time or other resources shall include, without limitation, any such costs in connection with clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*).

30.19    **Deduction from amounts payable by the Facility Agent**

If any Party owes an amount to the Facility Agent or the Collateral Management Agent under the Finance Documents the Facility Agent or the Collateral Management Agent  (as the case may be) may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Facility Agent or the Collateral Management Agent (as the case may be) would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of the amount owed.  For the purposes of the Finance Documents that Party shall be regarded as having received any amount so deducted.

# 31    The Security Agent

31.1    **Security Agent as trustee**

(a)    Subject to clause 31.2 (*German law security property*) below, the Security Agent declares that it holds the Transaction Security (to the extent possible under applicable law) on trust for the Secured Parties on the terms contained in this Agreement.  For the purpose of the Moroccan Pledge, the Security Agent is irrevocably appointed by the Secured Parties as their agent for the purpose of executing the Moroccan Pledge, and to register, manage and enforce the Moroccan Pledge on the terms of this clause 31.

(b)    Each of the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Issuing Bank and each Lender authorises the Security Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Finance Documents and any Multi-Party TPA Agreement together with any other incidental rights, powers, authorities and discretions (even if it involves self-contracting (*autocontratación*), multi-representation or conflict of interest), including, without limitation, to enter and raise into Spanish public status before a Spanish public notary any document related to this mandate and, specifically, those deemed necessary or appropriate according to the mandate received (including, but not limited to, documents of formalisation, acknowledgement, confirmation, modification or release, acceptance of any security interest and acceptance of acknowledgement of debts by Obligors).

31.2    **German law security property**

(a)    Each of the Secured Parties (other than the Security Agent) hereby appoints the Security Agent as trustee (*Treuhänder*) and administrator for the purpose of accepting and administering the Charged Property governed by German law (**German Security Property**) for and on behalf of the other Secured Parties.

(b)    The Security Agent shall:

(i)    hold and administer and, as the case may be, release any German Security Property which is security assigned (*Sicherungseigentum/Sicherungsabtretung*) or otherwise transferred under a non-accessory security right (*nichtakzessorische Sicherheit*) to it as trustee (*treuhänderisch*) for the benefit of the Secured Parties; and

(ii)    administer and, as the case may be, release any German Security Property which is pledged (*Verpfändung*) or otherwise transferred to the Secured Parties under an accessory security right (*akzessorische Sicherheit*) as agent.

(c)    Each of the Secured Parties hereby authorises the Security Agent (whether or not by or through employees or agents):

(i)    to exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the Security Agent under the German Security Property together with such powers and discretions as are reasonably incidental thereto;

(ii) to take such action on its behalf as may from time to time be authorised under or in accordance with the German Security Property; and

(iii) to accept as its representative (*Stellvertreter*) any pledge or other creation of any accessory security right granted in favour of such Secured Parties in connection with the Debt Documents and to agree to and execute on its behalf as its representative (*Stellvertreter*) any amendments, releases and/or alterations to any German Security Property which creates a pledge or any other accessory security right (*akzessorische Sicherheit*) including the release or confirmation of release of such German Security Property.

(d) Each Secured Party releases the Security Agent from any applicable restrictions on entering into any transaction as a representative of:

(i) two or more principals contracting with each other; and

(ii) one or more principals with whom it is contracting in its own name,

including in particular from the restrictions provided for in section 181 of the German Civil Code (*Bürgerliches Gesetzbuch*), and similar restrictions applicable to it pursuant to any other applicable law, in each case to the extent legally possible to such Secured Party. A Secured Party which is barred by its constitutional documents or by-laws from granting such exemption shall notify the Security Agent accordingly.

(e) The Security Agent shall be entitled to grant sub-powers of attorney (and shall be entitled to release any sub-attorney from the restrictions referred to in paragraph (d) above).

(f) Each Secured Party hereby ratifies and approves all acts and declarations previously done by the Security Agent on such Secured Party's behalf.

### 31.3 Parallel debt (Covenant to pay the Security Agent)

(a) Notwithstanding any other provision of this Agreement, each Obligor hereby irrevocably and unconditionally undertakes to pay to the Security Agent, as creditor in its own right and not as representative of the other Secured Parties, sums equal to and in the currency of each amount payable by the Obligors to each of the Secured Parties under each of the Finance Documents as and when that amount falls due for payment under the relevant Finance Document or would have fallen due but for any discharge resulting from failure of another Secured Party to take appropriate steps, in insolvency proceedings affecting the Obligor, to preserve its entitlement to be paid that amount.

(b) The Security Agent shall have its own independent right to demand payment of the amounts payable by the Obligors under this clause 31.3 irrespective of any discharge of the Obligor's obligation to pay those amounts to the other Secured Parties resulting from failure by them to take appropriate steps, in insolvency proceedings affecting the Obligor, to preserve their entitlement to be paid those amounts.

(c) Any amount due and payable by an Obligor to the Security Agent under this clause 31.3 shall be decreased to the extent that the other Secured Parties have received (and are able to retain) payment in full of the corresponding amount under the other provisions of the Finance Documents and any amount due and payable by the Obligors to the other Secured Parties under those provisions shall be decreased to the extent that the Security Agent has received (and is able to retain) payment in full of the corresponding amount under this clause 31.3.

### 31.4 Enforcement through Security Agent only

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the First Security or to exercise any right, power, authority or discretion arising under the First Security Documents except through the Security Agent.

If any Secured Party (other than the Security Agent) is a party to any of the Spanish Pledges it shall promptly upon being requested by the Facility Agent to do so grant a power of attorney or other sufficient authority to the Security Agent to enable the Security Agent to exercise any rights, discretions or powers or to grant any consents or releases under such Spanish Pledges.

31.5    **Instructions**

(a)    The Security Agent shall:

(i)    subject to paragraphs (d) and (e) below exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by the Majority Lenders (or the Facility Agent on their behalf);

(ii)    not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above (or if this Agreement stipulates the matter is a decision for any other Lender or group of Lenders in accordance with instructions given to it by that Lender or group of Lenders).

(b)    The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Lenders (or the Facility Agent on their behalf) (or, if this Agreement stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Security Agent may refrain from acting unless and until it receives those instructions or that clarification.

(c)    Save in the case of decisions stipulated to be a matter for any other Lender or group of Lenders under this Agreement and unless a contrary intention appears in this Agreement, any instructions given to the Security Agent by the Majority Lenders shall override any conflicting instructions given by any other Parties and will be binding on all Secured Parties.

(d)    Paragraph (a) above shall not apply:

(i)    where a contrary indication appears in this Agreement;

(ii)    where this Agreement requires the Security Agent to act in a specified manner or to take a specified action; or

(iii)    in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured Parties including, without limitation, clauses 31.8 (*No duty to account*) to clause 31.13 (*Exclusion of liability*), clause 31.16 (*Confidentiality*) to clause 31.22 (*Custodians and nominees*) and clause 31.25 (*Acceptance of title*) to clause 31.29 (*Disapplication of Trustee Acts*).

(e)    The Security Agent may refrain from acting in accordance with any instructions of any Lender or group of Lenders until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Finance Documents and which may include payment in advance) for any cost, loss or liability (together with any associated VAT) which it may incur in complying with those instructions.

(f)    Without prejudice to the provisions of the remainder of this clause 31.5, in the absence of instructions, the Security Agent may act (or refrain from acting) as it considers in its discretion to be appropriate.

31.6 **Duties of the Security Agent**

(a) The Security Agent's duties under the Finance Documents are solely mechanical and administrative in nature.

(b) The Security Agent shall promptly:

(i) forward to the Facility Agent a copy of any document received by the Security Agent from any Obligor, any Spanish Pledgor or any South African Pledge Counterparty under any Finance Document; and

(ii) forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

(c) Except where a Finance Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d) If the Security Agent receives notice from a Party referring to any Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the Facility Agent.

(e) The Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Finance Documents to which it is expressed to be a party (and no others shall be implied).

31.7 **No fiduciary duties to Obligors**

Nothing in this agreement constitutes the Security Agent as an agent, trustee or fiduciary of any Obligor.

31.8 **No duty to account**

The Security Agent shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

31.9 **Business with the Group**

The Security Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group.

31.10 **Rights and discretions**

(a) The Security Agent may:

(i) rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(ii) assume that:

(A) any instructions received by it from the Majority Lenders, the Lenders or any group of Lenders are duly given in accordance with the terms of the Finance Documents;

(B) unless it has received actual notice of revocation, that those instructions have not been revoked; and

<blockquote>
<blockquote>
<blockquote>
(C) if it receives any instructions to act in relation to the Transaction Security, that all applicable conditions under the Finance Documents for so acting have been satisfied; and
</blockquote>
</blockquote>

(iii) rely on a certificate from any person:

<blockquote>
(A) as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(B) to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.
</blockquote>
</blockquote>

(b) The Security Agent may assume (unless it has received notice to the contrary in its capacity as security trustee for the Secured Parties) that:

<blockquote>
(i) no Default has occurred;

(ii) any right, power, authority or discretion vested in any Party or any group of Lenders has not been exercised; and

(iii) any notice made by the Company is made on behalf of and with the consent and knowledge of all the Obligors.
</blockquote>

(c) The Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d) Without prejudice to the generality of paragraph (c) above or paragraph (e) below, the Security Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Security Agent (and so separate from any lawyers instructed by the Lenders and/or the Facility Agent) if the Security Agent in its reasonable opinion deems this to be desirable.

(e) The Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Secured Party) and shall not be responsible or liable for any losses to any person, any diminution in value or any liability arising as a result of its so relying.

(f) The Security Agent, any Receiver and any Delegate may act in relation to the Finance Documents and the Transaction Security through its officers, employees and agents and shall not:

<blockquote>
(i) be liable for any error of judgment made by any such person; or

(ii) be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,
</blockquote>

unless such error or such loss was directly caused by the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct.

(g) Unless this Agreement expressly specifies otherwise, the Security Agent may disclose to any other Party any information it reasonably believes it has received as security trustee under this Agreement.

(h) Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would, or might in its
</blockquote>

reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i)     Notwithstanding any provision of any Finance Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

### 31.11     Responsibility for documentation

None of the Security Agent, any Receiver nor any Delegate is responsible or liable for:

(a)     the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent, an Obligor or any other person in or in connection with any Finance Document or the transactions contemplated in the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security; or

(c)     any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

### 31.12     No duty to monitor

The Security Agent shall not be bound to enquire:

(a)     whether or not any Default has occurred;

(b)     as to the performance, default or any breach by any Party of its obligations under any Finance Document; or

(c)     whether any event specified in any Finance Document has occurred.

### 31.13     Exclusion of liability

(a)     Without limiting paragraph (b) below (and without prejudice to any other provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate), none of the Security Agent, any Receiver nor any Delegate will be liable for:

(i)     any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Finance Document or the Transaction Security unless directly caused by its gross negligence or wilful misconduct;

(ii)    exercising or not exercising any right, power, authority or discretion given to it by, or in connection with, any Finance Document, the Transaction Security or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Finance Document or the Transaction Security;

(iii)   any shortfall which arises on the enforcement or realisation of the Transaction Security; or

(iv)     without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs, losses, diminution in value or liability whatsoever arising as a result of:

(A)     any act, event or circumstance not reasonably within its control; or

(B)     the general risks of investment in, or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)     No Party (other than the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document or any Transaction Security and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this clause subject to clause 1.5 (*Third party rights*) and the provisions of the Third Parties Act.

(c)     Nothing in this Agreement shall oblige the Security Agent to carry out:

(i)     any "know your customer" or other checks in relation to any person; or

(ii)     any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any other Secured Party,

on behalf of any other Secured Party and each other Secured Party confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

(d)     Without prejudice to any provision of any Finance Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate, any liability of the Security Agent, any Receiver or Delegate arising under or in connection with any Finance Document or the Transaction Security shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate (as the case may be) or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, Receiver or Delegate (as the case may be) at any time which increase the amount of that loss. In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Security Agent, Receiver or Delegate (as the case may be) has been advised of the possibility of such loss or damages.

31.14     **Lenders' indemnity to the Security Agent**

(a)     Each Lender shall (in the proportion that its Commitments bear to the Total Commitments for the time being (or, if the Total Commitments are zero, immediately prior to their being reduced to zero)), indemnify the Security Agent and every Receiver and every Delegate, within three (3) Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the relevant Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or

Delegate under, or exercising any authority conferred under, the Debt Documents (unless the relevant Security Agent, Receiver or Delegate has been reimbursed by an Obligor pursuant to a Finance Document).

(b) Subject to paragraph (c) below, the Company shall immediately on demand reimburse any Lender for any payment that Lender makes to the Security Agent pursuant to paragraph (a) above.

(c) Paragraph (b) above shall not apply to the extent that the indemnity payment in respect of which the Lender claims reimbursement relates to a liability of the Security Agent to an Obligor.

## 31.15    Resignation of the Security Agent

(a) The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the Lenders and the Company.

(b) Alternatively the Security Agent may resign by giving thirty (30) days' notice to the Lenders and the Company, in which case the Majority Lenders may appoint a successor Security Agent.

(c) If the Majority Lenders have not appointed a successor Security Agent in accordance with paragraph (b) above within twenty (20) days after notice of resignation was given, the retiring Security Agent (after consultation with the Facility Agent) may appoint a successor Security Agent.

(d) The retiring Security Agent shall make available to the successor Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Finance Documents.  The Company shall, within three (3) Business Days of demand, reimburse the retiring Security Agent for the amount of all costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

(e) The Security Agent's resignation notice shall only take effect upon:

(i) the appointment of a successor; and

(ii) the transfer of all the Transaction Security to that successor.

(f) Upon the appointment of a successor, the retiring Security Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (b) of clause 31.27 (*Winding up of trust*) and paragraph (d) above) but shall remain entitled to the benefit of this clause 31 and clause 17.4 (*Indemnity to the Security Agent*) (and any Security Agent fees for the account of the retiring Security Agent shall cease to accrue from (and shall be payable on) that date).  Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

(g) The Majority Lenders may, by notice to the Security Agent, require it to resign in accordance with paragraph (b) above.  In this event, the Security Agent shall resign in accordance with paragraph (b) above.

## 31.16    Confidentiality

(a) In acting as trustee for the Secured Parties, the Security Agent shall be regarded as acting through its trustee division which shall be treated as a separate entity from any other of its divisions or departments.

(b)     If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it.

(c)     Notwithstanding any other provision of any Finance Document to the contrary, the Security Agent is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

## 31.17     Information from the Lenders

Each Lender shall supply the Security Agent with any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.

## 31.18     Credit appraisal by the Secured Parties

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Finance Document, each Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)     the financial condition, status and nature of each member of the Group;

(b)     the legality, validity, effectiveness, adequacy or enforceability of any Finance Document, the Transaction Security and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(c)     whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Finance Document, the Transaction Security, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document or the Transaction Security;

(d)     the adequacy, accuracy or completeness of any information provided by the Security Agent, any Party or by any other person under or in connection with any Finance Document, the transactions contemplated by any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(e)     the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property, the priority of any of the Transaction Security or the existence of any Security affecting the Charged Property.

## 31.19     Reliance and engagement letters

The Security Agent may obtain and rely on any certificate or report from any Obligor's auditor and may enter into any reliance letter or engagement letter relating to that certificate or report on such terms as it may consider appropriate (including, without limitation, restrictions on the auditor's liability and the extent to which that certificate or report may be relied on or disclosed).

## 31.20     No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

(a)     require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor or any Spanish Pledgor to any of the Charged Property;

(b)     obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Finance Document or the Transaction Security;

(c)     register, file or record or otherwise protect any of the Transaction Security (or the priority of any of the Transaction Security) under any law or regulation or to give notice to any person of the execution of any Finance Document or of the Transaction Security;

(d)     take, or to require any Obligor or any Spanish Pledgor to take, any step to perfect its title to any of the Charged Property or to render the Transaction Security effective or to secure the creation of any ancillary Security under any law or regulation; or

(e)     require any further assurance in relation to any Transaction Security Document.

## 31.21    Insurance by Security Agent

(a)     The Security Agent shall not be obliged:

(i)     to insure any of the Charged Property;

(ii)    to require any other person to maintain any insurance; or

(iii)   to verify any obligation to arrange or maintain insurance contained in any Finance Document.

and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

(b)     Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Majority Lenders request it to do so in writing and the Security Agent fails to do so within fourteen (14) days after receipt of that request.

## 31.22    Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the trust created under this Agreement and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

## 31.23    Delegation by the Security Agent

(a)     Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it as Security Agent, Receiver or Delegate.

(b)     That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

(c)     The Security Agent, Receiver or Delegate shall not be bound to supervise, or be in any way responsible for any loss incurred by reason of any misconduct, omission or default on the part of, any such delegate or sub-delegate.

31.24 **Additional Security Agents**

(a) The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it:

(i) if it considers that appointment to be in the interests of the Secured Parties; or

(ii) for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(iii) for obtaining or enforcing any judgment in any jurisdiction,

and the Security Agent shall give prior notice to the Company and the Lenders of that appointment.

(b) Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Finance Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c) The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

31.25 **Acceptance of title**

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Obligor or any Spanish Pledgor may have to any of the Charged Property and shall not be liable for, or bound to require any Obligor or any Spanish Pledgor to remedy, any defect in its right or title.

31.26 **Releases**

Upon a disposal of any of the Charged Property pursuant to the enforcement of the Transaction Security by a Receiver or the Security Agent, the Security Agent is irrevocably authorised (at the cost of the Obligors and without any consent, sanction, authority or further confirmation from any other Secured Party) release, without recourse or warranty, that property from the Transaction Security, any release of the Transaction Security or other claim over that asset and to issue any certificates of non-crystallisation of floating charges that may be required or desirable.

31.27 **Winding up of trust**

If the Security Agent, with the approval of the Facility Agent, determines that:

(a) all of the Secured Obligations and all other obligations secured by the Transaction Security Documents have been fully and finally discharged; and

(b) no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Obligor pursuant to the Finance Documents,

then:

(i) the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security and the rights of the Security Agent under each of the Transaction Security Documents; and

(ii) any Security Agent which has resigned pursuant to clause 31.15 (*Resignation of the Security Agent*) shall release, without recourse or warranty, all of its rights under each Transaction Security Document.

## 31.28 Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Finance Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

## 31.29 Disapplication of Trustee Acts

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement. Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent allowed by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

## 31.30 Order of Application

All amounts from time to time received or recovered by the Security Agent pursuant to the terms of any Finance Documents, under clause 31.3 (*Parallel Debt (Covenant to pay the Security Agent)*), or in connection with the realisation or enforcement of all or any part of the Transaction Security shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law, in the following order of priority:

(a) in discharging pro rata and pari passu any sums owing to the Security Agent (in its capacity as such) (other than pursuant to clause (a) (*Parallel debt (Covenant to pay the Security Agent)*), any Receiver or any Delegate;

(b) in payment or distribution to the Facility Agent, on its behalf and on behalf of the other Secured Parties, for application towards the discharge pro rata and pari passu of all sums due and payable by any Obligor, any Spanish Pledgor or any South African Pledge Counterparty to such parties under any of the Finance Documents in accordance with clause 34.6 (*Partial payments*);

(c) if none of the Obligors is under any further actual or contingent liability under any Finance Document, in payment or distribution pro rata to any person to whom the Security Agent is obliged to pay or distribute in priority to any Obligor; and

(d) the balance, if any, in payment or distribution to the relevant Obligor.

## 31.31 Investment of proceeds

Prior to the application of the proceeds of the Transaction Security in accordance with clause 31.30 (*Order of Application*) the Security Agent may, at its discretion, hold all or part of those proceeds in one or more interest bearing (if any) suspense accounts with any Acceptable Bank (including itself) and for so long as the Security Agent thinks fit (the interest (if any) being credited to the relevant account) pending the application from time to time of those monies at the Security Agent's discretion in accordance with the provisions of clause 31.30 (*Order of Application*).

## 31.32 Currency conversion

(a) For the purpose of, or pending the discharge of, any of the Secured Obligations the Security Agent may convert any moneys received or recovered by the Security Agent

from one currency to another, at the spot rate at which the Security Agent is able to purchase the currency in which the Secured Obligations are due with the amount received.

(b) The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

## 31.33 Permitted Deductions

The Security Agent shall be entitled (a) to set aside by way of reserve amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any law or regulation to make from any distribution or payment made by it under this Agreement, and to pay all Taxes which may be assessed against it in respect of any of the Charged Property, or as a consequence of performing its duties or exercising its rights, powers, authorities and discretions, or by virtue of its capacity as Security Agent under any of the Finance Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

## 31.34 Good discharge

(a) Any distribution or payment to be made in respect of the Secured Obligations by the Security Agent may be made to the Facility Agent on behalf of the Lenders and any distribution or payment made in that way shall be a good discharge, to the extent of that payment or distribution, by the Security Agent.

(b) The Security Agent is under no obligation to make payment to the Facility Agent in the same currency as that in which any Unpaid Sum is denominated.

## 31.35 Amounts received by Obligors

If any of the Obligors receives or recovers any amount which, under the terms of any of the Finance Documents, should have been paid to the Security Agent, that Obligor will hold the amount received or recovered on trust for the Security Agent and promptly pay that amount to the Security Agent for application in accordance with the terms of this Agreement.

## 31.36 Application and consideration

In consideration for the covenants given to the Security Agent by each Obligor in relation to clause 31.3 (*Parallel Debt (Covenant to pay the Security Agent)*), the Security Agent agrees with each Obligor to apply all moneys from time to time paid by such Obligor to the Security Agent in accordance with the foregoing provisions of this clause 31.

# 32 Conduct of Business by the Finance Parties

32.1 No provision of this Agreement will:

(a) interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b) oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c) oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

32.2    Each Facility B Lender agrees with the other Finance Parties that it will not without the prior written consent of the Facility Agent or unless expressly provided in this Agreement:

(a)    request, demand or accept repayment in respect of any Fronted Facility or accept any payment in respect thereof directly from an Obligor, any Spanish Pledgor or any South African Pledge Counterparty; or

(b)    exercise any rights of set-off, combination of accounts or other remedy against any Obligor, any Spanish Pledgor or any South African Pledge Counterparty or allow to exist or receive the benefit of any Security, guarantee or other assurance against loss otherwise than pursuant to the Finance Documents,

and each Facility B Lender agrees that any payments received by it otherwise than in accordance with clause 34 (*Payment mechanics*) or recoveries by way of set-off, in each case from the Obligors, any Spanish Pledgor or any South African Pledge Counterparty, shall be held by it for the benefit of all Finance Parties and applied in accordance with clause 33 (*Sharing among the Finance Parties*).

32.3    Each Lender agrees with the other Finance Parties that it will on each Monday (or if such date is not a Business Day, on the next Business Day) falling in the week after the date of issue of a scheduled Borrowing Base Report in accordance with clause 22.7(a)(i) (being every week) until all Availability Periods have expired deliver to the Collateral Management Agent a utilisation report in the form set out in Schedule 17 (*Form of Lender utilisation report*).

# 33    Sharing among the Finance Parties

## 33.1    Payments to Finance Parties

(a)    Subject to clause 25.4(c) (*Withdrawals from the Collection Account*) and to paragraph (ii) below, if a Finance Party (each a **Recovering Party**) receives or recovers any amount from an Obligor, any Spanish Pledgor or any South African Pledge Counterparty (or from a third party in respect of an obligation owing to it by an Obligor) other than in accordance with clause 34 (*Payment mechanics*) (including any amounts under or in connection with any Multi-Party TPA Agreement, FX Hedging Provider Hedging Agreement or Deed of Undertaking) (a **Recovered Amount**) and applies that amount to a payment due under the Finance Documents or in connection with any Multi-Party TPA Agreement or FX Hedging Provider Hedging Agreement then:

(i)    the Recovering Party shall, within three (3) Business Days, notify details of the receipt or recovery, to the Facility Agent;

(ii)    the Facility Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Party would have been paid had the receipt or recovery been received or made by the Facility Agent and distributed in accordance with clause 34 (Payment mechanics), without taking account of any Tax which would be imposed on the Facility Agent in relation to the receipt, recovery or distribution; and

(iii)    the Recovering Party shall, within three (3) Business Days of demand by the Facility Agent, pay to the Facility Agent an amount (the Sharing Payment) equal to such receipt or recovery less any amount which the Facility Agent determines may be retained by the Recovering Party as its share of any payment to be made, in accordance with clause 34.6 (*Partial payments*).

(b)    Paragraph (a) above shall not apply to any amount received or recovered by an Issuing Bank in respect of any cash cover provided for the benefit of that Issuing Bank.

## 33.2 Redistribution of payments

The Facility Agent shall treat the Sharing Payment as if it had been paid by the relevant Obligor and distribute it between the Finance Parties (other than the Recovering Party) (the **Sharing Parties**) in accordance with clause 34.6 (*Partial payments*) towards the obligations of that Obligor to the Sharing Parties.

## 33.3 Recovering Party's rights

On a distribution by the Facility Agent under clause 33.2 (*Redistribution of payments*) of a payment received by a Recovering Party from an Obligor, as between the relevant Obligor and the Recovering Party, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by that Obligor.

## 33.4 Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Party becomes repayable and is repaid by that Recovering Party, then:

(a) each Sharing Party shall, upon request of the Facility Agent, pay to the Facility Agent for the account of that Recovering Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Party for its proportion of any interest on the Sharing Payment which that Recovering Party is required to pay) (the **Redistributed Amount**); and

(b) as between the relevant Obligor and each relevant Sharing Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by that Obligor.

## 33.5 Exceptions

(a) This clause 33 shall not apply to the extent that the Recovering Party would not, after making any payment pursuant to this clause, have a valid and enforceable claim against the relevant Obligor.

(b) A Recovering Party is not obliged to share with any other Finance Party any amount which the Recovering Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i) it notified the other Finance Party of the legal or arbitration proceedings; and

(ii) the other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

## Section 11
## Administration

## 34     Payment mechanics

### 34.1     Payments to the Facility Agent

(a)     On each date on which an Obligor or a Lender is required to make a payment under a Finance Document that Obligor or Lender shall make the same available to the Facility Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Facility Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)     Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in such Participating Member State or London, as specified by the Facility Agent) and with such bank as the Facility Agent, in each case, specifies.

(c)     For the avoidance of doubt, each Obligor agrees that it shall not (without the prior written consent of the Facility Agent) make any payment under any of the Facilities directly to a Lender.

### 34.2     Distributions by the Facility Agent

Each payment received by the Facility Agent under the Finance Documents for another Party shall, subject to clause 34.3 (*Distributions to an Obligor*) and clause 34.4 (*Clawback and pre-funding*) be made available by the Facility Agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office), to such account as that Party may notify to the Facility Agent by not less than five (5) Business Days' notice with a bank specified by that Party in the principal financial centre of the country of that currency (or, in relation to euro, in the principal financial centre of a Participating Member State or London, as specified by that Party). Payments shall be applied in or towards payment *pro rata* of any unpaid amount owing to the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Security Agent, the Issuing Bank (including without limitation under clauses 6.4, 6.10 to 6.12 and 6.26) under those Finance Documents prior to interest on, or the principal amount of, the Loans or any fees, expenses, indemnities or other amounts, payable to any other Person hereunder.

### 34.3     Distributions to an Obligor

The Facility Agent may (with the consent of the Obligor or in accordance with clause 35 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

### 34.4     Clawback and pre-funding

(a)     Where a sum is to be paid to the Facility Agent under the Finance Documents for another Party, the Facility Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)     Unless paragraph (c) below applies, if the Facility Agent pays an amount to another Party and it proves to be the case that the Facility Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Facility Agent shall on demand refund the same to the Facility Agent together with interest on that amount from the date of payment to the date of receipt by the Facility Agent, calculated by the Facility Agent to reflect its cost of funds.

(c)     If the Facility Agent is willing to make available amounts for the account of a Borrower before receiving funds from the Lenders then if and to the extent that the Facility Agent does so but it proves to be the case that it does not then receive funds from a Lender in respect of a sum which it paid to the Borrower:

(i)     the Facility Agent shall notify the Borrower of that Lender's identity and the Borrower shall on demand refund it to the Facility Agent; and

(ii)    the Lender by whom those funds should have been made available or, if that Lender fails to do so, the Borrowers shall on demand pay to the Facility Agent the amount (as certified by the Facility Agent) which will indemnify the Facility Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from that Lender.

## 34.5     Impaired Agent

(a)     If, at any time, the Facility Agent becomes an Impaired Agent, an Obligor or a Lender which is required to make a payment under the Finance Documents to the Facility Agent in accordance with clause 34.1 (*Payments to the Facility Agent*) may instead either:

(i)     pay that amount direct to the required recipient(s); or

(ii)    if in its absolute discretion it considers that it is not reasonably practicable to pay that amount directly to the required recipient(s), pay that amount or the relevant part of that amount to an interest-bearing account held with an Acceptable Bank within the meaning of paragraph (a) of the definition of **Acceptable Bank** and in relation to which no Insolvency Event has occurred and is continuing, in the name of the Obligor or the Lender making the payment (the **Paying Party**) and designated as a trust account for the benefit of the Party or Parties beneficially entitled to that payment under the Finance Documents (the **Recipient Party** or **Recipient Parties**).

In each case such payments must be made on the due date for payment under the Finance Documents.

(b)     All interest accrued on the amount standing to the credit of the trust account shall be for the benefit of the Recipient Party or the Recipient Parties *pro rata* to their respective entitlements.

(c)     A Party which has made a payment in accordance with this clause 34.5 shall be discharged of the relevant payment obligation under the Finance Documents and shall not take any credit risk with respect to the amounts standing to the credit of the trust account.

(d)     Promptly upon the appointment of a successor Facility Agent in accordance with clause 30.12 (*Replacement of the Facility Agent or Collateral Management Agent*), each Paying Party shall (other than to the extent that that Party has given an instruction pursuant to paragraph (e) below) give all requisite instructions to the bank with whom the trust account is held to transfer the amount (together with any accrued interest) to the successor Facility Agent for distribution to the relevant Recipient Party or Recipient Parties in accordance with clause 34.2 (*Distributions by the Facility Agent*).

(e)     A Paying Party shall, promptly upon request by a Recipient Party and to the extent:

(i)     that it has not given an instruction pursuant to paragraph (d) above; and

(ii)    that it has been provided with the necessary information by that Recipient Party,

give all requisite instructions to the bank with whom the trust account is held to transfer the relevant amount (together with any accrued interest) to that Recipient Party.

34.6 **Partial payments**

(a) If the Facility Agent receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Facility Agent shall apply that payment towards the obligations of that Obligor under those Finance Documents in the following order:

(i) **first**, in or towards payment *pro rata* of any unpaid amount owing to the Facility Agent, the Collateral Management Agent, the Co-Ordinator, the Security Agent, the Issuing Bank ((including without limitation under clauses 6.4, 6.10 to 6.12 and 6.26)) under those Finance Documents;

(ii) **secondly**, in or towards payment to the Secured Parties *pro rata* of any accrued interest, fee or commission due but unpaid under the First Finance Documents;

(iii) **thirdly**, in or towards payment to the Secured Parties *pro rata* of any principal due but unpaid under those First Finance Documents;

(iv) **fourthly**, in or towards payment *pro rata* of any other sum due but unpaid under the First Finance Documents; and

(v) **fifthly**, in or towards any sum due put unpaid in relation to the Second Secured Obligations.

(b) The Facility Agent shall, if so directed by the Majority Lenders, vary the order set out in paragraphs (a)(ii) to (iv) above.

(c) Paragraphs (a) and (b) above will override any appropriation made by an Obligor.

34.7 **Set-off by Obligors**

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

34.8 **Business Days**

(a) Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

34.9 **Currency of account**

(a) Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b) A repayment of a Utilisation or a part of a Utilisation shall be made in the currency in which that Utilisation is denominated on its due date.

(c) Each repayment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated when that interest accrued.

(d) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e)     Any amount expressed to be payable in a currency other than Base Currency shall be paid in that other currency.

## 34.10    Change of currency

(a)     Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)      any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Facility Agent (after consultation with the Company); and

(ii)     any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Facility Agent (acting reasonably).

(b)     If a change in any currency of a country occurs, this Agreement will, to the extent the Facility Agent (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency, with the intention of putting the Obligors and the Finance Parties in the same position as if the change had not occurred.

## 34.11    Disruption to Payment Systems etc.

If either the Facility Agent determines (in its discretion) that a Disruption Event has occurred or the Facility Agent is notified by the Company that a Disruption Event has occurred:

(a)     the Facility Agent may, and shall if requested to do so by the Company, consult with the Company with a view to agreeing with the Company such changes to the operation or administration of the Facility as the Facility Agent may deem necessary in the circumstances;

(b)     the Facility Agent shall not be obliged to consult with the Company in relation to any changes mentioned in paragraph (a) if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)     the Facility Agent may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)     any such changes agreed upon by the Facility Agent and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of clause 40 (*Amendments and Waivers*);

(e)     the Facility Agent shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Facility Agent) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this clause 34.11; and

(f)     the Facility Agent shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

## 35    Set-Off

Without prejudice to clause 32.2 and subject to the Legal Reservations, a Finance Party may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to that Obligor, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 36    Notices

### 36.1    Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by email or letter.

### 36.2    Addresses

The address and email (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)    in the case of each Obligor, as follows:

10, Akti Kondili
Piraeus 185 45
Greece

Email: sfokas@ampni.com

Attention: Mr Spyros Fokas

(b)    in the case of each Lender, that notified in writing to the Facility Agent on or prior to the date on which it becomes a Party; and

(c)    in the case of the Facility Agent or the Security Agent, as follows:

**ABN AMRO Bank N.V.**
Agency Syndicated Loans
Attn: Team 1
Gustav Mahlerlaan 10 (HQ9037)
1082 PP Amsterdam
The Netherlands

E-mail: ABN.AMRO.Agency.Team.1@nl.abnamro.com

(d)    in the case of the Collateral Management Agent, as follows:

**ABN AMRO Bank N.V.**
Credit & Collateral Management

Att: Nelli Oganesian / Anastasia.Romm - HQ0051
Gustav Mahlerlaan 10
1082 PP Amsterdam
The Netherlands

T + 31 (0) 20 343 6703

E-mail: nelli.organesian@nl.abnamro.com and anastasia.romm@nl.abnamro.com

(e)     in the case of the Issuing Banks, as follows:

**ABN AMRO Bank N.V.**
Att: Nydhal El Mahfoudhi
Gustav Mahlerlaan 10
1082 PP Amsterdam
The Netherlands

Email: nydhal.elmahfoudhi@nl.abnamro.com

Tel:     +31 (0) 20 6 282 337

(f)     in the case of the Overdraft Bank, as follows:

**ABN AMRO Bank N.V.**
Att: Nydhal El Mahfoudhi
Gustav Mahlerlaan 10
1082 PP Amsterdam
The Netherlands

Email: nydhal.elmahfoudhi@nl.abnamro.com

Tel:     +31 (0) 20 6 282 337

or any substitute address, email or department or officer as the Party may notify to the Facility Agent (or the Facility Agent may notify to the other Parties, if a change is made by the Facility Agent) by not less than five (5) Business Days' notice.

36.3     **Delivery**

(a)     Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)     if by way of email, when received in legible form; or

(ii)     if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under clause 36.2 (*Addresses*), if addressed to that department or officer.

(b)     Any communication or document to be made or delivered to the Facility Agent, the Collateral Management Agent or the Security Agent will be effective only when actually received by the Facility Agent, the Collateral Management Agent or Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Facility Agent's or Collateral Management Agent's or Security Agent's signature below (or any substitute department or officer as the Facility Agent, the Collateral Management Agent or Security Agent shall specify for this purpose).

(c)     All notices from or to an Obligor shall be sent through the Facility Agent.

(d)     Any communication or document made or delivered to the Company in accordance with this clause 36.3 will be deemed to have been made or delivered to each of the Obligors.

(e)     Any communication or document which becomes effective, in accordance with paragraphs (a) to (d) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

36.4    **Notification of address and email**

Promptly upon receipt of notification of an address or email or change of address or email pursuant to clause 36.2 (*Addresses*) or changing its own address or email, the Facility Agent shall notify the other Parties.

36.5    **Communication when Facility Agent is Impaired Agent**

If the Facility Agent is an Impaired Agent the Parties may, instead of communicating with each other through the Facility Agent, communicate with each other directly and (while the Facility Agent is an Impaired Agent) all the provisions of the Finance Documents which require communications to be made or notices to be given to or by the Facility Agent shall be varied so that communications may be made and notices given to or by the relevant Parties directly. This provision shall not operate after a replacement Facility Agent has been appointed.

36.6    **Electronic communication**

(a)    Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication and if those two Parties:

(i)    notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(ii)    notify each other of any change to their address or any other such information supplied by them by not less than five (5) Business Days' notice.

(b)    Any electronic communication made between those two Parties will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Facility Agent, Collateral Management Agent or the Security Agent only if it is addressed in such a manner as the Facility Agent, Collateral Management Agent or Security Agent shall specify for this purpose.

(c)    Any electronic communication which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

36.7    **Use of websites**

(a)    The Company may satisfy its obligation under this Agreement to deliver any information in relation to those Lenders (the **Website Lenders**) who accept this method of communication by posting this information onto an electronic website designated by the Company and the Facility Agent (the **Designated Website**) if:

(i)    the Facility Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

(ii)    both the Company and the Facility Agent are aware of the address of and any relevant password specifications for the Designated Website; and

(iii)    the information is in a format previously agreed between the Company and the Facility Agent.

If any Lender (a **Paper Form Lender**) does not agree to the delivery of information electronically then the Facility Agent shall notify the Company accordingly and the Company shall at its own cost supply the information to the Facility Agent (in sufficient copies for each Paper Form Lender) in paper form. In any event the Company shall at its

own cost supply the Facility Agent with at least one copy in paper form of any information required to be provided by it.

(b) The Facility Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company and the Facility Agent.

(c) The Company shall promptly upon becoming aware of its occurrence notify the Facility Agent if:

(i) the Designated Website cannot be accessed due to technical failure;

(ii) the password specifications for the Designated Website change;

(iii) any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(iv) any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(v) the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If the Company notifies the Facility Agent under paragraph (c)(i) or paragraph (c)(v) above, all information to be provided by the Company under this Agreement after the date of that notice shall be supplied in paper form unless and until the Facility Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

(d) Any Website Lender may request, through the Facility Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. The Company shall at its own cost comply with any such request within ten (10) Business Days.

36.8 **English language**

(a) Any notice given under or in connection with any Finance Document must be in English.

(b) All other documents provided under or in connection with any Finance Document must be:

(i) in English; or

(ii) if not in English, and if so required by the Facility Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

# 37 Calculations and Certificates

37.1 **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

### 37.2 Certificates and determinations

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

### 37.3 Day count convention

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

## 38 Partial Invalidity

If, at any time, any provision of a Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 39 Remedies and Waivers

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 40 Amendments and Waivers

### 40.1 Required consents

(a) Subject to clause 40.2 (*All Lender matters*) and clause 40.3 (*Other exceptions*), any term of the Finance Documents may be amended or waived only with the consent of the Majority Lenders and the Company and any such amendment or waiver will be binding on all Parties.

(b) The Facility Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this clause 40.

(c) Without prejudice to the generality of paragraphs (c), (d) and (e) of clause 30.6 (*Rights and discretions*), the Facility Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment or waiver under this Agreement.

(d) Each Obligor agrees to any such amendment or waiver permitted by this clause 40 which is agreed to by the Company. This includes any amendment or waiver which would, but for this paragraph (d), require the consent of all of the Guarantors.

### 40.2 All Lender matters

(a) An amendment or waiver that has the effect of changing or which relates to:

(i) the definitions of **Majority Lenders**, **Prohibited Person**, **Sanctions**, **Sanctions Authority** or **Sanctions List** in clause 1.1 (*Definitions*);

(ii)   an extension to the date of payment of any amount under the Finance Documents (other than in relation to clause 9 (*Mandatory prepayment and cancellation*));

(iii)  a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable;

(iv)   a change in currency of payment of any amount under the Finance Documents;

(v)    an increase in any Commitment or the Total Commitments, an extension of the Availability Period or any requirement that a cancellation of Commitments reduces the Commitments rateably;

(vi)   a change to a Borrower or Guarantors;

(vii)  any provision which expressly requires the consent of all the Lenders;

(viii) clause 2.2 (*Finance Parties' rights and obligations*), clause 9 (*Mandatory prepayment and cancellation*), clause 22.13 (*Proof of Origin*), clause 27 (*Changes to the Lenders*), this clause 40, the governing law of any Finance Document or clause 44.1 (*Jurisdiction of English courts*);

(ix)   the nature or scope of:

(A)   the guarantee and indemnity granted under clause 20 (*Guarantee and Indemnity*);

(B)   the Charged Property; or

(C)   the manner in which the proceeds of enforcement of the Transaction Security are distributed; or

(x)    subject to clause 40.5 (*Release of non-eligible receivables by the Security Agent*), the release of any guarantee and indemnity granted under clause 20 (*Guarantee and Indemnity*) or of any Transaction Security,

shall not be made, or given, without the prior consent of all the Lenders.

40.3   **Other exceptions**

An amendment or waiver which relates to the rights or obligations of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Co-Ordinator, the Security Agent or FX Hedging Provider (each in their capacity as such) may not be effected without the consent of the Facility Agent, the Collateral Management Agent, the Issuing Bank, the Co-Ordinator, the Security Agent and the FX Hedging Provider.

40.4   **Excluded Commitments**

If any Lender fails to respond to a request for a consent, waiver, amendment of or in relation to any term of any Finance Document or any other vote of Lenders under the terms of this Agreement within ten (10) Business Days of that request being made (unless the Company and the Facility Agent agree to a longer time period in relation to any request):

(a)    its Commitments hall not be included for the purpose of calculating the Total Commitment when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) of Total Commitments has been obtained to approve that request; and

(b)    its status as a Lender shall be disregarded for the purpose of ascertaining whether the agreement of any specified group of Lenders (including, for the avoidance of doubt, all the Lenders) has been obtained to approve that request.

40.5    **Release of non-eligible receivables by the Security Agent**

Notwithstanding any other provision of any Finance Document, the Security Agent may in its sole discretion, and is hereby (without any further confirmation or instruction required) authorised to, execute a release from the Transaction Security from time to time of trade receivables which are not or have ceased to be Eligible Receivables and which have a face value in an amount which is less than $500,000 per receivable. The Security Agent (or the Facility Agent) shall notify the Lenders of any release made pursuant to this clause.

# 41    Confidentiality

41.1    **Confidential Information**

Each Finance Party agrees to use commercially reasonable efforts in accordance with safe and sound practices applicable to banks to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by clause 41.2 (*Disclosure of Confidential Information*) and clause 41.3 (*Disclosure to numbering service providers*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

41.2    **Disclosure of Confidential Information**

Any Finance Party may disclose:

(a)    to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, insurers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)    to any person:

(i)    to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Facility Agent, Collateral Management Agent or Security Agent and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(ii)    with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(iii)    appointed by any Finance Party or by a person to whom paragraph (b)(i) or (ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf (including, without limitation, any person appointed under paragraph (b) of clause 30.14 (*Relationship with the Lenders*));

(iv)    who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v)    to the Bankruptcy Court, in connection with a Sale Motion or otherwise to whom information is required or requested to be disclosed by any court of competent

jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi) to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii) to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to clause 27.8 (*Security over Lenders' rights*);

(viii) who is a Party; or

(ix) with the consent of the Company;

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A) in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B) in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C) in relation to paragraphs (b)(v), (b)(vi) and (b)(vii) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c) to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Company and the relevant Finance Party; and

(d) to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors.

41.3 **Disclosure to numbering service providers**

(a) Any Finance Party may disclose to any national or international numbering service provider appointed by that Finance Party to provide identification numbering services in respect of this Agreement, the Facility and/or one or more Obligors the following information:

(i) names of Obligors, the Spanish Pledgors and the South African Pledge Counterparties;

(ii) country of domicile of Obligors, the Spanish Pledgors and the South African Pledge Counterparties;

(iii) place of incorporation of Obligors, the Spanish Pledgors and the South African Pledge Counterparties;

(iv) date of this Agreement;

(v) clause 43 (*Governing Law*);

(vi) the names of the Facility Agent, the Collateral Management Agent and the Co-Ordinator;

(vii) amount of Total Commitments;

(viii) currency of the Facility;

(ix) type of Facility;

(x) ranking;

(xi) Termination Date;

(xii) changes to any of the information previously supplied pursuant to paragraphs (i) to (xi) above; and

(xiii) such other information agreed between such Finance Party and the Company,

to enable such numbering service provider to provide its usual syndicated loan numbering identification services.

(b) The Parties acknowledge and agree that each identification number assigned to this Agreement, the Facility and/or one or more Obligors by a numbering service provider and the information associated with each such number may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

(c) Each Obligor represents that none of the information set out in paragraphs (i) to (xiii) of paragraph (a) above is, nor will at any time be, unpublished price-sensitive information.

(d) The Facility Agent shall notify the Company and the other Finance Parties of:

(i) the name of any numbering service provider appointed by the Facility Agent in respect of this Agreement, the Facility and/or one or more Obligors; and

(ii) the number or, as the case may be, numbers assigned to this Agreement, the Facility and/or one or more Obligors by such numbering service provider.

## 41.4 Entire agreement

This clause 41 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

41.5    **Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

41.6    **Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Company:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to paragraph (b)(v) of clause 41.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this clause 41.

41.7    **Continuing obligations**

The obligations in this clause 41 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of twelve (12) months from the earlier of:

(a)    the date on which all amounts payable by the Obligors, the Spanish Pledgors and the South African Pledge Counterparties under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

# 42    Counterparts

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## Section 12
## Governing Law and Enforcement

## 43 Governing Law

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

## 44 Enforcement

### 44.1 Jurisdiction of English courts

(a) The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

(b) The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c) This clause 44.1 is for the benefit of the Finance Parties and Secured Parties only. As a result, no Finance Party or Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties and Secured Parties may take concurrent proceedings in any number of jurisdictions.

### 44.2 Service of process

(a) Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(i) irrevocably appoints Portland Place Nominees Limited of c/o Riches & Company, 34 Anyards Road, Cobham, Surrey KT11 2LA as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(ii) agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b) If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within three (3) days of such event taking place) appoint another agent on terms acceptable to the Facility Agent. Failing this, the Facility Agent may appoint another agent for this purpose.

### 44.3 Enforcement procedures in Spain

(a) This Agreement and any other Finance Document, at the discretion of the Facility Agent, as well as any amendments hereto or thereto, shall be formalised in a Spanish Public Document, so that it may have the status of a notarial document of loan for all purposes contemplated in Article 517, number 4 of the Spanish Civil Procedural Law (Law 1/2000 of 7th January) *("Ley de Enjuiciamiento Civil")* (the "**Civil Procedural Law**").

(b) For such purposes, upon demand by the Facility Agent or the Security Agent, any Spanish Obligor that may accede to this Agreement shall: (i) raise this Agreement to the status of a Spanish Public Document before a Spanish notary public and (ii) raise the deed by virtue of which any Spanish Obligor becomes a party to this Agreement to the status of a Spanish Public Document.

(c) Upon enforcement, the sum payable by the any Spanish Obligor or any Spanish Pledgor regarding the relevant Transaction Security shall be the total aggregate amount of the balance of the accounts maintained by the Facility Agent (and/or the relevant Finance Party, as the case may be). For the purposes of Articles 517 et seq. of the Civil Procedural Law, such balances shall be considered as due, liquid and payable and may be claimed pursuant to the same provisions of such law. In this regard:

(i) For purposes of enforcing the provisions of or foreclosing under this Agreement pursuant to Spanish law (including, without limitation, the guarantee provided by a Spanish Guarantor pursuant to Clause 20 or the security granted by any Spanish Pledgor under the Transaction Security Documents), the Facility Agent, in its capacity as such (and on behalf of the Finance Parties), shall open and maintain a special credit facility account in its books on behalf of the Obligors, from which all interest, fees, expenses, default interest, additional costs and any other amounts that the Obligors owe to the Finance Parties under the Finance Documents will be debited and into which all amounts received by or on account of the Finance Parties from the Obligors under the Finance Documents will be credited, so that the balance of the credit account represents the amount owed from time to time by the Obligors to the Finance Parties.

(ii) In addition to the account referred to in the above paragraph, each Finance Party shall open and maintain a special account in its records equivalent to that referred to above, into which the interest, fees, expenses, default interest, additional costs and any other amounts that the Obligors owe to the Finance Party hereunder will be debited and into which all amounts received by the Finance Party from the Obligors under the Finance Documents shall be credited, so that the sum of the balance of the credit account represents the amount owed from time to time by the Obligors to the Finance Party. In the event of assignment as provided in Clause 27, the assignor will totally or partially cancel the referenced accounts, with corresponding accounts to be opened by the assignee.

(iii) Any failure to keep the records referred to in paragraphs (i) and (ii) above or any error in doing so will not, however, limit or otherwise affect the obligation of the Obligors to pay any amount owed pursuant to the Finance Documents. In the event of any discrepancy between the accounts and records maintained by any Finance Party and the accounts and records of the Facility Agent corresponding to such matters, the Facility Agent's accounts and records will take precedence in the absence of manifest error.

(iv) If any of the events of termination by maturity or acceleration of the Facility occurs, the Facility Agent will settle the accounts referred to in this section. For the purposes of enforcement in judicial or extrajudicial proceedings, it is expressly agreed that the balance of the accounts referred to above resulting from the certification for that purpose issued by the Facility Agent will be deemed a liquid, due and payable amount enforceable against the Obligors, provided that it is evidenced in a notarial document that the settlement was made in the form agreed by the parties in the enforceable instrument (*título ejecutivo*) and that the outstanding balance is equivalent to that recording in the corresponding account of the Obligors opened in connection with the Facility.

(d) For the purpose of the provisions of Article 571. et seq. of the Civil Procedural Law, it is expressly agreed that the determination of the debt to be claimed through the enforcement proceedings shall be effected by the Facility Agent (or the relevant Finance Party, as the case may be) by means of the appropriate certificate evidencing the balances shown in the relevant account(s) referred to in paragraph (c) above. By virtue of the foregoing, to enforcement of this Agreement by the Facility Agent or any of the Finance Party it will be sufficient to deliver:

(i) an original notarial first or authentic copy of this Agreement;

(ii)     a notarial certificate, if necessary, for the purposes described in paragraph (e) below;

(iii)    the notarial document (*acta notarial*) which incorporates the certificate issued by the Facility Agent (and/or the relevant Finance Party, as the case may be) of the amount due by the Spanish Obligor including an excerpt of the credits and debits (including the interest applied) which appear in the relevant account(s) referred to in paragraph (iii) above, evidencing that the determination of the amounts due and payable by the Spanish Obligor have been calculated as agreed in this Agreement and that such amounts coincide with the balance of such accounts; and

(iv)     a notarial document (*acta notarial*) evidencing that the Spanish Obligor has been served notice of the amount that is due and payable.

(e)     Paragraph (c) above is also applicable to any Finance Party with regard to its participation in the Facility. Such Finance Party may issue the appropriate certification of the balances of the relevant account(s) referred to in paragraph (iii) above and the certification of the balances of such accounts may be legalised by a notary.

(f)     The amount of the balances so established shall be notified to the Spanish Obligor in an attestable manner at least three (3) days in advance of the enforcement action set out in paragraph (c) above.

(g)     the Facility Agent and the Security Agent (and each Finance Party, as appropriate) are hereby authorised to request and obtain certificates and documents issued by the notary who formalises this Agreement in order to evidence its compliance with the entries of his registry-book and the relevant entry date for the purposes of number 4 of Article 517, of the Spanish Civil Procedural Law in case this Agreement is notarized by means of a Spanish "*póliza*"; and to request any second or subsequent copies of the relevant Spanish Public Document in which this Agreement is formalised, in the event that it is formalised by means of a Spanish "*escritura pública*". The cost of such certificate and documents will be for the account of the Company and/or the Spanish Obligor in the manner provided under this Agreement.

(h)     For the purposes of a Spanish Obligor and the Guarantee it provides when acceding to this Agreement, the Spanish Public Document:

(i)     will have the effects established under articles 517 et seq. of the Spanish Civil Procedural Law; and

(ii)    may, at the decision of the Facility Agent or the Security Agent, include a translation into Spanish of this Clause 44.3 (*Enforcement Proceeding in Spain*).

## 45    Bail-in Clause

### 45.1    Contractual Recognition of bail-in

Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(a)     any Bail-In Action in relation to any such liability, including (without limitation):

(i)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(ii)    a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and;

(iii)     a cancellation of any such liability; and

(b)     a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

## 46     Resolution Stay

46.1     Each Party irrevocably and unconditionally acknowledges, consents, accepts and agrees that the occurrence, existence or continuation of a Resolution Event in relation to another Finance Party does not:

(a)     entitle it, directly or indirectly, whether pursuant to a default clause, a cross-default clause, a guarantee or otherwise, to:

(i)     exercise any termination, suspension, modification, netting or set-off rights or similar rights;  or

(ii)     obtain possession, exercise control or enforce any security over any property of such Finance Party,

under or in relation to this Agreement or any other agreement between it and such Finance Party; or

(b)     adversely affect the rights and remedies of such Finance Party under this Agreement or any other agreement between that Finance Party and it,

unless the Resolution Legislation explicitly provides otherwise.

46.2     Each Party shall promptly take all action that is necessary or in the opinion of the relevant Finance Party or any Resolution Authority desirable in connection with this clause, the exercise of a Resolution Power by any Resolution Authority, or the occurrence, existence or continuation of any Resolution Event.

46.3     Notwithstanding any other term, condition or clause in this Agreement or any other agreement, arrangement or understanding between a Finance Party and another Party, each Party irrevocably and unconditionally acknowledges, accepts, consents and agrees that this clause prevails and may be enforced by any Resolution Authority.

46.4     In this clause:

References to a Finance Party include any parent, subsidiary or branch of that Finance Party, including its successors in title and assigns and transferees.

**Resolution Authority** means any administrative authority or any other person with the ability to exercise a Resolution Power.

**Resolution Event** means:

(a)     the exercise by a Resolution Authority of any or more Resolution Powers in relation to a relevant Finance Party;

(b)     any other action taken by a Resolution Authority based on or taken in connection with Resolution Legislation in relation to a relevant Finance Party, including, without limitation, any request by the Resolution Authority to that Finance Party to take any action;

(c)     any action taken by a relevant Finance Party in connection with the events referred to under (a) or (b), including, without limitation, any action taken to comply with any request by the Resolution Authority referred to in paragraph (b) above; and

(d)     any event directly linked to any event as referred to in paragraphs (a), (b) or (c) above.

**Resolution Legislation** means any laws, regulations, rules, directives or requirements relating to the resolution or recovery of banks, banking group companies, credit institutions or investment firms applicable to a relevant Finance Party from time to time, including, without limitation, EU Directive 2014/59/EU ("**BRRD**") and EU Regulation No 806/2014 ("**SRM**"), both as amended from time to time, and any EU directive or regulation issued in replacement of or supplement to the same, and any laws, regulations, rules, directives or requirements implementing any of the foregoing.

**Resolution Power** means any power existing from time to time under any Resolution Legislation, including, without limitation, the power to take a crisis prevention measure or a crisis management measure such as write-down (a reduction, including, without limitation, to zero, in the principal amount or outstanding amount due, including any accrued but unpaid interest), conversion, cancellation, amendment or suspension powers existing from time to time, or to exercise any corresponding power.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

## Schedule 1
## The Original Parties

## Part I
## The Obligors

| Name of Original Borrowers | Registration number (or equivalent, if any) | Original Jurisdiction |
|---|---|---|
| Aegean Marine Petroleum S.A. | C-76656 | Liberia |
| Aegean Petroleum International Inc. | 28486 | Marshall Islands |
| Aegean NWE N.V. | BE412.527.142 | Belgium |
| Aegean Bunkering Germany GmbH | HRB 16326 KI | Germany |
| Obast Bunkering & Trading GmbH | HRB 13560 | Germany |

| Name of Original Guarantors | Registration number (or equivalent, if any) | Original Jurisdiction |
|---|---|---|
| Kithnos Maritime Inc. | 13452 | Marshall Islands |
| Paros Maritime Inc. | 13458 | Marshall Islands |
| Santorini I Maritime Limited | HE277602 | Cyprus |
| SERIFOS MARITIME INC. | 13451 | Marshall Islands |
| Lefkas Marine S.A. | | Liberia |
| Aegean Bunkering Services Inc. | 9165 | Marshall Islands |
| Aegean Shipholdings Inc. | 15000 | Marshall Islands |
| Aegean Breeze Maritime Company | 4390 | Greece |
| Aegean Tiffany Maritime Company | 4391 | Greece |
| Ithaki Marine S.A. | | Liberia |
| Cephallonia Marine S.A. | | Liberia |
| Kerkyra Marine S.A. | | Liberia |
| Kythira Marine S.A. | | Liberia |
| Ios Marine Inc. | | Liberia |
| Paxoi Marine S.A. | | Liberia |
| Zakynthos Marine Limited | HE378106 | Cyprus |
| Aegean Barges N.V. | BE0860.038.523, RPR/RPM Antwerp, section Antwerp | Belgium |
| Aegean NWE N.V. | BE0412.527.142, RPR/RPM Antwerp, section Antwerp | Belgium |
| Aegean Bunkering Germany GmbH | HRB 16326 KI | Germany |
| Obast Bunkering & Trading GmbH | HRB 13560 | Germany |
| Sifnos Marine Inc. | | Liberia |
| Andros Marine Limited | HE334504 | Cyprus |
| Dilos Marine Inc. | | Liberia |
| Ios Shipping Ltd | C58204 | Malta |
| Aegean VII Shipping Ltd | C22401 | Malta |
| Halki Navigation S.A. | | Liberia |
| Kassos Navigation S.A. | | Liberia |
| Symi Navigation S.A. | | Liberia |
| Tilos Shipping (Pte.) Ltd. | 201103601N | Singapore |
| Aegean Oil Terminal Corporation | 29458 | Marshall Islands |
| Aegean Management Services M.C. | 4281 | Greece |
| Kimolos Maritime Inc. | 13454 | Marshall Islands |
| Milos Shipping (Pte.) ~~LTD~~Ltd. | 200617549N | Singapore |
| Mykonos I Maritime Limited | HE277601 | Cyprus |

| Name of Original Guarantors | Registration number (or equivalent, if any) | Original Jurisdiction |
|---|---|---|
| Tinos Marine Inc. | | Liberia |
| Serifos Shipping (Pte.) Ltd. | 200617548D | Singapore |
| Aegean Ship XII Maritime Company | 4324 | Greece |
| Tempest Shiptrade Ltd. | 68920 | Marshall Islands |
| Amorgos Maritime Inc. | 13453 | Marshall Islands |
| Aegean Marine Petroleum Network Inc. | 14958 | Marshall Islands |
| Aegean Petroleum International Inc. | 28486 | Marshall Islands |
| Tasman Seaways Inc. | | Liberia |
| Santon Limited | | Liberia |
| Aegean Ace Maritime Company | 4392 | Greece |
| Aegean Ship III Maritime Company | 4326 | Greece |
| Aegean Ship VIII Maritime Company | 4325 | Greece |
| Nevado Navigation S.A. | | Liberia |
| Aegean Tanking S.A | | Liberia |
| Sealand Navigation Inc. | 47283 | Marshall Islands |
| Benmore Services S.A. | | Liberia |
| Eton Marine Ltd. | | Liberia |
| Ingram Enterprises Co. | | Liberia |
| Aegean Marine Petroleum S.A. | C-76656 | Liberia |
| I.C.S. Petroleum Ltd. | BC 0904178 | Canada |
| Aegean Bunkering (USA) LLC | 5427961 | Delaware |
| Aegean Maistros Maritime Company | 4254 | Greece |
| Aegean Gas Maritime Company | 3185 | Greece |
| Aegean Bunkering Combustibles Las Palmas SOCIEDAD ANÓNIMA | A76062967 | Las Palmas (Spain) |
| | | |
| Aegean (Fujairah) Bunkering SA | 20805 | Marshall Islands |
| Aegean Agency (Gibraltar) Limited | 94757 | Gibraltar |
| Caribbean Renewable Energy Sources Inc. | 1383829 | British Virgin Islands |
| West Coast Fuel Transport Ltd | BC 0393251 | Canada |
| Aegean Bunkering (Gibraltar) Limited | 62347 | Gibraltar |
| Aegean Holdings S.A. | 1932 | Marshall Islands |
| Aegean Bunkering (Jamaica) Limited | 69,725 | Jamaica |
| AMPN USA, LLC | 4268678 | Delaware |
| Aegean Oil (USA), LLC | 3827668 | Delaware |
| I.C.S. Petroleum (Montreal) Ltd. | 206054-0 | Canada |
| Aegean Bunkering Morocco SARL AU | 46175 (trade registry of Tangier, Morocco) | Morocco |
| Aegean Bunkering (Singapore) Pte. Ltd. | 200507771M | Singapore |
| Aegean Bunkering (Trinidad) Ltd. | A-3728(95) | Trinidad & Tobago |
| AMPNI Investments Co. Limited | HE245425 | Cyprus |
| AMPNI Holdings Co. Limited | HE245361 | Cyprus |
| Maistros RORO Shipholdings Ltd | C42783 | Malta |
| Ostria RORO Shipholdings Ltd | C42784 | Malta |
| Aegean Tankfarms Holdings S.A. | 47687 | Marshall Islands |
| Aegean Investments S.A. | 9825 | Marshall Islands |

## Part II
## The Original Lenders

| Name of Original Lender | Facility A Tranche 1 Commitments ($) | Facility A Tranche 2 Commitments ($) | Facility B Tranche 1 Commitments ($) | Facility B Tranche 2 Commitments ($) |
|---|---|---|---|---|
| Mercuria Energy Trading S.A. | 200,000,000 | 200,000,000 | [●]25,200,000 | 100,000,000 |

# Schedule 2
# Conditions precedent

## Part I
## Conditions precedent to initial Utilisation

*For the avoidance of doubt, these Part I conditions precedent applied to the initial Utilisation only and the initial Utilisation occurred prior to the Effective Date.*

**1      Obligors and parties to security documents**

(a)     A copy of the constitutional documents of each Obligor.

(b)     If required by the Facility Agent, a copy of a signed resolution of the board of directors of each Obligor:

      (i)      approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

      (ii)     authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf;

      (iii)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

      (iv)     in the case of an Obligor other than the Company, authorising the Company to act as its agent in connection with the Finance Documents.

(c)     A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(d)     A copy of a resolution signed by all the holders of the issued shares in each Guarantor approving the terms of, and the transactions contemplated by, the Finance Documents to which that Guarantor is a party.

(e)     If required, a copy of a resolution of the board of directors of each corporate shareholder of each Guarantor approving the terms of the resolution referred to in paragraph (d) above.

(f)     A certificate of each Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(g)     A certificate of an authorised signatory of the Company or other relevant Obligor certifying that each copy document relating to it specified in this Part I of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

(h)     A certificate of good standing in respect of each of the Parent, the Company and APII.

(i)     Evidence of the authority of Horizon Tangiers Terminal S.A. to execute the Moroccan Pledge.

(j)     Evidence of the authority of AOTC (as bailee) to execute the UAE Pledges.

(k)     In respect of Aegean Tanking S.A.:

(i)      a copy of its constitutional documents;

(ii)     a copy of a signed resolution of its board of directors:

     (A)    approving the terms of, and the transactions contemplated by, each South African Pledge to which it is a party and resolving that it execute, deliver and perform each South African Pledge to which it is a party;

     (B)    authorising a specified person or persons to execute each South African Pledge to which it is a party on its behalf; and

     (C)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with each South African Pledge to which it is a party;

(iii)    a specimen of the signature of each person authorised by the resolution referred to in paragraph (ii) above in relation to each South African Pledge; and

(iv)    a certificate of good standing.

(l)     In respect of Aegean Bunkering Marine Services Proprietary Limited:

(i)      a copy of its constitutional documents;

(ii)     a copy of a signed resolution of its board of directors:

     (A)    approving the terms of, and the transactions contemplated by, each South African Pledge to which it is a party and resolving that it execute, deliver and perform the New South African Security Documents to which it is a party;

     (B)    authorising a specified person or persons to execute each South African Pledge to which it is a party on its behalf; and

     (C)    authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices to be signed and/or despatched by it under or in connection with each South African Pledge to which it is a party; and

(iii)    a specimen of the signature of each person authorised by the resolution referred to in paragraph (ii) above in relation to each South African Pledge.

## 2    Finance Documents

(a)    This Agreement executed by the Obligors party to this Agreement.

(b)    The fee letters duly executed by each party.

(c)    Any Stock Monitoring Agreement or Collateral Management Agreement required pursuant to clause 22.15 (*Inspection and Management in Sensitive Zones*).

(d)    At least two originals of the documents referred to in paragraphs (a)-(g) of the definition of Transaction Security Documents (other than those listed as conditions subsequent in clause 24.25 (*Conditions subsequent*)), duly executed by each party.

(e)    A copy of all notices required to be sent under the Transaction Security Documents referred to in paragraph (d) above, executed by the Borrower, duly acknowledged by the addressee to the extent required by the relevant Transaction Security Document.

(f)     Evidence, satisfactory to the Facility Agent, that all steps have been taken in any relevant jurisdiction to perfect any Security created by the Transaction Security Documents.

## 3     Insurance

(a)     Copies of all insurances required to be maintained by the Borrowers and the Spanish Pledgor in respect of assets included or capable of being included in the Borrowing Base.

(b)     A letter from WILLIS Limited, 51 Line Street, London EC3M 7DQ, UK, as insurance broker, dated no earlier than the date of this Agreement addressed to the Facility Agent, the Security Agent and the Lenders listing the insurance policies of the Borrowers and the Spanish Pledgor and confirming that they are on risk and that the insurance for Borrowers and the Spanish Pledgor at the date of this Agreement are at a level acceptable to the Majority Lenders and covering appropriate risks for the business carried out by Borrowers and the Spanish Pledgor and otherwise confirming compliance by the Borrowers with the insurance requirements of this Agreement including that Security Agent and the US DIP Administrative Agent is each named as a co-insured and together sole loss payees in respect of such insurance.

## 4     Accounts

A letter from the Account Bank to the Collateral Management Agent, the Security Agent and the Facility Agent confirming the opening of each Facility Account and each Collection Account and specifying the account name, account number and the name and address of the bank where each such account is held.

## 5     Legal opinions

The following legal opinions, each addressed to the Facility Agent, the Security Agent and the Original Lenders and capable of being relied upon by any persons who become Lenders pursuant to the primary syndication of the Facility.

(a)     A legal opinion of the following legal advisers to the Facility Agent:

   (i)     Norton Rose Fulbright LLP as to English law;

   (ii)    Norton Rose Fulbright Morocco SARL as to Moroccan law;

   (iii)   Koan as to Belgian law;

   (iv)    Norton Rose Fulbright LLP as to Dutch law;

   (v)     Norton Rose Fulbright (Middle East) LLP as to UAE law;

   (vi)    Norton Rose Fulbright South Africa Inc. as to South African law;

   (vii)   Norton Rose Fulbright US LLP as to Marshall Islands law;

   (viii)  Norton Rose Fulbright US LLP as to Liberian law; and

   (ix)    Norton Rose Fulbright LLP as to German law,

   each substantially in the form distributed to the Original Lenders prior to signing this Agreement.

(b)     If an Obligor is incorporated in a jurisdiction other than those referred to in paragraph (a) above, a legal opinion of the legal advisers to the Facility Agent in the relevant jurisdiction, substantially in the form distributed to the Original Lenders prior to signing this Agreement.

## 6    Other documents and evidence

(a)    Evidence that any process agent referred to in clause 44.2 (*Service of process*), if not an Obligor, has accepted its appointment.

(b)    The Group Structure Chart.

(c)    A copy, certified by an authorised signatory of the Company to be a true copy, of the Original Financial Statements of each Obligor.

(d)    A letter of engagement with the Finance Parties and Secured Parties from the Auditors of the Group which will be providing Compliance Certificates.

(e)    A copy of any other Authorisation or other document, opinion or assurance which the Facility Agent considers to be necessary or desirable (if it has notified the Company accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(f)    Evidence that the fees, costs and expenses then due from the Company pursuant to clause 14 (*Fees*), clause 15.5 (*Stamp taxes*) and clause 19 (*Costs and Expenses*) have been paid or will be paid by the first Utilisation Date.

(g)    A copy of any waiver required under any existing loan facilities of any Group member in connection with the entry into of the Finance Documents.

(h)    A risk management policy as mandated by management in form and substance acceptable to the Lenders.

(i)    Evidence that each Material Subsidiary has executed this Agreement as a Guarantor and that no additional Guarantors are required to accede to this Agreement pursuant to clause 29.7 (*Additional Guarantors*).

(j)    Evidence that each Finance Party has satisfied its "know-your-customer" requirements in connection with the transactions contemplated by this Agreement.

(k)    An overview of existing security and existing indebtedness, to the extent not refinanced or released by the Facilities.

(l)    Evidence (in the form of deeds of release executed by the beneficiary of the security or such other form as the Facility Agent may require acting on the advice of legal counsel) that immediately following the making of the Utilisation any existing Security granted by any member of the Group in respect of Financial Indebtedness of any Group member (other than the Facilities) which relates to assets which may be included in the Borrowing Base and secured by the Transaction Security are released in full (including without limitation any Security in respect of the assets secured by the Moroccan Pledges and the Security Agreement and any floating charges or Security of similar general application in any jurisdiction).

(m)    An overview of existing loans and guarantees.

(n)    A copy of the Compliance Policy acceptable to the Lenders.

(o)    A copy of the Group's hedging policy in the form approved by all Lenders.

(p)    Address details for all warehouses where Eligible Inventory is located.

# Part II
# Conditions precedent required to be delivered by an Additional Obligor

1    An Accession Letter, duly executed by the Additional Obligor and the Company.

2    A copy of the constitutional documents of the Additional Obligor.

3    Originals of any Transaction Security Documents to be entered into by an Additional Borrower as required by the Facility Agent (acting on the instructions of the Majority Lenders) together with such legal opinions as the Facility Agent (acting on the instructions of the Majority Lenders) shall require in connection therewith.

4    A copy of a resolution of the board of directors of the Additional Obligor:

   (a)    approving the terms of, and the transactions contemplated by, the Accession Letter and the Finance Documents and resolving that it execute the Accession Letter;

   (b)    authorising a specified person or persons to execute the Accession Letter on its behalf;

   (c)    authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to an Additional Borrower, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents; and

   (d)    authorising the Company to act as its agent in connection with the Finance Documents.

5    A specimen of the signature of each person authorised by the resolution referred to in paragraph 4 above.

6    A copy of a resolution signed by all the holders of the issued shares of the Additional Guarantor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Guarantor is a party.

7    A certificate of the Additional Obligor (signed by a director) confirming that borrowing or guaranteeing, as appropriate, the Total Commitments would not cause any borrowing, guaranteeing or similar limit binding on it to be exceeded.

8    A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Part II of Schedule 2 is correct, complete and in full force and effect as at a date no earlier than the date of the Accession Letter.

9    A copy of any other Authorisation or other document, opinion or assurance which the Facility Agent considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Letter or for the validity and enforceability of any Finance Document.

10   If available, the latest audited financial statements of the Additional Obligor.

11   A legal opinion of Norton Rose Fulbright, legal advisers to the Facility Agent in England.

12   If the Additional Obligor is incorporated in a jurisdiction other than England and Wales, or is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Facility Agent in the jurisdiction in which the Additional Obligor is incorporated or, as the case may be, the jurisdiction of the governing law of that Finance Document.

13  If the proposed Additional Obligor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in clause 44.2 (*Service of process*), if not an Obligor, has accepted its appointment in relation to the proposed Additional Obligor.

14  Additionally, in respect of a Spanish Obligor:

(i)  a copy of the  excerpt (certificación literal parcial) issued by the relevant Commercial Registry of incorporation of such Spanish Obligor containing the up to date by-laws, the current composition of the management body, evidencing that it is duly incorporated and validly existing and has not been dissolved, liquidated or become subject to an insolvencyproceeding.

(ii)  a resolution signed by all the holders of the issued shares in it approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party for the purposes of Article 160f) of the Spanish Companies Act.

# Part III
## Conditions precedent required to be delivered in connection with Sensitive Zones

The Facility Agent shall have entered into a valid Stock Monitoring Agreement (in respect of floating storage) and a Collateral Management Agreement (in respect of inland storage) (as applicable) with the parties thereto and the relevant Borrowers shall have provided to the Facility Agent such security documents and related legal opinions as may be required by, and in a form and substance satisfactory to, the Facility Agent (acting on the instructions of all Lenders) in respect of the relevant part of the Sensitive Zone.

# Part IV
## Spanish Pledgor conditions precedent

(b)  A copy of the constitutional documents of the Spanish Pledgor and  a copy of the excerpt (*certificación literal*) issued by the relevant Commercial Registry containing the up-to-date bylaws, containing the current composition of the management body, evidencing that it is duly incorporated and validly existing and has not been dissolved, liquidated or become subject to an insolvency proceeding.

(c)  If required by the Facility Agent, a copy of a signed resolution of the board of directors of the Spanish Pledgor:

(i)  approving the terms of, and the transactions contemplated by, the Finance Documents to which it is a party and resolving that it execute, deliver and perform the Finance Documents to which it is a party;

(ii)  authorising a specified person or persons to execute the Finance Documents to which it is a party on its behalf;

(iii)  authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

(iv)  in the case of an Obligor other than the Company, authorising the Company to act as its agent in connection with the Finance Documents.

(d) A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above in relation to the Finance Documents and related documents.

(e) A copy of a resolution signed by all the holders of the issued shares in the Spanish Pledgor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Spanish Pledgor is a party for the purposes of Article 160f) of the Spanish Companies Act.

(f) A certificate of the Spanish Pledgor (signed by a director) confirming that securing the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(g) A certificate of an authorised signatory of the Spanish Pledgor certifying that each copy document relating to it specified in this Part IV of Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

(h) Evidence that any existing Security granted by the Spanish Pledgor which relates to assets which may be included in the Borrowing Base and secured by the Transaction Security are released in full.

# Schedule 3
# Utilisation Request

## Part A: Loans

From:       [Aegean Marine Petroleum S.A.] [Borrower]
To:         ABN AMRO Bank N.V. as Facility Agent
Copy:      ABN AMRO Bank N.V. as Collateral Management Agent
           [list all issuing banks]

Dated:

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1     We refer to the Facility Agreement.  This is a Utilisation Request.  Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2     We wish to make a Utilisation on the following terms:

     (a)    Proposed Utilisation Date:    [    ] (or, if that is not a Business Day, the next Business Day)

     (b)    Borrower:    [    ]

     (c)    Facility to be utilised: Facility A

     (d)    Tranche to be utilised:  [Tranche 1 / Tranche 2]

     (e)    Amount:   [    ] or, if less, the Available Facility

     (f)    Currency of Loan: [dollars/euro]

     (g)    Interest Period:  [    ]

     (h)    [Term or Expiry Date:  [    ]]

3     We confirm that:

     (a)    each condition specified [in clause 4.4 (*Further conditions precedent in relation to ABGG and OBTG*) and] clause 4.2 (*Further conditions precedent*) is satisfied on the date of this Utilisation Request; and

     (b)    each of the requirements set out in clauses 5.4(c) - (e) (*Currency and amount*) are correct as at the date of this Utilisation Request and will be correct on the Utilisation Date.

4     The proceeds of this Loan should be credited to [*account*].

5     This Utilisation Request is irrevocable.

Yours faithfully

…………………………………
authorised signatory for

[the Company on behalf of [*insert name of Borrower*]]/ [*insert name of Borrower*]

**Part B: Fronted Facilities**

From:      [Aegean Marine Petroleum S.A.] [Borrower]
To:         [ ] as Issuing Bank

Copy:     ABN AMRO Bank N.V. as Collateral Management Agent
            [list all issuing banks]

Dated:

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1      We refer to the Facility Agreement. This is a Utilisation Request. Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2      We wish to make a Utilisation on the following terms:

      (a)     Proposed Utilisation Date:    [     ] (or, if that is not a Business Day, the next Business Day)

      (b)     Borrower:     [     ]

      (c)     Facility to be utilised: [Facility B Tranche 1 / Facility B Tranche 2]

      (d)     Proposed Issuing Bank: [    ]

      (e)     Amount:    [     ] or, if less, the Available Facility

      (f)     [Beneficiary:    [     ]]

      (g)     [Term or Expiry Date:   [     ]]

      (h)     [Delivery Instructions]

3      We confirm that:

      (a)     each condition specified [in clause 4.4 (*Further conditions precedent in relation to ABGG and OBTG*) and] clause 4.2 (*Further conditions precedent*) and 5.8 (*Issue of Credit Instruments*) is satisfied on the date of this Utilisation Request; and

      (b)     each of the requirements set out in clauses 5.4(c) - (e) (*Currency and amount*) are correct as at the date of this Utilisation Request and will be correct on the Utilisation Date.

4      This Utilisation Request is irrevocable.

Yours faithfully

…………………………………
authorised signatory for

[the Company on behalf of [*insert name of Borrower*]]/ [*insert name of Borrower*]

## Schedule 4
## Form of Transfer Certificate

To:       ABN AMRO Bank N.V. as Facility Agent

From:   [*The Existing Lender*] (the **Existing Lender**) and [*The New Lender*] (the **New Lender**)

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1      We refer to the Facility Agreement.  This agreement (the **Agreement**) shall take effect as a Transfer Certificate for the purpose of the Facility Agreement.  Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2      We refer to clause 27.5 (*Procedure for transfer*) of the Facility Agreement:

(a)    The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation and in accordance with clause 27.5 (*Procedure for transfer*) all of the Existing Lender's rights and obligations under the Facility Agreement and the other Finance Documents which relate to that portion of the Existing Lender's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

(b)    The proposed Transfer Date is [        ].

(c)    The Facility Office and address, email and attention details for notices of the New Lender for the purposes of clause 36.2 (*Addresses*) are set out in the Schedule.

3      The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of clause 27.4 (*Limitation of responsibility of Existing Lenders*).

4      The New Lender confirms that it [is]/[is not]*** a Parent Affiliate.

45     This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

56     This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

67     This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:    The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

---

*** Delete as applicable.

# The Schedule
## Commitment/rights and obligations to be transferred

*[insert relevant details]*
*[Facility Office address, email and attention details for notices and account details for payments,]*

[Existing Lender]                                    [New Lender]

By:                                                  By:


This Agreement is accepted as a Transfer Certificate for the purposes of the Facility Agreement by the Facility Agent and the Transfer Date is confirmed as [  ].

[Facility Agent]

By:

# Schedule 5
# Form of Assignment Agreement

To: ABN AMRO Bank N.V. as Facility Agent and Aegean Marine Petroleum S.A. as the Company, for and on behalf of each Obligor

From: [the *Existing Lender*] (the **Existing Lender**) and [the *New Lender*] (the **New Lender**)

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1    We refer to the Facility Agreement. This is an Assignment Agreement. This agreement (the **Agreement**) shall take effect as an Assignment Agreement for the purpose of the Facility Agreement. Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2    We refer to clause 27.6 (*Procedure for assignment*) of the Facility Agreement:

   (a)    The Existing Lender assigns absolutely to the New Lender all the rights of the Existing Lender under the Facility Agreement, the other Finance Documents and in respect of the Transaction Security which correspond to that portion of the Existing Lender's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

   (b)    The Existing Lender is released from all the obligations of the Existing Lender which correspond to that portion of the Existing Lender's Commitment and participations in Utilisations under the Facility Agreement specified in the Schedule.

   (c)    The New Lender becomes a Party as a Lender and is bound by obligations equivalent to those from which the Existing Lender is released under paragraph (b) above.

3    The proposed Transfer Date is [ ].

4    On the Transfer Date the New Lender becomes Party to the relevant Finance Documents as a Lender.

5    The Facility Office and address, email and attention details for notices of the New Lender for the purposes of clause 36.2 (*Addresses*) are set out in the Schedule.

6    The New Lender expressly acknowledges the limitations on the Existing Lender's obligations set out in paragraph (c) of clause 27.4 (*Limitation of responsibility of Existing Lenders*).

7    The New Lender confirms that it [is]/[is not]*** a Parent Affiliate.

7̶8    This Agreement acts as notice to the Facility Agent (on behalf of each Finance Party) and, upon delivery in accordance with clause 27.7 (*Copy of Transfer Certificate or Assignment Agreement to the Company*), to the Company (on behalf of each Obligor) of the assignment referred to in this Agreement.

---

*** Delete as applicable.

89    This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

910    This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

1011    This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note:**    **The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Lender's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Lender to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Lender's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

# The Schedule

**Commitment/rights and obligations to be transferred by assignment, release and accession**

*[insert relevant details]*
*[Facility office address, email and attention details for notices and account details for payments]*

[Existing Lender]                                              [New Lender]

By:                                                                      By:

This Agreement is accepted as an Assignment Agreement for the purposes of the Facility Agreement by the Facility Agent and the Transfer Date is confirmed as [ ].

Signature of this Agreement by the Facility Agent constitutes confirmation by the Facility Agent of receipt of notice of the assignment referred to in this Agreement, which notice the Facility Agent receives on behalf of each Finance Party.

[Facility Agent]

By:

# Schedule 6
# Form of Compliance Certificate

To:     ABN AMRO Bank N.V. as Facility Agent

From:   Aegean Marine Petroleum Network Inc.

Dated:

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated pursuant to an amendment and restatement agreement dated [●] 2018 (the Facility Agreement)**

1    We refer to the Facility Agreement.  This is a Compliance Certificate.  Terms defined in the Facility Agreement have the same meaning when used in this Compliance Certificate unless given a different meaning in this Compliance Certificate.

2    We confirm that:

     *[Insert details to be certified].*

3    [We confirm that no Default is continuing.]*

Signed      ……………………..              ……………………..
            Director                        Director
            of                              Of
            Aegean Marine Petroleum Network    Aegean Marine Petroleum Network
            Inc.                            Inc.

[The Auditors confirm that in making the examination necessary to provide this Compliance Certificate no knowledge was obtained of any Default arising from a breach under clause [23] (*Budget variance*) or, if any such Default shall exist, stating the nature and status of such event. *

……………………..
for and on behalf of
[*name of Auditors of Parent*]**

**NOTES:**
*       If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.
**      To be provided only to the extent consistent with accounting industry policies generally followed by independent certified public accountants

# Schedule 7
# Timetables

| | Utilisations in euro | Utilisations in other currencies |
|---|---|---|
| Delivery of a duly completed Utilisation Request (clause 5.1 (*Delivery of a Utilisation Request*)) – **Facility A** | U-3<br>9.30am | U-3<br>9.30am |
| Delivery of a duly completed Utilisation Request (clause 5.1 (*Delivery of a Utilisation Request*)) – **Facility B** | not applicable | not applicable |
| Facility Agent determines (in relation to a Utilisation) the Base Currency Amount of the Loan, if required under clause 5.6 and notifies the Lenders of the Loan in accordance with clause 5.6 (*Role of Facility Agent and Issuing Bank*) | U-3<br>Noon | U-3<br>noon |
| Relevant Issuing Bank notifies the Facility B Lenders of the Fronted Facility in accordance with clause 5.6 (*Role of Facility Agent and Issuing Bank*) | | |
| LIBOR is fixed | Quotation Day as of 11:00 a.m. in respect of LIBOR | Quotation Day as of 11:00 a.m. |

| | | |
|---|---|---|
| "U" | = | date of utilisation or, if applicable, in the case of a Loan that has already been borrowed, the first day of the relevant Interest Period for that Loan. |
| "U - X" | = | X Business Days prior to date of utilisation |

# Schedule 8
## Forms of Notifiable Debt Purchase Transaction Notice

## Part I
## Form of Notice on Entering into Notifiable Debt Purchase Transaction

To:      ABN AMRO Bank N.V. as Facility Agent

From:    [*The Lender*]

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1    We refer to paragraph (b) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*) of the Facility Agreement.  Terms defined in the Facility Agreement have the same meaning in this notice unless given a different meaning in this notice.

2    We have entered into a Notifiable Debt Purchase Transaction.

3    The Notifiable Debt Purchase Transaction referred to in paragraph 2 above relates to the amount of our Commitment(s) as set out below.

| Commitment | Amount of our Commitment to which Notifiable Debt Purchase Transaction relates |
|---|---|
| Commitment | [*insert amount (of that Commitment) to which the relevant Debt Purchase Transaction applies*] |

[Lender]

By:

## Part II
## Form of Notice on Termination of Notifiable Debt Purchase Transaction / Notifiable Debt Purchase Transaction ceasing to be with Parent Affiliate

To:         ABN AMRO Bank N.V. as Facility Agent

From:     [*The Lender*]

Dated:

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Facility Agreement)**

1        We refer to paragraph (c) of clause 28.2 (*Disenfranchisement on Debt Purchase Transactions entered into by Parent Affiliates*) of the Facility Agreement.  Terms defined in the Facility Agreement have the same meaning in this notice unless given a different meaning in this notice.

2        A Notifiable Debt Purchase Transaction which we entered into and which we notified you of in a notice dated [ ] has [terminated]/[ceased to be with a Parent Affiliate].*

2~~3~~      The Notifiable Debt Purchase Transaction referred to in paragraph 2 above relates to the amount of our Commitment (s) as set out below.

| Commitment | Amount of our Commitment to which Notifiable Debt Purchase Transaction relates |
|---|---|
| [Commitment | [*insert amount (of that Commitment) to which the relevant Debt Purchase Transaction applies*] |

[Lender]

By:

| Name | Registration number (or equivalent, if any) Jurisdiction of incorporation | Invoice Buyer/ LC Buyer | [Any conditions in relation to that Buyer] |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

---

\*     Delete as applicable.

## Schedule 9
## Form of Accession Letter

To:    ABN AMRO Bank N.V. as Facility Agent

From: [Subsidiary] and Aegean Marine Petroleum S.A.

Dated: [●]

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Agreement)**

1    We refer to the Agreement.  This is an Accession Letter.  Terms defined in the Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

2    [*Subsidiary*] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Agreement as an Additional [Borrower]/[Guarantor] pursuant to clauses [29.2 and 0 (*Additional Borrowers*)]/[clauses 29.7 and 29.11 (*Additional Guarantors*)] of the Agreement. [Subsidiary] is a company duly incorporated under the laws of [*name of relevant jurisdiction*].

3    [The Company confirms that no Default is continuing or would occur as a result of [*Subsidiary*] becoming an Additional Borrower.]

4    [*Subsidiary's*] administrative details are as follows:

Address:

Email:

Attention:

5    This Accession Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

This Accession Letter is entered into by deed.


………………………….                    …………………………….

Aegean Marine Petroleum S.A.                    [Subsidiary]

# Schedule 10
# Form of Resignation Letter

To:    ABN AMRO Bank N.V. as Facility Agent

From: [resigning Obligor] and Aegean Marine Petroleum S.A.

Dated: [●]

Dear Sirs

**Aegean Marine Petroleum S.A. Superpriority Secured Debtor-In-Possession Facility Agreement dated 30 November 2017 as amended and restated on [●] 2018 (the Agreement)**

1    We refer to the Agreement.  This is a Resignation Letter.  Terms defined in the Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2    Pursuant to [clauses 29.4 and 29.5 (*Resignation of a Borrower*)]/[clauses 29.12 and 29.13 (*Resignation of a Guarantor*)], we request that [*resigning Obligor*] be released from its obligations as a [Borrower]/[Guarantor] under the Agreement.

3    We confirm that[:

    (a)    no Default is continuing or would result from the acceptance of this request; and

    (b)    no payment is due from us under the Finance Documents;

    (c)    [*where Guarantor is also a Borrower:*] we have no actual or contingent obligations as a Borrower under any Finance Document.

4    This Resignation Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.


………………………………        ………………………….

Aegean Marine Petroleum S.A.      [Subsidiary]

By:                         By:

# Schedule 11
# Borrowing Base Amount

**1**   **Borrowing Base**

(a)   The **Borrowing Base** shall be calculated by

(i) multiplying the Borrowing Base Items by the Advance Rate applicable to each specific Borrowing Base Item set out below; and

(ii) deducting 85% of trade payables to suppliers based on open credit:

| Borrowing Base Items | Advance Rate |
|---|---|
| Secured Cash | 100% |
| Hedging Credit Balances | 80% |
| Tier 1 Eligible Receivables | 100% |
| Tier 2 Eligible Receivables | 95% |
| Tier 3 Eligible Receivables | 85% |
| Tier 1 Eligible Inventory | 90% |
| Tier 2 Eligible Inventory | 85% |
| Tier 3 Eligible Inventory | 85% |
| Non-Performed Letters of Credit | 85% |

; and

(iii) and, without duplication of any other Availability Reserve of other eligibility criteria, deducting any Availability Reserve.

*provided that:*

(i)   all such assets referred to above will only be included in the calculation of the Borrowing Base Amount if such assets (and any insurances or other rights in relation thereto) are:

(A)   held by a Borrower or, in the case of assets secured by the Spanish Pledges, by a Spanish Pledgor with unencumbered title;

(B)   not subject to any dispute, litigation, arbitration proceedings or threatened litigation or arbitration proceedings;

(C)   (save as expressly contemplated to the contrary in this Schedule 12 (*Borrowing Base Amount*)) subject to a fully-perfected charge, pledge or other Security granted on a first-ranking basis in favour of the Security Agent in accordance with the terms of this Agreement and the Transaction Security Documents and not otherwise subject to any set-off or Security rights in favour of any party other than the Security Agent;

(D) in respect of inventory located in the Sensitive Zone, the subject of a Stock Monitoring Agreement (for floating storage) or a Collateral Management Agreement (for inland storage);

(ii) no asset shall be eligible for inclusion in the calculation of the Borrowing Base Amount if such asset does not otherwise comply with the eligibility conditions set out in this Agreement;

(iii) no asset shall be eligible for inclusion in more than one category of the same Borrowing Base Report;

(iv) promptly following receipt of each Borrowing Base Report required to be delivered under this Agreement, if the Majority Lenders agree on the amount of the Borrowing Base, such Majority Lenders shall notify the Facility Agent in writing of such amount. If following receipt of a Borrowing Base Report required to be delivered hereunder, there is not agreement among the Majority Lenders regarding the amount of the Borrowing Base, the Majority Lenders shall notify the Facility Agent in writing that the Borrowing Base is an amount equal to the weighted average (based on Commitment amount) of the amounts determined by each Lender for the Borrowing Base; and

(v) notwithstanding any other provision of this Agreement, in the event the Facility Agent (acting on the instructions of the Majority Lenders) imposes any changes to the Borrowing Base Items or Availability Reserves as a result of changing or reducing credit limits imposed on any account debtor, such changes (i) shall be effective two (2) Business Days following written notice thereof to the Borrower (it being agreed any Eligible Receivables created after such notice in excess thereof, may be excluded from the Borrowing Base) and (ii) shall not apply to any Eligible Receivables in existence as of the date of imposition of such change.

## 2    Reserves

Notwithstanding any other provision of this Agreement, the Facility Agent (on the instructions of the Majority Lenders) may at any time and from time to time after two (2) Business Days' prior written notice, establish and increase or decrease the Availability Reserve in the exercise of its Permitted Discretion. The Availability Reserve shall not duplicate eligibility criteria contained in the definition of Tier 1 Eligible Receivables or Tier 1 Eligible Receivables.

## 3    Definitions

Terms used in this Schedule 11 (*Borrowing Base Amount*) have the following meanings:

**Advance Rate** means each rate referred to in the second column of the table set out in paragraph 1(a) (*Borrowing Base*) above

**Approved Barge Territory** means Gibraltar and any other jurisdiction as may be approved in writing by the Facility Agent (acting on the instructions of Majority Lenders) to the Company from time to time

**Availability Reserve** means reserves in such amounts as the Facility Agent in its Permitted Discretion, upon the written instruction of the Majority Lenders in the exercise of such Permitted Discretion, and with two (2) Business Day's prior written notice to the Borrower (and the Facility Agent (acting on the instructions of the Majority Lenders) shall be available to discuss any such reserves with the Borrower), may elect to impose from time to time as being appropriate to (i) reflect the impediments to the Facility Agent's ability to realize upon the Transaction Security, (ii) to reflect claims and liabilities, including liens and claims that may have (or may appear to have hereafter) priority over that of the Finance Parties, that the Facility Agent determines will need to be satisfied in connection with the realization upon the Transaction Security, (iii) reflect the risk that a jurisdiction outside the United States does not give extraterritorial application of orders of the Bankruptcy Court, including (without limitation) with respect to perfection or priority

of Security on assets in the Borrowing Base established by order thereof, or (iv) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, the Transaction Security, the creation, perfection or priority of Security over Borrowing Base assets (or proceeds thereof), or the validity or enforceability of the Finance Documents or any remedies of the Secured Parties hereunder or thereunder, including (without limitation) matters related to the quality of inventory, rents and costs, taxes, senior obligations and other matters related to the calculation of the Borrowing Base

**Borrowing Base Item** means each item referred to in the first column of the table set out in paragraph 1(a) (*Borrowing Base*) above

**Credit Insurance** means credit insurance taken out with an insurer or insurers which has a rating for its long-term unsecured and non-credit-enhanced debt obligations of BBB- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or Baa3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency

**Eligible Inventory** means inventory representing a marked to market value (based on West Med FOB/CIF prices in Argus, Platts or any other pricing acceptable to the Lenders) up to a maximum amount before applying the Advance Rate of:

(a)     $100,000,000 per location; and

(b)     $350,000,000 in total,

or any other maximum amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Eligible Receivables** means trade receivables (excluding receivables owing from another member of the Group) which are governed by English, Greek or Belgian law (or any other governing law approved by the Facility Agent) and are payable into a Collection Account representing:

(a)     a nominal face value owing to the Borrowers up to a maximum amount before applying the Advance Rate per counterpart of $20,000,000, other than trade receivables in relation to:

(A) such entities notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company from time to time at such limits applicable to those entities as the Facility Agent (acting on the instructions of the Majority Lenders) may in its sole discretion apply; and

(B) Majors, for which the maximum amount in aggregate for a Listed Oil Major, its wholly-owned Subsidiaries and its Subsidiaries which are not wholly-owned but the obligations in respect of which are guaranteed by a parent company guarantee from such Listed Oil Major, shall be $40,000,000; and

(b)     a maximum tenor of:

(i)     if non-invoiced, invoices must be dispatched within five (5) Business Days of the physical delivery date; or

(ii)     if invoiced, sixty (60) days (such tenor being made up as follows: payment terms within forty five (45) days of the date of invoice (**Due Date**), with a grace period of no more than fifteen (15) days from the Due Date),

or any other maximum amount and maximum tenor from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Hedge Account** means an account held by the Company with a Hedging Provider or a Clearing Provider for the purpose of financing margin calls (and collecting margin returns and settlement amounts) and which is subject to the Transaction Security.

**Hedging Credit Balances** means any sum of cash (being in respect of margin calls) standing to the credit of a Hedge Account as an amount that is returnable after unwinding of, and payment of all amounts due from the Company under, Hedging Agreements.

**Inventory in Transit** mean inventory on board vessels:

(a)     for which bills of lading (comprising documents of title) are issued and endorsed in favour of (and in the possession of) the Security Agent and

     (i)     are in the possession of the Security Agent; or

     (ii)     have been deposited with a reputable international courier for delivery to the Security Agent (and the Security Agent has been provided with evidence satisfactory to it of the same); and

(b)     for a maximum tenor of forty-five (45) days from the bill of lading date for which original bills of lading are issued or endorsed in favour of the Security Agent.

**Listed Oil Major** means:

(a)     BP p.l.c.;

(b)     Chevron Corporation;

(c)     ConocoPhillips Co.;

(d)     ExxonMobil Corporation;

(e)     Royal Dutch Shell plc; and

(f)     Total S.A.

**Major** means:

(a)     a Listed Oil Major;

(b)     a Listed Oil Major's wholly-owned Subsidiaries;

(c)     any Subsidiaries of a Listed Oil Major that is not a wholly-owned Subsidiary but the obligations in respect of which are guaranteed by a parent company guarantee from such Listed Oil Major; and/or

(d)     any other debtor approved by the Facility Agent acting on the instructions of the Majority Lenders,

provided that the Facility Agent (acting on the instructions of the Majority Lenders) may from time to time by three Business Days' notice to the Company exclude any such debtor

**Non-Performed Letters of Credit** means a Credit Instrument in the form of a documentary or standby letter of credit in respect of which the relevant underlying physical transaction relating to the sale and purchase of oil products is yet to occur

**Permitted Discretion** means a determination made by the Majority Lenders in good faith and in the exercise of reasonable (from the prospective of a secured asset-based lender) business judgment exercised in accordance with its customary practices in asset-based credit facilities

**Secured Cash** means cash funds deposited in a Collection Account

**Tier 1 Eligible Receivables** means:

(a) VAT refund claims (*Steuervergütungsansprüche*) against the competent tax authority (*zuständige Finanzbehörde*) in the Federal Republic of Germany; and

(b) invoiced Eligible Receivables:

    (i) covered by a letter of credit issued or confirmed by an Acceptable Bank; or

    (ii) on open account for Majors; or

    (iii) meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company with at least two (2) Business Days prior written notice to the Borrowers (and during such time the Facility Agent (acting on the instructions of the Majority Lenders) shall be available to discuss such changes)

**Tier 2 Eligible Receivables** means invoiced Eligible Receivables on open account for non-Majors or meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Tier 3 Eligible Receivables** means non-invoiced Eligible Receivables up to a maximum amount before applying the Advance Rate of $90,000,000 in total or any other amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Tier 1 Eligible Inventory** means Eligible Inventory:

(a) located in an OECD country;

(b) subject to perfected Security in favour of the Security Agent; and

(c) excluding floating inventory; or

(d) meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company with at least two (2) Business Days prior written notice to the Borrowers (and during such time the Facility Agent (acting on the instructions of the Majority Lenders) shall be available to discuss such changes)

**Tier 2 Eligible Inventory** means:

(a) Eligible Inventory other than Tier 1 Eligible Inventory which is:

    (i) onshore, subject to perfected Security in favour of the Security Agent;

    (ii) Inventory in Transit (excluding inventory on barges);

    (iii) secured floating inventory (excluding inventory on barges) for which bills of lading (comprising documents of title) are issued or endorsed in favour of (and in the possession of) the Security Agent;

    (iv) inventory on barges if located in territorial waters of an Approved Barge Territory;

    (v) inventory on barges where such inventory is secured under a German Security Transfer Agreement prior to loading onto such barge and where such barge has remained in German territorial waters or international waters and has not entered the territory of any other jurisdiction;

(vi)     inventory on barges where such inventory is secured under a South African Pledge and located on a barge which is the subject of a South African Pledge where such barge has remained in South African territorial waters; or

(vii)    inventory on barges where such barges remain at all times in international waters; and

(b)      Eligible Inventory which is subject to a perfected South African Pledge and provided that the floating storage in relation to the South African Pledge is located within South African territorial waters; or

(c)      meets any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company,

and in aggregate up to a maximum amount before applying the Advance Rate of $25,000,000 in total or any other amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

**Tier 3 Eligible Inventory** means Eligible Inventory:

(a)      other than Tier 2 Eligible Inventory;

(b)      including unsecured floating inventory for which bills of lading are not issued or endorsed in favour of the Security Agent; and

(c)      up to a maximum amount before applying the Advance Rate of $30,000,000 in total or any other amount from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company; or

(d)      meeting any other criteria from time to time notified by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company

## Inventory locations

For the purposes of this Schedule 11 (and without prejudice to any of the foregoing):

(a) where inventory is located in a particular jurisdiction or in its territorial waters, it shall only be considered capable of being "secured" (ie capable of being included in the Borrowing Base, subject to the other conditions for inclusion in respect thereof) if it is located in one of the following jurisdictions or any other jurisdiction as may be approved in writing by the Facility Agent (acting on the instructions of the Majority Lenders) to the Company from time to time; and

(b)      in relation to any such jurisdiction the permitted locations/barges, conditions and limits set out below shall apply,

and each Borrowing Base Report shall include all relevant details identifying such jurisdictions and conditions.  Where permitted locations or barges are identified, the same may be amended or supplemented from time to time at the request of the Company and subject to the prior written consent of the Facility Agent (acting on the instructions of the Majority Lenders)

| Jurisdiction | Permitted Location | Permitted Barges | Other specific conditions for inclusion in the Borrowing Base |
|---|---|---|---|
| Spain | Subject to clause 24.25 (*Conditions Subsequent*) | | |
| Germany | Midgardstraße 50, 26954 Nordenham, Germany with Rhenus | Not limited to specific barges (subject to | Subject to clause 24.25 (*Conditions* |

| | | | |
|---|---|---|---|
| | Midgard GmbH & Co. KG<br><br>Alter Rethedamm 2, 21107 Hamburg, Germany with Vopak Dupeg Terminal Hamburg GmbH<br><br>Uferstraße 48, 24106 Kiel, Germany with UTG Unabhängige Tanklogistik GmbH (from 1 January 2018) | paragraph (a) (v) of the definition of "Tier 2 Eligible Inventory") | *Subsequent*) |
| Morocco | Horizon Terminals Tangiers facility located in Tanger Med Port, Morocco: Free Zone, Ksar Majed, Tanger Med, Tanger 90000, Morocco | n/a | n/a |
| UAE | Each tank identified in Schedule 1 (*Initial Pledged Assets*) of each UAE Pledge and or, following the date hereof, such tank or tanks as is or are identified in any Holding Certificate, Additional Pledged Assets Notice or Transfer Certificate, as relevant (each as defined in the UAE Pledges), and in each case forming part of the Aegean Oil Terminal located in the Fujairah Free Zone (FOIZ), Al Sudah, PO BOX 2688, Emirate of Fujairah, UAE | n/a | n/a |
| South Africa | FLOATING STORAGE UNIT "MT UMNENGA I" which is the subject of a South African Pledge, whilst in South African territorial waters | Subject to paragraph (a) (vi) of the definition of "Tier 2 Eligible Inventory" – which is limited to specific barges identified in the security. | Subject to clause 24.25 (*Conditions Subsequent*) |
| Gibraltar | n/a | Not limited to specific barges. | n/a |

## Schedule 12
## Form of Borrowing Base Report



FX Rates:
EUR/USD        1.17270
GBP/USD
USD/SGD



**Borrowing Base Certificate in USD**

As of        [Date]

| ASSETS | | Limits & CAPs | | Gross Collateral Before CAP | | Gross collateral After CAP | Advance Rate | Net Collateral |
|---|---|---|---|---|---|---|---|---|
| **Eligible Cash** | | | $ | 54,245,744 | | 54,245,744.22 | 100% | 54,245,744.22 |
| | | | | | | | | |
| Secured Cash held by the Account Bank | | | $ | - | $ | - | 100% | - |
| Hedging Credit Balances | | | $ | - | $ | - | 80% | - |
| **Eligible Receivables** | | | | | | | | |
| | | | | | | | | |
| **Tier1 Eligible Receivables** | | | | | | | | |
| Trade receivables covered by documentary or standby L/C | | | $ | - | $ | - | 100% | - |
| Trade receivables from open account sales to Majors | Max: | $ 40,000,000 | $ | 7,154,224 | $ | 7,154,224 | 100% | 7,154,223.82 |
| **Tier2 Eligible Receivables** | | | | | | | | |
| Trade Receivables from Approved Debtors | | | $ | 62,548,400 | $ | 62,548,400 | 95% | 59,420,980.32 |
| Trade Receivables from open account sales to other non-Majors | | | $ | 179,433,784 | $ | 179,433,784 | 95% | 170,462,094.99 |
| **Tier3 Eligible Receivables** | Max: | $ 90,000,000 | | | | | | |
| Not yet invoiced receivables | | | $ | 5,762,608 | $ | 5,762,608 | 85% | 4,898,216.70 |
| **Eligible Inventory** | Max: | $ 350,000,000 | | | | | | 166,035,350.23 |
| | | | | | | | | |
| **Tier1 Eligible Inventory** | | | | | | | | |
| Inventory Shoretank located in OECD country | | | $ | 11,435,012 | $ | 11,435,012 | 90% | 10,291,510.80 |
| **Tier2 Eligible Inventory** | | | | | | | | |
| Inventory Shoretank located in Non OECD country | | | $ | 75,877,326 | $ | 75,877,326 | 85% | 64,495,727.42 |
| Inventory in Transit (BLs to the order of the Security Agent) | | | $ | 68,423,397 | $ | 68,423,397 | 85% | 58,159,887.26 |
| Floating Storage | | | $ | 21,227,210 | $ | 21,227,210 | 85% | 18,043,128.32 |
| Total: | Max: | $ 250,000,000 | $ | 165,527,933 | $ | 165,527,933 | 85% | 140,698,743.00 |
| **Tier3 Eligible Inventory** | | | | | | | | |
| Inventory on Barges (no BLs) | Max: | $ 30,000,000 | $ | 25,075,161 | $ | 25,075,161 | 60% | 15,045,096.42 |
| (SB)LCs opened but not yet performed | | | | 62,000,000.00 | | | 80% | 49,600,000.00 |
| **Trade Payables (Deducted)** | | | | 1,073,632.96 | | | 85% | 912,588.01 |
| **GROSS / NET BORROWING BASE AMOUNT** | | | | 117,319,377.18 | | | | 270,793,682.46 |

| LIABILITIES | | Limits & CAPs | | Gross Colateral | | Advance Rate | Net Collateral |
|---|---|---|---|---|---|---|---|
| **Facility A Utilisation** | Max: | $ 200,000,000 | | | | | - |
| | | | | | | | |
| Loans | | | $ | - | | 100% | $ - |
| **Facility B Utilisation** | Max: | $ 550,000,000 | | | | | |
| | | | | | | | |
| Overdraft | | | | | | | |
| Overdraft | | | $ | - | | 100% | $ - |
| Credit Instruments | | | | | | | |
| Letter of Credit | | | $ | 52,000,000 | | 100% | $ 52,000,000 |
| Bank Guarantees | | | $ | 96,000,000 | | 100% | $ 96,000,000 |
| **TOTAL OUTSTANDING** | | | | - | | | 148,000,000.00 |
| **FACILITY EXCESS / (SHORTFALL)** | | | | | | | 122,793,682.46 |

Place, Date:        Piraeus, [Date]

Signature:

Function:

Company:

**OUTSTANDING UNDER THE GLOBAL BORROWING BASE FACILITIES**

**FRONTING**

| Issuing Lenders / Facility B | Issuance Caps | Total outstanding LCs/LGs | Total outstanding Overdraft | Text |
|---|---|---|---|---|
| ABN | $ 387,000,000 | $ - | $ - | NO BREACH |
| BNP | $ 150,000,000 | $ - | $ - | NO BREACH |
| KBC | $ 150,000,000 | $ - | $ - | NO BREACH |
| HSH | $ 52,000,000 | $ - | $ - | NO BREACH |
| TOTAL | $ 687,000,000 | $ - | $ - | NO BREACH |

**UTILISATION SUMMARY**

| Utilisation under Facility A (USD) | ABN | BNP | KBC | NATIXIS | HSH | BTMU | BELFIUS | CREDIT SUISSE | MASHREQ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Facility A Approved Amount | $ 40,000,000 | $ 39,000,000 | $ 25,000,000 | $ 18,000,000 | $ 18,000,000 | $ 18,000,000 | $ 15,000,000 | $ 13,000,000 | $ 13,000,000 | $ 199,000,000 |
| Total Facility A Utilisation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Facility A available | $ 40,000,000 | $ 39,000,000 | $ 25,000,000 | $ 18,000,000 | $ 18,000,000 | $ 18,000,000 | $ 15,000,000 | $ 13,000,000 | $ 13,000,000 | $ 199,000,000 |

| Utilisation under Facility B (USD) | ABN | BNP | KBC | NATIXIS | HSH | BTMU | BELFIUS | CREDIT SUISSE | MASHREQ | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Facility B Approved Amount | $ 110,000,000 | $ 101,000,000 | $ 70,000,000 | $ 52,000,000 | $ 52,000,000 | $ 52,000,000 | $ 41,000,000 | $ 36,000,000 | $ 36,000,000 | $ 550,000,000 |
| Total Facility B Utilisation | | | | | | | | | | |
| Bank overdrafts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Letters of Credit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Letters of Guarantee | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| LCs in Transit | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Facility B available | $ 110,000,000 | $ 101,000,000 | $ 70,000,000 | $ 52,000,000 | $ 52,000,000 | $ 52,000,000 | $ 41,000,000 | $ 36,000,000 | $ 36,000,000 | $ 550,000,000 |

| TOTAL UTILISATION | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**OUTSTANDING SPLIT PER BORROWER**

| TOTAL UTILISATION PER BORROWER | AMP | API | ANWE | ABU | ABG | OBAST | Total |
|---|---|---|---|---|---|---|---|
| Total Facility A & B Utilisation | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

| Utilisation under Facility A (Values in USD '000) | AMP | API | ANWE | ABU | ABG | OBAST | Total |
|---|---|---|---|---|---|---|---|
| Total Facility A Utilisation | | | | | | | $ - |

**ABN**

| Utilisation under Facility B (Values in USD '000) | AMP | API | ANWE | ABU | Total |
|---|---|---|---|---|---|
| Total Facility B Utilisation | 0 | 0 | 0 | 0 | 0 |
| Bank overdrafts | $ - | $ - | $ - | $ - | $ - |
| Letters of Credit | $ - | $ - | $ - | $ - | $ - |
| Letters of Guarantee | $ - | $ - | $ - | $ - | $ - |
| LCs in Transit | $ - | $ - | $ - | $ - | $ - |

**BNP**

| Utilisation under Facility B (Values in USD '000) | AMP | API | ANWE | ABU | Total |
|---|---|---|---|---|---|
| Total Facility B Utilisation | 0 | 0 | 0 | 0 | 0 |
| Bank overdrafts | $ - | $ - | $ - | $ - | $ - |
| Letters of Credit | $ - | $ - | $ - | $ - | 0 |
| Letters of Guarantee | $ - | $ - | $ - | $ - | 0 |
| LCs in Transit | $ - | $ - | $ - | $ - | 0 |

**KBC**

| Utilisation under Facility B (Values in USD '000) | AMP | API | ANWE | ABU | Total |
|---|---|---|---|---|---|
| Total Facility B Utilisation | $ - | $ - | $ - | $ - | $ - |
| Bank overdrafts | $ - | $ - | $ - | $ - | $ - |
| Letters of Credit | $ - | $ - | $ - | $ - | 0 |
| Letters of Guarantee | $ - | $ - | $ - | $ - | 0 |
| LCs in Transit | $ - | $ - | $ - | $ - | 0 |

**HSH**

| Utilisation under Facility B (Values in USD '000) | ABG | OBAST | Total |
|---|---|---|---|
| Total Facility B Utilisation | 0 | 0 | 0 |
| Bank overdrafts | $ - | $ - | $ - |
| Letters of Credit | $ - | $ - | 0 |
| Letters of Guarantee | $ - | $ - | 0 |
| LCs in Transit | $ - | $ - | 0 |

Place, Date    Piraeus,    [DATE]

Signature _____

Function _____

Company _____

# Schedule 13
# Approved Suppliers

BP p.l.c. and its wholly-owned subsidiaries (directly or indirectly)

Royal Dutch Shell plc and its wholly-owned subsidiaries (directly or indirectly)

Glencore PLC and its wholly-owned subsidiaries (directly or indirectly)

Mercuria Energy Group Ltd and its wholly-owned subsidiaries (directly or indirectly)

Trafigura Beheer BV and its wholly-owned subsidiaries (directly or indirectly)

Vitol Holding B.V. and its wholly-owned subsidiaries (directly or indirectly)

# Schedule 14
# Permitted Financial Indebtedness

1. Trade Receivables Purchase Agreement, dated as of March 30, 2016, among Aegean Bunkering (USA) LLC, a Delaware limited liability company, as seller, Deutsche Bank AG, New York Branch, as a purchaser and documentation agent and Deutsche Bank Trust Company Americas, as a purchaser, in the amount of $31,000,000.

2. Amended and Restated Trade Receivables Purchase Agreement, dated as of November 13, 2015, among Aegean Marine Petroleum S.A., a corporation organized under the laws of Liberia, as seller, Deutsche Bank AG, New York Branch, as a purchaser and documentation agent and Deutsche Bank Trust Company Americas, as a purchaser, as further amended and restated on November 14, 2016 and November 14, 2017 in the amount of $40,000,000.

3. Indenture, dated as of December 19, 2016, among Aegean Marine Petroleum Network Inc., a corporation organized under the laws of the Marshall Islands, as issuer, and U.S. Bank National Association, as trustee, in the amount of $172,500,000.

4. Senior Indenture, dated as of October 23, 2013, among Aegean Marine Petroleum Network Inc., a corporation organized under the laws of the Marshall Islands, as issuer, and Deutsche Bank Trust Company Americas, as trustee, in the amount of $132,050,000.

5. 2005 Newbuilding Secured Syndicated Term Loan, dated as of October 1, 2006, by and among Kithnos Maritime Inc., Lefkas Marine S.A., Paros Maritime Inc., Santorini Maritime Limited, and Serifos Shipping (Pte.) Ltd, as Borrowers, Aegean Bunkering Services Inc., Aegean Marine Petroleum Network Inc., Aegean Shipholding Inc. and Tempest Shiptrade Ltd., as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A , as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $35,500,000.

6. 2006 Newbuilding Secured Term Loan, dated as of October 1, 2006, by and among Kerkyra Marine S.A., Ithaki Marine S.A., Cephallonia Marine S.A., Paxoi Marine S.A., Zakynthos Marine S.A., Kythira Marine S.A. and Lefkas Shipping (PTE.) LTD., as Borrowers, Aegean Marine Petroleum Network Inc., Aegean Shipholdings Inc., Aegean Breeze Maritime Company and Aegean Tiffany Maritime Company, as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A , as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $64,750,000.

7. Second 2006 Newbuilding Secured Term Loan, dated as of October 27, 2006, by and among Tasman Seaways Inc., Santon Limited, as Borrowers, Aegean Marine Petroleum Network Inc., Aegean Bunkering Services Inc., as Guarantors, and National Bank of Greece S.A., as Lender and Agent, in the amount of $17,600,000.

8. Third 2006 Newbuilding Secured Term Loan, dated as of October 27, 2006, by and among Eton Marine LTD., Benmore Services S.A. and Ingram Enterprises Co., as Borrowers, Aegean Shipholdings Inc. and Aegean Marine Petroleum Network Inc., as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A., as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $26,250,000.

9. 2007 Newbuilding Secured Term Loan, dated as of July 5, 2007, by and among Andros Marine Limited, Dilos Marine Inc., Aegean VII Shipping Ltd, Ios Shipping Ltd and Sifnos Marine Inc., as Borrowers, Aegean Marine Petroleum Network Inc., as Guarantor, and Orix Investment and Management Private Ltd. (successor to The Royal Bank of Scotland) as Lender and Agent, in the amount of $37,560,000.

10. 2008 Newbuilding Secured Term Loan, dated as of April 24, 2008, by and among Kassos Navigation S.A., Symi Navigation S.A., Halki Navigation S.A. and Tilos Shipping (PTE.) LTD., as Borrowers, Aegean Marine Petroleum Network Inc. and Aegean Shipholdings Inc., as Guarantors, HSH Nordbank AG, and Aegean Baltic Bank S.A , as Lenders, and Aegean Baltic Bank S.A., as Agent, in the amount of $38,800,000.

11. 2017 Secured Term Loan, dated as of November 30, 2017 Aegean Bunkering Services Inc., as Borrower, Amorgos Maritime Inc., Kimolos Maritime Inc., Milos Shipping (Pte.) Ltd., Mykonos I Maritime Limited, Tinos Marine Inc. and Aegean Marine Petroleum Network Inc., as Guarantors, and Piraeus Bank S.A., as Lender and Agent, in the amount of $15,000,000.

12. 2015 Fujairah Credit Facility, dated as of October 7, 2015, by and among Aegean Oil Terminal Corporation, as Borrower, Aegean Marine Petroleum Network Inc., as Guarantor, United Arab Bank P.J.S.C., Abu Dhabi Commercial Bank P.J.S.C., Commercial Bank of Dubai psc and National Bank of Oman S.A.O.G., Dubai Branch, as Lenders, and United Arab Bank P.J.S.C., as Agent, in the amount of $440,000,000.

13. 2017 South Africa Credit Facility, dated as of November 20, 2017 by and among Aegean Bunkering Services Inc. and Nevado Navigation S.A., as Borrowers, Aegean Ship III Maritime Company, Aegean Ship VIII Maritime Company, Aegean Ace Maritime Company, Aegean Tanking S.A., Aegean Marine Petroleum Network Inc. and Aegean Management Services M.C., as Guarantors, Piraeus Bank S.A., as Lender and Agent, in the amount of $12,500,000.

14. Loan Agreement, dated as of September 7, 2018, by and among Aegean Marine Petroleum S.A., Aegean Marine Petroleum Network Inc., I.C.S. Petroleum Limited and Mercuria Energy Trading S.A, in the amount of $5,000,000.

15. Letter of Credit, dated as of October 16, 2018, in the amount of $5,000,000 issued by Sumitomo Mitsui Banking Corporation with Aegean Bunkering (USA) LLC as the beneficiary and Toyota Tsusho Petroleum PTE. LTD as applicant.

16. Letter of Credit, dated as of October 30, 2008, in the amount of $2,000,000 issued by Sumitomo Mitsui Banking Corporation with Aegean Marine Petroleum SA as the beneficiary and Toyota Tsusho Petroleum PTE. LTD as applicant with an expiration date of January 29, 2019.

17. Letter of Guarantee, dated as of January 12, 2018, in the amount of €3,000,000 with Aegean Bunkering Germany as the beneficiary and an expiration date of January 31, 2019.

18. Letter of Guarantee, dated as January 12, 2018, in the amount of €3,000,000 with Obast Bunkering & Trading GMBH as the beneficiary and an expiration date of January 31, 2019.

19. Letter of Credit, dated as December 28, 2017, in the amount of $2,580,000 with Obast Bunkering & Trading GMBH as the beneficiary and an expiration date of February 7, 2019.

20. Letter of Credit, dated as June 26, 2018, in the amount of $4,000,000 with Aegean Marine Petroleum as the beneficiary and an expiration date of January 31, 2019.

21. Letter of Credit, dated as October 25, 2018, in the amount of $1,223,200 with Aegean Marine Petroleum as the beneficiary and an expiration date of November 30, 2018.

22. Letter of Credit, dated as August 27, 2018, in the amount of $7,920,000 with Aegean North West Europe NV as the beneficiary and an expiration date of December 18, 2018.

23. Letter of Credit, dated as August 30, 2018, in the amount of $1,815,000 with Aegean North West Europe NV as the beneficiary and an expiration date of January 31, 2019.

24. Letter of Credit, dated as of November [1], 2018, issued by ABN AMRO Capital in the amount of $803,000 with PBF Holding Company LLC as the beneficiary and Aegean Bunkering (USA) LLC as the applicant with an expiration date of November 29, 2018.

# Schedule 15
# Form of New Lender Spanish Power of Attorney

## POWER OF ATTORNEY

**APPEARS**

Mr., [✱] as stated by the appearing party, acting in the name and on behalf [✱], an entity incorporated under the laws of [✱], having its registered office in [✱] registered and filed before [✱] (hereinafter, the "**Grantor**").

**GRANTS**

Grantor grants a Power of Attorney (hereinafter referred as the "**Power of Attorney**"), as wide as sufficient in law might be necessary, in favour of **ABN AMRO Bank N.V.,** a public company with limited liability duly organised and existing under the laws of the Netherlands having its registered office in Amsterdam at [at Gustav Mahlerlaan 10, 1082 PP] and registered at the Chamber of Commerce with number 34334259, that may act through its own attorneys (hereinafter, the "**Attorney**" or the "**Security Agent**") so that acting jointly and severally as, with its sole signature, any time, in connection with the financing executed between, among others, ABN AMRO Bank N.V.as security agent, ABN AMRO Bank N.V.as facility agent, and lender ("**Facility Agent**" and "**Lender**"), Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH and Obast Bunkering & Trading GmbH as borrower (the "**Borrowers**"), the Borrowers and Aegean Marine Petroleum Network Inc. as guarantors (the "**Guarantors**" and jointly with the Borrower, the "**Obligors**") for an amount up to [●] (the "**Facility Agreement**"), in the name and on behalf of the Grantor may perform any of the following authorities, even if entering in self-contracting (*auto-contratación*), multiple representation or conflict of interests and including expressly the authority of substitution:

1. Ratify and formalise the Facility Agreement as a Spanish notarial document.

2. Sign, grant, ratify and/or execute as Spanish notarial document, in the terms and conditions that the Attorney may deem appropriate, a non-possessory pledge over non-fixed assets (including but not limited to stocks, chattels, inventory and raw materials) in favour of the Grantor as lender under the Facility Agreement, and accept the creation of any such pledge in the name and on behalf of the Grantor.

3. Sign, grant, ratify and/or execute as Spanish notarial document, in the terms and conditions that the Attorney may deem appropriate, one or several assignment agreements to be entered into with any third party (either as assignor or assignee) in relation with the Facility Agreement and the Non-Possesory pledge referred to in the preceding paragraphs.

4. Sign, grant, ratify and/or execute as Spanish notarial document, any agreement or document for the amendment, rectification or clarification of any of the documents referred to above.

5. Appear and file any private and/or notarial documents before any private or public entity, as well as Public Registry, public administration, registries, consulates or tax administration, for its recording or validation (including its novation, assignments and amendments), and file and/or pay any tax or registry fees related to the granting, formalisation, execution, and registration of the documents and/or agreements described in the above paragraphs.

6. Act, appear before and disclose information to any authority or body of the Spanish or foreign public administration, state, provincial, municipal or regional agency, court of justice or any other public body of a civil, criminal, administrative or labour nature, to obtain all manner of permits or licenses and to make all such notifications as may be required by the applicable legislation

concerning the transactions included in the documents referred to above, and, in particular, but not limited to, the Bank of Spain ("Banco de España") and the Spanish Revenue ("Agencia Estatal de la Administración Tributaria") or any tax authorities, in order to execute, deliver and file, in the name and on behalf of Grantor, any document, statement, payment, application or official forms (including those of a tax nature) that may be necessary or advisable for the fulfilment of, or in connection with, any of the transactions, actions, faculties, agreements or documents foreseen in this power and any other ancillary measures required for the full and complete fulfilment of the powers hereby granted (including the granting of the final shareholder statement).

7.  In order to obtain and/or renew the Foreign Identification Number ("Número de Identificación de Extranjero"), carry out before the Spanish Revenue or any other institutions, as many actions which may be deemed necessary or convenient to obtain it, and for these effects sign any documents or forms needed, and in special fulfil the 036 form and designate the Grantor's address in Spain, sign and execute all documents, either notarial or private, that may be deemed necessary or convenient for this purpose and appear before the Spanish Revenue or any other institutions, trustees or any others.

8.  Enforce any personal guarantee, right "in rem" security as well as any undertakings to grant any personal guarantee or right "in rem" security granted in favour of the Grantor as security for the Facility Agreement, including but not limited to, any actions that they may deem necessary for the purposes of enforcement, such as making and submitting demands for payment, claims, notices, liquidations, announcements, issuing certifications, requesting certified first copies of documents (notarial or otherwise), appointing counsel and court-attorneys, initiating auctions and any type of enforcement action (in court or out of court) and appearing before any relevant notary public or court of jurisdiction.

9.  Appear before any courts, appellate courts and other ordinary or special courts, at any instance and in any order of jurisdiction, and before any other authority, judges, public prosecutor's office, notary's office, public registry, tax office or tax agency, or government office or officer; and thereat to file, conduct and terminate, acting either as claimant or defendant, all kinds of court or out-of court actions and proceedings relating to the Facility Agreement and the security documents entered into in relation to it.

10. The above authorities, in all or in part, may be delegated or substituted in favour of any third person that the Attorneys may deem convenient.

In WITNESS WHEREOF this Power of Attorney has been executed as a deed by the Grantor and is intended to be effective and is hereby delivered on the date of the Notarial Certificate below and shall be in force until [❋] unless it is revoked prior to such date.

In witness thereof this Power of Attorney is granted.

I have informed the attendant of his right to read this document himself, and I proceed to read this document aloud with his tacit consent.

This Power of Attorney is governed by and construed in accordance with the laws of [ ].

He states that he is aware of its contents and ratifies it in all its provisions, signing the same with me.

In [❋], on [❋].

[*Grantor's corporate name*]


_____

Mr. [❋]

Office: [❋]

# NOTARIAL CERTIFICATE

I, the undersigned, Notary Public in [      ], on this [      ] day of [      ] of 20[ ], do hereby certify that:

1. [Grantor's corporate name] is a [      ] incorporated in accordance with the laws of [    ], having its registered office in [          ] at [    ] and registered under number [  ], , and with sufficient capacity for the granting this power of attorney.

2. [    ] is authorised and has the capacity to grant the above power of attorney in the name and on behalf of [Grantor's corporate name] according to the laws of [        ], according to the laws of the incorporation of the Grantor, its constitutional documents, by-laws and other corporate documents.

3. The signature of [      ] in this document is authentic.

4. This power of attorney constitutes a legally valid and binding document and all actions undertaken by the attorneys-in-fact nominated herein within the scope of the power shall be legally valid and binding on [Grantor's corporate name].

WITNESS, I sign this power of attorney and stamp my official seal


Place: [✹]

Date: [✹]

Signature: [✹]

## Schedule 16
## Form of Deed of Undertaking

**THIS DEED** is made this [**] day of [**].

**Between**

1. [***Third party***], a company incorporated in [•] (Registration No. [**]) and having its registered office at [**] (the "**Applicant**"); and

2. [**AEGEAN MARINE PETROLEUM S.A. / AEGEAN PETROLEUM INTERNATIONAL INC. / AEGEAN NWE N.V. / AEGEAN BUNKERING GERMANY GMBH / OBAST BUNKERING & TRADING GMBH**], a company incorporated in [**] (Registration No. [**]) and having its registered office at [**](the "**Obligor**")

**in favour of:**

3. [***Relevant Issuing Bank***], a company incorporated in [**]and having its registered office at [**] (the "**Issuing Bank**").

**WHEREAS**:

(A) Issuing Bank, amongst others, has granted to Obligor, amongst others, certain facilities pursuant to a facility agreement for a borrowing base facility dated 30 November 2017 as amended and restated on [●] 2018 (any of or all of such facilities shall hereinafter be referred to as the "**Facilities**").

(B) Applicant and Obligor intend to jointly and severally authorise, empower and request Issuing Bank to issue a documentary letter of credit under, and subject to the terms and conditions of, the Facilities from time to time in favour of [**], subject to the approval of Issuing Bank at its absolute discretion (the "**Letter of Credit**").

(C) At all times, (i) as between the Obligor and the Issuing Bank, the responsibility and liability of any Letter of Credit in name of the Applicant shall rest with Obligor; and (ii) as between the Applicant and the Issuing Bank, the Applicant shall indemnify Issuing Bank in respect of any liabilities arising from any Letter of Credit.

**NOW THIS DEED WITNESSES AS FOLLOWS**:

1. Obligor herewith instructs Issuing Bank to indicate in the Letter of Credit the full name and address of Applicant if so indicated by Obligor in its requests to the Issuing Bank to issue Letter of Credit, rather than the full name and address of the Obligor itself as applicant, such however under the full responsibility and financial liability of the Obligor and under, and subject to the terms and conditions of, the Facilities.

2. Obligor undertakes to Issuing Bank that the Letter of Credit in the name of the Applicant shall be issued at the full risk, responsibility and financial liability of Obligor and consequently authorises Issuing Bank to debit (i) upon issuance of a Letter of Credit the liability account in in the name of Obligor in the books of Issuing Bank with the full amount of the Letter of Credit, and (ii) upon Letter of Credit settlement(s) the current account of Obligor in the books of the Issuing Bank for the full amount of each settlement.

3. Applicant herewith gives notice to Issuing Bank that it shall not have at any time any claim, right or demand or any pretension of any nature whatsoever against Issuing Bank in relation to the Letter of Credit, and herewith irrevocably instructs and authorises Issuing Bank and consents to the same:

    (a) to indicate its full name and address as applicant in the wording of the Letter of Credit as instructed by Obligor;

    (b) to follow the instructions of Obligor to amend the Letter of Credit without any obligation on the part of Applicant and without its further instructions or confirmation;

(c) to carry out all other instructions from Obligor in all matters related to the Letter of Credit;

(d) to address all correspondence relative to the Letter of Credit directly to Obligor;

(e) to handle and dispose the original shipping documents related to the Letter of Credit in accordance with the instructions of Obligor and to endorse the relevant bills of lading as per the instructions of Obligor to the order of any entity nominated by Obligor; and

(f) to act as its Attorney-in-Fact, in respect to endorsement of bills of lading (or other documents) under the Letter of Credit and authorises Issuing Bank to endorse the same, where applicable, to the order of any entity nominated to Issuing Bank by Obligor or as otherwise may be necessary to enforce security rights.

4. Applicant herewith expressly confirms (a) that this Deed is to be deemed as irrevocable on the part of the Applicant and that it has no right whatsoever to amend the same and (b) that it has no rights, or relinquishes, renounces and/or forfeits any and all of its rights to interest in and any claims in respect of:
(a) the relevant material purchased under the Letter of Credit (the "**Material**");

(b) the receivable(s) arising from the sale of such material (the "**Receivables**"); and

(c) the proceeds arising from collection of any Receivables.

5. Applicant herewith further expressly agrees that the Material, the Receivables and the proceeds thereof, will only belong to Obligor, or to ABN AMRO Bank N.V. as security taker of Obligor's property rights and Applicant hereby acknowledges the security interest of ABN AMRO Bank N.V. in the Material, the title documents covering the Material, the Receivables and the proceeds arising from collection of the Receivables.

6. Applicant herewith further expressly confirms that, immediately after payment of the Letter of Credit, no third party other than Obligor or ABN AMRO Bank N.V. as security taker of Obligor's property rights will have any rights and or interest of any nature whatsoever regarding any part of the Material or any part of the Receivables and proceeds thereof and/or the title with respect to the same.

7. Obligor and Applicant agree and accept that the issuance of the Letter of Credit and any amendment thereof shall at all times be subject to Issuing Bank's absolute discretion.

8. Neither Obligor nor Applicant shall make any claim that it has, may have or may have had against Issuing Bank, whether directly or indirectly, in connection to any Letter of Credit, or to the issuance or non-issuance of the Letter of Credit by the Issuing Bank.

9. Each of Applicant and Obligor hereby jointly and severally irrevocably and unconditionally undertake to indemnify Issuing Bank and to keep Issuing Bank indemnified fully and completely against all claims and demands actions and proceedings, losses, damages, costs and expenses including legal costs on a full indemnity basis and all other liabilities of whatsoever nature and description which may be made, taken, incurred or suffered by Issuing Bank as a result of acting in accordance with this Deed and the above mentioned instructions.

10. Applicant represents and warrants to Issuing Bank that:

(a) Capacity: it (i) is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation; (ii) has the power to own its assets and carry on its business as it is being conducted; and (iii) has duly executed and delivered, and has all requisite power, authority and approvals to enter into and perform its obligations under, this Deed;

(b) Authority: it has, and any person designated by it has, and it and they will at all times have, due authorisation to act in all respects in relation to this Deed;

(c) Validity: this Deed is a valid and legally binding obligation, enforceable against it in accordance with its terms except for the effect of bankruptcy, insolvency, reorganisation, moratorium and other similar laws relating to or affecting creditors' rights generally;

(d) Insolvency etc.: no bankruptcy, receivership, judicial management, winding up or liquidation notice, petition or analogous insolvency proceeding has been threatened or filed against it in any jurisdiction; and

(e) Violations: its execution, delivery and performance of this Deed does not and will not violate, contravene, conflict with or constitute a default under any provision of its memorandum and articles of association (or equivalent constituent documents) or any law, regulation, rule, decree, order, judgement or charge, contract, trust deed or other instrument binding on it or any of its assets.

11. Neither the Applicant nor the Obligor, nor any of their respective directors, officers or employees nor, to the knowledge of the Applicant or the Obligor, any persons acting on any of their behalf:

    (a)    is a Prohibited Person;

    (b)    is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person;

    (c)    owns or controls a Prohibited Person;

    (d)    is in breach of Sanctions; or

    (e)    has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect to Sanctions by any Sanctions Authority; or

    (f)    shall permit present any business or transaction to the Issuing Bank that contains any direct or indirect violation of Sanctions or authorise any other person to, directly or indirectly, use, make payments of, contribute or otherwise make available, the Letter of Credit or transactions contemplated thereby to fund or facilitate trade, business or other activities: (i) involving or for the benefit of any Prohibited Person; or (ii) relating to a country or territory that is the target of country-wide or territory-wide Sanctions; or (iii) in any other manner that could result in the Applicant or the Obligor or the Issuing Bank being in breach of any Sanctions or becoming a Prohibited Person.

For the purposes of this clause 11 the following words shall have the following meanings:

**Prohibited Person** means a person that is:

    (a)    listed on, or owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

    (b)    located in, incorporated under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a person located in or organized under the laws of a country or territory that is the target of country-wide or territory-wide Sanctions; or

    (c)    otherwise a target of Sanctions (namely a person with whom a US person or other national under the jurisdiction of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities)

**Sanctions** means the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by any Sanctions Authority (whether or not the Applicant or the Obligor or any other member of their respective groups or any affiliates of any group member is legally bound to comply with such laws, regulations, embargoes or measures)

**Sanctions Authority** means any of:

    (a)    the United States government;

    (b)    the United Nations;

    (c)    the United Kingdom;

(d) Switzerland;

(e) the European Union; or

(f) Hong Kong Special Administrative Region of the People's Republic of China,

and includes any government entity of any of the above, including, without limitation, the Office of Foreign Assets Control of the US Department of Treasury (OFAC), the United States Department of State, Her Majesty's Treasury (HMT) and the Swiss State Secretariat for Economic Affairs (SECO)

**Sanctions List** means:

(a) the "Specially Designated Nationals and Blocked Persons" list maintained by OFAC;

(b) the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by HMT; or

(c) any similar list maintained by, or public announcement of Sanctions designation made by, any other Sanctions Authority

If either Applicant or Obligor knows or may have reason to believe that the transaction under the Letter of Credit that is conducted through the Issuing Bank is or may become in violation with Sanctions or the above provisions, it will immediately notify the Issuing Bank thereof and provide all information on the business or transaction that may be relevant for the Issuing Bank, or as reasonably requested by the Issuing Bank. In such case, Applicant and Obligor shall use their best efforts to adjust the business or transaction in such a way that violation with the abovementioned laws, resolutions or regulations is prevented. If violation with the abovementioned laws, resolutions or regulations cannot be prevented Applicant and Obligor shall each use its best efforts to legally allow the Issuing Bank to exit the business or transaction without costs or other negative consequences for the Issuing Bank. Furthermore, each of the Applicant and Obligor undertakes to indemnify the Issuing Bank for any and all claims and demands actions and proceedings, losses, damages, costs and expenses incurred in connection with such business or transaction, in accordance with clause 9 of this Deed.

12. Issuing Bank's records, unless shown to be wrong, will be evidence of Obligor's and Applicant's dealings with Issuing Bank in connection with the Deed. Both Obligor and Applicant agree that it will not object to the admission of Issuing Bank's records as evidence in any legal proceedings on the grounds that such records are not originals, are not in writing or are documents produced by a computer. Obligor and Applicant will not rely on the Issuing Bank to comply with Obligor's and Applicant's record keeping obligations.

13. This Deed and the Facilities contain the entire agreement between the parties hereto relating to the subject matter of this Deed to the exclusion of any terms implied by law which may be excluded by contract.

14. Issuing Bank's rights under this Deed may be assigned to any person without the consent of either Obligor or Applicant. The Obligor's or Applicant's rights under this Deed are personal to that party and not capable of assignment.

15. The obligations under this Deed bind, and the rights will be enforceable by, each party hereto and each party's respective successors and permitted assigns.

16. Each provision of this Deed is severable and if any provision becomes invalid, void, voidable or unenforceable or contravenes any applicable regulations the remaining provisions will not be affected.

17. Other than ABN AMRO Bank N.V., a person who is not a party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 (the Third Parties Act) to enforce or enjoy the benefit of any its terms.

18. The rights and remedies provided under this Deed are cumulative and not exclusive of those provided by law. The failure to exercise or delay in exercising a right or remedy under this Deed will not constitute a waiver of the right or remedy or a waiver of any other rights or remedies and no single or partial exercise of a right or remedy under this Deed will prevent any further exercise of the right or remedy or the exercise of any other right or remedy.

19. This Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

The parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no party will argue to the contrary.

This clause 18 is for the benefit of the Issuing Bank only. As a result, the Issuing Bank shall not be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Issuing Bank may take concurrent proceedings in any number of jurisdictions.

Without prejudice to any other mode of service allowed under any relevant law, each of the Applicant and the Obligor irrevocably appoints [•] as its agent for service of process in relation to any proceedings before the English courts in connection with this Deed.]


**The parties have executed this Deed as a deed with the intention that it be delivered on the date written at the beginning of this Deed.**

| | |
|---|---|
| **Executed as a deed and delivered by [*third party*]** Acting persons who in accordance with the law of [•] are acting under the authority of the company | …………………………………………….. Name: Title: …………………………………………….. Name: Title: |
| **Signed as a deed and delivered by [AEGEAN MARINE PETROLEUM S.A. / AEGEAN PETROLEUM INTERNATIONAL INC. / AEGEAN NWE N.V. / AEGEAN BUNKERING GERMANY GMBH/ OBAST BUNKERING & TRADING GMBH]** Acting by persons who in accordance with the law of [**] are acting under the authority of the company | …………………………………………….. Name: Title: …………………………………………….. Name: Title: |
| Signed for and on behalf of [*Relevant Issuing Bank*] | …………………………………………….. Name: Title: …………………………………………….. Name: Title: |

## Schedule 17
## Form of Lender utilisation report

| Bank |
|---|
| Date |

| | Date of issuance | Beneficiary | Amount |
|---|---|---|---|
| Standby or Documentary Letter of Credit | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Open Account Payments to Suppliers | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total | |

## Schedule 18
## Debtors' Budget

[TO BE ATTACHED]

**Schedule 19**
**Interim DIP Order**

# Schedule 20 - Required Milestones

(a) On the Petition Date, the Debtors shall file a motion seeking approval of the facility evidenced by the Facility and the US DIP Credit Facilities.

(b) On or before three (3) Business Days after the Petition Date, the Interim DIP Order shall have been entered by the Bankruptcy Court.

(c) Each Obligor shall have executed and/or delivered, with respect to any Security for any Secured Obligations, within 45 days of the Effective Date (other than in respect of (i) any person organised under the laws of South Africa, or (ii) any pledge of Equity Interests of a person that is not an Obligor, in each case which shall be 60 days), , all new security agreements, pledge agreements, vessel mortgages, control agreements, financing statements, legal opinions, filings to perfect liens under applicable law, and such other documents and agreements as the Facility Agent (acting on the instructions of the Majority Lenders) may require (including amendments to the then-existing forms, if any, of such security agreements, pledge agreements, vessel mortgages, control agreements, financing statements, filings to perfect liens under applicable law and other documents) so as to create and perfect, or in connection with the creation and perfection of, liens upon and security interests in all of the Security of the Parent and the other Obligors to secure the Secured Obligations including without limitation with respect to all Security of Obligors that are "United States Persons" (as defined in Section 7701(a)(30) of the Code, **US Persons**):

    (i) an account control agreement with respect to certain bank accounts and such other documents or actions as may be necessary to establish UCC control with respect to any Security over which UCC control may be established pursuant to the UCC; and

    (ii) each Obligor shall have notified each storage facility, carrier, bailee or consignee holding inventory of any Obligor of the Security Agent's security interest in such inventory (and provide to the Facility Agent a copy of such notice) and each Obligor shall use commercially reasonable efforts to obtain from and each such storage facility, carrier, bailee or consignee shall have delivered a written acknowledgement of such notice,

provided that with respect to obligors that are not US Persons, and with respect to documents and actions necessary or advisable pursuant to the laws of jurisdictions outside of the United States and its States and territories, such obligation shall be subject to and in accordance with the Agreed Security Principles.

(d) On or before 45 days after the Petition Date, the Final Order authorizing and approving the Facilities on a final basis shall have been entered by the Bankruptcy Court.

(e) Not later than one day after entry by the Bankruptcy Court of the Interim DIP Order, the Debtors shall have filed with the Bankruptcy Court a motion (the **Sale Motion** and the date of such filing, the **Sale Motion Filing Date**) seeking (i) entry of an order, in form and substance acceptable to the Lenders, approving a sale under section 363 of the Bankruptcy Code of all or substantially all of the Debtors' assets (including, without limitation the Security) (the **Sale**); (ii) approval of bidding and sale procedures in form and substance acceptable to the Lenders (the **Bidding Procedures**); (iii) approval of (A) an agreement in form and substance acceptable to the Lenders, for the Sale and (B) such other agreements contemplated in the foregoing agreement of Sale as the Lenders may require, and (iv) as the the stalking horse bidder providing its bid for the Sale (the **Sale Bidder**), approving bid protections for such Sale Bidder (the **Bid Protections**).

(f) Promptly following exchange control approval from the Financial Surveillance Department of the South African Reserve Bank, and in any event within 40 Business Days of the entry

of the Interim DIP Order, the Borrowers shall cause Aegean Bunkering Marine Services Proprietary Limited, a limited liability company incorporated in South Africa, to join the guaranty and security documents made in relation to this Agreement and the US DIP Credit Agreement, and deliver such other documents and information as is contemplated by clauses 29.8, 29.10 and 24.40(b). Each Obligor shall (and shall procure that Aegean Bunkering Marine Services Proprietary Limited) use its best efforts to obtain such exchange control approval as soon as possible for the purpose of becoming an Additional Guarantor.

(g)(f) Within thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (the **Bidding Procedures Order**), in form and substance acceptable to the Lenders, approving the Bidding Procedures and the Bid Protections and setting related deadlines;

(h)(g) The Bidding Procedures Order shall provide that bids shall be due within at most seventy (70) calendar days after entry of the Bidding Procedures Order (the **Bid Deadline**);

(i)(h) Within five (5) business days of the Bid Deadline, the Debtors shall conduct the auction, if necessary, pursuant to the Bidding Procedures Order;

(j)(i) Within ten (10) business days of the Bid Deadline, the Bankruptcy Court shall enter an order, in form and substance acceptable to the Lenders and the Sale Bidder, approving the Sale; and

(k)(j) On the date of the closing of the Sale, the proceeds of the Sale shall have been used to repay the Secured Obligations, the Prepetition Obligations in full in cash and to pay any break-up fee required in the purchase agreement signed by any of the Debtors and any of the Lenders.

# Schedule 21 - Agreed Security Principles

## 1. Agreed Security Principles

The security to be provided under the Finance Documents which the Facility Agreement provides is to be created or perfected after the Effective Date will be given in accordance with the security principles set out in this Schedule 21 (the Agreed Security Principles). This Schedule 21 identifies the Agreed Security Principles and determines the extent and terms of the security proposed to be provided under any Finance Document.

## 2. Certain Principles

The Finance Parties have agreed and acknowledged that their rights and obligations under the Finance Documents to require any Security to be created or perfected shall not apply to the extent that such Transaction Security would:

(a)     result in any breach of corporate benefit, financial assistance, fraudulent preference or thin capitalisation laws or regulations (or analogous restrictions) of any applicable jurisdiction if the outcome of such regulations or restrictions would put the Obligor in a materially worse position than it was in before such creation or perfection; or

(b)     result in a significant risk to the officers of the relevant grantor of Transaction Security of contravention of their fiduciary duties (which shall include other directors duties) and of civil or criminal liability and, in particular, result in any breach of any applicable German capital maintenance rules requiring that upstream / cross-stream Security given by any German company incorporated as a GmbH or GmbH &Co. KG be limited;

(c)     result in time and cost (including adverse effects on taxes, interest deductibility, stamp duty, registration taxes, step or process in relation to paragraphs (a) and (b) respectively to avoid such breach or liability, notarial costs guarantee fees payable to any person that is not a member of the Group and all applicable legal fees) which, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)) be disproportionate to the benefit accruing to the Secured Parties of obtaining such security;

(d)     in relation to any assignment to be provided, require the consent of a third party for the creation or perfection of such Transaction Security and provided the Company and the relevant Obligor has used its best endeavours to obtain such consent applying best efforts; and

(e)     where a class of assets to be secured includes material and immaterial assets, result in costs in relation to the granting of security over the immaterial assets that would be, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)), disproportionate to the benefit of such security, in which case security will be granted over the material assets only.

Without prejudice to clause 20.10 (*Guarantee Limitations (Germany)*), for the purposes of this paragraph 2, references to **breach** and **liability** exclude those which may be avoided by the Obligors and/or any of the Secured Parties taking such steps, or carrying out any process which, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)) would not be disproportionate to the benefit accruing to the Secured Parties of obtaining such security, or inappropriate or outside the control of the relevant Obligor.

The Obligors' obligation to create and perfect Security shall include the obligation to deliver or caused to be delivered opinions of counsel, certificates of officers or directors of Obligors, certificates of public officials, and such other documents and to take or cause to be taken the adoption of authorizing resolutions and such other actions as in each case may be, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)), necessary or customary in connection with such creation and perfection (except where, in the case of any opinion, such opinion is customarily provided by counsel to any Secured Party).

## 3. Terms - Security Documents

The following principles will be reflected in the terms of any Security taken as part of this transaction:

(a)     Security shall, to the extent possible under local law, be enforceable on the occurrence of an Event of Default;

(b)     Unless otherwise specified in a Finance Document, any obligation of an Obligor or any other grantor of Transaction Security to perform any act, provide any document, or create any Transaction Security, must be discharged as soon as reasonably practicable;

(c)     To the extent the creation, perfection or maintenance (of priority or otherwise) of any Transaction Security requires any action other than due execution of the relevant Security Document (including notarisation, legalisation, apostillation, registration, payment of fees, duties or taxes, and delivery of notices to third parties), the relevant grantor of Transaction Security must (and the Borrowers' shall procure that each grantor of Transaction Security will) perform such action and complete it as soon as reasonably practicable following the execution of such Security Document, and in any event within any period required or permitted by applicable law to complete such action for the purpose of creation, perfection or maintenance of such Transaction Security and its priority.

(d)     In respect of any Transaction Security that is an assignment or otherwise requires notice to be delivered to a third party to be effective or perfected, unless otherwise agreed with the Security Agent (acting on the instructions of the Majority Lenders) or the relevant Existing Security Holder, the relevant grantor of Transaction Security must (and the Borrowers shall procure that each security provider will), as soon as reasonably practicable following the execution of the assignment or other agreement, deliver to the relevant counterparty or other third party a notice of assignment and actively and diligently seek an acknowledgment of such notice from the counterparty, in both cases in a form satisfactory to the Security Agent (acting on the instructions of the Majority Lenders (acting reasonably)) or the relevant Existing Security Holder, provided that the grantor of Transaction Security shall not be obliged to seek such acknowledgment where, in the reasonable opinion of the Security Agent or the relevant Existing Security Holder, doing so would be materially prejudicial to the commercial interests of that grantor of Transaction Security.

 (e)     In respect of any Transaction Security, the relevant grantor of Transaction Security must (and the Borrowers shall procure that each grantor of Transaction Security will) promptly provide to the Security Agent or relevant Existing Security Holder such supplementary documentation as may be required or as the Security Agent or relevant Existing Security Holder may reasonably request for the purposes of creating, perfecting or protecting such Transaction Security.

(f)     Where appropriate, defined terms in the Transaction Security Documents should mirror those in the Facility Agreement.

(g)     The parties to the Facility Agreement agree to negotiate the form of each Security Document diligently and in good faith in accordance with the terms of this Schedule and will ensure that all documentation required to be entered into is in a finally agreed form and duly executed as soon as reasonably practicable.

(h)     Each Security Document shall be in form and substance satisfactory to the Security Agent or Existing Security Holder (as applicable) and will include the terms customary for such document in the relevant jurisdiction for similar transactions and will include further assurance and perfection obligations on the relevant grantor of Transaction Security and exculpatory, indemnity and hold harmless provisions in favour of the Security Agent or Existing Security Holder.

(i)     Without prejudice to the above paragraph, where any Transaction Security is required to be created pursuant to these Agreed Security Principles then, to the extent equivalent Transaction Security has been created previously (such equivalence being determined by jurisdiction and type of assets involved), documentation in substantially the same form as the Security Document that creates such equivalent Transaction Security shall be used. This shall not, however, operate to require the Parties to use such a form of documentation where the Security Agent or Existing Security Holder (on the advice of its legal counsel) determines that as a result of any change in law, regulation, practice, factual circumstances or any other relevant matter such form of documentation is not the most appropriate form for the relevant Transaction Security.

(j)     The cost of documenting, creating, perfecting and maintaining the Transaction Security and supporting arrangements shall be borne in full by the Borrowers in accordance with clause 19 (*Costs and Expenses*) of the Facility Agreement and that provision shall be incorporated by reference in the individual Security Documents rather than set out in full unless required by law.

(k)     Each grantor of Transaction Security must (and the Borrowers shall procure that each grantor of Transaction Security will) provide such powers of attorney or delegations of authority to the Security Agent as it may reasonably request in respect of any Transaction Security provided by that grantor for the exercise of any rights, powers and remedies of the Security Agent or the Finance Paries provided by or pursuant to the Finance Documents or by law.

(l)     Any representations, warranties or undertakings which are required to be included in any Security Document shall reflect (to the extent to which the subject matter of such representation, warranty and undertaking is the same as the corresponding representation, warranty and undertaking in the Facility Agreement or any equivalent Security Document) the equivalent provisions set out in the Facility Agreement or such equivalent Security Document (save to the extent that the Security Agent's local counsel deem it necessary or advisable to include any further provisions (or deviate from those contained in the Facility Agreement or such equivalent Security Document) in order to protect or preserve the Transaction Security).

## 4.     Security

(a)     Subject to the due execution of all relevant Security Documents, completion of relevant perfection formalities within statutorily prescribed time limits, payment of all registration fees and documentary taxes, any other rights arising by operation of law, obtaining any relevant foreign legal opinions and subject to any qualifications which may be set out in this Agreement and any relevant legal opinions obtained and subject to the requirements of the Agreed Security Principles, it is further acknowledged that the Security Agent shall:

(i)     receive the benefit of Security granted to secure all liabilities of the Obligors under and in connection with the Finance Documents subject to the Agreed Security Principles; and

(ii)     without prejudice to the generality of the Required Milestones, (in the case of those Security Documents creating pledges or charges over shares in an member of the Group) obtain (1) a first priority valid charge or analogous or equivalent Security over all of the shares in issue at any time in that member of the Group which are owned by another member of the Group and (2) subject to the principles set out above, a first priority valid vessel mortgage in respect of each vessel owned by an Obligor. Subject to local law requirements, such Security Document shall be governed by the laws of the jurisdiction in which such member of the Group whose shares are being pledged is formed unless, in the opinion of the Security Agent (acting on the instructions of the Majority Lenders), any other law would be more appropriate.

 (b)     To the extent possible, all Security shall be given in favour of the Security Agent and not the Finance Parties individually. The concept of "parallel debt" will be used where necessary and clause 31.3 (*Parallel Debt* (*Covenant to pay the Security Agent*) of the Facility Agreement will apply and will not not be expressly set out in each Security Document unless required under local laws.

## 5.     Release of Transaction Security

Unless required by local law, the release of the Transaction Security shall be governed by the relevant provisions of the Intercreditor Agreement.

# Schedule 22 – Existing Security

1.  Security granted prior to the date of the Amendment and Restatement Agreement to secure obligations constituting the Permitted Financial Indebtedness listed on Schedule 14 (Permitted Financial Indebtedness)

2.  The following Security:

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 06/08/2018 | 2013 4980604 12/17/2013 | Aegean Bunkering (USA) LLC 299 Park Avenue, 2nd Floor New York, NY 10171 | ABN AMRO Capital USA LLC 100 Park Avenue New York, NY 10017 | All assets. |
| Secretary of State, Delaware | AMEND 06/08/2018 | 2014 3399318 08/25/2014 | | ABN AMRO Capital USA LLC, as Collateral Agent 100 Park Avenue New York, NY 10017 | Secured Party changed to: ABN AMRO Capital USA LLC, as Collateral Agent 100 Park Avenue New York, NY 10017 |
| Secretary of State, Delaware | UCC 06/08/2018 | 2016 5194327 08/25/2016 | Aegean Bunkering (USA) LLC 299 Park Avenue New York, NY 10171 | Deutsche Bank AG New York Branch 60 Wall Street New York, NY 10005 Additional Secured Party: Deutsche Bank Trust Company Americas 60 Wall Street New York, NY 10005 | Please see Annex A attached thereto for a description of the Collateral, which is hereby incorporated by reference therein and made a part thereof. See Schedule A hereto for full UCC-1 with attached exhibits. |

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Supreme Court, New York County, New York | LIT 06/14/2018 | 652568/2018 05/22/2018 | Defendant: Aegean Marine Petroleum Network, Inc. 52 Vanderbilt Ave, Suite 1405 New York, NY 10017 | Plaintiff: E. Nikolas Tavlarios | Status: Open Summons with Notice Breach of Contract - Section 1(f) of a Settlement Agreement effective May 31, 2017 between Plaintiff and Defendant. Relief sought: a) damages in the amount of $1,207,000 b) specific performance of the contract by delivery to Plaintiff of 340,000 unrestricted shares of AMPNI ; and c) other and further relief |
| Ontario, Canada | PPSA 06/28/2018 | 698932683 08/14/2014 | Aegean Bunkering (USA) LLC 299 Park Avenue New York, NY 10171 and AMPNI Holdings Co. Limited 299 Park Avenue New York, NY 10171 | ABN AMRO Capital USA, LLC, as Collateral Agent 100 Park Avenue, New York, NY 10017 | Inventory, Equipment, Accounts, Other, Motor Vehicles Included Expires 08/14/2024 |
| Ontario, Canada | PPSA 06/28/2018 | 698932701 08/14/2014 | Aegean Bunkering (USA) LLC 299 Park Avenue New York, NY 10171 and | ABN AMRO Capital USA, LLC, as Collateral Agent 100 Park Avenue, New York, NY 10017 | Inventory, Equipment, Accounts, Other, Motor Vehicles Included Expires 08/14/2024 |

| JURISDIC TION | FILING TYPE/ SEARCH ED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| U.S. District Court, New York Southern District | LIT 06/18/201 8 | 1:18-cv-04993-NRB 06/05/201 8 | Defendant: Aegean Marine Petroleum Network Inc. Additional defendant: E. Nikolas Tavlarios Additional defendant: Spyros Giannotis | Plaintiff: Nick Simco | Civil: Open Nature of Suit: 850 Securities/Commodities Cause: 15:78m(a) Securities Exchange Act Count I: Violation of Section 10(b) and Rule 10b-5 Against all Defendants Count II: The individual Defendants violated Section 20(a) of the Exchange Act |
| U.S. District Court, New York Southern District | LIT 06/18/201 8 | 1:18-cv-05165-NRB 06/08/201 8 | Defendant: Aegean Marine Petroleum Network Inc. Additional defendant: E. Nikolas Tavlarios Additional defendant: Spyros Giannotis | Plaintiff: Robert Strougo | Class Action Complaint Count I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against all Defendants Count II: Violation of Section 20(a) of the Exchange Act Against the individual Defendant(s) |
| Recorder of Deeds, Dist. of Columbia | UCC 06/25/201 8 | 20111055 34 10/19/201 1 | AEGEAN MARINE PETROLEU M S.A. 10, Akti Kondili Piraeus , Greece 185 45 | DEUTSCHE BANK AG, NEW YORK BRANCH 60 WALL STREET NEW YORK, NY 10005 | Please see Annex A attached thereto and made a part thereof for the "Collateral Description." |
| Recorder of Deeds, Dist. of Columbia | AMEND 06/25/201 8 | 20160877 02 08/26/201 6 | | Deutsche Bank Trust Company Americas 60 Wall Street New York, NY 10005 | Addition of Secured Party: Deutsche Bank Trust Company Americas 60 Wall Street New York, NY 10005 |

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Recorder of Deeds, Dist. of Columbia | AMEND 06/25/2018 | 20160889 12 08/30/2016 | | | Restatement of collateral: Please see Annex A attached thereto for a description of the Collateral, which is thereby incorporated by reference therein and made a part thereof. |
| Recorder of Deeds, Dist. of Columbia | UCC 06/25/2018 | 20131389 96 12/18/2013 | AMPNI HOLDINGS CO. LIMITED Vyronos 36, Nicosia Tower Center, 8th Floor Nicosia, CYP P.C. 1506 | ABN AMRO Capital USA LLC 100 Park Avenue New York, NY 10017 | All of Debtor's right, title and interest to the entire limited liability company membership interest of Aegean Bunkering (USA) LLC, a Delaware limited liability company, certain related assets and proceeds thereof, all as more particularly described on Schedule A attached to the UCC-1. See attached Schedule A hereto for UCC-1 with exhibits attached. |

# SIGNATURES

**THE COMPANY**

**AEGEAN MARINE PETROLEUM S.A.** ……………………..    …………………………

By:

**THE BORROWERS**

**AEGEAN MARINE PETROLEUM S.A.** ……………………..    …………………………

By:

**AEGEAN PETROLEUM INTERNATIONAL INC.** ……………………..    …………………………

By:

**AEGEAN NWE N.V.** ……………………..    …………………………

By:

**AEGEAN BUNKERING GERMANY GMBH** ……………………..    …………………………

By:

**OBAST BUNKERING & TRADING GMBH** ……………………..    …………………………

By:

**THE GUARANTORS**

**KITHNOS MARITIME INC.** ………………………… …………………………

By:

**PAROS MARITIME INC.** ………………………… …………………………

By:

**SANTORINI I MARITIME LIMITED** ………………………… …………………………

By:

**SERIFOS MARITIME INC.** ………………………… …………………………

By:

**LEFKAS MARINE S.A.** ………………………… …………………………

By:

**AEGEAN BUNKERING SERVICES INC.** ………………………… …………………………

By:

**AEGEAN SHIPHOLDINGS INC.** ………………………… …………………………

By:

**AEGEAN BREEZE MARITIME COMPANY** ………………………… …………………………

By:

**AEGEAN TIFFANY MARITIME COMPANY** ………………………… …………………………

By:

**ITHAKI MARINE S.A.** ………………………… …………………………

By:

**CEPHALLONIA MARINE S.A.** ………………………… …………………………

By:


**KERKYRA MARINE S.A.** ………………………… …………………………

By:


**KYTHIRA MARINE S.A.** ………………………… …………………………

By:


**IOS MARINE INC.** ………………………… …………………………

By:


**PAXOI MARINE S.A.** ………………………… …………………………

By:


**ZAKYNTHOS MARINE LIMITED** ………………………… …………………………

By:


**SIFNOS MARINE INC.** ………………………… …………………………

By:


**ANDROS MARINE LIMITED** ………………………… …………………………

By:


**DILOS MARINE INC.** ………………………… …………………………

By:


**IOS SHIPPING LTD** ………………………… …………………………

By:


**AEGEAN VII SHIPPING LTD** ………………………… …………………………

By:

**HALKI NAVIGATION S.A.**  ………………………… …………………………

By:


**KASSOS NAVIGATION S.A.**  ………………………… …………………………

By:


**SYMI NAVIGATION S.A.**  ………………………… …………………………

By:


**TILOS SHIPPING (PTE.) LTD.**  ………………………… …………………………

By:


**AEGEAN OIL TERMINAL CORPORATION**  ………………………… …………………………

By:


**AEGEAN MANAGEMENT SERVICES M.C.**  ………………………… …………………………

By:


**KIMOLOS MARITIME INC.**  ………………………… …………………………

By:


**MILOS SHIPPING (PTE.) LTD.**  ………………………… …………………………

By:


**MYKONOS I MARITIME LIMITED**  ………………………… …………………………

By:


**TINOS MARINE INC.**  ………………………… …………………………

By:

**SERIFOS SHIPPING (PTE.) LTD** ………………………… …………………………

By:

**AEGEAN SHIP XII MARITIME COMPANY** ………………………… …………………………

By:

**TEMPEST SHIPTRADE LTD.** ………………………… …………………………

By:

**AMORGOS MARITIME INC.** ………………………… …………………………

By:

**AEGEAN MARINE PETROLEUM NETWORK INC.** ………………………… …………………………

By:

**AEGEAN PETROLEUM INTERNATIONAL INC.** ………………………… …………………………

By:

**TASMAN SEAWAYS INC.** ………………………… …………………………

By:

**SANTON LIMITED** ………………………… …………………………

By:

**AEGEAN ACE MARITIME COMPANY** ………………………… …………………………

By:

**AEGEAN SHIP III MARITIME COMPANY** ………………………… …………………………

By:

**AEGEAN SHIP VIII MARITIME COMPANY** …………………………  …………………………

By:


**NEVADO NAVIGATION S.A.** …………………………  …………………………

By:


**AEGEAN TANKING S.A** …………………………  …………………………

By:


**SEALAND NAVIGATION INC.** …………………………  …………………………

By:


**BENMORE SERVICES S.A.** …………………………  …………………………

By:


**ETON MARINE LTD.** …………………………  …………………………

By:


**INGRAM ENTERPRISES CO.** …………………………  …………………………

By:


**AEGEAN MARINE PETROLEUM S.A.** …………………………  …………………………

By:


**I.C.S. PETROLEUM LTD.** …………………………  …………………………

By:


**AEGEAN BUNKERING (USA) LLC** …………………………  …………………………

By:


**AEGEAN MAISTROS MARITIME COMPANY** …………………………  …………………………

By:

**AEGEAN GAS MARITIME COMPANY** ………………………… …………………………

By:


**AEGEAN BUNKERING COMBUSTIBLES LAS PALMAS SOCIEDAD ANÓNIMA** ………………………… …………………………

By:


**AEGEAN (FUJAIRAH) BUNKERING SA** ………………………… …………………………

By:


**AEGEAN AGENCY (GIBRALTAR) LIMITED** ………………………… …………………………

By:


**CARIBBEAN RENEWABLE ENERGY SOURCES INC.** ………………………… …………………………

By:


**WEST COAST FUEL TRANSPORT LTD** ………………………… …………………………

By:


**AEGEAN BUNKERING (GIBRALTAR) LIMITED** ………………………… …………………………

By:


**AEGEAN HOLDINGS S.A.** ………………………… …………………………

By:


**AEGEAN BUNKERING (JAMAICA) LIMITED** ………………………… …………………………

By:


**AMPN USA, LLC** ………………………… …………………………

By:

**AEGEAN OIL (USA), LLC** ………………………… …………………………

By:


**I.C.S. PETROLEUM (MONTREAL) LTD.** ………………………… …………………………

By:

**AEGEAN BUNKERING MOROCCO SARL AU** ………………………… …………………………

By:

**AEGEAN BUNKERING (SINGAPORE) PTE. LTD.** ………………………… …………………………

By:

**AEGEAN BUNKERING (TRINIDAD) LTD.** ………………………… …………………………

By:

**AMPNI INVESTMENTS CO. LIMITED** ………………………… …………………………

By:

**AMPNI HOLDINGS CO. LIMITED** ………………………… …………………………

By:

**MAISTROS RORO SHIPHOLDINGS LTD** ………………………… …………………………

By:

**OSTRIA RORO SHIPHOLDINGS LTD** ………………………… …………………………

By:

**AEGEAN TANKFARMS HOLDINGS S.A.** …………………………   …………………………

By:

**AEGEAN INVESTMENTS S.A.** …………………………   …………………………

By:

**THE FACILITY AGENT**

**ABN AMRO BANK N.V.** ……………………..   …………………………

By:

**THE COLLATERAL MANAGEMENT AGENT**

**ABN AMRO BANK N.V.** ……………………..   …………………………

By:

**THE SECURITY AGENT**

**ABN AMRO BANK N.V.** ……………………..   …………………………

By:

**THE LENDERS**

**MERCURIA ENERGY TRADING S.A.** ……………………..   …………………………

By:


**THE CO-ORDINATOR**

**MERCURIA ENERGY TRADING S.A.** ……………………….. …………………………

By:


**THE ISSUING BANK**

**ABN AMRO BANK N.V.** ……………………….. …………………………

By:


**HEDGING PROVIDER**

**MERCURIA ENERGY TRADING S.A.** ……………………….. …………………………

By: