Hearing Date: To be determined by the Court
Objection Deadline: [●], 2018, at 4:00 p.m. (prevailing Eastern Time)

| | |
|---|---|
| Marc Kieselstein, P.C. | James H.M. Sprayregen, P.C. |
| Jonathan S. Henes, P.C. | Ross M. Kwasteniet, P.C. (*pro hac vice* pending) |
| Cristine Pirro Schwarzman | Adam C. Paul, P.C. (*pro hac vice* pending) |
| **KIRKLAND & ELLIS LLP** | W. Benjamin Winger (*pro hac vice* pending) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS LLP** |
| 601 Lexington Avenue | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| New York, New York 10022 | 300 North LaSalle Street |
| Telephone:    (212) 446-4800 | Chicago, Illinois 60654 |
| Facsimile:    (212) 446-4900 | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-13374 (MEW) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING
BIDDING PROCEDURES AND SECTION 365 PROCEDURES, (II) APPROVING THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (III) AUTHORIZING
THE ENTRY INTO AND PERFORMANCE UNDER THE STALKING HORSE ASSET
PURCHASE AGREEMENT, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion (this "<u>Motion</u>"):[2]

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have been granted joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration of Tyler Baron, Director of Aegean Marine Petroleum Network Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "<u>Baron First Day Declaration</u>"), filed contemporaneously herewith and incorporated by reference herein.

## Preliminary Statement

1.      The Debtors commenced these chapter 11 cases to stabilize business operations, address near-term debt maturities, and facilitate a value-maximizing restructuring transaction.  The Debtors, with the support of Mercuria Asset Holdings (Hong Kong) Limited (together with its affiliates, "Mercuria"), intend to undertake a robust, 120-day process to market their business as a going concern and otherwise solicit highest or otherwise best offers for the benefit of all parties in interest.  Over the four months leading to the Petition Date, Mercuria provided the Debtors with liquidity and funding that have enabled the Debtors to bridge to an orderly and organized chapter 11 filing while minimizing disruption to their underlying businesses.  Mercuria has further agreed to continue funding the Debtors through these chapter 11 cases with commitments of $532 million of DIP financing[3] and has provided a Stalking Horse baseline bid that provides $681 million in value to the Debtors' estates (through credit bid, cash, and assumed liabilities).  That bid is the byproduct of hard fought, arms' length, good faith negotiations between the Debtors and Mercuria that began in the summer of 2018 and culminated with the parties' entry into the Stalking Horse APA.

2.      The Stalking Horse APA and the related DIP Financing provided by Mercuria provide a viable path forward to position the Debtors' business for long-term success.  In exchange for the benefits provided by the Stalking Horse Bid (as described more fully below), including the agreement to serve as a floor for purposes of the Auction, the Stalking Horse APA contemplates certain bid protections—namely, a break-up fee in the amount of $19 million and reimbursement of Mercuria's reasonable and documented expenses (collectively, the "Bid Protections")—in the

---

[3]    On November 9, 2018, this Court entered an order approving the DIP financing on an interim basis [Docket No. 51].

2

event the marketing process delivers value to these estates in excess of the Stalking Horse Bid.

3.      The Debtors submit that the proposed marketing process, the Bidding Procedures, and the Stalking Horse APA represent the best available restructuring alternative at this time.  To be sure, the Debtors explored and negotiated alternative transactions predicated on non-binding proposals with other interested parties prior to entering into the Stalking Horse APA.  The Debtors also have negotiated a minimum cash component of the Purchase Price of $15 million to ensure these chapter 11 cases can be administered responsibly following the consummation of the Stalking Horse APA transaction.  And critically, the Debtors—as the sole fiduciary for all parties in interest—have negotiated room to continue to discharge their duties in furtherance of any transaction that maximizes the value of their estates.  Mercuria, critically, has provided a value-maximizing path forward by agreeing to both fund these chapter 11 cases and serve as a stalking horse bidder.  If a higher or otherwise better restructuring alternative materializes, the Debtors will, subject to the terms of the Stalking Horse APA and the proposed Bidding Procedures, pursue and potentially implement such alternative as value-accretive to their estates.  For all of these reasons, the Debtors respectfully request that the Court grant the relief requested herein.

## **Relief Requested**

4.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), and, at the conclusion of the Sale Hearing, an order, substantially in the form attached hereto as **Exhibit D** (the "Sale Order"):

      a.      authorizing and approving the bidding procedures for competitive bidding in connection with the Sale, substantially in the form attached hereto as **Exhibit 1** to **Exhibit A** (the "Bidding Procedures");

      b.      approving the form and manner of notice of the sale by auction and the sale hearing and related matters, substantially in the form attached hereto as **Exhibit B** (the "Sale Notice");

      c.      authorizing and approving procedures for the assumption and assignment

of contracts and leases (the "Assumption Procedures"), which are set forth in greater detail in the Bidding Procedures Order;

d.  authorizing and approving the sale free and clear of all liens, claims, interests and encumbrances (the "Sale") of the Acquired Assets pursuant to the terms of that certain Asset Purchase Agreement, dated as of November 5, 2018, by and between Aegean Marine Petroleum Network Inc. ("Aegean") and Mercuria (the "Stalking Horse Bidder"), (as amended, supplemented, or otherwise modified from time to time, the "Stalking Horse APA"), attached hereto as **Exhibit C**;[4]

e.  authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases to the Stalking Horse Bidder or other successful bidder arising from the Auction (a "Successful Bidder");

f.  establishing the following dates and deadlines for the sale process (the "Sale Process"), subject to modification:[5]

- Bidding Procedures Objection Deadline: [●], 2018, at 4:00 p.m. Eastern Time, as the deadline to object to the Bidding Procedures, Bid Protections, Stalking Horse APA, form and manner of Sale Notice, and Assumption Procedures (the "Bidding Procedures Objection Deadline");

- Bidding Procedures Hearing: [●],[6] 2018, at [•] p.m. Eastern Time, as the date the bidding procedures hearing (the "Bidding Procedures Hearing") will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York;

- Indication of Interest Deadline: January 3, 2019, as the last day by which an interested person must submit a non-binding Indication of Interest in the Sale Process.

- Assumption and Assignment Service Deadline: January 4, 2019, at 5:00 p.m. Eastern Time, as the last date by which the Debtors must serve the Cure Notice (as defined in the Bidding Procedures Order)

---

[4]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Stalking Horse APA.

[5]  All dates and times are subject to court availability and approval. Any modification to the dates and deadlines within the Sale Process, which do not affect the ability for the Court to enter the Sale Order by the date that is 120 days after the date of the Stalking Horse APA, does not constitute a violation of the Stalking Horse APA, Bidding Procedures, or Bidding Procedures Order, such that the Sale Order shall still find that the Debtors and Buyer complied with the terms thereof.

[6]  The Debtors intend to seek a hearing to consider the Motion on or about December 4, 2018.

on all non-Debtor counterparties to all Assumed Contracts;

- Stalking Horse Bid Objection Deadline:  January 18, 2019, at 4:00 p.m. Eastern Time, as the deadline to object to the Sale transactions contemplated by the Stalking Horse Bid or the assumption and assignment of the Assumed Contracts or cure amounts related thereto (the "Stalking Horse Bid Objection Deadline");

- Assumption and Assignment Objection Deadline: January 19, 2019 at 4:00 p.m. Eastern Time, as the deadline to object to assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder, including proposed Cure Costs (as defined in the Stalking Horse APA);

- Bid Deadline:  February 11, 2019, at 5:00 p.m. Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

- Sale Objection Deadline:  February 13, 2019, at 4:00 p.m. Eastern Time, as the deadline to object to the Sale transactions (other than the Stalking Horse Bid);

- Auction:  February 18, 2019, at 10:00 a.m. Eastern Time, as the date and time the auction, if one is needed (the "Auction"), which will be held at the offices of Kirkland & Ellis LLP, located at: 601 Lexington Avenue, New York, New York 10022; and

- Sale Hearing:  February 22, 2019, as the date the sale hearing (the "Sale Hearing") will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York.

**Jurisdiction and Venue**

5.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that

5

the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.       The bases for the relief requested herein are sections 105(a), 363, 365, and 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure, and rules 2002-1, 6004-1, 6006-1, and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") and the *Sale Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383* (the "Sale Guidelines").

## Background

8.       Aegean Marine Petroleum Network Inc., together with its Debtor and non-Debtor subsidiaries, is a leading marine fuel logistics company with approximately 850 employees and active operations in 20 countries worldwide.  The Debtors' core business involves marketing and physically supplying marine fuel and lubricants to vessels in port, at sea, on rivers and other waterways.  The Debtors own and/or operate a fleet of 57 vessels, including 38 owned double hull bunkering tankers, covering more than 50 ports worldwide, including Northern Europe and the Antwerp-Rotterdam-Amsterdam-region, the U.S. East and West Coasts, Gibraltar, Greece, Morocco, Canada, Jamaica, Trinidad and Tobago, the Gulf of Mexico, Germany, South Africa, and the U.S. Virgin Islands.  The Debtors also own or lease land-based storage facilities— consisting of two terminals and more than 1,000,000 cubic meters of storage capacity—in the United States, Morocco, Canary Islands, Germany, and the United Arab Emirates.  The Debtors are headquartered in Athens, Greece and have a corporate office in New York, New York.  As of November 6, 2018 (the "Petition Date"), the Debtors' funded debt obligations totaled

6

approximately $872 million consisting of 12 secured credit facilities and two issuances of unsecured convertible notes.

9.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have been granted procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).[7]  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated

### Overview of the Proposed Sale

## I.      Material Terms of the Stalking Horse APA.

10.     The following chart summarizes the key terms and conditions of the Stalking Horse APA, attached hereto as **Exhibit C** pursuant to Local Rule 6004-1 and the corresponding Sale Guidelines:[8]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Parties** | Sellers:  Aegean Marine Petroleum Network Inc. and certain of its subsidiaries |
| | Buyer:  Mercuria Asset Holdings (Hong Kong) Limited |
| **Purchase Price** | Total consideration of approximately $681,000,000[9] consisting of: |
| | • discharge of all or a portion of the then outstanding obligations under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility equal to $459,000,000; |
| | • an amount of cash equal to $15,000,000; and |

---

[7]    *See* Order Directing Joint Administration (Nov. 6, 2018) [Docket No. 19].

[8]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse APA, the latter governs in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse APA.

[9]    This number reflects the estimated total value attributable to the Stalking Horse Bid inclusive of assumed liabilities.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | • assumption of the Assumed Liabilities, representing an estimated value of at least $207,000,000.<br><br>*plus* certain Additional Administrative Costs, if any.<br><br><u>See</u> **Stalking Horse APA, at § 3.3(a).** |
| **Bid Protections** | <u>Break-Up Fee</u>:  If the Stalking Horse APA is terminated pursuant to Section 8.1(b)(ii) , Section 8.1(c), Section 8.1(d) or Section 8.1(o) of the Stalking Horse APA, Sellers shall pay to Buyer a cash amount equal to $19 million upon the consummation of an Alternative Transaction.  **See Stalking Horse APA, at § 8.2(b)(ii).**<br><br><u>Reimbursable Expenses</u>: Sellers shall, within two (2) Business Days after any termination of the Stalking Horse APA pursuant to Section 8.1(b)(ii), Section 8.1(c), Section 8.1(d), Section 8.1(g) or Section 8.1(o) of the Stalking Horse APA, reimburse Buyer for all of the actual, documented and reasonable out of pocket costs, fees and expenses incurred or to be incurred by Buyer or its Affiliates, including reasonable fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of the Stalking Horse APA, the Transactions, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions, in each case, less any expenses paid or reimbursed for under the DIP Facility.  **See Stalking Horse APA, at § 8.2(b)(i).** |
| **Acquired Assets** | Buyer proposes to acquire all the right, title and interest of Sellers in each and all of the Acquired Assets, which include, but are not limited to:  the Owned Real Property, the Leased Real Property, all Avoidance Actions, the Machinery and Equipment, the Assumed Contracts, the Transferable Permits, the Inventory, all accounts receivable relating to the Business, the Records, all Intellectual Property and IT Assets, goodwill associated with the Business, the Acquired Assets and the Assumed Liabilities, deposits and prepaid expenses, cash and cash equivalents and securities, all assets and rights of every nature under or relating to Joined Collective Bargaining Agreements in respect of Transferred Employees with respect to the period from and after the Closing and in respect of the Assumed Benefit Plans and the Assumed Collective Bargaining Agreements, all assets and rights of every nature related to or in respect of the Legal Employee Liabilities, Claims against third parties, all insurance policies and binders related to an Acquired Asset, all shares of stock or equity interests in the Acquired Companies, rights to refunds of Taxes and all Purchased Claims. **See Stalking Horse APA, at § 2.1.** |
| **Excluded Assets** | Buyer proposes to exclude all of the right, title, and interest in, to, and under the Excluded Assets, which include, but are not limited to: each Seller's rights under the Stalking Horse APA, Records related to Taxes paid or payable by any Seller or any of its Affiliates, shares of capital stock or other equity interests of any Seller or any of its Affiliates except with respect to the Acquired Companies, all properties, asset (including vessels) and rights of certain specified entities, confidential personnel and medical records pertaining to any employees of Sellers, documents or agreements relating to the Chapter 11 Cases, assets and rights of every nature under or relating to the Retained Collective Bargaining Agreements in respect of any current or former employees who are not Transferred Employees and any Transferred Employee with respect to the pre-Closing period and the Retained Benefit Plans, Permits and pending applications related solely to any other Excluded Asset or Excluded Liabilities, all prepayments, good faith and other bid |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | deposits submitted by any third party under the terms of the Bidding Procedures Order, all Claims that Sellers or any Affiliates may have against any third person solely with respect to any Excluded Assets or Excluded Liabilities, certain bank accounts and certain specified Contracts. **See Stalking Horse APA, at § 2.2.** |
| **Assumed Liabilities** | Buyer will assume the Assumed Liabilities, which consist of, but are not limited to, all of Sellers' liabilities under the Assumed Contracts, exclusive of any Liability arising from or related to a violation of Law occurring prior to the Closing Date, all trade and vendor accounts payables under each of the Assumed Contracts, all Liabilities relating to any environmental, health or safety matter arising under any Environmental Laws or relating to the release of Hazardous Materials, arising out of or relating to the operation of the Business or leasing, ownership or operation of the Acquired Assets occurring after the Closing, the Assumed Employee Liabilities, all Liabilities under or relating to the Joined Collective Bargaining Agreements in respect of Transferred Employees with respect to the period from and after the Closing or otherwise to the extent required by applicable Law or Joined Collective Bargaining Agreements and under the Assumed Benefit Plans and Assumed Collective Bargaining Agreements, Liabilities related to Property Taxes imposed upon or assessed against the Acquired Assets for the proration period after Closing, all Liabilities of the Acquired Companies (including all Indebtedness with respect to the Vessels), and all Liabilities relating to or arising out of the ownership or operation of the Facilities, the Business or any Acquired Asset from and after the Closing, except, in each case, any Excluded Liabilities. **See Stalking Horse APA, at § 2.3.** |
| **Excluded Liabilities** | Buyer proposes to exclude the Excluded Liabilities, including, but not limited to: costs and expenses incurred by Sellers in connection with consummation of the Transactions, Liabilities relating to or arising out of, or in connection with, any of the Excluded Assets, all Liabilities relating to any environmental matter arising out of or relating to the operation of the Business or Acquired Real Property prior to closing, all fines, penalties or other Liabilities assessed by a Governmental Entity as a result of noncompliance with applicable Law (including with respect to filings with the SEC), all third party Liabilities for toxic torts caused or allegedly caused by exposure, prior to the Closing Date, to Hazardous Materials related to the Facilities, the Business, or any Acquired Asset, Liabilities related to any current or former employees which are not Assumed Employee Liabilities, all Liabilities under or relating to the Retained Collective Bargaining Agreements in respect of any current or former employees of any Seller or any Subsidiary of any Seller who are not Transferred Employees and any Transferred Employee with respect to the pre-Closing period, and in respect of the Retained Benefit Plans, all Liabilities for Taxes of Sellers (except for those Taxes for which are Assumed Liabilities), and Property Taxes imposed against the Acquired Assets that are allocable to the portion of the Proration Period ending on the Closing Date, all Liabilities relating to, arising out of, or in connection with the events, circumstances, and conduct described in the June 4, 2018, Form 6-K disclosure of Aegean, concerning improper accounting for or recordation of accounts receivable, all Liabilities relating to, arising out of, or in connection with any payments or invoices concerning the construction and maintenance of the Aegean terminal in Fujairah, and all Liabilities relating to, arising out of, or in connection with certain Proceedings. **See Stalking Horse APA, at § 2.4.** |
| **Employee Matters** | • Within thirty (30) days following the date of the Stalking Horse APA, Sellers shall make available to Buyer a complete and accurate Seller Employee List.<br><br>• On the final day of each calendar month following the date of the Stalking |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Horse APA and ten (10) days prior to the Closing, Sellers shall make available to Buyer an updated version of the Seller Employee List. |
| | • Not less than twenty (20) days prior to Closing, Buyer shall make available to Sellers the Employee Offer List. |
| | • Approximately ten (10) days prior to the Closing, Buyer shall, or shall cause one of its Subsidiaries to, make an offer of employment to each Seller Employee on the Employee Offer List who (i) is neither an Automatic Transfer Employee nor an Employee of an Acquired Company and (ii) then remains a Seller Employee. |
| | • Within thirty (30) days following the date of the Stalking Horse APA and ten (10) days prior to the Closing, Sellers shall make available to Buyer a complete and accurate list of Benefit Plans. |
| | • Approximately ten (10) days prior to the Closing, Buyer shall make available to Sellers a schedule setting forth the Assumed Benefit Plans. |
| | • As and to the extent required by applicable Laws or the terms of any Collective Bargaining Agreement, Buyer shall assume the Assumed Collective Bargaining Agreements and join the Joined Collective Bargaining Agreements. |
| | • Buyer will provide each Transferred Employee with comparable compensation and benefits, recognize service credit of the Transferred Employees, and use commercially reasonable efforts to cause any required permit, pass, visa, or other approval to be obtained and in effect as of the Closing. |
| | • See Stalking Horse APA, § 6.7. |
| Conditions Precedent to Obligations of Buyer | The obligations of the Buyer to consummate the transactions contemplated by the Stalking Horse APA are subject to satisfaction of the following conditions: |
| | • Sellers' representations and warranties (i) that are Seller Fundamental Representations shall be true and correct in all respects other than *de minimis* inaccuracies, (ii) that are qualified as to Sellers Material Adverse Effect or material adverse effect shall be true and correct in all respects, and (iii) other than those set forth in clause (i) and (ii), shall be true and correct in the aggregate, in all material respects. |
| | • Sellers shall have performed in all material respects all material obligations and agreements contained in the Stalking Horse APA required to be performed by them on or prior to the Closing Date. |
| | • Buyer shall have received a certificate, dated to the Closing Date, of an executive officer of each Seller to the effect that certain conditions precedent have been fulfilled or waived. |
| | • All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required, and all of the applicable Governmental Entity approvals or consents required under certain Foreign Antitrust Laws have been received (or, if applicable, any waiting period in respect of any such approvals or consents under those Foreign Antitrust Laws shall have been terminated or expired). |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | • (i) All approvals or consents of Governmental Entities required prior to Closing that are material to the Business or to Buyer and its Affiliates shall have been obtained and (ii) there shall be no Law or Order that restrains or prevents the Transactions. |
| | • The Bankruptcy Court shall have entered the Sale Order. |
| | • There shall not have occurred a DIP Event of Default that is continuing, a Remedies Exercise Notice shall not have been delivered, and the DIP Facility Lenders shall not have acquired all or a material part of the Acquired Assets as a result of an exercise of remedies under the DIP Facility. |
| | • The Bankruptcy Court shall have entered a final non-appealable Order permitting Buyer to credit bid no less than $459 million (or, solely to the extent the borrowers under the DIP Facility have not borrowed the full amount available thereunder, the amount that would be the actual Credit Bid Consideration). |
| | • Sellers shall have obtained any consent or approval required under the Applicable Contracts as a result of the execution or performance of the Stalking Horse APA. |
| | • Sellers shall have assumed and assigned to Buyer, or the Acquired Companies shall have retained, the Material Licenses and Permits. |
| | • There shall not have occurred a Sellers Material Adverse Effect. |
| | • Any Acquired Company that is a debtor in the Chapter 11 Cases shall have been dismissed as a debtor in such Chapter 11 Cases by Order of the Bankruptcy Court or have resolved its Chapter 11 Cases in a manner acceptable to Buyer. |
| | • Sellers shall have implemented and continue to maintain a Hedging Program. |
| | • The Challenge Periods shall have passed and each of the Debtors' stipulations set forth in the DIP Order shall be binding on all persons, entities and parties in interest in the Chapter 11 Cases, including the Committee. |
| | • Sellers shall have delivered to Buyer all of the items set forth in Section 3.1(b). |
| | • **See Stalking Horse APA, at § 7.1.** |
| **Conditions Precedent to Obligations of Sellers** | The obligations of the Seller to consummate the transactions contemplated by the Stalking Horse APA are subject to satisfaction of the following conditions: |
| | • Buyer's representations and warranties (i) related to organization and due authorization shall be true and correct in all material respects, and (ii) other than those set forth in clause (i), shall be true and correct in all material respects, except where the failure of such representations or warranties to be correct has not, and would not reasonable be expected to have a Buyer Material Adverse Effect. |
| | • Buyer shall have performed in all material respects all obligations and agreements contained in the Stalking Horse APA required to be performed by it on or prior to the Closing Date. |
| | • Sellers shall have received a certificate, dated to the Closing Date, of an executive officer of Buyer to the effect that the certain conditions precedent have been fulfilled and/or waived. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
|  | • All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required, and all of the applicable Governmental Entity approvals or consents required under Foreign Antitrust Laws have been received (or, if applicable, any waiting period in respect of any such approvals or consents under those Foreign Antitrust Laws shall have been terminated or expired).<br><br>• All approvals or consents of Governmental Entities required prior to Closing shall have been obtained and there shall be no Law or Order that restrains or prevents the Transactions.<br><br>• The Bankruptcy Court shall have entered the Sale Order.<br><br>• Buyer shall have delivered to Sellers all of the items set forth in Section 3.1(c).<br><br>• **See Stalking Horse APA, at § 7.2.** |
| **Representations and Warranties of Sellers** | The Stalking Horse APA contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and standing; (b) authority; (c) non-contravention; (d) title to real property and assets; (e) legal proceedings; (f) employee benefits and labor; (g) environmental liabilities; (h) taxes; (i) permits; (j) contracts; (k) insurance; (l) intellectual property; (m) bank accounts; (n) anti-corruption and sanctions; and (o) exclusiveness of representations and warranties.  **See Stalking Horse APA, at §§ 4.1–4.20.** |
| **Representations and Warranties of Buyer** | The Stalking Horse APA contains customary representations and warranties by the Buyer, including representations of Buyer regarding: (a) organization and standing; (b) authority; (c) governmental approvals; (d) non-contravention; (e) financing; (f) adequate assurances regarding executory contracts; (g) condition and location of assets; and (h) exclusiveness of representations and warranties.  **See Stalking Horse APA, at §§ 5.1–5.9.** |
| **Other Covenants** | The Stalking Horse APA requires, among other things: (a) Sellers to conduct Sellers' Business in the ordinary course of business; (b) Sellers not to solicit Alternative Transactions prior to entry of the Bidding Procedures Order; (c) Buyer and Sellers to use commercially reasonable efforts to consummate the Transactions; and (d) Buyer to pay any Cure Costs related to the Assumed Contracts.<br><br>The Stalking Horse APA also contains customary provisions regarding, among other things, access, publicity, responsibility for tax liability, commercially reasonable efforts, bankruptcy matters and filings, risk of loss, and bulk transfer laws.<br><br>**See Stalking Horse APA, at §§ 6.1–6.14.** |

## II.    "Extraordinary Provisions" under the Sale Guidelines.

11.    The Stalking Horse APA contains the following terms, conditions and provisions that may be considered "Extraordinary Provisions" under Section I.D of the Sale Guidelines:[10]

---

[10]    This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted

a. **Sale to Insider**. The Stalking Horse Bidder is an affiliate of (i) the lender(s) under the DIP Financing, (ii) the lender(s) under the Debtors' prepetition borrowing base facilities, and (iii) a holder of 30% of the equity in the Debtors' ultimate parent, Aegean Marine Petroleum Network Inc. The Debtors disclose this connection out of an abundance of caution and reserve all rights regarding whether or not the Stalking Horse Bidder is an "insider" under section 101(31) of the Bankruptcy Code. As discussed *infra*, the DIP Financing and Stalking Horse APA were negotiated on an arm's-length basis between the Debtors and Stalking Horse Bidder. Further, the Debtor designed the Bidding Procedures to encourage all persons or entities to put their best bids forward such that the Debtors' proposed Auction maximizes value to the benefit of the Debtors' estates. Other parties had an opportunity to participate in a process, both with respect to the Sale and with respect to the DIP Financing, prior to selecting the Stalking Horse Bidder, and the Stalking Horse Bidder was the highest and best path forward for the Debtors. Importantly, the Debtors will use the time permitted under the DIP Financing and the Bidding Procedures to actively market the Acquired Assets in an attempt to solicit higher or otherwise better bids, pursuant to the terms of the Stalking Horse APA.

b. **Avoidance Actions**. The Stalking Horse APA requires that the Debtors transfer the Debtors' rights to pursue Avoidance Actions related to the Debtors' businesses.[11] The open nature of this sale transaction subjects the Avoidance Actions to a robust market test that benefits the Debtors' estates. Accordingly, the Debtors believe including such provision in the Sale Order is appropriate and reasonable.

c. **Successor Liability**. The Stalking Horse APA requires that the proposed Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability.[12] In light of the open nature of this sale transaction and the form and manner of the Sale Notice, including that the Sale Notice contains an express disclosure regarding successor liability findings in the Sale Order, the Debtors believe affected parties will have sufficient notice of the sale and, therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the sale's benefits to the Debtors' estates.

d. **Stay Waiver**. The proposed form of Sale Order provides for a waiver of the 14-day stay of the Sale Order arising under Bankruptcy Rule 6004(h), including the parties' ability to close the Sale and assign the Assumed

---

pursuant to section 363 of the Bankruptcy Code.

[11]   *See* Stalking Horse APA § 2.1(b).]

[12]   *See* Sale Order ¶ 19.

Contracts.[13]  A waiver of the stay is appropriate because the Sale will be extensively marketed and notice of the Sale will be adequately provided to all parties in interest.  Therefore, the Debtors submit there are adequate grounds to waive the 14-day stay so that the Sale Order is effective immediately.

e.    **No Good Faith Deposit by Stalking Horse**.  The Stalking Horse APA does not provide for a good faith deposit by the Stalking Horse Bidder, which was negotiated on an arm's-length basis between the Debtors and the Stalking Horse Bidder.[14]    Other bidders at auction will, however, be required to make a good faith deposit.[15]   The Debtors submit this is reasonable and appropriate because Mercuria has funded these chapter 11 cases as the DIP lender.

f.    **Records Retention**.  The Stalking Horse APA requires Buyer to provide Sellers (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all Records included in and otherwise related to the Acquired Assets for periods prior to the Closing and shall preserve such records until the later of (i) such period as shall be consistent with Buyer's retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases, or (iv) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.

## Bidding Procedures Order

## III.    Outline of the Bidding Procedures.

12.    The Bidding Procedures are intended to permit a fair and efficient competitive Sale

Process, consistent with the timeline of these cases, to help determine whether the Stalking Horse

Bid is, indeed, the best offer or promptly identify the alternative bid that is higher or otherwise

---

13    *See* Sale Order ¶ 29.

14    Stalking horse bids have been approved in this and other jurisdictions in circumstances where the stalking horse bidder provided DIP Financing, was a secured lender with the ability to credit bid a substantial portion of the purchase price, or where the stalking horse purchaser otherwise helped finance the costs of the sale process. *See, e.g.*, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. 2008) (no good faith deposit required of any bidder where stalking horse provided partial funding required to close the transaction); *In re Sungevity, Inc.*, No. 17-10561 (Bankr. D. Del. 2017) (no good faith deposit required of stalking horse bidder who is DIP lender); *In re Xtera, Inc.*, No 17-10561 (same).

15    *See* Bid. Proc., at p. 9-10.

better.  Because the Bidding Procedures are attached as **Exhibit 1** to **Exhibit A** hereto, they are

not restated in their entirety herein.   Generally speaking, however, the Bidding Procedures

establish, among other things:

> a.    the requirements that Potential Bidders must satisfy to participate in the bidding process and become "Potential Bidders;"[16]
>
> b.    the availability of, access to, and conduct during due diligence by Potential Bidders;[17]
>
> c.    the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger an Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and deadline that must be met by any Potential Bidder (other than the Stalking Horse Bidder) to be considered a "Qualified Bidder";[18]
>
> d.    the manner in which Qualified Bids will be evaluated by the Debtors, in consultation with their advisors, to determine the Starting Bid for the Auction;[19]
>
> e.    the conditions for having an Auction and procedures for conducting the Auction, if any;[20] and
>
> f.    the criteria by which the Successful Bidder will be selected by the Debtors, in consultation with their advisors.[21]

13.    Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations

to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified

Bids, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate

---

[16]   *See* Bid. Proc., at p. 3.

[17]   *See* Bid. Proc., at p. 3-5.

[18]   *See* Bid. Proc., at p. 10.

[19]   *See* Bid. Proc., at p. 11.

[20]   *See* Bid. Proc., at p. 12-15.

[21]   *See* Bid. Proc., at p. 14-15.

to maximize value for their estates, subject to the terms of the Stalking Horse APA.[22]

## IV.   Form and Manner of Sale Notice.

14.      Within seven days after the entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors will serve the Sale Notice, the Stalking Horse APA, the Bidding Procedures Order, and the Bidding Procedures in accordance with the Sale Guidelines by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon the following parties:  (a) the Master Service List; (b) counsel to the Stalking Horse Bidder, the DIP Lenders, and the Prepetition Lenders; (c) any parties known or reasonably believed to have expressed interest in any of the Assets; (d) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the Assets; (e) all parties to executory contracts or unexpired leases to be assumed and assigned, or rejected as part of the transaction; and (f) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder.[23]

15.      Additionally, on the Mailing Date or as soon as practicable thereafter, the Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in *The Financial Times* and *The Wall Street Journal*, global edition.  Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

16.      The Debtors submit that the Sale Notice is reasonably calculated to provide all

---

[22]  In the event a potential buyer seeks to purchase the equity of certain debtor subsidiaries under section 363(b) of the Bankruptcy Code, the Debtors reserve the right to seek dismissal of the chapter 11 cases as to such subsidiaries pursuant to sections 305(a) and 1112(b) of the Bankruptcy Code.  Under such circumstances, the Debtors would, at that time, file a motion for dismissal on appropriate grounds.

[23]  Capitalized terms used but not defined in this Paragraph 19 shall have the meanings set forth in the *Final Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. 3].

interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the Stalking Horse Bid Objection Deadline and Sale Objection Deadline; (d) reasonably specific identification of the Acquired Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse APA; (f) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances with respect to those Assets which are currently property of the Debtors' estates, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds; (g) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; and (h) notice of the proposed assumption and assignment of contracts and leases to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures and deadlines for objecting thereto.  The Debtors propose that no other or further notice of the Sale shall be required.  Accordingly, the Debtors request that the form and manner of the Sale Notice be approved.

## V.    Summary of the Assumption Procedures

17.    The Debtors are also seeking approval of the Assumption Procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale.  Because the Assumption Procedures are set forth in detail in the attached Bidding Procedures Order, they are not restated herein.[24]  Generally speaking, however, the Assumption Procedures: (a) outline the process by which the Debtors will serve notice to all counterparties to the Assumed

---

[24]    The proposed Assumption Procedures set forth in the Bidding Procedures relate specifically to the proposed mechanism for providing notice of cure amounts to certain contract and lease counterparties, entertaining objections thereto and resolving disputes related thereto.

Contracts regarding the proposed assumption and assignment and related cure amounts, if any,

informing such parties of their right and the procedures to object thereto; and (b) establish

objection and other relevant deadlines and the manner for resolving disputes relating to assumption

and assignment of Assumed Contracts to the extent necessary.

<u>Basis for Relief</u>

**I.    The Bidding Procedures Are Fair, Appropriate, and Should Be Approved.**

18.    "When conducting an asset sale, the ultimate responsibility of the debtor, and the

primary focus of the bankruptcy court, is the maximization of the value of the assets sold."  John

J. Jerome & Robert D. Drain, <u>Bankruptcy Court Is Newest Arena for M&A Action</u>, N.Y.L.J., June

3, 1991.  In furtherance of that goal, bidding procedures and bid protections, such as those proposed

here, may be used in court-supervised asset sales because they streamline the acquisition process,

"help to provide an adequate basis by which to compare offers," and maximize value.[25]   In

overseeing an asset sale subject to an auction process, the bankruptcy court walks a tightrope

between:

> on the one hand, providing for an orderly bidding process, recognizing the danger
> that absent such a fixed and fair process bidders may decline to participate in the
> auction; and, on the other hand, retaining the liberty to respond to differing
> circumstances so as to obtain the greatest return for the bankrupt estate.[26]

Because the court must perform this difficult balancing act, "a bankruptcy judge's broad

discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical

rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court

---

[25]   *See id.*; *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*),
147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage
bidding and to maximize the value of the debtor's assets"); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670
(Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by
expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.").

[26]   *In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992).

must necessarily have to enhance the value of the estates before it."[27]

19.     Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtors' estates.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the Sale by these estates.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

20.     At the same time, the Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the completion of the Sale.  Entering into the Stalking Horse APA with the Stalking Horse Bidder ensures the Debtors obtain fair market value by setting a minimum purchase price that will be tested in the marketplace.  As such, the Debtors and their creditors can be assured that, taking into account the financial condition of the Debtors and the economy, the consideration obtained will be fair and reasonable and at or above market.

## A.    The Bid Protections Have Sound Business Purpose and Should Be Approved.

21.     The Debtors are also requesting approval of a Break-Up Fee equal to $19 million and Reimbursable Expenses subject to a reasonable, documented, and actually incurred standard.  The Break-Up Fee represents approximately 2.8% of the total potential value to Aegean of approximately $681 million.  The Bid Protections are payable upon the occurrence of certain "triggering events" typical and customary for transactions of this kind, but always subject to consummation of an Alternative Transaction with a Person other than the Stalking Horse Bidder.

---

[27]  *See id.* at 169-70.

The total potential value includes at least approximately $15 million in cash proceeds (before transaction costs and purchase price adjustments), the discharge of $459 million of indebtedness, and the assumption of approximately $207 million of liabilities.

22.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard, and it is well established in this district that courts consider whether:  (a) the relationship of the parties who negotiated the break-up fee was tainted by self-dealing or manipulation; (b) the fee hampers, rather than encourages, bidding; and (c) the amount of the fee is unreasonable relative to the proposed purchase price.[28]  The Debtors submit that the Bid Protections are appropriate under each of the three foregoing factors.

23.     First, the Bid Protections are the product of good faith, arm's-length negotiations between Mercuria and the Debtors, who were acting not in their own self-interest, but rather, in the interest of the bankruptcy estates consistent with their fiduciary duties.  Further, the Stalking Horse APA provisions relating to the Bid Protections (as well as the other Stalking Horse APA provisions) were scrutinized by the Debtors' professionals, reviewed and vetted with outside advisors through the marketing process and approved unanimously by the Debtors' board of directors (excluding the Mercuria-appointed director which recused itself entirely from this process).

24.     Second, the Debtors believe, based on their reasoned business judgment, that the presence of the Bid Protections enhances their ability to maximize value without chilling bidding.

---

[28]  *In re Genco Shipping & Trading Limited*, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014) (citing *Metaldyne*, 409 B.R. at 670); *See also Integrated Res.*, 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment); *Fin. News Network*, 980 F.2d 165 (2d Cir. 1992).

The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse APA.  Indeed, granting these Bid Protections convinced the Stalking Horse Bidder to enter into the Stalking Horse APA, which assures the Debtors of a Sale to a contractually-committed bidder at a price they believe is fair and reasonable. Additionally, the Stalking Horse APA provides the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer at the Auction which, absent such a bid floor, might otherwise never have been realized.[29]

25.    Third, the Debtors believe, based on their reasoned business judgment, that the Bid Protections are reasonable and appropriate relative to the size, nature, and complexity of this transaction and the commitments made and resources expended by the Stalking Horse Bidder in connection therewith in view of:

a.    the meaningful floor established by the Stalking Horse APA for competitive bidding;

b.    the substantial benefits already received by the Debtors and their estates from having a Stalking Horse Bid serve as a catalyst for other potential or actual bidders to confirm that the Debtors receive the highest and best offer by subjecting the Sale to an open auction and competitive bidding;

c.    the need of the Debtors to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the timeline of these chapter 11 cases;

d.    the extensive due diligence, analysis and negotiations undertaken by the Stalking Horse Bidder in connection with the Sale;

e.    the risks borne by the Stalking Horse Bidder for being the stalking horse in this transaction and any opportunity costs incurred as a result thereof; and

f.    the payment that would be made on account of the Break-Up Fee to the Stalking Horse Bidder represents 2.8% of the total consideration of

---

[29]  *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.").

approximately $681,000,000.

26.     Accordingly, the Debtors respectfully submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**II.     The Form and Manner of the Sale Notice Should Be Approved.**

27.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.  The Sale Notice complies with the Sale Guidelines, and the Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002, Local Rule 2002-1, and the Sale Guidelines.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

**III.     The Assumption Procedures Are Appropriate and Should Be Approved.**

28.     In connection with the assumption and assignment of the Assumed Contracts, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and counterparties to Assumed Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such counterparties can object to the assumption and assignment of Assumed Contracts or related cure amounts.

29.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to:  (a) the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order and (b) assignment

22

notwithstanding any anti-alienation provision or other restriction on assignment.[30]

30.    The Debtors believe that the Assumption Procedures are fair and reasonable,
provide sufficient notice to parties to the Assumed Contracts and provide certainty to all parties in
interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request
the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## IV.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.

31.    Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of
the estate outside the ordinary course of business after notice and a hearing.  Section 363(b) does
not, however, provide a standard for determining when such a sale should be authorized if
proposed outside confirmation of a chapter 11 plan.  In the Second Circuit, that standard is
well-established by case law:  a debtor's decision to sell assets outside the ordinary course of
business must be based upon sound business judgment.[31]

32.    When determining whether to approve a proposed sale under section 363 of the
Bankruptcy Code, courts generally apply standards that, although stated various ways, represent
essentially a business judgment test.[32]  In *Lionel*, the Court of Appeals for the Second Circuit listed
several (albeit not exclusive) factors bankruptcy courts in this district may consider in conducting

---

[30]    *See, e.g.*, *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by
not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R.
661, 667 (Bankr. W.D. La. 1985) (same).

[31]    *See, e.g.*, *In re MF Glob. Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); *Genco*, 509 B.R. at 464; *Licensing By
Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Official Comm. of Unsecured Creditors of
LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir.1992); *Committee
of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Integrated Res.*,
147 B.R. at 656 (law vests the debtor's decision to use property out of the ordinary course of business with a
strong presumption that in making a business decision, the directors acted on an informed basis, in good faith and
in the honest belief that the action taken was in the best interests of the company).

[32]    *See, e.g.*, *MF Glob.*, 535 B.R. at 605; *Genco*, 509 B.R. at 464; *In re Global Crossing Ltd.*, 295 B.R. 726, 744
(Bankr. S.D.N.Y. 2003).

a section 363(b) analysis, including, for example, whether:  (a) a "sound business purpose" exists

that justifies the sale; (b) adequate and reasonable notice has been provided to interested parties;

(c) the sale value obtained is fair and reasonable; and (d) the debtor acted in good faith.[33]

### A.    A Sound Business Purpose Exists for the Sale.

33.    The Debtors have a sound business justification for entering into this

transaction.  The opportunity to sell the Acquired Assets at a fair price presents an attractive

opportunity to reorganize the Debtors' business while generating significant value for the Debtors'

estates.  The proceeds from the sale will be utilized to maximize creditor recoveries and will result

in a reorganized business with a robust balance sheet capable of funding future business operations.

34.    Notably, the Stalking Horse APA was only executed after:  (a) potential alternatives

were evaluated; (b) the DIP financing was aggressively marketed; (c) the Stalking Horse Bidder

emerged as the only viable source of DIP financing; and (d) all of the foregoing was presented to

the members of the board who, in conjunction with advice from experienced professionals,

discharged their fiduciary duties, exercised sound and appropriate business judgment, and

determined to pursue the Sale on the terms of the Stalking Horse APA, subject to competitive

bidding sanctioned by the Court.

35.    Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing,

because the Stalking Horse APA (or any marked APA, as the case may be) constitutes

(or will constitute) the highest or otherwise best offer, on balance of the facts and circumstances

of the moment, and provides greater recovery for these estates than any known or practicably

available alternative, the Debtors submit that the execution thereof represents sound reasonable

business judgment.

---

[33]    *See Global Crossing*, 295 B.R. at 744 (citing *Lionel*, 722 F.2d at 1071).

**B.    Adequate and Reasonable Notice of the Sale Will Be Provided.**

36.    As described above, the Sale Notice:  (a) will be served in a manner that provides at least 21 days' notice of the date, time and location of the Sale Hearing; (b) informs interested parties of the deadlines for objecting to the Sale or the assumption and assignment of Assumed Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale in accordance with the Sale Guidelines.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest, and, as such, the Debtors are confident the Sale Notice will be properly vetted by the time of service thereof.

**C.    The Sale and Purchase Price Reflect a Fair Value Transaction.**

37.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.[34]  This is especially true here, where the Assets and related transaction will be subjected to an extensive auction and sale process and intensively scrutinized by the Debtors and their retained advisors.

38.    Moreover, even as the Debtors move forward with the Sale, Moelis will continue to market the transaction and solicit other offers for the Acquired Assets consistent with the Bidding Procedures and subject to the Stalking Horse APA, including, for example, by contacting previously solicited parties, providing acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are

---

[34]    See *Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "§ 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

eligible to participate in a competitive auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse APA purchase price will, conclusively, be fair value.

**D.    The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser."**

39.    While the Bankruptcy Code does not define "good faith," the Second Circuit has held that the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.[35]

40.    The Debtors submit the Stalking Horse Bidder, or other Successful Bidder arising from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[36]    First, the consideration to be received by the Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable.    Second, the parties entered into the Stalking Horse APA in good faith and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel of similar bargaining positions.    Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or

---

[35]    *See, e.g.*, *Gucci*, 126 F.3d at 390 (a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

[36]    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code. Finally, the Stalking Horse Bidder's offer was evaluated and approved by the board in consultation with the Debtors' professionals. Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder) and Stalking Horse APA (or other marked APA) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.    Except as Otherwise Set Forth in the Stalking Horse APA, the Sale Should Be Approved "Free and Clear" Under Section 363(f) with Respect to the Acquired Assets.

41.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.[37]

42.    The Debtors believe that any of the parties holding liens in the Acquired Assets could be compelled to accept a monetary satisfaction of such interests or reinstated or otherwise rendered unimpaired pursuant to a chapter 11 plan. Where the purchase price for a debtor's assets is the best available under the circumstances, a court may authorize the sale free and clear of existing liens, claims, and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims, and encumbrances.[38] In

---

[37]    *See* 11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) (where a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met); *In re Dundee Equity Corp.*, 1992 WL 53743 (Bankr. S.D.N.Y 1992) (same).

[38]    *See In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); *In re Beker Indus., Inc.*, 63 B.R.

this instance, the procedures outlined herein, and the Debtors' extensive and continuing efforts to market their businesses, ensure that the purchase price paid for the Acquired Assets is the best available.  Importantly, the Stalking Horse Bidder has agreed to assume certain liabilities (and reinstate related liens, claims, and encumbrances) in respect of the Acquired Assets.  For example, where the Stalking Horse Bidder purchases the equity held by a Debtor entity, it is doing so on the basis that any funded debt or liabilities encumbering the target subsidiary are assumed.  Therefore, except as otherwise carved out under the Stalking Horse APA, the Sale should be approved free and clear of any and all liens, claims, and encumbrances against the Acquired Assets, regardless of their face amount.

43.    Finally, the Sale Order provides that any lien, claim, or encumbrance in the Acquired Assets will attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors believe that the sale of the Acquired Assets in accordance with the Stalking Horse APA will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the Sale should be approved free and clear of all liens, claims, and encumbrances against the Acquired Assets.

## V.    Assumption and Assignment of Contracts and Leases Should Be Approved.

### A.    The Assumption of the Assumed Contracts Reflects Business Judgment.

44.    Here too, the Debtors must demonstrate that the assumption of the Assumed Contracts in connection with the Sale reflects sound business judgment.[39]

---

474, 477-78 (Bankr. S.D.N.Y. 1986).

[39]    *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (purpose behind allowing assumption under section 365(a) is to permit the debtor, subject to the approval of the court, to use valuable property of the estate); *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage").

45.    In the Second Circuit, a motion to assume an executory contract is considered a summary proceeding, whereby the court efficiently reviews a "debtor's decision to adhere to a particular contract in the course of the swift administration of the bankruptcy estate."[40]  In conducting such review, the bankruptcy court should "examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it."[41]

46.    In other words, the Court must place itself in the position of the Debtors and determine "whether assuming the contract would be a good business decision or a bad one."[42]  If a debtor's business judgment has been exercised reasonably, the court should approve the assumption of an executory contact.[43]

47.    Here, a review of relevant facts shows that the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of their business judgment, consistent with the well-settled standard in this district governing same.

    a.    First, the Assumed Contracts are necessary to run the Debtors' business.  As such, they are essential to inducing the best offer for the Acquired Assets.

    b.    Second, it is unlikely that any purchaser would want to acquire any assets on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction.

    c.    Third, the Stalking Horse APA provides that the assumption and assignment of Assumed Contracts is integral to, and inextricably integrated in, the Sale.

    d.    Finally, the Assumed Contracts will be assumed and assigned though the

---

[40]  *See Orion Pictures*, 4 F.3d at 1099.

[41]  *Id*. (the court "sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed").

[42]  *Penn Traffic*, 524 F.3d at 383; *Orion Pictures*, 4 F.3d at 1099.

[43]  *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *Ionosphere*, 100 B.R. at 673.

> process approved by the Court by the Bidding Procedures Order, and thus
> will be reviewed by key constituents.

48.    Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

### B.    Defaults Under the Assumed Contracts Will Be Cured Through the Sale.

49.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code: (a) that a debtor cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."[44]

50.    The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because the Stalking Horse APA requires that the Debtors cure all defaults associated with, or required to properly assume, the Assumed Contracts. Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

---

[44]    *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

### C.       Non-Debtor Parties Will be Adequately Assured of Future Performance.

51.       Similarly, the Debtors submit that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase "adequate assurance of future performance," adopted from section 2-609 of the Uniform Commercial Code, "[is] to be given a practical, pragmatic construction" based upon the facts and circumstances of each case.[45]  Although no single solution will satisfy every case, the required assurance will fall short of an absolute guarantee of performance.[46]  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.[47]

52.       The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder) will be satisfied at the Sale Hearing.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party to perform under the Assumed Contracts and assumed leases).  Further, all counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

---

[45]  *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).

[46]  *Luce Indus.*, 8 B.R. at 107; *see also In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 674 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance[.]'") (internal citation omitted).

[47]  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources to perform and has expressed a willingness to devote sufficient funding to its business to do so).

## Waiver of Bankruptcy Rule 6004(a) and Rule 6004(h)

53.    To implement the foregoing successfully, the Debtors request that the Court enter

an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that the Debtors have established cause to exclude such relief from the 14-day stay period under

Bankruptcy Rule 6004(h).

## Reservation of Rights

54.    Nothing contained herein is intended or should be construed as (a) an admission as

to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors'

rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to

pay any prepetition claim, (d) an implication or admission that any particular claim is of a type

specified or defined in the Motion or this Interim Order, (e) a request or authorization to assume

any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or

(f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or

any other applicable law.

## Motion Practice

55.    This Motion includes citations to the applicable rules and statutory authorities upon

which the relief requested herein is predicated and a discussion of their application to this Motion.

Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

56.    Notice of the hearing on the relief requested in the Motion has been provided by

the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the

Local Rules, and is sufficient under the circumstances.  Without limiting the forgoing, due notice

was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-

in-interest, including (a) the Office of the United States Trustee for the Southern District of New

York; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents for each of the Debtors' secured credit facilities; (d) the indenture trustee for each of the Debtors' unsecured notes; (e) the ad hoc group of unsecured noteholders; (f) counsel to the Stalking Horse Bidder, the DIP Lenders, and the Prepetition Lenders; (g) counsel to the agent under the Debtors' debtor-in-possession financing facility; (h) counsel to the parties referenced in clauses (c) through (e); (i) the Office of the United States Attorney for the Southern District of New York; (j) the state attorneys general for states in which the Debtors conduct business; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) any parties known or reasonably believed to have expressed interest in any of the Assets; (o) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the Assets; (p) all parties to executory contracts or unexpired leases to be assumed and assigned, or rejected as part of the transaction[48] and ; (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given

### No Prior Request

57.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

---

[48] Capitalized terms used but not defined in this paragraph shall have the meanings set forth in the *Final Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. 3].

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, and the Sale Order, substantially in the form attached hereto as **Exhibit D**, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

|  |  |
|---|---|
| New York, New York<br>Dated:  November 9, 2018 | */s/ Jonathan S. Henes, P.C.*<br>Marc Kieselstein, P.C.<br>Jonathan S. Henes, P.C.<br>Cristine Pirro Schwarzman<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:     (212) 446-4900<br><br>- and -<br><br>James H.M. Sprayregen, P.C.<br>Ross M. Kwasteniet, P.C. (*pro hac vice* pending)<br>Adam C. Paul, P.C. (*pro hac vice* pending)<br>W. Benjamin Winger (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:     (312) 862-2200<br><br>*Proposed Counsel to the Debtors and Debtors in Possession* |

**<u>Exhibit A</u>**

**Proposed Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) ) | Case No. 18-13374 (MEW) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**ORDER APPROVING (A) BIDDING PROCEDURES, (B) STALKING
HORSE ASSET PURCHASE AGREEMENT AND BID PROTECTIONS,
(C) FORM AND MANNER OF NOTICE OF AUCTION, SALE TRANSACTION,
AND SALE HEARING, (D) ASSUMPTION AND ASSIGNMENT PROCEDURES,
AND (E) DATE FOR AUCTION, IF NECESSARY, AND SALE HEARING**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), pursuant to sections 105, 363, 365, 503, and 507 of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-

1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York (the "Local Bankruptcy Rules"), for entry of an order approving (a) the Bidding

Procedures attached hereto as **Exhibit 1**, (b) the Bid Protections granted to the Stalking Horse

Bidder as provided in that certain Asset Purchase Agreement (together with the exhibits and

schedules thereto, and as may be amended, modified, or supplemented from time to time in

accordance with the terms thereof, the "Stalking Horse APA"), dated as of November 5, 2018,

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint
administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or
like numbers is not provided herein.  A complete list of such information may be obtained on the website of the
Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean
Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is
52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    Capitalized terms utilized but not defined herein shall have the meanings given them in the Motion, the Stalking
Horse APA, or the Bidding Procedures, as applicable (as each of those terms is defined herein).

attached to the Motion as **Exhibit B**, (c) the form and manner of notice of the Auction and Sale

Hearing, (d) the Assumption and Assignment Procedures, including the procedures for

determining cure costs, (e) a date for the Auction and Sale Hearing (collectively, the "Bidding and

Auction Process"), (f) the marketing and potential sale of the Acquired Assets (as defined in the

Stalking Horse APA) free and clear of all liens, claims, encumbrances, and other interests (other

than as set forth in the Stalking Horse APA) pursuant to section 363(f) of the Bankruptcy Code or,

in the case of a potential bidder other than the Stalking Horse Bidder, a confirmed chapter 11 plan,

as applicable, and (g) the process for assuming and assigning certain executory contracts and

unexpired leases in connection therewith (the "Assumed Contracts" and subparts (a) through (g),

the "Sale Transaction"), all as more fully described in the Motion; and this Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant

to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided therein,

and such notice having been adequate and appropriate under the circumstances; and it appearing

that no other or further notice need be provided; and any objections to the requested relief having

been withdrawn or overruled on their merits; and this Court having held a hearing to consider the

relief requested in the Motion as to the Bidding and Auction Process (the "Hearing"); and all of

the proceedings had before this Court; and this Court having reviewed the Motion and the First

Day Declarations; and this Court having found and determined that the relief sought in the Motion

as to the Bidding and Auction Process is in the best interests of the Debtors, their estates and

creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[3]

A.     This Court has jurisdiction to hear and determine the Motion and to grant

the relief requested herein with respect to the Bidding and Auction Process pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The statutory and legal predicates for the relief requested in the Motion are

sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004,

6006, and 9014.

C.     Good and sufficient notice of the Motion, the Bidding and Auction Process,

and the relief sought in the Motion has been given under the circumstances, and no other or further

notice is required except as set forth herein and in the Bidding Procedures.  A reasonable

opportunity to object or be heard regarding the relief provided herein has been afforded to parties

in interest.

D.     The Bidding Procedures are fair, reasonable and appropriate, were

negotiated in good faith by the Debtors and the Stalking Horse Bidder, and are designed to promote

participation and active bidding and ensure that the highest or best value is generated for the

Acquired Assets.

E.     The Debtors and their advisors engaged in a robust and extensive marketing

and sale process before and after the Petition Date to solicit and develop the highest or best offer

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

for the Acquired Assets.  Further, the Bidding Procedures are adequately designed to continue that robust and extensive marketing and sale process after entry of this Order.

F.      Mercuria Asset Holdings (Hong Kong) Limited, on behalf of certain of its affiliates (collectively, "Mercuria"), submitted a bid, which bid includes a credit bid component on account of Mercuria's claims as assignee of the right to credit bid the Prepetition Lenders' claims under the Prepetition Credit Facilities and the DIP Lenders' claims under the DIP Credit Facilities, for the Acquired Assets as reflected in the Stalking Horse APA (the "Stalking Horse Bid"), which Stalking Horse Bid represents the highest or best offer the Debtors have received to date to purchase the Acquired Assets.

G.      Mercuria shall act as the "Stalking Horse Bidder" under the Stalking Horse APA and be subject to higher or better offers in accordance with the Bidding Procedures.

H.      Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking Horse APA as a "stalking-horse" sale agreement was and is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse APA provides the Debtors with the opportunity to sell the Acquired Assets in a manner that will maximize value for their estates and stakeholders.  Without the Stalking Horse APA, the Debtors would likely realize a lower price for the Acquired Assets; therefore, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtors and their estates and creditors.  The Stalking Horse APA will enable the Debtors to secure a fair and adequate baseline price for the Acquired Assets at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

I.        The Bid Protections, including, but not limited to, the Break-Up Fee and Reimbursable Expenses (as such terms are defined in the Stalking Horse APA), (i) have been negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arm's length and in good faith and (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue the Stalking Horse APA and the Sale Transaction.  The Break-Up Fee and Reimbursable Expenses, to the extent payable under the Stalking Horse APA, (a) are (x) actual and necessary costs and expenses of preserving each of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and (y) joint and several obligations of each Debtor and its estate, (b) shall be treated as allowed superpriority administrative expense claims against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code equal in priority to the superpriority claims arising under the DIP Order (but junior to the Carve Out (as defined therein)), (c) shall be secured by liens equal in priority to the DIP Liens granted under the DIP Order (but junior to the Carve Out (as defined therein)); (d) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (e) are fair, reasonable, and appropriate, including in light of the size and nature of the Sale Transaction and the efforts that have been, and will be, expended by the Stalking Horse Bidder.  The Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse APA without which the Stalking Horse Bidder would not have executed the Stalking Horse APA.  Unless it is assured that the Bid Protections, including, but not limited to, the Break-Up Fee and Reimbursable Expenses, will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

J.    The Debtors have articulated good and sufficient business reasons for this Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the Bid Protections (to the extent payable under the Stalking Horse APA), and (iv) the form and manner of notice of the Auction and Sale Hearing for the Sale Transaction.

K.    The Stalking Horse Bidder and its advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of its Bid Protections and the Bidding Procedures and the Stalking Horse Bidder's negotiation and entry into the Stalking Horse APA.

L.    The Assumption and Assignment Procedures, including notice of proposed cure costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Assumed Contracts to raise any objections to the proposed assumption and assignment or to the cure costs.

M.    The Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the Sale Transaction (including the sale of the Acquired Assets (as set forth under the Stalking Horse APA) free and clear of any liens, claims, encumbrances, or interests (other than as set forth in the Stalking Horse APA) pursuant to section 363(f) of the Bankruptcy Code) (with such liens, claims, encumbrances, or interests attaching to the proceeds of any such sale), and any and all objection deadlines related thereto, and no other or further notice shall be required for the motion to approve the Sale Transaction or the assumption and assignment of the Assumed Contracts except as expressly required herein.

N.    Notwithstanding anything to the contrary in any prior order, the Prepetition Liens on the Prepetition ABL Collateral and the DIP Liens on the DIP Collateral (each as defined in the DIP Order) are valid, binding, enforceable, nonavoidable, and properly perfected, and the Stalking Horse Bidder is entitled to credit bid with respect to the Prepetition ABL Collateral and the DIP Collateral.

O.    The Stalking Horse Bidder is entitled to credit bid up to the full amount of the Senior Secured Claims (as defined in the Bidding Procedures) for the purchase of the Acquired Assets as reflected in the Stalking Horse APA pursuant to section 363(k) of the Bankruptcy Code. Nothing contained herein shall prejudice or impair the right of the Stalking Horse Bidder to increase its credit bid as set forth in, and subject to the terms of, the Stalking Horse APA.  Allowing the Stalking Horse Bidder to credit bid will not chill the Bidding and Auction Process and neither the Stalking Horse Bidder nor its Affiliates have engaged in any inequitable conduct with respect to the Debtors or the Sale Transaction.  As such, no "cause" exists to limit or condition the ability of the Stalking Horse Bidder to credit bid under section 363(k) of the Bankruptcy Code.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is granted to the extent set forth herein.

2.    All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, hereby are overruled and denied on the merits with prejudice.

3.    The Sale Transaction contemplated under the Stalking Horse APA shall be implemented pursuant to section 363 of the Bankruptcy Code.  Notwithstanding the foregoing, a Potential Bidder may submit a proposal to implement a Sale Transaction through a chapter 11 plan,

so long as the Successful Bidder refinances the DIP Credit Facilities and the Prepetition Credit

Facilities and otherwise satisfies the Senior Secured Claims in full, in cash, in U.S. dollars, upon

the earlier of (i) termination, expiration, or maturity of any of the DIP Credit Facilities and

(ii) consummation of the sale to a Successful Bidder other than the Stalking Horse Bidder.  For the

avoidance of doubt, any Successful Bidder (other than the Stalking Horse Bidder) must provide

replacement debtor-in-possession financing, whether such Successful Bidder's proposal seeks to

implement a Sale Transaction through a chapter 11 plan or pursuant to section 363 of the

Bankruptcy Code.

### **Important Dates and Deadlines**

4.      The Bidding and Auction Process shall be subject to the following

milestones, each of which is subject to change in accordance with the Bidding Procedures and this

Order.

| Event | Date / Deadline |
|-------|-----------------|
| Indication of Interest Deadline | January 3 2019, at 5:00 p.m. EST |
| Cure Notices | January 4, 2019, at 5:00 p.m. EST |
| Stalking Horse APA Objection Deadline | January 18, 2019, at 4:00 p.m. EST |
| Bid Deadline | February 11, 2019, at 5:00 p.m. EST |
| Notification of Qualified Bidders (if any) | February 13, 2019, at 5:00 p.m. EST |
| Sale Objection Deadline (if necessary) | February 13, 2019, at 4:00 p.m. EST |
| Auction (if necessary) | February 18, 2019, at 10:00 a.m. EST |
| Sale Hearing | February 22, 2019, at [_____ _.m.] EST |

### **Notice Matters**

5.      The Sale Notice and the Publication Sale Notice, substantially in the forms

annexed hereto as **Exhibit 2** and **Exhibit 3**, respectively, are approved.

6.        All parties in interest shall receive or be deemed to have received good and sufficient notice of (a) the Motion, (b) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA or to a Successful Bidder other than the Stalking Horse Bidder, (c) the Auction, (d) the Sale Transaction, including the sale of the Acquired Assets (as set forth under the Stalking Horse APA) free and clear of all Liens (other than as expressly set forth in the Stalking Horse APA), and (e) the Sale Hearing, and no further notice of the foregoing shall be required, if:

(a)        as soon as reasonably practicable, but no later than three (3) business days after entry of this Order, the Debtors will cause the Sale Notice to be filed with this Court and served by email, mail, facsimile, or overnight delivery on:  (i) counsel for the Stalking Horse Bidder, the Prepetition Lenders, and the DIP Lenders; (ii) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Acquired Assets in whole or in part during the past 12 months; (iii) all entities known by the Debtors to have asserted any Liens in the Acquired Assets (for whom identifying information and addresses are available to the Debtors); (iv) all non-Debtor parties to the Assumed Contracts (for whom identifying information and addresses are available to the Debtors); (v) any Governmental Entity (as defined in the Stalking Horse APA); (vi) the United States Attorney for the Southern District of New York; (vii) the Office of the Attorney General in each state in which the Debtors operate; (viii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (ix) the Federal Trade Commission; (x) the United States Attorney General/Antitrust Division of Department of Justice; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) all applicable competition, environmental, and taxing authorities; (xiv) all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); and (xv) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by the Court (for whom identifying information and addresses are available to the Debtors); and

(b)        as soon as reasonably practicable, but no later than five (5) business days after entry of this Order, the Debtors will cause the Publication Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in *The Financial Times* and *The Wall Street Journal*, global edition.

9

## **Bidding Procedures and Auction**

7.    The Bidding Procedures, attached hereto as **Exhibit 1**, are fully incorporated herein and approved, and shall apply with respect to any bids for, and the auction and sale of, the Acquired Assets set forth under the Stalking Horse APA.    The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a Qualified Bid, are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.    The Debtors are authorized to take all actions, including incurring and paying costs and expenses, as are necessary or appropriate to implement the Bidding Procedures.

8.    The deadline by which any party interested in making a proposal, solicitation, or offer in respect of the Acquired Assets must submit a non-binding indication of interest (each, an "Indication of Interest") is **January 3, 2019, at 5:00 p.m. (prevailing Eastern Time)** (the "Indication of Interest Deadline"); *provided*, *however*, that submitting an Indication of Interest shall not obligate any party to submit a formal bid or otherwise participate in the Bidding and Auction Process and shall not be a prerequisite for Potential Bidders to submit a Qualified Bid.

9.    The deadline for submitting Qualified Bids (the "Bid Deadline") is **February 11, 2019 at 4:00 p.m. (Eastern Time)**.    Any party that does not submit a Qualified Bid by the Bid Deadline in accordance with the Bidding Procedures will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in the Auction.    The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse APA is a Qualified Bid for all purposes and requirements pursuant to the Bidding Procedures.

10.     All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Bidding and Auction Process.

11.     To qualify as a Qualified Bid, each such bid must be accompanied by information supporting the bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including the bidder's financial wherewithal and willingness to perform under any contracts that will be assumed and assigned to such bidder.  In addition to the other requirements of a Qualified Bid as set forth in the Bidding Procedures, each such bid must be accompanied by a written statement confirming that (a) the bidder has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction and (b) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

12.     Subject to the rights of the Stalking Horse Bidder under the Stalking Horse APA, the Bidding Procedures, and this Order, the Debtors shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Bidding Procedures, including to:  (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the Baseline Bid; (iv) determine which bids are the Successful Bid and Back-Up Bid, each as it relates to the Auction; (v) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, or this Order, or (c) contrary to the best interests of the Debtors and their estates; (vi) adjourn or cancel the Auction and/or the Sale Hearing; and (vii) modify the Bidding Procedures consistent with their fiduciary duties and bankruptcy law, in each case, as

11

provided in the Bidding Procedures. In no event may the Debtors extend the timeframes or deadlines set forth in the Stalking Horse APA or the Bidding Procedures, or otherwise extend or enlarge the Stalking Horse Bidder's obligations thereunder or reduce or modify the Stalking Horse Bidder's rights thereunder without the consent of the Stalking Horse Bidder.

13.      The Debtors, in consultation with the Consultation Party (as defined in the Bidding Procedures), shall identify those bids that qualify as Qualified Bids (each bidder that submits such a Qualified Bid being a "<u>Qualified Bidder</u>"), determine which Qualified Bid shall serve as the Baseline Bid at the Auction, and inform the Qualified Bidders of the Baseline Bid by **February 13, 2019 at 5:00 p.m. (Eastern Time)**. If more than one Qualified Bid (inclusive of the Stalking Horse Bid) is timely received, the Auction shall be conducted at the offices of **Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022** on **February 18, 2019 at 10:00 a.m. (Eastern Time)**. As set forth more fully in the Bidding Procedures, (a) only Qualified Bidders and their legal and financial advisors will be permitted to participate in the Auction, (b) the Debtors may, subject to the exercise of their business judgment and with the prior written consent of the Stalking Horse Bidder (which shall not be unreasonably delayed, conditioned, or withheld), adjourn the Auction, (c) copies of the Baseline Bid shall be provided to all of the Qualified Bidders (including the Stalking Horse Bidder) and the Consultation Party at least forty-eight (48) hours prior to the start of the Auction, and (d) all proceedings at the Auction shall be transcribed.

14.      If the bid of the Stalking Horse Bidder, as reflected in the Stalking Horse APA, is the only Qualified Bid received for the Acquired Assets, the Debtors will not conduct the Auction, and shall file and serve, by **February 12, 2019 at 5:00 p.m. (Eastern Time)**, a notice indicating that the Auction has been cancelled and that the Stalking Horse Bidder is the Successful

Bidder.  In such case, the Debtors will seek entry of an order by the Court approving the Stalking

Horse APA no later than February 15, 2019.

### Sale Hearing and Sale Objection Deadline

15.     The Sale Hearing shall be held before this Court on **February 22, 2019 at**

_____ _.m. (**Eastern Time**); *provided*, that the Debtors shall be entitled to request a hearing

before such time if the Stalking Horse APA is the only Qualifying Bid.  The Debtors may seek an

adjournment of the Sale Hearing as the Debtors deem appropriate in the exercise of their

reasonable business judgment and as is consistent with the Stalking Horse APA or the Successful

Bidder's asset purchase agreement (the "Successful Bidder APA"), the Bidding Procedures, and

this Order.

16.     The Successful Bidder (which may be the Stalking Horse Bidder) shall

appear at the Sale Hearing and be prepared, if necessary, to have a representative(s) testify in

support of the Successful Bid and the Successful Bidder's ability to close in a timely manner

consistent with the Successful Bidder APA, and provide adequate assurance of its future

performance under any and all executory contracts and unexpired leases to be assumed and

assigned as part of the proposed Sale Transaction.

17.     Objections to the Sale Transaction and entry of the Sale Order (other than

objections to the provision of adequate assurance of future performance by a Successful Bidder

other than the Stalking Horse Bidder) (each, a "Sale Objection") must:  (i) be in writing and specify

the nature of such objection; (ii) comply with the Bankruptcy Rules and the Local Bankruptcy

Rules; and (iii) be filed with this Court and served on (a) proposed counsel to the Debtors, Kirkland

& Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Jonathan S. Henes, P.C.

and Cristine Pirro Schwarzman), Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois

60654 (Attn: Marc Kieselstein, P.C., Ross M. Kwasteniet, P.C., Adam C. Paul, P.C., and W.

Benjamin Winger), and Kirkland & Ellis LLP, 901 Main Street, Dallas, Texas 75202 (Attn: Michael Considine, P.C. and Dilen Kumar), (b) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases, if any, (c) counsel to Mercuria, in its capacities as Stalking Horse Bidder, DIP Lender, and Prepetition Lender, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, 28 Liberty Street, New York, New York 10005 (Attn:  Abhilash Raval, Esq. and Lauren C. Doyle, Esq.) and Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, Texas 77010-3095 (Attn:  Louis Strubeck, Esq. and Josh Agrons, Esq.), and (d) counsel to the ad hoc group of convertible noteholders, Akin Gump Strauss Hauer & Feld LLP, 1 Bryant Park, New York, New York 10036 (Attn:  Ira S. Dizengoff, Esq.) (collectively, the "Objection Notice Parties").  Any Sale Objection will be heard by this Court at the Sale Hearing.  The deadline to assert a Sale Objection with respect to the Stalking Horse APA is **January 18, 2019, at 5:00 p.m. (Eastern Time)**.  The deadline to assert a Sale Objection with respect to any other Sale Transaction is **February 13, 2019, at 5:00 p.m. (Eastern Time)**.

18.    The failure of any objecting person or entity to timely file and serve a Sale Objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Stalking Horse APA or, if the Auction is held, the Successful Bidder APA, including the transfer of the Acquired Assets to the Stalking Horse Bidder or the Successful Bidder, free and clear of all liens (other than as provided in the Successful Bidder APA) pursuant to section 363(f) of the Bankruptcy Code or a confirmed chapter 11 plan.

**Assumption and Assignment Procedures**

19.    The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, and are approved.

20.    As soon as reasonably practicable, but not later than January 4, 2019, the Debtors shall file with this Court and serve by first class mail on each non-Debtor party to the Assumed Contracts a notice (the "Cure Notice," the form of which is attached hereto as **Exhibit 4**) that shall:  (i) provide a description of each such Assumed Contract, (ii) state the amount, if any, that the Debtors believe are necessary to cure, or compensate the non-Debtor party for, any and all defaults under such Assumed Contract pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"); (iii) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Acquired Assets; (iv) state the date of the Sale Hearing and that any unresolved objections to any Cure Costs or to assumption and assignment will be heard at the Sale Hearing or such later date as the Debtors and the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, may, in consultation with the Consultation Party, determine, in accordance with this Order; and (v) state the appropriate deadline by which the non-Debtor party must file an objection to the Cure Costs or assumption and assignment of the Assumed Contracts.  Upon service of the Cure Notice, all non-Debtor parties to the Assumed Contracts shall receive or be deemed to have received good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Assumed Contracts.

21.    The Cure Notice is hereby approved.  It is reasonably calculated to provide sufficient notice to the non-Debtor parties to the Assumed Contracts of the Debtors' intent to assume and assign the Assumed Contracts in connection with the Sale Transaction and constitutes adequate notice thereof.

22.    All Objections to any proposed Cure Costs (each, a "Cure Objection") and to the provision of adequate assurance of future performance (each, an "Adequate Assurance Objection") must:  (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local

Bankruptcy Rules; (iii) with respect to a Cure Objection, state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with this Court and served on the Objection Notice Parties. The deadline to assert a Cure Objection and an Adequate Assurance Objection with respect to the Stalking Horse APA is **January 19, 2019, at 4:00 p.m. (Eastern Time)**. The deadline to assert an Adequate Assurance Objection with respect to any other Sale Transaction is **February 19, 2019, at 4:00 p.m. (Eastern Time)**.

23.     If a timely Cure Objection or Adequate Assurance Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtors and the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder may, in consultation with the Consultation Party, determine.

24.     To the extent the Debtors identify, at any time after the Cure Notice is served but prior to the closing of the Sale Transaction, additional Assumed Contracts to be assumed and assigned to the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, the Debtors shall file with this Court and serve by first class mail on the non-Debtor party to such Assumed Contract a supplemental Cure Notice (each, a "Supplemental Cure Notice," the form of which shall be identical to the form of Cure Notice attached hereto as **Exhibit 4**).

25.     If a Supplemental Cure Notice is served by January 4, 2019, the objection deadlines and hearing schedule in connection with the Cure Notice, as set forth above, shall apply to any Cure Objection or Adequate Assurance Objection in respect of an Assumed Contract identified in such Supplemental Cure Notice. To the extent a Supplemental Cure Notice is served after January 4, 2019, any related Cure Objection or Adequate Assurance Objection must be filed and served within seven (7) days after service of the Supplemental Cure Notice. If such a Cure Objection or Adequate Assurance Objection is timely received and cannot otherwise be resolved

16

by the parties, the Debtors may, in their discretion (after consultation with the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder and the Consultation Party), schedule an emergency hearing to hear such objection prior to any scheduled closing of the Sale Transaction.

26.    If no timely Cure Objection is filed and served in respect of an Assumed Contract, the Cure Cost identified on the Cure Notice or a Supplemental Cure Notice, as applicable, will be the only amount necessary under section 365(b) of the Bankruptcy Code to cure all defaults under such Assumed Contract.  Any party failing to timely file a Cure Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder.  If no timely Adequate Assurance Objection is filed and served with respect to an Assumed Contract, the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, will be deemed to have provided adequate assurance of future performance for such Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.  If no timely Cure Objection or Adequate Protection Objection is filed and served with respect to an Assumed Contract, the non-Debtor party to such Assumed Contract shall be deemed to have consented to (i) the Cure Costs, (ii) the assumption and assignment of the Assumed Contract to the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, (iii) related relief requested in the Motion, and (iv) the Sale Transaction.

27.    The Debtors' assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or, if the Auction has been conducted, the Successful Bidder is subject to approval of this Court and consummation of the Sale Transaction.  Accordingly, absent the closing of such Sale Transaction, the Assumed Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

28.     The inclusion of a contract or other document or Cure Cost on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder or Successful Bidder, as applicable, or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code, that the stated Cure Cost is due (all rights with respect thereto being expressly reserved), or a guarantee that any such contract or other document will ultimately be assumed or assumed and assigned.  The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to each contract or other document listed on the Cure Notice or any Supplemental Cure Notice.

29.     The Debtors shall provide written notice to the parties to all Assumed Contracts that are ultimately assumed and assigned to the Successful Bidder of (i) such assumption and assignment and (ii) the identity of the Successful Bidder.

**Stalking Horse APA and Bid Protections**

30.     The form of Stalking Horse APA is hereby approved.  All of the Debtors' pre-closing obligations under the Stalking Horse APA are authorized as set forth herein; *provided* that, for the avoidance of doubt, consummation of the Sale Transaction contemplated by the Stalking Horse APA shall be subject to entry of the Sale Order and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse APA.

31.     The Bid Protections are approved in their entirety, including, without limitation, the Break-Up Fee and Reimbursable Expenses payable in accordance with, and subject to the terms of, the Stalking Horse APA.  Except as expressly provided for herein or in the Stalking Horse APA, no other termination payments are authorized or permitted under this Order.

32.     The Debtors are authorized and directed to pay the Break-Up Fee and Reimbursable Expenses, to the extent payable under the Stalking Horse APA, without further order

of this Court.  The Break-Up Fee and Reimbursable Expenses, to the extent payable under the

Stalking Horse APA, shall (i) constitute joint and several obligations of each Debtor and its estates,

(ii) be treated as allowed superpriority administrative expense claims against the Debtors' estates

pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code equal in priority to the

superpriority claims arising under the DIP Order (but junior to the Carve Out (as defined therein)),

and (iii) be secured by liens equal in priority to the DIP Liens granted under the DIP Order (but

junior to the Carve Out (as defined therein)).

33.    In accordance with section 8.2 of the Stalking Horse APA, the Debtors shall

pay to the Stalking Horse Bidder, in cash, by wire transfer of immediately available funds, an

amount equal to:

(a)    in the event the Stalking Horse APA is terminated pursuant to sections 8.1(b)(ii), (c), (d), (g), or (o) of the Stalking Horse APA, the Debtors shall reimburse the Stalking Horse Bidder for all of the actual, documented and reasonable out of pocket costs, fees, and expenses incurred or to be incurred by the Stalking Horse Bidder or its Affiliates, including reasonable fees, costs, and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts, and consultants) retained by the Stalking Horse Bidder or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution, and performance of the Stalking Horse APA, the Transactions, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions, in each case, less any expenses paid or reimbursed for under the DIP Facility (the "Reimbursable Expenses"); *provided* that the Stalking Horse Bidder shall not be required to file a formal fee application, submit its professionals' time entries, or otherwise comply with section 330 of the Bankruptcy Code; and

(b)    in the event the Stalking Horse APA is terminated pursuant to (i) sections 8.1(b)(ii), (d), or (o) of the Stalking Horse APA, the Debtors shall pay to the Stalking Horse Bidder a cash amount equal to $19,000,000 (the "Break-Up Fee") upon consummation of an Alternative Transaction, or (ii) section 8.1(c) of the Stalking Horse APA at a time when the Debtors have breached their representations, warranties, covenants, or agreements contained in the Stalking Horse APA in any material respect, the Debtors shall pay to the Stalking Horse Bidder a cash amount equal to the Break-Up Fee upon the consummation of an Alternative Transaction, solely in the case of this clause (ii) to the extent that within 6 months after the date of such

19

termination, the Debtors consummate an Alternative Transaction. Any payment made pursuant to this clause (ii) shall be made within two (2) Business Days of consummation of such Alternative Transaction.

34.     The stipulations in favor of the Prepetition Lenders and the DIP Lenders set forth in the DIP Order are irrevocably binding on, and enforceable against, all persons and parties in interest, including the Committee and any trustee appointed in these cases or conversion of these cases under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary in the DIP Order or any prior order of the Court, all persons and parties in interest, including the Committee and any trustee appointed in these cases or conversion of these cases under chapter 7 of the Bankruptcy Code, are enjoined from bringing any action that would violate the stipulations set forth in the DIP Order (including, without limitation, any action or pursuing any litigation seeking to invalidate or avoid any lien or security interest of the DIP Lenders or the Prepetition Lenders or bring any claim, counterclaim, cause of action, right of setoff, or defense against the DIP Lenders or the Prepetition Lenders).

35.     The Stalking Horse Bidder is entitled to credit bid up to the full amount of the Senior Secured Claims for the purchase of the Acquired Assets as reflected in the Stalking Horse APA pursuant to section 363(k) of the Bankruptcy Code.

### Negotiation with Prepetition Term Parties

36.     From the date of entry of this Order, any Bidder, including the Stalking Horse Bidder, may execute definitive documentation with the Prepetition Term Parties (as defined in the DIP Order) (i) to purchase all or a portion of the Prepetition Term Parties' claims arising under the Prepetition Term Loan Facilities (as defined in the DIP Order) and/or (ii) with respect to the terms on which the Prepetition Term Loan Facilities may be assumed by such Bidder upon the closing of the Sale Transaction; *provided*, that if any such Bidder is not the Successful Bidder, then such Bidder shall sell, at the closing of the Sale Transaction, such claims to the Successful

20

Bidder at the price such Bidder paid for such claims; *provided further* that no Bidder may enter into any exclusivity agreement with any Prepetition Term Party.

**General Provisions**

37.    All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

38.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any applicable provisions of the Local Bankruptcy Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this order.

39.    For the avoidance of doubt, nothing in the Bidding Procedures or this Order waives, modifies, limits, or otherwise amends the terms of the DIP Order and the DIP Loan Documents or any of the rights of the DIP Secured Parties or the Prepetition Secured Parties or any of the obligations of the Debtors or other parties thereunder, including without limitation the right to repayment of the Senior Secured Claims upon termination, expiration, or maturity of the DIP Credit Facilities (each as defined in the DIP Order).

40.    All sale proceeds shall be distributed in accordance with the terms of the Final DIP Order and the DIP Loan Documents and the Prepetition Secured Obligations and the DIP Obligations shall be repaid in full, in cash upon the earlier of (i) consummation of a Sale Transaction with a Successful Bidder (other than the Stalking Horse Bidder) and (ii) termination, expiration, or maturity of the DIP Credit Facilities.

41.     The requirements set forth in Local Bankruptcy Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

42.     This Order shall be binding on the Debtors, their estates, and their successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors or their estates under any applicable law.

43.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, to allow the Stalking Horse Bidder to deliver any notice provided for in the Stalking Horse APA, including, without limitation, a notice terminating the Stalking Horse APA, and allow the Stalking Horse Bidder to take any and all actions permitted under the Stalking Horse APA in accordance with the terms and conditions thereof.

44.     The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order in accordance with the Motion.

45.     The Stalking Horse Bidder has standing to enforce this Order.

46.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____, 2018
        New York, New York

                                    _____
                                    THE HONORABLE MICHAEL E. WILES
                                    UNITED STATES BANKRUPTCY JUDGE

## **<u>Exhibit 1</u>**

Bidding Procedures

## BIDDING PROCEDURES

### Overview

On November 6, 2018, Aegean Marine Petroleum Network Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

The Debtors are seeking to sell the Acquired Assets (as defined below) for the highest or best offer. On December [•], 2018, the Bankruptcy Court entered an order [Docket No. [•]] (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to pursue a sale process in accordance with the procedures set forth below (the "Bidding Procedures") and to conduct an auction for the sale of all or substantially all of the Debtors' assets and/or equity interests in the Debtors or one or more of their direct and indirect subsidiaries, including in accordance with the terms of the Stalking Horse APA (the "Sale Transaction" and, collectively, the "Acquired Assets"). The Sale Transaction under the Stalking Horse APA shall be implemented pursuant to section 363 of the Bankruptcy Code. Notwithstanding the foregoing, a Potential Bidder (as defined below) may submit a proposal to implement a Sale Transaction through a chapter 11 plan, so long as the Successful Bidder (as defined below) refinances the DIP Credit Facilities and the Prepetition Credit Facilities and otherwise satisfies the Senior Secured Claims (as defined below) in full, in cash, in U.S. dollars, upon the earlier of (i) termination, expiration, or maturity of any of the DIP Credit Facilities and (ii) consummation of the sale to a Successful Bidder other than the Stalking Horse Bidder. For the avoidance of doubt, any Successful Bidder (other than the Stalking Horse Bidder) must provide replacement debtor-in-possession financing, whether such Successful Bidder's proposal seeks to implement a Sale Transaction through a chapter 11 plan or pursuant to section 363 of the Bankruptcy Code.

Mercuria Asset Holdings (Hong Kong) Limited ("Mercuria") submitted a stalking horse bid (the "Stalking Horse Bid" and such bidder, the "Stalking Horse Bidder"), which bid includes a credit bid component on account of Mercuria's claims as assignee of the right to credit bid pursuant to section 363(k) of the Bankruptcy Code the Prepetition Lenders' claims under the Prepetition Credit Facilities and otherwise satisfies the Senior Secured Claims (collectively, the "Senior Secured Claims"). The Stalking Horse Bidder has executed that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Stalking Horse APA"),[1] dated as of November 5, 2018. The Stalking Horse APA contemplates, pursuant to the terms and subject to the conditions and purchase price adjustments and mechanics contained therein, the sale of the Acquired Assets to the Stalking Horse Bidder in consideration of approximately [$681,000,000.00]. The willingness of the Stalking Horse Bidder to proceed with the transactions contemplated under the Stalking Horse APA is expressly conditioned upon, and being done in reliance upon, the right of the Stalking Horse Bidder to credit bid up to the full amount of the Senior Secured Claims, receive payment of the Bid Protections (as defined below),

---

[1]    Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse APA.

and for an Auction (as defined below) to occur in compliance with the terms herein and those set out in the Bidding Procedures Order.

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.  These Bidding Procedures describe, among other things:  (i) the procedures for bidders to submit bids for the Acquired Assets; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Acquired Assets (the "<u>Auction</u>"); (v) the ultimate selection of the Successful Bidder (as defined below); and (vi) Bankruptcy Court approval of the sale of the Acquired Assets to the Successful Bidder at a hearing before the Honorable Judge Michael E. Wiles, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York (the "<u>Sale Hearing</u>").

**The Debtors may, subject to the exercise of their business judgment and with the prior written consent of the Stalking Horse Bidder and the DIP Lenders (which shall not be unreasonably delayed, conditioned, or withheld), modify or terminate these Bidding Procedures, waive or modify terms and conditions set forth herein, extend any of the deadlines or other dates set forth herein, and/or adjourn the Auction and/or Sale Hearing; *provided* that, for the avoidance of doubt, the Bidding Procedures and the Bidding Procedures Order must, at all times, be in form and substance satisfactory to the Stalking Horse Bidder pursuant to the Stalking Horse APA.**

## Summary of Important Dates

| | |
|---|---|
| **January 3, 2019 at 5:00 p.m. (ET)** | • Deadline to submit a non-binding Indication of Interest. |
| **January 4, 2019** | • Deadline to Send Cure Notices |
| **January 18, 2019 at 5:00 p.m. (ET)** | • Stalking Horse APA Objection Deadline |
| **January 19, 2019 at 4:00 p.m. (ET)** | • Deadline to Object to Assumption and Assignment of Acquired Contracts to Stalking Horse Bidder, Including Proposed Cure Costs |
| **February 11, 2019 at 5:00 p.m. (ET)** | • Deadline to Submit Bids |
| **February 13, 2019 at 5:00 p.m. (ET)** | • Deadline for Debtors to Designate and Publish Baseline Bid |
| **February 13, 2019 at 5:00 p.m. (ET)** | • Sale Objection Deadline (with respect to any other Sale Transaction) |
| **February 15, 2019 at ____ _.m. (ET)** | • Sale Hearing if no Qualified Bid other than Stalking Horse Bid received for Acquired Assets |

| February 18, 2019 at 10:00 a.m. (ET) | • Auction, if necessary, to be conducted at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 |
|---|---|
| February 19, 2019 | • Deadline for Debtors to File and Serve Notice of Successful Bidder and Back-Up Bidder |
| February 19, 2019 at 4:00 p.m. (ET) | • Deadline to File Adequate Assurance Objection for Successful Bidder other than the Stalking Horse Bidder |
| February 20, 2019 at 4:00 p.m. (ET) | • Debtors' and Stalking Horse Bidder's Reply Deadline |
| February 22, 2019 at ___ _.m. (ET) | • Sale Hearing |

## Due Diligence

The Debtors have posted copies of material documents related to the Acquired Assets to the Debtors' confidential electronic data room (the "Data Room"). To access the Data Room, a party must submit to the Debtors or their advisors:

(A)    an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing and unexpired confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern);

(B)    sufficient information, as reasonably determined by the Debtors, to allow the Debtors, in consultation with the Consultation Party (as defined below), to determine that the interested party has the financial wherewithal to close a purchase of the Acquired Assets, including such portion necessary to satisfy the Senior Secured Claims in full, in cash, in U.S. dollars, replacement debtor-in-possession financing and, if such interested party is an acquisition vehicle or newly-formed entity, a guarantee from an entity securing such party's performance under these Bidding Procedures and the Bidding Procedures Order; and

(C)    identification of the Potential Bidder and any of the principals, members, partners, limited partners, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction.

An interested party that meets the above requirements to the satisfaction of the Debtors, in consultation with the Consultation Party, shall be a "Potential Bidder." As soon as practicable, the Debtors will provide such Potential Bidder access to the Data Room; *provided* that such access may be terminated by the Debtors in their discretion at any time for any reason whatsoever, after prior notice to, and in consultation with, the Consultation Party, including that a Potential Bidder does not become a "Qualified Bidder" (as defined below) or these Bidding Procedures are terminated.

The Debtors shall keep the Consultation Party reasonably informed of all interested parties that become Potential Bidders and the status of their due diligence.

Each Potential Bidder shall comply with all requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate a sale transaction and shall provide such information to the Debtors and the Consultation Party.

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be initially directed to:    (i) [●] ([●]@moelis.com) and [●] ([●]@moelis.com) of Moelis & Company; and (ii) [●] ([●]@kirkland.com) and [●] ([●]@kirkland.com) of Kirkland & Ellis LLP.  Subject to the immediately following paragraph, the Debtors will simultaneously distribute to all Potential Bidders and the Stalking Horse Bidder via the Data Room any additional diligence materials not previously available to other Potential Bidders or the Stalking Horse Bidder.  Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) these Bidding Procedures are terminated.  The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors will have no obligation, but will have the right, to furnish any due diligence information to anyone other than Qualified Bidders.  No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the business or assets of the Debtors to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth above, or (iii) has not established, in the Debtors' reasonable business judgment, that such Potential Bidder intends in good faith to, or have the capacity to, consummate the Sale Transaction.  The Debtors shall take such reasonable or appropriate steps to protect any commercially sensitive information, including in relation to a Potential Bidder that may be a competitor.  The Debtors reserve the right to withhold any diligence materials that the Debtors determine are sensitive, proprietary, or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor or is affiliated with any competitor of the Debtors; *provided*, that this foregoing paragraph shall not apply to the Stalking Horse Bidder.

Each Qualified Bidder will be deemed to acknowledge and represent that, as of the Bid Deadline, it (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' assets and liabilities that are the subject of the Auction to the extent of the assets and liabilities that are the subject of their Bid prior to making any such bids, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, in each case except as expressly stated in these Bidding Procedures or the Stalking Horse APA.  None of the Debtors, the DIP Lenders, the Prepetition Lenders, or the Stalking Horse Bidder, nor any of their respective employees, officers, directors, affiliates,

4

subsidiaries, representatives, agents, advisors, or professionals are responsible for, or will bear any liability with respect to such Potential Bidder or any information obtained by Potential Bidders in connection with the Sale Transaction.

<u>Bid Deadline</u>

         A Potential Bidder that desires to make a bid on the Acquired Assets shall deliver electronic copies of its bid so as to be received no later than **February 11, 2019 at 5:00 p.m. (Eastern Time)** (the "<u>Bid Deadline</u>").  **The submission of a bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Acquired Assets**.  Any party that does not submit a bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in the Auction.

         All Bids, including all documentation required to be submitted under the section "Form and Content of Bid," should be submitted by email to the following representatives:

**Counsel to the Debtors**:

<u>Kirkland & Ellis LLP</u>
Jonathan S. Henes, P.C.
jonathan.henes@kirkland.com

Marc Kieselstein, P.C.
marc.kieselstein@kirkland.com

Ross M. Kwasteniet, P.C.
ross.kwasteniet@kirkland.com

Adam C. Paul, P.C.
adam.paul@kirkland.com

W. Benjamin Winger
benjamin.winger@kirkland.com

Michael P. Considine, P.C.
michael.considine@kirkland.com

Dilen Kumar
dilen.kumar@kirkland.com

with full copies to:

**Counsel to the DIP Lenders, Prepetition Lenders, and Stalking Horse Bidder**

<u>Milbank, Tweed, Hadley & McCloy LLP</u>

Abhilash M. Raval, Esq.
ARaval@milbank.com

Lauren C. Doyle, Esq.
LDoyle@milbank.com

-and-

Norton Rose Fulbright US LLP

Louis Strubeck, Esq.
louis.strubeck@nortonrosefulbright.com

Josh Agrons, Esq.
josh.agrons@nortonrosefulbright.com

**Right to Credit Bid**

The Stalking Horse Bidder shall be entitled to credit bid up to the full amount of the Senior Secured Claims. Any other Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured and, consistent with the procedures set forth herein, any such credit bid shall also include a bid for all of the Acquired Assets and provide sufficient cash consideration to satisfy the Cash Bid Amount (as defined below) in full at the earlier of (i) consummation of the Sale Transaction and (ii) the termination, expiration, or maturity of the DIP Credit Facilities.

Form and Content of Bid

A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders, guarantors, or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other material party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following (a "Bid"):

(A)    Finalized Agreement. In both PDF and MS-WORD format, an executed copy of an asset purchase agreement (the "APA") that does not deviate substantially from the Stalking Horse APA and shall be subject to no greater conditionality than the Stalking Horse APA, along with a copy of same that has been marked against the Stalking Horse APA.

(B)    Same or Better Terms. A statement that the applicable Potential Bidder offers to purchase the Acquired Assets, pursuant to a transaction that is no less favorable to the Debtors' estates, as the Debtors may reasonably determine, in consultation with the Consultation Party, than the transactions contemplated in the Stalking Horse APA.

6

(C)    Unconditional Offer.  A statement that the Bid is formal, binding, and unconditional in all respects (except for those conditions expressly set forth in the Stalking Horse APA) and is not subject to any contingency not set forth in the Stalking Horse APA and is irrevocable until the earlier of the first business day following the closing of the proposed sale transaction or the Outside Date (as defined below), except as otherwise provided in these Bidding Procedures.

(D)    Form of Consideration.  A statement confirming that the Bid is based on a cash offer in U.S. dollars in an amount no less than an amount sufficient to immediately satisfy, in each case upon the closing of the proposed transaction, the Cash Bid Amount (as defined below).

(E)    Purchase Price; Minimum Bid.  The value of each Bid, as determined by the Debtors in their business judgment and in consultation with the Consultation Party, must (I) provide a cash component in U.S. dollars that exceeds the aggregate sum of (a) the Stalking Horse Bid, (b) the Break-Up Fee and the Reimbursable Expenses (together, the "Bid Protections"), (c) the Minimum Overbid Amount (as defined below), and (d) the Senior Secured Claims (to the extent the value of which is not already included in the Stalking Horse Bid) (collectively, the "Cash Bid Amount"); and (II) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid.  The Debtors and their advisors, in good faith, and in consultation with the Consultation Party, will determine the value of any assumed liabilities that differ from those included in the Stalking Horse APA.

(F)    Committed Financing.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the transaction set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, including copies of unredacted commitment letters, documented to the satisfaction of the Debtors, in consultation with the Consultation Party, that demonstrates the Potential Bidder has:  (i) received sufficient debt and/or equity funding commitments to satisfy such bidder's purchase price and other obligations under its Bid, including the ability to immediately satisfy, upon the closing of the proposed transaction, the Cash Bid Amount in full, in cash, in U.S. dollars and, if applicable, replacement debtor-in-possession financing, as needed, from the earlier of (i) entry of the Sale Order and (ii) termination, expiration, or maturity of the DIP Credit Facilities, through the closing of such Successful Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Acquired Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors in consultation with the Consultation Party.

(G)    Proof of Financial and Legal Ability to Perform.  Each Bid must contain such financial and other information that allows the Debtors, after consultation with the Consultation Party, to make a reasonable determination as to the Potential Bidder's

financial, legal, and other capabilities to consummate the sale transaction (and that such Potential Bidder will maintain the financial wherewithal to consummate the sale transaction while such Bid remains binding on such Potential Bidder), including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are to be assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof (being not more than one (1) calendar year old in relation to any annual financial statements and not more than one (1) calendar quarter old in relation to any quarterly financial statement), proof of unconditional financing commitments, if needed to close the transaction, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that such Potential Bidder has the ability to close the sale transaction. If the Potential Bidder is an acquisition vehicle or a newly formed entity, such Bid must also include a guarantee from an entity securing the Potential Bidder's performance under these Bidding Procedures and the Bidding Procedures Order.

(H)  <u>Designation of Contracts and Leases</u>. Each Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing the sale transaction; *provided* that the APA may allow for the Potential Bidder to remove executory contracts and unexpired leases from the list of contracts to be assumed and assigned any time prior to the closing of the sale transaction; *provided further* that to the extent the Debtors identify any additional executory contracts or unexpired leases after the Bid is submitted, the APA may allow for the Potential Bidder to add such executory contracts and unexpired leases to the list of contracts to be assumed and assigned any time from and after the Bid is submitted as provided for in the Stalking Horse APA.

(I)  <u>Required Approvals</u>. A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, any Foreign Antitrust Laws, or any and all other anti-competition laws, as applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental, regulatory, or other third-party approvals to operate the Debtors' business from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

(J)     <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  A statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Acquired Assets.

(K)     <u>Joint Bids</u>.  The Debtors, in consultation of the Consulting Party, are authorized to approve joint Bids in their reasonable discretion on a case-by-case basis.

(L)     <u>As-Is, Where-Is</u>.    Each Bid must include a written acknowledgment and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to the Bid Deadline; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except, in each case, as expressly stated in the APA.

(M)     <u>Agreement to Terms of the Bidding Procedures</u>.  A statement that the Potential Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code and agrees to be bound by these Bidding Procedures.

A Potential Bidder must also accompany its Bid with:  (N) a Deposit (as defined below); (O) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder; (P) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Stalking Horse APA), and such other evidence of ability to consummate the transaction contemplated by the APA, including an amount sufficient to pay the Cash Bid Amount in full, in cash, in U.S. dollars, and, if applicable, replacement debtor-in-possession financing, as acceptable in the Debtors' business judgment and in consultation with the Consultation Party; (Q) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the APA if the Potential Bidder is the Successful Bidder at the Auction; (R) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable Antitrust Laws and other applicable regulatory requirements; and (S) if the value of the Bid relative to the Stalking Horse APA includes additional non-cash components (such as fewer contingencies than are in the Stalking Horse APA), a reasonably detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value.

<u>Deposit</u>

To qualify as a Qualified Bid (as defined below), each Bid must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the total purchase price

(inclusive of any assumption of liabilities) set forth in the APA (the "Deposit"), to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "Escrow Agent") in a U.S. escrow account to be identified and established pursuant to the authority granted by the order authorizing the Debtors to maintain and operate their bank accounts and subject in all respect to the DIP Order (the "Escrow Account"). The Debtors' interests in the Deposit and the Escrow Account shall be subject to the superpriority claims and liens of the DIP Lenders and the Prepetition Lenders and shall constitute DIP Collateral (each as defined in the DIP Order). As set forth below and notwithstanding the foregoing, the Debtors will refund any Bidder's deposit and all accumulated interest thereon on or within ten (10) business days after the Bid Deadline if a Bid is determined by the Debtors not to be a Qualified Bid.

To the extent a Qualified Bid is modified before the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the proposed purchase price, to the extent the purchase price under such Qualified Bid is also so modified.

The requirements set forth in this "Deposit" section do not apply with respect to the Stalking Horse Bid or the Stalking Horse Bidder and no "Deposit" shall be required of the Stalking Horse Bidder.

Review of Bids; Designation of Qualified Bids

The Debtors, in consultation with the Consultation Party, will evaluate timely submitted Bids and may engage in negotiations with Potential Bidders who submitted Bids as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid. The Debtors shall promptly notify the Consultation Party of any changes to any submitted Bids.

By no later than February 12, 2019, the Debtors shall determine, in their reasonable judgment, after consultation with the Consultation Party, which of the Bids received by the Bid Deadline qualifies as a "Qualified Bid" (each Potential Bidder that submits such a Qualified Bid being a "Qualified Bidder"). The Debtors shall consult with the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder regarding the sufficiency of any Bid with respect to such bidder's ability to satisfy the Cash Bid Amount in full, in U.S. dollars, and each of the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder shall have the right to object if it believes that any Bid is not sufficient to satisfy the Cash Bid Amount in full, in U.S. dollars. The Debtors shall notify each Potential Bidder of its status as a Qualified Bidder as promptly as possible following such determination.

Notwithstanding anything contained herein to the contrary, the Debtors shall not accept any offer which would result in the net cash proceeds contemplated by such offer being less than the amount necessary to pay the Cash Bid Amount in full, in cash, in U.S. dollars on the date the sale contemplated by such Bid is consummated or the termination, expiration, or maturity of the DIP Credit Facilities, whichever is earlier; *provided* that the Successful Bidder shall be required to provide replacement or other debtor-in-possession financing through the anticipated closing of the Bid as and to the extent necessary.

Notwithstanding anything contained herein to the contrary, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid.

Without the written consent of the Debtors and the Stalking Horse Bidder, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid remains binding as specified herein; *provided* that, if the proposed modifications or amendments to a Qualified Bid include additional non-cash components (such as fewer contingencies than are in the Stalking Horse APA), then such Qualified Bidder shall include a reasonably detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; *provided further* that any Qualified Bid may be improved at the Auction, as set forth in these Bidding Procedures.

Determination and Announcement of Baseline Bids and Qualified Bidders

In evaluating the Bids, the Debtors, in consultation with the Consultation Party, shall also make a determination regarding which Qualified Bid is the highest or best Qualified Bid for the Acquired Assets and will therefore serve as the starting point at the Auction (the "Baseline Bid"). On or before February 13, 2019 at 5:00 p.m. (Eastern Time) (the "Designation Deadline"), the Debtors shall file a notice designating the Baseline Bid and/or distribute the same at the Auction. The Debtors shall also provide copies of such Baseline Bid (if applicable, marked against the Stalking Horse Bid) to all of the Qualified Bidders (including the Stalking Horse Bidder) and the Consultation Party.

If a Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Bidder's deposit and all accumulated interest thereon on or within ten (10) business days after the Bid Deadline.

Failure to Receive More Qualified Bids

If no Qualified Bid other than the one submitted by the Stalking Horse Bidder is received by the Bid Deadline, the Debtors will not conduct the Auction and the Stalking Horse APA will be deemed the Successful Bid and, subject to the termination rights under the Stalking Horse APA, the Debtors will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse APA no later than February 15, 2019**.**

**Negotiation with Prepetition Term Parties**

From the date of entry of the Bidding Procedures Order, any Bidder, including the Stalking Horse Bidder, may execute definitive documentation with the Prepetition Term Parties (as defined in the DIP Order) (i) to purchase all or a portion of the Prepetition Term Parties' claims arising under the Prepetition Term Loan Facilities (as defined in the DIP Order) and/or (ii) with respect to the terms on which the Prepetition Term Loan Facilities may be assumed by such Bidder upon the closing of the Sale Transaction; *provided*, that if any such Bidder is not the Successful Bidder, then such Bidder shall sell, at the closing of the Sale Transaction, such claims to the Successful Bidder at the price such Bidder paid for such claims; *provided further* that no Bidder may enter into any exclusivity agreement with any Prepetition Term Party.

### Sale Hearing and Sale Order

At a hearing before the Bankruptcy Court (the "Sale Hearing"), the Debtors will seek the entry of an order authorizing and approving, *inter alia*, the applicable sale transaction (the "Sale Order"). The Sale Order shall authorize and approve the applicable sale transaction:

(A)    if no other Qualified Bid is received by the Debtors, to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse APA; or

(B)    if the Auction is held, to the Successful Bidder or, if the Successful Bid is not consummated within the timeframe contemplated by the APA, to the Back-Up Bidder.

In the Debtors' discretion (after consultation with the Consultation Party and with the consent of the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder), the Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing.

The Stalking Horse Bidder shall have standing to, without limitation, appear, object, and/or otherwise respond to any matter at the Sale Hearing or any related hearing.

### Auction Procedures

If there are two or more Qualified Bids, the Debtors will conduct the Auction on **February 18, 2019, beginning at 10:00 a.m. (Eastern Time) at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022**, or such later time or other place as the Debtors (in consultation with the Consultation Party and with the consent of the Stalking Horse Bidder) notify the Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

1.    only Qualified Bidders and their legal and financial advisors are permitted to attend the Auction;

2.    only Qualified Bidders (including the Stalking Horse Bidder) will be permitted to bid at the Auction;

3.    at the start of the Auction, the Debtors shall describe the terms of the Baseline Bid;

4.    bidding will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in minimum increments of at least $5,000,000 of additional value (a "Minimum Overbid Amount"), as determined by the Debtors in the exercise of their business judgment; *provided*, that the Debtors reserve the right to and may modify the Minimum Overbid Amount at any time during the Auction;

12

5.    in each round of bidding at the Auction, the Stalking Horse Bidder will also be entitled to a "credit" in the amount of the Bid Protections to be counted towards its bid in such round such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Bid Protections "credit" must exceed the most recent bid by at least the Minimum Overbid Amount; *provided* that the Stalking Horse Bidder shall not be obligated to exercise such credit during any round of bidding at the Auction.  To the extent a Qualified Bidder fails, in any round of bidding at the Auction, to submit a bid that is of a higher value or is a better offer than the immediately preceding bid submitted in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* that the Stalking Horse Bidder shall have the right (but not the obligation) to, during a single round of bidding at the Auction, submit a bid that matches the prior bid and does not increase such bid by the Minimum Overbid Amount;

6.    upon the solicitation of each round of applicable overbids relative to the Baseline Bid (each, an "Overbid"), the Debtors may establish a reasonable deadline on notice to all Bidders by which an Overbid must be submitted to the Debtors.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid made by that Bidder, as determined by the Debtors' reasonable business judgment in consultation with the Consultation Party, but shall otherwise comply with the terms of these Bidding Procedures;

7.    subsequent to each Overbid deadline, the Debtors shall announce whether the Debtors have identified an Overbid as being higher or otherwise better than the Baseline Bid or, as applicable in subsequent rounds, the Overbid previously designated as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid;

8.    the Debtors, in their reasonable discretion and in consultation with the Consultation Party, shall afford the Qualified Bidders a reasonable amount of time to respond to the Prevailing Highest Bid;

9.    the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

10.   each Qualified Bidder will be required to confirm on the record of the Auction that (a) it has not engaged in any collusion with respect to the bidding or the Sale Transaction, and (b) its Bid and any Overbid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder; and

13

11. the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest Bid.

With the consent of the Stalking Horse Bidder, the Debtors may modify or adopt such other rules for the Auction at any time that the Debtors, in consultation with the Consultation Party, reasonably determine to be appropriate to promote a robust auction.  Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Stalking Horse APA (as may be consensually modified at the Auction) without the prior written consent of the Stalking Horse Bidder.  Any rules developed by the Debtors will provide that all bids in the Auction will be made and received on an open basis, and all other bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder placing a bid at the Auction will be fully disclosed to all other bidders participating in the Auction (as well as the Consultation Party) and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be disclosed to all other bidders (as well as the Consultation Party).  Each Qualified Bidder will be permitted what the Debtors, in consultation with the Consultation Party, reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction.  The Auction will be conducted openly and shall be transcribed or recorded, and the Qualifying Bidders will be informed of the material terms of the previous bid.

In evaluating a Qualified Bid submitted at the Auction, the Debtors may consider, among other things and without limitation, the amount of cash (or as may be applicable, reduction of liabilities of the estates) to be paid or delivered, the speed and certainty of consummating a transaction, and any other relevant factor.  Prior to the conclusion of the Auction, the Debtors, after consultation with the Consultation Party, shall announce on the record that it has determined in its business judgment that it has received the highest or otherwise best Qualified Bid, and the Qualified Bidder that had submitted such Qualified Bid (the "Successful Bid") shall be declared the winning bidder (the "Successful Bidder").  The Debtors shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (the "Back-Up Bid") who shall be declared the "Back-Up Bidder."  The Debtors shall consult with the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder regarding the amount of the Cash Bid Amount set forth in the Successful Bid and the Back-Up Bid, and each of the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder shall have the right to object if it believes that either the Successful Bid or the Back-Up Bid is not sufficient to satisfy the Cash Bid Amount in full, in U.S. dollars.  The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) March 30, 2019 (the "Outside Date"), (ii) consummation of the transaction with the Successful Bidder, and (iii) the release of such bid by the Debtors in writing (such date, the "Back-Up Bid Expiration Date").  If a transaction with the Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid; *provided* that, if the Stalking Horse Bidder is declared the Back-Up Bidder, then the Stalking Horse Bidder shall only be obligated to consummate the Back-Up Bid to the extent required under the Stalking Horse APA.

Within two (2) business days after the Auction, the Successful Bidder shall submit, to the extent applicable, to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid.  The Successful Bid may not be assigned to any entity without the

14

express written consent of the Debtors and, to the extent the Back-Up-Bidder is the Stalking Horse Bidder, the Stalking Horse Bidder.

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

In the event the Stalking Horse Bidder is not the Successful Bidder, any sale order approving the proposed transaction shall provide for the immediate transfer, in cash, in U.S. dollars, upon the closing of the proposed transaction, of such portion of the Cash Bid Amount to the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder that remains unpaid as of such date.

At any time before entry of the Sale Order approving the applicable transaction envisioned by a Successful Bid, the Debtors reserve the right to and may, after consultation with the Consultation Party, reject such Successful Bid if such Successful Bid, in the Debtors' judgment, is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the applicable sale transaction; or (iii) contrary to the best interests of the Debtors and their estates, except that if the Stalking Horse Bid is the Successful Bid, the foregoing provisions of this sentence will be inoperative. No attempt by the Debtors to reject a Successful Bid under this paragraph will modify any rights of the Debtors or the Stalking Horse Bidder under the Stalking Horse APA.

## Post-Auction Process

The Debtors shall not consider any bids submitted after the conclusion of the Auction. Within one (1) day after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid, Successful Bidder, Back-Up Bid, and Back-Up Bidder. At the Sale Hearing, the Debtors will present the Successful Bid to the Bankruptcy Court for approval. The Successful Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of the Successful Bid and the Successful Bidder's ability to close within the timeframe contemplated by the APA and provide adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and/or assigned as part of the proposed sale transaction.

Within seven (7) business days after the Auction, the Debtors shall direct the Escrow Agent to return the deposit of any bidder, together with interest accrued thereon, who is not declared the Successful Bidder or Back-Up Bidder. Within five (5) business days after the Back-Up Bid Expiration Date, the Debtors shall direct the Escrow Agent to return the deposit of such Back-Up Bidder, together with interest accrued thereon. Upon the authorized return of any such deposit, the bid of such Potential or Qualified Bidder shall be deemed revoked in all respects (without any action required by the Bankruptcy Court) and no longer enforceable.

The deposit of the Successful Bidder shall be applied against the cash purchase price of such bidder's Successful Bid upon the consummation of the sale transaction.

In addition to the foregoing, the deposit of a Qualified Bidder will be forfeited to the Debtors if the Qualified Bidder (i) attempts to modify, amend, or withdraw its Qualified Bid,

except as permitted herein, during the time the Qualified Bid remains binding and irrevocable, (ii) is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate a sale transaction according to these Bidding Procedures and, as applicable, the APA or Stalking Horse APA, or (iii) breaches the Bidding Procedures, in each case, in addition to (and without limiting) any other remedies the Debtors may have.

### Consultation Party

The term "Consultation Party" as used in these Bidding Procedures shall mean the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases, if any.

The Debtors shall use their reasonable best efforts to consult and confer with the Consultation Party in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Party by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

The Debtors may not modify the consultation or consent rights of the Consultation Party or the Stalking Horse Bidder, as applicable, as set forth herein without the consent of such affected party.

### Consent to Jurisdiction and Authority as Condition to Bidding

All bidders (including the Stalking Horse Bidder) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

### Fiduciary Out

Nothing in these Bidding Procedures shall require or prevent the board of directors, board of managers, or such similar governing body of any Debtor from seeking Bankruptcy Court authority (on an emergency basis) and/or taking any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body believes, based on the advice of external legal counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided*, that the foregoing shall not impair the Stalking Horse Bidder's right to exercise any rights and remedies, including, without limitation, with respect to any breach of the Stalking Horse APA.

*        *        *        *

**<u>Exhibit 2</u>**

Sale Notice

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK | ) | Case No. 18-13374 (MEW) |
| INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE OF DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER (I) ESTABLISHING**
**BIDDING PROCEDURES AND GRANTING RELATED**
**RELIEF, AND (II) APPROVING THE SALE OF CERTAIN ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

**PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on November 4, 2018 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE THAT** on November 9, 2018 in connection with the proposed sale (the "Sale") of the Acquired Assets[2] to Mercuria Asset Holdings (Hong Kong) Limited, or any other Successful Bidder for the Acquired Assets, at an auction for the Acquired Assets (the "Auction"), the Debtors filed a motion (the "Motion") [Docket No. [●]] seeking, among other things, the entry of an order approving: (a) bidding procedures governing the Sale (the "Bidding Procedures"); (b) the Stalking Horse APA; (c) payment of a Break-Up Fee and Reimbursable Expenses to the Stalking Horse Bidder in certain instances, including if the Successful Bidder at the Auction consummates a transaction; (d) procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption Procedures"); and (e) the form and manner of notices.

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on December [●], 2018 the Bankruptcy Court entered an order [Docket No. [●]] (the "<u>Bidding Procedures Order</u>") granting certain of the relief sought in the Motion, including, among other things, approving:  (a) the Bidding Procedures and (b) the Assumption Procedures.

### Contact Person for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Acquired Assets **must** comply strictly with the Bidding Procedures.  **Only Qualified Bids will be considered by the Debtors**. Any persons interested in making an offer to purchase the Acquired Assets should contact:

| Financial Advisor to Debtors | Counsel to Debtors |
|---|---|
| Moelis & Company LLC<br>399 Park Ave, FL 5<br>New York, New York 10022<br>Attn: [●]<br><br>(212)-883-3800 | Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn: Jonathan S. Henes, P.C., Esq.,<br>Cristine Pirro Schwarzman, Esq.<br><br>(212)-446-4800<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Marc Kieselstein, P.C., Esq., Ross M. Kwasteniet, P.C., Esq., Adam C. Paul, P.C., Esq. and W. Benjamin Winger, Esq.<br><br>(312)-862-2000 |

### Obtaining Information

Copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available upon request to Epiq Corporate Restructuring, LLC, the Debtors' notice and claims agent, at (646)-282-2500, or by visiting the case website at http://dm.epiq11.com/aegean.

### Important Dates and Deadlines

1.      The deadline to submit a Qualified Bid is **5:00 p.m. Eastern Time on February 11, 2019**.

2.      The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") is **4:00 p.m. Eastern Time on February 13, 2019** (the "Sale Objection Deadline").

3.      The Auction for the Acquired Assets, if one is necessary, will commence at **10:00 a.m. Eastern Time on February 18, 2019**, or such other date as determined by the United States Bankruptcy Court for the Southern District of New York (the "Court"), at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

4.      A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Honorable Michael E. Wiles of the Court at **[TIME] Eastern Time on February 22, 2019**, or such other date as determined by the Court, at One Bowling Green, New York, New York 10004.

## Filing Objections to the Sale

Any objection to the Motion as it relates to the Sale must:  (a) be in writing; (b) state with specificity the nature of such objection; (c) comply with the Bankruptcy Rules and the LBRs for the Southern District of New York; and (d) be filed with this Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline, by the following parties:

| Debtors | Counsel to Debtors |
|---|---|
| Aegean Bunkering (USA) LLC<br>52 Vanderbilt Ave, Ste 1405<br>New York, New York 10017<br>Attn: Spyros Fokas, VP & Deputy General Counsel | Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn: Jonathan S. Henes, P.C., Esq.<br>Cristine Pirro Schwarzman, Esq.<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Marc Kieselstein, P.C., Esq., Ross M. Kwasteniet, P.C., Esq.,  Adam C. Paul,  P.C., Esq., and W. Benjamin Winger, Esq. |

| Counsel to the Creditors' Committee | United States Trustee |
|---|---|
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq. | Office of the United States Trustee<br>Southern District of New York<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, New York 10014<br>Attn: Brian S. Masumoto, Esq. and Andrew Velez-Rivera, Esq. |
| **Counsel to the Debtors' Prepetition Lender and DIP Lender** | **Counsel to the Stalking Horse Bidder** |
| Norton Rose Fulbright US LLP<br>1301 McKinney, Suite 5100<br>Houston, Texas 77010-3095<br>Attn: Louis Strubeck, Esq. and Josh Agrons, Esq. | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005-1413<br>Attn: Abhilash Raval, Esq. and Lauren C. Doyle, Esq |
| **Counsel to the Ad Hoc Group** | **United States Attorney** |
| Akin Gump Strauss Hauer &Feld LLP<br>Bank of America Tower<br>1 Bryant Park<br>New York, New York 10036<br>Attn: Philip Dublin, Esq | Office of the United States Attorney for the Southern District of New York<br>86 Chambers Street, 3rd Floor<br>New York, New York 10007 |
| **U.S. Bank National Association, the Indenture Trustee for the 4.25% Convertible Senior Notes due 2021** | **Deutsche Bank Trust Company Americas, the Indenture Trustee for the 4.00% Convertible Senior Notes due 2018** |
| U.S. Bank National Association<br>100 Wall Street, Suite 1600<br>New York, New York 10005<br>Attn: Office of the Trustee | Deutsche Bank Trust Company Americas<br>60 Wall Street, MSNYC602710<br>New York, New York 10005<br>Attn: Trust and Agency Services |
| **Counsel to Aegean Baltic Bank S.A., the Agent for the Debtors' Prepetition Loan Agreements, dated August 30, 2005, October 1, 2006, October 27, 2006, and April 24, 2008** | **Counsel to Orix Investment and Management Private Ltd., the Agent for the Debtors' Prepetition Loan Agreement, dated July 5, 2007, if known** |
| White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020-1095<br>Attn: Scott Greissman, Esq<br><br>-and-<br><br>White & Case LLP<br>75 State Street<br>Boston, Massachusetts 02109-1814<br>Attn: Mark Franke, Esq. | **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq |

| **Counsel to Piraeus Bank S.A., the Agent for the Debtors' Prepetition Loan Agreements, dated November 20, 2017 and November 30, 2017, if known** | **Counsel to United Arab Bank P.J.S.C., the Agent for the Debtors' Prepetition Term Loan Facility, dated October 7, 2015** |
|---|---|
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq | Clifford Chance LLP<br>31 West 52nd Street<br>New York, New York 10019-6131<br>Attn: Jennifer DeMarco, Esq |
| **Counsel to Deutsche Bank AG, New York Branch, the Agent for the Debtors' Prepetition Trade Receivables Purchase Agreements, dated March 30, 2016 and November 13, 2015, if known** | **Counsel to ABN AMRO Capital USA LLC, the Agent for the Debtors' Prepetition Uncommitted Credit Agreement, dated August 3, 2017** |
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Ana Alfonso, Esq |
| **Counsel to ABN AMRO BANK N.V., the Agent for the Debtors' Prepetition Borrowing Base Facility, dated November 30, 2017** | |
| Allen & Overy LLP<br>One Bishops Square<br>London E1 6AD<br>Attn: Jennifer Marshall, Esq | |

### Consequences of Failing to Timely File and Serve an Objection:

Any party or entity who fails to timely file and serve an Objection to the Sale on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order shall be forever barred from asserting any Objection to the Sale, including with respect to the transfer of the Acquired Assets of the Debtor estates free and clear of liens, claims, encumbrances, and other interests effected thereunder.

5

---

### No Successor or Transferee Liability

The proposed Sale Order provides that the Stalking Horse Bidder and/or Successful Bidder, if applicable, will have no responsibility for, and the Acquired Assets will be sold free and clear of, any successor liability, including the following:  (a) any liability or other obligation of the Debtors' estates or related to the Debtors' Acquired Assets other than as expressly set forth in the Stalking Horse Asset Purchase Agreement; or (b) any claims against the Debtors, their estates, or any of their predecessors or affiliates.  Except as expressly provided in the Sale Order or the Stalking Horse APA, the Stalking Horse Bidder or Successful Bidder shall have no liability whatsoever with respect to the Debtors' estates' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' estates' (or their predecessors' or affiliates') obligations (as described below, "Successor Liability") based on any action taken in connection with the Sale, the assumption of the Assumed Liabilities (as defined in the Stalking Horse Asset Purchase Agreement), or the continued operation of the Business on any basis, including under any doctrines of successor, transferee, or vicarious liability (whether based on de facto merger, mere continuation, or any other basis or theory of liability), including (a) any past, present, or future liabilities of Aegean or any of its affiliates to any shareholder, governmental entity, or person, (b) any past, present or future liabilities of Aegean or any of its affiliates arising out of any civil or criminal investigations or claims brought by any governmental entity, including the United States Attorney's Office or the Securities and Exchange Commission, seeking sanctions, penalties, restitution, disgorgement, or other amounts owed or that become owed, and (c) any past, present or future claims of or liability associated with indemnity, advancement, reimbursement or contribution of legal or other expenses incurred by current or former directors, officers, employees, agents, attorneys, or other representatives of Aegean or its affiliates in connection with or arising out of any proceedings, including those referenced in sections (a) and (b) above.

---

## **Exhibit 3**

Publication Sale Notice


[Form to be provided.]

## **Exhibit 4**

Cure Notice

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK | ) | Case No. 18-13374 (MEW) |
| INC., *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

   **PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on November 6, 2018 (the "Petition Date").

   **PLEASE TAKE FURTHER NOTICE THAT** on November 9, 2018 in connection with the proposed sale (the "Sale") of the Acquired Assets[2] to any Successful Bidder for the Acquired Assets, at an auction for the Acquired Assets (the "Auction"), the Debtors filed a motion  (the "Motion") [Docket No. [●]] seeking, among other things:  the entry of an order approving (a) bidding procedures governing the Sale; (b) the Stalking Horse APA; (c) payment of a Break-Up Fee to the Stalking Horse Bidder in certain instances defined in the Stalking Horse APA; (d) the form and manner of notices; and (e) procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale.

   **PLEASE TAKE FURTHER NOTICE THAT** on December [●], 2018, the Bankruptcy Court entered an order (the "Bidding Procedures Order") [Docket No. [●]] granting certain of the relief sought in the Motion, including, among other things, approving:  (a) the bidding procedures (the "Bidding Procedures") for the Sale of the Acquired Assets; and (b) procedures

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Bidding Procedures, as applicable.

(the "Assumption Procedures") for the assumption and assignment of executory contracts and unexpired leases (the "Assumed Contracts"). Copies of the Bidding Procedures Order (which incorporates the Assumption Procedures) and the Bidding Procedures are enclosed herein.

**PLEASE TAKE FURTHER NOTICE THAT** upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder or any other Successful Bidder the Assumed Contracts set forth on **Exhibit 1** hereto. In addition, the cure payments, if any, necessary for the assumption and assignment of the Assumed Contracts (the "Cure Costs") are set forth on **Exhibit 1**.

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE STALKING HORSE BIDDER HAS IDENTIFIED YOU AS A COUNTERPARTY TO A POTENTIAL ASSUMED CONTRACT**. Under the terms of the Assumption Procedures, the Stalking Horse Bidder may modify the list of Assumed Contracts until the Bid Deadline, and the Debtors reserve the right at any time after the Assumption and Assignment Service Deadline and before the closing of a Sale, to: (a) supplement the list of Assumed Contracts on the Contract Assumption Notice with previously omitted executory contracts or unexpired leases; (b) remove an Assumed Contract from the list of executory contracts and unexpired leases ultimately selected as an Assumed Contract that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (c) modify the previously stated Cure Costs associated with any Assumed Contract. Any counterparty impacted by such a modification will receive notice thereof (the "Supplemental Assumption Notice") and an opportunity to object to the proposed assumption and assignment of the Assumed Contract, if applicable.

### Obtaining Additional Information

Additional copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available upon request to Epiq Corporate Restructuring LLC, the Debtors' notice and claims agent, at (646)-282-2500, or by visiting the case website at http://dm.epiq11.com/aegean.

### Important Dates and Deadlines

1.   The deadline to submit a Qualified Bid is **5:00 p.m. Eastern Time on February 11, 2019**.

2.   The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") is **4:00 p.m. Eastern Time on February 13, 2019** (the "Sale Objection Deadline").

3.      The Auction for the Assets, if one is necessary, will commence at **10:00 a.m. Eastern Time on February 18, 2019**, or such other date as determined by the Court, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

4.      A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Honorable Michael E. Wiles of the Bankruptcy Court at **[TIME] Eastern Time on February 22, 2019**, or such other date as determined by the Court, at One Bowling Green, New York, New York 10004.

### Filing Assumption and Assignment Objections

Pursuant to the Assumption Procedures, objections to the proposed assumption and assignment of a Assumed Contract, including any objection relating to the Cure Costs and/or adequate assurance of future performance, must:  (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Costs, including applicable and appropriate documentation in support of such alleged Cure Costs; (c) comply with the Bankruptcy Rules and the LBRs; and (d) be filed with the Bankruptcy Court and served so as to be **actually received** on or before **(i) January 19, 2019, at 4:00 p.m. Eastern Time, or (iii) for those counterparties that receive a Supplemental Assumption Notice, the deadline set forth therein**.

Failure to timely file an objection shall constitute a waiver of any objections related to accepting performance by, or rendering performance to, the Stalking Horse Bidder for purposes of section 365(c)(1) of the Bankruptcy Code.

In the event the Auction results in a Successful Bidder other than the Stalking Horse Bidder, parties who have previously received this notice shall have **one (1) Business Days after the Auction** to file an objection related to adequate assurance of future performance or related to whether applicable law excuses the party from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code.

Any objections will be considered at the Sale Hearing, or as soon thereafter as counsel may be heard, and must be served on the following parties:

| Debtors | Counsel to Debtors |
|---|---|
| Aegean Bunkering (USA) LLC<br>52 Vanderbilt Ave, Ste 1405<br>New York, New York 10017<br>Attn: Spyros Fokas, VP & Deputy General Counsel | Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn: Jonathan S. Henes, P.C., Esq.<br>Cristine Pirro Schwarzman, Esq.<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Marc Kieselstein, P.C., Esq., Ross M. Kwasteniet, P.C., Esq.,  Adam C. Paul,  P.C., Esq., and W. Benjamin Winger, Esq. |
| **Counsel to the Creditors' Committee** | **United States Trustee** |
| **[LAW FIRM[<br>[ADDRESS LINE 1]<br>[ADDRESS LINE 2]**<br>Attn: [●], Esq. | Office of the United States Trustee<br>Southern District of New York<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, New York 10014<br>Attn: Brian S. Masumoto, Esq. and Andrew Velez-Rivera, Esq. |
| **Counsel to the Debtors' Prepetition Lender and DIP Lender** | **Counsel to the Stalking Horse Bidder** |
| Norton Rose Fulbright US LLP<br>1301 McKinney, Suite 5100<br>Houston, Texas 77010-3095<br>Attn: Louis Strubeck, Esq. and Josh Agrons, Esq. | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005-1413<br>Attn: Abhilash Raval, Esq. and Lauren C. Doyle, Esq |
| **Counsel to the Ad Hoc Group** | **United States Attorney** |
| Akin Gump Strauss Hauer &Feld LLP<br>Bank of America Tower<br>1 Bryant Park<br>New York, New York 10036<br>Attn: Philip Dublin, Esq | Office of the United States Attorney for the Southern District of New York<br>86 Chambers Street, 3rd Floor<br>New York, New York 10007 |
| **U.S. Bank National Association, the Indenture Trustee for the 4.25% Convertible Senior Notes due 2021** | **Deutsche Bank Trust Company Americas, the Indenture Trustee for the 4.00% Convertible Senior Notes due 2018** |
| U.S. Bank National Association<br>100 Wall Street, Suite 1600<br>New York, New York 10005<br>Attn: Office of the Trustee | Deutsche Bank Trust Company Americas<br>60 Wall Street, MSNYC602710<br>New York, New York 10005<br>Attn: Trust and Agency Services |

4

| Counsel to Aegean Baltic Bank S.A., the Agent for the Debtors' Prepetition Loan Agreements, dated August 30, 2005, October 1, 2006, October 27, 2006, and April 24, 2008 | Counsel to Orix Investment and Management Private Ltd., the Agent for the Debtors' Prepetition Loan Agreement, dated July 5, 2007, if known |
|---|---|
| White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020-1095<br>Attn: Scott Greissman, Esq<br><br>-and-<br><br>White & Case LLP<br>75 State Street<br>Boston, Massachusetts 02109-1814<br>Attn: Mark Franke, Esq. | **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq |
| **Counsel to Piraeus Bank S.A., the Agent for the Debtors' Prepetition Loan Agreements, dated November 20, 2017 and November 30, 2017, if known** | **Counsel to United Arab Bank P.J.S.C., the Agent for the Debtors' Prepetition Term Loan Facility, dated October 7, 2015** |
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq | Clifford Chance LLP<br>31 West 52nd Street<br>New York, New York 10019-6131<br>Attn: Jennifer DeMarco, Esq |
| **Counsel to Deutsche Bank AG, New York Branch, the Agent for the Debtors' Prepetition Trade Receivables Purchase Agreements, dated March 30, 2016 and November 13, 2015, if known** | **Counsel to ABN AMRO Capital USA LLC, the Agent for the Debtors' Prepetition Uncommitted Credit Agreement, dated August 3, 2017** |
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Ana Alfonso, Esq |
| **Counsel to ABN AMRO BANK N.V., the Agent for the Debtors' Prepetition Borrowing Base Facility, dated November 30, 2017** | |
| Allen & Overy LLP<br>One Bishops Square<br>London E1 6AD<br>Attn: Jennifer Marshall, Esq | |

### Consequences of Failing to Timely File and Serve an Objection

Any counterparty to an Assumed Contract who fails to timely file and serve an Objection to the proposed assumption and assignment of an Assumed Contract in accordance with the Bidding Procedures Order and the Assumption Procedures shall be forever barred from asserting any Objection to the assumption and assignment of the

**Assumed Contract and/or the cure amount set forth on <u>Exhibit 1</u>, including asserting additional cure amounts with respect to the Assumed Contract relating to any period prior to the time of assumption and assignment.**

**<u>Exhibit 1</u>**

**Transferred Contracts and Assumed Leases**

**Exhibit B**

**Proposed Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| AEGEAN MARINE PETROLEUM NETWORK | )    Case No. 18-13374 (MEW) |
| INC., *et al.*,[1] | ) |
| | ) |
| Debtors. | )    (Joint Administration Requested) |
| | ) |

**NOTICE OF DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER (I) ESTABLISHING**
**BIDDING PROCEDURES AND GRANTING RELATED**
**RELIEF, AND (II) APPROVING THE SALE OF CERTAIN ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

    **PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on November 4, 2018 (the "Petition Date").

    **PLEASE TAKE FURTHER NOTICE THAT** on November 9, 2018 in connection with the proposed sale (the "Sale") of the Acquired Assets[2] to Mercuria Asset Holdings (Hong Kong) Limited, or any other Successful Bidder for the Acquired Assets, at an auction for the Acquired Assets (the "Auction"), the Debtors filed a motion (the "Motion") [Docket No. [●]] seeking, among other things, the entry of an order approving: (a) bidding procedures governing the Sale (the "Bidding Procedures"); (b) the Stalking Horse APA; (c) payment of a Break-Up Fee and Reimbursable Expenses to the Stalking Horse Bidder in certain instances, including if the Successful Bidder at the Auction consummates a transaction; (d) procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption Procedures"); and (e) the form and manner of notices.

---

[1]      Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean. The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on December [●], 2018 the Bankruptcy Court entered an order [Docket No. [●]] (the "<u>Bidding Procedures Order</u>") granting certain of the relief sought in the Motion, including, among other things, approving:  (a) the Bidding Procedures and (b) the Assumption Procedures.

## Contact Person for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Acquired Assets **must** comply strictly with the Bidding Procedures.  **Only Qualified Bids will be considered by the Debtors**. Any persons interested in making an offer to purchase the Acquired Assets should contact:

| Financial Advisor to Debtors | Counsel to Debtors |
|---|---|
| Moelis & Company LLC<br>399 Park Ave, FL 5<br>New York, New York 10022<br>Attn: [●]<br><br>(212)-883-3800 | Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn: Jonathan S. Henes, P.C., Esq.,<br>Cristine Pirro Schwarzman, Esq.<br><br>(212)-446-4800<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Marc Kieselstein, P.C., Esq., Ross M.<br>Kwasteniet, P.C., Esq., Adam C. Paul, P.C., Esq. and<br>W. Benjamin Winger, Esq.<br><br>(312)-862-2000 |

## Obtaining Information

Copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available upon request to Epiq Corporate Restructuring, LLC, the Debtors' notice and claims agent, at (646)-282-2500, or by visiting the case website at http://dm.epiq11.com/aegean.

## Important Dates and Deadlines

1.    The deadline to submit a Qualified Bid is **5:00 p.m. Eastern Time on February 11, 2019**.

2.      The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") is **4:00 p.m. Eastern Time on February 13, 2019** (the "Sale Objection Deadline").

3.      The Auction for the Acquired Assets, if one is necessary, will commence at **10:00 a.m. Eastern Time on February 18, 2019**, or such other date as determined by the United States Bankruptcy Court for the Southern District of New York (the "Court"), at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

4.      A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Honorable Michael E. Wiles of the Court at **[TIME] Eastern Time on February 22, 2019**, or such other date as determined by the Court, at One Bowling Green, New York, New York 10004.

## Filing Objections to the Sale

Any objection to the Motion as it relates to the Sale must:  (a) be in writing; (b) state with specificity the nature of such objection; (c) comply with the Bankruptcy Rules and the LBRs for the Southern District of New York; and (d) be filed with this Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline, by the following parties:

| Debtors | Counsel to Debtors |
|---|---|
| Aegean Bunkering (USA) LLC<br>52 Vanderbilt Ave, Ste 1405<br>New York, New York 10017<br>Attn: Spyros Fokas, VP & Deputy General Counsel | Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn: Jonathan S. Henes, P.C., Esq.<br>Cristine Pirro Schwarzman, Esq.<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Marc Kieselstein, P.C., Esq., Ross M. Kwasteniet, P.C., Esq.,  Adam C. Paul,  P.C., Esq., and W. Benjamin Winger, Esq. |

| Counsel to the Creditors' Committee | United States Trustee |
|---|---|
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq. | Office of the United States Trustee<br>Southern District of New York<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, New York 10014<br>Attn: Brian S. Masumoto, Esq. and Andrew Velez-Rivera, Esq. |
| **Counsel to the Debtors' Prepetition Lender and DIP Lender** | **Counsel to the Stalking Horse Bidder** |
| Norton Rose Fulbright US LLP<br>1301 McKinney, Suite 5100<br>Houston, Texas 77010-3095<br>Attn: Louis Strubeck, Esq. and Josh Agrons, Esq. | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005-1413<br>Attn: Abhilash Raval, Esq. and Lauren C. Doyle, Esq |
| **Counsel to the Ad Hoc Group** | **United States Attorney** |
| Akin Gump Strauss Hauer &Feld LLP<br>Bank of America Tower<br>1 Bryant Park<br>New York, New York 10036<br>Attn: Philip Dublin, Esq | Office of the United States Attorney for the Southern District of New York<br>86 Chambers Street, 3rd Floor<br>New York, New York 10007 |
| **U.S. Bank National Association, the Indenture Trustee for the 4.25% Convertible Senior Notes due 2021** | **Deutsche Bank Trust Company Americas, the Indenture Trustee for the 4.00% Convertible Senior Notes due 2018** |
| U.S. Bank National Association<br>100 Wall Street, Suite 1600<br>New York, New York 10005<br>Attn: Office of the Trustee | Deutsche Bank Trust Company Americas<br>60 Wall Street, MSNYC602710<br>New York, New York 10005<br>Attn: Trust and Agency Services |
| **Counsel to Aegean Baltic Bank S.A., the Agent for the Debtors' Prepetition Loan Agreements, dated August 30, 2005, October 1, 2006, October 27, 2006, and April 24, 2008** | **Counsel to Orix Investment and Management Private Ltd., the Agent for the Debtors' Prepetition Loan Agreement, dated July 5, 2007, if known** |
| White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020-1095<br>Attn: Scott Greissman, Esq<br><br>-and-<br><br>White & Case LLP<br>75 State Street<br>Boston, Massachusetts 02109-1814<br>Attn: Mark Franke, Esq. | **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq |

| Counsel to Piraeus Bank S.A., the Agent for the Debtors' Prepetition Loan Agreements, dated November 20, 2017 and November 30, 2017, if known | Counsel to United Arab Bank P.J.S.C., the Agent for the Debtors' Prepetition Term Loan Facility, dated October 7, 2015 |
|---|---|
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq | Clifford Chance LLP<br>31 West 52nd Street<br>New York, New York 10019-6131<br>Attn: Jennifer DeMarco, Esq |
| Counsel to Deutsche Bank AG, New York Branch, the Agent for the Debtors' Prepetition Trade Receivables Purchase Agreements, dated March 30, 2016 and November 13, 2015, if known | Counsel to ABN AMRO Capital USA LLC, the Agent for the Debtors' Prepetition Uncommitted Credit Agreement, dated August 3, 2017 |
| **[LAW FIRM]**<br>**[ADDRESS LINE 1]**<br>**[ADDRESS LINE 2]**<br>Attn: [●], Esq | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn: Ana Alfonso, Esq |
| Counsel to ABN AMRO BANK N.V., the Agent for the Debtors' Prepetition Borrowing Base Facility, dated November 30, 2017 | |
| Allen & Overy LLP<br>One Bishops Square<br>London E1 6AD<br>Attn: Jennifer Marshall, Esq | |

## Consequences of Failing to Timely File and Serve an Objection:

Any party or entity who fails to timely file and serve an Objection to the Sale on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order shall be forever barred from asserting any Objection to the Sale, including with respect to the transfer of the Acquired Assets of the Debtor estates free and clear of liens, claims, encumbrances, and other interests effected thereunder.

5

## No Successor or Transferee Liability

The proposed Sale Order provides that the Stalking Horse Bidder and/or Successful Bidder, if applicable, will have no responsibility for, and the Acquired Assets will be sold free and clear of, any successor liability, including the following: (a) any liability or other obligation of the Debtors' estates or related to the Debtors' Acquired Assets other than as expressly set forth in the Stalking Horse Asset Purchase Agreement; or (b) any claims against the Debtors, their estates, or any of their predecessors or affiliates. Except as expressly provided in the Sale Order or the Stalking Horse APA, the Stalking Horse Bidder or Successful Bidder shall have no liability whatsoever with respect to the Debtors' estates' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' estates' (or their predecessors' or affiliates') obligations (as described below, "Successor Liability") based on any action taken in connection with the Sale, the assumption of the Assumed Liabilities (as defined in the Stalking Horse Asset Purchase Agreement), or the continued operation of the Business on any basis, including under any doctrines of successor, transferee, or vicarious liability (whether based on de facto merger, mere continuation, or any other basis or theory of liability), including (a) any past, present, or future liabilities of Aegean or any of its affiliates to any shareholder, governmental entity, or person, (b) any past, present or future liabilities of Aegean or any of its affiliates arising out of any civil or criminal investigations or claims brought by any governmental entity, including the United States Attorney's Office or the Securities and Exchange Commission, seeking sanctions, penalties, restitution, disgorgement, or other amounts owed or that become owed, and (c) any past, present or future claims of or liability associated with indemnity, advancement, reimbursement or contribution of legal or other expenses incurred by current or former directors, officers, employees, agents, attorneys, or other representatives of Aegean or its affiliates in connection with or arising out of any proceedings, including those referenced in sections (a) and (b) above.

**<u>Exhibit C</u>**

**Stalking Horse APA**

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

dated as of November 5, 2018

by and among

MERCURIA ASSET HOLDINGS (HONG KONG) LIMITED, as Buyer,

and

AEGEAN MARINE PETROLEUM NETWORK INC.,

and

THE SUBSIDIARIES SIGNATORY HERETO,
as Sellers

_____

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................ 1

    1.1     Defined Terms ............................................................................................ 1
    1.2     Interpretation ........................................................................................... 14

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES .................................. 15

    2.1     Assets to be Acquired .............................................................................. 15
    2.2     Excluded Assets ....................................................................................... 17
    2.3     Liabilities to be Assumed by Buyer ........................................................ 18
    2.4     Excluded Liabilities ................................................................................. 19
    2.5     Non-Assignment of Assumed Contracts .................................................. 20
    2.6     Identification of Assumed Contracts and Acquired Companies ............... 21

ARTICLE 3 CLOSING; PURCHASE PRICE ......................................................................... 22

    3.1     Closing; Transfer of Possession; Certain Deliveries ............................... 22
    3.2     [Reserved] ................................................................................................ 22
    3.3     Consideration ........................................................................................... 23
    3.4     Allocation of Purchase Price .................................................................... 23
    3.5     Withholding ............................................................................................. 23

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ......................................... 24

    4.1     Organization ............................................................................................ 24
    4.2     Subsidiaries ............................................................................................. 24
    4.3     Due Authorization, Execution and Delivery; Enforceability ................... 25
    4.4     Consents .................................................................................................. 25
    4.5     No Conflicts ............................................................................................. 25
    4.6     [Reserved] ................................................................................................ 25
    4.7     Title to Acquired Real Property ............................................................... 26
    4.8     Title to Acquired Assets other than Acquired Real Property; Sufficiency ...... 26
    4.9     Litigation; Orders .................................................................................... 27
    4.10    Employment and ERISA Matters ............................................................ 27
    4.11    Environmental .......................................................................................... 29
    4.12    Taxes ....................................................................................................... 29
    4.13    Compliance with Laws; Permits .............................................................. 30
    4.14    Contracts .................................................................................................. 31
    4.15    Insurance Claims ..................................................................................... 31
    4.16    Vessels .................................................................................................... 31
    4.17    Intellectual Property ................................................................................ 32
    4.18    Bank Accounts; Power of Attorney .......................................................... 32
    4.19    Anti-Corruption and Sanctions ............................................................... 32

#4852-4560-1655

4.20     Exclusive Representations and Warranties ........................................................ 33

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 33

5.1     Organization ...................................................................................................... 33
5.2     Due Authorization, Execution and Delivery; Enforceability ........................... 33
5.3     Governmental Approvals ................................................................................... 33
5.4     No Conflicts ....................................................................................................... 34
5.5     Availability of Funds ......................................................................................... 34
5.6     Adequate Assurances Regarding Executory Contracts ..................................... 34
5.7     Condition and Location of Acquired Assets ..................................................... 34
5.8     Exclusive Representations and Warranties ........................................................ 34
5.9     No Other Representations or Warranties of Sellers; Disclaimers ..................... 34

ARTICLE 6 COVENANTS OF THE PARTIES ..................................................................... 35

6.1     Conduct of Business Pending the Closing ........................................................ 35
6.2     No Solicitation of Alternative Transactions ..................................................... 37
6.3     Access ................................................................................................................ 38
6.4     Public Announcements ...................................................................................... 38
6.5     Tax Matters ........................................................................................................ 38
6.6     Approvals; Commercially Reasonable Efforts; Notification; Consent ............. 39
6.7     Employee Matters .............................................................................................. 40
6.8     Further Assurances ............................................................................................ 43
6.9     Bankruptcy Court Filings .................................................................................. 43
6.10    Cure Costs .......................................................................................................... 44
6.11    Preservation of Records ..................................................................................... 44
6.12    Risk of Loss ....................................................................................................... 45
6.13    Bulk Transfer Laws ........................................................................................... 45
6.14    Hedging Program ............................................................................................... 45
6.15    Intercompany Payables ...................................................................................... 45

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES .................................. 46

7.1     Conditions Precedent to Obligations of Buyer ................................................. 46
7.2     Conditions Precedent to the Obligations of Sellers .......................................... 47

ARTICLE 8 TERMINATION .................................................................................................. 48

8.1     Termination of Agreement ................................................................................. 48
8.2     Consequences of Termination ........................................................................... 51

ARTICLE 9 [RESERVED] ...................................................................................................... 52

ARTICLE 10 MISCELLANEOUS .......................................................................................... 52

10.1    Expenses ............................................................................................................ 52

ii

10.2    Assignment ...................................................................................................... 52
10.3    Parties in Interest ............................................................................................. 52
10.4    Releases ........................................................................................................... 52
10.5    Notices ............................................................................................................. 53
10.6    Choice of Law .................................................................................................. 54
10.7    Entire Agreement; Amendments and Waivers ................................................. 54
10.8    Counterparts; Facsimile and Electronic Signatures ........................................ 54
10.9    Severability ...................................................................................................... 54
10.10   Headings .......................................................................................................... 55
10.11   Exclusive Jurisdiction and Specific Performance ........................................... 55
10.12   WAIVER OF RIGHT TO TRIAL BY JURY ................................................... 55
10.13   Survival ............................................................................................................ 56
10.14   Computation of Time ....................................................................................... 56
10.15   Time of Essence ............................................................................................... 56
10.16   Non-Recourse ................................................................................................... 56
10.17   Disclosure Schedules ....................................................................................... 56
10.18   Sellers' Representative; Dealings Among Sellers ........................................... 57
10.19   Mutual Drafting ............................................................................................... 57
10.20   Fiduciary Obligations ...................................................................................... 57

**EXHIBITS**

Exhibit A       Bidding Procedures
Exhibit B       Bidding Procedures Order
Exhibit C       Sale Order

#4852-4560-1655

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of November 5, 2018 (the "Agreement Date"), by and among Aegean Marine Petroleum Network Inc., a company incorporated under the laws of the Republic of the Marshall Islands ("Aegean"), and each of Aegean's Subsidiaries listed on the signature page hereto (together with Aegean, "Sellers" and each a "Seller"), and Mercuria Asset Holdings (Hong Kong) Limited, a company incorporated in Hong Kong with limited liability ("Buyer").  Each Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

### WITNESSETH:

**WHEREAS**, Sellers are currently engaged in the Business;

**WHEREAS**, on or shortly following the Agreement Date, Aegean and certain other Sellers intend to file a voluntary petition and commence a case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court (the date of such filing, the "Petition Date"); and

**WHEREAS**, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Business as a going concern as of the Closing on the terms and subject to the conditions set forth herein and subject to the approval of the Bankruptcy Court and, in furtherance of the foregoing, (a) Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, the Acquired Assets as of the Closing, and (b) Buyer is willing to assume from Sellers the Assumed Liabilities as of the Closing, in the case of clause (a) and (b) above, on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1     Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Acquired Companies" shall have the meaning specified in Section 2.1(p).

"Acquired Company Leased Real Property" shall mean real property leased by an Acquired Company together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto

"Acquired Company Owned Real Property" shall mean real property owned by an Acquired Company, together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto.

"Acquired Company Real Property" shall mean collectively the Acquired Company Leased Real Property and the Acquired Company Owned Real Property.

"Acquired Real Property" shall mean collectively the Owned Real Property and the Leased Real Property.

"Additional Administrative Costs" shall mean an amount in cash equal to the Administrative Expenses incurred by Sellers or their respective estates (i) in excess of $1,000,000 of Liabilities that result from or arise out of Buyer's determination not to include any Seller Employee on the Employee Offer List including costs arising from such Seller Employee's subsequent termination (e.g., severance and termination costs) or (ii) from any material increases in Liabilities resulting from Buyer's elections pursuant to Section 2.6, excluding in this clause (ii) costs and expenses with respect to the underlying Liabilities that allowed the Buyer to make such election.

"Additional Amount" shall have the meaning specified in Section 3.3(a).

"Administrative Expense" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Aegean" shall have the meaning specified in the preamble.

"Aegean Subsidiary" shall have the meaning specified in Section 4.2.

"Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and the Disclosure Schedules, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"Allocation" shall have the meaning specified in Section 3.4.

"Alternative Arrangement" shall have the meaning specified in Section 2.5(a).

"Alternative Transaction" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of a Seller or any Affiliate of a Seller (including any exchange of all or a substantial portion of a Seller's or its Affiliates' outstanding debt obligations for equity securities of one or more Seller or their respective Affiliates), (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Affiliates is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets or the Business, (iii) any direct or indirect sale of all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets (including the Acquired Companies) or the Business or (iv) any other transaction, including a plan of liquidation or reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), in each instance (A) that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the assets of Sellers, the Acquired Assets or the Business to any party other than Buyer and (B) whether or not such transactions are entered into in connection with any bankruptcy, insolvency or similar Proceedings; provided, however, that notwithstanding the foregoing, any investment in, financing of, capital contribution or loan to, or any sale of assets of, a Seller or any Affiliate

2

of a Seller that would not reasonably be expected to, individually or in the aggregate, interfere with or impede the Transactions, interfere with, limit or modify any of Buyer's rights or privileges hereunder or result in the imposition of any liabilities or costs on Buyer or any of its Affiliates shall not be considered an "Alternative Transaction".

"Anti-Corruption Laws" shall mean applicable laws enacted to prohibit bribery and corruption, including the U.S. Foreign Corrupt Practices Act of 1977 (as amended), the UK Bribery Act 2010, and applicable laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"Anti-Corruption Prohibited Activity" shall mean (a) using funds in violation of Anti-Corruption Laws for unlawful contributions, gifts, or entertainment, or other unlawful expenses relating to political activity; or (b) making or taking an act in furtherance of an offer, promise, or authorization of any bribe, rebate, payoff, influence payment, kickback or other similar payment, whether directly or indirectly to any Governmental Entity or to any private commercial entity for the purpose of either gaining an improper business advantage or encouraging the recipient to violate the policies of his or her employer or to breach an obligation of good faith or loyalty in violation of Anti-Corruption Laws.

"Anti-Money Laundering Laws" shall mean applicable laws relating to money laundering and terrorism financing, including the USA PATRIOT Act of 2001, the U.S. Money Laundering Control Act of 1986, as amended; the applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended; the EU Anti-Money Laundering Directives and any laws, decrees, administrative orders, circulars, or instructions implementing or interpreting the same; and other similar applicable laws and regulations.

"Asset Sale Guidelines" shall mean the Guidelines for the Conduct of Asset Sales, as adopted by the Bankruptcy Court pursuant to General Order M-383.

"Assignment and Assumption Agreement" shall mean the assignment and assumption agreement to be entered into by Sellers and Buyer concurrently with the Closing in a form mutually agreed to by the Parties.

"Assumed Benefit Plans" shall have the meaning specified in Section 6.7(c).

"Assumed Collective Bargaining Agreements" shall have the meaning specified in Section 6.7(d).

"Assumed Contracts" shall have the meaning specified in Section 2.1(d).

"Assumed Employee Liabilities" shall have the meaning specified in Section 2.3(d).

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Auction" shall have the meaning ascribed to it in the Bidding Procedures.

"Automatic Transfer Employees" shall have the meaning specified in Section 6.7(b)(ii).

"Avoidance Actions" means any and all claims for relief of any Seller or any of its Subsidiaries under chapter 5 of the Bankruptcy Code.

"Back-Up Bidder" shall have the meaning specified in Section 6.2(b).

3

"Bankruptcy Code" shall have the meaning specified in the recitals.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Base Purchase Price" shall have the meaning specified in Section 3.3(a).

"Benefit Plan" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, incentive compensation, stock purchase, stock option or other equity or equity-linked compensation, disability, death benefit, hospitalization, medical, dental, life, employment, retention, change in control, termination, severance, separation, vacation, sick leave, holiday pay, paid time off, leave of absence, fringe benefit, compensation, incentive, insurance, welfare or any similar plan, program, policy, practice, agreement or arrangement (including any funding mechanism therefor), written or oral, whether or not subject to ERISA, and whether funded or unfunded, in each case that is adopted, sponsored, maintained, entered into, contributed to, or required to be maintained or contributed to, by any Seller or any Subsidiary of any Seller, or pursuant to or in connection with which any Seller or any Subsidiary of any Seller could have any Liabilities, but in each case other than a Collective Bargaining Agreement.

"Bidding Procedures" shall mean the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, (i) in the form attached hereto as Exhibit A and, in any case, (ii) in form and substance satisfactory to Buyer in its reasonable discretion; it being understood that Bidding Procedures in substantially the form of Exhibit A will be deemed satisfactory to Buyer.

"Bidding Procedures Order" shall mean an Order of the Bankruptcy Court approving the Bidding Procedures (i) in the form attached hereto as Exhibit B, (ii) providing for approval of the Break-Up Fee and the Reimbursable Expenses pursuant to Section 8.2(b) and (iii) in any case, in form and substance satisfactory to Buyer in its reasonable discretion; it being understood that a Bidding Procedures Order in substantially the form of Exhibit B will be deemed satisfactory to Buyer.

"Break-Up Fee" shall have the meaning specified in Section 8.2(b)(ii).

"Business" shall mean the business of Aegean and the other Sellers, excluding the entities listed on Schedule 2.2(d), as conducted as of the Agreement Date, including marketing, supplying, trading, and delivering refined marine fuel and lubricants to vessels in port, at sea and on rivers.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"Buyer" shall have the meaning specified in the preamble.

"Buyer Material Adverse Effect" shall mean a material adverse effect on the ability of Buyer to consummate the Transactions.

"Buyer Released Parties" shall have the meaning specified in Section 10.4.

"Cash Consideration" shall have the meaning specified in Section 3.3(a).

"<u>Chapter 11 Cases</u>" shall have the meaning specified in the recitals.

"<u>Claim</u>" shall mean all actions, claims, counterclaims, suits, proceedings, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"<u>Closing</u>" shall have the meaning specified in <u>Section 3.1(a)</u>.

"<u>Closing Date</u>" shall have the meaning specified in <u>Section 3.1(a)</u>.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

"<u>Collective Bargaining Agreement</u>" shall mean any collective bargaining agreement or similar agreement of or with a labor, collective or similar organization governing the terms and conditions of employment of any employee or group of employees of Sellers or their respective Subsidiaries.

"<u>Confidentiality Agreement</u>" shall mean that certain Confidentiality Agreement, dated as of June 13, 2018, between Aegean and Mercuria Energy Trading S.A.

"<u>Contract</u>" shall mean any contract, lease, license, purchase order, sales order, indenture, note, bond, loan, instrument, obligation, promise or other agreement, arrangement, understanding or commitment, whether or not in written form, that is binding upon a Person or its property.

"<u>Credit Bid Consideration</u>" shall have the meaning specified in <u>Section 3.3(a)</u>.

"<u>Cure Costs</u>" shall mean all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts, and any other amounts that must be paid pursuant to section 365 of the Bankruptcy Code, at the time of the assumption thereof and assignment to Buyer or an Affiliate of Buyer as provided hereunder, in each case as such amounts are determined by the Bankruptcy Court.

"<u>D&O Policies</u>" shall mean any insurance policy held by any Seller as of the Agreement Date that provides coverage in respect of Claims against any director or officer of a Seller, including, the AIG CorporateGuard 2013 Policy No. P2301005099 and all corresponding excess policies.

"<u>Deeds</u>" shall have the meaning specified in <u>Section 3.1(b)(iii)</u>.

"<u>DIP Event of Default</u>" shall mean an "Event of Default" (as defined in the U.S. DIP Facility).

"<u>DIP Facility</u>" shall mean the U.S. DIP Facility and the Global DIP Facility.

"<u>DIP Facility Lenders</u>" shall mean the "Secured Parties" (as defined in the U.S. DIP Facility).

"<u>DIP Lien</u>" shall have the meaning specified in the DIP Order.

"<u>DIP Order</u>" shall have the meaning specified in the U.S. DIP Facility.

"Disclosure Schedules" shall mean the disclosure schedules, delivered by Sellers and Buyer concurrently with the execution and delivery of this Agreement, as amended from time to time in accordance with and subject to the terms hereof.

"Employee Offer List" shall have the meaning specified in Section 6.7(a).

"Employment Offer" shall have the meaning specified in Section 6.7(b)(i).

"Environmental Laws" shall mean all Laws relating to pollution, storage, transport, release of, contamination by, or exposure to Hazardous Materials, or protection of the environment, natural resources, human safety, or human health (to the extent related to exposure to Hazardous Materials).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, by reason of its relationship with any Seller or any Subsidiary of any Seller, is aggregated with such Seller or its applicable Subsidiary under Section 414 of the Code.

"Event of Loss" shall have the meaning specified in Section 6.12.

"Exchange Act" shall mean Securities Exchange Act of 1934, as amended.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Liabilities" shall have the meaning specified in Section 2.4.

"Export Control Laws" shall mean applicable export control laws and regulations, including the EC Regulation 428/2009 and the implementing laws and regulations of the EU member states; the U.S. Export Administration Act, U.S. Export Administration Regulations, U.S. Arms Export Control Act, U.S. International Traffic in Arms Regulations, and their respective implementing rules and regulations; the U.K. Export Control Act 2002 (as amended and extended by the Export Control Order 2008) and its implementing rules and regulations; and other applicable export control laws or restrictions.

"Facilities" shall mean all buildings, tanks, pipelines, terminals, docks and fixtures owned or leased by Sellers, located on the Owned Real Property or the Leased Real Property and used primarily in the Business, but excluding for the avoidance of doubt (i) power lines, pipelines, telephone lines and other improvements and fixtures owned by public utilities furnishing utilities to the Owned Real Property or the Leased Real Property, and (ii) rail lines, pipelines and other improvements and fixtures owned by third parties and located on existing easements for such purpose which encumber the Owned Real Property or the Leased Real Property.

"FIRPTA Affidavit" shall mean an affidavit of each Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner) that is a U.S. Person, sworn to under penalty of perjury, setting forth such Seller's (or, if applicable, regarded owner's) name, address and U.S. federal tax identification number and stating that such Seller (or, if applicable, regarded owner) is not a "foreign person" within the meaning of Section 1445 of the Code and otherwise complying with the Treasury Regulations issued pursuant to Section 1445 of the Code.

"Foreign Antitrust Laws" means any applicable antitrust or other competition Laws of any non-U.S. jurisdiction.

#4852-4560-1655

"<u>Fraud</u>" means an actual and intentional misrepresentation of material facts with respect to (i) the making of any representation or warranty of Sellers or the Acquired Companies set forth in <u>Article 4</u> or in any other Transaction Document, (ii) the making of the covenants or agreements by Sellers or the Acquired Companies, in this Agreement or in any other Transaction Document, or (iii) the certifications of Sellers set forth in the certificates delivered by Sellers pursuant to <u>Section 7.1(c)</u>, in each case which satisfies all of the elements of common law fraud under applicable Law.

"<u>Fujairah Entity</u>" shall mean Aegean Marine Petroleum LLC.

"<u>GAAP</u>" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"<u>Global Borrowing Base</u>" shall mean that certain Facility Agreement for a Borrowing Base Facility, dated as of November 30, 2017, by and among Aegean, Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GMBH, OBAST Bunkering & Trading GMBH and Aegean Petroleum Uruguay S.A., as borrowers, certain companies party thereto as guarantors, ABN AMRO Bank N.V. as facility agent, collateral management agent, security agent and documentation bank, and the lenders party thereto, as the same may be amended, modified or supplemented from time to time.

"<u>Global DIP Facility</u>" shall mean that certain Amendment and Restatement Agreement, dated on or about November 5, 2018, by and among Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GMBH, OBAST Bunkering & Trading GMBH, Aegean Petroleum Uruguay S.A., as borrowers, certain companies party thereto as guarantors, ABN AMRO Bank N.V., as facility agent and collateral management agent, certain persons party thereto as lenders, certain persons party thereto as issuing banks and Mercuria Energy Trading S.A., as co-ordinator and hedging provider, providing a secured super-priority debtor-in-possession revolving loan facility to the borrowers in the aggregate principal amount set forth therein.

"<u>Governmental Entity</u>" shall mean any federal, state, provincial, local, municipal, foreign, multinational, international or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal or stock exchange.

"<u>Hazardous Material</u>" shall mean any material, substance or waste defined, listed or regulated as a "contaminant" or "pollutant" or as "hazardous" or "toxic" (or words of similar meaning or intent) under any applicable Environmental Law, including materials exhibiting the characteristics of ignitability, corrosivity, reactivity or toxicity, as such terms are defined in connection with hazardous materials, hazardous wastes or hazardous or toxic substances in any applicable Environmental Law and including asbestos, petroleum and petroleum breakdown constituents and polychlorinated biphenyls.

"<u>Hedging Program</u>" shall have the meaning specified in <u>Section 6.14</u>.

"<u>HSR Act</u>" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any successor law and the rules and regulations thereunder or under any successor law.

"<u>Indebtedness</u>" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible

or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in <u>clauses (i)</u> through <u>(iv)</u> of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in <u>clauses (i)</u> through <u>(v)</u> of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"<u>Intellectual Property</u>" shall mean all intellectual property and proprietary rights, including (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all provisionals, reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof, (b) all Trademarks, (c) all works of authorship and other copyrightable works, all copyrights, any and all website content, and all applications, registrations, and renewals in connection therewith, (d) all industrial designs and mask works, and all applications, registrations, and renewals in connection therewith and (e) all trade secrets and confidential business information (including technical data, designs, drawings, specifications, research records, records of inventions, test information, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals).

"<u>Interim DIP Order</u>" shall have the meaning specified in the U.S. DIP Facility.

"<u>Interim Period</u>" shall have the meaning specified in <u>Section 6.1</u>.

"<u>Inventory</u>" shall have the meaning specified in <u>Section 2.1(f)</u>.

"<u>IT Assets</u>" shall mean computers, software, servers, workstations, associated data, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by Sellers.

"<u>Joined Collective Bargaining Agreements</u>" shall have the meaning specified in <u>Section 6.7(d)</u>.

"<u>Knowledge</u>" shall mean, with respect to Sellers, the actual knowledge of the Chief Operating Officer, Chief Financial Officer or General Counsel of Aegean after due inquiry.

"<u>Law</u>" shall mean any federal, state, provincial, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, Order, principle of common law, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"<u>Leased Machinery and Equipment</u>" shall have the meaning specified in <u>Section 2.1(c)</u>.

"<u>Leased Real Property</u>" shall have the meaning specified in <u>Section 2.1(a)</u>.

"<u>Legal Employee Liabilities</u>" shall have the meaning specified in <u>Section 2.3(d)</u>.

"<u>Liabilities</u>" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown,

#4852-4560-1655

and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include any Claim, pledge, option, charge, lien, debentures, trust deeds, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.

"Local Bankruptcy Rules" shall mean the Local Bankruptcy Rules for the Southern District of New York applicable to all cases in such district governed by the Bankruptcy Code.

"Machinery and Equipment" shall have the meaning specified in Section 2.1(c).

"Material Licenses and Permits" shall have the meaning specified in Section 4.13.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Necessary Consent" shall have the meaning specified in Section 2.5(a).

"Neutral Accountant" shall mean a national independent accounting firm selected by Buyer and reasonably acceptable to Sellers.

"No-Shop Period" shall have the meaning specified in Section 6.2(a).

"Notices" shall have the meaning specified in Section 10.5.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity.

"Ordinary Course of Business" means that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action is consistent in nature, scope and magnitude with the past practices of such Person, recognizing that Sellers have filed the Chapter 11 Cases, and is taken in the ordinary course of the normal day-to-day operations of such Person.

"Outside Back-Up Date" shall mean March 30, 2019.

"Owned Machinery and Equipment" shall have the meaning specified in Section 2.1(c).

"Owned Real Property" shall have the meaning specified in Section 2.1(a).

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"Permitted Liens" shall mean:  (a) Liens for Taxes not yet due; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; (d) applicable zoning, subdivision, building and other land use Laws and other land use restrictions that do not impair the present use of the subject real property; (e) liens or encumbrances that arise solely by reason of acts of Buyer or its successors and assigns or otherwise consented to by Buyer in accordance with the terms of this Agreement;

9

(f) easements, covenants, conditions, restrictions and other similar encumbrances on real property that arise in the Ordinary Course of Business and that do not (together with all other encumbrances affecting the real property in question) materially detract from the value of the affected Acquired Real Property and do not materially interfere with the present use of such Acquired Real Property; (g) the leasehold estate or any sublease, license, or rights of occupancy in any Owned Real Property where a Seller is lessor and the lease or license has been delivered to Buyer in accordance with this Agreement; (h) any Lien or claim affecting any Owned Real Property that does not, individually or in the aggregate, interfere in any material respect with the present use of, or materially detract from the value of, the Owned Real Property subject thereto; (i) non-exclusive licenses granted in the Ordinary Course of Business; or (j) any Lien granted or incurred in connection with an Order of the Bankruptcy Court.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Petition Date" shall have the meaning specified in the recitals.

"Post-Closing Covenant" shall have the meaning specified in Section 10.13.

"Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity, including but not limited to any and all such actions related to restitution or remission in criminal proceedings and civil forfeiture and confiscation proceedings under the Law of any jurisdiction.

"Properties" shall have the meaning specified in Section 4.11(a).

"Property Taxes" shall mean all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Proration Period" shall have the meaning specified in Section 6.5(b).

"Purchase Price" shall have the meaning specified in Section 3.3(a).

"Purchased Claims" shall mean (i) all Claims against any Person (other than a Seller or a Seller's estate), and existing at any time, arising out of, concerning, in connection with, or relating to the events, circumstances, and conduct described in the June 4, 2018, Form 6-K disclosure of Aegean, concerning improper accounting for or recordation of accounts receivable, including any misstated accounting records, misappropriation of funds, or any related actions or conspiracy to defraud or injure Aegean or its investors, as well as the right to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, restitution or remission in criminal proceedings, civil forfeiture, confiscation proceeding or other proceeding or action by any government or governmental agency in connection with the foregoing; (ii) all Claims against any Person (other than a Seller or a Seller's estate), and existing at any time, arising out of, concerning, in connection with, or relating to any payments or invoices concerning the construction and maintenance of the Aegean terminal in Fujairah, as well as the right to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, restitution or remission in criminal proceedings, civil forfeiture, confiscation proceeding or other proceeding or action by any government or governmental agency in connection with the foregoing; (iii) all Claims against Hess Corporation or any affiliate thereof in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014; (iv) all Claims against any

#4852-4560-1655

Person (other than a Seller or a Seller's estate), and existing at any time, arising out of, concerning, in connection with, or relating to unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof; (v) all Claims against any Person (other than a Seller or a Seller's estate), and existing at any time, arising out of, concerning, in connection with, or relating to HSFO product loaded from Petrotrin in Trinidad in December 2016; and (vi) all rights, privileges, immunities, documents, and work product relevant to or associated with the foregoing.

"Qualified Benefit Plan" shall have the meaning specified in Section 4.10(g).

"Records" shall have the meaning specified in Section 2.1(h).

"Registered IP" shall have the meaning specified in Section 4.17(a).

"Reimbursable Expenses" shall have the meaning specified in Section 8.2(b)(i).

"Remedies Exercise Notice" shall have the meaning specified in the DIP Order.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, consultant, other advisor, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Restricted Party" shall mean (a) any Person or government that is the subject of Sanctions, (b) any Person resident in or organized under the laws of any country or territory that is the subject of country- or territory-wide Sanctions (including Cuba, Iran, North Korea, Syria, or the Crimea region) or (c) owned or controlled by a Person or Persons described in (a) or (b).

"Retained Benefit Plans" shall have the meaning specified in Section 2.2(h).

"Retained Collective Bargaining Agreements" shall mean the Collective Bargaining Agreements which are not Assumed Collective Bargaining Agreements.

"Sale Hearing" shall mean the hearing conducted by the Bankruptcy Court to approve the Transactions and to seek entry of the Sale Order.

"Sale Motion" shall mean the motion of Sellers, in form and substance satisfactory to Buyer in its reasonable discretion, seeking entry of the Bidding Procedures Order and Sale Order.

"Sale Order" shall mean an Order or Orders of the Bankruptcy Court, approving, without limitation, this Agreement and all of the terms and conditions hereof and authorizing Sellers to consummate the Transactions pursuant to sections 363 and 365 of the Bankruptcy Code, (i) in the form attached hereto as Exhibit C and (ii) in any case, in form and substance satisfactory to Buyer in its reasonable discretion.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by (a) the U.S. government (including the U.S. Department of State and the Office of Foreign Assets Control of the U.S. Department of the Treasury), (b) the United Nations Security Council, (c) the European Union, (d) Her Majesty's Treasury of the United Kingdom, or (e) other relevant sanctions authority with jurisdiction over any Party.

"SEC" shall mean the U.S. Securities and Exchange Commission.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended.

"<u>Seller</u>" or "<u>Sellers</u>" shall have the meaning specified in the preamble.

"<u>Seller Employee</u>" shall have the meaning specified in <u>Section 4.10(a)</u>.

"<u>Seller Employee List</u>" shall have the meaning specified in <u>Section 6.7(a)</u>.

"<u>Seller Fundamental Representations</u>" shall have the meaning specified in <u>Section 7.1(a)</u>.

"<u>Sellers Material Adverse Effect</u>" shall mean any change, effect, event, occurrence, circumstance, state of facts or development that, individually or in the aggregate (taking into account all other such changes, effects, events, occurrences, circumstances, states of facts or developments), (a) has had, or would reasonably be expected to have, a material adverse effect on the ability of Sellers to consummate the Transactions or (b) has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, the Business, condition (financial or otherwise) of the Business or results of operations of the Business; <u>provided</u>, <u>however</u>, that with respect to <u>clause (b)</u> only, the term "Material Adverse Effect" shall not include any change, effect, event, occurrence, circumstance, state of facts or development that, directly or indirectly, alone or taken together, arising out of or attributable to:  (i) any change generally affecting the international, national or regional markets applicable to the Business; (ii) any change in general macroeconomic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities; (iii) changes in Law, GAAP or official interpretations of the foregoing; (iv) the effect of any action expressly required by this Agreement; (v) any matters arising out of the Chapter 11 Cases, including changes arising from, or effects of, any motion, application, pleading or Order filed under or in connection with, the Chapter 11 Case and any objections in the Bankruptcy Court to (A) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (B) the reorganization of Sellers and any related plan of reorganization or disclosure statement, (C) the Bidding Procedures or the Sale Motion, or (D) the assumption or rejection of any Assumed Contract; (vi) acts of nature, including hurricanes, storms and other natural disasters; (vii) the departure of officers or directors of Seller after the Agreement Date; (viii)  the pendency of the Chapter 11 Cases or the financial condition of Seller; and (ix) the execution and delivery of this Agreement or the announcement thereof or consummation of the Transactions; which, in the case of any of the foregoing <u>clauses (i)</u> through <u>(iii)</u> and <u>(vi)</u> does not disproportionately affect the Business relative to other companies that participate in the markets and industries applicable to the Business.

"<u>Sellers Released Parties</u>" shall have the meaning specified in <u>Section 10.4</u>.

"<u>Sellers' Representative</u>" shall have the meaning specified in <u>Section 10.18</u>.

"<u>Sellers SEC Documents</u>" means the all reports, schedules, registration statements and other documents filed with or furnished to the SEC.

"<u>Subsidiary</u>" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Successful Bidder" shall mean, if an Auction is conducted, the prevailing party at the conclusion of such Auction.

"Taking" shall have the meaning specified in Section 6.12.

"Tax" or "Taxes" shall mean any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Trademarks" shall mean all trademarks, service marks, trade names, trade dress, corporate names, company names, business names, Internet domain names, logos, certification marks, collective marks, and other indicia of origin, together with all translations, adaptations, derivations and combinations thereof, all registrations, applications and renewals in connection therewith, and all of the goodwill connected with the use of, and symbolized by any of, the foregoing.

"Transactions" shall mean the transactions contemplated by this Agreement to be consummated at the Closing, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities as provided for in this Agreement.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document entered into pursuant to the terms hereof, including the Assignment and Assumption Agreement.

"Transfer Regulations" means the Council Directive 2001/23/EC of 12 March 2001 and any subsequent amendments (the "Acquired Rights Directive"), and any equivalent Law (a) in any jurisdiction that has implemented the Acquired Rights Directive or (b) that requires the automatic transfer or assignment of any person's employment to Buyer or one of its Affiliates as a result of the Transactions.

"Transfer Tax" or "Transfer Taxes" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"Transferable Permits" shall have the meaning specified in Section 2.1(e).

"Transferred Employee" shall have the meaning specified in Section 6.7(b)(i).

"<u>U.S. Borrowing Base</u>" shall mean that certain Second Amended and Restated Uncommitted Credit Agreement, dated as of August 3, 2017, by and among Aegean Bunkering (USA) LLC, as borrower, the lenders parties thereto, ABN AMRO Capital USA LLC, as administrative agent, collateral agent, daylight overdraft lender, swing ling lender and an issuing lender, and BNP Paribas, as documentation agent, as the same may be amended, modified, or supplemented from time to time.

"<u>U.S. DIP Facility</u>" shall mean that certain Superpriority Secured Debtor-in-Possession Credit Agreement, proposed to be dated on or about November 5, 2018, by and among Aegean Bunkering (USA) LLC, as borrower, the lenders party thereto, the issuing bank party thereto, and ABN AMRO Capital USA LLC, as the administrative agent for the lenders, providing a secured super-priority debtor-in-possession revolving loan facility to the borrower in the aggregate principal amount set forth therein and a secured super-priority debtor-in-possession term loan facility to the borrower in the aggregate principal amount set forth therein..

"<u>U.S. Person</u>" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"<u>Vessels</u>" shall mean each of the barges, ships, tankers and/or other vessels owned, leased or chartered by Sellers and their Affiliates (excluding, for the avoidance of doubt, the entities listed on <u>Schedule 2.2(d)</u>), including bunkering vessels and tankers.

"<u>WARN Act</u>" shall mean the Worker Adjustment and Retraining Notification Act of 1988 and any similar Law, including any other Law of any jurisdiction relating to plant closings or mass layoffs.

1.2     <u>Interpretation</u>.

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     Words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)     A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)     All references to "$" and dollars shall be deemed to refer to United States currency.

(f)     All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedules and exhibit references are to this Agreement unless otherwise specified.  All article, section, paragraph, schedules and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement unless otherwise specified.

#4852-4560-1655

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.  All references herein to time are references to New York City time, unless otherwise specified herein.

(j)    If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)    A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)    Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Acquired</u>.  Subject to the entry of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Aegean prior to the Sale Hearing), and Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Aegean prior to the Sale Hearing) shall purchase, acquire and accept, all of the right, title and interest, free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens or as otherwise set forth in the Sale Order), of Sellers in each and all of the Acquired Assets.  "<u>Acquired Assets</u>" shall mean all properties, assets and rights of every nature, tangible and intangible, of Sellers, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers as the same shall exist on the Closing Date that are used or held for use in or relating to the Business (other than the Excluded Assets), including the following assets:

(a)    (i) all right, title and interest of Sellers in the real property set forth on <u>Schedule 2.1(a)-1</u>, together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "<u>Owned Real Property</u>") and (ii) all right, title and leasehold interest of Sellers in the real property set forth on <u>Schedule 2.1(a)-2</u>, together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "<u>Leased Real Property</u>");

(b)    all Avoidance Actions;

(c)    all (i) Sellers' owned equipment (including cars, trucks, fork lifts, tanks and other industrial vehicles), machinery, furniture, spare parts, fixtures and improvements and tooling used or held for use in the Business (the "<u>Owned Machinery and Equipment</u>"), (ii) rights of Sellers to the equipment (including cars, trucks, fork lifts and other industrial vehicles), machinery, furniture, spare parts, fixtures and improvements and tooling which are leased pursuant to an Assumed Contract (the "<u>Leased Machinery and Equipment</u>" and collectively with the Owned Machinery and Equipment, the "<u>Machinery and</u>

15

Equipment"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers and sellers of the Machinery and Equipment;

(d)      those leases (including leases and subleases of Acquired Real Property and of Machinery and Equipment) and other Contracts (together with all of Seller's deposits thereunder) entered into by any Seller and used or held for use in or relating to the Business, in each case listed on Schedule 2.1(d) (collectively, the "Assumed Contracts");

(e)      all Permits relating to the ownership or operation of the Facilities, the Business or the Vessels (excluding those Permits held by Acquired Companies), including, those Permits listed on Schedule 2.1(e), but only if and to the extent that such Permits are transferable by Sellers to Buyer by assignment or otherwise (including upon request or application to a Governmental Entity, or which will pass to Buyer as successor in title to the Acquired Assets by operation of Law) (the "Transferable Permits");

(f)      all inventory (including in transit), finished goods, raw materials, work in progress, packaging, supplies, parts, components and other inventories used or intended to be used in connection with the Business (including the manufacture, sale or distribution of products) (collectively, "Inventory");

(g)      all accounts receivable relating to the Business;

(h)      except as set forth in Sections 2.2(c) and (g), and subject to the right of Sellers to retain copies (at their expense) for their use, all books, accounting records, operating records, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports and equipment repair, safety, maintenance or service records of any Seller used or held for use in or relating to the operation of the Facilities and/or the Business ("Records") and all files relating to compliance with Environmental Laws, Permits issued pursuant to Environmental Laws, and files related to the environmental condition of, or release of Hazardous Materials from, the Facilities, the Business or the Vessels, in each case in the possession of any Seller and whether in hard or electronic format;

(i)      all right, title or interest in and to (i) all Intellectual Property used or held for use in or relating to the Business and (ii) the IT Assets used or held for use in or relating to the Business;

(j)      all goodwill associated with the Business, the Acquired Assets and the Assumed Liabilities;

(k)      all deposits and prepaid expenses of Sellers, including (i) security deposits with third party suppliers, vendors, service providers or landlord and lease and rental payments, (ii) tenant reimbursements, (iii) prepaid Property Taxes, and (iv) pre-payments;

(l)      all cash and cash equivalents, securities, security entitlements, instruments and other investments of Sellers and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto;

(m)      (i) all assets and rights of every nature (A) under or relating to the Joined Collective Bargaining Agreements in respect of Transferred Employees with respect to the period from and after the Closing and (B) in respect of the Assumed Benefit Plans and the Assumed Collective Bargaining Agreements, in each case including all associated funding media, assets, reserves, credits and service agreements and all documents created, filed or maintained in connection therewith, together with any applicable insurance policies related thereto, (ii) those portions of employment, personnel and compensation records relating to the Transferred Employees that can be transferred to Buyer or one of its

Affiliates under applicable Law, and (iii) all assets and rights of every nature related to or in respect of the Legal Employee Liabilities;

(n)    all rights, Claims, credits, or rights of set off and/or recoupment, equity rights or defenses that Sellers may have (i) against third parties, including rights under vendors' and manufacturers' warranties, indemnities and guaranties, other than any Claims (A) contemplated by Section 2.2(l) or (B) against professionals and other service providers, and (ii) with respect to any Assumed Liabilities;

(o)    all insurance policies and binders and all Claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders, in each case to the extent related to an Acquired Asset;

(p)    all shares of capital stock or other equity interests of the Persons set forth on Schedule 2.1(p) (the "Acquired Companies") or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Acquired Company;

(q)    all of the Acquired Companies' certificate of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Acquired Company as a corporation, limited liability company or other entity;

(r)    all rights to refunds of Taxes paid by any Seller; and

(s)    all Purchased Claims of Sellers.

2.2    Excluded Assets.  The Acquired Assets do not include Sellers' right, title or interest in or to any of the following properties and assets of Sellers (collectively, the "Excluded Assets"):

(a)    each Seller's rights under this Agreement (including the right to receive the Purchase Price);

(b)    except with respect to the Acquired Companies, all of Sellers' or any of their respective Affiliates' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Affiliates as a corporation, limited liability company or other entity;

(c)    all Records related to Taxes paid or payable by any Seller or any of its Affiliates, provided that Buyer shall be entitled to copies of Property Tax Returns relating to the Acquired Assets and copies of all Tax Returns of the Acquired Companies;

(d)    except with respect to the Acquired Companies, all shares of capital stock or other equity interests of any Seller or any of its Affiliates or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any of its Affiliates, including the entities listed on Schedule 2.2(d);

(e)    all properties, assets (including vessels) and rights of every nature of the entities listed on Schedule 2.2(d);

17

(f)    any (i) confidential personnel and medical records pertaining to any employees of Sellers or any of their respective Affiliates or (ii) other Records, in either case, that Sellers and their respective Affiliates are required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings; provided that, to the extent permitted by applicable Law, Buyer shall have the right to obtain copies of any portions of such retained Records and documents to the extent that such portions materially relate to the Business or any Acquired Asset or are otherwise necessary for Buyer to comply with applicable Law;

(g)    any documents and agreements relating to the Chapter 11 Cases or to the sale or other disposition of the Business, the Acquired Assets or any other asset of any Seller or any of its Affiliates other than those to be delivered to Buyer in accordance with this Agreement;

(h)    (i) all assets and rights of every nature (A) under or relating to the Retained Collective Bargaining Agreements in respect of (I) any current or former employees of any Seller or any Subsidiary of any Seller who are not Transferred Employees and (II) any Transferred Employee with respect to the pre-Closing period, and (B) in respect of the Benefit Plans or portions thereof which are not Assumed Benefit Plans (the "Retained Benefit Plans"), in each case including all associated funding media, assets, reserves, credits and service agreements, and all documents created, filed or maintained in connection therewith, together with any applicable insurance policies related thereto, (ii) all employment, personnel and compensation records relating to any current or former employee of any Seller or any Subsidiary of any Seller who is not, and does not become, a Transferred Employee, and (iii) those portions of employment, personnel and compensation records relating to the Transferred Employees that cannot be transferred to Buyer or one of its Affiliates under applicable Law;

(i)    all Permits and pending applications therefor to the extent related solely to any other Excluded Asset or the Excluded Liabilities;

(j)    all prepayments, good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(k)    all Claims that Sellers or any of their respective Affiliates may have against any third Person solely with respect to any Excluded Assets or Excluded Liabilities, including all Claims against all professionals and services providers (other than as provided in Section 2.1(r));

(l)    the bank accounts listed on Schedule 2.2(l) (but without limitation to Section 2.1(l) for the cash in such accounts); and

(m)    the Contracts set forth on Schedule 2.2(m).

2.3    Liabilities to be Assumed by Buyer.  Subject to the terms and conditions of this Agreement, at the Closing, Sellers shall assign to Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Sellers prior to the submission of the Sale Order) and Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Sellers prior to the submission of the Sale Order) shall assume from Sellers and pay when due, perform and discharge, in due course, without duplication, each of the Assumed Liabilities.  "Assumed Liabilities" shall mean solely the following Liabilities:

(a)    all Liabilities of Sellers under each of the Assumed Contracts, exclusive of any Liability arising from or related to a violation of Law occurring prior to the Closing Date;

(b)    all trade and vendor accounts payables under each of the Assumed Contracts;

#4852-4560-1655

(c)     all Liabilities relating to any environmental, health or safety matter, including Liabilities arising under any Environmental Laws or relating to the release of Hazardous Materials, arising out of or relating to the operation of the Business or leasing, ownership or operation of the Acquired Assets, including the Acquired Real Property (and any off-site waste disposal facilities), occurring after the Closing, except any Excluded Liabilities;

(d)     (i) subject to Sellers' compliance with Section 6.7(j), all Liabilities under the WARN Act with respect to Seller Employees to the extent such Liabilities arise on or following the Closing as a direct result of any termination of the employment of any Transferred Employee(s) by Buyer or its Subsidiaries, and (ii) all Liabilities related to the Transferred Employees (A) in respect of the pre-Closing period which transfer to Buyer or one of its Affiliates by operation of Law (including the Transfer Regulations) in connection with the Transactions (all Liabilities captured by this clause (A), together with any Benefit Plans or portions thereof that Buyer is required to assume by applicable Law, the "Legal Employee Liabilities"), or (B) first incurred during the period beginning immediately following the Closing, including under the WARN Act ((i) and (ii) collectively, the "Assumed Employee Liabilities");

(e)     all Liabilities (i) under or relating to the Joined Collective Bargaining Agreements in respect of Transferred Employees with respect to the period from and after the Closing or otherwise to the extent required by applicable Law or Joined Collective Bargaining Agreements, and (ii) under the Assumed Benefit Plans and the Assumed Collective Bargaining Agreements;

(f)     all Liabilities related to Property Taxes imposed upon or assessed directly against the Acquired Assets for the Proration Period beginning after the Closing Date;

(g)     all Liabilities of the Acquired Companies, whether arising before, on or after the Closing, including all Indebtedness with respect to the Vessels; and

(h)     for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of the Facilities, the Business or any Acquired Asset from and after the Closing, except in each case, any Excluded Liabilities.

2.4     Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not and does not assume, and shall be deemed not to have assumed, any Liabilities of Sellers (other than with respect to the Acquired Companies, for which, for the avoidance of doubt, Buyer shall assume, and be deemed to have assumed, all Liabilities) whatsoever relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)     all costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the Transactions;

(b)     all Liabilities relating to or arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)     all (i) Liabilities relating to any environmental matter arising out of or relating to the operation of the Business or leasing, ownership or operation of the Acquired Real Property prior to the Closing (ii) fines or penalties assessed as a result of any noncompliance with Environmental Law prior to Closing related to the Facilities, the Business or any Acquired Asset and (iii) Liabilities arising out of, relating to, in respect or connection with disposal or release of Hazardous Materials prior to Closing by Sellers at any location that is not an Acquired Real Property, including any location formerly owned, operated or leased by any Seller, whether any such Liability described in clauses (i), (ii) and (iii) first arises prior to or after Closing;

19

(d)    all fines, penalties or other Liabilities assessed by a Governmental Entity as a result of any noncompliance with applicable Law, including with respect to filings with the SEC;

(e)    all third party Liabilities for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date) caused or allegedly caused by exposure, prior to the Closing Date, to Hazardous Materials related to the Facilities, the Business or any Acquired Asset, including any Hazardous Materials present at, on, in, under adjacent to or migrating from the Acquired Assets;

(f)    all Liabilities related to any current or former employee of any Seller of any Subsidiary of any Seller which are not Assumed Employee Liabilities, including all severance and termination costs (including any Liabilities or obligations pursuant to the WARN Act);

(g)    all Liabilities (i) under or relating to the Retained Collective Bargaining Agreements in respect of (A) any current or former employees of any Seller or any Subsidiary of any Seller who are not Transferred Employees and (B) any Transferred Employee with respect to the pre-Closing period, and (ii) in respect of the Retained Benefit Plans;

(h)    all Liabilities for (x) any and all Taxes of Sellers (including any Liability of Sellers for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by Contract or otherwise) except for Taxes for which Buyer is liable pursuant to <u>Section 2.3(f)</u>, and (y) Property Taxes imposed upon or assessed directly against the Acquired Assets that are properly allocable to portion of the Proration Period ending on the Closing Date;

(i)    all Liabilities arising out of, concerning, in connection with, or relating to the events, circumstances, and conduct described in the June 4, 2018, Form 6-K disclosure of Aegean, concerning improper accounting for or recordation of accounts receivable, including any misstated accounting records, misappropriation of funds, or any related actions or conspiracy to defraud or injure Aegean or its investors or any other person;

(j)    all Liabilities arising out of, concerning, in connection with, or relating to any payments or invoices concerning the construction and maintenance of the Aegean terminal in Fujairah; and

(k)    all Liabilities arising out of, concerning, in connection with, or relating to the Proceedings listed in <u>Schedule 4.9</u>.

2.5    <u>Non-Assignment of Assumed Contracts</u>.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Acquired Asset if, after giving effect to sections 363 and 365 of the Bankruptcy Code, (i) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder and (ii) the Bankruptcy Court has not entered an Order that, in Buyer's reasonable judgment, is enforceable with respect to such Acquired Asset providing that such Necessary Consent is not required.  In such event, Sellers will use their commercially reasonable efforts, and at Buyer's expense, to obtain the Necessary Consents with respect to any such Acquired Asset or any Claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; <u>provided</u>, <u>however</u>, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested,

other than to the extent any such consideration is otherwise required under applicable Law for purposes of obtaining such Necessary Consent. If such Necessary Consent has not been obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Buyer would not in fact receive all such rights, such Seller and Buyer will cooperate in a mutually agreeable arrangement (the "Alternative Arrangement"), to the extent feasible (taking into account the pendency of the Chapter 11 Cases), under which Buyer, at Buyer's expense, would obtain from such Seller the benefits and assume the obligations thereunder in accordance with this Agreement, including such Seller subcontracting, sub-licensing or sub-leasing to Buyer, or under which Buyer would assume such benefits and such Seller would enforce, for the benefit of Buyer such Seller's obligations and any and all rights of such Seller against a third party thereto. Sellers shall hold in trust for, and pay to Buyer promptly upon receipt thereof, all income, proceeds and other monies received by Sellers derived from their use of any such Acquired Asset or any Claim or right or any benefit arising under the Alternative Arrangement. Once any such Necessary Consent is obtained, Sellers shall promptly transfer, assign, convey and deliver such Acquired Asset and all Claims, right and benefits arising thereunder at no additional cost to Buyer and Sellers and Buyer shall terminate the Alternative Arrangement in all respects.

(b)      Subject to Section 2.5(a), if after the Closing (i) Buyer or any of its Affiliates holds any Excluded Assets or Excluded Liabilities or (ii) any Seller or any of their Affiliates holds any Acquired Assets or Assumed Liabilities, Buyer or the applicable Seller, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party. Prior to any such transfer, the party receiving or possessing any such asset will hold it in trust for such other party.

2.6      Identification of Assumed Contracts and Acquired Companies.

(a)      Notwithstanding anything in this Agreement to the contrary, at any time prior to the date that (i) is five (5) Business Days prior to the anticipated Closing Date, Buyer will be entitled, in its sole discretion, to designate any Contract of Sellers as an Excluded Asset by providing written notice thereof to Sellers and any Contract so designated will be deemed to be an "Excluded Asset" (and not an "Assumed Contract") for all purposes hereunder and (ii) is five (5) Business Days prior to the anticipated Closing Date, Buyer will be entitled, in its sole discretion, to designate any Contract of Sellers as an Assumed Contract by providing written notice thereof to Sellers and any Contract so designated will be deemed to be an "Assumed Contract" and "Acquired Asset" (and not an "Excluded Asset") for all purposes hereunder. Any Assumed Contract that is designated as an Excluded Asset in accordance with the foregoing sentence shall not be assumed and assigned to Buyer in accordance with Section 6.10; any Assumed Contract that is designated as an Acquired Asset in accordance with the foregoing sentence shall be assumed and assigned to Buyer in accordance with Section 6.10. Sellers will give written notice to Buyer prior to the submission by any Seller of any motion in its Chapter 11 Case or the Chapter 11 Cases to reject any Contract used or held for use in the Business and provide Buyer with an opportunity to designate such Contract as either an Assumed Contract or Excluded Asset; provided that in no event will any Seller reject or seek to reject any Contract used or held for use in the Business prior to the date that is five (5) Business Days prior to the anticipated Closing Date unless prior written approval has been obtained from Buyer.

(b)      Notwithstanding anything in this Agreement to the contrary, at any time prior to the date that is five (5) Business Days prior to the anticipated Closing Date, Buyer will be entitled, upon a determination in its reasonable discretion that an Acquired Company holds material Liabilities that were not disclosed to Buyer on or prior to the Agreement Date, to require Sellers to remove from the list of Acquired Companies any such Acquired Company (provided, however, that notwithstanding the foregoing, Buyer shall be entitled to require Sellers to remove from the list of Acquired Companies the Fujairah Entity for any reason in Buyer's sole determination), and (i) the equity interests in any such entity so removed will constitute an Excluded Asset, (ii) any such entity shall file a voluntary petition to be added to the Chapter

21

11 Cases as a "Debtor" thereunder and (iii) such entity shall execute such documents as are necessary to become a Seller hereunder and the applicable assets of such entity shall be either Acquired Assets or Excluded Assets hereunder, as determined by Buyer in its sole and absolute discretion.

## ARTICLE 3
## CLOSING; PURCHASE PRICE

3.1    Closing; Transfer of Possession; Certain Deliveries.

(a)    The consummation of the Transactions (the "Closing") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in Article 7 (or the waiver thereof by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree. The Closing shall be held at the offices of Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, at 10:00 a.m., local time, unless the Parties hereto otherwise agree. The actual date of the Closing is herein called the "Closing Date." For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 A.M. on the Closing Date.

(b)    At the Closing, Sellers shall deliver to Buyer:

(i)    a duly executed bill of sale, in a form mutually agreed to by the Parties, transferring the Acquired Assets to Buyer;

(ii)    the duly executed Assignment and Assumption Agreement;

(iii)    duly executed quitclaim deeds (the "Deeds") in a form reasonably satisfactory to Sellers and Buyer containing such covenants, if any, as may be required by statute, so as to convey to Buyer fee simple absolute title to the Owned Real Property, free of all title exceptions other than Permitted Liens, all as required by this Agreement, which Deeds shall be in recordable form, duly executed and acknowledged;

(iv)    for each Seller (or if any Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner) that is a U.S. Person, a duly executed FIRPTA Affidavit from each such Seller (or, if such Seller is a disregarded entity for U.S. federal income tax purposes, its regarded owner); and

(v)    duly executed lease assignments in a form reasonably satisfactory to Sellers and Buyer or Sale Order or Orders of the Bankruptcy Court as shall be required to convey to Buyer all of Sellers' interests in respect of the Leased Real Property, which lease assignments shall be in recordable form, duly executed and acknowledged.

(c)    At the Closing, Buyer shall deliver to Sellers:

(i)    the Purchase Price in accordance with the provisions of Section 3.3; and

(ii)    the duly executed Assignment and Assumption Agreement.

3.2    [Reserved].

#4852-4560-1655

3.3     Consideration.

(a)     Purchase Price.  The aggregate consideration for the Acquired Assets (the "Purchase Price") shall be (i) $474,000,000.00 *plus* the Additional Administrative Costs, if any (the "Base Purchase Price"), and (ii) the assumption of the Assumed Liabilities.  The consideration for the Base Purchase Price shall consist of (A) the discharge of all of the then outstanding obligations under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility which is anticipated to equal to $459,000,000.00 (the "Credit Bid Consideration"), and (B) an amount of cash equal to $15,000,000.00 *plus* the Additional Administrative Costs, if any (the "Cash Consideration"); provided, however, that if the Credit Bid Consideration is less than $459,000,0000, solely as a result of the borrowers under the DIP Facility not having borrowed the full amounts available thereunder (the difference between $459,000,000 and the actual Credit Bid Consideration, the "Additional Amount"), then the Cash Consideration amount will be increased by the Additional Amount.

(b)     Payment of Cash Consideration.  On the Closing Date, the Cash Consideration shall be paid to Sellers by wire transfer of immediately available funds to an account or accounts designated in writing by Sellers before the Closing.  For the avoidance of doubt, Buyer and its Affiliates will have no claims against the Cash Consideration under any circumstances and hereby waive any right thereto.

(c)     Payment of the Credit Bid Consideration.  On the Closing Date, Buyer will satisfy the Credit Bid Consideration by releasing to Sellers from Indebtedness under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility and any other documents or agreements entered into therewith in an amount equal to the Credit Bid Consideration, which amount shall be payable by means of a dollar-for-dollar credit against the amount of such Indebtedness.

3.4     Allocation of Purchase Price.  (i) The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated between Sellers and (ii), with respects to amounts allocated to Sellers that are U.S. Persons, the amount allocated to the Acquired Assets sold by each such Seller shall be further allocated among such Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Allocation").  The Allocation shall be delivered by Buyer to Sellers within ninety (90) days after the Closing.  Sellers will have the right to raise reasonable objections to the Allocation within thirty (30) days after Buyer's delivery thereof, in which event Buyer and Sellers will negotiate in good faith to resolve such dispute.  If Buyer and Sellers cannot resolve such dispute within fifteen (15) days after Sellers notify Buyer of such objections, such dispute with respect to the Allocation shall be resolved promptly by the Neutral Accountant, the costs of which shall be shared in equal amounts by Buyer, on the one hand, and Sellers, on the other hand.  The decision of the Neutral Accountant in respect of the Allocation shall be final and binding upon Buyer and Sellers.  Buyer and Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation absent a change in Law; provided, however, that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation.  Buyer and Sellers shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the Allocation of the Purchase Price pursuant to this section.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

3.5     Withholding.  Buyer shall be entitled to deduct and withhold from the Purchase Price such amounts as are required to be deducted and withheld with respect to the making of such payment under any provision of applicable Laws.  If Buyer so withholds any such amounts and pays such amounts over to the appropriate Governmental Entity, such amounts shall be treated for all purposes of this Agreement as

having been paid to the applicable Person in respect of which Buyer made such deduction and withholding. Notwithstanding the foregoing, if Buyer intends to withhold under this <u>Section 3.5</u> on any amounts payable pursuant to this Agreement, Buyer shall use commercially reasonable efforts to give the Person with respect to whom it intends to withhold at least five (5) days written notice of such intention and cooperate with such Person to reduce any potential withholding, and Buyer shall accept any relevant forms establishing an entitlement to reduced withholding.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except (a) as disclosed in Sellers SEC Documents publicly filed or furnished since January 1, 2015 and prior to the Agreement Date (but excluding any disclosures set forth in any risk factors section, any disclosures in any section relating to "forward-looking statements" and any other disclosures to the extent they are predictions or forward-looking in nature and, <u>provided</u>, that in no event shall any disclosure in any Sellers SEC Document qualify or limit the representations and warranties of Sellers set forth in <u>Section 4.1</u> (*Organization*), <u>Section 4.2</u> (*Subsidiaries*) and <u>Section 4.3</u> (*Due Authorization, Execution and Delivery; Enforceability*)) and (b) as set forth in the Disclosure Schedules, Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date as follows:

4.1    <u>Organization</u>.

(a)    Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all requisite corporate power and authority to own, lease, develop and operate the Acquired Assets and to carry on the Business as now being conducted.

(b)    Each Seller (i) is duly qualified or licensed to do business as a foreign corporation or limited liability company, as applicable, and is in good standing under the Laws of each jurisdiction where the nature of the property owned or leased by it or the nature of the Business makes such qualification or license necessary, except where any such failure to be so qualified or licensed, individually in the aggregate, would not result in a Sellers Material Adverse Effect; and (ii) pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the Orders of the Bankruptcy Court, has all necessary corporate or limited liability company power and authority to own and operate its properties, to lease the property it operates under lease and to conduct the Business as debtor in possession.

4.2    <u>Subsidiaries</u>.    <u>Schedule 4.2</u> sets forth a true, correct and complete list of (i) the name of each direct or indirect Subsidiary of Aegean (each an "<u>Aegean Subsidiary</u>"), (ii) the jurisdiction of organization of each such Aegean Subsidiary and (iii) the ownership of each such Aegean Subsidiary. The Aegean Subsidiaries constitute all of the direct or indirect Subsidiaries of Aegean. None of the Acquired Companies owns or holds the right to acquire any stock, partnership interest or joint venture interest or other equity ownership interest in any other Person, other than as set forth on <u>Schedule 4.2</u>. Except as set forth on <u>Schedule 4.2</u>, each of the Aegean Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, has all requisite power and authority and all authorizations, licenses and permits necessary to own and operate its properties and to carry on its businesses as now conducted, except where any such failure to be so qualified or licensed, individually or in the aggregate, would not be material to the Business. Sellers have made available to Buyer prior to the date hereof true, correct and complete copies of each Aegean Subsidiaries' respective organizational documents, in each case, as amended and in effect as of the Agreement Date. With respect to each Aegean Subsidiary set forth on <u>Schedule 4.2</u>, no such Aegean Subsidiary has any stock, partnership interest or joint venture interest or other equity ownership interest authorized, issued or outstanding other than as set forth on <u>Schedule 4.2</u>. There are no agreements or other obligations (contingent or otherwise) which require any Aegean Subsidiary to issue or sell any stock, partnership interest or joint venture interest

24

or other equity ownership interest, or to repurchase or otherwise acquire any of such Aegean Subsidiary's stock, partnership interest or joint venture interest or other equity ownership interest. Except as set forth on Schedule 4.2, there are no voting trusts, proxies or other agreements or understandings in effect with respect to the stock, partnership interest or joint venture interest or other equity ownership interest of any Aegean Subsidiary.

4.3     Due Authorization, Execution and Delivery; Enforceability.  Each Seller has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order). The execution, delivery and performance by each of Sellers of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each such Seller and no other corporate or limited liability company action, as applicable, on the part of each such Seller is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order). This Agreement and the other Transaction Documents to which each of Sellers is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by each such Seller and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than such Seller) constitute (or will constitute) valid and binding obligations of each such Seller enforceable against each such Seller in accordance with their terms (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).

4.4     Consents.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity or other Person is required by any Seller with respect to such Sellers' execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) as may be required under the HSR Act, (b) such notices to, consents, approvals or authorization of or designation, declaration or filing with any Governmental Entity required pursuant to Section 7.1(e), (c) the Necessary Consents set forth on Schedule 4.4(c), (d) the Sale Order having been entered by the Bankruptcy Court, and (e) notices, filings and consents required in connection with the Chapter 11 Cases.

4.5     No Conflicts.  Subject to the receipt of the approvals of the Governmental Entities required pursuant to Section 7.1(e), the Necessary Consents set forth on Schedule 4.4(c) and the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by such Seller of any Transaction Document to which such Seller is (or will become at Closing) a party, and the consummation of the Transactions does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any Assumed Contract, or any Contract in which an Acquired Company is a party, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clause (c), as would not, individually or in the aggregate, result in a Sellers Material Adverse Effect.

4.6     [Reserved].

4.7     <u>Title to Acquired Real Property</u>.

(a)     <u>Schedule 4.7(a)</u> sets forth a true, correct and complete list of all material real property owned in whole or in part (and states the ownership percentage of all partially Owned Real Property) by Sellers and used in connection with the Business or otherwise constituting an Acquired Asset. With respect to the Owned Real Property and the Acquired Company Owned Real Property:  (i) the applicable Seller or Acquired Company has good and marketable title, free and clear of all Liens other than Permitted Liens; (ii) neither Sellers nor the Acquired Companies have leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or Acquired Company Owned Real Property or any material portion thereof which is still in effect, other than the granting of Permitted Liens; and (iii) neither Sellers nor the Acquired Companies have granted any outstanding options, rights of first refusal, rights of first offer, rights of reverter or other third party rights to purchase such Owned Real Property or Acquired Company Owned Real Property other than the granting of Permitted Liens.

(b)     <u>Schedule 4.7(b)</u> sets forth a true, correct and complete list of all material leases, ground leases, subleases, licenses, options or other agreements related to Leased Real Property.  Each lease, ground lease, sublease, license, option or other agreement related to the Leased Real Property and the Acquired Company Leased Real Property to which any Seller or Acquired Company is a party is a legal, valid, binding and enforceable obligation of the applicable Seller and Acquired Company and, each such lease, ground lease, sublease, license, option or other agreement is in full force and effect.  Sellers and the Acquired Companies are not in material default under any such leases, ground leases, subleases, licenses, options or other agreements, and no condition exists which (with notice or lapse of time or both) would constitute a material default by any Seller thereunder or, to the Knowledge of Sellers, by the other parties thereto.  Neither Sellers nor the Acquired Companies have subleased or otherwise granted any Person the right to use or occupy any Leased Real Property which is still in effect.  Neither Sellers nor the Acquired Company have collaterally assigned or granted any other security interest in the Leased Real Property or Acquired Company Leased Real Property or any interest therein which is still in effect.  Except for the Permitted Liens, there exist no Liens affecting the Leased Real Property or Acquired Company Leased Real Property created by, through or under Sellers or the Acquired Companies, and to the Knowledge of Sellers, there exists no other Liens affecting any leasehold interest with respect to the Leased Real Property or Acquired Company Leased Real Property.

(c)     Except as would not reasonably be material to Sellers, the Acquired Companies or the Business, individually or in the aggregate, all of the Acquired Real Property and Acquired Company Real Property and buildings, fixtures and improvements thereon are in good operating condition without structural defects, and all mechanical and other systems located thereon are in good operating condition, and no condition exists requiring repairs, alterations or corrections.  There is no pending, or to the Knowledge of Sellers, proposed Proceeding to change or redefine the zoning classification of all or any portion of the Acquired Real Property or Acquired Company Real Property.

(d)     There is no pending or, to the Knowledge of Sellers, threatened appropriation, condemnation, expropriation, eminent domain or similar Proceeding materially affecting the Acquired Real Property, the Acquired Company Real Property or any part thereof.

4.8     <u>Title to Acquired Assets other than Acquired Real Property; Sufficiency</u>.  Except for Permitted Liens, Sellers have good and valid title to the Acquired Assets (other than the Acquired Real Property, which is addressed in <u>Section 4.7</u>).  No Subsidiaries or Affiliates of Aegean, other than Sellers and the Acquired Companies, hold any material assets, other than Excluded Assets, used or held for use in, and necessary for, the operation of the Business as presently operated.

4.9    <u>Litigation; Orders</u>.    Except as set forth on <u>Schedule 4.9</u> (a) there are no material Proceedings pending or, to the Knowledge of Sellers, threatened against or affecting any Seller, the Acquired Assets or the Business (other than the Chapter 11 Cases) and (b) Sellers and the Acquired Companies are not subject to any material outstanding Order (other than those issued in relation to the Chapter 11 Cases).    To the Knowledge of Sellers, no Subsidiary of Aegean that is not a Seller possesses any Purchased Claims.

4.10    <u>Employment and ERISA Matters</u>.

(a)    <u>Schedule 4.10(a)</u> sets forth a complete and accurate list of each employee of any Seller or any Subsidiary of any Seller (each, a "<u>Seller Employee</u>"), together with each Seller Employee's work location and base compensation (as a salary or hourly rate, as applicable).

(b)    <u>Schedule 4.10(b)</u> sets forth a complete and accurate list of each Collective Bargaining Agreement.    With respect to each Collective Bargaining Agreement, Sellers have delivered or made available to Buyer true and complete copies of the Collective Bargaining Agreement and any amendments thereto, and any related agreements, side letters, or similar documents.

(c)    Except as set forth on <u>Schedule 4.10(c)</u>, (i) no Seller or any Subsidiary of any Seller has experienced, nor, to the Knowledge of Sellers, has there been any threat of, any labor strike, work stoppage, slowdown, lockout, concerted refusal to work overtime or other similar labor disruption or other dispute against any Seller or any Subsidiary of any Seller since January 1, 2015 and, to the Knowledge of Sellers, none of the foregoing is currently pending or threatened; (ii) since January 1, 2015, no Seller or any Subsidiary of any Seller has received written notice from any Governmental Entity of any charge, complaint or Proceeding pending or threatened before or by the National Labor Relations Board, the Equal Employment Opportunity Commission, or any other Governmental Entity with respect to any its employees or other service providers; (iii) no Proceeding arising out of or under any Collective Bargaining Agreement or any Law pertaining to labor or employment is pending or, to the Knowledge of Sellers, threatened against any Seller or any Subsidiary of any Seller; (iv) each Seller and each Subsidiary of each Seller is and has at all times been in compliance in all material respects with the Collective Bargaining Agreements; (v) other than pursuant to the Collective Bargaining Agreements, to the Knowledge of Sellers, no union organizational campaign is pending or threatened with respect to any employee of any Seller or any Subsidiary of any Seller; and (vi) to the Knowledge of Sellers, since January 1, 2015, there have not been any activities or proceedings by any labor union, works council, labor organization, employee representative or other representative body to represent any employee of any Seller or any Subsidiary of any Seller.

(d)    Each Seller and each Subsidiary of each Seller is, and has at all times during the past six years been, in compliance in all material respects with all applicable Laws pertaining to labor and employment, including Laws pertaining to terms and conditions of employment, collective bargaining, overtime eligibility classifications, wages, immigration, data privacy, hours of work, withholding, discrimination, immigration and occupational safety and health.    All employees and other service providers of Sellers and their respective Subsidiaries are and have been correctly classified as employees, independent contractors or otherwise for all purposes.

(e)    <u>Schedule 4.10(e)</u> sets forth a true and complete list of all material U.S. Benefit Plans.    With respect to each Benefit Plan, Sellers have delivered or made available to Buyer true and complete copies of the plan documents and any amendments thereto, any related trust or other funding vehicle, annual reports required to be filed with any Governmental Entity with respect to such plan, actuarial reports, funding and financial information returns and statements, plan summaries or summary plan descriptions, summary annual reports, booklets and personnel manuals, administrative service agreements,

and any other reports or summaries required under ERISA, the Code, or other Laws and the most recent determination letter or approval letter received from the Internal Revenue Service with respect to each such plan intended to qualify under Section 401(a) or 501(c)(9) of the Code.

(f)     Each Benefit Plan and related trust or funding vehicle is, and has at all times during the past six years been, in compliance in all material respects with and operated in compliance in all material respects with all applicable Laws, including ERISA and the Code and, to the Knowledge of Sellers, no event or condition has occurred or is occurring that could reasonably be expected to result in any such material noncompliance. All benefits, contributions and premiums required by and due under the terms of each Benefit Plan or any Collective Bargaining Agreement, or pursuant to any applicable Law, have been timely paid in all material respects in accordance with such requirement(s). There is no pending or, to the Knowledge of Sellers, threatened action, Claim or Proceeding relating to a Benefit Plan or the assets thereof (other than routine Claims for benefits in the Ordinary Course of Business) that would reasonably be expected to result in material liability to Sellers.

(g)     Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "Qualified Benefit Plan") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype plan, is entitled to rely on a favorable opinion letter from the Internal Revenue Service to the prototype plan sponsor. To the Knowledge of Sellers, no fact or event has occurred that could adversely affect the qualified status of any such Qualified Benefit Plan or the exempt status of any related trust.

(h)     No Seller, no Subsidiary of any Seller and no ERISA Affiliate contributes to, has contributed to, has ever had an obligation to contribute to, or has or could reasonably be expected to have any Liabilities with respect to: (i) a plan subject to Title IV of ERISA, the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; (ii) a Multiemployer Plan; (iii) a multiple employer plan (within the meaning of Section 4063 or 4064 of ERISA or Section 413(c) of the Code); or (iv) a multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA). None of the assets of any Benefit Plan are invested in employer securities or employer real property.

(i)     Any Benefit Plan (whether or not subject to the Laws of the United States) providing retirement, pension or any similar or other payments or benefits has been funded in compliance in all material respects with all applicable Laws and the terms of such Benefit Plan.

(j)     Other than as required under Section 4980B of the Code or other similar applicable Law, no Seller and no Subsidiary of any Seller has any obligation to provide (or Liabilities with respect to) benefits or coverage in the nature of health, life, death or disability insurance following retirement or other termination of employment or service.

(k)     Neither the entry into this Agreement nor the consummation of the Transactions (either alone or in combination with any other event, condition or circumstance) will: (i) result in the payment or provision to any current or former employee, manager, director or consultant of any Seller or any Subsidiary of any Seller of any money, benefits or other property in the nature of compensation from any Seller or any Affiliate of any Seller (or pursuant to any Benefit Plan), or any increase in any of the foregoing; (ii) accelerate the vesting or payment timing of, or provide any additional compensatory rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any current or former employee, manager, director or consultant of any Seller or any Subsidiary of any Seller from any Seller or any Affiliate of any Seller (or pursuant to any Benefit Plan); or (iii) limit or restrict the ability of any Person to merge, amend or terminate any Benefit Plan of which all or a portion thereof is or becomes an Assumed Benefit Plan.

(l)      No payments or benefits payable, as a result of or in connection with this Agreement or the consummation of the Transactions (whether alone or in combination with any other event, condition or circumstance, including any subsequent termination of employment or service), to any Person will be either subject to an excise Tax or non-deductible under Section 4999 or 280G, respectively, of the Code.

(m)      With respect to each Benefit Plan that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, (i) the terms of such arrangement have at all relevant times been in compliance in all material respects with, and (ii) such arrangement has, at all times while subject to Section 409A of the Code, been operated in compliance in all material respects with, Section 409A of the Code and all applicable guidance thereunder.

(n)      No Benefit Plan provides any Person with a "gross up" or similar payment in respect of any Taxes that may become payable under Section 409A or 4999 of the Code.

4.11    Environmental.

(a)      None of the real properties currently or formerly owned, leased or operated by or on behalf of any Seller or Acquired Company (including soil and groundwater under such real properties) (the "Properties") and none of the Vessels, in each case that are part of the Business, is the subject of any pending or, to the Knowledge of Sellers, threatened Proceeding by any Governmental Entity or any other Person regarding a release of any Hazardous Materials.  To the Knowledge of Sellers, Hazardous Materials have not been stored, used, or released by any Seller or any Acquired Company or in a quantity or manner at, from or on any Property or Vessel or at any off-site location, which, individually or in the aggregate, would reasonably be expected to result in any material Liability of any Seller or any Acquired Company with respect to the Acquired Assets and the properties and assets of the Acquired Companies to pay for or perform any remedial action.

(b)      Sellers and the Acquired Companies, with respect to the Business, have not received any written notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other material Liability regarding the release or disposal of Hazardous Materials or any actual or alleged material violation of or other material Liability under Environmental Laws.

(c)      No Seller or Acquired Company, with respect to the Business, has any unresolved material Liability in connection with any release of any Hazardous Materials into the environment or with compliance with Environmental Laws.

(d)      Sellers have delivered or made available to Buyer copies of all material environmental reports, audits, and assessments prepared by or for Sellers or their Affiliates that are in Sellers' possession or reasonable control, as well as all material correspondence with Governmental Entities or other Persons relating to material environmental conditions or other material environmental matters at any Property or otherwise concerning the operation of the Business.

4.12    Taxes.

(a)      Each Seller, each Acquired Company and each of its Subsidiaries has timely filed all material Tax Returns required to be filed by it with the appropriate Tax Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted such Seller, Acquired Company or Subsidiary), and all such Tax Returns are complete and accurate in all material respects.  All material amounts of Taxes due and payable by or on behalf of each Seller, each Acquired Company or any of its Subsidiaries have been timely paid.

29

(b)      All material deficiencies asserted or material assessments made as a result of any examinations by any Tax Authority of the Tax Returns related to the Acquired Assets or the Acquired Companies or their Subsidiaries have been fully paid, settled or withdrawn, and there are no other audits or investigations by any Tax Authority in progress, nor has any Seller, Acquired Company or Subsidiary received any written notice from any Tax Authority that it intends to conduct such an audit or investigation related to the Acquired Assets, the Acquired Companies or their Subsidiaries.

(c)      Sellers, the Acquired Companies and their Subsidiaries have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and have duly and timely withheld and paid over to the appropriate Tax Authorities all material amounts required to be so withheld and paid over under all applicable Laws.

(d)      No written Claim has been made during the past three years by a Tax Authority in a jurisdiction in which any Seller, any Acquired Company or any of its Subsidiaries does not currently file a Tax Return such that such Seller, Acquired Company or Subsidiary is or may be subject to taxation by that jurisdiction.

(e)      No agreement, waiver or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including any applicable statute of limitation) has been executed or filed with any Tax Authority by or on behalf of any Seller, any Acquired Company or any of its Subsidiaries (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business), which waiver or extension is in effect as of the Agreement Date.

(f)      There are no Liens for Taxes upon any of the Acquired Assets or the assets of the Acquired Companies or their Subsidiaries, except for Permitted Liens.

(g)      There are no Tax indemnification, Tax allocation or Tax sharing agreements under which any Acquired Company or any of its Subsidiaries would reasonably be expected to be liable for the Tax Liability of a Person other than any Acquired Company or any of its Subsidiaries, other than any such agreements in Contracts not primarily related to Taxes.

(h)      Neither the Acquired Companies nor any of their Subsidiaries (i) is treated for any Tax purpose as a resident in a country other than the country of its incorporation, (ii) has a branch, agency or permanent establishment in a country other than the country of its incorporation or (iii) is or has been a member of any consolidated, combined, unitary or similar Tax group (other than a group the members of which are solely the Acquired Companies and their Subsidiaries or any combination thereof) nor has any Liability for Taxes of any other Person as a transferee or successor under applicable Law.

4.13      Compliance with Laws; Permits.   Sellers and the Acquired Companies are, and the Facilities and Vessels are, operated in material compliance with all applicable Laws (including Environmental Laws), and no Seller or Acquired Company has received any written notice of any alleged material violation of applicable Law from any Governmental Entity or other Person.  All Vessels are in material compliance with all applicable Laws (including Environmental Laws).  Sellers and the Acquired Companies hold all material Permits necessary or required pursuant to applicable Law (including Environmental Laws) for the operation of the Business as presently conducted and for the ownership, lease or operation of the Business and the construction of any improvements currently under construction on the Acquired Real Property or the Acquired Company Real Property ("Material Licenses and Permits").  All such Material Licenses and Permits are listed on Schedule 4.13.  Each such Material License and Permit is valid and in full force and effect, is not subject to any pending or, to the Knowledge of Sellers, threatened, Proceeding to revoke, cancel, suspend or declare such Material License and Permit invalid in any respect.

#4852-4560-1655

Aegean has delivered or made available to Buyer true, correct and complete copies of all Material Licenses and Permits.

4.14    <u>Contracts</u>.

(a)    Subject to receipt of the Necessary Consents set forth on <u>Schedule 4.4(c)</u> and compliance with <u>Section 6.10</u>, (i) each of the Assumed Contracts and each Contract to which an Acquired Company is a party, constitutes a valid and binding obligation of the applicable Seller or Acquired Company, as applicable, and, to the Knowledge of Sellers, each other party thereto, (ii) no Seller or Acquired Company is in breach or default in any material respect under any of the Assumed Contracts (or in the case of an Acquired Company, any Contract to which it is a party) and, to the Knowledge of Sellers, the other parties to the such Contracts are not in breach or default in any material respect thereunder (and in each such case no event exists that with the passage of time or the giving of notice would constitute such material breach or default, result in a loss of material rights, result in the payment of any damages or penalties or result in the creation of any Liens thereunder or pursuant thereto other than Permitted Liens), (iii) the Assumed Contracts and the Contracts to which an Acquired Company is a party may be transferred to Buyer or one of Buyer's Affiliates pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any material rights thereunder and (iv) no Seller or Acquired Company has received notice from any other party to any such Contract of any threatened termination of such Contract.  On or prior to the date hereof Aegean has delivered or made available to Buyer true, correct and complete copies of all Assumed Contracts and Contracts to which an Acquired Company is a party.

(b)    Except for the Assumed Contracts or as set forth on <u>Schedule 4.14(b)</u>, no Seller or Acquired Company is a party to or otherwise obligated under any Contract related to the Business (i) the performance of which requires aggregate payments to or from any Seller, individually or in the aggregate, in excess of $500,000 per year; (ii) that provides for the sale after the Agreement Date of any property, right or asset, for consideration in excess of $500,000; (iii) that constitutes a joint venture, partnership or similar Contract involving a sharing of profits or expenses; (iv) that is with respect to any Vessels, including the ownership, operation, or maintenance thereof; or (v) that is with respect to the Owned Real Property, Leased Real Property or the Facilities.

4.15    <u>Insurance Claims</u>.  <u>Schedule 4.15</u> contains a true, correct and complete list of all insurances policies as of the Agreement Date (including the names and insurers and policy numbers) that are owned by any Seller or an Acquired Company or name any Seller or an Acquired Company as an insured or loss payee and that pertain to Sellers or Acquired Company's assets, real estate, employees, or other liabilities related to the Business.  Sellers have within the past three (3) years reported all known material Claims or incidents to the respective insurers that have issued current and prior insurance policies insuring the Properties (either specifically or as part of a master insurance policy and whether relating to property, liability or workers' compensation) to the extent that any such Claims or incidents would reasonably be expected to create a covered event under the terms and conditions of such policies and Sellers were required to report them pursuant to the terms of the policies.

4.16    <u>Vessels</u>.  <u>Schedule 4.16</u> sets forth a true, correct and complete list of all of the Vessels owned, operated, leased or chartered by Sellers or the Acquired Companies (categorized by type of Vessel), together with a description of each Vessel, including its name, owner, capacity (gt or dwt, as specified therein), year built, hull type, the country of its registration and its classification society.  Except as set forth in <u>Schedule 4.16</u>, each such Vessel (i) is duly registered under the flag indicated in <u>Schedule 4.16</u>, (ii) is seaworthy and in good operating condition, (iii) has all national and international operating and trading certificates and endorsements, each valid and unextended, which are required for the operation of such Vessel in the trades and geographic areas in which it is operated, (iv) has been classed by a classification

31

society which is a member of the International Association of Classification Societies, and is fully in class with no outstanding material recommendations or notations, and, to the Knowledge of Sellers, (A) no event has occurred and no condition exists that would cause such Vessel's class to be suspended or withdrawn, and (B) all events and conditions which are required to be reported as to class have been disclosed and reported to such Vessel's classification society, in each case, except as would not be expected to be material.

4.17    Intellectual Property.

(a)    Schedule 4.17(a) sets forth a true, correct and complete list of all material Intellectual Property that is, as of the Agreement Date, issued, registered, or subject to an application for registration that is owned by Sellers or the Acquired Companies (the "Registered IP").

(b)    Sellers and the Acquired Companies own all Registered IP and all other Intellectual Property owned by Sellers and the Acquired Companies free and clear of all Liens (other than Permitted Liens), and such Registered IP remains pending or in full force and effect and has not expired or been cancelled.  To the Knowledge of Sellers, each Seller and Acquired Company has a valid right to use all Intellectual Property licensed to such Seller or Acquired Company pursuant to an Assumed Contract.

(c)    To the Knowledge of Sellers, (i) the Registered IP is valid and enforceable except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and (ii) the past three (3) years of use and current use by Sellers and the Acquired Companies of the Intellectual Property owned by or licensed to Sellers or the Acquired Companies does not infringe or otherwise violate any Intellectual Property of any other Person.  There is no Proceeding pending or, to the Knowledge of Sellers, threatened, alleging any such infringement or violation or challenging any Seller's or Acquired Company's rights in or to the Registered IP or other Intellectual Property owned by Sellers or the Acquired Companies.  To the Knowledge of Sellers, no Person is infringing or otherwise violating the Registered IP or other Intellectual Property owned by Sellers or the Acquired Companies.  Neither the execution nor performance of this Agreement will give any Person the right to terminate or alter Sellers' rights or interests to any Registered IP or other Intellectual Property owned by Sellers or the Acquired Companies.

4.18    Bank Accounts; Power of Attorney.  Schedule 4.18 contains a true, correct and complete list of (a) the names and locations of all banks, trust companies, and other financial institutions at which Sellers and the Acquired Companies maintain accounts of any nature or safe deposit boxes and lists the respective signatories therefor.  Unless otherwise specifically indicated on Schedule 4.18 no Person holds a power of attorney to act on behalf of any Seller.

4.19    Anti-Corruption and Sanctions.

(a)    Each Seller and each of such Seller's Subsidiaries (including the Acquired Companies), and, to the Knowledge of Sellers, all of their respective directors, officers, agents or employees, has been for the past five (5) years and currently is in compliance in all material respects with, Anti-Corruption Laws and Sanctions, Anti-Money Laundering Laws and Export Control Laws.

(b)    None of Sellers or any of their Subsidiaries (including the Acquired Companies), or, to the Knowledge of Sellers, any directors, officers, agents or employees or Affiliates of Sellers or any of their Subsidiaries, or any other Person acting on their behalf has, (i) directly or indirectly, engaged in any Anti-Corruption Prohibited Activity, (ii) directly or indirectly engaged in any transaction or other business with a Restricted Party in violation of applicable Sanctions, or (iii) been or is the subject of any investigation by any Governmental Entity concerning compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, Export Control Laws, or Sanctions.  None of Sellers or any of their Subsidiaries, nor to

32

the Knowledge of Sellers any of their respective officers, directors, employees, Affiliates or agents acting on their behalf, is a Restricted Party.

4.20    Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 4 (as modified by the Disclosure Schedules), none of Sellers nor their respective Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Sellers or otherwise in respect of Sellers or the Business.  Except for the representations and warranties contained in this Article 4 (as modified by the Disclosure Schedules), each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Sellers or any of their respective Affiliates).  Sellers make no representations or warranties to Buyer regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Sellers Material Adverse Effect.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represent and warrant to Sellers, as of the Agreement Date, except as set forth on the Disclosure Schedules, as follows:

5.1    Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2    Due Authorization, Execution and Delivery; Enforceability.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and to perform its obligations hereunder and thereunder (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become at Closing) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer is (or will become at Closing) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3    Governmental Approvals.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity or other Person is required by Buyer with

respect to Buyer's execution and delivery of any Transaction Document to which it is (or will become at Closing) a party or the consummation of the Transactions, except (a) as may be required under the HSR Act, (b) such notices to, consents, approvals or authorization of or designation, declaration or filing with any Governmental Entity required pursuant to Section 7.2(e) and (c) the Sale Order having been entered by the Bankruptcy Court.

5.4    No Conflicts.  Subject to the receipt of the approvals of Governmental Entities required pursuant to Section 7.2(e), the execution, delivery and performance by Buyer of any Transaction Document to which Buyer is (or will become at Closing) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of Buyer, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

5.5    Availability of Funds.  Buyer, as of the Closing, will have sufficient funds available to it to pay the Purchase Price on the Closing Date and to enable Buyer to perform all of its obligations under this Agreement.

5.6    Adequate Assurances Regarding Executory Contracts.  Buyer (or such of Buyer's Affiliates which will be assuming any Assumed Contract) is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.7    Condition and Location of Acquired Assets.  Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Acquired Assets are furnished "as is", "where is" and, subject only to the representations and warranties contained in Article 4, with all faults, limitations and defects (hidden and apparent) and, subject to the representations and warranties contained in Article 4, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for Buyer's intended use or a particular purpose or any use or purpose whatsoever.

5.8    Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 5 (as modified by the Disclosure Schedules), none of Buyer, its Affiliates, nor any of their respective Representatives, makes or has made any other representation or warranty on behalf of Buyer.  Except for the representations and warranties contained in this Article 5 (as modified by the Disclosure Schedules), Buyer (a) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Sellers or their respective Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Sellers by any Representative of Buyer or any of their respective Affiliates).  The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Buyers Material Adverse Effect.

5.9    No Other Representations or Warranties of Sellers; Disclaimers.

(a)    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, BUYER ACKNOWLEDGES AND AFFIRMS THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER,

AND DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF SELLERS OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, SELLERS' COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLERS). BUYER FURTHER ACKNOWLEDGES AND AFFIRMS THAT SELLERS MAKE NO REPRESENTATION, COVENANT OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY OR COMPLETENESS OF ANY FILES, RECORDS OR DATA HERETOFORE OR HEREAFTER FURNISHED IN CONNECTION WITH THE ACQUIRED ASSETS (INCLUDING WITHOUT LIMITATION IN ANY CONFIDENTIAL INFORMATION STATEMENT OR MEMORANDUM, MANAGEMENT PRESENTATION, OR DOCUMENT MADE AVAILABLE IN A DATAROOM). ANY AND ALL SUCH FILES, RECORDS AND DATA FURNISHED BY SELLERS ARE PROVIDED AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THE TRANSACTION DOCUMENTS, BUYER FURTHER ACKNOWLEDGES AND AFFIRMS THAT SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE ACQUIRED ASSETS, (B) THE CONDITION OF THE ACQUIRED ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING UNDERSTOOD THAT THE ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) FREEDOM FROM HIDDEN OR REDHIBITORY DEFECTS OR VICES (D) ANY INFRINGEMENT BY SELLERS OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (E) ANY INFORMATION, DATA, OR OTHER MATERIALS.

(b)      Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Acquired Assets (including Buyer's own estimate and appraisal of the extent and value of the Acquired Assets and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Acquired Assets). Buyer acknowledges that in entering into this Agreement, it has relied on the aforementioned investigation. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Sellers or any of their respective Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1      <u>Conduct of Business Pending the Closing</u>. During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing (the "<u>Interim Period</u>"), except as may be required by Order of the Bankruptcy Court (provided that no Seller directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court), Sellers shall carry on the Business in the Ordinary Course of Business and, to the extent consistent therewith, use commercially reasonable efforts to preserve the Business intact and preserve the goodwill of relationships with Governmental Entities, customers, suppliers, employees and others having business dealings with the Business. Notwithstanding the first sentence of this <u>Section 6.1</u>, during the Interim Period, Sellers shall not, and shall cause their Affiliates not to, directly or indirectly, without the prior written consent of Buyer:

(a)    modify, amend, terminate, waive any rights or obligations under or otherwise seek to reject any Assumed Contract or any material contract to which an Acquired Company is a party;

(b)    lease, license, surrender, relinquish, sell, transfer, convey, assign or otherwise dispose of any interest in any Acquired Assets or the properties and assets of the Acquired Companies other than (i) Inventory and immaterial assets, in each case in the Ordinary Course of Business, (ii) pursuant to an Order of the Bankruptcy Court (provided that no Seller directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court), (iii) abandoning or permitting to lapse Registered IP that is not material to the Business or (iv) as expressly permitted by the DIP Facility;

(c)    mortgage, pledge or subject to Liens (other than Permitted Liens) any of the Acquired Assets and the properties and assets of the Acquired Companies;

(d)    except as required pursuant to the terms of any Benefit Plan set forth on Schedule 4.10(e) or any Collective Bargaining Agreement set forth on Schedule 4.10(b), or as otherwise required by applicable Law, (i) increase any element of compensation or any benefit of any current or former director or independent contractor of any Seller or any Subsidiary of any Seller, or any officer or employee who is or becomes a Transferred Employee; (ii) accelerate the vesting or payment of the compensation payable or the benefits provided or to become payable or provided to any current or former director or independent contractor of any Seller or any Subsidiary of any Seller, or any officer or employee who is or becomes a Transferred Employee, or otherwise pay any amounts not due to any such individual (including with respect to severance); or (iii) adopt, enter into, amend, terminate or renew any Benefit Plan that is or becomes an Assumed Benefit Plan (including any employment, severance, consulting or other individual agreement), or which would otherwise increase the Assumed Liabilities, or adopt or enter into any other plan, program, policy, agreement or arrangement that would be considered a Benefit Plan if it were in existence on the date of this Agreement that is or becomes an Assumed Benefit Plan, or which would otherwise increase the Assumed Liabilities;

(e)    with respect to any Acquired Company and its Subsidiaries, adopt a plan or agreement of complete or partial liquidation or dissolution or otherwise fail to maintain its limited liability company, corporate or similar existence;

(f)    institute, settle or agree to settle any material Proceeding (other than the Chapter 11 Cases) before any Governmental Entity relating to the Acquired Assets or the Business, or modify in any manner that is adverse to the Business or the Acquired Assets, rescind, reject or terminate a Transferable Permit (or application therefor) relating to the Acquired Assets;

(g)    with respect to any Acquired Asset, Acquired Company or any of its Subsidiaries, (i) make, change or revoke any material Tax election, (ii) change any annual Tax accounting period, (iii) enter into any agreement with respect to material Taxes or apply for any Tax ruling, (iv) file any amended Tax Return (unless otherwise required to do so under applicable Law), (v) settle or compromise any Tax Liability or Claim for a Tax refund, (vi) surrender any right to Claim a refund for Taxes, (vii) incur any material Tax Liability outside of the Ordinary Course of Business, (viii) file any Tax Return other than one prepared in a manner consistent with past practice, (ix) consent to an extension of the statute of limitations applicable to any Tax Claim or assessment (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business) or (x) change (or request any Governmental Entity to change) any aspect of its method of accounting for Tax purposes;

(h)    fail to maintain in full force and effect insurance policies covering the Acquired Assets and the operation of the Business, in form and amount consistent with past practice;

36

(i)        amend any organizational documents of the Acquired Companies or their Subsidiaries,

(j)        (i) authorize, issue or grant, (ii) pledge, encumber or permit the creation of, or suffer to exist, any Lien (other than a Permitted Lien) on, or (iii) sell, transfer, assign, convey, distribute or otherwise dispose of (including by merger with any other Person), any stock, partnership interest or joint venture interest or other equity ownership interest of an Acquired Company or its Subsidiaries;

(k)        incur any capital expenditures or any Liabilities in respect thereof other than in the Ordinary Course of Business or as expressly permitted by the DIP Facility;

(l)        create, incur, assume, guarantee or otherwise be liable with respect to any Indebtedness (or amend or modify terms of any such Indebtedness) except as (i) does not relate to any Acquired Company or (ii) is permitted under the DIP Facility;

(m)        make any loans, advances or capital contributions to, or investments in, any Person, other than advances made to another Seller to the extent expressly permitted by the DIP Facility; or

(n)        enter into any Contract to do any of the foregoing.

6.2        <u>No Solicitation of Alternative Transactions</u>.

(a)        Solely during the period commencing on the Agreement Date and continuing until the earlier of (x) the date that the Bankruptcy Court has entered the Bidding Procedures Order and (y) the termination of this Agreement in accordance with <u>Article 8</u> (the "<u>No-Shop Period</u>"), Sellers shall not (and shall cause their respective Representatives and Affiliates not to) directly or indirectly (i) solicit, initiate, encourage, respond to, or take any other action designed to solicit an Alternative Transaction, (ii) enter into negotiations with respect to, or execute, any letter of intent, agreement in principle, acquisition agreement or other similar agreement related to any Alternative Transaction or (iii) furnish information to any Person or entity with respect to Aegean, the other Sellers, their respective Affiliates, the Business or an Alternative Transaction; <u>provided</u>, <u>however</u>, that Sellers (and their respective Representatives and Affiliates) may respond to, enter into negotiations with and furnish information to any third party who submits an unsolicited, bona fide inquiry and for which Sellers determine in good faith, after receiving advice from outside legal counsel, that failure to participate in negotiations with or provide information to would result in a breach of fiduciary duties.  During the No-Shop Period, Aegean will promptly (and in all events within 24 hours) notify in writing Buyer of any other offer, proposal or expression of interest for or in relation to an Alternative Transaction that it or any of its Affiliates or Representatives may receive and will reasonably cooperate with Buyer with respect thereto.  From and after the date the Bidding Procedures Order is entered by the Bankruptcy Court and until the entry of the Sale Order, Sellers are permitted, and are permitted to cause their Affiliates and Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with or for purposes of pursuing any Alternative Transaction, in each case solely to the extent permitted and in accordance with the Bidding Procedures Order.  In addition, Sellers may supply information relating to the Business and the Acquired Assets to any other Person who may be or has expressed interest in being a prospective purchaser under an Alternative Transaction or who proposed to submit an Alternative Transaction; <u>provided</u>, that no non-public information may be furnished until Sellers receive an executed confidentiality agreement from any such Person; <u>provided</u>, <u>further</u>, that any such disclosure shall only be made in accordance with the Bidding Procedures Order.

#4852-4560-1655

(b)    If an Auction is conducted, and Buyer is not the Successful Bidder, Buyer shall, in accordance with and subject to the Bidding Procedures, be required to serve as the back-up bidder if Buyer is the next highest or otherwise best bidder at the Auction (such party that is the next highest or otherwise best bidder at the Auction, the "Back-Up Bidder") and, if Buyer is the Back-Up Bidder, Buyer shall, notwithstanding Section 8.1(b)(ii), be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) open and irrevocable until the Outside Back-Up Date. Following the Auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Buyer, if Buyer is the Back-Up Bidder, will be deemed to have the new prevailing bid, and Sellers may seek authority to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer in the Auction) with the Back-Up Bidder.

6.3    Access.    Subject to applicable Law, during the Interim Period, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, Vessels, officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers, (b) shall furnish to Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as Buyer and its Representatives reasonably request and (c) shall cooperate reasonably with Buyer in its investigation of the Business. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder. Buyer agrees that any on-site inspections of any of the Acquired Real Property shall be conducted in the presence of Sellers or their Representatives. All inspections shall be conducted so as not to interfere unreasonably with the use of any of the Acquired Real Property by Sellers. Notwithstanding the foregoing, Buyer shall not (i) have any access or investigation right to the extent it relates to the negotiation of this Agreement or the Transactions or (ii) conduct or cause to be conducted any sampling, testing, or subsurface or otherwise invasive investigation of the air, soil, surface water, groundwater, building materials or other environmental media (commonly known as a Phase II environmental assessment) at any property of Sellers, including any Acquired Real Property. Buyer agrees to indemnify and hold Sellers and their Affiliates and their respective Representatives harmless of and from all actions, Claims, investigations, deficiencies, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to physical injuries arising from Buyer's inspection of the Acquired Assets (other than to the extent any of the foregoing results from the gross negligence or the willful misconduct of the Person seeking such indemnification), and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement. All information obtained pursuant to this Section 6.3 shall be subject to the terms and conditions of the Confidentiality Agreement.

6.4    Public Announcements.    Buyer and Sellers will consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the Transactions, and neither Buyer nor any Seller shall issue any such press release or public announcement without the prior approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court as an exhibit to the Sale Motion) or by obligations pursuant to any listing agreement with any national securities exchange. Buyer and each Seller shall cause its Affiliates and Representatives to comply with this Section 6.4.

6.5    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by Sellers. Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any Claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer or Sellers, as applicable, shall file all necessary

documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Parties hereto.  Sellers shall pay all such Transfer Taxes when due.  Notwithstanding the foregoing, Buyer shall be reimbursed by Sellers with respect to any such Transfer Taxes paid by Buyer.

(b)    All Property Taxes imposed upon or assessed directly against the Acquired Assets for the Tax period in which the Closing occurs (the "Proration Period") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes, which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of such Taxes and the denominator being the total number of days in the Proration Period, by (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If Sellers have paid more than their allocated portion of such Taxes prior to the Closing, Buyer shall pay to Sellers an amount equal to such excess; and if Sellers have paid less than their allocated portion of such Taxes prior to the Closing, Sellers shall pay to Buyer an amount equal to such deficiency.  Buyer shall file all Tax Returns relating to Property Taxes with respect to the Acquired Assets that are required to be filed after the Closing Date.

(c)    Each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

(d)    Any and all Tax allocation or Tax sharing agreements between any Acquired Company or any of its Subsidiaries, on the one hand, and any Seller or any of its Affiliates, on the other hand, shall be terminated as of the Closing Date and, from and after the Closing Date, neither such Acquired Company nor any of its Subsidiaries shall be obligated to make any payment pursuant to any such agreement for any past or future period.

6.6    Approvals; Commercially Reasonable Efforts; Notification; Consent.

(a)    Subject to the terms and conditions of this Agreement, each Party shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under applicable Law to consummate and make effective the Transactions.  Without limiting the generality of the foregoing, the Parties will, at Buyer's sole cost and expense, use their respective commercially reasonable efforts to (i) prepare and file as soon as practicable all forms, registrations and notices relating to the consents of Governmental Entities that are required by applicable Law to be filed in order to consummate Transactions that are material to the Business or to Buyer and its Affiliates (with respect to any filing required under the HSR Act, within five (5) Business Days following the Agreement Date, and with respect to any other such filing, as soon as reasonably possible), and take such actions as are reasonably necessary to obtain any consents from, or to avoid any action or proceeding by, any Governmental Entity relating to such approvals, including any Notification and Report Forms in connection with the HSR Act, Foreign Antitrust Laws, or approvals required under Environmental Law, including notifications and approvals necessary to transfer Permits, licenses and other authorizations required under Environmental Law (to the extent such Permits, licenses and other authorizations are transferable), (ii) take all actions necessary to transfer the Acquired Assets, (iii) take all actions necessary to cause all conditions set forth in Article 7 to be satisfied as soon as practicable (iv) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (v) effect all necessary registration, applications, notices and other

39

filings required by applicable Law, including, as applicable to Sellers, under the Bankruptcy Code, and (vi) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement. Buyer and Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to adversely affect the approval of any Governmental Entity of any of the filings referred to in this Section 6.6(a).  Notwithstanding anything to the contrary provided herein, neither Buyer nor any of its Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, or any of the Acquired Assets, (ii) to agree to any limitation on the operation or conduct of the Business, or (iii) to waive any of the conditions to this Agreement set forth in Section 7.1.

(b)    Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity relating to the matters described in Section 6.6(a), (ii) not extend any waiting period or agree to refile under the HSR Act or any applicable Foreign Antitrust Laws (except with the prior written consent of the other Parties hereto, which consent shall not be unreasonably withheld, conditioned or delayed) and (iii) not enter into any agreement with the any Governmental Entity agreeing not to consummate the Transactions.

(c)    In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity:  (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the Transactions, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing, (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the Transactions unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion and (iii) subject to the attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the Transactions; provided, however, that any such Party may limit the disclosure of filings to protect confidential information, including limiting dissemination of filings to an "outside counsel only" basis.

6.7    Employee Matters.

(a)    Employee Offer List.  Within thirty (30) days following the date of this Agreement, Sellers shall make available to Buyer Schedule 6.7(a)(i), setting forth a complete and accurate list of each Seller Employee, together with each Seller Employee's employing entity, work location, job function, base compensation (as a salary or hourly rate, as applicable), any bonus or other additional compensation to which the employee may be entitled (including any retention or similar bonus or compensation), union representation, active/leave status, credited service date and treatment by Sellers and their respective Subsidiaries of any United States employee as exempt or non-exempt (the "Seller Employee List").  From and after the thirtieth (30th) day following the date of this Agreement, Sellers shall make available to Buyer an updated version of the Seller Employee List that is complete and accurate as of the date it is made available (i) on the final day of each calendar month following the date of this Agreement and prior to the Closing, and (ii) on the date that is ten (10) days prior to the anticipated Closing.  Not less than twenty (20) days prior the anticipated Closing, Buyer shall make available to Sellers Schedule 6.7(a)(ii), setting forth a list of each Seller Employee (other than Seller Employees who are Automatic Transfer Employees) on the Seller Employee List to whom Buyer has determined, in its sole discretion, to make an offer of employment

in connection with the Closing or to otherwise retain in employment following the Closing (the "<u>Employee Offer List</u>").

        (b)        <u>Transferred Employees</u>.

        (i)        Unless an earlier offer is otherwise required by applicable Law, approximately ten (10) days prior to the anticipated Closing, Buyer shall, or shall cause one of its Subsidiaries to, make an offer of employment, on such terms and conditions as Buyer may determine in its sole discretion (but subject to and in compliance with applicable Law), to each Seller Employee on the Employee Offer List who (i) is neither an Automatic Transfer Employee nor an employee of an Acquired Company and (ii) then remains a Seller Employee (each, an "<u>Employment Offer</u>"). Each (A) Seller Employee listed on the Employee Offer List who is an employee of an Acquired Company as of the Closing and (B) Seller Employee who accepts an Employment Offer, in either case who commences or continues employment with Buyer or its Subsidiaries effective immediately following the Closing, together with each other Seller Employee whose employment is required by applicable Law to transfer to Buyer or its Subsidiaries in connection with the Closing (including the Automatic Transfer Employees), shall be deemed a "<u>Transferred Employee</u>" for purposes of this Agreement. Sellers shall, and shall cause their respective Subsidiaries to, take all actions permitted by applicable Law that are necessary to ensure that no Seller Employee who is not listed on the Employee Offer List (and who is not an Automatic Transfer Employee) remains employed by any Acquired Company as of the Closing Date (and, for the avoidance of doubt, Buyer shall be responsible for all Additional Administrative Costs in connection therewith).

        (ii)        To the extent required by applicable Laws, the employment and the employment agreements of the Seller Employees whose employment is required to transfer automatically to Buyer or its Subsidiaries pursuant to the Transfer Regulations (such Seller Employees, the "<u>Automatic Transfer Employees</u>"), will transfer from Sellers or their respective Subsidiaries automatically by operation of law to Buyer or one of its Subsidiaries as a result of the Transactions. Notwithstanding the foregoing, to the extent any Automatic Transfer Employee rejects such a transfer, Buyer may make an Employment Offer to such rejecting Automatic Transfer Employee in accordance with the general procedures set forth in <u>Section 6.7(b)(i)</u> (or on such later date as may be reasonably practicable given the applicable circumstances); provided, however, that no such rejecting Automatic Transfer Employee shall become a Transferred Employee unless (A) Buyer elects, in its sole discretion, to make such rejecting Automatic Transfer Employee an Employment Offer, (B) such rejecting Automatic Transfer Employee accepts such Employment Offer, and (C) such rejecting Automatic Transfer Employee who commences or continues employment with Buyer or its Subsidiaries effective immediately following the Closing.

        (c)        <u>Assumed Benefit Plans</u>. Sellers shall make available to Buyer <u>Schedule 6.7(c)(i)</u>, setting forth a list of all Benefit Plans that is complete and accurate as of the date it is made available, (i) within thirty (30) days following the date of this Agreement, and (ii) on the date that is ten (10) days prior to the anticipated Closing. Approximately ten (10) days prior to the anticipated Closing, Buyer shall make available to Sellers <u>Schedule 6.7(c)(ii)</u>, setting forth a list of the Benefit Plans or portions thereof that Buyer intends to assume upon the Closing. For purposes of this Agreement, the term "<u>Assumed Benefit Plans</u>" means the Benefit Plans or portions thereof listed on <u>Schedule 6.7(c)(ii)</u>, together with any other Benefit Plans or portions thereof that Buyer is required to assume by applicable Law.

        (d)        <u>Collective Bargaining Agreements</u>. As and to the extent required by applicable Laws or the terms of any Collective Bargaining Agreement, effective upon the transfer or continuation of employment of any Transferred Employee to or with Buyer or its Subsidiaries in connection with the Closing, Buyer shall, or shall cause its applicable Subsidiary to, assume from Sellers and their respective Subsidiaries the Collective Bargaining Agreement which governs the terms and conditions of employment of such Transferred Employee, but only if all Seller Employees subject to or covered by such Collective

41

Bargaining Agreement are Transferred Employees (such assumed Collective Bargaining Agreements, the "Assumed Collective Bargaining Agreements").  As and to the extent required by applicable Laws or the terms of any Collective Bargaining Agreement, Buyer shall, or shall cause its applicable Subsidiary to, join any Collective Bargaining Agreement which (i) is not an Assumed Collective Bargaining Agreement and (ii) governs the terms and conditions of employment of any Transferred Employee(s) (the "Joined Collective Bargaining Agreements").  As and to the extent required by applicable Laws or the terms of any Collective Bargaining Agreement, Sellers and their respective Subsidiaries, as applicable, shall remain parties and subject to the Joined Collective Bargaining Agreements with respect to each current or former employee of any Seller or any Subsidiary of any Seller who is not a Transferred Employee.

(e)    Benefit Comparability.  Beginning immediately following the Closing and continuing until December 31 of the year in which the Closing occurs, Buyer shall, or shall cause its applicable Subsidiaries to, provide each Transferred Employee with (i) a base salary or hourly wage rate that is not less than, and (ii) other employee benefits (excluding any equity, retention or incentive compensation and any pension or retiree benefits) that are not materially less favorable in the aggregate than, the level provided by Sellers and their respective Subsidiaries as of immediately prior to the Closing, in each case unless otherwise required by any applicable Assumed Collective Bargaining Agreement, Joined Collective Bargaining Agreement or Law.

(f)    Service Credit.  With respect to its employee benefit plans, programs and policies, Buyer shall, or shall cause its applicable Subsidiaries to, recognize for purposes of participation, eligibility and vesting the service of any Transferred Employee with Sellers and their respective Subsidiaries prior to the Closing, but in each case only to the extent set forth on the Seller Employee List and recognized under a comparable Benefit Plan as of immediately prior to the Closing.  Notwithstanding the foregoing, in no event shall any Transferred Employee receive benefit accrual credit for purposes of any defined benefit pension plan, and there shall be no duplication of benefits.  With respect to the Transferred Employees, Buyer shall use its commercially reasonable efforts to cause the waiver of any pre-existing condition requirements, evidence of insurability provisions, waiting period requirements or any similar provisions under any employee benefit plan or compensation arrangements maintained or sponsored by or contributed to by Buyer or its Subsidiaries for Transferred Employees after the Closing to the extent that such requirements or provisions were waived or satisfied under the applicable comparable Benefit Plan as of immediately prior to the Closing.

(g)    Visas.  If any Transferred Employee is required by applicable Laws to possess a work permit, employment pass, visa or other legal or regulatory approval for his or her employment with Buyer or its Subsidiaries, Buyer shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to cause any such permit, pass, visa or other approval to be obtained and in effect as of the Closing, and Sellers and their respective Subsidiaries shall reasonably assist Buyer and its Affiliates in any manner necessary or appropriate to obtain or transfer any such permit, pass, visa or other approval prior to the Closing.

(h)    No Rights.  Nothing in this Section 6.7 shall create any third party beneficiary right in any Person (other than the Parties), including any Seller Employee, any other current or former employee or service provider of any of Sellers or any Subsidiary of any one or more Sellers, any participant in any Benefit Plan, or any dependent or beneficiary thereof, or any right to continued employment or service with any of Sellers, Buyer or any of their respective Subsidiaries or Affiliates.  Nothing in this Section 6.7 shall be deemed to constitute an amendment to any Benefit Plan or any other compensation or benefit plan, program, policy, agreement or arrangement, or to guarantee or require the employment or service of any Person for any length of time, or with any particular level of any element of compensation or benefit, except as may be required under applicable Law.

(i)    Cooperation.  Buyer and Sellers shall, and shall cause their respective Subsidiaries to, reasonably cooperate with each other (including sharing documentation and providing assistance) in connection with (i) the transition of the Transferred Employees pursuant to, and the compliance with, the requirements of this Section 6.7, and (ii) timely satisfying all notice and/or consultation requirements pursuant to or in connection with any Collective Bargaining Agreement or other agreement with any labor-related organization or works council, or pursuant to applicable Law.

(j)    WARN Act.  On the Closing Date, Sellers shall provide to Buyer Schedule 6.7(j), setting forth a list, by date and location, of all employee terminations or layoffs (whether individually or as a group) implemented by any Seller or any Subsidiary of any Seller during the ninety (90) day period preceding the Closing.

6.8    Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Date, Sellers shall execute and deliver to Buyer such documents, instruments, certificates, bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, and take such additional actions as Buyer may reasonably request to vest in Buyer all of each one of Sellers' right, title and interest in and to the Acquired Assets.  Sellers and Buyer shall also cooperate in the transition of operational matters in respect of the Facilities and the Business.  Sellers shall take all steps to maintain and preserve coverage under the D&O Policies, including by giving any required notices to the insurers.  Sellers shall, at Buyer's expense, cooperate with Buyer in prosecuting any Purchased Claims, including by transferring to Buyer all relevant evidence, documents and findings of investigations (or copies thereof), and by providing access to knowledgeable witnesses upon reasonable request (to the extent in the control and ability of Sellers to do so).

6.9    Bankruptcy Court Filings.

(a)    Sellers shall use reasonable efforts to provide draft copies of all "first day" motions, applications, and other documents that any Seller or its Affiliates intends to file with the Bankruptcy Court in the Chapter 11 Cases to counsel for Buyer at least two (2) Business Days prior to the date when such Person intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.

(b)    Sellers shall pursue the entry of the Bidding Procedures Order and the Sale Order. Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Asset Sale Guidelines in connection with obtaining approval of the Bidding Procedures Order and the Sale Order.  Sellers shall consult with Buyer and its Representatives concerning the Bidding Procedures Order, the Sale Order, any other Orders of the Bankruptcy Court relating to the Transactions, and the bankruptcy proceedings in connection therewith, and use commercially reasonable efforts to provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to filing.  In furtherance of the foregoing, Sellers shall provide Buyer with a reasonable opportunity to review and comment on all material motions to be filed in the Chapter 11 Cases that relate to the transactions contemplated by this Agreement, to the extent practicable, prior to their filing with the Bankruptcy Court.

(c)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith"

43

purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(d)    No later than one (1) day after the approval of the Interim DIP Order by the Bankruptcy Court, Sellers shall file the Sale Motion seeking entry by the Bankruptcy Court of all proposed Orders, including the Bidding Procedures Order and the Sale Order and related exhibits, and shall use their commercially reasonable efforts to have the Bankruptcy Court enter the Bidding Procedures Order within thirty (30) days from the filing date of the Sale Motion.

(e)    Sellers acknowledge and agree that Buyer has expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Acquired Assets.  In consideration therefor, the Sale Motion shall include a request from Sellers that the Bankruptcy Court approve the Break-Up Fee and Reimbursable Expenses as allowed superpriority administrative expense claims against Sellers' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code and equal in priority to claims arising under the DIP Order and shall be secured by Liens equal in priority to the DIP Liens granted under the DIP Order.

(f)    Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order as promptly as practicable following entry of the Bidding Procedures Order, but in no event later than February 15, 2019 if there are no Qualified Bids (as defined in the Bidding Procedures) other than Buyer.

(g)    Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions except as expressly permitted pursuant to Section 6.2 or the Bidding Procedures.

6.10    Cure Costs.  Sellers shall transfer and assign all Assumed Contracts to Buyer or an Affiliate of Buyer designated by Buyer, and Buyer or such designated Affiliate of Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.  As promptly as practicable following the date hereof, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the Cure Costs under each Assumed Contract, if any, so as to permit the assumption and assignment of each such Assumed Contract pursuant to section 365 of the Bankruptcy Code in connection with the Transactions.  In connection with the assignment and assumption of the Assumed Contracts, Buyer shall cure any defaults under the Assumed Contracts by payment of any Cure Costs (or create reserves therefor) as ordered by the Bankruptcy Court.  Buyer or its designated Affiliate shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts.

6.11    Preservation of Records.  After the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all Records included in and otherwise related to the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer

acknowledges that Sellers have the right to retain originals or copies of all of Records included in or related to the Acquired Assets for periods prior to the Closing.

6.12    <u>Risk of Loss</u>.  If during the Interim Period any of the Acquired Assets or assets of an Acquired Company are damaged by fire or other casualty (each such event, an "<u>Event of Loss</u>"), or are taken by a Governmental Entity by exercise of the power of eminent domain (each, a "<u>Taking</u>"), then Sellers shall promptly give Buyer written notice of such occurrence, including reasonable particulars with respect thereto, and the following provisions of this <u>Section 6.12</u> shall apply:

(a)    With regard to an Event of Loss or Taking occurring after the Agreement Date, without Buyer's prior consent (which shall not be unreasonably withheld, conditioned or delayed), no insurance or condemnation proceeds shall be committed or applied by Sellers or the Acquired Companies to repair, restore or replace a lost, damaged, destroyed or taken portion of the Acquired Assets or assets of the Acquired Companies if the cost to repair, restore or replace a lost, damaged, destroyed or taken portion of the Acquired Assets and assets of the Acquired Companies is projected to exceed $5,000,000.00.  To the extent such proceeds are not committed or applied by Sellers and the Acquired Companies prior to the Closing Date in accordance with this <u>Section 6.12</u>, Sellers shall at the Closing pay to Buyer all sums paid to Sellers by reason of such loss, damage, destruction or taking, less any reasonable and documented out-of-pocket costs and expenses incurred by Sellers in collecting such proceeds.  In addition and to the extent such proceeds have not been committed or applied by Sellers in accordance with this <u>Section 6.12</u> in such repair, restoration or replacement, Sellers shall transfer to Buyer, at the Closing, without recourse against Sellers, all of the right, title and interest of Sellers in and to any unpaid insurance or condemnation proceeds arising out of such loss, damage, destruction or taking, less any reasonable costs and expenses incurred by Sellers in collecting such proceeds.  Any such funds that have been committed by Sellers for repair, restoration or replacement as aforesaid shall be paid by Sellers for such purposes or, at Sellers' option, delivered to Buyer upon Sellers' receipt from Buyer of adequate assurance and indemnity that Sellers shall incur no liability or expense as a result of such commitment.

(b)    Notwithstanding anything to the contrary in this Agreement, at the Closing, the Acquired Assets and assets of the Acquired Companies affected by an Event of Loss or Taking shall be included in the Closing.

Notwithstanding anything to the contrary, this <u>Section 6.12</u> shall not in any respect modify or waive any of the conditions precedent to closing set forth in <u>Section 7.1</u> or the determination of whether a Sellers Material Adverse Effect has or is reasonably expected to occur.

6.13    <u>Bulk Transfer Laws</u>.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the Transactions, and hereby waives all Claims related to the non-compliance therewith.

6.14    <u>Hedging Program</u>.  Sellers shall implement a comprehensive hedging program that is reasonably acceptable to Buyer as promptly as practicable following the date hereof (a "<u>Hedging Program</u>"), and shall maintain the Hedging Program through the Closing (it being understood that a hedging program substantially similar to the hedging program of Sellers in effect on the Agreement Date will be deemed reasonably acceptable to Buyer).

6.15    <u>Intercompany Payables</u>.  Effective as of the Closing, all intercompany payable, receivables and accounts between an Acquired Company, on the one hand, and Aegean, any of its Subsidiaries or their respective Affiliates, on the other hand, shall be terminated (regardless of the terms of payment of such intercompany accounts), and all agreements between such Acquired Company, on the one hand, and Aegean, any of its Subsidiaries or any of the respective Affiliates, on the other hand, shall be terminated,

in each case without further liability or obligation (contingent or otherwise) of any party thereunder (it being agreed that Buyer shall be entitled to control and direct the manner in which such intercompany accounts are so terminated).

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1    <u>Conditions Precedent to Obligations of Buyer</u>.  The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Sellers (i) set forth in <u>Section 4.1</u> (*Organization*) and <u>Section 4.3</u> (*Due Authorization*) (collectively, the "<u>Seller Fundamental Representations</u>") shall be true and correct in all respects other than *de minimis* inaccuracies, (ii) set forth in <u>Article 4</u> qualified as to Sellers Material Adverse Effect or material adverse effect shall be true and correct in all respects and (iii) set forth in <u>Article 4</u> (other than the Seller Fundamental Representations and those described in <u>clause (ii)</u>) shall be true and correct, in the aggregate, in all material respects, in the case of each of <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u>, as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    <u>Performance of Obligations</u>.  Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)    <u>Officer's Certificate</u>.  Buyer shall have received a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in <u>Sections 7.1(a)</u> and <u>7.1(b)</u> above have been fulfilled and/or waived.

(d)    <u>Antitrust Approvals</u>.  (i) All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required, and (ii) all of the applicable Governmental Entity approvals or consents required under Foreign Antitrust Laws that are material to the Business or to Buyer and its Affiliates shall have been received (or, if applicable, any waiting period (and any extension thereof) in respect of any such approvals or consents under Foreign Antitrust Laws shall have been terminated or shall have expired).

(e)    <u>Governmental Approvals</u>.  (i) All approvals or consents of Governmental Entities required prior to Closing that are material to the Business or to Buyer and its Affiliates shall have been obtained and (ii) there shall be no Law or Order that restrains or prevents the Transactions.

(f)    <u>Bankruptcy Court Order</u>.  After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order (i) shall have become final and non-appealable, (ii) shall not have been reversed, stayed, modified or amended, vacated, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, and (iii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Sale Order no longer being in form and substance satisfactory to Buyer in its reasonable discretion.

46

(g)    DIP Default.  (i) There shall not have occurred any DIP Event of Default that is continuing, (ii) a Remedies Exercise Notice shall not have been delivered and (iii) the DIP Facility Lenders shall not have acquired all or a material part of the Acquired Assets as a result of the exercise of remedies under the DIP Facility.

(h)    Credit Bid.  (i) The Bankruptcy Court shall have entered a final non-appealable Order permitting Buyer to discharge no less than $459,000,000.00 of the then outstanding obligations under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility as Credit Bid Consideration for all of the Acquired Assets (or, solely to the extent the borrowers under the DIP Facility have not borrowed the full amount available thereunder, the amount that would be the actual Credit Bid Consideration in accordance with Section 3.3), and (ii) there shall be no cause under section 363(k) of the Bankruptcy Code prohibiting Buyer from discharging all (or such lower amount necessary to satisfy the Purchase Price) of the then outstanding obligations under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility as Credit Bid Consideration for all of the Acquired Assets.

(i)    Assumed Contracts; Consents.  Sellers shall have obtained any consent or approval required under the Applicable Contracts as a result of the execution or performance of this Agreement or the consummation of the Transactions, in form and substance reasonably satisfactory to Buyer, and each such consent shall be in full force and effect and shall not have been revoked.  The "Applicable Contracts" shall mean (i) the Assumed Contracts and (ii) the Contracts to which an Acquired Company is a party, in each case, (A) that require a Necessary Consent, (B) that Buyer determines in its reasonable discretion to be material to the Business or the Transactions taking into account the extent to which a commercially reasonable Alternative Arrangement or alternative third-party arrangement to such Contract is practically obtainable by Buyer following the Closing and the timing for implementing such arrangement.

(j)    Permits.  Sellers shall have assumed and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code and the Sale Order, or the Acquired Companies shall have retained, the Material Licenses and Permits that Buyer determines in its reasonable discretion to be material to the Business, and such Material Licenses and Permits shall be in full force and effect and shall not have been revoked.

(k)    No MAE.  Since the Agreement Date through the Closing Date, there shall not have occurred a Sellers Material Adverse Effect.

(l)    Acquired Companies.  Any Acquired Company that is a debtor in the Chapter 11 Cases shall have shall have either (i) been dismissed as a debtor in such Chapter 11 Cases by Order of the Bankruptcy Court, or (ii) resolved its Chapter 11 Cases in a manner acceptable to Buyer.

(m)    Hedging Program.  Sellers shall have implemented and continue to maintain a Hedging Program in accordance with Section 6.14.

(n)    Committee Investigation.  The Challenge Periods (as defined in the DIP Order) shall have passed and each of the Debtors' (as defined in the DIP Order) stipulations set forth in the DIP Order shall be binding on all persons, entities and parties in interest in the Chapter 11 Cases, including the Committee (as defined in the DIP Order).

(o)    Sellers' Deliveries.  Sellers shall have delivered to Buyer all of the items set forth in Section 3.1(b).

7.2    Conditions Precedent to the Obligations of Sellers.  The obligation of Sellers to consummate the Transactions is subject to the satisfaction (or waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

47

(a)    <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Buyer (i) set forth in <u>Section 5.1</u> (*Organization*) and <u>Section 5.2</u> (*Due Authorization*), shall be true and correct in all material respects and (ii) set forth in <u>Article 5</u> (other than those described in <u>clause (i)</u>) shall be true and correct in all material respects, except where the failure of such representations or warranties to be correct and correct has not, and would not reasonably be expected to have a Buyer Material Adverse Effect, in the case of each of <u>clauses (i)</u>, <u>(ii)</u>, as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)    <u>Performance of Obligations</u>.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)    <u>Officer's Certificate</u>.  Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer to the effect that the conditions specified in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> above have been fulfilled and/or waived.

(d)    <u>Antitrust Approvals</u>.  (i) All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required, and (ii) all of the applicable Governmental Entity approvals or consents required under Foreign Antitrust Laws that are material to the Business or to Buyer and its Affiliates shall have been received (or, if applicable, any waiting period (and any extension thereof) in respect of any such approvals or consents under Foreign Antitrust Laws shall have been terminated or shall have expired).

(e)    <u>Governmental Approvals</u>.  (i) All approvals or consents of Governmental Entities required prior to Closing that are material to the Business or to Buyer and its Affiliates shall have been obtained and (ii) there shall be no Law or Order that restrains or prevents the Transactions.

(f)    <u>Bankruptcy Court Order</u>.  After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall not have been stayed, stayed pending appeal or vacated; provided, however, that even if an appeal, notice of appeal, motion to amend or make additional findings of fact or motion for a new trial is timely filed, or the Sale Order is otherwise challenged in any respect, such Sale Order will be deemed a final order if it provides that it is effective immediately upon entry on the Bankruptcy Court's docket and not subject to any stay notwithstanding Rules 6004(h), 6006(d), or 7062 of the Federal Rules of Bankruptcy Procedure or Rule 62 of the Federal Rules of Civil Procedure.

(g)    <u>Buyer's Deliveries</u>.  Buyer shall have delivered to Sellers all of the items set forth in <u>Section 3.1(c)</u>.

## ARTICLE 8
## TERMINATION

8.1    <u>Termination of Agreement</u>.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)    by written agreement of Sellers and Buyer;

(b)    by either Sellers or Buyer:

#4852-4560-1655

(i)        if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final;

(ii)       subject to Section 6.2(b), upon the Bankruptcy Court's entry of an order approving an Alternative Transaction;

(iii)      if (A) the Bankruptcy Court shall not have entered the Bidding Procedures Order on or before December 4, 2018, as such date may be extended by mutual agreement of Sellers and Buyer or (B) an order of any court in any jurisdiction shall be entered relating to the Chapter 11 Cases of Sellers (x) staying for a period in excess of ten (10) days, vacating or reversing the Bidding Procedures Order or (y) amending, supplementing or otherwise modifying the Bidding Procedures Order in a manner that results in the Bidding Procedures Order no longer being substantially in the form set forth in Exhibit B hereto; provided, that Sellers shall not be permitted to terminate this Agreement pursuant to clause (y) if Buyer approves of any such amendment, supplement or other modification to the Bidding Procedures Order; or

(iv)      if (A) a trustee or an examiner with expanded powers is appointed in any of the Chapter 11 Cases or (B) any of the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(c)        by Buyer if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in Section 7.1, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Sellers; provided, that as of such date, Buyer is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2;

(d)        by Buyer if, subject to Section 6.2(b), (i) Sellers comply with the Bidding Procedures and accept a Successful Bid (as defined in the Bidding Procedures) from a Person other than Buyer or its permitted transferee or (ii) Sellers enter into an Alternative Transaction;

(e)        by Sellers, if (i) there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2, or (ii) any other event or condition shall result in Buyer being incapable of satisfying one or more conditions set forth in Section 7.2, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within twenty (20) days after written Notice thereof shall have been received by Buyer; provided that as of such date, any Seller is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1;

(f)        by Buyer, if (i) the Petition Date does not occur on or before the date that is one (1) day after the approval of the Interim DIP Order by the Bankruptcy Court, (ii) if Sellers fail to file the Sale Motion on or before the date that is one (1) day after the approval of the Interim DIP Order by the Bankruptcy Court, or (iii) the Auction (if any) shall not have commenced by February 18, 2019;

49

(g)    by Buyer, if (i) any DIP Event of Default shall occur and be continuing, (ii) a Remedies Exercise Notice shall have been delivered or (iii) the DIP Facility Lenders acquire all or a material part of the Business as a result of the exercise of remedies under the DIP Facility;

(h)    by Buyer if the Closing shall not have occurred on or before the date that is one hundred twenty (120) days after the date hereof; provided, however, that Buyer is not in material and willful breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder; provided further, however, that such date shall automatically extend an additional 60 days if the conditions precedent in Sections 7.1(d) and 7.1(e) have not been satisfied;

(i)    by Sellers if the Closing shall not have occurred on or before the date that is one hundred eighty (180) days after the date hereof; provided, however, that no Seller not in material and willful breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder; provided further, however, that such date shall automatically extend an additional 60 days if the conditions precedent in Sections 7.1(d) and 7.1(e) have not been satisfied;

(j)    by Buyer if the Bankruptcy Court shall have entered an Order invalidating, disallowing or otherwise prohibiting Buyer from discharging at least $459,000,000.00 of the then outstanding obligations under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility as Credit Bid Consideration for all of the Acquired Assets (or, solely to the extent the borrowers under the DIP Facility have not borrowed the full amount available thereunder, the amount that would be the actual Credit Bid Consideration in accordance with Section 3.3);

(k)    by Buyer if the "Schedule of Liabilities and Assets" and the "Statement of Financial Affairs" have not been filed with the Bankruptcy Court within sixty (60) days of the Petition Date;

(l)    [Reserved];

(m)    by Buyer if the Bankruptcy Court shall not have entered the Sale Order on or before February 25, 2019;

(n)    by Buyer if Buyer or any of its Affiliates shall have been named as a defendant or third-party defendant in or otherwise subject to any Proceeding, motion or objection in any of the Chapter 11 Cases or any ancillary or adversary proceedings related thereto, and an Order has been entered which avoids, voids, invalidates, recharacterizes, equitably subordinates, disallows or otherwise limits the allowance of any portion of Buyer's or any of its Affiliates' Liens or Claims under the U.S. Borrowing Base, the Global Borrowing Base or the DIP Facility; or

(o)    by Sellers if the governing body of any Seller, determines, upon advice from outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would violate its or such governing body's fiduciary obligations under applicable Law, including to pursue an Alternative Transaction.  For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with Section 8.1), Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

#4852-4560-1655

8.2    Consequences of Termination.

(a)    In the event of any termination of this Agreement by either or both of Buyer and Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than Section 6.4 (*Public Announcements*), this Section 8.2 (*Consequences of Termination*) and Article 10 (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, Article 1 (*Definitions*)), and the Transactions shall be abandoned without further action of the Parties hereto, except that, subject to Section 8.2(b) such termination shall not relieve any Party of any Liability for Fraud, gross negligence or willful breach of this Agreement.

(b)    Break-Up & Expense Reimbursement Amount.

(i)    Sellers shall, within two (2) Business Days after any termination of this Agreement pursuant to Section 8.1(b)(ii), Section 8.1(c), Section 8.1(d), Section 8.1(g) or Section 8.1(o), reimburse Buyer for all of the actual, documented and reasonable out of pocket costs, fees and expenses incurred or to be incurred by Buyer or its Affiliates, including reasonable fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the Transactions, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions, in each case, less any expenses paid or reimbursed for under the DIP Facility (such costs, fees and expenses, the "Reimbursable Expenses").

(ii)    If this Agreement is terminated pursuant to (A) Section 8.1(b)(ii), Section 8.1(d) or Section 8.1(o), Sellers shall pay to Buyer a cash amount equal to $19,000,000.00 (the "Break-Up Fee") upon the consummation of an Alternative Transaction, or (B) Section 8.1(c) at a time when Sellers have breached their representations, warranties, covenants or agreements contained in this Agreement in any material respect, Sellers shall pay to Buyer a cash amount equal to the Break-Up Fee upon the consummation of an Alternative Transaction, solely, in the case of clause (B) to the extent that, within 6 months after the date of such termination, Sellers consummate an Alternative Transaction. Any payment made pursuant to this Section 8.2(b)(ii) shall be made within two (2) Business Days of consummation of such Alternative Transaction.

(iii)    Sellers acknowledge and agree that (A) the payment of the Break-Up Fee and the Reimbursable Expenses are integral parts of the Transactions, (B) in the absence of Sellers' obligations to make these payments, Buyer would not have entered into this Agreement, (C) time is of the essence with respect to the payment of the Break-Up Fee and the Reimbursable Expenses and (D) the Break-Up Fee and the Reimbursable Expenses shall constitute allowed superpriority administrative expense claims against Sellers' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code and equal in priority to claims arising under the DIP Order and shall be secured by Liens equal in priority to the DIP Liens granted under the DIP Order. To the extent that all amounts due in respect of the Break-Up Fee and the Reimbursable Expenses pursuant to this Section 8.2(b) have actually been paid by Sellers to Buyer, Buyer shall not have any additional recourse against any Seller or its Affiliates for any Liabilities relating to or arising from this Agreement. Further, prior to the Closing in the event of any breach of this Agreement by Sellers, subject to the rights of Buyer pursuant to Section 10.11(d), the sole and exclusive remedies of Buyer and its Affiliates and Representatives will be, if applicable, to (i) terminate this Agreement pursuant to Section 8.1 and (ii) receive, if applicable, any payments payable pursuant to this Section 8.2(b). Subject to the rights of Buyer pursuant to Section 10.11(d), prior to the Closing, in no

51

event will Sellers or any of their respective Affiliates or Representatives be liable for any monetary damages for any breach of this Agreement, other than any payments, if applicable, as described in the immediately preceding sentence.  Further, in connection with the payment of all amounts due in respect of the Break-Up Fee and the Reimbursable Expenses pursuant to this <u>Section 8.2(b)</u>, Buyer shall execute and deliver to Sellers a general release of Sellers and their Affiliates, which shall fully discharge and release the others from any further Liability in respect of this Agreement and the Transactions.

**ARTICLE 9**
**[RESERVED]**

**ARTICLE 10**
**MISCELLANEOUS**

10.1    <u>Expenses</u>.  Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

10.2    <u>Assignment</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; <u>provided</u>, that Buyer may assign its rights and obligations to any Affiliate so long as Buyer remains primarily liable for its obligations.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including any liquidating trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases.

10.3    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of Sellers, Buyer and their respective successors or permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

10.4    <u>Releases</u>.  Effective as of the Closing, Sellers hereby release Buyer and its Affiliates, equityholders, directors, managers, officers, employees, members, partners, limited partners, agents and representatives of Buyer and its Affiliates (collectively, the "<u>Buyer Released Parties</u>") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Seller or its respective Affiliates and all such Persons' respective successors and assigns, have or may have against any of Buyer Released Parties; <u>provided</u>, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing; and (ii) Buyer and the Acquired Companies hereby release Sellers and their respective Affiliates, equityholders, directors, managers, officers, employees, members, partners, limited partners, agents and representatives of Sellers and their respective Affiliates (collectively, the "<u>Sellers Released Parties</u>") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that Buyer and any Acquired Company or their respective Affiliates and all such Persons' respective successors and assigns, have or may have against any of Sellers Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing.

#4852-4560-1655

10.5    <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; <u>provided</u>, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day.  Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

|  |  |  |
|---|---|---|
| If to any Seller: | Aegean Marine Petroleum Network, Inc. | |
| | 10, Akti Kondili | |
| | 185 45, Piraeus | |
| | Greece | |
| | Attention: | Spyros Fokas |
| | Email: | S.Fokas@ampni.com |
| | | |
| With copies to: | Kirkland & Ellis LLP | |
| | 601 Lexington Avenue | |
| | New York, NY 10022 | |
| | Attention: | Jonathan S. Henes, P.C. |
| | Email: | jonathan.henes@kirkland.com |
| | | |
| | Kirkland & Ellis LLP | |
| | 300 North LaSalle | |
| | Chicago, Illinois 60654 | |
| | Attention: | Marc Kieselstein, P.C. |
| | | Ross M. Kwasteniet, P.C. |
| | | Adam C. Paul, P.C. |
| | | W. Benjamin Winger |
| | Email: | marc.kieselstein@kirkland.com |
| | | ross.kwasteniet@kirkland.com |
| | | adam.paul@kirkland.com |
| | | benjamin.winger@kirkland.com |
| | | |
| | Kirkland & Ellis LLP | |
| | 901 Main Street | |
| | Dallas, TX 75202 | |
| | Attention: | Michael P. Considine, P.C. |
| | | Dilen Kumar |
| | Email: | MPConsidine@kirkland.com |
| | | dilen.kumar@kirkland.com |

#4852-4560-1655

<table>
<tbody>
<tr><td>If to Buyer:</td><td>Mercuria Asset Holdings (Hong Kong) Limited<br>c/o Mercuria Energy Group Limited<br>50 rue du Rhône<br>6th Floor<br>1204 Geneva<br>Switzerland<br>Attention:  François Sornay<br>Email:  fsornay@mercuria.com</td></tr>
</tbody>
</table>

|  |  |  |
|---|---|---|
| With copies to: | Milbank, Tweed, Hadley & McCloy LLP | |
| | 28 Liberty Street | |
| | New York, NY 10005 | |
| | Attention: | Abhilash M. Raval |
| | | Lauren C. Doyle |
| | | Scott W. Golenbock |
| | Email: | ARaval@milbank.com |
| | | LDoyle@milbank.com |
| | | SGolenbock@milbank.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.6    Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

10.7    Entire Agreement; Amendments and Waivers.  This Agreement, the Confidentiality Agreement and all Transaction Documents and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

10.8    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

10.9    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

#4852-4560-1655

10.10    <u>Headings</u>.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

10.11    <u>Exclusive Jurisdiction and Specific Performance</u>.

(a)    Subject to <u>Section 10.11(b)</u>, without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in <u>Section 10.5</u>.  For the avoidance of doubt, this <u>Section 10.11</u> shall not apply to any Claims that Buyer or its Affiliates may have against any third party following the Closing.

(b)    Notwithstanding anything herein to the contrary, in the event the Chapter 11 Cases of Sellers are closed or dismissed, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

(c)    Buyer acknowledges that Sellers would be damaged irreparably in the event that the terms of this Agreement are not performed by Buyer in accordance with its specific terms or otherwise breached or Buyer fails to consummate the Closing and that, in addition to any other remedy that Sellers may have under law or equity, Sellers shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Buyer.  Buyer further agrees that no Seller shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 10.11</u>, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

(d)    Sellers acknowledge that Buyer would be damaged irreparably in the event that the terms of this Agreement are not performed by Sellers in accordance with its specific terms or otherwise breached or Sellers fail to consummate the Closing and that, in addition to any other remedy that Buyer may have under law or equity, Buyer shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Sellers.  Each Seller further agrees that Buyer shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 10.11</u>, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

10.12    <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  FOR THE AVOIDANCE OF DOUBT, THIS <u>SECTION 10.12</u> SHALL NOT APPLY TO ANY CLAIMS THAT BUYER OR ITS AFFILIATES MAY HAVE AGAINST ANY THIRD PARTY FOLLOWING THE CLOSING.

#4852-4560-1655

10.13    <u>Survival</u>.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing (each, a "<u>Post-Closing Covenant</u>")) shall expire and be of no further force and effect as of the Closing.  Each Post-Closing Covenant shall survive the Closing until the earlier of (a) performance of such Post-Closing Covenant in accordance with this Agreement or, (b) (i) if time for performance of such Post-Closing Covenant is specified in this Agreement, sixty (60) days following the expiration of the time period for such performance or (ii) if time for performance of such Post-Closing Covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such Post-Closing Covenant; provided that if a written notice of any claim with respect to any Post-Closing Covenant is given prior to the expiration thereof then such Post-Closing Covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

10.14    <u>Computation of Time</u>.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

10.15    <u>Time of Essence</u>.  Time is of the essence of this Agreement.

10.16    <u>Non-Recourse</u>.    No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of any Seller shall have any Liability for any Liabilities of such Seller under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions.

10.17    <u>Disclosure Schedules</u>.  Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person.  The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract).  Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement.  The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates; <u>provided</u>, <u>however</u>, that any information set forth in one Section of the Disclosure Schedules will be deemed to apply to each other section or subsection thereof to which its relevance is reasonably apparent on its face.  Until the Auction (if any), Sellers shall have the right (but not the obligation) to amend, modify and/or supplement <u>Schedule 2.1(a)-1</u>, <u>Schedule 2.1(a)-2</u>, <u>Schedule 2.1(d)</u>, <u>Schedule 2.1(e)</u>, <u>Schedule 2.2(l)</u>, <u>Schedule 4.4(c)</u>, <u>Schedule 4.7(a)</u>, <u>Schedule 4.7(b)</u> <u>Schedule 4.9</u>, <u>Schedule 4.10(a)</u>, <u>Schedule 4.10(b)</u>, <u>Schedule 4.10(c)</u>, <u>Schedule 4.10(e)</u>, <u>Schedule 4.13</u>, <u>Schedule 4.14(b)</u>, <u>Schedule 4.15</u>, <u>Schedule 4.16</u>, <u>Schedule 4.17(a)</u> and <u>Schedule 4.18</u> with respect to any matters discovered or occurring subsequent to the Agreement Date (it being agreed that any amendments, modifications and/or supplements to <u>Schedule 2.1(a)-1</u>, <u>Schedule 2.1(a)-2</u>, and <u>Schedule 2.1(d)</u> shall be subject to Buyer's right to designate any Contract as an "Excluded Asset" pursuant to <u>Section 2.6(a)</u>); <u>provided</u>, that had such matters been existing, occurring or known on the Agreement Date, they would have been required to be set forth or described in the Disclosure Schedules in order to make the representations and warranties true and correct as of the Agreement Date. Notwithstanding anything to the contrary in this Agreement, any such amendments, modifications and/or supplements to <u>Schedule 4.7(a)</u>, <u>Schedule 4.7(b)</u>, <u>Schedule 4.10(a)</u>, <u>Schedule 4.10(b)</u>, <u>Schedule 4.10(e)</u>, <u>Schedule 4.13</u>, <u>Schedule 4.14(b)</u>, <u>Schedule 4.15</u>, <u>Schedule 4.16</u>, <u>Schedule 4.17(a)</u> and <u>Schedule 4.18</u>, and any amendments,

modifications and/or supplements to <u>Schedule 4.4(c)</u> with respect to Contracts first added to <u>Schedule 4.14(b)</u> following the date hereof, shall be deemed to have cured any breach of the corresponding representation or warranty under this Agreement for purposes of determining if the conditions precedent to Closing in <u>Article 7</u> have been satisfied.

10.18    <u>Sellers' Representative; Dealings Among Sellers</u>.  By its execution and delivery of this Agreement, each Seller hereby irrevocably constitutes and appoints Aegean as its true and lawful agent and attorney-in-fact (the "<u>Sellers' Representative</u>"), with full power of substitution to act in such Seller's name, place and stead with respect to all Transactions and all terms and provisions of this Agreement, and to act on such Seller's behalf in any Proceeding, and to do or refrain from doing all such further acts and things, and execute all such documents as Sellers' Representative shall deem necessary or appropriate in connection with the Transactions.  The appointment of Sellers' Representative shall be deemed coupled with an interest and shall be irrevocable, and Buyer, its Affiliates and any other Person may conclusively and absolutely rely, without inquiry, upon any action of Sellers' Representative on behalf of Sellers in all matters referred to herein or contemplated hereby including any direction regarding the amount of any payment to any Seller.  Buyer shall have no obligation of any nature whatsoever for determining any allocation of any payments among Sellers.  Without limiting the generality of the foregoing, absent specific direction by Sellers' Representative, Buyer shall be deemed to have fulfilled its obligations hereunder absolutely with respect to any amounts payable by it under or pursuant to this Agreement or the delivery of any instruments if Buyer shall pay any such amounts or deliver such instruments to Sellers' Representative.  All Notices delivered by Buyer (whether prior to or following the Closing) to Sellers' Representative (whether pursuant hereto or otherwise) for the benefit of Sellers shall constitute valid and timely Notice to all of Sellers.

10.19    <u>Mutual Drafting</u>.  This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

10.20    <u>Fiduciary Obligations</u>.    Nothing in this Agreement, or any document related to the Transactions contemplated hereby, without limiting in any way Buyer's rights and remedies set forth in this Agreement, will require any Seller or any of their respective governing bodies, directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations in each such case so long as Sellers exercise their right to terminate this Agreement in accordance with the terms of <u>Section 8.1(o)</u>).

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written

**BUYER**:

MERCURIA ASSET HOLDINGS (HONG KONG) LIMITED

By: _____

Name:  HENRY BIAT

Title:  DIRECTOR

[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]

**SELLERS**:

AEGEAN MARINE PETROLEUM NETWORK
INC.

By: _____
Name:        Spyros Fokas
Title:        Authorized Person

AEGEAN INVESTMENTS S.A.

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN BUNKERING MOROCCO SARL AU

By: _____
Name: Spyros Fokas
Title: Authorized Person

AEGEAN HOLDINGS S.A.

By: _____
Name: Spyros Fokas
Title: Authorized Person

WEST COAST FUEL TRANSPORT LTD

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN CARIBBEAN HOLDINGS INC.

By: _____

Name: Spyros Fokas

Title: Authorized Person

CARIBBEAN RENEWABLE ENERGY SOURCES INC.

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN BUNKERING (HONG KONG) LTD

By: _____

Name: Spyros Fokas

Title: Authorized Person

ICS PETROLEUM (MONTREAL) LTD.

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN MARINE PETROLEUM S.A.

By: _____

Name: Spytos foxes

Title: Authorized Person

AEGEAN (FUJAIRAH) BUNKERING S.A.

By: _____

Name: Spyridon Fokas

Title:

AEGEAN BUNKERING (SINGAPORE) PTE LTD.

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN BUNKERING SERVICES INC.

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN OIL TERMINAL CORP

By: _____

Name: Spyros Fokas

Title: Authorized Person

AMPNI HOLDINGS CO. LIMITED

By:
Name:    Spyros Fokas
Title:    Authorized Person

AEGEAN BUNKERING (USA) LLC

By: _____

Name: Spyros Fokas

Title: Authorized Person

AMPNI INVESTMENTS CO. LIMITED

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN SHIPHOLDINGS INC.

By: _____

Name: Spyros Fokas

Title: Authorized Person

AEGEAN MANAGEMENT SERVICES M.C.

By: _____

Name: Spyros Fokas

Title: Authorized Person

## Exhibit A

**Bidding Procedures**

(See attached.)

**FINAL FORM**

## BIDDING PROCEDURES

### Overview

On November [•], 2018, Aegean Marine Petroleum Network Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

The Debtors are seeking to sell the Acquired Assets (as defined below) for the highest or best offer. On [•], 2018, the Bankruptcy Court entered an order [Docket No. [•]] (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to pursue a sale process in accordance with the procedures set forth below (the "Bidding Procedures") and to conduct an auction for the sale of all or substantially all of the Debtors' assets and/or equity interests in the Debtors or one or more of their direct and indirect subsidiaries, including in accordance with the terms of the Stalking Horse APA (the "Sale Transaction" and, collectively, the "Acquired Assets"). The Sale Transaction under the Stalking Horse APA shall be implemented pursuant to section 363 of the Bankruptcy Code. Notwithstanding the foregoing, a Potential Bidder (as defined below) may submit a proposal to implement a Sale Transaction through a chapter 11 plan, so long as the Successful Bidder (as defined below) refinances the DIP Credit Facilities and the Prepetition Credit Facilities and otherwise satisfies the Senior Secured Claims (as defined below) in full, in cash, in U.S. dollars, upon the earlier of (i) termination, expiration, or maturity of any of the DIP Credit Facilities and (ii) consummation of the sale to a Successful Bidder other than the Stalking Horse Bidder. For the avoidance of doubt, any Successful Bidder (other than the Stalking Horse Bidder) must provide replacement debtor-in-possession financing, whether such Successful Bidder's proposal seeks to implement a Sale Transaction through a chapter 11 plan or pursuant to section 363 of the Bankruptcy Code.

Mercuria Asset Holdings (Hong Kong) Limited ("Mercuria") submitted a stalking horse bid (the "Stalking Horse Bid" and such bidder, the "Stalking Horse Bidder"), which bid includes a credit bid component on account of Mercuria's claims as assignee of the right to credit bid pursuant to section 363(k) of the Bankruptcy Code the Prepetition Lenders' claims under the Prepetition Credit Facilities and the DIP Lenders' claims under the DIP Credit Facilities (collectively, the "Senior Secured Claims"). The Stalking Horse Bidder has executed that certain Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Stalking Horse APA"),[1] dated as of November [•], 2018. The Stalking Horse APA contemplates, pursuant to the terms and subject to the conditions and purchase price adjustments and mechanics contained therein, the sale of the Acquired Assets to the Stalking Horse Bidder in consideration of approximately $[681,000,000.00]. The willingness of the Stalking Horse Bidder to proceed with the transactions contemplated under the Stalking Horse APA is expressly conditioned upon, and being done in reliance upon, the right of the Stalking Horse Bidder to credit bid up to the full amount of the Senior Secured Claims, receive payment of the Bid Protections (as defined below),

---

[1]    Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse APA.

and for an Auction (as defined below) to occur in compliance with the terms herein and those set out in the Bidding Procedures Order.

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures. These Bidding Procedures describe, among other things: (i) the procedures for bidders to submit bids for the Acquired Assets; (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Acquired Assets (the "<u>Auction</u>"); (v) the ultimate selection of the Successful Bidder (as defined below); and (vi) Bankruptcy Court approval of the sale of the Acquired Assets to the Successful Bidder at a hearing before the Honorable Judge [•], United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York (the "<u>Sale Hearing</u>").

**The Debtors may, subject to the exercise of their business judgment and with the prior written consent of the Stalking Horse Bidder and the DIP Lenders (which shall not be unreasonably delayed, conditioned, or withheld), modify or terminate these Bidding Procedures, waive or modify terms and conditions set forth herein, extend any of the deadlines or other dates set forth herein, and/or adjourn the Auction and/or Sale Hearing; *provided* that, for the avoidance of doubt, the Bidding Procedures and the Bidding Procedures Order must, at all times, be in form and substance satisfactory to the Stalking Horse Bidder pursuant to the Stalking Horse APA.**

### Summary of Important Dates

| | |
|---|---|
| **January 3, 2019 at 5:00 p.m. (ET)** | • Deadline to submit a non-binding Indication of Interest. |
| **January 4, 2019** | • Deadline to Send Cure Notices |
| **January 18, 2019 at 5:00 p.m. (ET)** | • Stalking Horse APA Objection Deadline |
| **January 19, 2019 at 4:00 p.m. (ET)** | • Deadline to Object to Assumption and Assignment of Acquired Contracts to Stalking Horse Bidder, Including Proposed Cure Costs |
| **February 11, 2019 at 5:00 p.m. (ET)** | • Deadline to Submit Bids |
| **February 13, 2019 at 5:00 p.m. (ET)** | • Deadline for Debtors to Designate and Publish Baseline Bid |
| **February 13, 2019 at 5:00 p.m. (ET)** | • Sale Objection Deadline (with respect to any other Sale Transaction) |
| **February 15, 2019 at ____ _.m. (ET)** | • Sale Hearing if no Qualified Bid other than Stalking Horse Bid received for Acquired Assets |

| February 18, 2019 at 10:00 a.m. (ET) | • Auction, if necessary, to be conducted at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 |
|---|---|
| February 19, 2019 | • Deadline for Debtors to File and Serve Notice of Successful Bidder and Back-Up Bidder |
| February 19, 2019 at 4:00 p.m. (ET) | • Deadline to File Adequate Assurance Objection for Successful Bidder other than the Stalking Horse Bidder |
| February 20, 2019 at 4:00 p.m. (ET) | • Debtors' and Stalking Horse Bidder's Reply Deadline |
| February 22, 2019 at ___ _.m. (ET) | • Sale Hearing |

### Due Diligence

The Debtors have posted copies of material documents related to the Acquired Assets to the Debtors' confidential electronic data room (the "Data Room"). To access the Data Room, a party must submit to the Debtors or their advisors:

(A) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing and unexpired confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern);

(B) sufficient information, as reasonably determined by the Debtors, to allow the Debtors, in consultation with the Consultation Party (as defined below), to determine that the interested party has the financial wherewithal to close a purchase of the Acquired Assets, including such portion necessary to satisfy the Senior Secured Claims in full, in cash, in U.S. dollars, replacement debtor-in-possession financing and, if such interested party is an acquisition vehicle or newly-formed entity, a guarantee from an entity securing such party's performance under these Bidding Procedures and the Bidding Procedures Order; and

(C) identification of the Potential Bidder and any of the principals, members, partners, limited partners, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction.

An interested party that meets the above requirements to the satisfaction of the Debtors, in consultation with the Consultation Party, shall be a "Potential Bidder." As soon as practicable, the Debtors will provide such Potential Bidder access to the Data Room; *provided* that such access may be terminated by the Debtors in their discretion at any time for any reason whatsoever, after prior notice to, and in consultation with, the Consultation Party, including that a Potential Bidder does not become a "Qualified Bidder" (as defined below) or these Bidding Procedures are terminated.

The Debtors shall keep the Consultation Party reasonably informed of all interested parties that become Potential Bidders and the status of their due diligence.

Each Potential Bidder shall comply with all requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate a sale transaction and shall provide such information to the Debtors and the Consultation Party.

Until the Bid Deadline (as defined below), the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be initially directed to: (i) [●] ([●]@moelis.com) and [●] ([●]@moelis.com) of Moelis & Company; and (ii) [●] ([●]@kirkland.com) and [●] ([●]@kirkland.com) of Kirkland & Ellis LLP. Subject to the immediately following paragraph, the Debtors will simultaneously distribute to all Potential Bidders and the Stalking Horse Bidder via the Data Room any additional diligence materials not previously available to other Potential Bidders or the Stalking Horse Bidder. Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) these Bidding Procedures are terminated. The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors will have no obligation, but will have the right, to furnish any due diligence information to anyone other than Qualified Bidders. No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the business or assets of the Debtors to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth above, or (iii) has not established, in the Debtors' reasonable business judgment, that such Potential Bidder intends in good faith to, or have the capacity to, consummate the Sale Transaction. The Debtors shall take such reasonable or appropriate steps to protect any commercially sensitive information, including in relation to a Potential Bidder that may be a competitor. The Debtors reserve the right to withhold any diligence materials that the Debtors determine are sensitive, proprietary, or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor or is affiliated with any competitor of the Debtors; *provided*, that this foregoing paragraph shall not apply to the Stalking Horse Bidder.

Each Qualified Bidder will be deemed to acknowledge and represent that, as of the Bid Deadline, it (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' assets and liabilities that are the subject of the Auction to the extent of the assets and liabilities that are the subject of their Bid prior to making any such bids, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or assets in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, in each case except as expressly stated in these Bidding Procedures or the Stalking Horse APA. None of the Debtors, the DIP Lenders, the Prepetition Lenders, or the Stalking Horse Bidder, nor any of their respective employees, officers, directors, affiliates,

4

subsidiaries, representatives, agents, advisors, or professionals are responsible for, or will bear any liability with respect to such Potential Bidder or any information obtained by Potential Bidders in connection with the Sale Transaction.

<u>Bid Deadline</u>

A Potential Bidder that desires to make a bid on the Acquired Assets shall deliver electronic copies of its bid so as to be received no later than **February 11, 2019 at 5:00 p.m. (Eastern Time)** (the "<u>Bid Deadline</u>"). **The submission of a bid by the Bid Deadline shall constitute a binding and irrevocable offer to acquire the Acquired Assets**. Any party that does not submit a bid by the Bid Deadline will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in the Auction.

All Bids, including all documentation required to be submitted under the section "Form and Content of Bid," should be submitted by email to the following representatives:

**Counsel to the Debtors**:

<u>Kirkland & Ellis LLP</u>
Jonathan S. Henes, P.C.
jonathan.henes@kirkland.com

Marc Kieselstein, P.C.
marc.kieselstein@kirkland.com

Ross M. Kwasteniet, P.C.
ross.kwasteniet@kirkland.com

Adam C. Paul, P.C.
adam.paul@kirkland.com

W. Benjamin Winger
benjamin.winger@kirkland.com

Michael P. Considine, P.C.
michael.considine@kirkland.com

Dilen Kumar
dilen.kumar@kirkland.com

with full copies to:

**Counsel to the DIP Lenders, Prepetition Lenders, and Stalking Horse Bidder**

<u>Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP</u>

Abhilash M. Raval, Esq.
ARaval@milbank.com

Lauren C. Doyle, Esq.
LDoyle@milbank.com

-and-

Norton Rose Fulbright US LLP

Louis Strubeck, Esq.
louis.strubeck@nortonrosefulbright.com

Josh Agrons, Esq.
josh.agrons@nortonrosefulbright.com

**Right to Credit Bid**

The Stalking Horse Bidder shall be entitled to credit bid up to the full amount of the Senior Secured Claims. Any other Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "Secured Creditor") and the right and power to credit bid claims secured by such liens, shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured and, consistent with the procedures set forth herein, any such credit bid shall also include a bid for all of the Acquired Assets and provide sufficient cash consideration to satisfy the Cash Bid Amount (as defined below) in full at the earlier of (i) consummation of the Sale Transaction and (ii) the termination, expiration, or maturity of the DIP Credit Facilities.

Form and Content of Bid

A bid is a signed document from a Potential Bidder received by the Bid Deadline that identifies the purchaser by its legal name (including any equity holders, guarantors, or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other material party that will be participating in connection with the bid or the sale transaction, and includes, at a minimum, the following (a "Bid"):

(A)     Finalized Agreement. In both PDF and MS-WORD format, an executed copy of an asset purchase agreement (the "APA") that does not deviate substantially from the Stalking Horse APA and shall be subject to no greater conditionality than the Stalking Horse APA, along with a copy of same that has been marked against the Stalking Horse APA.

(B)     Same or Better Terms. A statement that the applicable Potential Bidder offers to purchase the Acquired Assets, pursuant to a transaction that is no less favorable to the Debtors' estates, as the Debtors may reasonably determine, in consultation with the Consultation Party, than the transactions contemplated in the Stalking Horse APA.

6

(C)     Underline{Unconditional Offer}.  A statement that the Bid is formal, binding, and unconditional in all respects (except for those conditions expressly set forth in the Stalking Horse APA) and is not subject to any contingency not set forth in the Stalking Horse APA and is irrevocable until the earlier of the first business day following the closing of the proposed sale transaction or the Outside Date (as defined below), except as otherwise provided in these Bidding Procedures.

(D)     Form of Consideration.  A statement confirming that the Bid is based on a cash offer in U.S. dollars in an amount no less than an amount sufficient to immediately satisfy, in each case upon the closing of the proposed transaction, the Cash Bid Amount (as defined below).

(E)     Purchase Price; Minimum Bid.  The value of each Bid, as determined by the Debtors in their business judgment and in consultation with the Consultation Party, must (I) provide a cash component in U.S. dollars that exceeds the aggregate sum of (a) the Stalking Horse Bid, (b) the Break-Up Fee and the Reimbursable Expenses (together, the "Bid Protections"), (c) the Minimum Overbid Amount (as defined below), and (d) the Senior Secured Claims (to the extent the value of which is not already included in the Stalking Horse Bid) (collectively, the "Cash Bid Amount"); and (II) propose an alternative transaction that provides substantially similar or better terms than the Stalking Horse Bid.  The Debtors and their advisors, in good faith, and in consultation with the Consultation Party, will determine the value of any assumed liabilities that differ from those included in the Stalking Horse APA.

(F)     Committed Financing.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the transaction set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, including copies of unredacted commitment letters, documented to the satisfaction of the Debtors, in consultation with the Consultation Party, that demonstrates the Potential Bidder has:  (i) received sufficient debt and/or equity funding commitments to satisfy such bidder's purchase price and other obligations under its Bid, including the ability to immediately satisfy, upon the closing of the proposed transaction, the Cash Bid Amount in full, in cash, in U.S. dollars and, if applicable, replacement debtor-in-possession financing, as needed, from the earlier of (i) entry of the Sale Order and (ii) termination, expiration, or maturity of the DIP Credit Facilities, through the closing of such Successful Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Acquired Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors in consultation with the Consultation Party.

(G)     Proof of Financial and Legal Ability to Perform.  Each Bid must contain such financial and other information that allows the Debtors, after consultation with the Consultation Party, to make a reasonable determination as to the Potential Bidder's

7

financial, legal, and other capabilities to consummate the sale transaction (and that such Potential Bidder will maintain the financial wherewithal to consummate the sale transaction while such Bid remains binding on such Potential Bidder), including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are to be assumed and assigned to such party. Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof (being not more than one (1) calendar year old in relation to any annual financial statements and not more than one (1) calendar quarter old in relation to any quarterly financial statement), proof of unconditional financing commitments, if needed to close the transaction, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that such Potential Bidder has the ability to close the sale transaction. If the Potential Bidder is an acquisition vehicle or a newly formed entity, such Bid must also include a guarantee from an entity securing the Potential Bidder's performance under these Bidding Procedures and the Bidding Procedures Order.

(H)    <u>Designation of Contracts and Leases</u>. Each Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and, as applicable, assignment of which is a condition to closing the sale transaction; *provided* that the APA may allow for the Potential Bidder to remove executory contracts and unexpired leases from the list of contracts to be assumed and assigned any time prior to the closing of the sale transaction; *provided further* that to the extent the Debtors identify any additional executory contracts or unexpired leases after the Bid is submitted, the APA may allow for the Potential Bidder to add such executory contracts and unexpired leases to the list of contracts to be assumed and assigned any time from and after the Bid is submitted as provided for in the Stalking Horse APA.

(I)    <u>Required Approvals</u>. A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, any Foreign Antitrust Laws, or any and all other anti-competition laws, as applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all governmental, regulatory, or other third-party approvals to operate the Debtors' business from and after closing the sale transaction and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable.

(J)     <u>No Entitlement to Expense Reimbursement or Other Amounts</u>.  A statement that the Bid does not entitle the Potential Bidder to any breakup fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Acquired Assets.

(K)     <u>Joint Bids</u>.  The Debtors, in consultation of the Consulting Party, are authorized to approve joint Bids in their reasonable discretion on a case-by-case basis.

(L)     <u>As-Is, Where-Is</u>.   Each Bid must include a written acknowledgment and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to the Bid Deadline; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection therewith or the Auction, except, in each case, as expressly stated in the APA.

(M)     <u>Agreement to Terms of the Bidding Procedures</u>.  A statement that the Potential Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code and agrees to be bound by these Bidding Procedures.

A Potential Bidder must also accompany its Bid with:  (N) a Deposit (as defined below); (O) the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder; (P) written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Stalking Horse APA), and such other evidence of ability to consummate the transaction contemplated by the APA, including an amount sufficient to pay the Cash Bid Amount in full, in cash, in U.S. dollars, and, if applicable, replacement debtor-in-possession financing, as acceptable in the Debtors' business judgment and in consultation with the Consultation Party; (Q) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the APA if the Potential Bidder is the Successful Bidder at the Auction; (R) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable Antitrust Laws and other applicable regulatory requirements; and (S) if the value of the Bid relative to the Stalking Horse APA includes additional non-cash components (such as fewer contingencies than are in the Stalking Horse APA), a reasonably detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value.

<u>Deposit</u>

To qualify as a Qualified Bid (as defined below), each Bid must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the total purchase price

(inclusive of any assumption of liabilities) set forth in the APA (the "Deposit"), to be deposited, prior to the Bid Deadline, with an escrow agent selected by the Debtors (the "Escrow Agent") in a U.S. escrow account to be identified and established pursuant to the authority granted by the order authorizing the Debtors to maintain and operate their bank accounts and subject in all respect to the DIP Order (the "Escrow Account"). The Debtors' interests in the Deposit and the Escrow Account shall be subject to the superiority claims and liens of the DIP Lenders and the Prepetition Lenders and shall constitute DIP Collateral (each as defined in the DIP Order). As set forth below and notwithstanding the foregoing, the Debtors will refund any Bidder's deposit and all accumulated interest thereon on or within ten (10) business days after the Bid Deadline if a Bid is determined by the Debtors not to be a Qualified Bid.

To the extent a Qualified Bid is modified before the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the proposed purchase price, to the extent the purchase price under such Qualified Bid is also so modified.

The requirements set forth in this "Deposit" section do not apply with respect to the Stalking Horse Bid or the Stalking Horse Bidder and no "Deposit" shall be required of the Stalking Horse Bidder.

<u>Review of Bids; Designation of Qualified Bids</u>

The Debtors, in consultation with the Consultation Party, will evaluate timely submitted Bids and may engage in negotiations with Potential Bidders who submitted Bids as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Bid. The Debtors shall promptly notify the Consultation Party of any changes to any submitted Bids.

By no later than February 12, 2019, the Debtors shall determine, in their reasonable judgment, after consultation with the Consultation Party, which of the Bids received by the Bid Deadline qualifies as a "Qualified Bid" (each Potential Bidder that submits such a Qualified Bid being a "Qualified Bidder"). The Debtors shall consult with the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder regarding the sufficiency of any Bid with respect to such bidder's ability to satisfy the Cash Bid Amount in full, in U.S. dollars, and each of the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder shall have the right to object if it believes that any Bid is not sufficient to satisfy the Cash Bid Amount in full, in U.S. dollars. The Debtors shall notify each Potential Bidder of its status as a Qualified Bidder as promptly as possible following such determination.

Notwithstanding anything contained herein to the contrary, the Debtors shall not accept any offer which would result in the net cash proceeds contemplated by such offer being less than the amount necessary to pay the Cash Bid Amount in full, in cash, in U.S. dollars on the date the sale contemplated by such Bid is consummated or the termination, expiration, or maturity of the DIP Credit Facilities, whichever is earlier; *provided* that the Successful Bidder shall be required to provide replacement or other debtor-in-possession financing through the anticipated closing of the Bid as and to the extent necessary.

Notwithstanding anything contained herein to the contrary, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid.

Without the written consent of the Debtors and the Stalking Horse Bidder, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid remains binding as specified herein; *provided* that, if the proposed modifications or amendments to a Qualified Bid include additional non-cash components (such as fewer contingencies than are in the Stalking Horse APA), then such Qualified Bidder shall include a reasonably detailed analysis of the value of any additional non-cash component of the Bid and back-up documentation to support such value; *provided further* that any Qualified Bid may be improved at the Auction, as set forth in these Bidding Procedures.

Determination and Announcement of Baseline Bids and Qualified Bidders

In evaluating the Bids, the Debtors, in consultation with the Consultation Party, shall also make a determination regarding which Qualified Bid is the highest or best Qualified Bid for the Acquired Assets and will therefore serve as the starting point at the Auction (the "Baseline Bid"). On or before February 13, 2019 at 5:00 p.m. (Eastern Time) (the "Designation Deadline"), the Debtors shall file a notice designating the Baseline Bid and/or distribute the same at the Auction. The Debtors shall also provide copies of such Baseline Bid (if applicable, marked against the Stalking Horse Bid) to all of the Qualified Bidders (including the Stalking Horse Bidder) and the Consultation Party.

If a Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Bidder's deposit and all accumulated interest thereon on or within ten (10) business days after the Bid Deadline.

Failure to Receive More Qualified Bids

If no Qualified Bid other than the one submitted by the Stalking Horse Bidder is received by the Bid Deadline, the Debtors will not conduct the Auction and the Stalking Horse APA will be deemed the Successful Bid and, subject to the termination rights under the Stalking Horse APA, the Debtors will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse APA no later than February 15, 2019**.**

## **Negotiation with Prepetition Term Parties**

From the date of entry of the Bidding Procedures Order, any Bidder, including the Stalking Horse Bidder, may execute definitive documentation with the Prepetition Term Parties (as defined in the DIP Order) (i) to purchase all or a portion of the Prepetition Term Parties' claims arising under the Prepetition Term Loan Facilities (as defined in the DIP Order) and/or (ii) with respect to the terms on which the Prepetition Term Loan Facilities may be assumed by such Bidder upon the closing of the Sale Transaction; *provided*, that if any such Bidder is not the Successful Bidder, then such Bidder shall sell, at the closing of the Sale Transaction, such claims to the Successful Bidder at the price such Bidder paid for such claims; *provided further* that no Bidder may enter into any exclusivity agreement with any Prepetition Term Party.

## Sale Hearing and Sale Order

At a hearing before the Bankruptcy Court (the "Sale Hearing"), the Debtors will seek the entry of an order authorizing and approving, *inter alia*, the applicable sale transaction (the "Sale Order"). The Sale Order shall authorize and approve the applicable sale transaction:

(A)     if no other Qualified Bid is received by the Debtors, to the Stalking Horse Bidder pursuant to the terms and conditions set forth in the Stalking Horse APA; or

(B)     if the Auction is held, to the Successful Bidder or, if the Successful Bid is not consummated within the timeframe contemplated by the APA, to the Back-Up Bidder.

In the Debtors' discretion (after consultation with the Consultation Party and with the consent of the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder), the Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing.

The Stalking Horse Bidder shall have standing to, without limitation, appear, object, and/or otherwise respond to any matter at the Sale Hearing or any related hearing.

## Auction Procedures

If there are two or more Qualified Bids, the Debtors will conduct the Auction on **February 18, 2019, beginning at 10:00 a.m. (Eastern Time) at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022**, or such later time or other place as the Debtors (in consultation with the Consultation Party and with the consent of the Stalking Horse Bidder) notify the Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

1.  only Qualified Bidders and their legal and financial advisors are permitted to attend the Auction;

2.  only Qualified Bidders (including the Stalking Horse Bidder) will be permitted to bid at the Auction;

3.  at the start of the Auction, the Debtors shall describe the terms of the Baseline Bid;

4.  bidding will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in minimum increments of at least $5,000,000 of additional value (a "Minimum Overbid Amount"), as determined by the Debtors in the exercise of their business judgment; *provided*, that the Debtors reserve the right to and may modify the Minimum Overbid Amount at any time during the Auction;

12

5.  in each round of bidding at the Auction, the Stalking Horse Bidder will also be entitled to a "credit" in the amount of the Bid Protections to be counted towards its bid in such round such that the cash and other consideration proposed by the Stalking Horse Bidder plus the Bid Protections "credit" must exceed the most recent bid by at least the Minimum Overbid Amount; *provided* that the Stalking Horse Bidder shall not be obligated to exercise such credit during any round of bidding at the Auction.  To the extent a Qualified Bidder fails, in any round of bidding at the Auction, to submit a bid that is of a higher value or is a better offer than the immediately preceding bid submitted in such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* that the Stalking Horse Bidder shall have the right (but not the obligation) to, during a single round of bidding at the Auction, submit a bid that matches the prior bid and does not increase such bid by the Minimum Overbid Amount;

6.  upon the solicitation of each round of applicable overbids relative to the Baseline Bid (each, an "Overbid"), the Debtors may establish a reasonable deadline on notice to all Bidders by which an Overbid must be submitted to the Debtors.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid made by that Bidder, as determined by the Debtors' reasonable business judgment in consultation with the Consultation Party, but shall otherwise comply with the terms of these Bidding Procedures;

7.  subsequent to each Overbid deadline, the Debtors shall announce whether the Debtors have identified an Overbid as being higher or otherwise better than the Baseline Bid or, as applicable in subsequent rounds, the Overbid previously designated as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid;

8.  the Debtors, in their reasonable discretion and in consultation with the Consultation Party, shall afford the Qualified Bidders a reasonable amount of time to respond to the Prevailing Highest Bid;

9.  the bidding will be transcribed to ensure an accurate recording of the bidding at the Auction;

10. each Qualified Bidder will be required to confirm on the record of the Auction that (a) it has not engaged in any collusion with respect to the bidding or the Sale Transaction, and (b) its Bid and any Overbid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder; and

13

11. the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest Bid.

With the consent of the Stalking Horse Bidder, the Debtors may modify or adopt such other rules for the Auction at any time that the Debtors, in consultation with the Consultation Party, reasonably determine to be appropriate to promote a robust auction. Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Stalking Horse APA (as may be consensually modified at the Auction) without the prior written consent of the Stalking Horse Bidder. Any rules developed by the Debtors will provide that all bids in the Auction will be made and received on an open basis, and all other bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder placing a bid at the Auction will be fully disclosed to all other bidders participating in the Auction (as well as the Consultation Party) and that all material terms of each Qualified Bid submitted in response to the Baseline Bid or to any successive bids made at the Auction will be disclosed to all other bidders (as well as the Consultation Party). Each Qualified Bidder will be permitted what the Debtors, in consultation with the Consultation Party, reasonably determine to be an appropriate amount of time to respond to the previous bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded, and the Qualifying Bidders will be informed of the material terms of the previous bid.

In evaluating a Qualified Bid submitted at the Auction, the Debtors may consider, among other things and without limitation, the amount of cash (or as may be applicable, reduction of liabilities of the estates) to be paid or delivered, the speed and certainty of consummating a transaction, and any other relevant factor. Prior to the conclusion of the Auction, the Debtors, after consultation with the Consultation Party, shall announce on the record that it has determined in its business judgment that it has received the highest or otherwise best Qualified Bid, and the Qualified Bidder that had submitted such Qualified Bid (the "Successful Bid") shall be declared the winning bidder (the "Successful Bidder"). The Debtors shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (the "Back-Up Bid") who shall be declared the "Back-Up Bidder." The Debtors shall consult with the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder regarding the amount of the Cash Bid Amount set forth in the Successful Bid and the Back-Up Bid, and each of the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder shall have the right to object if it believes that either the Successful Bid or the Back-Up Bid is not sufficient to satisfy the Cash Bid Amount in full, in U.S. dollars. The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) March 30, 2019 (the "Outside Date"), (ii) consummation of the transaction with the Successful Bidder, and (iii) the release of such bid by the Debtors in writing (such date, the "Back-Up Bid Expiration Date"). If a transaction with the Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid; *provided* that, if the Stalking Horse Bidder is declared the Back-Up Bidder, then the Stalking Horse Bidder shall only be obligated to consummate the Back-Up Bid to the extent required under the Stalking Horse APA.

Within two (2) business days after the Auction, the Successful Bidder shall submit, to the extent applicable, to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid. The Successful Bid may not be assigned to any entity without the

14

express written consent of the Debtors and, to the extent the Back-Up-Bidder is the Stalking Horse Bidder, the Stalking Horse Bidder.

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

In the event the Stalking Horse Bidder is not the Successful Bidder, any sale order approving the proposed transaction shall provide for the immediate transfer, in cash, in U.S. dollars, upon the closing of the proposed transaction, of such portion of the Cash Bid Amount to the DIP Lenders, the Prepetition Lenders, and the Stalking Horse Bidder that remains unpaid as of such date.

At any time before entry of the Sale Order approving the applicable transaction envisioned by a Successful Bid, the Debtors reserve the right to and may, after consultation with the Consultation Party, reject such Successful Bid if such Successful Bid, in the Debtors' judgment, is:  (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the applicable sale transaction; or (iii) contrary to the best interests of the Debtors and their estates, except that if the Stalking Horse Bid is the Successful Bid, the foregoing provisions of this sentence will be inoperative.  No attempt by the Debtors to reject a Successful Bid under this paragraph will modify any rights of the Debtors or the Stalking Horse Bidder under the Stalking Horse APA.

## **Post-Auction Process**

The Debtors shall not consider any bids submitted after the conclusion of the Auction.  Within one (1) day after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court notice of the Successful Bid, Successful Bidder, Back-Up Bid, and Back-Up Bidder.  At the Sale Hearing, the Debtors will present the Successful Bid to the Bankruptcy Court for approval.  The Successful Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of the Successful Bid and the Successful Bidder's ability to close within the timeframe contemplated by the APA and provide adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and/or assigned as part of the proposed sale transaction.

Within seven (7) business days after the Auction, the Debtors shall direct the Escrow Agent to return the deposit of any bidder, together with interest accrued thereon, who is not declared the Successful Bidder or Back-Up Bidder.  Within five (5) business days after the Back-Up Bid Expiration Date, the Debtors shall direct the Escrow Agent to return the deposit of such Back-Up Bidder, together with interest accrued thereon.  Upon the authorized return of any such deposit, the bid of such Potential or Qualified Bidder shall be deemed revoked in all respects (without any action required by the Bankruptcy Court) and no longer enforceable.

The deposit of the Successful Bidder shall be applied against the cash purchase price of such bidder's Successful Bid upon the consummation of the sale transaction.

In addition to the foregoing, the deposit of a Qualified Bidder will be forfeited to the Debtors if the Qualified Bidder (i) attempts to modify, amend, or withdraw its Qualified Bid,

except as permitted herein, during the time the Qualified Bid remains binding and irrevocable, (ii) is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate a sale transaction according to these Bidding Procedures and, as applicable, the APA or Stalking Horse APA, or (iii) breaches the Bidding Procedures, in each case, in addition to (and without limiting) any other remedies the Debtors may have.

### Consultation Party

The term "Consultation Party" as used in these Bidding Procedures shall mean the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases, if any.

The Debtors shall use their reasonable best efforts to consult and confer with the Consultation Party in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Party by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

The Debtors may not modify the consultation or consent rights of the Consultation Party or the Stalking Horse Bidder, as applicable, as set forth herein without the consent of such affected party.

### Consent to Jurisdiction and Authority as Condition to Bidding

All bidders (including the Stalking Horse Bidder) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction, and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

### Fiduciary Out

Nothing in these Bidding Procedures shall require or prevent the board of directors, board of managers, or such similar governing body of any Debtor from seeking Bankruptcy Court authority (on an emergency basis) and/or taking any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body believes, based on the advice of external legal counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided*, that the foregoing shall not impair the Stalking Horse Bidder's right to exercise any rights and remedies, including, without limitation, with respect to any breach of the Stalking Horse APA.

*    *    *    *

**<u>Exhibit B</u>**

**Bidding Procedures Order**

(See attached.)

**FINAL FORM**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEGEAN MARINE PETROLEUM NETWORK | ) | Case No. 18-[_____] (___) |
| INC., *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

ORDER APPROVING (A) BIDDING PROCEDURES, (B) STALKING
HORSE ASSET PURCHASE AGREEMENT AND BID PROTECTIONS,
(C) FORM AND MANNER OF NOTICE OF AUCTION, SALE TRANSACTION,
AND SALE HEARING, (D) ASSUMPTION AND ASSIGNMENT PROCEDURES,
AND (E) DATE FOR AUCTION, IF NECESSARY, AND SALE HEARING

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), pursuant to sections 105, 363, 365, 503, and 507 of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-

1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York (the "Local Bankruptcy Rules"), for entry of an order approving (a) the Bidding

Procedures attached hereto as **Exhibit 1**, (b) the Bid Protections granted to the Stalking Horse

Bidder as provided in that certain Asset Purchase Agreement (together with the exhibits and

schedules thereto, and as may be amended, modified, or supplemented from time to time in

accordance with the terms thereof, the "Stalking Horse APA"), dated as of November [•], 2018,

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint
administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or
like numbers is not provided herein.  A complete list of such information may be obtained on the website of the
Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean
Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is
52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    Capitalized terms utilized but not defined herein shall have the meanings given them in the Motion, the Stalking
Horse APA, or the Bidding Procedures, as applicable (as each of those terms is defined herein).

attached to the Motion as **Exhibit B**, (c) the form and manner of notice of the Auction and Sale

Hearing, (d) the Assumption and Assignment Procedures, including the procedures for

determining cure costs, (e) a date for the Auction and Sale Hearing (collectively, the "Bidding and

Auction Process"), (f) the marketing and potential sale of the Acquired Assets (as defined in the

Stalking Horse APA) free and clear of all liens, claims, encumbrances, and other interests (other

than as set forth in the Stalking Horse APA) pursuant to section 363(f) of the Bankruptcy Code or,

in the case of a potential bidder other than the Stalking Horse Bidder, a confirmed chapter 11 plan,

as applicable, and (g) the process for assuming and assigning certain executory contracts and

unexpired leases in connection therewith (the "Assumed Contracts" and subparts (a) through (g),

the "Sale Transaction"), all as more fully described in the Motion; and this Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012

(Preska, C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant

to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided therein,

and such notice having been adequate and appropriate under the circumstances; and it appearing

that no other or further notice need be provided; and any objections to the requested relief having

been withdrawn or overruled on their merits; and this Court having held a hearing to consider the

relief requested in the Motion as to the Bidding and Auction Process (the "Hearing"); and all of

the proceedings had before this Court; and this Court having reviewed the Motion and the First

Day Declarations; and this Court having found and determined that the relief sought in the Motion

as to the Bidding and Auction Process is in the best interests of the Debtors, their estates and

creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is hereby

## FOUND AND DETERMINED THAT:[3]

A.      This Court has jurisdiction to hear and determine the Motion and to grant

the relief requested herein with respect to the Bidding and Auction Process pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory and legal predicates for the relief requested in the Motion are

sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004,

6006, and 9014.

C.      Good and sufficient notice of the Motion, the Bidding and Auction Process,

and the relief sought in the Motion has been given under the circumstances, and no other or further

notice is required except as set forth herein and in the Bidding Procedures.   A reasonable

opportunity to object or be heard regarding the relief provided herein has been afforded to parties

in interest.

D.      The Bidding Procedures are fair, reasonable and appropriate, were

negotiated in good faith by the Debtors and the Stalking Horse Bidder, and are designed to promote

participation and active bidding and ensure that the highest or best value is generated for the

Acquired Assets.

E.      The Debtors and their advisors engaged in a robust and extensive marketing

and sale process before and after the Petition Date to solicit and develop the highest or best offer

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To
the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To
the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

for the Acquired Assets.  Further, the Bidding Procedures are adequately designed to continue that robust and extensive marketing and sale process after entry of this Order.

F.       Mercuria Asset Holdings (Hong Kong) Limited, on behalf of certain of its affiliates (collectively, "Mercuria"), submitted a bid, which bid includes a credit bid component on account of Mercuria's claims as assignee of the right to credit bid the Prepetition Lenders' claims under the Prepetition Credit Facilities and the DIP Lenders' claims under the DIP Credit Facilities, for the Acquired Assets as reflected in the Stalking Horse APA (the "Stalking Horse Bid"), which Stalking Horse Bid represents the highest or best offer the Debtors have received to date to purchase the Acquired Assets.

G.       Mercuria shall act as the "Stalking Horse Bidder" under the Stalking Horse APA and be subject to higher or better offers in accordance with the Bidding Procedures.

H.       Pursuit of the Stalking Horse Bidder as a "stalking-horse" bidder and its Stalking Horse APA as a "stalking-horse" sale agreement was and is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.  The Stalking Horse APA provides the Debtors with the opportunity to sell the Acquired Assets in a manner that will maximize value for their estates and stakeholders.  Without the Stalking Horse APA, the Debtors would likely realize a lower price for the Acquired Assets; therefore, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtors and their estates and creditors.  The Stalking Horse APA will enable the Debtors to secure a fair and adequate baseline price for the Acquired Assets at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

I.        The Bid Protections, including, but not limited to, the Break-Up Fee and Reimbursable Expenses (as such terms are defined in the Stalking Horse APA), (i) have been negotiated by the Stalking Horse Bidder and the Debtors and their respective advisors at arm's length and in good faith and (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue the Stalking Horse APA and the Sale Transaction.  The Break-Up Fee and Reimbursable Expenses, to the extent payable under the Stalking Horse APA, (a) are (x) actual and necessary costs and expenses of preserving each of the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and (y) joint and several obligations of each Debtor and its estate, (b) shall be treated as allowed superpriority administrative expense claims against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code equal in priority to the superpriority claims arising under the DIP Order (but junior to the Carve Out (as defined therein)), (c) shall be secured by liens equal in priority to the DIP Liens granted under the DIP Order (but junior to the Carve Out (as defined therein)); (d) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (e) are fair, reasonable, and appropriate, including in light of the size and nature of the Sale Transaction and the efforts that have been, and will be, expended by the Stalking Horse Bidder.  The Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse APA without which the Stalking Horse Bidder would not have executed the Stalking Horse APA.  Unless it is assured that the Bid Protections, including, but not limited to, the Break-Up Fee and Reimbursable Expenses, will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

J.      The Debtors have articulated good and sufficient business reasons for this Court to approve (i) the Bidding Procedures, (ii) the Assumption and Assignment Procedures, (iii) the Bid Protections (to the extent payable under the Stalking Horse APA), and (iv) the form and manner of notice of the Auction and Sale Hearing for the Sale Transaction.

K.      The Stalking Horse Bidder and its advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of its Bid Protections and the Bidding Procedures and the Stalking Horse Bidder's negotiation and entry into the Stalking Horse APA.

L.      The Assumption and Assignment Procedures, including notice of proposed cure costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Assumed Contracts to raise any objections to the proposed assumption and assignment or to the cure costs.

M.      The Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, the Sale Hearing, and the Sale Transaction (including the sale of the Acquired Assets (as set forth under the Stalking Horse APA) free and clear of any liens, claims, encumbrances, or interests (other than as set forth in the Stalking Horse APA) pursuant to section 363(f) of the Bankruptcy Code) (with such liens, claims, encumbrances, or interests attaching to the proceeds of any such sale), and any and all objection deadlines related thereto, and no other or further notice shall be required for the motion to approve the Sale Transaction or the assumption and assignment of the Assumed Contracts except as expressly required herein.

N.      Notwithstanding anything to the contrary in any prior order, the Prepetition Liens on the Prepetition ABL Collateral and the DIP Liens on the DIP Collateral (each as defined in the DIP Order) are valid, binding, enforceable, nonavoidable, and properly perfected, and the Stalking Horse Bidder is entitled to credit bid with respect to the Prepetition ABL Collateral and the DIP Collateral.

O.      The Stalking Horse Bidder is entitled to credit bid up to the full amount of the Senior Secured Claims (as defined in the Bidding Procedures) for the purchase of the Acquired Assets as reflected in the Stalking Horse APA pursuant to section 363(k) of the Bankruptcy Code. Nothing contained herein shall prejudice or impair the right of the Stalking Horse Bidder to increase its credit bid as set forth in, and subject to the terms of, the Stalking Horse APA. Allowing the Stalking Horse Bidder to credit bid will not chill the Bidding and Auction Process and neither the Stalking Horse Bidder nor its Affiliates have engaged in any inequitable conduct with respect to the Debtors or the Sale Transaction. As such, no "cause" exists to limit or condition the ability of the Stalking Horse Bidder to credit bid under section 363(k) of the Bankruptcy Code.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, hereby are overruled and denied on the merits with prejudice.

3.      The Sale Transaction contemplated under the Stalking Horse APA shall be implemented pursuant to section 363 of the Bankruptcy Code. Notwithstanding the foregoing, a Potential Bidder may submit a proposal to implement a Sale Transaction through a chapter 11 plan,

so long as the Successful Bidder refinances the DIP Credit Facilities and the Prepetition Credit Facilities and otherwise satisfies the Senior Secured Claims in full, in cash, in U.S. dollars, upon the earlier of (i) termination, expiration, or maturity of any of the DIP Credit Facilities and (ii) consummation of the sale to a Successful Bidder other than the Stalking Horse Bidder.  For the avoidance of doubt, any Successful Bidder (other than the Stalking Horse Bidder) must provide replacement debtor-in-possession financing, whether such Successful Bidder's proposal seeks to implement a Sale Transaction through a chapter 11 plan or pursuant to section 363 of the Bankruptcy Code.

**Important Dates and Deadlines**

4.      The Bidding and Auction Process shall be subject to the following milestones, each of which is subject to change in accordance with the Bidding Procedures and this Order.

| Event | Date / Deadline |
|---|---|
| Indication of Interest Deadline | January 3 2019, at 5:00 p.m. EST |
| Cure Notices | January 4, 2019, at 5:00 p.m. EST |
| Stalking Horse APA Objection Deadline | January 18, 2019, at 5:00 p.m. EST |
| Bid Deadline | February 11, 2019, at 5:00 p.m. EST |
| Notification of Qualified Bidders (if any) | February 13, 2019, at 5:00 p.m. EST |
| Sale Objection Deadline (if necessary) | February 13, 2019, at [●] EST |
| Auction (if necessary) | February 18, 2019, at [●] EST |
| Sale Hearing | February 22, 2019, at [●] EST |

**Notice Matters**

5.      The Sale Notice and the Publication Sale Notice, substantially in the forms annexed hereto as **Exhibit 2** and **Exhibit 3**, respectively, are approved.

6.       All parties in interest shall receive or be deemed to have received good and sufficient notice of (a) the Motion, (b) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA or to a Successful Bidder other than the Stalking Horse Bidder, (c) the Auction, (d) the Sale Transaction, including the sale of the Acquired Assets (as set forth under the Stalking Horse APA) free and clear of all Liens (other than as expressly set forth in the Stalking Horse APA), and (e) the Sale Hearing, and no further notice of the foregoing shall be required, if:

(a)       as soon as reasonably practicable, but no later than three (3) business days after entry of this Order, the Debtors will cause the Sale Notice to be filed with this Court and served by email, mail, facsimile, or overnight delivery on:  (i) counsel for the Stalking Horse Bidder, the Prepetition Lenders, and the DIP Lenders; (ii) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Acquired Assets in whole or in part during the past 12 months; (iii) all entities known by the Debtors to have asserted any Liens in the Acquired Assets (for whom identifying information and addresses are available to the Debtors); (iv) all non-Debtor parties to the Assumed Contracts (for whom identifying information and addresses are available to the Debtors); (v) any Governmental Entity (as defined in the Stalking Horse APA); (vi) the United States Attorney for the Southern District of New York; (vii) the Office of the Attorney General in each state in which the Debtors operate; (viii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (ix) the Federal Trade Commission; (x) the United States Attorney General/Antitrust Division of Department of Justice; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue Service; (xiii) all applicable competition, environmental, and taxing authorities; (xiv) all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); and (xv) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by the Court (for whom identifying information and addresses are available to the Debtors); and

(b)       as soon as reasonably practicable, but no later than five (5) business days after entry of this Order, the Debtors will cause the Publication Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in *The Financial Times* and *The Wall Street Journal*, global edition.

**Bidding Procedures and Auction**

7.      The Bidding Procedures, attached hereto as **Exhibit 1**, are fully incorporated herein and approved, and shall apply with respect to any bids for, and the auction and sale of, the Acquired Assets set forth under the Stalking Horse APA.  The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a Qualified Bid, are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  The Debtors are authorized to take all actions, including incurring and paying costs and expenses, as are necessary or appropriate to implement the Bidding Procedures.

8.      The deadline by which any party interested in making a proposal, solicitation, or offer in respect of the Acquired Assets must submit a non-binding indication of interest (each, an "Indication of Interest") is **January 3, 2019, at 5:00 p.m. (prevailing Eastern Time)** (the "Indication of Interest Deadline"); *provided*, *however*, that submitting an Indication of Interest shall not obligate any party to submit a formal bid or otherwise participate in the Bidding and Auction Process and shall not be a prerequisite for Potential Bidders to submit a Qualified Bid.

9.      The deadline for submitting Qualified Bids (the "Bid Deadline") is **February 11, 2019 at 4:00 p.m. (Eastern Time)**.  Any party that does not submit a Qualified Bid by the Bid Deadline in accordance with the Bidding Procedures will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in the Auction.  The Stalking Horse Bidder is a Qualified Bidder and the bid reflected in the Stalking Horse APA is a Qualified Bid for all purposes and requirements pursuant to the Bidding Procedures.

10.     All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Bidding and Auction Process.

11.     To qualify as a Qualified Bid, each such bid must be accompanied by information supporting the bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including the bidder's financial wherewithal and willingness to perform under any contracts that will be assumed and assigned to such bidder.  In addition to the other requirements of a Qualified Bid as set forth in the Bidding Procedures, each such bid must be accompanied by a written statement confirming that (a) the bidder has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction and (b) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

12.     Subject to the rights of the Stalking Horse Bidder under the Stalking Horse APA, the Bidding Procedures, and this Order, the Debtors shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Bidding Procedures, including to:  (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the Baseline Bid; (iv) determine which bids are the Successful Bid and Back-Up Bid, each as it relates to the Auction; (v) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, or this Order, or (c) contrary to the best interests of the Debtors and their estates; (vi) adjourn or cancel the Auction and/or the Sale Hearing; and (vii) modify the Bidding Procedures consistent with their fiduciary duties and bankruptcy law, in each case, as

provided in the Bidding Procedures.  In no event may the Debtors extend the timeframes or deadlines set forth in the Stalking Horse APA or the Bidding Procedures, or otherwise extend or enlarge the Stalking Horse Bidder's obligations thereunder or reduce or modify the Stalking Horse Bidder's rights thereunder without the consent of the Stalking Horse Bidder.

13.    The Debtors, in consultation with the Consultation Party (as defined in the Bidding Procedures), shall identify those bids that qualify as Qualified Bids (each bidder that submits such a Qualified Bid being a "<u>Qualified Bidder</u>"), determine which Qualified Bid shall serve as the Baseline Bid at the Auction, and inform the Qualified Bidders of the Baseline Bid by **February 13, 2019 at 5:00 p.m. (Eastern Time)**.  If more than one Qualified Bid (inclusive of the Stalking Horse Bid) is timely received, the Auction shall be conducted at the offices of **Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022** on **February 18, 2019 at 10:00 a.m. (Eastern Time)**.  As set forth more fully in the Bidding Procedures, (a) only Qualified Bidders and their legal and financial advisors will be permitted to participate in the Auction, (b) the Debtors may, subject to the exercise of their business judgment and with the prior written consent of the Stalking Horse Bidder (which shall not be unreasonably delayed, conditioned, or withheld), adjourn the Auction, (c) copies of the Baseline Bid shall be provided to all of the Qualified Bidders (including the Stalking Horse Bidder) and the Consultation Party at least forty-eight (48) hours prior to the start of the Auction, and (d) all proceedings at the Auction shall be transcribed.

14.    If the bid of the Stalking Horse Bidder, as reflected in the Stalking Horse APA, is the only Qualified Bid received for the Acquired Assets, the Debtors will not conduct the Auction, and shall file and serve, by **February 12, 2019 at 5:00 p.m. (Eastern Time)**, a notice indicating that the Auction has been cancelled and that the Stalking Horse Bidder is the Successful

Bidder.  In such case, the Debtors will seek entry of an order by the Court approving the Stalking

Horse APA no later than February 15, 2019.

**Sale Hearing and Sale Objection Deadline**

15.     The Sale Hearing shall be held before this Court on **February 22, 2019 at**

_____ _.m. (**Eastern Time**); *provided*, that the Debtors shall be entitled to request a hearing

before such time if the Stalking Horse APA is the only Qualifying Bid.  The Debtors may seek an

adjournment of the Sale Hearing as the Debtors deem appropriate in the exercise of their

reasonable business judgment and as is consistent with the Stalking Horse APA or the Successful

Bidder's asset purchase agreement (the "Successful Bidder APA"), the Bidding Procedures, and

this Order.

16.     The Successful Bidder (which may be the Stalking Horse Bidder) shall

appear at the Sale Hearing and be prepared, if necessary, to have a representative(s) testify in

support of the Successful Bid and the Successful Bidder's ability to close in a timely manner

consistent with the Successful Bidder APA, and provide adequate assurance of its future

performance under any and all executory contracts and unexpired leases to be assumed and

assigned as part of the proposed Sale Transaction.

17.     Objections to the Sale Transaction and entry of the Sale Order (other than

objections to the provision of adequate assurance of future performance by a Successful Bidder

other than the Stalking Horse Bidder) (each, a "Sale Objection") must:  (i) be in writing and specify

the nature of such objection; (ii) comply with the Bankruptcy Rules and the Local Bankruptcy

Rules; and (iii) be filed with this Court and served on (a) proposed counsel to the Debtors, Kirkland

& Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Jonathan S. Henes, P.C.

and Cristine Pirro Schwarzman), Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois

60654 (Attn: Marc Kieselstein, P.C., Ross M. Kwasteniet, P.C., Adam C. Paul, P.C., and W.

Benjamin Winger), and Kirkland & Ellis LLP, 901 Main Street, Dallas, Texas 75202 (Attn: Michael Considine, P.C. and Dilen Kumar), (b) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases, if any, (c) counsel to Mercuria, in its capacities as Stalking Horse Bidder, DIP Lender, and Prepetition Lender, Milbank, Tweed, Hadley & M$^{c}$Cloy LLP, 28 Liberty Street, New York, New York 10005 (Attn:  Abhilash Raval, Esq. and Lauren C. Doyle, Esq.) and Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, Texas 77010-3095 (Attn:  Louis Strubeck, Esq. and Josh Agrons, Esq.), and (d) counsel to the ad hoc group of convertible noteholders, Akin Gump Strauss Hauer & Feld LLP, 1 Bryant Park, New York, New York 10036 (Attn:  Ira S. Dizengoff, Esq.) (collectively, the "Objection Notice Parties").  Any Sale Objection will be heard by this Court at the Sale Hearing.  The deadline to assert a Sale Objection with respect to the Stalking Horse APA is **January 18, 2019, at 5:00 p.m. (Eastern Time)**.  The deadline to assert a Sale Objection with respect to any other Sale Transaction is **February 13, 2019, at 5:00 p.m. (Eastern Time)**.

18.    The failure of any objecting person or entity to timely file and serve a Sale Objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Stalking Horse APA or, if the Auction is held, the Successful Bidder APA, including the transfer of the Acquired Assets to the Stalking Horse Bidder or the Successful Bidder, free and clear of all liens (other than as provided in the Successful Bidder APA) pursuant to section 363(f) of the Bankruptcy Code or a confirmed chapter 11 plan.

**Assumption and Assignment Procedures**

19.    The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, and are approved.

14

20.     As soon as reasonably practicable, but not later than January 4, 2019, the Debtors shall file with this Court and serve by first class mail on each non-Debtor party to the Assumed Contracts a notice (the "Cure Notice," the form of which is attached hereto as **Exhibit 4**) that shall:  (i) provide a description of each such Assumed Contract, (ii) state the amount, if any, that the Debtors believe are necessary to cure, or compensate the non-Debtor party for, any and all defaults under such Assumed Contract pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"); (iii) notify the non-Debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Acquired Assets; (iv) state the date of the Sale Hearing and that any unresolved objections to any Cure Costs or to assumption and assignment will be heard at the Sale Hearing or such later date as the Debtors and the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, may, in consultation with the Consultation Party, determine, in accordance with this Order; and (v) state the appropriate deadline by which the non-Debtor party must file an objection to the Cure Costs or assumption and assignment of the Assumed Contracts.  Upon service of the Cure Notice, all non-Debtor parties to the Assumed Contracts shall receive or be deemed to have received good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Assumed Contracts.

21.     The Cure Notice is hereby approved.  It is reasonably calculated to provide sufficient notice to the non-Debtor parties to the Assumed Contracts of the Debtors' intent to assume and assign the Assumed Contracts in connection with the Sale Transaction and constitutes adequate notice thereof.

22.     All Objections to any proposed Cure Costs (each, a "Cure Objection") and to the provision of adequate assurance of future performance (each, an "Adequate Assurance Objection") must:  (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local

15

Bankruptcy Rules; (iii) with respect to a Cure Objection, state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with this Court and served on the Objection Notice Parties.  The deadline to assert a Cure Objection and an Adequate Assurance Objection with respect to the Stalking Horse APA is **January 19, 2019, at 4:00 p.m. (Eastern Time)**.  The deadline to assert an Adequate Assurance Objection with respect to any other Sale Transaction is **February 19, 2019, at 4:00 p.m. (Eastern Time)**.

23.    If a timely Cure Objection or Adequate Assurance Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtors and the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder may, in consultation with the Consultation Party, determine.

24.    To the extent the Debtors identify, at any time after the Cure Notice is served but prior to the closing of the Sale Transaction, additional Assumed Contracts to be assumed and assigned to the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, the Debtors shall file with this Court and serve by first class mail on the non-Debtor party to such Assumed Contract a supplemental Cure Notice (each, a "Supplemental Cure Notice," the form of which shall be identical to the form of Cure Notice attached hereto as **Exhibit 4**).

25.    If a Supplemental Cure Notice is served by January 4, 2019, the objection deadlines and hearing schedule in connection with the Cure Notice, as set forth above, shall apply to any Cure Objection or Adequate Assurance Objection in respect of an Assumed Contract identified in such Supplemental Cure Notice.  To the extent a Supplemental Cure Notice is served after January 4, 2019, any related Cure Objection or Adequate Assurance Objection must be filed and served within seven (7) days after service of the Supplemental Cure Notice.  If such a Cure Objection or Adequate Assurance Objection is timely received and cannot otherwise be resolved

16

by the parties, the Debtors may, in their discretion (after consultation with the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder and the Consultation Party), schedule an emergency hearing to hear such objection prior to any scheduled closing of the Sale Transaction.

26.    If no timely Cure Objection is filed and served in respect of an Assumed Contract, the Cure Cost identified on the Cure Notice or a Supplemental Cure Notice, as applicable, will be the only amount necessary under section 365(b) of the Bankruptcy Code to cure all defaults under such Assumed Contract.  Any party failing to timely file a Cure Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder.  If no timely Adequate Assurance Objection is filed and served with respect to an Assumed Contract, the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, will be deemed to have provided adequate assurance of future performance for such Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.  If no timely Cure Objection or Adequate Protection Objection is filed and served with respect to an Assumed Contract, the non-Debtor party to such Assumed Contract shall be deemed to have consented to (i) the Cure Costs, (ii) the assumption and assignment of the Assumed Contract to the Stalking Horse Bidder or, if the Auction is held, the Successful Bidder, (iii) related relief requested in the Motion, and (iv) the Sale Transaction.

27.    The Debtors' assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or, if the Auction has been conducted, the Successful Bidder is subject to approval of this Court and consummation of the Sale Transaction.  Accordingly, absent the closing of such Sale Transaction, the Assumed Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

17

28.     The inclusion of a contract or other document or Cure Cost on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Bidder or Successful Bidder, as applicable, or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code, that the stated Cure Cost is due (all rights with respect thereto being expressly reserved), or a guarantee that any such contract or other document will ultimately be assumed or assumed and assigned.  The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to each contract or other document listed on the Cure Notice or any Supplemental Cure Notice.

29.     The Debtors shall provide written notice to the parties to all Assumed Contracts that are ultimately assumed and assigned to the Successful Bidder of (i) such assumption and assignment and (ii) the identity of the Successful Bidder.

**Stalking Horse APA and Bid Protections**

30.     The form of Stalking Horse APA is hereby approved.  All of the Debtors' pre-closing obligations under the Stalking Horse APA are authorized as set forth herein; *provided* that, for the avoidance of doubt, consummation of the Sale Transaction contemplated by the Stalking Horse APA shall be subject to entry of the Sale Order and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse APA.

31.     The Bid Protections are approved in their entirety, including, without limitation, the Break-Up Fee and Reimbursable Expenses payable in accordance with, and subject to the terms of, the Stalking Horse APA.  Except as expressly provided for herein or in the Stalking Horse APA, no other termination payments are authorized or permitted under this Order.

32.     The Debtors are authorized and directed to pay the Break-Up Fee and Reimbursable Expenses, to the extent payable under the Stalking Horse APA, without further order

18

of this Court.  The Break-Up Fee and Reimbursable Expenses, to the extent payable under the

Stalking Horse APA, shall (i) constitute joint and several obligations of each Debtor and its estates,

(ii) be treated as allowed superpriority administrative expense claims against the Debtors' estates

pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code equal in priority to the

superpriority claims arising under the DIP Order (but junior to the Carve Out (as defined therein)),

and (iii) be secured by liens equal in priority to the DIP Liens granted under the DIP Order (but

junior to the Carve Out (as defined therein)).

33.    In accordance with section 8.2 of the Stalking Horse APA, the Debtors shall

pay to the Stalking Horse Bidder, in cash, by wire transfer of immediately available funds, an

amount equal to:

(a)    in the event the Stalking Horse APA is terminated pursuant to sections 8.1(b)(ii), (c), (d), (g), or (n) of the Stalking Horse APA, the Debtors shall reimburse the Stalking Horse Bidder for all reasonable out of pocket costs, fees, and expenses incurred or to be incurred by the Stalking Horse Bidder or its Affiliates, including reasonable fees, costs, and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts, and consultants) retained by the Stalking Horse Bidder or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution, and performance of the Stalking Horse APA, the Transactions, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions (the "Reimbursable Expenses"); *provided* that the Stalking Horse Bidder shall not be required to file a formal fee application, submit its professionals' time entries, or otherwise comply with section 330 of the Bankruptcy Code; and

(b)    in the event the Stalking Horse APA is terminated pursuant to (i) sections 8.1(b)(ii), (d), or (n) of the Stalking Horse APA, the Debtors shall pay to the Stalking Horse Bidder a cash amount equal to $[19,000,000] (the "Break-Up Fee") upon consummation of an Alternative Transaction, or (ii) section 8.1(c) of the Stalking Horse APA at a time when the Debtors have breached their representations, warranties, covenants, or agreements contained in the Stalking Horse APA in any material respect, the Debtors shall pay to the Stalking Horse Bidder a cash amount equal to the Break-Up Fee upon the consummation of an Alternative Transaction, solely in the case of this clause (ii) to the extent that within 6 months after the date of such termination, the Debtors consummate an Alternative Transaction.   Any

19

payment made pursuant to this clause (ii) shall be made within two (2) Business Days of consummation of such Alternative Transaction.[4]

34.     The stipulations in favor of the Prepetition Lenders and the DIP Lenders set forth in the DIP Order are irrevocably binding on, and enforceable against, all persons and parties in interest, including the Committee and any trustee appointed in these cases or conversion of these cases under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary in the DIP Order or any prior order of the Court, all persons and parties in interest, including the Committee and any trustee appointed in these cases or conversion of these cases under chapter 7 of the Bankruptcy Code, are enjoined from bringing any action that would violate the stipulations set forth in the DIP Order (including, without limitation, any action or pursuing any litigation seeking to invalidate or avoid any lien or security interest of the DIP Lenders or the Prepetition Lenders or bring any claim, counterclaim, cause of action, right of setoff, or defense against the DIP Lenders or the Prepetition Lenders).

35.     The Stalking Horse Bidder is entitled to credit bid up to the full amount of the Senior Secured Claims for the purchase of the Acquired Assets as reflected in the Stalking Horse APA pursuant to section 363(k) of the Bankruptcy Code.

**Negotiation with Prepetition Term Parties**

36.     From the date of entry of this Order, any Bidder, including the Stalking Horse Bidder, may execute definitive documentation with the Prepetition Term Parties (as defined in the DIP Order) (i) to purchase all or a portion of the Prepetition Term Parties' claims arising under the Prepetition Term Loan Facilities (as defined in the DIP Order) and/or (ii) with respect to the terms on which the Prepetition Term Loan Facilities may be assumed by such Bidder upon

---

[4] [NTD: to be conformed to the final APA]

the closing of the Sale Transaction; *provided*, that if any such Bidder is not the Successful Bidder, then such Bidder shall sell, at the closing of the Sale Transaction, such claims to the Successful Bidder at the price such Bidder paid for such claims; *provided further* that no Bidder may enter into any exclusivity agreement with any Prepetition Term Party.

**General Provisions**

37.    All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

38.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any applicable provisions of the Local Bankruptcy Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this order.

39.    For the avoidance of doubt, nothing in the Bidding Procedures or this Order waives, modifies, limits, or otherwise amends the terms of the DIP Order and the DIP Loan Documents or any of the rights of the DIP Secured Parties or the Prepetition Secured Parties or any of the obligations of the Debtors or other parties thereunder, including without limitation the right to repayment of the Senior Secured Claims upon termination, expiration, or maturity of the DIP Credit Facilities (each as defined in the DIP Order).

40.    All sale proceeds shall be distributed in accordance with the terms of the Final DIP Order and the DIP Loan Documents and the Prepetition Secured Obligations and the DIP Obligations shall be repaid in full, in cash upon the earlier of (i) consummation of a Sale

Transaction with a Successful Bidder (other than the Stalking Horse Bidder) and (ii) termination, expiration, or maturity of the DIP Credit Facilities.

41.    The requirements set forth in Local Bankruptcy Rules 6004-1, 9006-1, and 9013-1 are hereby satisfied or waived.

42.    This Order shall be binding on the Debtors, their estates, and their successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the Debtors or their estates under any applicable law.

43.    The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court, to allow the Stalking Horse Bidder to deliver any notice provided for in the Stalking Horse APA, including, without limitation, a notice terminating the Stalking Horse APA, and allow the Stalking Horse Bidder to take any and all actions permitted under the Stalking Horse APA in accordance with the terms and conditions thereof.

44.    The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order in accordance with the Motion.

45.    The Stalking Horse Bidder has standing to enforce this Order.

46.    This Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____, 2018
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit C**

**Sale Order**

(See attached.)

FINAL FORM

| | |
|---|---|
| Marc Kieselstein, P.C. | James H.M. Sprayregen, P.C |
| Jonathan S. Henes, P.C. | Ross M. Kwasteniet, P.C. (*pro hac vice* pending) |
| Cristine Pirro Schwarzman | Adam C. Paul, P.C. (*pro hac vice* pending) |
| **KIRKLAND & ELLIS LLP** | W. Benjamin Winger (*pro hac vice* pending) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS LLP** |
| 601 Lexington Avenue | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| New York, New York 10022 | 300 North LaSalle Street |
| Telephone:    (212) 446-4800 | Chicago, Illinois 60654 |
| Facsimile:    (212) 446-4900 | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) ) ) | Case No. 18-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING BIDDING PROCEDURES AND SECTION 365 PROCEDURES, (II) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (III) AUTHORIZING THE ENTRY INTO AND PERFORMANCE UNDER THE STALKING HORSE ASSET PURCHASE AGREEMENT, AND (IV) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on November [•], 2018, Aegean Marine Petroleum Network Inc. and its affiliated debtors in the above captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures and Section 365 Procedures, (II) Approving the Sale of*

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.    A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.    The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

*Substantially All of the Debtors' Assets, (III) Authorizing the Entry into and Performance under the Stalking Horse Asset Purchase Agreement, and (IV) Granting Related Relief* (the "Motion"). A hearing on the Motion will be held before the Honorable **[JUDGE NAME]** of the United States Bankruptcy Court for the Southern District of New York (the "Court"), in Room [●], One Bowling Green, New York, New York 10004-1408, on **[DATE], 2018, at [TIME] (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion (each, an "Objection") shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the *Final Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. [●]] (the "Case Management Order"), and shall be filed with the Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M–399 (which can be found at http://www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers as set forth in the Case Management Order), in accordance with the customary practices of the Bankruptcy Court and General Order M–399, to the extent applicable, and served so as to be actually received no later than **[DATE], 2018, at [TIME] (prevailing Eastern Time)** (the "Objection Deadline")—on the Master Service List (as defined in the Case Management Order), including:

(a)     Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022 (Attn: Jonathan S. Henes, P.C., Esq. and Cristine Pirro Schwarzman, Esq.) and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654 (Attn: Marc Kieselstein, P.C., Esq., Ross M. Kwasteniet, P.C., Esq., Adam C. Paul, P.C., Esq., and W. Benjamin Winger, Esq.), proposed counsel to the Debtors;

(b)     The United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Brian S. Masumoto, Esq. and Andrew

Velez-Rivera, Esq.);

(c)     Counsel to the official committee of unsecured creditors, if one is appointed in these chapter 11 cases; and

(d)     Norton Rose Fulbright US LLP, 1301 McKinney, Suite 5100, Houston, Texas 77010-3095 (Attn:  Louis Strubeck, Esq. and Josh Agrons, Esq.) and Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005-1413 (Attn:  Abhilash Raval, Esq. and Lauren C. Doyle, Esq.), co-counsel to Mercuria Energy Group Limited and certain of its affiliates.

**PLEASE TAKE FURTHER NOTICE** that if no Objections or other responses are timely filed and served with respect to the Motion, the Debtors shall, on or after the Objection Deadline, submit to the Court an order substantially in the form annexed as <u>Exhibit A</u> to the Motion, which order the Court may enter without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates in open court at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and Case Management Order may be obtained free of charge by visiting the website of Epiq Corporate Restructuring LLC at http://dm.epiq11.com/aegean.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated:  November [•], 2018

/s/ Draft
Marc Kieselstein, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

4

Hearing Date:  [MONTH] [DATE], 2018, at [TIME] (prevailing Eastern Time)
Objection Deadline:  [MONTH] [DATE], 2018, at [TIME] (prevailing Eastern Time)

Marc Kieselstein, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING
BIDDING PROCEDURES AND SECTION 365 PROCEDURES, (II) APPROVING THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (III) AUTHORIZING
THE ENTRY INTO AND PERFORMANCE UNDER THE STALKING HORSE ASSET
PURCHASE AGREEMENT, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration of Tyler Baron, Director of Aegean Marine Petroleum Network Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "Baron First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

**Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases to stabilize business operations, address near-term debt maturities, and facilitate a value-maximizing restructuring transaction.  The Debtors, with the support of Mercuria Asset Holdings (Hong Kong) Limited (together with its affiliates, "Mercuria"), intend to undertake a robust, 120-day process to market their business as a going concern and otherwise solicit highest or otherwise best offers for the benefit of all parties in interest.  Over the four months leading to the Petition Date, Mercuria provided the Debtors with liquidity and funding that have enabled the Debtors to bridge to an orderly and organized chapter 11 filing while minimizing disruption to their underlying businesses.  Mercuria has further agreed to continue funding the Debtors through these chapter 11 cases with commitments of $532 million of DIP financing and has provided a Stalking Horse baseline bid that provides $681 million in value to the Debtors' estates (through credit bid, cash, and assumed liabilities).  That bid is the byproduct of hard fought, arms' length, good faith negotiations between the Debtors and Mercuria that began in the summer of 2018 and culminated with the parties' entry into the Stalking Horse APA.

2.      The Stalking Horse APA and the related DIP Financing provided by Mercuria provide a viable path forward to position the Debtors' business for long-term success.  In exchange for the benefits provided by the Stalking Horse Bid (as described more fully below), including the agreement to serve as a floor for purposes of the Auction, the Stalking Horse APA contemplates certain bid protections—namely, a break-up fee in the amount of $19 million and reimbursement of Mercuria's reasonable and documented expenses (collectively, the "Bid Protections")—in the event the marketing process delivers value to these estates in excess of the Stalking Horse Bid.

3.      The Debtors submit that the proposed marketing process, the Bidding Procedures, and the Stalking Horse APA represent the best available restructuring alternative at this time.  To

2

be sure, the Debtors explored and negotiated alternative transactions predicated on non-binding proposals with other interested parties prior to entering into the Stalking Horse APA. The Debtors also have negotiated a minimum cash component of the Purchase Price of $15 million to ensure these chapter 11 cases can be administered responsibly following the consummation of the Stalking Horse APA transaction. And critically, the Debtors—as the sole fiduciary for all parties in interest—have negotiated room to continue to discharge their duties in furtherance of any transaction that maximizes the value of their estates. Mercuria, critically, has provided a value-maximizing path forward by agreeing to both fund these chapter 11 cases and serve as a stalking horse bidder. If a higher or otherwise better restructuring alternative materializes, the Debtors will, subject to the terms of the Stalking Horse APA and the proposed Bidding Procedures, pursue and potentially implement such alternative as value-accretive to their estates. For all of these reasons, the Debtors respectfully request that the Court grant the relief requested herein.

### Relief Requested

4.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), and, at the conclusion of the Sale Hearing, an order, substantially in the form attached hereto as **Exhibit D** (the "Sale Order"):

a.      authorizing and approving the bidding procedures for competitive bidding in connection with the Sale, substantially in the form attached hereto as **Exhibit 1** to **Exhibit A** (the "Bidding Procedures");

b.      approving the form and manner of notice of the sale by auction and the sale hearing and related matters, substantially in the form attached hereto as **Exhibit B** (the "Sale Notice");

c.      authorizing and approving procedures for the assumption and assignment of contracts and leases (the "Assumption Procedures"), which are set forth in greater detail in the Bidding Procedures Order;

d.      authorizing and approving the sale free and clear of all liens, claims, interests and encumbrances (the "Sale") of the Acquired Assets pursuant to the terms of that certain Asset Purchase Agreement, dated as of November

3

[●], 2018, by and between Aegean Marine Petroleum Network Inc. ("Aegean") and Mercuria (the "Stalking Horse Bidder"), (the "Stalking Horse APA"), attached hereto as **Exhibit C**;[3]

e.      authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases to the Stalking Horse Bidder or other successful bidder arising from the Auction (a "Successful Bidder");

f.      establishing the following dates and deadlines for the sale process (the "Sale Process"), subject to modification:[4]

- Bidding Procedures Objection Deadline: November [•], 2018, at 5:00 p.m. Eastern Time, as the deadline to object to the Bidding Procedures, Bid Protections, Stalking Horse APA, form and manner of Sale Notice, and Assumption Procedures (the "Bidding Procedures Objection Deadline");

- Bidding Procedures Hearing: November [30], 2018, at [•] p.m. Eastern Time, as the date the bidding procedures hearing (the "Bidding Procedures Hearing") will be held before the Honorable [**JUDGE NAME**], United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York;

- Assumption and Assignment Service Deadline: January 4, 2019, at 5:00 p.m. Eastern Time, as the last date by which the Debtors must serve the Contract Assumption Notice (as defined in the Bidding Procedures Order) on all non-Debtor counterparties to all Assumed Contracts;

- Sale Objection Deadline: January 18, 2019, at 4:00 p.m. Eastern Time, as the deadline to object to the Sale transactions or the assumption and assignment of the Assumed Contracts or cure amounts related thereto (the "Sale Objection Deadline");

- Bid Deadline: February 11, 2019, at 5:00 p.m. Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

- Auction: February 18, 2019, at 10:00 a.m. Eastern Time, as the date

---

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Stalking Horse APA.

[4]   All dates and times are subject to court availability and approval. Any modification to the dates and deadlines within the Sale Process, which do not affect the ability for the Court to enter the Sale Order by the date that is 120 days after the date of the Stalking Horse APA, does not constitute a violation of the Stalking Horse APA, Bidding Procedures, or Bidding Procedures Order, such that the Sale Order shall still find that the Debtors and Buyer complied with the terms thereof.

and time the auction, if one is needed (the "<u>Auction</u>"), which will be held at the offices of Kirkland & Ellis LLP, located at: 601 Lexington Avenue, New York, New York 10022; and

- <u>Sale Hearing</u>: February 22, 2019, as the date the sale hearing (the "<u>Sale Hearing</u>") will be held before the Honorable **[JUDGE NAME]**, United States Bankruptcy Judge for the Bankruptcy Court for the Southern District of New York.

## <u>Jurisdiction and Venue</u>

5.    The United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The bases for the relief requested herein are sections 105(a), 363, 365, and 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure, and rules 2002-1, 6004-1, 6006-1, and 9006-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>") and the *Sale Guidelines for the Conduct of Asset Sales established and adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383* (the "<u>Sale Guidelines</u>").

## <u>Background</u>

8.    Aegean Marine Petroleum Network Inc., together with its Debtor and non-Debtor

subsidiaries, is a leading marine fuel logistics company with approximately 850 employees and active operations in 20 countries worldwide. The Debtors' core business involves marketing and physically supplying marine fuel and lubricants to vessels in port, at sea, on rivers and other waterways. The Debtors own and/or operate a fleet of 57 vessels, including 38 owned double hull bunkering tankers, covering more than 50 ports worldwide, including Northern Europe and the Antwerp-Rotterdam-Amsterdam-region, the U.S. East and West Coasts, Gibraltar, Greece, Morocco, Canada, Jamaica, Trinidad and Tobago, the Gulf of Mexico, Germany, South Africa, and the U.S. Virgin Islands. The Debtors also own or lease land-based storage facilities—consisting of two terminals and more than 1,000,000 cubic meters of storage capacity—in the United States, Morocco, Canary Islands, Germany, and the United Arab Emirates. The Debtors are headquartered in Athens, Greece and have a corporate office in New York, New York. As of the date hereof (the "Petition Date"), the Debtors' funded debt obligations totaled approximately $872 million consisting of 12 secured credit facilities and two issuances of unsecured convertible notes.

9.    On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated

**Overview of the Proposed Sale**

I.    **Material Terms of the Stalking Horse APA.**

10.    The following chart summarizes the key terms and conditions of the Stalking Horse

6

APA, attached hereto as **<u>Exhibit C</u>** pursuant to Local Rule 6004-1 and the corresponding Sale

Guidelines:[5]

---

[5] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse APA, the latter governs in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Stalking Horse APA.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Parties** | Sellers:  Aegean Marine Petroleum Network Inc. and certain of its subsidiaries<br><br>Buyer:  Mercuria Asset Holdings (Hong Kong) Limited |
| **Purchase Price** | Total consideration of approximately $681,000,000[6] consisting of:<br><br>• discharge of all or a portion of the then outstanding obligations under the U.S. Borrowing Base, the Global Borrowing Base and the DIP Facility equal to $459,000,000;<br><br>• an amount of cash equal to $15,000,000; and<br><br>• assumption of the Assumed Liabilities, representing an estimated value of at least $207,000,000.<br><br>*plus* certain Additional Administrative Costs, if any.<br><br>**See Stalking Horse APA, at § 3.3(a).** |
| **Bid Protections** | Break-Up Fee:  If the Stalking Horse APA is terminated pursuant to Section 8.1(b)(ii) , Section 8.1(c), Section 8.1(d) or Section 8.1(o) of the Stalking Horse APA, Sellers shall pay to Buyer a cash amount equal to $19 million upon the consummation of an Alternative Transaction.  **See Stalking Horse APA, at § 8.2(b)(ii).**<br><br>Reimbursable Expenses: Sellers shall, within two (2) Business Days after any termination of the Stalking Horse APA pursuant to Section 8.1(b)(ii), Section 8.1(c), Section 8.1(d), Section 8.1(g) or Section 8.1(o) of the Stalking Horse APA, reimburse Buyer for all of the actual, documented and reasonable out of pocket costs, fees and expenses incurred or to be incurred by Buyer or its Affiliates, including reasonable fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of the Stalking Horse APA, the Transactions, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions, in each case, less any expenses paid or reimbursed for under the DIP Facility.  **See Stalking Horse APA, at § 8.2(b)(i).** |
| **Acquired Assets** | Buyer proposes to acquire all the right, title and interest of Sellers in each and all of the Acquired Assets, which include, but are not limited to:  the Owned Real Property, the Leased Real Property, all Avoidance Actions, the Machinery and Equipment, the Assumed Contracts, the Transferable Permits, the Inventory, all accounts receivable relating to the Business, the Records, all Intellectual Property and IT Assets, goodwill associated with the Business, the Acquired Assets and the Assumed Liabilities, deposits and prepaid expenses, cash and cash equivalents and securities, all assets and rights of every nature under or relating to Joined Collective Bargaining Agreements in respect of Transferred Employees with respect to the period from and after the Closing and in respect of the Assumed Benefit Plans and the Assumed Collective Bargaining Agreements, all assets and rights of every nature related to or in respect of the Legal Employee Liabilities, Claims against third parties, all insurance policies and binders related to an Acquired Asset, all shares of stock or equity interests in the Acquired Companies, rights to refunds of Taxes and all Purchased Claims. **See Stalking Horse APA, at § 2.1.** |

---

[6]    This number reflects the estimated total value attributable to the Stalking Horse Bid inclusive of assumed

liabilities.

| | |
|---|---|
| **Excluded Assets** | Buyer proposes to exclude all of the right, title, and interest in, to, and under the Excluded Assets, which include, but are not limited to: each Seller's rights under the Stalking Horse APA, Records related to Taxes paid or payable by any Seller or any of its Affiliates, shares of capital stock or other equity interests of any Seller or any of its Affiliates except with respect to the Acquired Companies, all properties, asset (including vessels) and rights of certain specified entities, confidential personnel and medical records pertaining to any employees of Sellers, documents or agreements relating to the Chapter 11 Cases, assets and rights of every nature under or relating to the Retained Collective Bargaining Agreements in respect of any current or former employees who are not Transferred Employees and any Transferred Employee with respect to the pre-Closing period and the Retained Benefit Plans, Permits and pending applications related solely to any other Excluded Asset or Excluded Liabilities, all prepayments, good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order, all Claims that Sellers or any Affiliates may have against any third person solely with respect to any Excluded Assets or Excluded Liabilities, certain bank accounts and certain specified Contracts.  **See Stalking Horse APA, at § 2.2.** |
| **Assumed Liabilities** | Buyer will assume the Assumed Liabilities, which consist of, but are not limited to, all of Sellers' liabilities under the Assumed Contracts, exclusive of any Liability arising from or related to a violation of Law occurring prior to the Closing Date, all trade and vendor accounts payables under each of the Assumed Contracts, all Liabilities relating to any environmental, health or safety matter arising under any Environmental Laws or relating to the release of Hazardous Materials, arising out of or relating to the operation of the Business or leasing, ownership or operation of the Acquired Assets occurring after the Closing, the Assumed Employee Liabilities, all Liabilities under or relating to the Joined Collective Bargaining Agreements in respect of Transferred Employees with respect to the period from and after the Closing or otherwise to the extent required by applicable Law or Joined Collective Bargaining Agreements and under the Assumed Benefit Plans and Assumed Collective Bargaining Agreements, Liabilities related to Property Taxes imposed upon or assessed against the Acquired Assets for the proration period after Closing, all Liabilities of the Acquired Companies (including all Indebtedness with respect to the Vessels), and all Liabilities relating to or arising out of the ownership or operation of the Facilities, the Business or any Acquired Asset from and after the Closing, except, in each case, any Excluded Liabilities.  **See Stalking Horse APA, at § 2.3.** |

| | |
|---|---|
| **Excluded Liabilities** | Buyer proposes to exclude the Excluded Liabilities, including, but not limited to: costs and expenses incurred by Sellers in connection with consummation of the Transactions, Liabilities relating to or arising out of, or in connection with, any of the Excluded Assets, all Liabilities relating to any environmental matter arising out of or relating to the operation of the Business or Acquired Real Property prior to closing, all fines, penalties or other Liabilities assessed by a Governmental Entity as a result of noncompliance with applicable Law (including with respect to filings with the SEC), all third party Liabilities for toxic torts caused or allegedly caused by exposure, prior to the Closing Date, to Hazardous Materials related to the Facilities, the Business, or any Acquired Asset, Liabilities related to any current or former employees which are not Assumed Employee Liabilities, all Liabilities under or relating to the Retained Collective Bargaining Agreements in respect of any current or former employees of any Seller or any Subsidiary of any Seller who are not Transferred Employees and any Transferred Employee with respect to the pre-Closing period, and in respect of the Retained Benefit Plans, all Liabilities for Taxes of Sellers (except for those Taxes for which are Assumed Liabilities), and Property Taxes imposed against the Acquired Assets that are allocable to the portion of the Proration Period ending on the Closing Date, all Liabilities relating to, arising out of, or in connection with the events, circumstances, and conduct described in the June 4, 2018, Form 6-K disclosure of Aegean, concerning improper accounting for or recordation of accounts receivable, all Liabilities relating to, arising out of, or in connection with any payments or invoices concerning the construction and maintenance of the Aegean terminal in Fujairah, and all Liabilities relating to, arising out of, or in connection with certain Proceedings. **See Stalking Horse APA, at § 2.4.** |

| | |
|---|---|
| **Employee Matters** | • Within thirty (30) days following the date of the Stalking Horse APA, Sellers shall make available to Buyer a complete and accurate Seller Employee List. |
| | • On the final day of each calendar month following the date of the Stalking Horse APA and ten (10) days prior to the Closing, Sellers shall make available to Buyer an updated version of the Seller Employee List. |
| | • Not less than twenty (20) days prior to Closing, Buyer shall make available to Sellers the Employee Offer List. |
| | • Approximately ten (10) days prior to the Closing, Buyer shall, or shall cause one of its Subsidiaries to, make an offer of employment to each Seller Employee on the Employee Offer List who (i) is neither an Automatic Transfer Employee nor an Employee of an Acquired Company and (ii) then remains a Seller Employee. |
| | • Within thirty (30) days following the date of the Stalking Horse APA and ten (10) days prior to the Closing, Sellers shall make available to Buyer a complete and accurate list of Benefit Plans. |
| | • Approximately ten (10) days prior to the Closing, Buyer shall make available to Sellers a schedule setting forth the Assumed Benefit Plans. |
| | • As and to the extent required by applicable Laws or the terms of any Collective Bargaining Agreement, Buyer shall assume the Assumed Collective Bargaining Agreements and join the Joined Collective Bargaining Agreements. |
| | • Buyer will provide each Transferred Employee with comparable compensation and benefits, recognize service credit of the Transferred Employees, and use commercially reasonable efforts to cause any required permit, pass, visa, or other approval to be obtained and in effect as of the Closing. |
| | • <u>See</u> **Stalking Horse APA, § 6.7.** |

| Conditions Precedent to Obligations of Buyer | The obligations of the Buyer to consummate the transactions contemplated by the Stalking Horse APA are subject to satisfaction of the following conditions: |
|---|---|

The obligations of the Buyer to consummate the transactions contemplated by the Stalking Horse APA are subject to satisfaction of the following conditions:

- Sellers' representations and warranties (i) that are Seller Fundamental Representations shall be true and correct in all respects other than *de minimis* inaccuracies, (ii) that are qualified as to Sellers Material Adverse Effect or material adverse effect shall be true and correct in all respects, and (iii) other than those set forth in clause (i) and (ii), shall be true and correct in the aggregate, in all material respects.

- Sellers shall have performed in all material respects all material obligations and agreements contained in the Stalking Horse APA required to be performed by them on or prior to the Closing Date.

- Buyer shall have received a certificate, dated to the Closing Date, of an executive officer of each Seller to the effect that certain conditions precedent have been fulfilled or waived.

- All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required, and all of the applicable Governmental Entity approvals or consents required under certain Foreign Antitrust Laws have been received (or, if applicable, any waiting period in respect of any such approvals or consents under those Foreign Antitrust Laws shall have been terminated or expired).

- (i) All approvals or consents of Governmental Entities required prior to Closing that are material to the Business or to Buyer and its Affiliates shall have been obtained and (ii) there shall be no Law or Order that restrains or prevents the Transactions.

- The Bankruptcy Court shall have entered the Sale Order.

- There shall not have occurred a DIP Event of Default that is continuing, a Remedies Exercise Notice shall not have been delivered, and the DIP Facility Lenders shall not have acquired all or a material part of the Acquired Assets as a result of an exercise of remedies under the DIP Facility.

- The Bankruptcy Court shall have entered a final non-appealable Order permitting Buyer to credit bid no less than $459 million (or, solely to the extent the borrowers under the DIP Facility have not borrowed the full amount available thereunder, the amount that would be the actual Credit Bid Consideration).

- Sellers shall have obtained any consent or approval required under the Applicable Contracts as a result of the execution or performance of the Stalking Horse APA.

- Sellers shall have assumed and assigned to Buyer, or the Acquired Companies shall have retained, the Material Licenses and Permits.

- There shall not have occurred a Sellers Material Adverse Effect.

- Any Acquired Company that is a debtor in the Chapter 11 Cases shall have been dismissed as a debtor in such Chapter 11 Cases by Order of the Bankruptcy Court or have resolved its Chapter 11 Cases in a manner acceptable to Buyer.

- Sellers shall have implemented and continue to maintain a Hedging Program.

- The Challenge Periods shall have passed and each of the Debtors' stipulations set forth in the DIP Order shall be binding on all persons, entities and parties

| | |
|---|---|
| | in interest in the Chapter 11 Cases, including the Committee.<br><br>• Sellers shall have delivered to Buyer all of the items set forth in Section 3.1(b).<br><br>• **See Stalking Horse APA, at § 7.1.** |
| **Conditions Precedent to Obligations of Sellers** | The obligations of the Seller to consummate the transactions contemplated by the Stalking Horse APA are subject to satisfaction of the following conditions:<br><br>• Buyer's representations and warranties (i) related to organization and due authorization shall be true and correct in all material respects, and (ii) other than those set forth in clause (i), shall be true and correct in all material respects, except where the failure of such representations or warranties to be correct has not, and would not reasonable be expected to have a Buyer Material Adverse Effect.<br><br>• Buyer shall have performed in all material respects all obligations and agreements contained in the Stalking Horse APA required to be performed by it on or prior to the Closing Date.<br><br>• Sellers shall have received a certificate, dated to the Closing Date, of an executive officer of Buyer to the effect that the certain conditions precedent have been fulfilled and/or waived.<br><br>• All applicable waiting periods under the HSR Act related to the Transactions shall have expired or been terminated, if required, and all of the applicable Governmental Entity approvals or consents required under Foreign Antitrust Laws have been received (or, if applicable, any waiting period in respect of any such approvals or consents under those Foreign Antitrust Laws shall have been terminated or expired).<br><br>• All approvals or consents of Governmental Entities required prior to Closing shall have been obtained and there shall be no Law or Order that restrains or prevents the Transactions.<br><br>• The Bankruptcy Court shall have entered the Sale Order.<br><br>• Buyer shall have delivered to Sellers all of the items set forth in Section 3.1(c).<br><br>• **See Stalking Horse APA, at § 7.2.** |

| Representations and Warranties of Sellers | The Stalking Horse APA contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and standing; (b) authority; (c) non-contravention; (d) title to real property and assets; (e) legal proceedings; (f) employee benefits and labor; (g) environmental liabilities; (h) taxes; (i) permits; (j) contracts; (k) insurance; (l) intellectual property; (m) bank accounts; (n) anti-corruption and sanctions; and (o) exclusiveness of representations and warranties. **See Stalking Horse APA, at §§ 4.1–4.20.** |
|---|---|
| Representations and Warranties of Buyer | The Stalking Horse APA contains customary representations and warranties by the Buyer, including representations of Buyer regarding: (a) organization and standing; (b) authority; (c) governmental approvals; (d) non-contravention; (e) financing; (f) adequate assurances regarding executory contracts; (g) condition and location of assets; and (h) exclusiveness of representations and warranties. **See Stalking Horse APA, at §§ 5.1–5.9.** |
| Other Covenants | The Stalking Horse APA requires, among other things: (a) Sellers to conduct Sellers' Business in the ordinary course of business; (b) Sellers not to solicit Alternative Transactions prior to entry of the Bidding Procedures Order; (c) Buyer and Sellers to use commercially reasonable efforts to consummate the Transactions; and (d) Buyer to pay any Cure Costs related to the Assumed Contracts.

The Stalking Horse APA also contains customary provisions regarding, among other things, access, publicity, responsibility for tax liability, commercially reasonable efforts, bankruptcy matters and filings, risk of loss, and bulk transfer laws.

**See Stalking Horse APA, at §§ 6.1–6.14.** |

## II.    "Extraordinary Provisions" under the Sale Guidelines.

11.    The Stalking Horse APA contains the following terms, conditions and provisions that may be considered "Extraordinary Provisions" under Section I.D of the Sale Guidelines:[7]

a.    **Sale to Insider.** The Stalking Horse Bidder is [an affiliate of] (i) the lender(s) under the DIP Financing, (ii) the lender(s) under the Debtors' prepetition borrowing base facilities, and (iii) a holder of 30% of the equity in the Debtors' ultimate parent, Aegean Marine Petroleum Network Inc. The Debtors disclose this connection out of an abundance of caution and reserve all rights regarding whether or not the Stalking Horse Bidder is an "insider" under section 101(31) of the Bankruptcy Code. As discussed *infra*, the DIP Financing and Stalking Horse APA were negotiated on an arm's-length basis between the Debtors and Stalking Horse Bidder. Further, the Debtor designed the Bidding Procedures to encourage all persons or entities to put their best bids forward such that the Debtors' proposed Auction maximizes value to the benefit of the Debtors' estates. Other parties had an opportunity to participate in a process, both with respect to the Sale and with respect to the DIP Financing, prior to selecting

---

[7]    This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted pursuant to section 363 of the Bankruptcy Code.

the Stalking Horse Bidder, and the Stalking Horse Bidder was the highest and best path forward for the Debtors. Importantly, the Debtors will use the time permitted under the DIP Financing and the Bidding Procedures to actively market the Acquired Assets in an attempt to solicit higher or otherwise better bids, pursuant to the terms of the Stalking Horse APA.

b.   **Avoidance Actions**. The Stalking Horse APA and proposed form of [Sale Order] require that the Debtors transfer the Debtors' rights to pursue Avoidance Actions related to the Debtors' businesses.[8] The open nature of this sale transaction subjects the Avoidance Actions to a robust market test that benefits the Debtors' estates. Accordingly, the Debtors believe including such provision in the Sale Order is appropriate and reasonable.

c.   **Successor Liability**. The Stalking Horse APA requires that the proposed Sale Order include certain findings that the Acquired Assets are being sold free of successor or other similar liability.[9] In light of the open nature of this sale transaction and the form and manner of the Sale Notice, including that the Sale Notice contains an express disclosure regarding successor liability findings in the Sale Order, the Debtors believe affected parties will have sufficient notice of the sale and, therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the sale's benefits to the Debtors' estates.

d.   **Stay Waiver**. The proposed form of Sale Order provides for a waiver of the 14-day stay of the Sale Order arising under Bankruptcy Rule 6004(h), including the parties' ability to close the Sale and assign the Assumed Contracts.[10] A waiver of the stay is appropriate because the Sale will be extensively marketed and notice of the Sale will be adequately provided to all parties in interest. Therefore, the Debtors submit there are adequate grounds to waive the 14-day stay so that the Sale Order is effective immediately.

e.   **No Good Faith Deposit by Stalking Horse**. The Stalking Horse APA does not provide for a good faith deposit by the Stalking Horse Bidder, which was negotiated on an arm's-length basis between the Debtors and the Stalking Horse Bidder.[11] Other bidders at auction will, however, be

---

[8]   *See* [Sale Order ¶ [●].]

[9]   *See* Sale Order ¶ [●].

[10]   *See* Sale Order ¶ [●].

[11]   Stalking horse bids have been approved in this and other jurisdictions in circumstances where the stalking horse bidder provided DIP Financing, was a secured lender with the ability to credit bid a substantial portion of the purchase price, or where the stalking horse purchaser otherwise helped finance the costs of the sale process. *See, e.g.*, *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. 2008) (no good faith deposit required of any bidder where stalking horse provided partial funding required to close the transaction); *In re Sungevity, Inc.*, No. 17-10561 (Bankr. D. Del. 2017) (no good faith deposit required of stalking horse bidder who is DIP

required to make a good faith deposit.[12]  The Debtors submit this is reasonable and appropriate because Mercuria has funded these chapter 11 cases as the DIP lender.

    f.    **Records Retention**.  The Stalking Horse APA requires Buyer to provide Sellers (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all Records included in and otherwise related to the Acquired Assets for periods prior to the Closing and shall preserve such records until the later of (i) such period as shall be consistent with Buyer's retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases, or (iv) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.

## Bidding Procedures Order

### III.    Outline of the Bidding Procedures.

12.    The Bidding Procedures are intended to permit a fair and efficient competitive Sale Process, consistent with the timeline of these cases, to help determine whether the Stalking Horse Bid is, indeed, the best offer or promptly identify the alternative bid that is higher or otherwise better.  Because the Bidding Procedures are attached as **Exhibit 1** to **Exhibit A** hereto, they are not restated in their entirety herein.  Generally speaking, however, the Bidding Procedures establish, among other things:

    a.    the requirements that Potential Bidders must satisfy to participate in the bidding process and become "Potential Bidders;"[13]

    b.    the availability of, access to, and conduct during due diligence by Potential Bidders;[14]

    c.    the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be

---

lender); *In re Xtera, Inc.*, No 17-10561 (same).

[12]    *See* Bid. Proc., at § [●].

[13]    *See* Bid. Proc., at § [●].

[14]    *See* Bid. Proc., at § [●].

"Qualified Bids" sufficient to trigger an Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and deadline that must be met by any Potential Bidder (other than the Stalking Horse Bidder) to be considered a "Qualified Bidder";[15]

d.   the manner in which Qualified Bids will be evaluated by the Debtors, in consultation with their advisors, to determine the Starting Bid for the Auction;[16]

e.   the conditions for having an Auction and procedures for conducting the Auction, if any;[17] and

f.   the criteria by which the Successful Bidder will be selected by the Debtors, in consultation with their advisors.[18]

13.   Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates, subject to the terms of the Stalking Horse APA.[19]

**IV.   Form and Manner of Sale Notice.**

14.   Within [•] days after the entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors will serve the Sale Notice, the Stalking Horse APA, the Bidding Procedures Order, and the Bidding Procedures in accordance with the Sale Guidelines by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon the following parties:  (a) the

---

[15]   *See* Bid. Proc., at § [•].

[16]   *See* Bid. Proc., at § [•].

[17]   *See* Bid. Proc., at § [•].

[18]   *See* Bid. Proc., at § [•].

[19]   In the event a potential buyer seeks to purchase the equity of certain debtor subsidiaries under section 363(b) of the Bankruptcy Code, the Debtors reserve the right to seek dismissal of the chapter 11 cases as to such subsidiaries pursuant to sections 305(a) and 1112(b) of the Bankruptcy Code.  Under such circumstances, the Debtors would, at that time, file a motion for dismissal on appropriate grounds.

18

Master Service List; (b) counsel to the Stalking Horse Bidder, the DIP Lenders, and the Prepetition Lenders; (c) any parties known or reasonably believed to have expressed interest in any of the Assets; (d) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the Assets; (e) all parties to executory contracts or unexpired leases to be assumed and assigned, or rejected as part of the transaction; and (f) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder.[20]

15.    Additionally, on the Mailing Date or as soon as practicable thereafter, the Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in [●].[21]  Such publication notice shall be deemed sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

16.    The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the Sale Objection Deadline; (d) reasonably specific identification of the Acquired Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse APA; (f) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances with respect to those Assets which are currently property of the Debtors' estates, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds; (g) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; and (h) notice of the proposed assumption and assignment of contracts

---

[20]   Capitalized terms used but not defined in this Paragraph 19 shall have the meanings set forth in the *Final Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. [●]].

[21]   **NTD:** Insert publications in which notice will be published.

and leases to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures and deadlines for objecting thereto. The Debtors propose that no other or further notice of the Sale shall be required. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved.

## V.    Summary of the Assumption Procedures

17.    The Debtors are also seeking approval of the Assumption Procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale. Because the Assumption Procedures are set forth in detail in the attached Bidding Procedures Order, they are not restated herein.[22] Generally speaking, however, the Assumption Procedures: (a) outline the process by which the Debtors will serve notice to all counterparties to the Assumed Contracts regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of Assumed Contracts to the extent necessary.

## Basis for Relief

## I.    The Bidding Procedures Are Fair, Appropriate, and Should Be Approved.

18.    "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, Bankruptcy Court Is Newest Arena for M&A Action, N.Y.L.J., June 3, 1991. In furtherance of that goal, bidding procedures and bid protections, such as those proposed

---

[22]    The proposed Assumption Procedures set forth in the Bidding Procedures relate specifically to the proposed mechanism for providing notice of cure amounts to certain contract and lease counterparties, entertaining objections thereto and resolving disputes related thereto.

here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and maximize value.[23]   In overseeing an asset sale subject to an auction process, the bankruptcy court walks a tightrope between:

> on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate.[24]

Because the court must perform this difficult balancing act, "a bankruptcy judge's broad discretionary power in conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it."[25]

19.    Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts in this district and in the best interest of the Debtors' estates.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the net value realized from the Sale by these estates.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

20.    At the same time, the Bidding Procedures provide the Debtors with an adequate

---

[23]   *See id.*; *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.").

[24]   *In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992).

[25]   *See id.* at 169-70.

opportunity to consider competing bids and select the highest and best offer for the completion of

the Sale.  Entering into the Stalking Horse APA with the Stalking Horse Bidder ensures the Debtors

obtain fair market value by setting a minimum purchase price that will be tested in the marketplace.

As such, the Debtors and their creditors can be assured that, taking into account the financial

condition of the Debtors and the economy, the consideration obtained will be fair and reasonable

and at or above market.

### A.        The Bid Protections Have Sound Business Purpose and Should Be Approved.

21.        The Debtors are also requesting approval of a Break-Up Fee equal to $19 million

and Reimbursable Expenses subject to a reasonable, documented, and actually incurred standard.

The Break-Up Fee represents approximately 2.8% of the total potential value to Aegean of

approximately $681 million.  The Bid Protections are payable upon the occurrence of certain

"triggering events" typical and customary for transactions of this kind, but always subject to

consummation of an Alternative Transaction with a Person other than the Stalking Horse Bidder.

The total potential value includes at least approximately $15 million in cash proceeds (before

transaction costs and purchase price adjustments), the discharge of $459 million of indebtedness,

and the assumption of approximately $207 million of liabilities.

22.        Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding

incentives such as these under the "business judgment rule" standard, and it is well established in

this district that courts consider whether:  (a) the relationship of the parties who negotiated the

break-up fee was tainted by self-dealing or manipulation; (b) the fee hampers, rather than

encourages, bidding; and (c) the amount of the fee is unreasonable relative to the proposed

purchase price.[26]  The Debtors submit that the Bid Protections are appropriate under each of the

---

[26] *In re Genco Shipping & Trading Limited*, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014) (citing *Metaldyne*, 409 B.R. at 670); *See also Integrated Res.*, 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business

three foregoing factors.

23.     First, the Bid Protections are the product of good faith, arm's-length negotiations between Mercuria and the Debtors, who were acting not in their own self-interest, but rather, in the interest of the bankruptcy estates consistent with their fiduciary duties.  Further, the Stalking Horse APA provisions relating to the Bid Protections (as well as the other Stalking Horse APA provisions) were scrutinized by the Debtors' professionals, reviewed and vetted with outside advisors through the marketing process and approved unanimously by the Debtors' board of directors (excluding the Mercuria-appointed director which recused itself entirely from this process).

24.     Second, the Debtors believe, based on their reasoned business judgment, that the presence of the Bid Protections enhances their ability to maximize value without chilling bidding.  The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse APA.  Indeed, granting these Bid Protections convinced the Stalking Horse Bidder to enter into the Stalking Horse APA, which assures the Debtors of a Sale to a contractually-committed bidder at a price they believe is fair and reasonable.  Additionally, the Stalking Horse APA provides the upside opportunity that the Debtors could potentially receive a higher or otherwise better offer at the Auction which, absent such a bid floor, might otherwise never have been realized.[27]

25.     Third, the Debtors believe, based on their reasoned business judgment, that the Bid Protections are reasonable and appropriate relative to the size, nature, and complexity of this

---

judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment); *Fin. News Network*, 980 F.2d 165 (2d Cir. 1992).

[27]  *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.").

transaction and the commitments made and resources expended by the Stalking Horse Bidder in connection therewith in view of:

    a.    the meaningful floor established by the Stalking Horse APA for competitive bidding;

    b.    the substantial benefits already received by the Debtors and their estates from having a Stalking Horse Bid serve as a catalyst for other potential or actual bidders to confirm that the Debtors receive the highest and best offer by subjecting the Sale to an open auction and competitive bidding;

    c.    the need of the Debtors to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the timeline of these chapter 11 cases;

    d.    the extensive due diligence, analysis and negotiations undertaken by the Stalking Horse Bidder in connection with the Sale;

    e.    the risks borne by the Stalking Horse Bidder for being the stalking horse in this transaction and any opportunity costs incurred as a result thereof; and

    f.    the payment that would be made on account of the Break-Up Fee to the Stalking Horse Bidder represents 2.8% of the total consideration of approximately $681,000,000.

26.    Accordingly, the Debtors respectfully submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

## II.    The Form and Manner of the Sale Notice Should Be Approved.

27.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.  The Sale Notice complies with the Sale Guidelines, and the Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002,

24

Local Rule 2002-1, and the Sale Guidelines.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice proposed herein.

## III.    The Assumption Procedures Are Appropriate and Should Be Approved.

28.    In connection with the assumption and assignment of the Assumed Contracts, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and counterparties to Assumed Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such counterparties can object to the assumption and assignment of Assumed Contracts or related cure amounts.

29.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to:  (a) the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order and (b) assignment notwithstanding any anti-alienation provision or other restriction on assignment.[28]

30.    The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the Assumed Contracts and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## IV.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.

31.    Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Section 363(b) does not, however, provide a standard for determining when such a sale should be authorized if

---

[28]    *See, e.g.*, *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

proposed outside confirmation of a chapter 11 plan. In the Second Circuit, that standard is well-established by case law: a debtor's decision to sell assets outside the ordinary course of business must be based upon sound business judgment.[29]

32.    When determining whether to approve a proposed sale under section 363 of the Bankruptcy Code, courts generally apply standards that, although stated various ways, represent essentially a business judgment test.[30] In *Lionel*, the Court of Appeals for the Second Circuit listed several (albeit not exclusive) factors bankruptcy courts in this district may consider in conducting a section 363(b) analysis, including, for example, whether: (a) a "sound business purpose" exists that justifies the sale; (b) adequate and reasonable notice has been provided to interested parties; (c) the sale value obtained is fair and reasonable; and (d) the debtor acted in good faith.[31]

### A.    A Sound Business Purpose Exists for the Sale.

33.    The Debtors have a sound business justification for entering into this transaction. The opportunity to sell the Acquired Assets at a fair price presents an attractive opportunity to reorganize the Debtors' business while generating significant value for the Debtors' estates. The proceeds from the sale will be utilized to maximize creditor recoveries and will result in a reorganized business with a robust balance sheet capable of funding future business operations.

34.    Notably, the Stalking Horse APA was only executed after: (a) potential alternatives

---

[29]    *See, e.g.*, *In re MF Glob. Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015); *Genco*, 509 B.R. at 464; *Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Official Comm. of Unsecured Creditors of LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir.1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Integrated Res.*, 147 B.R. at 656 (law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that in making a business decision, the directors acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company).

[30]    *See, e.g.*, *MF Glob.*, 535 B.R. at 605; *Genco*, 509 B.R. at 464; *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003).

[31]    *See Global Crossing*, 295 B.R. at 744 (citing *Lionel*, 722 F.2d at 1071).

were evaluated; (b) the DIP financing was aggressively marketed; (c) the Stalking Horse Bidder emerged as the only viable source of DIP financing; and (d) all of the foregoing was presented to the members of the board who, in conjunction with advice from experienced professionals, discharged their fiduciary duties, exercised sound and appropriate business judgment, and determined to pursue the Sale on the terms of the Stalking Horse APA, subject to competitive bidding sanctioned by the Court.

35.     Thus, for the reasons set forth herein, as will be further shown at the Sale Hearing, because the Stalking Horse APA (or any marked APA, as the case may be) constitutes (or will constitute) the highest or otherwise best offer, on balance of the facts and circumstances of the moment, and provides greater recovery for these estates than any known or practicably available alternative, the Debtors submit that the execution thereof represents sound reasonable business judgment.

**B.     Adequate and Reasonable Notice of the Sale Will Be Provided.**

36.     As described above, the Sale Notice:  (a) will be served in a manner that provides at least 21 days' notice of the date, time and location of the Sale Hearing; (b) informs interested parties of the deadlines for objecting to the Sale or the assumption and assignment of Assumed Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale in accordance with the Sale Guidelines.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest, and, as such, the Debtors are confident the Sale Notice will be properly vetted by the time of service thereof.

**C.     The Sale and Purchase Price Reflect a Fair Value Transaction.**

37.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure

to the market.[32]   This is especially true here, where the Assets and related transaction will be subjected to an extensive auction and sale process and intensively scrutinized by the Debtors and their retained advisors.

38.    Moreover, even as the Debtors move forward with the Sale, Moelis will continue to market the transaction and solicit other offers for the Acquired Assets consistent with the Bidding Procedures and subject to the Stalking Horse APA, including, for example, by contacting previously solicited parties, providing acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse APA purchase price will, conclusively, be fair value.

**D.    The Sale Has Been Proposed in Good Faith and Without Collusion and the Stalking Horse Bidder or Successful Bidder Is a "Good Faith Purchaser."**

39.    While the Bankruptcy Code does not define "good faith," the Second Circuit has held that the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may not be made.[33]

40.    The Debtors submit the Stalking Horse Bidder, or other Successful Bidder arising

---

[32]   *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "§ 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

[33]   *See, e.g., Gucci*, 126 F.3d at 390 (a purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citations omitted); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

from the Auction, is or would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, or any marked version thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[34]  First, the consideration to be received by the Debtors pursuant to the Stalking Horse APA is substantial, fair, and reasonable.  Second, the parties entered into the Stalking Horse APA in good faith and after extensive, arm's-length negotiations, during which both parties were represented by competent counsel of similar bargaining positions.  Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code.  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the board in consultation with the Debtors' professionals.  Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Successful Bidder) and Stalking Horse APA (or other marked APA) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.    Except as Otherwise Set Forth in the Stalking Horse APA, the Sale Should Be Approved "Free and Clear" Under Section 363(f) with Respect to the Acquired Assets.

41.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

---

[34]  Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.[35]

42.    The Debtors believe that any of the parties holding liens in the Acquired Assets could be compelled to accept a monetary satisfaction of such interests or reinstated or otherwise rendered unimpaired pursuant to a chapter 11 plan.  Where the purchase price for a debtor's assets is the best available under the circumstances, a court may authorize the sale free and clear of existing liens, claims, and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims, and encumbrances.[36]  In this instance, the procedures outlined herein, and the Debtors' extensive and continuing efforts to market their businesses, ensure that the purchase price paid for the Acquired Assets is the best available.  Importantly, the Stalking Horse Bidder has agreed to assume certain liabilities (and reinstate related liens, claims, and encumbrances) in respect of the Acquired Assets.  For example, where the Stalking Horse Bidder purchases the equity held by a Debtor entity, it is doing so on the basis that any funded debt or liabilities encumbering the target subsidiary are assumed.  Therefore, except as otherwise carved out under the Stalking Horse APA, the Sale should be approved free and clear of any and all liens, claims, and encumbrances against the Acquired Assets, regardless of their face amount.

43.    Finally, the Sale Order provides that any lien, claim, or encumbrance in the

---

[35]    *See* 11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) (where a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met); *In re Dundee Equity Corp.*, 1992 WL 53743 (Bankr. S.D.N.Y 1992) (same).

[36]    *See In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); *In re Beker Indus., Inc.*, 63 B.R. 474, 477-78 (Bankr. S.D.N.Y. 1986).

Acquired Assets will attach to the net proceeds of the Sale, subject to any claims and defenses the

Debtors may possess with respect thereto. Accordingly, the Debtors believe that the sale of the

Acquired Assets in accordance with the Stalking Horse APA will satisfy the statutory prerequisites

of section 363(f) of the Bankruptcy Code and the Sale should be approved free and clear of all

liens, claims, and encumbrances against the Acquired Assets.

**V.    Assumption and Assignment of Contracts and Leases Should Be Approved.**

    **A.    The Assumption of the Assumed Contracts Reflects Business Judgment.**

44.    Here too, the Debtors must demonstrate that the assumption of the Assumed

Contracts in connection with the Sale reflects sound business judgment.[37]

45.    In the Second Circuit, a motion to assume an executory contract is considered a

summary proceeding, whereby the court efficiently reviews a "debtor's decision to adhere to a

particular contract in the course of the swift administration of the bankruptcy estate."[38]    In

conducting such review, the bankruptcy court should "examine a contract and the surrounding

circumstances and apply its best 'business judgment' to determine if it would be beneficial or

burdensome to the estate to assume it."[39]

46.    In other words, the Court must place itself in the position of the Debtors and

determine "whether assuming the contract would be a good business decision or a bad one."[40]    If

a debtor's business judgment has been exercised reasonably, the court should approve the

---

[37]    *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099
(2d Cir. 1993) (purpose behind allowing assumption under section 365(a) is to permit the debtor, subject to the
approval of the court, to use valuable property of the estate); *In re Penn Traffic Co.*, 524 F.3d 373, 383
(2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only
where doing so will be to its economic advantage").

[38]    *See Orion Pictures*, 4 F.3d at 1099.

[39]    *Id.* (the court "sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed").

[40]    *Penn Traffic*, 524 F.3d at 383; *Orion Pictures*, 4 F.3d at 1099.

assumption of an executory contact.[41]

47.    Here, a review of relevant facts shows that the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of their business judgment, consistent with the well-settled standard in this district governing same.

      a.    <u>First</u>, the Assumed Contracts are necessary to run the Debtors' business.  As such, they are essential to inducing the best offer for the Acquired Assets.

      b.    <u>Second</u>, it is unlikely that any purchaser would want to acquire any assets on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction.

      c.    <u>Third</u>, the Stalking Horse APA provides that the assumption and assignment of Assumed Contracts is integral to, and inextricably integrated in, the Sale.

      d.    <u>Finally</u>, the Assumed Contracts will be assumed and assigned though the process approved by the Court by the Bidding Procedures Order, and thus will be reviewed by key constituents.

48.    Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

**B.    Defaults Under the Assumed Contracts Will Be Cured Through the Sale.**

49.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code:  (a) that a debtor cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance

---

[41]    *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *Ionosphere*, 100 B.R. at 673.

between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."[42]

50.    The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will promptly be satisfied because the Stalking Horse APA requires that the Debtors cure all defaults associated with, or required to properly assume, the Assumed Contracts. Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### C.    Non-Debtor Parties Will be Adequately Assured of Future Performance.

51.    Similarly, the Debtors submit that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  The phrase "adequate assurance of future performance," adopted from section 2-609 of the Uniform Commercial Code, "[is] to be given a practical, pragmatic construction" based upon the facts and circumstances of each case.[43]  Although no single solution will satisfy every case, the required assurance will fall short of an absolute guarantee of performance.[44]  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property

---

[42]    *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

[43]    *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).

[44]    *Luce Indus.*, 8 B.R. at 107; *see also In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 674 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance[.]'") (internal citation omitted).

assigned.[45]

52.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder) will be satisfied at the Sale Hearing.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party to perform under the Assumed Contracts and assumed leases).  Further, all counterparties will be provided with notice of the proposed assumption and assignment and will have adequate time and opportunity to object to the assumption or proposed cure amount or otherwise be heard with respect thereto.

### Waiver of Bankruptcy Rule 6004(a) and Rule 6004(h)

53.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

54.     Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Interim Order, (e) a request or authorization to assume

---

[45]  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources to perform and has expressed a willingness to devote sufficient funding to its business to do so).

any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## Motion Practice

55.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

56.    Notice of the hearing on the relief requested in the Motion has been provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Rules, and is sufficient under the circumstances.  Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including (a) the Office of the United States Trustee for the Southern District of New York; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents for each of the Debtors' secured credit facilities; (d) the indenture trustee for each of the Debtors' unsecured notes; (e) the ad hoc group of unsecured noteholders; (f) counsel to the Stalking Horse Bidder, the DIP Lenders, and the Prepetition Lenders; (g) counsel to the agent under the Debtors' debtor-in-possession financing facility; (h) counsel to the parties referenced in clauses (c) through (e); (i) the Office of the United States Attorney for the Southern District of New York; (j) the state attorneys general for states in which the Debtors conduct business; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (n) any parties known or reasonably believed to have expressed interest in any of the Assets; (o) all entities known or reasonably believed to have

asserted a lien, encumbrance, claim or other interest in any of the Assets; (p) all parties to executory contracts or unexpired leases to be assumed and assigned, or rejected as part of the transaction[46] and ; (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given

## **No Prior Request**

57.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

---

[46]    Capitalized terms used but not defined in this paragraph shall have the meanings set forth in the *Final Order Establishing Certain Notice, Case Management, and Administrative Procedures* [Docket No. [●]].

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, [and the Sale Order, substantially in the form attached hereto as **Exhibit D**,] granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

New York, New York
Dated:  November [●], 2018

*/s/ Jonathan S. Henes, P.C.*

Marc Kieselstein, P.C.
Jonathan S. Henes, P.C.
Cristine Pirro Schwarzman
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Adam C. Paul, P.C. (*pro hac vice* pending)
W. Benjamin Winger (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

EXECUTION VERSION

# AMENDMENT NO. 1

## TO

## ASSET PURCHASE AGREEMENT

THIS AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT (this "Amendment")*)*, effective as of November 9, 2018, hereby amends that certain Asset Purchase Agreement, dated as of November 5, 2018 (as the same may be amended, restated or otherwise modified from time to time, the "Agreement"), by and among Aegean Marine Petroleum Network Inc., a company incorporated under the laws of the Republic of the Marshall Islands ("Aegean"), and each of Aegean's Subsidiaries listed on the signature pages thereto (together with Aegean, "Sellers" and each a "Seller"), and Mercuria Asset Holdings (Hong Kong) Limited, a company incorporated in Hong Kong with limited liability ("Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Agreement.

**WHEREAS**, pursuant to Section 10.7 of the Agreement, the Agreement may be amended, supplemented or modified, and any of the of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance; and

**WHEREAS**, Buyer and Sellers desire to amend the Agreement in accordance with and subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the parties hereby agrees as follows:

1. **Amendment**. Section 8.1(l) shall be revised in its entirety to read as follows:

   "by Buyer, if any Debtor (as defined in the Interim DIP Order), Borrower (as defined in the Interim DIP Order) or any other Person that, as of November 9, 2018, is a guarantor or provider of security under the DIP Facility, ceases to guaranty, be obligated under, or provide security to secure the DIP Facility;"

2. **Effect on Agreement**. Other than as specifically set forth herein, all other terms and provisions of the Agreement shall remain unaffected by the terms of this Amendment, and shall continue in full force and effect.

3. **Representations and Warranties**. Each Party represents and warrants to the other Parties that such Party has all requisite corporate or limited liability company power and authority to execute and deliver this Amendment. The execution and delivery by each Party of this Amendment has been duly and validly authorized by all requisite corporate or limited liability company action, as applicable, on the part of each such Party and no other corporate or limited liability company action, as applicable, on the part of each such Party is necessary to authorize this Amendment. This Amendment has been duly and validly executed and delivered by each such Party and (assuming the due authorization, execution

and delivery by all other Parties) constitutes a valid and binding obligation of each such Party enforceable against each such Party in accordance with their terms.

4.  **Counterparts**.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Amendment may be delivered via facsimile or electronic mail.  In proving this Amendment, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the undersigned have executed this Amendment No. 1 to Asset Purchase Agreement as of the date first above written.

<u>**BUYER**</u>:

MERCURIA ASSET HOLDINGS (HONG KONG) LIMITED

By: _____
      Name:
      Title:

**<u>SELLERS</u>**:

AEGEAN MARINE PETROLEUM NETWORK INC.

By: _____
Name:
Title:

AEGEAN INVESTMENTS S.A.

By: _____
     Name:
     Title:

AEGEAN BUNKERING MOROCCO SARL AU

By: _____
     Name:
     Title:

AEGEAN HOLDINGS S.A.

By: _____
     Name:
     Title:

WEST COAST FUEL TRANSPORT LTD


By: _____
      Name:
      Title:


AEGEAN CARIBBEAN HOLDINGS INC.


By: _____
      Name:
      Title:


CARIBBEAN    RENEWABLE    ENERGY
SOURCES INC.


By: _____
      Name:
      Title:


AEGEAN BUNKERING (HONG KONG) LTD


By: _____
      Name:
      Title:


[SIGNATURE PAGE TO AMENDMENT NO.1 TO ASSET PURCHASE AGREEMENT]

ICS PETROLEUM (MONTREAL) LTD.

By: _____
      Name:
      Title:

AEGEAN MARINE PETROLEUM S.A.

By: _____
      Name:
      Title:

AEGEAN (FUJAIRAH) BUNKERING S.A.

By: _____
      Name:
      Title:

AEGEAN BUNKERING (SINGAPORE) PTE LTD.

By: _____
      Name:
      Title:

AEGEAN BUNKERING SERVICES INC.


By: _____
     Name:
     Title:



AEGEAN OIL TERMINAL CORP


By: _____
     Name:
     Title:



AMPNI HOLDINGS CO. LIMITED


By: _____
     Name:
     Title:



AEGEAN BUNKERING (USA) LLC


By: _____
     Name:
     Title:

[SIGNATURE PAGE TO AMENDMENT NO.1 TO ASSET PURCHASE AGREEMENT]

AMPNI INVESTMENTS CO. LIMITED


By: _____
        Name:
        Title:



AEGEAN SHIPHOLDING INC.


By: _____
        Name:
        Title:



AEGEAN MANAGEMENT SERVICES M.C.


By: _____
        Name:
        Title:

**<u>Exhibit D</u>**

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------- x
                                                           :
In re                                                      :        Chapter 11
                                                           :
Aegean Marine Petroleum Network Inc., et al.,              :        Case No. 18-13374 (MEW)
                                                           :
             Debtors.¹                                     :        (Jointly Administered)
                                                           :
---------------------------------------------------------- x
```

### ORDER (I) APPROVING PURCHASE AGREEMENT AMONG SELLERS AND PURCHASER, (II) AUTHORIZING SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES IN CONNECTION THEREWITH, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated November [●], 2018 [Docket No. [●]] (the "Motion")² of

Aegean Marine Petroleum Network Inc. and its affiliated debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105, 363, and

365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-

1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York

(the "Local Bankruptcy Rules"), for an order authorizing and approving the sale of the Acquired

Assets and the assumption and assignment of certain executory contracts and unexpired leases of

the Debtors in connection therewith; and the Court having taken into consideration this Court's

---

¹    Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/aegean. The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

²    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated November 5, 2018, a copy of which is attached hereto as Exhibit A (the "Asset Purchase Agreement," and together with the exhibits and schedules thereto, and as amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Purchase Agreement").

prior order, dated [●], 2018 [Docket No. [●]] (the "Bidding Procedures Order"), approving bidding

procedures for the sale of the Acquired Assets (the "Bidding Procedures") and granting certain

related relief; and [●] (the "Purchaser") having submitted the highest and best bid for the Acquired

Assets and was thus designated the Successful Bid (as defined in the Bidding Procedures) for the

Acquired Assets; and this Court having conducted a hearing to consider the Sale Transaction (as

defined below) on [●], 2019 (the "Sale Hearing"), during which time all interested parties were

offered an opportunity to be heard with respect to the Sale Transaction; and this Court having

reviewed and considered (i) the Motion and the exhibits thereto, (ii) the Purchase Agreement, by

and between the Debtors and the Purchaser, whereby the Debtors have agreed, among other things,

to sell the Acquired Assets to the Purchaser, including certain executory contracts and unexpired

leases of the Debtors that will be assumed and assigned to the Purchaser (the "Assumed

Contracts"), on the terms and conditions set forth in the Purchase Agreement (the "Sale

Transaction"), (iii) the Declaration of [●] in Support of the Motion [Docket No. [●]] (the "[●]

Declaration"), (iv) the Declaration of [●] in Support of the Motion [Docket No. [●]] (together with

the [●] Declaration, the "Sale Declarations"), and (v) the arguments of counsel made, and the

evidence proffered and adduced, at the Sale Hearing; and due notice of the Motion and the form

of this Order (the "Proposed Sale Order") having been provided; and all objections to the Sale

Transaction and the Proposed Sale Order having been withdrawn, resolved, or overruled with

prejudice; and it appearing that the relief granted herein is in the best interests of the Debtors, their

estates, creditors, and all parties in interest in these chapter 11 cases; and upon the record of the

Sale Hearing and these chapter 11 cases; and after due deliberation and sufficient cause appearing

therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction to decide the Motion and over the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.      **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief granted herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, Local Bankruptcy Rules 6004-1 and 6006-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

D.      **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014 and in compliance with the Local Bankruptcy Rules.  The Debtors have complied with all obligations to provide notice of the Motion, the Sale Hearing, the APA, and the Sale Transaction as required by the Bidding Procedures Order, including to the Notice Parties (as defined below) and more broadly by publication as set forth in the Affidavit of Publication [Docket No. __] on _____.  The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Sale Hearing, the Purchase Agreement, or the Sale Transaction is

3

required.  The disclosures made by the Debtors concerning the Purchase Agreement, the Sale

Transaction, and the Sale Hearing were sufficient, complete, and adequate.

   E. **Opportunity to Object**.  A fair and reasonable opportunity to object to, and be

heard with respect to, the Motion and the Sale Transaction has been given to all Persons entitled

to notice pursuant to the Bidding Procedures Order, including, but not limited to, the following:

(i) counsel for the Stalking Horse Bidder, the DIP Lenders, and the Prepetition Lenders; (ii) all

Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with

respect to the Acquired Assets in whole or in part during the past 12 months; (iii) all entities known

by the Debtors to have asserted any Liens in the Acquired Assets (for whom identifying

information and addresses are available to the Debtors); (iv) all non-Debtor parties to the Assumed

Contracts (for whom identifying information and addresses are available to the Debtors); (v) any

Governmental Entity; (vi) the United States Attorney for the Southern District of New York;

(vii) the Office of the Attorney General in each state in which the Debtors operate; (viii) the Office

of the Secretary of State in each state in which the Debtors operate or are organized; (ix) the

Federal Trade Commission; (x) the United States Attorney General/Antitrust Division of

Department of Justice; (xi) the Securities and Exchange Commission; (xii) the Internal Revenue

Service; (xiii) all applicable competition, environmental, and taxing authorities; (xiv) all of the

Debtors' known creditors (for whom identifying information and addresses are available to the

Debtors); and (xv) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed

by the Court (for whom identifying information and addresses are available to the Debtors)

(collectively, the "Notice Parties").

   F. **Final Order**.  This Order constitutes a final order within the meaning of

28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent

necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made

applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay

in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

G.    **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and

sound business purposes and justifications for approval of and entry into the Purchase Agreement

and the other agreements, documents, and instruments deliverable thereunder (collectively, with

the Purchase Agreement, the "<u>Transaction Documents</u>"), and approval of the Sale Transaction.

The Debtors' entry into and performance under the Transaction Documents (i) constitutes a sound

and reasonable exercise of the Debtors' business judgment, (ii) provides value to and is beneficial

to the Debtors' estates, and is in the best interests of the Debtors and their stakeholders, and (iii) is

reasonable and appropriate under the circumstances.   Business justifications for the Sale

Transaction include, but are not limited to, the following:  (i) the Purchase Price set forth in the

Purchase Agreement constitutes the highest and best offer received for the Acquired Assets; (ii) the

Purchase Agreement and the transactions contemplated thereby present the best opportunity to

maximize the value of the Acquired Assets; (iii) unless the Sale Transaction and all of the other

transactions contemplated by the Purchase Agreement are concluded expeditiously, as provided

for pursuant to the Purchase Agreement, certainty of consummating the Sale Transaction will be

compromised and recoveries will be materially diminished; and (iv) the value of the Debtors'

estates will be maximized through the sale of the Acquired Assets pursuant to the Purchase

Agreement.

H.    **Compliance with Bidding Procedures Order**.  The Debtors and the Purchaser

complied with the Bidding Procedures Order and the Bidding Procedures in all respects.  The

Purchaser subjected its bid to the competitive Bidding Procedures approved by this Court and[, as

5

the only bidder to submit a Qualified Bid by the Bid Deadline (as defined in the Bidding Procedures),] [following the Auction (as defined in the Bidding Procedures),] was designated the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures Order and the Bidding Procedures.  The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Acquired Assets.

I.      **Marketing Process**.   (i) The Debtors and their advisor, Moelis & Company, engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11 cases and through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures, (ii) the Debtors conducted a fair and open sale process, (iii) the sale process and the Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets, and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures obtained the highest and best value for the Acquired Assets, and any other transaction would not have yielded as favorable an economic result for the Debtors and their estates.

J.      **Fair Consideration; Highest or Best Value**.   As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The consideration to be provided by the Purchaser under the Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair

6

consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable laws.  Such consideration constitutes the highest and best bid for the Acquired Assets.  No other Person or entity, or group of Persons or entities, has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors than the Purchaser, including through the reduction of claims against the Debtors' estates.

K.    **No Successor or Other Derivative Liability**.    No sale, transfer, or other disposition of the Acquired Assets pursuant to the Purchase Agreement or entry into the Purchase Agreement will subject the Purchaser to any liability for any Claims (as defined below) asserted against the Debtors or the Debtors' interests in such Acquired Assets by reason of such transfer under any Laws, whether foreign or domestic, including any bulk-transfer Laws or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories.  By virtue of the consummation of the Sale Transaction contemplated by the Purchase Agreement, (i) the Purchaser is not a continuation of the Debtors and their respective estates, there is no continuity or continuity of enterprise between the Purchaser and the Debtors, and there is no common identity between the Debtors and the Purchaser, (ii) the Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates, and (iii) the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates.  Accordingly, the Purchaser is not and shall not be deemed a successor to the Debtors or their respective estates as a result of the consummation of the Sale Transaction contemplated by the Purchase Agreement.

L.    **No Sub Rosa Plan**:    Entry into the Purchase Agreement and the transactions contemplated thereby neither impermissibly restructures the rights of the Debtors' creditors nor

impermissibly dictates the terms of a chapter 11 plan for the Debtors.  Entry into the Purchase

Agreement does not constitute a *sub rosa* chapter 11 plan.

M.    **Good Faith**.    The Transaction Documents and each of the transactions

contemplated therein were negotiated, proposed, and entered into by the Debtors and the Purchaser

in good faith, without collusion, and from arms'-length bargaining positions.  The Purchaser is a

"good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such,

is entitled to all the protections afforded thereby.  Effective upon the Closing, it shall be judicially

determined that neither the Debtors nor the Purchaser have engaged in any conduct that would

cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under

section 363(n) of the Bankruptcy Code.  The Transaction Documents were not entered into and

the Sale Transaction is not being consummated for the purpose of hindering, delaying, or

defrauding present or future creditors of the Debtors or their Affiliates.  All payments to be made

by the Purchaser in connection with the Sale Transaction have been disclosed.  Neither the Debtors

nor the Purchaser is entering into the Transaction Documents, or proposing to consummate the

Sale Transaction, fraudulently, for the purpose of statutory and common law fraudulent

conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under any other

applicable Law.  The Purchaser has not acted in a collusive manner with any person or entity nor

was its bidding or participation in the Auction controlled by any agreement among bidders.  The

Purchaser's prospective performance and payment of any amounts owing under the Purchase

Agreement will be undertaken in good faith and for valid business purposes.

N.    **Cure Notice**.  As evidenced by the certificates of service filed with this Court, and

in accordance with the provisions of the Bidding Procedures Order, the Debtors have served notice

of the Debtors' intent to assume and assign the Assumed Contracts and of the related proposed

cure amounts (the "Cure Costs") upon each non-Debtor party to the Assumed Contracts (the "Cure Notice").  The service of the Cure Notice was timely, good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Assumed Contracts.  All non-Debtor parties to the Assumed Contracts have had a reasonable opportunity to object both to the Cure Costs listed on the Cure Notice and to the assumption and assignment of the Assumed Contracts to the Purchaser.  No defaults exist in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay the Cure Costs, as may be required, or such defaults that are not required to be cured.

O.    **Satisfaction of Section 363(f) Standards**.  Notwithstanding any provision to the contrary in any other agreement, the Debtors are authorized to sell the Acquired Assets to the Purchaser free and clear of all Liens against the Debtors or the Acquired Assets, including, without limitation, any debts, claims (including all "claims" as defined in the Bankruptcy Code), rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer pension or benefit plan claims (including any such claim arising out of, relating to, or resulting from the Debtors' withdrawal from participation in any such plans), labor agreement claims (including, but not limited to, any such claim relating to any and all collective bargaining agreements), workers' compensation claims, severance claims, retiree healthcare or life insurance claims, and/or claims for taxes of or against the Debtors and/or the Acquired Assets, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any

9

state, territory, or possession thereof, or any other applicable jurisdiction), whether arising prior or subsequent to the commencement of these chapter 11 cases, whether known or unknown, fixed or contingent, anticipated or unanticipated, accrued or not, or imposed by agreement, understanding, Law, equity, or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Acquired Assets, the operation of the Debtors' business before the Closing, or the transfer of the Debtors' interests in the Acquired Assets to the Purchaser, all Excluded Assets, and all Excluded Liabilities (collectively, excluding any Assumed Liabilities and Permitted Liens, the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Claims who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Debtors' entry into the Transaction Documents pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims who did object and that have an interest in the Acquired Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims that constitute interests in the Acquired Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transaction, subject to any defenses of the Debtors.  All Persons having Claims of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Claims against the Purchaser or any of its assets, property, Affiliates, successors, assigns, or the Acquired Assets.

P.    The Purchaser would not have entered into the Transaction Documents and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and

10

their estates and their creditors, if the sale of the Acquired Assets was not free and clear of all

Claims, or if the Purchaser would, or in the future could, be liable for any such Claims.  A sale of

the Acquired Assets, other than one free and clear of all Claims, would yield substantially less

value for the Debtors' estates, with less certainty than the Sale Transaction.

Q.     **Assumption and Assignment of Assumed Contracts**.  The assumption and

assignment of the Assumed Contracts are integral to the Purchase Agreement, are in the best

interests of the Debtors and their estates, and represent the valid and reasonable exercise of the

Debtors' sound business judgment.  Specifically, the assumption and assignment of the Assumed

Contracts (i) is necessary to sell the Acquired Assets to the Purchaser, (ii) allows the Debtors to

sell their business to the Purchaser as a going concern, (iii) limits the losses suffered by non-Debtor

parties to the Assumed Contracts, and (iv) maximizes the recoveries to other creditors of the

Debtors by limiting the amount of Claims against the Debtors' estates by avoiding the rejection of

the Assumed Contracts.

R.     With respect to each of the Assumed Contracts, the Debtors have met all

requirements of section 365(b) of the Bankruptcy Code.  Further, the Debtors have cured or will

cure on or before the Closing any monetary default required to be cured with respect to the

Assumed Contracts under section 365(b)(1) of the Bankruptcy Code, and the Purchaser has

provided adequate assurance of future performance under the Assumed Contracts in satisfaction

of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is

required and not waived by the non-Debtor parties to such Assumed Contracts.  Accordingly, the

Assumed Contracts may be assumed by the Debtors and assigned to the Purchaser as provided for

in the Purchase Agreement and herein.  Upon such assignment, the Assumed Contracts shall be

enforceable by the Purchaser in accordance with the terms herein.

S.      **Validity of Transfer**.  As of the Closing, the transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, will vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets, free and clear of all Claims.  The consummation of the Sale Transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

T.      The Debtors (i) have full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary action of the Debtors, (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Transaction Documents, and (iii) upon entry of this Order, other than any consents identified in the Purchase Agreement (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the Sale Transaction.

U.      The Acquired Assets constitute property of the Debtors' estates and good title to the Acquired Assets is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

V.      The Transaction Documents are valid and binding contracts between the Debtors and the Purchaser and shall be enforceable pursuant to their terms.  None of the Transaction Documents was entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under any other applicable Law.  The Transaction Documents, the Sale Transaction itself, and the consummation thereof, shall be specifically enforceable against and

binding upon (without posting any bond) the Debtors, their Affiliates, successors, and assigns, and any affected third parties, including all Persons asserting an interest in the Acquired Assets, any Person, or Governmental Entity, any official committee of unsecured creditors, any chapter 7 or chapter 11 trustee or examiner, or any other fiduciary, liquidator, or receiver, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases") and shall not be subject to rejection, modification, or avoidance by the foregoing parties or any other Person.

W.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreement.  Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Order.

X.    **Dismissal of the Acquired Companies Cases**.  Dismissal of the chapter 11 cases of the Acquired Companies (as defined in the Purchase Agreement) (the "Acquired Companies Cases") is justified and warranted by the facts and circumstances of these cases and is the best interests of creditors.

Y.    **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion, the Sale Declarations, and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT:**

1.    **Motion is Granted**.  The Motion and the relief requested therein is granted and approved as set forth herein.

2.    **Objections Overruled**.  All objections, if any, and any and all joinders thereto, to the Motion or the relief requested therein that have not been withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing, by stipulation filed with this Court, or as provided in this Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein including, without limitation, all non-Debtor counterparties to the Assumed Contracts.

3.    **Notice**.  Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

4.    **Fair Purchase Price**.  The consideration provided by the Purchaser under the Purchase Agreement is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws.

5.    **Approval of the Purchase Agreement**.  The Transaction Documents, including all transactions contemplated therein and all of the terms and conditions thereof, are hereby approved in their entirety.  The failure specifically to include any particular provision of the Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents, and the Debtors' entry

therein, be authorized and approved in their entirety and are incorporated by reference as if fully set forth herein.

6.    **Consummation of Sale Transaction**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, their Affiliates, as well as their officers, directors, representatives, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Transaction Documents and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Transaction Documents and this Order.

7.    The Debtors, their Affiliates, and their respective officers, directors, representatives, employees, and agents are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Transaction Documents, including the transfer and, as applicable, the assignment of all the Acquired Assets, and the assumption and assignment of all the Assumed Contracts, the dismissal of the Acquired Companies Cases, and to take all further actions as may be (i) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to the Purchaser's possession, the Acquired Assets and/or (ii) necessary or appropriate to the performance of the obligations contemplated by the Transaction Documents, all without further order of this Court.

8.    All Persons that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the Purchaser as of the Closing.

9.      Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate or otherwise reasonably requested by the Purchaser to consummate the transactions contemplated by the Transaction Documents.

10.      **Transfer of Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized, empowered, and directed to transfer the Acquired Assets in accordance with the terms of the Purchase Agreement.  The Acquired Assets shall be transferred to the Purchaser and, upon the Closing, such transfer shall: (i) be valid, legal, binding, and effective; (ii) vest the Purchaser with all right, title, and interest of the Debtors in the Acquired Assets; and (iii) be free and clear of all Claims in accordance with section 363(f) of the Bankruptcy Code, with any and all Claims that represent interests in property to attach to the net proceeds of the Sale Transaction (to the extent there is any), in the same amount and order of their priority, with the same extent, validity, force, and effect which they have against the Acquired Assets, and subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing.

11.      Except as otherwise provided in the Purchase Agreement, all Persons (and their respective successors and assigns) including, without limitation, all debt security holders, equity security holders, Governmental Entities, lenders, customers, vendors, employees, former employees, pension plans, multiemployer pension or benefit plans (including their respective trustees), labor unions, litigation claimants, trustees, trade creditors, and any other creditors, Persons, or entities who may or do hold Claims against the Debtors, the Acquired Assets, and/or the Debtors' business are hereby forever barred, estopped, and permanently enjoined from

16

asserting or pursuing such Claims against the Purchaser, its Affiliates, successors, assigns, its property, or the Acquired Assets, including, without limitation, taking any of the following actions with respect to any Claims: (i) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding worldwide, against the Purchaser, its Affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order worldwide against the Purchaser, its Affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (iii) creating, perfecting, or enforcing anywhere in the world any Claim against the Purchaser, its successors, assigns, assets (including the Acquired Assets), and/or properties; (iv) asserting a Claim as a setoff, right of subrogation, recoupment, or defense of any kind against any obligation due the Purchaser or its successors or assigns; or (v) commencing or continuing any action in any manner or place worldwide that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof.

12.     Following the Closing, no holder of any Claim shall interfere with the Purchaser's title to or use or enjoyment of the Acquired Assets based on or related to any Claim or based on any actions or omissions by the Debtors, including any actions or omissions the Debtors may take in these chapter 11 cases.

13.     Except as expressly set forth in the Purchase Agreement, and notwithstanding any provision to the contrary in any other agreement, including, without limitation, any employment or labor agreement (including, but not limited to, any and all collective bargaining agreements) or documents relating to the Debtors' sponsorship of, or participation in, any defined benefit pension plan (including any multiemployer pension or benefit plan), following the Closing, the Purchaser

17

and each of its Affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Claims, whether known or unknown, as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether liquidated or unliquidated, whether asserted derivatively or vicariously, whether asserted based on the Purchaser's status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever, including Claims based on, relating to, and/or arising under, without limitation: (i) any employment or labor agreements; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's Affiliates or predecessors or any current or former employees of any of the foregoing, including, without limitation, the Benefit Plans and any participation or other agreements related to the Benefit Plans, the termination of any of the foregoing, or withdrawal from any multiemployer pension or benefit plan; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; (v) any employee, workers' compensation, occupational disease or unemployment or temporary disability related Law, including, without limitation, any Claims, rights, or causes of action that might arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Multiemployer Pension Plan Amendments Act of 1980, (k) applicable discrimination laws, (l) applicable unemployment compensation Laws or any other similar Laws, (m) workers'

compensation Laws, and/or (n) any other applicable employee benefit Laws, regulations, or rules or other regulations or rules relating to, wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (vi) any antitrust laws, including any Foreign Antitrust Laws; (vii) any product liability or similar Laws (viii) any environmental Laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq.; (ix) any bulk sales or similar Laws; (x) any tax statutes, rules, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xi) any common law doctrine of *de facto* merger, successor, transferee, or vicarious liability, substantial continuity liability, successor-in-interest liability theory, and/or any other theory of or related to successor liability.

14.     The recitation, in the immediately preceding paragraph of this Order, of specific agreements, plans, or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments, or obligations referred to as "Claims" therein. For the avoidance of doubt, following the Closing, the Purchaser and each of its Affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Claims arising under any Laws.

15.     Notwithstanding any provision of the Transaction Documents or any provision of this Order to the contrary, nothing in this Order or any Transaction Document releases, nullifies, precludes, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including, but not limited to, environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order; *provided*, *however*, that nothing herein shall subject the Purchaser to any

liability to Governmental Entity for any monetary fines or penalties for days of violation prior to Closing.

16.     This Order (i) shall be effective as a determination that, as of the Closing, the conveyances and transfers described herein have been effected and (ii) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local, and foreign officials, and all other Persons who may be required by operation of Law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee and owner of the Acquired Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

17.     If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Claims against the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all interests which the Person has with respect to the Debtors or the Acquired Assets, then with regard to the Acquired Assets that are acquired by the Purchaser pursuant to the Purchase Agreement and this Order (i) the Debtors are hereby authorized to execute and file such statements, instruments, or releases on behalf of the Person with respect to the Acquired Assets and (ii) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order,

which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, and foreign government agency, department, or office.  Notwithstanding the foregoing, the provisions of this Order authorizing the Sale and assignment of the Acquired Assets free and clear of claims and liens shall be self-executing, and neither the Debtors nor the Successful Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

18.     To the maximum extent available under applicable Law and to the extent provided for under the Purchase Agreement, the Purchaser shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets and, to the maximum extent available under applicable Law and to the extent provided for under the Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing.  No governmental unit may revoke or suspend any such license, permit, registration, governmental authorization, or approval related to the Acquired Assets on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale contemplated by the Purchase Agreement.

19.     **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, neither the Purchaser nor any of its Affiliates shall be deemed to:  (i) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of Law or equity (other than, for the Successful Bidder, with respect to any obligations as an assignee under the Assumed Contracts arising after the Closing); (ii) have, *de facto* or otherwise, merged with or into any or all

Debtors or their estates; (iii) have a common identity or a continuity of enterprise with the Debtors; or (iv) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors. Upon the Closing, to the maximum extent available under applicable Law, the Purchaser's acquisition of the Acquired Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of the Closing and the Acquired Assets shall not be subject to any Claims arising under or in connection with any Excluded Asset or Excluded Liability. The operations of the Purchaser and its Affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Acquired Assets.

20.      **Dismissal of the Acquired Companies Cases**. The Acquired Companies Cases shall, as of the Closing (as defined in the Purchase Agreement), be dismissed. Concurrently with the dismissal of the Acquired Companies Cases, the Debtors shall file and serve on any affected party, a notice of dismissal of each of the Acquired Companies Cases.

21.      **Assumption and Assignment of Assumed Contracts**. The Debtors are hereby authorized and directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Purchaser free and clear of all Claims, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary or as reasonably requested to assign and transfer the Assumed Contracts to the Purchaser as provided in the Purchase Agreement. Upon the Closing, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors in, to, and under the Assumed Contracts and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be released from any liability with respect to the Assumed Contracts. The Purchaser acknowledges and agrees that, from and

after the Closing, it shall comply with the terms of each Assumed Contract in its entirety, including

any indemnification obligations expressly contained in such Assumed Contracts that could arise

as a result of events or omissions that occur from and after the Closing. Each Assumed Contract

shall be enforceable by the Purchaser in accordance with the terms of such Assumed Contract and

applicable Law.

22.    All Cure Costs that have not been waived shall be determined in accordance with

the Bidding Procedures Order or other applicable order of this Court. The Purchaser shall cure

any defaults under the Assumed Contracts by payment of any Cure Costs on or prior to Closing.

The Purchaser or its designated Affiliate shall be responsible for demonstrating and establishing

adequate assurance of future performance with respect to the Assumed Contracts. Payment of the

Cure Costs shall be in full satisfaction and cure of any and all defaults under the Assumed

Contracts and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f)

of the Bankruptcy Code. Each non-Debtor party to an Assumed Contract is forever barred,

estopped, and permanently enjoined from asserting against the Debtors or the Purchaser, their

Affiliates, successors, or assigns, or the property of any of them, any default existing as of the date

of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have

been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the

Purchaser, of each of the Assumed Contracts.

23.    The Cure Costs set forth on [Exhibit [●]] hereto (or such other amounts as agreed

to with the applicable contract counterparty or upon further order of the Court) are the sole amounts

necessary under sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code to cure all such

monetary defaults and pay all actual pecuniary losses under the Assumed Contracts. To the extent

a non-Debtor party to an Assumed Contract failed to timely object to a Cure Cost, such Cure Cost

has been and shall be deemed to be finally determined and any such non-Debtor party shall be

prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at

any time.

24.    The assignment of each of the Assumed Contracts is made in good faith under

sections 363(b) and (m) of the Bankruptcy Code.

25.    **Ipso Facto Clauses**.  Except as otherwise specifically provided for by order of this

Court, the Assumed Contracts shall be transferred to, and remain in full force and effect for the

benefit of, the Purchaser in accordance with their respective terms, including all rights of the

Purchaser as the assignee of the Assumed Contracts, notwithstanding any provision in any such

Assumed Contracts (including, without limitation, those of the type described in sections 365(e)(1)

and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

There shall be no, and all non-Debtor parties to any Assumed Contract are forever barred and

permanently enjoined from raising or asserting against the Debtors or the Purchaser any defaults,

breach, Claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases, or any

other fees charged to the Purchaser or the Debtors as a result of the assumption or assignment of

the Assumed Contracts.

26.    Except as otherwise specifically provided for by order of this Court, upon the

Debtors' assignment of the Assumed Contracts to the Purchaser, no default shall exist under any

Assumed Contracts, and no non-Debtor party to any Assumed Contracts shall be permitted to

declare a default by any Debtor or the Purchaser, or otherwise take action against the Purchaser,

as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its

obligations under the relevant Assumed Contracts.  Any provision in an Assumed Contract that

prohibits or conditions the assignment or sublease of such Assumed Contract (including without limitation, the granting of a lien therein) or allows the non-Debtor party thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, constitutes an unenforceable anti-assignment provision that is void and of no force and effect.  The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed Contract.

27.    **Statutory Mootness**.  The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction (or any of the transactions contemplated herein) nor the transfer of the Acquired Assets to the Purchaser free and clear of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

28.    **No Avoidance of Purchase Agreement**.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

29.    **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062 and 9014 or any applicable provisions of the Local Bankruptcy Rules, the terms and conditions of this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

Time is of the essence in closing the Sale Transaction and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by Law and prior to the Closing, or risk its appeal will be foreclosed as moot.

30.    **Allowance of Claims Affecting Purchaser**.  The Debtors shall not consent or agree to the allowance of any Claim to the extent that it would constitute an Assumed Liability without the prior written consent of the Purchaser.  The Purchaser shall have standing in these chapter 11 cases to object to the validity, amount, or priority of any Claim against the Debtors to the extent it would otherwise constitute an Assumed Liability, and this Court will retain the right to hear and determine such objections.  The Purchaser shall pay or otherwise satisfy the Assumed Liabilities on or before the later of:  (i) the date on which such liability becomes due and owing to the holder of same in the ordinary course of business; (ii) 90 days after the Closing; and (iii) the date on which the Purchaser and the holder agree such liability is to be satisfied.

31.    **Exculpation and Release of Purchaser**.  Effective upon the Closing, and to the maximum extent available under applicable Law, neither the Purchaser nor any of its members, partners, employees, Affiliates, successors, assigns, advisors, or representatives shall have or incur any Liability to, or be subject to any action by, the Debtors, their estates, or any of their predecessors, successors or assigns, including any trustee or examiner appointed in these cases or upon a conversion of these cases to chapter 7 of the Bankruptcy Code, any official committee of unsecured creditors, other fiduciaries that are or may be appointed in these cases, or any Persons or entities, arising from, based on, or related in any way to the negotiation, documentation, or due diligence in respect of, or the performance or consummation of the Purchase Agreement and any related agreements entered into in connection therewith, the Debtors, their estates, and the conduct

of their business prior to the Closing, and the entry into and consummation of the Sale Transaction, other than (with respect to the Purchaser only) the Purchaser's obligations under this Order or the Purchase Agreement or any related agreements entered into in connection with the Sale Transaction; *provided* that, to the extent that a claim or cause of action by the Debtors, their estates, or any of their predecessors, successors, or assigns is determined by order of this Court or any court of competent jurisdiction to have resulted from fraud, gross negligence, or willful misconduct of the Purchaser, such claim or cause of action shall not be released against the Purchaser.

32. **Validity of Liens; Credit Bid**. Notwithstanding anything to the contrary in any prior order, the Prepetition Liens on the Prepetition ABL Collateral and the DIP Liens on the DIP Collateral are valid, binding, enforceable, nonavoidable, and properly perfected, and the Purchaser was entitled to credit bid with respect to the Prepetition ABL Collateral and the DIP Collateral for the purchase of the Acquired Assets as reflected in the Purchase Agreement. Allowing the Purchaser to credit bid did not chill the Bidding and Auction Process and neither the Purchaser nor its Affiliates have engaged in any inequitable conduct with respect to the Debtors or the Sale Transaction. As such, no "cause" existed to limit or condition the ability of the Purchaser to credit bid under section 363(k) of the Bankruptcy Code.

33. **Application of Sale Proceeds**. The net proceeds of the Sale Transaction (to the extent of any) shall be applied to Claims against the Debtors' estates in accordance with the terms of the Final DIP Order and the Bankruptcy Code.

34. **Stipulations Authorized**. The entry of this Order shall authorize and approve any and all stipulations entered into prior to the date of this Order between the Debtors and any non-Debtor party resolving any objection timely filed by such non-Debtor party to the Sale Transaction,

27

or any proposed Cure Cost or the provision of adequate assurance of future performance in connection therewith.

35.    **Binding Effect of this Order**.    The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates, the Purchaser and its Affiliates, successors, and assigns, and any affected third parties, including all Persons asserting Claims, notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other Law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, or any trustee, examiner, or receiver.  Any trustee or examiner appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code or in any Successor Case, shall be authorized and directed to (i) operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of the Transaction Documents and (ii) perform under the Transaction Documents without the need for further order of this Court.

36.    **Survival**.    The terms and provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the chapter 11 cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the chapter 11 cases or Successor Cases.  The terms and provisions of this Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the chapter 11 cases, in any Successor Cases, or following dismissal of the chapter 11 cases or any Successor Cases.

28

37.    **Conflicts; Precedence**.  To the extent there are any inconsistencies between the terms of this Order and the terms of (i) any other order of this Court or (ii) the Transaction Documents, the terms of this Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases, any order confirming such plan, or any other order shall conflict with or derogate from the provisions of the Transaction Documents or the terms of this Order and, to the extent that there is any conflict among them, the terms of the Transaction Documents and/or this Order, as applicable, shall control.

38.    **Modification of Purchase Agreement**.  Subject to the terms of the Transaction Documents, the Transaction Documents, including the Purchase Agreement, and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court.

39.    **Bulk Sales**.  No bulk sales Law, bulk transfer Law, or similar Law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

40.    **Automatic Stay**.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Transaction Documents or any other sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order.

41.    **Provisions Non-Severable**.  The provisions of this Order are nonseverable and mutually dependent.

42.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction until the Closing or the dismissal of these chapter 11 cases to, among other things, (i) interpret, enforce, and implement the terms and provisions of this Order and the Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Successful Bidder) and (ii) adjudicate, if necessary, any and all disputes related to this Order and the Purchase Agreement (including all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith).

New York, New York

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE