Abhilash M. Raval
Lauren C. Doyle
Alexander Lees
**MILBANK, TWEED, HADLEY & MᶜCLOY LLP**
28 Liberty Street
New York, New York 10005-1413
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
*Counsel to Mercuria*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*, | ) Case No. 18-13374 (MEW) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |

**STATEMENT OF MERCURIA IN SUPPORT OF THE PROPOSED**
**BIDDING PROCEDURES AND REPLY TO THE COMMITTEE'S OBJECTION**

Mercuria Asset Holdings (Hong Kong) Limited (together with certain of its affiliates, "Mercuria"), files this statement in support of the Bidding Procedures proposed in the *Debtors' Motion for Entry of an Order (i) Establishing Bidding Procedures and Section 365 Procedures, (ii) Approving the Sale of Substantially All of the Debtors' Assets, (iii) Authorizing the Entry into and Performance Under the Stalking Horse Asset Purchase Agreement, and (iv) Granting Related Relief* [ECF No. 59] (the "Motion") and reply to the objection (the "Objection") interposed thereto by the Official Committee of Unsecured Creditors (the "Committee").[1]   In support of the foregoing, Mercuria respectfully represents as follows:

**Preliminary Statement**

1.     The harsh reality of these cases, which the Committee well knows but chooses to

---

[1]   Failure to specifically address any particular argument in the Objection is not an admission as to the validity of such arguments, and Mercuria reserves all rights in connection therewith.

ignore, is that Aegean[2] (in the Debtors' own words)[3] is on life-support—life-support provided by Mercuria. The Debtors are operating at a loss and are being propped up by the financial support provided by Mercuria both pre- and postpetition. But there is only so much support that Mercuria can and is willing to provide and only so much exposure that it can and is willing to accept to keep the Debtors afloat. That support roughly equates to the $72 million of new money DIP financing that Mercuria has agreed to provide on top of the over $300 million of new financing under the ABL DIP facilities. Even with that large amount of cash, however, the DIP budgets presume that the Debtors will run out of money by the end of February, leaving only a short window to run a viable sale process.

2.      In serving as DIP lender and Stalking Horse Bidder (which no other party was willing to do notwithstanding the failed efforts of the Ad Hoc Group (whose advisors now represent the Committee)), Mercuria is providing immense value to the estates that will quickly be depleted by litigation tactics. Its support is ensuring that the Debtors have funding to run a sale process, while providing the Debtors with a floor price for the Auction to maximize value. At the same time, Mercuria is taking on substantial risk, tying up millions of dollars in capital while still facing the possibility that it will be outbid, or worse yet, that this house of cards will collapse altogether. To compensate for that risk, as established law, Mercuria is entitled to bid protections, such as the right to credit bid, receive a break-up fee and expense reimbursement, have the assurance of case milestones, and consent rights over certain aspects of the process.

3.      Despite    the    Committee's    baseless    accusations    of    misconduct    and

---

[2]    Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in the Motion or the *Declaration of Tyler Barron, Director of Aegean Marine Petroleum Network Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "Baron Declaration"), as applicable.

[3]    See Baron Declaration ¶ 15.

mischaracterizations of the facts, the Stalking Horse APA and the Bidding Procedures are amply supported by the Debtors' business judgment. The evidence establishes that they are the product of months' long, good-faith, arms-length negotiations, in which each party was represented by independent, competent counsel; were approved by the Debtors' *independent* directors, consistent with their fiduciary duties; and represent the best way to maximize value for the estates. Nevertheless, in an effort to keep these cases on track and respond to some of the concerns raised by the Committee, Mercuria has agreed to a number of modifications requested to the Bidding Procedures and Bidding Procedures Order, including, without limitation:

- providing an expedited schedule for the Committee and other parties in interest to challenge Mercuria's right to credit bid; Bid Procedures Order ¶ 15;

- allowing bidders to bid for less than all of the Acquired Assets, so long as such individual bids can be aggregated to comprise a bid that is higher or better than the Stalking Horse Bid; Bidding Procedures at p. 1;

- providing additional time for the Successful Bidder to provide alternative DIP financing; Bidding Procedures at p. 7;

- clarifying that only the Deposit of the Successful Bidder and is unable to close is retained; Bidding Procedures at p. 16;

- granting the Committee broad consultation rights; see generally Bidding Procedures;

- limiting Mercuria's consent rights and automatic standing, and oversight; see generally Bidding Procedures;

- providing that the Stalking Horse Bidder will not receive copies of the other bids, nor will the Debtors share anything with the Stalking Horse Bidder that could chill bidding; see Bidding Procedures at pp. 5-6, 17;

- eliminating the right of the Stalking Horse Bidder to match a bid without including a minimum overbid; and

- capping Mercuria's Reimbursable Expenses. Bid Procedures Order ¶ 32.

4.      With these modifications, the Bidding Procedures should be approved so that the Debtors can move forward with the Auction.

## Background

5.      Mercuria's history with the Debtors thus far is a short one.    Faced with a

deteriorating business, slumping gas prices, the revelation of a massive fraud perpetrated by former management, and lenders seeking to exit the exposure caused by such fraud, the Debtors were on the verge of liquidation and in dire need of financial support by the summer of 2018. The Debtors attempted to engage with their existing lenders, including the Ad Hoc Group, which was represented by the Committee's current advisors, to no avail. At the same time, the Debtors engaged in a search for an alternative financial or strategic partner. In Mercuria, they found both. Over the course of July and August, the Debtors and Mercuria engaged in arms-length discussions and transactions concerning a mutually-beneficial solution to the Debtors' financial crisis. This led, initially, to a financial and strategic partnership memorialized in the Exclusivity Letter (to which was attached a term sheet, commonly referred to in these cases as the MOU), which contemplated that by August 15, 2018, Mercuria would (a) become the sole lender under both of the Debtors' prepetition ABL facilities, (b) extend waivers in connection with existing defaults, and (c) provide new financing that would allow Aegean to continue operating. The MOU contemplated that, upon closing, Mercuria would receive 30% of Aegean's outstanding common stock and would be entitled to nominate one member to Aegean's board of directors (the "Board"). Mercuria's nominee to the Board was not appointed until October 2018 and since that time recused himself from every called meeting of the Board.

6.    The Exclusivity Letter provided Mercuria and Aegean the runway through which to explore the strategic partnership. The MOU included an express carve-out permitting the Debtors to engage in discussions with, among others, their former secured lenders, members of the Ad Hoc Group, and potential DIP financing sources.[4] In exchange for this grant of limited exclusivity,

---

[4]    The Committee's assertion that "[f]rom the time that the Debtors' started engaging with Mercuria through most of September, the Debtors refused to engage with other creditor groups in any meaningful negotiations or discussions," (Objection ¶ 20) is simply not true. The Debtors' extensive discussions with the Ad Hoc Group

Mercuria agreed to provide extensive support to the Debtors, including direct credit support of supplier and customer contracts.[5]  As testified to by Zul Jamal of Moelis & Company LLC, the terms of the MOU did not preclude any party that wanted to engage with the company from signing an NDA.[6]  Both prior to and following their entry into the MOU, the Debtors engaged in negotiations with multiple potential financial and strategic investors, including the Ad Hoc Group, to explore various alternatives, including both in-court and out-of-court restructuring solutions. The economic reality, however, was that there were, and are, no other sources of funding for these chapter 11 cases:  there is simply insufficient collateral to support any additional lending.[7]

7.    In addition to the critical liquidity that Mercuria provided during the summer of 2018 to forestall the Debtors' immediate liquidation, Mercuria provided additional liquidity just prior to the Petition Date by increasing the borrowing base availability, thus enabling the Debtors to transition smoothly into chapter 11.  Mercuria's fully committed DIP financing provides the Debtors with $72 million of incremental liquidity and enables them to pursue the going concern sale contemplated by the Bidding Procedures.  But given that the Debtors continue to lose money

---

included an in-person meeting in late September (when its members agreed to become restricted) and "subsequent meetings and discussions . . . on an almost continuous basis, both with respect to DIP financing as well as other types of transactions."  Transcript of Hearing attached hereto as Exhibit A re *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (i) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims, (iii) Authorizing Use of Cash Collateral, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief* (the interim order entered with respect thereto at ECF 51, the "Interim DIP Order", and the hearing transcript, the "Transcript of First Day Hearing") at 113:6-11, In re Aegean Marine Petroleum Network Inc., No. 19-13374.  These negotiations continued through October but, ultimately, the Ad Hoc Group was unable to obtain committed financing before the Petition Date.

5    See Baron Declaration at ¶ 14.

6    Transcript of First Day Hearing at 111:11-12.

7    As Zul Jamal testified, the market had "very limited interest" in loaning money to the Debtors, and there was absolutely zero interest in loaning any money on an unsecured or even non-priming secured basis.  Transcript of First Day Hearing at 111:22-25-112:5-13.

and their assets further depreciate every day, even this additional liquidity will last only a few short months.  This unfortunate circumstance means that Mercuria's DIP commitment and the Stalking Horse Bid are not indefinite.  Thus, the milestones incorporated into the Bidding Procedures are not designed to shut out competitors (as the Committee asserts) but instead to ensure that a sale may be consummated before the Debtors run out of money and these cases are thrown into chaos.

8.      The Committee would rather that these cases be converted to chapter 7 so that the out-of-the money, structurally junior creditors of Aegean get a chance of benefiting from the Litigation Claims (as defined in the Objection).  Such a path, however, would be value destructive, to severe detriment to all of the Debtors' stakeholders other than Aegean's creditors.  To that end, the Objection is filled with allegations and conjectures that are simply not supported by the facts of these cases.  Specifically, the Committee has failed:

- to offer any evidence in support of its allegation that Mercuria is or was in control of the Debtors or that the entire fairness standard should apply to these transactions;

- to demonstrate that the decision to enter into the Stalking Horse APA and seek approval of the Bidding Procedures was not within the sound business judgment of the Debtors;

- to demonstrate any basis to limit Mercuria's credit bid rights;

- to demonstrate that the Bid Protections are inconsistent with market standards or otherwise will chill a competitive bidding process for the Debtors' assets;

- to provide any explanation of how its professed preference for liquidation would help the creditors of the 74 Debtors that are structurally senior to Aegean's creditors; and

- to identify any source of funding willing to replace Mercuria and loan the Debtors additional funds to enable a longer sale process or closing timeline.

Accordingly, the Committee's remaining objections should be overruled.

**Statement and Reply**

I.      **Application of the Entire Fairness Standard is Not Warranted by the Circumstances of these Cases**

9.      The Committee, and its predecessor, the Ad Hoc Group (previously represented by the Committee's counsel), have sought to portray Mercuria as a malicious, self-dealing "insider"

6

attempting to take advantage of a financially troubled competitor. This is starkly inaccurate. Despite the Committee's advisors' involvement in these matters since July when Mercuria first stepped in, the Committee has failed to present a single fact that would support any of the baseless allegations contained in the Objection. The mere fact that Mercuria is a statutory "insider" of the Debtors does not provide any reason to second guess the Debtors' business judgment in entering into the Stalking Horse APA and proposing the Bidding Procedures.

10.    The Committee states repeatedly that Mercuria is an "insider" by virtue of section 101(31)(B) of the Bankruptcy Code (Objection at fn. 2 and ¶ 17) without any attempt to provide any actual evidence that Mercuria is or was a "person in control" of the Debtors. 11 U.S.C. § 101(31)(B)(iii). Footnote 2 of the Objection lists various alleged "facts" purportedly demonstrating control, but most are completely unsupported. The only enumerated facts that have a basis in the evidence are that (a) Mercuria purchased the Debtors' obligations under the prepetition facilities, (b) Mercuria acquired a minority position in Aegean's equity, (c) Mercuria was granted the right to appoint a single member of the Board, and (d) the letter agreement provides for a break-up fee. None of these facts, however, either alone or together, establishes that Mercuria was a "person in control" of the Debtors – i.e., that Mercuria actually dictated business and management decisions. See Radnor Holdings Corp. v. Tennenbaum Capital Ptnrs, 353 B.R. 820, 841 (Bankr. D. Del. 2006) (stating that "to be determined a 'person in control,' the person must control the company so as to dictate corporate policy and disposition of corporate assets without limits"); Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns., Inc.), 348 B.R. 234, 279 (Bankr. D. Del. 2005) (stating that "[t]here must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake").[8]

---

[8]    Moreover, the ability of a lender to control the use of capital under a borrowing base facility in default, is no more

Mercuria *only* qualifies as an insider of the Debtors under section 101(31)(E) of the Bankruptcy Code, as a result of its ownership of a minority position in the Aegean's equity.

11.     On this flimsy premise, the Committee makes the giant leap of arguing that the Debtors' business judgment is not entitled to deference, and that the burden is on Mercuria and the Debtors to demonstrate the "entire fairness" of the proposed transaction.  But that is not how the business judgment rule works.  "Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity" by showing that a majority of board members were tainted by self-dealing.  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).  "The appropriate test is the 'entire fairness' of a transaction rather than the business judgment rule *only in the face of illicit manipulation of a board's deliberative process by self-interested corporate fiduciaries*."  Id. at 658 (emphasis added).

12.     In Integrated Resources, a group of creditors challenged the proposed grant of bid protections to a stalking horse, and the court held that the business judgment rule applied – and not the "entire fairness" standard – because the debtor's "board of directors reviewed and approved" the stalking-horse proposal and "[f]ive out of the eight board members were disinterested outside directors."  Id. at 655; 657-58.

13.     This is precisely the situation here.  The evidence at the hearing will confirm that the majority of the Board members were independent of Mercuria and had no personal interest in the transaction.  Moreover, Mercuria's appointee recused himself from the relevant deliberations and decisions, and the Stalking Horse APA and the Bidding Procedures were unanimously

---

an exercise of control prepetition, than it is for a DIP lender to approve and restrict uses of capital under a DIP facility to line items of a budget.

approved by the remaining directors.[9]  Just as in <u>Integrated Resources</u>, the Committee has "failed

to meet its burden of establishing any material personal interest or self-dealing by a majority of

[the debtor's] directors."  147 B.R. at 658.

14.    The Committee's cited cases do not compel a contrary result.  Most of these cases

are factually distinguishable,[10] while others do not pertain to section 363 or any other matter

premised on an exercise of a debtor's business judgment.[11]  At least one of the Committee's cases

supports the Debtors' and Mercuria's position that no heightened scrutiny applies to an insider

transaction when an independent fiduciary controlled the negotiation process.[12]  At most, the

Committee's cases suggest that when an insider is involved in a proposed transaction, a bankruptcy

court must be careful to avoid the possibility of abuse.  But there is no evidence that Mercuria

abused its status as an equity holder or its Board seat in any way.  The concerns expressed by

courts in other situations involving transactions with insiders simply are not present here.  In this

---

[9]    *Declaration of Zul Jamal in Support of Debtors' Motion for Entry of an Order (i) Establishing Bidding Procedures and Section 365 Procedures, (ii) Approving the Sale of Substantially All of the Debtors' Assets, (iii) Authorizing the Entry into and Performance Under the Stalking Horse Asset Purchase Agreement, and (iv) Granting Related Relief* ("<u>Jamal Declaration</u>") ¶ 13 ("The Debtors' board of directors (excluding David Gallagher, the Debtors' Mercuria-appointed director), in their business judgment, authorized the approval of the Stalking Horse APA and the associated Bidding Procedures contemplated by the Motion.").

[10]    <u>See</u> Objection ¶ 32 for discussion of <u>In re Bidermann Indus. U.S.A., Inc.</u>, 203 B.R. 547, 551 (S.D.N.Y. 1997); <u>In re Family Christian, LLC</u>, 533 B.R. 600, 627 (W.D. Mich. 2015) (auction process was plagued by flaws and proponents failed to provide sufficient evidence that auction achieved a fair price); <u>In re Phila. Newspapers, LLC</u>, 2009 WL 3243392, at *12 (Bankr. E.D. Pa. Oct. 8, 2009) (debtors made clear their "preference" for the success of the insider stalking horse bidder and the "perpetuation of 'local ownership'"); <u>rev'd in part</u>, 418 B.R. 548 (E.D. Pa. 2009).

[11]    <u>Pepper v. Litton</u>, 308 U.S. 295, 307 (1939) (rigorous scrutiny applies when evaluating bases for disallowing or subordinating insider's claim); <u>In re Marquam Inv. Corp.</u>, 942 F.2d 1462, 1465 (9th Cir. 1991) (same); <u>In re Papercraft Corp.</u>, 211 B.R. 813 (W.D. Pa. 1997) (assessing equitable subordination of insider's claim); <u>In re Crown Vill. Farm, LLC</u>, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (declining to dismiss chapter 11 petition; noting in dicta that proposed asset sale to an insider stalking horse would be subject to "close scrutiny").

[12]    <u>See In re Residential Capital, LLC</u>, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (debtor's entry into plan support agreement involving an insider was supported by the "business judgment standard" where agreement was negotiated by an "unconflicted fiduciary").

case, therefore, the business judgment presumption applies.

15.    Even if the Court finds that heightened scrutiny were applicable here, that still should not prevent the Court from approving the Bidding Procedures, including the Bid Protections, because they easily pass muster under that standard as well.  When the entire fairness standard applies, a transaction must be "fair" as to both process and price.  See Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983);[13] see also In re Innkeepers USA Trust, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (when "applying heightened scrutiny, courts . . . typically examin[e] whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration").  To determine whether the process is "fair," courts examine how the transaction was "timed . . . initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."  Weinberger, 457 A.2d at 711.  "Fair price" relates to the economic and financial terms of the transaction.  Id.

16.    Here, the Debtors have conducted a robust marketing process by actively engaging in discussions with numerous parties, including multiple potential financial and strategic investors, and provided such parties with diligence materials.  During this process, the Debtors were represented by competent, independent counsel and advised by an experienced investment banker.  Ultimately, the six independent members of the Board concluded that the Stalking Horse APA and the Bidding Procedures represented the best path forward.  With respect to price, despite this extensive marketing process, the Debtors only received restructuring proposals from two sources,

---

[13]  The Parent is incorporated in the Republic of the Marshall Islands.  The law of the Marshall Islands directs courts to look to Delaware corporate law.  See Rosenquist v. Economou, RMI Supreme Court Case No. 2010-002, October 5, 2011 Opinion, at p. 10 (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98-99 (1991)).

the Ad Hoc Group[14] and Mercuria, and the independent members of the Board determined that Mercuria's offer was superior. Regardless, however, this purchase price will be tested in the open market, subject to an auction process overseen by this Court, thereby ensuring that the Debtors will obtain the best value available for their assets.

## II.    There is no Basis to Limit Mercuria's Right to Credit Bid

17.    The Committee is unhappy that the bulk of the purchase price under the Stalking Horse APA consists of a credit bid of Mercuria's prepetition and DIP secured claims. But credit bidding is a statutory right granted to secured creditors by Congress, except where "the court for cause orders otherwise." See 11 U.S.C. § 363(k). Courts have recognized that the right to credit bid is a "fundamental protection" granted to secured creditors that may only be denied or limited in extraordinary circumstances. See, e.g., Radlax Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 649 (2012); Paul T. v. Fifth Third Mortg. Co. (In re J & M Salupo Dev. Co.), 388 B.R. 795, 803 n.2 (B.A.P. 6th Cir. 2008) (the right to credit bid is a "fundamental," "vital" protection given to secured creditors by Congress); In re Aeropostale Inc., 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016) (denying or limiting secured creditor's right to credit bid should be "the *extraordinary exception* and not the norm") (emphasis added).[15]

18.    No "extraordinary circumstances" exist to deprive Mercuria of its statutory right. The Committee acknowledged that there is nothing wrong with a "loan to own" strategy *per se*.[16]

---

[14]  Although the Debtors never shared the Ad Hoc Group's term sheet with Mercuria (or for that matter its terms), the Debtors' public disclosures indicate that the Debtors' viewed that proposal as unexecutable and subject to financing not yet committed. Mercuria's proposal on the other hand was fully baked.

[15]  Courts agree that "the chilling of bidding alone 'is [not] sufficient to justify a limit on a credit bid'" (In re Aeropostale, 555 B.R. at 416) because "all credit bidding chills an auction process to some extent." Id. at 417 (quoting American Bankruptcy Institute Commission to Study the Reform of Chapter 11, 2012-2014 Final Report and Recommendations 147 (2014)).

[16]  Objection at ¶1.

Indeed, the members of the Ad Hoc Group sought to implement a similar transaction, but could not obtain financing necessary to execute on that strategy. Mere allegations of Mercuria's "control" over the Debtors, without proof to back them up, are insufficient to limit Mercuria's right to credit bid. In any event, the evidence at the hearing, including testimony by the Debtors themselves, will establish that Mercuria was not in control of the Debtors and instead engaged at arms' length.

**A.      Roll-Up and Additional Collateral Issues Will be Decided by the Court in Connection with the Final DIP Order**

19.     It is standard practice for a DIP lender to obtain liens on previously unencumbered assets to protect its new money loans. Mercuria, in its capacity as a prepetition ABL lender, was continually lending new cash to the Debtors on the assumption that these loans would be repaid from the Debtors' receivables. At any time prior to the Petition Date, Mercuria could have stopped the clock, collected the receivables, and refused to lend more money. It did not do so. Instead, as it had already done during the summer of 2018, it allowed the Debtors to continue borrowing new funds to make a going concern sale possible. Similarly, Mercuria did not have to provide new money under the DIP facilities. It could have sought to lift the automatic stay, demanded the payment of its loans and walked away, leaving the Debtors to their own devices (as is common practice with ABL facilities). Again, it did not do so. Instead, Mercuria allowed the Debtors to continue to borrow under the rolled-up prepetition facilities and provided new money under a DIP term loan. In exchange for the agreement to lend new money—money that will be used by all of the Debtors and for the benefit of non-Debtor Affiliates—Mercuria is entitled to additional collateral.

20.     In any case, the issue of the propriety of the various features of the DIP financing, including the roll-up and the additional liens on account of new borrowings under the DIP

facilities, is not before the Court on this Motion.  This issue will be addressed in the more appropriate context of approving the Final DIP Order, with the Court taking cognizance of the Debtors' financial condition, the unavailability of alternative financing, and the fact that there is no value at Mercuria's prepetition obligors to cover the incremental borrowings it has already provided to the Debtors under the Interim DIP Order under the DIP Facilities.  If the Court declines to approve these features of the proposed DIP financing, Mercuria will not be in a position to extend continued financing and, accordingly, the appropriateness of its credit bid will be moot.

21.    The Committee also asserts that, even if the Court approves the proposed DIP financing, Mercuria still should nevertheless not be allowed to credit bid the rolled-up prepetition debt for the assets that were not part of its prepetition collateral package.  The Committee does not explain why that is the case -- other than saying that its advisors were not able to find any precedent where this occurred.  But so too were the Committee's advisors unable to refer to a single precedent where this was forbidden.  And, there can be no dispute that DIP lenders in this district have been allowed to credit bid the rolled-up portion of their prepetition debt.  See, e.g., In re Blockbuster Inc., No. 10-14997 (BRL) (Bankr S.D.N.Y 2010) [ECF No. 947]; In re SunEdison, Inc., No. 16-10992 (SMB) (Bankr. S.D.N.Y. 2016) [ECF No. 523].

**B.    Mercuria Has the Right to Bid for the Litigation Claims**

22.    The proceeds of the Litigation Claims are an essential component of the DIP Collateral (as defined in the Interim DIP Order).  The Committee's focus on the Litigation Claims is noteworthy.  While insisting repeatedly that these assets must be preserved for "unsecured creditors," it neglects to mention that it seeks to preserve these assets solely for the benefit of unsecured creditors who only have claims against the Aegean (i.e., the bondholders, including the members of the Committee), while the vast majority of the other Debtors' creditors are better off with the deal proposed by Mercuria under which their claims are being assumed.  None of the

Debtors' other creditors—to which the Committee also owes the aforementioned fiduciary duty—objected to either the proposed DIP financing or the Bidding Procedures.

23.    Likewise, it is disingenuous for the Committee to assert that unsecured creditors are the only parties "aggrieved" by the fraud of the Debtors' former management. But for such fraud, it is unlikely that the Debtors would have suffered such a precipitous downward spiral leading to their inability to satisfy over $207 million of additional funded debt that Mercuria is proposing to assume. Under these circumstances, it is not unfair that Mercuria benefits from any recoveries on the Litigation Claims.

24.    In any event, there is nothing improper about the Debtors' proposal to sell the Litigation Claims. Choses in action are assets of the estates no different from any other, and no principle of law requires that they be given special treatment in the section 363 context. The Litigation Claims, like all of the other assets included in the APA, will be subject to an auction process and market test.

## IV.       The Proposed Bid Protections Should Be Approved

25.    Bidding incentives such as the proposed Bid Protections are commonplace in connection with section 363 sales. As the Committee acknowledges, in evaluating the debtor's decision to agree to provide incentives to a stalking horse, courts generally look at whether (a) the relationship of the parties who negotiated the breakup fee is tainted by self-dealing or manipulation; (b) the fee hampers, rather than encourages, alternative proposals; and (c) the amount of the fee is unreasonable relative to the proposed investment. Integrated Res., 147 B.R. at 657-58. Despite the Committee's protestations, each of these factors supports approval of the Bid Protections.

## A.      The Bid Protections Were Negotiated at Arm's Length and In Good Faith

26.    Despite    the    Committee's    unsupported    allegations    of    "self-dealing    and

manipulation," the Bid Protections are the product of good faith, arm's-length negotiations between Mercuria and the Debtors, with each party represented by competent, independent counsel. Mercuria's appointee on the Board recused himself from all meetings, discussions, and decisions relating to the Stalking Horse APA and the contemplated Sale Transaction. Thus, the Board's unanimous decision to grant the Bid Protections to Mercuria was made by directors who are entirely disinterested and independent from Mercuria. Moreover, the Bid Protections were heavily scrutinized and negotiated by the Debtors' highly experienced outside advisors. That is precisely the process that numerous courts have deemed appropriate. See, e.g., In re Genco Shipping & Trading Ltd, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014) (approving termination fee where "the Debtors [were] making their own decisions through an independent board of directors . . . [and had] consulted with and [been] advised by counsel and [their] financial advisor").

27.    Instead of providing any evidence of the alleged "self-dealing and manipulation," the Committee simply lists all of the provisions of the Bidding Procedures with which it is unhappy. But this is insufficient to deny the Motion. It is standard for a DIP lender to protect its investment, whether through the right to receive satisfaction of its debt in full in cash or its right to credit bid for its collateral. These protections almost always include the granting of additional collateral and case controls, such as case milestones and consent and termination rights. This Court has approved comparable procedures in numerous other cases. See, e.g., In re Avaya Inc., No. 17-10089 (SMB) (Bankr. S.D.N.Y. 2017) [ECF No. 356] (requiring consent of the stalking horse bidder to modify the bidding procedures); In re SunEdison, Inc., No. 16-10992 (SMB) (Bankr. S.D.N.Y. 2016) [ECF No. 1206] (requiring consultation with the DIP lenders before allowing a Qualified Bidder to modify, amend, or withdraw its bid ); In re Angelica Corp., No. 17-10870 (JLG) (Bankr. S.D.N.Y. 2017) [ECF No. 137] (requiring that the stalking horse bidder be

promptly informed of all bids received and provided with summaries of their material terms).

28.    Relying on its exaggerated claims regarding the import of Mercuria's status as a statutory insider, the Committee asserts that this case is "similar" to In re Bidermann Indus. U.S.A., 203 B.R. 547 (Bankr. S.D.N.Y. 1997) and therefore the Bid Protections should not be granted. The analogy is unavailing, however. First, the Bidermann debtors never marketed their assets or even hired an investment banker. 203 B.R. at 551. Furthermore, although the bidding procedures in purported to give the debtors a "fiduciary out," the court found it largely illusory: the proposed procedure expected potential bidders to make their offers (including a $20 million overbid requirement) *before* conducting due diligence or even talking to the debtors' management. Id. at 552. Other features, such as the fact that one of the equity holders of the stalking horse entity in would be evaluating any competing proposals *on the debtors' behalf*, also served to discourage any competing bids. Id. In contrast, the Debtors here have conducted a robust marketing process since July 2018, actively engaging in discussions with numerous parties regarding strategic alternatives, and provided such parties with diligence materials. Moreover, the Bidding Procedures provide the Debtors with a "fiduciary out" and enable prospective bidders to conduct their own due diligence.

29.    Furthermore, the Bidermann court did find manifest and flagrant self-dealing: the same individual, in its capacity as the debtors' retained restructuring consultant and CEO, had an obligation "to enhance the value of the debtors' businesses . . . [and] to help ensure that the debtors received the highest and best offer available," while in its capacity as an equity participant in the stalking horse bidder and future CEO and chairman of the stalking horse bidder, "was, or ha[d] to have been perceived as being, motivated to secure for himself and the [stalking horse bidder] the

lowest sale price reasonably attainable." Id. at 551.[17]  In contrast, there is no evidence of any conflicts of interest or self-dealing here and the Committee has failed to produce any.

**B.    The Bid Protections Will Not Discourage Competitive Bidding**

30.    The Bid Protections were a material inducement for the Stalking Horse Bidder to enter into the Stalking Horse APA, which provides the floor for the purchase price.  Without the Bid Protections, the Stalking Horse Bidder would not have agreed to commit to holding its offer open while the Debtors attempted to obtain a higher or otherwise better one.   Moreover, the requirement that any overbid include the amount of the Bid Protections is customary and standard. See, e.g., In re Boston Generating, LLC, No. 10-14418 (SCC) (Bankr S.D.N.Y. 2010) [ECF No. 268]; In re Nine West Holdings, Inc., No. 18-10947 (SCC) (Bankr. S.D.N.Y. 2018) [ECF No. 223]; In re Avaya Inc., No. 17-10089 (SMB) (Bankr. S.D.N.Y. 2017) [ECF No. 356]; In re Advance Watch Co. LTD, No. 15-12690 (MG) (Bankr. S.D.N.Y. 2015) [ECF No. 105]; In re D.A.B. Grp. LLC, No. 14-12057 (SCC) (Bankr. S.D.N.Y. 2014) [ECF No. 79].

**C.    The Size of the Bid Protections is Market**

31.    The Bid Protections are reasonable and appropriate relative to the size, nature, and complexity of the contemplated Sale Transaction.  The proposed Break-Up Fee, which represents 2.8% of the total consideration payable under the Stalking Horse APA, is well within the range of break-up fees routinely approved in other large chapter 11 cases in the district.   See, e.g., In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approximately 3% of the purchase price); In re Gawker Media LLC, No. 16-11700 (SMB) (Bankr. S.D.N.Y. 2016) (2.75% of purchase price); In re D.A.B. Grp., LLC, No. 14-12057 (SCC) (Bankr. S.D.N.Y. 2014), ECF No.

---

[17]    To add insult to injury, the CEO's equity position in the stalking horse bidder was to be financed by the success fee payable to this individual's firm "for selling the business to themselves." Id. at 549.

79 (approximately 3% of purchase price); <u>In re Total Fitness of Greater New York</u>, No. 07-12395 (Bankr. S.D.N.Y. 2007) (4.3% of purchase price).

32.    The Committee argues that the Break-Up Fee should be based solely on the cash portion of the proposed consideration, rather than the total value provided under the Stalking Horse Bid APA. Objection ¶ 54. But the Committee can point to no case to support this proposition. In fact, courts in this jurisdiction and elsewhere have awarded break-up fees calculated off of both cash and non-cash components (including credit bids and assumed liabilities). <u>See</u>, <u>e.g.</u>, <u>In re Avaya, Inc.</u>, No. 17-10089 (Bankr S.D.N.Y. 2017) (approving break-up fee equal to 3% of purchase price, inclusive of assumed liabilities); <u>In re Sancilio Pharm. Co., Inc.</u>, No. 18-11333 (Bankr. D. Del. 2018) (approving break-up fee equal to 3% of purchase price, inclusive of credit component); <u>In re Katy Indus., Inc.</u>, No. 17-11101 (Bankr. D. Del. 2017) (approving break-up fee equal to 2.8% of DIP credit bid and assumed liabilities). Further, at least one Court in this jurisdiction has previously acknowledged that the total value of the transaction, including the non-cash components, should be considered when evaluating the appropriateness of break-up or termination fees. <u>See</u>, <u>e.g.</u>, <u>In re Genco Shipping & Trading Ltd</u>, 509 B.R. 455 (Bankr. S.D.N.Y. 2014). As the Court analogized in <u>Genco</u>, there is nothing wrong with calculating a termination fee based on the "credit portion" of a purchase price. In <u>Genco</u>, prepetition lenders provided for a fully back-stopped $100 million rights offering in addition to an approximately $1.1 billion debt-for-equity exchange. The proposed termination fee was based on the entire value of the transaction. The Court dismissed the objectors' arguments that the fee should be based only on the cash portion of the transaction, finding that the non-cash components of the transaction created "value for the estate on many different levels" and holding that this value should be taken into consideration when evaluating the reasonableness of the termination fee. <u>Id.</u> at 465-66.

33.     By credit bidding and by assuming significant liabilities of the Debtors, Mercuria is providing value to the Debtors' estates far in excess of the cash component of its bid: these non-cash components of Mercuria's bid will have the combined effect of removing approximately $666 million of secured debt from the Debtors' balance sheet.  Thus, the Court should determine that the break-up fee is reasonable.

## V.     The Proposed Milestones Are Reasonable Under the Circumstances

34.     The Committee acknowledges that "on its face the Debtors' timeline does not appear totally unreasonable,"[18] yet nevertheless complains that it somehow impedes the ability of other bidders to participate in the process and evinces Mercuria's undue influence over the sale process. What the Committee really seems to find objectionable is the unfortunate place in which its members find themselves—subordinate to over $459 million of Mercuria's debt and lacking a willing financial participant.  Additional time will not solve this problem.

35.     The proposed bidding and sale process timeline provides potential bidders with more than adequate time to perform due diligence (most of which has been collected for them by Mercuria) and obtain the information necessary to submit timely, well-informed bids.  At the same time, it provides the Debtors with an adequate opportunity to consider competing bids and select the highest or otherwise best bid.  The Bidding Procedures provide that bids are due approximately 69 days (over two months) from the date of the hearing on the approval of the Bidding Procedures or approximately 94 days (over three months) from the date of the filing of the Motion.  Courts in this district have consistently found that similar and even shorter timelines were appropriate.[19]

---

[18]   Objection ¶ 61.

[19]   See, e.g., In re Avaya Inc., No. 17-10089 (SMB), (Bankr. S.D.N.Y. 2017) [ECF No. 356] (43 days between entry of the bidding procedures order and the bid deadline (71 from motion)); In re Advance Watch Co., Ltd., No. 15-12690, (Bankr. S.D.N.Y. 2015) [ECF No. 105] (12 days between entry of order and bid deadline (34 from motion)); In re Choice Bldg. Supplies of Westchester Co. Inc., No. 13-23859 (RDD), (Bankr. S.D.N.Y. 2014)

36.    More importantly, time is of the essence here. The Debtors have long been operating "below breakeven sales volume and remain[ ] cash flow negative." Baron Declaration ¶ 15. At the same time, numerous vendors, suppliers, and longstanding customers have expressed "significant unease" regarding the Debtors' "stability" and "financial situation." Baron Declaration ¶¶ 10, 85. Moreover, there is only sufficient DIP financing to fund these cases through the end of February 2019, presuming current budgets are not exceeded or left to be varied by values in excess of the Budget variance, exceedances which the Committee fully supports.[20] The Debtors are projected to run out of cash and the DIP Facilities are set to mature just days after the Sale Hearing. Under these circumstances, an expeditious sale is the only way to preserve the Debtors' going concern value and avoid a value-destroying liquidation.

37.    Courts have repeatedly found that where a debtor's liquidity situation is dire and, absent an expeditious going concern sale, the debtor will have no other option but to liquidate, such an expeditious sale should be approved. See, e.g., In re Lionel, 722 F.2d 1063, 1069 (2d Cir. 1983) (an expeditious sale prevents "further, unnecessary losses" where "the court is faced with the situation of a so-called 'melting ice cube'"); In re Lehman Bros. Holdings, Inc., 445 B.R. 143, 181 (Bankr. S.D.N.Y. 2011) (same); In re Summit Global Logistics, Inc., 2008 WL 819934 *10 (Bankr. D.N.J. Mar. 26, 2008) (an expedited sale process is indicated where the debtors "experience a liquidity crisis," their customer and vendor confidence is lost, their DIP financing is no longer available, and the only alternative to a quick sale is "a complete shut-down of the

---

[ECF No. 26] (23 days between entry of order and bid deadline (31 from motion)); In re Cabrini Med. Ctr., No. 09-14398 (AJG), (Bankr. S.D.N.Y. 2009) [ECF No. 224] (26 days between entry of order and bid deadline (52 from motion))

[20]    See Objection of the Official Committee of Unsecured Creditors of Aegean Marine Petroleum Network Inc., et al., to the Debtors' DIP Financing Motion [ECF No. 113] at p. 31 (asserting that permitted variances "must be increased").

[d]ebtors' operations").

38.     Thus, where "a good business opportunity presents itself that might soon disappear, quick action [is] justified to increase or maintain the value of an asset to the estate by the sale of [such] asset." In re GSC, Inc., 453 B.R. 132, 164 (Bankr. S.D.N.Y. 2011).    "That business justification is even stronger where the purchaser is providing funding to the estate and that funding would be placed at risk." Id; see also In re Gen. Motors, 407 B.R. 463, 492-93 (same).

## IV.        The Committee's Other Objections Should Similarly be Overruled

39.     The Committee throws into its Objection a myriad of other objections to provisions of the Bidding Procedures that it perceives to demonstrate Mercuria's "control over" the Debtors. Contrary to the Committee's assertions, these provisions do not present a bar to entry but provide credibility to those who enter by protecting the Debtors, their estates and the auction process.

- **Requirement for Replacement DIP Financing**: Mercuria has provided incremental liquidity to the Debtors to enable them to conduct a sale process, which will maximize value.  This financing matures shortly after the Auction.  Requiring the Successful Bidder to commit to funding the Debtors' chapter 11 cases through the closing of a sale is reasonable and customary under these circumstances.  Jamal Declaration ¶ 30.

- **Prohibition on Consideration of Bids after Bid Deadline**:  Potential Bidders will have over two months from the entry of the Bidding Procedures Order to conduct due diligence.  This is ample time and supported by precedent, especially considering that such Bidders will benefit from the extensive work Mercuria has already performed.

- **Minimum Overbid is Too High**:   It is market to require a party to set an initial overbid amount to include payment of the break-up fee and expense reimbursement in order to guarantee that if an alternative transaction is selected, it is the purchaser that bears the cost and not the estates.

- **Requirement of Cash Deposit on Assumed Liabilities**:  This provision benefits and protects all creditors ensuring adequate compensation in the event the Successful Bidder harms the estates, including failing to enter into the required definitive documentation or to consummate a sale transaction.

## Conclusion

WHEREFORE, Mercuria respectfully requests that the Court overrule the Objection and

enter the Bidding Procedures Order.

New York, New York
Dated: November 30, 2018

/s/ Lauren C. Doyle
Abhilash M. Raval
Lauren C. Doyle
Alexander Lees
**MILBANK, TWEED, HADLEY & MᶜCLOY LLP**
28 Liberty Street
New York, New York 10005-1413
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
*Counsel to Mercuria*

**Exhibit A**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 18-13374-mew

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    AEGEAN MARINE PETROLEUM NETWORK INC.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  November 7, 2018

17                  1:59 PM

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  UNKNOWN

Page 2

1  HEARING re Debtors' Motion for Entry of Interim and Final

2  Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364,

3  503, and 507 (I) Authorizing the Debtors to Obtain Senior

4  Secured Priming Superpriority Postpetition Financing, (II)

5  Granting Liens and Superpriority Administrative Expense

6  Claims, (III) Authorizing Use of Cash Collateral, (IV)

7  Granting Adequate Protection, (V) Modifying the Automatic

8  Stay, (VI) Scheduling a Final Hearing, and (VII) Granting

9  Related Relief

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4         Attorneys for the Debtors

 5         300 North LaSalle

 6         Chicago, IL 60654

 7

 8   BY:  ADAM C. PAUL

 9         MICHAEL B. SLADE

10         MARC KIESELSTEIN

11         BEN WINGER

12         CHRISTOPHER M. HAYES

13         YATES FRENCH

14

15   AKIN GUMP STRAUSS HAUER & FELD LLP

16         Attorneys for Ad Hoc Noteholder Group

17         One Bryant Park

18         New York, NY 10036

19

20   BY:  ABID QURESHI

21         BRIAN CARNEY

22         PHILIP C. DUBLIN

23

24

25
```

Page 4

1    WILLKIE FARR & GALLAGHER LLP

2         Attorneys for ABN AMRO Bank N.V and ABN AMRO Capital

3         USA LLC

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:  ANA M. ALFONSO

8

9    WHITE & CASE LLP

10        Attorneys for Aegean Balta Bank N.A. Agent for itself

11        as Nordbank

12        1221 Avenue of the Americas

13        New York, NY 10020

14

15   BY:  SCOTT GREISSMAN

16

17   NORTON ROSE FULBRIGHT US LLP

18        Attorneys for Mercuria Energy Group Ltd.

19        1301 Avenue of the Americas

20        New York, NY 10019

21

22   BY:  MARC D. ASHLEY

23        LOUIS R. STRUBECK

24

25

Page 5

```
1    NORTON ROSE FULBRIGHT US LLP

2         Attorneys for Mercuria Energy Group Ltd.

3         2200 Ross Avenue, Suite 3600

4         Dallas, TX 75201

5

6    BY:  KRISTIAN WILLIAM GLUCK

7

8    MILBANK, TWEED, HADLEY & MCCLOY LLP

9         28 Liberty Street

10        New York, NY 10005

11

12   BY:  LAUREN C. DOYLE

13        ALEXANDER B. LEES

14

15   ROPES & GRAY LLP

16        Attorneys for Deutsche Bank Trust Company Americas, as

17        Trustee

18        1211 Avenue of the Americas

19        New York, NY 10036

20

21   BY:  MARK R. SOMERSTEIN

22

23

24

25
```

1    MASLON LLP

2        Attorneys for US Bank National Association as Notes

3        Trustee

4        3300 Wells Fargo Center

5        90 South Seventh Street

6        Minneapolis, MN 55402

7

8    BY:  JASON REED

9

10    APPEARING TELEPHONICALLY:

11    DAVID M. EPSTEIN

12    CAITLIN M. GRIFFIN

13    STEPHEN KING

14    ERIC L. RUIZ

15    TRICIA L. SCHWALTER

16    GEORGE R. BRICKFIELD

17    BETH BROWNSTEIN

18    PATRICIA CHEN

19    ANA CHILINGARISHVILL

20    JASON DIBATTISTA

21    SUZANNE DURNEY

22    TAYLOE B. HARRISON

23    ANA LUCIA HURTADO

24    ADAM KASSNER

25    STEPHEN LAM

1   KEVIN MCCOLGAN

2   GABRIEL E. SASSON

3   ANGELO THALASSINOS

4   CONOR TULLY

5   MEERA VEERAPPAN

6   SETH WASCHITZ

7   GREG WILKES

8   BRIAN ZUCCO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1               P R O C E E D I N G S
2          CLERK:  Good afternoon, please be seated.
3          THE COURT:  Aegean Marine.
4          MR. PAUL:  Good afternoon, Your Honor, Adam Paul
5    appearing on behalf of the debtors and debtors in
6    possession.  Your Honor, I'm joined here in the courtroom
7    today with my colleagues, Marc Kieselstein, Michael Slade,
8    Yates French, Benjamin Winger, Cristy Pirro and Christopher
9    Hayes, along with our financial advisor, Andrew Hede from
10   E&Y, and our investment banker, Zul Jamal from.
11         Your Honor, first, let me express my sincere
12   gratitude to you and your staff for jumping in here on short
13   notice.
14         THE COURT:  Everybody's jumping in on short
15   notice.
16         MR. PAUL:  Yeah, and that's not a metaphor
17   associated with the shipping industry.  And I'm also passing
18   along my gratitude both on behalf of the advisors as well as
19   the company.  I'd also ask that you pass along our gratitude
20   to Judge Wiles' staff who performed, basically, logistical
21   gymnastics to try to get us before you and then Judge Wiles
22   today.
23         Your Honor, we would also, for the record, like to
24   thank the office and the efforts of the United States
25   Trustee, who have provided a number of helpful comments and
```

Page 9

1    made themselves readily available, both during the week and

2    over weekends.  And of course, I'd like to also thank all of

3    the principals and professionals who haven't slept in weeks,

4    including on both sides of the table, to get us to where we

5    are today.

6              And finally, Your Honor, I would be remiss if I

7    didn't also recognize and commend our entire Board of

8    Directors who took their decisions and fiduciary duties

9    seriously and, in particular, Donald Moore and Tyler Baron,

10   who worked tirelessly in an effort to save this company.

11             Your Honor, I recognize that we're here before you

12   today on a contested DIP hearing, and we're, although

13   starting at 2:00 PM, we may have a limited period of time

14   before Your Honor before turning to Judge Wile, so I'll keep

15   my opening remarks short.

16             THE COURT:  I'll deal with your other first day

17   motions that are scheduled, we'll deal with them tomorrow,

18   the other three or four motions that Judge Wiles was going

19   to hear.

20             MR. PAUL:  Okay.  With the Court's permission,

21   then, especially since the Court will be dealing with those

22   other three motions, I'd like to give a brief opening and

23   introduction that I believe will provide very helpful

24   background to the Court, and also explain the perspective of

25   the advisors in the company who were involved with a number

1    of the allegations or circumstances that were included with

2    in the objection that the ad hoc group filed, which I think

3    we would politely characterize as mischaracterizations.

4    Again, Your Honor, I'd like to keep these remarks brief and

5    get to the DIP order, which is the issue of the day.

6          Your Honor, I do have a short presentation that

7    I'd like to approach and hand out.

8          THE COURT:  Do you have copies for the ad hoc

9    committee?

10          MR. PAUL:  I do.  So, Your Honor, as set forth in

11   the presentation on slide two, there are really four

12   questions that I wanted to answer for the Court today.

13   First, who are the debtors?  Second, why are the debtors

14   here?  Third, what have the debtors done to address their

15   issues?  And finally, fourth, where do the debtors go from

16   here?

17          So, first, Your Honor, who are the debtors?  And

18   so, starting on slide four.  As set for therein, Aegean

19   Marine is a leading marine fuel logistics company that is in

20   what is called the bunkering business, or as we'd like to

21   think about it or characterize it, or as we'd like to think

22   about it or characterize it, Aegean is basically a mobile

23   gas station for the shipping industry.  They have a large

24   and modern fleet of 56 bunkering vessels and they also have

25   a number of physical locations that serve as supply hubs and

Page 11

1    terminals throughout the globe.  They operate in 50 ports

2    worldwide, including in a number of continents.  And if you

3    turn to slide five, you'll see that Aegean is truly a

4    worldwide operation.

5            So, Your Honor, again, with respect to who are the

6    debtors, on slide six, Aegean has grown tremendously from

7    its inception as a single bunkering station in 1995.  It now

8    employs 850 individuals in more than 20 countries, and it

9    has key offices, again, around the world.

10           Turning to slide seven, Your Honor, this is an

11   illustration, a simple illustration of the bunkering

12   business.  Again, Aegean has certain owned vessels, certain

13   chartered-in vessels that both contribute to their bunkering

14   operations, and also derives a small amount of revenue from

15   chartering out its own vessels.

16           On slide eight, Your Honor, we included a chart of

17   the debtors' capital structure.  Now, while the chart may

18   seem somewhat complicated, Aegean's capital structure is, at

19   least in our mind, relatively simple, albeit with somewhat

20   complex credit agreements, as I'm sure Your Honor can

21   appreciate given the number of paper that landed on Your

22   Honor's desk yesterday.

23           But primarily, the capital structure, I think of

24   it in three primary buckets.  You have the senior secured

25   credit facilities, both the global and a US, that provide

1   working capital to fund operations.  You have a bucket of a

2   number of secured term loans that were all used to either

3   purchase vessels or locations such as Fujairah.  And then

4   you have the convertible unsecured notes to facilities of

5   unsecured notes:  one that matured on November 1, 2018, and

6   another that matures 2021.  And it's those holders that

7   comprise the ad hoc group that filed the objection today to

8   the DIP loan.

9           So, on slide nine, Your Honor, second question,

10  why are the debtors here?  And how did we get here?  Your

11  Honor, like most companies that find themselves in chapter

12  11, there are a variety of contributing factors that led to

13  what we would characterize as a perfect storm, and that

14  place the company in what became really a slow form of self-

15  liquidation.

16          What are those circumstances, Your Honor?  On

17  slide ten, first, Aegean's financial performance

18  deteriorated.  This deterioration occurred in late 2017 and

19  early 2018.  It's caused by strong competition.  It was

20  caused by certain one-time accounting expenses, and then

21  also losses on hedging contracts.  So, you had the financial

22  wherewithal of the company was deteriorating during that

23  period of time.

24          Second, there was an acquisition that was proposed

25  by Aegean's founder, who's no longer with the company.  The

1    acquisition was of HEC Europe, and it would have been a

2    related transaction, and the market immediately reacted to

3    that related transaction by having the stock drop 40

4    percent, because there were concerns around -- and I'll get

5    to this in a moment -- that it was a way in which the

6    founder was attempting to deal with the $200 million of

7    receivables that now we've discovered have lacked any

8    financial wherewithal.

9           Third, our lenders took notice of both the

10   deteriorating financial performance of the company, and then

11   also the proposed related party transaction.  And they

12   notified Aegean that the availability under the senior

13   secured facilities was going to be reduced, and

14   significantly reduced, as a condition to waiving certain

15   covenant defaults associated with missing financial

16   statements, and then also certain financial performance

17   metrics.

18          Fourth, Your Honor, oil prices spiked in a company

19   that operates in this space.  It's a very capital-intensive

20   operation.  And by having those oil prices spike, it further

21   reduced our liquidity at a critical time.  And finally, Your

22   Honor, essentially, the straw that broke the camel's back

23   was the announcement on June 4, 2018, that $200 million of

24   accounts receivable needed to be written off.  In all of

25   these things, especially that announcement, caused a crisis

Page 14

```
 1    of confidence in the marketplace, and among Aegean's

 2    customers, that led to this down road spiral that we had

 3    found ourselves in, in May and June of 2018.

 4           Your Honor, on slide 11 -- that's entitled "The

 5    Downward Slide Accelerates" -- again, Your Honor, beginning

 6    in March, the lenders were reducing our availability under

 7    our borrowing base and again, in a capital-intensive

 8    business such as this, we needed that liquidity desperately.

 9    And in fact, the size of the facility went from

10    approximately $1 billion all the way down less than $500

11    million.  And all during this time, when Aegean was

12    attempting to focus all of its efforts on stabilizing the

13    business, the lenders themselves were asking for short-term

14    waivers and a number of diligence requests that further

15    depleted the limited resources that the company had to

16    address some of its issues.

17           This really created what we've characterized as a

18    negative feedback loop, but I would rather call it something

19    like a black hole, or this self-liquidation.  On Page 12,

20    you'll see an illustration of what that looked like for the

21    company, and if you start from the right-hand side and work

22    your way across, the right-hand side is the factors that led

23    to this downward spiral.  You had breach of certain

24    financial covenants, you had the disclosure related to the

25    accounts receivable, you had the reduction in availability,
```

1    and then you had, because of the distressed nature of the

2    company suppliers reducing trade credit and asking for

3    letters of credit or prepayment, again, tightening the

4    liquidity.  You had rising oil prices contributing, and

5    then, obviously, increased operating costs associated with

6    operating a distressed business.  And all of this led to

7    this, again, perfect storm, black hole, whatever,

8    characterization you want to use, where you had a shrinking

9    borrowing base and liquidity constraints which led to the

10   inability by the company to purchase sufficient inventory,

11   which then led to the inability by the company to timely

12   serve as customers, leading to additional customers leaving,

13   which then led to less volume, less accounts receivable,

14   which then led to shrinking borrowing base, and on and on it

15   went.  And that's really the form of slow self-liquidation

16   that the company found itself in, especially in the months

17   of June and early July of 2018.

18            Your Honor, on Page 13, that's a summary and

19   timeline of events where we're finding ourselves in -- this

20   period of time is between June and July, again, of 2018.

21            So, Your Honor, third question, on Page 14, what

22   has Aegean done to address its issues?  And respectfully,

23   Aegean has done a lot.

24            First, on slide 15, Aegean engaged with its

25   investors and creditors in the spring and summer of 2018

1    when it became painfully obvious that it was in this slow

2    form of liquidation.  It engaged with financial investors,

3    it engaged with strategic investors, and it engaged with its

4    note holders and senior secured lenders.  Suffice to say,

5    Your Honor, given the position that the company was in when,

6    for all intents and purposes it was weeks away from a

7    liquidation at that point in time, in June, it really left

8    no stone unturned in its search for a solution.

9              Ultimately, Your Honor, these negotiations

10   culminated in a memorandum of understanding with Mercuria.

11   So, turning to Page 16, who is Mercuria?

12             Established in 2004, Mercuria is the largest

13   integrated energy and commodity trading company -- or one of

14   the largest -- companies in the world.  It's core business,

15   as set forth on that page, is sourcing, supplying and

16   trading crude oil, and petroleum products.  It operates 38

17   offices in 27 countries.  It employs more than 1,000 people.

18   It has over 3.1 billion in net asset value, and

19   approximately 450 million in net revenue in 2017.

20             So, turning to slide 17, what did Mercuria do?

21   Your Honor, it's no exaggeration, especially for those

22   involved with the company at the time, that Mercuria saved

23   the company, in early July, from an uncontrolled liquidation

24   that would either have taken place as a very quick chapter

25   11 or chapter seven in the US, or frankly, an uncontrolled

1    liquidation in multiple jurisdictions throughout the world.

2            Immediately upon signing that memorandum of

3    understanding, Aegean injected 30 million of near-term

4    liquidity into the company.  It helped reestablish customer

5    relationships, which was characterized as a negative in the

6    objection but was a positive; increased the company's

7    volumes and made it more profitable.  And finally, Your

8    Honor, it refinanced all of the company's senior secured

9    debt, thereby removing the heavy yoke that the company had

10   been living under with the existing lenders.  In exchange,

11   Mercuria received 30 percent of the equity in the company,

12   appointed a board member who has recused himself from every

13   single board meeting, and entered into exclusivity to

14   consummate a broader transaction for the company, that

15   exclusivity carved out any negotiation with the ad hoc

16   committee of bond holders or any other stakeholders in the

17   company.

18           What else did Aegean do?  On slide 18, it

19   appointed highly qualified independent board members, it

20   engaged in management changes, and launched much needed

21   operational measures to stem losses and increase

22   profitability.

23           What else did it do?  Page 18.  It launched a

24   comprehensive investigation.  It hired independent advisors

25   both to run the investigation and recover any

1     misappropriated assets.  And what I'd like to note for Your

2     Honor and for the record and for folks in the Court today,

3     the investigation is unfettered in scope.  It's not limited

4     to the accounts receivable.  The individuals involved with

5     the fraud have been removed from the company.  The

6     investigation is ongoing and the company is cooperating with

7     all relevant federal and local agencies.

8              So, Your Honor, I promised you answers to four

9     questions.  This leads me to the fourth question, which is

10    where do the debtors go from here?  Page 21.  First near-

11    term goal:  obtain court approval of DIP financing, which is

12    why we're here today.  Shortly following, hopefully, Your

13    Honor's approval of our interim DIP order, we would seek, we

14    would file and seek approval of bidding procedures that we

15    hope would maximize the value of the company by providing

16    for a full, fair and transparent marketing process.  We

17    would then close the sale and promptly file a liquidating

18    plan under chapter 11.

19             But the most important point on this slide is that

20    the debtors intend, and they have been, but they intend to

21    continue discussions with all stakeholders, including any

22    unsecured creditors committee appointed in these cases, and

23    in fact, also with the folks that are objecting to our

24    interim relief today.

25             And finally, Your Honor -- this is probably more

1   appropriate for Judge Wiles who will be handling the case --

2   we also included a timeline associated with the question,

3   where do the debtors go from here?

4        So, Your Honor, unless you have any questions for

5   me associated with the presentation, I'd like to thank the

6   Court for its patience and its time, and I would like to, at

7   this time, turn the podium over to my colleagues who will be

8   handling the presentation of the DIP motion today.

9        THE COURT:  Before you do that, does anyone want

10  to be heard, just generally, about the case and the matters

11  that Mr. Paul covered?  Hearing no response, go ahead.

12        MR. PAUL:  Thank you, Your Honor.

13        MR. WINGER:  Good afternoon, Your Honor, Ben

14  Winger from Kirkland & Ellis, proposed counsel to debtors

15  and debtors in possession.  I'm going to second Mr. Paul's

16  comments and thank the Court for jumping into this case on

17  extremely short notice.  We are here to consider the interim

18  approval of DIP financing in the provision of adequate

19  protection.  And if it pleases the Court, I'll cut to the

20  chase, that there's three headline facts that frame the

21  relief requested and, from our perspective, they're not

22  changing.

23        Number one, the debtors desperately need access to

24  liquidity right away.  This DIP financing, which is being

25  provided by Mercuria consists of, essentially, three parts.

1   There is the global DIP ABL in the amount of 300 million,

2   there is a US DIP ABL in the amount of 160 million, and then

3   there is a new 72 million term of which we're seeking relief

4   to access 40 million on an interim basis.  This is new money

5   across the board.

6           THE COURT:  Are you seeking any of the 300 million

7   or 100 million on an interim basis?

8           MR. WINGER:  With respect to the DIP ABLs, we are

9   seeking to access those facilities right away.

10          THE COURT:  How much do you need for the next

11  weeks?  This is an emergency hearing.

12          MR. WINGER:  Well, I would say we need 40 million

13  over the next 25 days, that's with respect to the term loan

14  piece.  Now, the way the company accesses cash and runs the

15  business, they also need access to their working capital

16  facilities during that time.  And that's, essentially,

17  accounts receivable recycling in the normal life of the

18  business.

19          THE COURT:  That's use of cash collateral,

20  correct?

21          MR. WINGER:  It would be pursuant to a DIP ABL

22  facility that would be a post-petition financing, as opposed

23  to cash collateral.

24          THE COURT:  Well, normally, if you want to use the

25  proceeds of your receivables, that's a cash collateral

1    request.

2            MR. WINGER:  The accounts receivables regenerate,

3    Your Honor, in the normal course of business and we,

4    obviously, can't force our pre-petition lenders to continue

5    to extend credit to us under these ABL facilities.

6            THE COURT:  No, but the debtors could seek the

7    involuntary use of cash collateral provided they could

8    adequately protect you, right?  It's not just a distinction

9    of terms.

10           MR. WINGER:  Well, Your Honor, we're not here

11   today on a nonconsensual basis with respect to our secured

12   lender.

13           THE COURT:  But my question is really, how much

14   money do you need based on what's coming in over the next

15   couple of weeks, or three weeks, if you want to use 25 days,

16   and cash?  What do you need to operate?  This is an

17   emergency hearing.  That's the question.

18           MR. WINGER:  Your Honor, I submit, it's the 40

19   million of incremental liquidity under the term loan that's

20   essentially filling the hole that exists today to operate

21   the business and, secondly, it's with respect to the normal

22   course recycling of accounts receivable.  And we are here

23   today to present --

24           THE COURT:  How much is that though?  I'm just

25   trying to find out how much money you need?

1             MR. WINGER:  Your Honor, we will put forward a

2     witness who can speak to the particulars.  I'm going to try

3     to answer.

4             THE COURT:  Okay.  But you can't tell me?

5     Somebody's going to give you a number.

6             MR. WINGER:  The accounts receivable recycles

7     every 45 to 60 days.  That's the entirety of the ABL

8     borrowing base, as I understand it, which is roughly 380

9     million on a prepetition basis, and that's going to 460 on a

10    post-petition basis.  There's 250 outstanding on the global

11    borrowing base, and 130 on the US borrowing base.

12            THE COURT:  I'll wait to hear from your witness.

13    Go ahead.

14            MR. WINGER:  The second fact, Your Honor, is that

15    this DIP was extensively shopped.  The debtors' investment

16    bankers, Moelis, conducted a process in terms of seeking

17    funding from inside and outside the capital structure.  And

18    we submit, Your Honor, there is no alternative to this DIP

19    financing at this time.  This was a situation where we truly

20    had a red team and blue team engaging in parallel tracks,

21    and we worked day and night with the parties who were

22    objecting to the relief requested to try to turn what we

23    considered an indication of interest, or a construct at

24    best, into an actionable proposal.  We are prepared to

25    continue to work with them on a higher and better deal, from

Page 23

1    the debtors' perspective, with respect to financing these

2    cases.  The third fact, from our perspective --

3              THE COURT:  If I authorize the use of interim

4    financing, and you negotiate a different deal, isn't that an

5    event of default under the cash collateral agreement, the

6    DIP agreements?

7              MR. WINGER:  If we obtain alternative financing,

8    Your Honor, our perspective is that will necessarily take

9    out the existing DIP lenders and at that point, an event of

10   default under that facility is --

11             THE COURT:  What if somebody is willing to make a

12   subordinate loan?  That's an event of default though, isn't

13   it?

14             MR. WINGER:  We, Your Honor, have no reason to

15   believe that there's anyone out there who is interested in

16   putting a --

17             THE COURT:  You're not answering my questions.  Go

18   ahead.

19             MR. WINGER:  So, Your Honor, with respect to the

20   third point, which is our headline point, is that this DIP

21   provides a path forward for this company to continue as

22   going concern.  There are already allusions in the objection

23   to conversions to chapter seven, to liquidations of the

24   company could be preferable.  We would submit that that's

25   not a close call.

Page 24

1          THE COURT:  Well, the company is going to be

2     liquidated.  It's either going to be liquidated in chapter

3     11 or chapter seven, right?

4          MR. WINGER:  And the debtors' objective is to sell

5     the company as a going concern and to keep this enterprise

6     going as opposed to stopping the music on day one.

7          Your Honor, very briefly, with respect to where we

8     stand on this motion, we made our deponents available for

9     more than five hours of deposition yesterday with the

10    convertible holders.  They filed an objection and we will

11    address those issues in due course.

12         With respect to the United States Trustee's

13    office, we have had multiple conversations with them.  We

14    believe we've narrowed the issues significantly.  And

15    really, the headline issue, as we understand it, is whether

16    a rollup of the DIP ABL facilities is appropriate at this

17    stage of the case.

18         On the adequate protection side of the house, we

19    have been in close contact with our vessel lenders, some of

20    which are represented here today.  We believe we are final

21    on business terms and just working through the last language

22    of the adequate protection stipulations that were included

23    in the motion, and we are happy to work through those.

24         THE COURT:  Can I ask you a question?  One of the

25    provisions of the interim order says the DIP lending

Page 25

1   agreements are approved, right?

2          MR. WINGER:  That's correct.

3          THE COURT:  What happens if at the final hearing,

4   whether it's me or Judge Wiles, says "I don't approve them.

5   I've had time to look at them now and I don't approve them."

6   How does that work?

7          MR. WINGER:  Your Honor, I believe we would have a

8   conversation with our lenders about the terms in which we're

9   able to --

10         THE COURT:  No, I'm asking you, what happens?

11  Your lenders don't decide what happens.  I'm just asking,

12  legally, if I approve these agreements, which I got less

13  than 24 hours ago, and neither I, nor I suspect anybody else

14  here, has had a lot of time to read, and I, or Judge Wiles

15  or whoever decides, you know what?  I don't think I'm going

16  to approve them, what happens?  What's the effect on the

17  interim order?

18         MR. WINGER:  On the interim relief?

19         THE COURT:  Yeah.

20         MR. WINGER:  Well, Your Honor, we're happy to work

21  through kind of provision by provision.  There are a number

22  of --

23         THE COURT:  I'm not talking about the marshaling

24  of those kinds of things which are subject to a final order.

25         MR. WINGER:  Your Honor, with respect to the new

1    money that's advanced, particularly the 40 million, if it's

2    approved, in an interim drawn to the term loan, that money

3    would get the benefits of 364(e) and the remainder is

4    subject to challenge and unwind the rollup, for example,

5    that we have proposed, and is in all respects, subject to

6    challenge and being unwound at a later point.

7            Your Honor, we've touched upon a few things, just

8    a few final remarks before we'll turn it over to our

9    litigators and let the evidence come in.  Number one, we

10   submit that converting these cases and liquidating this

11   company at this stage would be a big mistake.  Number two,

12   with respect to the rollup, we believe this is new money

13   being objected into the process every day when we advance.

14           THE COURT:  Does the rollup reduce the amount --

15   as part of the advances, going to be used to pay the rollup

16   or the is the rollup simply, basically, a bookkeeping matter

17   where you elevate a portion of the pre-petition debt to

18   post-petition debt?

19           MR. WINGER:  That's my understanding, Your Honor.

20           THE COURT:  I said two different things.

21           MR. WINGER:  That it would be a bookkeeping

22   adjustment.

23           THE COURT:  All right.  But would the debtor be

24   paying any fees based on that rollup?

25           MR. WINGER:  It would be paying fees relative to

Page 27

1     the committed capital.  That's correct, Your Honor.

2            THE COURT:  But would it be paying fees based on

3     the rollup, which is basically just a bookkeeping entry?

4            MR. WINGER:  Well, it's not just a bookkeeping

5     entry in that it enables the company to continue to access

6     the working capital facility on a post-petition basis.

7     Letters of credit, for example, Your Honor, are essential to

8     being able to purchase crude oil on the market.  In the

9     absence of these letters of credit you'd have to use cash.

10           THE COURT:  I'm talking about that 50 percent

11    rollup mechanism that's in the order, which is simply what

12    I've described as a bookkeeping entry, or an accounting

13    entry, that elevates a portion of the pre-petition debt to

14    post-petition debt.  Is a fee charged on that?

15           MR. WINGER:  Yes, the fees are calculated relative

16    to the entire portion of the committed facility, so that

17    would be the full 430 million.  Or, I'm sorry, the full 460

18    million.  With respect to fees, Your Honor, and we are happy

19    to bring this out further in testimony in our evidence, we

20    don't think this is a close call; that the fees are

21    reasonable under the circumstances relative to the

22    alternative indication of interest we received from the

23    bondholders, it's actually significantly cheaper than the

24    Mercuria proposal.

25           THE COURT:  My understanding of the objection to

1    the fees is not the percentages or anything like that, but

2    the charging of fees on moneys that are not actually going

3    to be expended, so that's why I raised the rollup.  It's not

4    really a cash expenditure, or a loan.

5          MR. WINGER:  My understanding, Your Honor, is with

6    respect to the DIP ABL, that they are committing the full

7    amount of capital, and they are lending against that on a

8    post-petition basis and that's --

9          THE COURT:  Maybe somebody can explain that to me

10   later, because I just don't understand how it works.

11         MR. WINGER:  Your Honor, we're happy to work

12   through the balance of the issues, unless you have any at a

13   later point.  Unless you have any questions at this time

14   we'd propose to let our litigation partners jump in and --

15         THE COURT:  Let me just hear if anybody else wants

16   to be heard before we begin the evidence?  Yes, sir.

17         MR. QURESHI:  Good afternoon, Your Honor.  For the

18   record, Abid Qureshi, Akin Gump Strauss Hauer & Feld, here

19   with my partners, Philip Dublin and Brian Carney, on behalf

20   of the ad hoc group of unsecured convertible noteholders.

21         Your Honor, the ad hoc group that we represent

22   holds exactly 74 percent of the 2018 and the 2021 unsecured

23   convertible notes.  Your Honor, I would like, at the outset,

24   to address a handful of provisions in the proposed DIP order

25   that we have trouble with, but before I do that, I'd like to

1   answer very directly a couple of questions that Your Honor

2   asked of the debtors.

3          There's a DIP budget, so we know how much money

4   they need. New money for the next 30 days, our read of that

5   budget, exclusive of what would go to Mercuria under that

6   budget, they need $18 million.

7          THE COURT:  They're also getting cash collateral,

8   but they can't use -- presumably, without the consent of

9   Mercuria, and Mercuria would be entitled to adequate

10  protection, some form of adequate protection for the use of

11  that cash collateral.

12         MR. QURESHI:  That I agree with.

13         THE COURT:  Which is why I'm trying to understand

14  how much money, both additional funds and cash, what I've

15  called cash collateral, is needed -- and I said over the

16  next two weeks, because this is an emergency hearing.

17         MR. QURESHI:  The use of cash collateral, and an

18  additional, approximately $18 million of liquidity, plus

19  adequate protection along with that cash collateral, as we

20  understand it, would be enough to get the debtors through

21  more than just two weeks, but more like 30 days.

22         Your Honor, also asked a question about what would

23  happen if this interim order is entered as is, and then we

24  get to a final order.  We point out in our objection, Your

25  Honor, that the way this order is drafted, is problematic in

1    that respect.  In its paragraph 6.8 of the DIP order --

2             THE COURT:  What page is it on?

3             MR. QURESHI:  Sixty-one.  And what that -- if you

4    look at the top of Page 61, the runover paragraph, what that

5    says, Your Honor, is in the provided, that section, in the

6    event the final order is entered, the terms and conditions

7    of such final orders shall control over the interim, with

8    respect to any DIP obligations.  But then it says, "Occurred

9    upon or after entry of the final order."  And that's the

10   language that's problematic.

11            So, our read of this, Your Honor, is that if the

12   interim order is entered and becomes a final order, we're

13   stuck, it can't be undone.  And that's why that's one of the

14   provisions that we think is problematic with this order and

15   needs to be changed.

16            Now, Your Honor, if I could, there are a number of

17   other provisions of the order that I'd like to get to, but

18   before I do that, if I could just provide a little bit of

19   context, because I think it's important.  So, let's start

20   with who the DIP lender is.  We've heard a little bit about

21   Mercuria, Your Honor, not a commercial lender.  But what

22   they are is a direct competitor of Aegean, and that's

23   important.  When Aegean stumbled as a result of the industry

24   headwinds and ultimately fraud, Mercuria saw an opportunity.

25   They saw an opportunity to basically take out one of its

1    principal competitors, and their vehicle for doing so was to

2    become a lender in the first instance.  And so, they signed

3    up to the MOU.  From our perspective, Your Honor, we see a

4    very clear loan-to-own strategy that --

5              THE COURT:  I read that, and what's wrong with

6    that?  Putting aside -- and I understand your objections

7    relating to the process -- if Mercuria had come in and said

8    look, we'll loan the money, we want to bid for the assets

9    and buy them, what's wrong with that?

10             MR. QURESHI:  In principle, Your Honor, nothing at

11   all.  But when they use their position as a lender first of

12   all, to exercise day-to-day control over the company in a

13   way that we think is inappropriate for a lender, then that

14   turns into an equity stake and a board seat and they become

15   an insider.

16             THE COURT:  I understand your process objections.

17   I was just asking because, you talk about the strategy in

18   your objection, but so what if they want to buy up the debt

19   and bid it in at a sale?

20             MR. QURESHI:  If everything was exposed to the

21   market and the process was fair and transparent, Your Honor,

22   in principle, no difficulty with the concept of a lender

23   becoming an owner.  It's the process that's fatal here and

24   it has led to a bunch of provisions that either have no

25   legal support at all, or simply contrary to bankruptcy

1   court.   That's the issue.

2          So, standard of review:   This is not business

3   judgment, this is an insider transaction, Your Honor.   And

4   insider transactions are subject to the entire fairness

5   standard.   Now, courts have described that standard as

6   requiring rigorous scrutiny.   In the burden, it's on the

7   insider, Your Honor, not only to prove the good faith of

8   this transaction, but also to show the inherent fairness of

9   the transaction from the viewpoint of the corporation, and

10  everybody who has interests in the corporation.   I don't

11  think there's any evidence being offered by the insider

12  today with respect to that or to any other issue.

13         Now, the MOU that Your Honor heard about, that was

14  entered into between the debtors and Mercuria on July 5,

15  again, not a simple lending relationship; a lot of strings

16  attached to that MOU, including an exclusivity provision

17  that gave Mercuria the exclusive right to provide the

18  financing, and also to exercise a strategic transaction.

19  And that had a $10 million penalty in the event the debtors

20  breached it: 30 percent of the equity, a board seat; all

21  things that caused Mercuria to put itself in a position of,

22  basically, having control over the company's purse strings.

23  And what we saw in the pre-petition negotiation process,

24  Your Honor, is that Mercuria was using that control, and

25  they were using that control to advantage themselves and to

Page 33

1   ensure that the process was not as open and competitive as

2   it certainly should have been.

3          Now, Your Honor, I won't get into too much detail

4   on this now, but just as a little bit of flavor, the

5   bondholders did propose, through a term sheet, a $50 million

6   secured financing facility that would have gotten past the

7   November 1 maturity issue.  But we found a company, at that

8   point, because it was post the Mercuria MOU, unwilling to

9   meaningfully negotiate with other parties.  And this

10  happened through a number of ways.

11         THE COURT:  I thought you were carved out of the

12  MOU.

13         MR. QURESHI:  Indeed, the existing lenders are

14  carved out of the MOU, and so it was not the MOU directly

15  that was a block, but rather Mercuria's control that they

16  achieved through the MOU.  And that manifested itself in a

17  number of ways, Your Honor.  One was, either no or very slow

18  responses to diligence requests that had the effect of

19  impeding competing proposals coming together.  And the other

20  was -- and this not with respect to our group but rather

21  other lenders -- difficulties in getting to confidentiality

22  agreements.  The confidentiality agreement here, Your Honor,

23  had a very peculiar provision in it.  And that provision was

24  that it required that any party that was proposing financing

25  represent that it was not a competitor -- not of the

Page 34

1    company, Your Honor, which would be normal, but rather that

2    it was not a competitor of Mercuria.

3            Now, Mercuria has an incredibly broad commodity

4    trading business.  And so, virtually any financial

5    institution, any bank that has any type of commodity trading

6    business whatsoever, arguably, could be considered a direct

7    competitor of Mercuria.  And so, that led to all sorts of

8    issues and ultimately delay in those institutions being able

9    to sign up to a confidentiality agreement, all while the

10   debtor was, of course, running out of liquidity and running

11   out of time.

12           So, again, these are process objections, but they

13   arise as a result of the behavior of an insider which, in

14   turn, Your Honor, creates issues around whether this

15   insider, based on that conduct, should be able to credit it;

16   whether that conduct gives rise to causes of action against

17   that insider; whether it be equitable subordination or

18   recharacterization, or other avoidance of their obligations.

19   All sorts of issues have arisen as a result of that conduct.

20           THE COURT:  But the order is written, which is

21   common in these types of orders, and recognized by our own

22   local rules, it's a party in interest, 60 days, basically,

23   to seek standing or commence an adversary proceeding.

24           MR. QURESHI:  So, Your Honor, we have in our

25   objection -- I think it's in paragraph 26 -- a long list of

1      issues that we have with the order.  What I'd like to do

2      first is just address a few of the principal ones, the big

3      ones.  Can I start with the rollup, Your Honor?

4              The debtors have this DIP as a $532 million

5      financing, but it's not.  The incremental financing, the

6      actual new money coming in, our read, is at most $152

7      million through the revolving post-petition credit facility

8      and the new delayed draw term loan.  The remaining, roughly

9      $380 million, of so-called DIP financing is nothing more

10     than a rollup of prepetition debt.  Now, what the debtors

11     are seeking, as we understand it, Your Honor, is that 50

12     percent of that prepetition debt automatically be rolled

13     upon entry of the interim order today --

14              THE COURT:  Is that part of the 380 million?

15              MR. QURESHI:  Yeah.  And the remaining 50 percent

16     be transformed into post-petition debt through what we call

17     a creeping rollup, as those --

18              THE COURT:  I read that.  But what's wrong with a

19     company collecting its accounts receivable, which are cash

20     collateral, and paying the cash collateral to the

21     prepetition lender and then getting fresh money?

22              MR. QURESHI:  In concept, nothing's wrong with

23     that, but it goes, first of all, fees shouldn't be paid on

24     account of that, because that's already effectively

25     committed.  And so, to justify a fee based on that amount

1    doesn't make sense.  But also, Your Honor, I do think that

2    approval of rollups on an interim basis, not appropriate.  I

3    mean this court's general order provides rollups ordinarily

4    will not be approved in interim orders without substantial

5    cause shown, or compelling circumstances, which we think are

6    absent here.

7           When rollups are approved at an interim hearing,

8    Your Honor, typically the debtor can prove, or the secured

9    lender can prove that they're over secured and that their

10   liens are not subject to challenge.  And here, again, based

11   on Mercuria's role as an insider, and their conduct, those

12   liens, at the very least, need to be investigated, their

13   conduct needs to be investigated and --

14           THE COURT:  But there's the provision in the order

15   that provides that to the extent the rollup is unrolled --

16   not the rollup but to the extent the liens are successfully

17   challenged, they've got to pay back the rollup, basically,

18   which is the usual provision.

19           MR. QURESHI:  As long as there are clear

20   provisions in the order that provide for that, and for any

21   disgorgement of fees to the extent that's subsequently

22   disallowed, those would all be provisions that, from our

23   perspective, are important.

24           Now, the other issue we have, Your Honor, is

25   unencumbered assets.  There are unencumbered assets.

Page 37

1    Prepetition, Mercuria's debt was the obligation of only a

2    subset of the debtors, and was secured by only a limited

3    collateral package.  The effect of the rollup here, Your

4    Honor, is that Mercuria will now enjoy the benefit of a

5    super priority administrative expense claim at every debtor

6    entity, and even at certain non-debtor entities, and they're

7    going to receive the benefit of liens on all of the debtors'

8    assets.

9               THE COURT:  But it's not unusual for someone who's

10   getting adequate protection, for example, to get adequate

11   protection unencumbered assets or subordinate liens and

12   somebody else's collateral.

13              MR. QURESHI:  With the adequate protection, Your

14   Honor, again, there are two, what the proposed form of

15   adequate protection here is, that Mercuria, on account of

16   its prepetition claims, are getting super priority liens and

17   claims at every debtor, and regardless of whether that was a

18   debtor at which they had security prior.  And the

19   prepetition credit facilities are not the obligation of

20   every debtor.  So, the adequate protection grants should be

21   limited to those debtors at which Mercuria had prepetition

22   claims.  We don't think, Your Honor, that there's a basis

23   for a more expansive --

24              THE COURT:  So, you object to guarantees being

25   given by debtors who are not presently obligated under the

1    prepetition agreements, or pledging their collateral?

2            MR. QURESHI:  That's correct.  We don't think

3    there's a basis for that.  And very significantly, Your

4    Honor, what the debtors also propose here is to pledge as

5    collateral litigation claims.  And let me spend a minute on

6    that.  As Your Honor has now been told, this proceeding -- I

7    think it was characterized as the straw that broke the

8    camel's back, is of course, the massive fraud.  The debtors'

9    audit committee, upon completing its investigation,

10   announced that up to $300 million was misappropriated by a

11   fraud orchestrated by a former affiliate of the debtors.  We

12   know that dozens of employees of the debtors were involved,

13   including members of senior management.  And, of course, we

14   know that this entire scheme is being investigated by the US

15   Attorney's Office among, I'm sure, many other law

16   enforcement authorities.

17           And, Your Honor, at the time that this fraudulent

18   scheme was taking place, Mercuria had no relationship to

19   these debtors whatsoever, other than they were a competitor.

20   Mercuria was not harmed in any way by the fraud.  In fact,

21   it's arguably an indirect beneficiary of the fraud in that

22   fraud provided the opportunity for Mercuria to step in and

23   take out a competitor.  So, from our perspective, it's

24   remarkable that the debtors are proposing to pledge at all,

25   let alone upon an interim order, as collateral for the DIP,

1   the proceeds of litigation claims, including in respect of

2   that fraud.

3           THE COURT:  Why is that unusual though?

4           MR. QURESHI:  I think in these circumstances, Your

5   Honor, where first of all, the scale of the fraud, $300

6   million, I mean that would be enough, if that could be

7   recovered, to satisfy the unsecured convertible notes in

8   full.

9           THE COURT:  So, you're basically arguing that come

10  hell or high water, this case should be liquidated today and

11  the claims should be preserved for the benefit of the

12  unsecured creditors?

13          MR. QURESHI:  Your Honor, let me answer the

14  question this way:  If the choice were the interim DIP order

15  being entered as it has been presented to the Court, or this

16  case converting to chapter seven today, that's an easy one.

17  It should convert to chapter seven today, no question about

18  that, because we think those litigation claims could be

19  quite valuable.

20          THE COURT:  But the litigation claims aren't being

21  assigned to them for ownership.  They're just security,

22  right?  So, if they're worth $500 million, they'll be over

23  secured if they're over secured now, and they'll get paid

24  and then the unsecured creditors will get paid.

25          MR. QURESHI:  Depending how the waterfall comes

1    out and what values end up being, of course, Your Honor.

2    But again, we think --

3              THE COURT:  Why are the litigation claims

4    different from any other unencumbered assets that the

5    debtors who are borrowers may own?

6              MR. QURESHI:  They're not.  Again, we think

7    unencumbered assets that exist here should not be pledged to

8    the insider, so those unencumbered assets should remain

9    available for unsecured creditors.  To the extent that

10   unencumbered assets are being pledged, whether as DIP

11   collateral or in the form of adequate protection, again,

12   Your Honor, that adequate protection should not extend

13   beyond debtor entities where there's already an obligation.

14   That's our review.

15             THE COURT:  If Citibank instead of Mercuria were

16   loaning the money, would you have an objection to the pledge

17   of the claims?

18             MR. QURESHI:  Depending upon the size of the DIP

19   facility and the amount of the new money coming in, we

20   might.  Now, Your Honor, the interim order also, we think,

21   inappropriately includes findings regarding Mercuria's good

22   faith.  There's been no investigation about their conduct.

23   There's no testimony.  There's no evidence, as we understand

24   it, being offered from Mercuria about its conduct.  We don't

25   think in those circumstances, that a good faith finding

Page 41

1    pursuant to Section 364(e) is appropriate.  There's no

2    record before the Court, and again, we understand the --

3            THE COURT:  Well, there will be though.

4            MR. QURESHI:  Well, but not from Mercuria.  Our

5    understanding is that there's no declaration and no witness

6    testimony.

7            THE COURT:  So, why can't the debtors say they

8    were separately represented and they had their own advisors

9    and this is the deal and --

10           MR. QURESHI:  Your Honor, our read of the case law

11   is that that record needs to come from the inside, and not

12   just from the debtors.  Your Honor, we also take issue with

13   the milestones; don't think those should be approved,

14   certainly not at an interim hearing.  They're aggressive,

15   they're approximately 30 days for bid procedures acceptable

16   to Mercuria to be approved, and then 75 days for an auction

17   to occur.  Again, we don't think that's -- that's certainly

18   not something that needs to be approved in connection with

19   an emergency hearing, which is what this is.  And I'm not

20   surprised that Mercuria is asking for that because it's part

21   of their strategy here to lock the debtors into a process

22   where they can acquire these assets with as little exposure

23   to the market as possible.

24           Finally, Your Honor, credit bid.  So, given the

25   investigation that we think needs to take place, and that an

1    official creditors committee will undoubtedly want to

2    undertake concerning the role that Mercuria played

3    prepetition, the control it exercised over the debtors'

4    funding decisions, the operational control that it has

5    exercised, there should be no fining in the interim order

6    that authorizes Mercuria to credit bid its prepetition

7    secured debt.  Again, emergency relief.  There's just no

8    reason for that type of a provision to be in an interim

9    order.  The committee should be appointed and should be

10   permitted to do its work before that type of provision is

11   brought before the Court.

12           And I mentioned the fees so, Your Honor, to the

13   extent that Your Honor does approve an interim DIP today,

14   the fees should be calculated based off whatever the new

15   money is that the debtors are authorized to take on an

16   interim basis.  So, if our reading of the DIP budget is

17   correct, and they need roughly $18 million to get through

18   the next 30 days, the fees should be calculated off of that

19   $18 million.

20           THE COURT:  But then, the way the DIP works,

21   Mercuria is going to re-lend, or lend fresh funds after it

22   collects all debt.  Why shouldn't Mercuria be entitled to

23   fees on that?

24           MR. QURESHI:  That really, Your Honor, is cash

25   collateral.  Functionally, the way we think about it is --

1           THE COURT:  I agree with you, but they can object

2    to the use of cash collateral and then we'll be having the

3    same hearing.  The debtors will have to give them adequate

4    protection and it may or may not include these fees.

5           MR. QURESHI:  Well, certainly, Your Honor, those

6    are things that should be explored.  Again, we questioned,

7    given that this is an insider DIP, is that an option that

8    was fully explored?  Those are things that can happen

9    between an interim and a final hearing and should be allowed

10   to play out between an interim and a final hearing.

11          In conclusion, Your Honor, this DIP bears all of

12   the hallmarks of an insider-led scheme designed to use post-

13   petition financing, not for the benefit of these estates,

14   but instead for the benefit of an insider.  So, what are we

15   asking for today?  We don't think the DIP should be approved

16   in its final form.

17          I should add, on the point, in response to Your

18   Honor's question about isn't a chapter seven liquidation

19   preferable from our point of view?  We did note one peculiar

20   thing which is Mr. Hede, in his declaration, states that a

21   liquidation process would impair creditor recoveries as

22   compared to what recoveries would be if the DIP order is

23   entered.  And yet, our understanding, based on the

24   deposition that we took of Mr. Hede, and this will be in the

25   record shortly, is that no liquidation analysis has as yet

1    been conducted by him, or to his knowledge, by anybody else.

2    So, not sure what the basis for that statement is.

3         But in any event, Your Honor, to the extent that

4    this Court authorizes a DIP today, it should be the bare

5    minimum necessary to get these debtors through to a final

6    hearing.  Again, we think that's assuming a final hearing

7    would be approximately 30 days from today, about $18 million

8    of new money; fees calculated solely based on that amount;

9    no authorization to credit bid until that relief is sought

10   at the final hearing; no rollup, no assets that are

11   presently unencumbered; no litigation claims to be pledged.

12   And then a number of other issues that, as I referenced,

13   Your Honor, in paragraph 26 of our objection which, if we

14   get to the order later, we can take a (indiscernible).

15        Unless the Court has any other questions, I'll

16   leave it there for now.

17        THE COURT:  Thank you.  Call your first witness.

18   Do you want to be heard?

19        MR. MASUMOTO:  If I may, Your Honor.

20        THE COURT:  I think he stood a little faster -- go

21   ahead Mr. Masumoto.

22        MR. MASUMOTO:  Good afternoon, Your Honor.  Brian

23   Masumoto of the Office of the United States Trustee.  Your

24   Honor, as indicated by debtor's counsel, our office had some

25   discussions regarding the rollup, and as Your Honor is quite

1    aware, our office does recommend that the interim order not

2    provide for a rollup.  Just for informational purposes, we

3    have agreed with the debtor that an organizational meeting

4    will be held next week, November 15, Thursday at 11 AM.  The

5    location will be lot New York Palace at 455 Madison Avenue,

6    in the Spellman Room, again, at 11 o'clock.

7            From our standpoint we believe that certainly

8    elements regarding the rollup should be reserved for the

9    input of the committee and we're doing our best to

10   accelerate the organizational meeting to achieve that.

11           Having said that, there are a couple of issues

12   regarding the rollup that was involved in our discussion

13   with the debtors' counsel.  And one thing that wasn't

14   entirely clear, and that we had asked and weren't quite sure

15   about is whether or not the terms of interest and so forth

16   regarding the prepetition ABL and the post-petition ABL were

17   the same or equivalent, or were the post-petition interest

18   rates lower than the prepetition amounts, so that there

19   might be some savings?  And frankly, we didn't get a clear-

20   cut answer to that, and not quite sure.  So, depending on

21   the realities of whether or not that rollup is appropriate,

22   certainly if it's more expensive to do the rollup for the

23   debtor, we certainly believe, in fact even more so, that the

24   committee should have input into that decision.

25           The other concern that we had, and I know Your

1    Honor mentioned that, I guess, some of the other orders,

2    including the cash management order, will be heard tomorrow.

3    One of our major concerns about the cash management, which I

4    do believe impacts the DIP, is that according to the cash

5    management, there are over -- well, there 271 bank accounts,

6    77 of which are related to non-debtor entities, and one of

7    our primary questions was, how much of estate funds will be

8    distributed to the non-debtor entities, at least until the

9    final order, or during the period for which the interim

10   order seeks to fund, because that would represent funds that

11   go outside the estate to non-debtor entities. And, at least

12   in my experience, courts are generally concerned about those

13   amounts.

14          Now, in that regard, the budget that was provided

15   to us, was represented to us at the budget, included funds

16   that would go, disbursed to non-debtor entities, that

17   included both debtor and non-debtor.  Now, I'm not, again, I

18   don't have any verification, but I's my understanding.  So,

19   the amounts that are going out, pursuant to the budget,

20   would include amounts to non-debtor entities pursuant to the

21   cash management order, which -- we were inquiring is,

22   exactly much is going out and what would be approved.  So,

23   again, we believe that's another consideration that's

24   important for the committee to be able to have input into

25   before such disbursements occur.

1           With respect to -- it's also our understanding,

2    with respect to the DIP order, there were provisions that,

3    as Your Honor indicated, regarding the lien-avoidance

4    actions, equities of the case, and so forth, the 506(c), we

5    believe that language has been included -- I'm not sure the

6    Court has seen to it, but that was agreeable to us -- that

7    reflected that the waivers that are incorporated as part of

8    those provisions don't become effective until the final, as

9    opposed to -- issues have arisen regarding the subject to

10   the final order language being a possible interpretation

11   that if the language subject to applies, that in fact it

12   applies at the time the interim is entered subject to

13   finalization.  Whereas, what we're seeking is that any

14   waiver that occurs would be deferred until a final order is

15   actually addressed.

16           With respect to the technical aspects of the

17   rollup, again, I defer to the ad hoc committee.  They seem

18   to have a much better handle on it.  We were told, we'd

19   asked a question, just as they did, exactly how much --

20   actually, Your Honor's question -- exactly how much was

21   necessary if you exclude the rollup?  We were told $40

22   million, and that $40 million is represented on the -- I

23   believe it's referred to as AD USA, budget portion,

24   reflecting both the domestic and the global disbursements.

25   I believe the calculations through the week of December 7,

Page 48

1    total $36 million, and they rounded it up to $40 million.

2    And that was our understanding of how the $40 million

3    calculation was derived.  Again, I don't have any --

4              THE COURT:  I'm looking at the total disbursements

5    on the budget, and just for the USA budget I guess, the

6    disbursements are anywhere from 16 million to 22 million a

7    week.

8              MR. MASUMOTO:  Yes, I would have sort of the same

9    question --

10             THE COURT:  I understand that there's also cash

11   collateral coming in, and net, they don't need that much

12   money, but that doesn't really answer how much they need.

13             MR. MASUMOTO:  As it was explained to us, if you

14   look at that chart, further down after the net cash flow,

15   there's a term loan draw; in the first week there's $19

16   million.  We were advised that it was that line, carried out

17   to December 7, which I believe totals $36 million, and

18   rounded up to $40 million to indicate what they needed.  And

19   once again, I do want to emphasize, since this budget

20   apparently is supposed to include disbursements and non-

21   debtor entities, I'm not quite sure what portion of that

22   will be disbursed or is allegedly being disbursed to non-

23   debtor entities which, again, is a concern.

24             Other than that, Your Honor, again, we're happy to

25   address any questions that Your Honor may have or that may

Page 49

```
 1    arise based on the testimony.

 2            THE COURT:  Thank you.

 3            MR. STURUBECK:  Thank you, Your Honor.  I had a

 4    little easier path from over there than from the back.

 5            THE COURT:  Well, he had a head start.  Who are

 6    you and who do you represent?

 7            MR. STURUBECK:  Your Honor, you've probably been

 8    waiting to hear from me.  For the record, Louis Strubeck, of

 9    Norton Rose Fulbright.  And I'm here with several of my

10    colleagues, I'll introduce a little bit later, on behalf of

11    Mercuria Energy Group Limited.

12            And so, Judge, let me go ahead and follow suit in

13    terms of providing a little context, with your permission,

14    that I think will then feed into some specific comments that

15    I've got regarding the objections that had been raised by

16    the ad hoc committee.  And, I guess, I won't coin a phrase

17    from Mr. Paul, I think he said it was a mischaracterized

18    characterization.  I found it really interesting reading,

19    that I'm referring to, of course, is the objection from the

20    ad hoc -- not based on any evidence, by the way, but a whole

21    lot of conjecture about things that happened before, and

22    things that may happen, loan-to-own strategies.  And by the

23    way, I agree with Your Honor, there's no loan-to-own

24    strategy here, but even if there were, there's nothing wrong

25    with that.  That happens all the time.  There's a reason,
```

1      Judge --

2              THE COURT:  I'm not so sure I agree with you on

3      the first part of that.

4              MR. STURUBECK:  That there's nothing wrong with

5      it, or it happens all the time?

6              THE COURT:  No, that there is no loan-to-own

7      strategy.  It's an event of default not to approve your

8      bidding procedures, which means they can foreclose on the

9      collateral.

10             MR. STURUBECK:  There's a reason Judge, to follow

11     this through on the context.  There's a reason that the

12     debtors are here asking for approval of the Mercuria debt,

13     and it's because it's the only proposal that was received by

14     the debtors in connection with providing what is critical by

15     any estimation financing for these debtors.  I mean, the

16     bottom line is, Judge, they can't operate unless you approve

17     a DIP facility today.  And the suggestion that somehow, if

18     you go back to the summer months, that Mercuria was

19     complicitous in trying to preclude others from being able to

20     provide this lifeline that Mr. Adams talks about, that we

21     provided Judge -- otherwise we would have had a liquidation,

22     either a freefall bankruptcy or liquidation last summer.

23     And so, I think it's important to keep in the context the

24     fact that Mercuria stepped up in the summer, provided what

25     was critical financing at the time.  And when you heard some

1    of the descriptions earlier about things that happened

2    earlier in the summer, they refer to the existing lender.

3    The lenders at the time that were producing borrowing basis

4    and constricting liquidity, it wasn't until August, Your

5    Honor, of this year, that Mercuria acquired the existing

6    debts at the time from the then lenders.  And Judge, the

7    record is going to be made clear while the evidence gets put

8    on, that since that time, Mercuria has provided kind of a

9    series of what I'll call bridge loans, without protection to

10   save this company.  So, when you heard the debtors say that

11   we provided a lifeline and we were the savior, that's true,

12   we did.  There's no competing bid here that you're being

13   asked to consider, Your Honor, in connection with this DIP

14   facility.  If the bond holders had one, you would have heard

15   from it by now.  But the problem is, Judge, they couldn't

16   get there.  And they still can't get there.  And so, this is

17   the only game in town, Judge, and it is an important game

18   because but for this financing this company can't survive.

19   It has obligations it has to pay immediately.  Despite

20   everything you've heard, there is not just a little bit, but

21   substantial fresh financing that's being provided here.

22   These rollup concepts are no different -- I was in front of

23   Your Honor in the Sun Edison case -- these rollup concepts

24   are not something that are peculiar to any of these

25   financings.  In fact, I'd go so far as to say that probably

Page 52

1    nowhere in the Southern --

2              THE COURT:  Maybe I made a mistake there.

3              MR. STURUBECK:  I don't think you did, Your Honor.

4    I'm going to tell you why in a second.  I don't think, Your

5    Honor, there's anything peculiar about it.  In fact, my

6    experience, I have the good fortune of coming back and forth

7    between Texas and New York, and I don't know that I've been

8    in a district where rollups are an ordinary part of every

9    DIP financing on an interim basis as much as they are here.

10   And there's a reason for that, because there's a local rule,

11   as Your Honor alluded to earlier, that protects all that.

12             THE COURT:  Well, it's not just that, it's just,

13   you know, it's the fees and it's a lot of other things that

14   are involved in this.  And just transforming a prepetition

15   loan into a post-petition loan shouldn't really generate any

16   additional cost to the debtor.

17             MR. STURUBECK:  I agree, Your Honor.  And I think

18   the whole rollup here is a red herring.  And the reason I

19   say that, Your Honor, is because, as many provisions as

20   we're going to talk about in this interim order today -- I'm

21   afraid we're going to talk about a lot of them during the

22   course of however long you have patience to listen to this -

23   - we haven't attempted, the debtors haven't attempted to

24   restrict or reduce the investigation period that a committee

25   is going to have here.  They're going to have their 60 days.

1    And so, to the extent, Your Honor, that they find something,

2    and I submit to you they're not going to find anything --

3    but to the extent that they find something, they're going to

4    have all their rights preserved.  And under local rule --

5            THE COURT:  Except nobody's got standing to

6    prosecute them under the order.

7            MR. STURUBECK:  Not yet, but I have a feeling that

8    if they ask Your Honor, and ask the debtor, that's probably

9    a hurdle that --

10           THE COURT:  So, why shouldn't the committee have

11   standing if the debtor is punting on all these claims?  Who

12   is the estate representative here?

13           MR. STURUBECK:  Pardon me?  Well, that's a good

14   point, but I was going to take a step back from that and say

15   if the debtors are willing to cede that kind of authority --

16           THE COURT:  The debtors are saying they can't

17   challenge it.

18           MR. STURUBECK:  I don't think, at the end of the

19   day, Your Honor, we know how that will come out and we won't

20   hear a lot of opposition from us.  But I mean, I think maybe

21   the brush to paint on this --

22           THE COURT:  What if they make the application on

23   the 60th day and it's decided after the 60th day?

24           MR. STURUBECK:  Then they're in trouble, because

25   the 60-day period is passed.

1             THE COURT:  That's a bad answer.  Go ahead.

2             MR. STURUBECK:  Your Honor, I think that's

3     something that can easily be overcome here.  Mr. Kieselstein

4     just mentioned colorable claims, and that goes back to the

5     comments that I made at the very beginning.  There's no

6     evidence for any of these things that have been said.  The

7     term 'fanciful fiction' came to mind today.  It's great

8     reading, but as a practical matter if you read the

9     deposition transcripts from yesterday, the ad hoc pod

10    holders counsel tried and tried and tried to get the

11    debtors' representatives to say that somehow Mercuria

12    controlled this process, and we didn't.  In fact, you're

13    going to hear testimony, Judge, that while we had a board

14    seat, we never participated in any decision that was made on

15    behalf of the company.  So, we are an insider by the most

16    technical definition, under the bankruptcy code of insider -

17    - but we did nothing to control the process, to provide

18    unnecessary input, to do anything that gave us a position

19    that we weren't supposed to have.

20             So, Judge, with that overview, and to emphasize

21    once again, that I don't really think that there's anything,

22    notwithstanding what was said here, that is all that unusual

23    from the DIPs that Your Honor sees and other justices see in

24    this district on a day-to-day basis.  Unless you have some

25    questions, I wanted to focus on some of the specific issues

1   that had been raised with respect to the provisions in the

2   interim DIP.

3          You know, Judge, the first one, I'm looking at

4   Page 6 now, the objection from the ad hoc committee, that

5   the rollup shouldn't be approved.  There is significant new

6   --

7      (Recess)

8          CLERK:  All rise.  Please be seated.

9          THE COURT:  All right, we stopped you in

10  midsentence.  Go ahead.

11         MR. STRUBECK:  Thank you, Your Honor, and I--I got

12  your cue loud and clear, and I'm going to finish up very

13  quickly --

14         THE COURT:  Okay.

15         MR. STRUBECK:  -- so I know you want to get into

16  the evidence.  And I'm almost finished, Judge; just a couple

17  of -- maybe just one last point.  And again, I was on Page 6

18  and Page 7 of the objection from the ad hoc bond holders.  I

19  had spoken earlier about the good faith finding as part of

20  the interim order and said that was a very important

21  consideration, as it would be for any lender in connection

22  with providing a DIP facility.  You addressed my comment

23  about the milestones.

24         Two other points, Your Honor:  The idea that

25  Mercuria shouldn't be able to credit bid, pursuant to the

Page 56

1    interim order -- I mentioned this at the beginning -- I

2    think that is a huge red herring to a very large extent, and

3    the reason for it is this.  To the extent -- the right to

4    credit bid is based exclusively on our having valid,

5    enforceable, properly granted liens.  To the extent that the

6    committee is able to challenge those liens effectively, then

7    we wouldn't have the right to credit bid.

8              THE COURT:  But why does it have to be decided

9    now, is the question?  In other words, there will be an

10   application for bidding procedures and a sale, and that's

11   when you usually -- if there's an objection to credit

12   bidding, because presumptively, you're entitled to credit

13   bid.  If there's an objection, somebody would hear it at

14   that time.

15             MR. STRUBECK:  Yeah, and the answer to that, Your

16   Honor, is because of the way this is structured, I mean,

17   there has to be -- this DIP is a bridge to something.

18   There's only two ways that this can end.  It either is going

19   to end through an auction under Section 363 outside of a

20   plan, or pursuant to a plan.  And so the reason that these

21   bid procedures and other things are kind of inextricably

22   connected to the DIP financing is because there is a very

23   short period of time here, where we have an opportunity to

24   take advantage of a going concern maximum value to have an

25   auction.  And so, our ability to credit bid at that auction,

Page 57

1    unless it's taken away because we don't have the liens we

2    think we have, is critical, Your Honor, and a major

3    component to our agreement to provide this DIP facility.

4              THE COURT:  Okay.

5              MR. STRUBECK:  And finally, Your Honor, the

6    payment of the fees in connection with the interim order, I

7    mean, I would note you're going to hear testimony that these

8    were market rates that were negotiated.  They were heavily,

9    heavily negotiated.  I've been doing this for a long time,

10   as my appearance suggests, and I've never been involved in a

11   situation where there has been a more heavily negotiated DIP

12   than this one, even though there wasn't even another

13   competitor really out there.

14             So I think those fees are reasonable.  You'll hear

15   testimony to back that up.  And you know, to the extent that

16   there was ever a -- never manifested itself into a proposal,

17   the fees, ironically, that the ad hocs were looking for were

18   actually higher than the fees that we've asked for here.

19             The last thing I'll close with is, you heard the

20   ad hoc's Counsel say that if they were presented with a

21   choice today whether to select between the interim DIP or to

22   have this convert to Chapter 7, it would be an easy call,

23   they said, in terms of converting it.  Well, wearing their

24   glasses, bonds that are trading for about $0.10 on the

25   dollar, that might be a completely different situation than

1    some of the other creditors who I think you're going to hear

2    from, who will tell you that this process that's set up to

3    maximize value through a going concern auction is better for

4    everybody.  So, I'll close with that, Your Honor.

5              THE COURT:  Thank you.  Call your first witness.

6              MR. FRENCH:  Good afternoon, Your Honor.  Yates

7    French from Kirkland & Ellis on behalf of proposed Counsel

8    for the Debtors.  Before I call my witness, we have a small

9    set of documents we might use with our witnesses.  May I

10   pass them out?

11             THE COURT:  Sure.

12             MR. FRENCH:  May I approach?

13             THE COURT:  Yes.

14             MR. FRENCH:  Also planning to copy

15   (indiscernible).

16             THE COURT:  Well, I have it, as long as it's the

17   same one.

18             MR. FRENCH:  It is.  Your Honor, the Debtors call

19   Andrew Hede.

20             THE COURT:  Would you raise your right hand,

21   please.  Do you solemnly swear that the testimony you are

22   about to give will be the truth?

23             MR. HEDE:  Yes, I do.

24             THE COURT:  Please take a seat, and speak into the

25   microphone.

1                   DIRECT EXAMINATION OF ANDREW HEDE

2      BY MR. FRENCH:

3      Q    Good afternoon, Mr. Hede.  Could you please state your

4      employer?

5      A    EY Turnaround Management Services, LLC.

6      Q    And what's your role at EY?

7      A    I'm a senior managing director within the restructuring

8      practice.

9      Q    How many years have you been a restructuring

10     professional?

11     A    Approximately 25.

12     Q    Could you give the Court a few examples of

13     restructuring matters you've worked on?

14     A    In terms of the companies themselves, Crescent

15     Resources, Dex Media, (indiscernible) Communications,

16     Fleming Companies, Kimball Hill Homes, and a number of

17     others.

18     Q    Okay.  I want to start by answering the Court's

19     questions, because they're a lot more important than mine.

20     May I approach with a copy of the DIP budget?

21              THE COURT:  Yes.

22     Q    Mr. Hede, were you involved in the preparation of this

23     DIP budget?

24     A    Yes, I was.  I think the budget's actually missing a

25     couple pages.  Hold on.  I'm missing a couple pages.

1              THE COURT:  Are we marking this as an exhibit?

2              MR. FRENCH:  Yes, Your Honor, we will be.

3              THE COURT:  (Indiscernible).  Are the exhibits

4    pre-marked?

5              MR. FRENCH:  This one is not, Your Honor.

6              THE COURT:  So what should we call it?

7              MR. FRENCH:  Exhibit 1.

8              THE COURT:  Debtors' 1?  Okay.

9              MR. FRENCH:  Is it -- Andrew, is it on the back

10   page?

11             MR. HEDE:  No, this is just the U.S.

12             THE COURT:  You've given him an incomplete budget.

13   Do you have a complete one now?

14             MR. HEDE:  Yes, I do.

15   Q    Mr. Hede, can you walk the Judge through the DIP budget

16   and explain how much money the Debtors need to operate on an

17   interim basis?

18   A    Yes.  Subject to the timeframe that we're talking

19   about, but for the purposes of this, I'll assume through

20   December 7, there's two parts to it.  Firstly is the

21   projected draws under the term loan, which if you look at

22   Page 1 of the budget, which is AB USA Cash Flow Forecast,

23   there is a line about two-thirds of the way down called term

24   loan draws.  The aggregate amount of those through December

25   7 is $36 million, which we rounded up to $40 million for

1    conservative purposes.  So that's part one.

2        The second part relates to obviously the ABL

3    facilities.  And obviously, on a daily basis and a weekly

4    basis, the company is collecting cash that pays down the

5    existing balance under the ABL, and it's assumed at the same

6    time that it is regenerating new working capital in the form

7    of new receivables that it then has the ability to borrow

8    against.  For the purposes of the budget, we assumed that

9    the borrowing base itself, in terms of the assets comprising

10   of it, stay flat throughout this period, which is consistent

11   with recent trends.  And that -- so on that assumption,

12   effectively, the amount that you are receiving each day,

13   you're re-borrowing an equivalent amount.  So the

14   incremental amount in terms of usage of the ABL facilities

15   would be, you know, the numbers equating to the total

16   receipts for each week through December 7.  I've not gone

17   and aggregated those, but on the -- in relation to the U.S.

18   business, it's approximately $16 million a week.  And on the

19   global business, which is the second budget, you know, it's

20   approximately $45 to $50 million a week.

21       The way that the borrowing base works is that all of

22   these receipts for the ABL facilities would likely recycle

23   completely on the global in probably five, maybe six weeks,

24   and on the U.S., probably six to eight weeks.

25   Q    Is the primary use of the loan proceeds to acquire oil?

1    A    That's the lion's share of the disbursements.

2    Q    And then, their business is selling oil, right?

3    A    Yes.

4    Q    In doing so, do they generate both a payable and a

5    receivable?

6    A    Yes.

7    Q    What are the Debtors' terms on their receivables?

8    A    The majority of customers have 30-day terms.  There are

9    some with slightly higher, but the majority is 30 days.

10   Q    And how does that contrast with the terms of their

11   payables?

12   A    In relation to the purchase of oil, the company

13   typically has terms of delivery plus up to three days, but

14   in the majority of instances, those purchase are all

15   supported by a letter of credit issued prior to the cargo

16   being loaded.

17   Q    Unless the Court has additional questions on the need

18   for interim cash or the recycling of the Debtors' inventory,

19   I'd like to move on to some other matters.

20          THE COURT:  Go ahead.

21   Q    What's your current role at Aegean?

22   A    EY serves as the restructuring advisor to Aegean.

23   Q    And when did you begin providing those services to

24   Aegean?

25   A    In early April of this year.

1  Q    Tell me a bit about the state of the company when you

2  arrived.

3  A    It was, you know, showing increasing signs of stress

4  from a liquidity perspective and was -- they'd started some

5  fairly contentious negotiations with its lenders.

6  Q    What was the company's capital stack at the time?

7  A    The capital stack broke down into what I described as

8  the three buckets.  There was a U.S. ABL facility that

9  covers the U.S. operations only, and then there's what we

10  refer to as the global ABL facility, which covers basically

11  the rest of the world, so those two are completely

12  independent facilities.

13      In addition to that, there is a range of asset-specific

14  financing relating to the company's fleet, and also the

15  terminal that it has in Fujairah in the UAE.  Each of those

16  are independent facilities.

17      Finally, there was two tranches of convertible

18  unsecured notes that sit at the parent.

19  Q    What did the company's asset-based lenders do in early

20  2018?

21  A    Following the announcement of the proposed

22  (indiscernible) transaction, which included this

23  consideration, the $200 million of receivables, the lenders

24  posed various questions to the company in relation to what

25  these receivables were.  They were -- evidently had never

1    sat within their collateral package or outside -- they sat

2    outside of the borrowing base.  They asked various questions

3    of the company in that regard.  The company didn't provide,

4    I'm told, very satisfactory answers, and as a result of that

5    plus an interest coverage ratio default, both sets of

6    lenders entered into short-term waivers, the most

7    significant element of which was the reduction in the

8    maximum size of the -- both facilities.

9    Q    What did that do to the company's liquidity?

10   A    As they basically lowered the facilities to the current

11   outstandings, it significantly limited the company's

12   liquidity.

13   Q    How important is liquidity to Aegean's day-to-day

14   operations?

15   A    Extremely.  As I indicated earlier in terms of the way

16   the company's business model works of you sell and get 30-

17   day terms, and you basically purchase oil on, you know,

18   basically zero terms, you have a very significant working

19   capital carry.

20        Additionally, it's not like a typical business whereby

21   you have the benefit of open credit or unsecured credit to

22   fund the operation.  So the ability to access the ABL

23   facilities is essentially the company's lifeline to acquire

24   oil.

25   Q    So at the same time that the ABL lenders were

1    decreasing liquidity, what was happening to oil prices?

2    A    Oil prices moved up materially the first quarter of

3    this year.

4    Q    And how did that affect the company's need for

5    liquidity?

6    A    It -- you know, it increased it, because now with a cap

7    on the amount of the facilities, essentially in the period,

8    I want to say from December to April, oil prices went up

9    approximately 20 percent.  So think of it in the context of

10   our purchases are now 20 percent more expensive, or the

11   inverse of that is our cap ABL facilities go sort of 20

12   percent less further.

13   Q    Was the company facing possible liquidation at the

14   time?

15   A    I would -- within a couple of months of us getting

16   there, yes.

17   Q    Did it enter into negotiations with its creditors?

18   A    Yes.

19   Q    How'd they go?

20   A    There was extensive conversations with the global and

21   ABL lenders starting really when we started in April.  There

22   was, you know, a significant back-and-forth with them.

23   Essentially, the culmination of those was that the ABL

24   lenders were not willing to either enter into a long-term

25   waiver or provide any further accommodations and essentially

Page 66

1    said to the company that, you know, they wanted out of the

2    facility and there was two ways of doing that, either a

3    take-out or refinance, or alternatively, they would push the

4    company into a Chapter 11 filing.

5    Q    Did the company discuss possible DIP financing with the

6    ABL lenders?

7    A    Yes.

8    Q    What was their response?

9    A    Their response was, well, they were willing to provide

10   a DIP on a very limited basis, essentially to allow for an

11   orderly liquidation of the company.  They were not

12   interested in funding a long-term case whereby the company

13   would have the ability to purchase oil and continue normal

14   operations.  It would be very much a liquidating filing.

15   Q    Was the company involved in negotiations for advisors

16   of the ad hoc note group -- noteholders group?

17   A    Yes, starting in, I want to say, about June.

18   Q    As part of those negotiations, were they provided due

19   diligence materials?

20   A    Yes.

21   Q    Can you elaborate?

22   A    Like all advisors, we, you know, we received a -- you

23   know, a long list of diligence materials that they wanted.

24   You know, certain things were available, and they were

25   uploaded to an electronic data room.  There were certain

Page 67

1    things that, you know, either didn't exist or would need to

2    be created that obviously were not fulfilled.

3    Q    Did the ad hoc group of noteholders make an offer that

4    would have satisfied the company's liquidity needs at the

5    time?

6    A    No.

7    Q    Did they make any offer?

8    A    In early July, you know, a proposal was made to

9    essentially extend a small, I'll describe it as sort of

10   second-lien loan in around -- in the amount of approximately

11   $35 to $50 million, I believe that was.  You know, they

12   viewed that as a potential fix.

13   Q    Why would that not have been sufficient?

14   A    It didn't solve the issue that we had with the global

15   and the U.S. ABL lenders in that, just to put it crudely,

16   they wanted out.

17   Q    Other than Mercuria, was there anybody at that time

18   offering financing to the company that would have satisfied

19   its liquidity needs?

20   A    No.

21   Q    Did the company ultimately enter into a transaction

22   with Mercuria?

23   A    Yes.

24   Q    In negotiating that transaction, did the company have

25   its own representation?

1    A    Yes.

2    Q    What kind of a company is Mercuria?

3         THE COURT:  When you say company, who are you

4    referring to?

5         MR. FRENCH:  Aegean, Your Honor; what is now

6    collectively the Debtors, Your Honor.

7    A    I'm sorry, could you repeat the question?

8    Q    What kind of company is Mercuria?

9    A    They're a, what I'd sort of say, a global commodities

10   trader with a heavy focus on oil.

11   Q    Could you describe the terms of the transaction that

12   the company entered into?

13   A    The transaction took a couple of phases, obviously.  As

14   been talked about earlier was the exclusivity letter that

15   was entered into in early July.  The intention of that,

16   initially, was to provide the company with a new trade

17   finance facility that would be sufficient to manage its

18   ongoing operations.  Given the challenges with the existing

19   lender group, that transaction effectively pivoted to a

20   structure whereby Mercuria would take out those lenders

21   under the existing facility documents.

22   Q    In addition to the additional liquidity that Mercuria

23   provided, are there any other benefits to the company?

24   A    As part of the transaction, Mercuria, in addition to

25   sort of continuing the lending relationship, they provided

1    an incremental $30 million of liquidity.  Also, they

2    loosened various, you know, restrictions that had been put

3    in place in the borrowing-based facilities, and also

4    assisted the company with his process called sleeving.

5    Obviously--

6            THE COURT:  What's sleeving?

7    A    I'm going to explain it, Your Honor.  So, obviously,

8    the way that the company's business works is that, you know,

9    it purchases oil, it holds it either in tank or vessels for

10   then sale to a party.  Certain markets, the period that

11   you're holding it is relatively short, where you're

12   basically pulling a barge up to a port, taking delivery, and

13   loading it onto, you know, a customer's vessel, so you're

14   not holding it.  Other parts of the world, where the company

15   has physical tanks, you basically have big oil tanks full of

16   fuel.

17       Obviously, that places a significant amount of, you

18   know, pressure on the balance sheet in terms of it's all on

19   balance sheet.  So the concept of sleeving was to sort of --

20   is to avoid sort of the capital requirement from the company

21   perspective.  Under the sleeving arrangement, Mercuria

22   procures the oil, takes delivery, and puts it into basically

23   a subleased tank within the company facility.  They hold the

24   oil until such point as the company is ready to deliver it

25   to the customer.  The company, being Aegean, loads it onto a

Page 70

1   vessel, and in effect, takes flash title to it.  It delivers

2   it to the company and then creates a receivable as a result

3   of that.

4   Q   Prior to the Mercuria transaction, was the company

5   sleeving any of its inventory?

6   A   No, it was required to purchase all of the inventory,

7   which, to my comment earlier, increases the constraints in

8   relation to the capital needs on the balance sheet, but also

9   often soaks up availability on the facility because you are

10  consistently issuing letters of credit in support of

11  proposed purchases.

12  Q   As part of the Mercuria transaction, did Aegean enter

13  into an exclusivity agreement with Mercuria?

14  A   Yes.

15  Q   Did this exclusivity agreement preclude them from

16  continuing negotiations with the ad hoc group of

17  noteholders?

18  A   No, it was specifically carved out.

19  Q   After the Mercuria transaction, did Mercuria control

20  the company's disbursements?

21  A   No.

22  Q   So long as there was sufficient borrowing base and the

23  company provided sufficient documentation to show that they

24  had incurred expenses, was Mercuria the final one to release

25  the payment?

1    A    Yes, but --

2              MR. CARNEY:  This is leading, Your Honor.

3              THE COURT:  Leading in the form of the question is

4    questionable, so sustained.

5    Q    What was Mercuria's role in overseeing disbursements

6    from the borrowers -- from the company's proceeds?

7    A    So the way that the company's cash management system

8    works in relation to the global business is, I will say, a

9    little unusual sort of versus how we would typically see it

10   in the U.S.  Each day, the company loads into, effectively,

11   a payment system that sits with ABN AMRO, all of the

12   payments that it wants to make that day.  Obviously, during

13   the course of the day, the company calculates its borrowing

14   base, which is done on a daily basis, and, you know -- which

15   obviously nets to the bottom of what the borrowing capacity

16   is that the company has on that day.  If it's positive, they

17   can spend up to that amount; if it's negative, they can't

18   spend anything.

19        Once the borrowing base has been approved, and as I

20   said earlier, the payments have already been loaded into the

21   system, there is essentially, you know, two points of

22   release.  One, ABN AMRO, as basically the disbursing agent,

23   needs to approve it.  And additionally, Mercuria, as the

24   majority lender, approves that that they released.  And

25   subject to there being appropriate documentation, the

1    payments are released.

2    Q    So, is Mercuria exercising business judgment over what

3    accounts the company pays or doesn't pay?

4            MR. CARNEY:  Objection, Your Honor.

5            THE COURT:  Sustained.  How does he know what

6    Mercuria is doing?  What's the foundation for these

7    questions?

8    Q    The system that you just described, how did it compare

9    to the company's payment system in place before the Mercuria

10   transaction?

11   A    It was identical.  It would always require ABN's sign-

12   off to release the payments.

13   Q    Were there times when the company lacked sufficient

14   borrowing base, and Mercuria still approved the

15   disbursements?

16   A    Yes.

17   Q    Did Mercuria direct the company not to engage in

18   business operations?

19   A    No.

20   Q    After the Mercuria transaction, did Aegean continue to

21   negotiate with its creditors?

22   A    Yes.

23   Q    Now, the noteholders, in their objection, Paragraph 19,

24   they say that Aegean effectively ignored the ad hoc group

25   for more than one month after the Mercuria transaction was

```
 1    consummated, until the week of September 16, when Mercuria

 2    advised the Debtors that they were ready to have principal-

 3    level discussions with the ad hoc group.  Is that accurate?

 4    A    I don't believe so.

 5    Q    Why not?

 6    A    Throughout this period, there's been, you know, an

 7    ongoing dialogue between the company and its advisors and

 8    the advisors to the ad hoc group.  Like all such processes,

 9    there is periods where it's a lot heavier than others, but

10    there's been, you know, continued dialogue between the

11    parties since June.

12    Q    While you were providing advice to the company, did you

13    ever observe Mercuria using their relationship with the

14    company to advantage themselves to the detriment of the

15    company?

16    A    No.

17    Q    Did the company ultimately receive an offer of DIP

18    financing from Mercuria?

19    A    Yes.

20    Q    And after that offer was made, did it continue to

21    negotiated with its other creditors?

22    A    Yes.

23    Q    Did those negotiations include the ad hoc group of

24    noteholders?

25    A    Yes, they did.
```

```
 1   Q     Were the noteholders working with Goldman Sachs?

 2   A     Yes.

 3   Q     What was Goldman Sachs's role, as you understand it?

 4   A     Goldman Sachs were proposed to be effectively the

 5   senior secured lender in their DIP proposal.

 6   Q     Was Aegean requested to pay Goldman's fees?

 7   A     Yes.

 8   Q     Did they?  Did Aegean pay those fees?

 9   A     Yes, they did.

10   Q     What was your understanding as to the need to pay

11   Goldman's fees?  What did you believe, before the payment

12   was made?

13   A     Our understanding was that Goldman was very well

14   advanced in terms of their underwriting process.  They

15   needed some fees to cover legal expenses, but otherwise,

16   they were largely there from an underwriting perspective,

17   maybe subject to some confirmatory due diligence.

18   Q     What did you learn after paying Goldman's fees?

19   A     After the fees were paid and we started interacting

20   extensively directly with Goldman, it became very clear that

21   they were nowhere near as advanced as what we had believed.

22   They required significant additional diligence in relation

23   to the company, the business, the proposed transaction

24   structure.  And additionally, they would, in all likelihood,

25   to be able to be able to issue a commitment letter, you
```

1   know, need to make a number of structural changes to how the

2   capital structure currently worked with the existing

3   facilities.

4   Q    What did you receive from the noteholders on October

5   28?

6   A    We received a commitment letter signed by certain

7   members of the ad hoc group, which basically agreed to

8   provide, or offered to provide, a junior DIP facility of

9   approximately $215 million that it was proposed would be

10  comprised -- combined with the Goldman Sachs facility.

11  Q    Was it contingent on receiving a senior Goldman Sachs

12  facility?

13  A    The transaction wouldn't work without it.

14  Q    After receiving the terms sheet, did you attempt to

15  deliver the diligence materials requested from Goldman and

16  from the noteholders' advisors?

17  A    Yes.

18  Q    Were you engaged in phone calls and communications with

19  them?

20  A    Yes.

21  Q    Did you assist in preparing a demonstrative that

22  summarizes some of those communications?

23  A    Yes, I did.

24       MR. FRENCH:  Your Honor, if I may please direct

25  your attention to Tab 3 in the binder, and you have it in

1    front of you.

2            THE COURT:  Do you have an extra -- do you have a

3    binder?  Do you have an extra binder for the clerks?

4            MR. FRENCH:  One or two?

5            THE COURT:  Whatever you can spare.

6    Q    Did you assist in the preparation of this

7    demonstrative?

8    A    Yes, I did.

9    Q    Now, I'm not going to walk you through every single

10   entry, but is this generally an accurate summary of your

11   recollection of these negotiations?

12   A    Yes, it is.

13   Q    Were you personally involved in many of these meetings

14   and phone calls?

15   A    Yes, I was.

16   Q    Let me ask you this:  When did you first provide

17   Goldman and the noteholders a DIP budget for their proposal?

18   A    I believe it was October 30.

19   Q    So it was two days after you received their terms

20   sheet?

21   A    Yes.

22   Q    Did they -- what was their response?

23   A    After thanking us for sending it over, you know, we had

24   a call in relation to certain questions they had on the

25   budget.  They also, or I believe it may have been PJT,

1    requested that we model the proposed capital structure a

2    little differently.

3    Q    Did you make the revisions?

4    A    Yes, we did.

5    Q    How long did that take?

6    A    I believe that we made the changes overnight and sent

7    it back at some point on the morning of the 31st.

8    Q    Why did it take you two days to create a revised DIP

9    budget for their proposal?

10   A    Two primary reasons.  One was the fact that this was at

11   a time where we had a work stream basically negotiating a

12   DIP proposal with Mercuria.  We were also preparing,

13   obviously, the company for a likely Chapter 11 filing.  So,

14   to sort of put it simply, there was a lot going on.

15        The second part of it was this wasn't just simply

16   changing the capital structure in the DIP budget, which

17   typically is relatively easy to do.  By moving from a

18   Mercuria structure, which incorporated the sleeving that we

19   talked about earlier, to a structure with the bondholders

20   whereby sleeving would went away -- would go away and the

21   company would be required to have more inventory on balance

22   sheet, wouldn't have a higher requirement for letters of

23   credit, required one, some internal thought in terms of

24   estimating and understanding what those needs would be and

25   how it would change the budget.  And two, there were

1    structural changes that needed to be made to the budget, so

2    that's the reason why it wasn't a three-hour exercise.

3    Q    Were you personally involved in the Goldman diligence

4    process?

5    A    Yes.

6    Q    Can you describe your efforts?

7    A    You know, I participated in a number of calls with

8    Goldman, as well as advisors to the ad hoc committee, in

9    relation to obviously diligence in relation to the budget,

10   diligence in relation to the business, understanding the

11   company's, for lack of a better description, legal entity

12   structure in terms of who were borrowers, where those

13   companies were domiciled, how cash management worked, et

14   cetera, and there were multiple calls in that regard.

15   Q    Was Goldman ever able to resolve its outstanding

16   diligence items?

17   A    No.

18   Q    Did Goldman ever make a firm commitment to lend money

19   to Aegean?

20   A    No.

21   Q    Without Goldman's participation, how far short did

22   their terms sheet come?

23   A    Subject to the tenor of the DIP, it was, you know,

24   probably at a minimum $275 million, maybe even as high as

25   $325.

1    Q    Other than the Mercuria DIP, are you aware of any

2    viable DIP financing proposals for the Debtors?

3    A    No, I'm not.

4    Q    Did you consider having the Debtors file for bankruptcy

5    without DIP financing?

6    A    It was briefly considered.

7    Q    What was your assessment?

8    A    I didn't believe it was a viable course of action,

9    because without it, the company would immediately liquidate.

10   Q    Could the company fund its bankruptcy through the use

11   of cash collateral?

12   A    No.

13   Q    Do the Debtors -- other than the potential litigation

14   claims, do the Debtors have any material unencumbered

15   assets?

16   A    Nothing that I'd consider material.  There is a small

17   amount of cash that sits in some jurisdictions that would be

18   extremely challenging, for various reasons, to move cash

19   around, but that is a number that I think is probably no

20   more than $4 million.

21   Q    Has any party offered to fund the company in

22   liquidation?

23   A    No.

24   Q    If the company were to litigate, would that create

25   claims at the subsidiary levels?

1    A    Sorry, litigate or liquidate?

2    Q    Excuse me; if the company -- if there was a crash

3    liquidation of the company, would that create claims at the

4    subsidiary levels?

5    A    Yes, it would.

6    Q    What sort of claims?

7    A    Obviously, there would be claims for termination of

8    employees, likely claims in rejection -- in relation to

9    rejection of the executory contracts.  I can make a --

10   obviously, potential for claims from customers in relation

11   to if we don't deliver, et cetera.  Obviously, all of those

12   are of the operating companies.

13   Q    Do you have a sense of the magnitude of these claims?

14   A    I don't.

15   Q    Are you aware of any claims that the noteholders hold

16   against the subsidiaries?

17   A    No.

18            MR. FRENCH:  Nothing further at this time, Your

19   Honor.

20            THE COURT:  Thank you.  Cross examination?

21            MR. CARNEY:  Yes, Your Honor.

22                    CROSS-EXAMINATION OF ANDREW HEDE

23   BY MR. CARNEY:

24   Q    Good afternoon, Mr. Hede.  Mr. Hede, you're a senior

25   managing --

1            THE COURT:  I'm sorry, who are you?

2            MR. CARNEY:  I'm sorry, Your Honor.  For the

3    record, Brian Carney of Akin Gump Strauss Hauer & Feld for

4    the ad hoc convertible noteholders.

5            THE COURT:  Thank you.

6    Q    Let's try this again.  Good afternoon, Mr. Hede.

7    A    Good afternoon.

8    Q    Mr. Hede, you're a senior managing director at EY

9    Turnaround Management Services.  Is that right?

10   A    Yes.

11   Q    E&Y has been working with the Debtors since April on

12   potential restructuring alternatives.  Is that right?

13   A    Yes.

14   Q    You have described your role as restructuring advisor

15   to Aegean?

16   A    Yes.

17   Q    One of E&Y's jobs in connection with being

18   restructuring advisor to Aegean is to be knowledgeable about

19   the internal workings of the company, right?

20   A    Generally, yes.

21   Q    You heard Mercuria's Counsel get up here and say that

22   it was a fanciful fiction that Mercuria had any control over

23   the company while it was a lender.  Did you hear that?

24   A    I believe so.

25   Q    Okay.  In fact, the Debtors' Counsel, even, was very

1   focused on asking questions about how Mercuria had no

2   control over the Debtors while it was lender.  Is that

3   right?

4   A   Yes.

5   Q   Okay, you're aware -- as part of your role at E&Y,

6   you're aware of how Aegean handled the process of paying

7   prepetition disbursements.  Is that right?

8   A   Generally, yes.

9   Q   When a request came in, it would go to Aegean's

10   treasury department in Greece, who would then make the

11   disbursement, once it was approved.

12   A   Yes, pursuant to the mechanics that I outlined a short

13   time ago.

14   Q   Okay, but the company's lenders had the ability to

15   control what disbursements were made, didn't they?

16   A   I would not classify it as control.  As I indicated

17   earlier, the payments go into the payment system.  So long

18   as there is borrowing base availability, and so long as

19   there is sufficient supporting documentation, the payments

20   are released.

21   Q   Okay, so you're absolutely positive that you would not

22   characterize the lenders' ability to have a say over

23   disbursements as control?  You're absolutely positive on

24   that?

25   A   Yes.

1    Q    Okay.  Do you recall giving a deposition yesterday?

2    A    Yes.

3    Q    And that was me, and I asked you a bunch of questions,

4    and you gave answers?

5    A    Yes.

6    Q    It was under oath.  Do you recall me asking, are you

7    aware of anyone, other than company employees, that had

8    input into whether disbursements were made during the

9    prepetition period while you were engaged?  You answered

10   yes.  And I said --

11            MR. FRENCH:  Your Honor, (indiscernible) direction

12   to line and page numbers.

13            MR. CARNEY:  Yeah, sure.  Page 90, Lines 4 through

14   16 -- sorry, lines 4 through 14.

15            THE COURT:  Is this in Tab 8 of the book I've been

16   given?

17            MR. CARNEY:  Your Honor, yes, the deposition

18   transcript of Mr. Hede is attached.

19   Q    So, I'll start again on this.  I asked, "Anyone other

20   than company employees that had input into whether

21   disbursements were made during the prepetition period while

22   you were engaged?"  You answered, "Yes."  I asked who that

23   was, and you said, "Typically, the  company's lenders in the

24   way that the cash management structure is established have,

25   you know, the ability to control what goes in and what goes

Page 84

1    out."  Do you recall testifying to that?

2    A    Yes.

3    Q    Okay.  And to be fair, I want to also note that you

4    said, "But I wouldn't say control in terms of the normal

5    sense," right?

6    A    Yes.

7    Q    Okay, so I suggested the term input.  Do you recall me

8    suggesting that?

9    A    Not specifically, but I'll trust you if it's in the

10   transcript.

11   Q    I asked you if that would be a better term, and

12   actually, you said no, it would not be a better term.  Do

13   you recall that?

14   A    I don't specifically recall.

15   Q    Okay.  You corrected me, and you actually said that it

16   means that -- what you meant was that the lenders are the

17   party that is the final one to release the payments.  Do you

18   recall testifying to that?

19   A    Yes.

20   Q    And I wanted to make absolutely sure that you were

21   referring to Mercuria, so I asked you, would that include

22   Mercuria?  Do you recall me asking that?

23   A    Yes.

24   Q    And then I said, "So is it fair to say," and this goes

25   on to Page 91, "You said that they're the party that is the

1   final one to release the payment.  Is it fair to say that in

2   some instances, Mercuria, after they became a lender, was,

3   in your words, the final one to release the payment?"  Your

4   answer, "Yes."  Do you recall that?

5   A    Yes.

6         MR. FRENCH:  Your Honor, I don't believe that the

7   deposition transcript has impeached the witness testimony.

8         THE COURT:  Well, you can make that argument.  If

9   that's an objection, it's overruled.

10        MR. CARNEY:  Thank you, Your Honor.  I'm actually

11  done with that, anyway.  Okay, Mr. Hede, I'm going to show

12  you what's been previously marked as Noteholders' Exhibit 1,

13  and Your Honor, I spoke with Debtors' Counsel before, and I

14  understand that they don't have any objection to this being

15  admitted into evidence, but perhaps they can --

16        THE COURT:  So we're using numbers for both the

17  Debtors and the ad hoc committee?

18        MR. CARNEY:  If I may approach, I will bring a

19  copy of this.  It's a copy of the exclusivity letter that

20  was referred to during the (indiscernible).

21        THE COURT:  Thank you.  I'm sorry, did you say you

22  were offering this?

23        MR. CARNEY:  Yes, Your Honor.

24        THE COURT:  Is there any objection?

25        MR. FRENCH:  No objection, Your Honor.

```
 1              THE COURT:  Proceed.

 2    Q    Okay, so Mr. Hede, you're familiar with this

 3    exclusivity letter between Aegean and Mercuria.  Is that

 4    right?

 5    A    Yes.

 6    Q    And this is the exclusivity agreement that was being

 7    referred to during your direct testimony?

 8    A    Yes.

 9    Q    If you would flip, please, to the second page, let me

10    just ask a couple foundation questions first.  E&Y was

11    engaged with Aegean in July of 2008 when this was executed.

12    Is that right?

13    A    Yes.

14    Q    And Ernst & Young didn't have any input into the terms

15    of this exclusivity letter?

16    A    No, in fact, I didn't see it until after it was

17    executed.

18    Q    But before yesterday's deposition.

19    A    Sorry?

20    Q    You saw this letter before yesterday.

21    A    Yes.

22    Q    Okay, if you focus on Paragraph 3, is it fair to say

23    that this paragraph here, entitled Restrictions and

24    Exceptions, prevented the Debtors or its affiliates from

25    soliciting or facilitating, proposing, requesting, or even
```

1    encouraging any form of financing that could compete with

2    Mercuria?  Is that right?

3    A    I believe so.

4    Q    Okay, and the exclusivity period, if you look at

5    Paragraph 2, that ran all the way through the end of January

6    2019, didn't it?

7         MR. FRENCH:  Objection, Your Honor.  The

8    document's been admitted into evidence --

9         THE COURT:  Yeah, and the witness didn't prepare

10   it.  You could argue from what the document says, but

11   there's no point asking the witness about what it says.

12   Q    Okay, fair enough.  So, Mr. Hede, you referenced a

13   carve-out during your direct testimony that permitted the ad

14   hoc convertible noteholders from getting a proposed

15   alternative financing.  Do you recall that testimony?

16   A    Yes.

17   Q    Okay.  But even under the carve-out where the ad hoc

18   group could make a proposal, those lenders had to certify

19   that they were not a direct competitor of Mercuria.  Is that

20   right?

21   A    That's my understanding, but again, I didn't draft the

22   document.

23   Q    Okay, and in fact, there's actually no definition of

24   direct competitor, is there?

25         MR. FRENCH:  Same.  Same objection, Your Honor.

1          MR. CARNEY:  This isn't in this document; this is

2     a cross question.

3          THE COURT:  Overruled.

4          MR. CARNEY:  Thank you.

5     A    Sorry, could you repeat the question again?

6     Q    I'll re-ask the question.  There's actually no

7     definition of what direct competitor is, is there?

8     A    I'd have to go and, you know, read the document again.

9     Q    Okay, but sitting here right now, you have no idea what

10    the definition of direct competitor was, do you, as the

11    Debtors' restructuring advisor.

12    A    I don't believe so.

13    Q    And in fact, it can mean whatever Mercuria wanted it to

14    mean, couldn't it?

15         MR. FRENCH:  Objection --

16         THE COURT:  Yeah, that's argumentative.

17         MR. CARNEY:  Okay.  Okay, okay, I'll move on, Your

18    Honor.

19    Q    You're familiar with the Mercuria DIP that we're

20    talking about here today, right?

21    A    Yes.

22    Q    You're aware, also, the Mercuria DIP includes a roll-up

23    provision.  We've been discussing that at length.

24    A    Yes.

25    Q    In fact, you participated -- you personally

1    participated in discussions that the company had with

2    Mercuria about the roll-up?

3    A    I participated in certain discussions.  I'm not sure if

4    I participated in all of them.

5    Q    Sure.  Do you recall that Mercuria told the company

6    that the roll-up was extremely important to them?

7    A    Yes.

8    Q    You're also aware of the $200 million write-off we've

9    been discussing regarding a fraud that occurred at the

10   company?

11   A    I'm generally aware, yes.

12   Q    And the Mercuria DIP, you're aware, includes liens on

13   the Debtors' litigation claims and causes of action that

14   would arise from that $200 million write-off, right?

15   A    My understanding is that the liens are on the proceeds

16   of those, not the claims themselves.

17   Q    Okay.  Did -- regardless of whether the lien is on the

18   causes of action themselves or the proceeds, did you or

19   anyone at E&Y -- I should say neither you nor anyone at E&Y

20   conducted any analysis as to the reasonableness of giving

21   Mercuria a lien on those proceeds, did you?

22   A    No, I believe that's a legal conclusion.

23   Q    And you also understand, don't you, that the proposed

24   interim order provides broad releases to Mercuria?

25   A    Generally, yes.

1    Q     E&Y, neither you nor E&Y didn't have -- had any

2    conversations with the company at all regarding whether that

3    release provision was reasonable, right?

4    A     Again, I believe that's a legal conclusion.

5    Q     Mr. Hede, in your declaration submitted to the Court in

6    support of the DIP proposal, you state that if the Debtors

7    liquidate, it will impair Creditor recoveries as compared to

8    the proposed Mercuria DIP.  Is that right?

9    A     Yes.

10   Q     But neither you nor E&Y has conducted any litigate --

11   any liquidation analysis, have you?

12   A     Not a formal liquidation analysis, no.

13   Q     And you're not aware of anyone at the company

14   performing any liquidation analysis either, are you?

15   A     Not to my knowledge.

16             THE COURT:  So why do you think it will impair

17   Creditor recoveries?

18             MR. HEDE:  Without a DIP, the company has no

19   ability to continue to operate.  It cannot -- it cannot

20   operate tomorrow in terms of purchasing fuel, and there's no

21   cash on hand, so it will, you know, effectively immediately

22   go out of business, which then, per what I testified to

23   earlier, will trigger a whole  range of additional claims,

24   whether that's employee severance, you know, breaches of

25   contracts, rejection of contracts, et cetera.  The die has

1    basically been cast in relation to the company is

2    liquidating.

3    Q    And that's a liquidation, isn't it?

4    A    Sorry?

5    Q    That's a liquidation, what you're describing, isn't it?

6    A    Yes.

7    Q    If you could refer back to what -- it's going to be a

8    little confusing -- Debtors 1, but actually, it was

9    originally handed to you as not a complete document, so I

10   provided it as (indiscernible) Noteholders' 3.  So, if we

11   could just replace Debtors' 1 with Noteholders' 3, that's

12   the complete DIP budget.

13            THE COURT:  I thought he was eventually given the

14   full-page budget.

15            MR. HEDE:  It was his, the one that's marked

16   Noteholders' 3.

17            THE COURT:  Oh, okay, so we're calling it

18   Noteholders' 3?

19            MR. CARNEY:  Yes, Your Honor.

20   Q    Okay, so if we can go back down to that term loan draw

21   row, Mr. Hede?

22   A    Yes.

23   Q    And let me clear, I'm on Page 593 of 692, on the top.

24   A    Yes.

25   Q    Okay, this is for the U.S. facility, right?

1    A    Yes.

2    Q    And this reflects, am I right, that the Debtors would

3    need approximately $36 million in the term loan draw row of

4    financing to make it through November 30, right?

5    A    I believe the $36 million was through December 7, is

6    the next column.

7    Q    I'm sorry, you're right.  I'm sorry, $30 million

8    through November 30, right?

9    A    Yes.

10   Q    Okay.  Do you see right below in the November 9 column,

11   do you see right below the $19 million, there is a $13

12   million intercompany advance?  Do you see that?

13   A    Yes.

14   Q    Okay.  And if you flip to the global cash flow

15   forecast, which is on Page 596 of Noteholders' 3 --

16   A    Yes.

17   Q    -- do you see a $13,000 -- $13 million inflow coming in

18   under the row that says Intercompany AB USA term loan draw?

19   A    Yes.

20   Q    Is it fair to say that the $13 million outflow showed

21   on the -- on the U.S. page is the same as the $13 million

22   inflow shown on the global page?

23   A    Yes.

24   Q    In other words, the $13 million being transferred from

25   the U.S. to the global, right?

1    A    Yes.

2    Q    And then you see right above the $13 million, there's a

3    $12 million outflow in the row, Pay Down of (indiscernible)

4    Advance.  See that?

5    A    Yes.

6    Q    And that's going to Mercuria, isn't it?

7    A    It's going -- it's going to the global lenders, which

8    is Mercuria.

9    Q    Thank you.  So, indeed, if you look through November 30

10   of 2018, you subtract out the $12 million going to Mercuria,

11   actually, the Debtors only need $18 million of DIP room,

12   right?

13   A    Assuming that the company didn't have to pay down the

14   current over-advance on the global ABL facility, that's

15   correct.  I would add that that excludes the -- what we

16   talked about earlier in relation to the collection of the

17   receivables and the redrawing on the ABL facilities.

18            THE COURT:  Can I ask you a question?  With

19   respect to the global cash flow forecast, these are funds

20   owed by -- owed by non-Debtors, right?

21            MR. HEDE:  So there are -- the global customer

22   forecast includes both Debtors and non-Debtors.

23            THE COURT:  So is there anything that prevents the

24   non-Debtors from using the receipts that are coming in, to

25   your knowledge?

1          MR. HEDE:  Other than the fact that they

2    essentially all go into, you know, a centralized collections

3    account and then are comingled.

4          THE COURT:  Okay, go ahead.

5          MR. CARNEY:  Mr. Hede, I'm going to show you what

6    has been previously marked as Noteholders' Exhibit 4.  May I

7    approach the --

8          THE COURT:  Yes.

9          MR. CARNEY:  Unfortunately, this came up during

10   direct and we only have one copy of this.  If the Debtors

11   have it, it's the company's borrowing-based certificate for

12   both U.S. and global, dated October 31, 2018.  If you have

13   it, I'd appreciate you telling me that.  Otherwise, I can

14   show you this one, certainly.

15         THE COURT:  Did you --

16         MR. FRENCH:  I don't think I have a copy.  It

17   would be nice to be able to actually follow along.

18         MR. CARNEY:  Well, if you want to do what I did, I

19   took a picture of it with my cell phone, so --

20         MR. FENCH:  Nice.

21         THE COURT:  Can I see it?

22         MR. CARNEY:  The cell phone or the exhibit?

23         THE COURT:  Whatever is easiest to read.

24         MR. FRENCH:  With Your Honor's permission if I use

25   my phone, of course.

1          THE COURT:  This is a high tech courtroom now.

2          MR. FRENCH:  Well, it's very prominent

3     (indiscernible).

4          THE COURT:  Okay.

5          MR. CARNEY:  Thanks.  Your Honor, if I may, I'll

6     just show you what I intend to ask him about.

7          THE COURT:  Okay.

8          MR. CARNEY:  And it's just going to be the

9     collateral here, the collateral amounts.

10          THE COURT:   (Indiscernible).

11          MR. CARNEY:  The total collateral and the total

12     gross collateral amounts.

13          THE COURT:  Okay.

14          MR. CARNEY:  Thank you.

15     Q    Mr. Hede, do you recognize that?

16     A    Yes, I do.

17     Q    What is it?

18     A    The top shade is the company's global borrowing

19     (indiscernible) certificate, and then the second page is the

20     U.S. borrowing (indiscernible) certificate.

21     Q    Okay, and fair to say that this document shows --

22     reflects the value, in the company's view, of the collateral

23     on the outstanding U.S. and global ABL?

24     A    It shows the book value of the collateral assets.  It

25     then applies the advance rate under the creditors'

1    agreements, and then come up with net collateral for both.

2    And then, yes, it shows the amount outstanding under each

3    facility.

4    Q   Okay, and the book value that you refer to is referred

5    to there as gross collateral, right?

6    A   That's correct.

7    Q   If you look at the gross collateral column on the

8    global certificate, which is the first page, do you see that

9    is has a gross collateral value there of approximately

10    $251.6 million?

11    A   Yes.

12    Q   Do you also see at the bottom, there's a row, total

13    outstanding?  Do you see that?

14    A   Yes.

15    Q   And you see that has a number, $241 million

16    outstanding?

17    A   Yes.

18    Q   So that means, under the gross collateral column, there

19    is approximately, let's call it $10-plus million of excess

20    collateral as compared to outstanding on the global ABL.  Is

21    that right?

22    A   Yes, before advance rights, yes.

23    Q   Correct.  Now let's turn to the U.S. page.  I'm going

24    to do the same thing here.  Do you see on there, there is a

25    number in the row, Subtotal Borrowing Base?  Do you see

1   that?

2   A    Yes.

3   Q    On the column Gross Value?

4   A    Yes.

5   Q    And that number is approximately $150.3 million.  Do

6   you see that?

7   A    Yes.

8   Q    And that reflects the total gross collateral value on

9   the -- securing the U.S. ABL, right?

10   A    Yes.

11   Q    And if you look down on the availability section, do

12   you see that?

13   A    Yes.

14   Q    Shows approximately $139 million outstanding on the

15   U.S. ABL.  Is that right?

16   A    Yes.

17   Q    So that's about $11 million of excess coverage on the

18   U.S. ABL, right?

19   A    On a book value basis, yes.

20   Q    Okay.  Total, 10 plus 11, I think we can agree is about

21   $21 million of excess gross collateral under the global and

22   U.S. ABLs?

23   A    Again, on a book value basis, yes.

24   Q    One slightly off-topic question, Mr. Hede:  How many

25   Debtor entities that are not currently obligors on the

1   prepetition facilities are going to become obligors as a

2   result of the roll-up, do you know?

3   A    I don't.

4   Q    Just one more area, briefly.  Mr. Hede, you testified

5   on direct about the noteholders making a bunch of diligence

6   requests.  Do you recall that testimony?

7   A    Yes.

8   Q    And one of the things that the noteholders requested

9   was a DIP budget, right?

10  A    Yes.

11  Q    Isn't it true, Mr. Hede, that the noteholders actually

12  had to request a DIP budget at least three separate times in

13  the course of the week leading up to the Debtors' Chapter 11

14  filing?

15  A    I couldn't tell you specifically, sort of how many

16  times or sort of what dates were those.

17  Q    Okay, well let's start with this, and then we'll --

18  I'll show you a couple documents to refresh your

19  recollection, hopefully, on that.  But throughout your

20  career, you've been involved in more than 10 deals that have

21  involved DIPs and DIP budgets, right?

22  A    Yes.

23  Q    And in your experience, treating capital structure and

24  restructuring-related items, and a DIP budget takes a couple

25  days, right?

```
 1   A     Depending on the -- you know, the complexity of the

 2   situation.

 3   Q     But typically, it takes about a couple of days,

 4   depending on the complexity, right?

 5   A     Depending on the complexity.

 6         MR. CARNEY:  I'm going to make three exhibits, to

 7   try to save some time here, at once.  And I do have copies

 8   of these for everybody.  I've got it marked, for

 9   identification purposes, Noteholders 7, 8 and 9.  Three

10   separate emails, first dated Thursday, October 25th, the

11   second, that's the top email --

12         MR. HEDE:  Sorry, your numbers don't

13   (indiscernible).

14         THE COURT:  What number are you marking that as?

15         MR. CARNEY:  Sure.

16         MR. HEDE:  The numbers are 5, 6 and 7.

17         MR. CARNEY:  Oh, I'm sorry, I'm using the tab

18   numbers, it's my fault.

19   Q     Okay, I marked Noteholders 5, 6 and 7.  The first,

20   Noteholders 5, should be -- have an email, the top email,

21   Thursday, October 25th, 2018.  Noteholders 6, top email

22   actually doesn't have a date, but the one immediately below

23   says Monday, October 29th, and then Noteholders 7, top

24   email, Tuesday, October 30th, 2018.  Do you see those three

25   emails?
```

Page 100

1    A    Yes.

2    Q    And you're on all three, aren't you?

3    A    I believe I am.

4    Q    Okay.  First, let me ask you this question.  Mr. Hede,

5    do you recall -- and I should clarify, you are on the second

6    to the top email on Noteholders 5, you're not reflected on

7    the very top.  My question is, for Noteholders 5, do you

8    recall receiving this email on Thursday, October 25th?

9    A    The one below?

10   Q    Yes, the second to top?

11   A    I don't specifically recall receiving it, but as I'm on

12   it, I assume I got it.

13   Q    Okay, thank you, and same question for 18, but this

14   one, you actually are reflected on the top.  Do you recall

15   receiving this email chain on Monday, October 29th?

16   A    Again, I don't specifically recall the email, but I'm

17   on it, so I assume that I got it.

18   Q    Same question for Noteholders 7, Tuesday, October 30th

19   email, you are reflected on the top email.  Do you recall

20   receiving this?

21   A    Same answer.

22          MR. CARNEY:  Your Honor, we would move to admit

23   these three emails into evidence as Noteholders 5, 6 and 7.

24          THE COURT:  Any objection?

25          MR. FRENCH:  It's hard to know the relevance

1    without questions, Your Honor, but no objection.

2              THE COURT:  Are you objecting on the grounds of

3    relevance?

4              MR. FRENCH:  No objection at this time.

5              THE COURT:  Well, this is the time, so.

6              MR. FRENCH:  No objection.

7              THE COURT:  They are received.

8              MR. CARNEY:  Okay, well, the relevance will become

9    pretty clear because the emails all specifically talk about

10   DIP budget, so I'll ask you the questions.

11   Q    Do you see here, on the top email, on Noteholders 5,

12   Mr. Hede, where it's an email from Mr. Cotton, Harry, who I

13   will represent to you is from PJT, to Moelis and others, and

14   says: "Also, can you please let us know timing on the

15   revised DIP budget," do you see that?

16   A    Yes.

17   Q    And Noteholders 6, this is the October 29th email, this

18   is an email from Mr. Herlihy and PJT to you and others and

19   asks if there's any update on the DIP budget, do you see

20   that?

21   A    Yes.

22   Q    Noteholders 7, October 30th, Mr. Herlihy again, to you,

23   this week after -- sorry, five days after the first email,

24   saying: "Guys, we need info.  This is basic stuff any

25   lenders requires," do you see that?

```
 1    A    Yes.

 2    Q    And he goes on, he says: "Still haven't seen a DIP

 3    budget," that's right, right?

 4    A    Yes.

 5    Q    At no time, did you ever respond to this and say, well,

 6    there are some complexities here, this is why you're not

 7    getting a DIP budget, did you?

 8    A    I didn't specifically respond, I don't know if others

 9    did.

10    Q    In fact, no one at EY did, did they?

11    A    I can't say whether anyone did or not.

12    Q    Last point, this is very minor, I believe you testified

13    on direct that PJT as the noteholders' advisor, sent you the

14    DIP -- sent EY the DIP term sheet for the first time on

15    October 25th, 2018, do you recall that testimony?

16    A    I don't believe I testified to October 25th.

17    Q    Okay, well, let me -- isn't it true that actually, PJT

18    sent the original term sheet to you on October 23rd, is that

19    right?

20    A    I don't specifically recall, sorry.

21              MR. CARNEY:  Okay, Your Honor, I'm not going to

22    mark this, just to refresh his recollection, if I can

23    approach?

24              THE COURT:  Go ahead.

25              MR. CARNEY:  Okay.
```

1   Q    Just showing you a project from this term sheet dated

2   October 23rd, do you recognize that?  On the very front, it

3   says October 23rd?

4   A    Yes.

5   Q    Okay, does that refresh your recollection as to when

6   PJT sent you a term sheet?

7   A    I don't specifically recall.  I don't -- I believe I've

8   seen this document before, I don't specifically recall it,

9   so -- there was a lot going on.

10           MR. CARNEY:  No further questions, sir.

11           THE COURT:  Does anybody else want to cross-

12   examine the witness?  Hearing no response, any redirect?

13           MR. FRENCH:  Briefly, Your Honor.

14           THE COURT:  Go ahead.

15           MR. FRENCH:  May I proceed?

16           THE COURT:  Go ahead.

17               REDIRECT EXAMINATION OF ANDREW HEDE

18   BY MR. FRENCH:

19   Q    The first question is a little bit difficult because

20   you have this document and I don't, but do you have the

21   calculation of book value of certain assets?

22   A    Not anymore.

23           MR. FRENCH:  May I approach?

24           THE COURT:  It's Noteholders 4, borrowing base

25   certificate.  Is that what we're talking about?

1          MR. FRENCH:  Yes, Your Honor.

2    Q    Do you recall being asked questions about the book

3    value of certain assets reflected on that?

4    A    Yes.

5    Q    Do you have a view as to whether the book value of

6    those assets reflects the true value of unencumbered assets

7    available to the Debtors?

8          MR. CARNEY:  Objection, foundation, Your Honor.

9          THE COURT:  Sustained.  You're asking him to value

10   the Debtors' assets.  Are you asking for accounting purposes

11   or valuation purposes?

12         MR. FRENCH:  The first question was whether or not

13   he has a view as to it.  I mean, I think the door was open

14   when he directed him to calculate the book value --

15         THE COURT:  No, he just asked him what the

16   document said, I thought.  You didn't ask for him to

17   calculate anything.

18         MR. FRENCH:  Okay, that's fine.

19   Q    Could you turn to the DIP budget, please?

20         THE COURT:  And I thought the issue was whatever

21   the book value -- whatever the actual value is, there was

22   $21 million dollars of additional borrowing capacity.

23   Wasn't that what you were trying to bring out?

24         MR. FRENCH:  I think that was the argument now.

25         THE COURT:  All right.

1    A    I don't have the DIP budget anymore, it's back with

2    counsel.

3    Q    Oh, I'm sorry.

4         THE COURT:  It's on his phone.

5    Q    Do you recall being asked questions about the

6    indication of payment to Mercuria of the current over

7    balance?

8    A    Over advance?

9    Q    Over advance, thank you.

10   A    Yes.

11   Q    Do you know the current balance of the over advance

12   owed to Mercuria?

13   A    As of the filing date, it was just under $12 million

14   dollars.  As collections have come in over the last 24

15   hours, I believe it's $9 point something million.

16   Q    Do you still have a copy of the exclusivity agreement?

17   A    No.

18        MR. FRENCH:  All right, I have.  May I approach,

19   Your Honor?

20        THE COURT:  Yes.

21   Q    What's the date at the top of that document?

22   A    July 4th.

23   Q    On July 4th, were you involved in diligence processes

24   with Mercuria?

25   A    To some extent.

1    Q    To your view, did it appear that their advisors were

2    spending substantial time on diligence at that time?

3    A    Sorry, Mercuria's advisors?

4    Q    Yes.

5    A    Mercuria negotiated a significant part of this

6    transaction on their own, so I don't know --

7    Q    Did you see them spending a lot of time on diligence?

8    A    Yes.

9    Q    And the last questions that I have relate to your

10   testimony on Mercuria's oversight of company disbursements.

11   So long as there was sufficient borrowing base, and

12   sufficient backup, did Mercuria ever prevent the company

13   from making a disbursement?

14   A    Not that I'm aware of.

15   Q    To your knowledge, could they have?

16   A    Sorry, could they have?

17   Q    If there was sufficient borrowing base and

18   documentation, could they have prevented disbursements?

19             THE COURT:  Is that governed by an agreement?

20             MR. FRENCH:  I'm asking to his knowledge.

21   A    I couldn't tell you, so.

22             MR. FRENCH:  Nothing further, Your Honor.

23             THE COURT:  You can step down, thank you.  Call

24   your next witness.

25             MR. SLADE:  Your Honor, the Debtors call Zul

1    Jamal.  Can I take a look at the document that no one has a

2    copy of?

3              CLERK:  Raise your right hand, please.  Do you

4    solemnly swear that the testimony you're about to give will

5    be the truth?

6              MR. JAMAL:  I do.

7              CLERK:  Okay, please take a seat.

8              MR. SLADE:  Michael Slade for the Debtors, Your

9    Honor.  May I proceed?

10             THE COURT:  Go ahead.

11                 DIRECT EXAMINATION OF ZUL JAMAL

12   BY MR. SLADE:

13   Q    Can you introduce yourself for the Court, sir?

14   A    Yes, my name is Zul Jamal.

15   Q    Where do you work?

16   A    I work at Moelis & Company.

17   Q    What do you do?:

18   A    I'm a Managing Director in Moelis's Recapitalization

19   and Restructuring Group.

20   Q    Can you give the Court a sense of your educational

21   background?

22   A    Yes, I have a Bachelor of Science and Economics from

23   the Wharton School at the University of Pennsylvania.

24   Q    Can you take the Court through your professional

25   background?

```
 1    A    Yes.  I spent the first nine years of my career at

 2    Jeffries & Company, both in New York and then in London,

 3    where I worked primarily on restructurings, but also on

 4    leveraged finance transactions and mergers and acquisitions.

 5    I subsequently moved to Moelis in 2008, where I've been,

 6    since that time, focused on restructurings, financings and

 7    MNA.

 8    Q    So, how long have you been working in the investment

 9    bank in the restructuring space?

10    A    Approximately 18 years.

11    Q    How many DIPs have you worked on?

12    A    A few dozen.

13    Q    Could you give the Court some (indiscernible) examples

14    of your DIP experience?

15    A    Sure.  I worked representing the company in the Aleris

16    International and (indiscernible) situations, represent the

17    creditors in both (indiscernible) and American Airlines, to

18    name a few.

19    Q    When did you get involved with the Debtors?

20    A    Moelis was originally retained in July of 2018.

21    Q    At the time you got involved, what was the Debtors'

22    situation with respect to its lenders?

23    A    It was right in the middle of a very challenging period

24    with the lenders, as Mr. Hede described, and we got involved

25    right around the time that the Mercuria MOU was being
```

1    entered into.

2    Q    Can you describe to the Court the challenge that the

3    Debtors faced before Mercuria took out the existing lenders

4    (indiscernible)?

5    A    So, at that time, the lenders were being very difficult

6    in terms of providing the Debtors with -- or the company

7    with, at the time, liquidity.  There was a lot of work being

8    done by their attorneys and advisors to look at every single

9    thing, and it was really a very challenging situation.

10   Q    Now, can you describe to the Court how Mercuria

11   actually became the Debtors' primary lender?

12   A    So, between the signing of the MOU and august, the --

13   there were a range of discussions.  Ultimately, Mercuria

14   ended up buying out all of the assignments from the lenders

15   under the global and the US borrowing base facilities in a

16   series of negotiated transactions directly with those

17   lenders.

18   Q    How did Mercuria's take out of the existing lenders

19   affect the Debtors' ability to borrow?

20   A    It significantly enhanced it, because they provided

21   additional liquidity as well as loosened up some of the

22   requirements in the documents.

23   Q    Okay, and we heard about sleeving a little bit during

24   Mr. Hede's testimony.  How important is sleeving currently

25   to the Debtors' financial situation?

1   A    My understanding is that it continues to be extremely

2   important because without it, as Mr. Hede said, it would

3   require the Debtors to have significantly more borrowing

4   capacity, as well as equity to fund the equity portion of

5   those -- that financing.

6   Q    Mr. Jamal, at some point, did you begin to search for

7   Debtor-in-Possession financing?

8   A    We did, yes.

9   Q    Why?

10  A    Because it became clear that one of the paths that the

11  company may have to go down was a Chapter 11 filing.

12  Q    Did the Debtors need a DIP to operate during these

13  Chapter 11 cases?

14  A    Yes.

15  Q    What happens to the Debtors' business without a DIP?

16  A    It stops.

17  Q    Now, what were your goals in going out to the market

18  and looking for a DIP?

19  A    We were primarily focused on finding somebody who could

20  provide the Debtors with the liquidity they needed to

21  operate on terms that would work for the Debtors.

22  Q    Can you describe for the Court the process that you

23  went through to market the DIP?

24  A    Our team at Moelis identified 24 lenders, which was

25  made up of a combination of traditional bank lenders and

1   alternative financing providers.  We reached out to all of

2   those parties to enquire whether they would have an interest

3   in potentially evaluating opportunity to provide a DIP for

4   Aegean.  To the extent they were interested, we provided

5   them with a non-disclosure agreement which, if they

6   executed, we would provide them with access to information.

7   Q    Now, we heard a little bit of testimony about the

8   exclusivity letter and the direct competitor language, do

9   you recall that testimony?

10  A    I do.

11  Q    Are you aware of the direct competitor language

12  preventing any NDA from being executed?

13  A    Not to my knowledge.

14  Q    What were the challenges that you faced in finding DIP

15  financing for this company?

16  A    Unfortunately, they were a multitude.  Firstly, the

17  fact that the lenders, under the -- both the US and global

18  borrowing base facility all sold out to Mercuria, I believe,

19  at a discount, and those lenders, frankly, represented the

20  large subset of lenders that would lend to this industry,

21  meant that the most obvious people that you could go to, you

22  know, were obviously not interested.  In addition, the

23  company had no historical audited financials because of the

24  investigations and other challenges that it faced, and it

25  was still losing money on an operating basis because the

Page 112

1   borrowing facilities had shrunk to a level where it was not

2   operating at break-even volume levels.

3   Q    What was the market's reaction when you presented the

4   opportunity to loan money to the group?

5   A    There was very limited interest.  Of the 24 parties, I

6   believe only 9 entered into non-disclosure agreements.  Of

7   those parties, none put forth any proposals.

8   Q    Is there anybody on the market willing to lend to

9   Aegean on an unsecured basis?

10  A    No.

11  Q    Is there anybody willing to lend to Aegean on a non-

12  priming basis?

13  A    No.

14  Q    Did that surprise you?

15  A    No.

16  Q    Why not?

17  A    Because of the reasons I just went through.

18  Q    Now, did you engage with the advisors from the

19  unsecured bondholder during the DIP (indiscernible)?

20  A    Extensively.

21  Q    Why'd you do that?

22  A    We had been engaging with them for some time prior to

23  us launching that process because we had been evaluating a

24  series of potential transactions to try and keep the company

25  out of the Court process, initially, which would have

1    required negotiating something with the noteholders, given

2    the convert maturity on November 1st.

3    Q    Okay, can you describe for the Court just the amount of

4    engagement that you had with the advisors for the

5    noteholders during this process?

6    A    Yes.  We had extensive discussions with them in

7    September leading up to an in-person meeting in late

8    September where their clients got -- became restricted.  We

9    had subsequent meetings and discussions with them on an

10   almost continuous basis, both with respect to DIP financing

11   as well as other types of transactions.

12   Q    Was it any secret to the noteholders how much DIP

13   financing the company needed?

14   A    So, I believe early on, we -- E&Y and the company

15   produced a DIP sizing analysis, which generally scoped out

16   the overall size of a potential DIP facility.

17   Q    Did you engage with Mercuria during the DIP financing

18   process?

19   A    We did.

20   Q    And tell the Court what you did.

21   A    So, we had extensive negotiations with Mercuria

22   regarding a DIP as part of, again, that set of discussions

23   we had around potential transactions to address the

24   company's capital structure and funding needs.

25   Q    Okay, and ultimately, did you get a DIP proposal from

Page 114

1    Mercuria?

2    A    We did.

3    Q    Can you describe the proposal that you got and how it

4    was ultimately negotiated into what's before the Court

5    today?

6    A    So, originally, Mercuria gave us a proposal for three

7    facilities: a US borrowing base facility, a global borrowing

8    base facility, and a term loan.  That proposal went through

9    extensive iterations and negotiations both with counsel as

10   well as with Moelis and E&Y and members of the company's

11   management team, to get it into a place where I think we all

12   collectively felt it was something the company could live

13   with.

14   Q    Was the company independently represented in its DIP

15   negotiations with Mercuria?

16   A    Yes.

17   Q    Was Mercuria independently represented in its

18   negotiations with the company?

19   A    Yes, I believe, by themselves and with counsel.

20   Q    And how would you characterize the negotiations?

21   A    Hard-fought, long, intensive, they probably broke down,

22   I don't know, five or six times, at least, along the way,

23   for one reason or the other, given the difficulty of

24   structuring the facility and the various terms that we

25   needed, that we hard to achieve.

1   Q   Did the company negotiate in good faith?

2   A   I believe so.

3   Q   Do you have any reason to believe Mercuria didn't

4   negotiate in good faith?

5   A   I don't.

6   Q   Ultimately, was Mercuria's proposal the best available

7   option for the company?

8   A   It was the only actionable DIP proposal the company

9   received.

10  Q   Okay, can you describe for the Court the benefits of

11  the proposed Mercuria DIP?

12  A   So, fundamentally, the Mercuria DIP allows the company

13  to continue to operate as a going concern for some period of

14  time, which will enable the company to be exposed to the

15  marketplace to see if there is a transaction available that

16  will ultimately be better than the stalking horse bid that

17  Mercuria, presumably, is putting forth very shortly.

18  Q   During opening, opposing counsel made the assertion

19  that no loan would be better than this DIP loan.  Do you

20  recall that?

21  A   I do.

22  Q   Do you agree?

23  A   I do not.

24  Q   Why not?

25  A   Because I believe that the company, if exposed to a

1    marketing process, we will realize whatever the maximum

2    value is available.  I think uncontrolled liquidation will

3    not allow that discovery to occur, and I think there is a

4    possibility that someone else may come forward, perhaps the

5    noteholders, perhaps another party, to put forth a proposal

6    that's superior to where Mercuria is today.

7    Q    In your opinion, was the Debtors' decision to pursue

8    the Mercuria proposed DIP reasonable?

9    A    Yes.

10   Q    Did you advise the Debtors to go in this direction?

11   A    Yes.

12   Q    Now, at some point, Mr. Jamal, did you get

13   (indiscernible) from a bondholder for an alternative to the

14   Mercuria DIP?

15   A    We did.

16   Q    What did you receive?

17   A    We initially received a term sheet.

18   Q    What did it say?

19   A    It contemplated a structure where the noteholders would

20   provide a FILO or a first in, last out financing, as well as

21   a term loan.  The FILO was in the amount of $175 million

22   dollars, the term loan was in the amount of $40 million

23   dollars.  It also contemplated a sort of secured first out

24   facility of $325 million dollars.

25   Q    And who was the proposed provider of that facility?

1    A    Goldman Sachs.

2    Q    What did you do to try -- well, first of all, what was

3    your reaction when you got the proposal from the -- whatever

4    it was, from the bondholders?

5    A    We were very happy to see it because it potentially

6    provided a path not just to provide financing for the

7    company, but it had contained in it at least some proposed

8    terms for a potential recapitalization of the business that

9    would have been supported by the noteholders.

10   Q    What did you do to try and move the bondholder's

11   suggestion forward?

12   A    We had extensive discussions with the noteholders'

13   advisors about how best to convert that term sheet from a

14   term sheet to a binding commitment.

15   Q    Now, how much information did you provide to the

16   bondholders and to Goldman Sachs?

17   A    I believe between E&Y and counsel and Moelis and the

18   company, we provided extensive information either through

19   documents or through a large number of calls going through a

20   range of due diligence questions.

21   Q    Why aren't we here today presenting a bondholder DIP?

22   A    I believe because Goldman Sachs couldn't get there in

23   terms of the secured facility, or at least they have not got

24   there yet.

25   Q    Now, do you think Goldman Sachs's refusal to commit

Page 118

1    today is as a result of the company being too slow to

2    provide information?

3    A     No.

4    Q     Why not?

5    A     Because the issues that Goldman Sachs has raised are

6    issues that involved fundamentally restructuring how the

7    company's business operates from a financing standpoint

8    today, as well as they raised some business due diligence

9    questions that are challenging to answer.

10   Q     Can you take a look -- I believe there's still a black

11   binder in front of you?

12   A     Yes.

13            MR. SLADE:  Your Honor, this is the Debtors'

14   Exhibit 6, I believe you all have a copy.

15   Q     Have you seen the Debtors' Exhibit 6 before, sir?

16   A     I have.

17   Q     What is Debtors' Exhibit 6?

18   A     This is an email from someone at Goldman Sachs to a

19   whole lot of people.

20            MR. SLADE:  Your Honor, I offer Debtors' Exhibit

21   6.

22            THE COURT:  Any objection?

23            MR. CARNEY:  Your Honor, just give me one second

24   (indiscernible).  No objection.

25            THE COURT:  It's received.

1            MR. SLADE:  Your Honor, did you receive -- I'm

2     sorry.

3     Q    Mr. Jamal, did you receive Debtors' Exhibit 6?

4     A    I did.

5     Q    And that was on this past Sunday, right?

6     A    It was.

7     Q    As we were getting ready to file these Chapter 11

8     cases?

9     A    Yes.

10    Q    What did the email suggest to you about Goldman's

11    readiness to commit to this transaction?

12    A    It suggested that they still had a fair amount of

13    additional work left to do, as well as they required some

14    additional money from the Debtors to advance their work

15    forward.

16    Q    Mr. Jamal, do you hope that Goldman ultimately commits

17    to this transaction?

18    A    Absolutely.

19    Q    But at this point, can you recommend to the company

20    that we wait and see?

21    A    I cannot.

22    Q    Why not?

23    A    Because the list of issues raised by Goldman require

24    substantial work to overcome, and it may be not possible to

25    overcome some of the issues that they raised.

1   Q    But ultimately, Mr. Jamal, if the bondholder's

2   alternative becomes actionable, can the company accept it

3   and replace Mercuria?

4   A    Yes.

5   Q    Okay, can you take a look in your binder, sir, at

6   Exhibit 5?

7   A    I've got it, yeah.

8   Q    Have you seen Exhibit 5 before, Mr. Jamal?

9   A    Yes.

10   Q    What is Exhibit 5?

11   A    Exhibit 5 is a comparison of the Mercuria DIP facility

12   and the combined proposal from bondholders and construct

13   from Goldman Sachs.

14   Q    Is Exhibit 5 a demonstrative that your team put

15   together to help you explain to the Court the distinctions

16   between the proposed DIP and the construct that Goldman

17   Sachs left?

18   A    Yes.

19   Q    Can you take Exhibit 5 and just walk the Court through

20   some of the key differences between the two backings?

21   A    So, and -- well, just to take a step back, the Mercuria

22   facility is obviously fully committed.  The Goldman and ad

23   hoc noteholders facility is not.  While we had commitment

24   letters from the noteholders, we did not have the same from

25   Goldman Sachs, so, other than that, I would note that the --

1    both the rates and the fees on the Mercuria-led facility

2    were lower than those on the Goldman and noteholder

3    facility, both in terms of interest as well as commitment

4    fees.

5    Q    How much lower?

6    A    So, the Mercuria facilities has upfront fees on the ABL

7    portion of 1.5 percent, and on the term loan of 2.5 percent.

8    The ABL -- first out ABL --

9    Q    Actually, I want to (indiscernible).

10             THE COURT:  Can I ask you what a first in, last

11   out loan is?

12             MR. JAMAL:  Yes.  So, the way it would work is, if

13   you have an ABL, where you have $300 million of collateral

14   and you're borrowing, the first in, last out loan would be

15   the first dollars that are borrowed.  But, as the ABL is

16   repaid, it's the last dollars that are repaid.  So, in the

17   context of, let's say, a liquidation, the first $175 is

18   borrowed, that's the first in, then you borrow $125 million,

19   but in the wind-down, the $125 million will get repaid

20   first, and then the $175 million gets repaid next.  So, to

21   the extent there's a deficiency, the $175 million bears the

22   full exposure to that deficiency.

23   Q    Just so we're right, the part that Goldman has

24   (indiscernible) is last in and first out?

25   A    Correct, the easiest part of the loan.

1    Q   And I had interrupted you.  Can you tell the Court how

2    much more expensive the construct the bondholders suggested

3    is than the Mercuria DIP that's up for suggested approval

4    today?

5    A   So, it's substantially more expensive.  As I was

6    saying, the Goldman portion of the ABL, which is just a last

7    out -- the last in, first out piece, by itself, was more

8    expensive on a cash basis than Mercuria's entire ABL

9    portion, and then the Mercuria term loan portion is

10    substantially cheaper than the first in, last out and the

11    second lien, although I would note that both of those are,

12    obviously, paid in kind, but would have to be repaid, at

13    some point, by the estates.  And then, in terms of interest

14    rates, the Mercuria ABL piece, as a LIBOR plus 350 -- you

15    know, the Goldman proposal was higher than that by a couple

16    of hundred basis points, and then stepped down.  The US term

17    loan from Mercuria is at LIBOR plus 650.  The noteholders

18    FILO is at LIBOR plus 875, and then the second lien is at

19    LIBOR plus 1000.  So, again, a lot more expensive.

20    Q   So, I want to discuss a little bit more about the fees

21    that are in the Mercuria proposed DIP, Mr. Jamal.  Can you

22    take the Court -- just describe to the Court the negotiation

23    of the fees between Mercuria on the one hand and Aegean on

24    the other?

25    A   So, like everything else with Mercuria, it was a

1    difficult and hard-fought negotiation to get to the place

2    where we ultimately landed.   There was a lot of verbal back

3    and forth and storming out of rooms and the like.

4    Q     In your operation, are the fees in the Mercuria

5    proposed DIP reasonable?

6    A     Under these circumstances, I believe they are, yes.

7    Q     And what work did you do to come to that conclusion?

8    A     So, we looked at some comparables that we had pulled,

9    as well as I think the Goldman proposal helped inform our

10   perspective as well.

11   Q     Now, in your operation, Mr. Jamal, is it reasonable for

12   the full commitment fee to be payable on the first day?

13   A     It can be, yes.

14   Q     Why?

15   A     Because Mercuria's committing all this capital today,

16   notwithstanding the fact that, on an interim basis, perhaps

17   not all of it is approved for use today.  And so, in my

18   experience, lenders often require fees on the full amount

19   that they're committing.

20   Q     Is that typical, in your experience?

21   A     It happens often.

22   Q     I want to now move to a few of the other terms that

23   have been discussed so far, and I'll start with the rollups.

24   In your experience, Mr. Jamal, is it common for DIPs to have

25   rollups?

Page 124

```
 1   A     I think it's very common for ABLs to have rollups,

 2   generally, in my experience, I'd say it's somewhat less

 3   common for term loans to have rollups.

 4   Q     Okay, and here, what do we have?

 5   A     We have an ABL.

 6   Q     Now, can you describe for the Court how the rollup

 7   works in connection with the entirety of the proposed DIP?

 8   A     So, I think, as Mr. Hede testified to, the entire

 9   collateral base of the Debtors turns over every 60 days or

10   so, so, to the extent the company's operating in the normal

11   course, the receivables and the working capital will convert

12   to cash, and then require borrowing under the ABL facility,

13   and all of that will be re-borrowed in approximately 60 days

14   or so.  The way the rollup works is that Mercuria is

15   requiring us to roll up half of what they have outstanding

16   today, today, as well as to roll up, as they -- as we repay

17   and re-borrow, on a post-petition basis.

18   Q     So, why did the company agree to the rollup?

19   A     We agreed to it because it was required by Mercuria to

20   provide us with the DIP financing.

21   Q     And overall, do you still believe the DIP is

22   reasonable?

23   A     Yes, for the reasons I previously discussed.

24   Q     There's been some discussion about liens on the

25   proceeds of the claims that the company might have.  And
```

Page 125

1    you've been listening to that this morning?

2    A    I have.

3    Q    Now, is it your understanding that, if they interim

4    order is approved, Mercuria gets a lien on the proceeds of

5    those claims?

6    A    My understanding from counsel is that they do not.

7    Q    And that was reserved for the final order?

8    A    Yes, that's right.

9    Q    Just a few questions to sum up, Mr. Jamal.  Do the

10   Debtors need a DIP?

11   A    Yes.

12   Q    Do the Debtors have any alternative other than the

13   proposed Mercuria DIP?

14   A    No.

15   Q    Did you look into the market to see if there was anyone

16   willing to lend on better terms?

17   A    Yes.

18   Q    Was there?

19   A    No.

20          MR. SLADE:  No further questions, Your Honor.

21          THE COURT:  Cross-examination?

22          MR. CARNEY:  Yes, Your Honor.  Again, for the

23   record, Brian Carney of Akin Gump Strauss Hauer & Feld for

24   the convertible noteholders.

25                CROSS-EXAMINATION OF ZUL JAMAL

1    BY MR. CARNEY:

2    Q    Good afternoon, or actually, evening, Mr. Jamal.

3    A    Good evening.

4    Q    You testified on direct that the Debtors business would

5    stop without a DIP, right?

6    A    Yes.

7    Q    Do you think that the DIP loan would be better for the

8    Debtors' creditors than no loan at all, right?

9    A    Yes.

10   Q    But Moelis hasn't prepared any liquidation analysis at

11   all, right?

12   A    We have not.

13   Q    In fact, you haven't even discussed preparing a

14   liquidation analysis, have you?

15   A    I mean, typically, in these situations, E&Y would

16   prepare the liquidation analysis, so we have not.

17   Q    Yet you're sitting here testifying that you know for

18   sure that the DIP loan is better than no loan.

19   A    I think I said that my belief is that if the company

20   got a DIP and was exposed to a marketing process, that it is

21   likely to maximize the value for the estates.

22   Q    But E&Y is the one doing the analysis on that, right?

23   A    Well, E&Y is the one that would, ultimately, likely do

24   the liquidation analysis.  I'm just offering my operation

25   that I believe a marketing process is likely to lead to some

1   level of price discovery, which should maximize values for

2   these estates.

3   Q    Operation based on no liquidation analysis.

4   A    Right, was that --

5   Q    It's a question.

6   A    Yes, as of now, that's right.

7   Q    Thanks.  You don't even recall any discussions with any

8   of the company's advisors, even Ernst & Young regarding

9   liquidation analysis, do you?

10   A    Not specifically, no.

11   Q    And you don't know any work at all that has been done

12   to even begin preparations of a liquidation analysis by

13   anyone at the company, including Ernst & Young, right?

14          MR. SLADE:  Objection, asked and answered.

15          MR. CARNEY:  No, it's not.  It was a separate

16   question.

17          THE COURT:  Overruled.  Overruled.  Don't argue

18   with him.

19   A    I'm not aware of any, no.

20   Q    Thank you, Mr. Jamal.  Mr. Jamal, I believe you

21   testified that you're not aware of any potential

22   (indiscernible) being disqualified under what we're

23   referring to as the direct competitor provision, is that

24   right?

25   A    Not that I'm aware of, no.

Page 128

1   Q    You actually haven't had any conversations at all,

2   internally at Moelis, regarding what we're referring to as

3   the direct competitor provision, right?

4   A    I only really discussed it with counsel.

5   Q    And you don't recall any discussions at all regarding

6   the direct competitor provision with anyone else other than

7   counsel, right?

8   A    That's right, because whenever an NDA came in, counsel

9   was the one primarily charged with processing it, and to the

10  extent that language was an issue, counsel was the one that

11  was primarily resolving it.  But again, it's my

12  understanding that no party that came in -- ultimately, it

13  was not resolved.

14  Q    Okay, you testified on direct that, like everything

15  with Mercuria, the fees were the subject of a hard-fought

16  negotiation, right?

17  A    Yes.

18  Q    You remember that for sure, right?

19  A    Yes.

20  Q    But you don't recall the specifics of any of the

21  negotiation, right?

22  A    I recall -- well, there was a lot going on at the time,

23  and there were lots and lots of discussions happening

24  simultaneously about many things, so I recall that there

25  were lots of discussions about all kinds of terms in the

1    DIP, including the fees, and I recall that it was very hard-

2    fought.  I don't recall the specifics of the back and forth.

3    Q    And let me ask you a more specific question.  You don't

4    recall what Mercuria's initial ask was for a fee, right?

5    A    Not specifically.

6    Q    And you don't have any recollection as to the company

7    pushing back and asking for something else, do you?

8    A    Well, I recall that we absolutely pushed back because,

9    as I said, I distinctly remember, at various points,

10   Mercuria demanding various economic provisions that we

11   pushed back on very hard.

12   Q    But no specific recollection of any numbers, right?

13   A    No, because most -- many of those negotiations would be

14   on a business level with Mercuria principals where it would

15   be a discussion and lawyer drafts going back and forth on

16   those types of points.

17   Q    Okay, I'm going to now ask you the same question I

18   asked Mr. Hede.  Do you know how many Debtor entities that

19   are not currently obligors to pre-petition facilities are

20   going to become obligors as a result of the rollup?

21   A    I don't.

22   Q    The fees on the proposed Mercuria DIP are calculated on

23   the whole DIP and not just the new money, right?

24   A    They're calculated on the whole DIP, and I would

25   characterize, ultimately, the entire ABL as ultimately

Page 130

1    becoming new money, given how the working capital cycle

2    works.

3    Q    Okay, so -- but as of right now, isn't it true that

4    $330 million dollars of the proposed Mercuria DIP is being

5    rolled up?

6    A    I'd have to sit down and look at what the specific

7    numbers are.

8    Q    You don't have any recollection, sitting here, of how

9    much --

10   A    Well, I know it's 50 percent of their outstandings on

11   day one, and then they have a -- I guess what I'll describe

12   as a creeping rollup that will occur over time.

13              MR. CARNEY:  No further questions, Your Honor.

14              THE COURT:  May I ask, how -- we've been talking

15   about this 50 percent rollup.

16              MR. JAMAL:  Yes.

17              THE COURT:  Exactly what does that mean?

18              MR. JAMAL:  So, my understanding, Your Honor, is

19   that, of their outstandings on the ABL, today, half of it

20   will roll up immediately into post-petition financing, and

21   then, as the company moves forward in time, and the pre-

22   petition borrowings are, effectively, repaid, and then the

23   company re-borrows on the post-petition basis, that

24   effectively, slowly, will convert what were pre-petition

25   borrowings into post-petition borrowings.

1           THE COURT:  Thank you.  Anyone else want to cross-

2     examine the witness?  Any redirect?

3           MR. SLADE:  No, Your Honor.  Thank you.

4           THE COURT:  Okay, step down, thank you.  Call your

5     next witness?

6           MR. SLADE:  Your Honor, the Debtors rest.

7           THE COURT:  Do you have any witnesses?

8           MR. CARNEY:  No witnesses, Your Honor.

9           THE COURT:  Does anybody else want to call any

10    witnesses?  Hearing no response, I'll hear arguments.

11          MR. KIESELSTEIN:  Good afternoon, edging into

12    evening, Your Honor.  Mark Kieselstein on behalf of the

13    Debtors.  Your Honor, I'm going to be brief, because I think

14    the evidence is so lopsided here.  Your Honor, as we said in

15    our opening, there were three undisputed -- or two, at

16    least, undisputed facts.  One, there's an absolute need for

17    this DIP.  There's been no evidence to the contrary.  You

18    heard both Mr. Hede and Mr. Jamal say this company cannot

19    survive for a day or a fortnight, or maybe even a bunch of

20    hours without a DIP, and DIP liquidity.  It's undisputed,

21    there is an absolute lack of alternatives.  As we stand here

22    today, no one is arguing that there are any other DIPs

23    available to the company.  You heard Mr. Hede and Mr. Jamal

24    talk about a lack of alternatives as well.

25          You heard a little bit of insinuation, of which

Page 132

1    there's been a great deal today, about the company's could

2    have gotten there on this alternative DIP, if only Mr. Hede

3    had delivered his budget on the 326th and not the 28th, or

4    whatever those dates were.  But you've heard evidence that

5    Goldman Sachs had fundamental questions about diligence and

6    its ability to get there in time.  And as we've said, we

7    would be delighted if that DIP came to be, but it's not here

8    today.

9              THE COURT:  You know, I don't know anybody who

10   disputes that the Debtor needs money.

11             MR. KIESELSTEIN:  Right.  So, moving on, Your

12   Honor, we've heard what I think is a rhetorical device that

13   the noteholders prefer that the company be liquidated to

14   this DIP order being approved.  But you heard, I think,

15   extensive testimony from Mr. Hede regarding the impact of a

16   rapid shutdown of this business, and the idea that you need

17   a formal liquidated analysis for a man with 25 years of

18   restructuring experience to say, if I shut down tomorrow, my

19   customers would have recoupment claims, my vendors would

20   have claims for unpaid product, my employees would be out of

21   business and would have severance claims, all at the

22   subsidiary level, to which the bondholders are structurally

23   junior.

24             The only reason you would ever make this argument

25   is if you were convinced you were so far out of the money

Page 133

1    that you had nothing to lose, and maybe that's the argument,

2    I don't know.  Frankly, I think, as Mr. Jamal noted, a

3    marketing process, and to the extent people think that

4    marketing process is not fair, they'll be before Judge Wiles

5    at the appropriate time, saying the DIP procedures are one-

6    sided, rigged, or --

7               THE COURT:  But it's a default, under the interim

8    DIP, if the bid procedures are changed to the detriment of

9    Mercuria.

10              MR. KIESELSTEIN:  And so, what I was saying about

11   that --

12              THE COURT:  So, if that occurs, the Debtor has no

13   financing, at that point, to pay off Mercuria, which it has

14   to do within three days, otherwise, Mercuria starts seizing

15   collateral, presumably.

16              MR. KIESELSTEIN:  So, a couple of counterpoints on

17   that, Your Honor?

18              THE COURT:  Go ahead.

19              MR. KIESELSTEIN:  First, my partner, Ms. Pirro, is

20   going to go through a whole host of changes on the order.

21   We wanted to get to the testimony.  You heard a great deal

22   from Mr. Qureshi about the order, and its infirmities, so,

23   Ms. Pirro is going to take you through the order, if we get

24   that far.  Hopefully, we do.  So, I think that that is one

25   of the things that may be addressed, but even if it's not,

1    because I can't remember all of them as I'm sitting here

2    right now, the problem, and the reason we don't have other

3    dips available and people not beating a path to our door is,

4    the company loses money every day right now, and that's

5    because of the cost structure of the business is still

6    higher than the volumes we're able to access.  We are

7    getting this company up off of its knees, right?  And

8    eventually, this company will make money.  For now, it's not

9    making money because it hasn't gotten its volumes back up.

10   This is a margin business.  The more volume, the more

11   margin, the more profitability.

12            So, we have to get from here to there, and

13   Mercuria believes in that story, and the other parties we

14   talked to are not willing to take that risk.  So, what

15   Mercuria said is, look, we're not willing to fund into the

16   void, we're not going to have the DIP out there in a

17   freefall bankruptcy with no exit, no deal with the

18   bondholders, and just hang out there for six or nine months.

19   They want a -- that's why they want milestones.  Milestones

20   are hardly unique to this transaction, and I think they're

21   appropriate, when you're asking someone to overadvance,

22   essentially.

23            THE COURT:  Yeah, I don't think that they're

24   necessarily unique, but the question is whether they're

25   necessarily appropriate on the first day.  I mean, I said at

1    the beginning, Mercuria might be entitled to everything that

2    it's seeking, but the question is whether, on the first day,

3    when you're seeking emergency financing, these are

4    appropriate.

5              MR. KIESELSTEIN:  I mean, the problem is, there's

6    an important need to see that this case is on track and not

7    off the rails.  They are lending a great deal of money

8    between now and day 30, with the expectation, the case will

9    be on the rails.

10             THE COURT:  Why don't we have a final hearing in

11   two weeks?  Another hearing in two weeks, instead of 30

12   days?

13             MR. KIESELSTEIN:  I heard you suggest that, Your

14   Honor, and obviously, we'd love to send to the marketplace

15   that we've got funding for the next 30 days.  That's an

16   important intangible when you're dealing with customers and

17   vendors all over the world.

18             THE COURT:  Except tomorrow, when you tell me that

19   you have to pay critical vendors because the fact that the

20   funding isn't enough.

21             MR. KIESELSTEIN:  I don't think I'm going to tell

22   you --

23             THE COURT:  Okay.

24             MR. KIESELSTEIN:  Well, it's not critical vendors,

25   and I don't want to jump ahead, but I understand your point,

Page 136

1    Your Honor.

2            THE COURT:  Yes.

3            MR. KIESELSTEIN:  The point is that keeping this

4    case on track is something that I think is a reasonable

5    request for a lender to make, when you're talking about a

6    great deal of the DIP money going out within the first 30

7    days.

8            THE COURT:  Certainly, to preserve the value of

9    its collateral.

10           MR. KIESELSTEIN:  That's true.  So, I would say,

11   again, this business about a liquidation being better,

12   again, I think it's just a rhetorical device.  It certainly

13   wouldn't be better for the customers, it certainly wouldn't

14   be better for the vendors, it certainly wouldn't be better

15   for the employees, it wouldn't be better for the going

16   concern.  I'm sure a Creditors' Committee, which hopefully

17   will have a cross-section, maybe it will or maybe it won't,

18   would have a different view on the desirability of an

19   immediate liquidation.

20           THE COURT:  You can have a committee in a week.

21           MR. KIESELSTEIN:  We'll have a committee in a

22   week, and if they have the courage of their convictions, the

23   noteholders will file their motion to convert the case, and

24   we'll deal with it if and when they do.  Your Honor, I will

25   say, I think it's completely fair to say to a Mercuria or

Page 137

1    anyone else, just because you're the only game in town means

2    you get to write your own ticket.  All bets are off,

3    whatever we impose on you, you have to tolerate.  So, the

4    terms still have to be reasonable, and they still have to

5    pass muster with Your Honor, and we have had vigorous

6    debates with Mercuria about our perspective on what's

7    reasonable, what passes muster and what doesn't.  Those were

8    hard-fought and intense, as the evidence is undisputed, and

9    I think we generated a product that is reasonable, taken

10   together as a package.  And we understand Your Honor will

11   say -- you wear the robe, you'll say what you think is

12   reasonable and what isn't from a whole perspective, or even

13   from a line item veto perspective.  Our view of it is, Your

14   Honor, this is an extremely reasonable package, given what

15   we were dealing with.

16          The other thing I wanted to try to deal with is

17   this canard about insiders and insider transactions.  The

18   first thing I'll say is, you can pull out any standard you

19   want, you want to apply entire fairness, you want to apply

20   business judgment, it doesn't matter, because --

21          THE COURT:  You know what's unusual about it?

22   Usually, you have the CRO or the CEO testify as to why he or

23   she believes this is the appropriate exercise of business

24   judgment or the rationale that went into accepting a

25   package.  You never called somebody from the company.

1           MR. KIESELSTEIN:  Well, let me explain.  First of

2    all, Your Honor, Mr. Baron was scheduled to be here, and he

3    had a personal issue come up, and this was the only block of

4    time this whole week where he could not be here, but if you

5    go two weeks, or if you go 30 days, he'll be at the final,

6    and he can speak to some of these issues.

7           THE COURT:  Well, I guess what I'm asking is, how

8    can I make a determination without that kind of testimony to

9    at least hear from the decision -- the ultimate decision-

10   maker?

11          MR. KIESELSTEIN:  Well, I think the ultimate

12   decision-makers instructed Mr. Hede, they instructed me,

13   they instructed Mr. Jamal, and they are testifying, under

14   oath, with the vast collective experience that they have,

15   that this is an appropriate vote, and obviously, the Board

16   authorized it.  We filed, we have resolutions when we filed,

17   which are a matter of Court record, authorizing entry into

18   the DIP.  I was on those Board calls, I advised the Board,

19   and it was unanimous, and they didn't view it as a

20   particularly hard decision, given our situation.

21          THE COURT:  Are you a witness now?

22          MR. KIESELSTEIN:  Well, you asked the question,

23   Your Honor, so I'm just trying to respond.

24          THE COURT:  Well, do you want him to testify

25   tomorrow?

Page 139

1           MR. KIESELSTEIN:  Who, Mr. Baron?

2           THE COURT:  Yeah.

3           MR. KIESELSTEIN:  He lives in San Francisco, I

4    don't know that he could get back by tomorrow --

5           THE COURT:  All right.

6           MR. KIESELSTEIN:  -- he could be on the phone.  We

7    do (indiscernible).

8           THE COURT:  I won't take testimony on the phone.

9           MR. KIESELSTEIN:  Well, whatever time it would

10   take for him to get back here, he could get back here, Your

11   Honor.  But, as an officer of the Court, we represent -- and

12   I don't think it's disputed, frankly, that Mr. Baron was at

13   the center of these negotiations and was giving instruction

14   to Mr. Hede and Mr. Jamal.  Shall I proceed?

15          THE COURT:  Go ahead.

16          MR. KIESELSTEIN:  So, Your Honor, I think

17   understanding that the terms have to be reasonable, no

18   matter if you're the only game in town or not, you know,

19   argument is that the evidence is overwhelming that, in fact,

20   the terms are reasonable.  You heard Mr. Jamal speak about

21   the rollup, and I want to touch on that.  It's been the

22   subject of much discussion.

23          There is a huge distinction, as you know, between

24   an ABL rollup and a term rollup.  We've all seen DIP lenders

25   come into Court and say, I have a musty old piece of term

Page 140

1    debt for $100 million dollars.  I'm going to throw $10

2    million dollars the company's well, and I want my term debt

3    rolled up, and there's just a disproportion between what's

4    being given and what's being gotten.  ABL is completely

5    different, Your Honor.  First of all, we do have a term

6    loan, new money, that's undisputed.  That's pure new money.

7    The ABL advances, if you will, maybe it's metaphysical

8    whether it's cash collateral or whether it's DIP proceeds,

9    whether it's first generation, second generation, how fast

10   the things turn over.  What I will say is, there has been no

11   suggestion that we can live solely on cash collateral, and

12   there's been no suggestion that we can win a cash collateral

13   fight on a contested basis.

14          You heard the book values compared to the term --

15   the balances, so you heard, not that it was put in for that

16   purpose, that the equity cushion here is fairly thin, the

17   company loses money.  That's not a contested cash collateral

18   fight I would relish taking on.  So, this was the route that

19   was available for us, and given the many ABL rollup DIPs

20   that get done, I think it's fair for there to be the ABL

21   portion done here.  Now, how much are we putting into the

22   system in the next few weeks?  From the numbers you can

23   deduce, because their testimony was how quickly the

24   inventory and accounts receivables and working capital

25   assets turn over.  So, I think you've heard 45 -- 30 to 45

```
 1    days for the global, 45 to 60 for the US.  We go out to 30

 2    days that we're asking for, approximately, until the final

 3    hearing, you're talking about a couple of hundred million

 4    dollars plus, of lubrication being injected into the system.

 5    And you heard how the working capital cycle works for this

 6    company.  I will buy oil and pay you tomorrow, and I'm

 7    giving -- I'm pumping that oil onto somebody's barge, and

 8    they're like, I'll take your oil for a hamburger next

 9    Wednesday, and it's 30 days.  That is a huge working capital

10    cycle disconnect.

11            But there's no question the DIP liquidity needs to

12    go in for the company -- for the company's gears not to

13    seize up.  So, a rollup that corresponds to that is a rollup

14    that corresponds to new money going in, and I think if you

15    add up the 50 percent and then the creeping, and then the

16    new money, including the term and the ABL liquidity, the

17    ratio is not out of whack.  They're in pretty good

18    relationship to each other.  So, we think the rollup is

19    reasonable.  You didn't hear what PJT Bank are being called

20    as a witness to stand up on the stand and say, no, we think

21    that rollup is unreasonable, and there's a reason for that.

22    But I think the absence of evidence, the absence of

23    attempting to enter evidence, speaks volumes as to that

24    issue.

25            And I would say the same thing about the fees.
```

1    You saw -- the proof is in the pudding.  Their construct

2    contemplated wildly higher fees than what Mercuria is

3    offering.  If that suggests it wasn't a good back and forth,

4    I don't know how it's probative of the insinuation to Mr.

5    Jamal, we'll, you don't know exactly what the back and forth

6    was.  I can tell you, this was hard-fought on every level,

7    the evidence is undisputed as to that from both Mr. Hede and

8    Mr. Jamal.  So, when we talk about these key provisions -

9    the rollup, the fees, the reasonableness, now mind you, if

10   we had three or four other DIP lenders, actionable ones,

11   maybe we would have done better, but supply and demand

12   sometimes dictates exactly how well you're able to do.  We

13   think we did as well as we could, under the circumstances,

14   as Mr. Jamal kept referring to.

15          So, let's talk about a couple of the other issues

16   that were raised.  First, the liens on claims.  It's not a

17   lien on claims, it's a lien on proceeds.  It's not at the

18   interim, it's at the final.  And to be fair, that may be a

19   change to be ordered that we can negotiate with the U.S.

20   Trustee that they haven't seen yet.  Which -- where I think

21   was actually suggested some of these changes to them, but

22   time has been short today.  My colleague, Ms. Pirro, as I

23   said, will get up and go through the order changes.  And I

24   don't know normally that that's upsetting to them, I think

25   that ought to be viewed as a positive development and

1    responsive to one of the objections that they raised.

2         But in terms of the general appropriateness of

3    granting liens on proceeds of claims, Your Honor hit the

4    nail on the head.  This is what DIP lenders do.  They want

5    to batten down every hatch they can to protect the DIP funds

6    that they're expending, and that's perfectly appropriate.

7    It's done every day of the week.  I heard Mr. Qureshi say,

8    well, you know, the claims could be $300 million dollars

9    here.  How many zeros are on the end of it is irrelevant to

10   the appropriateness of whether the lien on proceeds is

11   granted.  Another thing I would note, Your Honor, is, it's

12   not clear where the claims -- are they at the TopCo or are

13   they at the subs?  So, I mean, that's our to-be-determined

14   issue.  So, we're not taking something from them

15   (indiscernible).

16        THE COURT:  What's your response to the argument

17   that F&Es that are not liable on the pre-petition debt are

18   now guaranteeing their post-petition debt?

19        MR. KIESELSTEIN:  I'd put that in the same

20   battening down the hatches category.  Lenders always -- DIP

21   lenders, I should say --

22        THE COURT:  Well, I understand, but isn't it

23   prejudicial to the creditors of those entities?

24        MR. KIESELSTEIN:  Compared to not having the DIP?

25   I heard them say they prefer conversion.  I don't believe it

1   for a minute, and the question is, if there are entities,

2   why shouldn't they, since the DIP is at the top of the totem

3   pole, why shouldn't they be able to condition it on that?

4   Again, to me, I'd never actually --

5              THE COURT:  They can ask for anything

6   (indiscernible).

7              MR. KIESELSTEIN:  Well, they can ask for anything,

8   and as I said, they don't get a blank check, but they do get

9   what's ordinary and customary.  And to me, what's ordinary

10  and customary is that they can have a lien, or they can have

11  obligors that they didn't have, and they didn't capture, in

12  the pre-petition universe.  Some competing Debtor -- sorry,

13  competing bid wants to come in and say, we'll take only the

14  original obligors and guarantors and we'll leave all the

15  rest aside, fantastic.  That'll be another quiver in the

16  arrow of someone coming together with a higher and better

17  proposal.  But, we've seen no evidence of that.  We're still

18  going to be hunting for it.  You heard Mr. Jamal say we

19  absolutely intend -- and I've told our friends at Mercuria

20  that a turnkey solution that would take them out and give us

21  an exit through a consensual plan of reorganization, for any

22  Debtors' lawyer, that's a better alternative, and if it

23  surfaces, that's fine.  There may be some cost involved, but

24  that's the price of them not getting there right now.

25              THE COURT:  Can a Debtor make a proposal involving

1    a different lender?

2            MR. KIESELSTEIN:  If there's a takeout of the --

3    of Mercuria?  Yes.

4            THE COURT:  Okay, and is that proposal, standing

5    alone, a default under the lending agreements?

6            MR. KIESELSTEIN:  Well, that's another area in

7    which we've modified the order, so, entry of an order, it's

8    sort of metaphysical at that point.  We're not going to do a

9    DIP unless it takes out Mercuria, unless someone comes in on

10   a junior basis with hundreds of millions of dollars, which

11   is possible, but unlikely.

12           THE COURT:  But that would be a default, right?

13           MR. KIESELSTEIN:  I think that would be a default.

14           THE COURT:  And you'd have no money to repay the

15   DIP, and they could come in on three days' notice and seize

16   your assets.

17           MR. KIESELSTEIN:  Suppose, Your Honor, if we're in

18   the -- if we're in the land of junior DIP that's big enough

19   to allow us to operate, but not big enough to take Mercuria,

20   I guess.  I just think that's a very remote contingency,

21   given everything we've seen through the marketing efforts of

22   Mr. Jamal.  So, I think that's a phantasm.

23           So, Your Honor, that's, essentially, the argument

24   we have.  It's the only, therefore it's the best, it's

25   reasonable, the evidence is overwhelming in that regard, the

Page 146

1   rollup is a reflection of real money being injected into the

2   system.  No witness has testified that these items are not

3   reasonable.  I'm sure we'll hear argument from the podium

4   that they're not, but no banker, no turnaround advisor, has

5   said that they aren't.  So, Your Honor, we think, given the

6   circumstances of the company, given the overwhelming nature

7   of the evidence, Your Honor, we would ask you to approve the

8   interim DIP funding as requested, and again, if you're

9   inclined to hear it, we would happily take you through the

10  order and show where we cleaned some things up.

11          THE COURT:  Okay, thank you.

12          MR. QUERSHI:  Thank you, Your Honor.  For the

13  record, Abid Qureshi, Akin Gump, on behalf of the ad hoc

14  bondholder group.  Your Honor, let me just knock out a few

15  of the minor issues.  The absence of their first-day

16  declarant.  We have no idea what his role was or wasn't.

17          THE COURT:  I'm sorry, the absence of what?

18          MR. QUERSHI:  Of the Debtors' first-day declarant,

19  Mr. Baron is not in the courtroom today.

20          THE COURT:  Well, his declaration isn't in

21  evidence, so --

22          MR. QUERSHI:  I don't believe is declaration is in

23  evidence.

24          THE COURT:  It's not.

25          MR. QUERSHI:  Right, and nor should it be, and we

1    had a dialogue with the Debtors' counsel last night and we

2    said we would not waive the requirement that he be in the

3    courtroom.  We may cross-examine him if they chose to call

4    him, they chose not to call him, they chose not to offer his

5    declaration.  Speculation from the podium as to what his

6    role was or wasn't is totally inappropriate and not part of

7    the record.

8            Secondly, Your Honor, as we're sitting here, we

9    are being told that a revised DIP order is in the process of

10   being filed on the docket.  So, it's a little bit like

11   Whack-A-Mole.  We don't know what we're shooting against

12   here.

13           THE COURT:  Do you want to wait to see it?  And

14   you've got to come back tomorrow anyway, and maybe we'll

15   just talk about it tomorrow.

16           MR. QUERSHI:  Right, we, indeed, will.  There's no

17   way of doing that today, but Your Honor, I think it goes to

18   a point that the Court raised, which is, this is an

19   emergency hearing, so we should be doing the minimum

20   necessary to get to a final hearing, where everybody, given

21   the stakes here, with an appropriate amount of time, and

22   with the oversight of a statutory Creditors' Committee, can

23   give this DIP and all of its provisions proper scrutiny.

24   Now, Your Honor, I'm not going to dwell on the record with

25   respect the pre-petition process.  Suffice to say, there is

1    evidence in the record, principally in the form of the odd

2    confidentiality agreement prohibiting --

3            THE COURT:  You say it's odd.  Nobody's testified

4    as to the general practice that it's odd or not odd.

5            MR. QUERSHI:  Fair enough, but Your Honor can

6    certainly look at the provision and conclude that not having

7    a competitor of the finance provider being permitted to sign

8    a confidentiality agreement would have a certain effect on

9    who's going to show up.  But regardless, Your Honor --

10           THE COURT:  I don't know if it would.

11           MR. QUERSHI:  -- I think the more important point

12   is, now that the company has filed, now that there is a

13   transparent process, now that there is oversight by this

14   Court, and let's not forget that this is an insider DIP, and

15   that is important.  So, now that we're in Court, Your Honor,

16   we've received inbounds, multiple inbounds, from parties who

17   profess to be willing to provide DIP financing on better

18   terms.  Will that turn into something?  I don't know.  I

19   have no idea.  I'm certainly not suggesting --

20           THE COURT:  But I'm being told that the interim

21   order, in whatever form it takes, won't preclude that.

22           MR. QUERSHI:  Well, that, I suppose, remains to be

23   seen because we don't know what is being changed and what is

24   not being changed, but that gets back to the point, which is

25   an interim order, let's do absolutely the minimum necessary.

1    Now, if I could, turn to the rollup.  So, what's the record?

2    The record is that $330 million dollars today is a rollup.

3    That's not new money.  That is being rolled up.  It's an

4    existing commitment.  Now, Your Honor, if this were -- if

5    the pre-petition loan here were -- if what the pre-petition

6    lender had was a claim on all assets of the company on

7    everything, then, in connection with the DIP, given that

8    lender liens on everything, I think that, arguably, would be

9    appropriate.  But Your Honor, what's impermissible, we say,

10   in the context of a rollup, is to take a pre-petition claim

11   that's assertable only against one group of entities, and

12   now make that same claim as a result of the rollup,

13   assertable against that group and against additional

14   entities.  There is just no legal basis for it.

15          Your Honor, those entities that are becoming

16   obligors on the DIP as a result of the rollup, they're

17   getting nothing in return.  It's a fraudulent conveyance,

18   among other things.  But they're getting no benefit from it,

19   and the pre-petition rights of the secured creditor are

20   being expanded in connection with no new money being made

21   available.  So, the rollup is absolutely not permissible.

22          Now, Your Honor, with respect cash collateral and

23   adequate protection, the argument is exactly the same.

24   Mercuria is entitled to adequate protection from entities

25   that are already obligors.  No question about that.  We

```
1    don't take issue with that.  Now, Your Honor, there is also

2    evidence now in the record as to what the funding need is,

3    and what the funding need is, is $18 million dollars, if we

4    exclude payments that would otherwise be (indiscernible)

5              THE COURT:  Well, as I said, I guess, four hours

6    ago, at this point, it's not just the new term loan, but

7    it's the money that's being collected to pay down the old

8    loan, which is a form of adequate protection, I suppose, and

9    then being re-lent.

10             MR. QUERSHI:  Right, and so --

11             THE COURT:  Re-loaned.

12             MR. QUERSHI:  -- and so, what the right outcome

13   would be, Your Honor, is for there to be the $18 million

14   dollars of new money that's actually needed, combined with

15   the use of cash collateral.

16             THE COURT:  Do you object to the notion that, as

17   the old loan is being paid down with the cash collateral,

18   that it's then being re-lent as new money?

19             MR. QUERSHI:  Yeah, I don't think that's the right

20   way to look at it, but --

21             THE COURT:  What's the economic difference,

22   though?

23             MR. QUERSHI:  Well, the economic difference, Your

24   Honor, is, what is being pledged in connection with the DIP,

25   right?  If it's treated as -- this is functionally the use
```

1    of cash collateral.  And what the court should do here is

2    enter an order allowing the Debtors to use cash collateral

3    between now and the final hearing.

4            THE COURT:  Yeah, it's not consensual, though.  I

5    would have to have a hearing on that.

6            MR. QUERSHI:  I think that's correct.  I think if

7    Your Honor says that the DIP order, as presented to the

8    Court, is not something that the Court is prepared to

9    approve, my suspicion is, the Debtors would be back seeking

10   the non-consensual use of cash collateral.  And so, the pre-

11   petition liens and the adequate protection liens, in that

12   case, Your Honor, would attach to the proceeds of their

13   collateral under 552, and that would put them in exactly the

14   same position as the rollup would, but with two exceptions.

15   One is that those claims would not extend -- or would not be

16   elevated, I should say, to post-petition administrative

17   expense claims that have to be paid in full in cash under a

18   plan, and secondly, those claims would remain at the

19   entities that were obligated on the debt pre-petition.

20           THE COURT:  But in terms of the economic

21   difference, and putting aside the entities, they still --

22   whether they are pre-petition secured or administrative

23   claims, they still have to be paid in full under a plan.  I

24   realize you can stretch out a pre-petition secured claim,

25   and possibly cram it down, but you're still paying the full

1    amount, or you have to pay the full amount under a plan,

2    don't you?

3            MR. QUERSHI:  Well, but, Your Honor, if there is

4    unencumbered value at the entities that are now being

5    pledged, or whose assets, I should say, are now being

6    pledged in connection with the rollup, then that's a

7    potential harm to unsecured creditors.  The other issue with

8    the rollup, Your Honor, is it prevents those term lenders

9    from being crammed down, because now they're --

10           THE COURT:  That I understand, they become

11    administrative debt.

12           MR. QUERSHI:  Right, because it becomes

13    administrative debt, so that's another prejudice.  So, all,

14    again, Your Honor, going back to the point that this is not

15    the type of relief that's appropriate at an interim hearing.

16    And so, let's figure out a way to get to a final hearing,

17    whether it's in 14 days or 21 days or 30 days, that doesn't

18    cause this kind of prejudice.  And it seems to me, there's a

19    way to do that here.  A limited amount of new funding, and

20    we have no issue with appropriate fees being granted in

21    connection with the amount of actual new liquidity that

22    these Debtors need, it's not about the fees.  We have no

23    issue with fees on new liquidity being extended.

24           And Your Honor, I want to come back to the

25    liquidation point.  And the liquidation point, I think, is

1    relevant for this reason.  This DIP lender is doing what so

2    many DIP lenders do, which is, effectively, playing chicken

3    with the Court and saying, I won't lend unless I get all of

4    these bells and whistles today, that I'm looking for.   I

5    won't do it, I'm the only game in town, those are the words

6    you heard from Mercuria's counsel.  And Your Honor, the

7    evidence is that no analysis has been done on liquidation.

8    Yes, it's true that if there was a liquidation, there would

9    be claims against operating entities.  We have no idea what

10   those claims would be.  The Debtors apparently don't know

11   what those claims would be, don't know the extent to which

12   those claims could recover against what collateral those --

13   or what assets those claims could recover.  Those things are

14   all unknown.

15          So, I raised it because, Your Honor, the DIP

16   lender here playing chicken, that's not a threat that when

17   the creditors are standing before Your Honor saying, as

18   between this DIP loan in the form of the order in which it

19   was originally filed, and converting to Chapter 7, unsecured

20   creditors are better off with the conversion to Chapter 7, I

21   think that tells Your Honor a lot about the credibility of

22   the threat that this pre-petition insider, with all sorts of

23   secured claims, is going to walk away over some sort of a

24   construct that bridges us to a final hearing two weeks from

25   now.  It's just not a credible threat, and with that, unless

1    the Court has questions, I'm done, other than, of course,

2    reserving the right to have an appropriate amount of time to

3    look at whatever revised orders are being placed on the

4    docket.

5              THE COURT:  Okay.

6              MR. QUERSHI:  Thank you.

7              MR. SOMERSTEIN:  Evening, Your Honor, Mark

8    Somerstein, Ropes & Grey for Deutsche Bank Trust Company,

9    Americas.  Your Honor, Deutsche Bank Trust Company,

10   Americas, is the indentured Trustee on the note -- the

11   convertible note, the 4 percent convertible notes that

12   matured in November.  We -- I stand for -- well, I want to

13   confer with the ad hoc group on one point but also just to

14   make sure that our client's rights are reserved with respect

15   to any form of new order, we have an opportunity to review.

16   But I would like to confer with the ad hoc group, I may have

17   a point, Your Honor.

18             THE COURT:  Okay.  Couldn't you have done that

19   before?

20             (LAUGHTER IN THE COURTROOM)

21             MR. SOMERSTEIN:  I think Mr. is going to address

22   another point.

23             THE COURT:  He's going to address your point.

24             (LAUGHTER IN THE COURTROOM)

25             THE COURT:  And then you'll respond to Mr.

1   Qureshi.  This is like a Woody Allen movie.

2         MR. QUERSHI:  Again, for the record, Adam Qureshi.

3   Mr. Somerstein reminded me, I did neglect to come back to

4   one point, which I did mention at the outset, which is the

5   good faith finding.  We have cited case law, Your Honor, in

6   our papers, that it is the insider, not the Debtor, not some

7   other witness, but the insider who must prove the good faith

8   of the transaction, who must show the inherent fairness of

9   the transaction from the viewpoint of the corporation and

10   those with interest in it.  There is no evidence in this

11   record whatsoever from the insider.  We cite in our papers

12   the Papercraft decision from the District Court, the Western

13   District of Pennsylvania, 211 B.R. 813.  In light of the

14   complete lack of any evidence, we certainly do not think

15   that what is in the record from the Debtors, from Mr. Jamal

16   saying really, without foundation, that he believes that

17   Mercuria acted in good faith does not satisfy that burden.

18   We do not think, at the interim stage, that a good faith

19   finding is appropriate.  Thank you.

20         THE COURT:  Mr. Somerstein, do you want to

21   respond?

22         (indiscernible)

23         MR. SOMERSTEIN:  No, Your Honor.

24         THE COURT:  Good, thank you.  Next.

25         MR. STRUBECK:  Your Honor, again, for the record,

1    Louis Strubeck of Norton Rose Fulbright on behalf of

2    Mercuria.  You heard what amounted to a lot of argument from

3    me in my opening statement, so I'm going to be very brief

4    and I know -- I'm mindful of the time, and we have about 15

5    minutes before we've got to conclude.

6           Let me address a couple things that have been

7    said, and first, it comes as no surprise that I agree with

8    everything that Mr. Kieselstein had to say about this

9    characterization of the evidence.  I think the evidence was

10   overwhelmingly in favor of this DIP proposal, and I disagree

11   with the bondholder's counsel in terms of, this is a

12   situation where the relief that's been asked for in the

13   interim basis needs to be granted.  The company gave you the

14   rationale for why that is.  The discussion, the continued

15   discussion, about the rollup, I frankly, just don't

16   understand it, because a rollup like this, and we're not

17   trying to rollup a (indiscernible) here, a rollup like this

18   where you have a revolver is something that is common in

19   just about every case that I see these days.

20           THE COURT:  Let me ask you something.  Suppose

21   that there's this rollup of, I don't know what the number

22   is, $300 million dollars to 50 percent, instead of that, you

23   just have the creeping rollup and in two weeks, somebody

24   else comes in and no further money is borrowed.  At that

25   point, the administrative claim is only, under the order,

1    only the creeping rollup, and not the additional $300

2    million dollars.  And isn't that the potential injuries of

3    the estate?

4            MR. STRUBECK:  That's what the order provides for,

5    Your Honor, and we've asked for an addition for the creeping

6    rollup, for extra protection, we've asked for the rollup of

7    50 percent.  I understand your question.

8            THE COURT:  I understand, but if it turns out, in

9    two weeks, 30 days, whatever it is, you've only actually

10   loaned, let's just pick a number, $100 million dollars under

11   the creeping rollup, and then the interim DIP is essentially

12   terminated because somebody else comes in, the Debtor has

13   assumed a lot more administrative debt, far in excess of the

14   new money it actually got, and that's the problem.

15           MR. STRUBECK:  Yeah, I understand the problem --

16           THE COURT:  In addition to the fees that are being

17   charged on it.

18           MR. STRUBECK:  Yeah, I mean, the fees, of course,

19   that's the subject of some separate comments, but I

20   understand the problem, and the only thing I would say on

21   that is, I don't think the situation is really any different

22   from other cases, including one that I was involved in, in

23   front of Your Honor is on Edison where there was a

24   significant rollup that was approved on an interim basis,

25   that was multiples of the actual funds that were being

Page 158

1    advanced.  So, I would tell the Court that I don't see any

2    reason to distinguish this from that case.  I'd also --

3         THE COURT:  Except I have very specific objection

4    this time.

5         MR. STRUBECK:  Understood.  I'd also point out,

6    Your Honor, that the notion that, somehow, this requirement

7    --

8         THE COURT:  I think Akin was looking for the

9    rollup in that case.

10        MR. STRUBECK:  Well, they were looking for the --

11        THE COURT:  They represented the second lien

12   lenders that time.

13        MR. STRUBECK:  There was a second lien lender

14   (indiscernible) that.

15        THE COURT:  That was another day.

16        MR. STRUBECK:  Your Honor, (indiscernible) that

17   point, they have offered absolutely no evidence, as I said

18   in my opening remarks, they wouldn't, in connection with the

19   objection that they filed.  And so, to the extent of this

20   attack of the good faith finding of the transaction, I

21   disagree with this characterization of the law, number one.

22   I think it would have been their burden to demonstrate there

23   were issues with that.  They didn't.  We heard that there

24   was a unanimous Board approval of the DIP facility.  I don't

25   really think that there's any merit to that claim.

1          A couple other things real quickly before --

2          THE COURT:  Don't you -- well, okay.

3          MR. STRUBECK:  Sorry.

4          THE COURT:  No, go ahead.

5          MR. STRUBECK:  A couple other real quick things

6     before I cede the podium, Your Honor.  I think it's very

7     telling that no one from PJT was here to try to provide a

8     contrary view of some of the things that are happening under

9     the DIP, including the payment of fees, and you saw the

10    chart that was provided by the Debtors that show that the

11    fees that are actually being requested under this DIP are

12    less than the ones that were being sought, at least under

13    the construct --

14          THE COURT:  They're not arguing about the fees,

15    per se.  They're saying that you don't need to pay all those

16    fees for what you're getting.

17          MR. STRUBECK:  And the last point that I'll make,

18    Your Honor, is that this -- your approval of this interim

19    DIP today doesn't, as Mr. Kieselstein pointed out, preclude

20    somebody else from coming in.  The fact of the matter is,

21    this has been fully vetted by Moelis, who does this for a

22    living.  Mr. Jamal does this for a living.  And this is a

23    unique situation, Judge.  There's a reason why you asked

24    earlier, would it be any different if Citi came in here and

25    provided this type of facility.  Well, they can't do it.

1    There's a lot of different aspects to this, and it's not

2    just the financing that's being provided, and the

3    availability.  And you also heard testimony about what a

4    generous lender Mercuria was before the filing.

5            But you also have other aspects of this, for

6    example, the sleeving that you heard so much about earlier

7    on, and it's not unique, Judge, just to this situation.

8    It's something within this industry that happens. But there

9    are very few parties that are in a position to be able to

10   provide that kind of sleeving accommodation, and we have

11   provided it, and we will continue to provide it in

12   connection with this DIP facility, if the DIP facility is

13   approved.

14           THE COURT:  What's the evidence in the record that

15   the new guarantor is getting any benefit from this?

16           MR. STRUBECK:  Mr. Kieselstein's statement about

17   how they're going to be dependent upon --

18           (LAUGHTER IN THE COURTROOM)

19           THE COURT:  You just answered the question.

20           MR. STRUBECK:  (indiscernible) because I --

21           MR. KIESELSTEIN:  Thank you for the promotion.

22           MR. STRUBECK:  You're welcome.  Your Honor, I

23   think it's implicit in the testimony, if we go that route.

24           THE COURT:  I don't know anything about these

25   businesses.

1           MR. STRUBECK:  Well, I think these businesses are

2     dependent upon having access to funds.  That -- and so, even

3     -- yeah, so that's my point on that, Your Honor.  And so,

4     anyway, I would echo Mr. Kieselstein's remarks that this

5     facility be approved as it's been requested, and I think

6     there's ample evidence to support it.

7           THE COURT:  Okay.

8           MR. STRUBECK:  Thank you.

9           THE COURT:  Anyone else?

10          MR. GREISSMAN:  Good evening, Your Honor, Scott

11    Greissman, White & Case for Aegean Baltic Bank, as agent for

12    itself and HSH (indiscernible).  We are agent on four credit

13    facilities with an original amount of about $165 million

14    dollars with liens on more than half of the --

15    (indiscernible) half of our assets, which are critical for

16    the Debtors' continued operations.  Just wanted to provide

17    some perspective.  The idea that creditors as a whole would

18    benefit from a liquidation or from continued instability,

19    that would inevitably follow denial of financing, is, I

20    think, not entirely correct.  In fact, we, as the hard asset

21    lenders, would probably have the most to lose under those

22    circumstances, and we urge the Court to approve the

23    financing.  Thank you.

24          THE COURT:  Thank you.

25          MR. EVELYN:  Good evening, Your Honor, Michael

1  Evelyn from Better Price.  We represent the National Bank of

2  Greece.  We are --

3        THE COURT:  What's your interest in the --

4        (LAUGHTER IN THE COURTROOM)

5        MR. EVELYN:  We are a lender under a facility that

6  has a couple of vessels that provide -- who lent money to

7  the Debtors, and those vessels brought collateral.  We

8  worked -- the Debtors have worked diligently with us, and we

9  are providing junior liens on our collateral, and the

10  Debtors have -- and we have reached an agreement on the

11  adequate protection that's being provided.  We'd like to

12  commend the Debtors for, in very short order, reaching out

13  to us and obtaining the agreements in a cooperative manner,

14  and would like to indicate our full support for the DIP

15  financing.  We also believe that the going concern of these

16  Debtors is better for all creditors, including my clients.

17  Thank you.

18        THE COURT:  Okay, well, that's at least 150 years

19  of thinking and reorganization.

20        (LAUGHTER IN THE COURTROOM)

21        THE COURT:  So, you're on firm ground on that one.

22  Nobody else?  Very briefly.

23        MR. KIESELSTEIN:  Your Honor, excuse me

24  (indiscernible).  Although it's against my nature, Your

25  Honor, I will be very brief.  Who's playing chicken here?

Page 163

1    It is this group of creditors up at the TopCo, without

2    regard to the interests of creditors at all these other

3    entities who would be crushed in a liquidation.  What we're

4    being asked to -- what they're asking to play chicken with

5    is a non-consensual motion for use of cash collateral so

6    they can preserve the right to somebody cram down the

7    secured creditors here for a company that's operationally

8    not yet profitable with a thin ribbon of equity in terms of

9    the loan versus the borrowing base assets.  That's a recipe

10   for a loss on top of a loss while the company burns.  I'd

11   also note, there is no, as far as I'm aware in the

12   Bankruptcy Code, motion for non-consensual forced sleeving,

13   right?

14            THE COURT:  Well, it's like a form of finance.

15            MR. KIESELSTEIN:  But they don't have to do it,

16   Your Honor.

17            THE COURT:  I understand, they don't have to lend

18   the money in the first place.

19            MR. KIESELSTEIN:  They don't have to lend the

20   money.

21            THE COURT:  So, it's part of a lending package.

22            MR. KIESELSTEIN:  It's part of the lending package

23   that is unique to Mercuria, and that is not something that

24   another lender could replicate, because of their -- and you

25   heard that testimony from Mr. Jamal, I won't indulge in

Page 164

1   further, only in testifying, I think Mr. Qureshi and I have

2   both been probably a little bit guilty of that.  In terms of

3   --

4           (LAUGHTER IN THE COURTROOM)

5           THE COURT:  But you have the burden of proof

6   (indiscernible).

7           MR. KIESELSTEIN:  You're the Judge.  So, in terms

8   of this -- the rollup amount, the $330, I think there's

9   actually a little bit of double counting in there, because

10  the creeping is going to deal with the same sort of ABL that

11  is getting rolled up, so I don't actually think that's the

12  right number, but it's a considerable amount of rollup, we

13  don't dispute that, in exchange for a considerable amount of

14  liquidity.  Fair trade, ABL versus term, that's why this is

15  done.  In terms of the additional obligors, I might remind

16  the Court that Mr. Qureshi's clients have no claims against

17  any of these obligors.  It's more value to them to step into

18  (indiscernible).

19          THE COURT:  How much notice did the creditors of

20  the additional obligors have with this proceeding and of

21  this filing?  This case was filed basically yesterday.

22          MR. KIESELSTEIN:  Understood, Your Honor.

23          THE COURT:  It was 692 pages worth of

24  documentation on this particular transaction alone, not

25  counting the declarations --

1          MR. KIESELSTEIN:  That's what our profession has

2     come to.  I agree with that, Your Honor.

3          THE COURT:  Well, and there's an issue of notice

4     here.

5          MR. KIESELSTEIN:  I understand.  You did have a

6     couple of creditors of other entities come up here and say,

7     my god, the idea of a liquidation is a horrendous scenario

8     (indiscernible).

9          THE COURT:  And I have most of the unsecured debts

10    saying it's preferable.

11         MR. KIESELSTEIN:  Most of the unsecured debt at

12    the TopCo, Your Honor.

13         THE COURT:  Okay, well.

14         MR. KIESELSTEIN:  The TopCo, I mean, we've got

15    findings about structural seniority and subordination and

16    (indiscernible) creditor disputes in practically every case.

17    So, the TopCo creditors putting on the mantle of the

18    subsidiary creditors I think we have to look at with a grain

19    of salt, a large grain of salt, Your Honor.  And I would

20    note that the relief, which is not before you today, but

21    includes the vendor motion, would actually pay a huge slug

22    of the amounts owed because we're worried about people not

23    recognizing the stay and they have 503(b)9 claims, and

24    things of that nature.  That all goes by the wayside if we

25    don't get a DIP, so that's empirical, Your Honor, that's not

Page 166

1    sort of subjective.  So, what I would say is, it's a narrow

2    slice of the capital structure, it's an important

3    constituency, we talk to them all the time, we respect their

4    advisors, but they don't speak for the rest of the capital

5    structure.  They shouldn't be heard, even though notice has

6    been thin, we shouldn't assume other people would be in the

7    same position with them.  In fact, I think that would be

8    averting the notice (indiscernible) discussed with them.

9    You're assuming they're in concert with the views of the

10   TopCo creditors, but they're not.

11            THE COURT:  I don't know what their views are,

12   that's --

13            MR. KIESELSTEIN:  Well, we've heard from a few of

14   them, and we know the relief we're seeking will benefit

15   them, right?

16            THE COURT:  But they're secured creditors.  They

17   want the preservation of their collateral.

18            MR. KIESELSTEIN:  I'm talking about vendors at the

19   subsidiary level, Your Honor.  Our motions tomorrow will

20   deal with those, if we're fortunate enough to live that

21   long.

22            THE COURT:  Okay.

23            MR. KIESELSTEIN:  So, Your Honor, that's our view,

24   and again, we would ask that Your Honor enter the form of

25   relief we're seeking, and again, Ms. Pirro, who I have been

Page 167

1    holding at bay, has the DIP order changes to the essential

2    elements (indiscernible).

3            THE COURT:  She's going to have to be held at bay

4    longer because it's 6:00.

5            MR. KIESELSTEIN:  That it is.

6            THE COURT:  So, we're adjourned until 10:30.

7    We'll go through the DIP order.  I have a lot of problems

8    with the deal and the DIP order.  We can go through them

9    tomorrow, but I'll hear the changes, if you can circulate

10   black line copies before, then that would be helpful.

11           MR. KIESELSTEIN:  Of course.

12           THE COURT:  I don't know how much it's going to

13   change anything, but...

14           MR. KIESELSTEIN:  Well, I think we'll --

15   hopefully, we'll have addressed many of your concerns.

16           THE COURT:  All right.

17           MR. KIESELSTEIN:  Thank you so much, Your Honor.

18           THE COURT:  Okay, see you tomorrow, 10:30.

19       (Whereupon these proceedings were concluded at 5:57 PM)

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 9, 2018

[& - 5]                                                                                          Page 1

## &

**&**   3:3,15 4:1,9 5:8
5:15 19:14 28:18
58:7 81:3 86:14
107:16 108:2
125:23 127:8,13
154:8 161:11

## 0

**0.10**   57:24

## 1

**1**   12:5 14:10 33:7
60:7,8,22 85:12
91:8,11
**1,000**   16:17
**1.5**   121:7
**10**   32:19 96:19
97:20 98:20 140:1
**100**   20:7 140:1
157:10
**1000**   122:19
**10004**   1:14
**10005**   5:10
**10019**   4:5,20
**10020**   4:13
**10036**   3:18 5:19
**105**   2:2
**10:30**   167:6,18
**11**   2:2 12:12 14:4
16:25 18:18 24:3
45:4,6 66:4 77:13
97:17,20 98:13
110:11,13 119:7
**11501**   168:23
**12**   14:19 93:3,10
105:13
**1211**   5:18
**1221**   4:12
**125**   121:18,19
**13**   15:18 92:11,17
92:20,21,24 93:2
**13,000**   92:17

**130**   22:11
**1301**   4:19
**139**   97:14
**14**   15:21 83:14
152:17
**15**   15:24 45:4
156:4
**150**   162:18
**150.3**   97:5
**152**   35:6
**16**   16:11 48:6
61:18 73:1 83:14
**160**   20:2
**165**   161:13
**17**   16:20
**175**   116:21 121:17
121:20,21
**18**   17:18,23 29:6
29:18 42:17,19
44:7 93:11 100:13
108:10 150:3,13
**18-13374**   1:3
**19**   48:15 72:23
92:11
**1995**   11:7
**1:59**   1:17
**1st**   113:2

## 2

**2**   87:5
**2.5**   121:7
**20**   11:8 65:9,10,11
**200**   13:6,23 63:23
89:8,14
**2004**   16:12
**2008**   86:11 108:5
**2017**   12:18 16:19
**2018**   1:16 12:5,19
13:23 14:3 15:17
15:20,25 28:22
63:20 93:10 94:12
99:21,24 102:15
108:20 168:25

**2019**   87:6
**2021**   12:6 28:22
**21**   18:10 97:21
104:22 152:17
**211**   155:13
**215**   75:9
**22**   48:6
**2200**   5:3
**23rd**   102:18 103:2
103:3
**24**   25:13 105:14
110:24 112:5
**241**   96:15
**25**   20:13 21:15
59:11 132:17
**250**   22:10
**251.6**   96:10
**25th**   99:10,21
100:8 102:15,16
**26**   34:25 44:13
**27**   16:17
**271**   46:5
**275**   78:24
**28**   5:9 75:5
**28th**   132:3
**29th**   99:23 100:15
101:17
**2:00**   9:13

## 3

**3**   75:25 86:22
91:10,11,16,18
92:15
**3.1**   16:18
**30**   17:3,11 29:4,21
32:20 41:15 42:18
44:7 62:8,9 64:16
69:1 76:18 92:4,7
92:8 93:9 135:8
135:11,15 136:6
138:5 140:25
141:1,9 152:17
157:9

**300**   3:5 20:1,6
38:10 39:5 121:13
143:8 156:22
157:1 168:22
**30th**   99:24 100:18
101:22
**31**   94:12
**31st**   77:7
**325**   78:25 116:24
**326th**   132:3
**330**   130:4 149:2
164:8 168:21
**3300**   6:4
**35**   67:11
**350**   122:14
**36**   48:1,17 60:25
92:3,5
**3600**   5:3
**361**   2:2
**362**   2:2
**363**   2:2 56:19
**364**   2:2 26:3 41:1
**38**   16:16
**380**   22:8 35:9,14

## 4

**4**   13:23 79:20
83:13,14 94:6
103:24 154:11
**40**   13:3 20:4,12
21:18 26:1 47:21
47:22 48:1,2,18
60:25 116:22
**430**   27:17
**45**   22:7 61:20
140:25,25 141:1
**450**   16:19
**455**   45:5
**460**   22:9 27:17
**4th**   105:22,23

## 5

**5**   32:14 99:16,19
99:20 100:6,7,23
101:11 120:6,8,10

120:11,14,19
**50**  11:1 27:10 33:5
35:11,15 61:20
67:11 130:10,15
141:15 156:22
157:7
**500**  14:10 39:22
**503**  2:3 165:23
**506**  47:4
**507**  2:3
**532**  35:4
**552**  151:13
**55402**  6:6
**56**  10:24
**593**  91:23
**596**  92:15
**5:57**  167:19

**6**

**6**  55:4,17 99:16,19
99:21 100:23
101:17 118:14,15
118:17,21 119:3
**6.8**  30:1
**60**  22:7 34:22
52:25 53:25 124:9
124:13 141:1
**60654**  3:6
**60th**  53:23,23
**61**  30:4
**650**  122:17
**692**  91:23 164:23
**6:00**  167:4

**7**

**7**  1:16 47:25 48:17
55:18 57:22 60:20
60:25 61:16 92:5
99:9,16,19,23
100:18,23 101:22
153:19,20
**72**  20:3
**74**  28:22
**75**  41:16

**75201**  5:4
**77**  46:6
**787**  4:4

**8**

**8**  83:15 99:9
**813**  155:13
**850**  11:8
**875**  122:18

**9**

**9**  92:10 99:9
105:15 112:6
165:23 168:25
**90**  6:5 83:13
**91**  84:25

**a**

**ab**  60:22 92:18
**abid**  3:20 28:18
146:13
**ability**  56:25 61:7
64:22 66:13 82:14
82:22 83:25 90:19
109:19 132:6
**abl**  20:1,2,21 21:5
22:7 24:16 28:6
45:16,16 61:2,5
61:14,22 63:8,10
64:22,25 65:11,21
65:23 66:6 67:15
93:14,17 95:23
96:20 97:9,15,18
121:6,8,8,13,15
122:6,8,14 124:5
124:12 129:25
130:19 139:24
140:4,7,19,20
141:16 164:10,14
**able**  25:9 27:8
34:8,15 46:24
50:19 55:25 56:6
74:25,25 78:15
94:17 134:6
142:12 144:3

160:9
**abls**  20:8 97:22
124:1
**abn**  4:2,2 71:11
71:22
**abn's**  72:11
**absence**  27:9
141:22,22 146:15
146:17
**absent**  36:6
**absolute**  131:16
131:21
**absolutely**  82:21
82:23 84:20
119:18 129:8
144:19 148:25
149:21 158:17
**accelerate**  45:10
**accelerates**  14:5
**accept**  120:2
**acceptable**  41:15
**accepting**  137:24
**access**  19:23 20:4
20:9,15 27:5
64:22 111:6 134:6
161:2
**accesses**  20:14
**accommodation**
160:10
**accommodations**
65:25
**account**  35:24
37:15 94:3
**accounting**  12:20
27:12 104:10
**accounts**  13:24
14:25 15:13 18:4
20:17 21:2,22
22:6 35:19 46:5
72:3 140:24
**accurate**  73:3
76:10 168:4

**achieve**  45:10
114:25
**achieved**  33:16
**acquire**  41:22
61:25 64:23
**acquired**  51:5
**acquisition**  12:24
13:1
**acquisitions**  108:4
**acted**  155:17
**action**  34:16 79:8
89:13,18
**actionable**  22:24
115:8 120:2
142:10
**actions**  47:4
**actual**  35:6
104:21 152:21
157:25
**ad**  3:16 10:2,8
12:7 17:15 28:20
28:21 47:17,23
49:16,20 54:9
55:4,18 57:17,20
66:16 67:3 70:16
72:24 73:3,8,23
75:7 78:8 81:4
85:17 87:13,17
120:22 146:13
154:13,16
**adam**  3:8 6:24 8:4
155:2
**adams**  50:20
**add**  43:17 93:15
141:15
**addition**  63:13
68:22,24 111:22
157:5,16
**additional**  15:12
29:14,18 52:16
62:17 68:22 74:22
90:23 104:22
109:21 119:13,14

149:13 157:1
164:15,20
**additionally**
64:20 71:23 74:24
**address** 10:14
14:16 15:22 24:11
28:24 35:2 48:25
113:23 154:21,23
156:6
**addressed** 47:15
55:22 133:25
167:15
**adequate** 2:7
19:18 24:18,22
29:9,10,19 37:10
37:10,13,15,20
40:11,12 43:3
149:23,24 150:8
151:11 162:11
**adequately** 21:8
**adjourned** 167:6
**adjustment** 26:22
**administrative**
2:5 37:5 151:16
151:22 152:11,13
156:25 157:13
**admit** 100:22
**admitted** 85:15
87:8
**advance** 26:13
92:12 93:4,14
95:25 96:22 105:8
105:9,11 119:14
**advanced** 26:1
74:14,21 158:1
**advances** 26:15
140:7
**advantage** 32:25
56:24 73:14
**adversary** 34:23
**advice** 73:12
**advise** 116:10

**advised** 48:16
73:2 138:18
**advisor** 8:9 62:22
81:14,18 88:11
102:13 146:4
**advisors** 8:18 9:25
17:24 41:8 66:15
66:22 73:7,8
75:16 78:8 106:1
106:3 109:8
112:18 113:4
117:13 127:8
166:4
**aegean** 1:7 4:10
8:3 10:18,22 11:3
11:6,12 13:12
14:11 15:22,23,24
17:3,18 30:22,23
62:21,22,24 68:5
69:25 70:12 72:20
72:24 74:6,8
78:19 81:15,18
82:6 86:3,11
111:4 112:9,11
122:23 161:11
**aegean's** 11:18
12:17,25 14:1
64:13 82:9
**affect** 65:4 109:19
**affiliate** 38:11
**affiliates** 86:24
**afraid** 52:21
**afternoon** 8:2,4
19:13 28:17 44:22
58:6 59:3 80:24
81:6,7 126:2
131:11
**agencies** 18:7
**agent** 4:10 71:22
161:11,12
**aggregate** 60:24
**aggregated** 61:17

**aggressive** 41:14
**ago** 25:13 82:13
150:6
**agree** 29:12 43:1
49:23 50:2 52:17
97:20 115:22
124:18 156:7
165:2
**agreeable** 47:6
**agreed** 45:3 75:7
124:19
**agreement** 23:5
33:22 34:9 57:3
70:13,15 86:6
105:16 106:19
111:5 148:2,8
162:10
**agreements** 11:20
23:6 25:1,12
33:22 38:1 96:1
112:6 145:5
162:13
**ahead** 19:11 22:13
23:18 44:21 49:12
54:1 55:10 62:20
94:4 102:24
103:14,16 107:10
133:18 135:25
139:15 159:4
**airlines** 108:17
**akin** 3:15 28:18
81:3 125:23
146:13 158:8
**albeit** 11:19
**aleris** 108:15
**alexander** 5:13
**alfonso** 4:7
**allegations** 10:1
**allegedly** 48:22
**allen** 155:1
**allow** 66:10 116:3
145:19

**allowed** 43:9
**allowing** 151:2
**allows** 115:12
**alluded** 52:11
**allusions** 23:22
**alternative** 22:18
23:7 27:22 87:15
111:1 116:13
120:2 125:12
132:2 144:22
**alternatively** 66:3
**alternatives** 81:12
131:21,24
**american** 108:17
**americas** 4:12,19
5:16,18 154:9,10
**amount** 11:14
20:1,2 26:14 28:7
35:25 40:19 44:8
60:24 61:12,13,14
65:7 67:10 69:17
71:17 79:17 96:2
113:3 116:21,22
119:12 123:18
147:21 152:1,1,19
152:21 154:2
161:13 164:8,12
164:13
**amounted** 156:2
**amounts** 45:18
46:13,19,20 95:9
95:12 165:22
**ample** 161:6
**amro** 4:2,2 71:11
71:22
**ana** 4:7 6:19,23
**analysis** 43:25
89:20 90:11,12,14
113:15 126:10,14
126:16,22,24
127:3,9,12 132:17
153:7

andrew  8:9 58:19
  59:1 60:9 80:22
  103:17
angelo  7:3
announced  38:10
announcement
  13:23,25 63:21
answer  10:12 22:3
  29:1 39:13 45:20
  48:12 54:1 56:15
  85:4 100:21 118:9
answered  83:9,22
  127:14 160:19
answering  23:17
  59:18
answers  18:8 64:4
  83:4
anybody  25:13
  28:15 44:1 67:17
  103:11 112:8,11
  131:9 132:9
anymore  103:22
  105:1
anyway  85:11
  147:14 161:4
apparently  48:20
  153:10
appear  106:1
appearance  57:10
appearing  6:10
  8:5
application  53:22
  56:10
applies  47:11,12
  95:25
apply  137:19,19
appointed  17:12
  17:19 18:22 42:9
appreciate  11:21
  94:13
approach  10:7
  58:12 59:20 85:18
  94:7 102:23

103:23 105:18
appropriate  19:1
  24:16 36:2 41:1
  45:21 71:25 133:5
  134:21,25 135:4
  137:23 138:15
  143:6 147:21
  149:9 152:15,20
  154:2 155:19
appropriateness
  143:2,10
approval  18:11,13
  18:14 19:18 36:2
  50:12 122:3
  158:24 159:18
approve  25:4,5,12
  25:16 42:13 50:7
  50:16 71:23 146:7
  151:9 161:22
approved  25:1
  26:2 36:4,7 41:13
  41:16,18 43:15
  46:22 55:5 71:19
  72:14 82:11
  123:17 125:4
  132:14 157:24
  160:13 161:5
approves  71:24
approximately
  14:10 16:19 29:18
  41:15 44:7 59:11
  61:18,20 65:9
  67:10 75:9 92:3
  96:9,19 97:5,14
  108:10 124:13
  141:2
april  62:25 65:8
  65:21 81:11
area  98:4 145:6
arguably  34:6
  38:21 149:8
argue  87:10
  127:17

arguing  39:9
  131:22 159:14
argument  85:8
  104:24 132:24
  133:1 139:19
  143:16 145:23
  146:3 149:23
  156:2
argumentative
  88:16
arguments  131:10
arisen  34:19 47:9
arrangement
  69:21
arrived  63:2
arrow  144:16
ashley  4:22
aside  31:6 144:15
  151:21
asked  29:2,22
  45:14 47:19 51:13
  57:18 64:2 83:3
  83:19,22 84:11,21
  104:2,15 105:5
  127:14 129:18
  138:22 156:12
  157:5,6 159:23
  163:4
asking  14:13 15:2
  25:10,11 31:17
  41:20 43:15 50:12
  82:1 83:6 84:22
  87:11 104:9,10
  106:20 129:7
  134:21 138:7
  141:2 163:4
asks  101:19
aspects  47:16
  160:1,5
assertable  149:11
  149:13
assertion  115:18

assessment  79:7
asset  16:18 63:13
  63:19 161:20
assets  18:1 31:8
  36:25,25 37:8,11
  40:4,7,8,10 41:22
  44:10 61:9 79:15
  95:24 103:21
  104:3,6,6,10
  140:25 145:16
  149:6 152:5
  153:13 161:15
  163:9
assigned  39:21
assignments
  109:14
assist  75:21 76:6
assisted  69:4
associated  8:17
  13:15 15:5 19:2,5
association  6:2
assume  60:19
  100:12,17 166:6
assumed  61:5,8
  157:13
assuming  44:6
  93:13 166:9
assumption  61:11
attach  151:12
attached  32:16
  83:18
attack  158:20
attempt  75:14
attempted  52:23
  52:23
attempting  13:6
  14:12 141:23
attention  75:25
attorney's  38:15
attorneys  3:4,16
  4:2,10,18 5:2,16
  6:2 109:8

**auction** 41:16
56:19,25,25 58:3
**audit** 38:9
**audited** 111:23
**august** 51:4
109:12
**authorities** 38:16
**authority** 53:15
**authorization**
44:9
**authorize** 23:3
**authorized** 42:15
138:16
**authorizes** 42:6
44:4
**authorizing** 2:3,6
138:17
**automatic** 2:7
**automatically**
35:12
**availability** 13:12
14:6,25 70:9
82:18 97:11 160:3
**available** 9:1 24:8
40:9 66:24 104:7
115:6,15 116:2
131:23 134:3
140:19 149:21
**avenue** 4:4,12,19
5:3,18 45:5
**averting** 166:8
**avoid** 69:20
**avoidance** 34:18
47:3
**aware** 45:1 79:1
80:15 82:5,6 83:7
88:22 89:8,11,12
90:13 106:14
111:11 127:19,21
127:25 163:11

**b**

**b** 1:21 3:9 5:13
6:22 165:23
**b.r.** 155:13
**bachelor** 107:22
**back** 13:22 36:17
38:8 49:4 50:18
52:6 53:14 54:4
57:15 60:9 65:22
77:7 91:7,20
105:1 120:21
123:2 129:2,7,8
129:11,15 134:9
139:4,10,10 142:3
142:5 147:14
148:24 151:9
152:14,24 155:3
**background** 9:24
107:21,25
**backings** 120:20
**backup** 106:12
**bad** 54:1
**balance** 28:12
61:5 69:18,19
70:8 77:21 105:7
105:11
**balances** 140:15
**balta** 4:10
**baltic** 161:11
**bank** 4:2,10 5:16
6:2 34:5 46:5
108:9 110:25
141:19 154:8,9
161:11 162:1
**banker** 8:10 146:4
**bankers** 22:16
**bankruptcy** 1:1
1:12,23 31:25
50:22 54:16 79:4
79:10 134:17
163:12
**bare** 44:4

**barge** 69:12 141:7
**baron** 9:9 138:2
139:1,12 146:19
**base** 14:7 15:9,14
22:8,11,11 61:9
61:21 64:2 70:22
71:14,19 72:14
82:18 96:25
103:24 106:11,17
109:15 111:18
114:7,8 124:9
163:9
**based** 21:14 26:24
27:2 34:15 35:25
36:10 42:14 43:23
44:8 49:1,20 56:4
63:19 69:3 94:11
127:3
**basic** 101:24
**basically** 8:20
10:22 26:16 27:3
30:25 32:22 34:22
36:17 39:9 63:10
64:10,17,18 69:12
69:15,22 71:22
75:7 77:11 91:1
164:21
**basis** 20:4,7 21:11
22:9,10 27:6 28:8
36:2 37:22 38:3
42:16 44:2 51:3
52:9 54:24 60:17
61:3,4 66:10
71:14 97:19,23
111:25 112:9,12
113:10 122:8,16
123:16 124:17
130:23 140:13
145:10 149:14
156:13 157:24
**batten** 143:5
**battening** 143:20

**bay** 167:1,3
**bears** 43:11
121:21
**beating** 134:3
**becoming** 31:23
130:1 149:15
**beginning** 14:5
54:5 56:1 135:1
**behalf** 8:5,18
28:19 49:10 54:15
58:7 131:12
146:13 156:1
**behavior** 34:13
**belief** 126:19
**believe** 9:23 23:15
24:14,20 25:7
26:12 45:7,23
46:4,23 47:5,23
47:25 48:17 67:11
73:4 74:11 76:18
76:25 77:6 79:8
81:24 85:6 87:3
88:12 89:22 90:4
92:5 100:3 102:12
102:16 103:7
105:15 111:18
112:6 113:14
114:19 115:2,3,25
117:17,22 118:10
118:14 123:6
124:21 126:25
127:20 143:25
146:22 162:15
**believed** 74:21
**believes** 134:13
137:23 155:16
**bells** 153:4
**ben** 3:11 19:13
**beneficiary** 38:21
**benefit** 37:4,7
39:11 43:13,14
64:21 149:18
160:15 161:18

166:14
**benefits** 26:3
68:23 115:10
**benjamin** 8:8
**bernstein** 1:22
**best** 22:24 45:9
115:6 117:13
145:24
**beth** 6:17
**bets** 137:2
**better** 22:25 47:18
58:3 78:11 84:11
84:12 115:16,19
125:16 126:7,18
136:11,13,14,14
136:15 142:11
144:16,22 148:17
153:20 162:1,16
**beyond** 40:13
**bid** 31:8,19 41:15
41:24 42:6 44:9
51:12 55:25 56:4
56:7,13,21,25
115:16 133:8
144:13
**bidding** 18:14
50:8 56:10,12
**big** 26:11 35:2
69:15 145:18,19
**billion** 14:10
16:18
**binder** 75:25 76:3
76:3 118:11 120:5
**binding** 117:14
**bit** 30:18,20 33:4
49:10 51:20 63:1
103:19 109:23
111:7 122:20
131:25 147:10
164:2,9
**black** 14:19 15:7
118:10 167:10

**blank** 144:8
**block** 33:15 138:3
**blue** 22:20
**board** 9:7 17:12
17:13,19 20:5
31:14 32:20 54:13
138:15,18,18
158:24
**bond** 17:16 51:14
55:18
**bondholder**
112:19 116:13
117:21 146:14
**bondholder's**
117:10 120:1
156:11
**bondholders**
27:23 33:5 77:19
117:4,16 120:12
122:2 132:22
134:18
**bonds** 57:24
**book** 83:15 95:24
96:4 97:19,23
103:21 104:2,5,14
104:21 140:14
**bookkeeping**
26:16,21 27:3,4
27:12
**borrow** 61:7
109:19 121:18
124:17
**borrowed** 121:15
121:18 124:13
156:24
**borrowers** 40:5
71:6 78:12
**borrowing** 14:7
15:9,14 22:8,11
22:11 51:3 61:9
61:13,21 64:2
69:3 70:22 71:13
71:15,19 72:14

82:18 94:11 95:18
95:20 96:25
103:24 104:22
106:11,17 109:15
110:3 111:18
112:1 114:7,7
121:14 124:12
163:9
**borrowings**
130:22,25,25
**borrows** 130:23
**bottom** 50:16
71:15 96:12
**bowling** 1:13
**breach** 14:23
**breached** 32:20
**breaches** 90:24
**break** 112:2
**brian** 3:21 7:8
28:19 44:22 81:3
125:23
**brickfield** 6:16
**bridge** 51:9 56:17
**bridges** 153:24
**brief** 9:22 10:4
131:13 156:3
162:25
**briefly** 24:7 79:6
98:4 103:13
162:22
**bring** 27:19 85:18
104:23
**broad** 34:3 89:24
**broader** 17:14
**broke** 13:22 38:7
63:7 114:21
**brought** 42:11
162:7
**brownstein** 6:17
**brush** 53:21
**bryant** 3:17
**bucket** 12:1

**buckets** 11:24
63:8
**budget** 29:3,5,6
42:16 46:14,15,19
47:23 48:5,5,19
59:20,23 60:12,15
60:22 61:8,19
76:17,25 77:9,16
77:25 78:1,9
91:12,14 98:9,12
98:24 101:10,15
101:19 102:3,7
104:19 105:1
132:3
**budget's** 59:24
**budgets** 98:21
**bunch** 31:24 83:3
98:5 131:19
**bunkering** 10:20
10:24 11:7,11,13
**burden** 32:6
155:17 158:22
164:5
**burns** 163:10
**business** 10:20
11:12 14:8,13
15:6 16:14 20:15
20:18 21:3,21
24:21 32:2 34:4,6
61:18,19 62:2
64:16,20 69:8
71:8 72:2,18
74:23 78:10 90:22
110:15 117:8
118:7,8 126:4
129:14 132:16,21
134:5,10 136:11
137:20,23
**businesses** 160:25
161:1
**buy** 31:9,18 141:6
**buying** 109:14

| c | | | |
|---|---|---|---|
| **c** 3:1,8,22 5:12 8:1 47:4 168:1,1 | **capture** 144:11 | 71:7 78:13 79:11 79:17,18 83:24 | **challenged** 36:17 |
| **caitlin** 6:12 | **career** 98:20 108:1 | 90:21 92:14 93:19 | **challenges** 68:18 111:14,24 |
| **calculate** 104:14 104:17 | **cargo** 62:15 | 122:8 124:12 140:8,11,12,17 | **challenging** 79:18 108:23 109:9 |
| **calculated** 27:15 42:14,18 44:8 129:22,24 | **carney** 3:21 28:19 71:2 72:4 80:21 80:23 81:2,3 83:13,17 85:10,18 85:23 88:1,4,17 91:19 94:5,9,18 94:22 95:5,8,11 95:14 99:6,15,17 100:22 101:8 102:21,25 103:10 104:8 118:23 125:22,23 126:1 127:15 130:13 131:8 | 149:22 150:15,17 151:1,2,10,17 163:5 | 118:9 |
| **calculates** 71:13 | | **cast** 91:1 | **change** 77:25 142:19 167:13 |
| **calculation** 48:3 103:21 | | **category** 143:20 | **changed** 30:15 133:8 148:23,24 |
| **calculations** 47:25 | | **cause** 36:5 152:18 | **changes** 17:20 75:1 77:6 78:1 133:20 142:21,23 167:1,9 |
| **call** 14:18 23:25 27:20 35:16 44:17 51:9 57:22 58:5,8 58:18 60:6 76:24 96:19 106:23,25 131:4,9 147:3,4 | | **caused** 12:19,20 13:25 32:21 | |
| | | **causes** 34:16 89:13,18 | **changing** 19:22 77:16 |
| | | **cede** 53:15 159:6 | **chapter** 12:11 16:24,25 18:18 23:23 24:2,3 39:16,17 43:18 57:22 66:4 77:13 98:13 110:11,13 119:7 153:19,20 |
| **called** 10:20 29:15 35:9 60:23 69:4 137:25 141:19 | | **cell** 94:19,22 | |
| | **carried** 48:16 | **center** 6:4 139:13 | |
| **calling** 91:17 | **carry** 64:19 | **centralized** 94:2 | |
| **calls** 75:18 76:14 78:7,14 117:19 138:18 | **carve** 87:13,17 | **ceo** 137:22 | **characterization** 15:8 49:18 156:9 158:21 |
| | **carved** 17:15 33:11,14 70:18 | **certain** 11:12,12 12:20 13:14,16 14:23 37:6 66:24 66:25 69:10 75:6 76:24 89:3 103:21 104:3 148:8 | |
| **camel's** 13:22 38:8 | **case** 1:3 4:9 19:1 19:10,16 24:17 39:10,16 41:10 47:4 51:23 66:12 135:6,8 136:4,23 151:12 155:5 156:19 158:2,9 161:11 164:21 165:16 | | **characterize** 10:3 10:21,22 12:13 82:22 114:20 129:25 |
| **canard** 137:17 | | **certainly** 33:2 41:14,17 43:5 45:7,22,23 94:14 136:8,12,13,14 148:6,19 155:14 | |
| **cap** 65:6,11 | | | **characterized** 14:17 17:5 38:7 |
| **capacity** 71:15 104:22 110:4 | | | **charged** 27:14 128:9 157:17 |
| | | **certificate** 94:11 95:19,20 96:8 103:25 | |
| **capital** 4:2 11:17 11:18,23 12:1 13:19 14:7 20:15 22:17 27:1,6 28:7 61:6 63:6,7 64:19 69:20 70:8 75:2 77:1,16 98:23 113:24 123:15 124:11 130:1 140:24 141:5,9 166:2,4 | **cases** 18:22 23:2 26:10 110:13 119:8 157:22 | | **charging** 28:2 |
| | **cash** 2:6 20:14,19 20:23,25 21:7,16 23:5 27:9 28:4 29:7,11,14,15,17 29:19 35:19,20 42:24 43:2 46:2,3 46:4,21 48:10,14 60:22 61:4 62:18 | **certified** 168:3 | **chart** 11:16,17 48:14 159:10 |
| | | **certify** 87:18 | **chartered** 11:13 |
| | | **cetera** 78:14 80:11 90:25 | **chartering** 11:15 |
| | | **chain** 100:15 | **chase** 19:20 |
| | | **challenge** 26:4,6 36:10 53:17 56:6 109:2 | **cheaper** 27:23 122:10 |

**check** 144:8
**chen** 6:18
**chicago** 3:6
**chicken** 153:2,16
162:25 163:4
**chilingarishvill**
6:19
**choice** 39:14
57:21
**chose** 147:3,4,4
**christopher** 3:12
8:8
**circulate** 167:9
**circumstances**
10:1 12:16 27:21
36:5 39:4 40:25
123:6 142:13
146:6 161:22
**cite** 155:11
**cited** 155:5
**citi** 159:24
**citibank** 40:15
**claim** 37:5 149:6
149:10,12 151:24
156:25 158:25
**claims** 2:6 37:16
37:17,22 38:5
39:1,11,18,20
40:3,17 44:11
53:11 54:4 79:14
79:25 80:3,6,7,8
80:10,13,15 89:13
89:16 90:23
124:25 125:5
132:19,20,21
142:16,17 143:3,8
143:12 151:15,17
151:18,23 153:9
153:10,11,12,13
153:23 164:16
165:23
**clarify** 100:5

**classify** 82:16
**cleaned** 146:10
**clear** 31:4 36:19
45:14,19 51:7
55:12 74:20 91:23
101:9 110:10
143:12
**clerk** 8:2 55:8
107:3,7
**clerks** 76:3
**client's** 154:14
**clients** 113:8
162:16 164:16
**close** 18:17 23:25
24:19 27:20 57:19
58:4
**code** 54:16 163:12
**coin** 49:16
**collateral** 2:6
20:19,23,25 21:7
23:5 29:7,11,15
29:17,19 35:20,20
37:3,12 38:1,5,25
40:11 42:25 43:2
48:11 50:9 64:1
79:11 95:9,9,11
95:12,22,24 96:1
96:5,7,9,18,20
97:8,21 121:13
124:9 133:15
136:9 140:8,11,12
140:17 149:22
150:15,17 151:1,2
151:10,13 153:12
162:7,9 163:5
166:17
**colleague** 142:22
**colleagues** 8:7
19:7 49:10
**collected** 150:7
**collecting** 35:19
61:4

**collection** 93:16
**collections** 94:2
105:14
**collective** 138:14
**collectively** 68:6
114:12
**collects** 42:22
**colorable** 54:4
**column** 92:6,10
96:7,18 97:3
**combination**
110:25
**combined** 75:10
120:12 150:14
**come** 26:9 31:7
39:9 41:11 53:19
78:22 96:1 105:14
116:4 123:7 138:3
139:25 144:13
145:15 147:14
152:24 155:3
165:2,6
**comes** 39:25
145:9 156:7,24
157:12
**coming** 21:14
33:19 35:6 40:19
48:11 52:6 92:17
93:24 144:16
159:20
**comingled** 94:3
**commence** 34:23
**commend** 9:7
162:12
**comment** 55:22
70:7
**comments** 8:25
19:16 49:14 54:5
157:19
**commercial** 30:21
**commit** 117:25
119:11

**commitment**
74:25 75:6 78:18
117:14 120:23
121:3 123:12
149:4
**commits** 119:16
**committed** 27:1
27:16 35:25
120:22
**committee** 10:9
17:16 18:22 38:9
42:1,9 45:9,24
46:24 47:17 49:16
52:24 53:10 55:4
56:6 78:8 85:17
136:16,20,21
147:22
**committing** 28:6
123:15,19
**commodities** 68:9
**commodity** 16:13
34:3,5
**common** 34:21
123:24 124:1,3
156:18
**communications**
59:15 75:18,22
**companies** 12:11
16:14 59:14,16
78:13 80:12
**company** 5:16
8:19 9:10,25
10:19 12:14,22,25
13:10,18 14:15,21
15:2,10,11,16
16:5,13,22,23
17:4,9,11,14,17
18:5,6,15 20:14
23:21,24 24:1,5
26:11 27:5 31:12
33:7 34:1 35:19
51:10,18 54:15
61:4 62:12 63:1

63:24 64:3,3
65:13 66:1,4,5,11
66:12,15 67:18,21
67:24 68:2,3,8,12
68:16,23 69:4,14
69:20,23,24,25
70:2,4,23 71:10
71:13,16 72:3,13
72:17 73:7,12,14
73:15,17 74:23
77:13,21 79:9,10
79:21,24 80:2,3
81:19,23 83:7,20
89:1,5,10 90:2,13
90:18 91:1 93:13
106:10,12 107:16
108:2,15 109:6
110:11 111:15,23
112:24 113:13,14
114:12,14,18
115:1,7,8,12,14
115:25 117:7,18
118:1 119:19
120:2 124:18,25
126:19 127:13
129:6 130:21,23
131:18,23 132:13
134:4,7,8 137:25
140:17 141:6,12
146:6 148:12
149:6 154:8,9
156:13 163:7,10
**company's** 17:6,8
32:22 63:6,14,19
64:9,11,16,23
65:4 67:4 69:8
70:20 71:6,7 72:9
78:11 82:14 83:23
94:11 95:18,22
113:24 114:10
118:7 124:10
127:8 132:1 140:2
141:12

**comparables**
123:8
**compare** 72:8
**compared** 43:22
90:7 96:20 140:14
143:24
**comparison**
120:11
**compelling** 36:5
**compete** 87:1
**competing** 33:19
51:12 144:12,13
**competition** 12:19
**competitive** 33:1
**competitor** 30:22
33:25 34:2,7
38:19,23 57:13
87:19,24 88:7,10
111:8,11 127:23
128:3,6 148:7
**competitors** 31:1
**complete** 60:13
91:9,12 155:14
**completely** 57:25
61:23 63:11
136:25 140:4
**completing** 38:9
**complex** 11:20
**complexities**
102:6
**complexity** 99:1,4
99:5
**complicated**
11:18
**complicitous**
50:19
**component** 57:3
**comprehensive**
17:24
**comprise** 12:7
**comprised** 75:10
**comprising** 61:9

**concept** 31:22
35:22 69:19
**concepts** 51:22,23
**concern** 23:22
24:5 45:25 48:23
56:24 58:3 115:13
136:16 162:15
**concerned** 46:12
**concerning** 42:2
**concerns** 13:4
46:3 167:15
**concert** 166:9
**conclude** 148:6
156:5
**concluded** 167:19
**conclusion** 43:11
89:22 90:4 123:7
**condition** 13:14
144:3
**conditions** 30:6
**conduct** 34:15,16
34:19 36:11,13
40:22,24
**conducted** 22:16
44:1 89:20 90:10
**confer** 154:13,16
**confidence** 14:1
**confidentiality**
33:21,22 34:9
148:2,8
**confirmatory**
74:17
**confusing** 91:8
**conjecture** 49:21
**connected** 56:22
**connection** 41:18
50:14 51:13 55:21
57:6 81:17 124:7
149:7,20 150:24
152:6,21 158:18
160:12
**conor** 7:4

**consensual**
144:21 151:4,10
163:5,12
**consent** 29:8
**conservative** 61:1
**consider** 19:17
51:13 79:4,16
**considerable**
164:12,13
**consideration**
46:23 55:21 63:23
**considered** 22:23
34:6 79:6
**consistent** 61:10
**consistently** 70:10
**consists** 19:25
**constituency**
166:3
**constraints** 15:9
70:7
**constricting** 51:4
**construct** 22:23
120:12,16 122:2
142:1 153:24
159:13
**consummate**
17:14
**consummated**
73:1
**contact** 24:19
**contained** 117:7
**contemplated**
116:19,23 142:2
**contentious** 63:5
**contested** 9:12
140:13,17
**context** 30:19
49:13 50:11,23
65:9 121:17
149:10
**continents** 11:2
**contingency**
145:20

**contingent**  75:11
**continue**  18:21
  21:4 22:25 23:21
  27:5 66:13 72:20
  73:20 90:19
  115:13 160:11
**continued**  73:10
  156:14 161:16,18
**continues**  110:1
**continuing**  68:25
  70:16
**continuous**
  113:10
**contracts**  12:21
  80:9 90:25,25
**contrary**  31:25
  131:17 159:8
**contrast**  62:10
**contribute**  11:13
**contributing**
  12:12 15:4
**control**  30:7 31:12
  32:22,24,25 33:15
  42:3,4 54:17
  70:19 81:22 82:2
  82:15,16,23 83:25
  84:4
**controlled**  54:12
**conversation**  25:8
**conversations**
  24:13 65:20 90:2
  128:1
**conversion**
  143:25 153:20
**conversions**  23:23
**convert**  39:17
  57:22 113:2
  117:13 124:11
  130:24 136:23
**convertible**  12:4
  24:10 28:20,23
  39:7 63:17 81:4
  87:14 125:24

  154:11,11
**converting**  26:10
  39:16 57:23
  153:19
**conveyance**
  149:17
**convictions**
  136:22
**convinced**  132:25
**cooperating**  18:6
**cooperative**
  162:13
**copies**  10:8 99:7
  167:10
**copy**  58:14 59:20
  85:19,19 94:10,16
  105:16 107:2
  118:14
**core**  16:14
**corporation**  32:9
  32:10 155:9
**correct**  20:20 25:2
  27:1 38:2 42:17
  93:15 96:6,23
  121:25 151:6
  161:20
**corrected**  84:15
**corresponds**
  141:13,14
**cost**  52:16 134:5
  144:23
**costs**  15:5
**cotton**  101:12
**counsel**  19:14
  44:24 45:13 54:10
  57:20 58:7 81:21
  81:25 85:13 105:2
  114:9,19 115:18
  117:17 125:6
  128:4,7,8,10
  147:1 153:6
  156:11

**counterpoints**
  133:16
**counting**  164:9,25
**countries**  11:8
  16:17
**country**  168:21
**couple**  21:15 29:1
  45:11 55:16 59:25
  59:25 65:15 68:13
  86:10 98:18,24
  99:3 122:15
  133:16 141:3
  142:15 156:6
  159:1,5 162:6
  165:6
**courage**  136:22
**course**  9:2 21:3,22
  24:11 34:10 38:8
  38:13 40:1 49:19
  52:22 71:13 79:8
  94:25 98:13
  124:11 154:1
  157:18 167:11
**court**  1:1,12 8:3
  8:14 9:16,21,24
  10:8,12 18:2,11
  19:6,9,16,19 20:6
  20:10,19,24 21:6
  21:13,24 22:4,12
  23:3,11,17 24:1
  24:24 25:3,10,19
  25:23 26:14,20,23
  27:2,10,25 28:9
  28:15 29:7,13
  30:2 31:5,16 32:1
  33:11 34:20 35:14
  35:18 36:14 37:9
  37:24 39:3,9,15
  39:20 40:3,15
  41:2,3,7 42:11,20
  43:1 44:4,15,17
  44:20 47:6 48:4
  48:10 49:2,5 50:2

  50:6 52:2,12 53:5
  53:10,16,22 54:1
  55:9,14 56:8 57:4
  58:5,11,13,16,20
  58:24 59:12,21
  60:1,3,6,8,12
  62:17,20 68:3
  69:6 71:3 72:5
  76:2,5 80:20 81:1
  81:5 83:15 85:8
  85:16,21,24 86:1
  87:9 88:3,16 90:5
  90:16 91:13,17
  93:18,23 94:4,8
  94:15,21,23 95:1
  95:4,7,10,13
  99:14 100:24
  101:2,5,7 102:24
  103:11,14,16,24
  104:9,15,20,25
  105:4,20 106:19
  106:23 107:10,13
  107:20,24 108:13
  109:2,10 110:22
  112:25 113:3,20
  114:4 115:10
  118:22,25 120:15
  120:19 121:10
  122:1,22,22 124:6
  125:21 127:17
  130:14,17 131:1,4
  131:7,9 132:9
  133:7,12,18
  134:23 135:10,18
  135:23 136:2,8,20
  137:21 138:7,17
  138:21,24 139:2,5
  139:8,11,15,25
  143:16,22 144:5
  144:25 145:4,12
  145:14 146:11,17
  146:20,24 147:13
  147:18 148:3,10

148:14,15,20
150:5,11,16,21
151:1,4,8,8,20
152:10 153:3
154:1,5,18,23,25
155:12,20,24
156:20 157:8,16
158:1,3,8,11,15
159:2,4,14 160:14
160:19,24 161:7,9
161:22,24 162:3
162:18,21 163:14
163:17,21 164:5
164:16,19,23
165:3,9,13 166:11
166:16,22 167:3,6
167:12,16,18
**court's** 9:20 36:3
59:18
**courtroom** 8:6
95:1 146:19 147:3
154:20,24 160:18
162:4,20 164:4
**courts** 32:5 46:12
**covenant** 13:15
**covenants** 14:24
**cover** 74:15
**coverage** 64:5
97:17
**covered** 19:11
**covers** 63:9,10
**cram** 151:25
163:6
**crammed** 152:9
**crash** 80:2
**create** 77:8 79:24
80:3
**created** 14:17
67:2
**creates** 34:14 70:2
**credibility** 153:21
**credible** 153:25

**credit** 11:20,25
15:2,3 21:5 27:7,9
34:15 35:7 37:19
41:24 42:6 44:9
55:25 56:4,7,11
56:12,25 62:15
64:21,21 70:10
77:23 161:12
**creditor** 43:21
90:7,17 149:19
165:16
**creditors** 15:25
18:22 39:12,24
40:9 42:1 58:1
65:17 72:21 73:21
95:25 108:17
126:8 136:16
143:23 147:22
152:7 153:17,20
161:17 162:16
163:1,2,7 164:19
165:6,17,18
166:10,16
**creeping** 35:17
130:12 141:15
156:23 157:1,5,11
164:10
**crescent** 59:14
**crisis** 13:25
**cristy** 8:8
**critical** 13:21
50:14,25 57:2
135:19,24 161:15
**cro** 137:22
**cross** 80:20,22
88:2 103:11
125:21,25 131:1
136:17 147:3
**crude** 16:16 27:8
**crudely** 67:15
**crushed** 163:3
**cue** 55:12

**culminated** 16:10
**culmination** 65:23
**current** 62:21
64:10 93:14 105:6
105:11
**currently** 75:2
97:25 109:24
129:19
**cushion** 140:16
**customary** 144:9
144:10
**customer** 17:4
69:25 93:21
**customer's** 69:13
**customers** 14:2
15:12,12 62:8
80:10 132:19
135:16 136:13
**cut** 19:19 45:20
**cycle** 130:1 141:5
141:10

**d**

**d** 4:22 8:1
**daily** 61:3 71:14
**dallas** 5:4
**data** 66:25
**date** 99:22 105:13
105:21 168:25
**dated** 94:12 99:10
103:1
**dates** 98:16 132:4
**david** 6:11
**day** 9:16 10:5
22:21 24:6 26:13
31:12,12 53:19,23
53:23,25 54:24,24
61:12 62:8 64:13
64:13,17 71:10,12
71:13,16 123:12
130:11 131:19
134:4,25 135:2,8
143:7 146:15,18
158:15

**days** 20:13 21:15
22:7 29:4,21
34:22 41:15,16
42:18 44:7 52:25
62:9,13 76:19
77:8 98:25 99:3
101:23 124:9,13
133:14 135:12,15
136:7 138:5 141:1
141:2,9 145:15
152:17,17,17
156:19 157:9
**deal** 9:16,17 13:6
22:25 23:4 41:9
132:1 133:21
134:17 135:7
136:6,24 137:16
164:10 166:20
167:8
**dealing** 9:21
135:16 137:15
**deals** 98:20
**debates** 137:6
**debt** 17:9 26:17
26:18 27:13,14
31:18 35:10,12,16
37:1 42:7,22
50:12 140:1,2
143:17,18 151:19
152:11,13 157:13
165:11
**debtor** 1:9 26:23
34:10 36:8 37:5,6
37:17,18,20 40:13
45:3,23 46:6,8,11
46:16,17,17,20
48:21,23 52:16
53:8,11 97:25
110:7 129:18
132:10 133:12
144:12,25 155:6
157:12

debtor's 44:24
debtors 2:1,3 3:4
8:5,5 10:13,13,14
10:15,17 11:6,17
12:10 18:10,20
19:3,14,15,23
21:6 22:15 23:1
24:4 29:2,20
32:14,19 35:4,10
37:2,7,21,25 38:4
38:8,11,12,19,24
40:5 41:7,12,21
42:3,15 43:3 44:5
45:13 50:12,14,15
51:10 52:23 53:15
53:16 54:11 58:8
58:18 60:8,16
62:7,18 68:6 73:2
79:2,4,13,14
81:11,25 82:2
85:13,17 86:24
88:11 89:13 90:6
91:8,11 92:2
93:11,20,22,22,24
94:10 98:13 104:7
104:10 106:25
107:8 108:19,21
109:3,6,11,19,25
110:3,12,15,20,21
116:7,10 118:13
118:15,17,20
119:3,14 124:9
125:10,12 126:4,8
131:6,13 144:22
146:18 147:1
151:2,9 152:22
153:10 155:15
159:10 161:16
162:7,8,10,12,16
debts 51:6 165:9
december 47:25
48:17 60:20,24
61:16 65:8 92:5

decide 25:11
decided 53:23
56:8
decides 25:15
decision 45:24
54:14 116:7 138:9
138:9,12,20
155:12
decisions 9:8 42:4
declarant 146:16
146:18
declaration 41:5
43:20 90:5 146:20
146:22 147:5
declarations
164:25
decreasing 65:1
deduce 140:23
default 23:5,10,12
50:7 64:5 133:7
145:5,12,13
defaults 13:15
defer 47:17
deferred 47:14
deficiency 121:21
121:22
definition 54:16
87:23 88:7,10
delay 34:8
delayed 35:8
delighted 132:7
deliver 69:24
75:15 80:11
delivered 132:3
delivers 70:1
delivery 62:13
69:12,22
demand 142:11
demanding
129:10
demonstrate
158:22

demonstrative
75:21 76:7 120:14
denial 161:19
department 82:10
dependent 160:17
161:2
depending 39:25
40:18 45:20 99:1
99:4,5
depleted 14:15
deponents 24:8
deposition 24:9
43:24 54:9 83:1
83:17 85:7 86:18
derived 48:3
derives 11:14
describe 67:9
68:11 78:6 109:2
109:10 110:22
113:3 114:3
115:10 122:22
124:6 130:11
described 27:12
32:5 63:7 72:8
81:14 108:24
describing 91:5
description 78:11
descriptions 51:1
designed 43:12
desirability
136:18
desk 11:22
desperately 14:8
19:23
despite 51:19
detail 33:3
deteriorated
12:18
deteriorating
12:22 13:10
deterioration
12:18

determination
138:8
determined
143:13
detriment 73:14
133:8
deutsche 5:16
154:8,9
development
142:25
device 132:12
136:12
dex 59:15
dialogue 73:7,10
147:1
dibattista 6:20
dictates 142:12
didn't 138:19
141:19 144:11,11
158:23
die 90:25
difference 150:21
150:23 151:21
differences
120:20
different 23:4
26:20 40:4 51:22
57:25 136:18
140:5 145:1
157:21 159:24
160:1
differently 77:2
difficult 103:19
109:5 123:1
difficulties 33:21
difficulty 31:22
114:23
diligence 14:14
33:18 66:19,23
74:17,22 75:15
78:3,9,10,16 98:5
105:23 106:2,7
117:20 118:8

132:5
**diligently**  162:8
**dip**  9:12 10:5 12:8
  18:11,13 19:8,18
  19:24 20:1,2,8,21
  22:15,18 23:6,9
  23:20 24:16,25
  28:6,24 29:3 30:1
  30:8,20 35:4,9
  38:25 39:14 40:10
  40:18 42:13,16,20
  43:7,11,15,22
  44:4 46:4 47:2
  50:17 51:13 52:9
  55:2,22 56:17,22
  57:3,11,21 59:20
  59:23 60:15 66:5
  66:10 73:17 74:5
  75:8 76:17 77:8
  77:12,16 78:23
  79:1,2,5 88:19,22
  89:12 90:6,8,18
  91:12 93:11 98:9
  98:12,21,24
  101:10,15,19
  102:2,7,14,14
  104:19 105:1
  108:14 110:12,15
  110:18,23 111:3
  111:14 112:19
  113:10,12,15,16
  113:17,22,25
  114:14 115:8,11
  115:12,19 116:8
  116:14 117:21
  120:11,16 122:3
  122:21 123:5
  124:7,20,21
  125:10,13 126:5,7
  126:18,20 129:1
  129:22,23,24
  130:4 131:17,20
  131:20 132:2,7,14

133:5,8 134:16
  136:6 138:18
  139:24 140:8
  141:11 142:10
  143:4,5,20,24
  144:2 145:9,15,18
  146:8 147:9,23
  148:14,17 149:7
  149:16 150:24
  151:7 153:1,2,15
  153:18 156:10
  157:11 158:24
  159:9,11,19
  160:12,12 162:14
  165:25 167:1,7,8
**dips**  54:23 98:21
  108:11 123:24
  131:22 134:3
  140:19
**direct**  30:22 34:6
  59:1 72:17 75:24
  86:7 87:13,19,24
  88:7,10 94:10
  98:5 102:13
  107:11 111:8,11
  126:4 127:23
  128:3,6,14
**directed**  104:14
**direction**  83:11
  116:10
**directly**  29:1
  33:14 74:20
  109:16
**director**  59:7 81:8
  107:18
**directors**  9:8
**disagree**  156:10
  158:21
**disallowed**  36:22
**disbursed**  46:16
  48:22,22
**disbursement**
  82:11 106:13

**disbursements**
  46:25 47:24 48:4
  48:6,20 62:1
  70:20 71:5 72:15
  82:7,15,23 83:8
  83:21 106:10,18
**disbursing**  71:22
**disclosure**  14:24
  111:5 112:6
**disconnect**  141:10
**discount**  111:19
**discovered**  13:7
**discovery**  116:3
  127:1
**discuss**  66:5
  122:20
**discussed**  123:23
  124:23 126:13
  128:4 166:8
**discussing**  88:23
  89:9
**discussion**  45:12
  124:24 129:15
  139:22 156:14,15
**discussions**  18:21
  44:25 73:3 89:1,3
  109:13 113:6,9,22
  117:12 127:7
  128:5,23,25
**disgorgement**
  36:21
**disproportion**
  140:3
**dispute**  164:13
**disputed**  139:12
**disputes**  132:10
  165:16
**disqualified**
  127:22
**distinction**  21:8
  139:23
**distinctions**
  120:15

**distinctly**  129:9
**distinguish**  158:2
**distressed**  15:1,6
**distributed**  46:8
**district**  1:2 52:8
  54:24 155:12,13
**docket**  147:10
  154:4
**document**  87:10
  87:22 88:1,8 91:9
  95:21 103:8,20
  104:16 105:21
  107:1
**document's**  87:8
**documentation**
  70:23 71:25 82:19
  106:18 164:24
**documents**  58:9
  68:21 98:18
  109:22 117:19
**doesn't**  72:3
  99:22 137:20
  152:17
**doing**  31:1 45:9
  57:9 62:4 66:2
  72:6 126:22
  147:17,19 153:1
**dollar**  57:25
**dollars**  104:22
  105:14 116:22,23
  116:24 121:15,16
  130:4 140:1,2
  141:4 143:8
  145:10 149:2
  150:3,14 156:22
  157:2,10 161:14
**domestic**  47:24
**domiciled**  78:13
**donald**  9:9
**don't**  100:16
  103:7,7,8,20
  106:6 129:3 134:2
  135:10 144:8

150:1 153:10,11
156:15 158:1,24
159:15 163:15,17
163:19 164:11,13
165:25 166:4
**door** 104:13 134:3
**double** 164:9
**downward** 14:5
14:23
**doyle** 5:12
**dozen** 108:12
**dozens** 38:12
**draft** 87:21
**drafted** 29:25
**drafts** 129:15
**draw** 35:8 48:15
91:20 92:3,18
**drawn** 26:2
**draws** 60:21,24
**drop** 13:3
**dublin** 3:22 28:19
**due** 24:11 66:18
74:17 117:20
118:8
**durney** 6:21
**duties** 9:8
**dwell** 147:24

**e**

**e** 1:21,21 3:1,1 7:2
8:1,1 26:3 41:1
168:1
**e&y** 8:10 81:11
82:5 86:10 89:19
89:19 90:1,1,10
113:14 114:10
117:17 126:15,22
126:23
**e&y's** 81:17
**earlier** 51:1,2
52:11 55:19 64:15
68:14 70:7 71:20
77:19 82:17 90:23
93:16 159:24

160:6
**early** 12:19 15:17
16:23 62:25 63:19
67:8 68:15 113:14
**easier** 49:4
**easiest** 94:23
121:25
**easily** 54:3
**easy** 39:16 57:22
77:17
**echo** 161:4
**economic** 129:10
150:21,23 151:20
**economics** 107:22
**ecro** 1:25
**edging** 131:11
**edison** 51:23
157:23
**educational**
107:20
**effect** 25:16 33:18
37:3 70:1 148:8
**effective** 47:8
**effectively** 35:24
56:6 61:12 68:19
71:10 72:24 74:4
90:21 130:22,24
153:2
**effort** 9:10
**efforts** 8:24 14:12
78:6 145:21
**eight** 11:16 61:24
**either** 12:2 16:24
24:2 31:24 33:17
50:22 56:18 65:24
66:2 67:1 69:9
90:14 117:18
**elaborate** 66:21
**electronic** 66:25
**element** 64:7
**elements** 45:8
167:2

**elevate** 26:17
**elevated** 151:16
**elevates** 27:13
**ellis** 3:3 19:14
58:7
**else's** 37:12
**email** 99:11,20,20
99:21,24 100:6,8
100:15,16,19,19
101:11,12,17,18
101:23 118:18
119:10
**emails** 99:10,25
100:23 101:9
**emergency** 20:11
21:17 29:16 41:19
42:7 135:3 147:19
**emphasize** 48:19
54:20
**empirical** 165:25
**employee** 90:24
**employees** 38:12
80:8 83:7,25
132:20 136:15
**employer** 59:4
**employs** 11:8
16:17
**enable** 115:14
**enables** 27:5
**encouraging** 87:1
**ended** 109:14
**energy** 4:18 5:2
16:13 49:11
**enforceable** 56:5
**enforcement**
38:16
**engage** 72:17
112:18 113:17
**engaged** 15:24
16:2,3,3 17:20
75:18 83:9,22
86:11

**engagement** 113:4
**engaging** 22:20
112:22
**enhanced** 109:20
**enjoy** 37:4
**enquire** 111:2
**ensure** 33:1
**enter** 65:17,24
67:21 70:12
141:23 151:2
166:24
**entered** 17:13
29:23 30:6,12
32:14 39:15 43:23
47:12 64:6 68:12
68:15 109:1 112:6
**enterprise** 24:5
**entire** 9:7 27:16
32:4 38:14 122:8
124:8 129:25
137:19
**entirely** 45:14
161:20
**entirety** 22:7
124:7
**entities** 37:6 40:13
46:6,8,11,16,20
48:21,23 97:25
129:18 143:23
144:1 149:11,14
149:15,24 151:19
151:21 152:4
153:9 163:3 165:6
**entitled** 14:4 29:9
42:22 56:12 86:23
135:1 149:24
**entity** 37:6 78:11
**entry** 2:1 27:3,5
27:12,13 30:9
35:13 76:10
138:17 145:7
**epstein** 6:11

[equating - ey]                                                                    Page 15

equating  61:15
equitable  34:17
equities  47:4
equity  17:11
  31:14 32:20 110:4
  110:4 140:16
  163:8
equivalent  45:17
  61:13
eric  6:14
ernst  86:14 127:8
  127:13
especially  9:21
  13:25 15:16 16:21
essential  27:7
  167:1
essentially  13:22
  19:25 20:16 21:20
  64:23 65:7,23,25
  66:10 67:9 71:21
  94:2 134:22
  145:23 157:11
established  16:12
  83:24
estate  46:7,11
  53:12 157:3
estates  43:13
  122:13 126:21
  127:2
estimating  77:24
estimation  50:15
et  78:13 80:11
  90:25
europe  13:1
evaluating  111:3
  112:23
evelyn  161:25
  162:1,5
evening  126:2,3
  131:12 154:7
  161:10,25
event  23:5,9,12
  30:6 32:19 44:3

50:7
events  15:19
eventually  91:13
  134:8
everybody  32:10
  58:4 99:8 147:20
everybody's  8:14
evidence  26:9
  27:19 28:16 32:11
  40:23 49:20 51:7
  54:6 55:16 85:15
  87:8 100:23
  131:14,17 132:4
  137:8 139:19
  141:22,23 142:7
  144:17 145:25
  146:7,21,23 148:1
  150:2 153:7
  155:10,14 156:9,9
  158:17 160:14
  161:6
evidently  63:25
exactly  28:22
  46:22 47:19,20
  130:17 142:5,12
  149:23 151:13
exaggeration
  16:21
examination  59:1
  80:20,22 103:17
  107:11 125:21,25
examine  103:12
  131:2 147:3
example  26:4 27:7
  37:10 160:6
examples  59:12
  108:13
exceptions  86:24
  151:14
excess  96:19
  97:17,21 157:13
exchange  17:10
  164:13

exclude  47:21
  150:4
excludes  93:15
exclusive  29:5
  32:17
exclusively  56:4
exclusivity  17:13
  17:15 32:16 68:14
  70:13,15 85:19
  86:3,6,15 87:4
  105:16 111:8
excuse  80:2
  162:23
executed  86:11,17
  111:6,12
executory  80:9
exercise  31:12
  32:18 78:2 137:23
exercised  42:3,5
exercising  72:2
exhibit  60:1,7
  85:12 94:6,22
  118:14,15,17,20
  119:3 120:6,8,10
  120:11,14,19
exhibits  60:3 99:6
exist  40:7 67:1
existing  17:10
  23:9 33:13 51:2,5
  61:5 68:18,21
  75:2 109:3,18
  149:4
exists  21:20
exit  134:17 144:21
expanded  149:20
expansive  37:23
expectation  135:8
expended  28:3
expending  143:6
expenditure  28:4
expense  2:5 37:5
  151:17

expenses  12:20
  70:24 74:15
expensive  45:22
  65:10 122:2,5,8
  122:19
experience  46:12
  52:6 98:23 108:14
  123:18,20,24
  124:2 132:18
  138:14
explain  9:24 28:9
  60:16 69:7 120:15
  138:1
explained  48:13
explored  43:6,8
exposed  31:20
  115:14,25 126:20
exposure  41:22
  121:22
express  8:11
extend  21:5 40:12
  67:9 151:15
extended  152:23
extensive  65:20
  113:6,21 114:9
  117:12,18 132:15
extensively  22:15
  74:20 112:20
extent  36:15,16
  36:21 40:9 42:13
  44:3 53:1,3 56:2,3
  56:5 57:15 105:25
  111:4 121:21
  124:10 128:10
  133:3 153:11
  158:19
extra  76:2,3 157:6
extremely  19:17
  64:15 79:18 89:6
  110:1 137:14
ey  59:5,6 62:22
  81:8 102:10,14

| f | | | |
|---|---|---|---|
| **f** 1:21 168:1 | 161:20 166:7 | 42:12,14,18,23 | 151:3 152:16 |
| **f&es** 143:17 | **factors** 12:12 | 43:4 44:8 52:13 | 153:24 |
| **faced** 109:3 | 14:22 | 57:6,14,17,18 | **finalization** 47:13 |
| 111:14,24 | **facts** 19:20 131:16 | 74:6,8,11,15,18 | **finally** 9:6 10:15 |
| **facilitating** 86:25 | **fair** 18:16 31:21 | 74:19 121:1,4,6 | 13:21 17:7 18:25 |
| **facilities** 11:25 | 84:3,24 85:1 | 122:20,23 123:4 | 41:24 57:5 63:17 |
| 12:4 13:13 20:9 | 86:22 87:12 92:20 | 123:18 128:15 | **finance** 68:17 |
| 20:16 21:5 24:16 | 95:21 119:12 | 129:1,22 141:25 | 108:4 148:7 |
| 37:19 61:3,14,22 | 133:4 136:25 | 142:2,9 152:20,22 | 163:14 |
| 63:12,16 64:8,10 | 140:20 142:18 | 152:23 157:16,18 | **financial** 8:9 |
| 64:23 65:7,11 | 148:5 164:14 | 159:9,11,14,16 | 12:17,21 13:8,10 |
| 69:3 75:3 93:17 | **fairly** 63:5 140:16 | **feld** 3:15 28:18 | 13:15,16 14:24 |
| 98:1 109:15 112:1 | **fairness** 32:4,8 | 81:3 125:23 | 16:2 34:4 109:25 |
| 114:7 121:6 | 137:19 155:8 | **felt** 114:12 | **financials** 111:23 |
| 129:19 161:13 | **faith** 32:7 40:22 | **fench** 94:20 | **financing** 2:4 |
| **facility** 14:9 20:22 | 40:25 55:19 115:1 | **fiction** 54:7 81:22 | 18:11 19:18,24 |
| 23:10 27:6,16 | 115:4 155:5,7,17 | **fiduciary** 9:8 | 20:22 22:19 23:1 |
| 33:6 35:7 40:19 | 155:18 158:20 | **fight** 140:13,18 | 23:4,7 32:18 33:6 |
| 50:17 51:14 55:22 | **familiar** 86:2 | **figure** 152:16 | 33:24 35:5,5,9 |
| 57:3 63:8,10 66:2 | 88:19 | **file** 18:14,17 79:4 | 43:13 50:15,25 |
| 68:17,21 69:23 | **fanciful** 54:7 | 119:7 136:23 | 51:18,21 52:9 |
| 70:9 75:8,10,12 | 81:22 | **filed** 10:2 12:7 | 56:22 63:14 66:5 |
| 91:25 93:14 96:3 | **fantastic** 144:15 | 24:10 138:16,16 | 67:18 73:18 79:2 |
| 111:18 113:16 | **far** 51:25 78:21 | 147:10 148:12 | 79:5 87:1,15 92:4 |
| 114:7,8,24 116:24 | 123:23 132:25 | 153:19 158:19 | 110:5,7 111:1,15 |
| 116:25 117:23 | 133:24 157:13 | 164:21 | 113:10,13,17 |
| 120:11,22,23 | 163:11 | **filing** 66:4,14 | 116:20 117:6 |
| 121:1,3 124:12 | **fargo** 6:4 | 77:13 98:14 | 118:7 124:20 |
| 158:24 159:25 | **farr** 4:1 | 105:13 110:11 | 130:20 133:13 |
| 160:12,12 161:5 | **fast** 140:9 | 160:4 164:21 | 135:3 148:17 |
| 162:5 | **faster** 44:20 | **filling** 21:20 | 160:2 161:19,23 |
| **facing** 65:13 | **fatal** 31:23 | **filo** 116:20,21 | 162:15 |
| **fact** 14:9 18:23 | **fault** 99:18 | 122:18 | **financings** 51:25 |
| 22:14 23:2 38:20 | **favor** 156:10 | **final** 2:1,8 24:20 | 108:6 |
| 45:23 47:11 50:24 | **federal** 18:7 | 25:3,24 26:8 | **find** 12:11 21:25 |
| 51:25 52:5 54:12 | **fee** 27:14 35:25 | 29:24 30:6,7,9,12 | 53:1,2,3 |
| 77:10 81:25 86:16 | 123:12 129:4 | 43:9,10,16 44:5,6 | **finding** 15:19 |
| 87:23 88:13,25 | **feed** 49:14 | 44:10 46:9 47:8 | 40:25 55:19 |
| 94:1 102:10 | **feedback** 14:18 | 47:10,14 70:24 | 110:19 111:14 |
| 111:17 123:16 | **feeling** 53:7 | 84:17 85:1,3 | 155:5,19 158:20 |
| 126:13 135:19 | **fees** 26:24,25 27:2 | 125:7 135:10 | **findings** 40:21 |
| 139:19 159:20 | 27:15,18,20 28:1 | 138:5 141:2 | 165:15 |
| | 28:2 35:23 36:21 | 142:18 147:20 | |

[fine - game]                                                                Page 17

fine   104:18
  144:23
fining   42:5
finish   55:12
finished   55:16
firm   78:18 162:21
first   8:11 9:16
  10:13,17 12:17
  15:24 18:10 31:2
  31:11 35:2,23
  39:5 44:17 48:15
  50:3 55:3 58:5
  65:2 76:16 86:10
  96:8 99:10,19
  100:4 101:23
  102:14 103:19
  104:12 108:1
  116:20,23 117:2
  121:8,10,14,15,17
  121:18,20,24
  122:7,10 123:12
  133:19 134:25
  135:2 136:6
  137:18 138:1
  140:5,9 142:16
  146:15,18 156:7
  163:18
firstly   60:20
  111:16
five   11:3 24:9
  61:23 101:23
  114:22
fix   67:12
flash   70:1
flat   61:10
flavor   33:4
fleet   10:24 63:14
fleming   59:16
flip   86:9 92:14
flow   48:14 60:22
  92:14 93:19
focus   14:12 54:25
  68:10 86:22

focused   82:1
  108:6 110:19
folks   18:2,23
follow   49:12
  50:10 94:17
  161:19
following   18:12
  63:21
force   21:4
forced   163:12
forecast   60:22
  92:15 93:19,22
foreclose   50:8
foregoing   168:3
forget   148:14
form   12:14 15:15
  16:2 29:10 37:14
  40:11 43:16 61:6
  71:3 87:1 148:1
  148:21 150:8
  153:18 154:15
  163:14 166:24
formal   90:12
  132:17
former   38:11
forth   10:10 16:15
  45:15 47:4 52:6
  65:22 112:7
  115:17 116:5
  123:3 129:2,15
  142:3,5
fortnight   131:19
fortunate   166:20
fortune   52:6
forward   22:1
  23:21 116:4
  117:11 119:15
  130:21
fought   114:21
  123:1 128:15
  129:2 137:8 142:6
found   14:3 15:16
  33:7 49:18

foundation   72:6
  86:10 104:8
  155:16
founder   12:25
  13:6
four   9:18 10:11
  10:18 18:8 142:10
  150:5 161:12
fourth   10:15
  13:18 18:9
frame   19:20
francisco   139:3
frankly   16:25
  45:19 111:19
  133:2 139:12
  156:15
fraud   18:5 30:24
  38:8,11,20,21,22
  39:2,5 89:9
fraudulent   38:17
  149:17
freefall   50:22
  134:17
french   3:13 8:8
  58:6,7,12,14,18
  59:2 60:2,5,7,9
  68:5 75:24 76:4
  80:18 83:11 85:6
  85:25 87:7,25
  88:15 94:16,24
  95:2 100:25 101:4
  101:6 103:13,15
  103:18,23 104:1
  104:12,18,24
  105:18 106:20,22
fresh   35:21 42:21
  51:21
friends   144:19
front   51:22 76:1
  103:2 118:11
  157:23
fuel   10:19 69:16
  90:20

fujairah   12:3
  63:15
fulbright   4:17 5:1
  49:9 156:1
fulfilled   67:2
full   18:16 27:17
  27:17 28:6 39:8
  69:15 91:14
  121:22 123:12,18
  151:17,23,25
  152:1 162:14
fully   43:8 120:22
  159:21
functionally
  42:25 150:25
fund   12:1 46:10
  64:22 79:10,21
  110:4 134:15
fundamental
  132:5
fundamentally
  115:12 118:6
funding   22:17
  42:4 66:12 113:24
  135:15,20 146:8
  150:2,3 152:19
funds   29:14 42:21
  46:7,10,15 93:19
  143:5 157:25
  161:2
further   13:20
  14:14 27:19 48:14
  65:12,25 80:18
  103:10 106:22
  125:20 130:13
  156:24 164:1

g

g   8:1
gabriel   7:2
gallagher   4:1
game   51:17,17
  137:1 139:18
  153:5

**gas** 10:23
**gears** 141:12
**general** 36:3
  143:2 148:4
**generally** 19:10
  46:12 76:10 81:20
  82:8 89:11,25
  113:15 124:2
**generate** 52:15
  62:4
**generated** 137:9
**generation** 140:9
  140:9
**generous** 160:4
**george** 6:16
**getting** 29:7 33:21
  35:21 37:10,16
  65:15 87:14 102:7
  119:7 134:7
  144:24 149:17,18
  159:16 160:15
  164:11
**give** 9:22 22:5
  43:3 58:22 59:12
  107:4,20 108:13
  118:23 144:20
  147:23
**given** 11:21 16:5
  37:25 41:24 43:7
  60:12 68:18 83:16
  91:13 113:1
  114:23 130:1
  137:14 138:20
  140:4,19 145:21
  146:5,6 147:20
  149:7
**gives** 34:16
**giving** 83:1 89:20
  139:13 141:7
**glasses** 57:24
**global** 11:25 20:1
  22:10 47:24 61:19
  61:23 63:10 65:20

67:14 68:9 71:8
  92:14,22,25 93:7
  93:14,19,21 94:12
  95:18,23 96:8,20
  97:21 109:15
  111:17 114:7
  141:1
**globe** 11:1
**gluck** 5:6
**go** 10:15 18:10
  19:3,11 22:13
  23:17 29:5 44:20
  46:11,16 49:12
  50:18 51:25 54:1
  55:10 62:20 65:11
  65:19 77:20 82:9
  82:17 88:8 90:22
  91:20 94:2,4
  102:24 103:14,16
  107:10 110:11
  111:21 116:10
  133:18,20 138:5,5
  139:15 141:1,12
  142:23 159:4
  160:23 167:7,8
**goal** 18:11
**goals** 110:17
**god** 165:7
**goes** 35:23 54:4
  83:25,25 84:24
  102:2 147:17
  165:24
**going** 9:18 13:13
  19:15 22:2,5,9
  23:22 24:1,2,5,6
  25:15 26:15 28:2
  37:7 42:21 46:19
  46:22 51:7 52:4
  52:20,21,25,25
  53:2,3,14 54:13
  55:12 56:18,24
  57:7 58:1,3 69:7
  76:9 77:14 85:11

91:7 93:6,7,7,10
  94:5 95:8 96:23
  98:1 99:6 102:21
  103:9 110:17
  115:13 117:19
  128:22 129:15,17
  129:20 131:13
  133:20,23 134:16
  135:21 136:6,15
  140:1 141:14
  144:18 145:8
  147:24 148:9
  152:14 153:23
  154:21,23 156:3
  160:17 162:15
  164:10 167:3,12
**goldman** 74:1,3,4
  74:13,20 75:10,11
  75:15 76:17 78:3
  78:8,15,18 117:1
  117:16,22,25
  118:5,18 119:16
  119:23 120:13,16
  120:22,25 121:2
  121:23 122:6,15
  123:9 132:5
**goldman's** 74:6
  74:11,18 78:14
  119:10
**good** 8:2,4 19:13
  28:17 32:7 40:21
  40:25 44:22 52:6
  53:13 55:19 58:6
  59:3 80:24 81:6,7
  115:1,4 126:2,3
  131:11 141:17
  142:3 155:5,7,17
  155:18,24 158:20
  161:10,25
**gotten** 33:6 132:2
  134:9 140:4
**governed** 106:19

**grain** 165:18,19
**granted** 56:5
  143:11 152:20
  156:13
**granting** 2:5,7,8
  143:3
**grants** 37:20
**gratitude** 8:12,18
  8:19
**gray** 5:15
**great** 54:7 132:1
  133:21 135:7
  136:6
**greece** 82:10
  162:2
**green** 1:13
**greg** 7:7
**greissman** 4:15
  161:10,11
**grey** 154:8
**griffin** 6:12
**gross** 95:12 96:5,7
  96:9,18 97:3,8,21
**ground** 162:21
**grounds** 101:2
**group** 3:16 4:18
  5:2 10:2 12:7
  28:20,21 33:20
  49:11 66:16,16
  67:3 68:19 70:16
  72:24 73:3,8,23
  75:7 87:18 107:19
  112:4 146:14
  149:11,13 154:13
  154:16 163:1
**grown** 11:6
**guaranteeing**
  143:18
**guarantees** 37:24
**guarantor** 160:15
**guarantors**
  144:14

guess  46:1 48:5
  49:16 130:11
  138:7 145:20
  150:5
guilty  164:2
gump  3:15 28:18
  81:3 125:23
  146:13
guys  101:24
gymnastics  8:21

**h**

hadley  5:8
half  124:15
  130:19 161:14,15
hallmarks  43:12
hamburger  141:8
hand  10:7 14:21
  14:22 58:20 90:21
  107:3 122:23
handed  91:9
handful  28:24
handle  47:18
handled  82:6
handling  19:1,8
hang  134:18
happen  29:23
  43:8 49:22
happened  33:10
  49:21 51:1
happening  65:1
  128:23 159:8
happens  25:3,10
  25:11,16 49:25
  50:5 110:15
  123:21 160:8
happily  146:9
happy  24:23
  25:20 27:18 28:11
  48:24 117:5
hard  100:25
  114:21,25 123:1
  128:15 129:1,11
  137:8 138:20

142:6 161:20
harm  152:7
harmed  38:20
harrison  6:22
harry  101:12
hasn't  126:10
  134:9
hatch  143:5
hatches  143:20
hauer  3:15 28:18
  81:3 125:23
hayes  3:12 8:9
he'll  138:5
head  49:5 143:4
headline  19:20
  23:20 24:15
headwinds  30:24
hear  9:19 22:12
  28:15 49:8 53:20
  54:13 56:13 57:7
  57:14 58:1 81:23
  131:10 138:9
  141:19 146:3,9
  167:9
heard  19:10 28:16
  30:20 32:13 44:18
  46:2 50:25 51:10
  51:14,20 57:19
  81:21 109:23
  111:7 131:18,23
  131:25 132:4,12
  132:14 133:21
  135:13 139:20
  140:14,15,25
  141:5 143:7,25
  144:18 153:6
  156:2 158:23
  160:3,6 163:25
  166:5,13
hearing  2:1,8 9:12
  19:11 20:11 21:17
  25:3 29:16 36:7
  41:14,19 43:3,9

43:10 44:6,6,10
  103:12 131:10
  135:10,11 141:3
  147:19,20 151:3,5
  152:15,16 153:24
heavier  73:9
heavily  57:8,9,11
heavy  17:9 68:10
hec  13:1
hede  8:9 43:20,24
  58:19,23 59:1,3
  59:22 60:11,14,15
  80:22,24,24 81:6
  86:2 87:12 90:5
  90:18 91:15,21
  93:21 94:1,5
  95:15 97:24 98:4
  98:11 99:12,16
  100:4 101:12
  103:17 108:24
  110:2 124:8
  129:18 131:18,23
  132:2,15 138:12
  139:14 142:7
hede's  109:24
hedging  12:21
held  45:4 167:3
hell  39:10
help  120:15
helped  17:4 123:9
helpful  8:25 9:23
  167:10
herlihy  101:18,22
herring  52:18
  56:2
high  39:10 78:24
  95:1
higher  22:25
  57:18 62:9 77:22
  122:15 134:6
  142:2 144:16

highly  17:19
hill  59:16
hired  17:24
historical  111:23
hit  143:3
hoc  3:16 10:2,8
  12:7 17:15 28:20
  28:21 47:17 49:16
  49:20 54:9 55:4
  55:18 66:16 67:3
  70:16 72:24 73:3
  73:8,23 75:7 78:8
  81:4 85:17 87:14
  87:17 120:23
  146:13 154:13,16
hoc's  57:20
hocs  57:17
hold  59:25 69:23
  80:15
holders  12:6 16:4
  17:16 24:10 51:14
  54:10 55:18
holding  69:11,14
  167:1
holds  28:22 69:9
hole  14:19 15:7
  21:20
homes  59:16
hon  1:22
honor  8:4,6,11,23
  9:6,11,14 10:4,6
  10:10,17 11:5,10
  11:16,20 12:9,11
  12:16 13:18,22
  14:4,5 15:18,21
  16:5,9,21 17:8
  18:2,8,25 19:4,12
  19:13 21:3,10,18
  22:1,14,18 23:8
  23:14,19 24:7
  25:7,20,25 26:7
  26:19 27:1,7,18
  28:5,11,17,21,23

29:1,22,25 30:5
30:11,16,21 31:3
31:10,21 32:3,7
32:13,24 33:3,17
33:22 34:1,14,24
35:3,11 36:1,8,24
37:4,14,22 38:4,6
38:17 39:5,13
40:1,12,20 41:10
41:12,24 42:12,13
42:24 43:5,11
44:3,13,19,22,24
44:25 46:1 47:3
48:24,25 49:3,7
49:23 51:5,13,23
52:3,5,11,17,19
53:1,8,19 54:2,23
55:11,24 56:16
57:2,5 58:4,6,18
60:2,5 68:5,6 69:7
71:2 72:4 75:24
80:19,21 81:2
83:11,17 85:6,10
85:13,23,25 87:7
87:25 88:18 91:19
95:5 100:22 101:1
102:21 103:13
104:1,8 105:19
106:22,25 107:9
118:13,20,23
119:1 125:20,22
130:13,18 131:3,6
131:8,12,13,14
132:12 133:17
135:14 136:1,24
137:5,10,14 138:2
138:23 139:11,16
140:5 143:3,11
145:17,23 146:5,7
146:12,14 147:8
147:17,24 148:5,9
148:15 149:4,9,15
149:22 150:1,13

150:24 151:7,12
152:3,8,14,24
153:6,15,17,21
154:7,9,17 155:5
155:23,25 157:5
157:23 158:6,16
159:6,18 160:22
161:3,10,25
162:23,25 163:16
164:22 165:2,12
165:19,25 166:19
166:23,24 167:17
**honor's**  11:22
18:13 43:18 47:20
94:24
**hope**  18:15 119:16
**hopefully**  18:12
98:19 133:24
136:16 167:15
**horrendous**  165:7
**horse**  115:16
**host**  133:20
**hour**  78:2
**hours**  24:9 25:13
105:15 131:20
150:5
**house**  24:18
**how'd**  65:19
**hsh**  161:12
**hubs**  10:25
**huge**  56:2 139:23
141:9 165:21
**hundred**  122:16
141:3
**hundreds**  145:10
**hunting**  144:18
**hurdle**  53:9
**hurtado**  6:23
**hyde**  2:25 168:3,8

**i**

**idea**  55:24 88:9
132:16 146:16
148:19 153:9

161:17 165:7
**identical**  72:11
**identification**
99:9
**identified**  110:24
**ignored**  72:24
**ii**  2:4
**iii**  2:6
**il**  3:6
**illustration**  11:11
11:11 14:20
**immediate**  136:19
**immediately**  13:2
17:2 51:19 79:9
90:21 99:22
130:20
**impact**  132:15
**impacts**  46:4
**impair**  43:21 90:7
90:16
**impeached**  85:7
**impeding**  33:19
**impermissible**
149:9
**implicit**  160:23
**important**  18:19
30:19,23 36:23
46:24 50:23 51:17
55:20 59:19 64:13
89:6 109:24 110:2
135:6,16 148:11
148:15 166:2
**impose**  137:3
**inability**  15:10,11
**inappropriate**
31:13 147:6
**inappropriately**
40:21
**inbounds**  148:16
148:16
**inception**  11:7
**inclined**  146:9

**include**  43:4
46:20 48:20 73:23
84:21
**included**  10:1
11:16 19:2 24:22
46:15,17 47:5
63:22
**includes**  40:21
88:22 89:12 93:22
165:21
**including**  9:4 11:2
18:21 32:16 38:13
39:1 46:2 127:13
129:1 141:16
157:22 159:9
162:16
**incomplete**  60:12
**incorporated**  47:7
77:18
**increase**  17:21
**increased**  15:5
17:6 65:6
**increases**  70:7
**increasing**  63:3
**incredibly**  34:3
**incremental**  21:19
35:5 61:14 69:1
**incurred**  70:24
**indentured**
154:10
**independent**
17:19,24 63:12,16
**independently**
114:14,17
**indicate**  48:18
162:14
**indicated**  44:24
47:3 64:15 82:16
**indication**  22:23
27:22 105:6
**indirect**  38:21
**indiscernible**
44:14 58:15 59:15

60:3 63:22 83:11
85:20 91:10 93:3
95:3,10,19,20
99:13 108:13,16
108:17 109:4
112:19 116:13
118:24 121:9,24
127:22 139:7
143:15 144:6
150:4 155:22
156:17 158:14,16
160:20 161:12,15
162:24 164:6,18
165:8,16 166:8
167:2
**individuals** 11:8
18:4
**indulge** 163:25
**industry** 8:17
10:23 30:23
111:20 160:8
**inevitably** 161:19
**inextricably**
56:21
**infirmities** 133:22
**inflow** 92:17,22
**info** 101:24
**inform** 123:9
**information** 111:6
117:15,18 118:2
**informational**
45:2
**inherent** 32:8
155:8
**initial** 129:4
**initially** 68:16
112:25 116:17
**injected** 17:3
141:4 146:1
**injuries** 157:2
**input** 45:9,24
46:24 54:18 83:8
83:20 84:7 86:14

**inquiring** 46:21
**inside** 22:17 41:11
**insider** 31:15 32:3
32:4,7,11 34:13
34:15,17 36:11
40:8 43:7,12,14
54:15,16 137:17
148:14 153:22
155:6,7,11
**insiders** 137:17
**insinuation**
131:25 142:4
**instability** 161:18
**instance** 31:2
**instances** 62:14
85:2
**institution** 34:5
**institutions** 34:8
**instructed** 138:12
138:12,13
**instruction**
139:13
**intangible** 135:16
**integrated** 16:13
**intend** 18:20,20
95:6 144:19
**intense** 137:8
**intensive** 13:19
14:7 114:21
**intention** 68:15
**intents** 16:6
**interacting** 74:19
**intercompany**
92:12,18
**interest** 22:23
27:22 34:22 45:15
45:17 64:5 111:2
112:5 121:3
122:13 155:10
162:3
**interested** 23:15
66:12 111:4,22

**interesting** 49:18
**interests** 32:10
163:2
**interim** 2:1 18:13
18:24 19:17 20:4
20:7 23:3 24:25
25:17,18 26:2
29:23 30:7,12
35:13 36:2,4,7
38:25 39:14 40:20
41:14 42:5,8,13
42:16 43:9,10
45:1 46:9 47:12
52:9,20 55:2,20
56:1 57:6,21
60:17 62:18 89:24
123:16 125:3
133:7 142:18
146:8 148:20,25
152:15 155:18
156:13 157:11,24
159:18
**internal** 77:23
81:19
**internally** 128:2
**international**
108:16
**interpretation**
47:10
**interrupted** 122:1
**introduce** 49:10
107:13
**introduction** 9:23
**inventory** 15:10
62:18 70:5,6
77:21 140:24
**inverse** 65:11
**investigated**
36:12,13 38:14
**investigation**
17:24,25 18:3,6
38:9 40:22 41:25
52:24

**investigations**
111:24
**investment** 8:10
22:15 108:8
**investors** 15:25
16:2,3
**involuntary** 21:7
**involved** 9:25
16:22 18:4 38:12
45:12 52:14 57:10
59:22 66:15 76:13
78:3 98:20,21
105:23 108:19,21
108:24 118:6
144:23 157:22
**involving** 144:25
**ironically** 57:17
**irrelevant** 143:9
**issue** 10:5 24:15
32:1,12 33:7
36:24 41:12 67:14
74:25 104:20
128:10 138:3
141:24 143:14
150:1 152:7,20,23
165:3
**issued** 62:15
**issues** 10:15 14:16
15:22 24:11,14
28:12 34:8,14,19
35:1 44:12 45:11
47:9 54:25 118:5
118:6 119:23,25
138:6 142:15
146:15 158:23
**issuing** 70:10
**item** 137:13
**items** 78:16 98:24
146:2
**iterations** 114:9
**iv** 2:6

| j | | | |
|---|---|---|---|

**j**

**jamal** 8:10 107:1
107:6,11,14 110:6
116:12 119:3,16
120:1,8 121:12
122:21 123:11,24
125:9,25 126:2
127:20,20 130:16
130:18 131:18,23
133:2 138:13
139:14,20 142:5,8
142:14 144:18
145:22 155:15
159:22 163:25
**january** 87:5
**jason** 6:8,20
**jeffries** 108:2
**jobs** 81:17
**joined** 8:6
**judge** 1:23 8:20
8:21 9:14,18 19:1
25:4,14 49:12
50:1,10,16,21
51:6,15,17 54:13
54:20 55:3,16
60:15 133:4
159:23 160:7
164:7
**judgment** 32:3
72:2 137:20,24
**july** 15:17,20
16:23 32:14 67:8
68:15 86:11
105:22,23 108:20
**jump** 28:14
135:25
**jumping** 8:12,14
19:16
**june** 13:23 14:3
15:17,20 16:7
66:17 73:11
**junior** 75:8
132:23 145:10,18

**jurisdictions** 17:1
79:17
**justices** 54:23
**justify** 35:25

**k**

**kassner** 6:24
**keep** 9:14 10:4
24:5 50:23 112:24
**keeping** 136:3
**kept** 142:14
**kevin** 7:1
**key** 11:9 120:20
142:8
**kieselstein** 3:10
8:7 54:3 131:11
131:12 132:11
133:10,16,19
135:5,13,21,24
136:3,10,21 138:1
138:11,22 139:1,3
139:6,9,16 143:19
143:24 144:7
145:2,6,13,17
156:8 159:19
160:21 162:23
163:15,19,22
164:7,22 165:1,5
165:11,14 166:13
166:18,23 167:5
167:11,14,17
**kieselstein's**
160:16 161:4
**kimball** 59:16
**kind** 25:21 51:8
53:15 56:21 68:2
68:8 122:12 138:8
152:18 160:10
**kinds** 25:24
128:25
**king** 6:13
**kirkland** 3:3
19:14 58:7

**knees** 134:7
**knock** 146:14
**know** 25:15 29:3
38:12,14 45:25
52:7,13 53:19
55:3,15 57:15
61:15,19 63:3
64:17 65:6,22
66:1,22,23,24
67:1,8,11 69:2,8
69:13,18 71:14,21
72:5 73:6,10 75:1
76:23 78:7,23
83:25 88:8 90:21
90:24 94:2 98:2
99:1 100:25
101:14 102:8
105:11 106:6
111:22 114:22
122:15 126:17
127:11 129:18
130:10 132:9,9
133:2 137:21
139:4,18,23 142:4
142:5,24 143:8
147:11 148:10,18
148:23 153:10,11
156:4,21 160:24
166:11,14 167:12
**knowledge** 44:1
90:15 93:25
106:15,20 111:13
**knowledgeable**
81:18
**kristian** 5:6

**l**

**l** 6:14,15
**lack** 78:11 131:21
131:24 155:14
**lacked** 13:7 72:13
**lam** 6:25
**land** 145:18

**landed** 11:21
123:2
**language** 24:21
30:10 47:5,10,11
111:8,11 128:10
**large** 10:23 56:2
111:20 117:19
165:19
**largely** 74:16
**largest** 16:12,14
**lasalle** 3:5
**late** 12:18 113:7
**laughter** 154:20
154:24 160:18
162:4,20 164:4
**launched** 17:20
17:23
**launching** 112:23
**lauren** 5:12
**law** 38:15 41:10
155:5 158:21
**lawyer** 129:15
144:22
**lead** 126:25
**leading** 10:19
15:12 71:2,3
98:13 113:7
**leads** 18:9
**learn** 74:18
**leave** 44:16
144:14
**leaving** 15:12
**led** 12:12 14:2,22
15:6,9,11,13,14
31:24 34:7 43:12
121:1
**ledanski** 2:25
168:3,8
**lees** 5:13
**left** 16:7 119:13
120:17
**legal** 31:25 74:15
78:11 89:22 90:4

149:14 168:20
**legally** 25:12
**lend** 42:21,21
　78:18 111:20
　112:8,11 125:16
　153:3 163:17,19
**lender** 21:12
　30:20,21 31:2,11
　31:13,22 35:21
　36:9 51:2 55:21
　68:19 71:24 74:5
　81:23 82:2 85:2
　109:11 136:5
　145:1 149:6,8
　153:1,16 158:13
　160:4 162:5
　163:24
**lenders** 13:9 14:6
　14:13 16:4 17:10
　21:4 23:9 24:19
　25:8,11 33:13,21
　51:3,6 63:5,19,23
　64:6,25 65:21,24
　66:6 67:15 68:20
　82:14,22 83:23
　84:16 87:18 93:7
　101:25 108:22,24
　109:3,5,14,17,18
　110:24,25 111:17
　111:19,20 123:18
　139:24 142:10
　143:4,20,21 152:8
　153:2 158:12
　161:21
**lending** 24:25
　28:7 32:15 68:25
　135:7 145:5
　163:21,22
**length** 88:23
**lent** 150:9,18
　162:6
**letter** 62:15 68:14
　74:25 75:6 85:19

86:3,15,20 111:8
**letters** 15:3 27:7,9
　70:10 77:22
　120:24
**level** 73:3 112:1
　127:1 129:14
　132:22 142:6
　166:19
**levels** 79:25 80:4
　112:2
**leveraged** 108:4
**liable** 143:17
**liberty** 5:9
**libor** 122:14,17,18
　122:19
**lien** 47:3 67:10
　89:17,21 122:11
　122:18 125:4
　142:17,17 143:10
　144:10 158:11,13
**liens** 2:5 36:10,12
　36:16 37:7,11,16
　56:5,6 57:1 89:12
　89:15 124:24
　142:16 143:3
　149:8 151:11,11
　161:14 162:9
**life** 20:17
**lifeline** 50:20
　51:11 64:23
**light** 155:13
**likelihood** 74:24
**limited** 9:13 14:15
　18:3 37:2,21
　49:11 64:11 66:10
　112:5 152:19
**line** 48:16 50:16
　60:23 83:12
　137:13 167:10
**lines** 83:13,14
**lion's** 62:1
**liquidate** 79:9
　80:1 90:7

**liquidated** 24:2,2
　39:10 132:13,17
**liquidating** 18:17
　26:10 66:14 91:2
**liquidation** 12:15
　14:19 15:15 16:2
　16:7,23 17:1
　43:18,21,25 50:21
　50:22 65:13 66:11
　79:22 80:3 90:11
　90:12,14 91:3,5
　116:2 121:17
　126:10,14,16,24
　127:3,9,12 136:11
　136:19 152:25,25
　153:7,8 161:18
　163:3 165:7
**liquidations** 23:23
**liquidity** 13:21
　14:8 15:4,9 17:4
　19:24 21:19 29:18
　34:10 51:4 63:4
　64:9,12,13 65:1,5
　67:4,19 68:22
　69:1 109:7,21
　110:20 131:20
　141:11,16 152:21
　152:23 164:14
**list** 34:25 66:23
　119:23
**listen** 52:22
**listening** 125:1
**litigate** 79:24 80:1
　90:10
**litigation** 28:14
　38:5 39:1,18,20
　40:3 44:11 79:13
　89:13
**litigators** 26:9
**little** 30:18,20
　33:4 41:22 44:20
　49:4,10,13 51:20
　71:9 77:2 91:8

103:19 109:23
　111:7 122:20
　131:25 147:10
　164:2,9
**live** 114:12 140:11
　166:20
**lives** 139:3
**living** 17:10
　159:22,22
**llc** 4:3 59:5
**llp** 3:3,15 4:1,9,17
　5:1,8,15 6:1
**loaded** 62:16
　71:20
**loading** 69:13
**loads** 69:25 71:10
**loan** 12:8 20:13
　21:19 23:12 26:2
　28:4 31:4,8 35:8
　48:15 49:22,23
　50:6 52:15,15
　60:21,24 61:25
　67:10 91:20 92:3
　92:18 112:4 114:8
　115:19,19 116:21
　116:22 121:7,11
　121:14,25 122:9
　122:17 126:7,8,18
　126:18 140:6
　149:5 150:6,8,17
　153:18 163:9
**loaned** 150:11
　157:10
**loaning** 40:16
**loans** 12:2 51:9
　124:3
**local** 18:7 34:22
　52:10 53:4
**location** 45:5
**locations** 10:25
　12:3
**lock** 41:21

logistical  8:20
logistics  10:19
london  108:2
long  34:25 36:19
  52:22 57:9 58:16
  65:24 66:12,23
  70:22 77:5 82:17
  82:18 106:11
  108:8 114:21
  166:21
longer  12:25
  167:4
look  25:5 30:4
  31:8 48:14 60:21
  87:4 93:9 96:7
  97:11 107:1 109:8
  118:10 120:5
  125:15 130:6
  134:15 148:6
  150:20 154:3
  165:18
looked  14:20
  123:8
looking  48:4 55:3
  57:17 110:18
  153:4 158:8,10
loop  14:18
loosened  69:2
  109:21
lopsided  131:14
lose  133:1 161:21
loses  134:4 140:17
losing  111:25
loss  163:10,10
losses  12:21 17:21
lot  15:23 25:14
  32:15 45:5 49:21
  52:13,21 53:20
  59:19 73:9 77:14
  103:9 106:7 109:7
  118:19 122:19
  123:2 128:22
  153:21 156:2

157:13 160:1
  167:7
lots  128:23,23,25
loud  55:12
louis  4:23 49:8
  156:1
love  135:14
lower  45:18 121:2
  121:5
lowered  64:10
lubrication  141:4
lucia  6:23

                m

m  1:22 3:12 4:7
  6:11,12
madison  45:5
magnitude  80:13
major  46:3 57:2
majority  62:8,9
  62:14 71:24
maker  138:10
makers  138:12
making  98:5
  106:13 134:9
man  132:17
manage  68:17
management
  17:20 38:13 46:2
  46:3,5,21 59:5
  71:7 78:13 81:9
  83:24 114:11
managing  59:7
  80:25 81:8 107:18
manifested  33:16
  57:16
manner  162:13
mantle  165:17
marc  3:10 4:22
  8:7
march  14:6
margin  134:10,11
marine  1:7 8:3
  10:19,19

mark  5:21 102:22
  131:12 154:7
marked  60:4
  85:12 91:15 94:6
  99:8,19
market  13:2 27:8
  31:21 41:23 57:8
  110:17,23 112:8
  125:15
market's  112:3
marketing  18:16
  116:1 126:20,25
  133:3,4 145:21
marketplace  14:1
  115:15 135:14
markets  69:10
marking  60:1
  99:14
marshaling  25:23
maslon  6:1
massive  38:8
masumoto  44:19
  44:21,22,23 48:8
  48:13
material  79:14,16
materially  65:2
materials  66:19
  66:23 75:15
matter  1:5 26:16
  54:8 137:20
  138:17 139:18
  159:20
matters  19:10
  59:13 62:19
matured  12:5
  154:12
matures  12:6
maturity  33:7
  113:2
maximize  18:15
  58:3 126:21 127:1
maximum  56:24
  64:8 116:1

mccloy  5:8
mccolgan  7:1
mean  36:3 39:6
  50:15 53:20 56:16
  57:7 88:13,14
  104:13 126:15
  130:17 134:25
  135:5 143:13
  157:18 165:14
meaningfully
  33:9
means  50:8 84:16
  96:18 137:1
meant  84:16
  111:21
measures  17:21
mechanics  82:12
mechanism  27:11
media  59:15
meera  7:5
meeting  17:13
  45:3,10 113:7
meetings  76:13
  113:9
member  17:12
members  17:19
  38:13 75:7 114:10
memorandum
  16:10 17:2
mention  155:4
mentioned  42:12
  46:1 54:4 56:1
mercuria  4:18 5:2
  16:10,11,12,20,22
  17:11 19:25 27:24
  29:5,9,9 30:21,24
  31:7 32:14,17,21
  32:24 33:8 34:2,3
  34:7 37:4,15,21
  38:18,20,22 40:15
  40:24 41:4,16,20
  42:2,6,21,22
  49:11 50:12,18,24

51:5,8 54:11
55:25 67:17,22
68:2,8,20,22,24
69:21 70:4,12,13
70:19,19,24 71:23
72:2,6,9,14,17,20
72:25 73:1,13,18
77:12,18 79:1
81:22 82:1 84:21
84:22 85:2 86:3
87:2,19 88:13,19
88:22 89:2,5,12
89:21,24 90:8
93:6,8,10 105:6
105:12,24 106:5
106:12 108:25
109:3,10,13
111:18 113:17,21
114:1,6,15,17
115:3,11,12,17
116:6,8,14 120:3
120:11,21 121:1,6
122:3,9,14,17,21
122:23,25 123:4
124:14,19 125:4
125:13 128:15
129:10,14,22
130:4 133:9,13,14
134:13,15 135:1
136:25 137:6
142:2 144:19
145:3,9,19 149:24
155:17 156:2
160:4 163:23

**mercuria's**  33:15
36:11 37:1 40:21
71:5 81:21 106:3
106:10 109:18
115:6 122:8
123:15 129:4
153:6

**mergers**  108:4

**merit**  158:25
**metaphor**  8:16
**metaphysical**
140:7 145:8
**metrics**  13:17
**mew**  1:3
**michael**  3:9 8:7
107:8 161:25
**microphone**  58:25
**middle**  108:23
**midsentence**
55:10
**milbank**  5:8
**milestones**  41:13
55:23 134:19,19
**million**  13:6,23
14:11 16:19 17:3
20:1,2,3,4,6,7,12
21:19 22:9 26:1
27:17,18 29:6,18
32:19 33:5 35:4,7
35:9,14 38:10
39:6,22 42:17,19
44:7 47:22,22
48:1,1,2,6,6,16,17
48:18 60:25,25
61:18,20 63:23
67:11 69:1 75:9
78:24 79:20 89:8
89:14 92:3,5,7,11
92:12,17,20,21,24
93:2,3,10,11
96:10,15,19 97:5
97:14,17,21
104:22 105:13,15
116:21,22,24
121:13,18,19,20
121:21 130:4
140:1,2 141:3
143:8 149:2 150:3
150:13 156:22
157:2,10 161:13

**millions**  145:10
**mind**  11:19 54:7
142:9
**mindful**  156:4
**mine**  59:19
**mineola**  168:23
**minimum**  44:5
78:24 147:19
148:25
**minneapolis**  6:6
**minor**  102:12
146:15
**minute**  38:5 144:1
**minutes**  156:5
**misappropriated**
18:1 38:10
**mischaracteriza...**
10:3
**mischaracterized**
49:17
**missing**  13:15
59:24,25
**mistake**  26:11
52:2
**mn**  6:6
**mna**  108:7
**mobile**  10:22
**model**  64:16 77:1
**modern**  10:24
**modified**  145:7
**modifying**  2:7
**moelis**  22:16
101:13 107:16
108:5,20 110:24
114:10 117:17
126:10 128:2
159:21
**moelis's**  107:18
**mole**  147:11
**moment**  13:5
**monday**  99:23
100:15

**money**  20:4 21:14
21:25 26:1,2,12
29:3,4,14 31:8
35:6,21 40:16,19
42:15 44:8 48:12
60:16 78:18
111:25 112:4
119:14 129:23
130:1 132:10,25
134:4,8,9 135:7
136:6 140:6,6,17
141:14,16 145:14
146:1 149:3,20
150:7,14,18
156:24 157:14
162:6 163:18,20
**moneys**  28:2
**month**  72:25
**months**  15:16
50:18 65:15
134:18
**moore**  9:9
**morning**  77:7
125:1
**motion**  2:1 19:8
24:8,23 136:23
163:5,12 165:21
**motions**  9:17,18
9:22 166:19
**mou**  31:3 32:13
32:16 33:8,12,14
33:14,16 108:25
109:12
**move**  62:19 79:18
88:17 100:22
117:10 123:22
**moved**  65:2 108:5
**moves**  130:21
**movie**  155:1
**moving**  77:17
132:11
**multiple**  17:1
24:13 78:14

148:16
**multiples** 157:25
**multitude** 111:16
**music** 24:6
**muster** 137:5,7
**musty** 139:25

**n**

**n** 3:1 8:1 168:1
**n.a.** 4:10
**n.v** 4:2
**nail** 143:4
**name** 107:14
   108:18
**narrow** 166:1
**narrowed** 24:14
**national** 6:2 162:1
**nature** 15:1 146:6
   162:24 165:24
**nda** 111:12 128:8
**near** 17:3 18:10
   74:21
**necessarily** 23:8
   134:24,25
**necessary** 44:5
   47:21 147:20
   148:25
**need** 19:23 20:10
   20:12,15 21:14,16
   21:25 29:4,6
   36:12 42:17 48:11
   48:12 60:16 62:17
   65:4 67:1 74:10
   75:1 92:3 93:11
   101:24 110:12
   125:10 131:16
   132:16 135:6
   150:2,3 152:22
   159:15
**needed** 13:24 14:8
   17:20 29:15 48:18
   74:15 78:1 110:20
   113:13 114:25
   150:14

**needs** 30:15 36:13
   41:11,18,25 67:4
   67:19 70:8 71:23
   77:24 113:24
   132:10 141:11
   156:13
**negative** 14:18
   17:5 71:17
**neglect** 155:3
**negotiate** 23:4
   33:9 72:21 115:1
   115:4 142:19
**negotiated** 57:8,9
   57:11 73:21 106:5
   109:16 114:4
**negotiating** 67:24
   77:11 113:1
**negotiation** 17:15
   32:23 122:22
   123:1 128:16,21
**negotiations** 16:9
   63:5 65:17 66:15
   66:18 70:16 73:23
   76:11 113:21
   114:9,15,18,20
   129:13 139:13
**neither** 25:13
   89:19 90:1,10
**net** 16:18,19
   48:11,14 96:1
**nets** 71:15
**network** 1:7
**never** 54:14 57:10
   57:16 63:25
   137:25 144:4
**new** 1:2,14 3:18
   4:5,13,20 5:10,19
   20:3,4 25:25
   26:12 29:4 35:6,8
   40:19 42:14 44:8
   45:5 52:7 55:5
   61:6,7 68:16
   108:2 129:23

130:1 140:6,6
   141:14,16 149:3
   149:20 150:6,14
   150:18 152:19,21
   152:23 154:15
   157:14 160:15
**nice** 94:17,20
**night** 22:21 147:1
**nine** 12:9 108:1
   134:18
**nobody's** 53:5
   148:3
**non** 37:6 46:6,8
   46:11,16,17,20
   48:20,22 93:20,22
   93:24 111:5 112:6
   112:11 151:10
   163:5,12
**nonconsensual**
   21:11
**nordbank** 4:11
**normal** 20:17
   21:3,21 34:1
   66:13 84:4 124:10
**normally** 20:24
   142:24
**north** 3:5
**norton** 4:17 5:1
   49:9 156:1
**note** 16:4 18:1
   43:19 57:7 66:16
   84:3 120:25
   122:11 143:11
   154:10,11 163:11
   165:20
**noted** 133:2
**noteholder** 3:16
   121:2
**noteholders** 28:20
   66:16 67:3 70:17
   72:23 73:24 74:1
   75:4,16 76:17
   80:15 81:4 85:12

87:14 91:10,11,16
   91:18 92:15 94:6
   98:5,8,11 99:9,19
   99:20,21,23 100:6
   100:7,18,23
   101:11,17,22
   102:13 103:24
   113:1,5,12 116:5
   116:19 117:9,12
   120:23,24 122:17
   125:24 132:13
   136:23
**notes** 6:2 12:4,5
   28:23 39:7 63:18
   154:11
**nothing's** 35:22
**notice** 8:13,15
   13:9 19:17 145:15
   164:19 165:3
   166:5,8
**notified** 13:12
**notion** 150:16
   158:6
**notwithstanding**
   54:22 123:16
**november** 1:16
   12:5 33:7 45:4
   92:4,8,10 93:9
   113:2 154:12
   168:25
**number** 8:25 9:25
   10:25 11:2,21
   12:2 14:14 19:23
   22:5 25:21 26:9
   26:11 30:16 33:10
   33:17 44:12 59:16
   75:1 78:7 79:19
   96:15,25 97:5
   99:14 117:19
   156:21 157:10
   158:21 164:12
**numbers** 61:15
   83:12 85:16 99:12

99:16,18 129:12
130:7 140:22
**ny** 1:14 3:18 4:5
4:13,20 5:10,19
168:23

**o**

**o** 1:21 8:1 168:1
**o'clock** 45:6
**oath** 83:6 138:14
**object** 37:24 43:1
150:16
**objected** 26:13
**objecting** 18:23
22:22 101:2
**objection** 10:2
12:7 17:6 23:22
24:10 27:25 29:24
31:18 34:25 40:16
44:13 49:19 55:4
55:18 56:11,13
72:4,23 85:9,14
85:24,25 87:7,25
88:15 100:24
101:1,4,6 104:8
118:22,24 127:14
158:3,19
**objections** 31:6,16
34:12 49:15 143:1
**objective** 24:4
**obligated** 37:25
151:19
**obligation** 37:1,19
40:13
**obligations** 30:8
34:18 51:19
**obligors** 97:25
98:1 129:19,20
144:11,14 149:16
149:25 164:15,17
164:20
**observe** 73:13
**obtain** 2:3 18:11
23:7

**obtaining** 162:13
**obvious** 16:1
111:21
**obviously** 15:5
21:4 61:2,3 67:2
68:13 69:5,7,17
71:12,15 77:13
78:9 80:7,10,11
111:22 120:22
122:12 135:14
138:15
**occur** 41:17 46:25
116:3 130:12
**occurred** 12:18
30:8 89:9
**occurs** 47:14
133:12
**october** 75:4
76:18 94:12 99:10
99:21,23,24 100:8
100:15,18 101:17
101:22 102:15,16
102:18 103:2,3
**odd** 148:1,3,4,4
**offer** 67:3,7 73:17
73:20 118:20
147:4
**offered** 32:11
40:24 75:8 79:21
158:17
**offering** 67:18
85:22 126:24
142:3
**office** 8:24 24:13
38:15 44:23,24
45:1
**officer** 139:11
**offices** 11:9 16:17
**official** 42:1
**oh** 91:17 99:17
105:3
**oil** 13:18,20 15:4
16:16 27:8 61:25

62:2,12 64:17,24
65:1,2,8 66:13
68:10 69:9,15,22
69:24 141:6,7,8
**okay** 9:20 22:4
55:14 57:4 59:18
60:8 81:25 82:5
82:14,21 83:1
84:3,7,15 85:11
86:2,22 87:4,12
87:17,23 88:9,17
88:17,17 89:17
91:17,20,25 92:10
92:14 94:4 95:4,7
95:13,21 96:4
97:20 98:17 99:19
100:4,13 101:8
102:17,21,25
103:5 104:18
107:7 109:23
113:3,25 115:10
120:5 124:4
128:14 129:17
130:3 131:4
135:23 145:4
146:11 154:5,18
159:2 161:7
162:18 165:13
166:22 167:18
**old** 139:25 150:7
150:17 168:21
**once** 48:19 54:21
71:19 82:11 99:7
**ones** 35:2,3
142:10 159:12
**ongoing** 18:6
68:18 73:7
**open** 33:1 64:21
104:13
**opening** 9:15,22
115:18 131:15
156:3 158:18

**operate** 11:1
21:16,20 50:16
60:16 90:19,20
110:12,21 115:13
145:19
**operates** 13:19
16:16 118:7
**operating** 15:5,6
80:12 111:25
112:2 124:10
153:9
**operation** 11:4
13:20 64:22 123:4
123:11 126:24
127:3
**operational** 17:21
42:4
**operationally**
163:7
**operations** 11:14
12:1 63:9 64:14
66:14 68:18 72:18
161:16
**opinion** 116:7
**opportunity**
30:24,25 38:22
56:23 111:3 112:4
154:15
**opposed** 20:22
24:6 47:9
**opposing** 115:18
**opposition** 53:20
**option** 43:7 115:7
**orchestrated**
38:11
**order** 10:5 18:13
24:25 25:17,24
27:11 28:24 29:23
29:24,25 30:1,6,9
30:12,12,14,17
34:20 35:1,13
36:3,14,20 38:25
39:14 40:20 42:5

42:9 43:22 44:14
45:1 46:2,9,10,21
47:2,10,14 52:20
53:6 55:20 56:1
57:6 89:24 125:4
125:7 132:14
133:20,22,23
142:23 145:7,7
146:10 147:9
148:21,25 151:2,7
153:18 154:15
156:25 157:4
162:12 167:1,7,8
**ordered** 142:19
**orderly** 66:11
**orders** 2:2 30:7
34:21 36:4 46:1
154:3
**ordinarily** 36:3
**ordinary** 52:8
144:9,9
**organizational**
45:3,10
**original** 102:18
144:14 161:13
**originally** 91:9
108:20 114:6
153:19
**ought** 142:25
**outcome** 150:12
**outflow** 92:20
93:3
**outlined** 82:12
**outset** 28:23 155:4
**outside** 22:17
46:11 56:19 64:1
64:2
**outstanding** 22:10
78:15 95:23 96:2
96:13,16,20 97:14
124:15
**outstandings**
64:11 130:10,19

**overadvance**
134:21
**overall** 113:16
124:21
**overcome** 54:3
119:24,25
**overnight** 77:6
**overruled** 85:9
88:3 127:17,17
**overseeing** 71:5
**oversight** 106:10
147:22 148:13
**overview** 54:20
**overwhelming**
139:19 145:25
146:6
**overwhelmingly**
156:10
**owed** 93:20,20
105:12 165:22
**owned** 11:12
**owner** 31:23
**ownership** 39:21

**p**

**p** 3:1,1 8:1
**package** 37:3 64:1
137:10,14,25
163:21,22
**page** 14:19 15:18
15:21 16:11,15
17:23 18:10 30:2
30:4 55:4,17,18
60:10,22 83:12,13
84:25 86:9 91:14
91:23 92:15,21,22
95:19 96:8,23
**pages** 59:25,25
164:23
**paid** 35:23 39:23
39:24 74:19
122:12 150:17
151:17,23

**painfully** 16:1
**paint** 53:21
**palace** 45:5
**paper** 11:21
**papercraft** 155:12
**papers** 155:6,11
**paragraph** 30:1,4
34:25 44:13 72:23
86:22,23 87:5
**parallel** 22:20
**pardon** 53:13
**parent** 63:18
**park** 3:17
**part** 26:15 35:14
41:20 47:7 50:3
52:8 55:19 61:1,2
66:18 68:24 70:12
77:15 82:5 106:5
113:22 121:23,25
147:6 163:21,22
**participated**
54:14 78:7 88:25
89:1,3,4
**participation**
78:21
**particular** 9:9
164:24
**particularly** 26:1
138:20
**particulars** 22:2
**parties** 22:21 33:9
73:11 111:2 112:5
112:7 134:13
148:16 160:9
**partner** 133:19
**partners** 28:14,19
**parts** 19:25 60:20
69:14
**party** 13:11 33:24
34:22 69:10 79:21
84:17,25 116:5
128:12

**pass** 8:19 58:10
137:5
**passed** 53:25
**passes** 137:7
**passing** 8:17
**path** 23:21 49:4
117:6 134:3
**paths** 110:10
**patience** 19:6
52:22
**patricia** 6:18
**paul** 3:8 8:4,4,16
9:20 10:10 19:11
19:12 49:17
**paul's** 19:15
**pay** 26:15 36:17
51:19 72:3 74:6,8
74:10 93:3,13
133:13 135:19
141:6 150:7 152:1
159:15 165:21
**payable** 62:4
123:12
**payables** 62:11
**paying** 26:24,25
27:2 35:20 74:18
82:6 151:25
**payment** 57:6
70:25 71:11 72:9
74:11 82:17 85:1
85:3 105:6 159:9
**payments** 71:12
71:20 72:1,12
82:17,19 84:17
150:4
**pays** 61:4 72:3
**peculiar** 33:23
43:19 51:24 52:5
**penalty** 32:19
**pennsylvania**
107:23 155:13
**people** 16:17
111:21 118:19

133:3 134:3
165:22 166:6
**percent** 13:4
17:11 27:10 28:22
32:20 35:12,15
65:9,10,12 121:7
121:7 130:10,15
141:15 154:11
156:22 157:7
**percentages** 28:1
**perfect** 12:13 15:7
**perfectly** 143:6
**performance**
12:17 13:10,16
**performed** 8:20
**performing** 90:14
**period** 9:13 12:23
15:20 46:9 52:24
53:25 56:23 61:10
65:7 69:10 73:6
83:9,21 87:4
108:23 115:13
**periods** 73:9
**permissible**
149:21
**permission** 9:20
49:13 94:24
**permitted** 42:10
87:13 148:7
**person** 113:7
**personal** 138:3
**personally** 76:13
78:3 88:25
**perspective** 9:24
19:21 23:1,2,8
31:3 36:23 38:23
63:4 69:21 74:16
123:10 137:6,12
137:13 161:17
**petition** 20:22
21:4 22:10 26:17
26:18 27:6,13,14
28:8 32:23 35:7

35:16 43:13 45:16
45:17 52:15
124:17 129:19
130:20,22,23,24
130:25 143:17,18
144:12 147:25
149:5,5,10,19
151:11,16,19,22
151:24 153:22
**petroleum** 1:7
16:16
**phantasm** 145:22
**phases** 68:13
**philip** 3:22 28:19
**phone** 75:18
76:14 94:19,22,25
105:4 139:6,8
**phrase** 49:16
**physical** 10:25
69:15
**pick** 157:10
**picture** 94:19
**piece** 20:14 122:7
122:14 139:25
**pirro** 8:8 133:19
133:23 142:22
166:25
**pivoted** 68:19
**pjt** 76:25 101:13
101:18 102:13,17
103:6 141:19
159:7
**place** 12:14 16:24
38:18 41:25 69:3
72:9 114:11 123:1
163:18
**placed** 154:3
**places** 69:17
**plan** 18:18 56:20
56:20 144:21
151:18,23 152:1
**planning** 58:14

**play** 43:10 163:4
**played** 42:2
**playing** 153:2,16
162:25
**please** 8:2 55:8
58:21,24 59:3
75:24 86:9 101:14
104:19 107:3,7
**pleases** 19:19
**pledge** 38:4,24
40:16
**pledged** 40:7,10
44:11 150:24
152:5,6
**pledging** 38:1
**plus** 29:18 62:13
64:5 96:19 97:20
122:14,17,18,19
141:4
**pm** 1:17 9:13
167:19
**pod** 54:9
**podium** 19:7
146:3 147:5 159:6
**point** 16:7 18:19
23:9,20,20 26:6
28:13 29:24 33:8
43:17,19 53:14
55:17 69:24 77:7
87:11 102:12
105:15 110:6
116:12 119:19
122:13 133:13
135:25 136:3
145:8 147:18
148:11,24 150:6
152:14,25,25
154:13,17,22,23
155:4 156:25
158:5,17 159:17
161:3
**pointed** 159:19

**points** 55:24
71:21 122:16
129:9,16
**pole** 144:3
**politely** 10:3
**port** 69:12
**portion** 26:17
27:13,16 47:23
48:21 110:4 121:7
122:6,9,9 140:21
**ports** 11:1
**posed** 63:24
**position** 16:5
31:11 32:21 54:18
151:14 160:9
166:7
**positive** 17:6
71:16 82:21,23
142:25
**possession** 8:6
19:15 110:7
**possibility** 116:4
**possible** 41:23
47:10 65:13 66:5
119:24 145:11
**possibly** 151:25
**post** 20:22 22:10
26:18 27:6,14
28:8 33:8 35:7,16
43:12 45:16,17
52:15 124:17
130:20,23,25
143:18 151:16
**postpetition** 2:4
**potential** 67:12
79:13 80:10 81:12
112:24 113:16,23
117:8 127:21
152:7 157:2
**potentially** 111:3
117:5
**practical** 54:8

**practically** 165:16
**practice** 59:8
  148:4
**pre** 21:4 26:17
  27:13 32:23 60:4
  129:19 130:21,24
  143:17 144:12
  147:25 149:5,5,10
  149:19 151:10,19
  151:22,24 153:22
**preclude** 50:19
  70:15 148:21
  159:19
**prefer** 132:13
  143:25
**preferable** 23:24
  43:19 165:10
**prejudice** 152:13
  152:18
**prejudicial**
  143:23
**preparation**
  59:22 76:6
**preparations**
  127:12
**prepare** 87:9
  126:16
**prepared** 22:24
  126:10 151:8
**preparing** 75:21
  77:12 126:13
**prepayment** 15:3
**prepetition** 22:9
  35:10,12,21 37:1
  37:16,19,21 38:1
  42:3,6 45:16,18
  52:14 82:7 83:9
  83:21 98:1
**present** 21:23
**presentation** 10:6
  10:11 19:5,8
**presented** 39:15
  57:20 112:3 151:7

**presenting** 117:21
**presently** 37:25
  44:11
**preservation**
  166:17
**preserve** 136:8
  163:6
**preserved** 39:11
  53:4
**pressure** 69:18
**presumably** 29:8
  115:17 133:15
**presumptively**
  56:12
**pretty** 101:9
  141:17
**prevent** 106:12
**prevented** 86:24
  106:18
**preventing**
  111:12
**prevents** 93:23
  152:8
**previously** 85:12
  94:6 124:23
**price** 127:1
  144:24 162:1
**prices** 13:18,20
  15:4 65:1,2,8
**primarily** 11:23
  108:3 110:19
  128:9,11
**primary** 11:24
  46:7 61:25 77:10
  109:11
**priming** 2:4
  112:12
**principal** 31:1
  35:2 73:2
**principally** 148:1
**principals** 9:3
  129:14

**principle** 31:10,22
**prior** 37:18 62:15
  70:4 112:22
**priority** 37:5,16
**probably** 18:25
  49:7 51:25 53:8
  61:23,24 78:24
  79:19 114:21
  161:21 164:2
**probative** 142:4
**problem** 51:15
  134:2 135:5
  157:14,15,20
**problematic**
  29:25 30:10,14
**problems** 167:7
**procedures** 18:14
  41:15 50:8 56:10
  56:21 133:5,8
**proceed** 86:1
  103:15 107:9
  139:14
**proceeding** 34:23
  38:6 164:20
**proceedings**
  167:19 168:4
**proceeds** 20:25
  39:1 61:25 71:6
  89:15,18,21
  124:25 125:4
  140:8 142:17
  143:3,10 151:12
**process** 18:16
  22:16 26:13 31:7
  31:16,21,23 32:23
  33:1 34:12 41:21
  43:21 54:12,17
  58:2 69:4 74:14
  78:4 82:6 110:22
  112:23,25 113:5
  113:18 116:1
  126:20,25 133:3,4
  147:9,25 148:13

**processes** 73:8
  105:23
**processing** 128:9
**procures** 69:22
**produced** 113:15
**producing** 51:3
**product** 132:20
  137:9
**products** 16:16
**profess** 148:17
**profession** 165:1
**professional**
  59:10 107:24
**professionals** 9:3
**profitability**
  17:22 134:11
**profitable** 17:7
  163:8
**prohibiting** 148:2
**project** 103:1
**projected** 60:21
**prominent** 95:2
**promised** 18:8
**promotion** 160:21
**promptly** 18:17
**proof** 142:1 164:5
**proper** 147:23
**properly** 56:5
**proposal** 22:24
  27:24 50:13 57:16
  67:8 74:5 76:17
  77:9,12 87:18
  90:6 113:25 114:3
  114:6,8 115:6,8
  116:5 117:3
  120:12 122:15
  123:9 144:17,25
  145:4 156:10
**proposals** 33:19
  79:2 112:7
**propose** 28:14
  33:5 38:4

**proposed** 12:24
13:11 19:14 26:5
28:24 37:14 58:7
63:21 70:11 74:4
74:23 75:9 77:1
87:14 89:23 90:8
115:11 116:8,25
117:7 120:16
122:21 123:5
124:7 125:13
129:22 130:4
**proposing** 33:24
38:24 86:25
**prosecute** 53:6
**protect** 21:8 143:5
**protection** 2:7
19:19 24:18,22
29:10,10,19 37:10
37:11,13,15,20
40:11,12 43:4
51:9 149:23,24
150:8 151:11
157:6 162:11
**protects** 52:11
**prove** 32:7 36:8,9
155:7
**provide** 9:23
11:25 30:18 32:17
36:20 45:2 50:20
54:17 57:3 64:3
65:25 66:9 68:16
75:8,8 76:16
110:20 111:3,6
116:20 117:6,15
118:2 124:20
148:17 159:7
160:10,11 161:16
162:6
**provided** 8:25
19:25 21:7 30:5
38:22 46:14 50:21
50:24 51:8,11,21
66:18 68:23,25

70:23 91:10
109:20 111:4
117:6,18 159:10
159:25 160:2,11
162:11
**provider** 116:25
148:7
**providers** 111:1
**provides** 23:21
36:3,15 89:24
157:4
**providing** 18:15
49:13 50:14 55:22
62:23 73:12 109:6
162:9
**provision** 19:18
25:21,21 32:16
33:23,23 36:14,18
42:8,10 88:23
90:3 127:23 128:3
128:6 148:6
**provisions** 24:25
28:24 30:14,17
31:24 36:20,22
47:2,8 52:19 55:1
129:10 142:8
147:23
**pudding** 142:1
**pull** 137:18
**pulled** 123:8
**pulling** 69:12
**pumping** 141:7
**punting** 53:11
**purchase** 12:3
15:10 27:8 62:12
62:14 64:17 66:13
70:6
**purchases** 65:10
69:9 70:11
**purchasing** 90:20
**pure** 140:6
**purpose** 140:16

**purposes** 16:6
45:2 60:19 61:1,8
99:9 104:10,11
**purse** 32:22
**pursuant** 2:2
20:21 41:1 46:19
46:20 55:25 56:20
82:12
**pursue** 116:7
**push** 66:3
**pushed** 129:8,11
**pushing** 129:7
**put** 22:1 32:21
51:7 67:15 69:2
77:14 112:7 116:5
120:14 140:15
143:19 151:13
**puts** 69:22
**putting** 23:16
31:6 115:17
140:21 151:21
165:17

**q**

**qualified** 17:19
**quarter** 65:2
**quershi** 146:12,18
146:22,25 147:16
148:5,11,22
150:10,12,19,23
151:6 152:3,12
154:6 155:2
**question** 12:9
15:21 18:9 19:2
21:13,17 24:24
29:22 39:14,17
43:18 47:19,20
48:9 56:9 68:7
71:3 88:2,5,6
93:18 97:24 100:4
100:7,13,18
103:19 104:12
127:5,16 129:3,17
134:24 135:2

138:22 141:11
144:1 149:25
157:7 160:19
**questionable** 71:4
**questioned** 43:6
**questions** 10:12
18:9 19:4 23:17
28:13 29:1 44:15
46:7 48:25 54:25
59:19 62:17 63:24
64:2 72:7 76:24
82:1 83:3 86:10
101:1,10 103:10
104:2 105:5 106:9
117:20 118:9
125:9,20 130:13
132:5 154:1
**quick** 16:24 159:5
**quickly** 55:13
140:23 159:1
**quite** 39:19 44:25
45:14,20 48:21
**quiver** 144:15
**qureshi** 3:20
28:17,18 29:12,17
30:3 31:10,20
33:13 34:24 35:15
35:22 36:19 37:13
38:2 39:4,13,25
40:6,18 41:4,10
42:24 43:5 133:22
143:7 146:13
155:1,2 164:1
**qureshi's** 164:16

**r**

**r** 1:21 3:1 4:23
5:21 6:16 8:1
168:1
**rails** 135:7,9
**raise** 58:20 107:3
**raised** 28:3 49:15
55:1 118:5,8
119:23,25 142:16

143:1 147:18
153:15
**ran** 87:5
**range** 63:13 90:23
109:13 117:20
**rapid** 132:16
**rate** 95:25
**rates** 45:18 57:8
121:1 122:14
**ratio** 64:5 141:17
**rationale** 137:24
156:14
**reached** 111:1
162:10
**reaching** 162:12
**reacted** 13:2
**reaction** 112:3
117:3
**read** 25:14 29:4
30:11 31:5 35:6
35:18 41:10 54:8
88:8 94:23
**readily** 9:1
**readiness** 119:11
**reading** 42:16
49:18 54:8
**ready** 69:24 73:2
119:7
**real** 146:1 159:1,5
**realities** 45:21
**realize** 116:1
151:24
**really** 10:11 12:14
14:17 15:15 16:7
21:13 24:15 28:4
42:24 48:12 49:18
52:15 54:21 57:13
65:21 109:9 128:4
155:16 157:21
158:25
**reason** 23:14 42:8
49:25 50:10,11
52:10,18 56:3,20

78:2 114:23 115:3
132:24 134:2
141:21 153:1
158:2 159:23
**reasonable** 27:21
57:14 90:3 116:8
123:5,11 124:22
136:4 137:4,7,9
137:12,14 139:17
139:20 141:19
145:25 146:3
**reasonableness**
89:20 142:9
**reasons** 77:10
79:18 112:17
124:23
**recall** 83:1,6 84:1
84:7,13,14,18,22
85:4 87:15 89:5
98:6 100:5,8,11
100:14,16,19
102:15,20 103:7,8
104:2 105:5 111:9
115:20 127:7
128:5,20,22,24
129:1,2,4,8
**recapitalization**
107:18 117:8
**receipts** 61:16,22
93:24
**receivable** 13:24
14:25 15:13 18:4
20:17 21:22 22:6
35:19 62:5 70:2
**receivables** 13:7
20:25 21:2 61:7
62:7 63:23,25
93:17 124:11
140:24
**receive** 37:7 73:17
75:4 116:16 119:1
119:3

**received** 17:11
27:22 50:13 66:22
75:6 76:19 101:7
115:9 116:17
118:25 148:16
**receiving** 61:12
75:11,14 100:8,11
100:15,20
**recess** 55:7
**recharacterization**
34:18
**recipe** 163:9
**recognize** 9:7,11
95:15 103:2
**recognized** 34:21
**recognizing**
165:23
**recollection** 76:11
98:19 102:22
103:5 129:6,12
130:8
**recommend** 45:1
119:19
**record** 8:23 18:2
28:18 41:2,11
43:25 49:8 51:7
81:3 125:23
138:17 146:13
147:7,24 148:1
149:1,2 150:2
155:2,11,15,25
160:14 168:4
**recoupment**
132:19
**recover** 17:25
153:12,13
**recovered** 39:7
**recoveries** 43:21
43:22 90:7,17
**recused** 17:12
**recycle** 61:22
**recycles** 22:6

**recycling** 20:17
21:22 62:18
**red** 22:20 52:18
56:2
**redirect** 103:12
103:17 131:2
**redrawing** 93:17
**reduce** 26:14
52:24
**reduced** 13:13,14
13:21
**reducing** 14:6
15:2
**reduction** 14:25
64:7
**reed** 6:8
**reestablish** 17:4
**refer** 51:2 63:10
91:7 96:4
**referenced** 44:12
87:12
**referred** 47:23
85:20 86:7 96:4
**referring** 49:19
68:4 84:21 127:23
128:2 142:14
**refinance** 66:3
**refinanced** 17:8
**reflected** 47:7
100:6,14,19 104:3
**reflecting** 47:24
**reflection** 146:1
**reflects** 92:2
95:22 97:8 104:6
**refresh** 98:18
102:22 103:5
**refusal** 117:25
**regard** 46:14 64:3
78:14 145:25
163:2
**regarding** 40:21
44:25 45:8,12,16
47:3,9 49:15 89:9

90:2 113:22 127:8
128:2,5 132:15
**regardless** 37:17
89:17 148:9
**regenerate** 21:2
**regenerating** 61:6
**rejection** 80:8,9
90:25
**relate** 106:9
**related** 2:9 13:2,3
13:11 14:24 46:6
98:24
**relates** 61:2
**relating** 31:7
63:14
**relation** 61:17
62:12 63:24 70:8
71:8 74:22 76:24
78:9,9,10 80:8,10
91:1 93:16
**relationship**
32:15 38:18 68:25
73:13 141:18
**relationships** 17:5
**relative** 26:25
27:15,21
**relatively** 11:19
69:11 77:17
**release** 70:24
71:22 72:12 84:17
85:1,3 90:3
**released** 71:24
72:1 82:20
**releases** 89:24
**relevance** 100:25
101:3,8
**relevant** 18:7
153:1
**relief** 2:9 18:24
19:21 20:3 22:22
25:18 42:7 44:9
152:15 156:12
165:20 166:14,25

**relish** 140:18
**remain** 40:8
151:18
**remainder** 26:3
**remaining** 35:8
35:15
**remains** 148:22
**remarkable** 38:24
**remarks** 9:15
10:4 26:8 158:18
161:4
**remember** 128:18
129:9 134:1
**remind** 164:15
**reminded** 155:3
**remiss** 9:6
**remote** 145:20
**removed** 18:5
**removing** 17:9
**reorganization**
144:21 162:19
**repaid** 121:16,16
121:19,20 122:12
130:22
**repay** 124:16
145:14
**repeat** 68:7 88:5
**replace** 91:11
120:3
**replicate** 163:24
**represent** 28:21
33:25 46:10 49:6
101:13 108:16
139:11 162:1
**representation**
67:25
**representative**
53:12
**representatives**
54:11
**represented** 24:20
41:8 46:15 47:22
111:19 114:14,17

158:11
**representing**
108:15
**request** 21:1 82:9
98:12 136:5
**requested** 19:21
22:22 74:6 75:15
77:1 98:8 146:8
159:11 161:5
**requesting** 86:25
**requests** 14:14
33:18 98:6
**require** 72:11
110:3 119:23
123:18 124:12
**required** 33:24
70:6 74:22 77:21
77:23 113:1
119:13 124:19
**requirement**
69:20 77:22 147:2
158:6
**requirements**
109:22
**requires** 101:25
**requiring** 32:6
124:15
**reserved** 45:8
125:7 154:14
**reserving** 154:2
**resolutions**
138:16
**resolve** 78:15
**resolved** 128:13
**resolving** 128:11
**resources** 14:15
59:15
**respect** 11:5 20:8
20:13 21:11,21
23:1,19 24:7,12
25:25 26:12 27:18
28:6 30:1,8 32:12
33:20 39:1 47:1,2

47:16 55:1 93:19
108:22 113:10
147:25 149:22
154:14 166:3
**respectfully** 15:22
**respects** 26:5
**respond** 102:5,8
138:23 154:25
155:21
**response** 19:11
43:17 66:8,9
76:22 103:12
131:10 143:16
**responses** 33:18
**responsive** 143:1
**rest** 63:11 131:6
144:15 166:4
**restrict** 52:24
**restricted** 113:8
**restrictions** 69:2
86:23
**restructuring**
59:7,9,13 62:22
81:12,14,18 88:11
98:24 107:19
108:9 118:6
132:18
**restructurings**
108:3,6
**result** 30:23 34:13
34:19 64:4 70:2
98:2 118:1 129:20
149:12,16
**retained** 108:20
**return** 149:17
**revenue** 11:14
16:19
**review** 32:2 40:14
154:15
**revised** 77:8
101:15 147:9
154:3

[revisions - section]                                                        Page 34

revisions 77:3
revolver 156:18
revolving 35:7
rhetorical 132:12
  136:12
ribbon 163:8
rigged 133:6
right 14:21,22
  19:24 20:9 21:8
  24:3 25:1 26:23
  32:17 39:22 55:9
  56:3,7 58:20 62:2
  81:9,12,19 82:3,7
  84:5 86:4,12 87:2
  87:20 88:9,20
  89:14 90:3,8
  91:25 92:2,4,7,8
  92:10,11,25 93:2
  93:12,20 96:5,21
  97:9,15,18 98:9
  98:21,25 99:4
  102:3,3,19 104:25
  105:18 107:3
  108:23,25 119:5
  121:23 125:8
  126:5,8,11,22
  127:4,6,13,24
  128:3,7,8,16,18
  128:21 129:4,12
  129:23 130:3
  132:11 134:2,4,7
  139:5 144:24
  145:12 146:25
  147:16 150:10,12
  150:19,25 152:12
  154:2 163:6,13
  164:12 166:15
  167:16
rights 53:4 96:22
  149:19 154:14
rigorous 32:6
rise 34:16 55:8

rising 15:4
risk 134:14
road 14:2 168:21
robe 137:11
role 36:11 42:2
  59:6 62:21 71:5
  74:3 81:14 82:5
  146:16 147:6
roll 88:22 89:2,6
  98:2 124:15,16
  130:20
rolled 35:12 130:5
  140:3 149:3
  164:11
rollup 24:16 26:4
  26:12,14,15,16,24
  27:3,11 28:3 35:3
  35:10,17 36:15,16
  36:17 37:3 44:10
  44:25 45:2,8,12
  45:21,22 47:17,21
  51:22,23 52:18
  55:5 124:6,14,18
  129:20 130:12,15
  139:21,24,24
  140:19 141:13,13
  141:18,21 142:9
  146:1 149:1,2,10
  149:12,16,21
  151:14 152:6,8
  156:15,16,17,17
  156:21,23 157:1,6
  157:6,11,24 158:9
  164:8,12
rollups 36:2,3,7
  52:8 123:23,25
  124:1,3
room 45:6 66:25
  93:11
rooms 123:3
ropes 5:15 154:8
rose 4:17 5:1 49:9
  156:1

ross 5:3
roughly 22:8 35:8
  42:17
rounded 48:1,18
  60:25
route 140:18
  160:23
row 91:21 92:3,18
  93:3 96:12,25
ruiz 6:14
rule 52:10 53:4
rules 34:22
run 17:25
running 34:10,10
runover 30:4
runs 20:14

s

s 3:1 8:1
sachs 74:1,4 75:10
  75:11 117:1,16,22
  118:5,18 120:13
  120:17,25 132:5
sachs's 74:3
  117:25
sale 18:17 31:19
  56:10 69:10
salt 165:19,19
san 139:3
sasson 7:2
sat 64:1,1
satisfactory 64:4
satisfied 67:4,18
satisfy 39:7
  155:17
save 9:10 51:10
  99:7
saved 16:22
savings 45:19
savior 51:11
saw 30:24,25
  32:23 86:20 142:1
  159:9

saying 53:16
  101:24 122:6
  133:5,10 153:3,17
  155:16 159:15
  165:10
says 24:25 25:4
  30:5,8 87:10,11
  92:18 99:23
  101:14 102:2
  103:3 151:7
scale 39:5
scenario 165:7
scheduled 9:17
  138:2
scheduling 2:8
scheme 38:14,18
  43:12
school 107:23
schwalter 6:15
science 107:22
scope 18:3
scoped 113:15
scott 4:15 161:10
scrutiny 32:6
  147:23
se 159:15
search 16:8 110:6
seat 31:14 32:20
  54:14 58:24 107:7
seated 8:2 55:8
second 10:13 12:9
  12:24 19:15 22:14
  52:4 61:2,19
  67:10 77:15 86:9
  95:19 99:11 100:5
  100:10 118:23
  122:11,18 140:7
  158:11,13
secondly 21:21
  147:8 151:18
secret 113:12
section 30:5 41:1
  56:19 97:11

136:17
**secured** 2:4 11:24
  12:2 13:13 16:4
  17:8 21:11 33:6
  36:8,9 37:2 39:23
  39:23 42:7 74:5
  116:23 117:23
  149:19 151:22,24
  153:23 163:7
  166:16
**securing** 97:9
**security** 37:18
  39:21
**see** 11:3 14:20
  31:3 54:23 71:9
  86:16 92:10,11,12
  92:17 93:2,4
  94:21 96:8,12,13
  96:15,24,25 97:6
  97:12 99:24
  101:11,15,19,25
  106:7 115:15
  117:5 119:20
  125:15 135:6
  147:13 156:19
  158:1 167:18
**seek** 18:13,14
  21:6 34:23
**seeking** 20:3,6,9
  22:16 35:11 47:13
  135:2,3 151:9
  166:14,25
**seeks** 46:10
**seen** 47:6 102:2
  103:8 118:15
  120:8 139:24
  142:20 144:17
  145:21 148:23
**sees** 54:23
**seize** 141:13
  145:15
**seizing** 133:14

**select** 57:21
**self** 12:14 14:19
  15:15
**sell** 24:4 64:16
**selling** 62:2
**send** 135:14
**sending** 76:23
**senior** 2:3 11:24
  13:12 16:4 17:8
  38:13 59:7 74:5
  75:11 80:24 81:8
**seniority** 165:15
**sense** 36:1 80:13
  84:5 107:20
**sent** 77:6 102:13
  102:14,18 103:6
**separate** 98:12
  99:10 127:15
  157:19
**separately** 41:8
**september** 73:1
  113:7,8
**series** 51:9 109:16
  112:24
**seriously** 9:9
**serve** 10:25 15:12
**serves** 62:22
**services** 59:5
  62:23 81:9
**set** 10:10,18 16:15
  58:2,9 113:22
**seth** 7:6
**sets** 64:5
**seven** 11:10 16:25
  23:23 24:3 39:16
  39:17 43:18
**seventh** 4:4 6:5
**severance** 90:24
  132:21
**shade** 95:18
**share** 62:1
**sheet** 33:5 69:18
  69:19 70:8 75:14

76:20 77:22 78:22
  102:14,18 103:1,6
  116:17 117:13,14
**shipping** 8:17
  10:23
**shooting** 147:11
**shopped** 22:15
**short** 8:12,14 9:15
  10:6 14:13 19:17
  56:23 64:6 69:11
  78:21 82:12
  142:22 162:12
**shortly** 18:12
  43:25 115:17
**show** 32:8 70:23
  85:11 94:5,14
  95:6 98:18 146:10
  148:9 155:8
  159:10
**showed** 92:20
**showing** 63:3
  103:1
**shown** 36:5 92:22
**shows** 95:21,24
  96:2 97:14
**shrinking** 15:8,14
**shrunk** 112:1
**shut** 132:18
**shutdown** 132:16
**side** 14:21,22
  24:18
**sided** 133:6
**sides** 9:4
**sign** 34:9 72:11
  148:7
**signed** 31:2 75:6
**significant** 55:5
  64:7,18 65:22
  69:17 74:22 106:5
  157:24
**significantly**
  13:14 24:14 27:23
  38:3 64:11 109:20

110:3
**signing** 17:2
  109:12
**signs** 63:3
**simple** 11:11,19
  32:15
**simply** 26:16
  27:11 31:25 77:14
  77:15
**simultaneously**
  128:24
**sincere** 8:11
**single** 11:7 17:13
  76:9 109:8
**sir** 28:16 103:10
  107:13 118:15
  120:5
**sit** 63:18 130:6
**sits** 71:11 79:17
**sitting** 88:9
  126:17 130:8
  134:1 147:8
**situation** 22:19
  57:11,25 99:2
  108:22 109:9,25
  138:20 156:12
  157:21 159:23
  160:7
**situations** 108:16
  126:15
**six** 11:6 61:23,24
  114:22 134:18
**sixty** 30:3
**size** 14:9 40:18
  64:8 113:16
**sizing** 113:15
**slade** 3:9 8:7
  106:25 107:8,8,12
  118:13,20 119:1
  125:20 127:14
  131:3,6
**sleeving** 69:4,6,19
  69:21 70:5 77:18

77:20 109:23,24
160:6,10 163:12
**slept** 9:3
**slice** 166:2
**slide** 10:11,18
11:3,6,10,16 12:9
12:17 14:4,5
15:24 16:20 17:18
18:19
**slightly** 62:9
97:24
**slow** 12:14 15:15
16:1 33:17 118:1
**slowly** 130:24
**slug** 165:21
**small** 11:14 58:8
67:9 79:16
**soaks** 70:9
**sold** 111:18
**solely** 44:8 140:11
**solemnly** 58:21
107:4
**soliciting** 86:25
**solution** 16:8
144:20
**solutions** 168:20
**solve** 67:14
**somebody** 23:11
28:9 37:12 56:13
110:19 137:25
156:23 157:12
159:20 163:6
**somebody's** 22:5
141:7
**somerstein** 5:21
154:7,8,21 155:3
155:20,23
**somewhat** 11:18
11:19 124:2
**sonya** 2:25 168:3
168:8
**sorry** 27:17 68:7
80:1 81:1,2 83:14

85:21 86:19 88:5
91:4 92:7,7 99:12
99:17 101:23
102:20 105:3
106:3,16 119:2
144:12 146:17
159:3
**sort** 48:8 65:11
67:9 68:9,25
69:19,20 71:9
77:14 80:6 98:15
98:16 116:23
145:8 153:23
164:10 166:1
**sorts** 34:7,19
153:22
**sought** 44:9
159:12
**sourcing** 16:15
**south** 6:5
**southern** 1:2 52:1
**space** 13:19 108:9
**spare** 76:5
**speak** 22:2 58:24
138:6 139:20
166:4
**speaks** 141:23
**specific** 49:14
54:25 63:13 129:3
129:12 130:6
158:3
**specifically** 70:18
84:9,14 98:15
100:11,16 101:9
102:8,20 103:7,8
127:10 129:5
**specifics** 128:20
129:2
**speculation** 147:5
**spellman** 45:6
**spend** 38:5 71:17
71:18

**spending** 106:2,7
**spent** 108:1
**spike** 13:20
**spiked** 13:18
**spiral** 14:2,23
**spoke** 85:13
**spoken** 55:19
**spring** 15:25
**stabilizing** 14:12
**stack** 63:6,7
**staff** 8:12,20
**stage** 24:17 26:11
155:18
**stake** 31:14
**stakeholders**
17:16 18:21
**stakes** 147:21
**stalking** 115:16
**stand** 24:8 131:21
141:20,20 154:12
**standard** 32:2,5,5
137:18
**standing** 34:23
53:5,11 145:4
153:17
**standpoint** 45:7
118:7
**start** 14:21 30:19
35:3 49:5 59:18
83:19 98:17
123:23
**started** 63:4 65:21
74:19
**starting** 9:13
10:18 65:21 66:17
**starts** 133:14
**state** 59:3 63:1
90:6
**statement** 44:2
156:3 160:16
**statements** 13:16
**states** 1:1,12 8:24
24:12 43:20 44:23

**station** 10:23 11:7
**statutory** 147:22
**stay** 2:8 61:10
165:23
**stem** 17:21
**step** 38:22 53:14
106:23 120:21
131:4 164:17
**stephen** 6:13,25
**stepped** 50:24
122:16
**stipulations** 24:22
**stock** 13:3
**stone** 16:8
**stood** 44:20
**stop** 126:5
**stopped** 55:9
**stopping** 24:6
**stops** 110:16
**storm** 12:13 15:7
**storming** 123:3
**story** 134:13
**strategic** 16:3
32:18
**strategies** 49:22
**strategy** 31:4,17
41:21 49:24 50:7
**strauss** 3:15 28:18
81:3 125:23
**straw** 13:22 38:7
**stream** 77:11
**street** 5:9 6:5
**stress** 63:3
**stretch** 151:24
**strings** 32:15,22
**strong** 12:19
**strubeck** 4:23
49:8 55:11,15
56:15 57:5 155:25
156:1 157:4,15,18
158:5,10,13,16
159:3,5,17 160:16
160:20,22 161:1,8

structural 75:1
  78:1 165:15
structurally
  132:22
structure 11:17
  11:18,23 22:17
  68:20 74:24 75:2
  77:1,16,18,19
  78:12 83:24 98:23
  113:24 116:19
  134:5 166:2,5
structured 56:16
structuring
  114:24
stuart 1:22
stuck 30:13
stuff 101:24
stumbled 30:23
sturubeck 49:3,7
  50:4,10 52:3,17
  53:7,13,18,24
  54:2
subject 25:24 26:4
  26:5 32:4 36:10
  47:9,11,12 60:18
  71:25 74:17 78:23
  128:15 139:22
  157:19
subjective 166:1
subleased 69:23
submit 21:18
  22:18 23:24 26:10
  53:2
submitted 90:5
subordinate
  23:12 37:11
subordination
  34:17 165:15
subs 143:13
subsequent 113:9
subsequently
  36:21 108:5

subset 37:2
  111:20
subsidiaries 80:16
subsidiary 79:25
  80:4 132:22
  165:18 166:19
substantial 36:4
  51:21 106:2
  119:24
substantially
  122:5,10
subtotal 96:25
subtract 93:10
successfully 36:16
suffice 16:4
  147:25
sufficient 15:10
  67:13 68:17 70:22
  70:23 72:13 82:19
  106:11,12,17
suggest 119:10
  135:13
suggested 84:7
  119:12 122:2,3
  142:21
suggesting 84:8
  148:19
suggestion 50:17
  117:11 140:11,12
suggests 57:10
  142:3
suit 49:12
suite 5:3 168:22
sum 125:9
summarizes 75:22
summary 15:18
  76:10
summer 15:25
  50:18,22,24 51:2
sun 51:23
sunday 119:5
super 37:5,16

superior 116:6
superpriority 2:4
  2:5
suppliers 15:2
supply 10:25
  142:11
supplying 16:15
support 31:25
  70:10 90:6 161:6
  162:14
supported 62:15
  117:9
supporting 82:19
suppose 145:17
  148:22 150:8
  156:20
supposed 48:20
  54:19
sure 11:20 38:15
  44:2 45:14,20
  47:5 48:21 50:2
  58:11 83:13 84:20
  89:3,5 99:15
  108:15 126:18
  128:18 136:16
  146:3 154:14
surfaces 144:23
surprise 112:14
  156:7
surprised 41:20
survive 51:18
  131:19
suspect 25:13
suspicion 151:9
sustained 71:4
  72:5 104:9
suzanne 6:21
swear 58:21 107:4
system 71:7,11,21
  72:8,9 82:17
  140:22 141:4
  146:2

superior 116:6

**t**

t 168:1,1
tab 75:25 83:15
  99:17
table 9:4
take 23:8 30:25
  38:23 41:12,25
  42:15 44:14 53:14
  56:24 58:24 66:3
  68:20 77:5,8
  107:1,7,24 109:18
  118:10 120:5,19
  120:21 122:22
  133:23 134:14
  139:8,10 141:8
  144:13,20 145:19
  146:9 149:10
  150:1
taken 16:24 57:1
  137:9
takeout 145:2
takes 69:22 70:1
  98:24 99:3 145:9
  148:21
talk 31:17 52:20
  52:21 101:9
  131:24 142:8,15
  147:15 166:3
talked 68:14
  77:19 93:16
  134:14
talking 25:23
  27:10 60:18 88:20
  103:25 130:14
  136:5 141:3
  166:18
talks 50:20
tank 69:9,23
tanks 69:15,15
tayloe 6:22
team 22:20,20
  110:24 114:11
  120:14

tech 95:1
technical 47:16
54:16
telephonically
6:10
tell 22:4 52:4 58:2
63:1 98:15 106:21
113:20 122:1
135:18,21 142:6
158:1
telling 94:13
159:7
tells 153:21
ten 12:17
tenor 78:23
term 12:2 14:13
17:3 18:11 20:3
20:13 21:19 26:2
33:5 35:8 48:15
54:7 60:21,23
64:6 65:24 66:12
84:7,11,12 91:20
92:3,18 102:14,18
103:1,6 114:8
116:17,21,22
117:13,14 121:7
122:9,16 124:3
139:24,25 140:2,5
140:14 141:16
150:6 152:8
164:14
terminal 63:15
terminals 11:1
terminated
157:12
termination 80:7
terms 21:9 22:16
24:21 25:8 30:6
45:15 49:13 57:23
59:14 61:9,14
62:7,8,10,13
64:15,17,18 68:11
69:18 74:14 75:14

76:19 77:23 78:12
78:22 84:4 86:14
90:20 109:6
110:21 114:24
117:8,23 121:3
122:13 123:22
125:16 128:25
137:4 139:17,20
143:2 148:18
151:20 156:11
163:8 164:2,7,15
testified 90:22
98:4 102:12,16
124:8 126:4
127:21 128:14
146:2 148:3
testify 137:22
138:24
testifying 84:1,18
126:17 138:13
164:1
testimony 27:19
40:23 41:6 49:1
54:13 57:7,15
58:21 85:7 86:7
87:13,15 98:6
102:15 106:10
107:4 109:24
111:7,9 132:15
133:21 138:8
139:8 140:23
160:3,23 163:25
texas 52:7
thalassinos 7:3
thank 8:24 9:2
19:5,12,16 44:17
49:2,3 55:11 58:5
80:20 81:5 85:10
85:21 88:4 93:9
95:14 100:13
105:9 106:23
127:20 131:1,3,4
146:11,12 154:6

155:19,24 160:21
161:8,23,24
162:17 167:17
thanking 76:23
thanks 95:5 127:7
thin 140:16 163:8
166:6
thing 43:20 45:13
57:19 96:24 109:9
137:16,18 141:25
143:11 157:20
things 13:25
25:24 26:7,20
32:21 43:6,8
49:21,22 51:1
52:13 54:6 56:21
66:24 67:1 98:8
128:24 133:25
140:10 146:10
149:18 153:13
156:6 159:1,5,8
165:24
think 10:2,21,21
11:23 25:15 27:20
30:14,19 31:13
32:11 34:25 36:1
36:5 37:22 38:2,7
39:4,18 40:2,6,20
40:25 41:13,17,25
42:25 43:15 44:6
44:20 49:14,17
50:23 52:3,4,17
53:18,20 54:2,21
56:2 57:2,14 58:1
59:24 65:9 79:19
90:16 94:16 97:20
104:13,24 114:11
116:2,3 117:25
123:9 124:1,8
126:7,19 131:13
132:12,14 133:2,3
133:24 134:20,23
135:21 136:4,12

136:25 137:9,11
138:11 139:12,16
140:20,25 141:14
141:18,20,22
142:13,20,24
145:13,20,22
146:5 147:17
148:11 149:8
150:19 151:6,6
152:25 153:21
154:21 155:14,18
156:9 157:21
158:8,22,25 159:6
160:23 161:1,5,20
164:1,8,11 165:18
166:7 167:14
thinking 162:19
third 10:14 13:9
15:21 23:2,20
thirds 60:23
thought 33:11
77:23 91:13
104:16,20
threat 153:16,22
153:25
three 9:18,22
11:24 19:20,25
21:15 62:13 63:8
78:2 98:12 99:6,9
99:24 100:2,23
114:6 131:15
133:14 142:10
145:15
throw 140:1
thursday 45:4
99:10,21 100:8
ticket 137:2
tightening 15:3
time 9:13 12:20
12:23 13:21 14:11
15:20 16:7,22
19:6,7 20:16
22:19 25:5,14

28:13 34:11 38:17
47:12 49:25 50:5
50:25 51:3,6,8
56:14,23 57:9
61:6 63:6 64:25
65:14 67:5,17
77:11 80:18 82:13
99:7 101:4,5
102:5,14 106:2,2
106:7 108:6,21,25
109:5,7 112:22
115:14 128:22
130:12,21 132:6
133:5 138:4 139:9
142:22 147:21
154:2 156:4 158:4
158:12 166:3
**timeframe** 60:18
**timeline** 15:19
19:2
**timely** 15:11
**times** 72:13 98:12
98:16 114:22
**timing** 101:14
**tirelessly** 9:10
**title** 70:1
**today** 8:7,22 9:5
9:12 10:12 12:7
18:2,12,24 19:8
21:11,20,23 24:20
32:12 35:13 39:10
39:16,17 42:13
43:15 44:4,7
50:17 52:20 54:7
57:21 88:20 114:5
116:6 117:21
118:1,8 122:4
123:15,17 124:16
124:16 130:19
131:22 132:1,8
142:22 146:19
147:17 149:2
153:4 159:19

165:20
**told** 38:6 47:18,21
64:4 89:5 144:19
147:9 148:20
**tolerate** 137:3
**tomorrow** 9:17
46:2 90:20 132:18
135:18 138:25
139:4 141:6
147:14,15 166:19
167:9,18
**top** 30:4 91:23
95:18 99:11,20,21
99:23 100:6,7,10
100:14,19 101:11
105:21 144:2
163:10
**topco** 143:12
163:1 165:12,14
165:17 166:10
**topic** 97:24
**total** 48:1,4 61:15
95:11,11 96:12
97:8,20
**totally** 147:6
**totals** 48:17
**totem** 144:2
**touch** 139:21
**touched** 26:7
**town** 51:17 137:1
139:18 153:5
**track** 135:6 136:4
**tracks** 22:20
**trade** 15:2 68:16
164:14
**trader** 68:10
**trading** 16:13,16
34:4,5 57:24
**traditional** 110:25
**tranches** 63:17
**transaction** 13:2,3
13:11 17:14 32:3
32:8,9,18 63:22

67:21,24 68:11,13
68:19,24 70:4,12
70:19 72:10,20,25
74:23 75:13 106:6
115:15 119:11,17
134:20 155:8,9
158:20 164:24
**transactions** 32:4
108:4 109:16
112:24 113:11,23
137:17
**transcribed** 2:25
**transcript** 83:18
84:10 85:7 168:4
**transcripts** 54:9
**transferred** 92:24
**transformed**
35:16
**transforming**
52:14
**transparent** 18:16
31:21 148:13
**treasury** 82:10
**treated** 150:25
**treating** 98:23
**tremendously**
11:6
**trends** 61:11
**tricia** 6:15
**tried** 54:10,10,10
**trigger** 90:23
**trouble** 28:25
53:24
**true** 51:11 98:11
102:17 104:6
130:3 136:10
153:8 168:4
**truly** 11:3 22:19
**trust** 5:16 84:9
154:8,9
**trustee** 5:17 6:3
8:25 44:23 142:20
154:10

**trustee's** 24:12
**truth** 58:22 107:5
**try** 8:21 22:2,22
81:6 99:7 112:24
117:2,10 137:16
159:7
**trying** 21:25
29:13 50:19
104:23 138:23
156:17
**tuesday** 99:24
100:18
**tully** 7:4
**turn** 11:3 19:7
22:22 26:8 34:14
96:23 104:19
140:10,25 148:18
149:1
**turnaround** 59:5
81:9 146:4
**turning** 9:14
11:10 16:11,20
**turnkey** 144:20
**turns** 31:14 124:9
157:8
**tweed** 5:8
**two** 10:11 26:11
26:20 29:16,21
37:14 55:24 56:18
60:20,23 63:11,17
66:2 71:21 76:4
76:19 77:8,10,25
120:20 131:15
135:11,11 138:5
151:14 153:24
156:23 157:9
**tx** 5:4
**tyler** 9:9
**type** 34:5 42:8,10
152:15 159:25
**types** 34:21
113:11 129:16

**typical** 64:20
  123:20
**typically** 36:8
  62:13 71:9 77:17
  83:23 99:3 126:15

**u**

**u.s.** 1:23 60:11
  61:17,24 63:8,9
  67:15 71:10 91:25
  92:21,25 94:12
  95:20,23 96:23
  97:9,15,18,22
  142:19
**u.s.c.** 2:2
**uae** 63:15
**ultimate** 138:9,11
**ultimately** 16:9
  30:24 34:8 67:21
  73:17 109:13
  113:25 114:4
  115:6,16 119:16
  120:1 123:2
  126:23 128:12
  129:25,25
**unanimous**
  138:19 158:24
**uncontrolled**
  16:23,25 116:2
**understand** 22:8
  24:15 28:10 29:13
  29:20 31:6,16
  35:11 40:23 41:2
  48:10 74:3 85:14
  89:23 135:25
  137:10 143:22
  152:10 156:16
  157:7,8,15,20
  163:17 165:5
**understanding**
  16:10 17:3 26:19
  27:25 28:5 41:5
  43:23 46:18 47:1
  48:2 74:10,13

77:24 78:10 87:21
  89:15 110:1 125:3
  125:6 128:12
  130:18 139:17
**understood** 158:5
  164:22
**undertake** 42:2
**underwriting**
  74:14,16
**undisputed**
  131:15,16,20
  137:8 140:6 142:7
**undone** 30:13
**undoubtedly** 42:1
**unencumbered**
  36:25,25 37:11
  40:4,7,8,10 44:11
  79:14 104:6 152:4
**unfettered** 18:3
**unfortunately**
  94:9 111:16
**unique** 134:20,24
  159:23 160:7
  163:23
**united** 1:1,12 8:24
  24:12 44:23
**universe** 144:12
**university** 107:23
**unknown** 1:25
  153:14
**unnecessary**
  54:18
**unpaid** 132:20
**unreasonable**
  141:21
**unrolled** 36:15
**unsecured** 12:4,5
  18:22 28:20,22
  39:7,12,24 40:9
  63:18 64:21 112:9
  112:19 152:7
  153:19 165:9,11

**unturned** 16:8
**unusual** 37:9 39:3
  54:22 71:9 137:21
**unwilling** 33:8
**unwind** 26:4
**unwound** 26:6
**update** 101:19
**upfront** 121:6
**uploaded** 66:25
**upsetting** 142:24
**urge** 161:22
**usa** 4:3 47:23 48:5
  60:22 92:18
**usage** 61:14
**use** 2:6 15:8 20:19
  20:24 21:7,15
  23:3 27:9 29:8,10
  29:17 31:11 43:2
  43:12 58:9 61:25
  79:10 94:24
  123:17 150:15,25
  151:2,10 163:5
**usual** 36:18
**usually** 56:11
  137:22

**v**

**v** 2:7
**valid** 56:4
**valuable** 39:19
**valuation** 104:11
**value** 16:18 18:15
  56:24 58:3 95:22
  95:24 96:4,9 97:3
  97:8,19,23 103:21
  104:3,5,6,9,14,21
  104:21 116:2
  126:21 136:8
  152:4 164:17
**values** 40:1 127:1
  140:14
**variety** 12:12
**various** 63:24
  64:2 69:2 79:18

114:24 129:9,10
**vast** 138:14
**veerappan** 7:5
**vehicle** 31:1
**vendor** 165:21
**vendors** 132:19
  135:17,19,24
  136:14 166:18
**verbal** 123:2
**verification** 46:18
**veritext** 168:20
**versus** 71:9 163:9
  164:14
**vessel** 24:19 69:13
  70:1
**vessels** 10:24
  11:12,13,15 12:3
  69:9 162:6,7
**veto** 137:13
**vetted** 159:21
**vi** 2:8
**viable** 79:2,8
**view** 43:19 95:22
  104:5,13 106:1
  136:18 137:13
  138:19 159:8
  166:23
**viewed** 67:12
  142:25
**viewpoint** 32:9
  155:9
**views** 166:9,11
**vigorous** 137:5
**vii** 2:8
**virtually** 34:4
**void** 134:16
**volume** 15:13
  112:2 134:10
**volumes** 17:7
  134:6,9 141:23
**vote** 138:15

| w |
|---|

**wait** 22:12 119:20
  147:13
**waiting** 49:8
**waive** 147:2
**waiver** 47:14
  65:25
**waivers** 14:14
  47:7 64:6
**waiving** 13:14
**walk** 60:15 76:9
  120:19 153:23
**want** 15:8 19:9
  20:24 21:15 31:8
  31:18 42:1 44:18
  48:19 55:15 59:18
  65:8 66:17 84:3
  94:18 103:11
  121:9 122:20
  123:22 131:1,9
  134:19,19 135:25
  137:19,19,19
  138:24 139:21
  140:2 143:4
  147:13 152:24
  154:12 155:20
  166:17
**wanted** 10:12
  54:25 66:1,23
  67:16 84:20 88:13
  133:21 137:16
  161:16
**wants** 28:15 71:12
  144:13
**waschitz** 7:6
**wasn't** 57:12
  104:23
**water** 39:10
**waterfall** 39:25
**way** 13:5 14:10,22
  20:14 29:25 31:13
  38:20 39:14 42:20
  42:25 49:20,23

56:16 60:23 61:21
  64:15 69:8 71:7
  83:24 87:5 114:22
  121:12 124:14
  147:17 150:20
  152:16,19
**ways** 33:10,17
  56:18 66:2
**wayside** 165:24
**we've** 13:7 14:17
  24:14 26:7 30:20
  57:18 88:23 89:8
  130:14 132:6,12
  135:15 139:24
  144:17 145:7,21
  148:16 156:5
  157:5,6 165:14
  166:13
**wear** 137:11
**wearing** 57:23
**wednesday** 141:9
**week** 9:1 45:4
  47:25 48:7,15
  61:16,18,20 73:1
  98:13 101:23
  136:20,22 138:4
  143:7
**weekends** 9:2
**weekly** 61:3
**weeks** 9:3 16:6
  20:11 21:15,15
  29:16,21 61:23,24
  135:11,11 138:5
  140:22 153:24
  156:23 157:9
**welcome** 160:22
**wells** 6:4
**went** 14:9 15:15
  65:8 77:20 110:23
  112:17 114:8
  137:24
**western** 155:12

**whack** 141:17
  147:11
**wharton** 107:23
**whatsoever** 34:6
  38:19 155:11
**wherewithal**
  12:22 13:8
**whistles** 153:4
**white** 4:9 161:11
**why'd** 112:21
**wildly** 142:2
**wile** 9:14
**wiles** 8:20,21 9:18
  19:1 25:4,14
  133:4
**wilkes** 7:7
**william** 5:6
**willing** 23:11
  53:15 65:24 66:9
  112:8,11 125:16
  134:14,15 148:17
**willkie** 4:1
**win** 140:12
**wind** 121:19
**winger** 3:11 8:8
  19:13,14 20:8,12
  20:21 21:2,10,18
  22:1,6,14 23:7,14
  23:19 24:4 25:2,7
  25:18,20,25 26:19
  26:21,25 27:4,15
  28:5,11
**witness** 22:2,12
  41:5 44:17 58:5,8
  85:7 87:9,11
  103:12 106:24
  131:2,5 138:21
  141:20 146:2
  155:7
**witnesses** 58:9
  131:7,8,10
**woody** 155:1

**words** 56:9 85:3
  92:24 153:5
**work** 14:21 22:25
  24:23 25:6,20
  28:11 42:10 75:13
  77:11 107:15,16
  109:7 110:21
  119:13,14,24
  121:12 123:7
  127:11
**worked** 9:10
  22:21 59:13 75:2
  78:13 108:3,11,15
  162:8,8
**working** 12:1
  20:15 24:21 27:6
  61:6 64:18 74:1
  81:11 108:8
  124:11 130:1
  140:24 141:5,9
**workings** 81:19
**works** 28:10
  42:20 61:21 64:16
  69:8 71:8 124:7
  124:14 130:2
  141:5
**world** 11:9 16:14
  17:1 63:11 69:14
  135:17
**worldwide** 11:2,4
**worried** 165:22
**worth** 39:22
  164:23
**write** 89:8,14
  137:2
**written** 13:24
  34:20
**wrong** 31:5,9
  35:18,22 49:24
  50:4

[x - zul]                                                                        Page 42

| x |
| --- |
| **x**   1:4,10 |

| y |
| --- |
| **yates**   3:13 8:8 |
| 58:6 |
| **yeah**   8:16 25:19 |
| 35:15 56:15 83:13 |
| 87:9 88:16 120:7 |
| 134:23 139:2 |
| 150:19 151:4 |
| 157:15,18 161:3 |
| **year**   51:5 62:25 |
| 65:3 |
| **years**   59:9 108:1 |
| 108:10 132:17 |
| 162:18 |
| **yesterday**   11:22 |
| 24:9 54:9 83:1 |
| 86:20 164:21 |
| **yesterday's**   86:18 |
| **yoke**   17:9 |
| **york**   1:2,14 3:18 |
| 4:5,13,20 5:10,19 |
| 45:5 52:7 108:2 |
| **young**   86:14 |
| 127:8,13 |

| z |
| --- |
| **zero**   64:18 |
| **zeros**   143:9 |
| **zucco**   7:8 |
| **zul**   8:10 106:25 |
| 107:11,14 125:25 |