**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-13374 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT PLAN OF REORGANIZATION OF AEGEAN MARINE PETROLEUM NETWORK INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Marc Kieselstein, P.C.
Cristine Pirro
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C.
Adam C. Paul, P.C. (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated: January 15, 2019

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/aegean. The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**........................................................................................................1
- A.    Defined Terms ...................................................................................................1
- B.    Rules of Interpretation .....................................................................................16
- C.    Computation of Time ........................................................................................16
- D.    Governing Law ..................................................................................................16
- E.    Reference to Monetary Figures .........................................................................17
- F.    Reference to the Debtors or the Reorganized Debtors .......................................17
- G.    Controlling Document ......................................................................................17

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** ...........................17
- A.    Administrative Claims ......................................................................................17
- B.    Professional Fee Claims ...................................................................................18
- C.    Committee Members' Fees and Expenses .........................................................19
- D.    Priority Tax Claims ..........................................................................................19
- E.    Payment of U.S. Trustee Statutory Fees ...........................................................19
- F.    DIP Credit Facility Claims ...............................................................................19

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .............................20
- A.    Summary of Classification ................................................................................20
- B.    Treatment of Claims and Interests ....................................................................21
- C.    Special Provision Governing Unimpaired Claims .............................................24
- D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................24
- E.    Elimination of Vacant Classes ..........................................................................24
- F.    Voting Classes; Presumed Acceptance by Non-Voting Classes .........................24
- G.    Intercompany Interests .....................................................................................25
- H.    Subordinated Claims ........................................................................................25

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ....................................25
- A.    General Settlement of Claims and Interests .......................................................25
- B.    Sources of Consideration for Plan Distributions ...............................................25
- C.    Issuance and Distribution of Reorganized Aegean Equity Interests ...................25
- D.    Exit Facilities ...................................................................................................26
- E.    Aegean Unsecured Claims Cash Pool ...............................................................26
- F.    Corporate Existence .........................................................................................27
- G.    Vesting of Assets in the Reorganized Debtors ..................................................27
- H.    Cancellation of Instruments, Certificates, Existing Securities, and Other Documents ..................27
- I.    Corporate Action ..............................................................................................28
- J.    Restructuring Transactions ...............................................................................28
- K.    Reorganized Aegean Organizational Documents ..............................................29
- L.    Exemption from Certain Taxes and Fees ...........................................................29
- M.    Preservation of Causes of Action .....................................................................30
- N.    Insurance Policies ............................................................................................30
- O.    Employee Matters ............................................................................................31
- P.    Payment of Fees and Expenses Payable under DIP Financing Orders.................32
- Q.    Payment of Certain Fees ..................................................................................32

**ARTICLE V. LITIGATION TRUST** ......................................................................................32
- A.    Creation and Governance of the Litigation Trust...............................................32
- B.    Purpose of the Litigation Trust .........................................................................33
- C.    Litigation Trust Agreement and Funding the Litigation Trust ...........................33
- D.    Valuation of Assets ..........................................................................................33
- E.    Litigation Trustee ............................................................................................33
- F.    Litigation Trust Advisory Board .......................................................................34

G.      Litigation Trust Interests................................................................................34
H.      Cooperation of the Reorganized Debtors.......................................................34
I.      Fiduciary Duties.............................................................................................35
J.      United States Federal Income Tax Treatment of the Litigation Trust...........35
K.      Distributions from the Litigation Trust; Withholding....................................35
L.      Dissolution of the Litigation Trust.................................................................36
M.      Tax Reporting.................................................................................................36

**ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES....................37**
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ...................37
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................38
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................38
D.      Dispute Resolution.........................................................................................38
E.      Indemnification Obligations...........................................................................39
F.      Collective Bargaining Agreements.................................................................39
G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.........39
H.      Reservation of Rights.....................................................................................40
I.      Nonoccurrence of Effective Date...................................................................40

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS.............................................40**
A.      Timing and Calculation of Amounts to Be Distributed..................................40
B.      Rights and Powers of Distribution Agent ......................................................40
C.      Special Rules for Distributions to Holders of Disputed Claims and Interests..............41
D.      Delivery of Distributions and Fractional, Undeliverable, or Unclaimed Distributions...................41
E.      Securities Registration Exemption .................................................................43
F.      Compliance with Tax Requirements...............................................................44
G.      Allocations.....................................................................................................44
H.      No Postpetition Interest on Claims.................................................................44
I.      Setoffs and Recoupment................................................................................44
J.      Claims Paid or Payable by Third Parties........................................................44

**ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND**
**DISPUTED CLAIMS.................................................................................................45**
A.      Disputed Claims Process................................................................................45
B.      Claims and Interests Administration Responsibilities....................................45
C.      Estimation of Claims......................................................................................46
D.      Adjustment to Claims Register without Objection..........................................46
E.      Time to File Objections to General Unsecured Claims and Claims Arising under Section
        503(b)(9) of the Bankruptcy Code.................................................................46
F.      Disallowance of Claims..................................................................................46
G.      Amendments to Claims...................................................................................47
H.      No Distributions Pending Allowance.............................................................47
I.      Distributions after Allowance........................................................................47
J.      Disputed Claims and Interests Reserves.........................................................47
K.      Single Satisfaction Rule.................................................................................47

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS....................48**
A.      Discharge of Claims and Termination of Interests..........................................48
B.      Debtor Release................................................................................................48
C.      Third Party Release ........................................................................................49
D.      Exculpation ....................................................................................................49
E.      Injunction .......................................................................................................50
F.      Limitations with Respect to Litigation Claims...............................................51
G.      Subordination Rights......................................................................................52
H.      Release of Liens.............................................................................................52

**ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** .......................52
    A.     Conditions Precedent to the Effective Date ....................................................52
    B.     Waiver of Conditions....................................................................................53
    C.     Substantial Consummation ............................................................................53
    D.     Effect of Non-Occurrence of Conditions to the Effective Date .....................53

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...........54
    A.     Modification and Amendments......................................................................54
    B.     Effect of Confirmation on Modifications ......................................................54
    C.     Revocation or Withdrawal of the Plan ..........................................................54

**ARTICLE XII. RETENTION OF JURISDICTION** ...........................................................................54

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ...........................................................................56
    A.     Immediate Binding Effect.............................................................................56
    B.     Additional Documents...................................................................................57
    C.     Reservation of Rights....................................................................................57
    D.     Successors and Assigns.................................................................................57
    E.     Service of Documents ...................................................................................57
    F.     Term of Injunctions or Stays.........................................................................58
    G.     Entire Agreement .........................................................................................58
    H.     Nonseverability of Plan Provisions ...............................................................58
    I.     Dissolution of Committee .............................................................................59
    J.     Request for Expedited Determination of Taxes .............................................59
    K.     Waiver or Estoppel.......................................................................................59

## INTRODUCTION

Aegean Marine Petroleum Network Inc. and its debtor affiliates propose this joint plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Adequate Protection Superpriority Claims*" means the superpriority administrative expense claims arising under the Secured Term Loan Adequate Protection Orders and the DIP Financing Orders.

2.      "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates pursuant to sections 503(b) (including Claims arising under section 503(b)(9) of the Bankruptcy Code), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) fees payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code.

3.      "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

4.      "*Aegean*" means Aegean Marine Petroleum Network Inc.

5.      "*Aegean Interests*" means all Interests in Aegean.

6.      "*Aegean Interests Distribution Value*" means, solely for the purposes of making distributions under the Plan, the aggregate value of all Aegean Interests outstanding as of the Petition Date, which amount shall be the product of: (a) the volume-weighted average price of Aegean Interests on the last Trading Day prior to the Petition Date on which Aegean Interests were publicly traded (which date may be, for the avoidance of doubt, the Petition Date); and (b) the total number of Aegean Interests outstanding at the close of such Trading Day.

7.      "*Aegean Unsecured Claims*" means each General Unsecured Claim against Aegean.

8.      "*Aegean Unsecured Claims Cash Pool*" means Cash in an amount equal to $40,000,000; provided, that Mercuria's obligation to fund the Aegean Unsecured Claims Cash Pool shall in no event exceed $40,000,000.

9.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code, including with respect to any non-Debtor Entity, as if such Entity were a Debtor solely for the purpose of applying the definition set forth in section 101(2) of the Bankruptcy Code.

10.     "*Allowed*" means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date in accordance with the Claims Bar Date Order (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules, if any, as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order; provided that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or, if such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order; provided, further, that (i)  the Debtors and Mercuria or, solely with respect to Aegean Unsecured Claims in Class 4A not otherwise Allowed pursuant to Article III.B.4.d herein, the Committee, prior to the Effective Date, or (ii) the Reorganized Debtors or, solely with respect to Aegean Unsecured Claims in Class 4A not otherwise Allowed pursuant to Article III.B.4.d herein, the Litigation Trustee, as applicable, after the Effective Date, may reasonably determine to allow any Claim described in clause (a) or (b) notwithstanding the fact that the period within which an objection may be interposed has not yet expired.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for, which no Proof of Claim is or has been timely Filed (if required by the Claims Bar Date Order), is not considered Allowed and shall be expunged without further action by the Debtors, Reorganized Debtors, or Litigation Trustee, as applicable, and without further notice to any party or action, approval or order of the Bankruptcy Court.  "Allow," "Allowing," and "Allowance," shall have correlative meanings.

11.     "*AmEx*" means American Express Travel Related Services Company, Inc.

12.     "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including, sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, and similar applicable non-bankruptcy law.

13.     "*Ballot*" means a ballot providing for the acceptance or rejection of the Plan and to make an election with respect to the Third Party Release provided by Article IX.C.

14.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

15.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of New York.

16.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

17.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.     "*Cash*" means the legal tender of the United States of America.

19.     "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362

2

of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; (e) any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions.

20.    "*Chapter 11 Cases*" means:  (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, in each case, as against a Debtor.

22.    "*Claims Bar Date*" means the dates as established by the Claims Bar Date Order by which Proofs of Claims must be Filed.

23.    "*Claims Bar Date Order*" means the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 240].

24.    "*Claims Objection Deadline*" means the deadline for objecting to Claims, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, with respect to all Claims other than Aegean Unsecured Claims in Class 4A, or the Litigation Trustee with respect to Aegean Unsecured Claims in Class 4A.

25.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent in the Chapter 11 Cases.

26.    "*Class*" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> pursuant to section 1122(a) of the Bankruptcy Code.

27.    "*Class A Litigation Trust Units*" means beneficial interests in the Litigation Trust entitling holders thereof to receive priority distribution of the recoveries from the Litigation Trust after payment in full of the Litigation Trust Loan and the Litigation Trust Funding Fee, as further described in the Plan and the Litigation Trust Agreement.

28.    "*Class B Litigation Trust Units*" means beneficial interests in the Litigation Trust entitling holders thereof to receive the remaining distribution of the recoveries from the Litigation Trust after payment in full of the Litigation Trust Loan and the Litigation Trust Funding Fee and after Holders of the Class A Litigation Trust Units receive Payment in Full, as further described in the Plan and the Litigation Trust Agreement.

29.    "*Committee*" means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 80].

30.    "*Committee Members*" means each Entity in its capacity as a member of the Committee.

31.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

33.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

34.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

35.    "*Consenting Unsecured Noteholders*" means, collectively, the beneficial Holders, or investment advisors or managers for the account of the beneficial Holders of the Unsecured Notes that are or become party to the Restructuring Support Agreement.

36.    "*Consummation*" means the occurrence of the Effective Date.

37.    "*Cure Claim*" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

38.    "*Cure Notice*" means a notice sent to the non-Debtor counterparties to an Executory Contract or Unexpired Lease in connection with the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease under the Plan pursuant to section 365 of the Bankruptcy Code, the form and substance of which notice shall be approved by the Disclosure Statement Order and shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) the proposed amount to be paid on account of Cure Claims, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

39.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors that cover current or former directors', managers', and officers' liability.  The Debtors shall file a schedule of their current D&O Liability Insurance Policies with the Plan Supplement.

40.    "*Debtors*" means, collectively:  (a) Aegean Bunkering (USA) LLC; (b) Aegean Marine Petroleum Network Inc.; (c) Aegean (Fujairah) Bunkering S.A.; (d) Aegean Ace Maritime Company; (e) Aegean Agency (Gibraltar) Limited; (f) Aegean Breeze Maritime Company; (g) Aegean Bunkering (Gibraltar) Limited; (h) Aegean Bunkering (Hong Kong) Limited; (i) Aegean Bunkering (Jamaica) Ltd.; (j) Aegean Bunkering (Singapore) Pte. Ltd.; (k) Aegean Bunkering (Trinidad) Ltd.; (l) Aegean Bunkering Combustibles Las Palmas, S.A.; (m) Aegean Bunkering Morocco SARL AU; (n) Aegean Bunkering Services Inc.; (o) Aegean Caribbean Holdings Inc.; (p) Aegean Gas Maritime Company; (q) Aegean Holdings S.A.; (r) Aegean Investments S.A.; (s ) Aegean Maistros Maritime Company; (t) Aegean Management Services M.C.; (u) Aegean Marine Petroleum S.A.; (v) Aegean Oil (USA), LLC; (w) Aegean Oil Terminal Corporation; (x) Aegean Petroleum International Inc.; (y) Aegean Ship III Maritime Company; (z) Aegean Ship VIII Maritime Company; (aa) Aegean Ship XII Maritime Company; (bb) Aegean Shipholdings Inc.; (cc) Aegean Tankfarms Holdings S.A.; (dd) Aegean Tanking S.A.; (ee) Aegean Tiffany Maritime Company; (ff) Aegean VII Shipping Ltd.; (gg) Amorgos Maritime Inc.; (hh) AMPN USA, LLC; (ii) AMPNI Holdings Co. Limited; (jj) AMPNI Investments Co. Limited; (kk) Andros Marine Limited; (ll) Benmore Services S.A.; (mm) Caribbean Renewable Energy Sources Inc.; (nn) Cephallonia Marine S.A.; (oo) Dilos Marine Inc.; (pp) Eton Marine Ltd.; (qq) Halki Navigation S.A.; (rr) I.C.S. Petroleum (Montreal) Ltd.; (ss) I.C.S. Petroleum Ltd.; (tt) Ingram Enterprises Co. (uu) Ios Marine Inc.; (vv) Ios Shipping Ltd.; (ww) Ithaki Marine S.A.(xx) Kassos Navigation S.A.; (yy) Kerkyra Marine S.A.; (zz) Kimolos Maritime Inc.; (aaa) Kithnos Maritime Inc.; (bbb) Kythira Marine S.A.; (ccc) Lefkas Marine S.A.; (ddd) Maistros Roro Shipholdings Ltd.; (eee) Milos Shipping (Pte.) Ltd.; (fff) Mykonos I Maritime Limited; (ggg) Nevado Navigation S.A.; (hhh) Ostria Roro Shipholdings Ltd.; (iii) Paros Maritime Inc.; (jjj) Paxoi Marine S.A.; (kkk) Santon Limited; (lll) Santorini I Maritime Limited; (mmm) Sealand Navigation Inc.; (nnn) Serifos Maritime Inc.; (ooo) Serifos Shipping (Pte.) Ltd.; (ppp) Sifnos Marine Inc.; (qqq) Symi Navigation S.A.; (rrr) Tasman Seaways Inc.; (sss) Tempest Shiptrade Ltd; (ttt) Tilos Shipping (Pte.) Ltd.; (uuu)Tinos Marine Inc.; (vvv) West Coast Fuel Transport Ltd.; and (www) Zakynthos Marine Limited, the debtors and debtors in possession in the Chapter 11 Cases.

41.    "*Description of Restructuring Transactions*" means a summary description of certain Restructuring Transactions to be filed with the Plan Supplement, including any changes to the corporate and/or capital structure of the Debtors (to the extent known) to be made on the Effective Date as reasonably determined by the Debtors and Mercuria.  For the avoidance of doubt, changes to the corporate and/or capital structure may include, but are not limited to, the transactions described in Article IV.J hereof.

42.    "*DIP Agents*" means (a) ABN AMRO Capital USA LLC, solely in its capacity as administrative agent and collateral agent to the DIP U.S. Credit Agreement and (b) ABN AMRO Bank, N.V., solely in its capacity

as facility agent, collateral management agent, and security agent under the DIP Global Credit Agreement, including any successors thereto.

43.    "*DIP Credit Agreements*" means the DIP U.S. Credit Agreement and the DIP Global Credit Agreement.

44.    "*DIP Credit Facility Claims*" means any and all Claims held by the DIP Agents and the DIP Lenders arising under, in connection with, or related to the DIP Facilities, the DIP Credit Facility Documents, the DIP Financing Orders, and all related agreements, documents, and instruments, executed in connection with the DIP Credit Agreements, including any and all Obligations and Secured Obligations (each as defined in the applicable DIP Credit Agreement), including all principal, accrued and unpaid interest, fees, and expenses arising under the DIP Credit Facility Documents, in each case, as authorized or approved by the DIP Financing Orders.  For the avoidance of doubt, all Prepetition Secured Credit Facility Claims shall be subsumed within the DIP Credit Facility Claims.

45.    "*DIP Credit Facility Documents*" means the DIP Credit Agreements, the DIP Financing Orders, and all related agreements, documents, and instruments executed in connection with the DIP Credit Agreements and authorized or approved by the DIP Financing Orders, each as amended, modified, or supplemented from time to time.

46.    "*DIP Facilities*" means, together, the DIP U.S. Credit Facility and the DIP Global Credit Facility.

47.    "*DIP Financing Orders*" means, collectively:  (a) the *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 And 507 (I) Authorizing The Debtors To Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens And Superpriority Administrative Expense Claims, (III) Authorizing Use Of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 51]; (b) the *Interim Bridge Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 And 507 (I) Authorizing The Debtors To Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens And Superpriority Administrative Expense Claims, (III) Authorizing Use Of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 239]; and (c) the *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 And 507 (I) Authorizing The Debtors To Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens And Superpriority Administrative Expense Claims, (III) Authorizing Use Of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying The Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 290].

48.    "*DIP Global Credit Agreement*" means that certain Superpriority Secured Debtor-in-Possession Facility Agreement for a Borrowing Base Facility, dated as of November 30, 2018 (as amended, restated, modified, or supplemented from time to time), by and among the Global Borrowers, the guarantors, ABN AMRO Bank, N.V., as facility agent, collateral management agent, security agent, issuing bank and overdraft bank, Mercuria Energy Trading S.A., as co-originator and as a hedging provider, and the lenders party thereto from time to time.

49.    "*DIP Global Credit Facility*" means the senior secured super-priority asset-based credit facilities contemplated under the terms of the DIP Global Credit Agreement.

50.    "*DIP Global Credit Facility Lenders*" means, as of the date hereof, collectively, ABN AMRO Bank N.V., as issuing bank and overdraft bank, and METSA, as lender.

51.    "*DIP Lenders*" means, together, the DIP U.S. Credit Facility Lenders and the DIP Global Credit Facility Lenders.

52.    "*DIP U.S. Credit Agreement*" means that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of November 9, 2018 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering (USA) LLC, as borrower, ABN AMRO Capital USA LLC, as administrative agent, swing line lender and issuing bank, and the lenders party thereto from time to time.

53.     "*DIP U.S. Credit Facility*" means, together, the DIP U.S. Revolving Credit Facility and the DIP U.S. Term Credit Facility.

54.     "*DIP U.S. Credit Facility Lenders*" means, as of the date hereof, collectively, ABN AMRO Capital USA LLC, as swing line lender and an issuing bank, and MUSAH.

55.     "*DIP U.S. Revolving Credit Facility*" means the senior secured super-priority asset-based revolving credit facility contemplated under the terms of the DIP U.S. Credit Agreement.

56.     "*DIP U.S. Term Credit Facility*" means the senior secured super-priority term loan credit facility contemplated under the terms of the DIP U.S. Credit Agreement.

57.     "*Disclosure Statement*" means the disclosure statement (as may be further amended, supplemented, or modified from time to time in accordance with its terms) for the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

58.     "*Disclosure Statement Order*" means a Final Order of the Bankruptcy Court approving the Disclosure Statement.

59.     "*Disputed*" means with respect to any Claim or Interest, any Claim or Interest that is (a) disputed under the Plan, or subject, or potentially subject, to a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (b) improperly asserted, by the untimely or otherwise improper filing of a Proof of Claim as required by order of the Bankruptcy Court, (c) that is disallowed pursuant to section 502(d) of the Bankruptcy Code (except as otherwise agreed to by the Reorganized Debtors with respect to General Unsecured Claims in Class 4B or the Litigation Trustee with respect to Aegean Unsecured Claims in Class 4A), or (d) in the case of General Unsecured Claims, that is disputed in a filing in the Bankruptcy Court by the Reorganized Debtors with respect to General Unsecured Claims in Class 4B or the Litigation Trustee with respect to Aegean Unsecured Claims in Class 4A.  A Claim or Administrative Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

60.     "*Disputed Aegean Unsecured Claims Reserve*" has the meaning set forth in <u>Article VIII.J</u> hereof.

61.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors, the Litigation Trustee, the Unsecured 4.00% Notes Indenture Trustee (with respect to the Unsecured 4.00% Notes Claims), the Unsecured 4.25% Notes Indenture Trustee (with respect to the Unsecured 4.25% Notes Claims), or any Entity the Reorganized Debtors or the Litigation Trustee, as applicable, select to make or to facilitate distributions in accordance with the Plan.

62.     "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims (other than Unsecured Notes Claims) are eligible to receive distributions under the Plan, which, unless otherwise specified in the Confirmation Order, shall be the Voting Deadline.

63.     "*DTC*" means The Depository Trust Company.

64.     "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors, in consultation with Mercuria and the Committee, on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in <u>Article X.A</u> have been satisfied or waived (in accordance with <u>Article X.B</u>); and (c) the Plan is declared effective.

65.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

66.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

67. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) AmEx; (g) the Unsecured Notes Indenture Trustees; (h) with respect to each of the foregoing entities in clauses (a)-(g) each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); and (i) with respect to each of the foregoing entities in clauses (a)-(h), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); provided, however, that, notwithstanding anything to the contrary herein, the scope of "Exculpated Parties" shall be subject to the limitations set forth in Article IX.F hereof.

68. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

69. "*Exit Financing*" means such exit financing, if any, in an amount and on terms as reasonably determined by the Debtors and Mercuria in advance of the Effective Date.

70. "*Exit Financing Documents*" means, collectively, all agreements, documents, and instruments delivered or entered into in connection with the Exit Financing (including any guarantee agreements, pledge and collateral agreements, and other security documents), which shall be materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and Mercuria.

71. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

72. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that, the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law, may be filed relating to such order shall not prevent such order from being a Final Order.

73. "*General Unsecured Claim*" means any Claim, including any Unsecured Notes Claims, other than: (a) Administrative Claims; (b) Professional Fee Claims; (c) Priority Tax Claims; (d) DIP Credit Facility Claims; (e) Other Priority Claims; (f) Other Secured Claims; (g) Section 510(b) Claims; (h) Prepetition Secured Credit Facility Claims; (i) Secured Term Loan Claims; and (j) Intercompany Claims.

74. "*Global Borrowers*" means Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, and OBAST Bunkering & Trading GmbH.

75. "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

76. "*Guarantors*" means, each guarantor under the DIP Facilities.

77. "*Holder*" means an Entity holding a Claim or an Interest, as applicable, each solely in its capacity as such.

78.    "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

79.    "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in effect as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, indemnification agreements, or employment or other contracts or instruments or arising under applicable non-bankruptcy law, for their directors and officers of the Debtors serving in such capacities as of the Petition Date.

80.    "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against another Debtor or a Non-Debtor Subsidiary.

81.    "*Intercompany Interest*" means any Interest or equity security, as applicable, held by a Debtor in another Debtor or a Non-Debtor Subsidiary.

82.    "*Interests*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in the Debtors (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

83.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 161].

84.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

85.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

86.    "*Litigation Claims*" means all of the following claims and Causes of Action belonging to any of the Debtors or their Non-Debtor Subsidiaries, and existing at any time on or prior to the Petition Date:  (a) claims and Causes of Action relating to the events, circumstances, and conduct described in the June 4, 2018, and November 2, 2018, Form 6-K disclosures of Aegean including conduct concerning improper accounting for or recordation of accounts receivable, as well as the right of any of the Debtors or their Non-Debtor Subsidiaries to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (b) claims and Causes of Action relating to the construction and maintenance of Aegean Oil Terminal Corp.'s fuel oil terminal located in Fujairah, UAE, as well as the right of any of the Debtors or their Non-Debtor Subsidiaries to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (c) claims and Causes of Action relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melissanidis, claims against auditors and other professionals related to misappropriation of funds, any related conspiracy to defraud Aegean or investors in Aegean, claims against Quality Solutions related to construction fraud or other fraud, misconduct, malpractice, or other malfeasance by any director, officer, employee, or agent of any of the Debtors or their Non-Debtor Subsidiaries in connection with any of the foregoing; (d) claims and Causes of Action brought by any of the Debtors or their Non-Debtor Subsidiaries, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014, including any appeals in connection with the foregoing; (e) claims and Causes of Action concerning unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof; (f) claims and Causes of Action concerning HSFO product loaded from Petrotrin in Trinidad in December 2016; (g) claims and Causes of Action arising from the repurchase of any equity interests in Aegean; (h) claims and Causes of Action against any of any of the Debtors' or their Non-Debtor Subsidiaries' directors or officers or other person covered by applicable D&O Liability Insurance Policies, including for breach of fiduciary duty; (i) [Reserved]; (j) claims and Causes of Action of any of the Debtors or their Non-Debtor Subsidiaries in connection with the Related Party Transactions described in the Form 20-F of Aegean for the fiscal year ended December 31, 2016; and (k) Avoidance Actions, with the exception of claims and Causes of Action to avoid and recover preferential transfers pursuant to Bankruptcy Code section 547; provided, however, that, notwithstanding anything to the contrary contained herein, the scope of "Litigation Claims"

shall be expressly subject to the limitations set forth in Article IX.F hereof. The "Litigation Claims" shall not include any Cause of Action that is not identified in clauses (a) - (k) of the foregoing sentence or any Cause of Action against Mercuria, David Gallagher, any Reorganized Debtor or Non-Debtor Subsidiary, or any other parties or entities described in the first sentence of the second paragraph of Article IX. F hereof.

87.    "*Litigation Trust*" means the trust established for the benefit of the Litigation Trust Beneficiaries on the Effective Date in accordance with the Plan and pursuant to the Litigation Trust Agreement.

88.    "*Litigation Trust Advisory Board*" means the board of three members selected to govern the Litigation Trust, as selected jointly by the Committee and the Requisite Consenting Unsecured Noteholders.

89.    "*Litigation Trust Agreement*" means the litigation trust agreement, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof, that, among other things, establishes the Litigation Trust and describes the powers, duties, and responsibilities of the Litigation Trustee, and otherwise in form and substance reasonably acceptable to the Debtors, Mercuria, and the Committee.

90.    "*Litigation Trust Assets*" means the Litigation Claims, the Litigation Trust Loan, and proceeds of the foregoing.

91.    "*Litigation Trust Backstop Commitment Agreement*" means that certain commitment agreement, in form and substance reasonably acceptable to Mercuria, the Debtors, and the Committee, pursuant to which Mercuria shall backstop the Litigation Trust Loan, the form of which shall be included in the Plan Supplement.

92.    "*Litigation Trust Beneficiaries*" means the holders of Litigation Trust Interests in accordance with the Plan and the Litigation Trust Agreement.

93.    "*Litigation Trust Documents*" means the Litigation Trust Agreement, the Litigation Trust Backstop Commitment Agreement, the definitive documents comprising the Litigation Trust Loan, and any other documents necessary for the establishment and implementation of the Litigation Trust, in each case in form and substance reasonably acceptable to the Debtors, the Committee, and Mercuria, and, after the Effective Date, the Litigation Trust Advisory Board.

94.    "*Litigation Trustee*" means the trustee for the Litigation Trust, as appointed in accordance with the Litigation Trust Agreement and with the consent of the Committee and the Requisite Consenting Unsecured Noteholders.

95.    "*Litigation Trust Funders*" means, collectively, (a) any party to the Restructuring Support Agreement (other than the Debtors and Mercuria) that elects to participate in the Litigation Trust Loan and (b) Mercuria, to the extent the Litigation Trust Loan is not fully funded by the parties set forth in (a) hereof.

96.    "*Litigation Trust Funding Fee*" means Cash in the amount of $3 million payable to the Litigation Trust Funders on a Pro Rata basis in accordance with the amount funded by each of them under the Litigation Trust Loan as consideration for providing the Litigation Trust Loan, payable from the proceeds of the Litigation Trust Assets before any distribution to any Holder of a Class A Litigation Trust Unit or a Class B Litigation Trust Unit in accordance with the Litigation Trust Documents and the Plan.

97.    "*Litigation Trust Interests*" means the Class A Litigation Trust Units and Class B Litigation Trust Units to be distributed in accordance with and under the Plan.

98.    "*Litigation Trust Loan*" means a loan in a committed amount of $15 million to be funded by the Litigation Trust Funders for the benefit of the Litigation Trust and to be repaid from the Litigation Trust Assets in accordance with the terms of the Litigation Trust Documents.

99.    "*Litigation Trust Loan Account*" means an interest-bearing account established in accordance with the Litigation Trust Documents on or prior to the Effective Date and into which, on the Effective Date, the proceeds of the Litigation Trust Loan will be funded by the Litigation Trust Funders.

100.    "*Litigation Trust Loan Payments*" means the payments to be made out of the Litigation Trust to the Litigation Trust Funders in accordance with the terms of the Plan and the Litigation Trust Documents.

101.    "*Mercuria*" means, collectively, unless otherwise indicated to the contrary elsewhere in the Plan, MAHHK, MEG, METSA, MUSAH, and each Affiliate and direct and indirect subsidiary of the foregoing.

102.    "*MAHHK*" means Mercuria Asset Holdings (Hong Kong) Limited.

103.    "*MEG*" means Mercuria Energy Group Limited.

104.    "*METSA*" means Mercuria Energy Trading S.A.

105.    "*MUSAH*" means Mercuria US Assets Holdings, LLC.

106.    "*Non-Debtor Subsidiaries*" means any subsidiaries of Aegean that are not Debtors in the Chapter 11 Cases.

107.    "*Non-Litigation Trust Causes of Action*" means any Cause of Action other than the Litigation Claims.

108.    "*Notice and Claims Agent*" means Epiq Corporate Restructuring, LLC, the notice, claims, and solicitation agent retained by the Debtors pursuant to the *Order Authorizing Employment and Retention of Epiq Corporate Restructuring LLC as Claims and Noticing Agent* [Docket No. 84] and *Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Administrative Advisor, Nunc Pro Tunc to the Petition* [Docket No. 162].

109.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) a DIP Credit Facility Claim; or (d) a Professional Fee Claim.

110.    "*Other Secured Claim*" means any Secured Claim against any Debtor, including any Secured Tax Claim, other than:  (a) DIP Credit Facility Claims; or (b) an Adequate Protection Superpriority Claim.  For the avoidance of doubt, "Other Secured Claims" includes any Claim arising under, derived from, or based upon any letter of credit issued in favor of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

111.    "*Payment in Full*" means payment in full of each Allowed Aegean Unsecured Claim, including postpetition interest at the applicable default contract rate for the period from the Petition Date through the Effective Date and if no such contract rate exists, at the federal judgment rate plus fees, costs, and expenses under such contract, if applicable.

112.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

113.    "*Petition Date*" means November 6, 2018.

114.    "*Plan*" means this *Joint Chapter 11 Plan of Reorganization of Aegean Marine Petroleum Network Inc., et al., and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (including the Plan Supplement and all exhibits hereto and thereto), as the same may be amended, modified, supplemented or amended and restated from time to time.

115.    "*Plan Supplement*" means a supplemental appendix to the Plan, which shall be Filed with the Bankruptcy Court not later than seven (7) calendar days prior to the Voting Deadline, containing, among other things, draft forms of documents (or term sheets thereof), schedules, and exhibits to the Plan, including, but not limited to, the following:  (a) the Rejected Executory Contracts and Unexpired Leases Schedule; (b) the identity and affiliations of the Reorganized Debtors' directors and officers; (c) the Schedule of Retained Causes of Action; (d) [Reserved]; (e) the Description of Restructuring Transactions (if any); (f) the Litigation Trust Documents; (g) form of Reorganized Debtor Organizational Documents; and (h) the Exit Financing Documents (if any).  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (h), as applicable.

116.    "*Prepetition Secured Credit Agreements*" means, together, the Prepetition Secured Global Credit Agreement and the Prepetition Secured U.S. Credit Agreement.

117.    "*Prepetition Secured Credit Facilities*" means those certain revolving credit, letter of credit, and term loan facilities provided under the Prepetition Secured Credit Facility Documents.

118.    "*Prepetition Secured Credit Facility Agents*" means, together, ABN AMRO Capital USA LLC and ABN AMRO Bank N.V.

119.    "*Prepetition Secured Credit Facility Claims*" means any and all Claims held by the Prepetition Secured Credit Facility Agents and the Prepetition Secured Credit Facility Lenders against any Debtor, arising under, in connection with, or related to the Prepetition Secured Credit Facilities, the Prepetition Secured Credit Facility Documents, the DIP Financing Orders, and all related agreements, documents, and instruments, executed in connection with the Prepetition Secured Credit Agreements, including any and all Obligations and Secured Obligations (each as defined in the applicable Prepetition Secured Credit Agreement), including all principal, accrued and unpaid interest, fees, and expenses arising under the Prepetition Secured Credit Facility Documents.

120.    "*Prepetition Secured Credit Facility Documents*" means the Prepetition Secured Credit Agreements and all related agreements, documents, and instruments, executed in connection with the Prepetition Secured Credit Agreements at any time prior to the Petition Date.

121.    "*Prepetition Secured Credit Facility Lenders*" means the lenders party to the Prepetition Secured Credit Agreements, from time to time, on or before the Petition Date, including MUSAH and METSA, as lenders, and ABN AMRO Capital USA LLC and ABN AMRO Bank N.V., as swing line lenders, issuing banks, and overdraft lenders, as applicable.

122.    "*Prepetition Secured Global Credit Agreement*" means that certain Facility Agreement for a Borrowing Base Facility, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH and Aegean Petroleum Uruguay S.A., as co-borrowers and guarantors, Aegean, as guarantor, ABN AMRO Bank N.V., as arranger, documentation bank, facility agent, collateral management agent, security agent, and certain financial institutions, as lender, issuing banks, and overdraft banks party thereto from time to time (including any successors thereto).

123.    "*Prepetition Secured U.S. Credit Agreement*" means that certain Second Amended and Restated Security Uncommitted Credit Agreement, dated as of August 3, 2017 (as amended, restated, modified, or supplemented from time to time), by and among, inter alia, Aegean Bunkering (USA) LLC, as borrower, ABN AMRO Capital USA, as administrative agent, collateral agent, syndication agent, swing line lender and issuing bank, BNP Paribas, as documentation agent, and the lenders party thereto from time to time (including any successors thereto).

124.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

125.    "*Pro Rata*" means (i) the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that respective Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims or Interests in a particular Class and

other Classes entitled to share in the same recovery as such Allowed Claim or Interest under the Plan, as applicable, and (ii) in relation to the payment of the Litigation Trust Funding Fee, the proportion of the actual amount of the Litigation Trust Loan contributed by each Litigation Trust Funder in its individual capacity to the aggregate amount of the Litigation Trust Loan.

126.    "*Professional*" means an Entity employed pursuant to a Final Order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

127.    "*Professional Fee Claims*" means all Claims for fees and expenses (including transaction, completion, and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

128.    "*Professional Fee Claims Estimate*" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.B.2.

129.    "*Professional Fee Escrow*" means a non-interest-bearing escrow account established and funded pursuant to Article II.B.3.

130.    "*Professional Fee Escrow Agent*" means an escrow agent for the Professional Fee Escrow appointed pursuant to Article II.B.3 and the escrow agreement entered into pursuant thereto.

131.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

132.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

133.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule (as may be amended), if any, as reasonably determined by the Debtors and Mercuria, of certain Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the Plan, which shall be included in the Plan Supplement.

134.    "*Released Party*" means each of the following in their capacity as such:  (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; provided, however, that any party in interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Released Party"; provided, further, however, that notwithstanding anything to the contrary herein, the scope of "Released Parties" shall be subject to the limitations set forth in Article IX.F hereof.

135.    "*Releasing Party*" means each of the following, solely in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing Entities in clauses (a) through (i), each

such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (j), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; (l) all Holders of Claims and Interests that vote to accept the Plan; (m) all Holders of Claims and Interests that vote to reject the Plan but do not elect to opt out of the Third Party Release; and (n) all Holders of Claims and Interests not described in the foregoing clauses (a) through (m); provided, however, that any such Holder of a Claim or Interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Releasing Party"; provided, further, however, that notwithstanding anything to the contrary herein, the scope of "Releasing Parties" shall be subject to the limitations set forth in Article IX.F hereof.

136.    "*Reorganized Aegean*" means, on or after the Effective Date, Aegean, as reorganized pursuant to the Plan, any successor thereto, one or more newly-formed Entity or Entities to hold, or any existing Mercuria Entity or Entities that acquire(s), the reorganized interests in Aegean's subsidiaries, in each case as reasonably determined by the Debtors and Mercuria, after giving effect to the Restructuring Transactions.

137.    "*Reorganized Aegean Board*" means the initial board of directors, members, or managers, as applicable, of Reorganized Aegean, as determined by Mercuria in consultation with the Debtors.

138.    "*Reorganized Aegean Equity Interests*" means the common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code) or other equity ownership interest in Reorganized Aegean.

139.    "*Reorganized Debtor Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, limited liability company operating agreements or such other applicable formation documents of each Reorganized Debtor, as contemplated by the Description of Restructuring Transactions and shall be in form and substance reasonably acceptable to the Debtors and Mercuria.

140.    "*Reorganized Debtors*" means, on or after the Effective Date, Reorganized Aegean and each of the other Debtors, as reorganized, pursuant to and under the Plan or any successor thereto, after giving effect to the Restructuring Transactions.

141.    "*Requisite Consenting Unsecured Noteholders*" means the Consenting Unsecured Noteholders holding at least 50.1% of the outstanding aggregate principal amount of Unsecured Notes held by all Consenting Unsecured Noteholders.

142.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of December 15, 2018 [Docket No. 223], including the Restructuring Term Sheet (as defined in and attached to the Restructuring Support Agreement) and all schedules and attachments thereto, by and among the Debtors, Mercuria, the Committee, AmEx, the Consenting Unsecured Noteholders, and such other Entities that may become party thereto, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

143.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.J hereof.

144.    "*Schedule of Retained Causes of Action*" means the schedule of retained Causes of Action to be included in the Plan Supplement, as reasonably determined by the Debtors, Mercuria, and the Committee.

145.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and substantially in accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

146.    "*Section 510(b) Claims*" means any Claim against any Debtor:  (a) arising from the rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a Security; (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; or (d) derived from, based upon, relating to, or arising under the subject matter of that certain securities litigation styled as *In re Aegean Marine Petroleum Network Inc. Securities Litigation*, No. 1:18-cv-04993 (NRB), currently pending in the United States Court for the Southern District of New York.

147.    "*Secured*" means, when referring to a Claim, a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, in each case, as determined pursuant to section 506(a) of the Bankruptcy Code.

148.    "*Secured Tax Claim*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

149.    "*Secured Term Loan Adequate Protection Orders*" means, collectively, (a) the *Final Order (I) Granting Adequate Protection to Piraeus Bank S.A., (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 241], (b) the *Final Order (I) Granting Adequate Protection to Aegean Baltic Bank S.A., as Agent, (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 242], (c) the *Final Order (I) Granting Adequate Protection to National Bank of Greece S.A., (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 243], (d) the *Final Order (I) Granting Adequate Protection to United Arab Bank P.J.S.C., as Agent, (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 244], and (e) the *Final Order (I) Granting Adequate Protection to Orix Investment And Management Pte. Ltd., (II) Authorizing Use of Cash Collateral, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 245].

150.    "*Secured Term Loan Agents*" means the agents under each respective Secured Term Loan Credit Agreements.

151.    "*Secured Term Loan Claims*" means any Claim held by the Secured Term Loan Agents and the Secured Term Loan Lenders, against any Debtor, arising under, in connection with, or related to the Secured Term Loan Credit Agreements, the DIP Financing Orders, the Secured Term Loan Adequate Protection Orders, and all related agreements, documents, and instruments, executed by any of the Debtors in connection with the Secured Term Loan Credit Agreements, including any and all Obligations (as defined in the Secured Term Loan Credit Agreements), including all principal, accrued and unpaid interest, fees, and expenses arising under the Secured Term Loan Credit Agreements, in each case, as approved by the DIP Financing Orders and the Secured Term Loan Adequate Protection Orders.

152.    "*Secured Term Loan Credit Agreements*" means those certain credit agreements (each as amended, supplemented, or otherwise modified from time to time in accordance with their terms) pursuant to which the Secured Term Loan Lenders have made the Secured Term Loans.

153.    "*Secured Term Loans*" means, collectively, the 2017 Secured Term Loan, 2017 South Africa Secured Term Loan, 2015 Fujairah Secured Term Loan, 2008 New Building Secured Term Loan, 2007 Newbuilding Secured Term Loan, First 2006 Newbuilding Secured Term Loan, Second 2006 Newbuilding Secured Term Loan, Third 2006 Newbuilding Secured Term Loan, 2005 Newbuilding Secured Term Loan, 2018 Barge Secured Term Loan, each as defined in the Restructuring Support Agreement.

154.    "*Secured Term Loan Lenders*" means the lender parties to the Secured Term Loan Credit Agreements, including any successor thereto.

155.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

156.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended, together with the rules and regulations promulgated thereunder.

157.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

158.    "*Trading Day*" means any date on which the New York Stock Exchange is open for business.

159.    "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

160.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

161.    "*Unimpaired*" means, with respect to a Claim or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

162.    "*Unsecured*" means, with respect to any Claim, any Claim that is not a Secured Claim.

163.    "*Unsecured 4.00% Notes*" means the 4.00% unsecured convertible notes issued pursuant to the Unsecured 4.00% Notes Indenture.

164.    "*Unsecured 4.00% Notes Claims*" means any Claim against Aegean arising from, based upon, or related to the Unsecured 4.00% Notes or the Unsecured 4.00% Notes Indenture.

165.    "*Unsecured 4.00% Notes Indenture*" means that certain Senior Indenture, as amended and supplemented by that certain First Supplemental Indenture, in each case, dated as of October 23, 2013, between Aegean, as issuer and the Unsecured 4.00% Notes Indenture Trustee, as amended, restated, supplemented or otherwise modified from time to time.

166.    "*Unsecured 4.00% Notes Indenture Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as trustee under the Unsecured 4.00% Notes Indenture, including any successor thereto.

167.    "*Unsecured 4.25% Notes*" means the 4.25% unsecured convertible notes issued pursuant to the Unsecured 4.25% Notes Indenture.

168.    "*Unsecured 4.25% Notes Claims*" means any Claim against Aegean arising from, based upon, or related to the Unsecured 4.25% Notes or the Unsecured 4.25% Notes Indenture

169.    "*Unsecured 4.25% Notes Indenture*" means that certain 4.25% indenture, dated as of December 19, 2016, by and among Aegean, as issuer, and U.S. Bank National Association, as trustee, pursuant to which the Unsecured 4.25% Notes were issued.

170.    "*Unsecured 4.25% Notes Indenture Trustee*" *means* U.S. Bank National Association, in its capacity as trustee under the Unsecured 4.25% Notes Indenture, including any successor thereto.

171.    "*Unsecured Notes*" means the Unsecured 4.00% Convertible Notes and the Unsecured 4.25% Convertible Notes.

172.    "*Unsecured Notes Claims*" means the Unsecured 4.00% Notes Claims and the Unsecured 4.25% Notes Claims.

173.    "*Unsecured Notes Indentures*" means the Unsecured 4.00% Notes Indenture and the Unsecured 4.25% Notes Indenture.

174.    "*Unsecured Notes Indenture Trustee Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, and disbursements of the Unsecured Notes Indenture Trustees through the Effective Date, whether incurred prior to or after the Petition Date, including any fees, expenses and disbursements of attorneys, advisors or agents retained or utilized by the Unsecured Notes Indenture Trustees.

175.    "*Unsecured Notes Indenture Trustees*" means the Unsecured 4.00% Notes Indenture Trustee and the Unsecured 4.25% Notes Indenture Trustee.

176.    "*Voting Deadline*" means 4:00 p.m. (Eastern Time) on March [•], 2019, as specifically set forth in the Disclosure Statement Order, which is the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

B.    *Rules of Interpretation*

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided in the Plan, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (d) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan; (e) unless otherwise stated herein, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (h) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (i) any capitalized term used herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (j) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (k) references to "Proofs of Claim," "Holders of Claims," "disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "disputed Interests," and the like as applicable; (l) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (m) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (n) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require or permit the application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); <u>provided</u> that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as

16

applicable) in the State of New York shall be governed by the laws of the jurisdiction of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

# ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including DIP Credit Facility Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in <u>Article III</u>.

A.      *Administrative Claims*

Except to the extent otherwise expressly provided herein, other than Professional Fee Claims and Administrative Claims that have already been paid during the Chapter 11 Cases, and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor, with the reasonable consent of Mercuria, or Reorganized Debtor agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash by the Reorganized Debtors through Cash on hand, proceeds of the DIP Facilities, and/or Cash funded by Mercuria:  (a) if such Administrative Claim is Allowed as of the Effective Date, not later than the Effective Date; and (b) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of a Final Order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; <u>provided</u> that if an Allowed Administrative Claim arises from liabilities incurred by the Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in this <u>Article II.A</u> and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; <u>provided</u>, <u>however</u> that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.  For the avoidance of doubt, the following Holders of Administrative Claims are not required to File and serve on the Reorganized Debtors requests for payment of Allowed Administrative Claims:  (a) Holders of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code timely filed in accordance with the Claims Bar Date Order; (b) Administrative Claims paid in full in Cash during the Chapter 11 Cases; and (c) Holders of Administrative Claims expressly exempted from compliance with the Claims Bar Date Order.

Notwithstanding the foregoing, requests for payment of fees and expenses of professionals compensated pursuant to the DIP Financing Orders are not required to File and serve such requests other than in compliance with the procedures set forth in the DIP Financing Orders.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR RESPECTIVE PROPERTY AND ASSETS AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

B.      *Professional Fee Claims*

1.      Final Fee Applications

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

2.      Professional Fee Claims Estimate

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and unreimbursed expenses incurred in rendering services to the Debtors or the Committee, as applicable, before and as of the Effective Date and shall deliver such good faith estimate to the Debtors and Mercuria no later than five (5) Business Days prior to the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors, in consultation with Mercuria, shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

3.      Professional Fee Escrow Account

If the Professional Fee Claims Estimate is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the Exit Financing or otherwise).  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (a) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (b) shall be held in trust for the Professionals; provided, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors; provided, further, that amounts held in the Professional Fee Escrow Accounts that exceed the aggregate outstanding unpaid amount requested in such Professionals' Final Fee Applications shall be released to the Reorganized Debtors from the Professional Fee Escrow at the earliest possible time.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided, that the Debtors' and Reorganized Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed limited in any way to the balance of funds held in the Professional Fee Escrow, as such amounts are solely estimates.

If the amount in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims owing to Professionals, the deficiency shall be promptly funded by the Debtors or the Reorganized Debtors, as applicable, to the Professional Fee Escrow without any further action or order of the Bankruptcy Court.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors and the Reorganized Debtors, subject to the terms of the Plan. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Debtors or the Litigation Trust as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Committee Members' Fees and Expenses*

On or before the Effective Date, the Debtors or Reorganized Debtors shall pay in full the reasonable and documented fees and expenses of the Committee Members (including the reasonable and documented fees and expenses of counsel for Committee Members). The Committee Members shall deliver an invoice to the Debtors and Mercuria no less than two (2) Business Days prior to the Effective Date, provided, that the Debtors' and Reorganized Debtors' obligations to pay in full the reasonable and documented fees and expenses of the Committee Members shall not be limited nor deemed limited in any way by the delivery of such invoice.

D.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor, with the reasonable consent of Mercuria, or Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of U.S. Trustee Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first, by the Debtors or the Reorganized Debtors, as applicable.

F.      *DIP Credit Facility Claims*

To the extent not fully satisfied prior to the Effective Date in accordance with the terms of the DIP Financing Orders, all DIP Credit Facility Claims shall be deemed Allowed as of the Effective Date in an amount not less than (1) the principal amount outstanding under the DIP Credit Agreements on such date, (2) all accrued and unpaid interest thereon to the date of payment, and (3) all accrued and unpaid fees, expenses and noncontingent indemnification obligations, in each case as and to the extent payable under the DIP Credit Agreements and the DIP Financing Orders. In full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed DIP Credit Facility Claim, Mercuria (or its designated affiliate(s)) shall receive one hundred percent (100%) of the Reorganized Aegean Equity Interests and may elect, in consultation with the Debtors, to otherwise satisfy, reinstate, or roll into the Exit Financing (if any), any portion of such DIP Credit Facility Claims to achieve a tax efficient structure; provided, that any such election shall be limited by satisfaction of the requirements for confirmation under section 1129 of the Bankruptcy Code, including sections 1129(a)(11) and 1129(b) of the Bankruptcy Code, as applicable. For the avoidance of doubt, all fees, costs, and expenses required to be paid under the terms of the DIP Facilities and the DIP Credit Facility Documents, including the fees of Mercuria, the DIP Agents, and the DIP Lenders, and the fees and expenses of counsel for each of Mercuria, the DIP Agents, and the DIP Lenders, shall be paid in Cash. For the avoidance of doubt, in accordance with the applicable DIP Financing Orders, all parties' rights, if any, to challenge or object to, among other things, the roll up of the Prepetition Secured Credit Facilities shall be irrevocably extinguished, released, and discharged upon the occurrence of the Effective Date.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Summary of Classification*

Claims and Interests, except for Administrative Claims, DIP Credit Facility Claims, Professional Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in this <u>Article III</u>.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The Debtors may, in consultation with Mercuria and the Committee, combine Classes of equal priority and/or separately re-classify Claims in a particular Class into a different Class and deem such different Class(es) to have accepted or rejected the Plan, as applicable, in order to pursue Confirmation pursuant to section 1129(b) of the Bankruptcy Code, and the description of the Classes below is expressly subject to such rights.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in <u>Article III.E</u>.

1.      <u>Class Identification</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Term Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4A | Aegean Unsecured Claims | Impaired | Entitled to Vote |
| 4B | General Unsecured Claims against All Other Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 7 | Section 510(b) Claims | Impaired | Entitled to Vote |
| 8 | Interests in Aegean | Impaired | Entitled to Vote |

B.    *Treatment of Claims and Interests*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, each such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.    Class 1 – Other Secured Claims

a.    *Classification*:  Class 1 consists of Other Secured Claims.

b.    *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive, as determined by the Debtors but subject in each case to Mercuria's reasonable consent, or the Reorganized Debtors, as applicable, either:

(i)    payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course;

(ii)    Reinstatement of such Claim;

(iii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or

(iv)    such other treatment rendering such Claim Unimpaired.

c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Priority Claims

a.    *Classification*:  Class 2 consists of Other Priority Claims.

b.    *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course.

c.    *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – Secured Term Loan Claims

    a.    *Classification*:  Class 3 consists of all Secured Term Loan Claims.

    b.    *Treatment:* In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Secured Term Loan Claim, each such Holder shall receive, in each case without duplication and as determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either:

        (i)    payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course;

        (ii)    Reinstatement of such Claim;

        (iii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or

        (iv)    such other treatment rendering such Claim Unimpaired.

    c.    *Voting*:  Class 3 is Unimpaired under the Plan.  Each Holder of an Allowed Secured Term Loan Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Secured Term Loan Claims are not entitled to vote to accept or reject the Plan.

4.    Class 4A – Aegean Unsecured Claims

    a.    *Classification*:  Class 4A consists of all Aegean Unsecured Claims.

    b.    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Aegean Unsecured Claim, each such Holder shall receive its Pro Rata share of:

        (i)    the Aegean Unsecured Claims Cash Pool; and

        (ii)    the Class A Litigation Trust Units.

    c.    *Voting*:  Class 4A is Impaired under the Plan.  Each Holder of an Allowed Class 4A Aegean Unsecured Claim is entitled to vote to accept or reject the Plan.

    d.    *Allowance*:  The Unsecured 4.00% Notes Claims shall be Allowed in the aggregate principal amount of $[94,550,000.00, plus accrued and unpaid interest,] as of the Petition Date.  The Unsecured 4.25% Notes Claims shall be Allowed in the aggregate principal amount of $[172,500,000.00, plus accrued and unpaid interest,] as of the Petition Date. The Claims of AmEx shall be Allowed in the amount of $22,466,292.32.

5.    Class 4B – General Unsecured Claims against All Debtors Other Than Aegean

    a.    *Classification*:  Class 4B consists of all General Unsecured Claims other than Aegean Unsecured Claims.

    b.    *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim, each such Holder shall receive:

        (i)    payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course; or

(ii)     such other treatment as agreed to by the applicable Debtor but subject in each case to Mercuria's reasonable consent, or the applicable Reorganized Debtor rendering such Claim Unimpaired.

c.     *Voting*:  Class 4B is Unimpaired under the Plan.  Each Holder of an Allowed Class 4B General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 4B General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.     Class 5 – Intercompany Claims

a.     *Classification*: Class 5 consists of all Intercompany Claims.

b.     *Treatment*:  Intercompany Claims shall be, as determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either Reinstated or canceled and released (including by way of capital contribution) without any distribution on account of such Claims.

c.     *Voting*:  Class 5 is either Unimpaired, in which case the Holders of Intercompany Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.     Class 6 – Intercompany Interests

a.     *Classification*:  Class 6 consists of all Intercompany Interests.

b.     *Treatment*:  Intercompany Interests shall be, as determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either Reinstated or canceled and released without any distribution on account of such Interests.

c.     *Voting*:  Class 6 is either Unimpaired, in which case the Holders of Intercompany Interests are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8.     Class 7 – Section 510(b) Claims

a.     *Classification*: Class 7 consists of all Section 510(b) Claims.

b.     *Allowance*:  Notwithstanding anything to the contrary herein, a Class 7 Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

c.     *Treatment*:  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Section 510(b) Claim, each such Holder shall receive its Pro Rata share of Class B Litigation Trust Units; provided, that for purposes of receiving the treatment provided herein, each Holder shall be treated as if such Holder held a number of Allowed Class 8 Aegean Interests equal in value (determined based on the Aegean Interest Distribution Value) to the amount of its Allowed Section 510(b) Claim.

    d.    *Voting*:  Holders of Section 510(b) Claims are Impaired under the Plan.  Holders of Section 510(b) Claims are entitled to vote to accept or reject the Plan.

9.    <u>Class 8 – Aegean Interests</u>

    a.    *Classification*:  Class 8 consists of all Aegean Interests.

    b.    *Treatment*: In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Aegean Interest, each such Holder shall receive its Pro Rata share of Class B Litigation Trust Units.

    c.    *Voting*:  Holders of Aegean Interests are Impaired under the Plan.  Holders of Aegean Interests are entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  Subject to the Restructuring Support Agreement (including section 3(b) thereof), the Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests and/or separately reclassifying Claims in a particular Class into a different Class and deeming such different Class(es) to have accepted or rejected the Plan, as applicable.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed to have been accepted by the Holders of such Claims in such Class.

G.      *Intercompany Interests*

For the avoidance of doubt, to the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure, for the ultimate benefit of the Holders of Reorganized Aegean Equity Interests, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

H.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto; provided, however, the reclassification of any Class 4A Aegean Unsecured Claim shall be reasonably determined by the Reorganized Debtors and the Litigation Trustee.

## ARTICLE IV.

### MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including resolution of intercompany liabilities, allocation of value among the Debtors, and treatment of Holders of General Unsecured Claims against each of the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VII, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

B.      *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan with (1) Cash on hand, proceeds of the DIP Facilities, and/or Cash funded by Mercuria; (2) the issuance and distribution of Reorganized Aegean Equity Interests and Litigation Trust Interests; and (3) proceeds from the Exit Facility (if any).

C.      *Issuance and Distribution of Reorganized Aegean Equity Interests*

On the Effective Date, Mercuria shall be issued one hundred percent (100%) of the Reorganized Aegean Equity Interests, in exchange for its DIP Credit Facility Claims as and to the extent set forth herein.  The issuance of the Reorganized Aegean Equity Interests shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.  All of the shares or units of Reorganized Aegean Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Aegean Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions

of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized Aegean and each of the other Reorganized Debtors shall be private companies. As such, upon the Effective Date, (1) the Reorganized Aegean Equity Interests shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange, and (2) none of the Reorganized Debtors will be a reporting company under the Securities Exchange Act. Reorganized Aegean and any of the Reorganized Debtors shall take all necessary action concurrent with or immediately after the Effective Date to suspend any requirement to (x) be a reporting company under the Securities Exchange Act and (y) file reports with the Securities and Exchange Commission or any other entity or party. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the Reorganized Aegean Organizational Documents may impose certain trading restrictions, and the Reorganized Aegean Equity Interests shall be subject to certain transfer and other restrictions pursuant to the Reorganized Aegean Organizational Documents.

D.     *Exit Facilities*

Reorganized Aegean and one or more Reorganized Debtors may enter into Exit Financing on the Effective Date, as reasonably determined by the Debtors and Mercuria, on terms set forth in the Exit Facilities Documents. To the extent applicable, the Exit Facilities Documents shall be included in the Plan Supplement.

On the Effective Date, the Exit Facilities Documents (if any) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (if any) (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (3) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, the Reorganized Debtors, the applicable agent or any lender), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

E.     *Aegean Unsecured Claims Cash Pool*

On or prior to the Effective Date, the Aegean Unsecured Claims Cash Pool shall be funded with Cash on hand and/or provided by Mercuria, a portion of which Cash may be deposited into a segregated account in connection with a Disputed Claims Reserve maintained by the Litigation Trustee as provided herein. On the Effective Date, such portion of the Aegean Unsecured Claims Cash Pool that is not segregated into the Disputed Claims Reserves shall be distributed Pro Rata by the Debtors or Reorganized Debtors to Holders of Allowed Aegean Unsecured Claims. After the Effective Date, the Litigation Trustee shall be responsible for reconciling Disputed Class 4A Aegean Unsecured Claims and distributing any funds in the Disputed Claims Reserve as Disputed Class 4A Aegean Unsecured Claims are compromised, settled, allowed, or disallowed.

F.      *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan) or as otherwise set forth in the Description of Restructuring Transactions, the Reorganized Aegean Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law) provided such modifications shall be implemented in accordance with the terms of the Restructuring Support Agreement or otherwise be in form and substance acceptable to Mercuria.

G.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Non-Litigation Trust Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, including with respect to the waiver of certain Avoidance Actions, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Cancellation of Instruments, Certificates, Existing Securities, and Other Documents*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all notes, instruments, certificates, equity security, share, bond, indenture, purchase right, option, warrant, or other documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest, including the obligations of the Debtors under the DIP Facility Documents, Prepetition Secured Credit Documents, and the Unsecured Notes Indentures, shall be terminated and cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided, however,* that (a) the DIP Credit Facility Documents and all related agreements, documents and instruments executed by the Debtors, Mercuria, the DIP Agents, or the DIP Lenders shall continue in effect solely with respect to any obligations thereunder governing the relationships between any or all of the Debtors, Mercuria, the DIP Agents and the DIP Lenders that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof (including but not limited to those provisions relating to the DIP Agents' and DIP Lenders' rights to expense reimbursement, indemnification and similar amounts); and (b) the Prepetition Secured Credit Facility Documents and all related agreements, documents and instruments executed by the Debtors, Mercuria, the Prepetition Secured Credit Facility Agents or the Prepetition Secured Credit Facility Lenders shall continue in effect solely with respect to any obligations thereunder governing the relationships between any or all of the Debtors, Mercuria, the Prepetition Secured Credit Facility Agents and the Prepetition Secured Credit Facility Lenders that may survive termination or maturity of the Prepetition Secured Credit Agreements in accordance with the terms thereof (including but not limited to those provisions relating to the Prepetition Secured Credit Facility Agents' and Prepetition Secured Credit Facility Lenders' rights to expense reimbursement, indemnification and similar amounts).  On the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such Holder of such Claim.  Such surrendered certificate or instrument shall be deemed cancelled as set forth herein.  Notwithstanding the foregoing or anything to contrary in the Plan or Confirmation Order, the Unsecured Notes Indentures shall remain in effect for the purposes of (a) enabling Holders of Allowed Unsecured

27

Notes Claims to receive distributions under the Plan as provided herein and (b) allowing and preserving the rights of the Unsecured Notes Indenture Trustees to (i) make distributions to Holders of Unsecured Notes Claims pursuant to this Plan, (ii) maintain and exercise their respective charging liens against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions, (iv) allow and preserve the rights of the Unsecured Notes Indenture Trustees to maintain and enforce (A) any right to indemnification, expense reimbursement, contribution, or subrogation or any other claim, entitlement, or protection that the Unsecured Notes Indenture Trustees may have under the applicable Unsecured Notes Indenture against any Person or Entity other than the Reorganized Debtors, and (B) any exculpations of the Unsecured Notes Indenture Trustees under the applicable Unsecured Notes Indenture, (v) exercise their rights and obligations relating to the interests of their holders pursuant to the applicable Unsecured Notes Indentures, and (vi) appear and be heard in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court.  For the avoidance of doubt, none of the Debtors, the Reorganized Debtors, nor Mercuria shall have any liability or funding obligations whatsoever for any of the foregoing costs, expenses, or liabilities incurred by the Unsecured Notes Indenture Trustees after the Effective Date.

On the Effective Date, all duties and responsibilities of the Unsecured Notes Indenture Trustees under the applicable Unsecured Notes Indenture shall be fully discharged unless otherwise specifically set forth in or provided for under the Plan or the Confirmation Order.  For the avoidance of doubt, the Unsecured Notes Indenture Trustees shall have no duties to the holders of Unsecured Notes under the Unsecured Notes Indentures following the Effective Date other than to distribute amounts actually received by the Unsecured Notes Indenture Trustees from the Debtors or the Litigation Trustee in accordance with the Plan and each respective Unsecured Notes Indenture, subject to the right of the Unsecured Notes Indenture Trustees to exercise their respective charging liens against any such distribution, including for purposes of payment of the Unsecured Notes Indenture Trustees Fees and Expenses.  The Unsecured Notes Indenture Trustees are authorized but not required to assist the Litigation Trustee in the distribution of Litigation Trust Interests and/or cash distributions made by the Litigation Trustee upon any such terms as each Unsecured Notes Indenture Trustee and the Litigation Trustee may agree to from time to time.

I.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan or as set forth in the Description of Restructuring Transactions, shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the issuance of the Reorganized Aegean Equity Interests and Litigation Trust Interests; (2) the selection of the directors and officers for Reorganized Aegean and the other Reorganized Debtors; (3) [Reserved]; (4) implementation of the Restructuring Transactions; (5) funding and distribution of the Aegean Unsecured Claims Cash Pool; (6) the creation of the Litigation Trust; (7) the funding and disbursement of the Litigation Trust Loan; (8) the selection of the Litigation Trustee; (9) the selection of the Litigation Trust Advisory Board; and (10) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of Reorganized Aegean and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Aegean, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized Aegean, or the other Reorganized Debtors as of the Effective Date.  On or before the Effective Date, as applicable, the appropriate officers of the Debtors, Reorganized Aegean, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Aegean and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *Restructuring Transactions*

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate as reasonably determined by the Debtors and Mercuria, prior to the Effective Date and thereafter the Reorganized Debtors, to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate or in furtherance of implementing the Plan (the "Restructuring Transactions").  The Restructuring Transactions may include one or more of the following:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring,

conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or other law; and (4) all other actions as reasonably determined by the Debtors and Mercuria to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan; provided that, the Restructuring Transactions shall not materially and adversely impact any Litigation Claim[; provided further, that the foregoing proviso shall not modify any rights of the Debtors and the Reorganized Debtors to modify their organizational documents to eliminate any indemnification obligations of any former officer or director not serving in such capacity on the Petition Date but solely to the extent such modification has no adverse impact on the ability of the Litigation Trust to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims].[2]  To the extent known, any such Restructuring Transactions may be summarized in the Description of Restructuring Transactions, and in all cases, such transactions shall be subject to the terms and conditions of this Plan as reasonably determined by the Debtors and Mercuria.  The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

K.      *Reorganized Aegean Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtors will file such Reorganized Aegean Organizational Documents as are required to be filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation; provided, that, nothing in the Reorganized Aegean Organizational Documents shall materially and adversely impact the Litigation Claims[; provided further, that the foregoing proviso shall not modify the rights of the Debtors and the Reorganized Debtors to modify their organizational documents to eliminate any indemnification obligations of any former officer or director not serving in such capacity on the Petition Date but solely to the extent such modification has no material and adverse impact on the ability of the Litigation Trust to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims].[3]  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Aegean Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective Reorganized Aegean Organizational Documents (provided that such amendments or restatements shall not include any retroactive change that [materially] and adversely impacts any Litigation Claims), and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized Aegean Organizational Documents.

L.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto (including to the Litigation Trust and the Disputed Claims Reserve and by the Litigation Trustee pursuant to the Litigation Trust Agreement) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental

---

[2]     The Debtors, Mercuria, and the Committee continue to negotiate the extent of assumed Indemnification Obligations in connection with the D&O Liability Insurance Policies with respect to former directors and officers.

[3]     The Debtors, Mercuria, and the Committee continue to negotiate the extent of assumed Indemnification Obligations in connection with the D&O Liability Insurance Policies with respect to former directors and officers.

assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

M.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article IX</u>, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Non-Litigation Trust Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Non-Litigation Trust Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Non-Litigation Trust Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Non-Litigation Trust Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Litigation Claims that a Debtor may hold against any Entity shall vest in the Litigation Trust. All Litigation Claims are expressly preserved for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the applicable Non-Litigation Trust Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Non-Litigation Trust Causes of Action. The Reorganized Debtors shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Non-Litigation Trust Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

N.      *Insurance Policies*

1.      <u>Director and Officer Liability Insurance</u>

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.

Notwithstanding anything to the contrary in the Plan, the Litigation Trust has the right to pursue any and all insurance proceeds under any and all D&O Liability Insurance Policies available to any defendant(s) in connection with the Litigation Claims in order to satisfy any settlement or judgment obtained by the Litigation Trust in respect of such claims.

[With regards to current officers and directors, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, any agreements, documents, and instruments related thereto, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan.][4]

---

[4]      The parties to the RSA have agreed in principle that the current directors and officers are intended to receive the benefits and protections of the Indemnification Obligations and the D&O Liability Insurance Policies. The Debtors, Mercuria, and the

[With regards to former officers and directors, no such indemnity obligations shall be assumed except to the extent necessary to preserve the availability of coverage under such D&O Liability Insurance Policies; provided, however, that the Reorganized Debtors shall not be required to fund any payment obligations with respect to such indemnity.][5]

[For the avoidance of doubt, no Indemnification Obligations shall be assumed with respect to any former officer or director not serving in such capacity as of the Petition Date; provided that the failure to assume such Indemnification Obligation has no adverse impact on the ability of the Litigation Trust to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims but without the creation of any payment obligation or any other liability, directly or indirectly, of the Reorganized Debtors, any of their subsidiaries or Mercuria. Notwithstanding any provision to the contrary contained in the Plan, neither the Debtors (or Reorganized Debtors) nor Mercuria will take any action, at any point in time, that will have an adverse impact on the Litigation Trust's ability to receive proceeds of the D&O Liability Insurance Policies in connection with the prosecution of the Litigation Claims, including, but not limited, reducing, eliminating or modifying any coverage provided by the D&O Liability Insurance Policies (and any agreements, documents, and instruments related thereto) at the time of the Petition Date.][6]

2.    Other Insurance Policies

Unless otherwise provided herein or the Plan Supplement or otherwise amended or modified, from and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article VI of the Plan. Nothing in the Plan shall impair or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under such insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

[Notwithstanding the foregoing, in regard to the Debtors' D&O Insurance Policies existing immediately prior to the Effective Date, the Debtors shall, prior to the Effective Date and in consultation with the Committee and Mercuria, obtain and fully pay the premium for a noncancelable extension of the directors' and officers' liability coverage of the Debtors' current and former directors, officers, agents and other persons entitled to coverage under such D&O Insurance Policies, in each case for a claims reporting or discovery period of at least six (6) years from and after the Effective Date with terms, conditions, retentions and limits of liability that are no less favorable than the coverage provided under the Debtors' existing policies.]

O.    *Employee Matters*

Unless otherwise provided herein or the Plan Supplement or otherwise amended or modified, all employee wages, compensation, contracts, agreements, policies, programs, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective

---

Committee, continue to negotiate the language around the protections afforded to the Debtors' current directors and officers with respect to the assumption of the unexpired D&O Liability Insurance Policies and related indemnification obligations.

[5]    The Debtors, Mercuria, and the Committee continue to negotiate the extent of assumed Indemnification Obligations in connection with the D&O Liability Insurance Policies with respect to former directors and officers.

[6]    The Debtors, Mercuria, and the Committee continue to negotiate the extent of assumed Indemnification Obligations in connection with the D&O Liability Insurance Policies with respect to former directors and officers.

Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

P.    *Payment of Fees and Expenses Payable under DIP Financing Orders*

The Reorganized Debtors shall, on and after the Effective Date and to the extent invoiced, pay all unpaid fees and reasonable and documented out-of-pocket costs and expenses (regardless of whether such fees, costs, and expenses were incurred before or after the Petition Date) of the DIP Agents and the DIP Lenders, including the reasonable fees, costs, and expenses of attorneys, advisors, consultants, or other professionals that are payable in accordance with the terms of the DIP Financing Orders and without application by such parties to the Bankruptcy Court and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. Notwithstanding anything to the contrary in this Plan, the fees and expenses described in this paragraph shall not be subject to the Administrative Claims Bar Date.

Q.    *Payment of Certain Fees*

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented unpaid Unsecured Notes Indenture Trustee Fees and Expenses that are required to be paid under the Unsecured Notes Indentures through the Effective Date, without the need for the Unsecured Notes Indenture Trustees to file any Proof of Claim, Administrative Claim form, fee application or any other pleading or document in the Chapter 11 Cases and without reduction to recoveries of the Holders of the Unsecured Notes. Nothing herein shall in any way affect or diminish the right of the Unsecured Notes Indenture Trustees to exercise any charging liens against distributions to Holders of Unsecured Notes with respect to any unpaid Unsecured Notes Indenture Trustee Fees and Expenses.

## ARTICLE V.

## LITIGATION TRUST

A.    *Creation and Governance of the Litigation Trust*

On the Effective Date, the Litigation Trust Funders shall fund the Litigation Trust Loan, the Debtors shall transfer to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Claims, and the Litigation Trustee shall execute the Litigation Trust Agreement and take all steps necessary to establish the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax. The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee. In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

The Litigation Trustee shall be the exclusive trustee of the assets of the Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(4). The powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article V. The Litigation Trustee shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement.

In connection with the vesting and transfer of the Litigation Trust Assets to the Litigation Trust, any attorney-client, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust, subject to the terms of the Litigation Trust Agreement and Article V.H of the Plan. The Debtors, the Reorganized Debtors, and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

B.      *Purpose of the Litigation Trust*

The Litigation Trust shall be established for the purpose of liquidating the Litigation Trust Assets, distributing the Litigation Trust Loan Payments, reconciling and objecting, if necessary, to Disputed Aegean Unsecured Claims in Class 4A, and distributing the proceeds of the Litigation Claims to the Litigation Trust Beneficiaries and is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the Litigation Trust.

C.      *Litigation Trust Agreement and Funding the Litigation Trust*

The Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the Litigation Trust expenses; (b) the payment of other reasonable expenses of the Litigation Trust, including the cost of pursuing the Litigation Claims; (c) the retention of counsel, accountants, financial advisors or other Professionals and the payment of their reasonable compensation; (d) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the Litigation Trust Assets; and (f) litigation of the Litigation Claims, which may include the prosecution, settlement, abandonment or dismissal of any such Litigation Claims.

The Litigation Trust shall be funded from the proceeds of the Litigation Trust Loan and proceeds of the Litigation Trust Assets. Any Holder of an Allowed Aegean Unsecured Claim that is a party to the Restructuring Support Agreement on or before the commencement of the Confirmation Hearing in respect of the Plan shall be entitled to participate in the Litigation Trust Loan, subject to the terms set forth in the Restructuring Support Agreement and Litigation Trust Documents. Holders of Class 4A Aegean Unsecured Claims will be given the option on their respective Ballot to become a party to the Restructuring Support Agreement and elect to participate in the funding of the Litigation Trust Loan. Holders of Class 4A Aegean Unsecured Claims who validly and timely exercise their participation rights as set forth in the Disclosure Statement Order will be contacted after the Voting Deadline to exercise their right to fund a portion of the Litigation Trust Loan before the Confirmation Hearing.

For the avoidance of doubt, the Litigation Trust costs and expenses shall be paid from the Litigation Trust Assets in accordance with the Plan and Litigation Trust Agreement. The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

D.      *Valuation of Assets*

As soon as reasonably practicable following the establishment of the Litigation Trust, the Litigation Trustee shall determine the value of the assets transferred to the Litigation Trust, based on the good faith determination of the Litigation Trust Advisory Board, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Litigation Trustee and the Litigation Trust Beneficiaries) for all federal income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Litigation Trust Agreement, the Litigation Trust shall be entitled to retain such professionals and advisors as the Litigation Trust shall determine to be appropriate or necessary, and the Litigation Trustee, subject to the direction of the Litigation Trust Advisory Board, shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

E.      *Litigation Trustee*

The Litigation Trustee shall be selected by the Committee and the Requisite Consenting Unsecured Noteholders acting together and shall be appointed on the Effective Date. The Litigation Trustee shall be compensated on terms acceptable to the Committee and the Requisite Consenting Unsecured Noteholders. The Litigation Trustee

shall be a professional person or a financial institution having trust powers with experience administering other litigation trusts. The Litigation Trustee shall not have voting rights with respect to the governance of the Litigation Trust and shall retain professionals approved by (x) if determined prior to the Effective Date, a unanimous decision of the Committee and the Requisite Consenting Unsecured Noteholders acting together, and (y) if determined after the Effective Date, the unanimous consent of the Litigation Trust Advisory Board.

F.    *Litigation Trust Advisory Board*

The Litigation Trust shall be governed by the Litigation Trust Advisory Board as set forth in the Litigation Trust Agreement. The Debtors or Reorganized Debtors shall be permitted to appoint a single *ex officio* member of the Litigation Trust Advisory Board who shall not have voting rights. If and when the holders of Class A Litigation Trust Units have received Payment in Full, the members appointed by the Committee and Requisite Consenting Unsecured Noteholders may be replaced by new members designated by holders of Class B Litigation Trust Units. The members of the Litigation Trust Advisory Board shall not be entitled to compensation for service on the Litigation Trust Advisory Board unless otherwise determined by the Committee and the Requisite Consenting Noteholders or the Litigation Trust Advisory Board.

G.    *Litigation Trust Interests*

Litigation Trust Interests shall be passive and shall not have voting, consent or other shareholder-like control rights with respect to the Litigation Trust. Litigation Trust Interests may be structured not to be securities and may or may not be transferable, in each case subject to applicable law and as otherwise determined (x) prior to the Effective Date, by the Committee and the Requisite Consenting Unsecured Noteholders, or (y) after the Effective Date, by the Litigation Trust Advisory Board as provided in the Litigation Trust Agreement.

H.    *Cooperation of the Reorganized Debtors*

To effectively investigate, prosecute, compromise, and/or settle the Litigation Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel may require reasonable access to the Debtors' and Reorganized Debtors' documents, information and work product relating to the Litigation Trust Assets, and, in such event, must be able to exchange such information with the Reorganized Debtors on a confidential basis and as protected by the common interest privilege without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, the Litigation Trust Agreement shall provide for the Litigation Trust to have reasonable access to copies of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets, including, electronic records, documents or work product related to the Litigation Claims, to the extent consistent with applicable law, but shall further provide that any records or information so shared shall continue to be protected by the attorney-client, work product, or common interest privilege and the Litigation Trust's access thereto shall not waive any of the Debtors', the Reorganized Debtors', or Mercuria's privileges or similar protections referenced in this paragraph. The Litigation Trust Agreement shall also provide that the Litigation Trust may not waive any privileges referenced in this paragraph belonging to or shared with the Debtors, the Reorganized Debtors, or Mercuria in respect of such records and documents, and that the Debtors, the Reorganized Debtors, and Mercuria shall be provided with reasonable notice and an opportunity to protect their rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.

The Reorganized Debtors shall preserve all records, documents or work product (including all electronic records, documents or work product) related to the Litigation Claims until the earlier of (1) such time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved, or (2) the termination of the Litigation Trust. The Reorganized Debtors shall reasonably cooperate with the Litigation Trustee with reasonable requests for interviews of current and former officers, directors, employees, and professionals of the Debtors in order to facilitate prosecution of the Litigation Claims; provided, however, that the Reorganized Debtors shall be reimbursed for any reasonable and documented out-of-pocket expenses in connection with such cooperation.

I.      *Fiduciary Duties*

The Litigation Trustee and each member of the Litigation Trust Advisory Board shall owe fiduciary duties to the holders of Litigation Trust Interests of the type that an official committee of unsecured creditors would owe to unsecured creditors, and shall have in place under the Litigation Trust Agreement applicable indemnity and waiver provisions to protect the Litigation Trustee and each member of the Litigation Trust Advisory Board from being personally liable for any claims or causes of action asserted by the Holders of Litigation Trust Interests, except for any clams of fraud, gross negligence, or willful misconduct.

J.      *United States Federal Income Tax Treatment of the Litigation Trust*

For all U.S. federal income tax purposes, all parties (including the Aegean Parties (as defined in the Litigation Trust Agreement), the Litigation Trustee and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) as (i) a transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) directly to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Class 4A Claims that are the responsibility of the Litigation Trust to resolve, to the Disputed Claims Reserve, followed by (ii) the transfer by the Litigation Trust Beneficiaries to the Litigation Trust of the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Litigation Trust Interests.  Accordingly, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to the Disputed Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  The Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

K.      *Distributions from the Litigation Trust; Withholding*

Distributions of proceeds from the Litigation Claims shall be made by the Litigation Trustee according to the following priorities:

- *First,* to the Litigation Trust Funders to repay the Litigation Trust Loan <u>plus</u> the Litigation Trust Funding Fee.

- *Second*, on a Pro Rata basis to the holders of Class A Litigation Trust Units until such Holders receive Payment in Full.

- *Third*, on a Pro Rata basis to the holders of Class B Litigation Trust Units.

Notwithstanding the foregoing, after repayment in full of the Litigation Trust Loan and the Litigation Trust Funding Fee, the Litigation Trust Advisory Board in the exercise of its business judgment may elect to withhold proceeds from the prosecution or settlement of Litigation Claims to pay reasonable projected costs and expenses of the Litigation Trust.  For the avoidance of doubt, the Litigation Trustee may pay accrued and unpaid reasonable and documented expenses of the Litigation Trust with proceeds of the Litigation Trust Loan prior to the receipt of any proceeds from any Litigation Claims.

The Litigation Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Trust Beneficiaries. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of this Agreement. The Litigation Trustee shall be authorized to collect such tax information from the Litigation Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Litigation Trust Agreement. As a condition to receive distributions under the Plan, all Litigation Trust Beneficiaries will need to identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent the Litigation Trustee deems appropriate, including an IRS Form W-9 or, in the case of Litigation Trust Beneficiaries that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Litigation Trustee may refuse to make a distribution to any Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Litigation Trust Beneficiary, the Litigation Trustee shall make such distribution to which the Litigation Trust Beneficiary is entitled, without interest; and, provided, further, that, if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Trustee for such liability. If the holder fails to comply with such a request for tax information within 180 days, the Litigation Trustee shall file a document with the Bankruptcy Court that will provide twenty-one (21) days' notice before such distribution shall be deemed an unclaimed distribution and treated in accordance with Article VII.D.5.

L.    *Dissolution of the Litigation Trust*

The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (1) the Litigation Trustee determines that the pursuit of additional Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (2) all distributions of Litigation Trust Loan Payments and proceeds of the Litigation Claims required to be made by the Litigation Trustee have been made, but in no event shall the Litigation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two (2) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets. Upon dissolution of the Litigation Trust, any remaining Litigation Trust Assets shall be distributed to all Litigation Trust Beneficiaries in accordance with the Plan and the Litigation Trust Agreement as appropriate; provided, however, that if the Litigation Trustee reasonably determines that such remaining Litigation Trust Assets (in an amount not to exceed [$[•]) are insufficient to render a further distribution practicable, the Litigation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Litigation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Litigation Trust, and any insider of the Litigation Trustee, and (iii) dissolve the Litigation Trust.

M.    *Tax Reporting*

The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee also will annually send to each Litigation Trust Beneficiary a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Litigation Trust) as relevant for U.S. federal income tax purposes and will instruct all such Litigation Trust Beneficiaries to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such Litigation Trust Beneficiary's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The

Litigation Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Litigation Trust that is required by any Governmental Unit.

The valuation of the Litigation Trust Assets prepared pursuant to Article V.D of the Plan shall be used consistently by all parties (including the Litigation Trust) for all federal income tax purposes. The Litigation Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any Taxes imposed on the Litigation Trust or the Litigation Trust Assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Class 4A Claims, such Taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Class 4A Claims or (ii) to the extent such Disputed Class 4A Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Litigation Trustee as a result of the resolution of such Disputed Class 4A Claims.

The Litigation Trustee may request an expedited determination of Taxes of the Litigation Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

## ARTICLE VI.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (a) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) those that have been previously rejected by a Final Order; (c) those that have been previously assumed by a Final Order; (d) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (e) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control", "assignment", or similar provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan, including the Restructuring Transactions shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default, breach, violation or acceleration rights with respect thereto. For the avoidance of doubt, no Restructuring Transaction shall be deemed to violate the terms of any assumed Unexpired Lease of non-residential real property. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

The Debtors, with the reasonable consent of Mercuria, or the Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedules (each, an "Amended Rejected Executory Contracts and Unexpired Leases Schedule") at any time through and including the date that is sixty (60) days after the Effective Date, which amended schedule shall be Filed with the Bankruptcy Court; provided, however, after the Effective Date, the Reorganized Debtors may not alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases with respect to Executory Contracts or Unexpired Leases of Aegean without the reasonable consent of the Litigation Trustee. The Debtors or Reorganized Debtors, as applicable, shall provide notice of any amendments to the Amended Rejected Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby.

Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court, served, and actually received by the Debtors on or before the deadline to object to Confirmation or, in the case of an Executory Contract or Unexpired Lease that is identified on any Amended Rejected Executory Contract and Unexpired Lease Schedule, on the date that is fourteen (14) days following the Filing of such amended schedule. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption, including any proposed cure amount, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption, including any proposed cure amount.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be disallowed upon an order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the Litigation Trust, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable; provided that nothing herein shall prevent the Reorganized Debtors, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Dispute Resolution*

In the event of a dispute between the Debtors and a non-Debtor counterparty to any Executory Contract or Unexpired Lease to be assumed or assumed and assigned regarding (a) the amount of any Cure Claim, (b) the ability

of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, assumption and assignment or the cure payments required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon in writing by the Debtors, with the reasonable consent of Mercuria, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following: (i) the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date, or (ii) upon the written, consensual resolution between the counterparty to any Executory Contract or Unexpired Lease and the Debtors or Reorganized Debtors, as applicable.  The Debtors, with the reasonable consent of Mercuria, or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes.  If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors, with the reasonable consent of Mercuria, or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date; provided, however, the Reorganized Debtors may not add an Executory Contract or Unexpired Lease of Aegean to the Rejected Executory Contracts and Unexpired Leases Schedule after the Effective Date without the reasonable consent of the Litigation Trustee.

E.    *Indemnification Obligations*

Except as otherwise provided herein or identified on the Rejected Executory Contracts and Unexpired Leases Schedule, each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such.  Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; provided that none of the Reorganized Debtors shall amend or restate any Reorganized Aegean Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Indemnification Obligations.

F.    *Collective Bargaining Agreements*

All of the Debtors' collective bargaining agreements and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all such agreements.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## H.    *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' schedules of assets, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## I.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

On the Effective Date, the Reorganized Aegean Equity Interests shall be distributed pursuant to the terms set forth herein.

## B.    *Rights and Powers of Distribution Agent*

### 1.    Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

### 2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the applicable Distribution Agent on or after the Effective Date (including taxes) and any reasonable and documented compensation and expense reimbursement claims (including reasonable attorney fees and

expenses) made by the applicable Distribution Agent shall be paid in Cash by the Reorganized Debtors or the Litigation Trust Assets, as applicable.

C.      *Special Rules for Distributions to Holders of Disputed Claims and Interests*

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D.      *Delivery of Distributions and Fractional, Undeliverable, or Unclaimed Distributions*

1.      <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the Distribution Record Date shall not apply to Unsecured Notes Claims and Aegean Interests.

2.      <u>Delivery of Distributions</u>

a.      Delivery of Distributions on account of General Unsecured Claims (other than Unsecured Notes Claims)

Except as otherwise provided herein, on the Effective Date, the Reorganized Debtors shall make distributions to Holders of Allowed General Unsecured Claims (other than Unsecured Notes Claims) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; <u>provided</u> that the address for each Holder of an Allowed General Unsecured Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

b.      Delivery of Distributions on account of Secured Term Loan Claims

Distributions, if any, to Holders of Allowed Secured Term Loan Claims shall be deemed completed when made to (or at the direction of) the Secured Term Loan Agents, which shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder.  As soon as practicable in accordance with the requirements set forth in this <u>Article VII</u>, distributions shall be made at the direction of the Secured Term Loan Agents in accordance with the Secured Term Loan Credit Agreements and subject to the rights of the Secured Term Loan Agents to assert their Secured Term Loan Claims.  If the Secured Term Loan Agents are unable to make, or consent to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Secured Term Loan Agents' cooperation, shall make such distributions to the extent practicable to do so.  The Secured Term Loan Agents shall not incur any liability whatsoever on account of any distributions under the Plan.

c.      Delivery of Distributions on account of Unsecured Notes Claims

Distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the Unsecured Notes Indenture Trustees, which trustees shall be deemed to be the Holders of all Allowed Unsecured Notes Claims for purposes of distribution of the Unsecured Notes' Claims' Pro Rata share of the

Aegean Claims Cash Pool to Holders of Unsecured Notes Claims; provided, however, that non-Cash consideration (including the Litigation Trust Interests), if any, shall not be distributed in the name of the Unsecured Notes Indenture Trustees.  As soon as practicable in accordance with the requirements set forth in this Article VII, each of the Unsecured Notes Indenture Trustees shall cause such distributions to be made to or on behalf of such Holders in accordance with the Unsecured Notes Indentures, subject to the respective rights, claims and interests, if any, that the Unsecured Notes Indenture Trustees may have under the Unsecured Notes Indentures or otherwise to the recovery and/or reimbursement of the Unsecured Notes Indenture Trustee Fees and Expenses from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise.  The Unsecured Notes Indenture Trustees may transfer or direct the transfer of such distributions directly through facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of Unsecured Notes Claims in accordance with the customary practices of DTC.  With respect to distributions to Holders of Allowed Unsecured Notes Claims from the Litigation Trust, the Litigation Trustee, with the Unsecured Notes Indenture Trustees' cooperation, may make such distributions directly to the Holders of Allowed Unsecured Notes Claims to the extent practicable to do so.

3.    Minimum Distributions

Holders of Allowed Claims entitled to distributions of $50.00 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article IX of this Plan, and its Holder shall be forever barred pursuant to Article IX of this Plan from asserting that Claim against the Reorganized Debtors or their property.

Any Cash not distributed in accordance with the terms of the Plan to Holders of Allowed Aegean Unsecured Claims in Class 4A shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and shall be transferred to the Litigation Trustee for distribution on account of other Allowed Aegean Unsecured Claims in Class 4A.

4.    No Fractional Distributions

No fractional shares or units of Reorganized Aegean Equity Interests or Litigation Trust Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of shares or units of Reorganized Aegean Equity Interests or Litigation Trust Interests that is not a whole number, such Reorganized Aegean Equity Interests or Litigation Trust Interests, as applicable, shall be rounded as follows:  (a) fractions of greater than one-half shall be rounded to the next higher whole number; and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares or units of Reorganized Aegean Equity Interests or Litigation Trust Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in payment of Cash of a fraction of a dollar, the actual payment shall be rounded as follows: (x) fractions of greater than half dollars shall be rounded to the next whole dollar; and (y) fractions of less than half dollars shall be rounded to the next lower whole dollar.

5.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors or Litigation Trustee, as applicable, have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of [six (6) months] from the original time of such distribution.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of this Article VII.D.5, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been disallowed) and all other unclaimed property or interests in property (with the exception of property within the Aegean Unsecured Claims Cash Pool Account) shall revert to the Reorganized Debtors or Litigation Trust, as applicable, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors or Litigation Trustee, as applicable, of an intent to accept a particular distribution; (c) responded to the Debtors', Reorganized Debtors', or Litigation Trustee's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

E.      *Securities Registration Exemption*

All shares or units of Reorganized Aegean Equity Interests are or may be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.  Such shares or units, including Reorganized Aegean Equity Interests to be issued to Holders of DIP Credit Facility Claims (or designated affiliates thereof) hereunder, in each case in exchange for such Claims, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

Shares or units of Reorganized Aegean Equity Interests issued in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof that, at the time of transfer, (1) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (2) has not been such an "affiliate" within ninety (90) days of such transfer, (3) has not acquired the Reorganized Aegean Equity Interests from an "affiliate" within one year of such transfer and (4) is not an entity that is an "underwriter".

To the extent any shares or units of Reorganized Aegean Equity Interests are issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, such shares or units will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.  In that regard, each of the Holders of DIP Credit Facility Claims has made customary representations to the Debtors (including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a "qualified institutional buyer" (as defined under Rule 144A promulgated under the Securities Act)).

The Debtors intend that the Litigation Trust Interests shall not be "securities" under applicable laws and believe the Litigation Trust Interests should not be deemed to be "securities," but to the extent such units are deemed to be "securities," the Debtors believe the issuance of such units under the Plan is exempt, pursuant to (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

Notwithstanding any policies, practices, or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by a Distribution Agent or an indenture trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest.  No Distribution Agent or indenture trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Aegean Equity Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

F.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Aegean, the Reorganized Debtors, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (a) liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, and (b) withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate, including using commercially reasonable efforts to obtain, if such information is not already in the possession of the Reorganized Debtors or the Distribution Agent, (i) in the case of a U.S. Holder, a properly executed Internal Revenue Service Form W-9 and, (ii) in the case of a non-U.S. Holder, a properly executed applicable Internal Revenue Service Form W-8 and any other forms required by any applicable law (or in each of the cases of clauses (i) and (ii) above, such Holder otherwise establishes eligibility for an exemption).  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

G.      *Allocations*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim for purposes of distributions under this Plan.

I.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Litigation Trustee may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Litigation Trustee of any such Claim it may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors, or Litigation Trustee (as applicable), unless:  (a) the Debtors or Litigation Trustee, as applicable, have consented (which consent shall not be unreasonably withheld), or (b) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and that such Holder asserts, has, or intends to preserve any right of recoupment or setoff pursuant to section 553 of the Bankruptcy Code or otherwise, or (c) such Holder timely Filed a Proof of Claim asserting any right of recoupment or setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

J.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the Litigation Trustee.  To the extent a Holder of a Claim receives a distribution on account

of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trustee on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor or the Litigation Trustee to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

### 2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice and Claims Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.  *Disputed Claims Process*

Except as otherwise provided herein, if a party Files a Proof of Claim and the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VIII. For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the Claims Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or the Litigation Trust, without the need for any objection by the Reorganized Debtors or the Litigation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court. On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors or Litigation Trustee, as applicable, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.**

B.  *Claims and Interests Administration Responsibilities*

### 1. Claims and Interests other than Class 4A Aegean Unsecured Claims

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw or litigate to judgment objections to Claims or Interests (other than Class 4A Aegean Unsecured Claims); (2) to settle or compromise any Disputed Claim (other than Disputed Aegean Unsecured Claims in Class 4A) without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register with respect to Claims other than Class 4A Aegean Unsecured Claims to reflect any such settlements or compromises without any further notice to or action, order or approval by

the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim (other than Class 4A Aegean Unsecured Claims) or Interest immediately before the Effective Date.

2.    Class 4A Aegean Unsecured Claims

Except as otherwise specifically provided in the Plan, after the Effective Date, the Litigation Trustee shall have the sole authority: (1) to File, withdraw or litigate to judgment objections to Disputed Aegean Unsecured Claims in Class 4A; (2) to settle or compromise any Disputed Aegean Unsecured Claim in Class 4A without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register with respect to Disputed Aegean Unsecured Claims in Class 4A to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, after the Effective Date, the Litigation Trustee shall have any and all rights and defenses that any Debtor had with respect to any Class 4A Aegean Unsecured Claim immediately before the Effective Date.

C.    *Estimation of Claims*

Before the Effective Date, the Debtors (with Mercuria's reasonable consent) and the Committee, and after the Effective Date, the Reorganized Debtors and the Litigation Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Committee, Mercuria (to the extent permissible under the Bankruptcy Code), the relevant Debtor or Reorganized Debtor or the Litigation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.    *Adjustment to Claims Register without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors or Litigation Trustee, as applicable, without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.    *Time to File Objections to General Unsecured Claims and Claims Arising under Section 503(b)(9) of the Bankruptcy Code*

Any objections to General Unsecured Claims not otherwise Allowed pursuant to Article III.B.4.d herein and Claims arising under section 503(b)(9) of the Bankruptcy Code shall be Filed by the Reorganized Debtors or Litigation Trustee, as applicable, on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

F.    *Disallowance of Claims*

Except to the extent otherwise agreed to by the Litigation Trustee in the case of Class 4A Aegean Unsecured Claims, any Claims held by Entities from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such

Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or Litigation Trustee, as applicable. All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit are assumed under the Plan), without any further notice to or action, order or approval of the Bankruptcy Court.

G.    *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors (or, solely in the case of Class 4A Aegean Unsecured Claims, the Litigation Trustee). Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.    *Distributions after Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

J.    *Disputed Claims and Interests Reserves*

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, may establish one or more reserves for: (a) alleged Class 4B General Unsecured Claims that have not yet been Allowed, in an estimated amount or as reasonably determined by the applicable Debtors, Mercuria, and the Committee; and (b) alleged Class 7 Section 510(b) Claims and Class 8 Aegean Interests that have not yet been Allowed, consisting of Litigation Trust Interests in the same proportions and amounts as provided for in the Plan. On the Effective Date, the Litigation Trustee may establish one or more reserves for alleged Class 4A Aegean Unsecured Claims that have not yet been Allowed, consisting of Litigation Trust Interests and the Cash from the Aegean Unsecured Claims Cash Pool in the same proportions and amounts as provided for in the Plan.

K.    *Single Satisfaction Rule*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case

shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred percent (100%) of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE IX.

### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, including the Litigation Trust Documents, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees or other service providers of the Debtors prior to the Effective Date (including any liabilities that arise from or relate to a termination of employment or service), any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan. Subject to the terms and conditions of the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date. For the avoidance of doubt, the Litigation Trust shall not commence or otherwise prosecute any Causes or Action against the Debtors and Reorganized Debtors, and any such Causes of Action that otherwise could have been commenced, continued, prosecuted or otherwise pursued by the Litigation Trust (if any) shall be subject to the discharge of this Article IX.A.

B.    *Debtor Release*

**EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED BY OR ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING TRANSACTIONS; (II) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE**

48

DISCLOSURE STATEMENT OR THE PLAN; (III) THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE RELEASES SET FORTH ABOVE WILL NOT RELEASE (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F HEREOF), OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.  THE DEBTOR RELEASE DOES NOT WAIVE OR RELEASE ANY RIGHT, CLAIM, OR CAUSE OF ACTION (A) IN FAVOR OF ANY DEBTOR OR REORGANIZED DEBTOR, AS APPLICABLE, ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO SUCH DEBTOR OR REORGANIZED DEBTOR NOT SATISFIED OR DISCHARGED UNDER THE PLAN OR (B) AS EXPRESSLY SET FORTH IN THE PLAN OR THE PLAN SUPPLEMENT.

C.    *Third Party Release*

EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, OR INTERCOMPANY TRANSACTIONS; (II) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING A LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; (III) THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) UPON ANY OTHER ACT, OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE RELEASES SET FORTH ABOVE SHALL NOT RELEASE (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F HEREOF) OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

D.    *Exculpation*

EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW AND WITHOUT AFFECTING OR LIMITING EITHER THE DEBTOR RELEASE OR THE THIRD-PARTY RELEASE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH

49

EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE EXCULPATION SET FORTH ABOVE SHALL NOT RELEASE OR BE AN EXCULPATION WITH RESPECT TO (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F HEREOF), OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

E.      *Injunction*

EFFECTIVE AS OF THE EFFECTIVE DATE, PURSUANT TO SECTION 524(A) OF THE BANKRUPTCY CODE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH

ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F HEREOF). FOR THE AVOIDANCE OF DOUBT, ANY CAUSES OF ACTION AGAINST MERCURIA, DAVID GALLAGHER, THE REORGANIZED DEBTORS OR THEIR NON-DEBTOR SUBSIDIARIES, OR ANY OTHER PARTY OR ENTITY DESCRIBED IN THE FIRST SENTENCE OF THE SECOND PARAGRAPH OF <u>ARTICLE IX.F</u> HEREOF THAT OTHERWISE COULD HAVE BEEN COMMENCED, CONTINUED, OR OTHERWISE PROSECUTED OR PURSUED BY THE LITIGATION TRUST SHALL BE SUBJECT TO THE TERMS OF THE INJUNCTION IN THIS <u>ARTICLE IX.E</u>.

F.      *Limitations with Respect to Litigation Claims*

The Debtor Release (<u>Article IX.B</u>), Third Party Release (<u>Article IX.C</u>), and Exculpation (<u>Article IX.D</u>) are each subject to a carve out in respect of the Litigation Claims in the last sentence of each such provision (collectively, the "<u>Litigation Claims Carve Out</u>"). The Litigation Claims, as described in greater detail herein, shall be transferred to, reviewed by, and, potentially, prosecuted by the Litigation Trust as part of the global settlement reached by and among the Debtors, Mercuria, the Committee, the Consenting Unsecured Noteholders, AmEx, and any other party that joins the Restructuring Support Agreement. Notwithstanding anything to the contrary contained herein, the scope of the Litigation Claims Carve Out is set forth in this <u>Article IX.F</u>.

The Litigation Claims Carve Out shall <u>not</u> extend to, limit, or otherwise modify the scope of the Debtor Release, Third Party Release, and Exculpation in relation to (1) Mercuria and each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such, (2) David Gallagher, (3) any other current officer or director of the Debtors that began working for the Debtors after May 1, 2018, (4) each of the Debtors' employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors that began working after May 1, 2018, or (5) the Professionals, excluding Professionals retained pursuant to the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 157]; provided, that, for the avoidance of doubt, each such entity or party referred to in subparts (1) - (5) are "Released Parties" and "Exculpated Parties" under this Plan. With respect to any current officer or director that began working for the Debtors before May 1, 2018, the Litigation Claims Carve Out shall modify the Debtor Release, Third Party, and Exculpation solely with respect to Litigation Claims, if any, against such parties for gross negligence, willful misconduct, fraud, or breach of fiduciary duty; provided, however, that each such party's liability, if any, for breach of fiduciary duty shall be limited by and with recourse solely to available coverage under applicable D&O Liability Insurance Policies so long as such limitation does not limit the availability of such insurance; provided, further, that, for the avoidance of doubt, each such party otherwise remains a "Released Party" and "Exculpated Party" in relation to the Debtor Release, Third Party Release, and Exculpation except to the extent of the foregoing carve out for gross negligence, willful misconduct, or fraud.

Except as expressly limited above, the definition of "Released Party" and "Exculpated Party" will not include any person or entity as and solely to the extent implicated in any way in any Litigation Claims or who or which may be liable in connection with any remedies available in connection with any Litigation Claims (including any immediate or mediate transferees connection with any Litigation Claims) and regardless of whether such implication or liability is known or unknown at any time. For the avoidance of doubt, any such party or entity that is also a "Released Party" and "Exculpated Party" in relation to the Debtor Release, Third Party Release, or Exculpation shall remain so except as and to the extent implicated or liable as contemplated in the preceding sentence.

In addition to the foregoing, no recovery in respect of a Litigation Claim shall result in a payment obligation, or any other liability, directly or indirectly, by the Reorganized Debtors, any of their subsidiaries, or Mercuria or David Gallagher. For the avoidance of doubt, the Litigation Claims Carve Out shall not extend to, limit, or otherwise modify the scope of the Debtor Release, Third Party Release, and Exculpation in relation to such payment obligations or any other liabilities described in the foregoing sentence.

G.    *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise and settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors, their respective property, and Claim and Interest Holders and is fair, equitable, and reasonable.

H.    *Release of Liens*

Except (a) with respect to the Liens securing the Exit Facilities (if any), and to the extent elected by the Debtors, in consultation with Mercuria, with respect to an Allowed Other Secured Claim in accordance with Article III.B.1, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, other than the Liens and security interests securing the DIP Facilities which, if not otherwise paid in full in Cash, shall remain in full force and effect and shall secure all obligations arising under, shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article X.B):

1.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors, the Committee, and Mercuria;

2.    the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated by the Debtors, the Committee, or Mercuria;

3.       there shall not be an ongoing and uncured Event of Default (as defined in the DIP Credit Facility Documents) under any of the DIP Facility Documents pursuant to which Mercuria is presently exercising remedies with the Bankruptcy Court;

4.       the Aegean Unsecured Claims Cash Pool shall have been funded in accordance with Article IV;

5.       the Litigation Trust and the Litigation Trust Account shall have both been established and the Litigation Trust Account shall have been funded with the proceeds of the Litigation Trust Loan and any Disputed Claims Reserve from the Aegean Unsecured Claims Cash Pool in accordance with the Plan and the Litigation Trust Documents;

6.       the reasonable and documented fees and expenses of the Committee Members (including the reasonable and documented fees and expenses of counsel for Committee Members) shall have been paid in full;

7.       the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.B.3;

8.       all regulatory approvals, authorizations, consents, or rulings that are necessary to implement and effectuate the Plan and each of the other transactions contemplated herein and by the Restructuring Transactions shall have been obtained;

9.       the Debtors shall have implemented the Restructuring Transactions in a manner consistent with Article IV.J hereof; and

10.       all fees and expenses payable pursuant to any of the DIP Credit Facility Documents shall have been paid in full in Cash.

B.       *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article X (other than entry of the Confirmation Order in Article X.A.I) may be waived only by the Debtors and Mercuria (and, solely with respect to the conditions specified in Article X.A.2-6, the Committee) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.       *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.       *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; provided, that all provisions of the Restructuring Support Agreement and DIP Credit

Facility Documents that survive termination of such agreement or order shall remain in effect in accordance with the terms thereof.

# ARTICLE XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the terms of the Restructuring Support Agreement (including section 3(b) thereof), the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in the terms of the Restructuring Support Agreement (including section 3(b) thereof), section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

Subject to the terms of the Restructuring Support Agreement (including section 3(b) thereof), the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the Non-Debtor Subsidiaries; or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries.

# ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests; <u>provided</u> that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the schedule of Executory Contracts and Unexpired Leases to be assumed or rejected; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to Litigation Claims;

8.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

10.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement and/or enforce such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.K.1;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

18.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.      hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code and section 4(a)(2) of the Securities Act, as applicable;

22.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.      enforce all orders previously entered by the Bankruptcy Court;

24.      decide and resolve all matters related to the Litigation Trust Documents;

25.      consider and adjudicate any dispute regarding the removal of a Litigation Trustee (including any dispute relating to any compensation or expense reimbursement due under the Litigation Trust Agreement);

26.      hear any other matter not inconsistent with the Bankruptcy Code and the jurisdiction of the Bankruptcy Court; and

27.      enter an order concluding or closing the Chapter 11 Cases.

provided, however, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article X.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan and, as applicable, the Restructuring Support Agreement, each Entity acquiring property under the Plan or the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, and subject to the terms of the Restructuring Support Agreement (including section 3(b) thereof), the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors, Mercuria, and the Committee shall be served on:

|  |  |
|---|---|
| Debtors: | Aegean Marine Petroleum Inc.<br>52 Vanderbilt Avenue Suite 1405<br>New York, New York 10017<br>Attention:  Tyler Baron<br>Email:  tbaron@sentinelrockcapital.com |
| with copies to: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Marc Kieselstein<br>Email: marc.kieselstein@kirkland.com |
| Mercuria: | Mercuria Energy Group Limited<br>50 rue du Rhône<br>6th Floor<br>1204 Geneva, Switzerland<br>Attention:  François Sornay<br>Email: fsornay@mercuria.com |
| with copies to: | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, NY 10005<br>Attention: Abhilash M. Raval and Lauren C. Doyle<br>Email:<br>ARaval@milbank.com<br>LDoyle@milbank.com<br><br>Norton Rose Fulbright US LLP |

2200 Ross Avenue Suite 3600
Dallas, TX 75201
Attention: Louis R. Strubeck Jr.
Email:
Louis.strubeck@nortonrosefulbright.com

Mercuria Energy Trading, Inc.
20 E. Greenway Plaza
Suite 650
Houston, Texas 77046
Attn: Mark L. Greenberg
Email: mgreenberg@mercuria.com

Committee:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Attention: Philip C. Dublin and Kevin Zuzolo
Email: pdublin@akingump.com
Email: kzuzolo@akingump.com

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.    *Entire Agreement*

The Plan and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order, provided, however, the Restructuring Support Agreement and any document included in the Plan Supplement shall operate in accordance with its terms and shall not be limited in any manner by this sentence.

H.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; provided, that at the request of the Debtors, with the reasonable consent of the Committee, the Requisite Consenting Unsecured Noteholders, AmEx, and Mercuria, in each case solely as and to the extent their respective rights are affected by such request, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be reasonably acceptable to the Debtors and, solely as and to the extent their respective rights are affected by such alteration, the Committee, the Requisite Consenting Unsecured Noteholders, AmEx, and Mercuria.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (c) nonseverable and mutually dependent.

I.      *Dissolution of Committee*

On the Effective Date, the Committee will dissolve; <u>provided</u>, <u>however</u>, that, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party.  Upon the dissolution of the Committee, the Committee Members and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the Committee Members or advisors to the Committee after the Effective Date, except for the limited purposes identified above.

J.      *Request for Expedited Determination of Taxes*

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to U.S. federal, state or local tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

K.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

*[Remainder of the Page Intentionally Left Blank.]*

Dated:  January 15, 2019

AEGEAN MARINE PETROLEUM NETWORK INC.
on behalf of itself and all other Debtors

By:    */s/ Tyler Baron*
Name:    Tyler Baron
Title:    Authorized Signatory