| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | Hearing Date: February 14, 2019<br>Hearing Time: 10:00 a.m. |

------------------------------------------------------- x
                                         :

In re                                    :            Chapter 11

AEGEAN MARINE PETROLEUM      :            Case No. 18-13374 (MEW)
NETWORK INC., *et al.*,                 :
                                         :            Jointly Administered
                           Debtors.   :
------------------------------------------------------- x

### OBJECTION OF THE UNITED STATES TRUSTEE TO DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF AEGEAN MARINE PETROLEUM NETWORK INC. AND ITS DEBTOR AFFILIATES

TO:    THE HONORABLE MICHEAL E. WILES,
         UNITED STATES BANKRUPTCY JUDGE

William K. Harrington, the United States Trustee for Region 2 (the "**United States Trustee**"), hereby submits this objection (the "**Objection**") to the Disclosure Statement for Joint Chapter 11 Plan of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates (the "**Disclosure Statement**" (or **"DST"**) and the "**Plan**"), filed by Aegean Marine Petroleum Network Inc. and its debtor affiliates (**"Debtors"**). ECF Doc Nos. 302 and 303. In support thereof, the United States Trustee respectfully states:

### I. PRELIMINARY STATEMENT

The United States Trustee objects to the Disclosure Statement because it fails to contain adequate information on a number of material issues. Specifically, while the Plan contains broad non-debtor third-party releases and an exculpation provision, the Disclosure Statement does not contain adequate information explaining to interested creditors and interest holders (i) exactly what releases are being imposed upon each creditor, and (ii) the legal basis for the Debtors'

belief that it is likely that the Plan will be confirmed with these provisions. The Disclosure Statement also fails to provide adequate information regarding:

- the impact of third party releases and exculpation provisions upon six non-voting classes of unimpaired creditors who are deemed to grant releases;

- the reasons why impaired classes are not entitled to an "opt in" procedure for granting releases, rather than being required to affirmatively opt out of the grant of releases or file formal objections to releases;

- the legal basis for the payment of the fees and expenses of counsel to each of the Creditors' Committee's individual members; and

- the reasons why the broad exculpation provisions in the Plan include entities other than strictly the fiduciaries of the Debtors' estates.

Until adequate information is provided in these important areas, the Disclosure Statement should not be approved.

## II.  BACKGROUND

### A.  General Background

1. On November 2, 2018, the Debtors commenced these cases by filing a voluntary petition under chapter 11 of the Bankruptcy Code. ECF Doc. No. 1.

2. The Debtors are an international marine fuel logistics company. Utilizing a fleet of 56 owned and chartered vessels and a network of supply hubs, the Debtors deliver high grade fuels to customers in over 20 countries and more than 50 ports. Declaration of Tyler Baron ("Baron Decl."), ECF Doc. No. 2.

3.  The Debtors report that these chapter 11 cases were commenced in order to stabilize business operations, address near term debt maturities, and to facilitate a value-maximizing restructuring transaction. Baron Decl., Paras. 6-7.

4.  On January 16, 2019, the Debtors filed a Joint Chapter 11 Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates and the Disclosure Statement to the Plan. ECF Doc. Nos. 303 and 302, respectively.

5.  The Plan contains broad injunction, release and exculpation provisions, which are copied verbatim in the Disclosure Statement (pp. 48-52). The Debtors' explanation to interested readers as to why the release, exculpations and injunctions in the Plan are appropriate is also set forth in the Disclosure Statement (pp. 59-63).

### III.  OBJECTION

**A.  General Standards**

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125. The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a such a hypothetical reasonable investor . . . to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994); In re Adelphia Commc'ns Corp.,

352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006); Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999).

To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. See In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ." In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. See In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. Adelphia, 352 B.R. at 596 (citing Century Glove, Inc. v. First American Bank of New York, 860 F.2d 94, 100 (3d Cir. 1988)). Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement too, at least so long as the additional information is accurate and its inclusion is not misleading. Adelphia, 352 B.R. at 596. The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. In re Duratech Indus., 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), aff'd, 241 B.R. 283 (E.D.N.Y. 1999). The

3

disclosure statement must inform the average creditor as to what it is going to get and when, and what contingencies there are that might intervene. In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

B.  **The Debtors Have Failed to Include Sufficient Information To Permit Creditors To Make Informed Judgments Regarding Whether the Debtors Are Likely To Succeed in Demonstrating that the Court Has Subject Matter Jurisdiction To Impose Third Party Releases**

The Plan, if confirmed, will provide a myriad of third parties with broad releases. For example, in addition to providing for third parties releases to parties such as Mercuria,[1] the DIP Agents and Lenders, the Prepetition Secured Credit Facility Agents and Lenders, the Unsecured Notes Indenture Trustees, and AmEx, also released are each of their current and former predecessors, successors, Affiliates (whether such interests are held directly or indirectly), subsidiary, portfolio companies, professional advisors, consultants, and so forth. See Article IV.C of the Plan; DST, pp. 60. In short, except for the released parties either mentioned by name or by their specific role in these cases, it is not known what connection, if any, some of these parties being released have to the Debtors or even to these chapter 11 cases other than some vague connection to a released party.

The third party releases contained in the Plan are material terms and should be addressed in a fulsome manner in the Disclosure Statement, so that interested creditors can determine (i) exactly what releases will be imposed upon them, and (ii) the likelihood of the Debtors' success in confirming a Plan with such broad third party releases. Unfortunately, in addition to vague assurances that the Debtors believe the releases contained in the Plan are reasonable and fair, the

---

1 Capitalized terms not identified specifically in this Objection have the same meaning given to them in the Plan or Disclosure Statement.

4

Disclosure Statement also contains seemingly contradictory information regarding the releases. The Disclosure Statement states that "[a]dditionally, in the Second Circuit, third party releases are permissible when they are consensual or where 'truly unusual circumstances' render the release terms integral to the success of the plan." DST at p. 60, citing, In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142-43 (2d Cir. 2005). The reference to Metromedia is frequently used by plans to permit non-consensual third party releases. The Disclosure Statement should make clear whether refusals to grant third party release will be respected or whether such refusals will be overridden using the Metromedia case. If Metromedia is being used to impose non-consensual third party releases, the Disclosure Statement should explain in a clear and succinct manner what releases are being imposed on creditors and interest holders and what support is found in the Bankruptcy Code and elsewhere for those broad third party release provisions.

To the extent third party releases will be imposed on any party, the Disclosure Statement must set forth a basis for the Debtors' apparent belief that this Court has subject matter jurisdiction to impose the third party releases. It is settled, binding law that a court may **not** approve releases and exculpations under the Plan unless the Court has subject matter jurisdiction. In re Johns-Manville Corp., 517 F.3d 52 (2d Cir. 2008) ("Manville II"), vacated & remanded on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d Cir. 2010) and Metromedia, 416 F.3d at 141; accord In re Dreier LLP, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010); In re Metcalfe & Mansfield Alternative Invs., 421 B.R.685, 695 (Bankr. S.D.N.Y. 2010).

More specifically, a bankruptcy court must assess whether it has jurisdiction to enjoin a third-party dispute. "[T]he question is not whether the court has . . . jurisdiction over the attempts

5

to enjoin the creditors' unasserted claims against the third party." In re SunEdison, Inc., 576 B.R. 453, 461 (Bankr.S.D.N.Y. 2017) (citing Manville II, 517 F.3d 52, 65). "[T]he touchstone for bankruptcy jurisdiction [over a non-debtor's claim] remains whether its outcome might have any 'conceivable effect' on the bankruptcy estate." SunEdison, 576 B.R. at 461 (citing Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC), 740 F.3d 81, 88 (2d Cir. 2014). The party asserting that the Court has subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists. SunEdison, 576 B.R. at 461 (citations omitted).

In Manville II, the Second Circuit held that "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate." Manville II, 517 F.3d at 66; see also Dreier, 429 B.R. at 133 (because the court lacks jurisdiction to enjoin claims that do not affect property of the estate or the administration of the estate, non-debtor third-party releases must be limited to claims that are derivative of the debtors). In fact, contrary to the assertion set forth by the Debtors that "each of the Released Parties has afforded value to the Debtors and aided in the reorganization process," see DST pp. 63, a bankruptcy court does not acquire subject matter jurisdiction "to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate." Manville II, 517 F.3d at 66. Otherwise, "a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions." Id. (quoting In re Combustion Eng'g, Inc., 391 F.3d 190, 228 (3d Cir 2004)).

Here, third party releases are to be given to parties defined as Released Parties. See Plan Article IX(C). As stated above, if confirmed, the Plan will bestow broad releases upon a myriad

6

of third parties. Whether this Court has subject matter to bestow such broad releases is a material issue and an issue that should be addressed by the Debtors in the Disclosure Statement so that interested creditors can determine (i) exactly what release are being imposed and on which creditors and (ii) the likelihood of Debtors' success of confirming a plan with such broad releases.

C.     **The Creditors That the Debtors Describe as Unimpaired May Be Impaired**

Pursuant to the Plan, Class 1, Other Secured Claims, Class 2, Other Priority Claims, Class 3, Secured Term Loan Claims, Class 4B, General Unsecured Claims against All Other Debtors, and Classes 5 and 6, Intercompany Claims, are listed as unimpaired, not entitled to vote and presumed to accept the Plan. Under the Bankruptcy Code, classes of creditors not impaired by a Plan are deemed to have accepted the Plan. 11 U.S.C. § 1127(f). However, whether a creditor is, in fact, impaired under a plan requires more than a simple determination as to whether the creditor is to be paid in full under the plan. See In re Chassix Holdings, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015). In Chassix, the Court stated that "it is difficult to understand how . . . a creditor" can be described as unimpaired if, in exchange for payment of its claim, that creditor "must release a claim against a third party under a plan. . . ." noted, [m]any courts have held that . . . an impaired class of creditors also is presumed to have consented to any third-party releases. . . ." Id. Under Chassix, then, "unimpaired creditors should not be deemed to have consented to the third party releases set forth in the Plan." Id. Similarly, the court in In re Genco Shipping & Trading Ltd., 513 B.R. 233,270 (Bankr. S.D.N.Y. 2014), held that classifying parties as unimpaired "does not mean that they should be somehow automatically deemed to grant a

7

release. . . ." In other words, full payment to a creditor is not the end-all be-all to a determination of whether a creditor is impaired. See Chassix, 533 B.R. at 81.

Here, not all parties have been given the opportunity to vote on the Plan. The Debtors label as "unimpaired" Classes 1, 2, 3, 4B, 5, and 6. The members of all unimpaired classes – without being afforded the opportunity to review the papers filed in this case – are deemed to accept not only their treatment under the Plan, but also all of the other Plan provisions. And as noted below, certain of those other provisions, such as the provisions that relate to releases and the prepayment of certain professionals without Court approval, render the Plan unconfirmable. Specifically with respect to the release provisions, as well as the injunction and exculpation provisions, these non-voting creditors are being deprived of their rights against third parties on a non-consensual basis. These non-voting creditors are not afforded an opportunity to opt out of the releases but must file an objection to the releases. These circumstances certainly call into question whether they are, in fact, unimpaired. See Chassix, 533 B.R. at 81.

**D.    The Plan Improperly Imposes "Deemed Consent to" Releases through an Opt Out, rather than an Opt In Procedure, on Certain Creditors and All Interest Holders**

The Disclosure Statement does not address the fact that the Plan appears to improperly deem that the Released Parties are released by holders of Impaired Claims and holders of Interests who abstain from voting or who vote to reject the Plan, but do not also opt out of granting the releases contained in the Plan. In general, courts have permitted creditors voting for a plan to be deemed to consent to releases. Here, however, under the Debtors' Plan, Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (all Interests in

8

Aegean), are entitled to vote, but must affirmatively opt out of the releases when abstaining from voting on the Plan or when rejecting the Plan.

The Court, in In re SunEdison, Inc., 576 B.R. 453 (Bankr. S.D.N.Y. 2017), ruled that non-voting creditors could not be deemed to consent to the releases in the plan. The SunEdison court cited to the following language in In re Chassix Holdings, 533 B.R. 54, 81 (Bankr. S.D.N.Y. 2015):

> Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.

SunEdison, 576 B.R. at 461.

Further, the SunEdison Court held that the debtors failed to sustain their burden of proving that the Court had subject matter jurisdiction to approve the third party releases. Id. at 461-63. In SunEdison, the non-voting releasors did not consent to the release, the creditors were not being paid in full, and the third party claims would have been extinguished rather than channeled to a fund for payment. Id. What's more, the SunEdison debtors did not identify which third party claims would directly impact their reorganization, and given the scope of the release, the Court determined that it was likely that many of those claims would not impact the reorganization. Id. Thus, the Court granted the debtors leave to propose a modified form of release, under the condition that they specify the release by name or readily identifiable group and identify the claims to be released, demonstrate how the outcome of the claims to be released might have a conceivable effect on the debtors' estates, and show that the case was one of the rare cases involving unique circumstances in which the release of the claims is appropriate under Metromedia. Id.

9

The <u>Chassix</u> Court also made clear its opposition to the requiring creditor to both reject the Plan and separately opt-out of the releases.

> As to creditors who might vote to reject the Plan: the Court noted that it was difficult to understand why any other action should be required to show that the creditor also objected to the proposed third party releases.  If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and "consented" to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third party releases that are set forth in the plan. The additional "opt out" requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor. In response, the Debtors agreed to modify the proposed Ballots so that creditors who rejected the Plan would be given the ability to "opt in" to the proposed releases by checking a box indicating their desire to do so. The revised [**41] disclosure materials stated clearly that if a creditor rejected the Plan, and did not affirmatively "opt into" the proposed releases, the creditor would not have consented to the releases.

<u>Chassix</u> at 40-41.

Accordingly, here, in both instances, holders of claims and interests who abstain from voting, or who reject the Plan, should not be deemed to consent to the releases contained in the Plan.  The Disclosure Statement should explain to interested holders of claims and interests the Debtors' basis for taking a different view of the case law and of provisions of the Bankruptcy Code regarding deemed consent by imposing an opt-out rather than an opt-in procedure.

**E.    If the Debtors Seek to Override the Refusal to Grant Releases, They Must Provide Adequate Information Establishing that the Proposed Releases and Exculpation Meet the Standard Required by the Second Circuit**

If, in fact, the Debtors seek to override refusals to grant releases, the Disclosure Statement should contain information explaining why the third-party releases it seeks to impose in the Plan are rare and unique circumstances under the facts of this case and as such, are likely

10

to be approved by the Court. Specifically, assuming the Debtors are successful in persuading the Court that it has subject matter jurisdiction to compel impaired creditors to provide non-consensual third party releases, the imposition of third-party releases are proper only in rare and unique circumstances. SunEdison, 576 B.R. at 461-62 (citing Metromedia, 416 F.3d at 141). In Metromedia, the Second Circuit articulated at least two reasons for its reluctance to approve these releases:

> First, the only explicit authorization in the Code for non-debtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims, [and] . . .
>
> Second, a non-debtor release is a device that lends itself to abuse. By it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect it may operate as a bankruptcy discharge without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity.

Id. at 142. See also In re DBSD N. Am., Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (footnotes omitted); In re Motors Liquidation Co., 477 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only in rare cases, with appropriate consent or under circumstances that can be regarded as unique, some of which the Circuit listed. But where those circumstances haven't been shown, third-party releases can't be found to be appropriate").[2]

---

[2] Other examples include: (i) In re Adelphia Comm'ns Corp., 368 B.R. 140, 268–69 (Bankr. S.D.N.Y. 2007) (holding that three categories of non-debtor third-party releases are acceptable under Metromedia: (1) persons indemnified by the estate under by-laws, employment contracts, or loan agreements, (2) persons involved in unique transactions, such as a party who makes a substantial financial contribution to the estate; and (3) persons who consent to the releases); (ii) In re Karta Corp., 342 B.R. 45 (S.D.N.Y. 2006) (framing inquiry as "whether a significant non-debtor financial contribution plus other unusual factors render a situation so "unique" that the non-debtor third-party releases are appropriate"). Id. at 55; (iii) In re Oneida Ltd., 351 B.R. 79 (Bankr. S.D.N.Y. 2006) (the equity committee had raised, but then abandoned, an objection to the validity of the non-debtor third-party

11

F.    **The Disclosure Statement Fails to Provide Adequate Information Concerning the Legal Basis for the Payment of the Fees and Expenses of the Counsel for Each of the Individual Creditors' Committee Members**

The Plan, through the Restructuring Term Sheet (the **"RTS"**), provides for the payment of all reasonable and documented fees and expenses of counsel retained by each individual Creditors' Committee Member (the "Members"). Disclosure Statement, Exh. A, RTS, p. 11. The Debtors propose to pay these fees as Allowed Administrative Claims, which means that for the Plan to be confirmed, they must be paid in cash, in full on the Effective Date. 11 U.S.C. § 1129(a)(9)(A).

The Disclosure Statement should set forth the legal basis upon which the Debtors rely to justify that the proposed payments of the Members' counsel fees and expenses in the RTS, in entirely undisclosed amounts and without Court approval, do not violate section 503(b) of the Bankruptcy Code.

G.    **The Debtors Must Explain why the Exculpation Provision is Not Unduly Broad**

The Plan contains a broad exculpation provision in Article IX(D). Exculpation provisions are meant to limit liability to the fiduciaries in the case. See In re Washington Mutual, Inc., 442 B.R. 314, 350-351 (Bankr. D. Del. 2011) (limiting exculpation clause to estate fiduciaries). Here, however, the exculpation provision's coverage extends way beyond the

---

releases, and the court found that the releases in that case were acceptable because all of the affected creditors had consented by affirmatively checking a box on the ballot indicating their willingness to grant the releases); (iv) In re Spiegel, Inc., No. 03-11540 (BRL), 2006 WL 2577825, *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (plan's non-debtor third-party releases and injunctions were critical components of the settlement that played a "vital part in the plan" and "were necessary to the proposed reorganization of the Debtors and the successful administration of their estates"); and (v) In re XO Commc'ns, Inc., 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (non-debtor third-party releases were permissible where the non-debtors provided significant consideration, the non-debtors were integral to the plan, and the non-debtors' interests aligned with those of the debtors with regard to the claims).

Debtors' fiduciaries. Furthermore, the exculpation provision fails to include a caveat that it should be limited to the extent permitted in Bankruptcy Code § 1125(e), while further making clear that the provision, as it applies to the parties' attorneys, is consistent with the New York Rules of Professional Conduct **("NYRPC")**. The Plan, as written, does not adhere to the NYRPC provision that restricts attorneys from making agreements limiting their liability to a client for malpractice. See N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1).

## IV.  CONCLUSION

WHEREFORE, the United States Trustee respectfully submits that the Court sustain the Objection of the United States Trustee, and grant such other relief as is just.

Dated: New York, New York
February 12, 2019

> Respectfully Submitted,
>
> WILLIAM K. HARRINGTON
> UNITED STATES TRUSTEE
>
> By:   /s/ *Brian S. Masumoto*
> Brian S. Masumoto
> Andrew D. Velez-Rivera
> Trial Attorneys
> 201 Varick Street, Room 1006
> New York, New York 10004
> (212) 510-0500