Marc Kieselstein, P.C.
Cristine Pirro
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Adam C. Paul, P.C. (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-13374 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF REVISED DISCLOSURE**
**STATEMENT FOR THE JOINT PLAN OF REORGANIZATION**
**OF AEGEAN MARINE PETROLEUM NETWORK INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that the above captioned debtors and debtors in possession

(collectively, "Debtors") hereby files a revised *Disclosure Statement for the Revised Joint Plan of*

*Reorganization of Aegean Marine Petroleum Network Inc. and Its Debtor Affiliates Pursuant to*

*Chapter 11 of the Bankruptcy Code* (the "Revised Disclosure Statement"), attached hereto as

**Exhibit A**.  A redline of the Revised Disclosure Statement is attached hereto as **Exhibit B**, which

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

reflects changes from the *Disclosure Statement for the Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 302] filed on January 16, 2019.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to materially alter, amend, or modify the Revised Disclosure Statement; <u>provided</u>, that if the Revised Disclosure Statement is altered, amended, or modified in any materials respect, the Debtors will file a revised version of such document the the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").

**PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider approval of the Revised Disclosure Statement (the "<u>Disclosure Statement Hearing</u>") will be held before the Honorable Michael E. Wiles of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), in Room 617, One Bowling Green, New York, New York 10004, on **February 14, 2019, at 10:00 a.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Revised Disclosure Statement may be obtained free of charge by visiting the website of Epiq Corporate Restructuring, LLC at <u>http://dm.epiq11.com/aegea</u>n.  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at <u>http://www.nysb.uscourts.gov</u> in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank.]*

New York, New York
Dated: February 13, 2019

/s/ Marc Kieselstein, P.C.

Marc Kieselstein, P.C.
Cristine Pirro
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Adam C. Paul, P.C. (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

## Revised Disclosure Statement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) | Case No. 18-13374 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR**
**THE JOINT PLAN OF REORGANIZATION OF**
**AEGEAN MARINE PETROLEUM NETWORK INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Marc Kieselstein, P.C.
Cristine Pirro
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James H.M. Sprayregen, P.C.
Adam C. Paul, P.C. (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated:  February 13, 2019

---

[1]    Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/Aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

18-13374-mew    Doc 362    Filed 02/13/19    Entered 02/13/19 13:07:44    Main Document
Pg 6 of 224

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

**THE DEADLINE TO VOTE ON THE PLAN IS**
**MARCH [19], 2019 AT 4:00 P.M. (PREVAILING EASTERN TIME)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT OR A MASTER BALLOT INCLUDING**
**YOUR VOTE MUST BE <u>ACTUALLY</u> <u>RECEIVED</u>**
**BY EPIQ CORPORATE RESTRUCTURING LLC, ON**
**OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE X</u> HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION

CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. SEE THE RISK FACTORS, SPECIFICALLY ARTICLE X.C AND ARTICLE X.D OF THIS DISCLOSURE STATEMENT. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS OR INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE X, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 69, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- ENVIRONMENTAL LIABILITIES;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:   THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

*       *       *       *       *

## TABLE OF CONTENTS

Page

I.      INTRODUCTION................................................................................................................. 1

II.     PRELIMINARY STATEMENT ........................................................................................ 1

        A.      Plan Overview................................................................................................... 2
        B.      The Adequacy of the Disclosure Statement ..................................................... 3

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND THE PLAN ................................................................................................................ 4

        A.      What is chapter 11?........................................................................................... 4
        B.      Why are the Debtors sending me this Disclosure Statement?........................... 4
        C.      Am I entitled to vote on the Plan? .................................................................... 4
        D.      What will I receive from the Debtors if the Plan is consummated?................... 5
        E.      What will I receive if I hold an Allowed Administrative Claim or an Allowed
                Priority Tax Claim? ........................................................................................... 8
        F.      What happens to my recovery if the Plan is not confirmed or does not go
                effective?............................................................................................................ 8
        G.      If the Plan provides that I get a distribution, do I get it upon Confirmation or
                when the Plan goes effective, and what is meant by "Confirmation," "Effective
                Date," and "Consummation?"............................................................................. 8
        H.      What are the sources of Cash and other consideration required to fund
                distributions under the Plan?............................................................................. 8
        I.      Who supports the Plan? ..................................................................................... 8
        J.      Is there potential litigation related to Confirmation of the Plan?...................... 9
        K.      Will there be releases and exculpation granted to parties in interest as part of the
                Plan? .................................................................................................................. 9
        L.      Can I opt out of the Third Party Release?........................................................ 11
        M.      What is the deadline to vote on the Plan? ....................................................... 11
        N.      How do I vote for or against the Plan? ............................................................ 11
        O.      What is the Litigation Trust Loan and can I participate in it? ......................... 12
        P.      Why is the Bankruptcy Court holding a Confirmation Hearing? .................... 12
        Q.      When is the Confirmation Hearing set to occur?............................................ 12
        R.      What is the purpose of the Confirmation Hearing? ........................................ 12
        S.      Who do I contact if I have additional questions with respect to this Disclosure
                Statement or the Plan? ..................................................................................... 12
        T.      Do the Debtors recommend voting in favor of the Plan? ............................... 13

IV.     BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES ........ 13

        A.      Corporate History and General Background..................................................... 13
        B.      Business Operations......................................................................................... 14
        C.      Employees........................................................................................................ 17
        D.      Senior Management ......................................................................................... 17
        E.      Aegean Board of Directors .............................................................................. 18
        F.      Prepetition Capital Structure ........................................................................... 18

V.      EVENTS LEADING TO THE CHAPTER 11 CASES ................................................. 22

        A.      Prepetition Challenges ..................................................................................... 22

B.    Appointment of Independent Directors and Composition of the Audit Committee ......... 24
C.    Prepetition Initiatives ................................................................................................. 24
D.    Audit Committee Investigation ................................................................................... 26
E.    The DIP Financing and Chapter 11 Filing ................................................................... 27

VI.    **EVENTS OF THE CHAPTER 11 CASES** .................................................................... **28**

A.    First Day Pleadings and Other Case Matters ............................................................... 28
B.    Other Procedural and Administrative Motions ............................................................ 30
C.    Other Matters Relevant to these Chapter 11 Cases ...................................................... 30
D.    Appointment of Official Committee of Unsecured Creditors ......................................... 32
E.    Debtor-in-Possession Financing .................................................................................. 32
F.    Sale Process Motion .................................................................................................... 35
G.    Restructuring Support Agreements .............................................................................. 36

VII.    **SUMMARY OF THE PLAN** ...................................................................................... **37**

A.    Overview .................................................................................................................... 38
B.    Treatment of Executory Contract and Unexpired Leases .............................................. 47
C.    Releases ..................................................................................................................... 50

VIII.    **SOLICITATION AND VOTING** ................................................................................. **56**

A.    Solicitation Packages .................................................................................................. 56
B.    Classes Entitled to Vote on the Plan ............................................................................ 57
C.    Votes Required for Acceptance by a Class .................................................................... 57
D.    Classes Not Entitled to Vote on the Plan ..................................................................... 57
E.    Voting Record Date ..................................................................................................... 58
F.    Voting on the Plan ....................................................................................................... 58
G.    Ballots Not Counted .................................................................................................... 59

IX.    **CONFIRMATION OF THE PLAN** .............................................................................. **59**

A.    Confirmation Standards ............................................................................................... 59
B.    Best Interests of Creditors/Liquidation Analysis .......................................................... 61
C.    Creditor Recoveries ..................................................................................................... 61
D.    Valuation .................................................................................................................... 61
E.    Financial Feasibility .................................................................................................... 61
F.    Acceptance by Impaired Classes .................................................................................. 62
G.    Confirmation without Acceptance by All Impaired Classes ........................................... 63
H.    The Debtor Releases, Third Party Releases, Exculpation, and Injunction
       Provisions .................................................................................................................. 64

X.    **RISK FACTORS** ........................................................................................................ **69**

A.    General ....................................................................................................................... 70
B.    Certain Bankruptcy Law Considerations ...................................................................... 70
C.    Risks Related to the Transaction .................................................................................. 74
D.    Risks Related to the Debtors' Businesses ..................................................................... 76
E.    Liquidity Risks ............................................................................................................ 79
F.    Risks Associated with Forward Looking Statements ..................................................... 80
G.    Disclosure Statement Disclaimer ................................................................................. 80
H.    Liquidation Under Chapter 7 ....................................................................................... 82

i

**XI.    CERTAIN SECURITIES LAW MATTERS**..................................................................**82**

    A.    Reorganized Aegean Equity Interests........................................................ 82

    B.    Issuance and Resale of Securities Under the Plan .................................... 82

    C.    U.S. Securities and Exchange Commission Rights Reserved.................... 85

**XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**...............**85**

    A.    Introduction.............................................................................................. 85

    B.    Certain U.S. Federal Income Tax Consequences to the U.S. Debtor ............... 86

    C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Aegean
           Unsecured Claims..................................................................................... 90

    D.    Accrued Interest ....................................................................................... 91

    E.    Market Discount ....................................................................................... 91

    F.    Information Reporting and Backup Withholding ...................................... 91

**XIII.    RECOMMENDATION** .................................................................................................**92**

**EXHIBITS**

EXHIBIT A    Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code

EXHIBIT B    Corporate Organizational Chart as of the Petition Date

EXHIBIT C    Restructuring Support Agreement

EXHIBIT D    Liquidation Analysis

EXHIBIT E    Valuation Analysis

EXHIBIT F    Financial Projections

## I. INTRODUCTION

Aegean Marine Petroleum Network Inc. ("Aegean") and its debtor affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each Debtor.

**THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN ARE SUPPORTED BY THE DEBTORS, THE COMMITTEE, MERCURIA, CONSENTING UNSECURED NOTEHOLDERS HOLDING 64 PERCENT OF THE PRINCIPAL AMOUNT OUTSTANDING OF THE UNSECURED NOTES, AND AMEX.**

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO ALL STAKEHOLDERS UNDER THE CIRCUMSTANCES.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS AND THE COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II. PRELIMINARY STATEMENT

The Debtors are an international marine fuel logistics company and a leading independent physical supplier of marine fuel to vessels in port, at sea, on rivers and other waterways around the globe.  Utilizing a modern fleet of 57 owned and chartered vessels and a broad network of supply hubs, the Debtors provide best-in-class bunkering services to customers in over 20 countries and more than 50 ports via a fully integrated supply chain comprised of fuel sourcing, storage (onshore and offshore), vessel-to-vessel delivery, and post-delivery customer care.  As of November 1, 2018, the Debtors employed approximately 850 individuals worldwide.

As of the Petition Date, the Debtors reported approximately $855 million in aggregate funded debt, including $131.3 million outstanding under its U.S. Credit Facility, $249.6 million outstanding under its Global Credit Facility, $206.6 million outstanding under ten secured term loan facilities—which generally financed the acquisition of the Debtors' fleet and the Fujairah terminal—and $267 million outstanding under two issuances of unsecured convertible notes by the Debtors' ultimate parent.  Since the Petition Date, and as of the date hereof, the entire prepetition amount of the U.S. Credit Facility and Global Credit Facility has been rolled-up into the Debtors' postpetition financing arrangements comprised of a $160 million DIP U.S. Revolving Credit Facility, $75 million DIP U.S. Term Credit Facility, and $300 million DIP Global Credit Facility.  Mercuria became the sole lender under the U.S. Credit Facility and Global Credit Facility in August 2018, is the sole lender under the DIP Facilities, and also owns approximately 30 percent of Aegean's common equity.

The Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Petition Date.  The Debtors in these chapter 11 cases consist of 75 entities.  An organizational chart

---

[1]  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified entirely by reference to the Plan.  In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.

setting forth the corporate structure of Aegean Marine—i.e., Debtors and Non-Debtor Subsidiaries—as of the Petition Date is attached hereto as **Exhibit B**.

The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and to distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan. To that end, the Debtors filed the Plan, which provides a comprehensive restructuring of the Debtors' obligations, preserves the going-concern value of the Debtors' businesses, and maximizes the value of creditor recoveries. The Debtors believe that the Plan accomplishes this objective and is in the best interests of the Debtors' estates and, therefore, the Debtors seek to confirm the Plan.

A.    **Plan Overview**

As described more fully below, the Debtors have engaged in extensive good faith negotiations with Mercuria, the Committee, the Consenting Unsecured Noteholders, AmEx, and other parties in interest regarding the consensual restructuring of the Debtors' obligations following the Petition Date. The Plan represents the culmination of these negotiations and embodies a global settlement memorialized in the Restructuring Support Agreement, attached hereto as **Exhibit C**. The Debtors and the other parties to the Restructuring Support Agreement believe that the Plan provides the best available path forward for these chapter 11 cases and maximizes the value of the Debtors' estates.

Generally, the Plan provides for the following treatment of Claims and Interests:

- satisfies in full Allowed Administrative Claims and Allowed Priority Tax Claims, if any, against all Debtors;

- provides for 100 percent recoveries on account of Allowed Other Secured Claims, Allowed Other Priority Claims, Allowed Secured Term Loan Claims, and Allowed General Unsecured Claims against all subsidiary Debtors (*i.e.*, other than Aegean);

- provides that Holders of Allowed Aegean Unsecured Claims shall receive their Pro Rata share of (i) $40 million in Cash (*i.e.*, the Aegean Unsecured Claims Cash Pool) and (ii) Class A Litigation Trust Units in the Litigation Trust, which shall own and monetize the Litigation Claims for the benefit of Holders of Allowed Aegean Unsecured Claims and, potentially, equity holders;

- provides that Holders of Allowed Section 510(b) Claims and Allowed Interests in Aegean shall receive their Pro Rata share of Class B Litigation Trust Units (*i.e.*, second in priority relative to the Class A Litigation Trust Units) in the Litigation Trust; and

- equitizes obligations owing to Mercuria under the DIP Credit Facility Claims.

The Plan enjoys the support of: (i) the Debtors; (ii) Mercuria, the Debtors' primary prepetition secured lender, sole DIP Lender, and approximately 30 percent equity holder; (iii) the Committee, the statutory fiduciary for all of the Debtors' general unsecured creditors; and (iv) the majority of Holders of Class 4A Claims (Aegean Unsecured Claims), including (a) 64 percent of the principal amount outstanding of the Unsecured Notes and (b) AmEx, the largest individual non-Unsecured Noteholder unsecured creditor at Aegean. This support for the Plan, and the consensual reorganization of the Debtors contemplated therein, is an important achievement for the Debtors in the face of the significant liquidity issues, a challenging operating environment, and the potential for protracted litigation in these chapter 11 cases.

2

The Debtors strongly believe that the Plan is in the best interests of their estates and represents the best available alternative for all of their stakeholders. The Debtors therefore urge Holders of Claims and Interests to vote to accept the Plan.

### B.      The Adequacy of the Disclosure Statement

The Debtors seek Bankruptcy Court approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history, corporate structure, business operations, and prepetition capital structure and indebtedness (Article IV herein);

- events leading to these chapter 11 cases, including the Debtors' restructuring negotiations (Article V herein);

- significant events in these chapter 11 cases (Article VI herein);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article III and Article VII herein);

- certain important effects of Confirmation of the Plan (Article IX herein);

- releases and exculpations contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article III and Article IX herein);

- the statutory requirements for confirming the Plan (Article IX herein);

- certain risk factors Holders of Claims or Interests should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article X herein); and

- certain U.S. federal income tax consequences of the Plan (Article XII herein).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors' boards of directors have approved the Plan and the Restructuring Transactions contemplated therein and believe that the Plan is in the best interests of the Debtors, the Estates, creditors, and equity interest holders as a whole. As such, the Debtors recommend that all Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan by returning their ballots, so as to be actually received by Epiq Corporate Restructuring, LLC, the Debtors' notice and claims agent (the "Notice and Claims Agent") no later than **March [19], 2019, at 4:00 p.m.** prevailing Eastern Time. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing, currently scheduled for **March [26], 2019, at [●]:00 a.m.** prevailing **Eastern Time.**

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date.

## III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.  What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.  Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.  Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Term Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 4A | Aegean Unsecured Claims | Impaired | Entitled to Vote |
| 4B | General Unsecured Claims against All Other Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Entitled to Vote |
| 8 | Interests in Aegean | Impaired | Entitled to Vote |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors (with Mercuria's consent, or the Reorganized Debtors, as applicable) and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest (or as soon as reasonably practicable following either of such dates).

The classification, treatment, and the projected recoveries of classified Claims set forth in the table below are estimates only and therefore are subject to material change. In particular, recoveries available to the Holders of Aegean Unsecured Claims are estimates based on information known to the Debtors as of the date hereof and actual recoveries could differ materially based on, among other things, the actual realized recoveries as to any one or more of the Litigation Claims, which are highly speculative and contingent upon successful prosecution of the Litigation Claims, and whether the amount of Claims actually allowed against the applicable Debtor exceed the estimates provided below. The recoveries available to Holders of Aegean Unsecured Claims could be materially lower when compared to the estimates provided below.

To the extent any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern. For a complete description of the Debtors' classification and treatment of Claims and Interests, reference should be made to the Plan.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount | Projected Recovery |
| 1 | Other Secured Claims | As determined by the Debtors but subject in each case to Mercuria's reasonable consent, or the Reorganized Debtors, as applicable, either: (i) payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course; (ii) Reinstatement; (iii) the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iv) such other treatment rendering such Claim Unimpaired. | $0 | 100% |
| 2 | Other Priority Claims | Payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course. | $0 | 100% |
| 3 | Secured Term Loan Claims | As determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either: (i) payment in full in Cash by the Reorganized Debtors the later of the Effective Date or in the ordinary course; (ii) Reinstatement; (iii) the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iv) such other treatment rendering such Claim Unimpaired. | $206.6 million | 100% |
| 4A | Aegean Unsecured Claims | Pro Rata share of the Aegean Unsecured Claims Cash Pool and the Class A Litigation Trust Units. | $294.5 million | 13.6%, plus the distributions, if any, from the Litigation Trust[2] |
| 4B | General Unsecured Claims against All Other Debtors | Payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course or such other treatment as agreed to by the applicable Debtor but subject in each case to Mercuria's reasonable consent or the applicable Reorganized Debtor rendering such Claim Unimpaired. | $7.1 million | 100% |

---

[2]    The projected recovery of 13.6% represents a baseline recovery for Holders of Class 4A Aegean Unsecured Claims and does not include amounts that may be distributed on account of prosecution of the Litigation Claims, which are unliquidated and not reasonably calculable at this time.  As a result, the actual recovery may be significantly higher.  This projected recovery assumes that the Aegean Unsecured Claims Pool will be shared Pro Rata among all Holders of Aegean Unsecured Claims. For the avoidance of doubt, all Holders of Class 4A Aegean Unsecured Claims will receive their Pro Rata share of Class A Litigation Trust Units and will share in any distributions therefrom in accordance with the waterfall set forth in Article V of the Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount | Projected Recovery |
| 5 | Intercompany Claims | As determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either Reinstated or canceled and released (including by way of capital contribution) without any distribution on account of such Claims. | N/A | 100% / 0% |
| 6 | Intercompany Interests | As determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either Reinstated or canceled and released without any distribution on account of such Interests. | N/A | 100% / 0% |
| 7 | Section 510(b) Claims | Pro Rata share of Class B Litigation Trust Units <u>provided</u>, that for purposes of receiving the treatment provided herein, each Holder shall be treated as if such Holder held a number of Allowed Class 8 Aegean Interests equal in value (determined based on the Aegean Interest Distribution Value) to the amount of its Allowed Section 510(b) Claim. | $0[3] | Contingent / Unknown[4] |
| 8 | Interests in Aegean | Pro Rata share of Class B Litigation Trust Units. | Approximately 53.19 million shares[5] | Contingent / Unknown[6] |

For illustrative purposes only, the following hypothetical demonstrates how to calculate the pro ration as between Holders of Class 7 Claims and Class 8 Interests. First assume that the Litigation Trust recovers $50 million in net proceeds after Class 4A Claims are Paid in Full, the entirety of which is available for distribution to Class B Litigation Trust Units. Assume further that there are $22 million in Allowed Class 7 Claims and the market capitalization of Class 8 Interests is $44 million. Holders of Allowed Class

---

[3]  No projected claim amount is provided for Class 7 Section 510(b) Claims, which are unliquidated and not reasonably calculable at this time. Article III.146 of the Plan defines Section 510(b) Claims as "any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a Security; (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; or (d) derived from, based upon, relating to, or arising under the subject matter of that certain securities litigation styled as *In re Aegean Marine Petroleum Network Inc. Securities Litigation*, No. 1:18-cv-04993 (NRB), currently pending in the United States Court for the Southern District of New York."

[4]  No recovery percentage is included for Class 7 Section 510(b) Claims because any such recovery is contingent on the prosecution of the Litigation Claims, which are unliquidated and not reasonably calculable at this time. For the avoidance of doubt, all Holders of Class 7 Section 510(b) Claims will receive their Pro Rata share of Class B Litigation Trust Units and will share in any distributions therefrom in accordance with the waterfall set forth in Article V of the Plan.

[5]  Aegean had a market capitalization of approximately $43.6 million, which is the product of (a) the volume-weighted average price of $0.75 per Aegean Interest on the Trading Day prior to the Petition Date, and (b) approximately 53.19 million Aegean Interests outstanding on the Trading Day prior to the Petition Date.

[6]  No recovery percentage is included for Class 8 Interests in Aegean because any such recovery is contingent on the prosecution of the Litigation Claims, which are unliquidated and not reasonably calculable at this time. For the avoidance of doubt, all Holders of Class 8 Interests in Aegean will receive their Pro Rata share of Class B Litigation Trust Units and will share in any distributions therefrom in accordance with the waterfall set forth in Article V of the Plan.

7 Claims would share Pro Rata in $16.67 million, calculated as follows: ($22 million / ($22 million + $44 million)) * $50 million.  Holders of Allowed Class 8 Interests would share Pro Rata in $33.33 million, calculated as follows: ($44 million / ($22 million + $44 million)) * $50 million.

**E.     What will I receive if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including DIP Credit Facility Claims), Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan. Administrative Claims, DIP Credit Facility Claims, Professional Fee Claims, and Priority Tax Claims will be satisfied as set forth in <u>Article II</u> of the Plan.

**F.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions contemplated by the Plan.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* <u>Article IX.B</u> of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **<u>Exhibit D</u>**.

**G.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* <u>Article IX</u> of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

**H.     What are the sources of Cash and other consideration required to fund distributions under the Plan?**

The distributions under the Plan will be funded by the following sources of cash and consideration: (i) Cash on hand, proceeds of the DIP Facilities, and/or Cash funded by Mercuria; (ii) the issuance and distribution of Reorganized Aegean Equity Interests and Litigation Trust Interests; and (iii) proceeds from the Exit Facility (if any).

**I.     Who supports the Plan?**

The Plan is supported by:  (i) the Debtors; (ii) Mercuria, the Debtors' primary prepetition secured lender, sole DIP Lender, and approximately 30 percent equity holder; (iii) the Committee, the statutory fiduciary for all of the Debtors' general unsecured creditors; and (iv) the vast majority of Holders of Class 4A Claims (Aegean Unsecured Claims), including (a) 64 percent of the principal amount outstanding of the Unsecured Notes issued by Aegean and (b) AmEx, the largest individual non-Unsecured Noteholder unsecured creditor at Aegean.

**J.      Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  In addition, if it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article X.B.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**K.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article IX of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties, subject to certain limitations and stakeholders' ability to "opt out" from, object to, or otherwise consent to the Third Party Release.  The Debtors' releases, third party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the Plan and the global settlement among the Debtors, Mercuria, the Committee, the Consenting Unsecured Noteholders, and AmEx in obtaining their support for the Plan.

All of the Released Parties are being consensually released, the Debtors have decided in their business judgment that they should be released, and all of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve value for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties is entitled to the benefit of the release and exculpation provisions.  Moreover, the exculpation provisions are appropriately limited to the Exculpated Parties' participation in the chapter 11 process and has no effect on liability resulting from actual fraud, willful misconduct, or gross negligence.  The Debtor Release, Third Party Release, and Exculpation are each subject to certain carve outs in relation to the Litigation Claims and the Securities Claims, as described further herein.

The Released Parties include: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; provided, however, that any party in interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Released Party"; provided, further, however, that notwithstanding anything to the contrary in the Plan, the scope of "Released Parties" shall be subject to the limitations set forth in Articles IX.F and IX.I of the Plan.  For the avoidance of doubt, the Released Parties referenced in the foregoing clauses (j) through (l), are "Released Parties" solely with

respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to Articles IX.B and IX.C of the Plan, subject to the limitations set forth in Article IX.F of the Plan.

The Releasing Parties include: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing Entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (j), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; (l) all Holders of Claims and Interests that vote to accept the Plan; (m) all Holders of Claims and Interests that vote to reject the Plan but do not elect to opt out of the Third Party Release; and (n) all Holders of Claims and Interests not described in the foregoing clauses (a) through (m); provided, however, that any such Holder of a Claim or Interest that opts out, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Releasing Party"; provided, further, however, that notwithstanding anything to the contrary herein, the scope of "Releasing Parties" shall be subject to the limitations set forth in Article IX.F and Article IX.I of the Plan.

The Exculpated Parties include: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) AmEx; (g) the Unsecured Notes Indenture Trustees; (h) with respect to each of the foregoing entities in clauses (a)-(g) each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); and (i) with respect to each of the foregoing entities in clauses (a)-(h), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); provided, however, that, notwithstanding anything to the contrary in the Plan, the scope of "Exculpated Parties" shall be subject to the limitations set forth in Article IX.F of the Plan. For the avoidance of doubt, the Exculpated Parties referenced in the foregoing clauses (h) and (i), are "Exculpated Parties" solely with respect to work performed on behalf of the applicable Entity for which exculpations are provided pursuant to Article IX.D of the Plan, subject to the limitations set forth in Article IX.F of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, injunction, and related provisions that are contained in the Plan are copied in Article VII.C of this Disclosure Statement, entitled "Releases."

**L.     Can I opt out of the Third Party Release?**

Yes, unless you (1) vote to accept the Plan, or (2) are a party to the Restructuring Support Agreement (in which case you have already agreed to grant the Third-Party Release).  Any Holder of a Claim or Interest that opts out of, files an objection to, or otherwise does not consent to the releases in the Plan will not be a "Releasing Party" for purposes of the Plan.

Holders of Claims that are not entitled to vote to accept or reject the Plan can opt out in a variety of ways, including by:

(1) filing an objection with the Bankruptcy Court expressly objecting to the inclusion of such Holder as a "Releasing Party" under the Plan;

(2) sending an email to the Claims and Solicitation Agent at tabulation@epiqglobal.com, with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held;

(3) sending a fax to the Claims and Solicitation Agent at (855) 853-9987, with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held;

(4) sending a letter to the Claims and Solicitation Agent, by first-class mail, at Aegean Ballot Processing c/o Epiq Corporate Restructuring, LLC PO Box 4422 Beaverton, OR 97076-4422 with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held;

(5) sending a letter to the Claims and Solicitation Agent, by overnight or hand delivery, at Aegean Ballot Processing c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Boulevard, Beaverton, OR 97005, with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held; or

(6) otherwise manifesting your intent not to be bound by the Third-Party Release, such as by appearing at the Confirmation Hearing and expressly objecting to the inclusion of such Holder as a "Releasing Party" under the Plan.

Holders of Claims or Interests entitled to vote to accept or reject the Plan may do any one of the foregoing or also check the box on their Ballot indicating they are "opting out" of the Third-Party Release.

**M.     What is the deadline to vote on the Plan?**

The Voting Deadline is **March [19], 2019 at 4:00 p.m. prevailing Eastern Time**.

**N.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot, or a master ballot including your vote, must be properly completed, executed, and delivered as directed, so it is **actually received** by Epiq Corporate Restructuring, LLC, **on or before the Voting Deadline, i.e., March [19], 2019 at 4:00 p.m. prevailing Eastern Time**.  *See* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting."

**O.      What is the Litigation Trust Loan and can I participate in it?**

The Litigation Trust Loan is a commitment by the Litigation Trust Funders to provide $15 million of funding for the Litigation Trust to pursue collection of the Litigation Claims. The Litigation Trust Loan Funders will receive the Litigation Trust Funding Fee (*i.e.*, $3 million, in the aggregate), as compensation for providing the Litigation Trust Loan. The repayment of the Litigation Trust Loan and the Litigation Trust Funding Fee to the Litigation Trust Loan Funders is first in priority from the proceeds of the Litigation Claims and before any distributions of such proceeds are made to the Litigation Trust Class A Units, as described further herein. Subject to certain limitations set forth in the Litigation Trust Documents, each Holder of an Allowed Aegean Unsecured Claim may participate in the Litigation Trust Loan if, prior to the Voting Deadline, such Holder indicates its intent to so participate by following the appropriate instructions on such Holder's ballot and then, prior to the Confirmation Hearing, executes the Restructuring Support Agreement and otherwise joins and executes any applicable Litigation Trust Documents.

**P.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **March [26], 2019 at [●] a.m. prevailing Eastern Time**. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than **March [19], 2019 at 4:00 p.m. prevailing Eastern Time** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**R.      What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to assess whether the Plan complies with each required provision of the Bankruptcy Code. If approved, the confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Epiq Corporate Restructuring, LLC, via one of the following methods:

> *By regular mail at:*
> Epiq Corporate Restructuring, LLC
> Re: Aegean Marine Petroleum Network Inc., et al.
> P.O. Box 4422

Beaverton, OR 97076-4422

By hand delivery or overnight mail at:
Epiq Corporate Restructuring, LLC
Re: Aegean Marine Petroleum Network Inc., et al.
10300 SW Allen Boulevard
Beaverton, OR 97005

*By electronic mail at:*
tabulation@epiqglobal.com
Note: Please reference "Aegean" within the subject line of your electronic mail.

*By telephone at:*
(888) 418-0324 (toll free)
(503) 520-4423 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent, Epiq Corporate Restructuring, LLC at the address above or by downloading the exhibits and documents from the website of the Notice and Claims Agent at https://dm.epiq11.com/Aegean (free of charge) or the Bankruptcy Court's website at https://ecf.nysb.uscourts.gov (for a fee).

**T.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.      BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

### A.      Corporate History and General Background

Aegean was incorporated as a Marshall Islands holding company under the Marshall Islands Business Corporations Act in June 2005.  On December 13, 2006, Aegean executed an initial public offering of common stock and listed on the New York Stock Exchange under the ticker "ANW."  Since 2006, the Debtors and their non-Debtor affiliates (collectively, "Aegean Marine") have expanded their global reach, and today operate as one of the world's largest physical suppliers of marine fuel with a sizable, modern fleet of bunkering vessels, storage facilities/terminals, and service centers dedicated to bunkering operations around the globe.

Aegean Marine maintains offices around the world in the various markets where they conduct physical supply operations.  Aegean Marine's corporate offices are located in Athens, Greece, where the company oversees certain corporate, financial and accounting, marketing, sales, and ship-management functions, and New York, New York, where the company oversees corporate, financial and accounting, marketing, sales and other functions for its U.S. operations.  Aegean Marine maintains station-level offices in various countries and cities around the world where the company conducts local bunkering operations.  Aegean Marine's offices are generally leased, except for owned office space in Kingston, Jamaica.

13

### B. Business Operations

Aegean Marine's core business is the physical supply of marine fuel (known as "bunkers") to many types of vessels, including: container ships, dry bulk carriers, cruise ships, oil tankers, and ferries. Vessel-to-vessel delivery is accomplished via a specialized "bunkering" tanker or barge that delivers bunkers directly to a recipient vessel, in port, at sea, on rivers or other waterways.

As set forth in the illustrative corporate structure chart attached hereto as **Exhibit B**, Aegean is the ultimate parent company of each Debtor in these chapter 11 cases. The remaining Debtors and non-Debtors can be grouped into four main categories: bunkering operations; management; marketing and administrative; and vessel-owning entities.

- ***Bunkering Operations***.  Aegean Marine principally transacts bunkering operations through Debtor Aegean Marine Petroleum S.A. ("AMPSA") and Debtor Aegean Bunkering (USA) LLC ("ABUSA") and operate locally in various jurisdictions through Debtor and non-Debtor direct or indirect subsidiaries.  Non-Debtor entities Aegean NEW N.V., OBAST Bunkering & Trading GmbH, and Aegean Bunkering Germany GmbH conduct the company's operations in the ARA Region (as defined below) and Germany.

- ***Ship Management***.  Aegean Marine provides for the management of bunkering vessels through: (a) Aegean Bunkering Services Inc. ("ABS") for vessels operating outside Greek territorial waters and (b) Aegean Management Services M.C., ("AMS") for vessels operating within Greek territorial waters.

- ***Marketing and Administrative Services***.  Aegean Marine provides general marketing and administrative services for bunkering operations through Aegean Oil (USA), LLC and AMPN USA, LLC.

- ***Vessel-Owning Entities***. Numerous vessel-owning entities are direct or indirect subsidiaries of Aegean Shipholdings Inc. and one vessel-owning entity is an indirect subsidiary of Aegean Holdings S.A.

#### 1. Vessels and Ship Management

As a physical supplier, Aegean Marine purchases bunkers on the spot market or pursuant to supply contracts, takes possession of the inventory for a limited period of time, ultimately reselling and delivering bunkers directly to customers.  To deliver bunkers, Aegean Marine operates a large, modern fleet of bunkering vessels of diverse sizes and types, ranging from inland waterway tankers and barges to ocean-going offshore bunkering tankers.  As of the Petition Date, Aegean Marine owned 41 vessels (the "Owned Vessels"), with an aggregate capacity of 316,778 deadweight tonnage ("dwt").[7]  The Owned Vessels are comprised of 37 double hull bunkering tankers, three double hull bunkering barges, and one single hull tanker.  In certain regions, specifically the ARA Region (as defined below) and Germany, Aegean Marine supplements its owned fleet by chartering-in additional vessels.  In the U.S., Aegean Marine contracts with third-party barge operators to deliver bunkers.  As of the Petition Date, Aegean Marine chartered-in 12 double hull bunkering tankers, three double hull in-land waterway bunkering tankers, and one bunkering barge, having an aggregate capacity of 58,219 dwt (the "Charter-In Vessels").

---

[7]    Deadweight tonnage is a measure of the carrying capacity of a vessel.

Aegean Marine typically enters into an intragroup management agreement between the corporate entity that owns the Owned Vessel and either ABS or AMS, to provide for the management of a vessel. ABS provides management services for Owned Vessels and Charter-In Vessels in territorial waters outside of Greece and AMS provides management safety services for Owned Vessels operating in Greek territorial waters. The ABS intragroup management agreement typically provides that ABS assume the technical management and the provision of services for the vessel for purposes of the International Safety Management Code. In return for the services they provide, ABS and AMS are paid a flat monthly management fee which steps up annually over the life of the agreement.

### 2. Storage Facilities

To assist with bunkering operations, Aegean Marine utilizes 13 land-based storage facilities where the company stores marine fuel in terminals to supply bunkering operations, with an aggregate storage capacity of over 1,000,000 cubic meters. The storage facilities, the majority of which are leased, are located in the U.S., Morocco, the Canary Islands, Germany, and the United Arab Emirates, and have a storage capacity of approximately 350,000, 218,000, 65,000, 33,000, and 465,000 cubic meters, respectively.

### 3. Physical Supply Locations

Aegean Marine's bunkering operations are coordinated through AMPSA and ABUSA, who are typically the Debtor counterparties to customer supply contracts and are the entities that procure the appropriate grade of bunker fuel from a supplier. Non-Debtor entities Aegean NEW N.V., OBAST Bunkering & Trading GmbH, and Aegean Bunkering Germany GmbH conduct the company's operations in the ARA Region (as defined below) and Germany. The specific process of delivering bunkers to an end customer is generally managed at the station-level in a specific jurisdiction. As of the Petition Date, Aegean Marine conducts bunkering operations in the following locations.

- *Germany*. Aegean Marine operates three double hull bunkering tankers in Germany's Baltic Sea and other North Sea ports and have access to approximately 33,000 cubic meters of onshore storage capacity. Bunkering operations are supported from offices in Hamburg and Rostock, which the company leases.

- *Gibraltar/Morocco*. Aegean Marine operates three double hull bunkering tankers in and around Gibraltar and store fuel at a storage facility with a capacity of 218,000 cubic meters, near the port of Tanger-Med in Tangiers, Morocco. Bunkering operations are supported from an office in Gibraltar, which the company leases.

- *Greece*. Aegean Marine charters-out numerous bunkering tankers and a floating storage facility to Aegean Oil S.A., which operates in Piraeus, Patras, and other parts of Greece. Bunkering operations are supported from an office in Athens, which the company leases.[8]

- *Gulf of Mexico*. Aegean Marine operates two double hull bunkering tankers in U.S. territorial waters and international waters in the Gulf of Mexico, supported by the Company's New York, New York office, which the company leases.

---

[8] Upon information and belief, Aegean Oil S.A. is owned and controlled by relatives of Mr. Dimitris Melisanidis, the founder and former majority shareholder of Aegean Marine. As of the Petition Date, Mr. Melisanidis had no known equity holdings in Aegean.

- ***Las Palmas and Tenerife***.  Aegean Marine operates two double hull bunkering tankers in Las Palmas and own the Shell Las Palmas terminal, a 20,000 square meter facility that includes a lubricants plant, a 65,000 metric ton storage facility and on-site blending facilities to mix all grades of fuel oils and distillates.  Bunkering operations are supported from an office in Las Palmas, which the company leases.

- ***Northern Europe and the Amsterdam-Rotterdam-Antwerp Region* ("ARA Region")**. Aegean Marine operates 12 double hull bunkering tankers both offshore and in numerous ports throughout Northern Europe, including the North Sea, Irish Sea (and St. George's Channel), the French Atlantic, the English Channel, Ghent, and throughout the ARA Region.  Bunkering operations are supported from an office near Antwerp, which the company leases.

- ***South Africa***.  Aegean Marine operates three double hull bunkering tankers and one floating storage facility near Port Elizabeth, South Africa.  Bunkering operations are supported from an office in Port Elizabeth, which the company leases.

- ***Trinidad and Tobago***.  Aegean Marine operates two double hull bunkering tankers in the area of Port of Spain in Trinidad and Tobago.  Bunkering operations are supported from an office in Port of Spain, which the company leases.

- ***United Arab Emirates***.  Aegean Marine charters-out two double hull bunkering tankers in the port of Fujairah region and store fuel in a storage facility with a capacity of 465,000 cubic meters in the port of Fujairah.  Bunkering operations were historically supported from offices in Fujairah and Khor Fakken, which the company leased.

- ***U.S. East Coast***.  Aegean Marine operates in the ports of New York, Philadelphia, Baltimore, Norfolk, Savannah, and Charleston and have access to approximately 300,000 cubic meters of leased tank storage to conduct operations.  Bunkering operations are supported from an office in New York, New York, which the company leases.

- ***U.S. Virgin Islands***.  Aegean Marine operates a service center in St. Croix, U.S. Virgin Islands pursuant to a cooperation agreement with Caribbean Bunkers LLC, a subsidiary of Freepoint Commodities LLC ("Freepoint"), which allows the company to market marine petroleum products supplied by Freepoint to customers calling on the Limetree Bay terminal in St. Croix.

- ***U.S. West Coast***.  Aegean Marine operates in the ports of Los Angeles and Long Beach and have access to approximately 50,000 cubic meters of leased tank storage to conduct operations. Bunkering operations are supported from an office in Los Angeles, California, which the company leases.

- ***Vancouver, Canada***.  Aegean Marine operates two double hull non self-propelled bunkering barges in the Port of Vancouver, British Columbia.  Bunkering operations are supported from an office in Vancouver, British Columbia, which the company leases.

### 4.        Charter-Out Operations

Aegean Marine also generates revenue by chartering certain Owned Vessels to third parties.  These revenues, and the associated costs of chartering are recognized over the duration of the charter.  As of the Petition Date, 15 Owned Vessels were chartered to third parties on a time-charter basis and one Owned Vessel was chartered on a voyage basis.

16

C.      **Employees**

As of the Petition Date, Aegean Marine employed approximately 850 employees in more than 20 countries across the globe, including 507 employees offshore that are involved in the day-to-day operations of the company's vessels and approximately 342 employees onshore that support the company's enterprise-wide operations. The company's employees have unique skills, knowledge, and an understanding of operations and infrastructure, which are essential to preserving operational stability and efficiency.

Certain of Aegean Marine's offshore employees are residents of nations with government-mandated collective bargaining (*i.e.*, the Republic of the Philippines, Greece, Romania, and Russia), which require the utilization of pre-approved employment contracts that typically have a term of four to six months. Certain of Aegean Marine's onshore employees in six countries—Greece, Africa, Brazil, Canada, the Canary Islands, and Gibraltar—are subject to collective bargaining agreements mandated by law. The Debtors have no defined benefit pension plans. Certain of Aegean Marine's employees operate or have generated information in countries or regions with heightened privacy laws, some of which are relatively untested.

D.      **Senior Management**

Set forth below are the names, position(s) and biographical information of members of senior management who oversee the business and Aegean Marine's affairs as of the Petition Date.

*Kostas Polydakis*, Chief Operating Officer. Mr. Polydakis has more than 20 years of experience in the shipping industry, including nearly 12 years at the Company. Prior to his appointment as Chief Operating Officer in August 2018, Mr. Polydakis served as Managing Director of Shipping, a role in which he oversaw the creation and growth of the company's shipping division. In that role, Mr. Polydakis completed over 40 sale and purchase transactions and multiple newbuilding projects and successfully reduced fleet operating expenses. In Mr. Polydakis's previous positions as Technical Manager and Deputy General Manager of the company's Bunkering Services division from 2006 to 2017, Mr. Polydakis was responsible for the performance and day-to-day operations of all division departments.

*John G. Mystakidis*, Interim Chief Financial Officer. Mr. Mystakidis has more than 25 years of experience in financial reporting, financial management and auditing, and has supported and advised clients with significant cross-border presences and foreign operations. During 11 years at Ernst & Young, Mr. Mystakidis acted as Lead Partner to multiple large Greek and multinational companies, helping them to address and resolve critical financial issues. In May 2018, Mr. Mystakidis began serving as a full-time consultant to the company and was appointed Chief Financial Officer in August 2018. Prior to Ernst & Young, Mr. Mystakidis was an Assurance and Business Advisory Partner at Arthur Andersen, where he supervised audits and due diligence reviews for a number of Greek and multinational clients.

*Salvatore Drago*, Global Director of Supply and Trading. Mr. Drago has over 25 years of experience trading fuel oil, feedstock and fuel blending components for key global bunkering locations. Mr. Drago previously served as Global Director of Supply and Trading, the position to which he recently returned, leading the company's arbitrage cargo movements, fuel oil blending and risk management efforts. Previously, Mr. Drago spent nine years at Hess Corporation, where he was Managing Director, Fuel Oil and Feedstock Trading. At Hess, Mr. Drago led the company's transition from a fuel oil wholesaler to a fully integrated supply and trading organization, with retail bunkering operations in five U.S. ports.

*Spyridon Fokas*, General Counsel. Mr. Fokas has served as the General Counsel since June 2005. Mr. Fokas has been practicing maritime law since 1982 and began representing Aegean Marine in 1998.

Mr. Fokas is a member of the Greek Maritime Law Association and the Hellenic Society of Maritime Lawyers.  Mr. Fokas holds a law degree from the University of Athens School of Law and has undertaken post-graduate studies in shipping law at the University College London.

### E.    Aegean Board of Directors

As of the date of this Disclosure Statement, the following persons comprise the board of directors of Aegean Marine Petroleum Network Inc.: Donald Moore (Chairman of the Board); Tyler Baron (Director); Raymond Bartoszek (Director); Spyridon Fokas (Director); George J. Konomos (Director); Konstantinos Koutsomitopoulos (Director); Yannis N. Papanicolaou (Director); and David Gallagher (Director).

### F.    Prepetition Capital Structure

As of the Petition Date, the Debtors were liable for approximately $855 million in aggregate funded debt.  The Debtors' prepetition capital structure is summarized as follows:

| Indebtedness | Balance Outstanding as of Petition Date |
|---|---|
| Global Credit Facility | $249,569,260 |
| U.S. Credit Facility | $131,338,116 |
| 2017 Secured Term Loan | $13,500,000 |
| 2017 South Africa Secured Term Loan | $5,984,585 |
| 2015 Fujairah Secured Term Loan | $90,335,430 |
| 2008 Newbuilding Secured Term Loan | $18,717,000 |
| 2007 Newbuilding Secured Term Loan | $9,158,800 |
| First 2006 Newbuilding Secured Term Loan | $33,459,740 |
| Second 2006 Newbuilding Secured Term Loan | $6,564,028 |
| Third 2006 Newbuilding Secured Term Loan | $12,200,500 |
| 2005 Newbuilding Secured Term Loan | $11,670,000 |
| 2018 Barge Secured Term Loan | $5,000,000 |
| 4.00% Convertible Unsecured Notes due 2018 | $94,550,000 |
| 4.25% Convertible Unsecured Notes due 2021 | $172,500,000 |
| **TOTAL** | **$854,547,459** |

These obligations are generally summarized below:

### 1.    Working Capital Credit Facilities

### (a)    Global Credit Facility

As of the Petition Date, the Debtors had a total of $249,569,260 aggregate principal amount outstanding, including letters of credit, under that certain Facility Agreement for a Borrowing Base Facility, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH and Aegean Petroleum Uruguay S.A., as co-borrowers and guarantors, Aegean, as guarantor, ABN AMRO Bank N.V., as arranger, documentation bank, facility agent, collateral management agent, security agent, and certain financial institutions, as lender, issuing banks, and overdraft banks thereto (the "Global Credit Facility"). Borrowings under the Global Credit Facility will mature, and lending commitments thereunder will terminate on, November 30, 2020, and all obligations and the guarantees of those obligations are secured by a first priority lien on certain assets of each co-borrower that make up the borrowing base assets, including certain inventory, receivables and goods as well as the assignment of documents and agreements

and pledge of certain accounts of the co-borrowers. In August 2018, Mercuria Energy Trading S.A. became the sole lender under the Global Credit Facility. Pursuant to the Final Order (as defined below), all obligations and amounts owing under the Global Credit Facility have been rolled up into the DIP Facilities on a final basis.

### (b)    U.S. Credit Facility

As of the Petition Date, the Debtors had a total of $131,688,116 aggregate principal amount outstanding, including letters of credit, under that certain Second Amended and Restated Security Uncommitted Credit Agreement, dated as of August 3, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering (USA) LLC, as borrower, ABN AMRO Capital USA, as administrative agent, collateral agent, syndication agent, and the lender thereto (the "U.S. Credit Facility"). Borrowings under the U.S. Credit Facility would have matured on November 8, 2018. All obligations under the U.S. Credit Facility are secured by a first priority lien on all of the assets of Aegean Bunkering (USA) LLC as well as a pledge of 100 percent of the equity of Aegean Bunkering (USA) LLC owned by its parent, AMPNI Holdings Co. Limited. In August 2018, Mercuria US Asset Holdings, LLC became the sole lender under the U.S. Credit Facility. Pursuant to the Final Order (as defined below), all obligations and amounts owing under the U.S. Credit Facility have been rolled up into the DIP Facilities on a final basis.

### 2.    Secured Term Loans

### (a)    2017 Secured Term Loan

As of the Petition Date, the Debtors had a total of $13,500,000 aggregate principal outstanding under that certain Loan Agreement, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering Services Inc., as borrower, Aegean, Amorgos Maritime Inc., Kimolos Maritime Inc., Milos Shipping (Pte.) Ltd., Mykonos I Maritime Limited and Tinos Marine Inc., as co-guarantors, and Piraeus Bank S.A., as lender (the "2017 Secured Term Loan"). The 2017 Secured Term Loan matures on November 30, 2022, and all obligations under the 2017 Secured Term Loan are secured by a first priority mortgage on certain vessels—*Amorgos, Kimolos, Milos, Mykonos* and *Syros*—as well as a pledge of certain earning and retention accounts.

### (b)    2017 South Africa Secured Term Loan

As of the Petition Date, the Debtors had a total of $5,984,585 aggregate principal outstanding under that certain Loan Agreement, dated as of November 20, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering Services Inc. and Nevado Navigation S.A., as co-borrowers, Aegean, Aegean Management Services M.C., Aegean Ship III Maritime Company, Aegean Ship VIII Maritime Company, Aegean Ace Maritime Company and Aegean Tanking S.A., as co-guarantors, and Piraeus Bank S.A., as lender (the "2017 South Africa Secured Term Loan"). The 2017 South Africa Secured Term Loan matures three years from the Drawdown Date (as that term is defined in the 2017 South Africa Secured Term Loan Agreement), and all obligations under the 2017 South Africa Secured Term Loan are secured by a first priority mortgage on certain vessels—*Aegean III*, *Aegean VIII*, *Aegean Ace*, and *Umnenga I*—as well as a pledge of certain earnings accounts and specific assignments of charterparty documents.

### (c)    2015 Fujairah Secured Term Loan

As of the Petition Date, the Debtors had a total of $90,335,430 aggregate principal outstanding under that certain Term Loan Facility Agreement, dated as of October 7, 2015 (as amended, restated,

modified, or supplemented from time to time), by and among Aegean Oil Terminal Corporation, as borrower, Aegean, as guarantor, United Arab Bank P.J.S.C., as agent, security agent and lender thereto (the "2015 Fujairah Secured Term Loan"). The 2015 Fujairah Secured Term Loan matures on September 30, 2023, and all obligations under the 2015 Fujairah Term Loan Facility are secured by substantially all of the assets of Aegean Oil Terminal Corporation.

### (d)    2008 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $18,717,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of April 24, 2008 (as amended, restated, modified, or supplemented from time to time), by and among Kassos Navigation S.A., Symi Navigation S.A., Halki Navigation S.A. and Tilos Shipping (PTE.) LTD., as co-borrowers, Aegean and Aegean Shipholdings Inc., as co-guarantors, Aegean Baltic Bank S.A., as arranger, agent, security agent, account bank, and lender thereto (the "2008 Newbuilding Secured Term Loan"). The 2008 Newbuilding Secured Term Loan matures on June 30, 2020, and all obligations under the 2008 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kassos*, *Tilos*, *Halki*, and *Symi*— as well as a pledge of certain operating accounts and assignments of certain contracts and refund guarantees.

### (e)    2007 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $9,158,800 million aggregate principal amount outstanding under that certain Loan Agreement, dated as of July 5, 2007 (as amended, restated, modified, or supplemented from time to time), by and among Andros Marine Inc., Dilos Marine Inc., Ios Shipping Ltd, Sifnos Marine Inc. and Aegean VII Shipping Ltd., as co-borrowers, Aegean, as guarantor, and Orix Investment and Management Private Ltd., as lender thereto (the "2007 Newbuilding Secured Term Loan"). The 2007 Newbuilding Secured Term Loan matures in part on February 3, 2020, May 4, 2020 and September 7, 2020, and all obligations under the 2007 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Andros*, *Dilos*, *Ios I*, *Anafi* and *Sikinos*—as well as a pledge of certain operating accounts, and assignments of certain contracts and refund guarantees.

### (f)    First 2006 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $33,459,740 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 1, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Kerkyra Marine S.A., Ithaki Marine S.A., Cephallonia Marine S.A., Paxoi Marine S.A., Zakynthos Marine S.A., Ios Marine Inc. and Kythira Marine S.A., as co-borrowers, Aegean, Aegean Shipholdings Inc., Aegean Breeze Maritime Company and Aegean Tiffany Maritime Company, as co-guarantors, Aegean Baltic Bank S.A., as arranger, agent, security agent, account bank, and lender thereto (the "First 2006 Newbuilding Secured Term Loan"). The First 2006 Newbuilding Secured Term Loan matures on December 31, 2019, and all obligations under the First 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kerkyra*, *Ithaki*, *Kefalonia*, *Paxoi*, *Zakynthos*, *Lefkas*, *Kythira*, *Aegean Tiffany*, and *Aegean Breeze*—as well as a pledge of certain operating accounts, and assignments of certain contracts and refund guarantees.

### (g)    Second 2006 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $6,564,028 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 27, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Tasman Seaways Inc. and Santon Limited, as co-borrowers, Aegean and Aegean Bunkering Services Inc., as co-guarantors, and the National Bank of Greece S.A., as lender thereto (the "Second 2006 Newbuilding Secured Term Loan"). The Second 2006

Newbuilding Secured Term Loan matures in part on November 30, 2018 and April 30, 2020, and all obligations under the Second 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kalymnos and Leros*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

### (h)    Third 2006 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $12,200,500 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 25, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Eton Marine LTD., Benmore Services S.A. and Ingram Enterprises Co., as co-borrowers, Aegean, Aegean Shipholdings Inc. and Sealand Navigation Inc., as co-guarantors, and Aegean Baltic Bank S.A. as arranger, agent, security agent, account bank, and lender thereto (the "Third 2006 Newbuilding Secured Term Loan"). The Third 2006 Newbuilding Secured Term Loan matures on December 31, 2019, and all obligations under the Third 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Patmos, Nisyros, Karpathos*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

### (i)    2005 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $11,670,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of August 30, 2005 (as amended, restated, modified, or supplemented from time to time), by and among Kithnos Maritime Inc., Lefkas Marine S.A., Paros Maritime Inc., Santorini I Maritime Limited and Serifos Shipping (Pte.) Ltd., as co-borrowers, Aegean, Aegean Shipholdings Inc., Aegean Bunkering Services Inc. and Tempest Shiptrade Ltd., as co-guarantors, and Aegean Baltic Bank S.A. as arranger, agent, security agent, account bank, and lender thereto (the "2005 Newbuilding Secured Term Loan"). The 2005 Newbuilding Secured Term Loan matures on January 7, 2019, and all obligations under the Third 2005 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kithnos, Naxos, Paros I, Santorini* and *Serifos*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

### (j)    2018 Barge Secured Term Loan

As of the Petition Date, the Debtors had a total of $5,000,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of September 7, 2018 (as amended, restated, modified, or supplemented from time to time), by and among AMPSA, as borrower, Aegean and I.C.S. Petroleum Limited, as co-guarantors, and Mercuria Energy Trading S.A., as lender thereto (the "2018 Barge Secured Term Loan"). The 2018 Barge Secured Loan matures on January 31, 2019, and all obligations under the 2018 Barge Secured Term Loan are secured by a first priority mortgage on certain vessels—*PT22 and PT40*.

### 3.    Unsecured Convertible Notes

### (a)    4.00% Unsecured Convertible Notes due 2018

As of the Petition Date, Aegean had approximately $94,550,000 principal amount outstanding 4.00% convertible senior unsecured notes due 2018, issued pursuant to that certain Senior Indenture, dated as of October 23, 2013 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine, as issuer, and Deutsche Bank Trust Company Americas, as trustee (the "4.00% Unsecured Convertible Notes"). The 4.00% Unsecured Convertible Notes matured on November 1, 2018 and require semi-annual coupon payments at an interest rate of 4.00% per year.

(b)      **4.25% Unsecured Convertible Notes due 2021**

As of the Petition Date, Aegean had approximately $172,500,000 principal amount outstanding 4.25% convertible senior unsecured notes due 2021, issued pursuant to that certain Indenture, dated as of December 19, 2016 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine, as issuer, and U.S. Bank National Association, as trustee (the "4.25% Unsecured Convertible Notes").  The 4.25% Unsecured Convertible Notes mature on December 15, 2021 and require semi-annual coupon payments at an interest rate of 4.25% per year.

4.      **Aegean's Publicly-Trade Common Stock**

As of Petition Date, Aegean had approximately 58.19 million shares of common stock, par value $0.01, issued and outstanding.  Aegean's common stock trades on the NYSE under the ticker "ANW."  As of the Petition Date, approximately 30 percent of Aegean's outstanding common stock was held by Mercuria Asset Holdings (Hong Kong) Limited.

# V.      EVENTS LEADING TO THE CHAPTER 11 CASES

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These factors included rising oil prices, limited liquidity after lenders under the Global Credit Facility and U.S. Credit Facility reduced the borrowing limits under each facility and imposed other conditions further limiting borrowing capacity, changes in trade terms provided by certain fuel vendors, the Debtors' failure to timely file audited financial statements, and the June 4, 2018 announcement that approximately $200 million of account receivables may be written off because the underlying transactions were likely without economic substance.

A.      **Prepetition Challenges**

Beginning in the third quarter and continuing through the fourth quarter of 2017, the Debtors' operational and financial performance began to deteriorate, with a sharp decline in bunker sales volumes, operating losses, and negative EBITDA.  Operationally, the Debtors' struggles resulted from increased competition in certain supply markets which decreased sales volumes and compressed margins. Financially, the Debtors' results were hampered by certain non-recurring expense charges resulting from the wind down of physical supply operations in certain jurisdictions and $12 million in losses on hedging contracts as oil prices climbed higher in late 2017.  Results in the first quarter of 2018 remained in a depressed but steady state compared to the fourth quarter of 2017, as industry competition persisted which forced the Debtors to restrain sales volumes in ports and business lines with lower profit margins.

On February 20, 2018, the Debtors announced the proposed acquisition of all outstanding shares of H.E.C. Europe Limited ("H.E.C.") from the shareholders of H.E.C. for aggregate consideration of approximately $367 million, including the assumption of certain debt.  The Debtors proposed to fund the H.E.C. acquisition via the issuance of 20 million newly issued shares of Aegean common stock, cash, an unsecured note, and certain accounts receivable that were not included as collateral under either the Global Credit Facility or the U.S. Credit Facility.  The significant dilution resulting from the to-be-issued common stock caused Aegean's common stock to drop close to 40 percent on the day the Debtors' announced the H.E.C. acquisition.  The announcement of the H.E.C. acquisition also raised concerns among the Debtors' lenders regarding the genesis of the accounts receivable not included as collateral under with the Global Credit Facility or U.S. Credit Facility.

In a letter dated February 28, 2018, the Debtors requested that ABN AMRO Bank N.V. ("ABN AMRO"), the agent under the Global Credit Facility, and the lenders thereto (the "Global Credit Facility

Lenders") consent and agree to the H.E.C. acquisition and waive certain provisions under the relevant financing agreement and financing documents related to the Global Credit Facility so that the Debtors could pursue the proposed H.E.C. acquisition. In a separate letter on the same date, the Debtors also sought the waiver and consent of ABN AMRO and the Global Credit Facility Lenders regarding the Debtors' breach of the interest coverage ratio under the Global Credit Facility. ABN AMRO responded to the Debtors' letters on March 6, 2018, and notified the Debtors that they were also in breach of various covenants requiring the timely delivery of financial statements, a default that, together with the default under the interest rate coverage ratio, would be temporarily waived if the Debtors agreed to certain conditions, including a reduction of borrowing base availability under the Global Credit Facility and delivery of daily reporting regarding the Debtors' borrowings, among other things, and setting a March 16, 2018 deadline by which the Debtors must fully remedy such defaults.[9]

The reduction of available borrowings under the Global Credit Facility constrained the Debtors' ability to operate efficiently because the Debtors lacked sufficient liquidity to purchase enough fuel to achieve breakeven levels, given its fixed costs, and to satisfy customer orders at a time when fuel prices were increasing.

During the same time period, certain fuel suppliers that had previously provided open credit to the Debtors began requesting that the Debtors post a letter of credit or even prepay when purchasing fuel; an impossible request given the Debtors' lack of liquidity. Concerns about the Debtors' credit quality continued to gain traction in the marketplace when certain credit insurance companies serving the marine fuels space cancelled their coverage of receivables from the Debtors due to Aegean's inability to file audited financials, which was reported to the SEC on April 30, 2018. This contagion also spread to Aegean Marine's customer base, as inquiries to quote and purchase bunkers dropped precipitously during May 2018. Some customers communicated that they would delay further purchases from the Debtors until the company demonstrated more stability, while others reported having been notified by their banks that the company was in distress. These issues had a cascading effect on the Global Credit Facility, eroding borrowing availability first via reduced fuel inventory levels and later by reduced accounts receivable, which in turn reduced the overall value of the borrowing base and eliminated the Debtors' ability to secure letters of credit to purchase fuel. As volumes fell, gross profit could not cover fixed costs leading to negative free cash flow. While accounts receivable were converting to cash, this cash was consumed by operating costs such that less liquidity was available to procure additional fuel. The lack of liquidity was exacerbated by the burden of professional fees related to the Debtors' advisors and those of the lenders under the Global Credit Facility.

Then, on June 4, 2018, the Debtors disclosed that $200 million of accounts receivable would likely be written off because the underlying transactions were likely without economic substance, causing Aegean's common stock to close down approximately 75 percent that day. Following this disclosure, the Debtors experienced additional deterioration in customer activity. But even when the Debtors had customer orders to satisfy, the Debtors often, as noted above, lacked sufficient liquidity to procure fuel for delivery.

---

[9]    On March 8, 2018, RBM Holdings LLC ("RBM") filed a complaint in the United States District Court for the Southern District of New York, seeking, among other things, preliminary and final injunctive relief to enjoin Aegean from entering into the H.E.C. acquisition. RBM's members were Tyler Baron, Justin Moore, and August Roth. Aegean and RBM reached a settlement in April 2018 that resulted in the appointment of three new independent members of the board of directors (the "New Independent Directors" as defined and used herein), agreements regarding the composition of certain committees of the board of directors, and other agreements in exchange for the voluntary dismissal of RBM's complaint. Prior to the settlement, on March 27, 2018, Aegean announced that all necessary approvals to consummate the H.E.C. acquisition had not been satisfied or waived and thus the H.E.C. acquisition was terminated in accordance with its terms.

In fact, on multiple business days during June 2018, the company had zero borrowing base availability and thus no liquidity, causing fuel inventories in certain critical supply hubs to virtually run dry.

Further exacerbating matters, the Debtors and their advisors had to negotiate daily with the syndicate of lenders under the Global Credit Facility and U.S. Credit Facility regarding short term waivers of continuing covenant defaults under these facilities. These negotiations, however, did not provide the Debtors with additional liquidity. Instead, these lenders required the Debtors to submit to extensive and ongoing financial reporting requirements, and urgently pursue strategic alternatives and contingency planning initiatives by certain milestones, while at the same time formally reducing the size of the credit facilities yet further. By the end of June 2018, the size of the Global Credit Facility had been reduced from $750 million to $300 million and size of the U.S. Credit Facility had been reduced from $250 million to $155 million. Below is a graphic representation of the challenges the Debtors faced through June 2018.



### B.    Appointment of Independent Directors and Composition of the Audit Committee

On May 2, 2018, the Debtors announced that Donald Moore, Tyler Baron, and Raymond Bartoszek, (the "New Independent Directors"), had been appointed to Aegean's board of directors (the "Board of Directors"), effective immediately. The appointment of the New Independent Directors increased the number of independent directors on the Board of Directors to six members.[10]  On May 22, 2018, the Debtors announced that Donald Moore had been appointed to serve as Chairman of the Board of Directors. On June 4, 2018, the Debtors announced that the audit committee of the Board of Directors (the "Audit Committee") had been recomposed of only the New Independent Directors, with Tyler Baron serving as Chair of the Audit Committee.

### C.    Prepetition Initiatives

Recognizing the substantial challenges facing the company, and the need to explore all restructuring initiatives, the Debtors retained Ernst & Young LLP ("E&Y") as their restructuring advisor, and Kirkland & Ellis LLP ("Kirkland") as their legal advisor in the spring of 2018, and then Moelis &

---

[10]    The other independent directors on Aegean's Board of Directors at that time were Yiannis N. Papanicolaou, George J. Konomos, and Konstantinos Koutsomitopoulos.

Company ("Moelis") as their financial advisor and investment banker in early July 2018. Together, these advisors assisted the Debtors with financial and operational initiatives, lender negotiations, and contingency planning, including reviewing and analyzing potential sale and/or financing transactions both out-of-court and in-court.

During June and July 2018, the Debtors and their advisors engaged in good-faith negotiations with certain third party financial and strategic investors as well as an ad hoc committee of Unsecured Noteholders (the "Ad Hoc Group") to explore and evaluate strategic alternatives and possible liquidity-generating transactions. These discussions included discussions with multiple financial investors regarding potential sale-leaseback and second lien financing transactions and multiple strategic investors regarding partnership opportunities such as a trade finance facility, joint venture, and/or acquisition. Of these strategic investors, seven executed non-disclosure agreements and five submitted diligence requests. One of these strategic investors was Mercuria.

In early July 2018, the Debtors determined after good faith, hard-fought negotiations that a proposal provided by Mercuria provided the best available path forward. At the time this decision was made, the Debtors had significantly reduced ordinary course operations due to the lack of liquidity and the splintering of many customer and supplier relationships.

### 1. Mercuria Transaction

On July 5, 2018, Aegean announced the entry of a memorandum of understanding (the "MOU") with Mercuria Energy Group Limited ("MEG"), which contemplated, among other things, refinancing the U.S. Credit Facility and Global Credit Facility by August 15, 2018, the provision of interim credit support to enhance liquidity, and other terms predicated on a potential future global strategic partnership between Mercuria and Aegean Marine. The MOU granted Mercuria limited exclusivity, subject to certain key carve-outs (including with respect to the Ad Hoc Group), to explore the strategic partnership. On August 21, 2018, Aegean filed a Form 6-K announcing that Mercuria had: (a) become the sole lender under both the U.S. Credit Facility and Global Credit Facility after acquiring all interests of the prior facility lenders in each of these facilities; (b) agreed to extend existing default waiver agreements for these facilities; and (c) agreed to provide $30 million of additional liquidity to Aegean Marine by way of amendments and waivers to the facilities and other financing arrangements. Mercuria also agreed to support operations by "sleeving" inventory (as described below) and providing other liquidity enhancing measures. In return, Aegean issued to an affiliate of MEG new common stock constituting 30 percent of Aegean's then outstanding common stock on a pro-forma basis and the Board of Directors unanimously agreed to expand the Board of Directors, and appoint a representative of Mercuria—David Gallagher—to the board.

Mercuria's injection of liquidity was a literal lifeline at a point when the Debtors' operations had all but ground to a halt. The Debtors and Mercuria then worked diligently in the weeks following both the announcement and completion of the transaction to reestablish customer relationships, increase sales volumes, improve cash flows, and regenerate the borrowing base.

### 2. Cost-Cutting Initiatives

Subsequent to executing the MOU, the Debtors also implemented internal cost-cutting and restructuring initiatives. In particular, the Debtors decreased onshore employee headcount by 14 percent, substantially reduced corporate overhead expenses, and realized or will realize substantial cost reductions from the following internal restructuring initiatives: (a) exiting bunkering operations in Fujairah, U.A.E. and Piraeus, Greece; (b) reconfiguration of bunkering vessels in and around Gibraltar and in the ARA Region; (c) winding down certain of the Debtors' (i) back-to-back trading operations', including four sales

offices related to these operations, and (ii) marine lubricants business; and (d) relocating the company's corporate offices in Greece.

### D.    Audit Committee Investigation

Following the June 4 announcement of the potential $200 million accounts receivable write-off, the Audit Committee began working closely with Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") to accelerate the investigation (the "Investigation") which had formally commenced in December 2017. To date, the Audit Committee and Arnold & Porter have committed substantial resources and efforts to the Investigation, and have plenary authority to review related party transactions and to follow leads wherever they go. Moreover, no legacy member of the Board of Directors has any role on the Audit Committee or oversight of the Investigation.

On November 2, 2018, the Debtors and the Audit Committee issued a press release and 6-K announcing the results of the Investigation as of the date of the filing. Pursuant to that press release, the Audit Committee alleged the following:

- The Audit Committee believes up to $300 million of the Debtors' cash and other assets may have been misappropriated through fraudulent activities. The Audit Committee believes that the principal beneficiary of the alleged misappropriation is OilTank Engineering & Consulting Ltd. ("OilTank"), a company based in Fujairah, United Arab Emirates and incorporated on March 15, 2010 in the Marshall Islands. On March 31, 2010, OilTank entered into a contract with a subsidiary of Aegean to oversee the construction of the Fujairah Oil Terminal Facility (the "Fujairah Facility"). The Audit Committee believes that this contract may have been used to misappropriate the Debtors' funds through inflated contracts and fraudulent pricing. The Audit Committee has reason to believe that OilTank is controlled by a former affiliate of the Debtors (the "Former Affiliate").

- As of December 31, 2017, the Debtors and their subsidiaries had an aggregate of approximately $200 million in accounts receivable that arose from purported commercial transactions in 2015, 2016, and 2017 that may have lacked economic substance, as the relevant counterparties were shell companies owned or controlled by former employees or affiliates of the Debtors with no material assets or operations. The Audit Committee believes that the receivables may have been improperly recorded as part of a potential scheme to facilitate and conceal an alleged extensive misappropriation of the Debtors' assets channeled to OilTank, but accounted for as transactions with these shell companies. The Audit Committee has further confirmed that the approximately $200 million of receivables are uncollectible and will be written off.

- The Investigation also uncovered additional potential actions to defraud the Debtors and its subsidiaries, including prepayments for future oil deliveries that were never made. These potential fraudulent activities appear to have commenced as early as 2010.

- The alleged misappropriation of the Debtors' assets, and the alleged fraudulent accounting entries and fictitious documentation designed to conceal it, involved over a dozen employees, including former members of senior management. The employees who directed the alleged scheme, which involved the creation of falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third party certifications, among others, have been terminated.

26

- The Audit Committee believes that this alleged misconduct occurred in part because the Former Affiliate exerted control over personnel and assets through inappropriate means, including threats of economic retaliation and physical violence.

In that same press release on November 2, 2018, the Audit Committee and the Debtors stated that the Debtors intend to take appropriate steps to seek redress from responsible individuals and other parties for the harm to the Debtors caused by their involvement in the activities described above, including instituting legal proceedings and seeking to seize assets in applicable jurisdictions wherever feasible and appropriate. The Audit Committee and the Debtors also stated that they had previously voluntarily reported their preliminary findings to the SEC and the U.S. Department of Justice and that on October 3, 2018, the Debtors had received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York in connection with suspected felonies. The Debtors have received an administrative subpoena from the SEC. The Debtors continue to cooperate with the government and respond to their requests.

Given the impact of the foregoing, the Audit Committee concluded that the Debtors' financial statements for (i) the fiscal years ended December 31, 2015 and December 31, 2016 included in the annual reports on Form 20-F for such years, (ii) the interim periods within such fiscal years included in the reports on Form 6-K for such periods, (iii) the periods ended March 31, 2017, June 30, 2017, September 30, 2017 included in the reports on Form 6-K for such periods, and (iv) related press releases describing the Debtors' financial results for such periods, as well as the fourth quarter of each of 2015, 2016 and 2017 (and the year ended December 31, 2017), should no longer be relied upon.

### E.    The DIP Financing and Chapter 11 Filing

Notwithstanding the benefits achieved through the transactions completed with Mercuria following the MOU and the cost-cutting and restructuring measures undertaken by the Debtors, substantial challenges faced the Debtors, which led them to explore restructuring alternatives. One such alternative was to pursue a restructuring through a chapter 11 process.

Beginning in September 2018, the Debtors and their advisors began focusing on procuring debtor-in-possession financing ("DIP financing") to sustain operations during these chapter 11 cases. In October 2018, Moelis engaged with 24 potential financing sources, of which nine signed non-disclosure agreements. Of the nine who signed non-disclosure agreements, six parties expressed some interest in potentially providing DIP financing, although none of these six parties ultimately submitted a DIP financing proposal.

In parallel, the Debtors engaged with existing creditors Mercuria and the Ad Hoc Group to provide DIP financing. Negotiations with these parties accelerated significantly in the weeks before the Petition Date, and ultimately, both Mercuria and the Ad Hoc Group provided DIP financing proposals that were each tied to restructuring transactions. For Mercuria, the proposed transaction was a sale process with Mercuria serving as stalking horse bidder through a credit bid of Mercuria's prepetition secured debt and $15 million of cash consideration. For the Ad Hoc Group, the proposed transaction was a restructuring support agreement between the Debtors and the Ad Hoc Group that memorialized the plan treatment for each proposed class of creditors.

### 1.    Ad Hoc Group DIP Financing Proposal

The Ad Hoc Group provided a DIP financing proposal that contemplated (i) an asset-backed revolving loan credit facility provided by Goldman Sachs Lending Partners LLC or an affiliate ("GSLP") and other institutions participating in the facility, (ii) a "first in last out" term loan, provided and fully backstopped by certain Holders of the Unsecured Notes, and (iii) a second lien term loan provided by certain

Holders of the Unsecured Notes.  This DIP financing proposal was tied to a restructuring support agreement that contemplated a standalone reorganization via a chapter 11 plan, the terms of which involved rolling certain of the DIP financing facilities into exit financing, the reinstatement of the Secured Term Loans, reinstatement or payment in full of all general unsecured claims at entities other than Aegean, and a split of equity, warrants, and additional consideration for all general unsecured claims at Aegean (including the Unsecured Notes).  Ultimately, the Ad Hoc Group was, *inter alia*, unable to obtain committed financing from GSLP or another third party to provide DIP financing as of the Petition Date and thus there was no actionable DIP financing proposal ever made by the Ad Hoc Group.

### 2.    Mercuria DIP Financing Proposal

The DIP financing proposal provided by Mercuria involved Mercuria rolling up the Prepetition Secured Credit Facilities into the postpetition DIP Facilities consisting of a (i) $160 million U.S. revolving credit facility, (ii) $72 million multiple delayed draw term loan credit facility, and (iii) $300 million global revolving credit facility.  The Mercuria proposal also contemplated the continuation of other liquidity enhancing measures such as hedging and sleeving.[11]  This proposal was tied to a sale process, the terms of which were memorialized in bidding procedures and a stalking horse asset purchase agreement (the "Stalking Horse Sale Process") which the Debtors filed shortly after the Petition Date.

## VI.    EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Pleadings and Other Case Matters

### 1.    First Day Pleadings

To facilitate the administration of the chapter 11 cases and minimize disruption to the Debtors' business operations, the Debtors filed certain motions with the Bankruptcy Court on the Petition Date seeking certain relief summarized below.  The relief sought in the "first day" pleadings facilitated the Debtors' seamless transition into chapter 11 and preserved the value the Debtors' enterprise.  Further information and a brief description of each of the first day motions and the evidence in support thereof is set forth in the *Declaration of Andrew Hede, Restructuring Advisor to Aegean Marine Petroleum Network Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 9] (the "Hede First Day Declaration").  The first day motions included the following:

- *Wages*.  On November 9, 2018, the Bankruptcy Court entered an interim order authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto [Docket No. 53].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 155].

---

[11]    The term "sleeving" refers to a credit enhancement transaction commonly used in the commodity trading industry where one party (X) with a strong balance sheet provides "credit" to another party (Y) whose liquidity is limited or may be otherwise unavailable from other sources.  The sleeving transaction could be a purchase or sale transaction and most commonly occurs where either (i) Y seeks to have X acquire inventory from a third party (Z) and sell that inventory to Y on extended credit terms or for delivery to Y at a later date (thereby having X carry the inventory on its balance sheet and relieving Y of this obligation), or (ii) X purchases inventory from Y on shorter payment terms (or on an immediate pay basis) and X delivers product to Z on standard credit terms, alleviating the need for Y to carry the inventory on its balance sheet or to reduce the timing for turnover.

- ***Cash Management***.  On November 9, 2018, the Bankruptcy Court entered an interim order approving the Debtors' motion seeking authority to (i) operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations thereto and (ii) continue intercompany transactions and funding consistent with the Debtors' historical practices [Docket No. 53] (the "Cash Management Motion").  On November 27, 2018, the Committee filed a limited objection to approval of the Cash Management Motion on a final basis [Docket No. 110].  Following negotiations regarding a global resolution of the issues raised in such objection (discussed further below), the Committee agreed, consistent with and subject to the Restructuring Support Agreement, to withdraw its objection to the relief requested in the Cash Management Motion.  On December 17, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 237].

- ***Insurance***.    On November 16, 2018, the Bankruptcy Court entered an interim order authorizing, but not directing, the Debtors to (a) continue their prepetition insurance coverage and surety bond program, (b) satisfy prepetition obligations thereto, (c) renew, supplement, or enter into new insurance policies and surety bonds in the ordinary course of business on a postpetition basis, and (d) continue to pay brokerage fees [Docket No. 85].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 153].

- ***Foreign Claims, Lien Claims, 503(b)(9) Claims, and HSE and Other Claims***.  On November 9, 2018, the Bankruptcy Court entered an interim order (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business all prepetition and postpetition amounts owing on account of (i) foreign claims, (ii) lien claims, (iii) 503(b)(9) claims, and (iv) HSE and other claims, and (b) confirming the administrative expense priority of certain outstanding purchase orders and authorizing the payment of such obligations in the ordinary course of business [Docket No. 54].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 150].

- ***Taxes***.  On November 16, 2018, the Bankruptcy Court entered an interim order authorizing, but not directing, the Debtors to pay and remit (a) certain prepetition taxes and fees and (b) certain taxes and fees that arise in the ordinary course of business on a postpetition basis [Docket No. 81].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 154].

- ***Hedging***.    On November 16, 2018, the Bankruptcy Court entered an interim order (a) authorizing, but not directing, the Debtors to (i) continue prepetition hedging practices, (ii) commence postpetition hedging practices, (iii) pay hedging obligations, whether they arose prepetition or postpetition, in the ordinary course of business, and (b) granting superpriority claims on account of postpetition hedging obligations [Docket No. 83].  On November 27, 2018, the Committee filed a limited objection to approval of such relief on a final basis [Docket No. 111].  Following negotiations regarding a global resolution of the issues raised in such objection, the Committee agreed, consistent with and subject to the Restructuring Support Agreement, to withdraw its objection.  On December 17, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 238].

- ***Automatic Stay Enforcement***.  On November 16, 2018, the Bankruptcy Court entered an order granting the Debtors' request for an order restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* provisions of the Bankruptcy Code and approving the form and manner of notice thereto [Docket No. 88].

- *Utilities*. On December 6, 2018, the Bankruptcy Court entered an order granting the Debtors' request to (a) establish procedures for, among other things, determining adequate assurance for utility providers, (b) prohibit utility providers from altering, refusing, or discontinuing services, and (c) determine that the Debtors are not required to provide any additional adequate assurance [Docket No. 151].

Each of the foregoing first day motions, the Hede First Day Declaration, and all orders for relief granted in these chapter 11 cases, can be viewed free of charge at https://dm.epiq11.com/Aegean.

### B.    Other Procedural and Administrative Motions

To facilitate the efficient administration of the chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the chapter 11 cases [Docket No. 3];

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, schedules of current income and expenditures, statements of financial affairs, and reports pursuant to Federal Rule of Bankruptcy Procedures 2015.3 [Docket No. 82];

- establishing certain notice, case management, and administrative procedures on an interim basis [Docket No. 109];

- allowing the Debtors to prepare a list of creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and to file a consolidated list of the Debtors' 30 largest creditors, as well as other related relief, on an interim basis [Docket No. 89] and on a final basis [Docket No. 152];

- allowing the Debtors to retain and compensate certain professionals utilized in the ordinary course of business [Docket No. 157]; and

- approving the procedures for the interim compensation and reimbursement of retained professionals in the chapter 11 cases [Docket No. 161].

### C.    Other Matters Relevant to these Chapter 11 Cases

#### 1.    Retention of Debtors' Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these chapter 11 cases. These professionals include: (a) Kirkland & Ellis LLP, as legal counsel; (b) EY Turnaround Management Services LLC, as restructuring advisor; (c) Moelis & Company LLC, as financial advisor and investment banker; (d) Kobre & Kim LLP, as special asset recovery counsel; (e) Arnold & Porter Kaye Scholer LLP, as special counsel; and (f) Epiq Corporate Restructuring, LLC, as claims agent and administrative advisor. The Committee has also sought the retention of various professionals in these chapter 11 cases, as discussed below.

### 2.    Schedules and Statements

On January 2, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. *See, e.g.*, Docket Nos. 262-63. Interested parties may review the Schedules of Assets and Liabilities and Statements of Financial Affairs and any amendments thereto for Aegean free of charge at https://dm.epiq11.com/Aegean.

### 3.    Bar Date Motion

On December 11, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 199] (the "Bar Date Motion"). On December 18, 2018, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 240] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").

Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these chapter 11 cases is **February 21, 2019 at 5:00 p.m. Eastern Time** (the "Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' chapter 11 cases is **May 6, 2019 at 5:00 p.m. Eastern Time**. The Bar Date Notice was served on January 3, 2019 and published in *The New York Times* (national and international editions), *Financial Times* (international edition), and *Tradewinds* on January 7, 2019, January 8, 2019, and January 11, 2019, respectively.

### 4.    Pending Litigation Proceedings and Claims

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome or disposition of these lawsuits, legal proceedings, and claims, although the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would (a) have a material adverse effect on their businesses, financial condition, or results of operations or (b) interfere with the feasibility of the Plan.

With certain exceptions, the filing of the chapter 11 cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the chapter 11 cases. The Debtors' liability with respect to litigation stayed by the commencement of the chapter 11 cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the chapter 11 cases.

A securities class action captioned as *In re Aegean Marine Petroleum Network Inc. Securities Litigation*, Case No. 18-cv-4993 (S.D.N.Y.) (the "Securities Litigation"), was commenced against AMPNI and certain of its officers in the United States District Court for the Southern District of New York in June of 2018. On January 31, 2019, the court-appointed lead plaintiff in the Securities Litigation filed a consolidated complaint naming a number of AMPNI's former and current directors and officers, as well as its former auditors, as defendants, seeking damages for violations of the Securities Exchange Act of 1934. The causes of action asserted in the consolidated complaint arise from, among other things, the allegedly fraudulent scheme discussed in Section V.D above. AMPNI was not named as a defendant in the amended consolidated complaint in the Securities Litigation. For the avoidance of doubt, the Litigation Trustee reserves the right to seek appropriate relief to recharacterize any alleged direct claims asserted in the Securities Litigation as derivative claims or Section 510(b) Claims, assert relative priority to the D&O

policy proceeds, or seek such other relief it deems necessary or appropriate to maximize the value of the Litigation Claims.

Notwithstanding anything to the contrary in the Plan, the Litigation Trust has the right to pursue any and all insurance proceeds under any and all D&O Liability Insurance Policies available to any defendant(s) in connection with the Litigation Claims in order to satisfy any settlement or judgment obtained by the Litigation Trust in respect of such Litigation Claims; provided that nothing in the Plan or Confirmation Order shall:  (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of any Estate or that the Litigation Trust has any priority to such insurance proceeds; (b) modify or supersede any provision (including any priority of payments provision) of any of the D&O Liability Insurance Policies; or (c) otherwise preclude the Lead Plaintiff and the putative class in the Securities Litigation, or any party entitled to coverage under the D&O Liability Insurance Policies from seeking and obtaining such coverage thereunder.

### D.    Appointment of Official Committee of Unsecured Creditors

On November 15, 2018, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 80], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in these chapter 11 cases.  The Committee is currently composed of the following members:  Deutsche Bank Trust Company Americas, U.S. Bank National Association, and AmEx.  The Committee has filed several applications and obtained authority to retain various professionals to assist the Committee in carrying out its duties under the Bankruptcy Code.  These professionals include: (a) Akin Gump Strauss Hauer & Feld LLP, as legal counsel, (b) PJT Partners, as investment banker, and (c) AlixPartners, LLP as financial advisor.

Since its formation, the Debtors have consulted with the Committee concerning the administration of these chapter 11 cases and the Committee has been an active participant in restructuring negotiations. The Debtors have also kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations to the extent the Committee's constituency would be affected by proposed actions or transactions outside of the ordinary course of the Debtors' businesses.

### E.    Debtor-in-Possession Financing

The Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 6] (the "DIP Motion") on the Petition Date.  The DIP Motion sought approval of $532 million in aggregate financing through a $160 million DIP U.S. Revolving Credit Facility, $72 million DIP U.S. Term Credit Facility, and $300 million DIP Global Credit Facility to be provided by Mercuria (collectively, the "DIP Financing").

On November 7, 2018, the Ad Hoc Group filed an objection to the DIP Financing [Docket No. 29]. Among other things, the Ad Hoc Group objected to certain relief requested upon entry of the interim order, including the immediate roll up of 50 percent of the Debtors' prepetition ABL obligations, the granting of liens on the Debtors' unencumbered assets, including the Litigation Claims, and approval and payment of certain fees.  The Ad Hoc Group also objected to provisions granting Mercuria the right to credit bid its prepetition debt in the proposed section 363 sale of the Debtors' assets and the inclusion of certain sale-related milestones unrelated to the DIP Financing, including requiring an auction with respect to the sale of the Debtors' assets within 75 days of the Petition Date.  After a two-day contested hearing, the

parties agreed to a revised form of interim order regarding the DIP Financing. Among other things, the revised form of interim order no longer provided for the immediate roll-up of the prepetition ABL obligations upon entry of the interim order, preserved the right of parties in interest to object to the granting of any liens or claims at Debtors that were not prepetition obligors, and no longer approved Mercuria's right to credit bid. Other issues raised in the objection of the Ad Hoc Group were reserved for determination at the final hearing.

On November 9, 2018, following resolution of the issues raised in the objection filed by the Ad Hoc Group to approval of the DIP Financing [Docket No. 29], the Bankruptcy Court entered the revised order approving the DIP Financing on an interim basis [Docket No. 51] (the "Interim Order"). Upon entry of the Interim Order, the Debtors had access to the full amount provided under the DIP U.S. Revolving Credit Facility and DIP Global Credit Facility, subject to borrowing base limitations under the DIP U.S. Credit Agreement and DIP Global Credit Agreement, and $40 million under the DIP U.S. Term Credit Facility. Following the entry of the Interim Order, the final hearing on the DIP Financing was scheduled for December 7, 2018.

On November 27, 2018, the Committee filed an objection to approval of the DIP Financing on a final basis [Docket No. 113]. Among other things, the Committee opposed the granting of claims and liens to Mercuria, and the roll up of Mercuria's prepetition debt, at Debtor entities that were not prepetition obligors. The Committee also objected to certain provisions in the DIP Financing that would limit the Committee's ability to object to Mercuria's stalking horse bid for the Debtors' assets and that would potentially prevent the Debtors from modifying the sale procedures to maximize value for the Debtors' estates. Following significant discovery, the Debtors, the Committee and Mercuria entered into extensive, hard fought, arm's length, and good faith negotiations for the resolution of the Committee's objections to the DIP Financing, as well as the Committee's objections to the Stalking Horse Sale Process [Docket No. 112]. At the courthouse immediately prior to the December 7, 2018 hearing, the Debtors, the Committee and Mercuria reached an agreement in principle for a global resolution that was generally announced to the Court at the December 7, 2018 hearing.

While the parties were continuing to negotiate the documentation for the global resolution announced in open court, the Debtors and the Committee received a proposal from, and began discussions with, Oaktree Opportunities Fund Xb Holdings (Cayman), L.P. ("Oaktree") and Hartree-OCM AMPN Holdings (Delaware), LLC ("Hartree") regarding the terms of an alternative DIP facility and restructuring proposal. These discussions ultimately resulted in Oaktree and Hartree offering to provide a DIP facility that the Debtors and the Committee deemed to be on terms more favorable to the Debtors' estates than the Mercuria proposal. A term sheet reflecting the Oaktree/Hartree proposal was presented to and approved by the Board of Directors on December 12, 2018. The term sheet included a $75 million DIP term loan facility (compared to $72 million already provided by Mercuria under the DIP Financing) and the same amount of financing under Mercuria's DIP U.S. Revolving Credit Facility and DIP Global Credit Facility but did not contemplate the roll-up of prepetition obligations (as the Debtors had no prepetition obligations to Oaktree/Hartree) and allowing for greater sharing in the Litigation Claims and avoidance actions with Holders of Aegean Unsecured Claims.

Once Mercuria was made aware of the Oaktree/Hartree term sheet proposal on December 12, 2018, Mercuria immediately provided to both the Committee and the Debtors confirmation of a topping proposal, including offering better terms on the DIP Financing (including better advance rates and term extension rates), meeting the $75 million DIP term loan facility value, providing the Holders of Aegean Unsecured Claims with 100 percent of the recovery on the Litigation Claims, offering $40 million of Cash to the Holders of Aegean Unsecured Claims, and offering to provide initial funding to the Litigation Trust. After receiving confirmation of this offer from Mercuria on December 12, 2018, on the morning of December 13, 2018, the Debtors filed a *Notice of Filing of Revised Final DIP Order Pursuant to 11 U.S.C. §§ 105,361,*

*362, 362, 364, 503 And 507 (I) Authorizing The Debtors To Obtain Senior Secured Priming Superpriority Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [Docket No. 205], and sought at a hearing before the Court hours later to replace the DIP Financing approved pursuant to the Interim Order with alternative DIP financing provided by Oaktree/Hartree (the "Oaktree/Hartree DIP").

At the hearing on the Oaktree/Hartree DIP on December 13, 2018, Mercuria informed the Court that it had made a topping offer and objected to approval of the Oaktree/Hartree DIP on the grounds that there was no emergency need to replace the DIP Financing, as sufficient availability existed to meet the then-current needs of the Debtors. At the hearing, the Court indicated that it was not considering approval of the Oaktree/Hartree RSA. The Court further indicated that it would not approve the Oaktree/Hartree DIP on the terms proposed, including those contemplating a prepayment premium and linking approval of the Oaktree/Hartree DIP with approval of the Oaktree/Hartree RSA. In response to this, Oaktree and Hartree indicated that the limitations to be imposed by the Court on its proposed DIP financing were unacceptable and announced that they were "withdrawing from the contest."

During that hearing, the Court also stated:

"My only concern here is what's fair to the estate and its constituents. What's not fair to them is to say that the deal that gets put on the record at 2:30 in the morning last night, that another party is saying that they are just clamoring for the opportunity to make a better counterproposal to, what's not fair to the constituents of the estate is to say, no, we're going to stop now. That doesn't make any sense." (Dec 13, 2018 Hr'g. Tr. at 45:7-45:3)

On December 15, 2018, following extensive negotiations with Mercuria and the Committee to finalize the terms a Mercuria-supported restructuring transaction, and in connection with the parties' entry into the Restructuring Support Agreement (as discussed below), the Debtors agreed to an *Interim Bridge Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 239] (the "Bridge Order"), that was entered by the Bankruptcy Court on December 17, 2018. The Bridge Order provided the Debtors with, among other things, access to $11 million in incremental liquidity under the DIP U.S. Term Credit Facility (for a total of $51 million in availability under that facility when combined with the authority provided under the Interim Order) in order to fund the Debtors through January 14, 2019, when the Bankruptcy Court would conduct a hearing to consider entry of a Final Order (as defined below).

On January 15, 2019, the Bankruptcy Court entered an order approving the Modified DIP Financing, including the roll up of all obligations and amounts owed under the U.S. Credit Facility and Global Credit Facility, on a final basis [Docket No. 290] (the "Final Order"). The Final Order further provides that, among other things, certain parties are or may be entitled to object to or otherwise challenge the roll up of the U.S. Credit Facility and Global Credit Facility and the validity of related claims and liens. However, in accordance with the Final Order, the Confirmation Order shall expressly provide that, among other things, all parties' rights, if any, to bring any such objection or challenge shall be irrevocably extinguished, released, and discharged upon the occurrence of the Effective Date.

34

1.        **Adequate Protection Stipulations**

Pursuant to the DIP Motion, the Debtors also requested authority to enter into adequate protection stipulations and consent orders with certain of the Debtors' prepetition secured lenders under the Secured Term Loans.  Interim orders granting the requested relief were entered for Aegean Baltic Bank S.A. [Docket No. 63], the National Bank of Greece, S.A. [Docket No. 64], and United Arab Bank P.J.S.C. [Docket No. 68] on November 13, 2018.  Final orders granting the requested relief were entered for Aegean Baltic Bank S.A. [Docket No. 242], the National Bank of Greece, S.A. [Docket No. 243], United Arab Bank P.J.S.C. [Docket No. 244], Piraeus Bank S.A. [Docket No. 241], and Orix Investment and Management PTE. LTD. [Docket No. 245] on December 18, 2018.

F.        **Sale Process Motion**

In parallel with the negotiations regarding the DIP Financing, prior to the Petition Date, the Debtors and Mercuria engaged in hard-fought negotiations surrounding the terms of a section 363 sale of certain Debtors' assets, with Mercuria to serve as stalking horse bidder.  The parties intensely debated a number of key terms, including whether the sale would be structured as an all-asset sale "free and clear" of all liens, claims, and encumbrances, which Mercuria preferred, or an all-equity sale, which the Debtors preferred. In the end, Mercuria and the Debtors agreed to a mixture of the two, affording Mercuria the right to acquire the assets of certain Debtors and the equity of 45 Aegean Marine entities.  In addition, Mercuria initially sought to acquire the Litigation Claims through a credit bid premised on the Litigation Claims, as assets of Aegean, being collateral under the DIP Financings; however, the Debtors did not want to sell such assets without receiving cash consideration.  This issue was heavily contested and resulted in the Debtors delaying the filing of their bankruptcy petitions by approximately a week while negotiations continued.  Through extensive, good-faith negotiations, Mercuria ultimately agreed to include a cash component in its stalking horse bid as compensation for the acquisition of 100 percent of the Litigation Claims.[12]  Once the Debtors and Mercuria reached an agreement, the Debtors were able to file their chapter 11 cases with financing in place and a baseline bid to set the floor for an auction.

On November 9, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures and Section 365 Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, (III) Authorizing the Entry Into and Performance Under the Stalking Horse Asset Purchase Agreement, and (IV) Granting Related Relief* (the "Sale Process Motion") [Docket No. 59].  Pursuant to the Sale Process Motion, the Debtors sought Bankruptcy Court authorization to commence a sale process for certain of the Debtors' assets, with Mercuria serving as stalking horse bidder.

Subsequent to the filing of the Sale Process Motion, the Committee filed an objection to the relief sought therein [Docket No. 112].  Among other things, the Committee objected to the inclusion of the Litigation Claims in the assets to be sold, the lack of information made available to prospective bidders regarding the value of the Debtors' assets, and the inability of potential bidders to bid on the Debtors' assets on an asset-by-asset basis under the proposed bidding procedures.  The Committee also objected to the proposed $19 million break-up fee and uncapped expense reimbursement in favor of Mercuria, and the failure of Mercuria's stalking horse bid to allocate the proposed credit bid on an asset-by-asset basis.

The Committee objection led to further negotiations among the Debtors, Mercuria, and the Committee.  The hearing on the Sale Process Motion and the DIP Financing, scheduled for December 7,

---

[12]      Mercuria's proposed acquisition of the Litigation Claims was offered as an alternative means of offsetting liabilities and obligations Mercuria would or might incur as a result of the acquisition of the equity of the 45 Aegean Marine entities and the absence of the Debtors to otherwise be able to provide any substantive indemnification for these liabilities and obligations.

2018, was postponed based on the agreement in principle reached among the parties, the terms of which contemplated a global settlement and sale of the Debtors in the context of a chapter 11 plan versus the proposed auction process (as discussed above). Under this revised structure, Mercuria would provide substantially more value than under its stalking horse bid, including a larger cash component to be paid to holders of unsecured claims at Aegean and an agreement to share with the unsecured creditors at Aegean the proceeds of the Debtors' Litigation Claims. Consistent with and subject to the Restructuring Support Agreement, the Debtors agreed to withdraw the Sale Process Motion and to terminate the stalking horse asset purchase agreement with Mercuria.

### G.    Restructuring Support Agreements

After announcing an agreement in principle regarding a global settlement among the Debtors, the Committee, and Mercuria at the December 7, 2018 hearing, the parties worked intensely over the following days to document the deal. As discussed above, a DIP financing and restructuring proposal was received from Oaktree and Hartree on December 10, 2018, which the Debtors and Committee determined, consistent with their fiduciary duties, included improved terms for the Debtors' estates and unsecured creditors, compared to the Sale Process Motion and DIP Financing provided by Mercuria. Also as discussed above, on December 12, 2018, Mercuria provided the principal terms of another proposal that Mercuria believed to be a topping proposal: Mercuria increased the cash component of its offer, agreed that unsecured creditors at Aegean could receive the entirety of the proceeds of the Litigation Claims (as opposed to a percentage), and offered to acquire the equity of all of Aegean's subsidiaries.

In the early morning hours of December 13, 2018, before Mercuria had finished documenting its proposal, the Debtors filed a *Notice of Filing of Restructuring Support Agreement*, by and among the Debtors, the Committee, Oaktree, Hartree, AmEx, and certain holders of the Unsecured Notes (the "Oaktree/Hartree RSA") [Docket No. 206]. The Oaktree/Hartree RSA contemplated a restructuring of the Debtors premised on the recapitalization of Aegean and unimpaired treatment of all creditors at subsidiary Debtors other than Aegean, as well as the Oaktree/Hartree DIP to replace the DIP Financing provided by Mercuria.

At the hearing before the Bankruptcy Court on December 13, 2018, the Debtors sought approval of the Oaktree/Hartree DIP. Mercuria, still in the process of working with the Committee and the Debtors to finalize documentation of its restructuring proposal, appeared at the December 13 hearing and requested that the Court not approve the Oaktree/Hartree DIP. Mercuria argued that there was no emergency need for the Oaktree/Hartree DIP to be implemented, as sufficient availability existed under the DIP Financing to meet the then-current needs of the Debtors, and informed the Court that Mercuria had previously proposed the principal terms of what it contended was a superior restructuring transaction. During the hearing, the Debtors confirmed that they were not seeking approval of the Oaktree/Hartree RSA at that time. The Court further indicated that it would not approve the Oaktree/Hartree DIP on the terms proposed under the Oaktree/Hartree RSA. In response, Oaktree and Hartree indicated that they were "withdrawing from the contest."

The Debtors and the Committee believe the Oaktree/Hartree RSA has been terminated by its own terms and also, on December 14, 2018, sent notices of termination to Oaktree and Hartree. On December 17, 2018, at a hearing before the Bankruptcy Court, Oaktree and Hartree indicated that they disputed the validity of the termination notices and reserved rights in connection therewith. At the hearing, the Bankruptcy Court recognized that Oaktree and Hartree's "participation was positive" and that they "helped to get a better result for the estates." (Dec. 17, 2018 Hr'g Tr. at 6:3-4). Additionally, counsel to the Committee stated at the December 17, 2018 hearing that:

From the committee's perspective, there's no doubt and I'd echo Your Honor's comments about the substantial value that Oak Tree [sic] provided to the process. It took us from a situation with Mercuria, where we did not have a meeting of the minds and an agreement on a transaction, to one that materially improved -- provided materially improved terms for unsecured creditors and the estate, generally, which then ultimately got us to even better terms for unsecured creditors in the estate through the now new transaction that we've agreed to subject to the RSA and the plan process, of course, with Mercuria. But there's no doubt about the substantial value that they have provided in connection with the process.

(Dec. 17, 2018 Hr'g. Tr. at 9:21-10:8).

Following the December 13, 2018 hearing, the Debtors, the Committee, and Mercuria engaged in negotiations regarding the terms of the restructuring proposal made by Mercuria in response to the Oaktree/Hartree proposal. On December 15, 2018, the Debtors entered into the Restructuring Support Agreement, attached hereto as **Exhibit C**, and also continued the hearing on DIP Financing to January 14, 2019. The Restructuring Support Agreement is the byproduct of hard-fought, arm's-length, good faith negotiations among the Debtors, Mercuria, and the Committee, and resolves all disputed issues between these parties related to DIP Financing, the Sale Process Motion (which has been withdrawn), the initial funding for and allocation of beneficial units in a litigation trust, and cash consideration to be distributed *pro rata* to Holders of Allowed Aegean Unsecured Claims. In addition, the Consenting Unsecured Noteholders, representing more than 64 percent in principal amount outstanding of the Unsecured Notes issued by Aegean, and AmEx, the largest individual non-Unsecured Noteholder unsecured creditor at Aegean, are also signatories to the Restructuring Support Agreement and support the transactions contemplated therewith and the Plan.

The Plan implements the Restructuring Transactions contemplated by the Restructuring Support Agreement and the restructuring term sheet attached thereto. Importantly, the global settlement embodied in the Restructuring Support Agreement eliminates costly protracted litigation during these chapter 11 cases and paves the way for an efficient, cost-effective confirmation process and consummation of a value-maximizing transaction vis-à-vis the Plan. The Debtors urge all Holders of Claims and Interests entitled to vote on the Plan to vote to accept the Plan.

Notwithstanding anything herein or to the contrary, the descriptions or statements in this section shall not constitute and may not be construed as an admission of fact, liability, stipulation, or waiver, and may not be used by any party in interest as evidentiary support of the matters described above.

## VII. SUMMARY OF THE PLAN

**THIS ARTICLE VII IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS**

**ARTICLE VII AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.**

**A.      Overview**

Article III of the Plan provides a summary of the classification and treatment of Claims and Interests under the Plan and Article IV of the Plan provides a summary of the structure and means for implementation of the Plan.  The discussion herein is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and the definitions therein).

Generally speaking, the Plan contemplates, among other things, a recapitalization of the Debtors and the establishment of a Litigation Trust to pursue collection of the Litigation Claims and fund recoveries for Holders of Aegean Unsecured Claims and, potentially, Section 510(b) Claims and Interests in Aegean (to the extent any Litigation Trust proceeds remain following Payment in Full of Allowed Aegean Unsecured Claims). The Plan includes the following key terms, among others described herein and therein:

**1.      General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including resolution of intercompany liabilities, allocation of value among the Debtors, and treatment of Holders of General Unsecured Claims against each of the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VII of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

**2.      Classification and Treatment of Claims and Interests**

Pursuant to section 1122 of the Bankruptcy Code, the Plan designates the Classes of Claims and Interests as set forth in Article III of the Plan and as described in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?"  The Plan provides that a Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and will receive distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

Article III.E of the Plan provides that certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be deemed eliminated for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejected of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**3.      Recoveries to Certain Holders of Claims and Interests**

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

4.    **Restructuring Transactions**

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate as reasonably determined by the Debtors and Mercuria, prior to the Effective Date and thereafter the Reorganized Debtors, to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate or in furtherance of implementing the Plan (the "Restructuring Transactions").   The Restructuring Transactions may include one or more of the following: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or other law; and (4) all other actions as reasonably determined by the Debtors and Mercuria to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan; provided that, the Restructuring Transactions shall not materially and adversely impact any Litigation Claim; provided further, that the foregoing proviso shall not modify any rights of the Debtors and the Reorganized Debtors to modify their organizational documents to eliminate any indemnification obligations of any former officer or director not serving in such capacity on the Petition Date but solely to the extent such modification has no adverse impact on the ability of the Litigation Trustee to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims; provided further, that notwithstanding anything to the contrary herein, the foregoing proviso shall not be construed to alter the treatment of any Claims that are Unimpaired under the Plan.   To the extent known, any such Restructuring Transactions may be summarized in the Description of Restructuring Transactions, and in all cases, such transactions shall be subject to the terms and conditions of this Plan as reasonably determined by the Debtors and Mercuria.   The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

5.    **Means for Implementation of the Plan**

Article IV of the Plan sets forth the means for implementation of the Plan, including, but not limited to, the issuance and distribution of Reorganized Aegean Equity Interests, the Exit Facilities (if any), and the establishment of the Aegean Unsecured Claims Cash Pool, while Article V of the Plan discusses the Litigation Trust.

6.    **Director and Officer Liability Insurance**

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed, pursuant to section 365(a) of the Bankruptcy Code, all unexpired D&O Liability Insurance Policies with respect to coverages provided to the Debtors' directors, managers, officers, and employees serving in such capacity on or prior to the Petition Date.   Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.

Notwithstanding anything to the contrary in the Plan, the Litigation Trust has the right to pursue any and all insurance proceeds under any and all D&O Liability Insurance Policies available to any defendant(s) in connection with the Litigation Claims in order to satisfy any settlement or judgment

obtained by the Litigation Trust in respect of such Litigation Claims; provided that nothing in the Plan or Confirmation Order shall: (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of any Estate or that the Litigation Trust has any priority to such insurance proceeds; (b) modify or supersede any provision (including any priority of payments provision) of any of the D&O Liability Insurance Policies; or (c) otherwise preclude the Lead Plaintiff and the putative class in the Securities Litigation, or any party entitled to coverage under the D&O Liability Insurance Policies from seeking and obtaining such coverage thereunder.

With regards to current officers and directors, Confirmation of the Plan shall not discharge, impair, or otherwise modify any Indemnification Obligations assumed by the Debtors or Reorganized Debtors as of the Effective Date or the foregoing assumption of the D&O Liability Insurance Policies by the Reorganized Debtors hereunder.

With regards to former officers and directors, no such Indemnity Obligations shall be assumed except to the extent necessary to preserve the availability of coverage under such D&O Liability Insurance Policies; provided, however, that the Reorganized Debtors shall not be required to fund any payment obligations with respect to such Indemnification Obligations; provided, that any such officers or directors shall be free to pursue any rights he or she may have in relation to the D&O Liability Insurance Policies for payment or reimbursement of any costs, expenses or other amounts for which coverage under the D&O Liability Insurance Policies may be available.

For the avoidance of doubt, no Indemnification Obligations shall be assumed with respect to any former officer or director not serving in such capacity as of the Petition Date; provided that the failure to assume such Indemnification Obligation has no adverse impact on the ability of the Litigation Trust to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims but without the creation of any payment obligation or any other liability, directly or indirectly, of the Reorganized Debtors, any of their subsidiaries, or Mercuria. To the extent that any Litigation Claims or Securities Claims against any of the current or former directors or officers are covered under the D&O Liability Insurance Policies, the Reorganized Debtors shall provide any applicable notices to the insurance carriers that may be required under the D&O Liability Insurance Policies and requested by the plaintiffs in the Securities Litigation or the Litigation Trustee

### 7.    Aegean Unsecured Claims Cash Pool

On or prior to the Effective Date, the Aegean Unsecured Claims Cash Pool shall be funded with Cash on hand and/or provided by Mercuria, a portion of which Cash may be deposited into a segregated account in connection with a Disputed Claims Reserve maintained by the Litigation Trustee as provided herein. On the Effective Date, such portion of the Aegean Unsecured Claims Cash Pool that is not segregated into the Disputed Claims Reserves shall be distributed Pro Rata by the Debtors or Reorganized Debtors to Holders of Allowed Aegean Unsecured Claims. After the Effective Date, the Litigation Trustee shall be responsible for reconciling Disputed Class 4A Aegean Unsecured Claims and distributing any funds in the Disputed Claims Reserve as Disputed Class 4A Aegean Unsecured Claims are compromised, settled, allowed, or disallowed.

### 8.    Exit Facilities

Reorganized Aegean and one or more Reorganized Debtors may enter into Exit Financing on the Effective Date, as reasonably determined by the Debtors and Mercuria, on terms set forth in the Exit Facilities Documents. To the extent applicable, the Exit Facilities Documents shall be included in the Plan Supplement.

On the Effective Date, the Exit Facilities Documents (if any) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (if any) (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (3) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, the Reorganized Debtors, the applicable agent or any lender), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 9.    Litigation Trust

On the Effective Date, the Litigation Trust Funders shall fund the Litigation Trust Loan, the Debtors shall transfer to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Claims, and the Litigation Trustee shall execute the Litigation Trust Agreement and take all steps necessary to establish the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee in accordance therewith.  In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

The Litigation Trust shall be established for the purpose of liquidating the Litigation Trust Assets, distributing the Litigation Trust Loan Payments, reconciling and objecting, if necessary, to Disputed Aegean Unsecured Claims in Class 4A, and distributing the proceeds of the Litigation Claims to the Litigation Trust Beneficiaries and is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the Litigation Trust.

The Litigation Trust shall be funded from the proceeds of the Litigation Trust Loan and proceeds of the Litigation Trust Assets.  Any Holder of an Allowed Aegean Unsecured Claim that is a party to the Restructuring Support Agreement on or before the commencement of the Confirmation Hearing in respect of the Plan shall be entitled to participate in the Litigation Trust Loan, subject to the terms set forth in the Restructuring Support Agreement and Litigation Trust Documents.  Holders of Class 4A Aegean Unsecured Claims will be given the option on their respective Ballot to become a party to the Restructuring Support Agreement and elect to participate in the funding of the Litigation Trust Loan.  Holders of Class 4A Aegean

Unsecured Claims who validly and timely exercise their participation rights as set forth in the Disclosure Statement Order will be contacted after the Voting Deadline to exercise their right to fund a portion of the Litigation Trust Loan before the Confirmation Hearing.

The Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the Litigation Trust expenses; (b) the payment of other reasonable expenses of the Litigation Trust, including the cost of pursuing the Litigation Claims; (c) the retention of counsel, accountants, financial advisors or other Professionals and the payment of their reasonable compensation; (d) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the Litigation Trust Assets; and (f) litigation of the Litigation Claims, which may include the prosecution, settlement, abandonment or dismissal of any such Litigation Claims.

### (a)    Litigation Trustee

The Litigation Trustee shall be selected by the Committee and the Requisite Consenting Unsecured Noteholders acting together and shall be appointed on the Effective Date. The Litigation Trustee shall be compensated on terms acceptable to the Committee and the Requisite Consenting Unsecured Noteholders. The Litigation Trustee shall be a professional person or a financial institution having trust powers with experience administering other litigation trusts. The Litigation Trustee shall not have voting rights with respect to the governance of the Litigation Trust and shall retain professionals approved by (x) if determined prior to the Effective Date, a unanimous decision of the Committee and the Requisite Consenting Unsecured Noteholders acting together, and (y) if determined after the Effective Date, the unanimous consent of the Litigation Trust Advisory Board.

The Litigation Trust Agreement shall also specify the powers, rights and responsibilities of the Litigation Trustee and shall include the authority and responsibility to, among other things, take the actions set forth in Article V of the Plan. The Litigation Trustee shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement.

### (b)    Litigation Trust Advisory Board

The Litigation Trust shall be governed by the Litigation Trust Advisory Board as set forth in the Litigation Trust Agreement. The Debtors or Reorganized Debtors shall be permitted to appoint a single *ex officio* member of the Litigation Trust Advisory Board who shall not have voting rights. If and when the holders of Class A Litigation Trust Units have received Payment in Full, the members appointed by the Committee and Requisite Consenting Unsecured Noteholders may be replaced by new members designated by holders of Class B Litigation Trust Units. The members of the Litigation Trust Advisory Board shall not be entitled to compensation for service on the Litigation Trust Advisory Board unless otherwise determined by the Committee and the Requisite Consenting Noteholders or the Litigation Trust Advisory Board.

### (c)    Litigation Trust Assets

On the Effective Date, the Debtors shall transfer to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Claims. Pursuant to the Plan, the definition of "Litigation Claims" is as follows:

- "Litigation Claims" means all of the following claims and Causes of Action belonging to any of the Debtors or their Non-Debtor Subsidiaries, and existing at any time on or prior to the Petition Date: (a) claims and Causes of Action relating to the events, circumstances, and conduct described in the June 4, 2018, and November 2, 2018, Form 6-K disclosures of Aegean

42

including conduct concerning improper accounting for or recordation of accounts receivable, as well as the right of any of the Debtors or their Non-Debtor Subsidiaries to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (b) claims and Causes of Action relating to the construction and maintenance of Aegean Oil Terminal Corp.'s fuel oil terminal located in Fujairah, UAE, as well as the right of any of the Debtors or their Non-Debtor Subsidiaries to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (c) claims and Causes of Action relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melissanidis, claims against auditors and other professionals related to misappropriation of funds, any related conspiracy to defraud Aegean or investors in Aegean, claims against Quality Solutions related to construction fraud or other fraud, misconduct, malpractice, or other malfeasance by any director, officer, employee, or agent of any of the Debtors or their Non-Debtor Subsidiaries in connection with any of the foregoing; (d) claims and Causes of Action brought by any of the Debtors or their Non-Debtor Subsidiaries, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014, including any appeals in connection with the foregoing; (e) claims and Causes of Action concerning unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof; (f) claims and Causes of Action concerning HSFO product loaded from Petrotrin in Trinidad in December 2016; (g) claims and Causes of Action arising from the repurchase of any equity interests in Aegean; (h) claims and Causes of Action against any of the Debtors' or their Non-Debtor Subsidiaries' directors or officers or other person covered under any of the applicable D&O Liability Insurance Policies, including for breach of fiduciary duty; (i) [Reserved]; (j) claims and Causes of Action of any of the Debtors or their Non-Debtor Subsidiaries in connection with the Related Party Transactions described in the Form 20-F of Aegean for the fiscal year ended December 31, 2016; and (k) Avoidance Actions, with the exception of claims and Causes of Action to avoid and recover preferential transfers pursuant to Bankruptcy Code section 547; provided, however, that, notwithstanding anything to the contrary contained in the Plan, the scope of "Litigation Claims" shall be expressly subject to the limitations set forth in Article IX.F of the Plan. For the avoidance of doubt, the "Litigation Claims" shall not include any claim or Cause of Action that is not identified in clauses (a) - (k) of the foregoing sentence or any claim or Cause of Action against Mercuria, David Gallagher, any Reorganized Debtor or Non-Debtor Subsidiary, or any other parties or entities described in the first sentence of the second paragraph of Article IX. F of the Plan.

For reference, certain of the Litigation Claims are briefly summarized below.

- The Debtors' litigation against Hess Corporation is currently on appeal following an August 3, 2018 judgment pursuant to which the presiding justice of the New York Supreme Court declined to award the Debtors any damages. In its complaint (as amended), the Debtors asserted claims against Hess Corporation arising out of the purchase and sale agreement executed on November 12, 2013 among the parties, and sought compensatory damages in the amount of $27.9 million, plus interest, reasonable attorneys' fees, costs, and disbursements.

- The Debtors have certain ongoing litigation related to unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and affiliates. This litigation is currently pending in courts in Greece and the United States, with certain of the claims in Greece on appeal following the rejection of the Debtors' claims. The Debtors reached final settlement or

judgment with regard to certain claims prior to the Petition Date. Asserted claims for active matters total approximately $3.0 million.

- The Debtors' claims for reimbursement against the Petroleum Company of Trinidad and Tobago Limited, or Petrotrin, the state-owned oil company of the Republic of Trinidad and Tobago, relate to off-spec marine fuel supplied by Petrotrin to certain of the Debtors' vessels in December 2016. This off-spec marine fuel was supplied to certain of the Debtors' customers, who thereafter submitted claims to the Debtors. The Debtors seek reimbursement from Petrotrin for approximately $700,000 paid by the Debtors to their customers related to Petrotrin's delivery of the off-spec marine fuel.

As soon as reasonably practicable following the establishment of the Litigation Trust, the Litigation Trustee shall determine the value of the assets transferred to the Litigation Trust, based on the good-faith determination of the Litigation Trust Advisory Board, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Litigation Trustee and the Litigation Trust Beneficiaries) for all federal income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Litigation Trust Agreement, the Litigation Trust shall be entitled to retain such professionals and advisors as the Litigation Trust shall determine to be appropriate or necessary, subject to the direction of the Litigation Trust Advisory Board, and the Litigation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

### (d)      Cooperation of the Reorganized Debtors

To effectively investigate, prosecute, compromise, and/or settle the Litigation Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel may require reasonable access to the Debtors' and Reorganized Debtors' documents, information and work product relating to the Litigation Trust Assets, and, in such event, must be able to exchange such information with the Reorganized Debtors on a confidential basis and as protected by the common interest privilege without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, the Litigation Trust Agreement shall provide for the Litigation Trust to have reasonable access to copies of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets, including, electronic records, documents or work product related to the Litigation Claims, to the extent consistent with applicable law, but shall further provide that any records or information so shared shall continue to be protected by the attorney-client, work product, or common interest privilege and the Litigation Trust's access thereto shall not waive any of the Debtors', the Reorganized Debtors', or Mercuria's privileges or similar protections referenced in this paragraph. The Litigation Trust Agreement shall also provide that the Litigation Trust may not waive any privileges referenced in this paragraph belonging to or shared with the Debtors, the Reorganized Debtors, or Mercuria in respect of such records and documents, and that the Debtors, the Reorganized Debtors, and Mercuria shall be provided with reasonable notice and an opportunity to protect their rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.

The Reorganized Debtors shall preserve all records, documents or work product (including all electronic records, documents or work product) related to the Litigation Claims until the earlier of (1) such time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved, or (2) the termination of the Litigation Trust. The Reorganized Debtors shall reasonably cooperate with the Litigation Trustee with reasonable requests for interviews of current and

44

former officers, directors, employees, and professionals of the Debtors in order to facilitate prosecution of the Litigation Claims; provided, however, that the Reorganized Debtors shall be reimbursed for any reasonable and documented out-of-pocket expenses in connection with such cooperation.

### (e)    Fiduciary Duties

The Litigation Trustee and each member of the Litigation Trust Advisory Board shall owe fiduciary duties to the holders of Litigation Trust Interests of the type that an official committee of unsecured creditors would owe to unsecured creditors, and shall have in place under the Litigation Trust Agreement applicable indemnity and waiver provisions to protect the Litigation Trustee and each member of the Litigation Trust Advisory Board from being personally liable for any claims or causes of action asserted by the Holders of Litigation Trust Interests, except for any clams of fraud, gross negligence, or willful misconduct.

### (f)    Securities Law Considerations

Litigation Trust Interests shall be passive and shall not have voting, consent or other shareholder-like control rights with respect to the Litigation Trust.  Litigation Trust Interests may be structured not to be securities and may or may not be transferable, in each case subject to applicable law and as otherwise determined (x) prior to the Effective Date, by the Committee and the Requisite Consenting Unsecured Noteholders, or (y) after the Effective Date, by the Litigation Trust Advisory Board as provided in the Litigation Trust Agreement.

### (g)    Tax Treatment

For all U.S. federal income tax purposes, all parties (including the Aegean Parties, the Litigation Trustee and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) as (i) a transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) directly to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Class 4A Claims that are the responsibility of the Litigation Trust to resolve, to the Disputed Claims Reserve, followed by (ii) the transfer by the Litigation Trust Beneficiaries to the Litigation Trust of the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Litigation Trust Interests. Accordingly, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to the Disputed Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  The Litigation Trust, the Litigation Trustee and the Litigation Trust Beneficiaries shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

### (h)    Distribution to Litigation Trust Beneficiaries

Distributions of proceeds from the Litigation Claims shall be made by the Litigation Trustee according to the following priorities:

- *First,* to the Litigation Trust Funders to repay the Litigation Trust Loan <u>plus</u> the Litigation Trust Funding Fee.

- *Second,* on a Pro Rata basis to the holders of Class A Litigation Trust Units until such Holders receive Payment in Full.[13]

- *Third*, on a Pro Rata basis to the holders of Class B Litigation Trust Units.

Notwithstanding the foregoing, after repayment in full of the Litigation Trust Loan and the Litigation Trust Funding Fee, the Litigation Trust Advisory Board in the exercise of its business judgment may elect to withhold proceeds from the prosecution or settlement of Litigation Claims to pay reasonable projected costs and expenses of the Litigation Trust. For the avoidance of doubt, the Litigation Trustee may pay accrued and unpaid reasonable and documented expenses of the Litigation Trust with proceeds of the Litigation Trust Loan prior to the receipt of any proceeds from any Litigation Claims.

The Litigation Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Trust Beneficiaries. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of this Agreement. The Litigation Trustee shall be authorized to collect such tax information from the Litigation Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Litigation Trust Agreement. As a condition to receive distributions under the Plan, all Litigation Trust Beneficiaries may be required to identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent the Litigation Trustee deems appropriate, including an IRS Form W-9 or, in the case of Litigation Trust Beneficiaries that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Litigation Trustee may refuse to make a distribution to any Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Litigation Trust Beneficiary, the Litigation Trustee shall make such distribution to which the Litigation Trust Beneficiary is entitled, without interest; and, provided, further, that, if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Trustee for such liability. If a Litigation Trust Beneficiary (other than a Holder of Unsecured Notes Claims) fails to comply with such a request for tax information within 180 days, the Litigation Trustee may file a document with the Bankruptcy Court that will provide twenty-one (21) days' notice before such distribution

---

[13] <u>Article I.112</u> of the Plan defines Payment in Full as "payment in full of each Allowed Aegean Unsecured Claim, including postpetition interest at the applicable default contract rate for the period from the Petition Date through the Effective Date and if no such contract rate exists, at the federal judgment rate plus fees, costs, and expenses under such contract, if applicable."

may be deemed an unclaimed distribution and treated in accordance with Article VII.D.5 of the Plan. In the event that the Litigation Trustee elects to make distributions through an intermediary (such as DTC or the Unsecured Notes Indenture Trustees), the party who would be the withholding agent with respect to distributions to the Litigation Trust Beneficiary under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Trustee.

### 10.    Committee Members' Fees and Expenses

On the Effective Date, the Debtors or Reorganized Debtors shall pay in full, subject to the provisions of Article IV.C of the Plan, the reasonable and documented fees and expenses of the Committee Members (including the reasonable and documented fees and expenses of counsel for Committee Members). The Committee Members shall deliver an invoice to the Debtors, Mercuria, and the U.S. Trustee no less than five (5) days prior to the Effective Date; provided, that the Debtors' and Reorganized Debtors' obligations to pay in full the reasonable and documented fees and expenses of the Committee Members shall not be limited nor deemed limited in any way by the delivery of such invoice, save to the extent set out in the immediately following sentence hereof. If the Debtors or Reorganized Debtors, as applicable, or the U.S. Trustee dispute the reasonableness of any such invoice, the Debtors, Reorganized Debtors, and/or the U.S. Trustee, as applicable, may submit such dispute to the Bankruptcy Court for the determination of the reasonableness of such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.

Following the invoice review process and the resolution of any reasonableness disputes (if necessary) as set forth above, the Debtors or Reorganized Debtors are authorized to pay Committee Members' reasonable and documented fees and expenses as an exercise of their business judgment consistent with section 363(b) of the Bankruptcy Code, and in compliance with sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code. The Debtors, Reorganized Debtors, and the Committee expressly reserve all rights to amend or assert additional legal bases in support of payment of Committee members' reasonable and documented fees and expenses pursuant to the Plan.

### B.    Treatment of Executory Contract and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contract and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than:  (a) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) those that have been previously rejected by a Final Order; (c) those that have been previously assumed by a Final Order; (d) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (e) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by

Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control", "assignment", or similar provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan, including the Restructuring Transactions shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default, breach, violation or acceleration rights with respect thereto.  For the avoidance of doubt, no Restructuring Transaction shall be deemed to violate the terms of any assumed Unexpired Lease of non-residential real property.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

The Debtors, with the reasonable consent of Mercuria, or the Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedules (each, an "Amended Rejected Executory Contracts and Unexpired Leases Schedule") at any time through and including the date that is sixty (60) days after the Effective Date, which amended schedule shall be Filed with the Bankruptcy Court; provided, however, after the Effective Date, the Reorganized Debtors may not alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases with respect to Executory Contracts or Unexpired Leases of Aegean without the reasonable consent of the Litigation Trustee.  The Debtors or Reorganized Debtors, as applicable, shall provide notice of any amendments to the Amended Rejected Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby.

Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court, served, and actually received by the Debtors on or before the deadline to object to Confirmation or, in the case of an Executory Contract or Unexpired Lease that is identified on any Amended Rejected Executory Contract and Unexpired Lease Schedule, on the date that is fourteen (14) days following the Filing of such amended schedule.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption, including any proposed cure amount, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption, including any proposed cure amount.

## 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be disallowed upon an order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the Litigation Trust, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3.      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable; provided that nothing herein shall prevent the Reorganized Debtors, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

4.      **Dispute Resolution**

In the event of a dispute between the Debtors and a non-Debtor counterparty to any Executory Contract or Unexpired Lease to be assumed or assumed and assigned regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, assumption and assignment or the cure payments required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon in writing by the Debtors, with the reasonable consent of Mercuria, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following:  (i) the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date, or (ii) upon the written, consensual resolution between the counterparty to any Executory Contract or Unexpired Lease and the Debtors or Reorganized Debtors, as applicable.  The Debtors, with the reasonable consent of Mercuria, or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors, with the reasonable consent of Mercuria, or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date; provided, however, the Reorganized Debtors may not add an Executory Contract or Unexpired Lease of Aegean to the Rejected Executory Contracts and Unexpired Leases Schedule after the Effective Date without the reasonable consent of the Litigation Trustee.

5.      **Indemnification Obligations**

Except as otherwise provided elsewhere herein or identified on the Rejected Executory Contracts and Unexpired Leases Schedule, each Indemnification Obligation shall be assumed by the applicable

49

Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive the Effective Date Unimpaired and unaffected, irrespective of when such obligation arose. Notwithstanding anything in the Plan or any Confirmation Order to the contrary, such indemnified director or officer covered under any assumed Indemnification Obligation shall only be entitled to indemnity to the extent so entitled under such assumed existing agreement, organizational document, or under applicable law.

### 6. Collective Bargaining Agreements

All of the Debtors' collective bargaining agreements and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all such agreements.

### 7. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 8. Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' schedules of assets, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 9. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

### C. Releases

The Plan contains certain releases, as described in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in Article IX of the Plan are copied in pertinent part below.

1.      **Release of Liens**

Except (a) with respect to the Liens securing the Exit Facilities (if any), and to the extent elected by the Debtors, in consultation with Mercuria, with respect to an Allowed Other Secured Claim in accordance with Article III.B.1, of the Plan or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, other than the Liens and security interests securing the DIP Facilities which, if not otherwise paid in full in Cash, shall remain in full force and effect and shall secure all obligations arising under, shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

2.      **Debtor Release**

**EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED BY OR ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS (INCLUDING THOSE RELATED TO THE PREPETITION SECURED CREDIT FACILITIES AND THE EXCLUSIVITY LETTER DATED JULY 4, 2018 (AND ATTACHED TERM SHEET) BETWEEN THE AEGEAN DEBTOR AND MERCURIA), INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING TRANSACTIONS; (II) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; (III) THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING CLAUSES (I) THROUGH (III) TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE**

PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE RELEASES SET FORTH ABOVE SHALL NOT RELEASE (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN), OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN. THE DEBTOR RELEASE DOES NOT WAIVE OR RELEASE ANY RIGHT, CLAIM, OR CAUSE OF ACTION (A) IN FAVOR OF ANY DEBTOR OR REORGANIZED DEBTOR, AS APPLICABLE, ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO SUCH DEBTOR OR REORGANIZED DEBTOR NOT SATISFIED OR DISCHARGED UNDER THE PLAN OR (B) AS EXPRESSLY SET FORTH IN THE PLAN OR THE PLAN SUPPLEMENT.

### 3. Third Party Release

EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS (INCLUDING THOSE RELATED TO THE PREPETITION SECURED CREDIT FACILITIES AND THE EXCLUSIVITY LETTER DATED JULY 4, 2018 (AND ATTACHED TERM SHEET) BETWEEN THE AEGEAN DEBTOR AND MERCURIA), OR INTERCOMPANY TRANSACTIONS; (II) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING A LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; (III) THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) UPON ANY OTHER ACT, OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING CLAUSES (I) THROUGH (III) TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE RELEASES SET FORTH ABOVE SHALL NOT RELEASE (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN), (II) ANY SECURITIES CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.I OF THE PLAN), OR (III) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

4.    **Exculpation**

EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW AND WITHOUT AFFECTING OR LIMITING EITHER THE DEBTOR RELEASE OR THE THIRD-PARTY RELEASE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE EXCULPATION SET FORTH ABOVE SHALL NOT RELEASE OR BE AN EXCULPATION WITH RESPECT TO (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN), OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

5.    **Injunction**

EFFECTIVE AS OF THE EFFECTIVE DATE, PURSUANT TO SECTION 524(A) OF THE BANKRUPTCY CODE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD

**CLAIMS OR INTERESTS THAT HAVE BEEN SETTLED UNDER THE PLAN, RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY CAUSE OF ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN AND THE CONFIRMATION ORDER.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN).  FOR THE AVOIDANCE OF DOUBT, ANY CLAIMS OR CAUSES OF ACTION AGAINST MERCURIA, DAVID GALLAGHER, THE REORGANIZED DEBTORS OR THEIR NON-DEBTOR SUBSIDIARIES, OR ANY OTHER PARTY OR ENTITY DESCRIBED IN THE FIRST SENTENCE OF THE SECOND PARAGRAPH OF ARTICLE IX.F OF THE PLAN THAT OTHERWISE COULD HAVE BEEN COMMENCED, CONTINUED, OR OTHERWISE PROSECUTED OR PURSUED BY THE LITIGATION TRUST OR ANY ONE OR MORE OF THE LITIGATION TRUST BENEFICIARIES SHALL BE SUBJECT TO THE TERMS OF THE INJUNCTION IN ARTICLE IX.E OF THE PLAN.**

### 6.     Limitations with Respect to Litigation Claims

The Debtor Release (Article IX.B of the Plan), Third Party Release (Article IX.C of the Plan), and Exculpation (Article IX.D of the Plan) are each subject to a carve out in respect of the Litigation Claims in each such provision (collectively, the "Litigation Claims Carve Out"). The Litigation Claims, as described in greater detail in the Plan, shall be transferred to, reviewed by, and, potentially, prosecuted by the Litigation Trust as part of the global settlement reached by and among the Debtors, Mercuria, the Committee, the Consenting Unsecured Noteholders, AmEx, and any other party that joins the Restructuring Support Agreement.  Notwithstanding anything to the contrary contained in the Plan, the scope of the Litigation Claims Carve Out is set forth in this Article IX.F of the Plan.

The Litigation Claims Carve Out shall not extend to, limit, or otherwise modify in any manner or at any time the scope of the Debtor Release, Third Party Release, and Exculpation in relation to (1) Mercuria

and each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such, (2) David Gallagher, (3) any current officer or director of the Debtors who began working for the Debtors after May 1, 2018, (4) each of the Debtors' employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors that began working after May 1, 2018, or (5) the Professionals, excluding Professionals retained pursuant to the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 157]; provided, that, for the avoidance of doubt, each such entity or party referred to in subparts (1) - (5) are "Released Parties" and "Exculpated Parties" under the Plan. With respect to any current officer or director who began working for the Debtors before May 1, 2018, the Litigation Claims Carve Out shall modify the Debtor Release, Third Party Release, and Exculpation solely with respect to Litigation Claims, if any, against such parties for gross negligence, willful misconduct, fraud, or breach of fiduciary duty; provided, however, that each such party's liability, if any, for breach of fiduciary duty shall be limited by and with recourse solely to available coverage under applicable D&O Liability Insurance Policies so long as such limitation does not limit the availability of such insurance; provided, further, that, for the avoidance of doubt, each such party otherwise remains a "Released Party" and "Exculpated Party" in relation to the Debtor Release, Third Party Release, and Exculpation except to the extent of the foregoing carve out for gross negligence, willful misconduct, or fraud.

Except as expressly limited above, the definition of "Released Party" and "Exculpated Party" will not include any person or entity as and solely to the extent implicated in any way in any Litigation Claims or who or which may be liable in connection with any remedies available in connection with any Litigation Claims (including any immediate or mediate transferees connection with any Litigation Claims) and regardless of whether such implication or liability is known or unknown at any time. For the avoidance of doubt, any such party or entity that is also a "Released Party" and "Exculpated Party" in relation to the Debtor Release, Third Party Release, or Exculpation shall remain so except as and to the extent implicated or liable as contemplated in the preceding sentence.

In addition to the foregoing, no recovery in respect of a Litigation Claim shall result in or create a payment obligation, or any other liability, directly or indirectly, by the Reorganized Debtors, any of their subsidiaries, or Mercuria or David Gallagher. For the avoidance of doubt, the Litigation Claims Carve Out shall not extend to, limit, or otherwise modify the scope of the Debtor Release, Third Party Release, and Exculpation in relation to such payment obligations or any other liabilities described in the foregoing sentence.

## 7.    Limitations with Respect to Securities Claims

The Third Party Release (Article IX.C of the Plan) is subject to a carve out in respect of the Securities Claims in the last sentence of such provision (the "Securities Claims Carve Out"). The Securities Claims Carve Out is part of a global settlement reached by and among the Debtors and the Lead Securities Plaintiff. Notwithstanding anything to the contrary contained in the Plan, the scope of the Securities Claims Carve Out is set forth in Article IX.I of the Plan.

The Securities Claims Carve Out shall not extend to, limit, or otherwise modify the scope of the Third Party Release in relation to (1) Mercuria and each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, and other professional advisors, each solely in their capacities as such, (2) David Gallagher, (3) any other current officer or director of the Debtors that began working for the Debtors after May 1, 2018, (4) each of the

Debtors' employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors that began working after May 1, 2018, or (5) the Professionals, excluding Professionals retained pursuant to the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 157]; provided, that, for the avoidance of doubt, each such entity or party referred to in subparts (1) - (5) are "Released Parties" under this Plan. With respect to any current officer or director that began working for the Debtors before May 1, 2018, the Securities Claims Carve Out shall modify the Third Party Release solely with respect to Securities Claims, if any, against such parties for gross negligence, willful misconduct, fraud, or the Section 20 Claims; provided, however, that each such party's liability, if any, on account of any Section 20 Claims shall be limited by and with recourse solely to available coverage under applicable D&O Liability Insurance Policies so long as such limitation does not limit the availability of such insurance; provided, further, that, for the avoidance of doubt, each such party otherwise remains a "Released Party" in relation to the Third Party Release except to the extent of the foregoing carve out for gross negligence, willful misconduct, or fraud.

In addition to the foregoing, no recovery in respect of a Securities Claim shall result in a payment obligation, or any other liability, directly or indirectly, by the Reorganized Debtors, any of their subsidiaries, or Mercuria (including each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such), or David Gallagher, and none of the foregoing shall be named as a party in any claim, complaint, or Cause of Action in the Securities Litigation. For the avoidance of doubt, the Securities Claims Carve Out shall not extend to, limit, or otherwise modify the scope of the Debtor Release, Third Party Release, and Exculpation in relation to such payment obligations or any other liabilities described in the foregoing sentence.

## VIII.    SOLICITATION AND VOTING

### A.    Solicitation Packages

On or about [●] [●], 2019, the Bankruptcy Court entered the Disclosure Statement Order. For purposes of this Article VIII, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, Holders of Claims and Interests who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "Solicitation Package"), which will include, in part, the following:

- this Disclosure Statement, including the Plan as an exhibit thereto; and

- the appropriate ballot(s) and applicable voting instructions, or appropriate notices, together with a pre-addressed, postage pre-paid return envelope.

The Solicitation Package may also be obtained: (1) from Epiq Corporate Restructuring, LLC by (a) visiting https://dm.epiq11.com/Aegean (free of charge), (b) writing to Aegean Marine Petroleum Network Inc., et al. c/o Epiq Corporate Restructuring, LLC at P.O. Box 4422, Beaverton, OR 97076-4422 (regular first class mail) or (c) writing to Aegean Marine Petroleum Network Inc., et al. c/o Epiq Corporate Restructuring, LLC at 10300 SW Allen Boulevard, Beaverton, OR 97005 (overnight mail or hand delivery) or (d) calling (888) 418-0324 (toll free in the U.S.) or (503) 520-4423 (International); or (2) for a fee via PACER (except for ballots) at https://ecf.nysb.uscourts.gov.

### B.    Classes Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in <u>Article III.C</u> of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class under the Plan.

The following Classes are the only Classes entitled to vote to accept or reject the plan and thus the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4A and Class 7 and Interests in Class 8 (collectively, the "<u>Voting Classes</u>").

| Class | Claim / Interest | Status |
|---|---|---|
| 4A | Aegean Unsecured Claims | Impaired |
| 7 | Section 510(b) Claims | Impaired |
| 8 | Interests in Aegean | Impaired |

The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

Holders of Class 4A Claims may also be entitled to participate in the Litigation Trust Loan if such Holder indicates its intent to so participate by following the instructions on such Holder's ballot and then, prior to the Confirmation Hearing, executes the Restructuring Support Agreement and otherwise joins and executes any applicable Litigation Trust Documents.

### C.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.  Each Class of Interests entitled to vote on the Plan will have accepted the Plan if the Holders of at least two-thirds in amount of the Interests actually voting in such Class vote to accept the Plan.

### D.    Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|

| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Term Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4B | General Unsecured Claims against All Other Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

Therefore, the Debtors are ___not___ soliciting votes from holders of Claims or Interests in Classes 1, 2, 3, 4B, 5, and 6.

### E.    Voting Record Date

**The Voting Record Date is February [12], 2019**.  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim or Interest.

### F.    Voting on the Plan

**The Voting Deadline is March [19], at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by Epiq Corporate Restructuring, LLC on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the enclosed reply envelope or as otherwise directed.  Certain Holders of Claims may also be entitled to complete an E-Ballot.

| BALLOTS |
| --- |
| To be counted, all ballots and Master Ballot must be **actually** **received** by Epiq Corporate Restructuring, LLC by the Voting Deadline, which is **March [19], 2019 at 4:00 p.m. (prevailing Eastern Time)** |
| If you have any questions, please call the Debtors' restructuring hotline maintained by Epiq Corporate Restructuring, LLC at: (888) 418-0324 (toll free in the U.S.) or (503) 520-4423 (International) |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot. All ballots must be properly executed, completed, and delivered according to the voting instructions set forth in the applicable ballot. Any ballot that is properly executed by the Holder of a Claim or Interest entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one ballot for each Claim or Interest held by such Holder. By signing and returning a ballot, each Holder of a Claim or Interest entitled to vote will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim or Interest has been cast or, if any other ballots have been cast with respect to such Claim or Interest, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

G.       **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than Epiq Corporate Restructuring, LLC), or the Debtors' financial or legal advisors instead; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

Any ballot received after the Voting Deadline or that is otherwise not in compliance with the Disclosure Statement Order will not be counted.

IX.       **CONFIRMATION OF THE PLAN**

A.       **Confirmation Standards**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to each of the Debtors. Because each of the Debtors must satisfy these requirements, it is possible that the Bankruptcy Court will enter a

Confirmation Order with respect to certain Debtors and not others.[14]  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or  (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

---

[14]    For example, the Bankruptcy Court may deny Confirmation for one or more of the Debtors if such Debtor fails to obtain the requisite acceptance of the Plan from its Classes, while still confirming the Plan with respect to the other Debtors.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court

## B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. Notwithstanding that section 1129(a)(7) only applies to impaired classes, the Liquidation Analysis also provides liquidation recoveries for certain unimpaired classes, including Class 4B (General Unsecured Claims Against All Other Debtors), on a consolidated basis.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

## C.    Creditor Recoveries

The Plan provides recoveries to, among others, the Holders of Claims in Class 4A (Aegean Unsecured Claims).  As shown in the Debtors' Liquidation Analysis, and as set forth in the Liquidation Analysis, such recoveries are higher than recoveries estimated to be available if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The recoveries described in this Disclosure Statement that are available to the Holders of Claims are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided herein. The Debtors believe that the treatment of Claims as provided by the Plan complies with the Bankruptcy Code and established case law.

## D.    Valuation

**The valuation information contained in this Disclosure Statement with regard to the Reorganized Debtors is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.**

The Debtors' advisors have undertaken the valuation analysis, attached hereto as **Exhibit E** (the "Valuation Analysis"), to determine the value available for distribution to Holders of Allowed Claims or Interests pursuant to the Plan, and to analyze and estimate the recoveries to such Holders thereunder. Accordingly, if the actual enterprise value of the Debtors differs from the estimated enterprise value in the Valuation Analysis, the actual distributions may be materially different than the estimations set forth herein.

## E.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for

further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit F** (the "Financial Projections"). Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## F.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan. Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code.[15]

---

[15]    *In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007).

### G.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

### 2.    Fair and Equitable Test

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

#### (a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) (x) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (y) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (ii) the holders of such secured claims realize the indubitable equivalent of such claims.[16]

#### (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive

---

[16]    *See* 11 U.S.C. § 1129(b)(2)(A).

or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest in any property.[17]

### (c)    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of  (x) the allowed amount of any fixed liquidation preference to which such holder is entitled, and (y) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.[18]

### H.    The Debtor Releases, Third Party Releases, Exculpation, and Injunction Provisions

Article IX.B of the Plan provides for releases of claims and Causes of Action the Debtors may hold against the Released Parties.  The Released Parties are each of the following in their capacity as such: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; provided, however, that any party in interest that opts out, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Released Party"; provided, further, however, that notwithstanding anything to the contrary in the Plan, the scope of "Released Parties" shall be subject to the limitations set forth in Articles IX.F and IX.I of the Plan.  For the avoidance of doubt, the Released Parties referenced in the foregoing clauses (j) through (l), are "Released Parties" solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to Articles IX.B and IX.C of the Plan, subject to the limitations set forth in Articles IX.F of the Plan.

Article IX.C of the Plan provides for the release of claims and Causes of Action of the Releasing Parties against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third Party Release").  The Releasing Parties are each of the following in their capacity as such: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured

---

[17]    See 11 U.S.C. § 1129(b)(2)(B).

[18]    See 11 U.S.C. § 1129(b)(2)(C).

Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing Entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (j), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; (l) all Holders of Claims and Interests that vote to accept the Plan; (m) all Holders of Claims and Interests that vote to reject the Plan but do not elect to opt out of the Third Party Release; and (n) all Holders of Claims and Interests not described in the foregoing clauses (a) through (m); <u>provided</u>, <u>however</u>, that any such Holder of a Claim or Interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Releasing Party"; <u>provided</u>, <u>further</u>, <u>however</u>, that notwithstanding anything to the contrary herein, the scope of "Releasing Parties" shall be subject to the limitations set forth in <u>Article IX.F</u> of the Plan.

Article IX.D of the Plan provides for the exculpation of each Exculpated Party for acts or omissions taken in connection with the chapter 11 cases. The Exculpated Parties are, collectively: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) AmEx; (g) the Unsecured Notes Indenture Trustees; (h) with respect to each of the foregoing entities in clauses (a)-(g) each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); and (i) with respect to each of the foregoing entities in clauses (a)-(h), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary in the Plan, the scope of "Exculpated Parties" shall be subject to the limitations set forth in <u>Article IX.F</u> of the Plan. For the avoidance of doubt, the Exculpated Parties referenced in the foregoing clauses (h) and (i), are "Exculpated Parties" solely with respect to work performed on behalf of the applicable Entity for which exculpations are provided pursuant to <u>Article IX.D</u> of the Plan, subject to the limitations set forth in <u>Article IX.F</u> of the Plan.

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[19] Debtor releases are granted by courts in the Second Circuit where the Debtors establish that such releases are in the "best interests of the estate."[20] Courts often find that releases pursuant to a settlement are appropriate.[21] Additionally, in the Second Circuit, third party releases are permissible when they are

---

[19] *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[20] *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[21] *See*, *e.g.*, *In re Spiegel*, No. 03-11540 (BRL) 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); *In re AMR Corp.*, No. 11-15463 (SHL)

consensual or where "truly unusual circumstances" render the release terms integral to the success of the plan.[22]  The determination is not a matter of "factors and prongs" but courts have provided some guidance for allowing third party releases. "Unusual circumstances" include instances in which: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished;(c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[23]  Courts typically allow releases of third party claims against non-debtors where there is the express consent of the party giving the release or where other circumstances in the case justify giving the release.[24]  Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[25]  In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[26]

"Most courts allow consensual [third party] releases to be included in a plan."[27]  Courts in this district have found that parties consent to give releases when they vote in favor of the plan or when they abstain from voting but do not opt out of releases.[28]  Third party releases may also be deemed consensual

---

[Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); *see also In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *accord In re Adelphia Communications Corp.*, 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[22]    *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005).

[23]    *Id.* at 141.

[24]    *Id.*

[25]    *See, e.g.*, *Oneida*, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[26]    *See In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *Enron*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[27]    *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also Indianapolis Downs*, 486 B.R. at 305 ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[28]    *See Metromedia*, 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent."); *In re Calpine Corp.*, No. 05-60200 BRL, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) ("Such releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan, who abstain from voting and choose not to opt out of the releases, or who have otherwise consented to give a release, and are consensual.");. *DBSD N. Am.*, 419 B.R. at 218–19  ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *Adelphia*, 368 B.R. at 268  (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Lear Corp.*, No. 09–14326, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible).

for unimpaired creditors who are deemed to accept the plan.[29]  Here, the Third Party Releases are consensual with respect to all of the Released Parties.  Importantly, the Ballots distributed to holders of Claims or Interests entitled to vote on the Plan quoted the entirety of the Third Party Release and related provisions and definitions of the Plan, clearly informing holders of Claims or Interests entitled to vote of the steps they should take if they disagreed with the scope of the release.[30]  Thus, affected parties were on notice of Third Party Release, including the option to opt out of the Third Party Release.  Parties entitled to vote that do not return a ballot will be subject to the Third Party Release unless they affirmatively "opt out" of such release by providing written notice to the Debtors or the Claims and Solicitation Agent.  As a result, the primary aspects of the Third Party Releases are consensual under the substantial majority of precedent in this jurisdiction, and the Court need not consider the other *Metromedia* factors with respect to such aspects.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan.  More specifically, a number of the Released Parties played a vital role in negotiations that resulted in the Restructuring Support Agreement.  The Restructuring Support Agreement was heavily negotiated among the Debtors and the Debtors' key economic stakeholders—Mercuria, the Committee and its members (including the Unsecured Notes Indenture Trustees), the Consenting Unsecured Noteholders, and AmEx—and sets forth the key terms by which a consensual, going-concern restructuring of the Debtors' businesses pursuant to a chapter 11 plan of reorganization that unimpairs the vast majority of creditors.  Mercuria, the Consenting Unsecured Noteholders, AmEx, and the DIP Lenders have each agreed to compromise their Claims under and support the Plan.  The releases, exculpations, and injunctions were a material inducement for parties to enter into the Restructuring Support Agreement.  The DIP Lenders and DIP Agents have provided the postpetition financing necessary to fund the administration of these chapter 11 cases, without which there would be no viable business to reorganize around.  Mercuria has also agreed to fund various recoveries under the Plan.

Mercuria's commitments to and support of the Debtors over the past several months helped the Debtors avoid an immediate free-fall liquidation and have provided the Debtors, their estates, and creditors with significant value, including in its capacities as a prepetition lender, DIP Lender, and Plan sponsor.  As a result of Mercuria's contributions, the majority of the Debtors' creditors will be entitled to 100 percent recoveries.  Therefore, Mercuria and its representatives are fully entitled to the releases and exculpations set forth in the Plan.

The Debtors reached out to numerous parties in search of a strategic alliance to stabilize their business during the summer of 2018.  The Debtors determined Mercuria was best suited to provide the necessary support.  Mercuria committed to provide the Debtors with a range of credit solutions.  Most notably, Mercuria provided the Debtors with significant sleeving and hedging services, and the parties negotiated Mercuria's participation in the trade financing facility.  Just as Mercuria began to work alongside the Debtors, the Debtors' lenders under the U.S. Credit Facility and Global Credit Facility, which had already severely restricted the Debtors' access to much-needed credit, threatened to exercise remedies that would deprive the Debtors of their very ability to avoid immediate liquidation.  In response, rather than leave the Debtors to their own fate, Mercuria agreed to step in and acquired all interests of the prior lenders

---

[29]  *See Indianapolis Downs*, 486 B.R. at 306 (finding that the releases, which included releases of unimpaired creditors who were deemed to accept the plan, "may be properly characterized as consensual").

[30]  *See, e.g.*, *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties).

to the U.S. Credit Facility and Global Credit Facility, restored their credit lines, enhanced liquidity, and waived past defaults.

Fully aware of the Debtors' precarious financial situation, Mercuria continued to support the Debtors and accepted their proposal that the parties pursue a chapter 11 process and a section 363 sale of the Debtors' assets. Under this plan, Mercuria agreed to provide debtor-in-possession financing and serve as a stalking horse bidder, setting the floor for an auction for the Debtors' assets.

At the very onset of the chapter 11 cases, the Debtors' DIP Financing Motion and Sale Process Motion were faced with opposition by the Ad Hoc Group, and later the Committee. In response, Mercuria engaged in negotiations to settle the dispute. As a result of these negotiations, Mercuria agreed to provide substantially more value than under its stalking horse bid, a larger cash component and an agreement to share the proceeds of the Debtors' litigation claims with the unsecured creditors. A robust auction for the Debtors' DIP Financing and acquisition of the Debtors then ensued. As a result, Mercuria agreed to increase the cash component of its offer, agreed that the unsecured creditors of AMPNI could receive the entirety of the proceeds of the Debtors' litigation claims (rather than just a percentage), and agreed to provide 100% recoveries to the Debtors' other unsecured creditors. The releases and exculpations set forth in the Plan have always been an essential component of the negotiations and was a material inducement to Mercuria's agreeing to acquire the Debtors and to support a Plan providing substantial value to all creditors.

The Debtors' directors and officers likewise contributed substantially to these chapter 11 cases. While continuing to serve in their operational capacities postpetition, the Debtors' directors and officers simultaneously undertook the considerable burden of guiding the Debtors through the restructuring, working with the Debtors' professionals to make and implement difficult financial and operational initiatives, and participated in the negotiation and formulation of the Stalking Horse Purchase Agreement, the Restructuring Support Agreement, the Plan, documents relating to the DIP Financing, and other critical documents in these chapter 11 cases. Certain directors and officers have committed an extraordinary amount of time and personal resources, both before and after the commencement of these chapter 11 cases, to the Investigation, including cultivating relevant documents, witnesses, and other evidence while cooperating with relevant authorities, above and beyond what would otherwise be required as part of their fiduciary duties. As a result of these efforts, Holders of Claims in Class 4A (Aegean Unsecured Claims) and Class 7 (Section 510(b) Claims), and Holders of Interests in Class 8 (Interests in Aegean), stand to realize the benefit of such contributions as part of the Litigation Trust's monetization of the Litigation Claims. Moreover, since the New Independent Directors were appointed in May 2018, these directors have contributed substantial value to the Debtors' overall enterprise resulting from their extraordinary efforts to stabilize business operations during June and July 2018 when operations had all but ground to a halt. The New Independent Directors were instrumental to sourcing and negotiating alternative financing proposals with multiple financial and strategic investors during the summer of 2018, the result of which was the MOU with Mercuria and later the refinancing of the prepetition revolving facilities.

The Debtors also believe that the Third Party Releases are consensual and, therefore, appropriate. The Plan provides the following with respect to granting of the Third Party Release, which in all respects is subject to the Litigation Claims Carve Out set forth in Article IX.F of the Plan and the Securities Claims Carve Out set forth in Article IX.I of the Plan. *First*, Holders of Claims or Interests entitled to vote on the Plan who vote to accept the Plan grant the Third Party Release. This is a sufficient manifestation of consent under applicable law. *Second*, Holders of Claims or Interests who are entitled to vote on the Plan, vote to reject the Plan, and do not check the box to opt out grant the Third Party Release. These holders will certify on such ballot that they have read and understand that they are making an election whether to grant the Third Party Release by returning a ballot, an express manifestation of consent. *Third*, Holders of Claims or Interests who are entitled to vote on the Plan, abstain from voting on the Plan, and fail to provide written notice to the Debtors or the Notice and Claims Agent, via Ballot or otherwise, will grant the Third Party

Release. *Fourth*, Holders of Claims that are Unimpaired and therefore deemed to accept the Plan have the opportunity to nevertheless opt out of granting the Third Party Release as provided for on the Notice of Non-Voting Status grant the Third Party Release.

The subject matter of the Third Party Release is narrowly tailored and only includes claims that relate to the Debtors, these chapter 11 cases, the Plan, and the Restructuring Transactions, as further modified by carve outs for the Litigation Claims and the Securities Claims. For example, the Third Party Release, as modified by the Litigation Claims Carve Out and Securities Claims Carve Out, does not release any potential claims against the Debtors' former officers and directors or any professionals named as defendants in the consolidated complaint filed in the Securities Litigation that may arise from a common nucleus of facts related to the Investigation and the misappropriation of assets or fraudulent accounts receivable. Conversely, the Third Party Release, as modified by the Litigation Claims Carve Out and Securities Claims Carve Out, does release any potential claims against (a) the Debtors' current officers and directors who served prior to May 1, 2018 and who remain in their respective positions as of the date hereof, (b) the New Independent Directors, and (c) Mercuria. Importantly, the Third Party Release is also consensual, consistent with applicable law, for the reasons set forth in the preceding paragraph and is integral to the Plan and is a material inducement to the Released Parties pledging their support for and making possible the value-maximizing transaction contemplated by the Plan. Given the foregoing, the Third Party Release is appropriate. Various Holders of Claims or Interests who are entitled to vote on the Plan may have claims against a Released Party and the Debtors express no opinion on whether a Holder has a claim or the value of the claim nor do the Debtors take a position as to whether a Holder should consent to grant this release.

The Bankruptcy Court has subject matter jurisdiction to approve the Third Party Release because prosecution of the potential claims to-be-released will have a conceivable effect on the bankruptcy estate. *See In re SunEdison, Inc.*, 576 B.R 461, 461 (Bankr. S.D.N.Y. 2017). The party asserting that a bankruptcy court has subject matter jurisdiction must prove by a preponderance of evidence that jurisdiction exists. *Id.* This is a low bar and is easily satisfied here. The claims subject to the Third Party Release only include claims that relate to the Debtors, these chapter 11 cases, the Plan, and the Restructuring Transactions, as modified by carve outs for the Litigation Claims and the Securities Claims. For example, the claims alleged in the consolidated complaint filed in the Securities Litigation could result in certain individuals seeking reimbursement for defense costs from applicable D&O Liability Insurance Policies, which would directly impact the amounts available under these D&O Liability Insurance Policies. This could impact potential recoveries of other stakeholders in these chapter 11 cases.

The Debtors believe that the releases, exculpations, and injunctions are a necessary part of the Plan. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan. Among other things, the Debtors will demonstrate at the Confirmation Hearing that, given the significant consideration being provided by the Released Parties to the Debtors and other Releasing Parties, the Debtors' releases in favor of the Released Parties are appropriate and within their reasonable business judgment.

## X.    RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

### A.    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place, and it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims or Interests.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan, and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not

unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that an impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

### 7.    Filing of a Competing Plan

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

### 8.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9.    The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed

amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

      **12.**      **The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article IX of the Plan of provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

      **13.**      **The Total Amount of Allowed Aegean Unsecured Claims May Be Higher Than Anticipated By the Debtors**

With respect to Holders of Allowed Aegean Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

      **14.**      **The Total Amount of Allowed Administrative and Priority Claims May Be Higher or the Amount of Distributable Cash may be Lower Than Anticipated By the Debtors**

The amount of Cash the Debtors hold prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization. Mercuria has agreed to pay all Allowed Administrative and Priority Claims if the proceeds of the DIP Financing facilities is insufficient. Accordingly, there is a risk that neither the Debtors nor Mercuria will be able to pay Allowed Administrative and Priority Claims in full in Cash on the Effective Date.

      **15.**      **The Actual Amount Collected by the Debtors on Account of Their Accounts Receivable and the Actual Timing of Such Collections May Materially Differ Than that Anticipated By the Debtors**

The Debtors will require proceeds on account of their accounts receivable to satisfy Administrative Claims and Priority Claims in accordance with the Plan. The actual amount the Debtors realize on their accounts receivable and the actual timing for the receipt of such proceeds may materially differ from that anticipated by the Debtors. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization. Mercuria has agreed to pay all Allowed Administrative and Priority Claims if the proceeds of the DIP Financing facilities is insufficient. Accordingly, there is a risk that neither the Debtors nor Mercuria will be able to pay Allowed Administrative and Priority Claims in full in Cash on the Effective Date.

### 16. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the chapter 11 cases may adversely affect certain Holders of Claims and Interests.

## C. Risks Related to the Transaction

### 1. The Support of the Parties to the Restructuring Support Agreement is Subject to the Terms of the Restructuring Support Agreement, Which is Subject to Termination in Certain Circumstances

Pursuant to the Restructuring Support Agreement, Mercuria, the Consenting Unsecured Noteholders, the Committee, and AmEx are obligated to support the Restructuring Transactions discussed above and the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events. Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and Consummation of the Plan because the Plan may no longer have the support of the these parties.

### 2. No Distributions May Be Made From the Litigation Trust if the Litigation Trustee is Not Successful in Prosecuting the Litigation Claims

The Litigation Trust may not be successful in prosecuting the Litigation Claims and there is no guarantee that the Litigation Trust will ever make distributions to its beneficiaries. Because the Litigation Trust Interests are a component of, or the entirety of, the consideration being distributed to Holders of Claims or Interests in Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (Interests in Aegean), there is a possibility that Holders of Claims or Interests in these classes will receive no recovery at all from the Litigation Trust. As a result, all or a material portion of the recovery of the Holders of Claims or Interests in Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (Interests in Aegean) is at risk if the Litigation Trustee is not successful in prosecuting and recovering on the Litigation Claims.

### 3. Even if the Litigation Trustee is Successful in Prosecuting the Litigation Claims, Any Potential Distributions Will be Limited by Other Factors.

The Litigation Trustee and any professionals or consultants retained by the Litigation Trustee are entitled to the payment of fees, expenses, and costs in connection with the performance of their duties under the Plan, the Confirmation Order, and the Litigation Trust Agreement. The fees (including fees resulting from any contingent fee arrangement), expenses, and costs to the Litigation Trustee or any professional retained by the Litigation Trustee may be paid subsequent to the repayment of funds provided by the Litigation Trust Funders (including the payment of the Litigation Trust Funding Fee), but in all other cases, prior to any distributions to beneficiaries of the Litigation Trust.

The Debtors have limited D&O insurance coverage. Available D&O insurance coverage is subject to numerous factors and assumptions, including, but not limited to, when potential claims are noticed to the insurance carriers and when the acts giving rise to those claims were or are proper subject of notice to such insurance carriers. Further, the amount of available D&O insurance coverage will fluctuate depending on the facts and circumstances of any claim for which recovery is available under such D&O insurance and when such claims are noticed to such insurance carriers. In addition, parties in interest other than the

Litigation Trust may assert claims against or with recourse to the D&O insurance coverage.  Such competing claims may impact the monetization of the Litigation Claims.

### 4.    Applicable Privacy Laws Could Hinder Access to Information That Is Relevant to the Prosecution of Certain Litigation Claims

The privacy laws in Greece, the European Union, or other countries may limit the Debtors' ability to access or process information that may be relevant to the Investigation and prosecution of the Litigation Claims.  Certain Debtors are party to an ongoing administrative proceeding in Greece related to alleged prepetition violations of the European Union General Data Protection Regulation ("GDPR"), the outcome of which may impact access to information related to the prosecution of certain Litigation Claims.  The Debtors dispute any such alleged violation and believe that they are able to access such information in compliance with applicable law.  If an organization is found to be in violation of the GDPR, the regulation provides a maximum fine of up to the higher of €20,000,000 or 4 percent of worldwide annual turnover of the preceding financial year and/or enforcement actions by a relevant supervisory authority.

### 5.    There is Inherent Uncertainty in the Debtors' Financial Projections

The Financial Projections attached hereto as **Exhibit F** includes projections covering the Debtors' operations through December 31, 2024.  The Financial Projections represent the Debtors' management team's best estimate of the Debtor' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. These projections are also based on various other assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the Reorganized Aegean Equity Interests and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the chapter 11 cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the chapter 11 cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.

### 6.    Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtors

If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Plan, without realizing any of the anticipated benefits of the Plan;

- the incurrence of substantial costs by the Debtors in connection with the restructuring, without realizing any of the anticipated benefits of the Plan;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing traditional chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and  interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

**D.      Risks Related to the Debtors' Businesses**

**1.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the chapter 11 cases, the Debtors' ability to operate will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the chapter 11 cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the chapter 11 cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the chapter 11 cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the chapter 11 cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition and ability to consummate the Plan. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the chapter 11 cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the chapter 11 cases that may be inconsistent with the Debtors' plans.

**2.      The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Audit Committee has concluded that the Debtors' financial statements for (i) the fiscal years ended December 31, 2015 and December 31, 2016 included in the annual reports on Form 20-F for such years, (ii) the interim periods within such fiscal years included in the reports on Form 6-K for such periods, (iii) the periods ended March 31, 2017, June 30, 2017, September 30, 2017 included in the reports on Form 6-K for such periods, and (iv) related press releases describing the Debtors' financial results for such periods, as well as the fourth quarter of each of 2015, 2016 and 2017 (and the year ended December 31, 2017), should no longer be relied upon.  In addition, the Audit Committee and its counsel, Arnold & Porter,

continue to conduct the Investigation into alleged fraudulent accounting entries and other potential fraudulent activity related to the Debtors.

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 3.    The Debtors May Not Be Able to Achieve Their Projected Financial Results

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects. If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence. The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations. They do not, however, guarantee the Debtors' future financial performance.

### 4.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the chapter 11 cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses. In addition, the longer the proceedings related to the chapter 11 cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the chapter 11 cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the chapter 11 cases. The chapter 11 proceedings also require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to fully draw on the availability under the DIP Financing, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

### 5.    The Debtors May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors or, in the future the Reorganized Debtors, may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in

settlements or damages that could significantly affect the Debtors or Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors or Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors or Reorganized Debtors' businesses and financial stability, however, could be material.

### 6. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base. The Debtors' recent liquidity issues and the chapter 11 cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 7. Increases in Oil and Fuel Prices Could have a Material Effect on the Debtors' Business

The purchase of oil and/or marine fuel represents large portion of the Debtors' overall cost structure. Increases in the costs of these inputs may increase the Debtors' overall costs and the Debtors may not be able to maintain projected gross margins on the sale of fuel or meet projected volume levels should customers have lower demand given the higher fuel cost. Higher fuel prices may also increase the Debtors' capital requirements.

### 8. Oil and Marine Fuel Prices Are Volatile, and Price Fluctuations Could Materially Adversely Affect the Debtors' Business, Results of Operations, and Financial Conditions

Oil and marine fuel are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and marine fuel prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The prices for oil and marine fuel are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil exploration and production activity;

- the level of global oil inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

### 9. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties.

The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file certain claims. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. Their liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

Any future proposed or fully enacted laws and regulations could have a material impact on the Debtors' business and operations. In particular, the International Maritime Organization (the "IMO"), a specialized agency of the United Nations responsible for regulating shipping, has promulgated the 2020 IMO fuel sulfur regulation (the "2020 Regulation"), which requires all vessels to utilize fuel oil with a maximum sulfur content of 0.5 percent by January 1, 2020. The impact of the 2020 Regulation on the Debtors' business and operations and on the price of marine fuel is unknown and could have a material impact on the Debtors' businesses, results of operations, and financial condition.

### 10. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Post-Effective Date Debtors' financial condition.

### E. Liquidity Risks

The Reorganized Debtors' ability to carry out capital spending that is important to their ongoing operations and future growth and will depend on a number of factors, including access to capital, sufficient liquidity to fund business operations including the purchase of inventory for sale to customers, and the

ability to achieve any business plan.  These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors that are beyond the Reorganized Debtors' control.

### F.        Risks Associated with Forward Looking Statements

This Disclosure Statement contains certain "forward-looking statements."  All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision," "plan," "potential," "preliminary," "predict," "should," "will" or "would" or the negative thereof or other variations thereof or comparable terminology.  The Debtors have based these forward-looking statements on their current expectations, assumptions, estimates and projections. While the Debtors believe these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond their control, which may cause their actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. **The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

### G.        Disclosure Statement Disclaimer

#### 1.        Information Contained in this Disclosure Statement is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 2.        This Disclosure Statement Has Not Been Approved by the United States Securities and Exchange Commission

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority.  Neither the SEC nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

#### 3.        No Legal, Business, Accounting, or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, accounting, or tax advice.  Each Holder of a Claim or an Interest should consult such Holder's own legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 4.     No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors), nor (b) deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, or Holders of Allowed Claims, or any other parties in interest.

### 5.     Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors, Reorganized Debtors, or the Litigation Trustee, as applicable, may seek to investigate, file, and prosecute objections to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests as Disputed Claims or Interests.

### 6.     No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

### 7.     Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### 8.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 9.     No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

### H.     Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is set forth in Article IX of this Disclosure Statement, "Confirmation of the Plan," and is also included in the Debtors' Liquidation Analysis.

## XI.    CERTAIN SECURITIES LAW MATTERS

### A.     Reorganized Aegean Equity Interests

As discussed herein, the Plan provides for the Debtors to distribute Reorganized Aegean Equity Interests to Holders of DIP Credit Facility Claims.  The Debtors believe that the Reorganized Aegean Equity Interests are or may be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (each, a "Blue Sky Law").

### B.     Issuance and Resale of Securities Under the Plan

#### 1.     Exemptions from Registration Requirements of the Securities Act and Blue Sky Laws

The Debtors intend that the Litigation Trust will be organized in compliance with applicable law such that the Litigation Trust Interests will not be treated as securities.  As a result, the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the Litigation Trust Interests or an exemption from such registration requirements is required.  However, to the extent that the Litigation Trust Interests are deemed to be securities, the issuance and distribution thereof under the Plan would qualify for the exemption from registration provided under (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

All shares or units of Reorganized Aegean Equity Interests issued under the Plan will be issued in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.  To the extent that the Litigation Trust Interests are determined to be securities in accordance with the Plan, the Litigation Trust Interests will also be issued in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") section 4(a)(2) under the Securities Act and/or Regulation D thereunder.  In reliance upon either or both of these exemptions, the offer and sale of the Reorganized Aegean Equity Interests (and the Litigation Trust Interests if they are determined to be securities) under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants, rights, privileges, or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for

administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or affiliate or are issued principally in such exchange and partly for cash and property.

To the extent that the issuance and distribution of the Reorganized Aegean Equity Interests and Litigation Trust Interests are covered by section 1145 of the Bankruptcy Code, the Reorganized Aegean Equity Interests and Litigation Trust Interests may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Reorganized Aegean Equity Interests (and the Litigation Trust Interests if they are determined to be securities) generally may be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of those exemptions for any such resale cannot be known unless individual state Blue Sky Laws are examined.

To the extent any shares or units of Reorganized Aegean Equity Interests and Litigation Trust Interests are issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, such shares or units will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each of the Holders of DIP Credit Facility Claims has made customary representations to the Debtors (including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a "qualified institutional buyer" (as defined under Rule 144A promulgated under the Securities Act)).

The Plan contemplates the application of (i) section 1145 of the Bankruptcy Code and/or (ii) section 4(a)(2) of the Securities Act or Regulation D thereunder to the Reorganized Aegean Equity Interests (and to the Litigation Trust Interests if they are determined to be securities) but at this time, the Debtors express no view as to whether any Person may freely resell Reorganized Aegean Equity Interests and Litigation Trust Interests without registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws. Recipients of Reorganized Aegean Equity Interests and Litigation Trust Interests are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act or Regulation D thereunder to the Reorganized Aegean Equity Interests and the Litigation Trust Interests and the availability of any exemption from registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

### 2. "Underwriters"; Resale of the Reorganized Aegean Equity Interests (and Litigation Trust Interests if determined to be securities) by Persons Deemed to be "Affiliates" or "Underwriters"; Resale of Reorganized Aegean Equity Interests (and Litigation Trust Interests if determined to be securities) Issued Pursuant to Section 4(a)(2) of the Securities Act or Regulation D Thereunder

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives

a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" any person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer, of securities. As a result, the reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer, director or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities, through contract or otherwise. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10 percent) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Reorganized Aegean Equity Interests (and the Litigation Trust Interests if they are determined to be securities) by an entity who (i) is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has been such an "affiliate" within ninety (90) days of such transfer, (iii) has acquired the Reorganized Aegean Equity Interests or Litigation Trust Interests from an "affiliate" in a private transaction within one year of such transfer, or (iv) is an "underwriter" (which definition includes "controlling Persons" of an issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law. Under certain circumstances, holders of Reorganized Aegean Equity Interests (and Litigation Trust Interests if they are determined to be securities) who have one of the above attributes or are deemed to be "underwriters," or who hold Reorganized Aegean Equity Interests or Litigation Trust Interests issued pursuant to section 4(a)(2) of the Securities Act or Regulation D thereunder, may be entitled to resell their Reorganized Aegean Equity Interests or Litigation Trust Interests pursuant to the limited safe harbor resale provisions for securities (including "control securities") under Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of control securities (such as securities issued under the Plan to an "affiliate") if current information regarding the issuer is publicly available, and if volume limitations, notice and manner of sale requirements are met and would permit the public sale of restricted securities (such as securities received from an "affiliate" in a private transaction) if current information regarding the issuer is publicly available and/or holding period requirements are met.

Whether any particular Person would be deemed to meet one or more of the above criteria or is an "underwriter" (including whether such Person is a "controlling Person" of an issuer) with respect to the Reorganized Aegean Equity Interests (and Litigation Trust Interests if they are determined to be securities), would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "affiliate" or "underwriter" with respect to the Reorganized Aegean Equity Interests (and to the Litigation Trust Interests if they are determined to be securities) and, in turn, whether any Person may freely resell Reorganized Aegean Equity Interests and Litigation Trust Interests. The Debtors recommend that potential recipients of Reorganized Aegean Equity Interests and Litigation Trust Interests consult their own counsel concerning their ability to freely trade such securities without registration or qualification with the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

C.    U.S. Securities and Exchange Commission Rights Reserved

Notwithstanding any language to the contrary contained in the Plan and/or the Plan Confirmation Order, no provision of this Plan or the Plan Confirmation Order (i) releases any non-Debtor Entity from any Claim or cause of action of the U.S. Securities and Exchange Commission; or (ii) enjoins, limits, impairs, or delays the U.S. Securities and Exchange Commission from commencing or continuing any Claims, causes of action, proceedings or investigations against any non-Debtor Entity in any forum.

## XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the U.S. Debtor (as defined below) and certain U.S. Holders (as defined below) of Claims.  Except as provided below, this summary does not address the U.S. federal income tax consequences to holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "IRS") all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion addresses only those U.S. Holders that hold Claims as capital assets within the meaning of Section 1221 of the Tax Code.  In addition, this summary does not address non-U.S., state, local, estate, or gift tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as persons who are related to a Debtor within the meaning of the Tax Code, persons that are not U.S. Holders, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims, or who will hold equity interests in the Reorganized Debtors, as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and U.S. Holders of Claims who are themselves in bankruptcy).  Furthermore, this discussion assumes that U.S. Holders of Claims hold only Claims in a single Class.  U.S. Holders of Claims in more than a single Class should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.  This discussion also assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, (A) the term "U.S. Holder" means a Holder of a Claim that is for U.S. federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person

for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source and (B) the term "U.S. Debtor" means ABUSA.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular U.S. Holder of a Claim. Each U.S. Holder of a Claim should seek advice from its own independent tax advisors concerning the U.S. federal, state, local, foreign income, and other tax consequences of the Plan to it in light of its particular circumstances.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

## B.    Certain U.S. Federal Income Tax Consequences to the U.S. Debtor

### 1.    Transfer of Litigation Assets to Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust should be treated as a "liquidation trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will take a position on the Litigation Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Holders of Aegean Unsecured Claims (and possibly the Holders of Section 510(b) Claims and Aegean Interests) and (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust.  If the IRS were to challenge successfully the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Litigation Trust, and the Holders of Claims and Interests receiving interests in the Litigation Trust shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Litigation Trust among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (e.g., income, gain, loss, deduction and credit). Each Litigation Trust Beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to Litigation Trust Beneficiaries who received their interests in the Litigation Trust in connection with the Plan.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Litigation Trustee of an IRS private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, any Disputed Claims reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the Litigation Trust Assets in such reserve, and all distributions from such reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by Holders in respect of their Claims or Interests as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

Because certain assets being transferred to the Litigation Trust by the Debtors include assets with no tax basis, the Debtors may recognize taxable income in connection with such transfers to the extent of the value of such assets.

### 2.    Cancellation of Debt and Reduction of Tax Attributes of the U.S. Debtor

In general, absent an exception, the U.S. Debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, however, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The amount of COD Income of the U.S. Debtor, and accordingly the amount of tax attributes of the U.S. Debtor required to be reduced, will depend on, if the DIP Credit Facility Claims against the U.S. Debtor are (i) cancelled, the adjusted issue price of the DIP U.S. Credit Facility or (ii) exchanged for Reorganized Aegean Equity Interests, the fair market value of such Reorganized Aegean Equity Interests. This value cannot be known with certainty at this time. However, as a result of Confirmation, the U.S. Debtor expects that there will be material reductions in, or elimination of, NOLs, NOL carryforwards and other tax attributes that are not utilized before the end of the tax year in which the Effective Date occurs.

### 3.    Limitation of NOL Carryforwards and Other Tax Attributes of the U.S. Debtor

Following Confirmation, the U.S. Debtor anticipates that any NOL carryover, capital loss carryover, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation or elimination under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan (to the extent such Pre-Change Losses are not eliminated pursuant to section 108 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the transactions contemplated by the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs). The section 382 limitation may be increased to the extent that the U.S. Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.    If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years following the first "ownership change" without triggering the elimination of its Pre-Change Losses.

89

The U.S. Debtor has not yet determined whether or not to utilize the 382(l)(5) Exception. It is possible that the U.S. Debtor will not qualify for the 382(l)(5) Exception. Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence. In either case, the U.S. Debtor expects that its use of the Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

### C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Aegean Unsecured Claims

The following discussion assumes that the Debtors will undertake the restructuring transactions currently contemplated by the Plan.  Holders of Aegean Unsecured Claims are urged to consult their tax advisors regarding the tax consequences of the restructuring transactions.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the Aegean Unsecured Claims, the holders of such Claims shall receive their Pro Rata share of the Aegean Unsecured Claims Cash Pool and the Class A Litigation Trust Units.

As discussed above, the Debtors expect (and the Litigation Trust documents shall provide) that the trustee of the Litigation Trust will treat the Litigation Trust as a grantor trust of which the Holders of Aegean Unsecured Claims (and possibly the Holders of Section 510(b) Claims and Aegean Interests) are the grantors.  Each Holder of an Aegean Unsecured Claim should accordingly be treated as having (a) received its Pro Rata share of the Litigation Trust Assets from the Debtors and (b) contributed such assets to the Litigation Trust in exchange for the Class A Litigation Trust Units.

A U.S. Holder's receipt of the Class A Litigation Trust Units should be treated as a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between: (i) the sum of (A) the amount of any Cash received plus (B) the fair market value of the Litigation Trust Assets deemed received; and (ii) such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in their Pro Rata share of each of the Litigation Trust Assets equal to the fair market value of such Holder's Pro Rata share of each Litigation Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

The U.S. federal income tax obligations of holders with respect to their beneficial interest in the Litigation Trust are not dependent on the Litigation Trust distributing any Cash or other proceeds. Holders of such Claims will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. In general, except with respect to the Disputed Claims Reserve, a distribution of Cash by the Litigation Trust will not be separately taxable to a holder of a beneficial interest in the Litigation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Litigation Trust).

HOLDERS OF ALLOWED AEGEAN UNSECURED CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE RIGHT TO RECEIVE AND OF THE RECEIPT (IF ANY) OF PROPERTY FROM THE LITIGATION TRUST.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

### D.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest that accrued during its holding period, such amount should be taxable to the U.S. Holder as interest income (to the extent not already taken into income by the Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the U.S. Holder of a Claim will be attributable to accrued interest is unclear.  The Plan generally provides that distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.  Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  The applicability of these Treasury Regulations to a partial recovery in a bankruptcy is unclear.  A U.S. Holder of a Claim with accrued and unpaid interest is urged to consult its own tax advisor as to the allocation of any recovery between principal and interest.

### E.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a U.S. Holder of a Claim on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### F.    Information Reporting and Backup Withholding

Payments with respect to Claims and Interests under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate).  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a U.S.

Holder's federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate timely claim for refund with the IRS (generally, a federal income tax return). Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Claims are urged to consult their own tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation. All Holders of Claims should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.

## XIII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and holders of other interests than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims or Interests in Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claim), and Class 8 (Interests in Aegean) vote to accept the Plan and support Confirmation of the Plan.

Dated: February 13, 2019

                                        AEGEAN MARINE PETROLEUM NETWORK INC.
                                        on behalf of itself and all other Debtors


                                        By:      */s/ Tyler Baron*
                                        Name:    Tyler Baron
                                        Title:   Authorized Signatory

## EXHIBIT A

**Joint Chapter 11 Plan of Reorganization**

**<u>EXHIBIT B</u>**

**Corporate Organizational Chart**

## EXHIBIT C

**Restructuring Support Agreement**

**<u>EXHIBIT D</u>**

**Liquidation Analysis**

**<u>EXHIBIT E</u>**

**Valuation Analysis**

## **EXHIBIT F**

**Financial Projections**

**<u>EXHIBIT B</u>**

**Redline to Revised Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) ) ) | Case No. 18-13374 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR
## THE JOINT PLAN OF REORGANIZATION OF
## AEGEAN MARINE PETROLEUM NETWORK INC. AND ITS DEBTOR
## AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Marc Kieselstein, P.C.
Cristine Pirro
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

James H.M. Sprayregen, P.C.
Adam C. Paul, P.C. (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated:  ~~January 15,~~**February 13,** 2019

---

[1]  Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/Aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

<div style="border:1px solid black; padding:4px; text-align:center">

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

</div>

**THE DEADLINE TO VOTE ON THE PLAN IS
MARCH [19], 2019 AT 4:00 P.M. (PREVAILING EASTERN TIME)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT OR A MASTER BALLOT
INCLUDING YOUR VOTE MUST BE <u>ACTUALLY RECEIVED</u>
BY EPIQ CORPORATE RESTRUCTURING LLC, ON
OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE X</u> HEREIN.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE

FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  SEE THE RISK FACTORS, SPECIFICALLY <u>ARTICLE X.C</u> AND <u>ARTICLE X.D</u> OF THIS DISCLOSURE STATEMENT.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS OR INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING <u>ARTICLE X</u>, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE ~~63,~~**69,** BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- ENVIRONMENTAL LIABILITIES;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.    THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.    THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.

*    *    *    *    *

## TABLE OF CONTENTS

Page

**I. INTRODUCTION** .......... **1**

**II. PRELIMINARY STATEMENT** .......... **1**

A. Plan Overview .......... 2
B. The Adequacy of the Disclosure Statement .......... 3

**III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN** .......... **4**

A. What is chapter 11? .......... 4
B. Why are the Debtors sending me this Disclosure Statement? .......... 4
C. Am I entitled to vote on the Plan? .......... 4
D. What will I receive from the Debtors if the Plan is consummated? .......... 5
E. What will I receive if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim? .......... ~~7~~**8**
F. What happens to my recovery if the Plan is not confirmed or does not go effective? .......... 8
G. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .......... 8
H. What are the sources of Cash and other consideration required to fund distributions under the Plan? .......... 8
I. Who supports the Plan? .......... 8
J. Is there potential litigation related to Confirmation of the Plan? .......... ~~8~~**9**
K. Will there be releases and exculpation granted to parties in interest as part of the Plan? .......... 9
L. **Can I opt out of the Third Party Release?** .......... **11¶**
**M.** What is the deadline to vote on the Plan? .......... ~~10~~**11**
~~M~~**N**. How do I vote for or against the Plan? .......... ~~10~~**11**
~~N~~**O**. What is the Litigation Trust Loan and can I participate in it? .......... ~~11~~**12**
~~O~~**P**. Why is the Bankruptcy Court holding a Confirmation Hearing? .......... ~~11~~**12**
~~P~~**Q**. When is the Confirmation Hearing set to occur? .......... ~~11~~**12**
~~Q~~**R**. What is the purpose of the Confirmation Hearing? .......... ~~11~~**12**
~~R~~**S**. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .......... ~~11~~**12**
~~S~~**T**. Do the Debtors recommend voting in favor of the Plan? .......... ~~12~~**13**

**IV. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES** .......... ~~**12**~~**13**

A. Corporate History and General Background .......... ~~12~~**13**
B. Business Operations .......... ~~13~~**14**
C. Employees .......... ~~16~~**17**
D. Senior Management .......... ~~16~~**17**
E. Aegean Board of Directors .......... ~~17~~**18**
F. Prepetition Capital Structure .......... ~~17~~**18**

**V. EVENTS LEADING TO THE CHAPTER 11 CASES** .......... ~~**21**~~**22**

A. Prepetition Challenges .......... ~~21~~**22**

B.      Appointment of Independent Directors and Composition of the Audit Committee ....... ~~23~~24
C.      Prepetition Initiatives ....... ~~23~~24
D.      Audit Committee Investigation ....... ~~25~~26
E.      The DIP Financing and Chapter 11 Filing ....... ~~26~~27

VI.     EVENTS OF THE CHAPTER 11 CASES ....... ~~27~~28

A.      First Day Pleadings and Other Case Matters ....... ~~27~~28
B.      Other Procedural and Administrative Motions ....... ~~29~~30
C.      Other Matters Relevant to these Chapter 11 Cases ....... ~~29~~30
D.      Appointment of Official Committee of Unsecured Creditors ....... ~~30~~32
E.      Debtor-in-Possession Financing ....... ~~31~~32
F.      Sale Process Motion ....... ~~33~~35
G.      Restructuring Support Agreements ....... ~~34~~36

VII.    SUMMARY OF THE PLAN ....... ~~35~~37

A.      Overview ....... ~~35~~38
B.      Treatment of Executory Contract and Unexpired Leases ....... ~~44~~47
C.      Releases ....... ~~47~~50

VIII.   SOLICITATION AND VOTING ....... ~~52~~56

A.      Solicitation Packages ....... ~~52~~56
B.      Classes Entitled to Vote on the Plan ....... ~~52~~57
C.      Votes Required for Acceptance by a Class ....... ~~53~~57
D.      Classes Not Entitled to Vote on the Plan ....... ~~53~~57
E.      Voting Record Date ....... ~~54~~58
F.      Voting on the Plan ....... ~~54~~58
G.      Ballots Not Counted ....... ~~55~~59

IX.     CONFIRMATION OF THE PLAN ....... ~~55~~59

A.      Confirmation Standards ....... ~~55~~59
B.      Best Interests of Creditors/Liquidation Analysis ....... ~~56~~61
C.      Creditor Recoveries ....... ~~57~~61
D.      Valuation ....... ~~57~~61
E.      Financial Feasibility ....... ~~57~~61
F.      Acceptance by Impaired Classes ....... ~~57~~62
G.      Confirmation without Acceptance by All Impaired Classes ....... ~~58~~63
H.      The Debtor Releases, Third Party Releases, Exculpation, and Injunction
        Provisions ....... ~~59~~64

X.      RISK FACTORS ....... ~~63~~69

A.      General ....... ~~63~~70
B.      Certain Bankruptcy Law Considerations ....... ~~63~~70
C.      Risks Related to the Transaction ....... ~~67~~74
D.      Risks Related to the Debtors' Businesses ....... ~~69~~76
E.      Liquidity Risks ....... ~~72~~79
F.      Risks Associated with Forward Looking Statements ....... ~~73~~80
G.      Disclosure Statement Disclaimer ....... ~~73~~80
H.      Liquidation Under Chapter 7 ....... ~~75~~82

XI.    CERTAIN SECURITIES LAW MATTERS ....................................................... ~~75~~82

    A.    Reorganized Aegean Equity Interests ......................................................... ~~75~~82
    B.    Issuance and Resale of Securities Under the Plan ..................................... ~~75~~82¶
    **C.    U.S. Securities and Exchange Commission Rights Reserved** ................ **85**

XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...... ~~78~~85

    A.    Introduction ................................................................................................ ~~78~~85
    B.    Certain U.S. Federal Income Tax Consequences to the U.S. Debtor ........ ~~79~~86
    C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Aegean
          Unsecured Claims ....................................................................................... ~~83~~90
    D.    Accrued Interest ......................................................................................... ~~84~~91
    E.    Market Discount ......................................................................................... ~~84~~91
    F.    Information Reporting and Backup Withholding ........................................ ~~84~~91

XIII.    RECOMMENDATION .................................................................................... ~~85~~92

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code |
| EXHIBIT B | Corporate Organizational Chart as of the Petition Date |
| EXHIBIT C | Restructuring Support Agreement |
| EXHIBIT D | Liquidation Analysis |
| EXHIBIT E | Valuation Analysis |
| EXHIBIT F | Financial Projections |

## I.    INTRODUCTION

Aegean Marine Petroleum Network Inc. ("Aegean") and its debtor affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each Debtor.

**THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN ARE SUPPORTED BY THE DEBTORS, THE COMMITTEE, MERCURIA, CONSENTING UNSECURED NOTEHOLDERS HOLDING [59]64 PERCENT OF THE PRINCIPAL AMOUNT OUTSTANDING OF THE UNSECURED NOTES, AND AMEX.**

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO ALL STAKEHOLDERS UNDER THE CIRCUMSTANCES.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS AND THE COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors are an international marine fuel logistics company and a leading independent physical supplier of marine fuel to vessels in port, at sea, on rivers and other waterways around the globe. Utilizing a modern fleet of 57 owned and chartered vessels and a broad network of supply hubs, the Debtors provide best-in-class bunkering services to customers in over 20 countries and more than 50 ports via a fully integrated supply chain comprised of fuel sourcing, storage (onshore and offshore), vessel-to-vessel delivery, and post-delivery customer care.  As of November 1, 2018, the Debtors employed approximately 850 individuals worldwide.

As of the Petition Date, the Debtors reported approximately $855 million in aggregate funded debt, including $131.3 million outstanding under its U.S. Credit Facility, $249.6 million outstanding under its Global Credit Facility, $206.6 million outstanding under ten secured term loan facilities—which generally financed the acquisition of the Debtors' fleet and the Fujairah terminal—and $267 million outstanding under two issuances of unsecured convertible notes by the Debtors' ultimate parent.  Since the Petition Date, and as of the date hereof, the entire prepetition amount of the U.S. Credit Facility and Global Credit Facility has been rolled-up into the Debtors' postpetition financing arrangements comprised of a $160 million DIP U.S. Revolving Credit Facility, $75 million DIP U.S. Term Credit Facility, and $300 million DIP Global Credit Facility.  Mercuria became the sole lender under the U.S. Credit Facility and Global Credit Facility in August 2018, is the sole lender under the DIP Facilities, and also owns approximately 30 percent of Aegean's common equity.

The Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Petition Date.  The Debtors in these chapter 11 cases consist of 75 entities.  An organizational chart

---

[1]  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified entirely by reference to the Plan.  In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.

setting forth the corporate structure of Aegean Marine—i.e., Debtors and Non-Debtor Subsidiaries—as of the Petition Date is attached hereto as **Exhibit B**.

The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and to distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan. To that end, the Debtors filed the Plan, which provides a comprehensive restructuring of the Debtors' obligations, preserves the going-concern value of the Debtors' businesses, and maximizes the value of creditor recoveries. The Debtors believe that the Plan accomplishes this objective and is in the best interests of the Debtors' estates and, therefore, the Debtors seek to confirm the Plan.

### A.    Plan Overview

As described more fully below, the Debtors have engaged in extensive good faith negotiations with Mercuria, the Committee, the Consenting Unsecured Noteholders, AmEx, and other parties in interest regarding the consensual restructuring of the Debtors' obligations following the Petition Date. The Plan represents the culmination of these negotiations and embodies a global settlement memorialized in the Restructuring Support Agreement, attached hereto as **Exhibit C**. The Debtors and the other parties to the Restructuring Support Agreement believe that the Plan provides the best available path forward for these chapter 11 cases and maximizes the value of the Debtors' estates.

Generally, the Plan provides for the following treatment of Claims and Interests:

- satisfies in full Allowed Administrative Claims and Allowed Priority Tax Claims, if any, against all Debtors;

- provides for 100 percent recoveries on account of Allowed Other Secured Claims, Allowed Other Priority Claims, Allowed Secured Term Loan Claims, and Allowed General Unsecured Claims against all subsidiary Debtors (*i.e.*, other than Aegean);

- provides that Holders of Allowed Aegean Unsecured Claims shall receive their Pro Rata share of (i) $40 million in Cash (*i.e.*, the Aegean Unsecured Claims Cash Pool) and (ii) Class A Litigation Trust Units in the Litigation Trust, which shall own and monetize the Litigation Claims for the benefit of Holders of Allowed Aegean Unsecured Claims and, potentially, equity holders;

- provides that Holders of Allowed Section 510(b) Claims and Allowed Interests in Aegean shall receive their Pro Rata share of Class B Litigation Trust Units (*i.e.*, second in priority relative to the Class A Litigation Trust Units) in the Litigation Trust; and

- equitizes obligations owing to Mercuria under the DIP Credit Facility Claims.

The Plan enjoys the support of: (i) the Debtors; (ii) Mercuria, the Debtors' primary prepetition secured lender, sole DIP Lender, and approximately 30 percent equity holder; (iii) the Committee, the statutory fiduciary for all of the Debtors' general unsecured creditors; and (iv) the majority of Holders of Class 4A Claims (Aegean Unsecured Claims), including (a) [59]64 percent of the principal amount outstanding of the Unsecured Notes and (b) AmEx, the largest individual non-Unsecured Noteholder unsecured creditor at Aegean. This support for the Plan, and the consensual reorganization of the Debtors contemplated therein, is an important achievement for the Debtors in the face of the significant liquidity issues, a challenging operating environment, and the potential for protracted litigation in these chapter 11 cases.

The Debtors strongly believe that the Plan is in the best interests of their estates and represents the best available alternative for all of their stakeholders.  The Debtors therefore urge Holders of Claims and Interests to vote to accept the Plan.

**B.    The Adequacy of the Disclosure Statement**

The Debtors seek Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history, corporate structure, business operations, and prepetition capital structure and indebtedness (Article IV herein);

- events leading to these chapter 11 cases, including the Debtors' restructuring negotiations (Article V herein);

- significant events in these chapter 11 cases (Article VI herein);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article III and Article VII herein);

- certain important effects of Confirmation of the Plan (Article IX herein);

- releases and exculpations contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article III and Article IX herein);

- the statutory requirements for confirming the Plan (Article IX herein);

- certain risk factors Holders of Claims or Interests should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article X herein); and

- certain U.S. federal income tax consequences of the Plan (Article XII herein).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors' boards of directors have approved the Plan and the Restructuring Transactions contemplated therein and believe that the Plan is in the best interests of the Debtors, the Estates, creditors, and equity interest holders as a whole.  As such, the Debtors recommend that all Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan by returning their ballots, so as to be actually received by Epiq Corporate Restructuring, LLC, the Debtors' notice and claims agent (the "Notice and Claims Agent") no later than **March [19], 2019, at 4:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing, currently scheduled for **March [26], 2019, at [●]:00 a.m. prevailing Eastern Time.**

3

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Term Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

4

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 4A | Aegean Unsecured Claims | Impaired | Entitled to Vote |
| 4B | General Unsecured Claims against All Other Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Entitled to Vote |
| 8 | Interests in Aegean | Impaired | Entitled to Vote |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors (with Mercuria's consent, or the Reorganized Debtors, as applicable) and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest (or as soon as reasonably practicable following either of such dates).

The classification, treatment, and the projected recoveries of classified Claims set forth in the table below are estimates only and therefore are subject to material change.  In particular, recoveries available to the Holders of Aegean Unsecured Claims are estimates based on information known to the Debtors as of the date hereof and actual recoveries could differ materially based on, among other things, the actual realized recoveries as to any one or more of the Litigation Claims, which are highly speculative and contingent upon successful prosecution of the Litigation Claims, and whether the amount of Claims actually allowed against the applicable Debtor exceed the estimates provided below.  The recoveries available to Holders of Aegean Unsecured Claims could be materially lower when compared to the estimates provided below.

To the extent any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern. For a complete description of the Debtors' classification and treatment of Claims and Interests, reference should be made to the Plan.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount | Projected Recovery |
| 1 | Other Secured Claims | As determined by the Debtors but subject in each case to Mercuria's reasonable consent, or the Reorganized Debtors, as applicable, either: (i) payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course; (ii) Reinstatement; (iii) the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iv) such other treatment rendering such Claim Unimpaired. | $0 | 100% |
| 2 | Other Priority Claims | Payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course. | $0 | 100% |
| 3 | Secured Term Loan Claims | As determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either: (i) payment in full in Cash by the Reorganized Debtors the later of the Effective Date or in the ordinary course; (ii) Reinstatement; (iii) the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iv) such other treatment rendering such Claim Unimpaired. | $206.6 million | 100% |
| 4A | Aegean Unsecured Claims | Pro Rata share of the Aegean Unsecured Claims Cash Pool and the Class A Litigation Trust Units. | $294.5 million | 13.6%, plus the distributions, if any, from the Litigation Trust [2] |
| 4B | General Unsecured Claims against All Other Debtors | Payment in full in Cash by the Reorganized Debtors on the later of the Effective Date or in the ordinary course or such other treatment as agreed to by the applicable Debtor but subject in each case to Mercuria's reasonable consent or the applicable Reorganized Debtor rendering such Claim Unimpaired. | $7.1 million | 100% |

---

[2]  The projected recovery of 13.6% represents a baseline recovery for Holders of Class 4A Aegean Unsecured Claims and does not include amounts that may be distributed on account of prosecution of the Litigation Claims, which are unliquidated and not reasonably calculable at this time. As a result, the actual recovery may be significantly higher. This projected recovery assumes that the Aegean Unsecured Claims Pool will be shared Pro Rata among all Holders of Aegean Unsecured Claims. For the avoidance of doubt, all Holders of Class 4A Aegean Unsecured Claims will receive their Pro Rata share of Class A Litigation Trust Units and will share in any distributions therefrom in accordance with the waterfall set forth in Article V of the Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount | Projected Recovery |
| 5 | Intercompany Claims | As determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either Reinstated or canceled and released (including by way of capital contribution) without any distribution on account of such Claims. | N/A | 100% / 0% |
| 6 | Intercompany Interests | As determined by the Debtors and Mercuria, or the Reorganized Debtors, as applicable, either Reinstated or canceled and released without any distribution on account of such Interests. | N/A | 100% / 0% |
| 7 | Section 510(b) Claims | Pro Rata share of Class B Litigation Trust Units _provided_, that for purposes of receiving the treatment provided herein, each Holder shall be treated as if such Holder held a number of Allowed Class 8 Aegean Interests equal in value (determined based on the Aegean Interest Distribution Value) to the amount of its Allowed Section 510(b) Claim. | $0[3] | Contingent / Unknown[4] |
| 8 | Interests in Aegean | Pro Rata share of Class B Litigation Trust Units. | Approximately 53.19 million shares[5] | Contingent / Unknown[6] |

**For illustrative purposes only, the following hypothetical demonstrates how to calculate the pro ration as between Holders of Class 7 Claims and Class 8 Interests. First assume that the Litigation Trust recovers $50 million in net proceeds after Class 4A Claims are Paid in Full, the entirety of which is available for distribution to Class B Litigation Trust Units. Assume further that there are $22 million in Allowed Class 7 Claims and the market capitalization of Class 8 Interests is $44 million. Holders of Allowed Class 7 Claims would share Pro Rata in $16.67 million, calculated as follows: ($22 million / ($22 million + $44 million)) * $50 million. Holders of**

---

[3]    No projected claim amount is provided for Class 7 Section 510(b) Claims, which are unliquidated and not reasonably calculable at this time. Article III.146 of the Plan defines Section 510(b) Claims as "any Claim against any Debtor: (a) arising from the rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such a Security; (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim; or (d) derived from, based upon, relating to, or arising under the subject matter of that certain securities litigation styled as _In re Aegean Marine Petroleum Network Inc. Securities Litigation_, No. 1:18-cv-04993 (NRB), currently pending in the United States Court for the Southern District of New York."

[4]    No recovery percentage is included for Class 7 Section 510(b) Claims because any such recovery is contingent on the prosecution of the Litigation Claims, which are unliquidated and not reasonably calculable at this time. For the avoidance of doubt, all Holders of Class 7 Section 510(b) Claims will receive their Pro Rata share of Class B Litigation Trust Units and will share in any distributions therefrom in accordance with the waterfall set forth in Article V of the Plan.

[5]    Aegean had a market capitalization of approximately $43.6 million, which is the product of (a) the volume-weighted average price of $0.75 per Aegean Interest on the Trading Day prior to the Petition Date, and (b) approximately 53.19 million Aegean Interests outstanding on the Trading Day prior to the Petition Date.

[6]    No recovery percentage is included for Class 8 Interests in Aegean because any such recovery is contingent on the prosecution of the Litigation Claims, which are unliquidated and not reasonably calculable at this time. For the avoidance of doubt, all Holders of Class 8 Interests in Aegean will receive their Pro Rata share of Class B Litigation Trust Units and will share in any distributions therefrom in accordance with the waterfall set forth in Article V of the Plan.

**Allowed Class 8 Interests would share Pro Rata in $33.33 million, calculated as follows: ($44 million / ($22 million + $44 million)) * $50 million.**

**E.    What will I receive if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including DIP Credit Facility Claims), Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. Administrative Claims, DIP Credit Facility Claims, Professional Fee Claims, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

**F.    What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions contemplated by the Plan. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article IX.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit D**.

**G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. See Article IX of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

**H.    What are the sources of Cash and other consideration required to fund distributions under the Plan?**

The distributions under the Plan will be funded by the following sources of cash and consideration: (i) Cash on hand, proceeds of the DIP Facilities, and/or Cash funded by Mercuria; (ii) the issuance and distribution of Reorganized Aegean Equity Interests and Litigation Trust Interests; and (iii) proceeds from the Exit Facility (if any).

**I.    Who supports the Plan?**

The Plan is supported by: (i) the Debtors; (ii) Mercuria, the Debtors' primary prepetition secured lender, sole DIP Lender, and approximately 30 percent equity holder; (iii) the Committee, the statutory fiduciary for all of the Debtors' general unsecured creditors; and (iv) the vast majority of Holders of Class 4A Claims (Aegean Unsecured Claims), including (a) [59]64 percent of the principal amount outstanding of the Unsecured Notes issued by Aegean and (b) AmEx, the largest individual non-Unsecured Noteholder unsecured creditor at Aegean.

**J.        Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation. In addition, if it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article X.B.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**K.        Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article IX of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties, subject to certain limitations and stakeholders' ability to "opt out" from, object to, or otherwise consent to the Third Party Release. The Debtors' releases, third party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the Plan and the global settlement among the Debtors, Mercuria, the Committee, the Consenting Unsecured Noteholders, and AmEx in obtaining their support for the Plan.

All of the Released Parties are either being consensually released, the Debtors have decided in their business judgment that they should be released, or they**and all of the Released Parties** have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve value for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties is entitled to the benefit of the release and exculpation provisions. Moreover, the exculpation provisions are appropriately limited to the Exculpated Parties' participation in the chapter 11 process and has no effect on liability resulting from actual fraud, willful misconduct, or gross negligence. The Debtor Release, Third Party Release, and Exculpation are each subject to certain carve outs in relation to the Litigation Claims **and the Securities Claims**, as described further herein.

The Released Parties include: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; provided, however, that any party in interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Released Party"; provided, further, however, that notwithstanding anything to the contrary herein**in the Plan**, the scope of "Released Parties" shall be subject to the limitations set forth in **Articles IX.F and IX.I of the Plan.**

**For the avoidance of doubt, the Released Parties referenced in the foregoing clauses (j) through (l), are "Released Parties" solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to Articles IX.B and IX.C of the Plan, subject to the limitations set forth in** Article IX.F of the Plan.

The Releasing Parties include: ~~(a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders~~; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing Entities in clauses (a) through (i), ~~each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies,~~ and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (j), ~~each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors~~; (l) all Holders of Claims and Interests that vote to accept the Plan; (m) all Holders of Claims and Interests that vote to reject the Plan but do not elect to opt out of the Third Party Release; and (n) all Holders of Claims and Interests not described in the foregoing clauses (a) through (m)~~; provided, however, that any such Holder of a Claim or Interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Releasing Party"; provided, further, however, that~~ notwithstanding anything to the contrary herein, the scope of "Releasing ~~Parties" shall be subject to the limitations set forth in Article IX.F of the Plan. ¶~~ ~~The Exculpated Parties include:~~ (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) ~~AmEx~~*the Consenting Unsecured Noteholders*; (g) the Unsecured Notes Indenture Trustees; (h) ~~with respect to each of the foregoing entities in clauses (a)-(g) each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); and (i)~~**AmEx; (i) each other party to the Restructuring Support Agreement; (j)** with respect to each of the foregoing ~~e~~**E**ntities in clauses (a)–~~(h~~**) through (i)**), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, **and** management companies**; (k) with respect to each of the foregoing Entities in clauses (a) through (j)**, each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors ~~(each solely in their capacity as such~~**; (l) all Holders of Claims and Interests that vote to accept the Plan; (m) all Holders of Claims and Interests that vote to reject the Plan but do not elect to opt out of the Third Party Release; and (n) all Holders of Claims and Interests not described in the foregoing clauses (a) through (m)**); provided, however, that~~, any such Holder of a Claim or Interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Releasing Party"; provided, further, however, that~~ notwithstanding anything to the contrary herein, the scope of "~~Exculpated~~**Releasing** Parties" shall be subject to the limitations set forth in Article IX.F **and Article IX.I** of the Plan. ¶

*The Exculpated Parties include: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f)* **AmEx; (g) the Unsecured Notes Indenture Trustees; (h)** *with respect to each of the foregoing entities in clauses (a)-(g) each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); and (i)* **with respect to each of the foregoing entities in clauses (a)-(h)**, *each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies,* **management companies,** *each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors* **(each solely in their capacity as such**); provided, however, that**, notwithstanding anything to the contrary in the Plan, the scope of "Exculpated** *Parties" shall be subject to the limitations set forth in Article IX.F of the Plan.* **For the avoidance of doubt, the Exculpated Parties referenced in the foregoing clauses (h) and (i), are "Exculpated Parties" solely with respect to work performed on behalf of the applicable Entity for which exculpations are provided pursuant to Article IX.D of the Plan, subject to the limitations set forth in Article IX.F of the Plan.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, injunction, and related provisions that are contained in the Plan are copied in Article VII.C of this Disclosure Statement, entitled "Releases."¶

**L.     Can I opt out of the Third Party Release?¶**

**      Yes, unless you (1) vote to accept the Plan, or (2) are a party to the Restructuring Support Agreement (in which case you have already agreed to grant the Third-Party Release).  Any Holder of a Claim or Interest that opts out of, files an objection to, or otherwise does not consent to the releases in the Plan will not be a "Releasing Party" for purposes of the Plan.  ¶**
**¶**
**      Holders of Claims that are not entitled to vote to accept or reject the Plan can opt out in a variety of ways, including by:¶**
**¶**
**(1) filing an objection with the Bankruptcy Court expressly objecting to the inclusion of such Holder as a "Releasing Party" under the Plan; ¶**
**¶**
**(2) sending an email to the Claims and Solicitation Agent at tabulation@epiqglobal.com, with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held;¶**
**¶**

**(3) sending a fax to the Claims and Solicitation Agent at (855) 853-9987, with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held;¶**

¶

**(4) sending a letter to the Claims and Solicitation Agent, by first-class mail, at Aegean Ballot Processing c/o Epiq Corporate Restructuring, LLC PO Box 4422 Beaverton, OR 97076-4422 with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held; ¶**

¶

**(5) sending a letter to the Claims and Solicitation Agent, by overnight or hand delivery, at Aegean Ballot Processing c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Boulevard, Beaverton, OR 97005, with "Aegean Opt Out" in the subject line, including such Holder's name and address, and affirming the amount of such Holder's Claim and the Debtor against which such Claim is held; or ¶**

¶

**(6) otherwise manifesting your intent not to be bound by the Third-Party Release, such as by appearing at the Confirmation Hearing and expressly objecting to the inclusion of such Holder as a "Releasing Party" under the Plan. ¶**

¶

**Holders of Claims or Interests entitled to vote to accept or reject the Plan may do any one of the foregoing or also check the box on their Ballot indicating they are "opting out" of the Third-Party Release. ¶**

**M.**    ~~L.~~ **What is the deadline to vote on the Plan?**

The Voting Deadline is **March [19], 2019 at 4:00 p.m. prevailing Eastern Time**.

**N.**    ~~M.~~ **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan. For your vote to be counted, your ballot, or a master ballot including your vote, must be properly completed, executed, and delivered as directed, so it is **actually received** by Epiq Corporate Restructuring, LLC, **on or before the Voting Deadline, *i.e.*, March [19], 2019 at 4:00 p.m. prevailing Eastern Time**. *See* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting."

**O.**    ~~N.~~ **What is the Litigation Trust Loan and can I participate in it?**

The Litigation Trust Loan is a commitment by the Litigation Trust Funders to provide $15 million of funding for the Litigation Trust to pursue collection of the Litigation Claims. The Litigation Trust Loan Funders will receive the Litigation Trust Funding Fee (*i.e.*, $3 million, in the aggregate), as compensation for providing the Litigation Trust Loan. The repayment of the Litigation Trust Loan and the Litigation Trust Funding Fee to the Litigation Trust Loan Funders is first in priority from the proceeds of the Litigation Claims and before any distributions of such proceeds are made to the Litigation Trust Class A Units, as described further herein. Subject to certain limitations set forth in the Litigation Trust Documents, each Holder of an Allowed Aegean Unsecured Claim may participate in the Litigation Trust Loan if, prior to the Voting Deadline, such Holder indicates its intent to so participate by following the appropriate instructions on such Holder's ballot and then, prior to the Confirmation

Hearing, executes the Restructuring Support Agreement and otherwise joins and executes any applicable Litigation Trust Documents.

**P.** ~~Q.~~ **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.** ~~P.~~ **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **March [26], 2019 at [●] a.m. prevailing Eastern Time**. The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than **March [19], 2019 at 4:00 p.m. prevailing Eastern Time** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**R.** ~~Q.~~ **What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to assess whether the Plan complies with each required provision of the Bankruptcy Code. If approved, the confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.** ~~R.~~ **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Epiq Corporate Restructuring, LLC, via one of the following methods:

> *By regular mail at:*
> Epiq Corporate Restructuring, LLC
> Re: Aegean Marine Petroleum Network Inc., et al.
> P.O. Box 4422
> Beaverton, OR 97076-4422
>
> By hand delivery or overnight mail at:
> Epiq Corporate Restructuring, LLC
> Re: Aegean Marine Petroleum Network Inc., et al.
> 10300 SW Allen Boulevard
> Beaverton, OR 97005

*By electronic mail at:*
tabulation@epiqglobal.com
<u>Note</u>: Please reference "Aegean" within the subject line of your electronic mail.

*By telephone at:*
(888) 418-0324 (toll free)
(503) 520-4423 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent, Epiq Corporate Restructuring, LLC at the address above or by downloading the exhibits and documents from the website of the Notice and Claims Agent at https://dm.epiq11.com/Aegean (free of charge) or the Bankruptcy Court's website at https://ecf.nysb.uscourts.gov (for a fee).

**T.** **S. Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.    BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

### A.    Corporate History and General Background

Aegean was incorporated as a Marshall Islands holding company under the Marshall Islands Business Corporations Act in June 2005. On December 13, 2006, Aegean executed an initial public offering of common stock and listed on the New York Stock Exchange under the ticker "ANW." Since 2006, the Debtors and their non-Debtor affiliates (collectively, "<u>Aegean Marine</u>") have expanded their global reach, and today operate as one of the world's largest physical suppliers of marine fuel with a sizable, modern fleet of bunkering vessels, storage facilities/terminals, and service centers dedicated to bunkering operations around the globe.

Aegean Marine maintains offices around the world in the various markets where they conduct physical supply operations. Aegean Marine's corporate offices are located in Athens, Greece, where the company oversees certain corporate, financial and accounting, marketing, sales, and ship-management functions, and New York, New York, where the company oversees corporate, financial and accounting, marketing, sales and other functions for its U.S. operations. Aegean Marine maintains station-level offices in various countries and cities around the world where the company conducts local bunkering operations. Aegean Marine's offices are generally leased, except for owned office space in Kingston, Jamaica.

### B.    Business Operations

Aegean Marine's core business is the physical supply of marine fuel (known as "bunkers") to many types of vessels, including: container ships, dry bulk carriers, cruise ships, oil tankers, and ferries. Vessel-to-vessel delivery is accomplished via a specialized "bunkering" tanker or barge that delivers bunkers directly to a recipient vessel, in port, at sea, on rivers or other waterways.

As set forth in the illustrative corporate structure chart attached hereto as **Exhibit B**, Aegean is the ultimate parent company of each Debtor in these chapter 11 cases. The remaining Debtors and

non-Debtors can be grouped into four main categories: bunkering operations; management; marketing and administrative; and vessel-owning entities.

- ***Bunkering Operations***.  Aegean Marine principally transacts bunkering operations through Debtor Aegean Marine Petroleum S.A. ("AMPSA") and Debtor Aegean Bunkering (USA) LLC ("ABUSA") and operate locally in various jurisdictions through Debtor and non-Debtor direct or indirect subsidiaries.  Non-Debtor entities Aegean NEW N.V., OBAST Bunkering & Trading GmbH, and Aegean Bunkering Germany GmbH conduct the company's operations in the ARA Region (as defined below) and Germany.

- ***Ship Management***.  Aegean Marine provides for the management of bunkering vessels through: (a) Aegean Bunkering Services Inc. ("ABS") for vessels operating outside Greek territorial waters and (b) Aegean Management Services M.C., ("AMS") for vessels operating within Greek territorial waters.

- ***Marketing and Administrative Services***.  Aegean Marine provides general marketing and administrative services for bunkering operations through Aegean Oil (USA), LLC and AMPN USA, LLC.

- ***Vessel-Owning Entities***. Numerous vessel-owning entities are direct or indirect subsidiaries of Aegean Shipholdings Inc. and one vessel-owning entity is an indirect subsidiary of Aegean Holdings S.A.

### 1.    Vessels and Ship Management

As a physical supplier, Aegean Marine purchases bunkers on the spot market or pursuant to supply contracts, takes possession of the inventory for a limited period of time, ultimately reselling and delivering bunkers directly to customers.  To deliver bunkers, Aegean Marine operates a large, modern fleet of bunkering vessels of diverse sizes and types, ranging from inland waterway tankers and barges to ocean-going offshore bunkering tankers.  As of the Petition Date, Aegean Marine owned 41 vessels (the "Owned Vessels"), with an aggregate capacity of 316,778 deadweight tonnage ("dwt").[7]  The Owned Vessels are comprised of 37 double hull bunkering tankers, three double hull bunkering barges, and one single hull tanker.  In certain regions, specifically the ARA Region (as defined below) and Germany, Aegean Marine supplements its owned fleet by chartering-in additional vessels.  In the U.S., Aegean Marine contracts with third-party barge operators to deliver bunkers.  As of the Petition Date, Aegean Marine chartered-in 12 double hull bunkering tankers, three double hull in-land waterway bunkering tankers, and one bunkering barge, having an aggregate capacity of 58,219 dwt (the "Charter-In Vessels").

Aegean Marine typically enters into an intragroup management agreement between the corporate entity that owns the Owned Vessel and either ABS or AMS, to provide for the management of a vessel. ABS provides management services for Owned Vessels and Charter-In Vessels in territorial waters outside of Greece and AMS provides management safety services for Owned Vessels operating in Greek territorial waters.  The ABS intragroup management agreement typically provides that ABS assume the technical management and the provision of services for the vessel for purposes of the International Safety Management Code.  In return for the services they provide, ABS and AMS are paid a flat monthly management fee which steps up annually over the life of the agreement.

---

[7]  Deadweight tonnage is a measure of the carrying capacity of a vessel.

## 2.    Storage Facilities

To assist with bunkering operations, Aegean Marine utilizes 13 land-based storage facilities where the company stores marine fuel in terminals to supply bunkering operations, with an aggregate storage capacity of over 1,000,000 cubic meters.  The storage facilities, the majority of which are leased, are located in the U.S., Morocco, the Canary Islands, Germany, and the United Arab Emirates, and have a storage capacity of approximately 350,000, 218,000, 65,000, 33,000, and 465,000 cubic meters, respectively.

## 3.    Physical Supply Locations

Aegean Marine's bunkering operations are coordinated through AMPSA and ABUSA, who are typically the Debtor counterparties to customer supply contracts and are the entities that procure the appropriate grade of bunker fuel from a supplier.  Non-Debtor entities Aegean NEW N.V., OBAST Bunkering & Trading GmbH, and Aegean Bunkering Germany GmbH conduct the company's operations in the ARA Region (as defined below) and Germany.  The specific process of delivering bunkers to an end customer is generally managed at the station-level in a specific jurisdiction.  As of the Petition Date, Aegean Marine conducts bunkering operations in the following locations.

- *Germany*.  Aegean Marine operates three double hull bunkering tankers in Germany's Baltic Sea and other North Sea ports and have access to approximately 33,000 cubic meters of onshore storage capacity.  Bunkering operations are supported from offices in Hamburg and Rostock, which the company leases.

- *Gibraltar/Morocco*.  Aegean Marine operates three double hull bunkering tankers in and around Gibraltar and store fuel at a storage facility with a capacity of 218,000 cubic meters, near the port of Tanger-Med in Tangiers, Morocco.  Bunkering operations are supported from an office in Gibraltar, which the company leases.

- *Greece*.  Aegean Marine charters-out numerous bunkering tankers and a floating storage facility to Aegean Oil S.A., which operates in Piraeus, Patras, and other parts of Greece.  Bunkering operations are supported from an office in Athens, which the company leases.[8]

- *Gulf of Mexico*.  Aegean Marine operates two double hull bunkering tankers in U.S. territorial waters and international waters in the Gulf of Mexico, supported by the Company's New York, New York office, which the company leases.

- *Las Palmas and Tenerife*.  Aegean Marine operates two double hull bunkering tankers in Las Palmas and own the Shell Las Palmas terminal, a 20,000 square meter facility that includes a lubricants plant, a 65,000 metric ton storage facility and on-site blending facilities to mix all grades of fuel oils and distillates.  Bunkering operations are supported from an office in Las Palmas, which the company leases.

- *Northern Europe and the Amsterdam-Rotterdam-Antwerp Region* (**"ARA Region"**).  Aegean Marine operates 12 double hull bunkering tankers both offshore and in numerous ports throughout Northern Europe, including the North Sea, Irish Sea (and St. George's Channel), the French Atlantic, the English Channel, Ghent, and throughout the ARA Region.  Bunkering operations are supported from an office near Antwerp, which the company leases.

---

[8]  Upon information and belief, Aegean Oil S.A. is owned and controlled by relatives of Mr. Dimitris Melisanidis, the founder and former majority shareholder of Aegean Marine.  As of the Petition Date, Mr. Melisanidis had no known equity holdings in Aegean.

- ***South Africa***.  Aegean Marine operates three double hull bunkering tankers and one floating storage facility near Port Elizabeth, South Africa.  Bunkering operations are supported from an office in Port Elizabeth, which the company leases.

- ***Trinidad and Tobago***.  Aegean Marine operates two double hull bunkering tankers in the area of Port of Spain in Trinidad and Tobago.  Bunkering operations are supported from an office in Port of Spain, which the company leases.

- ***United Arab Emirates***.  Aegean Marine charters-out two double hull bunkering tankers in the port of Fujairah region and store fuel in a storage facility with a capacity of 465,000 cubic meters in the port of Fujairah.  Bunkering operations were historically supported from offices in Fujairah and Khor Fakken, which the company leased.

- ***U.S. East Coast***.  Aegean Marine operates in the ports of New York, Philadelphia, Baltimore, Norfolk, Savannah, and Charleston and have access to approximately 300,000 cubic meters of leased tank storage to conduct operations.  Bunkering operations are supported from an office in New York, New York, which the company leases.

- ***U.S. Virgin Islands***.  Aegean Marine operates a service center in St. Croix, U.S. Virgin Islands pursuant to a cooperation agreement with Caribbean Bunkers LLC, a subsidiary of Freepoint Commodities LLC ("Freepoint"), which allows the company to market marine petroleum products supplied by Freepoint to customers calling on the Limetree Bay terminal in St. Croix.

- ***U.S. West Coast***.  Aegean Marine operates in the ports of Los Angeles and Long Beach and have access to approximately 50,000 cubic meters of leased tank storage to conduct operations.  Bunkering operations are supported from an office in Los Angeles, California, which the company leases.

- ***Vancouver, Canada***.  Aegean Marine operates two double hull non self-propelled bunkering barges in the Port of Vancouver, British Columbia.  Bunkering operations are supported from an office in Vancouver, British Columbia, which the company leases.

### 4.    Charter-Out Operations

Aegean Marine also generates revenue by chartering certain Owned Vessels to third parties.  These revenues, and the associated costs of chartering are recognized over the duration of the charter.  As of the Petition Date, 15 Owned Vessels were chartered to third parties on a time-charter basis and one Owned Vessel was chartered on a voyage basis.

### C.    Employees

As of the Petition Date, Aegean Marine employed approximately 850 employees in more than 20 countries across the globe, including 507 employees offshore that are involved in the day-to-day operations of the company's vessels and approximately 342 employees onshore that support the company's enterprise-wide operations.  The company's employees have unique skills, knowledge, and an understanding of operations and infrastructure, which are essential to preserving operational stability and efficiency.

Certain of Aegean Marine's offshore employees are residents of nations with government-mandated collective bargaining (*i.e.*, the Republic of the Philippines, Greece, Romania, and

17

Russia), which require the utilization of pre-approved employment contracts that typically have a term of four to six months. Certain of Aegean Marine's onshore employees in six countries—Greece, Africa, Brazil, Canada, the Canary Islands, and Gibraltar—are subject to collective bargaining agreements mandated by law. The Debtors have no defined benefit pension plans. Certain of Aegean Marine's employees operate or have generated information in countries or regions with heightened privacy laws, some of which are relatively untested.

### D.    Senior Management

Set forth below are the names, position(s) and biographical information of members of senior management who oversee the business and Aegean Marine's affairs as of the Petition Date.

*Kostas Polydakis*, Chief Operating Officer. Mr. Polydakis has more than 20 years of experience in the shipping industry, including nearly 12 years at the Company. Prior to his appointment as Chief Operating Officer in August 2018, Mr. Polydakis served as Managing Director of Shipping, a role in which he oversaw the creation and growth of the company's shipping division. In that role, Mr. Polydakis completed over 40 sale and purchase transactions and multiple newbuilding projects and successfully reduced fleet operating expenses. In Mr. Polydakis's previous positions as Technical Manager and Deputy General Manager of the company's Bunkering Services division from 2006 to 2017, Mr. Polydakis was responsible for the performance and day-to-day operations of all division departments.

*John G. Mystakidis*, Interim Chief Financial Officer. Mr. Mystakidis has more than 25 years of experience in financial reporting, financial management and auditing, and has supported and advised clients with significant cross-border presences and foreign operations. During 11 years at Ernst & Young, Mr. Mystakidis acted as Lead Partner to multiple large Greek and multinational companies, helping them to address and resolve critical financial issues. In May 2018, Mr. Mystakidis began serving as a full-time consultant to the company and was appointed Chief Financial Officer in August 2018. Prior to Ernst & Young, Mr. Mystakidis was an Assurance and Business Advisory Partner at Arthur Andersen, where he supervised audits and due diligence reviews for a number of Greek and multinational clients.

*Salvatore Drago*, Global Director of Supply and Trading. Mr. Drago has over 25 years of experience trading fuel oil, feedstock and fuel blending components for key global bunkering locations. Mr. Drago previously served as Global Director of Supply and Trading, the position to which he recently returned, leading the company's arbitrage cargo movements, fuel oil blending and risk management efforts. Previously, Mr. Drago spent nine years at Hess Corporation, where he was Managing Director, Fuel Oil and Feedstock Trading. At Hess, Mr. Drago led the company's transition from a fuel oil wholesaler to a fully integrated supply and trading organization, with retail bunkering operations in five U.S. ports.

*Spyridon Fokas*, General Counsel. Mr. Fokas has served as the General Counsel since June 2005. Mr. Fokas has been practicing maritime law since 1982 and began representing Aegean Marine in 1998. Mr. Fokas is a member of the Greek Maritime Law Association and the Hellenic Society of Maritime Lawyers. Mr. Fokas holds a law degree from the University of Athens School of Law and has undertaken post-graduate studies in shipping law at the University College London.

### E.    Aegean Board of Directors

As of the date of this Disclosure Statement, the following persons comprise the board of directors of Aegean Marine Petroleum Network Inc.: Donald Moore (Chairman of the Board); Tyler Baron (Director); Raymond Bartoszek (Director); Spyridon Fokas (Director); George J. Konomos

(Director); Konstantinos Koutsomitopoulos (Director); Yannis N. Papanicolaou (Director); and David Gallagher (Director).

## F.    Prepetition Capital Structure

As of the Petition Date, the Debtors were liable for approximately $855 million in aggregate funded debt.  The Debtors' prepetition capital structure is summarized as follows:

| Indebtedness | Balance Outstanding as of Petition Date |
|---|---|
| Global Credit Facility | $249,569,260 |
| U.S. Credit Facility | $131,338,116 |
| 2017 Secured Term Loan | $13,500,000 |
| 2017 South Africa Secured Term Loan | $5,984,585 |
| 2015 Fujairah Secured Term Loan | $90,335,430 |
| 2008 Newbuilding Secured Term Loan | $18,717,000 |
| 2007 Newbuilding Secured Term Loan | $9,158,800 |
| First 2006 Newbuilding Secured Term Loan | $33,459,740 |
| Second 2006 Newbuilding Secured Term Loan | $6,564,028 |
| Third 2006 Newbuilding Secured Term Loan | $12,200,500 |
| 2005 Newbuilding Secured Term Loan | $11,670,000 |
| 2018 Barge Secured Term Loan | $5,000,000 |
| 4.00% Convertible Unsecured Notes due 2018 | $94,550,000 |
| 4.25% Convertible Unsecured Notes due 2021 | $172,500,000 |
| **TOTAL** | **$854,547,459** |

These obligations are generally summarized below:

### 1.    Working Capital Credit Facilities

#### (a)    Global Credit Facility

As of the Petition Date, the Debtors had a total of $249,569,260 aggregate principal amount outstanding, including letters of credit, under that certain Facility Agreement for a Borrowing Base Facility, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine Petroleum S.A., Aegean Petroleum International Inc., Aegean NWE N.V., Aegean Bunkering Germany GmbH, OBAST Bunkering & Trading GmbH and Aegean Petroleum Uruguay S.A., as co-borrowers and guarantors, Aegean, as guarantor, ABN AMRO Bank N.V., as arranger, documentation bank, facility agent, collateral management agent, security agent, and certain financial institutions, as lender, issuing banks, and overdraft banks thereto (the "Global Credit Facility"). Borrowings under the Global Credit Facility will mature, and lending commitments thereunder will terminate on, November 30, 2020, and all obligations and the guarantees of those obligations are secured by a first priority lien on certain assets of each co-borrower that make up the borrowing base assets, including certain inventory, receivables and goods as well as the assignment of documents and agreements and pledge of certain accounts of the co-borrowers.  In August 2018, Mercuria Energy Trading S.A. became the sole lender under the Global Credit Facility.  Pursuant to the Final Order (as defined below), all obligations and amounts owing under the Global Credit Facility have been rolled up into the DIP Facilities on a final basis.

#### (b)    U.S. Credit Facility

As of the Petition Date, the Debtors had a total of $131,688,116 aggregate principal amount outstanding, including letters of credit, under that certain Second Amended and Restated Security

Uncommitted Credit Agreement, dated as of August 3, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering (USA) LLC, as borrower, ABN AMRO Capital USA, as administrative agent, collateral agent, syndication agent, and the lender thereto (the "U.S. Credit Facility"). Borrowings under the U.S. Credit Facility would have matured on November 8, 2018. All obligations under the U.S. Credit Facility are secured by a first priority lien on all of the assets of Aegean Bunkering (USA) LLC as well as a pledge of 100 percent of the equity of Aegean Bunkering (USA) LLC owned by its parent, AMPNI Holdings Co. Limited. In August 2018, Mercuria US Asset Holdings, LLC became the sole lender under the U.S. Credit Facility. Pursuant to the Final Order (as defined below), all obligations and amounts owing under the U.S. Credit Facility have been rolled up into the DIP Facilities on a final basis.

2.      **Secured Term Loans**

(a)      **2017 Secured Term Loan**

As of the Petition Date, the Debtors had a total of $13,500,000 aggregate principal outstanding under that certain Loan Agreement, dated as of November 30, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering Services Inc., as borrower, Aegean, Amorgos Maritime Inc., Kimolos Maritime Inc., Milos Shipping (Pte.) Ltd., Mykonos I Maritime Limited and Tinos Marine Inc., as co-guarantors, and Piraeus Bank S.A., as lender (the "2017 Secured Term Loan"). The 2017 Secured Term Loan matures on November 30, 2022, and all obligations under the 2017 Secured Term Loan are secured by a first priority mortgage on certain vessels—*Amorgos, Kimolos, Milos, Mykonos* and *Syros*—as well as a pledge of certain earning and retention accounts.

(b)      **2017 South Africa Secured Term Loan**

As of the Petition Date, the Debtors had a total of $5,984,585 aggregate principal outstanding under that certain Loan Agreement, dated as of November 20, 2017 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Bunkering Services Inc. and Nevado Navigation S.A., as co-borrowers, Aegean, Aegean Management Services M.C., Aegean Ship III Maritime Company, Aegean Ship VIII Maritime Company, Aegean Ace Maritime Company and Aegean Tanking S.A., as co-guarantors, and Piraeus Bank S.A., as lender (the "2017 South Africa Secured Term Loan"). The 2017 South Africa Secured Term Loan matures three years from the Drawdown Date (as that term is defined in the 2017 South Africa Secured Term Loan Agreement), and all obligations under the 2017 South Africa Secured Term Loan are secured by a first priority mortgage on certain vessels—*Aegean III*, *Aegean VIII*, *Aegean Ace*, and *Umnenga I*—as well as a pledge of certain earnings accounts and specific assignments of charterparty documents.

(c)      **2015 Fujairah Secured Term Loan**

As of the Petition Date, the Debtors had a total of $90,335,430 aggregate principal outstanding under that certain Term Loan Facility Agreement, dated as of October 7, 2015 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Oil Terminal Corporation, as borrower, Aegean, as guarantor, United Arab Bank P.J.S.C., as agent, security agent and lender thereto (the "2015 Fujairah Secured Term Loan"). The 2015 Fujairah Secured Term Loan matures on September 30, 2023, and all obligations under the 2015 Fujairah Term Loan Facility are secured by substantially all of the assets of Aegean Oil Terminal Corporation.

### (d)    2008 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $18,717,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of April 24, 2008 (as amended, restated, modified, or supplemented from time to time), by and among Kassos Navigation S.A., Symi Navigation S.A., Halki Navigation S.A. and Tilos Shipping (PTE.) LTD., as co-borrowers, Aegean and Aegean Shipholdings Inc., as co-guarantors, Aegean Baltic Bank S.A., as arranger, agent, security agent, account bank, and lender thereto (the "2008 Newbuilding Secured Term Loan").  The 2008 Newbuilding Secured Term Loan matures on June 30, 2020, and all obligations under the 2008 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kassos*, *Tilos*, *Halki*, and *Symi*— as well as a pledge of certain operating accounts and assignments of certain contracts and refund guarantees.

### (e)    2007 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $9,158,800 million aggregate principal amount outstanding under that certain Loan Agreement, dated as of July 5, 2007 (as amended, restated, modified, or supplemented from time to time), by and among Andros Marine Inc., Dilos Marine Inc., Ios Shipping Ltd, Sifnos Marine Inc. and Aegean VII Shipping Ltd., as co-borrowers, Aegean, as guarantor, and Orix Investment and Management Private Ltd., as lender thereto (the "2007 Newbuilding Secured Term Loan").  The 2007 Newbuilding Secured Term Loan matures in part on February 3, 2020, May 4, 2020 and September 7, 2020, and all obligations under the 2007 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Andros*, *Dilos*, *Ios I*, *Anafi* and *Sikinos*—as well as a pledge of certain operating accounts, and assignments of certain contracts and refund guarantees.

### (f)    First 2006 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $33,459,740 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 1, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Kerkyra Marine S.A., Ithaki Marine S.A., Cephallonia Marine S.A., Paxoi Marine S.A., Zakynthos Marine S.A., Ios Marine Inc. and Kythira Marine S.A., as co-borrowers, Aegean, Aegean Shipholdings Inc., Aegean Breeze Maritime Company and Aegean Tiffany Maritime Company, as co-guarantors, Aegean Baltic Bank S.A., as arranger, agent, security agent, account bank, and lender thereto (the "First 2006 Newbuilding Secured Term Loan"). The First 2006 Newbuilding Secured Term Loan matures on December 31, 2019, and all obligations under the First 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kerkyra*, *Ithaki*, *Kefalonia*, *Paxoi*, *Zakynthos*, *Lefkas*, *Kythira*, *Aegean Tiffany*, and *Aegean Breeze*—as well as a pledge of certain operating accounts, and assignments of certain contracts and refund guarantees.

### (g)    Second 2006 Newbuilding Secured Term Loan

As of the Petition Date, the Debtors had a total of $6,564,028 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 27, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Tasman Seaways Inc. and Santon Limited, as co-borrowers, Aegean and Aegean Bunkering Services Inc., as co-guarantors, and the National Bank of Greece S.A., as lender thereto (the "Second 2006 Newbuilding Secured Term Loan").  The Second 2006 Newbuilding Secured Term Loan matures in part on November 30, 2018 and April 30, 2020, and all obligations under the Second 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kalymnos and Leros*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

(h)     **Third 2006 Newbuilding Secured Term Loan**

As of the Petition Date, the Debtors had a total of $12,200,500 aggregate principal amount outstanding under that certain Loan Agreement, dated as of October 25, 2006 (as amended, restated, modified, or supplemented from time to time), by and among Eton Marine LTD., Benmore Services S.A. and Ingram Enterprises Co., as co-borrowers, Aegean, Aegean Shipholdings Inc. and Sealand Navigation Inc., as co-guarantors, and Aegean Baltic Bank S.A. as arranger, agent, security agent, account bank, and lender thereto (the "Third 2006 Newbuilding Secured Term Loan").  The Third 2006 Newbuilding Secured Term Loan matures on December 31, 2019, and all obligations under the Third 2006 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Patmos*, *Nisyros*, *Karpathos*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

(i)     **2005 Newbuilding Secured Term Loan**

As of the Petition Date, the Debtors had a total of $11,670,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of August 30, 2005 (as amended, restated, modified, or supplemented from time to time), by and among Kithnos Maritime Inc., Lefkas Marine S.A., Paros Maritime Inc., Santorini I Maritime Limited and Serifos Shipping (Pte.) Ltd., as co-borrowers, Aegean, Aegean Shipholdings Inc., Aegean Bunkering Services Inc. and Tempest Shiptrade Ltd., as co-guarantors, and Aegean Baltic Bank S.A. as arranger, agent, security agent, account bank, and lender thereto (the "2005 Newbuilding Secured Term Loan").  The 2005 Newbuilding Secured Term Loan matures on January 7, 2019, and all obligations under the Third 2005 Newbuilding Secured Term Loan are secured by a first priority mortgage on certain vessels—*Kithnos*, *Naxos*, *Paros I*, *Santorini* and *Serifos*—as well as certain operating account pledges, and assignments of certain contracts and refund guarantees.

(j)     **2018 Barge Secured Term Loan**

As of the Petition Date, the Debtors had a total of $5,000,000 aggregate principal amount outstanding under that certain Loan Agreement, dated as of September 7, 2018 (as amended, restated, modified, or supplemented from time to time), by and among AMPSA, as borrower, Aegean and I.C.S. Petroleum Limited, as co-guarantors, and Mercuria Energy Trading S.A., as lender thereto (the "2018 Barge Secured Term Loan").  The 2018 Barge Secured Loan matures on January 31, 2019, and all obligations under the 2018 Barge Secured Term Loan are secured by a first priority mortgage on certain vessels—*PT22 and PT40*.

3.     **Unsecured Convertible Notes**

(a)     **4.00% Unsecured Convertible Notes due 2018**

As of the Petition Date, Aegean had approximately $94,550,000 principal amount outstanding 4.00% convertible senior unsecured notes due 2018, issued pursuant to that certain Senior Indenture, dated as of October 23, 2013 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine, as issuer, and Deutsche Bank Trust Company Americas, as trustee (the "4.00% Unsecured Convertible Notes").  The 4.00% Unsecured Convertible Notes matured on November 1, 2018 and require semi-annual coupon payments at an interest rate of 4.00% per year.

(b)     **4.25% Unsecured Convertible Notes due 2021**

As of the Petition Date, Aegean had approximately $172,500,000 principal amount outstanding 4.25% convertible senior unsecured notes due 2021, issued pursuant to that certain Indenture, dated as of December 19, 2016 (as amended, restated, modified, or supplemented from time to time), by and among Aegean Marine, as issuer, and U.S. Bank National Association, as trustee (the "4.25% Unsecured Convertible Notes").  The 4.25% Unsecured Convertible Notes mature on December 15, 2021 and require semi-annual coupon payments at an interest rate of 4.25% per year.

### 4.     Aegean's Publicly-Trade Common Stock

As of Petition Date, Aegean had approximately 58.19 million shares of common stock, par value $0.01, issued and outstanding.  Aegean's common stock trades on the NYSE under the ticker "ANW." As of the Petition Date, approximately 30 percent of Aegean's outstanding common stock was held by Mercuria Asset Holdings (Hong Kong) Limited.

## V.     EVENTS LEADING TO THE CHAPTER 11 CASES

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These factors included rising oil prices, limited liquidity after lenders under the Global Credit Facility and U.S. Credit Facility reduced the borrowing limits under each facility and imposed other conditions further limiting borrowing capacity, changes in trade terms provided by certain fuel vendors, the Debtors' failure to timely file audited financial statements, and the June 4, 2018 announcement that approximately $200 million of account receivables may be written off because the underlying transactions were likely without economic substance.

### A.     Prepetition Challenges

Beginning in the third quarter and continuing through the fourth quarter of 2017, the Debtors' operational and financial performance began to deteriorate, with a sharp decline in bunker sales volumes, operating losses, and negative EBITDA.  Operationally, the Debtors' struggles resulted from increased competition in certain supply markets which decreased sales volumes and compressed margins. Financially, the Debtors' results were hampered by certain non-recurring expense charges resulting from the wind down of physical supply operations in certain jurisdictions and $12 million in losses on hedging contracts as oil prices climbed higher in late 2017.  Results in the first quarter of 2018 remained in a depressed but steady state compared to the fourth quarter of 2017, as industry competition persisted which forced the Debtors to restrain sales volumes in ports and business lines with lower profit margins.

On February 20, 2018, the Debtors announced the proposed acquisition of all outstanding shares of H.E.C. Europe Limited ("H.E.C.") from the shareholders of H.E.C. for aggregate consideration of approximately $367 million, including the assumption of certain debt.  The Debtors proposed to fund the H.E.C. acquisition via the issuance of 20 million newly issued shares of Aegean common stock, cash, an unsecured note, and certain accounts receivable that were not included as collateral under either the Global Credit Facility or the U.S. Credit Facility.  The significant dilution resulting from the to-be-issued common stock caused Aegean's common stock to drop close to 40 percent on the day the Debtors' announced the H.E.C. acquisition.  The announcement of the H.E.C. acquisition also raised concerns among the Debtors' lenders regarding the genesis of the accounts receivable not included as collateral under with the Global Credit Facility or U.S. Credit Facility.

In a letter dated February 28, 2018, the Debtors requested that ABN AMRO Bank N.V. ("ABN AMRO"), the agent under the Global Credit Facility, and the lenders thereto (the "Global Credit Facility

Lenders") consent and agree to the H.E.C. acquisition and waive certain provisions under the relevant financing agreement and financing documents related to the Global Credit Facility so that the Debtors could pursue the proposed H.E.C. acquisition.  In a separate letter on the same date, the Debtors also sought the waiver and consent of ABN AMRO and the Global Credit Facility Lenders regarding the Debtors' breach of the interest coverage ratio under the Global Credit Facility.  ABN AMRO responded to the Debtors' letters on March 6, 2018, and notified the Debtors that they were also in breach of various covenants requiring the timely delivery of financial statements, a default that, together with the default under the interest rate coverage ratio, would be temporarily waived if the Debtors agreed to certain conditions, including a reduction of borrowing base availability under the Global Credit Facility and delivery of daily reporting regarding the Debtors' borrowings, among other things, and setting a March 16, 2018 deadline by which the Debtors must fully remedy such defaults.[9]

The reduction of available borrowings under the Global Credit Facility constrained the Debtors' ability to operate efficiently because the Debtors lacked sufficient liquidity to purchase enough fuel to achieve breakeven levels, given its fixed costs, and to satisfy customer orders at a time when fuel prices were increasing.

During the same time period, certain fuel suppliers that had previously provided open credit to the Debtors began requesting that the Debtors post a letter of credit or even prepay when purchasing fuel; an impossible request given the Debtors' lack of liquidity.  Concerns about the Debtors' credit quality continued to gain traction in the marketplace when certain credit insurance companies serving the marine fuels space cancelled their coverage of receivables from the Debtors due to Aegean's inability to file audited financials, which was reported to the SEC on April 30, 2018.  This contagion also spread to Aegean Marine's customer base, as inquiries to quote and purchase bunkers dropped precipitously during May 2018.  Some customers communicated that they would delay further purchases from the Debtors until the company demonstrated more stability, while others reported having been notified by their banks that the company was in distress.  These issues had a cascading effect on the Global Credit Facility, eroding borrowing availability first via reduced fuel inventory levels and later by reduced accounts receivable, which in turn reduced the overall value of the borrowing base and eliminated the Debtors' ability to secure letters of credit to purchase fuel.  As volumes fell, gross profit could not cover fixed costs leading to negative free cash flow.  While accounts receivable were converting to cash, this cash was consumed by operating costs such that less liquidity was available to procure additional fuel.  The lack of liquidity was exacerbated by the burden of professional fees related to the Debtors' advisors and those of the lenders under the Global Credit Facility.

Then, on June 4, 2018, the Debtors disclosed that $200 million of accounts receivable would likely be written off because the underlying transactions were likely without economic substance, causing Aegean's common stock to close down approximately 75 percent that day.  Following this disclosure, the Debtors experienced additional deterioration in customer activity.  But even when the Debtors had customer orders to satisfy, the Debtors often, as noted above, lacked sufficient liquidity to procure fuel for delivery.  In fact, on multiple business days during June 2018, the company had zero borrowing base availability and thus no liquidity, causing fuel inventories in certain critical supply hubs to virtually run dry.

---

[9]   On March 8, 2018, RBM Holdings LLC ("RBM") filed a complaint in the United States District Court for the Southern District of New York, seeking, among other things, preliminary and final injunctive relief to enjoin Aegean from entering into the H.E.C. acquisition.  RBM's members were Tyler Baron, Justin Moore, and August Roth.  Aegean and RBM reached a settlement in April 2018 that resulted in the appointment of three new independent members of the board of directors (the "New Independent Directors" as defined and used herein), agreements regarding the composition of certain committees of the board of directors, and other agreements in exchange for the voluntary dismissal of RBM's complaint. P rior to the settlement, on March 27, 2018, Aegean announced that all necessary approvals to consummate the H.E.C. acquisition had not been satisfied or waived and thus the H.E.C. acquisition was terminated in accordance with its terms.

Further exacerbating matters, the Debtors and their advisors had to negotiate daily with the syndicate of lenders under the Global Credit Facility and U.S. Credit Facility regarding short term waivers of continuing covenant defaults under these facilities. These negotiations, however, did not provide the Debtors with additional liquidity. Instead, these lenders required the Debtors to submit to extensive and ongoing financial reporting requirements, and urgently pursue strategic alternatives and contingency planning initiatives by certain milestones, while at the same time formally reducing the size of the credit facilities yet further. By the end of June 2018, the size of the Global Credit Facility had been reduced from $750 million to $300 million and size of the U.S. Credit Facility had been reduced from $250 million to $155 million. Below is a graphic representation of the challenges the Debtors faced through June 2018.



## B.    Appointment of Independent Directors and Composition of the Audit Committee

On May 2, 2018, the Debtors announced that Donald Moore, Tyler Baron, and Raymond Bartoszek, (the "New Independent Directors"), had been appointed to Aegean's board of directors (the "Board of Directors"), effective immediately. The appointment of the New Independent Directors increased the number of independent directors on the Board of Directors to six members.[10] On May 22, 2018, the Debtors announced that Donald Moore had been appointed to serve as Chairman of the Board of Directors. On June 4, 2018, the Debtors announced that the audit committee of the Board of Directors (the "Audit Committee") had been recomposed of only the New Independent Directors, with Tyler Baron serving as Chair of the Audit Committee.

## C.    Prepetition Initiatives

Recognizing the substantial challenges facing the company, and the need to explore all restructuring initiatives, the Debtors retained Ernst & Young LLP ("E&Y") as their restructuring advisor, and Kirkland & Ellis LLP ("Kirkland") as their legal advisor in the spring of 2018, and then Moelis & Company ("Moelis") as their financial advisor and investment banker in early July 2018. Together, these advisors assisted the Debtors with financial and operational initiatives, lender negotiations, and contingency planning, including reviewing and analyzing potential sale and/or financing transactions both out-of-court and in-court.

---

[10]    The other independent directors on Aegean's Board of Directors at that time were Yiannis N. Papanicolaou, George J. Konomos, and Konstantinos Koutsomitopoulos.

During June and July 2018, the Debtors and their advisors engaged in good-faith negotiations with certain third party financial and strategic investors as well as an ad hoc committee of Unsecured Noteholders (the "Ad Hoc Group") to explore and evaluate strategic alternatives and possible liquidity-generating transactions. These discussions included discussions with multiple financial investors regarding potential sale-leaseback and second lien financing transactions and multiple strategic investors regarding partnership opportunities such as a trade finance facility, joint venture, and/or acquisition. Of these strategic investors, seven executed non-disclosure agreements and five submitted diligence requests. One of these strategic investors was Mercuria.

In early July 2018, the Debtors determined after good faith, hard-fought negotiations that a proposal provided by Mercuria provided the best available path forward. At the time this decision was made, the Debtors had significantly reduced ordinary course operations due to the lack of liquidity and the splintering of many customer and supplier relationships.

### 1.    Mercuria Transaction

On July 5, 2018, Aegean announced the entry of a memorandum of understanding (the "MOU") with Mercuria Energy Group Limited ("MEG"), which contemplated, among other things, refinancing the U.S. Credit Facility and Global Credit Facility by August 15, 2018, the provision of interim credit support to enhance liquidity, and other terms predicated on a potential future global strategic partnership between Mercuria and Aegean Marine. The MOU granted Mercuria limited exclusivity, subject to certain key carve-outs (including with respect to the Ad Hoc Group), to explore the strategic partnership. On August 21, 2018, Aegean filed a Form 6-K announcing that Mercuria had: (a) become the sole lender under both the U.S. Credit Facility and Global Credit Facility after acquiring all interests of the prior facility lenders in each of these facilities; (b) agreed to extend existing default waiver agreements for these facilities; and (c) agreed to provide $30 million of additional liquidity to Aegean Marine by way of amendments and waivers to the facilities and other financing arrangements. Mercuria also agreed to support operations by "sleeving" inventory (as described below) and providing other liquidity enhancing measures. In return, Aegean issued to an affiliate of MEG new common stock constituting 30 percent of Aegean's then outstanding common stock on a pro-forma basis and the Board of Directors unanimously agreed to expand the Board of Directors, and appoint a representative of Mercuria—David Gallagher—to the board.

Mercuria's injection of liquidity was a literal lifeline at a point when the Debtors' operations had all but ground to a halt. The Debtors and Mercuria then worked diligently in the weeks following both the announcement and completion of the transaction to reestablish customer relationships, increase sales volumes, improve cash flows, and regenerate the borrowing base.

### 2.    Cost-Cutting Initiatives

Subsequent to executing the MOU, the Debtors also implemented internal cost-cutting and restructuring initiatives. In particular, the Debtors decreased onshore employee headcount by 14 percent, substantially reduced corporate overhead expenses, and realized or will realize substantial cost reductions from the following internal restructuring initiatives: (a) exiting bunkering operations in Fujairah, U.A.E. and Piraeus, Greece; (b) reconfiguration of bunkering vessels in and around Gibraltar and in the ARA Region; (c) winding down certain of the Debtors' (i) back-to-back trading operations', including four sales offices related to these operations, and (ii) marine lubricants business; and (d) relocating the company's corporate offices in Greece.

### D.    Audit Committee Investigation

Following the June 4 announcement of the potential $200 million accounts receivable write-off, the Audit Committee began working closely with Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") to accelerate the investigation (the "Investigation") which had formally commenced in December 2017.  To date, the Audit Committee and Arnold & Porter have committed substantial resources and efforts to the Investigation, and have plenary authority to review related party transactions and to follow leads wherever they go.  Moreover, no legacy member of the Board of Directors has any role on the Audit Committee or oversight of the Investigation.

On November 2, 2018, the Debtors and the Audit Committee issued a press release and 6-K announcing the results of the Investigation as of the date of the filing.  Pursuant to that press release, the Audit Committee alleged the following:

- The Audit Committee believes up to $300 million of the Debtors' cash and other assets may have been misappropriated through fraudulent activities.  The Audit Committee believes that the principal beneficiary of the alleged misappropriation is OilTank Engineering & Consulting Ltd. ("OilTank"), a company based in Fujairah, United Arab Emirates and incorporated on March 15, 2010 in the Marshall Islands.  On March 31, 2010, OilTank entered into a contract with a subsidiary of Aegean to oversee the construction of the Fujairah Oil Terminal Facility (the "Fujairah Facility").  The Audit Committee believes that this contract may have been used to misappropriate the Debtors' funds through inflated contracts and fraudulent pricing.  The Audit Committee has reason to believe that OilTank is controlled by a former affiliate of the Debtors (the "Former Affiliate").

- As of December 31, 2017, the Debtors and their subsidiaries had an aggregate of approximately $200 million in accounts receivable that arose from purported commercial transactions in 2015, 2016, and 2017 that may have lacked economic substance, as the relevant counterparties were shell companies owned or controlled by former employees or affiliates of the Debtors with no material assets or operations.  The Audit Committee believes that the receivables may have been improperly recorded as part of a potential scheme to facilitate and conceal an alleged extensive misappropriation of the Debtors' assets channeled to OilTank, but accounted for as transactions with these shell companies.  The Audit Committee has further confirmed that the approximately $200 million of receivables are uncollectible and will be written off.

- The Investigation also uncovered additional potential actions to defraud the Debtors and its subsidiaries, including prepayments for future oil deliveries that were never made.  These potential fraudulent activities appear to have commenced as early as 2010.

- The alleged misappropriation of the Debtors' assets, and the alleged fraudulent accounting entries and fictitious documentation designed to conceal it, involved over a dozen employees, including former members of senior management.  The employees who directed the alleged scheme, which involved the creation of falsified and forged documents, including bank statements, audit confirmations, contracts, invoices and third party certifications, among others, have been terminated.

- The Audit Committee believes that this alleged misconduct occurred in part because the Former Affiliate exerted control over personnel and assets through inappropriate means, including threats of economic retaliation and physical violence.

27

In that same press release on November 2, 2018, the Audit Committee and the Debtors stated that the Debtors intend to take appropriate steps to seek redress from responsible individuals and other parties for the harm to the Debtors caused by their involvement in the activities described above, including instituting legal proceedings and seeking to seize assets in applicable jurisdictions wherever feasible and appropriate. The Audit Committee and the Debtors also stated that they had previously voluntarily reported their preliminary findings to the SEC and the U.S. Department of Justice and that on October 3, 2018, the Debtors had received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York in connection with suspected felonies. The Debtors have received an administrative subpoena from the SEC. The Debtors continue to cooperate with the government and respond to their requests.

Given the impact of the foregoing, the Audit Committee concluded that the Debtors' financial statements for (i) the fiscal years ended December 31, 2015 and December 31, 2016 included in the annual reports on Form 20-F for such years, (ii) the interim periods within such fiscal years included in the reports on Form 6-K for such periods, (iii) the periods ended March 31, 2017, June 30, 2017, September 30, 2017 included in the reports on Form 6-K for such periods, and (iv) related press releases describing the Debtors' financial results for such periods, as well as the fourth quarter of each of 2015, 2016 and 2017 (and the year ended December 31, 2017), should no longer be relied upon.

## E.    The DIP Financing and Chapter 11 Filing

Notwithstanding the benefits achieved through the transactions completed with Mercuria following the MOU and the cost-cutting and restructuring measures undertaken by the Debtors, substantial challenges faced the Debtors, which led them to explore restructuring alternatives. One such alternative was to pursue a restructuring through a chapter 11 process.

Beginning in September 2018, the Debtors and their advisors began focusing on procuring debtor-in-possession financing ("DIP financing") to sustain operations during these chapter 11 cases. In October 2018, Moelis engaged with 24 potential financing sources, of which nine signed non-disclosure agreements. Of the nine who signed non-disclosure agreements, six parties expressed some interest in potentially providing DIP financing, although none of these six parties ultimately submitted a DIP financing proposal.

In parallel, the Debtors engaged with existing creditors Mercuria and the Ad Hoc Group to provide DIP financing. Negotiations with these parties accelerated significantly in the weeks before the Petition Date, and ultimately, both Mercuria and the Ad Hoc Group provided DIP financing proposals that were each tied to restructuring transactions. For Mercuria, the proposed transaction was a sale process with Mercuria serving as stalking horse bidder through a credit bid of Mercuria's prepetition secured debt and $15 million of cash consideration. For the Ad Hoc Group, the proposed transaction was a restructuring support agreement between the Debtors and the Ad Hoc Group that memorialized the plan treatment for each proposed class of creditors.

### 1.    Ad Hoc Group DIP Financing Proposal

The Ad Hoc Group provided a DIP financing proposal that contemplated (i) an asset-backed revolving loan credit facility provided by Goldman Sachs Lending Partners LLC or an affiliate ("GSLP") and other institutions participating in the facility, (ii) a "first in last out" term loan, provided and fully backstopped by certain Holders of the Unsecured Notes, and (iii) a second lien term loan provided by certain Holders of the Unsecured Notes. This DIP financing proposal was tied to a restructuring support agreement that contemplated a standalone reorganization via a chapter 11 plan, the terms of which involved rolling certain of the DIP financing facilities into exit financing, the reinstatement of the

28

Secured Term Loans, reinstatement or payment in full of all general unsecured claims at entities other than Aegean, and a split of equity, warrants, and additional consideration for all general unsecured claims at Aegean (including the Unsecured Notes). Ultimately, the Ad Hoc Group was, *inter alia*, unable to obtain committed financing from GSLP or another third party to provide DIP financing as of the Petition Date and thus there was no actionable DIP financing proposal ever made by the Ad Hoc Group.

### 2.      Mercuria DIP Financing Proposal

The DIP financing proposal provided by Mercuria involved Mercuria rolling up the Prepetition Secured Credit Facilities into the postpetition DIP Facilities consisting of a (i) $160 million U.S. revolving credit facility, (ii) $72 million multiple delayed draw term loan credit facility, and (iii) $300 million global revolving credit facility. The Mercuria proposal also contemplated the continuation of other liquidity enhancing measures such as hedging and sleeving.[11] This proposal was tied to a sale process, the terms of which were memorialized in bidding procedures and a stalking horse asset purchase agreement (the "Stalking Horse Sale Process") which the Debtors filed shortly after the Petition Date.

## VI.      EVENTS OF THE CHAPTER 11 CASES

### A.      First Day Pleadings and Other Case Matters

### 1.      First Day Pleadings

To facilitate the administration of the chapter 11 cases and minimize disruption to the Debtors' business operations, the Debtors filed certain motions with the Bankruptcy Court on the Petition Date seeking certain relief summarized below. The relief sought in the "first day" pleadings facilitated the Debtors' seamless transition into chapter 11 and preserved the value the Debtors' enterprise. Further information and a brief description of each of the first day motions and the evidence in support thereof is set forth in the *Declaration of Andrew Hede, Restructuring Advisor to Aegean Marine Petroleum Network Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 9] (the "Hede First Day Declaration"). The first day motions included the following:

- *Wages*. On November 9, 2018, the Bankruptcy Court entered an interim order authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto [Docket No. 53]. On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 155].

- *Cash Management*. On November 9, 2018, the Bankruptcy Court entered an interim order approving the Debtors' motion seeking authority to (i) operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations thereto and (ii) continue intercompany transactions and funding consistent with the Debtors' historical practices [Docket No. 53] (the "Cash Management Motion"). On November 27, 2018, the Committee filed a limited objection to approval of the Cash Management Motion

---

[11]    The term "sleeving" refers to a credit enhancement transaction commonly used in the commodity trading industry where one party (X) with a strong balance sheet provides "credit" to another party (Y) whose liquidity is limited or may be otherwise unavailable from other sources. The sleeving transaction could be a purchase or sale transaction and most commonly occurs where either (i) Y seeks to have X acquire inventory from a third party (Z) and sell that inventory to Y on extended credit terms or for delivery to Y at a later date (thereby having X carry the inventory on its balance sheet and relieving Y of this obligation), or (ii) X purchases inventory from Y on shorter payment terms (or on an immediate pay basis) and X delivers product to Z on standard credit terms, alleviating the need for Y to carry the inventory on its balance sheet or to reduce the timing for turnover.

on a final basis [Docket No. 110]. Following negotiations regarding a global resolution of the issues raised in such objection (discussed further below), the Committee agreed, consistent with and subject to the Restructuring Support Agreement, to withdraw its objection to the relief requested in the Cash Management Motion. On December 17, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 237].

- *Insurance*.  On November 16, 2018, the Bankruptcy Court entered an interim order authorizing, but not directing, the Debtors to (a) continue their prepetition insurance coverage and surety bond program, (b) satisfy prepetition obligations thereto, (c) renew, supplement, or enter into new insurance policies and surety bonds in the ordinary course of business on a postpetition basis, and (d) continue to pay brokerage fees [Docket No. 85].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 153].

- *Foreign Claims, Lien Claims, 503(b)(9) Claims, and HSE and Other Claims*.  On November 9, 2018, the Bankruptcy Court entered an interim order (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business all prepetition and postpetition amounts owing on account of (i) foreign claims, (ii) lien claims, (iii) 503(b)(9) claims, and (iv) HSE and other claims, and (b) confirming the administrative expense priority of certain outstanding purchase orders and authorizing the payment of such obligations in the ordinary course of business [Docket No. 54].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 150].

- *Taxes*.  On November 16, 2018, the Bankruptcy Court entered an interim order authorizing, but not directing, the Debtors to pay and remit (a) certain prepetition taxes and fees and (b) certain taxes and fees that arise in the ordinary course of business on a postpetition basis [Docket No. 81].  On December 6, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 154].

- *Hedging*.  On November 16, 2018, the Bankruptcy Court entered an interim order (a) authorizing, but not directing, the Debtors to (i) continue prepetition hedging practices, (ii) commence postpetition hedging practices, (iii) pay hedging obligations, whether they arose prepetition or postpetition, in the ordinary course of business, and (b) granting superpriority claims on account of postpetition hedging obligations [Docket No. 83].  On November 27, 2018, the Committee filed a limited objection to approval of such relief on a final basis [Docket No. 111].  Following negotiations regarding a global resolution of the issues raised in such objection, the Committee agreed, consistent with and subject to the Restructuring Support Agreement, to withdraw its objection.  On December 17, 2018, the Bankruptcy Court granted such relief on a final basis [Docket No. 238].

- *Automatic Stay Enforcement*.  On November 16, 2018, the Bankruptcy Court entered an order granting the Debtors' request for an order restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* provisions of the Bankruptcy Code and approving the form and manner of notice thereto [Docket No. 88].

- *Utilities*.  On December 6, 2018, the Bankruptcy Court entered an order granting the Debtors' request to (a) establish procedures for, among other things, determining adequate assurance for utility providers, (b) prohibit utility providers from altering, refusing, or discontinuing services, and (c) determine that the Debtors are not required to provide any additional adequate assurance [Docket No. 151].

Each of the foregoing first day motions, the Hede First Day Declaration, and all orders for relief granted in these chapter 11 cases, can be viewed free of charge at https://dm.epiq11.com/Aegean.

**B.      Other Procedural and Administrative Motions**

To facilitate the efficient administration of the chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the chapter 11 cases [Docket No. 3];

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, schedules of current income and expenditures, statements of financial affairs, and reports pursuant to Federal Rule of Bankruptcy Procedures 2015.3 [Docket No. 82];

- establishing certain notice, case management, and administrative procedures on an interim basis [Docket No. 109];

- allowing the Debtors to prepare a list of creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor and to file a consolidated list of the Debtors' 30 largest creditors, as well as other related relief, on an interim basis [Docket No. 89] and on a final basis [Docket No. 152];

- allowing the Debtors to retain and compensate certain professionals utilized in the ordinary course of business [Docket No. 157]; and

- approving the procedures for the interim compensation and reimbursement of retained professionals in the chapter 11 cases [Docket No. 161].

**C.      Other Matters Relevant to these Chapter 11 Cases**

**1.      Retention of Debtors' Chapter 11 Professionals**

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these chapter 11 cases. These professionals include: (a) Kirkland & Ellis LLP, as legal counsel; (b) EY Turnaround Management Services LLC, as restructuring advisor; (c) Moelis & Company LLC, as financial advisor and investment banker; (d) Kobre & Kim LLP, as special asset recovery counsel; (e) Arnold & Porter Kaye Scholer LLP, as special counsel; and (f) Epiq Corporate Restructuring, LLC, as claims agent and administrative advisor. The Committee has also sought the retention of various professionals in these chapter 11 cases, as discussed below.

**2.      Schedules and Statements**

On January 2, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. *See, e.g.*, Docket Nos. 262-63. Interested parties may review the Schedules of Assets and Liabilities and Statements of Financial Affairs and any amendments thereto for Aegean free of charge at https://dm.epiq11.com/Aegean.

### 3.    Bar Date Motion

On December 11, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 199] (the "Bar Date Motion"). On December 18, 2018, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 240] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").

Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these chapter 11 cases is **February 21, 2019 at 5:00 p.m. Eastern Time** (the "Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' chapter 11 cases is **May 6, 2019 at 5:00 p.m. Eastern Time**. The Bar Date Notice was served on January 3, 2019 and published in *The New York Times* (national and international editions), *Financial Times* (international edition), and *Tradewinds* on January 7, 2019, January 8, 2019, and January 11, 2019, respectively.

### 4.    Pending Litigation Proceedings and Claims

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome or disposition of these lawsuits, legal proceedings, and claims, although the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would (a) have a material adverse effect on their businesses, financial condition, or results of operations or (b) interfere with the feasibility of the Plan.

With certain exceptions, the filing of the chapter 11 cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the chapter 11 cases. The Debtors' liability with respect to litigation stayed by the commencement of the chapter 11 cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the chapter 11 cases. ¶

A securities class action captioned as *In re Aegean Marine Petroleum Network Inc. Securities Litigation*, Case No. 18-cv-4993 (S.D.N.Y.) (the "Securities Litigation"), was commenced against AMPNI and certain of its officers in the United States District Court for the Southern District of New York in June of 2018. On January 31, 2019, the court-appointed lead plaintiff in the Securities Litigation filed a consolidated complaint naming a number of AMPNI's former and current directors and officers, as well as its former auditors, as defendants, seeking damages for violations of the Securities Exchange Act of 1934. The causes of action asserted in the consolidated complaint arise from, among other things, the allegedly fraudulent scheme discussed in Section V.D above. AMPNI was not named as a defendant in the amended consolidated complaint in the Securities Litigation. For the avoidance of doubt, the Litigation Trustee reserves the right to seek appropriate relief to recharacterize any alleged direct claims asserted in the Securities Litigation as derivative claims or Section 510(b) Claims, assert relative priority to the D&O policy proceeds, or seek such other relief it deems necessary or appropriate to maximize the value of the Litigation Claims.¶

Notwithstanding anything to the contrary in the Plan, the Litigation Trust has the right to pursue any and all insurance proceeds under any and all D&O Liability Insurance Policies available to any defendant(s) in connection with the Litigation Claims in order to satisfy any

**settlement or judgment obtained by the Litigation Trust in respect of such Litigation Claims; provided that nothing in the Plan or Confirmation Order shall: (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of any Estate or that the Litigation Trust has any priority to such insurance proceeds; (b) modify or supersede any provision (including any priority of payments provision) of any of the D&O Liability Insurance Policies; or (c) otherwise preclude the Lead Plaintiff and the putative class in the Securities Litigation, or any party entitled to coverage under the D&O Liability Insurance Policies from seeking and obtaining such coverage thereunder.**

### D.    Appointment of Official Committee of Unsecured Creditors

On November 15, 2018, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 80], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in these chapter 11 cases. The Committee is currently composed of the following members: Deutsche Bank Trust Company Americas, U.S. Bank National Association, and AmEx. The Committee has filed several applications and obtained authority to retain various professionals to assist the Committee in carrying out its duties under the Bankruptcy Code. These professionals include: (a) Akin Gump Strauss Hauer & Feld LLP, as legal counsel, (b) PJT Partners, as investment banker, and (c) AlixPartners, LLP as financial advisor.

Since its formation, the Debtors have consulted with the Committee concerning the administration of these chapter 11 cases and the Committee has been an active participant in restructuring negotiations. The Debtors have also kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations to the extent the Committee's constituency would be affected by proposed actions or transactions outside of the ordinary course of the Debtors' businesses.

### E.    Debtor-in-Possession Financing

The Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 6] (the "DIP Motion") on the Petition Date. The DIP Motion sought approval of $532 million in aggregate financing through a $160 million DIP U.S. Revolving Credit Facility, $72 million DIP U.S. Term Credit Facility, and $300 million DIP Global Credit Facility to be provided by Mercuria (collectively, the "DIP Financing").

On November 7, 2018, the Ad Hoc Group filed an objection to the DIP Financing [Docket No. 29]. Among other things, the Ad Hoc Group objected to certain relief requested upon entry of the interim order, including the immediate roll up of 50 percent of the Debtors' prepetition ABL obligations, the granting of liens on the Debtors' unencumbered assets, including the Litigation Claims, and approval and payment of certain fees. The Ad Hoc Group also objected to provisions granting Mercuria the right to credit bid its prepetition debt in the proposed section 363 sale of the Debtors' assets and the inclusion of certain sale-related milestones unrelated to the DIP Financing, including requiring an auction with respect to the sale of the Debtors' assets within 75 days of the Petition Date. After a two-day contested hearing, the parties agreed to a revised form of interim order regarding the DIP Financing. Among other things, the revised form of interim order no longer provided for the immediate roll-up of the prepetition ABL obligations upon entry of the interim order, preserved the right of parties in interest to object to the granting of any liens or claims at Debtors that were not prepetition obligors, and no longer approved

Mercuria's right to credit bid.   Other issues raised in the objection of the Ad Hoc Group were reserved for determination at the final hearing.

On November 9, 2018, following resolution of the issues raised in the objection filed by the Ad Hoc Group to approval of the DIP Financing [Docket No. 29], the Bankruptcy Court entered the revised order approving the DIP Financing on an interim basis [Docket No. 51] (the "Interim Order").  Upon entry of the Interim Order, the Debtors had access to the full amount provided under the DIP U.S. Revolving Credit Facility and DIP Global Credit Facility, subject to borrowing base limitations under the DIP U.S. Credit Agreement and DIP Global Credit Agreement, and $40 million under the DIP U.S. Term Credit Facility.  Following the entry of the Interim Order, the final hearing on the DIP Financing was scheduled for December 7, 2018.

On November 27, 2018, the Committee filed an objection to approval of the DIP Financing on a final basis [Docket No. 113].  Among other things, the Committee opposed the granting of claims and liens to Mercuria, and the roll up of Mercuria's prepetition debt, at Debtor entities that were not prepetition obligors.  The Committee also objected to certain provisions in the DIP Financing that would limit the Committee's ability to object to Mercuria's stalking horse bid for the Debtors' assets and that would potentially prevent the Debtors from modifying the sale procedures to maximize value for the Debtors' estates.  Following significant discovery, the Debtors, the Committee and Mercuria entered into extensive, hard fought, arm's length, and good faith negotiations for the resolution of the Committee's objections to the DIP Financing, as well as the Committee's objections to the Stalking Horse Sale Process [Docket No. 112].  At the courthouse immediately prior to the December 7, 2018 hearing, the Debtors, the Committee and Mercuria reached an agreement in principle for a global resolution that was generally announced to the Court at the December 7, 2018 hearing.

While the parties were continuing to negotiate the documentation for the global resolution announced in open court, the Debtors and the Committee received a proposal from, and began discussions with, Oaktree Opportunities Fund Xb Holdings (Cayman), L.P. ("Oaktree") and Hartree-OCM AMPN Holdings (Delaware), LLC ("Hartree") regarding the terms of an alternative DIP facility and restructuring proposal.  These discussions ultimately resulted in Oaktree and Hartree offering to provide a DIP facility that the Debtors and the Committee deemed to be on terms more favorable to the Debtors' estates than the Mercuria proposal.  A term sheet reflecting the Oaktree/Hartree proposal was presented to and approved by the Board of Directors on December 12, 2018.  The term sheet included a $75 million DIP term loan facility (compared to $72 million already provided by Mercuria under the DIP Financing) and the same amount of financing under Mercuria's DIP U.S. Revolving Credit Facility and DIP Global Credit Facility but did not contemplate the roll-up of prepetition obligations (as the Debtors had no prepetition obligations to Oaktree/Hartree) and allowing for greater sharing in the Litigation Claims and avoidance actions with Holders of Aegean Unsecured Claims.

Once **Mercuria was** made aware of the Oaktree/Hartree **term sheet** proposal on December 12, 2018, Mercuria immediately provided to both the Committee and the Debtors confirmation of a topping proposal, including offering better terms on the DIP Financing (including better advance rates and term extension rates), meeting the $75 million DIP term loan facility value, providing the Holders of Aegean Unsecured Claims with 100 percent of the recovery on the Litigation Claims, offering $40 million of Cash to the Holders of Aegean Unsecured Claims, and offering to provide initial funding to the Litigation Trust.  After receiving confirmation of this offer from Mercuria on December 12, 2018, ~~but before Mercuria had finished documenting its offer,~~ on the morning of December 13, 2018, the Debtors filed a *Notice of Filing of Revised Final DIP Order Pursuant to 11 U.S.C. §§ 105,361, 362, 362, 364, 503 And 507 (I) Authorizing The Debtors To Obtain Senior Secured Priming Superpriority Postpetition Financing, (ii) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay; and (VI)*

*Granting Related Relief* [Docket No. 205] ~~(the "Oaktree/Hartree DIP")~~, and sought at a hearing before the Court hours later to replace the DIP Financing approved pursuant to the Interim Order with alternative DIP financing provided by Oaktree/Hartree **(the "Oaktree/Hartree DIP")**.

At the hearing **on the Oaktree/Hartree DIP** on December 13, 2018, Mercuria informed the Court that it had made a topping offer and objected to approval of the Oaktree/Hartree DIP on the grounds that there was no emergency need to replace the DIP Financing, as sufficient availability existed to meet the then-current needs of the Debtors. ~~The Court~~**At the hearing, the Court indicated that it was not considering approval of the Oaktree/Hartree RSA. The Court further** indicated that it would not approve the Oaktree/Hartree DIP on the terms proposed, including those contemplating a prepayment premium and linking approval of the Oaktree/Hartree DIP with approval of ~~a related restructuring transaction sponsored by~~**the** Oaktree ~~and~~ **/**Hartree ~~(as discussed below)~~. **RSA. In response to this,** Oaktree and Hartree indicated that the limitations to be imposed by the Court **on its proposed DIP financing** were unacceptable and announced that they were "withdrawing from the contest." **¶**

**During that hearing, the Court also stated:¶**

**"My only concern here is what's fair to the estate and its constituents. What's not fair to them is to say that the deal that gets put on the record at 2:30 in the morning last night, that another party is saying that they are just clamoring for the opportunity to make a better counterproposal to, what's not fair to the constituents of the estate is to say, no, we're going to stop now. That doesn't make any sense." (Dec 13, 2018 Hr'g. Tr. at 45:7-45:3)**

On December 15, 2018, following extensive negotiations with Mercuria and the Committee **to finalize the terms a Mercuria-supported restructuring transaction**, and in connection with the parties' entry into the Restructuring Support Agreement (as discussed below), the Debtors agreed to an *Interim Bridge Order Pursuant to 11 U.S.C. § 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 239] (the "Bridge Order"), that was entered by the Bankruptcy Court on December 17, 2018. The Bridge Order provided the Debtors with, among other things, access to $11 million in incremental liquidity under the DIP U.S. Term Credit Facility (for a total of $51 million in availability under that facility when combined with the authority provided under the Interim Order) in order to fund the Debtors through January 14, 2019, when the Bankruptcy Court would conduct a hearing to consider entry of a Final Order (as defined below).

On January 15, 2019, the Bankruptcy Court entered an order approving the Modified DIP Financing, including the roll up of all obligations and amounts owed under the U.S. Credit Facility and Global Credit Facility, on a final basis [Docket No. 290] (the "Final Order"). The Final Order further provides that, among other things, certain parties are or may be entitled to object to or otherwise challenge the roll up of the U.S. Credit Facility and Global Credit Facility and the validity of related claims and liens. However, in accordance with the Final Order, the Confirmation Order shall expressly provide that, among other things, all parties' rights, if any, to bring any such objection or challenge shall be irrevocably extinguished, released, and discharged upon the occurrence of the Effective Date.

1.    **Adequate Protection Stipulations**

Pursuant to the DIP Motion, the Debtors also requested authority to enter into adequate protection stipulations and consent orders with certain of the Debtors' prepetition secured lenders under

the Secured Term Loans. Interim orders granting the requested relief were entered for Aegean Baltic Bank S.A. [Docket No. 63], the National Bank of Greece, S.A. [Docket No. 64], and United Arab Bank P.J.S.C. [Docket No. 68] on November 13, 2018. Final orders granting the requested relief were entered for Aegean Baltic Bank S.A. [Docket No. 242], the National Bank of Greece, S.A. [Docket No. 243], United Arab Bank P.J.S.C. [Docket No. 244], Piraeus Bank S.A. [Docket No. 241], and Orix Investment and Management PTE. LTD. [Docket No. 245] on December 18, 2018.

### F. Sale Process Motion

In parallel with the negotiations regarding the DIP Financing, prior to the Petition Date, the Debtors and Mercuria engaged in hard-fought negotiations surrounding the terms of a section 363 sale of certain Debtors' assets, with Mercuria to serve as stalking horse bidder. The parties intensely debated a number of key terms, including whether the sale would be structured as an all-asset sale "free and clear" of all liens, claims, and encumbrances, which Mercuria preferred, or an all-equity sale, which the Debtors preferred. In the end, Mercuria and the Debtors agreed to a mixture of the two, affording Mercuria the right to acquire the assets of certain Debtors and the equity of 45 Aegean Marine entities. In addition, Mercuria initially sought to acquire the Litigation Claims through a credit bid premised on the Litigation Claims, as assets of Aegean, being collateral under the DIP Financings; however, the Debtors did not want to sell such assets without receiving cash consideration. This issue was heavily contested and resulted in the Debtors delaying the filing of their bankruptcy petitions by approximately a week while negotiations continued. Through extensive, good-faith negotiations, Mercuria ultimately agreed to include a cash component in its stalking horse bid as compensation for the acquisition of 100 percent of the Litigation Claims.[12] Once the Debtors and Mercuria reached an agreement, the Debtors were able to file their chapter 11 cases with financing in place and a baseline bid to set the floor for an auction.

On November 9, 2018, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures and Section 365 Procedures, (II) Approving the Sale of Substantially All of the Debtors' Assets, (III) Authorizing the Entry Into and Performance Under the Stalking Horse Asset Purchase Agreement, and (IV) Granting Related Relief* (the "Sale Process Motion") [Docket No. 59]. Pursuant to the Sale Process Motion, the Debtors sought Bankruptcy Court authorization to commence a sale process for certain of the Debtors' assets, with Mercuria serving as stalking horse bidder.

Subsequent to the filing of the Sale Process Motion, the Committee filed an objection to the relief sought therein [Docket No. 112]. Among other things, the Committee objected to the inclusion of the Litigation Claims in the assets to be sold, the lack of information made available to prospective bidders regarding the value of the Debtors' assets, and the inability of potential bidders to bid on the Debtors' assets on an asset-by-asset basis under the proposed bidding procedures. The Committee also objected to the proposed $19 million break-up fee and uncapped expense reimbursement in favor of Mercuria, and the failure of Mercuria's stalking horse bid to allocate the proposed credit bid on an asset-by-asset basis.

The Committee objection led to further negotiations among the Debtors, Mercuria, and the Committee. The hearing on the Sale Process Motion and the DIP Financing, scheduled for December 7, 2018, was postponed based on the agreement in principle reached among the parties, the terms of which contemplated a global settlement and sale of the Debtors in the context of a chapter 11 plan versus the proposed auction process (as discussed above). Under this revised structure, Mercuria would provide substantially more value than under its stalking horse bid, including a larger cash component to be paid to

[12] Mercuria's proposed acquisition of the Litigation Claims was offered as an alternative means of offsetting liabilities and obligations Mercuria would or might incur as a result of the acquisition of the equity of the 45 Aegean Marine entities and the absence of the Debtors to otherwise be able to provide any substantive indemnification for these liabilities and obligations.

holders of unsecured claims at Aegean and an agreement to share with the unsecured creditors at Aegean the proceeds of the Debtors' Litigation Claims. Consistent with and subject to the Restructuring Support Agreement, the Debtors agreed to withdraw the Sale Process Motion and to terminate the stalking horse asset purchase agreement with Mercuria.

### G. Restructuring Support Agreements

After announcing an agreement in principle regarding a global settlement among the Debtors, the Committee, and Mercuria at the December 7, 2018 hearing, the parties worked intensely over the following days to document the deal. As discussed above, a DIP financing and restructuring proposal was received from Oaktree and Hartree~~,~~ **on December 10, 2018,** which the Debtors and Committee determined, consistent with their fiduciary duties, included improved terms for the Debtors' estates and unsecured creditors, compared to the Sale Process Motion and DIP Financing provided by Mercuria. Also as discussed above, ~~after~~**on December 12, 2018,** Mercuria ~~was informed of this~~**provided the principal terms of another** proposal~~,~~ **that** Mercuria ~~made~~**believed to be** a topping proposal ~~on December 12, 2018~~: Mercuria increased the cash component of its offer, agreed that unsecured creditors at Aegean could receive the entirety of the proceeds of the Litigation Claims (as opposed to a percentage), and offered to acquire the equity of all of Aegean's subsidiaries~~. The Debtors' and the Committees' advisors informed the Committee that Mercuria's offer was higher and better than the Oaktree/Hartree proposal~~.

In the early morning hours of December 13, 2018, ~~after~~**before** Mercuria had ~~confirmed its topping proposal but before it had~~ finished documenting ~~it~~**its proposal**, the Debtors filed a *Notice of Filing of Restructuring Support Agreement*, by and among the Debtors, the Committee, Oaktree, Hartree, AmEx, and certain holders of the Unsecured Notes (the "Oaktree/Hartree RSA") [Docket No. 206]. The Oaktree/Hartree RSA contemplated a restructuring of the Debtors premised on the recapitalization of Aegean ~~Marine~~ and unimpaired treatment of all creditors at subsidiary Debtors other than Aegean, as well as the Oaktree/Hartree DIP to replace the DIP Financing provided by Mercuria.

At the hearing before the Bankruptcy Court on December 13, 2018, the Debtors sought approval of the Oaktree/Hartree DIP ~~pursuant to the Oaktree/Hartree RSA~~. Mercuria, still in the process of ~~finalizing~~**working with the Committee and the Debtors to finalize** documentation of its restructuring proposal, appeared at the December 13 hearing and requested that the Court not approve the Oaktree/Hartree DIP. Mercuria argued that there was no emergency need for the Oaktree/Hartree DIP to be implemented, as sufficient availability existed under the DIP Financing to meet the then-current needs of the Debtors, and informed the Court that Mercuria had **previously proposed the principal terms of what it contended was** a superior restructuring ~~proposal. After the Bankruptcy Court~~**transaction. During the hearing, the Debtors confirmed that they were not seeking approval of the Oaktree/Hartree RSA at that time. The Court further** indicated that it would not approve the Oaktree/Hartree DIP on the terms proposed ~~therein~~**under the Oaktree/Hartree RSA. In response**, Oaktree and Hartree indicated that they ~~no longer supported the restructuring transactions contemplated by the Oaktree/Hartree RSA and~~ were "withdrawing from the contest**.**" ~~to sponsor *a chapter 11 plan of reorganization* and to provide funding pursuant to the Oaktree/Hartree DIP.~~ ¶

The Debtors and the Committee believe the Oaktree/Hartree RSA has been terminated by its own terms and also**, on December 14, 2018,** sent notices of termination to Oaktree and Hartree. **On December 17, 2018, at a** *hearing before the Bankruptcy Court*, Oaktree and Hartree **indicated that they disputed the validity of the termination notices and** reserved rights in connection therewith ~~at a subsequent *hearing before the Bankruptcy Court* on December 17, 2018~~**. At the hearing, the Bankruptcy Court recognized that Oaktree and Hartree's "participation was positive" and that**

**they "helped to get a better result for the estates."  (Dec. 17, 2018 Hr'g Tr. at 6:3-4).  Additionally, counsel to the Committee stated at the December 17, 2018 hearing that:¶**

> **From the committee's perspective, there's no doubt and I'd echo Your Honor's comments about the substantial value that Oak Tree [sic] provided to the process.  It took us from a situation with Mercuria, where we did not have a meeting of the minds and an agreement on a transaction, to one that materially improved -- provided materially improved terms for unsecured creditors and the estate, generally, which then ultimately got us to even better terms for unsecured creditors in the estate through the now new transaction that we've agreed to subject to the RSA and the plan process, of course, with Mercuria.  But there's no doubt about the substantial value that they have provided in connection with the process.¶**

**(Dec. 17, 2018 Hr'g. Tr. at 9:21-10:8).¶**

Following the December 13, 2018 hearing, the Debtors, the Committee, and Mercuria engaged in negotiations regarding the terms of the restructuring proposal made by Mercuria ~~on December 12, 2018~~ **in response to the Oaktree/Hartree proposal.**  On December 15, 2018, the Debtors entered into the Restructuring Support Agreement, attached hereto as **Exhibit C**, and also continued the hearing on DIP Financing to January 14, 2019.  The Restructuring Support Agreement is the byproduct of hard-fought, arm's-length, good faith negotiations among the Debtors, Mercuria, and the Committee, and resolves all disputed issues between these parties related to DIP Financing, the Sale Process Motion (which has been withdrawn), the initial funding for and allocation of beneficial units in a litigation trust, and cash consideration to be distributed *pro rata* to Holders of Allowed Aegean Unsecured Claims.  In addition, the Consenting Unsecured Noteholders, representing more than ~~[59]~~**64** percent in principal amount outstanding of the Unsecured Notes issued by Aegean, and AmEx, the largest individual non-Unsecured Noteholder unsecured creditor at Aegean, are also signatories to the Restructuring Support Agreement and support the transactions contemplated therewith and the Plan.

The Plan implements the Restructuring Transactions contemplated by the Restructuring Support Agreement and the restructuring term sheet attached thereto.  Importantly, the global settlement embodied in the Restructuring Support Agreement eliminates costly protracted litigation during these chapter 11 cases and paves the way for an efficient, cost-effective confirmation process and consummation of a value-maximizing transaction vis-à-vis the Plan.  The Debtors urge all Holders of Claims and Interests entitled to vote on the Plan to vote to accept the Plan.¶

**Notwithstanding anything herein or to the contrary, the descriptions or statements in this section shall not constitute and may not be construed as an admission of fact, liability, stipulation, or waiver, and may not be used by any party in interest as evidentiary support of the matters described above.**

## VII.    SUMMARY OF THE PLAN

**THIS <u>ARTICLE VII</u> IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO.    ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF**

ALL SUCH TERMS AND PROVISIONS, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN.   TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS <u>ARTICLE VII</u> AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.

A.    Overview

Article III of the Plan provides a summary of the classification and treatment of Claims and Interests under the Plan and Article IV of the Plan provides a summary of the structure and means for implementation of the Plan.  The discussion herein is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and the definitions therein).

Generally speaking, the Plan contemplates, among other things, a recapitalization of the Debtors and the establishment of a Litigation Trust to pursue collection of the Litigation Claims and fund recoveries for Holders of Aegean Unsecured Claims and, potentially, Section 510(b) Claims and Interests in Aegean (to the extent any Litigation Trust proceeds remain following Payment in Full of Allowed Aegean Unsecured Claims). The Plan includes the following key terms, among others described herein and therein:

1.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including resolution of intercompany liabilities, allocation of value among the Debtors, and treatment of Holders of General Unsecured Claims against each of the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness.  Subject to Article VII of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

2.    Classification and Treatment of Claims and Interests

Pursuant to section 1122 of the Bankruptcy Code, the Plan designates the Classes of Claims and Interests as set forth in Article III of the Plan and as described in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?"  The Plan provides that a Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and will receive distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

Article III.E of the Plan provides that certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be deemed eliminated for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejected of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 3. Recoveries to Certain Holders of Claims and Interests

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 4. Restructuring Transactions

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate as reasonably determined by the Debtors and Mercuria, prior to the Effective Date and thereafter the Reorganized Debtors, to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate or in furtherance of implementing the Plan (the "Restructuring Transactions"). The Restructuring Transactions may include one or more of the following: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or other law; and (4) all other actions as reasonably determined by the Debtors and Mercuria to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan; provided that, the Restructuring Transactions shall not materially and adversely impact any Litigation Claim; provided further, that the foregoing proviso shall not modify any rights of the Debtors and the Reorganized Debtors to modify their organizational documents to eliminate any indemnification obligations of any former officer or director not serving in such capacity on the Petition Date but solely to the extent such modification has no adverse impact on the ability of the Litigation Trustee to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims[.];[13] **provided further, that notwithstanding anything to the contrary herein, the foregoing proviso shall not be construed to alter the treatment of any Claims that are Unimpaired under the Plan.** To the extent known, any such Restructuring Transactions may be summarized in the Description of Restructuring Transactions, and in all cases, such transactions shall be subject to the terms and conditions of this Plan as reasonably determined by the Debtors and Mercuria. The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

### 5. Means for Implementation of the Plan

Article IV of the Plan sets forth the means for implementation of the Plan, including, but not limited to, the issuance and distribution of Reorganized Aegean Equity Interests, the Exit Facilities (if any), and the establishment of the Aegean Unsecured Claims Cash Pool, while Article V of the Plan discusses the Litigation Trust.¶

### 6. Director and Officer Liability Insurance¶

**To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed, pursuant to section 365(a) of the**

---

[13] The Debtors, Mercuria, and the Committee continue to negotiate the extent of assumed Indemnification Obligations in connection with the D&O Liability Insurance Policies with respect to former directors and officers.

Bankruptcy Code, all unexpired D&O Liability Insurance Policies with respect to coverages provided to the Debtors' directors, managers, officers, and employees serving in such capacity on or prior to the Petition Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.¶

Notwithstanding anything to the contrary in the Plan, the Litigation Trust has the right to pursue any and all insurance proceeds under any and all D&O Liability Insurance Policies available to any defendant(s) in connection with the Litigation Claims in order to satisfy any settlement or judgment obtained by the Litigation Trust in respect of such Litigation Claims; provided that nothing in the Plan or Confirmation Order shall:  (a) constitute a finding or stipulation that any proceeds of any of the D&O Liability Insurance Policies are property of any Estate or that the Litigation Trust has any priority to such insurance proceeds; (b) modify or supersede any provision (including any priority of payments provision) of any of the D&O Liability Insurance Policies; or (c) otherwise preclude the Lead Plaintiff and the putative class in the Securities Litigation, or any party entitled to coverage under the D&O Liability Insurance Policies from seeking and obtaining such coverage thereunder.¶

With regards to current officers and directors, Confirmation of the Plan shall not discharge, impair, or otherwise modify any Indemnification Obligations assumed by the Debtors or Reorganized Debtors as of the Effective Date or the foregoing assumption of the D&O Liability Insurance Policies by the Reorganized Debtors hereunder.¶

With regards to former officers and directors, no such Indemnity Obligations shall be assumed except to the extent necessary to preserve the availability of coverage under such D&O Liability Insurance Policies; provided, however, that the Reorganized Debtors shall not be required to fund any payment obligations with respect to such Indemnification Obligations; provided, that any such officers or directors shall be free to pursue any rights he or she may have in relation to the D&O Liability Insurance Policies for payment or reimbursement of any costs, expenses or other amounts for which coverage under the D&O Liability Insurance Policies may be available.¶

For the avoidance of doubt, no Indemnification Obligations shall be assumed with respect to any former officer or director not serving in such capacity as of the Petition Date; provided that the failure to assume such Indemnification Obligation has no adverse impact on the ability of the Litigation Trust to obtain recovery from the proceeds of the D&O Insurance Policies in connection with the Litigation Claims but without the creation of any payment obligation or any other liability, directly or indirectly, of the Reorganized Debtors, any of their subsidiaries, or Mercuria.  To the extent that any Litigation Claims or Securities Claims against any of the current or former directors or officers are covered under the D&O Liability Insurance Policies, the Reorganized Debtors shall provide any applicable notices to the insurance carriers that may be required under the D&O Liability Insurance Policies and requested by the plaintiffs in the Securities Litigation or the Litigation Trustee

### 7.    6. Aegean Unsecured Claims Cash Pool

On or prior to the Effective Date, the Aegean Unsecured Claims Cash Pool shall be funded with Cash on hand and/or provided by Mercuria, a portion of which Cash may be deposited into a segregated account in connection with a Disputed Claims Reserve maintained by the Litigation Trustee as provided herein.  On the Effective Date, such portion of the Aegean Unsecured Claims Cash Pool that is not

segregated into the Disputed Claims Reserves shall be distributed Pro Rata by the Debtors or Reorganized Debtors to Holders of Allowed Aegean Unsecured Claims. After the Effective Date, the Litigation Trustee shall be responsible for reconciling Disputed Class 4A Aegean Unsecured Claims and distributing any funds in the Disputed Claims Reserve as Disputed Class 4A Aegean Unsecured Claims are compromised, settled, allowed, or disallowed.

### **8.** ~~7.~~ Exit Facilities

Reorganized Aegean and one or more Reorganized Debtors may enter into Exit Financing on the Effective Date, as reasonably determined by the Debtors and Mercuria, on terms set forth in the Exit Facilities Documents. To the extent applicable, the Exit Facilities Documents shall be included in the Plan Supplement.

On the Effective Date, the Exit Facilities Documents (if any) shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (if any) (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (3) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, the Reorganized Debtors, the applicable agent or any lender), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### **9.** ~~8.~~ Litigation Trust

On the Effective Date, the Litigation Trust Funders shall fund the Litigation Trust Loan, the Debtors shall transfer to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Claims, and the Litigation Trustee shall execute the Litigation Trust Agreement and take all steps necessary to establish the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax. The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee in accordance therewith. In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

The Litigation Trust shall be established for the purpose of liquidating the Litigation Trust Assets, distributing the Litigation Trust Loan Payments, reconciling and objecting, if necessary, to Disputed Aegean Unsecured Claims in Class 4A, and distributing the proceeds of the Litigation Claims to the Litigation Trust Beneficiaries and is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the Litigation Trust.

The Litigation Trust shall be funded from the proceeds of the Litigation Trust Loan and proceeds of the Litigation Trust Assets. Any Holder of an Allowed Aegean Unsecured Claim that is a party to the Restructuring Support Agreement on or before the commencement of the Confirmation Hearing in respect of the Plan shall be entitled to participate in the Litigation Trust Loan, subject to the terms set forth in the Restructuring Support Agreement and Litigation Trust Documents. Holders of Class 4A Aegean Unsecured Claims will be given the option on their respective Ballot to become a party to the Restructuring Support Agreement and elect to participate in the funding of the Litigation Trust Loan. Holders of Class 4A Aegean Unsecured Claims who validly and timely exercise their participation rights as set forth in the Disclosure Statement Order will be contacted after the Voting Deadline to exercise their right to fund a portion of the Litigation Trust Loan before the Confirmation Hearing.

The Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the Litigation Trust expenses; (b) the payment of other reasonable expenses of the Litigation Trust, including the cost of pursuing the Litigation Claims; (c) the retention of counsel, accountants, financial advisors or other Professionals and the payment of their reasonable compensation; (d) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (e) the orderly liquidation of the Litigation Trust Assets; and (f) litigation of the Litigation Claims, which may include the prosecution, settlement, abandonment or dismissal of any such Litigation Claims.

### (a)    Litigation Trustee

The Litigation Trustee shall be selected by the Committee and the Requisite Consenting Unsecured Noteholders acting together and shall be appointed on the Effective Date. The Litigation Trustee shall be compensated on terms acceptable to the Committee and the Requisite Consenting Unsecured Noteholders. The Litigation Trustee shall be a professional person or a financial institution having trust powers with experience administering other litigation trusts. The Litigation Trustee shall not have voting rights with respect to the governance of the Litigation Trust and shall retain professionals approved by (x) if determined prior to the Effective Date, a unanimous decision of the Committee and the Requisite Consenting Unsecured Noteholders acting together, and (y) if determined after the Effective Date, the unanimous consent of the Litigation Trust Advisory Board.

The Litigation Trust Agreement shall also specify the powers, rights and responsibilities of the Litigation Trustee and shall include the authority and responsibility to, among other things, take the actions set forth in Article V of the Plan. The Litigation Trustee shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement.

### (b)    Litigation Trust Advisory Board

The Litigation Trust shall be governed by the Litigation Trust Advisory Board as set forth in the Litigation Trust Agreement. The Debtors or Reorganized Debtors shall be permitted to appoint a single *ex officio* member of the Litigation Trust Advisory Board who shall not have voting rights. If and when the holders of Class A Litigation Trust Units have received Payment in Full, the members appointed by the Committee and Requisite Consenting Unsecured Noteholders may be replaced by new members

designated by holders of Class B Litigation Trust Units.  The members of the Litigation Trust Advisory Board shall not be entitled to compensation for service on the Litigation Trust Advisory Board unless otherwise determined by the Committee and the Requisite Consenting Noteholders or the Litigation Trust Advisory Board.

### (c)    Litigation Trust Assets

On the Effective Date, the Debtors shall transfer to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Claims.  Pursuant to the Plan, the definition of "Litigation Claims" is as follows:

- "Litigation Claims" means all of the following claims and Causes of Action belonging to any of the Debtors or their Non-Debtor Subsidiaries, and existing at any time on or prior to the Petition Date:  (a) claims and Causes of Action relating to the events, circumstances, and conduct described in the June 4, 2018, and November 2, 2018, Form 6-K disclosures of Aegean including conduct concerning improper accounting for or recordation of accounts receivable, as well as the right of any of the Debtors or their Non-Debtor Subsidiaries to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (b) claims and Causes of Action relating to the construction and maintenance of Aegean Oil Terminal Corp.'s fuel oil terminal located in Fujairah, UAE, as well as the right of any of the Debtors or their Non-Debtor Subsidiaries to the proceeds of or recovery in any suit, prosecution, investigation, settlement, enforcement proceeding, fine, penalty, or other proceeding or action by any government or governmental agency in connection with the foregoing; (c) claims and Causes of Action relating to misstated accounting records, fraudulent misappropriation of funds by Dimitris Melissanidis, claims against auditors and other professionals related to misappropriation of funds, any related conspiracy to defraud Aegean or investors in Aegean, claims against Quality Solutions related to construction fraud or other fraud, misconduct, malpractice, or other malfeasance by any director, officer, employee, or agent of any of the Debtors or their Non-Debtor Subsidiaries in connection with any of the foregoing; (d) claims and Causes of Action brought by any of the Debtors or their Non-Debtor Subsidiaries, as Plaintiffs, against Hess Corporation, as Defendant, commenced in the Supreme Court of the State of New York, County of New York: Part 39, Index Number 653887/2014, including any appeals in connection with the foregoing; (e) claims and Causes of Action concerning unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and any affiliate thereof; (f) claims and Causes of Action concerning HSFO product loaded from Petrotrin in Trinidad in December 2016; (g) claims and Causes of Action arising from the repurchase of any equity interests in Aegean; (h) claims and Causes of Action against any of ~~any of~~ the Debtors' or their Non-Debtor Subsidiaries' directors or officers or other person covered ~~by~~**under any of the** applicable D&O Liability Insurance Policies, including for breach of fiduciary duty; (i) [Reserved] ; (j) claims and Causes of Action of any of the Debtors or their Non-Debtor Subsidiaries in connection with the Related Party Transactions described in the Form 20-F of Aegean for the fiscal year ended December 31, 2016; and (k) Avoidance Actions, with the exception of claims and Causes of Action to avoid and recover preferential transfers pursuant to Bankruptcy Code section 547; provided, however, that, notwithstanding anything to the contrary contained ~~herein~~**in the Plan**, the scope of "Litigation Claims" shall be expressly subject to the limitations set forth in Article IX.F of the Plan.  ~~The~~**For the avoidance of doubt, the** "Litigation Claims" shall not include any **claim or** Cause of Action that is not identified in clauses (a) - (k) of the foregoing sentence or any **claim or** Cause of Action against Mercuria, David Gallagher, any Reorganized Debtor or Non-Debtor

Subsidiary, or any other parties or entities described in the first sentence of the second paragraph of Article IX. F of the Plan.

For reference, certain of the Litigation Claims are briefly summarized below.

- The Debtors' litigation against Hess Corporation is currently on appeal following an August 3, 2018 judgment pursuant to which the presiding justice of the New York Supreme Court declined to award the Debtors any damages. In its complaint (as amended), the Debtors asserted claims against Hess Corporation arising out of the purchase and sale agreement executed on November 12, 2013 among the parties, and sought compensatory damages in the amount of $27.9 million, plus interest, reasonable attorneys' fees, costs, and disbursements.

- The Debtors have certain ongoing litigation related to unpaid invoices for marine fuels supplied through agreements entered into with O.W. Group and affiliates. This litigation is currently pending in courts in Greece and the United States, with certain of the claims in Greece on appeal following the rejection of the Debtors' claims. The Debtors reached final settlement or judgment with regard to certain claims prior to the Petition Date. Asserted claims for active matters total approximately $3.0 million.

- The Debtors' claims for reimbursement against the Petroleum Company of Trinidad and Tobago Limited, or Petrotrin, the state-owned oil company of the Republic of Trinidad and Tobago, relate to off-spec marine fuel supplied by Petrotrin to certain of the Debtors' vessels in December 2016. This off-spec marine fuel was supplied to certain of the Debtors' customers, who thereafter submitted claims to the Debtors. The Debtors seek reimbursement from Petrotrin for approximately $700,000 paid by the Debtors to their customers related to Petrotrin's delivery of the off-spec marine fuel.

As soon as reasonably practicable following the establishment of the Litigation Trust, the Litigation Trustee shall determine the value of the assets transferred to the Litigation Trust, based on the good-faith determination of the Litigation Trust Advisory Board, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Litigation Trustee and the Litigation Trust Beneficiaries) for all federal income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Litigation Trust Agreement, the Litigation Trust shall be entitled to retain such professionals and advisors as the Litigation Trust shall determine to be appropriate or necessary, subject to the direction of the Litigation Trust Advisory Board, and the Litigation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

### (d)     Cooperation of the Reorganized Debtors

To effectively investigate, prosecute, compromise, and/or settle the Litigation Claims on behalf of the Litigation Trust, the Litigation Trustee and its counsel may require reasonable access to the Debtors' and Reorganized Debtors' documents, information and work product relating to the Litigation Trust Assets, and, in such event, must be able to exchange such information with the Reorganized Debtors on a confidential basis and as protected by the common interest privilege without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Accordingly, the Litigation Trust Agreement shall provide for the Litigation Trust to have reasonable access to copies

of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets, including, electronic records, documents or work product related to the Litigation Claims, to the extent consistent with applicable law, but shall further provide that any records or information so shared shall continue to be protected by the attorney-client, work product, or common interest privilege and the Litigation Trust's access thereto shall not waive any of the Debtors', the Reorganized Debtors', or Mercuria's privileges or similar protections referenced in this paragraph.  The Litigation Trust Agreement shall also provide that the Litigation Trust may not waive any privileges referenced in this paragraph belonging to or shared with the Debtors, the Reorganized Debtors, or Mercuria in respect of such records and documents, and that the Debtors, the Reorganized Debtors, and Mercuria shall be provided with reasonable notice and an opportunity to protect their rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.

The Reorganized Debtors shall preserve all records, documents or work product (including all electronic records, documents or work product) related to the Litigation Claims until the earlier of (1) such time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved, or (2) the termination of the Litigation Trust.  The Reorganized Debtors shall reasonably cooperate with the Litigation Trustee with reasonable requests for interviews of current and former officers, directors, employees, and professionals of the Debtors in order to facilitate prosecution of the Litigation Claims; provided, however, that the Reorganized Debtors shall be reimbursed for any reasonable and documented out-of-pocket expenses in connection with such cooperation.

### (e)    Fiduciary Duties

The Litigation Trustee and each member of the Litigation Trust Advisory Board shall owe fiduciary duties to the holders of Litigation Trust Interests of the type that an official committee of unsecured creditors would owe to unsecured creditors, and shall have in place under the Litigation Trust Agreement applicable indemnity and waiver provisions to protect the Litigation Trustee and each member of the Litigation Trust Advisory Board from being personally liable for any claims or causes of action asserted by the Holders of Litigation Trust Interests, except for any clams of fraud, gross negligence, or willful misconduct.

### (f)    Securities Law Considerations

Litigation Trust Interests shall be passive and shall not have voting, consent or other shareholder-like control rights with respect to the Litigation Trust.  Litigation Trust Interests may be structured not to be securities and may or may not be transferable, in each case subject to applicable law and as otherwise determined (x) prior to the Effective Date, by the Committee and the Requisite Consenting Unsecured Noteholders, or (y) after the Effective Date, by the Litigation Trust Advisory Board as provided in the Litigation Trust Agreement.

### (g)    Tax Treatment

For all U.S. federal income tax purposes, all parties (including the Aegean Parties, the Litigation Trustee and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) as (i) a transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) directly to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Class 4A Claims that

are the responsibility of the Litigation Trust to resolve, to the Disputed Claims Reserve, followed by (ii) the transfer by the Litigation Trust Beneficiaries to the Litigation Trust of the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Litigation Trust Interests.   Accordingly, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to the Disputed Claims Reserve).   The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.   The Litigation Trust, the Litigation Trustee and the Litigation Trust Beneficiaries shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

### (h)    Distribution to Litigation Trust Beneficiaries

Distributions of proceeds from the Litigation Claims shall be made by the Litigation Trustee according to the following priorities:

- *First,* to the Litigation Trust Funders to repay the Litigation Trust Loan plus the Litigation Trust Funding Fee.

- *Second*, on a Pro Rata basis to the holders of Class A Litigation Trust Units until such Holders receive Payment in Full.[1413]

- *Third*, on a Pro Rata basis to the holders of Class B Litigation Trust Units.

Notwithstanding the foregoing, after repayment in full of the Litigation Trust Loan and the Litigation Trust Funding Fee, the Litigation Trust Advisory Board in the exercise of its business judgment may elect to withhold proceeds from the prosecution or settlement of Litigation Claims to pay reasonable projected costs and expenses of the Litigation Trust.   For the avoidance of doubt, the Litigation Trustee may pay accrued and unpaid reasonable and documented expenses of the Litigation Trust with proceeds of the Litigation Trust Loan prior to the receipt of any proceeds from any Litigation Claims.

The Litigation Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Trust Beneficiaries.   Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.   All such amounts withheld and

---

[1413]    Article I.112 of the Plan defines Payment in Full as "payment in full of each Allowed Aegean Unsecured Claim, including postpetition interest at the applicable default contract rate for the period from the Petition Date through the Effective Date and if no such contract rate exists, at the federal judgment rate plus fees, costs, and expenses under such contract, if applicable."

paid to the appropriate taxing authority shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of this Agreement. The Litigation Trustee shall be authorized to collect such tax information from the Litigation Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Litigation Trust Agreement. As a condition to receive distributions under the Plan, all Litigation Trust Beneficiaries ~~will need~~**may be required** to identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent the Litigation Trustee deems appropriate, including an IRS Form W-9 or, in the case of Litigation Trust Beneficiaries that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Litigation Trustee may refuse to make a distribution to any Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Litigation Trust Beneficiary, the Litigation Trustee shall make such distribution to which the Litigation Trust Beneficiary is entitled, without interest; and, provided, further, that, if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Trustee for such liability. If ~~the holder~~**a Litigation Trust Beneficiary (other than a Holder of Unsecured Notes Claims)** fails to comply with such a request for tax information within 180 days, the Litigation Trustee ~~shall~~**may** file a document with the Bankruptcy Court that will provide **twenty-one (**21**)** days' notice before such distribution ~~shall~~**may** be deemed an unclaimed distribution and treated in accordance with Article VII.D.5 of the Plan. **In the event that the Litigation Trustee elects to make distributions through an intermediary (such as DTC or the Unsecured Notes Indenture Trustees), the party who would be the withholding agent with respect to distributions to the Litigation Trust Beneficiary under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Trustee.¶**

### 10.    Committee Members' Fees and Expenses¶

**On the Effective Date, the Debtors or Reorganized Debtors shall pay in full, subject to the provisions of Article IV.C of the Plan, the reasonable and documented fees and expenses of the Committee Members (including the reasonable and documented fees and expenses of counsel for Committee Members). The Committee Members shall deliver an invoice to the Debtors, Mercuria, and the U.S. Trustee no less than five (5) days prior to the Effective Date; provided, that the Debtors' and Reorganized Debtors' obligations to pay in full the reasonable and documented fees and expenses of the Committee Members shall not be limited nor deemed limited in any way by the delivery of such invoice, save to the extent set out in the immediately following sentence hereof. If the Debtors or Reorganized Debtors, as applicable, or the U.S. Trustee dispute the reasonableness of any such invoice, the Debtors, Reorganized Debtors, and/or the U.S. Trustee, as applicable, may submit such dispute to the Bankruptcy Court for the determination of the reasonableness of such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein. ¶**

**Following the invoice review process and the resolution of any reasonableness disputes (if necessary) as set forth above, the Debtors or Reorganized Debtors are authorized to pay Committee Members' reasonable and documented fees and expenses as an exercise of their business judgment consistent with section 363(b) of the Bankruptcy Code, and in compliance with sections 1123(b)(6) and 1129(a)(4) of the Bankruptcy Code. The Debtors, Reorganized Debtors, and the Committee expressly reserve all rights to amend or assert additional legal bases in support**

**of payment of Committee members' reasonable and documented fees and expenses pursuant to the Plan.**

**B.      Treatment of Executory Contract and Unexpired Leases**

**1.      Assumption and Rejection of Executory Contract and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than:  (a) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) those that have been previously rejected by a Final Order; (c) those that have been previously assumed by a Final Order; (d) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (e) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control", "assignment", or similar provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan, including the Restructuring Transactions shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default, breach, violation or acceleration rights with respect thereto.  For the avoidance of doubt, no Restructuring Transaction shall be deemed to violate the terms of any assumed Unexpired Lease of non-residential real property.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

The Debtors, with the reasonable consent of Mercuria, or the Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedules (each, an "Amended Rejected Executory Contracts and Unexpired Leases Schedule") at any time through and including the date that is sixty (60) days after the Effective Date, which amended schedule shall be Filed with the Bankruptcy Court; provided, however, after the Effective Date, the Reorganized Debtors may not alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases with respect to Executory Contracts or Unexpired Leases of Aegean without the reasonable consent of the Litigation Trustee.  The Debtors or Reorganized Debtors, as applicable, shall provide notice of any amendments to the Amended Rejected Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby.

Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court, served, and actually received by the Debtors on or before the deadline to object to Confirmation or, in the case of an Executory Contract or Unexpired Lease that is identified on any Amended Rejected Executory Contract and Unexpired Lease Schedule, on the date that is fourteen (14) days following the Filing of such amended schedule. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption, including any proposed cure amount, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption, including any proposed cure amount.

### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be disallowed upon an order of the Bankruptcy Court, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the Litigation Trust, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III</u> of the Plan.

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable; <u>provided</u> that nothing herein shall prevent the Reorganized Debtors, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 4. Dispute Resolution

In the event of a dispute between the Debtors and a non-Debtor counterparty to any Executory Contract or Unexpired Lease to be assumed or assumed and assigned regarding (a) the amount of any

Cure Claim, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, assumption and assignment or the cure payments required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon in writing by the Debtors, with the reasonable consent of Mercuria, or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following:  (i) the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment, which Final Order or orders may, for the avoidance of doubt, be entered (and any related hearing may be held) after the Effective Date, or (ii) upon the written, consensual resolution between the counterparty to any Executory Contract or Unexpired Lease and the Debtors or Reorganized Debtors, as applicable.   The Debtors, with the reasonable consent of Mercuria, or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes.  If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors, with the reasonable consent of Mercuria, or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date; provided, however, the Reorganized Debtors may not add an Executory Contract or Unexpired Lease of Aegean to the Rejected Executory Contracts and Unexpired Leases Schedule after the Effective Date without the reasonable consent of the Litigation Trustee.

### 5.    Indemnification Obligations

Except as otherwise provided elsewhere herein or identified on the Rejected Executory Contracts and Unexpired Leases Schedule, each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive the Effective Date Unimpaired and unaffected, irrespective of when such obligation arose.  Notwithstanding anything in the Plan or any Confirmation Order to the contrary, such indemnified director or officer covered under any assumed Indemnification Obligation shall only be entitled to indemnity to the extent so entitled under such assumed existing agreement, organizational document, or under applicable law.¶

The Debtors shall assume the Indemnification Obligations for the current directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such.  Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; provided that none of the Reorganized Debtors shall amend or restate any Reorganized Aegean Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Indemnification Obligations.

### 6.    Collective Bargaining Agreements

All of the Debtors' collective bargaining agreements and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all such agreements.

### 7.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 8.    Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' schedules of assets, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 9.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

### C.    Releases

The Plan contains certain releases, as described in Article III.K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in Article IX of the Plan are copied in pertinent part below.

### 1.    Release of Liens

Except (a) with respect to the Liens securing the Exit Facilities (if any), and to the extent elected by the Debtors, in consultation with Mercuria, with respect to an Allowed Other Secured Claim in accordance with Article III.B.1, of the Plan or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, other than the Liens and security interests securing the DIP Facilities which, if not otherwise paid in full in Cash, shall remain in full force and effect and shall secure all obligations arising under, shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title,

and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

   **2.      Debtor Release**

EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED BY OR ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS (INCLUDING THOSE RELATED TO THE PREPETITION SECURED CREDIT FACILITIES AND THE EXCLUSIVITY LETTER DATED JULY 4, 2018 (AND ATTACHED TERM SHEET) BETWEEN THE AEGEAN DEBTOR AND MERCURIA), INTERCOMPANY TRANSACTIONS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING TRANSACTIONS; (II) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; (III) THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING CLAUSES (I) THROUGH (III) TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE RELEASES SET FORTH ABOVE WILL SHALL NOT RELEASE (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN), OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN. THE DEBTOR RELEASE DOES NOT WAIVE OR RELEASE ANY RIGHT, CLAIM, OR CAUSE OF ACTION (A) IN FAVOR OF ANY DEBTOR OR REORGANIZED DEBTOR, AS APPLICABLE, ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO SUCH DEBTOR OR REORGANIZED DEBTOR NOT SATISFIED

OR DISCHARGED UNDER THE PLAN OR (B) AS EXPRESSLY SET FORTH IN THE PLAN OR THE PLAN SUPPLEMENT.

### 3.    Third Party Release

EFFECTIVE AS OF THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART: (I) THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS (INCLUDING THOSE RELATED TO THE PREPETITION SECURED CREDIT FACILITIES AND THE EXCLUSIVITY LETTER DATED JULY 4, 2018 (AND ATTACHED TERM SHEET) BETWEEN THE AEGEAN DEBTOR AND MERCURIA), OR INTERCOMPANY TRANSACTIONS; (II) ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING A LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; (III) THE CHAPTER 11 CASES, THE DISCLOSURE STATEMENT, THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT; OR (IV) UPON ANY OTHER ACT, OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED TO THE FOREGOING CLAUSES (I) THROUGH (III) TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE RELEASES SET FORTH ABOVE SHALL NOT RELEASE (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN) OR (II, (II) ANY SECURITIES CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.I OF THE PLAN), OR (III) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

### 4.    Exculpation

EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW AND WITHOUT AFFECTING OR LIMITING EITHER THE DEBTOR RELEASE OR THE THIRD-PARTY RELEASE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE

CHAPTER 11 CASES, THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, OTHER THAN WITH RESPECT TO THE REORGANIZED DEBTORS AND THE NON-DEBTOR SUBSIDIARIES THEMSELVES, THE EXCULPATION SET FORTH ABOVE SHALL NOT RELEASE OR BE AN EXCULPATION WITH RESPECT TO (I) ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN), OR (II) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

5.    Injunction

EFFECTIVE AS OF THE EFFECTIVE DATE, PURSUANT TO SECTION 524(A) OF THE BANKRUPTCY CODE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN SETTLED UNDER THE PLAN, RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT,

AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY **CAUSE OF** ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN **AND THE CONFIRMATION ORDER.** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR IN THE PLAN, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN ANY LITIGATION CLAIMS (SUBJECT TO THE LIMITATIONS SET FORTH IN ARTICLE IX.F OF THE PLAN). FOR THE AVOIDANCE OF DOUBT, ANY **CLAIMS OR** CAUSES OF ACTION AGAINST MERCURIA, DAVID GALLAGHER, THE REORGANIZED DEBTORS OR THEIR NON-DEBTOR SUBSIDIARIES, OR ANY OTHER PARTY OR ENTITY DESCRIBED IN THE FIRST SENTENCE OF THE SECOND PARAGRAPH OF ARTICLE IX.F OF THE PLAN THAT OTHERWISE COULD HAVE BEEN COMMENCED, CONTINUED, OR OTHERWISE PROSECUTED OR PURSUED BY THE LITIGATION TRUST **OR ANY ONE OR MORE OF THE LITIGATION TRUST BENEFICIARIES** SHALL BE SUBJECT TO THE TERMS OF THE INJUNCTION IN ~~THIS~~ ARTICLE IX.E OF THE PLAN.

6.      **Limitations with Respect to Litigation Claims**

The Debtor Release (Article IX.B of the Plan), Third Party Release (Article IX.C of the Plan), and Exculpation (Article IX.D of the Plan) are each subject to a carve out in respect of the Litigation Claims in ~~the last sentence of~~ each such provision (collectively, the "Litigation Claims Carve Out"). The Litigation Claims, as described in greater detail ~~herein~~**in the Plan**, shall be transferred to, reviewed by, and, potentially, prosecuted by the Litigation Trust as part of the global settlement reached by and among the Debtors, Mercuria, the Committee, the Consenting Unsecured Noteholders, AmEx, and any other party that joins the Restructuring Support Agreement.   Notwithstanding anything to the contrary contained ~~herein~~**in the Plan**, the scope of the Litigation Claims Carve Out is set forth in **this** Article IX.F of the Plan.

The Litigation Claims Carve Out shall <u>not</u> extend to, limit, or otherwise modify **in any manner or at any time** the scope of the Debtor Release, Third Party Release, and Exculpation in relation to (1) Mercuria and each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such, (2) David Gallagher, (3) any ~~other~~ current officer or director of the Debtors ~~that~~**who** began working for the Debtors after May 1, 2018, (4) each of the Debtors' employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors that began

working after May 1, 2018, or (5) the Professionals, excluding Professionals retained pursuant to the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 157]; provided, that, for the avoidance of doubt, each such entity or party referred to in subparts (1) - (5) are "Released Parties" and "Exculpated Parties" under th~is~e Plan.  With respect to any current officer or director *that*who began working for the Debtors before May 1, 2018, the Litigation Claims Carve Out shall modify the Debtor Release, Third Party **Release**, and Exculpation solely with respect to Litigation Claims, if any, against such parties for gross negligence, willful misconduct, fraud, or breach of fiduciary duty; provided, however, that each such party's liability, if any, for breach of fiduciary duty shall be limited by and with recourse solely to available coverage under applicable D&O Liability Insurance Policies so long as such limitation does not limit the availability of such insurance; provided, further, that, for the avoidance of doubt, each such party otherwise remains a "Released Party" and "Exculpated Party" in relation to the Debtor Release, Third Party Release, and Exculpation except to the extent of the foregoing carve out for gross negligence, willful misconduct, or fraud.

Except as expressly limited above, the definition of "Released Party" and "Exculpated Party" will not include any person or entity as and solely to the extent implicated in any way in any Litigation Claims or who or which may be liable in connection with any remedies available in connection with any Litigation Claims (including any immediate or mediate transferees connection with any Litigation Claims) and regardless of whether such implication or liability is known or unknown at any time.  For the avoidance of doubt, any such party or entity that is also a "Released Party" and "Exculpated Party" in relation to the Debtor Release, Third Party Release, or Exculpation shall remain so except as and to the extent implicated or liable as contemplated in the preceding sentence.

In addition to the foregoing, no recovery in respect of a Litigation Claim shall result in **or create** a payment obligation, or any other liability, directly or indirectly, by the Reorganized Debtors, any of their subsidiaries, or Mercuria or David Gallagher.  For the avoidance of doubt, the Litigation Claims Carve Out shall not **extend to, limit, or otherwise modify the scope of the Debtor Release, Third Party Release, and Exculpation in relation to such payment obligations or any other liabilities described in the foregoing sentence.¶**

**7.        Limitations with Respect to Securities Claims¶**

**The Third Party Release (Article IX.C of the Plan) is subject to a carve out in respect of the Securities Claims in the last sentence of such provision (the "Securities Claims Carve Out").  The Securities Claims Carve Out is part of a global settlement reached by and among the Debtors and the Lead Securities Plaintiff.  Notwithstanding anything to the contrary contained in the Plan, the scope of the Securities Claims Carve Out is set forth in Article IX.I of the Plan.¶**

**The Securities Claims Carve Out shall not extend to, limit, or otherwise modify the scope of the Third Party Release in relation to (1) Mercuria and each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such, (2) David Gallagher, (3) any *other* current officer or director of the Debtors *that* began working for the Debtors after May 1, 2018, (4) each of the Debtors' employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors that began working after May 1, 2018, or (5) the Professionals, excluding Professionals retained pursuant to the *Order Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 157]; provided, that, for the avoidance of doubt, each such entity or party**

referred to in subparts (1) - (5) are "Released Parties" under *this* Plan. With respect to any current officer or director *that* began working for the Debtors before May 1, 2018, the Securities Claims Carve Out shall modify the Third Party Release solely with respect to Securities Claims, if any, against such parties for gross negligence, willful misconduct, fraud, or the Section 20 Claims; provided, however, that each such party's liability, if any, on account of any Section 20 Claims shall be limited by and with recourse solely to available coverage under applicable D&O Liability Insurance Policies so long as such limitation does not limit the availability of such insurance; provided, further, that, for the avoidance of doubt, each such party otherwise remains a "Released Party" in relation to the Third Party Release except to the extent of the foregoing carve out for gross negligence, willful misconduct, or fraud.¶

In addition to the foregoing, no recovery in respect of a Securities Claim shall result in a payment obligation, or any other liability, directly or indirectly, by the Reorganized Debtors, any of their subsidiaries, or Mercuria (including each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such), or David Gallagher, and none of the foregoing shall be named as a party in any claim, complaint, or Cause of Action in the Securities Litigation. For the avoidance of doubt, the Securities Claims Carve Out shall not extend to, limit, or otherwise modify the scope of the Debtor Release, Third Party Release, and Exculpation in relation to such payment obligations or any other liabilities described in the foregoing sentence.

## VIII.    SOLICITATION AND VOTING

### A.    Solicitation Packages

On or about [●] [●], 2019, the Bankruptcy Court entered the Disclosure Statement Order. For purposes of this <u>Article VIII</u>, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, Holders of Claims and Interests who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "<u>Solicitation Package</u>"), which will include, in part, the following:

- this Disclosure Statement, including the Plan as an exhibit thereto; and

- the appropriate ballot(s) and applicable voting instructions, or appropriate notices, together with a pre-addressed, postage pre-paid return envelope.

The Solicitation Package may also be obtained: (1) from Epiq Corporate Restructuring, LLC by (a) visiting <u>https://dm.epiq11.com/Aegean</u> (free of charge), (b) writing to Aegean Marine Petroleum Network Inc., et al. c/o Epiq Corporate Restructuring, LLC at P.O. Box 4422, Beaverton, OR 97076-4422 (regular first class mail) or (c) writing to Aegean Marine Petroleum Network Inc., et al. c/o Epiq Corporate Restructuring, LLC at 10300 SW Allen Boulevard, Beaverton, OR 97005 (overnight mail or hand delivery) or (d) calling (888) 418-0324 (toll free in the U.S.) or (503) 520-4423 (International); or (2) for a fee via PACER (except for ballots) at <u>https://ecf.nysb.uscourts.gov</u>.

### B.    Classes Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in <u>Article III.C</u> of this Disclosure Statement,

entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class under the Plan.

The following Classes are the only Classes entitled to vote to accept or reject the plan and thus the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4A and Class 7 and Interests in Class 8 (collectively, the "Voting Classes").

| Class | Claim / Interest | Status |
|-------|-----------------|--------|
| 4A | Aegean Unsecured Claims | Impaired |
| 7 | Section 510(b) Claims | Impaired |
| 8 | Interests in Aegean | Impaired |

The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan.

Holders of Class 4A Claims may also be entitled to participate in the Litigation Trust Loan if such Holder indicates its intent to so participate by following the instructions on such Holder's ballot and then, prior to the Confirmation Hearing, executes the Restructuring Support Agreement and otherwise joins and executes any applicable Litigation Trust Documents.

### C.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan. Each Class of Interests entitled to vote on the Plan will have accepted the Plan if the Holders of at least two-thirds in amount of the Interests actually voting in such Class vote to accept the Plan.

### D.    Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Secured Term Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4B | General Unsecured Claims against All Other Debtors | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

Therefore, the Debtors are **_not_** soliciting votes from holders of Claims or Interests in Classes 1, 2, 3, 4B, 5, and 6.

### E.    Voting Record Date

**The Voting Record Date is February [12], 2019**.  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim or Interest.

### F.    Voting on the Plan

**The Voting Deadline is March [19], at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by Epiq Corporate Restructuring, LLC on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the enclosed reply envelope or as otherwise directed.  Certain Holders of Claims may also be entitled to complete an E-Ballot.

| BALLOTS |
|---|
| To be counted, all ballots and Master Ballot must be **actually received** by Epiq Corporate Restructuring, LLC by the Voting Deadline, which is **March [19], 2019 at 4:00 p.m. (prevailing Eastern Time)** |
| If you have any questions, please call the Debtors' restructuring hotline maintained by Epiq Corporate Restructuring, LLC at: (888) 418-0324 (toll free in the U.S.) or (503) 520-4423 (International) |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot. All ballots must be properly executed, completed, and delivered according to the voting instructions set forth in the applicable ballot. Any ballot that is properly executed by the Holder of a Claim or Interest entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim or Interest entitled to vote to accept or reject the Plan may cast only one ballot for each Claim or Interest held by such Holder. By signing and returning a ballot, each Holder of a Claim or Interest entitled to vote will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim or Interest has been cast or, if any other ballots have been cast with respect to such Claim or Interest, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

### G.    Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than Epiq Corporate Restructuring, LLC), or the Debtors' financial or legal advisors instead; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

Any ballot received after the Voting Deadline or that is otherwise not in compliance with the Disclosure Statement Order will not be counted.

## IX.    CONFIRMATION OF THE PLAN

### A.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to each of the Debtors. Because each of the Debtors must satisfy these requirements, it is possible that the Bankruptcy Court will enter a Confirmation Order with respect to certain Debtors and not others.[15][14] The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

---

[15][14]    For example, the Bankruptcy Court may deny Confirmation for one or more of the Debtors if such Debtor fails to obtain the requisite acceptance of the Plan from its Classes, while still confirming the Plan with respect to the other Debtors.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the chapter 11 cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court

## B.      Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. Notwithstanding that section 1129(a)(7) only applies to impaired classes, the Liquidation Analysis also provides liquidation recoveries for certain unimpaired classes, including Class 4B (General Unsecured Claims Against All Other Debtors), on a consolidated basis.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Creditor Recoveries

The Plan provides recoveries to, among others, the Holders of Claims in Class 4A (Aegean Unsecured Claims).  As shown in the Debtors' Liquidation Analysis, and as set forth in the Liquidation Analysis, such recoveries are higher than recoveries estimated to be available if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The recoveries described in this Disclosure Statement that are available to the Holders of Claims are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided herein. The Debtors believe that the treatment of Claims as provided by the Plan complies with the Bankruptcy Code and established case law.

### D.    Valuation

**The valuation information contained in this Disclosure Statement with regard to the Reorganized Debtors is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.**

The Debtors' advisors have undertaken the valuation analysis, attached hereto as **Exhibit E** (the "Valuation Analysis"), to determine the value available for distribution to Holders of Allowed Claims or Interests pursuant to the Plan, and to analyze and estimate the recoveries to such Holders thereunder. Accordingly, if the actual enterprise value of the Debtors differs from the estimated enterprise value in the Valuation Analysis, the actual distributions may be materially different than the estimations set forth herein.

### E.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit F** (the "Financial Projections").  Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement.  Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

F.      **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan. Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code.[15]

G.      **Confirmation without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request

---

[15]   *In re Tribune Co.*, 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007).

Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

### 2.    Fair and Equitable Test

The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

### (a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) (x) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (y) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (ii) the holders of such secured claims realize the indubitable equivalent of such claims.[16]

### (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest in any property.[17]

### (c)    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of  (x) the allowed amount of any fixed liquidation preference to which such holder is entitled, and (y) any fixed redemption price to which such holder is entitled; (ii) the value of such

---

[16]  *See* 11 U.S.C. § 1129(b)(2)(A).

[17]  *See* 11 U.S.C. § 1129(b)(2)(B).

interest; or (iii) if the class does not receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.[1918]

### H.        The Debtor Releases, Third Party Releases, Exculpation, and Injunction Provisions

Article IX.B of the Plan provides for releases of claims and Causes of Action the Debtors may hold against the Released Parties.  The Released Parties are each of the following in their capacity as such: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; provided, however, that any party in interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Released Party"; provided, further, however, that notwithstanding anything to the contrary herein in the Plan, the scope of "Released Parties" shall be subject to the limitations set forth in Article IX.F of the Plan. Articles IX.F and IX.I of the Plan.  For the avoidance of doubt, the Released Parties referenced in the foregoing clauses (j) through (l), are "Released Parties" solely with respect to work performed for or on behalf of the applicable Entity for which releases are given pursuant to Articles IX.B and IX.C of the Plan, subject to the limitations set forth in Articles IX.F of the Plan.

Article IX.C of the Plan provides for the release of claims and Causes of Action of the Releasing Parties against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third Party Release").  The Releasing Parties are each of the following in their capacity as such: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) the Consenting Unsecured Noteholders; (g) the Unsecured Notes Indenture Trustees; (h) AmEx; (i) each other party to the Restructuring Support Agreement; (j) with respect to each of the foregoing Entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, and management companies; (k) with respect to each of the foregoing Entities in clauses (a) through (j), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors; (l) all Holders of Claims and Interests that vote to accept the Plan; (m) all Holders of Claims and Interests that vote to reject the Plan but do not elect to opt out of the Third Party Release; and (n) all Holders of Claims and Interests not described in the foregoing clauses (a) through (m); provided, however, that any such Holder of a Claim or Interest that opts out of, Files an objection to, or otherwise does not consent to the releases in the Plan shall not be a "Releasing Party"; provided, further, however, that notwithstanding

---

[1918]  See 11 U.S.C. § 1129(b)(2)(C).

anything to the contrary herein, the scope of "Releasing Parties" shall be subject to the limitations set forth in <u>Article IX.F</u> of the Plan.

Article IX.D of the Plan provides for the exculpation of each Exculpated Party for acts or omissions taken in connection with the chapter 11 cases.  The Exculpated Parties are, collectively: (a) the Debtors and Reorganized Debtors; (b) Mercuria; (c) the DIP Agents and DIP Lenders, (d) the Prepetition Secured Credit Facility Agents and Prepetition Secured Credit Facility Lenders, (e) the Committee and the Committee Members; (f) AmEx; (g) the Unsecured Notes Indenture Trustees; (h) with respect to each of the foregoing entities in clauses (a)-(g) each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); and (i) with respect to each of the foregoing entities in clauses (a)-(h), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies, each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (each solely in their capacity as such); <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary ~~herein~~**in the Plan**, the scope of "Exculpated Parties" shall be subject to the limitations set forth in **Article IX.F of the Plan.  For the avoidance of doubt, the Exculpated Parties referenced in the foregoing clauses (h) and (i), are "Exculpated Parties" solely with respect to work performed on behalf of the applicable Entity for which exculpations are provided pursuant to Article IX.D of the Plan, subject to the limitations set forth in** Article IX.F of the Plan. ~~¶~~

~~The Plan provides that all Holders of Claims or Interests who are entitled to vote on the Plan who vote to accept the Plan, abstain from voting, or reject the Plan and do not check the box to opt out of the Third Party Release will be granting a release of any claims or rights they have or may have as against many individuals and Entities.  The Plan also provides that all Holders of Claims or Interests who are not entitled to vote, and do not elect to opt out, will be granting a release of any claims or rights they have or may have as against many individuals and Entities.  The release that these Holders of Claims or Interests will be giving is broad and it includes any and all claims that such Holders may have against the Released Parties, which in any way relate to the Debtors, their operations either before or after the chapter 11 cases began, any securities of the Debtors, whether purchased or sold, including sales or purchases which have been rescinded, and any transaction that these Released Parties had with the Debtors.~~  *~~Various Holders of Claims or Interests who are entitled to vote on the Plan may have claims against a Released Party and the Debtors express no opinion on whether a Holder has a claim or the value of the claim nor do the Debtors take a position as to whether a Holder should consent to grant this release.~~*

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[~~20~~19]  Debtor releases are granted by courts in the Second Circuit where the Debtors establish that such releases are in the "best interests of the estate."[~~21~~20]  Courts often find that releases pursuant to a settlement

---

[~~20~~19] *See In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[~~21~~20] *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

are appropriate.[2321]   Additionally, in the Second Circuit, third party releases are permissible when they are consensual or where "truly unusual circumstances" render the release terms integral to the success of the plan.[2322]   The determination is not a matter of "factors and prongs" but courts have provided some guidance for allowing third party releases. "Unusual circumstances" include instances in which: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished;(c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[2323]   Courts typically allow releases of third party claims against non-debtors where there is the express consent of the party giving the release or where other circumstances in the case justify giving the release.[2324]   Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[2325]   In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[2326]

     "Most courts allow consensual [third party] releases to be included in a plan."[2327]   Courts in this district have found that parties consent to give releases when they vote in favor of the plan or when they abstain from voting but do not opt out of releases.[2328]   Third party releases may also be deemed

---

[2321]   *See, e.g.*, *In re Spiegel*, No. 03-11540 (BRL) 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); *see also In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *accord In re Adelphia Communications Corp.*, 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[2322]   *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005).

[2323]   *Id.* at 141.

[2324]   *Id.*

[2325]   *See, e.g.*, *Oneida*, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[2326]   *See In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd, In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *Enron*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[2327]   *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also Indianapolis Downs*, 486 B.R. at 305 ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[2328]   *See Metromedia*, 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent."); *In re Calpine Corp.*, No. 05-60200 BRL, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) ("Such releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan, who abstain from voting and choose not to opt out of the releases, or who have otherwise consented to give a release, and are consensual."); *DBSD N. Am.*, 419 B.R. at 218–19  ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *Adelphia*, 368 B.R. at 268  (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Lear Corp.*, No. 09–14326, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible).

consensual for unimpaired creditors who are deemed to accept the plan.[30][29]  Here, the Third Party Releases are consensual with respect to all of the Released Parties.  Importantly, the ~~b~~**B**allots distributed to holders of Claims or Interests entitled to vote on the Plan quoted the entirety of the Third Party Release and related provisions and definitions of the Plan, clearly informing holders of Claims or Interests entitled to vote of the steps they should take if they disagreed with the scope of the release.[31][30]  Thus, affected parties were on notice of Third Party Release, including the option to opt out of the Third Party ~~Releases~~**Release.  Parties entitled to vote that do not return a ballot will be subject to the Third Party Release unless they affirmatively "opt out" of such release by providing written notice to the Debtors or the Claims and Solicitation Agent**.  As a result, the primary aspects of the Third Party Releases are consensual under the substantial majority of precedent in this jurisdiction, and the Court need not consider the other *Metromedia* factors with respect to such aspects.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan.  ~~The Debtors believe that each~~**More specifically, a number** of the Released Parties  ~~has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.  The Debtors further believe that such~~**played a vital role in negotiations that resulted in the Restructuring Support Agreement.  The Restructuring Support Agreement was heavily negotiated among the Debtors and the Debtors' key economic stakeholders—Mercuria, the Committee and its members (including the Unsecured Notes Indenture Trustees), the Consenting Unsecured Noteholders, and AmEx—and sets forth the key terms by which a consensual, going-concern restructuring of the Debtors' businesses pursuant to** *a chapter 11 plan of reorganization* **that unimpairs the vast majority of creditors.  Mercuria, the Consenting Unsecured Noteholders, AmEx, and the DIP Lenders have each agreed to compromise their Claims under and support the Plan.  The** releases, exculpations, and injunctions *are a necessary part of the Plan.  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of***were a material inducement for parties to enter into the Restructuring Support Agreement.  The DIP Lenders and DIP Agents have provided the postpetition financing necessary to fund the administration of these chapter 11 cases, without which there would be no viable business to reorganize around.  Mercuria has also agreed to fund various recoveries under** the Plan.~~¶~~

~~The Third Party Releases are consensual and, therefore, appropriate.  Moreover, the Third Party Releases are an integral part of the Plan and¶~~

**Mercuria's commitments to and support of the Debtors over the past several months helped the Debtors avoid an immediate free-fall liquidation and have provided the Debtors, their estates, and creditors with significant value, including in its capacities as a prepetition lender, DIP Lender, and Plan sponsor.  As a result of Mercuria's contributions, the majority of the Debtors' creditors will be entitled to 100 percent recoveries.  Therefore, Mercuria and its representatives are fully entitled to the releases and exculpations set forth in the Plan. ¶**

---

[30][29]  *See Indianapolis Downs*, 486 B.R. at 306 (finding that the releases, which included releases of unimpaired creditors who were deemed to accept the plan, "may be properly characterized as consensual").

[31][30]  *See, e.g.*, *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties).

The Debtors reached out to numerous parties in search of a strategic alliance to stabilize their business during the summer of 2018. The Debtors determined Mercuria was best suited to provide the necessary support. Mercuria committed to provide the Debtors with a range of credit solutions. Most notably, Mercuria provided the Debtors with significant sleeving and hedging services, and the parties negotiated Mercuria's participation in the trade financing facility. Just as Mercuria began to work alongside the Debtors, the Debtors' lenders under the U.S. Credit Facility and Global Credit Facility, which had already severely restricted the Debtors' access to much-needed credit, threatened to exercise remedies that would deprive the Debtors of their very ability to avoid immediate liquidation. In response, rather than leave the Debtors to their own fate, Mercuria agreed to step in and acquired all interests of the prior lenders to the U.S. Credit Facility and Global Credit Facility, restored their credit lines, enhanced liquidity, and waived past defaults. ¶

Fully aware of the Debtors' precarious financial situation, Mercuria continued to support the Debtors and accepted their proposal that the parties pursue a chapter 11 process and a section 363 sale of the Debtors' assets. Under this plan, Mercuria agreed to provide debtor-in-possession financing and serve as a stalking horse bidder, setting the floor for an auction for the Debtors' assets. ¶

At the very onset of the chapter 11 cases, the Debtors' DIP Financing Motion and Sale Process Motion were faced with opposition by the Ad Hoc Group, and later the Committee. In response, Mercuria engaged in negotiations to settle the dispute. As a result of these negotiations, Mercuria agreed to provide substantially more value than under its stalking horse bid, a larger cash component and an agreement to share the proceeds of the Debtors' litigation claims with the unsecured creditors. A robust auction for the Debtors' DIP Financing and acquisition of the Debtors then ensued. As a result, Mercuria agreed to increase the cash component of its offer, agreed that the unsecured creditors of AMPNI could receive the entirety of the proceeds of the Debtors' litigation claims (rather than just a percentage), and agreed to provide 100% recoveries to the Debtors' other unsecured creditors. The releases and exculpations set forth in the Plan have always been an essential component of the negotiations and was a material inducement to Mercuria's agreeing to acquire the Debtors and to support a Plan providing substantial value to all creditors.¶

The Debtors' directors and officers likewise contributed substantially to these chapter 11 cases. While continuing to serve in their operational capacities postpetition, the Debtors' directors and officers simultaneously undertook the considerable burden of guiding the Debtors through the restructuring, working with the Debtors' professionals to make and implement difficult financial and operational initiatives, and participated in the negotiation and formulation of the Stalking Horse Purchase Agreement, the Restructuring Support Agreement, the Plan, documents relating to the DIP Financing, and other critical documents in these chapter 11 cases. Certain directors and officers have committed an extraordinary amount of time and personal resources, both before and after the commencement of these chapter 11 cases, to the Investigation, including cultivating relevant documents, witnesses, and other evidence while cooperating with relevant authorities, above and beyond what would otherwise be required as part of their fiduciary duties. As a result of these efforts, Holders of Claims in Class 4A (Aegean Unsecured Claims) and Class 7 (Section 510(b) Claims), and Holders of Interests in Class 8 (Interests in Aegean), stand to realize the benefit of such contributions as part of the Litigation Trust's monetization of the Litigation Claims. Moreover, since the New Independent Directors were appointed in May 2018, these directors have contributed substantial value to the Debtors' overall enterprise resulting from their extraordinary efforts to stabilize business operations during June and July 2018 when operations

had all but ground to a halt. The New Independent Directors were instrumental to sourcing and negotiating alternative financing proposals with multiple financial and strategic investors during the summer of 2018, the result of which was the MOU with Mercuria and later the refinancing of the prepetition revolving facilities.¶

The Debtors also believe that the Third Party Releases are consensual and, therefore, appropriate. The Plan provides the following with respect to granting of the Third Party Release, which in all respects is subject to the Litigation Claims Carve Out set forth in Article IX.F of the Plan and the Securities Claims Carve Out set forth in Article IX.I of the Plan. *First*, Holders of Claims or Interests entitled to vote on the Plan who vote to accept the Plan grant the Third Party Release. This is a sufficient manifestation of consent under applicable law. *Second*, Holders of Claims or Interests who are entitled to vote on the Plan, vote to reject the Plan, and do not check the box to opt out grant the Third Party Release. These holders will certify on such ballot that they have read and understand that they are making an election whether to grant the Third Party Release by returning a ballot, an express manifestation of consent. *Third*, Holders of Claims or Interests who are entitled to vote on the Plan, abstain from voting on the Plan, and fail to provide written notice to the Debtors or the Notice and Claims Agent, via Ballot or otherwise, will grant the Third Party Release. *Fourth*, Holders of Claims that are Unimpaired and therefore deemed to accept the Plan have the opportunity to nevertheless opt out of granting the Third Party Release as provided for on the Notice of Non-Voting Status grant the Third Party Release.¶

The subject matter of the Third Party Release is narrowly tailored and only includes claims that relate to the Debtors, these chapter 11 cases, the Plan, and the Restructuring Transactions, as further modified by carve outs for the Litigation Claims and the Securities Claims. For example, the Third Party Release, as modified by the Litigation Claims Carve Out and Securities Claims Carve Out, does not release any potential claims against the Debtors' former officers and directors or any professionals named as defendants in the consolidated complaint filed in the Securities Litigation that may arise from a common nucleus of facts related to the Investigation and the misappropriation of assets or fraudulent accounts receivable. Conversely, the Third Party Release, as modified by the Litigation Claims Carve Out and Securities Claims Carve Out, does release any potential claims against (a) the Debtors' current officers and directors who served prior to May 1, 2018 and who remain in their respective positions as of the date hereof, (b) the New Independent Directors, and (c) Mercuria. Importantly, the Third Party Release is also consensual, consistent with applicable law, for the reasons set forth in the preceding paragraph and is integral to the Plan and is a material inducement to the Released Parties pledging their support ~~and making~~for and making possible the value-maximizing transaction contemplated by the Plan ~~possible. Under these circumstances, the Third Party Releases are appropriate.~~. Given the foregoing, the Third Party Release is appropriate *Various Holders of Claims or Interests who are entitled to vote on the Plan may have claims against a Released Party and the Debtors express no opinion on whether a Holder has a claim or the value of the claim nor do the Debtors take a position as to whether a Holder should consent to grant this release*.¶

The Bankruptcy Court has subject matter jurisdiction to approve the Third Party Release because prosecution of the potential claims to-be-released will have a conceivable effect on the bankruptcy estate. *See In re SunEdison, Inc.*, 576 B.R 461, 461 (Bankr. S.D.N.Y. 2017). The party asserting that a bankruptcy court has subject matter jurisdiction must prove by a preponderance of evidence that jurisdiction exists. *Id.* This is a low bar and is easily satisfied here. The claims subject to the Third Party Release only include claims that relate to the Debtors, these chapter 11 cases, the Plan, and the Restructuring Transactions, as modified by carve outs for the Litigation Claims and the Securities Claims. For example, the claims alleged in the consolidated complaint

filed in the Securities Litigation could result in certain individuals seeking reimbursement for defense costs from applicable D&O Liability Insurance Policies, which would directly impact the amounts available under these D&O Liability Insurance Policies.  This could impact potential recoveries of other stakeholders in these chapter 11 cases.

The Debtors believe that the releases, exculpations, and injunctions are a necessary part of the Plan.  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.  Among other things, the Debtors will demonstrate at the Confirmation Hearing that, given the significant consideration being provided by the Released Parties to the Debtors and other Releasing Parties, the Debtors' releases in favor of the Released Parties are appropriate and within their reasonable business judgment. Furthermore, the third party releases are consensual because each class that is presumed to accept or deemed to reject, or votes to reject will be provided with an opt-out election form. Classes that are eligible to accept or reject the plan have the opportunity to affirmatively opt-out of granting the releases; provided, however that Holders of Claims or Interests that vote to accept the Plan or abstain from voting will be deemed a Releasing Party.

## X.    RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.

### A.    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

### B.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors

created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in <u>Article X</u> of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place, and it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims or Interests.

### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan, and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that an impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

### 7.    Filing of a Competing Plan

At the outset of the Chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals because creditors and others may propose a plan.

### 8.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

9.      **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

11.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

12.      **The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article IX of the Plan of provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

13.      **The Total Amount of Allowed Aegean Unsecured Claims May Be Higher Than Anticipated By the Debtors**

With respect to Holders of Allowed Aegean Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

14. **The Total Amount of Allowed Administrative and Priority Claims May Be Higher or the Amount of Distributable Cash may be Lower Than Anticipated By the Debtors**

The amount of Cash the Debtors hold prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization. Mercuria has agreed to pay all Allowed Administrative and Priority Claims if the proceeds of the DIP Financing facilities is insufficient. Accordingly, there is a risk that neither the Debtors nor Mercuria will be able to pay Allowed Administrative and Priority Claims in full in Cash on the Effective Date.

15. **The Actual Amount Collected by the Debtors on Account of Their Accounts Receivable and the Actual Timing of Such Collections May Materially Differ Than that Anticipated By the Debtors**

The Debtors will require proceeds on account of their accounts receivable to satisfy Administrative Claims and Priority Claims in accordance with the Plan. The actual amount the Debtors realize on their accounts receivable and the actual timing for the receipt of such proceeds may materially differ from that anticipated by the Debtors. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization. Mercuria has agreed to pay all Allowed Administrative and Priority Claims if the proceeds of the DIP Financing facilities is insufficient. Accordingly, there is a risk that neither the Debtors nor Mercuria will be able to pay Allowed Administrative and Priority Claims in full in Cash on the Effective Date.

16. **Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the chapter 11 cases may adversely affect certain Holders of Claims and Interests.

C. **Risks Related to the Transaction**

1. **The Support of the Parties to the Restructuring Support Agreement is Subject to the Terms of the Restructuring Support Agreement, Which is Subject to Termination in Certain Circumstances**

Pursuant to the Restructuring Support Agreement, Mercuria, the Consenting Unsecured Noteholders, the Committee, and AmEx are obligated to support the Restructuring Transactions discussed above and the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events. Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and Consummation of the Plan because the Plan may no longer have the support of the these parties.

2.      **No Distributions May Be Made From the Litigation Trust if the Litigation Trustee is Not Successful in Prosecuting the Litigation Claims**

The Litigation Trust may not be successful in prosecuting the Litigation Claims and there is no guarantee that the Litigation Trust will ever make distributions to its beneficiaries.  Because the Litigation Trust Interests are a component of, or the entirety of, the consideration being distributed to Holders of Claims ~~of~~**or** Interests in Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (Interests in Aegean), there is a possibility that Holders of Claims or Interests in these classes will receive no recovery at all from the Litigation Trust.  As a result, all or a material portion of the recovery of the Holders of Claims or Interests in Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claims), and Class 8 (Interests in Aegean) is at risk if the Litigation Trustee is not successful in prosecuting and recovering on the Litigation Claims.¶

3.      **Even if the Litigation Trustee is Successful in Prosecuting the Litigation Claims, Any Potential Distributions Will be Limited by Other Factors.¶**

**The Litigation Trustee and any professionals or consultants retained by the Litigation Trustee are entitled to the payment of fees, expenses, and costs in connection with the performance of their duties under the Plan, the Confirmation Order, and the Litigation Trust Agreement.  The fees (including fees resulting from any contingent fee arrangement), expenses, and costs to the Litigation Trustee or any professional retained by the Litigation Trustee may be paid subsequent to the repayment of funds provided by the Litigation Trust Funders (including the payment of the Litigation Trust Funding Fee), but in all other cases, prior to any distributions to beneficiaries of the Litigation Trust.¶**

**The Debtors have limited D&O insurance coverage.  Available D&O insurance coverage is subject to numerous factors and assumptions, including, but not limited to, when potential claims are noticed to the insurance carriers and when the acts giving rise to those claims were or are proper subject of notice to such insurance carriers.  Further, the amount of available D&O insurance coverage will fluctuate depending on the facts and circumstances of any claim for which recovery is available under such D&O insurance and when such claims are noticed to such insurance carriers.  In addition, parties in interest other than the Litigation Trust may assert claims against or with recourse to the D&O insurance coverage.  Such competing claims may impact the monetization of the Litigation Claims.¶**

### 4. Applicable Privacy Laws Could Hinder Access to Information That Is Relevant to the Prosecution of Certain Litigation Claims ¶

The privacy laws in Greece, the European Union, or other countries may limit the Debtors' ability to access or process information that may be relevant to the Investigation and prosecution of the Litigation Claims. Certain Debtors are party to an ongoing administrative proceeding in Greece related to alleged prepetition violations of the European Union General Data Protection Regulation ("GDPR"), the outcome of which may impact access to information related to the prosecution of certain Litigation Claims. The Debtors dispute any such alleged violation and believe that they are able to access such information in compliance with applicable law. If an organization is found to be in violation of the GDPR, the regulation provides a maximum fine of up to the higher of €20,000,000 or 4 percent of worldwide annual turnover of the preceding financial year and/or enforcement actions by a relevant supervisory authority.

### 5. ~~3.~~ There is Inherent Uncertainty in the Debtors' Financial Projections

The Financial Projections attached hereto as **Exhibit F** includes projections covering the Debtors' operations through December 31, 2024. The Financial Projections represent the Debtors' management team's best estimate of the Debtor' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. These projections are also based on various other assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the Reorganized Aegean Equity Interests and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the chapter 11 cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the chapter 11 cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.

### 6. ~~4.~~ Failure to Confirm and Consummate the Plan Could Negatively Impact the Debtors

If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Plan, without realizing any of the anticipated benefits of the Plan;

- the incurrence of substantial costs by the Debtors in connection with the restructuring, without realizing any of the anticipated benefits of the Plan;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing traditional chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

### D.    Risks Related to the Debtors' Businesses

#### 1.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the chapter 11 cases, the Debtors' ability to operate will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the chapter 11 cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the chapter 11 cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the chapter 11 cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the chapter 11 cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition and ability to consummate the Plan. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the chapter 11 cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the chapter 11 cases that may be inconsistent with the Debtors' plans.

#### 2.    The Debtors May Not Be Able to Accurately Report Their Financial Results

The Audit Committee has concluded that the Debtors' financial statements for (i) the fiscal years ended December 31, 2015 and December 31, 2016 included in the annual reports on Form 20-F for such years, (ii) the interim periods within such fiscal years included in the reports on Form 6-K for such periods, (iii) the periods ended March 31, 2017, June 30, 2017, September 30, 2017 included in the reports on Form 6-K for such periods, and (iv) related press releases describing the Debtors' financial results for such periods, as well as the fourth quarter of each of 2015, 2016 and 2017 (and the year ended December 31, 2017), should no longer be relied upon. In addition, the Audit Committee and its counsel, Arnold & Porter, continue to conduct the Investigation into alleged fraudulent accounting entries and other potential fraudulent activity related to the Debtors.

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 3.    The Debtors May Not Be Able to Achieve Their Projected Financial Results

The Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that the Debtors have assumed in projecting their future business prospects. If the Debtors do not achieve these projected revenue or cash flow levels, the Debtors may lack sufficient liquidity to continue operating as planned after emergence. The financial projections represent management's view based on currently known facts and hypothetical assumptions about their future operations. They do not, however, guarantee the Debtors' future financial performance.

### 4.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the chapter 11 cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses. In addition, the longer the proceedings related to the chapter 11 cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the chapter 11 cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the chapter 11 cases. The chapter 11 proceedings also require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to fully draw on the availability under the DIP Financing, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

### 5.    The Debtors May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Debtors or, in the future the Reorganized Debtors, may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Debtors or Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the

treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors or Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors or Reorganized Debtors' businesses and financial stability, however, could be material.

### 6.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base.  The Debtors' recent liquidity issues and the chapter 11 cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 7.    Increases in Oil and Fuel Prices Could have a Material Effect on the Debtors' Business

The purchase of oil and/or marine fuel represents large portion of the Debtors' overall cost structure.  Increases in the costs of these inputs may increase the Debtors' overall costs and the Debtors may not be able to maintain projected gross margins on the sale of fuel or meet projected volume levels should customers have lower demand given the higher fuel cost. Higher fuel prices may also increase the Debtors' capital requirements.

### 8.    Oil and Marine Fuel Prices Are Volatile, and Price Fluctuations Could Materially Adversely Affect the Debtors' Business, Results of Operations, and Financial Conditions

Oil and marine fuel are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short- and long-term cyclical trends. Oil and marine fuel prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  The prices for oil and marine fuel are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil exploration and production activity;

- the level of global oil inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

### 9. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive laws and regulations in a number of different countries across the globe, including complex environmental laws and occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties.

The Debtors' operations create the risk of environmental liabilities to governments or third parties for any unlawful discharge of pollutants into the air or water. In the event of environmental violations, the Reorganized Debtors may be charged with remedial costs and land owners may file certain claims. Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage regardless of negligence or fault. In addition, pollution and similar environmental risks generally are not fully insurable. Their liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

Any future proposed or fully enacted laws and regulations could have a material impact on the Debtors' business and operations. In particular, the International Maritime Organization (the "IMO"), a specialized agency of the United Nations responsible for regulating shipping, has promulgated the 2020 IMO fuel sulfur regulation (the "2020 Regulation"), which requires all vessels to utilize fuel oil with a maximum sulfur content of 0.5 percent by January 1, 2020. The impact of the 2020 Regulation on the Debtors' business and operations and on the price of marine fuel is unknown and could have a material impact on the Debtors' businesses, results of operations, and financial condition.

### 10. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Post-Effective Date Debtors' financial condition.

### E. Liquidity Risks

The Reorganized Debtors' ability to carry out capital spending that is important to their ongoing operations and future growth and will depend on a number of factors, including access to capital,

sufficient liquidity to fund business operations including the purchase of inventory for sale to customers, and the ability to achieve any business plan. These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors that are beyond the Reorganized Debtors' control.

F.    **Risks Associated with Forward Looking Statements**

This Disclosure Statement contains certain "forward-looking statements." All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision," "plan," "potential," "preliminary," "predict," "should," "will" or "would" or the negative thereof or other variations thereof or comparable terminology. The Debtors have based these forward-looking statements on their current expectations, assumptions, estimates and projections. While the Debtors believe these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond their control, which may cause their actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. **The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

G.    **Disclosure Statement Disclaimer**

1.    **Information Contained in this Disclosure Statement is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.    **This Disclosure Statement Has Not Been Approved by the United States Securities and Exchange Commission**

This Disclosure Statement has not and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

3.    **No Legal, Business, Accounting, or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, accounting, or tax advice. Each Holder of a Claim or an Interest should consult such Holder's own legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

83

### 4.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors), nor (b) deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, or Holders of Allowed Claims, or any other parties in interest.

### 5.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors, Reorganized Debtors, or the Litigation Trustee, as applicable, may seek to investigate, file, and prosecute objections to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests as Disputed Claims or Interests.

### 6.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

### 7.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### 8.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 9.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

H.        **Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is set forth in <u>Article IX</u> of this Disclosure Statement, "Confirmation of the Plan," and is also included in the Debtors' Liquidation Analysis.

## XI.    CERTAIN SECURITIES LAW MATTERS

A.        **Reorganized Aegean Equity Interests**

As discussed herein, the Plan provides for the Debtors to distribute Reorganized Aegean Equity Interests to Holders of DIP Credit Facility Claims. The Debtors believe that the Reorganized Aegean Equity Interests are or may be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (each, a "<u>Blue Sky Law</u>").

B.        **Issuance and Resale of Securities Under the Plan**

1.        **Exemptions from Registration Requirements of the Securities Act and Blue Sky Laws**

The Debtors intend that the Litigation Trust will be organized in compliance with applicable law such that the Litigation Trust Interests will not be treated as securities. As a result, the Debtors do not believe that registration under the Securities Act and applicable state law in connection with the issuance and distribution of the Litigation Trust Interests or an exemption from such registration requirements is required. However, to the extent that the Litigation Trust Interests are deemed to be securities, the issuance and distribution thereof under the Plan would qualify for the exemption from registration provided under (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") section 4(a)(2) under the Securities Act and/or Regulation D thereunder.

All shares or units of Reorganized Aegean Equity Interests issued under the Plan will be issued in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act. To the extent that the Litigation Trust Interests are determined to be securities in accordance with the Plan, the Litigation Trust Interests will also be issued in reliance upon (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) (including with respect to an entity that is an "underwriter") section 4(a)(2) under the Securities Act and/or Regulation D thereunder. In reliance upon either or both of these exemptions, the offer and sale of the Reorganized Aegean Equity Interests (and the Litigation Trust Interests if they are determined to be securities) under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock,

options, warrants, rights, privileges, or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or affiliate or are issued principally in such exchange and partly for cash and property.

To the extent that the issuance and distribution of the Reorganized Aegean Equity Interests and Litigation Trust Interests are covered by section 1145 of the Bankruptcy Code, the Reorganized Aegean Equity Interests and Litigation Trust Interests may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Reorganized Aegean Equity Interests (and the Litigation Trust Interests if they are determined to be securities) generally may be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of those exemptions for any such resale cannot be known unless individual state Blue Sky Laws are examined.

To the extent any shares or units of Reorganized Aegean Equity Interests and Litigation Trust Interests are issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, such shares or units will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each of the Holders of DIP Credit Facility Claims has made customary representations to the Debtors (including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a "qualified institutional buyer" (as defined under Rule 144A promulgated under the Securities Act)).

The Plan contemplates the application of (i) section 1145 of the Bankruptcy Code and/or (ii) section 4(a)(2) of the Securities Act or Regulation D thereunder to the Reorganized Aegean Equity Interests (and to the Litigation Trust Interests if they are determined to be securities) but at this time, the Debtors express no view as to whether any Person may freely resell Reorganized Aegean Equity Interests and Litigation Trust Interests without registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws. Recipients of Reorganized Aegean Equity Interests and Litigation Trust Interests are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act or Regulation D thereunder to the Reorganized Aegean Equity Interests and the Litigation Trust Interests and the availability of any exemption from registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

2.    **"Underwriters"; Resale of the Reorganized Aegean Equity Interests (and Litigation Trust Interests if determined to be securities) by Persons Deemed to be "Affiliates" or "Underwriters"; Resale of Reorganized Aegean Equity Interests (and Litigation Trust Interests if determined to be securities) Issued Pursuant to Section 4(a)(2) of the Securities Act or Regulation D Thereunder**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if

such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" any person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer, of securities. As a result, the reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer, director or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities, through contract or otherwise. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10 percent) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Reorganized Aegean Equity Interests (and the Litigation Trust Interests if they are determined to be securities) by an entity who (i) is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has been such an "affiliate" within ninety (90) days of such transfer, (iii) has acquired the Reorganized Aegean Equity Interests or Litigation Trust Interests from an "affiliate" in a private transaction within one year of such transfer, or (iv) is an "underwriter" (which definition includes "controlling Persons" of an issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law. Under certain circumstances, holders of Reorganized Aegean Equity Interests (and Litigation Trust Interests if they are determined to be securities) who have one of the above attributes or are deemed to be "underwriters," or who hold Reorganized Aegean Equity Interests or Litigation Trust Interests issued pursuant to section 4(a)(2) of the Securities Act or Regulation D thereunder, may be entitled to resell their Reorganized Aegean Equity Interests or Litigation Trust Interests pursuant to the limited safe harbor resale provisions for securities (including "control securities") under Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of control securities (such as securities issued under the Plan to an "affiliate") if current information regarding the issuer is publicly available, and if volume limitations, notice and manner of sale requirements are met and would permit the public sale of restricted securities (such as securities received from an "affiliate" in a private transaction) if current information regarding the issuer is publicly available and/or holding period requirements are met.

Whether any particular Person would be deemed to meet one or more of the above criteria or is an "underwriter" (including whether such Person is a "controlling Person" of an issuer) with respect to the Reorganized Aegean Equity Interests (and Litigation Trust Interests if they are determined to be securities), would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "affiliate" or "underwriter" with respect to the Reorganized Aegean Equity Interests (and to the Litigation Trust Interests if they are determined to be securities) and, in turn, whether any Person may freely resell Reorganized Aegean Equity Interests and Litigation Trust Interests. The Debtors recommend that potential recipients of

Reorganized Aegean Equity Interests and Litigation Trust Interests consult their own counsel concerning their ability to freely trade such securities without registration or qualification with the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.¶

**C.        U.S. Securities and Exchange Commission Rights Reserved¶**

**Notwithstanding any language to the contrary contained in the Plan and/or the Plan Confirmation Order, no provision of this Plan or the Plan Confirmation Order (i) releases any non-Debtor Entity from any Claim or cause of action of the U.S. Securities and Exchange Commission; or (ii) enjoins, limits, impairs, or delays the U.S. Securities and Exchange Commission from commencing or continuing any Claims, causes of action, proceedings or investigations against any non-Debtor Entity in any forum.**

## XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the U.S. Debtor (as defined below) and certain U.S. Holders (as defined below) of Claims.  Except as provided below, this summary does not address the U.S. federal income tax consequences to holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules, rulings, and pronouncements of the U.S. Internal Revenue Service (the "IRS") all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested and will not request a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion addresses only those U.S. Holders that hold Claims as capital assets within the meaning of Section 1221 of the Tax Code.  In addition, this summary does not address non-U.S., state, local, estate, or gift tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as persons who are related to a Debtor within the meaning of the Tax Code, persons that are not U.S. Holders, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, tax exempt organizations, investors in pass-through entities, subchapter S corporations, persons who hold Claims, or who will hold equity interests in the Reorganized Debtors, as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and U.S. Holders of Claims who are themselves in bankruptcy).  Furthermore, this discussion assumes that U.S. Holders of Claims hold only Claims in a single Class.  U.S. Holders of Claims in more than a single Class should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.  This discussion also assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, (A) the term "U.S. Holder" means a Holder of a Claim that is for U.S. federal income tax purposes (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source and (B) the term "U.S. Debtor" means ABUSA.

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular U.S. Holder of a Claim. Each U.S. Holder of a Claim should seek advice from its own independent tax advisors concerning the U.S. federal, state, local, foreign income, and other tax consequences of the Plan to it in light of its particular circumstances.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

### B.        Certain U.S. Federal Income Tax Consequences to the U.S. Debtor

#### 1.        Transfer of Litigation Assets to Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust should be treated as a "liquidation trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will take a position on the Litigation Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Holders of Aegean Unsecured Claims (and possibly the Holders of Section 510(b) Claims and Aegean Interests) and (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust. If the IRS were to challenge successfully the classification of the Litigation Trust as a grantor trust, the federal income tax consequences to the Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Litigation Trust as a so-called "complex

trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Litigation Trust, and the Holders of Claims and Interests receiving interests in the Litigation Trust shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Litigation Trust among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five (5) years from the creation of such Litigation Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (e.g., income, gain, loss, deduction and credit). Each Litigation Trust Beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to Litigation Trust Beneficiaries who received their interests in the Litigation Trust in connection with the Plan.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Litigation Trustee of an IRS private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, any Disputed Claims reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the Litigation Trust Assets in such reserve, and all

distributions from such reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by Holders in respect of their Claims or Interests as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

Because certain assets being transferred to the Litigation Trust by the Debtors include assets with no tax basis, the Debtors may recognize taxable income in connection with such transfers to the extent of the value of such assets.

### 2.    Cancellation of Debt and Reduction of Tax Attributes of the U.S. Debtor

In general, absent an exception, the U.S. Debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, however, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The amount of COD Income of the U.S. Debtor, and accordingly the amount of tax attributes of the U.S. Debtor required to be reduced, will depend on, if the DIP Credit Facility Claims against the U.S. Debtor are (i) cancelled, the adjusted issue price of the DIP U.S. Credit Facility or (ii) exchanged for Reorganized Aegean Equity Interests, the fair market value of such Reorganized Aegean Equity Interests. This value cannot be known with certainty at this time. However, as a result of Confirmation, the U.S. Debtor expects that there will be material reductions in, or elimination of, NOLs, NOL carryforwards and other tax attributes that are not utilized before the end of the tax year in which the Effective Date occurs.

### 3.    Limitation of NOL Carryforwards and Other Tax Attributes of the U.S. Debtor

Following Confirmation, the U.S. Debtor anticipates that any NOL carryover, capital loss carryover, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation or elimination under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan (to the extent such Pre-Change Losses are not eliminated pursuant to section 108 of the Tax Code).

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the transactions contemplated by the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs). The section 382 limitation may be increased to the extent that the U.S. Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.    If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor

corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years following the first "ownership change" without triggering the elimination of its Pre-Change Losses.

The U.S. Debtor has not yet determined whether or not to utilize the 382(l)(5) Exception. It is possible that the U.S. Debtor will not qualify for the 382(l)(5) Exception. Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence. In either case, the U.S. Debtor expects that its use of the Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

C.      **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Aegean Unsecured Claims**

The following discussion assumes that the Debtors will undertake the restructuring transactions currently contemplated by the Plan. Holders of Aegean Unsecured Claims are urged to consult their tax advisors regarding the tax consequences of the restructuring transactions.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the Aegean Unsecured Claims, the holders of such Claims shall receive their Pro Rata share of the Aegean Unsecured Claims Cash Pool and the Class A Litigation Trust Units.

As discussed above, the Debtors expect (and the Litigation Trust documents shall provide) that the trustee of the Litigation Trust will treat the Litigation Trust as a grantor trust of which the Holders of Aegean Unsecured Claims (and possibly the Holders of Section 510(b) Claims and Aegean Interests) are the grantors. Each Holder of an Aegean Unsecured Claim should accordingly be treated as having (a) received its Pro Rata share of the Litigation Trust Assets from the Debtors and (b) contributed such assets to the Litigation Trust in exchange for the Class A Litigation Trust Units.

A U.S. Holder's receipt of the Class A Litigation Trust Units should be treated as a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between: (i) the sum of (A) the amount of any Cash received plus (B) the fair market value of the Litigation Trust Assets deemed received; and (ii) such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in their Pro Rata share of each of the Litigation Trust Assets equal to the fair market value of such Holder's Pro Rata share of each Litigation Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

The U.S. federal income tax obligations of holders with respect to their beneficial interest in the Litigation Trust are not dependent on the Litigation Trust distributing any Cash or other proceeds. Holders of such Claims will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. In general, except with respect to the Disputed Claims Reserve, a distribution of Cash by the Litigation Trust will not be separately taxable to a holder of a beneficial interest in the Litigation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Litigation Trust).

**HOLDERS OF ALLOWED AEGEAN UNSECURED CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE RIGHT TO RECEIVE AND OF THE RECEIPT (IF ANY) OF PROPERTY FROM THE LITIGATION TRUST.**

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### D.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest that accrued during its holding period, such amount should be taxable to the U.S. Holder as interest income (to the extent not already taken into income by the Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by the U.S. Holder of a Claim will be attributable to accrued interest is unclear. The Plan generally provides that distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. Nevertheless, the Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. The applicability of these Treasury Regulations to a partial recovery in a bankruptcy is unclear. A U.S. Holder of a Claim with accrued and unpaid interest is urged to consult its own tax advisor as to the allocation of any recovery between principal and interest.

### E.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a U.S. Holder of a Claim on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "accrued market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### F.    Information Reporting and Backup Withholding

Payments with respect to Claims and Interests under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate).  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate timely claim for refund with the IRS (generally, a federal income tax return).  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders of Claims are urged to consult their own tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

The U.S. federal income tax consequences of the Plan are complex.  The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation.  All Holders of Claims should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws and of any change in applicable tax laws.

## XIII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and holders of other interests than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims or Interests in Class 4A (Aegean Unsecured Claims), Class 7 (Section 510(b) Claim), and Class 8 (Interests in Aegean) vote to accept the Plan and support Confirmation of the Plan.

Dated: ~~January 15,~~ **February 13,** 2019

AEGEAN MARINE PETROLEUM NETWORK INC.
on behalf of itself and all other Debtors

By:      */s/ Tyler Baron*
Name:   Tyler Baron
Title:    Authorized Signatory

## EXHIBIT A

**Joint Chapter 11 Plan of Reorganization**

**<u>EXHIBIT B</u>**

**Corporate Organizational Chart**

## EXHIBIT C

**Restructuring Support Agreement**

**EXHIBIT D**

**Liquidation Analysis**

## EXHIBIT E

**Valuation Analysis**

## **EXHIBIT F**

**Financial Projections**

Document comparison by Workshare Compare on Wednesday, February 13, 2019 11:47:14 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://KEDMS/LEGAL/58448370/18 |
| Description | #58448370v18<LEGAL> - Aegean - Disclosure Statement [Proposed Filing Version] |
| Document 2 ID | interwovenSite://KEDMS/LEGAL/58448370/31 |
| Description | #58448370v31<LEGAL> - Aegean - Disclosure Statement [2-13 FILING] |
| Rendering set | Color |

| Legend: | |
|---|---|
| **Insertion** | |
| Deletion | |
| *Moved from* | |
| *Moved to* | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 330 |
| Deletions | 212 |
| Moved from | 17 |
| Moved to | 17 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 576 |