**SILVERMANACAMPORA LLP**
Counsel to Mercuria US Asset Holdings, LLC
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman
Brian Powers

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
In re:

AEGEAN MARINE PETROLEUM
NETWORK, INC., *et al.*[1]

Debtor.
-------------------------------------------------------------------------x

Chapter 11

Case No: 18-13374 (MEW)

**OBJECTION OF MERCURIA US ASSET HOLDINGS, LLC
TO APPLICATION OF OAKTREE CAPITAL MANAGEMENT, L.P.
AND HARTREE PARTNERS, LP PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D)
AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF PROFESSIONAL FEES
AND EXPENSES INCURRED MAKING A SUBSTANTIAL CONTRIBUTION**

Mercuria US Asset Holdings, LLC ("**MUSAH**"), as DIP Lender[2] under the DIP U.S. Credit Agreement, hereby submits its objection to the *Application of Oaktree Capital Management, L.P. and Hartree Partners, LP Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Professional Fees and Expenses Incurred Making a Substantial Contribution* (ECF Doc No. 421) (the "**Application**"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1. After voluntarily withdrawing from providing debtor in possession financing and

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/Aegean. The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

[2] Capitalized terms used but not otherwise defined herein shall have the same meanings given to them in the *Joint Plan of Reorganization of Aegean Marine Petroleum Network, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 303) (the "**Plan**") or the Application, as applicable.

bidding to purchase the Debtors, Oaktree is now essentially seeking an *ex post facto* breakup fee for helping to increase the winning bid. Although there is no dispute that the alternative deal structure proposed by Oaktree created an environment of increased competition with respect to the terms of the Plan, Oaktree's self-interested actions only incidentally benefited the estate. The facts of the case and the overwhelming case law concerning Bankruptcy Code § 503(b)(3)(D) dictate that Oaktree cannot be determined to have made a "substantial contribution" to these Chapter 11 Cases.

2.  First, the plain language of Bankruptcy Code § 503(b)(3)(D) and the vast majority of courts across the country require that only certain parties specifically enumerated in the statute, including creditors of the Debtors' estate, may make a claim for a "substantial contribution" pursuant to section 503(b)(3)(D). Oaktree Capital Management, L.P. and Hartree Partners, LP (together, "**Oaktree**") purchased a claim against the Debtors at the very last moment in order to promote their offer, having sold that claim shortly after "withdrawing from the contest," and thus were not creditors for the majority of the time period for which they seek reimbursement of their counsel's fees. Such reimbursement is simply not permitted under the Bankruptcy Code.

3.  Moreover, contrary to how the Application presents the facts of this case, Oaktree was not a "white knight" riding in at the last minute to save the day for all creditors of the estate. Rather, Oaktree's involvement was entirely self-interested. Oaktree's intended purchase of the Debtors was for its own pecuniary gain, not for the benefit of the Debtor's estate and its creditors. Additionally, much of its counsel's time for which Oaktree seeks reimbursement was expended *after* Oaktree had withdrawn its offer to purchase the Debtors. Thus, such services could not possibly have benefitted the Debtors' estates. The services rendered to Oaktree by its

2

counsel also cannot be considered a "substantial contribution" to these Chapter 11 Cases because those services, primarily negotiating a new deal that was superior to MUSAH's original offer, were clearly duplicated by the estates' professionals with whom Oaktree was negotiating.

4. Finally, Oaktree has provided absolutely no evidence that its counsel fees are reasonable under the circumstances. There were no time records attached to the Application and the time records provided to MUSAH for review are completely devoid of any detail relating to the services rendered by particular timekeepers. It is impossible for the Court, or any parties in interest (such as MUSAH), to determine from the Application as filed whether Oaktree's counsel's fees were reasonable. Thus, Oaktree has not satisfied its burden of proof and the Application must be denied.

## BACKGROUND

5. On November 6, 2018 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

6. On November 15, 2018, the United States Trustee appointed the Committee pursuant to Bankruptcy Code § 1102.

7. From the beginning of these Chapter 11 Cases, the Debtors have moved forward towards a sale of all of their assets in an attempt to maximize their going concern value. Prior to the Petition Date, MUSAH made an offer to the Debtors for such a sale, which offer included the funding of debtor in possession financing, assumption of certain liabilities, and providing the estates with cash (the "**Initial Mercuria Offer**"). The Debtors accepted the Initial Mercuria Offer and, after the Petition Date, announced their intention to have MUSAH serve as a stalking horse bidder.

8. Prior to the December 7, 2019 hearing (the "**Bidding Procedures Hearing**") with

3

respect to the Debtors' motion to approve the bidding procedures for the stalking horse auction process (ECF Doc. No. 59) (the "**Bidding Procedures Motion**"), and in response to the Committee's objection to the Bidding Procedures Motion (ECF Doc. No. 112), the Committee, the Debtors, and MUSAH reached a "courthouse steps" agreement in principal on the terms and conditions of a proposed plan of reorganization for the Debtors (the "**Second Mercuria Offer**"). The existence of the Second Mercuria Offer, but not its proposed terms, were announced by the parties to the Court at the Bidding Procedures Hearing.

9. Subsequently, the Committee, the Debtors, and MUSAH immediately entered into substantive negotiations to finalize the Second Mercuria Offer, working in good faith around the clock to have such Second Mercuria Offer in place and ready to present to the Court at a the final hearing on the DIP Facilities scheduled for December 13, 2018 (the "**Final DIP Hearing**").

10. Prior to the Final DIP Hearing, negotiations on the Second Mercuria Offer abruptly ceased without any explanation given to MUSAH. As MUSAH would later find out, such negotiations ceased because Oaktree had engaged the Committee in negotiations to provide a superior bid to the Second Mercuria Offer and to acquire the Debtors for themselves. As a result of those negotiations, Oaktree made an offer to the Debtors which would have provided a greater recovery for the Debtors' creditors than the Second Mercuria Offer.

11. On December 12, 2018, the day immediately preceding the scheduled Final DIP Hearing, MUSAH was for the first time advised of the term sheet offer from Oaktree, which essentially amounted to a bid at auction. Within no more than two or so hours of being advised of the Oaktree offer, MUSAH increased its bid for the Debtors (the "**Final MUSAH Offer**"). The Final MUSAH Offer was accepted by representatives of the Debtors and the Committee on that day, and was, subsequent to the Final DIP Hearing on December 13, 2018 (at which Oaktree

4

withdrew from the bidding process) and following substantive negotiations with the Committee and Debtors, as well as other parties in interest, incorporated into the terms of the Plan.

## THE APPLICATION MUST BE DENIED

Section 503(b)(3)(D) Does Not Permit Oaktree to Receive a Substantial
Contribution Claim for Services Rendered When it Was Not a Creditor of the Estates

12. Bankruptcy Code § 503(b)(3)(D) allows a court to award an administrative expense claim to certain enumerated parties that made a "substantial contribution" to a chapter 11 case, specifically "a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102. . . ." Similarly, Bankruptcy Code § 503(b)(4) permits the allowance of professional fees of a party whose expenses are allowable under section 503(b)(3)(D).

13. In enacting Bankruptcy Code § 503(b)(3)(D), Congress specifically determined that certain parties might make a "substantial contribution" to a debtor's reorganization efforts, and specifically listed those parties in the statute. Clearly, if Congress believed that losing bidders or proposed plan funders were entitled to such administrative claims, such parties would be expressly enumerated in the statute. In fact, several courts have held that a claim for substantial contribution was only permissible for the period *after* which a party became a creditor or equity holder of the estate. *See In re First Baldwin Bancshares, Inc.*, 2013 Bankr. LEXIS 2200 (Bankr. S.D. Ala. May 30, 2013) (entity that purchased stock in debtor postpetition lacked standing under section 503(b)(3)(D) because the fees and expenses were incurred before the entity became an equity security holder); *In re Kidron, Inc.*, 278 B.R. 626 (Bankr. M.D. Fla. 2002) (unsuccessful noncreditor purchaser had standing to seek administrative expense claim under section 503(b)(3)(D) only for fees and expenses incurred after it acquired claim and became creditor).

5

14. The sole case that Oaktree cites for the proposition that an unsuccessful purchaser has standing to pursue a substantial contribution claim is *In re S & Y Enters.*, 480 B.R. 452 (Bankr. E.D.N.Y. 2012).[3] In that case, Judge Stong held that the word "including" in the main text of section 503(b) made the enumerated parties in 503(b)(3)(D) a non-exhaustive list. Not surprisingly, the majority of courts around the country have held the exact opposite,[4] applying the rule of statutory construction that "[w]hen a subsection directly addresses the type of administrative expense sought, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of § 503(b)." (citing *In re Beale*, 358 B.R. 744, 748 (Bankr. N.D. Ill. 2006); *In re Elder*, 321 B.R. 820, 829 (Bankr. E.D. Va. 2005)).

15. Accordingly, based upon the plain language of Bankruptcy Code § 503(b)(3)(D), Oaktree is not entitled to a substantial contribution claim for any time during which it was not a creditor of the Debtors' estates. Oaktree acknowledges that it was not a creditor when its negotiations began, but rather became a creditor "by purchasing prepetition secured term loan claims during the course of their restructuring negotiations. . . ." Application, ¶23. Thus, Oaktree solely has standing to pursue a substantial contribution claim for the period *after* it purchased a claim against the Debtors.[5]

16. Based upon a review of the pleadings and the docket of the Debtors' Chapter 11 Cases, it is unclear exactly when Oaktree became a creditor of the Debtors. However, upon information and belief, MUSAH believes that Oaktree acquired a claim against the Debtors

---

[3] In the *S & Y Enterprises* case, Judge Stong denied the motion to allow a substantial contribution claim and found that a party outside of the enumerated categories "must make a substantial showing in order to shift its counsel fees and costs to the Debtors' estates in the form of an allowed administrative expense." *Id.* at 465. As described below, Oaktree has made no such showing.

[4] In fact, MUSAH has been unable to find any other case with a similar holding to that in *S & Y Enters.*

[5] After Oaktree withdrew from the bidding, it sold its claim against the Debtors to MUSAH. Thus, Oaktree was no longer a creditor of the estates subsequent to that sale and only held a claim against the Debtors for a short period of time.

6

subsequent to its negotiations with the Committee and its submission of the Oaktree/Hartree Restructuring Agreement. Thus, the vast majority of the counsel fees for which Oaktree seeks reimbursement are from a period prior to when Oaktree became a creditor of the estates. The Court must deny the Application with respect to such time period.

Oaktree's Counsel's Services Do Not Satisfy
the Standard for Allowance of a Substantial Contribution Claim

17. As the Application correctly states, "[c]ourts in the Second Circuit consider various factors when analyzing a request for substantial contribution, including: (i) whether the services benefited a creditor, the estate itself, or all interested parties; (ii) whether the services resulted in an actual significant and demonstrable benefit to the estate; and (iii) whether the services were duplicated by the efforts of others involved in the case." *In re AMR Corp.*, No. 11-15463 (SHL), 2014 Bankr. LEXIS 3298, at *4 (Bankr. S.D.N.Y. Aug. 5, 2014) (citing *Trade Creditor Grp. v. L.J. Hooker Corp., Inc.* (*In re Hooker Invs., Inc.*), 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd*, 109 F.3d 349 (2d. Cir. 1996); *In re Best Prods. Co., Inc.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994)). An analysis of those factors clearly shows that (i) Oaktree's self-interested actions were intended to benefit only itself, (ii) substantial portions of the services were rendered during a period when Oaktree was no longer a potential plan funder, and (iii) any services that it alleges benefitted the estate as a whole were entirely duplicative of the services that were rendered by counsel to the Debtor and the Committee or made wholly unnecessary based upon any benefit the Estates and certain classes of creditors may have already realized.

    i.    Oaktree's Efforts Were for the Sole Benefit of
        Oaktree, and Any Benefit to the Estate Was Merely Incidental

18. "Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily for their own interests' and '[e]fforts undertaken by creditors solely to further their own self interest are not compensable

7

under section 503(b)' and 'services calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate.'" *In re Bayou Grp., LLC*, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010) (quoting *In re Dana Corp.*, 390 B.R. 100, 109-10 (Bankr. S.D.N.Y. 2008)).

19. With respect to substantial contribution claims under Bankruptcy Code § 503(b)(3)(D), the Third Circuit has held that "[i]nherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests. Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection." *Lebron v. Mechem Fin.,* 27 F.3d 937, 944 (3d Cir. 1994) (internal citations omitted); *see also In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) ("services calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate"). The Court further held that "the purpose of § 503(b)(3)(D) is to encourage activities that will benefit the estate as a whole, and in line with the twin objectives of § 503(b)(3)(D), 'substantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate." *Lebron*, 27 F.3d at 944. This rule is especially appropriate when of an unsuccessful purchaser attempts to assert a claim pursuant to section 503(b)(3)(D).

20. For example, in the case of *In re S & Y Enters.*, 480 B.R. 452, 466 (Bankr. E.D.N.Y. 2012), cited by Oaktree for the proposition that an unsuccessful purchaser has standing to seek a substantial contribution claim, the court denied the unsuccessful purchaser's motion for

8

approval of a section 503(b)(3)(D) claim. In its analysis, the Court noted that the unsuccessful purchaser was extremely active in the debtors' Chapter 11 Cases, finding that it "prepared transaction documents and the second amended plans in support of its acquisition of the Debtors' properties, it participated in motion practice including the motion to reject to eliminate obstacles to its acquisition of the Debtors' properties, and it took an active role in negotiations in furtherance of its goal of acquiring the Debtors' properties." *Id*. at 466. The court noted that the unsuccessful purchaser took an active role in the ultimately successful reorganization of the debtors through the sale of their properties. However, the court held that the unsuccessful purchaser's "efforts were directed towards its own objectives, not the entire bankruptcy process." Accordingly, the court held that the unsuccessful purchaser was not entitled to a substantial contribution claim.

21.    Similar to the case of *S & Y Enters.*, here Oaktree's actions from the very beginning of its involvement in these Chapter 11 Cases were solely intended for the pecuniary benefit of Oaktree. The Application itself reinforces this point by describing, in detail, Oaktree's efforts to top MUSAH's offer and become the new DIP lender and plan funder for the Debtors. In fact, after MUSAH confirmed in open court that it had increased its offer on the previous day and the Court clearly stated to Oaktree that it would not entertain the Oaktree debtor in possession financing proposal (including pre-payment penalty provisions and provisions tying such proposal to a plan proposal not then before the Court for ruling), Oaktree "elected to drop out of the process." Dec. 17, 2018 Hr'g Tr. at 5:24. The history of this case and Oaktree's own actions show that at no time was Oaktree acting to benefit the estate or other parties in interest, but was always seeking to negotiate a deal that would benefit Oaktree. Any benefit to the estate created by Oaktree's involvement was entirely incidental to that goal, and thus cannot be

considered a "substantial contribution" under the applicable case law. *See In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); *In re Public Service Co. of New Hampshire*, 160 B.R. 404, 452 (Bankr. D.N.H. 1993) (holding that, when a creditor is pursuing its own economic self-interest, as by definition it does as a bidder at a bankruptcy auction, then that creditor cannot establish the requisite "direct benefit" required to establish a substantial contribution).

22.     Moreover, even if the Court determined that the circumstances in these cases were so unique and that Oaktree provided a substantial contribution to the Debtors' reorganization efforts beyond creating a competitive bidding environment, the Court must limit the recovery of attorneys' fees solely to those services which benefitted the estate as a whole and not just Oaktree itself. *See In re Kidron, Inc.*, 278 B.R. 626, 634 (Bankr. M.D. Fla. 2002) (limiting failed purchaser's 503(b)(3)(D) claim solely to its efforts to "even the playing field" by streamlining the diligence process to other parties in a compressed time frame, but not allowing claim for its own work to make a bid on the debtor's assets); *In re Best Prods. Co.*, 173 B.R. 862, 866-67 (Bankr. S.D.N.Y. 1994) (denying motion to allow substantial contribution claim because "the applicants were acting to further their own self-interest" and the application did not exclude services rendered solely to benefit the applicant); *In re Richton Int'l Corp.*, 15 B.R. 854 (Bankr. S.D.N.Y. 1981) (allowing 503(b)(3)(D) claim for attorneys' fees, but noting that the fees sought had already been limited to remove all fees incurred for solely representing the interests of the creditor).

      ii.     Many of the Services Were Provided After Oaktree Withdrew Its Bid and Could not Possibly Have Provided a Substantial Contribution to the Estate

23.     The second factor considered by courts in this Circuit is whether the services resulted in an actual significant and demonstrable benefit to the estates.

24.     In this case, Oaktree alleges that all of the services of its counsel provided a

10

significant and demonstrable benefit to the estates. It does not explain, however, how no less than 187.8 of counsel's time billed *after* Oaktree had withdrawn its bid and the Debtors moved forward with the MUSAH RSA benefitted the Debtors' estates. Throughout the Application, Oaktree discusses how the services of its counsel were allegedly beneficial during its negotiations with the Committee, however at no point does the Application explain how any subsequent services could possibly have been beneficial to the estates.

25.    Based on the foregoing, the Application must be denied with respect to all services rendered to Oaktree after December 13, 2018, the date upon which, as has been pointed out, Oaktree voluntarily withdrew from the process once it realized the Court would not afford Oaktree the self-interested benefits it was seeking.

        iii.    Any Services Rendered that Allegedly Benefitted the
                  Estate were Duplicative of Services Rendered by Estate Professionals

26.    In addition to the foregoing, the Application must be denied because the services, which are alleged to have made a substantial contribution to the Debtors' estates, are duplicative of the efforts of the Debtors' counsel and the Committee's counsel.

27.    "The majority of cases allowing creditors' substantial contribution claims under sections 503(b)(3)(D) and (b)(4) have . . . found that the creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed; most have, consistent with pre-Bankruptcy Code practice, involved a creditor who actively facilitated the negotiation and successful confirmation of the chapter 11 plan or, in opposing a plan, brought about the confirmation of a more favorable plan." *In re Bayou Grp., LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) (citing *In re Granite Partners, L.P.*, 213 B.R. 440 (Bankr. S.D.N.Y. 1997)). In those cases, "the movants performed functions that normally would have been undertaken by estate-compensated professionals, or that had to be performed

11

because estate compensated professionals were not doing their job." *Id.* (citing *In re McLean Indus., Inc.*, 88 B.R. 36, 39 (Bankr. S.D.N.Y. 1988); *In re Baldwin-United Corp.*, 79 B.R. 321, 344 (Bankr. S.D. Ohio 1982); *see also* 4 Collier on Bankruptcy P 503.10 (16th 2018) at 503-65 (listing instances of "substantial contribution" awards earned other than in the plan context).

28.    Although the Application goes to great lengths to paint the picture of Oaktree as the champion of the cause of creditors of the estates, it is clear from the record of this case that substantial efforts to increase the value received by the estates' creditors were undertaken by the Committee and the Debtors, not Oaktree. In fact, the Application itself describes the Committee's extensive efforts to negotiate a new, more favorable deal with Oaktree for the benefit of the estates. Clearly it was the Committee's fiduciary duty to maximize the value of the Debtors' assets, and it approached the negotiations with Oaktree with that goal. It is counter-intuitive, therefore, for Oaktree to contend that its counsel's services constituted a "substantial contribution" that increased value to the estates. Instead, Oaktree (on one side) negotiated with the Committee (on the other side) to better its *own* position, with the Committee specifically responsible for ensuring that the value of the Debtors' assets was maximized.

29.    Based on the foregoing, the Application must be denied because the services which allegedly benefitted the estates were duplicative of services that were rendered by the estates' retained professionals.

<u>Oaktree Has Not Demonstrated that the Services Rendered were Reasonable</u>

30.    Finally, even if the Court determines that Oaktree has standing to make an application for a 503(b)(3)(D) claim and that Oaktree made a "substantial contribution" to the Debtors' reorganization, Oaktree has not satisfied its burden of proof to demonstrate that the services rendered by its counsel were reasonable as required by the plain language of section

503(b)(4).

31.     The Application does not attach time records, but rather contains a statement that such records will be provided to the Debtor, Committee, and the United States Trustee, and may be requested by other parties. It is unclear whether the Court received fulsome time records for *in camera* review. Moreover, Oaktree's proposed order granting the Application only provides the United States Trustee with an opportunity to review Oaktree's counsel's time records and object, rather than the Debtors, the Committee, or any other parties in interest (which includes MUSAH in its capacity as a DIP Lender).

32.     When MUSAH requested copies of time records from Oaktree's counsel, it received what appear to be time records which have been redacted to specifically exclude any and all detail relating to the services rendered to Oaktree. Instead of specific time records which could help parties to understand the particular services rendered to Oaktree by each timekeeper and are generally necessary for – at a minimum – the Debtors who rely on the DIP U.S. Credit Facility for funding these costs to confirm the value to be paid, the sole categories in the time records MUSAH received are "Date," "Timekeeper," and "Hours."

33.     Based on what Oaktree has filed in support of the Application, and the documentation that Oaktree has provided to parties in interest upon request, it is impossible for parties in interest to properly review Oaktree's counsel's time records to determine whether the services performed were reasonable. Likewise, if the Court has also not been provided with fulsome time records, it is impossible for the Court to determine whether such fees are reasonable as required by section 503(b)(4).

34.     Accordingly, based on the foregoing, the Application must be denied because Oaktree has not met its burden of proof with respect to the reasonableness of its counsel's fees

or, at a minimum, parties in interest must be provided with an opportunity to review Oaktree's counsel's time records and object on the basis of reasonableness.

WHEREFORE, MUSAH respectfully requests that this Court (a) enter an order denying the Application, and (b) grant MUSAH such other relief as the Court deems just and proper.

Dated: Jericho, New York
March 15, 2019

**SILVERMANACAMPORA LLP**
Counsel to Mercuria US Asset Holdings, LLC

By: *s/ Ronald J. Friedman*
Ronald J. Friedman
Member of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Tel: (516) 479-6300