Marc Kieselstein, P.C.
Cristine Pirro
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C.
Adam C. Paul, P.C. (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AEGEAN MARINE PETROLEUM NETWORK INC., *et al.*,[1] | ) Case No. 18-13374 (MEW) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MEMORANDUM OF LAW**
**IN SUPPORT OF NONCONSENSUAL THIRD PARTY RELEASE**

---

[1]  Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification, registration, or like numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/aegean.  The location of Debtor Aegean Bunkering (USA) LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 52 Vanderbilt Avenue, Suite 1405, New York, New York 10017.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 2

ARGUMENT .................................................................................................................... 4

I.    The Third Party Release Is Appropriate and Justified ......................................... 6

    A.    The Third Party Release Is Limited in Scope ........................................... 8

    B.    The Nonconsensual Released Parties Substantially Contributed to the Debtors' Restructuring ........................................................................... 10

        1.    Mercuria's Contributions Support the Third Party Release ...................... 11

        2.    The Contributions of the New Audit Committee Support the Third Party Release .......................................................................... 16

    C.    Additional *Metromedia* Factors Support the Third Party Release ........................ 24

II.    The Court Has Subject Matter Jurisdiction to Grant the Third Party Release ................. 26

    A.    The Third Party Release Covers Claims within the Court's Core Subject Matter Jurisdiction ............................................................................. 27

    B.    The Third Party Release Covers Claims That Would Have a 'Conceivable Effect' on the Bankruptcy Estate ....................................................... 29

CONCLUSION ................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...........................................................................6, 10, 25

*In re Amanat*,
   338 B.R. 574 (Bankr. S.D.N.Y. 2005) ...................................................................................30

*Baker v. Simpson*,
   613 F.3d 346 (2d Cir. 2010)...................................................................................................28

*Bond St. Assocs v. Ames Dep't Stores, Inc.*,
   174 B.R. 28 (S.D.N.Y. 1994)..................................................................................................29

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
   342 B.R. 45 (S.D.N.Y. 2006)........................................................................................6, 10, 25

*City of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
   572 F. Supp 2d 314 (E.D.N.Y. 2008) .....................................................................................29

*In re Cuyahoga Equip. Corp.*,
   980 F.2d 110 (2d Cir. 1992)....................................................................................................29

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
   416 F.3d 136 (2d Cir. 2005)........................................................................................... *passim*

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D.N.Y. 2010) ...................................................................................29

*In re FairPoint Commc'ns, Inc.*,
   452 B.R. 21 (S.D.N.Y. 2011)..................................................................................................30

*In re Fairway Group Holdings Corp.*,
   No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) .....................................................9, 10

*In re Finlay Enters., Inc.*,
   No. 19-14873, 2010 WL 6580268 (Bankr. S.D.N.Y. June 29, 2010) ..............................15, 23

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
   517 F.3d 52 (2d Cir. 2008)................................................................................................27, 29

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) ............................................................................ *passim*

*In re Kirwan Offices S.à.r.l.*,
  592 B.R. 489 (S.D.N.Y. 2018) ..........................................................................26

*In re Masterwear Corp.*,
  241 B.R. 511 (Bankr. S.D.N.Y. 1999) ...............................................................30

*MBNA Am. Bank, N.A. v. Hill*,
  436 F.3d 104 (2d Cir. 2006) ..............................................................................28

*Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*),
  880 F.2d 694 (4th Cir. 1989) .............................................................................25

*In re Metro. 885 Third Ave. Leasehold, LLC*,
  No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y. Dec. 22, 2010) ................15

*In Matter of Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1813 (2017) .................28

*Pfizer, Inc. v. Law Offices of Peter G. Angelos*,
  133 S. Ct. 2849 (2013) ......................................................................................28

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012) ....................................................................26, 27, 29

*In re Relativity Fashion, LLC*,
  696 Fed. Appx. 26 (2d Cir. 2017) ......................................................................28

*In re Residential Capital, LLC*,
  497 B.R. 720 (Bankr. S.D.N.Y. 2013) ...............................................................30

*In re Residential Capital, LLC*,
  No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) ...................................6, 23

*In re Robert Plan Corp.*,
  777 F.3d 594 (2d Cir. 2015) ..............................................................................28

*Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ncs, Inc.*),
  330 B.R. 394 (Bankr. S.D.N.Y. 2005) ...............................................7, 10, 15, 25

*SEC v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*),
  960 F.2d 285 (2d Cir. 1992) .............................................................................5, 6

*Stern v. Marshall*,
  564 U.S. 462 (2011) ...........................................................................................26

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) ...........................................................................................27

*In re Trinsum Grp., Inc.*,
    No. 08-12547, 2013 WL 1821592 (Bankr. S.D.N.Y. Apr. 30, 2013) ...................................... 29

*In re U.S. Lines, Inc.*,
    197 F.3d 631 (2d Cir. 1999) .................................................................................................... 28

*U1it4less, Inc. v. Fedex Corp.*,
    871 F.3d 199 (2d Cir. 2017) .................................................................................................... 15

*Winstar Holdings, LLC v. Blackstone Grp., L.P.*,
    No. 07-4634, 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) ................................................... 29

**Statutes**

11 U.S.C. § 157 .............................................................................................................................. 26

11 U.S.C. § 157(a) ......................................................................................................................... 26

11 U.S.C. § 157(b) ......................................................................................................................... 27

28 U.S.C. § 157(b)(2)(L) ............................................................................................................... 27

28 U.S.C. § 1334(b) .................................................................................................................. 26, 29

**Other Authorities**

9 Bus. Orgs. and Tax Planning (Matthew Bender & Co., Inc., 2019) ........................................... 16

David F. Larcker and Brian Tayan, *Board of Directors: Duties and Liabilities* .......................... 16

David F. Larcker and Brian Tayan, *Strategy & Risk Oversight* ................................................... 17

Aegean Marine Petroleum Network Inc. ("Aegean") and its above-captioned debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") submit this Memorandum of Law (this "Memorandum") in support of confirmation of the *Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 382] (as amended, supplemented, or otherwise modified from time to time, the "Plan") and the grant of the Third Party Release[2] described therein on a nonconsensual basis solely with respect to (i) Mercuria and each of its current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, each solely in their capacities as such (the "Mercuria Agents"); and (ii) Tyler Baron, Donald Moore, and Raymond Bartoszek (the "New Audit Committee") (and, collectively, the "Nonconsensual Released Parties").[3]    The Debtors respectfully state as follows.

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the *Findings of Fact, Conclusions of Law, and Order Confirming the Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtors Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order"), filed contemporaneously herewith.

[3]    In further support hereof, and of confirmation of the Plan, the following are being filed contemporaneously herewith:  (a) *Debtors' Memorandum of Law in Support of Confirmation of the Joint Plan of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and Omnibus Reply to Objections Thereto* (the "Confirmation Brief"); (b) *Declaration of Tyler Baron in Support of Confirmation of the Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Baron Confirmation Declaration"); (c) *Declaration of Andrew Hede in Support of Confirmation of the Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Hede Confirmation Declaration"); and (d) *Declaration of Zul Jamal in Support of Confirmation of the Joint Plan of Reorganization of Aegean Marine Petroleum Network Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Jamal Confirmation Declaration" and, together with the Baron Confirmation Declaration and the Hede Confirmation Declaration, the "Confirmation Declarations").

## PRELIMINARY STATEMENT

1.      The Plan is the culmination of an extraordinarily successful resuscitation of a dying business—the product of extensive good faith, arm's-length negotiations between the Debtors and their key stakeholders in these chapter 11 cases, including the Committee, Mercuria, the Consenting Unsecured Noteholders, AmEx, the Unsecured Notes Indenture Trustees, the Lead Securities Plaintiff, the United States Attorney's Office, and other parties in interest.  Those negotiations included the Third Party Release, and this Court approved the methods by which the Debtors solicited the consents of Releasing Parties to grant the Third Party Release in favor of the Released Parties.

2.      The Plan implements a going-concern reorganization of the Debtors that allows them to move on from a period of operational and financial *extremis* while paying allowed operational claims in full and preserving substantial claims against prepetition wrongdoers that contributed to such distress, recoveries from which will directly benefit the Debtors' prepetition stakeholders.  While the Debtors have largely succeeded in obtaining a consensual Third Party Release from the RSA Parties and other stakeholders voting to accept the Plan, the Debtors now request a greater degree of closure via this Court's approval of the Third Party Release on a nonconsensual basis in favor of a carefully limited subset of the Released Parties whose contributions and circumstances satisfy the standard set forth in *Metromedia*: Mercuria, the Mercuria Agents, and the New Audit Committee.

3.      The Third Party Release, as modified by the Litigation Claims Carve Out and the Securities Claims Carve Out, is calibrated to shield the Nonconsensual Released Parties—key contributors who provided unique and singular value to the restructuring—from speculative litigation while preserving the value of material claims—including the Litigation Claims and the Securities Claims—that the New Audit Committee helped cultivate for the benefit of Releasing

Parties that intend to retain and monetize them.  Meanwhile, Mercuria has contributed financially by funding the company prepetition, these chapter 11 cases, and stakeholder recoveries under the Plan.  Thus, there is a direct link between the contributions of the Nonconsensual Released Parties and the benefits afforded to the Releasing Parties under the Plan.

4.    These Nonconsensual Released Parties have—through extraordinary efforts—earned some measure of certainty and finality, even on a nonconsensual basis, as the Litigation Trust pursues the Litigation Claims and the Lead Securities Plaintiff pursues the Securities Claims in close proximity.  They should not be subject to the cost and uncertainty of litigating baseless claims.  The Securities Litigation, for example, implicates precisely the type of claims against New Audit Committee members that ought to be released.  It is not difficult to imagine the Securities Claims being amended to assert additional theories alleging that such directors did not discover the fraud quicker, disclose the fraud sooner, or otherwise conduct the investigation properly.  Similarly, Mercuria has faced allegations of lender liability during these chapter 11 cases, which the Debtors maintain are meritless.  Stakeholders may nevertheless pursue such claims directly against Mercuria in the absence of a release.

5.    The Nonconsensual Released Parties have earned, and deserve, better, as reflected in the negotiation of the Third Party Release as integral to the structure of the Plan:  it affords non-Debtor parties who made substantial, material contributions to the restructuring certainty that their support for the Debtors' restructuring and the Plan will not be unfairly turned against them.  It also recognizes the identity of interest between the Debtors and the Nonconsensual Released Parties—to whom the Debtors have indemnity obligations.  And, significantly, except with respect to the limited number of Nonconsensual Released Parties, the Third Party Release is fully consensual as to all other Released Parties.  Due to their substantial contributions to the Debtors and their

restructuring efforts, and as will be more fully described herein, it is appropriate to impose the

Third Party Release on a nonconsensual basis with respect to the Nonconsensual Released Parties.

## **ARGUMENT**

6.      Consistent with Second Circuit case law, the Debtors believe that the

Nonconsensual Released Parties have provided the Debtors and their restructuring with substantial

contributions that justify the Third Party Release on a nonconsensual basis.  As more fully set forth

herein and in the Confirmation Declarations, the Nonconsensual Released Parties' contributions

include, among other things: (a) funding the Debtors pre- and postpetition operations and

recoveries under the Plan; (b) rescuing the Debtors from certain, value-destroying liquidation;

(c) advancing the investigation, analyzing the transactions and related claims, cooperating with

enforcement agencies, working to develop, collect, and preserve information, witnesses, and other

evidence necessary to monetize the Litigation Claims; and (d) implementing a successful, total

operational turnaround.  With respect to the New Audit Committee in particular, the evidence is

unique and compelling:  three new board members were thrust into intimate involvement in the

daily operations of the business while simultaneously navigating a severe liquidity crisis,

preventing a disorderly liquidation, and leading an international investigation into a massive,

complex fraud pre-dating the board members' tenure—all of which created and preserved the value

the Debtors are on the precipice of distributing.  Together, the New Audit Committee contributed

thousands of hours and incommensurable sweat equity to the Debtors.  The Debtors can state

without exaggeration that, absent the contributions of the Nonconsensual Released Parties, the

Debtors' business would simply have ceased to exist as a going concern in summer 2018, and

recoveries would bear no resemblance to the Plan that the Court is being asked to confirm.

7.      The Third Party Release releases a known, *limited* universe of non-Debtor claims

that were the subject of substantial investigation and negotiation for a consensual Plan.  It does

*not*—consensually or otherwise—release those claims subject to the Litigation Claims Carve Out or the Securities Claims Carve Out, nor does it immunize directors and officers of the Debtors that occupied such roles *pre* May 1, 2018 (including in relation to past wrongs perpetuated against the company). By contrast, the Nonconsensual Released Parties are—and have always been—excluded from the scope of those carve-outs (each of which was heavily negotiated) and entitled to the full, unqualified benefit of the Third Party Release (whether consensually or otherwise). Each Nonconsensual Released Party can trace its initial, released connection to the Debtors to the *post* May 1, 2018 period. Neither Mercuria nor the New Audit Committee members (in their capacities as such) had any involvement with the Debtors prior to such time. And, to be clear, the Third Party Release itself extends *only* to claims in relation to the Debtors' pre- and postpetition restructuring efforts and other parties'-in-interest support thereof.

8.    The Second Circuit has held that a bankruptcy court may enjoin future prosecution of claims against third parties in certain circumstances where the injunction "plays an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 960 F.2d 285, 293 (2d Cir. 1992). This is true where: (a) a bankruptcy court has subject matter jurisdiction over the claims to be released; and (b) the release is "important" to the success of the chapter 11 plan due to "unusual circumstances." *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141–43 (2d Cir. 2005). In light of the facts of these cases, the scope of the Third Party Release, and the carefully limited set of the Nonconsensual Released Parties, the Plan meets each of these requirements, and the Court should grant the Third Party Release of the Nonconsensual Released Parties.

## I.       The Third Party Release Is Appropriate and Justified

9.       The Second Circuit has held that nonconsensual third party releases are appropriate where "unusual circumstances" are present such that releases "play[] an important part" in the debtor's reorganization plan. *Metromedia*, 416 F.3d at 141–43 (citing *Drexel Burnham*, 960 F.2d at 293). While "not a matter of factors and prongs," the Second Circuit suggested the following non-exhaustive list of considerations bear on the importance (and, therefore, appropriateness) of nonconsensual third party releases:

- whether the estate received substantial contribution;

- whether the enjoined claims were channeled to a settlement fund rather than extinguished;

- whether the enjoined claims would directly impact the debtor's reorganization by way of indemnity or contribution;

- whether the plan otherwise provided for the full payment of the enjoined claims; and

- whether the affected creditors consented to the release.

*Id.* at 142 (citing cases). Nonconsensual releases have been approved under *Metromedia* in cases where, for example, the released party:

- supplied financial and operational support that no other entity was willing to provide, provided the debtors with a stalking horse bid and DIP financing, and funded most of the cash available for distribution to unsecured creditors. *See In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) [Docket No. 6066] ¶¶ 266–283;

- contributed "substantial financial and non-financial consideration" that "no other party party could have done," *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 258–59 (Bankr. S.D.N.Y. 2009);

- agreed to rework the transactions initially contemplated as part of the restructuring when creditor feuding made it impossible to confirm the originally bargained-for plan, *see In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007);

- provided essential operational support to the debtors, *see, e.g.*, *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 54–55 (S.D.N.Y. 2006); and

- made contributions to provide distributions that would not otherwise have been available but-for those contributions, *see Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ncs, Inc.*), 330 B.R. 394, 438 (Bankr. S.D.N.Y. 2005).

10.     Here the Debtors received full and fair consideration for the Third Party Release from the Nonconsensual Released Parties that has benefited ***all*** stakeholders in these cases. The need to provide closure to the Nonconsensual Released Parties—whose contributions made possible the Plan, including the preservation of the Litigation Claims for the benefit of junior, impaired stakeholders—renders these circumstances unique and the Third Party Release appropriate. The overwhelming affirmative support for the Plan (including the Third Party Release) further buttresses this argument.

11.     The Debtors also have contractual indemnification obligations to the Nonconsensual Released Parties: pursuant to the Final DIP Order, the Debtors are required to indemnify Mercuria (in its capacities as DIP Agent and DIP Lender) for any claims arising out of the DIP,[4] and the Debtors also have contractual indemnification obligations to Messrs. Baron, Bartoszek, and Moore under Aegean's corporate bylaws.[5] These indemnification obligations to

---

[4]     The *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 290] (the "Final DIP Order") provides, in relevant part: "The Debtors shall indemnify and hold harmless each DIP Agent and each DIP Lender, solely in their capacities as such, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys advisors, financial advisors, financial advisors, consultants, professionals, officers, directors, managers, shareholders and employees, past, present, and future, and their respective heirs, predecessors, successors, and assigns . . . , in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved on a final basis." Final DIP Order § 1.7. Indemnification obligations similar to those under the DIP Loan Documents arise under the Debtors' Prepetition Secured Credit Facilities.

[5]     *See* Amended and Restated Bylaws of Aegean Marine Petroleum Network Inc., Art. VIII, §§ 1–2 (providing for indemnification of directors against "expenses (including attorneys' fees), judgments, fines and amounts paid in settlement . . . if he acted in good faith and in a manner he reasonably believed to be in or not to be opposed to the best interests of [Aegean][.]") (attached hereto as **Exhibit A**). *See also* Plan at 42 (providing for assumption of prepetition indemnification obligations).

the Nonconsensual Released Parties provide further support for approving the Third Party Release

(in addition to supporting jurisdiction, as discussed herein).

### A.    The Third Party Release Is Limited in Scope

12.    The Third Party Release is carefully calibrated to the facts and circumstances of

these cases.  Critically, the Third Party Release is limited by:

- subject matter—e.g., the released claim must have a nexus with the Debtors and their restructuring[6];

- capacity—e.g., the release extends only to work performed for or on behalf of a named Nonconsensual Released Party and the related released subject matter; and

- the Litigation Claims Carve Out, the Securities Claims Carve Out, and the Domestic Governmental Unit (as defined in the Confirmation Order) carve out set forth in paragraphs 90–94 of the Confirmation Order.

13.    In addition, the Mercuria Agents are Nonconsensual Released Parties "solely with

respect to work performed for or on behalf of" Mercuria, subject to the subject matter limitations

set forth in the Plan.  *See* Plan at 12–13.  For example, if an employee of Mercuria assisted in the

preparation of the Disclosure Statement, the Third Party Release would release any potential

claims by Releasing Parties against him or her relating to that work.  By contrast, if an employee

of Mercuria hit a Releasing Party with his or her car, the Third Party Release would ***not*** release

potential claims against the employee for negligence—that claim neither has a nexus with the

---

6    The Third Party Release extends solely to claims "based on or relating to, or in any manner arising from, in whole or in part: (i) the Debtors, or the Debtors' in- or out-of-court restructuring efforts . . . (ii) any Restructuring Transaction, contract, instrument, release, or other agreement or document . . . created or entered into in connection with the Disclosure Statement or the Plan; (iii) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the Restructuring Support Agreement, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement; or (iv) upon any other act, or omission, transaction, agreement, event, or other occurrence related to the foregoing clauses (i) through (iii) taking place on or before the effective date." Plan at 52–53.

Debtors' restructuring nor would it be incurred within the scope of the tortfeasor's employment at Mercuria.

14.    The limited scope of the Third Party Release and narrow universe of Nonconsensual Released Parties are similar to the nonconsensual third party release approved by this Court in *Fairway Group Holdings*.  There, a nonconsensual third party release, limited by capacity and subject matter, was granted in favor of secured lenders (and their affiliates), the "Lender Released Parties,"[7] in exchange for their contributions to facilitate and implement the plan.  *See In re Fairway Group Holdings Corp.*, No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) [Docket No. 156] (confirmation order).  That release extended only to claims "based on or relating to, or in any manner arising from, in whole or in part," the various agreements related to the *Fairway* debtors' restructuring.[8]  Based on the testimony of the debtors' chief restructuring officer presented at the confirmation hearing, the Court expressly found that the Lender Released Parties had provided sufficient contribution to justify nonconsensual releases.  *In re Fairway Group Holdings Corp.*, No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) [Docket No. 158]. In *Fairway*, the Court observed:

> [F]rom the point of view of the lenders, who are the ones identified as making [] concessions, nobody can point to anything other than a concern that they not be sued for actions taken under the credit agreement. . . . I'm happy to give them that [release]. . . . The lenders have made a contribution that I think is sufficient to entitle them to releases of claims that might be made against them, as to the credit that they have extended and the repayments the[re]under[.].

---

[7]    The confirmed *Fairway* chapter 11 plan defines "Lender Released Parties" to include a list of specified lenders, arrangers, and agents, and, with respect to each named entity, "all persons and [e]ntities who acted on their behalf in connection with the matters as to which releases are being given herein."  *See In re Fairway Group Holdings Corp.*, No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) [Docket No. 154], at 7.

[8]    *In re Fairway Group Holdings Corp.*, No. 16-11241 (MEW) (Bankr. S.D.N.Y. June 8, 2016) [Docket No. 154], at 40.

55:25–56:6, 57:19–23 (confirmation hearing transcript).    The Third Party Release of the Nonconsensual Released Parties in this case is similarly limited by both subject matter and capacity and is supported by a robust factual record as set forth in the Confirmation Declarations.

### B.    The Nonconsensual Released Parties Substantially Contributed to the Debtors' Restructuring

15.    The Nonconsensual Released Parties' contributions to the case are truly unique and provide a compelling justification for the Third Party Release, particularly when coupled with the overwhelming creditor support discussed above and the absence of any meaningful impact of the Third Party Release on dissenting claimants.    Courts in this district have repeatedly approved nonconsensual third party releases in favor of parties whose contributions to the case were important to its success, as contemplated by *Metromedia*.    For example, in *Charter Communications*, the court approved a release where the third party had contributed "substantial financial and non-financial consideration."    419 B.R. at 258–59.    Likewise, the court in *Karta Corp.* approved a release where the third parties' operational support was necessary for the debtors to "fund the Plan [and] comply with other Plan obligations."    342 B.R. at 54–55.    In *Adelphia*, the court approved a third party release in favor of parties who "agreed to rework their agreements . . . when creditor feuding made it impossible to confirm the reorganization plan that the Buyers originally bargained for."    368 B.R. at 268.    And the court in *XO Communications* granted a release to third parties whose "contributions will provide for certain distributions that would not have been made available but for these nondebtor parties' contributions."    330 B.R. at 438.

16.    Each Nonconsensual Released Party made substantial contributions to the Debtors' restructuring that warrant the Third Party Release as to such Nonconsensual Released Party.

### 1.    *Mercuria's Contributions Support the Third Party Release*

17.    Mercuria has provided significant financial support to the Debtors for the past nine months that no other party would (or even could) provide.  First and foremost, had Mercuria not entered into the July 5, 2018 memorandum of understanding with the Debtors—which bought the Debtors' more time with their prepetition secured credit facility lenders—and eventually, by early August, stepped into the shoes of those same prepetition secured credit facility lenders, the Debtors would have been forced to liquidate as evaporating lender commitments and a weakening borrowing base severely constricted the Debtors' liquidity.[9]  Moreover, the "sleeving" services Mercuria voluntarily provided at that time (and continues to provide) have been invaluable to the Debtors' continued viability as a going concern.[10]

18.    Later, Mercuria's stalking horse bid for the Debtors' assets set the floor for realizable value in these chapter 11 cases.  And still before the Petition Date, despite a robust marketing process, Mercuria was the only lender who provided the Debtors with a viable DIP financing proposal.

19.    When Mercuria entered the scene in June of 2018, the Debtors were on the precipice of collapse: impending, value-destroying liquidation was averted via a company-saving deal whereby Mercuria stepped into the shoes of the lenders under the Debtors' prepetition working

---

[9]    Baron Confirmation Declaration ¶ 21 ("By reducing the size of these facilities, lenders severely constricted Aegean's access to necessary working capital to purchase inventory and meet customer demand. . . . The combined pressures of decreased liquidity and decreased borrowing base created a downward spiral and leading towards an eventual liquidation.").

[10]   As explained by the Debtors' financial advisor, Mr. Andrew Hede, at the contested hearing to approve the Debtors' DIP financing on an interim basis, "Under the sleeving arrangement, Mercuria procures the oil, takes delivery, and puts it into basically a subleased tank within the [Aegean] facility.  They hold the oil until such point as the company is ready to deliver it to the customer.  [Aegean] loads it onto a vessel, and in effect, takes flash title to it.  It delivers it to the company and then creates a receivable as a result of that."  Nov. 7, 2018 Hr'g Trans. at 69:21–70:3.  By holding working inventory on its balance sheet, Mercuria substantially alleviates the Debtors' working capital (and, thus, liquidity) needs.

capital facilities and agreed to provide inventory "sleeving" services that insulated the Debtors from the risk of adverse price movement in the marine fuel market. Absent this company-saving transaction with Mercuria, evaporating lender commitments, expiring forbearance agreements, uncured and incurable defaults, and the Debtors' weakening borrowing base would have left the Debtors with no choice but to liquidate their businesses.

20.     Even with Mercuria's prepetition support, a near term bond maturity that could not be refinanced by the Debtors made it clear that the Debtors would be forced to seek chapter 11 relief. Faced with the prospect of the Debtors' "free fall" into chapter 11, or worse, total liquidation, Mercuria provided the Debtors with (a) a stalking horse bid that set the floor for realizable value in these chapter 11 cases; (b) time and liquidity to properly prepare their worldwide business for chapter 11; and (c) the only viable DIP financing proposal the Debtors received prepetition, notwithstanding the Debtors' extensive marketing efforts.[11]

21.     When objections to Mercuria's stalking horse bid and proposed DIP financing threatened to overwhelm these cases with costly and uncertain litigation, Mercuria negotiated in good faith with parties in interest to fund increased recoveries to unsecured claimholders at Aegean (including those most aggressive in the foregoing litigation), as well as committing to provide the DIP financing necessary to fund a going concern reorganization. These contributions provided significant and critical incremental value to the Debtors' estates, putting the adequacy of the consideration provided for the Third Party Release beyond good faith dispute.

---

[11]    Further details regarding the Debtors' prepetition efforts to market the DIP financing proposal may be found in the *Declaration of Zul Jamal in Support of the Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 17, Ex. B].

22.    The following timeline provides a summary of the Debtors' distress and Mercuria's

involvement in the Debtors' restructuring:

- Beginning in March 2018 and continuing through the summer, Aegean and its lenders entered into a series of short-term forbearance agreements—some as short as 10 days—relating to Aegean's breaches of its interest coverage ratio covenant and covenant to deliver audited financial statements on a timely basis;

- March to May 2018:  lenders reduced the size of Aegean's working capital facilities from $1 billion to $600 million (on an aggregate basis), which severely constricted access to liquidity to purchase inventory and meet customer demand;

- June 4, 2018: Aegean announced that it believed approximately $200 million of accounts receivable owed to Aegean as of December 31, 2017 will need to be written off, as the transactions giving rise thereto may have been, in whole or in part, without economic substance[12];

- During June 2018, Aegean experienced additional deterioration in customer activity and operated without enough liquidity to procure additional stocks of fuel to supply the network, such that on multiple business days Aegean had zero borrowing base availability, causing fuel inventories in certain critical supply hubs to run dry[13];

- June 29, 2018:  Aegean's lenders further reduced the size of Aegean's working capital facilities from $600 million to $455 million (on an aggregate basis), which further constricted access to liquidity to purchase inventory and meet customer demand;

- During June and July 2018, Aegean and its advisors negotiated with third party financial and strategic investors as well as an ad hoc committee of Unsecured Convertible Noteholders to explore and evaluate strategic alternatives[14];

- July 5, 2018: Aegean announced entry into a memorandum of understanding with Mercuria, which contemplated, among other things, refinancing Aegean's prepetition secured credit facilities by August 15, 2018, the provision of interim credit support to enhance liquidity, and other terms predicated on a potential future global strategic partnership between Aegean and Mercuria[15];

- August 21, 2018:  Aegean announced that Mercuria had: (a) become the sole lender under Aegean's prepetition working capital facilities; (b) agreed to extend existing

---

[12]   Aegean's publicly-traded common stock fell approximately 75% that day.  *See* Baron Confirmation Decl. ¶ 24.

[13]   Baron Confirmation Decl. ¶ 25.

[14]   Baron Confirmation Decl. ¶ 26.

[15]   Baron Confirmation Decl. ¶ 28.

covenant waiver agreements for these facilities; (c) agreed to provide $30 million of sorely needed liquidity by way of amendments and additional waivers to the facilities as well as other financing arrangements; and (d) agreed to support operations by "sleeving" inventory. In return, Aegean issued Mercuria new common stock constituting 30% of Aegean's outstanding common stock (on a pro forma basis) and its Board unanimously agreed to expand the Board and subsequently appoint a representative of Mercuria thereto[16];

- November 2, 2018: Aegean announced that (i) it believed up to $300 million of cash and other assets were misappropriated through fraudulent activities and (ii) it had confirmed that approximately $200 million of questionable receivables were uncollectible and would be written off;

- November 5, 2018: Aegean and Mercuria entered into that certain asset purchase agreement dated as of November 5, 2018, which provided for the terms of Mercuria's "stalking horse" bid;

- December 7, 2018: the Debtors, Mercuria, and the Committee reached a "courthouse steps" agreement in principle on the terms and conditions of a proposed plan of reorganization for the Debtors;

- December 15, 2018: following Oaktree's withdrawal from the contest to sponsor a plan,[17] the Debtors, Mercuria, and the Committee entered into a Restructuring Support Agreement premised on Mercuria's agreement to sponsor a chapter 11 plan of reorganization of the Debtors (*i.e.*, the Plan) that provides for an even higher and better recovery than the Oaktree and Hartree proposal.

23.    The unencumbered value available for distribution is ***vastly*** greater as a result of

Mercuria's agreement to support ***100%*** recoveries to unsecured creditors at subsidiary Debtors,

fund $40 million of cash recoveries for general unsecured creditors at Aegean, and contribute the

Litigation Claims to the Litigation Trust. Further, there can be no doubt that stakeholders are better

off because Mercuria has agreed to fund Allowed Administrative Claims and backstop the

$15 million Litigation Trust Loan which will fund the Litigation Trust—all above and beyond

that contributed by Mercuria through the DIP Facilities (including a $75 million term loan facility)

---

[16]    Baron Confirmation Decl. ¶ 29.

[17]    *See* Disclosure Statement at 34.

and associated "sleeving" services. Moreover, Mercuria's agreement to equitize its DIP loans and certain secured term loans will deleverage the Debtors' balance sheet by over ***$800 million***.

24.    Courts have granted a nonconsensual third party release in exchange for far less. *See, e.g.*, *In re Finlay Enters., Inc.*, 2010 WL 6580268, at *9–10 (Bankr. S.D.N.Y. June 29, 2010) (approving nonconsensual release in favor of party that contributed $7 million to fund recoveries to general unsecured creditors who would otherwise have received no distribution from the debtors' estates); *In re Metro. 885 Third Ave. Leasehold, LLC*, No. 10-16103, 2010 WL 6982778, at *11 (Bankr. S.D.N.Y. Dec. 22, 2010) (finding that waiver of $160 million claims constituted "substantial consideration"); *XO Commc'ns*, 330 B.R. at 437–40 (approving release based on "certain distributions" that would not have occurred absent third party contributions).

25.    In addition, Mercuria's contributions support the Third Party Release as to the Mercuria Agents. As a preliminary matter, Mercuria, a corporate entity, "can act only through its employees, subsidiaries, or agents." *Ulit4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017). Thus, substantial contributions attributable to Mercuria are equally attributable to—and indeed would not have been possible without—those persons acting on its behalf or as its agents. Moreover, such persons participated in the Debtors' restructuring at Mercuria's behest and are Released Parties "solely with respect to work performed for or on behalf of [Mercuria]." *See* Plan at 12. That Mercuria's contributions support an appropriately scoped release of those who acted on its behalf is an uncontroversial proposition in this District. *See, e.g.*, *In re Finlay Enters.*, No. 19-14873, 2010 WL 6580628, at *9, *15 (Bankr. S.D.N.Y. June 29, 2010) (Peck, J.) (approving release of each named released party's "present or former directors, officers, members, managers, partners, employees, affiliates, agents, financial advisors, restructuring advisors, attorneys and

representatives and their respective affiliates" because they "participated in [the chapter 11 cases] on behalf of the [named released parties].")

### 2. The Contributions of the New Audit Committee Support the Third Party Release

26.     The directors comprising the New Audit Committee, namely Tyler Baron, Raymond Bartoszek, and Donald Moore, have gone wildly above and beyond their obligations and duties as board members of the Debtors, contributing invaluably to the Debtors' operational and financial restructuring.  These individuals have made onerous investments of their personal time and resources to salvage the Debtors' business and maximize its value going forward, benefiting *all* stakeholders in these chapter 11 cases.  The time and energy expended in these zealous pursuits has far exceeded what could reasonably be expected or demanded of them in their distinct capacities as directors of Aegean.

27.     The role of a typical company director is to (a) consult with management regarding the strategic and operational direction of the company and (b) monitor company performance and generally provide oversight.[18]  Board members do *not* typically run the company on a day-to-day basis; that role falls to management.[19]  Moreover, while the typical board of directors reviews and

---

[18]    David F. Larcker and Brian Tayan, *Board of Directors: Duties and Liabilities* at 2, Corporate Governance Research Initiative, Stanford Graduate School of Business (2015).  *Accord* 9 Bus. Orgs. with Tax Planning § 108.02 (Matthew Bender & Co., Inc., 2019) ("Generally, the board of directors of a public company has five primary functions:  (1) to oversee and review the performance of senior executive officers; (2) to review and approve major corporate plans and actions; (3) to advise top management; (4) to propose candidates for office as directors; and (5) to review the performance of systems to comply with applicable laws.").

[19]    According to the Stanford Graduate School of Business Corporate Governance Research Initiative, directors report typically spending 20 hours per month on board matters.  Audit committees oversee the company's accounting policies and external and internal auditors, but are reliant upon external and internal auditors to ensure that material information is adequately disclosed:  the typical audit committee meets for fewer than 22 hours per *year*.  *Id.* at 5–7.

monitors the company's business strategy, it is management's responsibility to propose the strategy, develop the business model, and identify risks and performance indicators.[20]

28.     Here, the New Audit Committee did not step into the shoes of typical company directors; rather, as more fully set forth in the Confirmation Declarations, when Messrs. Baron, Bartoszek, and Moore joined the board of directors of Debtor Aegean (the "Board"):

- Aegean was operating under the cloud of its attempt—blocked by Mr. Baron and other Aegean shareholders—to acquire H.E.C. Europe Limited, a company controlled by Aegean's founder, on apparently less than arm's-length terms[21];

- Little to nothing had been done to investigate the $200 million of questionable receivables which had been intended to be used as a form of consideration in the attempted H.E.C. Europe Limited acquisition[22];

- Aegean's payroll and HR systems were impossible to reconcile with actual disbursements to employees[23];

- Aegean's lenders had reduced the sizes of Aegean's working capital facilities from a peak of $1 billion to $600 million by May 5, 2018 (which would further fall to $455 million by June 29, 2018), severely constraining liquidity.  These headline numbers, in fact, bore no resemblance to actual, formula-based borrowing availability, which was zero or close to zero on most working days in June 2018[24];

- Aegean's volumes had fallen below breakeven levels as a result of constrained liquidity and increased fuel prices, leading to negative free cash flow[25];

- Credit insurance companies serving the marine fuels space had canceled their coverage of Aegean due to its inability to file audited financials[26];

---

[20]     David F. Larcker and Brian Tayan, *Strategy & Risk Oversight* at 4, Corporate Governance Research Initiative, Stanford Graduate School of Business (2015).

[21]     Baron Confirmation Decl. ¶¶ 11–13.

[22]     Baron Confirmation Decl. ¶ 14.

[23]     Baron Confirmation Decl. ¶ 38.

[24]     Baron Confirmation Decl. ¶ 25.

[25]     Baron Confirmation Decl. ¶ 21.

[26]     Baron Confirmation Decl. ¶ 23.

- Aegean's customers had begun delaying purchases from Aegean due to widespread concerns about Aegean's stability[27];

- Aegean, members of the New Audit Committee, and their advisors had to negotiate daily with a syndicate of lenders regarding short-term waivers of continuing covenant defaults.  Such lenders were unwilling to provide additional liquidity and instead required extensive and ongoing financial reporting and development of contingency plans such as liquidation budgets by certain milestone dates;

- Aegean and the Board had yet to gather any evidence of fraudulent transactions or identify any links between fraudulent receivables and any shell companies[28];

- Aegean had no access to critical electronic files necessary to discover and investigate the Litigation Claims[29]; and

- Aegean had not located any cooperating witnesses and had not identified any support for potential claims against specific malefactors or professionals.[30]

In addition, Aegean lacked effective management prior to the involvement of Messrs. Baron, Bartoszek, and Moore:  Aegean's management structure was dysfunctional and members of the prior management team had limited experience in many critical function areas and next to no information about key elements of the business[31]; and Aegean's internal financial function lacked *any* internal financial planning and was ill-equipped to manage liquidity or address Aegean's capital structure.[32]

---

[27]  *Id.*

[28]  Baron Confirmation Decl. ¶ 19.

[29]  *Id.*

[30]  *Id.*

[31]  Baron Confirmation Decl. ¶ 40.

[32]  *Id.* ("[There was a] complete lack of accounting systems in Greece and reliable historical accounting information. For example, there was no financial plan, no operational or financial statistics by port or customer, no cost reporting, no accurate list of employee headcount, etc.").  *See also id.* ¶ 32 ("Given the lack of reliable historical financials and significant challenges with the accounting system and processes in Greece, there was no visibility into how and where [Aegean] was spending money.  I led an analysis of [Aegean's] cost structure by category and location of spend, and we worked with members of management to drive over $30 million of annualized cost reductions.  I also led the development of a station-level operating model which further informed decision-making on cost rationalization and resource allocation.").

29.     The appointment of Messrs. Baron, Bartoszek, and Moore to the Board was crucial to salvaging the Debtors' business at a period of substantial market uncertainty. The New Audit Committee went above and beyond the call of duty, becoming intimately involved in the daily operations of the business while simultaneously navigating a severe liquidity crisis and preventing a disorderly liquidation, while at the same time leading an international investigation into a massive, complex fraud pre-dating the board members' tenure.[33]

30.     Not merely overseeing, but actively participating in the internal investigation that developed the Litigation Claims, avoiding the uncontrolled liquidation of Aegean, and operationally restructuring Aegean in the face of a liquidity crisis has been a full-time job for Messrs. Baron, Bartoszek, and Moore: Messrs. Baron and Moore estimate they each spent upwards of 2,000 hours working for Aegean in 2018, and Mr. Bartoszek spent more than 500 hours in the same period.[34]  Messrs. Baron and Moore essentially took on the role of interim co-CEOs for Aegean, traveling to the company's headquarters in Greece for weeks on end and exercising direct oversight over the company's employees, while Mr. Bartoszek addressed operational rationalization at the Debtors' Americas business units.[35]  Messrs. Baron and Moore assumed de facto managerial responsibility for all important work streams at Aegean, including monitoring and pushing the investigation, negotiating with Mercuria and Aegean's creditors, and supervising day-to-day operations.

31.     With respect to liquidity, members of the New Audit Committee personally engaged a number of third-party financial and strategic investors as well as an ad hoc committee

---

[33]    Baron Confirmation Decl. ¶¶ 31–36.

[34]    Baron Confirmation Declaration ¶¶ 31, 37.

[35]    Baron Confirmation Decl. ¶¶ 31–32, 37–38.

of Unsecured Noteholders to explore and evaluate strategic alternatives and liquidity-generating transactions.  Such individuals, together with their advisors, provided significant diligence, held multiple conferences, and otherwise engaged parties in interest in both contingency planning and strategic alternatives.  Along with advisors, Mr. Baron identified and actively engaged Mercuria as a potential source of capital, making multiple trips to visit Mercuria's offices in Europe and engaging in countless conferences with Mercuria and its advisors.  These efforts were ultimately successful and enabled the company to avoid an uncontrolled liquidation.  Aegean, led by the New Audit Committee, and Mercuria thereafter worked diligently to reestablish customer relationships, increase sales volumes, improve cash flows, and regenerate the borrowing base.  The New Audit Committee also implemented internal cost cutting and restructuring initiatives, including winding down the back-to-back bunkering trading and marine lubricants businesses, reducing corporate overhead, reducing station level costs, cutting storage costs, developing management information reporting and other internal controls, and reconfiguring the fleet to reduce overcapacity and increase revenues by chartering out vessels to third parties.  Improvements to the Debtors' cost structure, for example, generated more than $30 million of annualized cost savings.[36]

32.    With respect to the investigation, the New Audit Committee also took it upon themselves to supercharge the Debtors' internal investigation that led to the discovery and development of the Litigation Claims.  In particular, they, among other things[37]:

- Gained the trust of and participated in interviews of potential witnesses that had previously been uncooperative to gain information related to the Litigation Claims;

- Worked diligently to remediate the conditions that enabled the fraudulent behavior to take place and remain undetected for so many years;

---

[36]    Baron Confirmation Decl. ¶¶ 27, 30, 32.

[37]    *See* Baron Confirmation Decl. ¶¶ 33–36.

- Removed over half the named directors and officers of the Debtors and likewise made comprehensive changes to the list of authorized signatories for the Debtors' more than two hundred bank accounts;

- Replaced over two dozen employees believed to have been involved in or to have had knowledge of the fraudulent activities by promoting and hiring trusted employees;

- Worked to disentangle the Debtors from all legacy relationships with former related parties, including moving the Greece office out of its historical location in a building controlled by Aegean's founder (and which was under extensive video and audio surveillance);

- Supervised the investigation on a daily basis, working with outside counsel and investigators; and

- Familiarized themselves with key evidence.

33.     In response to these preservation efforts, Aegean's founder initiated a Greek privacy lawsuit, alleging that the Debtors had improperly accessed confidential data, to which Mr. Moore, in particular, spent significant time responding.[38] Messrs. Baron and Moore (particularly Mr. Moore) undertook extraordinary efforts to overcome other obstacles imposed by Aegean's founder, such as attempts by him to destroy documents and intimidate witnesses.[39] These efforts preserved the Litigation Claims that are the cornerstone of recovery to Aegean's junior, impaired stakeholders in these chapter 11 cases.

34.     This effort went well beyond what is expected from a company's directors. Messrs. Baron and Moore spent weeks at a time on the road, in multiple countries, pushing the investigation forward, including by pursuing legal remedies in Greece to gain access to critical documents and data needed to investigate apparent improprieties, while those malefactors responsible for the

---

[38]    Baron Confirmation Decl. ¶ 35.

[39]    Baron Confirmation Declaration ¶ 34 ("We worked to overcome extensive hurdles to the investigation. This included attempts to destroy documents and to intimidate witnesses. Moving the investigation forward in the face of this conduct required extraordinary efforts by Mr. Moore in particular. We also worked closely with trusted members of management to recover and preserve extensive physical and digital evidence related to the Litigation Claims.").

misconduct were engaged in efforts to conceal the information that would prove their misdeeds.[40] For the last nine months, Messrs. Baron and Moore have driven the investigation of the Litigation Claims forward, acted as the Debtors' liaison with respect to governmental agencies whose investigatory work is proceeding on a parallel path, and (along with counsel) created the current strategy to pursue the Litigation Claims—the key source of value that permitted the Debtors to create the agreed-upon Plan.[41]  They did all of this while overcoming a liquidity crisis that threatened to destroy the entire business and managing a company that lacked a management team capable of doing so without substantial, day-to-day and in-the-weeds, oversight.

35.    On the operational side, Mr. Bartoszek contributed more than 500 hours in 2018 to overhauling the Debtors' operations, especially with respect to US operations.[42]  Before joining the Debtors' board, Mr. Bartoszek had a 20-plus year energy trading career at Texaco and Glencore Limited before becoming involved in private equity and developing a family office with a diversified portfolio.  His services in helping to run Aegean's day-to-day business while overseeing critical cost control initiatives have been integral to Aegean's operational restructuring.[43]  In fact, after joining the board, Mr. Bartoszek relocated to the New York City area in order to be closer to one of the Debtors' principal offices and facilitate the rationalization of the Debtors' internal operations.[44]  Over a period of months, Mr. Bartoszek added substantial value by, among other things, conducting reviews of the Debtors' stations in the Americas as well as

---

[40]    Baron Confirmation Decl. ¶¶ 16–17.

[41]    Baron Confirmation Decl. ¶ 18.

[42]    *See* Baron Confirmation Decl. ¶ 37.

[43]    *Id.*

[44]    Baron Confirmation Decl. ¶ 38.

their supply and trading strategies and working to develop a clear picture of actual payroll and ensure that the Debtors were only paying for employees working for the Debtors and not for other entities run by Aegean's founder. He was also heavily involved in improving vessel utilization at Aegean's Americas business units—particularly those in the Gulf and the Caribbean—leading to annual savings exceeding $5 million. His role, too, far exceeded the standard duties of a company director.[45]

36.    Courts in this district have approved nonconsensual releases of a debtor's directors and officers who made contributions similar to those of the New Audit Committee. For example, in *Finlay Enterprises*, the court approved nonconsensual releases in favor of the debtors' directors, officers, and employees who "made significant personal sacrifices of time and effort by actively participating in the chapter 11 and auction process while simultaneously managing the [d]ebtors' businesses throughout these [chapter 11] cases," which efforts "directly resulted in" maximizing value for the debtors' estates and creditor constituencies. *Finlay Enters., Inc.*, 2010 WL 6580268, at *9. In *Charter Communications*, the court overruled objections to and approved the nonconsensual release of the debtors' largest prepetition equity holder based on his cooperation in effecting a restructuring transaction that would allow the debtors to reinstate their senior secured credit facility, the terms of which were highly favorable to the debtors. *Charter Commc'ns*, 419 B.R. at 258–59. Finally, in *Residential Capital*, the court approved a nonconsensual release in favor of third parties (including directors and officers) who "helped maintain the value of the [d]ebtors' [business]," similar to the pre- and postpetition contributions of the New Audit Committee in these cases. *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) [Docket No. 6065].

---

[45]    *Id.*

37.     As more fully described in the Confirmation Declarations, the New Audit Committee contributed to and supported the Debtors' restructuring efforts in ways far exceeding the usual involvement of directors and officers of chapter 11 debtors.  In light of these facts and precedent cases approving nonconsensual releases of directors and officers on similar terms, the nonconsensual Third Party Release of the New Audit Committee is appropriate and justified.

### C.     Additional *Metromedia* Factors Support the Third Party Release

38.     The other *Metromedia* factors also favor approval of the Third Party Release.  First, certain key claims—namely, the Litigation Claims and Securities Claims—are expressly carved out from the Third Party Release.  Pursuant to the Plan, the Litigation Claims are contributed to the Litigation Trust, and the Securities Claims are not enjoined relative to the named defendants, including certain of the Debtors' *pre* May 1, 2018 directors and officers.  As such, while surely possible, only remote or speculative claims remain in the scope of the Third Party Release, and any such claims would be subject to the Debtors' indemnification obligations in any case.  To be sure, each of the Committee and the Lead Securities Plaintiff separately agreed to grant the *post* May 1, 2018 parties—i.e., the Nonconsensual Released Parties—a full, unqualified release.

39.     The SEC, in its objection,[46] apparently believes that the ***examples*** of circumstances that would support third party releases offered by the Second Circuit in *Metromedia* are ***necessary elements*** of a finding that third party releases are appropriate and justified.  *See* SEC Objection at 7 (arguing that the Third Party Release does not satisfy the *Metromedia* standard because "the enjoined claims are not being channeled to any meaningful settlement fund" and "the Plan is not providing for the full payment of enjoined claims.")  That is simply incorrect.  The examples of

---

[46]   On March 19, 2019, the SEC filed the *Limited Objection of the U.S. Securities and Exchanges Commission to Confirmation of the Debtors' Joint Plan of Reorganization* [Docket No. 454] (the "<u>SEC Objection</u>").

circumstances that would justify a third party release in connection with confirmation of a chapter 11 plan of reorganization discussed in *Metromedia* are just that—examples—and courts applying the *Metromedia* standard have not interpreted it as the SEC does. *See, e.g.*, *Karta Corp.*, 342 B.R. at 54–55 (approving nonconsensual release of party that provided essential operational support to the debtors); *Adelphia Commc'ns Corp.*, 368 B.R. at 268 (approving nonconsensual release of party that agreed to rework bargained-for transactions when creditor feuding made confirmation impossible). *Metromedia* itself rebuts the SEC's theory. *Metromedia Fiber Network, Inc.*, 416 F.3d at 142 ("[T]his is not a matter of factors and prongs").

40.      Finally, certain of the Nonconsensual Released Parties, including the New Audit Committee and Mercuria, have potential indemnification claims against the Debtors for the claims subject to the Third Party Release. The Debtors' indemnification obligations to the Nonconsensual Released Parties weigh in favor of granting the Third Party Release. *See Metromedia*, 416 F.3d at 142 ("Courts have approved nondebtor releases when . . . the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution[.]'") (citing *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 701 (4th Cir. 1989). Courts applying the *Metromedia* standard have pointed to the existence of indemnification obligations and other "identity of interest" concerns as a justification for nonconsensual third party releases. *Charter Commc'ns*, 419 B.R. at 258–59; *see also XO Commc'ns*, 330 B.R. at 440 (approving nonconsensual third party release based partly on the "identity of interest present as a result of indemnification/contribution exposure of the Debtor").

41.      For example, the Debtors have contractual indemnification obligations under the DIP Credit Facility Documents that have been authorized by this Court,[47] and the Debtors are

---

[47] The Final DIP Order provides, in relevant part: "The Debtors shall indemnify and hold harmless each DIP Agent and each DIP Lender, solely in their capacities as such, and each of their respective successors, assigns, affiliates,

required under their respective bylaws and organizational documents to indemnify directors, including Messrs. Baron, Bartoszek, and Moore.[48]   Any such indemnification claims would operate as an endrun to the discharge injunction, enabling third parties to pursue prepetition claims where the Reorganized Debtors are the economic party in interest.   These additional *Metromedia* factors support imposing the Third Party Release on a nonconsensual basis.

## II.    The Court Has Subject Matter Jurisdiction to Grant the Third Party Release

42.    The Court has subject matter jurisdiction over the claims subject to the Third Party Release.[49]   A bankruptcy court's jurisdiction is delineated by 28 U.S.C. §§ 1334(b) and 157. Section 1334(b) confers jurisdiction on the district courts of "all civil proceedings arising under title 11, or arising in or related to cases under title 11," and section 157(a) allows district courts to "provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the

---

parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys advisors, financial advisors, financial advisors, consultants, professionals, officers, directors, managers, shareholders and employees, past, present, and future, and their respective heirs, predecessors, successors, and assigns . . . , in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved on a final basis." Final DIP Order § 1.7.  Indemnification obligations similar to those under the DIP Loan Documents arise under the Debtors' Prepetition Secured Credit Facilities.

[48]   *See* Amended and Restated Bylaws of Aegean Marine Petroleum Network Inc., Art. VIII, §§ 1–2 (providing for indemnification of directors against "expenses (including attorneys' fees), judgments, fines and amounts paid in settlement . . . if he acted in good faith and in a manner he reasonably believed to be in or not to be opposed to the best interests of [Aegean][.]") (attached hereto as **Exhibit A**).  *See also* Plan at 42 (providing for assumption of prepetition indemnification obligations).

[49]   While no party has raised a *Stern* issue with the Court's constitutional authority to grant the Third Party Release, for avoidance of doubt, the Debtors believe it is clear that this Court has such authority.  *See, e.g.*, *In re Kirwan Offices S.à.r.l.*, 592 B.R. 489, 511 (S.D.N.Y. 2018) ("A reorganization plan is a creature solely of Bankruptcy law and must comply with all of the provisions of 11 U.S.C. § 1129(a) & (b).  And the third-party releases contained in a confirmed plan are subject to 11 U.S.C. §§ 1129(a)(1), 1123(b)(5) & (6), 105, and 524(e).  In other words, those releases 'flow from a federal statutory scheme.'") (citing *Stern*, 564 U.S. 462, 493 (2011)); *accord In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("*Stern* is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case.") (citations omitted).

district."[50]   Section 157(b) confers statutory authority on bankruptcy judges to hear all "core

proceedings arising under title 11, or arising in a case under title 11."  As discussed above, the

Third Party Release is a component of the Plan being presented for confirmation, which is "core."

*See* 28 U.S.C. § 157(b)(2)(L).  In addition, the Third Party Release extends only to claims

> based on or relating to, or in any manner arising from, in whole or in part:  (i) the
> Debtors, or the Debtors' in- or out-of-court restructuring efforts . . . ; (ii) any
> restructuring transaction, contract, instrument, release, or other agreement or
> document . . . created or entered into in connection with the Disclosure Statement
> or the Plan; (iii) the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing
> of the Chapter 11 Cases, the Restructuring Support Agreement, the pursuit of
> confirmation, the pursuit of consummation, the administration and implementation
> of the Plan, or the distribution of property under the Plan or any other related
> agreement; or (iv) upon any other act, or omission, transaction, agreement, event,
> or other occurrence related to the foregoing clauses (i) through (iii) taking place on
> or before the Effective Date.[51]

43.    Such claims (a) fall squarely within the core jurisdiction of this Court (e.g., all

claims relating to the Disclosure Statement or the Plan) or, to the extent they are not, (b) are

sufficiently "related to" these chapter 11 cases to support non-core subject matter jurisdiction

because they might conceivably affect, and in some cases directly impact, the bankruptcy estate.[52]

A.    **The Third Party Release Covers Claims within the Court's Core Subject Matter Jurisdiction**

44.    This Court's core jurisdiction extends to all civil claims "arising under" title 11 or

"arising in" a case under title 11.  As the Second Circuit has explained, proceedings "arising under"

---

[50]   The District Court for the Southern District of New York has so provided.  *See Amended Standing Order of Reference from the United States District Court for the Southern District of New York* (Jan. 31, 2012).

[51]   Plan at 52–53.

[52]   *In re Quigley Co.*, 676 F.3d at 57 ("[T]he touchstone for bankruptcy jurisdiction remains 'whether [a third party action] might have any 'conceivable effect' on the bankruptcy estate.'") (citations omitted), *cert. denied sub nom. Pfizer, Inc. v. Law Offices of Peter G. Angelos*, 133 S. Ct. 2849 (2013); *see also Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*), 517 F.3d 52, 66 (2d Cir. 2008) ("*Manville III*") ("[A] bankruptcy court only has jurisdiction to enjoin third party non-debtor claims that directly affect the *res* of the bankruptcy estate."), *rev'd sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).

the Bankruptcy Code are those that "invoke substantive rights created by federal bankruptcy law." *In re Robert Plan Corp.*, 777 F.3d 594, 596 (2d Cir. 2015) (citing *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108–09 (2d Cir. 2006)). By contrast, claims "arising in" a case under title 11 are those "that are not based on any right expressly created by the Bankruptcy Code, but nevertheless, would have no existence outside of the bankruptcy." *Id.* at 596–97 (quoting *Baker v. Simpson*, 613 F.3d 346, 350–51 (2d Cir. 2010)).[53]

45.    Bankruptcy courts' core jurisdiction extends as far as constitutional limits allow. *See In re Relativity Fashion, LLC*, 696 Fed. Appx. 26, 28 (2d Cir. 2017) ("This Court has ruled that 'core proceedings should be given a broad interpretation that is close to or congruent with constitutional limits.'") (quoting *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999)). Within such limits, bankruptcy courts have "comprehensive power" to resolve claims and enter orders or judgments in core proceedings. *Id.*, citing *In Matter of Motors Liquidation Co.*, 829 F.3d at 153.

46.    Most if not all claims subject to the Third Party Release are "core" to these chapter 11 cases. All of the Debtors' postpetition restructuring efforts—including the RSA, Plan, and Disclosure Statement—are creatures of the Bankruptcy Code or would not have occurred but for its existence. Further, even the Debtors' prepetition restructuring efforts—such as the investigation, prepetition negotiations with Mercuria over the MOU, stalking horse asset purchase agreement, and the DIP Facilities—arose out of a contemplated chapter 11 filing. As such, this Court has core jurisdiction to grant the Third Party Release.

---

[53]    By way of example, a "bankruptcy court's decision to interpret and enforce a prior sale order falls under this formulation of 'arising in' jurisdiction." *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 153 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1813 (2017). This is because the "order consummating a debtor's sale of property would not exist but for the Code, and the Code charges the bankruptcy court with carrying out its orders." *Id.* (citations omitted).

### B.      The Third Party Release Covers Claims That Would Have a 'Conceivable Effect' on the Bankruptcy Estate

47.      Even if it could successfully be argued that the Third Party Release extends to claims beyond the core subject matter jurisdiction of this Court, this Court nonetheless has subject matter jurisdiction over such claims because they fall within the Court's "related to" subject matter jurisdiction.[54] The Second Circuit extends "related to" bankruptcy jurisdiction to any civil action for which the outcome "might have *any* 'conceivable effect'" on the bankruptcy estate.  *See Quigley*, 676 F.3d at 57 (emphasis added) (citation omitted).  To have a "conceivable effect" on a bankruptcy estate, "certainty, or even likelihood, is not required."  *Winstar Holdings, LLC v. Blackstone Grp., L.P.*, No. 07-4634, 2007 WL 4323003, at *1 n.1 (S.D.N.Y. Dec. 10, 2007); *see also Manville III*, 517 F.3d at 66–67 (explaining that bankruptcy court has jurisdiction over claims that affect the *res* of the estate); *In re Trinsum Grp., Inc.*, No. 08-12547, 2013 WL 1821592, at *5 (Bankr. S.D.N.Y. Apr. 30, 2013) (discussing standard).

48.      This Court has "related to" jurisdiction to release non-Debtor claims against the Released Parties because such claims "directly affect the *res* of the bankruptcy estate."  *Manville III*, 517 F.3d at 66; *accord In re Dreier LLP*, 429 B.R. 112, 131 (Bankr. S.D.N.Y. 2010) ("In assessing a court's jurisdiction to enjoin a third party dispute, the question is not whether the court has jurisdiction over the settlement, but whether it has jurisdiction over the attempts to enjoin the creditors' unasserted claims against the third party."); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) ("The test for determining whether litigation has a significant

---

[54]    The scope of "related to" subject matter jurisdiction under 28 U.S.C. § 1334(b) is broad.  *See Bond St. Assocs v. Ames Dep't Stores, Inc.*, 174 B.R. 28, 32–33 (S.D.N.Y. 1994) ("The legislative history makes it clear that section 1334(b), taken as a whole, constitutes an extraordinarily broad grant of jurisdiction to the Article III District Court."); *accord City of Ann Arbor Emps. Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, 572 F. Supp 2d 314, 317 (E.D.N.Y. 2008) ("The scope of 'related to' jurisdiction has been broadly interpreted by the Second Circuit.").

connection with a pending bankruptcy proceeding [sufficient to confer bankruptcy jurisdiction] is whether its outcome might have any 'conceivable effect' on the bankrupt estate.").

49.     The Debtors' contractual obligations to indemnify the Nonconsensual Released Parties for any losses the Nonconsensual Released Parties incur in defending against third party claims are a well-settled basis for this Court's jurisdiction over such claims.  Courts in this district have consistently held that "a bankruptcy court has 'related to' jurisdiction over non-debtor litigation if the estate is obligated to indemnify or contribute to the losing party."  *In re Amanat*, 338 B.R. 574, 579 (Bankr. S.D.N.Y. 2005); *accord In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011) (holding that bankruptcy court had jurisdiction to enjoin non-debtor litigation that might impact the bankruptcy estate via indemnity or contribution); *In re Residential Capital, LLC*, 497 B.R. 720, 745 (Bankr. S.D.N.Y. 2013) ("In the Second Circuit, 'related to' bankruptcy jurisdiction exists in any civil action where the outcome might have any conceivable effect on [a bankruptcy] estate."); *In re Masterwear Corp.*, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) ("In litigation involving non-debtors, 'relatedness' often turns on the estate's obligation to indemnify the losing party.  Where the obligation to indemnify is contractual and absolute, the third party litigation is 'related to' the bankruptcy case.").  Thus, the Debtors' indemnification obligations support this Court's "related to" jurisdiction.

<u>CONCLUSION</u>

As discussed in this Memorandum and the Confirmation Declarations, and as will be more fully set forth at the Confirmation Hearing, this Court has the constitutional authority to grant the Third Party Release, the claims subject to the Third Party Release are within the subject matter jurisdiction of this Court, and the nonconsensual Third Party Release of the Nonconsensual Released Parties is appropriate and justified under applicable law.  The Debtors respectfully

request that the Court grant the Third Party Release of the Nonconsensual Released Parties in connection with confirmation of the Plan.

| | |
|---|---|
| New York, New York<br>Dated:  March 22, 2019 | */s/ Marc Kieselstein, P.C.* |
| | Marc Kieselstein, P.C.<br>Cristine Pirro<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL**<br>**LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 |
| | - and - |
| | James H.M. Sprayregen, P.C.<br>Adam C. Paul, P.C. (admitted *pro hac vice*)<br>W. Benjamin Winger (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL**<br>**LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200 |
| | *Counsel to the Debtors and Debtors in Possession* |

# **EXHIBIT A**

Aegean Bylaws

*Exhibit "A"*                                                                                        ~~Appendix A~~

## AEGEAN MARINE PETROLEUM NETWORK INC.
(the "Corporation")

### AMENDED AND RESTATED BYLAWS

As Adopted November 2, 2006

ARTICLE I
OFFICES

The principal place of business of the Corporation shall be at such place or places as the directors shall from time to time determine. The Corporation may also have an office or offices at such other places within or without the Marshall Islands as the Board of Directors (the "Board") may from time to time appoint or the business of the Corporation may require.

ARTICLE II
SHAREHOLDERS

Section 1. **Annual Meeting:**

The annual meeting of shareholders of the Corporation shall be held on such day and at such time and place within or without the Marshall Islands as the Board may determine for the purpose of electing directors and or transacting such other business as may properly be brought before the meeting.

Section 2. **Nature of Business at Annual Meetings of Shareholders:**

No business may be transacted at an annual meeting of shareholders, other than business that is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board (or any duly authorized committee thereof); (b) otherwise properly brought before the annual meeting by or at the direction of the Board (or any duly authorized committee thereof); or (c) otherwise properly brought before the annual meeting by any shareholder of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in Section 2 of this Article II and has remained a shareholder of record through the record date for the determination of shareholders entitled to vote at such annual meeting and (ii) who complies with the notice procedures set forth in Section 2 of this Article II. In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation (the "Secretary").

To be timely a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than one-hundred twenty (120) days nor more than one-hundred eighty (180) days prior to the one year

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

anniversary of the immediately preceding annual meeting of shareholders. In no event shall the public disclosure of any adjournment of an annual meeting of the shareholders commence a new time period for the giving of the shareholder's notice described herein.

To be in proper written form, a shareholder's notice to the Secretary must set forth as to each matter such shareholder proposes to bring before the annual meeting (i) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (ii) the name and record address of such shareholder, (iii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by such shareholder, (iv) a description of all arrangements or understandings between such shareholder and any other person or persons (including their names) in connection with the proposal of such business by such shareholder and any material interest of such shareholder in such business and (v) a representation that such shareholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting. In addition, notwithstanding anything in Section 2 of this Article II to the contrary, a shareholder intending to nominate one or more persons for election as a Director at an annual meeting must comply with Article III Section 3 of these Amended and Restated Bylaws for such nomination or nominations to be properly brought before such meeting.

No business shall be conducted at the annual meeting of shareholders except business brought before the annual meeting in accordance with the procedures set forth in Section 2 of this Article II; provided, however, that, once business has been properly brought before the annual meeting in accordance with such procedures, nothing in Section 2 of this Article II shall be deemed to preclude discussion by any shareholder of any such business. If the Chairman of an annual meeting determines that business was not properly brought before the annual meeting in accordance with the foregoing procedures, the Chairman of the meeting shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

Section 3. **Special Meeting:**

A special meeting of the shareholders may be called at any time by the Board, or by the Chairman of the Board, or by the President. No other person or persons are permitted to call a special meeting. No business may be conducted at the special meeting other than business brought before the meeting by the Board, the Chairman of the Board or the President. The Chairman of the Board or in the Chairman's absence, another person designated by the Board shall act as the Chairman of all meetings of shareholders. If the Chairman of the special meeting determines that business was not properly brought before the special meeting in accordance with the foregoing procedures, the Chairman shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

Section 4. **Notice of Meetings:**

2

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Notice of every annual and special meeting of shareholders, other than any meeting the giving of notice of which is otherwise prescribed by law, stating the date, time, place and purpose thereof, and in the case of special meetings, the name of the person or persons at whose direction the notice is being issued, shall be given personally or sent by mail, telegraph, cablegram, telex or teleprinter at least fifteen (15) but not more than sixty (60) days before such meeting, to each shareholder of record entitled to vote thereat and to each shareholder of record who, by reason of any action proposed at such meeting would be entitled to have his shares appraised if such action were taken, and the notice shall include a statement of that purpose and to that effect. If mailed, notice shall be deemed to have been given when deposited in the mail, directed to the shareholder at his address as the same appears on the record of shareholders of the Corporation or at such address as to which the shareholder has given notice to the Secretary. Notice of a meeting need not be given to any shareholder who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting prior to the conclusion thereof the lack of notice to him.

Section 5. **Adjournments:**

Any meeting of shareholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the meeting is adjourned for lack of quorum, notice of the new meeting shall be given to each shareholder of record entitled to vote at the meeting. If after an adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each shareholder of record on the new record date entitled to notice in Section 4 of this Article II.

Section 6. **Quorum:**

At all meetings of shareholders, except as otherwise expressly provided by law, there must be present either in person or by proxy shareholders of record holding at least a majority of the shares issued and outstanding and entitled to vote at such meetings in order to constitute a quorum, but if less than a quorum is present, a majority of those shares present either in person or by proxy shall have power to adjourn any meeting until a quorum shall be present. Voting:If a quorum is present, and except as otherwise expressly provided by law, the affirmative vote of a majority of the shares of stock represented at the meeting shall be the act of the shareholders. At any meeting of shareholders, with respect to matter for which a shareholder is entitled to vote, each such shareholder shall be entitled to one vote for each share it holds. Each shareholder may exercise such voting right either in person or by proxy provided, however, that no proxy shall be valid after the expiration of eleven months from the date such proxy was authorized unless otherwise provided in the proxy. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with

3

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

an interest sufficient in the law of the Marshall Islands to support an irrevocable power. A shareholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary. Shareholders may act by way of written consent in accordance with the provisions of Section 67 of the BCA.

Section 7. **Fixing of Record Date:**

The Board may fix a time not more than sixty (60) nor less than fifteen (15) days prior to the date of any meeting of shareholders as the time as of which shareholders entitled to notice of and to vote at such a meeting shall be determined, and all persons who were holders of record of voting shares at such time and no other shall be entitled to notice of and to vote at such meeting. The Board may fix a time not exceeding sixty (60) days preceding the date fixed for the payment of any dividend, the making of any distribution, the allotment of any rights or the taking of any other action, as a record time for the determination of the shareholders entitled to receive any such dividend, distribution, or allotment or for the purpose of such other action.

ARTICLE III
DIRECTORS

Section 1. **Number:**

The affairs, business and property of the Corporation shall be managed by a Board to consist of such number of directors, not less than three, as shall be fixed by a vote of not less than 70% of the entire Board from time to time. The directors, other than those who may be elected by the holders of one or more series of preferred stock voting separately as a class pursuant to the provisions of a resolution of the Board providing for the establishment of any series of preferred stock, shall be divided into three classes, which shall be as nearly equal in number as possible. Should the number of directors be increased, there shall be no classification of the additional directors until the next annual meeting of the shareholders. Each director shall serve his respective term of office until his successor shall have been elected and qualified, except in the event of his death, resignation or removal. No decrease in the number of directors shall shorten the term of any incumbent director. The directors need not be residents of the Marshall Islands or shareholders of the Corporation. Corporations may, to the extent permitted by law, be elected or appointed directors.

Section 2. **How Elected:**

Except as otherwise provided by law or in Section 5 of this Article III, the directors of the Corporation (other than the first Board of Directors if named in the Articles of Incorporation or designated by the incorporators) shall be elected at an annual meeting of shareholders. Except as otherwise provided in the Articles of Incorporation or in Section 1 of this Article III, each Director shall be elected to serve until the third succeeding

4

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

annual meeting of shareholders and until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal or the earlier termination of his term of office.

Section 3. **Nomination of Directors:**

Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided in the Articles of Incorporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of directors in certain circumstances. Nominations of persons for election to the Board may be made at any annual meeting of shareholders (a) by or at the direction of the Board (or any duly authorized committee thereof) or (b) by any shareholders of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in Section 3 of this Article III and on the record date for the determination of shareholder entitled to vote at such meeting and (ii) who complies with the notice procedures set forth in Section 3 of this Article III.

In addition to any other applicable requirements, for a nomination to be made by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary.

To be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than one-hundred twenty (120) days nor more than one-hundred eighty (180) days prior to the anniversary date of the immediately preceding annual meeting of shareholders.

To be in proper written form, a shareholder's notice to the Secretary must set forth: (a) as to each person whom the shareholder proposes to nominate for election as a director (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by the person and (iv) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder applicable to issuers that are not foreign private issuers and (b) as to the shareholder giving the notice (i) the name and record address of such shareholder, (ii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially and of record by such shareholder, (iii) a description of all arrangements or understandings between such shareholder and each proposed nominee and any other person and persons (including their names) pursuant to which the nomination(s) are to be made by such shareholder, (iv) a representation that such shareholder intends to appear in person or by proxy at the meeting to nominate the person or persons named in its notice and (v) any other information relating to such

5

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

shareholder that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in Section 3 of this Article III. If the Chairman of the meeting determines that a nomination was not made in accordance with the foregoing procedures, the Chairman shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Section 4. **Removal:**

Any or all of the directors may be removed, with cause, by the affirmative vote of holders of 70% of the issued and outstanding voting shares of the Corporation. No director may be removed without cause. Except as otherwise provided by applicable law, cause for the removal of a director shall be deemed to exist only if the director whose removal is proposed: (i) has been found to have been negligent or guilty of misconduct in the performance of his duties to the Corporation in any matter of substantial importance to the Corporation by the affirmative vote of at least 80% of the directors then in office, other than the director whose removal is being sought, at any meeting of the Board called for that purpose; or (ii) has been adjudicated by a court of competent jurisdiction to be mentally incompetent, which mental incompetence directly affects his ability to serve as a director of the Corporation.

No proposal by a shareholder to remove a director shall be voted upon at a meeting of the shareholders unless such shareholder has given timely notice thereof in proper written form to the Secretary. To be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than one hundred and twenty (120) days nor more than one hundred eighty (180) days prior to the anniversary date of the immediately preceding annual meeting of the shareholders. To be in proper written form, a shareholder's notice must set forth: (a) a statement of the grounds, if any, on which such director is proposed to be removed, (b) evidence reasonably satisfactory to the Secretary, of such shareholder's status as such and of the number of shares of each class of capital stock of the Corporation beneficially owned by such shareholder, and (c) a list of the names and addresses of other shareholders of the Corporation, if any, with whom such shareholder is acting in concert, and the number of shares of each class of capital stock of the Corporation beneficially owned by each such shareholder.

No shareholder proposal to remove a director shall be voted upon at an annual meeting of the shareholders unless proposed in accordance with the procedures set forth in Section 4 of this Article III. If the Chairman of the meeting determines, based on the facts, that a shareholder proposal to remove a director was not made in accordance with the foregoing

6

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

procedures, the Chairman shall declare to the meeting that a proposal to remove a director of the Corporation was not made in accordance with the procedures prescribed by these Amended and Restated Bylaws, and such defective proposal shall be disregarded.

All of the foregoing provisions of Section 4 of this Article III are subject to the terms of any preferred stock with respect to the directors to be elected solely by the holders of such preferred stock.

Section 5. **Vacancies:**

Any vacancies in the Board of Directors for any reason, and any created directorships resulting from any increase in the number of directors, may be filled by the vote of not less than a majority of the members of the Board of Directors then in office, although less than a quorum, and any directors so chosen shall hold office until the next election of the class for which such directors shall have been chosen and until their successors shall be elected and qualified. No decrease in the number of directors shall shorten the term of any incumbent director. Notwithstanding the foregoing, and except as otherwise required by law, whenever the holders of any one or more series of preferred stock shall have the right, voting separately as a class, to elect one or more directors of the Corporation, the then authorized number of directors shall be increased by the number of directors so to be elected, and the terms of the director or directors elected by such holders shall expire at the next succeeding annual meeting of shareholders.

Section 6. **Regular meetings:**

Regular meetings of the Board may be held at such time and place as may be determined by resolution of the Board and no notice shall be required for any regular meeting. Except as otherwise provided by law, any business may be transacted at any regular meeting.

Section 7. **Special meeting:**

Special meetings of the Board may, unless otherwise prescribed by law, be called from time to time by the Chairman, the President, or any officer of the Corporation who is also a director. The President or the Secretary shall call a special meeting of the Board upon written request directed to either of them by any two directors stating the time, place and purpose of such special meeting. Special meetings of the Board shall be held on a date and at such time and at such place as may be designated in the notice thereof by the officer calling the meeting.

Section 8. **Notice of Special Meeting:**

Notice of the special date, time and place of each special meeting of the Board shall be given to each Director at least forty-eight (48) hours prior to such meeting, unless the

7

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

notice is given orally or delivered in person, in which case it shall be given at least twenty-four (24) hours prior to such meeting. For the purpose of this section, notice shall be deemed to be duly given to a Director if given to him personally (including by telephone) or if such notice be delivered to such Director by mail, telegraph, cablegram, telex or teleprinter to his last known address. Notice of a meeting need not be given to any Director who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting, prior to the conclusion thereof, the lack of notice to him.

### Section 9. *Quorum:*

A majority of the directors at the time in office, present in person or by proxy or conference telephone, shall constitute a quorum for the transaction of business.

### Section 10. Interested Directors.

No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board or committee thereof which authorizes the contract or transaction, or solely because his or her or their votes are counted for such purpose, if: (i) the material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee and the Board or committee in good faith *authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, or, if the votes of the disinterested directors are insufficient to* constitute an act of the Board as defined in Section 55 of the BCA, by unanimous vote of the disinterested directors; or (ii) the material facts as to his relationship or interest and as to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board, a committee thereof or the shareholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee which authorizes the contract or transaction.

### Section 11. *Voting:*

The vote of the majority of the directors, present in person or by proxy or conference telephone, at a meeting at which a quorum is present shall be the act of the directors. Any action required or permitted to be taken at a meeting may be taken without a meeting if all members of the Board consent thereto in writing.

8

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Section 12. **Compensation of Directors and Members of Committees:**

The Board may from time to time, in its discretion, fix the amounts which shall be payable to members of the Board and to members of any committee, for attendance at the meetings of the Board or of such committee and for services rendered to the Corporation.

ARTICLE IV
COMMITTEES

The Board may, by resolution or resolutions passed by a majority of the entire Board, designate from among its members an executive committee to consist of two or more of the directors of the Corporation, which, to the extent provided in said resolution or resolutions, or in these Amended and Restated Bylaws, shall have and may exercise, to the extent permitted by law, the powers of the Board in the management of the business and affairs of the Corporation, and may have power to authorize the seal of the Corporation to be affixed to all papers which may require it; however, that no committee shall have the power or authority to (i) fill a vacancy in the Board or in a committee thereof, (ii) amend or repeal any bylaw or adopt any new bylaws, (iii) amend or repeal any resolution of the entire Board, (iv) or increase the number of directors on the Board, or (v) remove any Director. In addition, the Board may designate from among its members other committees to consist of two or more of the directors of the Corporation, each of which shall perform such functions and have such authority and powers as shall be delegated to such committee by said resolution or resolutions or as provided for in these Amended and Restated Bylaws, except that only the executive committee may have and exercise the powers of the Board. Members of the executive committee and any other committee shall hold office for such period as may be prescribed by the vote of the entire Board, subject, however, to removal at any time by the vote of the Board. Vacancies in membership of such committees shall be filled by vote of the Board. Committees may adopt their own rules of procedures and may meet at stated times or on such notice as they may determine. Each committee shall keep a record of its proceedings and report the same to the Board when required.

ARTICLE V
OFFICERS

Section 1. **Number and Designation:**

The Board shall elect a President, Secretary and Treasurer and such other officers as it may deem necessary. Officers may be of any nationality and need not be residents of the Marshall Islands. The Officers shall be elected annually by the Board at its first meeting following the annual election of directors. (except that the initial officers may be named by the Board at its first meeting following such Board's appointment in the Articles of Incorporation or as designated by the incorporators) but in the event of the failure of the Board to so elect any officer, such officer may be elected at any subsequent meeting of

9

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

the Board. The salaries of officers and any other compensation paid to them shall be fixed from time to time by the Board. The Board may at any meeting elect additional officers. Each officer shall hold office until the first meeting of the Board following the next annual election of directors and until his successor shall have been duly elected and qualified except in the event of the earlier termination of his term of office, through death, resignation, removal or otherwise. Any officer may be removed by the Board at any time with or without cause. Any vacancy in an office may be filled for the unexpired position of the term of such office by the Board at any regular or special meeting.

Section 2. **President:**

In the absence of the Chairman of the Board, the President of the Corporation shall preside at all meetings of the Board and of the shareholders at which he or she shall be present. The President shall perform all duties incident to the office of president of a corporation and such other duties as may, from time to time, be assigned to him or her by the Board or as may be provided by law.

Section 3. **Secretary:**

The Secretary shall act as secretary of all meetings of the shareholders and of the Board at which he is present, shall have supervision over the giving and serving of notices of the Corporation, shall be the custodian of the corporate records of the corporate seal of the Corporation, shall be empowered to affix the corporate seal to those documents, the execution of which, on behalf of the Corporation under its seal, is duly authorized and when so affixed may attest the same, and shall exercise the powers and perform such other duties as may be assigned to him by the Board or the President.

Section 4. **Treasurer:**

The Treasurer shall have general supervision over the care and custody of the funds, securities, and other valuable effects of the Corporation and shall deposit the same or cause the same to be deposited in the name of the Corporation in such depositories as the Board may designate, shall disburse the funds of the Corporation as may be ordered by the Board, shall have supervision over the accounts of all receipts and disbursements of the Corporation, shall, whenever required by the Board, render or cause to be rendered financial statements of the Corporation, shall have the power and perform the duties usually incident to the office of Treasurer, and shall have such powers and perform other duties as may be assigned to him by the Board or President.

Section 5. **Other Officers:**

Officers other than those treated in Sections 2 through 4 of this Article V shall exercise such powers and perform such duties as may be assigned to them by the Board or the President.

10

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Section 6. **Bond:**

The Board shall have power to the extent permitted by law to require any officer, agent or employee of the Corporation to give bond for the faithful discharge of his duties in such form and with such surety as the Board may deem advisable.

ARTICLE VI
CERTIFICATES FOR SHARES

Section 1. **Form and Issuance:**

The Shares of the Corporation shall be represented by certificates in form meeting the requirements of law and approved by the Board. Certificates shall be signed by (i) the President or a Vice-President and by (ii) the Secretary or any Assistant Secretary or the Treasurer or any Assistant Treasurer. These signatures may be facsimiles if the certificate is countersigned by a transfer agent or registered by a registrar other than the Corporation itself or its employee.

Section 2. **Transfer:**

The Board shall have power and authority to make such rules and regulations as they may deem expedient concerning the issuance, registration and transfer of certificates representing shares of the Corporation's stock, and may appoint transfer agents and registrars thereof.

Section 3. **Loss of Stock Certificates:**

The Board may direct a new certificate of stock to be issued in place of any certificate or certificates theretofore issued by the Corporation alleged to have been lost or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost or destroyed. When authorizing such issue of a new certificate or certificates, the Board may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or give the Corporation a bond in such sum as it may direct indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost or destroyed.

ARTICLE VII
DIVIDENDS

Dividends may be declared in conformity with applicable law by, and at the discretion of, the Board at any regular or special meeting. Dividends may be declared and paid in cash, stock or other property of the Corporation.

11

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

## ARTICLE VIII
## INDEMNIFICATION

Section 1.    The Corporation shall indemnify, to the full extent permitted by law, any person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 2.    The Corporation shall indemnify, to the full extent permitted by law, any person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the court in which such action or suit was properly brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court having proper jurisdiction shall deem proper.

Section 3.    To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Sections 1 or 2 of this Article VIII, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection therewith.

12

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Section 4.    Any indemnification under Sections 1 or 2 of this Article VIII (unless ordered by a court having proper jurisdiction) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in such section. Such determination shall be made:

    (i)    by the Board by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding; or

    (ii)    if such a quorum is not obtainable, or, even if obtainable a quorum of disinterested directors so directs, by independent legal counsel in a written opinion; or

    (iii)    by the shareholders.

Section 5.    Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized in this Section.

Section 6.    The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

Section 7.    The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this Article VIII.

Section 8.    For purposes of this Article VIII, references to the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article VIII with respect to the resulting or surviving

13

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

corporation as he would have with respect to such constituent corporation of its separate existence had continued.

Section 9.    For purposes of this Article VIII, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article VIII.

Section 10.    The indemnification and advancement of expenses provided by, or granted pursuant to, the other sections of this Article VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any Bylaw, agreement, vote of shareholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

Section 11.    No director or officer of the Corporation shall be personally liable to the Corporation or to any shareholder of the Corporation for monetary damages for breach of fiduciary duty as a director or officer, provided that this provision shall not limit the liability of a director or officer (i) for any breach of the director's or the officer's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the director or officer derived an improper personal benefit

### ARTICLE IX
### CORPORATE SEAL

The Seal of the Corporation, if any, shall be circular in form, with the name of the Corporation in the circumference and such other appropriate legend as the Board may from time to time determine.

### ARTICLE X
### FISCAL YEAR

The fiscal year of the Corporation shall be such period of twelve consecutive months as the Board may by resolution designate.

14

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

ARTICLE XI
AMENDMENTS

These Amended and Restated Bylaws may be amended, added to, altered or repealed, or new Bylaws may be adopted, solely at any regular or special meeting of the Board by the affirmative vote of 66 2/3% of the entire Board, or by the shareholders by the affirmative vote of the holders of 70% or more of the outstanding shares of stock entitled to vote (considered for this purpose as one class). The phrase "66 2/3% of the entire Board" shall be deemed to refer to 66 2/3% of the number of directors constituting the Board as set forth in accordance with Article III, without regard to any vacancies, or if the number of Directors constituting 66 2/3% of the entire Board is greater than the number of members of the Board then in office, the unanimous vote of Directors in office.

15

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)